**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

RECEIVED

OCT 11 2006

U.S. CLERK
MINNEAPOLIS, MINNESOTA
DISTRICT COURT

Fair Isaac Corporation,

                Plaintiff,

v.

Equifax Inc.; Experian Information
Solutions Inc.; Trans Union, LLC; and
VantageScore Solutions, LLC,

                Defendants.

Civil Action No: 06CV4112

PJS/KLE

**Complaint**

*Demand for Jury Trial*

---

### Table of Contents

| | | |
|---|---|---|
| I. | Nature of this Action | 2 |
| II. | Definitions | 7 |
| III. | Parties and Jurisdiction | 8 |
| IV. | Factual Background | 9 |
| | A. Types and Components of Credit Scores | 9 |
| | B. Fair Isaac and Its Trademarks | 11 |
| | C. Types of Fair Isaac Credit Scores | 14 |
| | D. Distribution and Pricing of Fair Isaac Credit Scores | 16 |
| | E. Goodwill in Fair Isaac Credit Scores | 17 |
| V. | The Defendants' Activities | 20 |
| | A. The Credit Bureau Defendants' Creation of VantageScore | 20 |
| | B. Confusion Created by the Defendants' Use of Overlapping Scoring Range | 22 |
| | C. Harm Caused by the Defendants' Use of Fair Isaac's Score Range and Marks | 27 |
| | D. The Defendants' False and Misleading Representations | 30 |
| | E. Ownership and Control of Consumer Credit Scores | 40 |
| | F. Elimination of Competition in the Market for Aggregated Consumer Credit Data | 45 |

    G.    Interstate Commerce ............................................................................................... 50

    H.    Damages and Continuing Injury .............................................................................. 51

Count One: Federal Unfair Competition, 15 U.S.C. § 1125(a) ................................................. 51

Count Two: Infringement of Registered Trademark, 15 U.S.C. § 1114 ..................................... 52

Count Three: Trademark Infringement, Minnesota Common Law ........................................... 53

Count Four: Unfair Competition and False Advertising, 15 U.S.C. § 1125(a) .......................... 53

Count Five: Deceptive Trade Practices, Minn. Stat. § 325D.44 ................................................ 54

Count Six: Unjust Enrichment, Minnesota Common Law ....................................................... 55

Count Seven: Unreasonable and Illegal Restraint of Trade, 15 U.S.C. § 1 ............................... 56

Count Eight: Illegal Merger or Acquisition, 15 U.S.C. §§ 1, 18 ............................................... 58

Count Nine: Attempt to Monopolize, 15 U.S.C. § 2 ................................................................. 60

Count Ten: Conspiracy to Monopolize, 15 U.S.C. § 1 ............................................................. 61

Count Eleven: Illegal Concerted Refusal to Deal, Minn. Stat. § 325D.53................................. 62

Prayer for Relief ...................................................................................................................... 63

---

Fair Isaac Corporation ("Fair Isaac") brings this suit against the three national credit reporting agencies Equifax Inc. ("Equifax"), Experian Information Solutions Inc. ("Experian"), and Trans Union, LLC ("TransUnion") (collectively, the "Credit Bureaus"), as well as the joint venture they created and jointly own, VantageScore Solutions, LLC ("VantageScore"). For its Complaint against these Defendants, Fair Isaac states and alleges as follows:

### I. Nature of this Action

1.      The most important aspect of a consumer's financial profile is his or her credit score. Lenders, financial institutions, and others use credit scores to determine whether to provide credit (or rent an apartment, or open an account, etc.) and on what terms. This case will determine whether consumers, lenders, and financial institutions will continue to have the benefit

2

of innovation, choice, and price competition in the collection and scoring of consumer credit information that is aggregated by credit reporting agencies. It arises out of a conspiracy by the three powerhouse credit reporting agencies ("Credit Bureaus")—Equifax, Experian, and TransUnion—to extend their collective control of the market for aggregated consumer credit data to dominate and control consumer credit scoring as well. The Credit Bureaus are not attempting to compete individually through honest hard work, creative development, and competition on the merits, but instead they have embarked on a joint effort (i) to misappropriate the efforts of Fair Isaac, (ii) to trade on its goodwill, (iii) to manipulate their control of access to and pricing over aggregated credit data and consumer credit scores in order to eliminate competition, (iv) to engage in false and misleading representations about competitive products, and (v) to employ other unfair and anticompetitive practices in order to exclude competition and move the financial industry to their jointly-owned and controlled VantageScore products.

2.      Fair Isaac pioneered credit scoring in the 1950s and continues to be a primary innovator. Its trademarked 300-850® consumer credit score (the "classic FICO" score) is the leading credit score in the financial industry today due to its reputation for superior predictive value. Each Credit Bureau has licensed credit scoring algorithms or software from Fair Isaac designed specifically for use with that Credit Bureau's unique aggregated consumer data. At least until their decision to join forces, each Credit Bureau competed in the collection and reporting of predictive aggregated credit data, the development of scores based on that data, and the sale of those scores to financial institutions and consumers.

3.      In March 2006, however, the three powerhouse Credit Bureaus announced that they now are working closely together to own and control a common risk scoring algorithm through a joint venture called VantageScore. According to Defendants, the VantageScore scoring model is based on a single "[i]dentical scoring algorithm and leveled [data] characteristics across all three" Credit Bureaus. On information and belief, "leveling the attributes" across the Credit Bureaus degrades the predictive power of the scores produced by VantageScore's algorithm, as the algorithm must use a common set of data attributes, necessarily

3

requiring the omission of potentially predictive data that is not common to all three Credit

Bureaus. In addition to eliminating the significance of any qualitative differences between the

data and scores of the three Credit Bureaus, VantageScore claims to take advantage of "deep

knowledge" of each Credit Bureau's independent data set, which they have shared with each

other. *See* www.vantagescore.com. This "new" offering is based on a scoring range of 501-990

which overlaps the trademarked Fair Isaac scoring range 300-850®.

4.      Defendants jointly and intentionally created VantageScore's model using a

confusingly similar scoring range of 501-990 to trade on Fair Isaac's goodwill. They also have

made numerous false and misleading statements in promotional materials and on their websites

that suggest that: (1) the VantageScore model is the first, and only, consistent and objective

credit scoring product in the industry; (2) the VantageScore algorithm produces the most

accurate and predictive credit scores available; and (3) calculating a particular consumer's credit

score using the VantageScore algorithm will result in the same credit score regardless of which

Credit Bureau's data is used. These statements are false and likely will mislead consumers,

lenders, and financial institutions to believe that Fair Isaac's credit scores are inferior,

inconsistent, and not predictive.

5.      The joint creation, ownership, control, and false and misleading promotion of

VantageScore's products is designed to move the market towards VantageScore products, not

through competition on the merits but through anticompetitive conduct that excludes third-party

providers of scoring algorithms, like Fair Isaac, from the market. Moreover, the Credit Bureaus'

joint creation and ownership of VantageScore represents a serious anticompetitive threat to the

welfare of consumers and financial institutions. Through VantageScore, the Credit Bureaus not

only are able to coordinate strategies and restrain competition among the only three providers of

aggregated consumer credit data, which together enjoy a tight oligopoly, but they also can

protect that oligopoly from potential competition.

6.      First, through the joint ownership and control of a common algorithm for

generating credit scores from aggregated credit data, the only three national Credit Bureaus will

4

have complete transparency into what each pays for this critical input into the credit scoring

bundle they sell to lenders and other financial institutions, resulting in reduced price competition.

Moreover, use of an identical algorithm by all three Credit Bureaus is a turnabout from the

current competitive status quo in which an individual Credit Bureau works either on its own or in

confidence with a third party to tailor algorithms that maximize the predictiveness and accuracy

of credit scores generated from its unique set of aggregated consumer credit data. As a result of

their agreement to create, own, and control a common scoring algorithm, and sharing

information to preserve a "leveled" credit score, the Credit Bureaus have agreed to an

arrangement that will unreasonably reduce the incentive of each to innovate and develop more

accurate and complete credit data from which more predictive credit scores can be generated. In

other words, through their joint ownership and control of VantageScore, each Credit Bureau will

have a "window" into the confidential collection and storage practices of its competitors and, on

information and belief, will be able to exercise a veto over what characteristics are reflected in

the jointly-controlled scoring algorithm.

7.      Second, by jointly owning and controlling an algorithm intended to be relied on

by the financial industry to generate Credit Scores, the Credit Bureaus will be able to protect

their stranglehold on aggregated consumer credit data against outside competitive forces.

Currently, a third-party provider of an industry-recognized scoring algorithm like Fair Isaac can

help a potential competitor overcome the high barriers to entry that protect the incumbent Credit

Bureaus' oligopoly. In addition, industry-recognized scoring algorithms that do not use

aggregated credit data to evaluate consumer creditworthiness, such as Fair Isaac's Expansion

score, can and do act as a catalyst for the development of such sources of information. These

other sources of information are not controlled by the Credit Bureaus and, over time, can develop

into a competitive alternative to aggregated consumer credit data.

8.      The Credit Bureaus decided amongst themselves to eliminate the differences in

how they assess and report the aggregated credit data that underlies the millions of consumer

credit decisions made every day. Once the Credit Bureaus achieve their objective of imposing,

5

without competition on the merits, VantageScore on the financial industry, they will cement their iron grip on the collection, assessment, and reporting of consumer credit information. No one will be able to compete against the Credit Bureaus, either in the aggregated credit data market or the credit scoring market, because the Credit Bureaus will control access to both their data and the scoring algorithm.

9.      Defendant Credit Bureaus' joint creation, ownership, control, and false and misleading promotion of their VantageScore products amounts to an anticompetitive and collusive scheme designed to: (1) drive competitors such as Fair Isaac from the marketplace; (2) diminish competition and facilitate collusion between and among the Credit Bureaus; and (3) protect the Credit Bureaus' market power over aggregated consumer credit data and consumer credit scores from emerging competitive threats. As set forth below, the Credit Bureaus have engaged in a concerted course of action to: (1) confuse and mislead consumers, lenders, and other financial institutions about the source and supposed qualities and characteristics of the Credit Bureaus' jointly-owned credit scoring product; (2) falsely disparage Fair Isaac's scoring algorithms and products; (3) replace the Credit Bureaus' independently-developed and competing "proprietary" scoring products with a single, common algorithm; (4) reduce competition between themselves on the quality and predictiveness of their credit data; and (5) exploit their control over aggregated consumer credit data and data processing costs so as to disadvantage Fair Isaac's products, to impair Fair Isaac's ability to compete, and, eventually, to drive Fair Isaac from the relevant markets and eliminate emerging competitive threats. Far from providing consumers with a competitive alternative, the Defendants have colluded to confuse consumers, steal Fair Isaac's goodwill, and reduce and eliminate choice and competition. Fair Isaac brings this suit to challenge the Defendants' illegal activities so that consumers, lenders, and other financial institutions will continue to have the benefit of honest competition and innovation.

10.      Fair Isaac's claims against the Defendants are based on acts constituting federal unfair competition, trademark infringement, misleading and false advertising, and antitrust

violations, as well as deceptive trade practices, unfair competition, trademark infringement, and antitrust violations under Minnesota law.

## II. Definitions

11.    Throughout this Complaint, the following defined terms (among others defined in other parts of the Complaint) are used:

a.    "Relevant Markets" means those product and geographic markets relevant to Fair Isaac's antitrust claims, which are defined as follows:

(i)    Aggregated Credit Data Market—The product dimension of this Relevant Market is no broader than the market for Aggregated Credit Data. The geographic dimension of this Relevant Market is the United States. Sellers in this market include the three Credit Bureaus. Buyers include Lenders, Credit-Scoring firms (such as Fair Isaac) and Consumers.

(ii)    Credit Scoring Market—The product dimension of this Relevant Market is no broader than the market for Credit Scoring sold to Lenders and to Consumers. The geographic dimension of this Relevant Market is the United States. Sellers or potential sellers in this market include Fair Isaac, the three Credit Bureaus, and VantageScore. Buyers include Lenders and Consumers.

b.    "Aggregated Credit Data" means the historical records of an individual Consumer's borrowing and repayment as reported to credit reporting agencies by multiple lenders and servicers of loans among other sources, and does not include credit data relating to commercial institutions.

c.    "Credit Score" means a representation of an individual Consumer's financial credit worthiness that quantifies the risk that a Consumer will fail to repay a loan or other credit obligation.

7

d.  "Credit Scoring" means the process by which an algorithm, or set of algorithms is applied to Aggregated Credit Data to generate a Credit Score.

e.  "Lender" or "Lenders" means a financial institution(s) or other firm(s) in the business of regularly extending credit to Consumers.

f.  "Consumer" or "Consumers" means any natural person(s) to whom credit is or may be extended by any Lender.

g.  "Consuming Public" means the combination of Lender and Consumer.

### III. Parties and Jurisdiction

12.  Fair Isaac Corporation is a Delaware Corporation, with its principal place of business in Minneapolis, Minnesota.

13.  Equifax Inc. is a Georgia Corporation, with its principal place of business at 1550 Peachtree St. N.W., Atlanta, Georgia 30309. Equifax does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

14.  Experian Information Solutions Inc. is an Ohio Corporation, with its principal place of business at 475 Anton Blvd, Costa Mesa, California 92626. Experian does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

15.  TransUnion, LLC is a Delaware Limited Liability Company, with its principal place of business at 555 W. Adams St., 6th Fl., Chicago, Illinois 60661-3614. TransUnion does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

8

16.     VantageScore Solutions LLC is a Delaware Limited Liability Company, with its principal place of business in Stanford, Connecticut.  Its members are Equifax, Experian, and TransUnion.  VantageScore's registered agent is Corporation Service Company at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  On information and belief, VantageScore does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

17.     This Court has jurisdiction over this Complaint and over this action pursuant to 28 U.S.C. § 1331 in that this action involves questions of federal law; and 28 U.S.C. §§ 1338(a) and 1337(a) in that this action involves claims for federal unfair competition, trademark infringement, false advertising and unreasonable and illegal restraints of trade all under Titles 15 of the United States Code.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) for claims of unfair competition, deceptive trade practices, trademark infringement, and illegal restraints of trade under Minnesota law.

18.     Venue is proper in this District under 28 U.S.C. § 1391(c) and 15 U.S.C. § 22 in that the Defendants are subject to personal jurisdiction in this District.  Some or all of the illegal acts alleged herein were committed by the Defendants in this District, the claims alleged in this action arose, at least in part, in this District, and the Defendants regularly conduct business in this District.

## IV. Factual Background

### A.     *Types and Components of Credit Scores*

19.     A Credit Score represents a Consumer's financial creditworthiness and quantifies the risk that a Consumer will fail to repay a loan or other credit obligation. Banks, credit card companies, residential mortgage lenders, automobile dealerships, and other Lenders use Credit Scores to assess the risk associated with loans and to reduce potential "bad debt" losses.  They use Credit Scores, among other reasons, to determine whether to extend credit or issue a loan, to

9

assign interest rates and credit limits, and to manage existing accounts. Institutions that purchase or securitize debt in secondary markets rely on Credit Scores to assess the quality of portfolios of consumer debt.

20. There are different types of Credit Scores. The most well-known are the credit risk scores developed by Fair Isaac, which are distributed to Lenders and resellers by the Credit Bureaus. In addition the Credit Scores are sometimes distributed directly to Consumers, for example, through myfico.com. Consumers are concerned about and rely on their Credit Scores to negotiate better long-term interest rates. The Credit Bureaus and other third-party developers also offer Credit Scores. In addition, scoring models are developed for use by individual Lenders (either internally or through a third-party provider) and for specific industries (*e.g.*, mortgage, automobile, and telecommunication industries).

21. A Credit Score is the product of two essential components: (1) Aggregated Credit Data, and (2) a credit scoring algorithm. A Credit Score cannot be generated without access to both. A Credit Score is calculated by applying a scoring algorithm to a Consumer's Aggregated Credit Data, which reflects that Consumer's record of borrowing and repayment as reported to a particular Credit Bureau. That Aggregated Credit Data—which the Credit Bureaus obtain from various public record sources, Lenders, and credit issuers, and which reflects years of information on hundreds of millions of Consumers—is an essential input for the calculation of a Credit Score. The Credit Score almost always is accompanied by a credit report, which is compiled by the Credit Bureau and reflects the underlying Aggregated Credit Data used to calculate the Credit Score.

22. The three Credit Bureaus control virtually 100% of the market for Aggregated Credit Data in the United States.

23. Credit reporting in the United States is entirely voluntary. Creditors, merchants, collection agencies, and other Lenders have agreements to provide Consumer credit data to all, some, or none of the Credit Bureaus. As a result, the Credit Bureaus often will have collected different credit data for the same Consumer. Additional variation between and among Credit

10

Bureau Consumer credit files can result from: (1) the collection of credit data from different data sources; (2) the unique ways Credit Bureaus organize their data in a database; and (3) discrepancies and errors in the credit data aggregated by the Credit Bureaus. According to the Credit Data Information Association, of the 57.4 million credit file disclosures issued to Consumers by the Credit Bureaus in 2003, almost 22% led to a Consumer-initiated reinvestigation by one of the Credit Bureaus. Variation in Aggregated Credit Data may result in different Credit Scores, irrespective of the particular algorithm used to generate the score.

24.     At least until the development of their VantageScore scoring algorithm, each of the Defendant Credit Bureaus competed with the others to make sure that the scoring algorithms applied to its Aggregated Credit Data account for the specific strengths and weaknesses of its data and thereby maximizes the predictiveness of that data. On information and belief, each of the Credit Bureaus understands that the unique attributes of their data sets are competitively sensitive and their ability to accentuate the strengths of their data (and to minimize the weaknesses) in calculating Credit Scores is an important dynamic to competition among the Credit Bureaus today. Moreover, because of differences among the data sets of the three Credit Bureaus, scores generated from each of those sets—even using an identical scoring algorithm— will usually be different. This is one reason why Lenders, such as those in the residential lending industry, may require Credit Scores derived from each of the three Credit Bureaus' Aggregated Credit Data before they make a lending decision.

25.     Until their collaboration on VantageScore, the Credit Bureaus invested in developing and marketing their own proprietary scoring algorithms and scoring products based on those algorithms. The Defendant Credit Bureaus also market and distribute various Credit Scores generated by various Fair Isaac algorithms, as well as those generated by other third-party scoring vendors, which are tailored to the particular Credit Bureau's unique data set.

**B.     *Fair Isaac and Its Trademarks***

26.     Fair Isaac pioneered the concept of Credit Scoring more than 50 years ago. Fair Isaac developed the first-ever Credit Scoring model for American Investment Co., a St. Louis-

11

based finance company, in 1958. In 1985, Fair Isaac developed Credit Bureau scores which were used for "prescreening" credit applications. This was followed by the first general-purpose credit risk score for Equifax in 1989, which began to be used for loan originations, account management, and prescreening purposes. By at least 1991, such general-purpose scoring algorithms developed by Fair Isaac were made commercially available from all three Credit Bureaus, and were based on the scoring range 300-850.

27.     Since the inception of Credit Scoring using Credit Bureau-aggregated Consumer credit data, Fair Isaac has made significant investments in, and collaborated closely with, each of the Credit Bureaus to develop credit scoring algorithms tailored for each Credit Bureau's proprietary data set.

28.     Fair Isaac uses the three-digit number range 300-850 to uniquely identify its Credit Scores and to distinguish its scores from the scoring models and scores of its competitors. Under these models, Consumers are rank-ordered according to the likelihood that they will repay their credit obligations. Higher Credit Scores correspond to lower levels of risk.

29.     Fair Isaac owns at least the following U.S. trademark registrations in connection with its 300-850 Credit Scores.

**300-850**





U.S. Trademark Registration No.
**3,083,563**

U.S. Trademark Registration No.
**3,080,499**

U.S. Trademark Registration No.
**3,121,526**

30.     Fair Isaac owns: (1) U.S. Registration No. 3,083,563 for "credit scoring and credit risk management"; (2) U.S. Registration No. 3,080,499 for "credit scoring services, credit management and risk management services"; and (3) U.S. Registration No. 3,121,526 for "credit

12

risk management and risk management services, credit scoring services." Copies of the

Certificates of Registration for each of these trademarks are attached as Exhibit 1. Fair Isaac's

300-850 trademarks are generally referred to throughout this Complaint as the "300-850®

Marks."

31.     Fair Isaac also uses the name and mark FICO in connection with its Credit Scores.

Fair Isaac has obtained U.S. trademark registrations for the mark FICO. *See e.g.,* U.S.

Registration Nos. 2,573,131 and 2,989,390.

32.     Fair Isaac uses its 300-850® Marks on advertising and promotional materials, as

well as on its website at www.myfico.com. The following are a few examples from Fair Isaac's

website showing use of its 300-850® Marks:







**What's in your FICO® scores?**

- Payment history
- Amounts owed
- Length of credit history
- New credit
- Types of credit used

Learn more about FICO® scores

| For a $216,000 30-year, fixed rate mortgage: | | |
|---|---|---|
| If your FICO® score is: | Your interest rate is: | ...and your monthly payment is: |
| 760 - 850 | 6.42% | $1,354 |
| 700 - 759 | 6.64% | $1,386 |
| 680 - 699 | 6.82% | $1,411 |
| 660 - 679 | 7.03% | $1,442 |
| 640 - 659 | 7.46% | $1,505 |
| 620 - 639 | 8.01% | $1,586 |
| national interest rates, updated daily | | |

*See* Exhibit 2.

## C.   *Types of Fair Isaac Credit Scores*

33.   To compute the most predictive Credit Scores, Fair Isaac's 300-850® classic FICO® score is based on scoring algorithms tailored to the unique data set collected by each Credit Bureau. These Credit Bureau-specific algorithms, developed by Fair Isaac, account for the different types of information collected by each bureau, as well as the particular methodology used by that bureau to organize and summarize its data. Fair Isaac's scoring algorithms optimize the most predictive data elements available to a Credit Bureau in order to maximize the predictive power that can be generated by that bureau's unique data set. By placing the results of the application of each unique algorithm to each Credit Bureau's unique data on its 300-850® scoring range, Fair Isaac also tries to ensure that the Consumer credit risk predicted by a three-digit Fair Isaac Credit Score generated from one Credit Bureau's Aggregated Credit Data is equivalent to the level of credit risk reflected by the same three-digit Credit Score generated by Fair Isaac from either of the other two Credit Bureaus' credit data—*e.g.*, a Consumer's Credit Score of 650 calculated using Aggregated Credit Data from TransUnion indicates the same relative level of risk as a Credit Score of 650 calculated using credit data aggregated by Equifax. Fair Isaac works with the Credit Bureaus to update and refine its algorithms as needed to reflect current Consumer repayment behavior. Credit Scores generated using Fair Isaac's unique scoring algorithms thus provide consistent and highly effective predictive power regardless of the Credit Bureau providing the data.

34.   Fair Isaac's 300-850® FICO® Expansion score is calculated from nontraditional credit data (*i.e.*, other credit related data that are usually not reported to Equifax, TransUnion or Experian, such as deposit account records and rental/utility payments). The score is designed to

MP3 20197737.1

"fill gaps" by generating predictive Credit Scores for Consumers that do not have a 300-850®

classic FICO® score due to "thin" (limited) or even non-existent credit histories at the three

Credit Bureaus. While at present the FICO® Expansion score and the nontraditional data

sources that it reflects are complements to, rather than substitutes for, a traditional Credit Score

(such as classic FICO®) and traditional Aggregated Credit Data, over time the ability to extract

predictive results from nontraditional sources of data will improve, and those nontraditional

sources of information, together with Credit Scores developed from this data, increasingly will

become an alternative or substitute to the traditional data sources and scores available through

the Credit Bureaus.

35.    In 2001, Fair Isaac introduced its NextGen FICO® score as a more advanced

alternative to the 300-850® classic FICO® score. Two major benefits of this model are that

(1) it has greater predictive power, and (2) it is able to generate Credit Scores for more people

(*e.g.*, for people who cannot receive a classic FICO® score due to limited credit history).

Through the use of enhanced predictive variables, refined performance classification and deeper

segmentation, use of the NextGen score permits Lenders to reduce risk and/or increase their

loan-approval rate for all Consumers across the score range. Although the enhanced capabilities

of the NextGen score have been tested and validated, approximately only one percent of

financial institutions using Fair Isaac Credit Scores have migrated to using the NextGen score.

On information and belief, the low level of migration, or upgrading, is due to significant

switching costs and discriminatory high prices charged for NextGen scores since its inception by

the Credit Bureaus, which control both end-user pricing for, and the distribution of, most Fair

Isaac Consumer Credit Scores to Lenders.

15

**D.**    ***Distribution and Pricing of Fair Isaac Credit Scores***

36.    The Credit Bureaus control access to their sets of Aggregated Credit Data and license their use to providers of scoring algorithms, such as Fair Isaac.  They also license the use of the Aggregated Credit Data to resellers of such data, financial institutions that have their own scoring algorithms, and to each other (for the production of "tri-merged" credit reports which are used in the mortgage industry and that merge the Credit Bureaus' data into a single credit report).

37.    The Credit Bureaus are licensed by Fair Isaac to generate and provide Fair Isaac's various Credit Scores directly to Lenders and, in some cases, to Consumers.  Under these agreements, the Credit Bureaus apply Fair Isaac's unique algorithms to their Aggregated Credit Data to calculate Fair Isaac Credit Scores.  After the Credit Bureaus process the scores, they deliver them directly to Lenders and Consumers.  Currently, Fair Isaac cannot sell its scoring products directly to Lenders without cooperation from the Credit Bureaus.

38.    Even with respect to those Credit Scores that Fair Isaac does sell directly (e.g., PreScore service and FICO Score Delivery service), a Credit Bureau must still process the data and generate the score that will be distributed to the Lender. The algorithm by itself is useless; a Credit Score can only be derived by applying the algorithm to the Aggregated Credit Data for which it has been designed. Irrespective of whether it is the Credit Bureaus or Fair Isaac who is delivering Fair Isaac's Credit Scores, each Credit Bureau controls access to and pricing of its Aggregated Credit Data and also insists that only the Credit Bureau process the data with the scoring algorithm to generate a Credit Score. As a result, by manipulating the price of Aggregated Credit Data and processing supplied in connection with Fair Isaac's algorithm (relative to their price when delivered with the Credit Bureaus' proprietary algorithm), the Credit Bureaus have the ability to control, or at least heavily influence, the price of Fair Isaac's Credit

16

Scores and thus to disadvantage Fair Isaac's Credit Scores relative to any proprietary Credit Score, including the VantageScore products, marketed by the Credit Bureaus.

39.     In 2001, Fair Isaac began to sell its 300-850® classic FICO® Credit Score directly to Consumers, as permitted under Fair Isaac's license agreements with Equifax, and subsequently the other Credit Bureaus. Fair Isaac takes the Consumer's purchase order at www.myfico.com, and then requests a Credit Score and credit report from the Credit Bureau selected by the Consumer. The Credit Bureau generates a 300-850® Credit Score by applying the Fair Isaac scoring algorithm and sends it to Fair Isaac along with a credit report. Fair Isaac delivers the Credit Score and credit report to the Consumer under an agreement with the Credit Bureau. Fair Isaac must pay the Credit Bureau a fee for the Aggregated Credit Data, the Credit Score, and data processing costs. On information and belief, the fee paid by Fair Isaac to the Credit Bureau in these circumstances for the credit report and Credit Score is significantly higher than the fee paid by other resellers for credit reports to be used for similar purposes.

### E.     Goodwill in Fair Isaac Credit Scores

40.     Fair Isaac's scoring models have been based on its 300-850 scoring range since at least the late 1980s, and Fair Isaac has promoted and educated the Consuming Public about its 300-850 scoring range since at least the mid 1990s.

41.     Fair Isaac has developed goodwill in its 300-850® Marks and its 300-850® Credit Scores. In fact, Fair Isaac's 300-850® classic FICO score is the premier Credit Score used most by Lenders today. This Credit Score is used by most of the 100 largest financial institutions and by most mortgage loan originators.

42.    Fair Isaac has spent a great deal of time, money, and other resources educating Consumers about the meaning of their 300-850® Credit Score. Much of this information has been made available to the public at no charge.

43.    In addition, when Consumers purchase individual Credit Scores from Fair Isaac, each score is accompanied by key supplementary information that helps the Consumer understand and use the score. This information includes the Consumer's underlying credit report and Fair Isaac's customized explanation, including where the Consumer's score falls in the 300-850® range, what factors contributed most to their particular score, and what steps the Consumer can take to manage the score over time.

44.    For example, on January 26, 2003, Fair Isaac promoted awareness of its Credit Scores in a television commercial during the Super Bowl. This advertisement highlighted the importance of Credit Scores in determining Consumer interest rates on loans and referred viewers to Fair Isaac's website (www.myfico.com) to obtain their score and additional information.

45.    In addition, Fair Isaac encouraged media coverage on the importance of Credit Scores to Consumers and on Fair Isaac's efforts to empower and educate Consumers about their 300-850® credit score. The media responded very favorably and generated articles and broadcasted coverage in hundreds of outlets including *The Wall Street Journal*, *The New York Times*, *USA Today*, *Newsweek*, *NBC Network News*, *National Public Radio*, and *The Today Show*. Traffic at Fair Isaac's website increased after each significant media event.

46.    Personal finance expert and television personality Suze Orman also has been instrumental in educating Consumers about Fair Isaac's Credit Scores and their importance to Consumers' financial health. Fair Isaac distributes a Consumer product called the Suze Orman®

18

FICO® Kit that provides Consumers with access to their 300-850® FICO® Credit Scores as well as educational information developed in conjunction with Ms. Orman relating to Credit Scores and personal credit management. Ms. Orman has promoted this product on public broadcasting stations across the country as well as the QVC shopping channel.

47.     Consumers can attend seminars and read books on how to improve their 300-850® Credit Score in order to arm themselves with more bargaining power in negotiating a loan and obtaining lower interest rates. Fair Isaac also makes educational materials available for free to Consumers on its website.

48.     Consumers have taken such an interest in knowing their three-digit score that Fair Isaac offers Consumers a service that monitors changes to their 300-850® Credit Score based on Equifax data and notifies them when their score changes.

49.     Information is even available for Consumers to see the interest rates they might qualify for based on their 300-850® FICO Credit Score. Since 2002, Fair Isaac has offered a free interest-rate table on its website that shows how a Consumer's 300-850® Credit Score could qualify the Consumer for different interest rates currently charged by Lenders for different types of loans. This information helps Consumers quickly understand how getting a better score can translate into more attractive credit terms and significant dollar savings over time.

50.     On information and belief, Lenders and Consumers are familiar with the 300-850® Marks and they identify such three-digit Credit Scores as coming from Fair Isaac, being affiliated or associated with Fair Isaac, or being sponsored by, endorsed by, or connected with Fair Isaac.

51.     Through experience, care, and skill, Fair Isaac's 300-850® Marks and its 300-850® Credit Scores have become widely known and have acquired a reputation for excellence,

19

consistency, and reliability. Fair Isaac has consistently and continuously invested significant resources into the development of its scoring models' reputation as high-quality, consistent, and accurate predictors of Consumer credit risk. As such, Fair Isaac's reputation, goodwill, and trademarks for its 300-850® Credit Scores are valuable assets to Fair Isaac, and it maintains those assets through consistent and continuous delivery of its 300-850® Credit Scores.

52.     As a result of Fair Isaac's long use and promotion of its 300-850® Marks and its 300-850 Credit Scores, the 300-850® Marks and scores have become distinctive and serve to identify Fair Isaac's Credit Scores and high-quality services, and to distinguish Fair Isaac's products and services from those offered or sold by others, and to distinguish the source or origin of Fair Isaac's products and services. The relevant Consuming Public widely recognizes and associates the 300-850® Marks and Credit Scores with Fair Isaac and its products and services. In addition, the relevant Consuming Public widely recognizes and associates a three-digit Credit Score falling within the number range 300-850 as coming from a particular source of quality, consistency, and reliability—Fair Isaac.

## V. The Defendants' Activities

### A.     *The Credit Bureau Defendants' Creation of VantageScore*

53.     In March 2006, TransUnion, Equifax, and Experian announced that they jointly created a Credit Score of their own. The Defendant Credit Bureaus created VantageScore, which owns a scoring algorithm that is marketed and sold through the Credit Bureaus via licensing agreements with VantageScore. VantageScore is owned by Equifax, Experian, and TransUnion.

54.     VantageScore's model uses the scoring range 501-990. This number range overlaps Fair Isaac's trademarked 300-850® score range. And similar to Fair Isaac's Credit Scores, higher scores under the Defendants' 501-990 model represent a lower likelihood of risk.

55.     Defendants' use of VantageScore's overlapping 501-990 scoring range will likely confuse Consumers to believe that their individual Credit Score generated from VantageScore's model is somehow associated or affiliated with Fair Isaac, or that it is the same as a 300-850® FICO® score. Consumers associate their three-digit Credit Scores within the range 300-850® as coming from a particular source of quality—Fair Isaac. Individual Consumers are therefore likely to be confused to think that their 501-990 VantageScore Credit Score has the same meaning on Fair Isaac's 300-850® scale as their individual FICO® Credit Score has on Fair Isaac's 300-850® scale. This likelihood of confusion will not only be harmful to Fair Isaac's goodwill, it will also be harmful to individual Consumers because a good score under Fair Isaac's 300-850® FICO® Credit Scoring models might not be a good score under VantageScore's 501-990 model. For example, as explained in more detail below, a Consumer who gets a mid-range score on the 501-990 VantageScore range may believe his Credit Score is better than it actually is because he will likely think it equates to a higher score on Fair Isaac's well-known 300-850® scale.

56.     On information and belief, the Credit Bureaus do not share Consumer credit information with one another in calculating their 501-990 Credit Scores. Therefore, similar to any other Credit Score, an individual Consumer will have three separate 501-990 Credit Scores—one score based on the differing credit data collected by each Credit Bureau.

57.     Moreover, use of a common algorithm, which by definition cannot be altered to take advantage of a particular Credit Bureau's Aggregated Credit Data set's strengths or correct unique weaknesses in that Credit Bureau's data, will result in a less predictive Credit Score.

58.     On information and belief, each of the Defendant Credit Bureaus offers its 501-990 Credit Score to Lenders. Moreover, Experian offers its 501-990 score directly to Consumers

21

at www.experian.com and www.freecreditreport.com, and TransUnion and Equifax announced

on their websites that Consumers will be able to purchase their VantageScore Credit Scores on

those websites in the near future.

59.     On information and belief, Experian and TransUnion also sell their own

proprietary credit scores that use a scoring range of 300-850. On information and belief,

Experian and TransUnion will eventually stop offering their proprietary scores to Consumers and

Lenders, and will instead only offer their 501-990 scores.

## B.     *Confusion Created by the Defendants' Use of an Overlapping Scoring Range*

60.     As licensees of Fair Isaac algorithms and authorized distributors of the 300-850®

Credit Score, the Defendant Credit Bureaus have an enhanced duty to create clear messages

about Fair Isaac's products and services, and to distinguish other products and services from

those of Fair Isaac to avoid confusion with Fair Isaac's products, services and technologies, and

to avoid disparaging Fair Isaac's Credit Scores and the 300-850® Marks. Despite their enhanced

duty, the Credit Bureaus intentionally sell, advertise and promote their VantageScore product

with a confusingly similar scoring range of 501-990. Because of the Credit Bureaus' history and

status as licensees of Fair Isaac's Credit Scores, their promotion of their VantageScore product

increases the likelihood of confusion among the Consuming Public.

61.     The Defendants advertise and promote their 501-990 score in promotional

materials and on their websites. The following are just a few examples from the Defendants'

websites and advertising materials which highlight their use of 501-990:

a.     *Press release by VantageScore, TransUnion, Equifax and Experian:*

"VantageScore uses score ranges from 501-990."

*See* Exhibit 3.

b.   *VantageScore website located at www.vantagescore.com:*

"Easy to understand and apply-Returns a score range of 501-990 (higher scores represent a lower likelihood of risk)"

"Returns a score range of 501-990 (higher scores represent a lower likelihood of risk)"

*See* Exhibit 4.

c.   *VantageScore brochure (obtained from www.vantagescore.com):*

"Uses a common score range of 501-990 (higher scores represent a lower likelihood of risk)"

*See* Exhibit 5.

d.   *Experian brochure:*

"Uses a common score range of 501 to 990 (high scores equal low risk)"

*See* Exhibit 6.

e.   *Experian website located at www.experian.com:*

"VantageScore is easy to understand and apply.  It uses score ranges from 501-990.  Consumers and credit grantors alike will recognize the following logical score groupings that approximate the familiar academic scale:

- A: 901-990  (Super Prime)
- B: 801-900  (Prime Plus)
- C: 701-800  (Prime)
- D: 601-700  (Non-Prime)
- F: 501-600  (High Risk)"

*See* Exhibit 7.

f.   *Experian press release*:

"VantageScore uses a score range from 501 to 990.  Consumers and credit grantors will recognize the logical score groupings that approximate the familiar academic scale:

\*   901-990   A
\*   801-900   B

23

     *   701-800   C
     *   601-700   D
     *   501-600   F"

*See* Exhibit 8.

g.     *TransUnion website located at www.transunion.com and press release:*

"VantageScore was developed . . . and uses a score range of 990-501 and score groupings that approximate the familiar academic scale:

- 901-990   A
- 801-900   B
- 701-800   C
- 601-700   D
- 501-600   F"

*See* Exhibit 9.

62.     The Defendants' use of their 501-990 Credit Score described above constitutes unauthorized use of Fair Isaac's 300-850 scoring range and its 300-850® Marks, and trades on Fair Isaac's goodwill in its Credit Scores and marks.

63.     The Defendants' use of their 501-990 credit-score range described above is likely to cause confusion and harm to Consumers and Lenders. For example, mortgage applicants with a 300-850® FICO® Credit Score of 620 or greater are considered less risky and generally require less documentation with their loan submission than applicants with a lower score. But under the VantageScore model, a Credit Score of 620 apparently translates on its so-called "academic scale" to a "D-." Lenders likely would want to consider a person with such a grade and score as high-risk and treat them differently from Consumers with a 620 FICO® score.

64.     Similarly, on information and belief, a Consumer with a score of 720, for example, under the Defendants' model, may be hard-pressed to discover the relevance (or irrelevance) of this score and may make wrong choices based on their misunderstanding of the meaning of their 501-990 score on the 300-850® FICO scale. "A FICO credit score above 720 means you have decent credit. A VantageScore rating of 720 means your credit isn't so great." *See* Exhibit 10.

65.     Indeed, Consumer confusion already has happened. As one example, below is an excerpt from a story that Michelle Singletary wrote for the Washington Post on April 6, 2006:

> "'It appears now that someone with a credit score of, say, 800 under the current system, certainly top of the line since 850 is the current ceiling, would move from top rating to average under the new system,' the reader wrote.
>
> That's an incorrect conclusion. The two systems are not being merged . . . ."

*See* Exhibit 11.

66.     In the recent months, there have been many articles written about the likelihood of confusion that the Defendants' 501-990 score will cause. Chip Cummings, a 23-year mortgage-industry veteran and international speaker who has been featured on radio, TV, and print media recently wrote:

> "The new Vantage Credit Scoring system, just released by the three major credit reporting agencies, Equifax, Experian and Trans Union, could cause major confusion in the industry. What used to be a good credit score, may now be considered 'marginal,' costing Consumers through higher interest rates, shorter credit terms, and increased costs."

*See* Exhibit 12. In addition, the following excerpts taken from other articles show the industry's fear that the Defendant's 501-990 score will cause confusion among the Consuming Public:

> "As we discuss in Part 4, FICO scores, with a range of 300 to 850, have been the scoring norm. If VantageScores with a cap of 990 take hold, this is bound to cause consumer confusion. You might think, for example, that a score of 850 puts you at the top as a credit risk. You'd be right if your lender used a FICO score. But, if your lender scores under the VantageScore system, you'll only get a B. (For a description of VantageScore numerical ranges and how this translates to a letter grade, see Experian's news release, dated March 14, 2006."

*See* Exhibit 13.

> "This is because FICO bases their credit ratings on a scale from 300 to 850 and VantageScore bases its credit ratings on a scale from 520 to 990. If you apply with a lender and they turn you down because your credit rating is 650, you may get really confused, not realizing they're not using the

25

FICO model to determine they're [sic] credit ratings. If you want to understand exactly where your credit score stands, you need to know which credit rating system the lender is using."

*See* Exhibit 10.

"However, since the system is new, it will no doubt cause some confusion with lenders who may confuse it with the FICO score, which operates on a scale of 350 to 850, so a good FICO score may not be a good VantageScore."

*See* Exhibit 14.

"'There could be confusion among consumers unless they make it clear that there are two systems,' said Linda Sherry, a spokeswoman for Consumer Action, which is based in San Francisco. 'People have gotten used to thinking a certain number like 700 is a good score. That might be true if it's a FICO, but might not be under the new system.'"

*See* Exhibit 15.

67.    In addition, on information and belief, the Credit Bureaus use Fair Isaac's trademarked scoring range in a scheme to lure individual Consumers to them so they can later sell those Consumers a non-Fair Isaac score.  For example, Experian posts banner ads on the Internet that read as follows:

"The U.S. average credit score is 678.  What's yours?"

*See* Exhibit 16. On information and belief, a score of 678 from VantageScore equates to a "D" on VantageScore's scale and, hence, is likely not the average Credit Score on VantageScore's scale. Therefore, Experian is trading on the goodwill in Fair Isaac's trademarked 300-850® scoring range to get Consumers to go to its website and purchase their individual Credit Scores. The banner ads lead to Experian's website where individual Consumers can purchase a VantageScore Credit Score. Fair Isaac's Credit Scores are not offered on this website. Experian's actions will deceive Consumers into believing that they will be able to obtain their Fair Isaac 300-850® FICO® scores at the linked website, when the Fair Isaac score is not even

26

available there.  In addition, because Experian is using Fair Isaac's well-known scoring scale to

lure individual Consumers to its website, Consumers likely will be confused to believe that the

VantageScore Credit Score offered at the Experian site is somehow affiliated or associated with,

or sponsored or approved by Fair Isaac—the source of the trademarked 300-850® scoring range.

     As another example, Experian posts the following banner ads on the Internet:



Like the banner ads in the first example, these banner ads also lead to Experian's website.  This

shows once again that Experian is trading off of the goodwill in Fair Isaac's trademarked 300-

850® scoring range in order to lure Consumers to its website.  Here, the banner ad represents

that a Credit Score of 670 is good (by the smiley face) and a Credit Score of 820 is excellent (by

the happy face).  These are true representations under the FICO® score range.   But they are not

true under the VantageScore 501-990 score range.  Indeed, a Credit Score of 670 on the

VantageScore range is considered very poor (and gets a "D" grade) and a Consumer cannot even

get a Credit Score of 450 on VantagScore's scale.  Accordingly, Experian is using the 300-850®

score range to lure Consumers to its website to sell a VantageScore Credit Score.

## C.     *Harm Caused by the Defendants' Use of Fair Isaac's Score Range and Marks*

     68.     On information and belief, the Defendants' use of Fair Isaac's 300-850® Marks,

or marks substantially similar to the 300-850® Marks, and a credit-score range that is either

identical to or overlaps Fair Isaac's 300-850® credit-score range, and Credit Scores that fall

within Fair Isaac's 300-850® credit-score range, is deliberate, and the Defendants have used and

27

continue to use these Credit Scores and marks for the purpose of giving the Defendants' Credit Scores and Credit-Scoring services appeal, credibility, and salability.

69.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to or overlaps Fair Isaac's 300-850® credit-score range, and Credit Scores that fall within Fair Isaac's 300-850® credit-score range, is likely to cause confusion, to cause mistake, or to deceive the Consuming Public, as to affiliation, connection, or association of the Defendants with Fair Isaac, or as to the origin, sponsorship, or approval of the Defendants' products and services. This likelihood of confusion is increased by the fact that the Defendants are licensees and distributors of Fair Isaac's 300-850® Credit Score and offer the 300-850® score directly to Lenders and Consumers.

70.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to or overlaps Fair Isaac's 300-850® credit-score range in the manner described above, falsely designates the origin of their products and services, and falsely and misleadingly describes and represents facts with respect to the Defendants and their products and services.

71.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to or overlaps Fair Isaac's 300-850® credit-score range in the manner described above, falsely indicates to the relevant Consuming Public that the Defendants' services are affiliated, connected, or associated with Fair Isaac, or are sponsored, endorsed, or approved by Fair Isaac, or are in some manner related to Fair Isaac or its products or services.

MP3 20197737.1

72.    The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to or overlaps Fair Isaac's 300-850® score range in the manner described above, enables them to trade on and receive the benefit of the goodwill in Fair Isaac's Credit Scores and in its 300-850® Marks, which Fair Isaac has built up at great labor and expense over many years, and to gain acceptance for their products and services not solely on their own merits, but on the reputation and goodwill of Fair Isaac, its Credit Scores, its 300-850® Marks and its products and services.

73.    The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to or overlaps Fair Isaac's 300-850® score range, unjustly enriches the Defendants at Fair Isaac's expense.

74.    The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a score range that is either identical to or overlaps Fair Isaac's 300-850® FICO score range, removes from Fair Isaac the ability to control the nature and quality of its Credit Scores and the 300-850® Marks.  In addition, it places Fair Isaac's reputation and goodwill at least in part in the hands of the Defendants, over whom Fair Isaac has no control.

75.    The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a score range that is either identical to or overlaps Fair Isaac's 300-850® score range, and Credit Scores that fall within Fair Isaac's 300-850® score range, will cause irreparable injury to Fair Isaac and to the public unless restrained by this Court.

76.     The Defendant's acts have been malicious, deliberate, willful, intentional and in bad faith, with full knowledge and conscious disregard of Fair Isaac's rights in the 300-850® Marks and score range, and with an intent to trade on Fair Isaac's vast goodwill in its Credit Scores and the 300-850® Marks, and with the intent to confuse the public.

**D.     The Defendants' False and Misleading Representations**

77.     In addition to trading on Fair Isaac's goodwill by using the 300-850® Marks, and credit-score ranges that fall within or overlap the 300-850® credit-score range, the Defendants have made many misleading and false representations of fact regarding the qualities and characteristics of their 501-990 Credit Score and Fair Isaac's Credit Scores.

78.     On information and belief, while the Defendants have made representations of fact about the quality and characteristics of their 501-990 score compared to Fair Isaac's Credit Scores, they have never actually tested their score against Fair Isaac's Credit Scores to determine the truthfulness of their statements or representations.

**False and Misleading Statements by Experian**

79.     The following is not necessarily an exhaustive list of additional misleading and false statements made by defendant Experian:

a.      "VantageScore was developed jointly by the three national credit reporting companies and is the credit reporting industry's first scoring model to deliver consistent, objective scores across their respective databases."

*See* Exhibit 17. This statement falsely suggests that Fair Isaac's Credit Scores are not consistent or objective. It also falsely suggests that VantageScore is the first, and only, scoring model to generate consistent and objective scores.

b.      "Leveled credit characteristics across all three national credit reporting companies ensure that any score differences for the same consumer are attributable to content differences, not the scoring algorithm."

30

*See* Exhibit 18.  This statement falsely suggests that a Consumer's Fair Isaac Credit Score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of actual differences in the Credit Bureaus' data for the particular Consumer.  In addition, this statement falsely suggests VantageScore's product is more predictive than Fair Isaac's because VantageScore's model applies the same algorithm to each Credit Bureau's data set in generating Credit Scores.  In fact, the use of the identical algorithm across the different data sets of the Credit Bureaus makes the resulting Credit Scores less predictive.

      c.     "Score differences across the three companies are attributed to content differences, as opposed to the scoring algorithm itself."

*See* Exhibit 18.  This also falsely suggests that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of differences in the Credit Bureau's data for a particular Consumer.

      d.     "As a result, it leverages the collective expertise of the industry's leading experts on credit data, scoring and analytics to offer greater predictiveness and consistency."

*See* Exhibit 18.  This representation falsely suggests that the three Credit Bureaus are more knowledgeable about Credit Scoring than Fair Isaac.  It also falsely suggests that the Credit Bureaus have more expertise in developing credit-scoring algorithms than Fair Isaac does and that their algorithm is more predictive and consistent than Fair Isaac's scoring algorithms.

      e.     "Given the lack of scoring solutions in the market today that capitalize on data from all three credit reporting companies, choices were limited to risk decisioning tools to create effective lending strategies.  With VantageScore, you can make the best risk management decisions with improved prediction power that is consistent across all three national credit reporting companies."

*See* Exhibit 18.  This statement falsely suggests that Fair Isaac's Credit Scores cannot be generated from all three Credit Bureaus' data.  It also suggests that Fair Isaac's scores are not

31

consistent. Moreover, it suggests that financial institutions can better manage risk with the Defendants' model.

     f.     "By combining the consistent predictive power of VantageScore with Experian's robust database, you can achieve the most accurate outcome of risk assessment with the most up-to-date information available on the market today."

*See* Exhibit 18. This falsely suggests that VantageScore's model uses more accurate and updated information from the Credit Bureaus than Fair Isaac's models. In calculating a Fair Isaac score, the Credit Bureaus apply their credit data for a particular Consumer to Fair Isaac's algorithm uniquely created for that Credit Bureau. This data used is the most up to date information the Credit Bureau has on the particular individual Consumer. This representation by Experian also falsely suggests that the Defendants' model is more accurate than Fair Isaac's models.

     g.     "Unprecedented in implementing the same score at all three national credit reporting companies."

*See* Exhibit 18. This falsely suggests that with VantageScore's model, a Consumer will always get the same score for each Credit Bureau —even if the Credit Bureaus have different data for the Consumer.

     h.     "VantageScore, which is both used by lenders and now available to Consumers . . . ."

*See* Exhibit 19. This statement falsely suggests that Lenders currently use and have accepted the Defendants' VantageScore model as a viable method of determining risk.

### False and Misleading Statements by TransUnion

80.     The following is not necessarily an exhaustive list of misleading and false statements made by Defendant TransUnion:

     a.     "The score is unprecedented in that it looks at and analyzes data at the same point in time on the same consumer records from all three national credit reporting companies."

*See* Exhibit 20. This falsely suggests that Fair Isaac's scoring models do not analyze the Credit Bureaus' data for a particular Consumer for the same time period.

b.    "'By developing a patent-pending approach to consistently interpret the credit information stored within each credit repository, also referred to as characteristic leveling, any credit scoring differences between the credit reporting companies can be attributed to data differences in a consumer's credit file rather than data interpretation—as is the case in most scoring models today,' said Wiermanski. 'With VantageScore, a significant achievement is accomplished by creating this consistent scaling across the credit reporting companies; an approach we believe is long overdue and will be universally embraced.'"

*See* Exhibit 9. These representations falsely suggest that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of differences in the Credit Bureaus' data for a particular Consumer. They also falsely suggest that Fair Isaac's models do not consistently interpret data.

### False and Misleading Statements by Equifax

81.    The following is not necessarily an exhaustive list of misleading and false statements made by defendant Equifax:

a.    "No other model does a better job of delivering objective and consistent credit scoring. Through the unprecedented collaboration of the three major credit reporting companies, VantageScore leverages unmatched data and state-of-the-art modeling techniques. The result: greater predictive power that leads to better risk management and increased profitability."

*See* Exhibit 21. These representations falsely suggest that VantageScore has access to better Consumer data than Fair Isaac does. They also suggest that the Credit Bureaus share Consumer information among one another and use data to which Fair Isaac does not have access. Once again, in calculating a Fair Isaac score, the Credit Bureaus apply their Aggregated Credit Data for a particular Consumer to Fair Isaac's algorithm uniquely created for that Credit Bureau. This data is the most up-to-date information the Credit Bureau has on the particular individual Consumer. In addition, these statements falsely suggest that the Defendants' scores are better and more predictive than Fair Isaac's scores. Even further, they falsely suggest that the VantageScore model will lead to better and more profitable decisions for Lenders than Fair Isaac's models.

      b.    "VantageScore employs the same, consistent scoring algorithm at all three CRCs. So any differences in one consumer's scores across the CRCs would be due to data content differences, not the scoring formula."

*See* Exhibit 22. This statement falsely suggests that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of the actual differences in the Credit Bureaus' data for a particular Consumer. It also falsely suggests that Fair Isaac's scoring models are inconsistent.

      c.    "Leveling the attributes across the CRCs contributes to the model's superior predictive power over scores on the market today. And the VantageScore model is unprecedented in looking at data from all three CRCs at the same point in time."

*See* Exhibit 22. This statement falsely suggests that Fair Isaac's models do not analyze data from the same time period when generating a Consumer's scores from all three Credit Bureaus. It also falsely indicates that "leveling" increases a Credit Score's predictiveness when, in fact, leveling reduces predictiveness.

      d.    "Why Will Lenders Use VantageScore?
VantageScore's across-the-board consistency reduces the need for creditors to manually review applications or impose their own personal methods when determining your credit worthiness. As VantageScore becomes the industry standard, all players in the credit lending market—from consumers to investors— will benefit from increased efficiency and effectiveness."

*See* Exhibit 23. These representations falsely suggest that the Defendants' VantageScore model will always generate the same score across Credit Bureaus for a Consumer. They also falsely suggest that Lenders are required to implement their own personal methods of determining creditworthiness of a Consumer when Fair Isaac's scores are used and that Lenders must critically review Fair Isaac's scores, thereby suggesting that Fair Isaac's Credit Scores are not accurate or trustworthy.

34