### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Fair Isaac Corporation; and myFICO Consumer Services, Inc.; | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No: |
| Equifax Inc.; Equifax Information Services LLC; Experian Information Solutions Inc.; TransUnion, LLC; VantageScore Solutions LLC; and Does I through X; | ) ) ) ) ) ) | 0:06-cv-04112 (ADM/JSM) |
| Defendants. | ) ) ) | |

---

### <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u>
### <u>MOTION TO COMPEL PLAINTIFF TO PRODUCE DOCUMENTS</u>
### <u>RESPONSIVE TO DEFENDANTS' FIRST SET OF</u>
### <u>REQUESTS FOR THE PRODUCTION OF DOCUMENTS</u>

Pursuant to Rules 34 and 37(a)(2) of the Federal Rules of Civil Procedure and

Rule 37 of the Local Rules of the United States District Court for the District of

Minnesota, Defendants Equifax Inc., Equifax Information Services LLC, Experian

Information Solutions, Inc., TransUnion LLC, and VantageScore Solutions LLC

("VantageScore") (collectively "Defendants") hereby submit this memorandum of law in

support of their accompanying motion to compel Plaintiff Fair Isaac Corporation ("Fair

Isaac" or "Plaintiff") to produce documents responsive to Defendants' First Set of

Requests for the Production of Documents, which were served on January 17, 2007.

## STATEMENT OF FACTS

As this Court is aware, this case involves antitrust, trademark, false advertising, and other claims asserted by Fair Isaac against the credit bureaus and VantageScore – the antitrust claims being particularly ironic in light of the fact that Fair Isaac is an entrenched monopolist and the dominant provider of generic credit risk scoring services, while VantageScore represents the first serious competitor to Fair Isaac to come along in years.[1]  However, having put in issue matters such as Fair Isaac's dealings with competitors, pricing and sales in the marketplace, purported trademarks, and alleged injury as a result of the new competition, Plaintiff nonetheless has in significant respects sought to deny Defendants critical discovery on these key issues.

Accordingly, by the accompanying Motion, Defendants seek an order compelling Plaintiff to produce all documents responsive to a number of document requests relating to issues central to this litigation, including Plaintiff's alleged relevant markets and other elements of Plaintiff's antitrust claims, the validity of Plaintiff's claimed trademark in the scoring range 300-850, and Plaintiff's claim that it suffered damages as a result of Defendants' alleged actions.  The specific requests at issue in this Motion are Defendants' Document Request Nos. 5, 29, 52, 62, and 72-75.[2]  See Defendants' First Set

---

[1] Indeed, Plaintiff has gone so far as to request the elimination of VantageScore from the marketplace.  See Sec. Amended Compl., prayer for relief ¶ 11.

[2] Defendants are moving to compel Plaintiff to produce documents in response to only some of the Requests for which Plaintiff has refused to do so.  For certain other outstanding Requests, Defendants believe that the parties may yet be able to come to some resolution after further negotiation, including with respect to certain global issues in

of Requests for the Production of Documents (the "Requests"), attached to Declaration of

Bryan D. Gant (hereinafter "Gant Decl."), Ex. 1. Plaintiff has refused to produce either

some or all of the documents called for by these Requests.

On January 17, 2007, Defendants served the Requests on Plaintiff. On February

16, 2007, Plaintiff served its Responses to Defendants' First Set of Requests for the

Production of Documents (the "Responses"), objecting to each of the above Requests and

either refusing to produce any responsive documents or agreeing to produce only limited

types of documents. See Plaintiff Fair Isaac's Responses to Defendants' First Set of

Requests for the Production of Documents, Gant Decl., Ex. 2.

### The Parties' Negotiations Regarding Defendants' Requests

The parties met and conferred regarding Plaintiff's objections to these Requests on

February 26th and 28th and were able to resolve a number of the outstanding issues.

Plaintiff agreed to further consider its position on several Requests, and Defendants

agreed to narrow or clarify the scope of several Requests, including some of those at

issue in this Motion. Defendants made a variety of substantial concessions during these

negotiations and agreed to forgo discovery in a number of areas Defendants believe are

important in order to keep the discovery process moving forward expeditiously and to

narrow the issues that may require Court intervention.

On March 5, Defendants sent a letter to Plaintiff summarizing the parties'

discussions and requesting that Plaintiff reconsider whether it would be willing to

---

this litigation related to the products subject to discovery and similar matters. Defendants
reserve the right to seek relief with respect to those Requests as necessary in the future.

produce responsive documents for certain Requests, including all of the Requests at issue here. See Gant Decl., Ex. 3. Having received no response, on March 15 Defendants sent a further letter to Plaintiff requesting whether Plaintiff would agree to produce responsive documents. See Gant Decl., Ex. 4.

On March 26, one month after the parties' meet and confer regarding these Requests, Plaintiff responded in a letter offering to agree to certain of the Requests, but continuing to refuse to produce some or all responsive documents for others, including the Requests here. See Gant Decl., Ex. 5.

On April 6, 2007, Defendants sent a third letter to Plaintiff, identifying the Requests on which the parties continued to disagree and reiterating the relevance of the information sought. See Gant Decl., Ex. 6. This letter requested that Plaintiff inform Defendants by April 13 whether it would agree to produce responsive documents. Having received no response, on April 17 Defendants sent a follow-up e-mail to Plaintiff's counsel requesting an answer and indicating the need to seek the Court's guidance if the parties were unable to resolve these issues. See Gant Decl., Ex. 7. Plaintiff's counsel sent a short e-mail response acknowledging Defendants' likely request for Court intervention and otherwise stating only that Plaintiff "was working on a response." See Gant Decl., Ex. 8. On April 20, 2007, two weeks after receiving Defendants' letter and over three months after service of Defendants' Requests, Plaintiff sent a letter to the Defendants agreeing to produce documents in response to some of the outstanding requests, but reiterating its refusal to produce the documents at issue in this Motion. See Gant Decl., Ex. 9. Defendants therefore bring this Motion to seek an order

4

compelling Plaintiff to produce documents responsive to these Requests, all of which are relevant to Plaintiff's claims and/or Defendants' defenses.

## ARGUMENT

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party," and courts have interpreted the Rules to provide for liberal discovery. Credit Lyonnais, S.A. v. SGC Int'l, Inc., 160 F.3d 428, 430 (8th Cir. 1998); Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1993); Sinco, Inc. v. B&O Manufacturing, Inc., 03-5277, 2005 WL 1432202, at *1 (D. Minn., May 23, 2005)[3] (citing Edgar v. Finley, 312 F.2d 533, 535 (8th Cir. 1963)).

Each of the Requests at issue is directly relevant either to Plaintiff's own allegations or Defendants' defenses. Set forth below, pursuant to Local Rule 37.2, are the Requests for which Plaintiff has refused to produce responsive documents, Plaintiff's Responses, and a brief discussion of the basis for Defendants' request for an order compelling production.

## I.    REQUEST NUMBER 5 – DOCUMENTS RELATED TO CONTRACTS AND NEGOTIATIONS BETWEEN THE PARTIES

### Request:

All agreements, contracts, and licenses involving or relating to Fair Isaac, on the one hand, and Experian, Equifax, Trans Union, and/or VantageScore on the other hand, including documents reflecting the negotiation of same.

---

[3] Attached as Gant Decl. Ex. 10.

### Plaintiff's Response:

Fair Isaac objects to this Request to the extent it seeks documents protected by the attorney-client privilege or the work-product doctrine and it objects to this Request as overbroad to the extent that it seeks "documents reflecting the negotiation" of agreements or licenses. Despite these objections and without waiving these objections, responsive agreements, contracts, and licenses will be produced. No agreements or licenses between Fair Isaac and VantageScore exist.

### Discussion:

Documents reflecting the negotiation of the agreements between Plaintiff and the respective Defendants are relevant to multiple aspects of the claims asserted by Fair Isaac. First, in Count Twelve of its Complaint Fair Isaac alleges that it was "coerced" into signing certain agreements with the Defendants. See Sec. Amend. Compl. at ¶¶ 255-58. Information regarding any such claimed coercion most likely would be found not in the agreements themselves, but rather in documents relating to their negotiation. Plaintiff, however, has refused to produce all but a narrow subset of such negotiation documents.

As noted above, Plaintiff initially agreed to produce only the actual agreements, contracts, and licenses between itself and Defendants. In its April 20 letter, Plaintiff for the first time offered to produce "any documents it intends to rely on to support its allegations that defendants coerced it into signing certain agreements." See April 20, 2007 Letter from Michael Collyard to Bryan Gant, Gant Decl., Ex. 9 (emphasis added). However, this Request seeks, and Defendants are entitled to receive, documents relevant to the claimed coercion, regardless of whether they support or refute such claims. Plaintiff cannot cherry pick the documents on which it wishes to rely while withholding

other relevant material, such as documents that may refute Plaintiff's claims. Plaintiff

must produce documents on which it intends to rely, but also must produce responsive

documents within its possession, custody, or control that Defendants may use to refute its

arguments. See, e.g., Triple Five of Minnesota, Inc. v. Simon, 212 F.R.D. 523, 526 (D.

Minn. 2002); Powers v. CSX Transportation, Inc., 164 F. Supp. 2d 1299, n.1 (S.D. Al.

2001); Immuno Vital, Inc. v. Telemundo Group, Inc., 203 F.R.D. 561, 571 (S.D. Fla.

2001); Bauer v. Ford Motor Credit Company, 2000 WL 34494805, at *3 (D. Minn.

2000).[4] Cf. Rule 401, Federal Rules of Evidence ("[E]vidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence" is relevant.)

(emphasis added).

Second, and more broadly, such negotiation material will contain information

regarding Fair Isaac's view of the markets at issue in the case as well as the parties'

relative positions in such markets – such matters being essential to evaluating the

antitrust claims asserted by Fair Isaac here.  Among other things, Fair Isaac's internal

strategizing should provide valuable insights into its own view of what constitutes the

appropriate product markets as well as its own market power.  Negotiation documents

also will reveal the differing, and independent, strategies of the defendant credit bureaus

in their respective dealings with Fair Isaac.  Such documents will bear on the various

assertions of inter-bureau collusion found in the Complaint and Fair Isaac's

contemporaneous sense of whether there was collusion.

---

[4] Attached as Gant Decl. Ex. 11.

In short, Defendants are entitled to all documents reflecting the negotiation of any responsive agreements.

## II.   REQUEST NUMBER 29 – DOCUMENTS RELATED TO TRANSACTIONAL DATA

### Request:

Transactional data, in electronic format, sufficient to show disaggregated revenues, discounts, and costs by product, by customer, by transaction, and by date. This database must be sufficient to calculate at least the following for each Credit Risk Scoring Service and/or Scoring Algorithm:

a.   The royalties or other remuneration received by Fair Isaac from each of the Defendant Credit Bureaus or any third parties, by transaction, expressed in dollars and units (scores);

b.   Fair Isaac's direct sales, in dollars and units (scores), separately for each transaction, for each lender or other financial institution;

c.   Fair Isaac's monthly direct sales, in dollars and units (scores), to consumers;

d.   Fair Isaac's costs of goods sold associated with the revenues identified in subparts (a), (b), and (c) above;

e.   Fair Isaac's gross and net revenue, including the supporting data, including but not limited to discounts and other non-price concessions, inducements, technical support, or other services, for all line items comprising the difference between the gross and net revenues;

f.   Fair Isaac's gross and net profit, including the supporting data for all line items comprising the difference between the gross and net profit.

### Plaintiff's Response:

Fair Isaac objects to this Request as overbroad, unduly burdensome, and vague and ambiguous. Despite these objections and without waving these objections, Fair Isaac will produce its annual reports and Form 10-K's from January 1, 2001, to the present.

**Discussion:**

Transactional data is commonly used by economists and statisticians in antitrust cases to evaluate markets, the state of competition in those markets, and damages issues. See Manual for Complex Litigation (4th) § 30.2 (antitrust cases often involve the collection of transactional data); ABA Section of Antitrust Law, Econometrics, 1, 62, (2005) (explaining that econometric experts can be used to provide evidence relevant to the presence of market power, the nature of relevant markets, the likelihood of anticompetitive effects, the fact of injury, and the quantification of damages, that "courts have used econometric evidence in antitrust cases for more than twenty years" and that "[p]erhaps the most useful types of data for econometric methods are data that measure price and quantity over time."); ABA Section of Antitrust Law, Market Power Handbook, 141-42 (2005) (market power can be demonstrated by comparing prices and costs over time). Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 236 (1993) (relying on changes in pricing and costs over time to refute claims of market power). Such data likely is also easy to produce, particularly when requested, as here, in electronic form.

Plaintiff's initial Response to this Request was to refuse to produce anything other than annual reports and Form 10-K's, neither of which contain any transactional-level data and which are therefore entirely non-responsive to this Request. In its March 26 Letter, Plaintiff again refused to produce anything responsive,[5] but did agree to "consider

---

[5] In this letter, Plaintiff agreed to produce "audited financial statements and financial information for its scoring business," which, again, will not contain transactional data.

requests for more specific financial information as the case progresses if the defendants are able to identify specific types of documents." Defendants' April 6 Letter pointed to the specific information called for by this Request, which should be reasonably easy to obtain, and requested that Plaintiff produce that specific material. This information includes, for example, "Fair Isaac's monthly direct sales, in dollars and units (scores), to consumers." See Gant Decl., Ex. 6.

Plaintiff's April 20 Letter refused to produce such information on the grounds that doing so would be burdensome. See April 20, 2007 Letter from Michael Collyard to Bryan Gant, Gant Decl., Ex. 9. Plaintiff, however, has yet to identify any particular burden that would result from downloading and producing this information, which Plaintiff has not denied (and cannot deny) is readily available in its electronic files.

## III.   REQUEST NUMBERS 52 & 62 – DOCUMENTS RELATED TO FAIR ISAAC'S PURPORTED TRADEMARKS

### Request 52:

Without regard to the Time Period defined above, all documents relating to consumer and trade advertisements, promotions, and publicity in which the Fair Isaac Designations have been used in connection with Fair Isaac's Credit Risk Scoring Services, including but not limited to all documents concerning the creation or design of such advertising, promotional and publicity material.

### Plaintiff's Response:

Fair Isaac objects to this Request as overbroad and unduly burdensome. Despite these objections and without waiving these objections, without regard to the Time Period, representative samples of consumer and trade advertisements, promotions, and publicity that have used Fair Isaac's trademarks at issue in this litigation will be produced.

---

As this Request calls for only transactional data, and Plaintiff's proposed responses would contain no such transactional data, the documents Plaintiff proposes to produce are entirely non-responsive to this Request.

**Discussion:**

Plaintiff has agreed to produce representative samples of marketing materials, and to provide information (in some form) regarding where and when they were published. However, this Request also calls for marketing and other internal documents that led to the creation of these samples.

Plaintiff has claimed that it holds a valid trademark over a range of three-digit numbers from 300-850. <u>See</u> Sec. Amend. Compl. at ¶¶ 31-32. Plaintiff claims that it began using 300-850 as a scoring range in 1991 and that it uses that scoring range as a trademark to uniquely identify its products. <u>See</u> Sec. Amend. Compl. at ¶¶ 28, 30. In a trademark filing, Fair Isaac alleges that it began using 300-850 as a trademark in March 2001. <u>See</u> Sec. Amend. Compl. at Exhibit 1, p. 3. Defendants dispute all these claims, and argue that (a) Plaintiff cannot own trademark rights in a "range" of numbers; (b) Plaintiff used the term "300-850" generically, and not as a trademark, for many years to identify the range of possible scores a consumer might receive; and (c) that Plaintiff did not begin using "300-850" as a trademark until at least after the introduction of VantageScore, if ever.

Marketing and other internal documents are likely to provide relevant information regarding the manner in which Fair Isaac has used, and intended to use, the 300-850 scoring range and the strength or weakness of its alleged trademark. For example, if 300-850 was intended to be used as a trademark, Plaintiff should have documents discussing whether or not to use it in advertising, or whether customers would recognize it as a symbol of Fair Isaac if included on the face of some marketing materials. Conversely, if

(as Defendants argue) Plaintiff was using 300-850 in a purely descriptive manner,

Defendants would expect to find that there was no such consideration of making any

trademark use of the scoring range or the term 300-850. Although the marketing and

other internal documents that led to the creation of Plaintiff's marketing materials would

be the most likely place to find such relevant material, Plaintiff has refused to produce

these relevant documents.

### Request 62:

Without regard to the Time Period defined above, all documents relating to or
constituting communications between Fair Isaac and any other person concerning any of
the Fair Isaac Designations, including but not limited to communications between Fair
Isaac and any Defendant.

### Plaintiff's Response:

Fair Isaac objects to this Request as overbroad and unduly burdensome. Despite these
objections and without waiving these objections communications between Fair Isaac and
the Defendants regarding Fair Isaac's trademarks at issue will be produced, in addition to
documents responsive to Request Nos. 60 and 61.

### Discussion:

Request 62 calls for communications with any person regarding the trademarks at

issue in this case, as well as all internal documents relating to those communications.

Plaintiff has sought to limit this Request such that internal communications would be

produced only if they related to a communication with one of the Defendants. Plaintiff

refuses to produce such documents if they relate to communications with third parties.

See April 20, 2007 Letter from Michael Collyard to Bryan Gant, p. 4, Request 62, Gant

Decl., Ex. 9.

The Request seeks information regarding attempts by Plaintiff to enforce its alleged trademark, which will be relevant to the strength and validity of Plaintiff's purported trademark. Enforcing or failing to enforce a trademark is relevant to a party's claim that it holds a valid trademark and to the scope of protection afforded to the mark. The unexcused failure to police one's mark leading to the proliferation of third-party marks tends to show that the mark is weak, and possibly generic. See, e.g., The Morningside Group Ltd. v. Morningside Capital Group, 182 F.3d 133, 139 (2d Cir. 1999) (noting that "the successful policing of a mark adds to its strength to the extent that it prevents weakening of the mark's distinctiveness in the relevant market"); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 265 (5th Cir. 1980) (concluding that the mark was of limited strength due to plaintiff's failure to be "vigilant in protecting its rights in the 'Domino' mark" and concluding that "[a] trademark owner that strongly believed its customers were being deceived would hardly have remained idle for such an extended period of time"); see also Gateway, Inc. v. Companion Products, Inc., 320 F. Supp. 2d 912, 928 (D.S.D. 2002) (in trademark misuse context); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:91 (4th ed. 2007) (commenting that "[i]f the trademark owner is quiescent and tolerates the encroachment of infringers, it will find that its trademark asset has 'eroded' and 'shrunken' because the strength of its mark as a distinctive and distinguishing symbol has been diminished by the presence of similar marks"). If Plaintiff has decided to selectively enforce its trademarks against only certain competitors, that information would be highly probative to demonstrate whether Plaintiff treats its alleged 300-850 trademark as a trademark.

## IV.    REQUEST NUMBERS 72-75 – DOCUMENTS RELATED TO INJURY

### Request 72:

All documents relating to any past, present, or future economic injury to Fair Isaac resulting from the wrongdoing alleged in the Amended Complaint, including those alleged in Paragraphs 5-7, 100-101, 111, 115-122, 124-125, 171-172, 182-184, 191, 193, 198, and 199.

### Plaintiff's Response:

Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as vague and unduly burdensome. Despite these objections and without waiving these objections, non-privileged documents that support Fair Isaac's claim that it has been injured as a result of the wrongdoing of the Defendants will be produced.

### Request 73:

All documents relating to any past, present, or future economic injury to purchasers of credit reports by reason of the formation or operation of the VantageScore joint venture, including, without limitation, injury occurring by reason of an alleged conspiracy to fix prices, coordination of prices, or reduced incentive to innovate.

### Plaintiff's Response:

Fair Isaac objects to this Request as overbroad, unduly burdensome, and vague. Despite these objections and without waiving these objections, documents that support Fair Isaac's claim that it has been injured by reason of the formation and operation of VantageScore will be produced.

### Request 74:

All documents relating to any past, present, or future economic injury caused by the formation or operation of the VantageScore joint venture, or any other misconduct alleged in the Amended Complaint, to either potential direct competitors of the Credit Reporting Agencies in the Aggregated Credit Data market, and/or other competitors or potential competitors in the market for algorithm development, or competitors or potential competitors in the Credit Scoring market.

### Plaintiff's Response:

Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as overbroad, unduly burdensome, and vague. Despite these objections and without

waiving these objections, non-privileged documents that support Fair Isaac's claim that it has been injured as a result of the wrongdoing of the Defendants will be produced.

### Request 75:

All documents relating to any past, present, or future economic injury to Fair Isaac by reason of any alleged trademark infringement by one or more of the Defendants in this action.

### Plaintiff's Response:

Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as unduly burdensome and vague. Despite these objections and without waiving these objections, non-privileged document that support Fair Isaac's claim that it has been injured by reason of any trademark infringement by one or more of the Defendants will be produced.

### Discussion:

Although Plaintiff's Complaint is 92 pages long and contains 275 paragraphs of allegations and a 17-paragraph Prayer for Relief, it contains no explanation of how Fair Isaac or anyone else has been injured by any of Defendants' alleged actions, and Defendants have not seen any indication that there has been or will be any cognizable injury. Although there will be a time for expert discovery and analysis of any damages calculation that Plaintiff presents, at this stage Defendants are entitled to discovery of the factual basis of Plaintiff's claim that it was injured at all, as well as the amount of damages, if any, that it claims to have suffered.

For example, Plaintiff may claim that it has lost sales as a result of Defendants' alleged actions. If so, Defendants are entitled to documents and data reflecting the fact and amount of any alleged lost sales.[6]

However, Plaintiff argues that it may respond to these Requests by producing only documents relating to alleged injuries to Fair Isaac and third parties that <u>support</u> its damages claims, while refusing to produce any documents unfavorable to those claims.[7] The Request seeks discovery into the facts surrounding Plaintiff's and any third party's claimed injury, whether Plaintiff finds that discovery helpful or harmful to its case. Defendants are entitled to that production.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court order Plaintiff Fair Isaac to produce all documents responsive to Document Requests 5, 29, 52, 62, and 72-75.

---

[6] Indeed, it appears that Fair Isaac has been telling investors that the introduction of VantageScore had no effect on Fair Isaac's sales or revenue. <u>See</u> Citigroup, Company Flash, Fair Isaac Corp (FIC), April 16, 2007, p. 2, Gant Decl., Ex. 12 (Fair Isaac "indicated that they have seen no pressure from VantageScore").

[7] Plaintiff further claims that it is constrained to this approach by the vagueness of Defendants' Requests, though it is difficult to determine how it is that Plaintiff has sufficient knowledge about its claimed injury to produce materials supportive of those claims – and presumably sufficient to provide a good faith basis on which to file this lawsuit – but not enough knowledge to produce materials that tend to refute them.

## LOCAL RULE 7.1(C) CERTIFICATE

The undersigned movants certify that this Memorandum of Law contains 4,199 words. This count was prepared with the word count feature of Microsoft Office Word 2003, the program used to prepare this Memorandum of Law. The word count was applied specifically to include all text, including headings, footnotes, and quotations, but excluding captions, signature text, and certificates of counsel.

Respectfully submitted this 25th day of April, 2007.

**Lindquist & Vennum PLLP**

By: s/Mark A. Jacobson
         Mark A. Jacobson (MN Bar #188943)
         Mark H. Zitzewitz (MN Bar #0289073)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 371-3211
Fax: (612) 371-3207

– and –

M. Elaine Johnston
Robert A. Milne
Christopher J. Glancy
**White & Case LLP**
1155 Avenue of the Americas
New York, NY 10036-2787
Tel: (212) 819-8200
Fax: (212) 354-8113

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

**Briggs and Morgan, P.A.**


By: s/Jay W. Schlosser
      Jeffrey J. Keyes (MN Bar #55505)
      Jay W. Schlosser (MN Bar #204353)

2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 977-8400
Fax: (612) 977-8650

– and –

Peter Kontio
Michael P. Kenny
Teresa T. Bonder
**Alston & Bird LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777

*Attorneys for Defendants Equifax Inc. and*
*Equifax Information Services LLC*

**Bassford Remele**


By: s/Christopher R. Morris
      Lewis A. Remele, Jr. (MN Bar #90724)
      Christopher R. Morris (MN Bar
      #230613)

33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

– and –

James K. Gardner
Ralph T. Russell
**Neal, Gerber & Eisenberg LLP**
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*TransUnion LLC*

**Kelly & Berens**


By: s/Barbara P. Berens
     Barbara Podlucky Berens (MN Bar
     #209788)
     John D. Bessler (MN Bar #218418)

3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

*Attorneys for Defendant*
*VantageScore Solutions, LLC*