## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Fair Isaac Corporation; and myFICO
Consumer Services, Inc.,

                Plaintiffs,

v.

Equifax Inc.; Equifax Information Services
LLC; Experian Information
Solutions Inc.; Trans Union, LLC; and
VantageScore Solutions, LLC ; Does I
through X,

                Defendants.

Civil Action No: 06 CV 4112 DSD/JJG

**Plaintiff's Memorandum of Law in
Support of Its Motion to Compel**

---

## Introduction

In 2005, the three defendant credit bureaus—Equifax Inc. and its subsidiary,

Equifax Information Services LLC; Experian Information Solutions Inc.; and

TransUnion, LLC (collectively, the "Bureau Defendants")—formed a joint venture called

VantageScore Solutions, LLC ("VantageScore"), which is also a defendant. The Bureau

Defendants formed VantageScore to compete with plaintiff Fair Isaac Corporation in

providing credit scores to lenders and consumers. The Bureau Defendants—who have

been selling Fair Isaac's credit-scoring products under licensing agreements for many

years—developed VantageScore's competing scoring product in an extraordinarily short

amount of time, and they developed it with the help of an employee(s) of TransUnion

who had access for years to Fair Isaac's trade-secret computer specifications for credit

scoring. The defendants announced the launch of VantageScore in March 2006 and immediately began a barrage of advertising about the supposedly superior qualities in VantageScore's scoring product—advertising that Fair Isaac believes is false and misleading.

Fair Isaac has filed what is now a Second Amended Complaint in response to these facts (as well as others). In that complaint, Fair Isaac alleges that all of the defendants have engaged in false and misleading advertising; that TransUnion and VantageScore have misappropriated Fair Isaac's trade secrets and proprietary information; that TransUnion has breached its agreements with Fair Isaac regarding the use of Fair Isaac's trade secrets, proprietary information, and other property; and that VantageScore has interfered with Fair Isaac's agreements with TransUnion.

Despite these allegations, during discovery, the defendants—with TransUnion leading the charge—have absolutely refused to produce information that is necessary for Fair Isaac to prove its claims. Fair Isaac, for example, requested production of the computer specifications for VantageScore's scoring model and it requested the data and documents relating to the planning for and development and testing of the model. But the defendants have refused to produce any of those documents. Fair Isaac offered to enter into an agreement for a protective order that would make clear that no one employed by Fair Isaac would have access to the documents or data and that only attorneys and outside experts would have access, with appropriate safeguards in place for the protection of the information. But still, the defendants refused—and they refused despite that their own

initial disclosures and document requests identified credit-scoring algorithms and related documents as a legitimate subject for discovery. Flip flopping on what they consider relevant, the defendants now maintain that VantageScore's algorithm and related documents are too confidential to be produced and, in any event, that the documents are not relevant to the claims in the complaint.

This motion, therefore, presents a fairly straightforward issue: Should the defendants be required to produce VantageScore's algorithm and related documents? The answer is yes.

## Background

### A.    Fair Isaac, the Bureau Defendants, and VantageScore

Fair Isaac is in the business of developing algorithms and software for generating consumer credit scores for lenders, consumers, and others, using data collected by the three Bureau Defendants: Equifax, Experian, and TransUnion. Fair Isaac pioneered this credit-scoring business in the 1950s and it continues to be a primary innovator in the industry. *See* Second Amend. Comp. ¶ 2. Fair Isaac's trademarked 300-850® credit score is the leading credit score in the financial industry today. *Id.* Fair Isaac is *not* in the business of collecting credit data on consumers; it only provides the algorithm or software for processing the data. Consumer credit data is collected by the Bureau Defendants, all three of whom, for many years, have licensed Fair Isaac's credit-scoring algorithms or software. *Id.* at ¶ 2, 24, 44. These licensing agreements allow the Bureau

Defendants to sell the Fair Isaac credit scores that lenders have come to use in making their credit decisions. *Id.*

In March 2006, the Bureau Defendants announced (with much fanfare) that they had formed a joint venture (VantageScore) and that, through the joint venture, they had (secretly) developed their own joint algorithm or software for generating credit scores. *Id.* at ¶¶ 3-4. The defendants developed their algorithm in an extraordinarily short period of time—six months or less. When they announced their new product, the defendants touted VantageScore's credit scores as the superior product in the marketplace—more objective, predictive, accurate, consistent, state-of-the-art, etc. than the competing products. *Id.* at ¶¶ 99-103. (One thing the defendants could hardly claim was different were the scores that their new model produced: the defendants decided to use a confusingly similar numerical scoring range (501-990) to trade on Fair Isaac's goodwill, in Fair Isaac's view.)

**B.      Fair Isaac's claims in this lawsuit**

Fair Isaac commenced this action in October 2006, alleging antitrust claims and Lanham-Act claims, among others, against the Bureau Defendants and VantageScore. In particular, Fair Isaac alleged claims:

- that credit scoring ranges used by the defendants, including their new joint venture (VantageScore), are confusingly similar to Fair Isaac's 300-850 score range and trademarks and that the defendants' actions constitute a violation of Section 43(a) of the Lanham Act and trademark infringement;

- that the defendants have made misleading and false representations of fact about the nature or quality of the credit scores offered by VantageScore, in violation of Section 43(a) of the Lanham Act;

- that the joint creation and ownership of VantageScore represents an agreement to limit competition among the Defendant Bureaus, in violation of Section 1 of the Sherman Act, and an illegal merger or acquisition under Section 7 of the Clayton Act and Section 1 of the Sherman Act; and,

- that the defendants' actions represent an attempt to monopolize and a conspiracy to monopolize the market for consumer credit scoring, in violation of Section 2 of the Sherman Act.

Recently, after the defendants served their Initial Disclosures and produced a small quantity of documents, the defendants agreed to allow Fair Isaac to file a Second Amended Complaint, which adds additional instances of trademark infringement by two of the defendants (Experian and TransUnion) and adds passing-off allegations against all of the defendants. The Second Amended complaint also adds claims relating to Fair Isaac's trade secrets and its contracts with TransUnion, including claims:

- that TransUnion and VantageScore misappropriated Fair Isaac's trade secrets and proprietary information, including but not limited to algorithms or specifications for its credit-scoring models;

- that TransUnion breached its agreements with Fair Isaac by, among other things, misappropriating Fair Isaac's trade secrets or other property and by

allowing employees who have had access to Fair Isaac's confidential or trade-secret information to be involved in the development of VantageScore's competing algorithm and scoring model;

• that VantageScore has interfered with Fair Isaac's contracts with TransUnion by inducing TransUnion to breach those contracts.

**C.    Defendants' initial disclosures and requests—and their later about-face**

At the outset of this litigation, all of the defendants seemed to recognize the relevance of documents relating to the development and testing of VantageScore's algorithm. In January 2007, for example, in the Bureau Defendants' Initial Disclosures, they all volunteered the identities of people who had what they recognized was "discoverable information" in the areas, among others, of the "[p]redictiveness of competing algorithms," the "development of the VantageScore algorithm," and the "testing" of VantageScore's scoring service. *See* Collyard Decl. Exhs. 1 at 2 (Experian's Initial Disclosures); 2 at 2 (TransUnion's Initial Disclosures); and 3 at 2 (Equifax's Initial Disclosures). In their Initial Disclosures, the defendants also acknowledged that they had discoverable documents relating to the "development" of the scoring services that they offer (which would include VantageScore) and the "validation" or "performance" of the credit scores that they sell. *See id.* Exh. 1 at 3 (Experian); Exh. 2 at 3 (TransUnion); Exh. 3 at 4 (Equifax).

Similarly, in the defendants' joint document requests to Fair Isaac in January 2007, all of the defendants, in their Request No. 16, asked for every document in Fair

Isaac's possession or control that related to the intricacies of and science behind Fair

Isaac's various algorithms:

> All documents relating to the capabilities, attributes, variables, performance classifications, segmentation, and uses of each Fair Isaac Credit Scoring Service and/or Scoring Algorithm (excluding routine transactional documents).

Collyard Decl. Exh. 4 at 9.

Similarly, in their Request No. 10 to Fair Isaac, the defendants demanded the

production of every test or assessment or validation that Fair Isaac had done regarding the

performance of its own algorithms:

> All assessments, validations, or tests concerning the predictiveness, consistency, efficacy or performance, whether alone or by comparison to any other Credit Scoring Service, of each Credit Risk Scoring Service or Scoring Algorithm that Fair Isaac has offered, presently offers, or expects to offer, directly or indirectly, for sale in the Credit Scoring Market (including, but not limited to, FICO Classic, FICO Expansion, NextGen, and Fair Isaac's other products or services).

*Id.* at 8; *see also id.* (No. 11: seeking all documents relating to the predictiveness or

accuracy of VantageScore's algorithm versus Fair Isaac's algorithms) and *id.* at 9 (No.

15: seeking all documents relating to efforts Fair Isaac has made to improve the accuracy

or predictiveness of its algorithms).

The defendants likewise wanted Fair Isaac to produce all of the documents relating

to the development or testing of the specific features or lack thereof in Fair Isaac's

algorithm. In Request No. 12, for example, the defendants wanted all of the documents

that relate to "fair lending" or disparate impact studies concerning Fair Isaac's . . .

Scoring Algorithms." *Id.* at 8. And in Request No. 13, the defendants demanded

production of all the documents in Fair Isaac's possession or control that relate to "VantageScore's and Fair Isaac's attempt to develop leveled algorithms," which refers to a feature of VantageScore's algorithm that Fair Isaac contends degrades the predictive power of a credit score. *Id.* at 9; s*ee also* Second Amend. Compl. ¶ 3; Huyhn Decl. ¶ 9.

Sometime after serving these document requests and before responding to Fair Isaac's requests, the defendants apparently changed their minds and decided that they now want to argue that VantageScore's algorithm and all of the documents relating to the planning for and development and testing of that algorithm are off limits in discovery. Undeterred by the obvious contradiction between what they asked for from Fair Isaac and what they were willing to produce themselves, the defendants, in response to Fair Isaac's requests for the same or similar documents that the defendants had sought, objected to Fair Isaac's requests and flatly refused to produce any of the documents. The defendants now maintain that the type of documents that they had requested from Fair Isaac are irrelevant to the claims at issue in this lawsuit and too closely guarded as trade secrets to be part of discovery.

**D.     The Fair Isaac requests at issue**

Several of Fair Isaac's requests for documents relate to VantageScore's algorithm and the planning for and development and testing of that algorithm. These documents are both relevant and necessary to prove that all of the defendants engaged in false and misleading advertising about the efficacy and supposed superiority of VantageScore's product and that TransUnion and VantageScore misappropriated Fair Isaac's trade secrets

and breached or interfered with Fair Isaac's agreements regarding the use of Fair Isaac's

trade secrets and proprietary information. The relevant pages of each defendant's

response to Fair Isaac's requests are attached to the Declaration of Michael Collyard. *See*

Collyard Decl. Exhs. 5 (Experian's responses), 6 (TransUnion's responses), 7 (Equifax's

responses), & 8 (VantageScore's responses). For space considerations, only a few of the

requests and lengthy, multiple responses at issue are set forth in full in this Memorandum.

Fair Isaac's Request No. 142 is straightforward in asking for the complete

specifications for VantageScore's model, which would include a description of the

capabilities, attributes, variables, etc. for that model:

> ***Request No. 142:*** Complete specifications for VantageScore's models,
> including but not limited to the algorithms included in the models. (This
> request is not subject to the Instruction above, at the outset of these
> Requests. Fair Isaac requests that VantageScore's model be produced in its
> native electronic format.)

The defendants responded to this request by objecting to it in its entirety, making

no mention (of course) of the fact that the defendants themselves had asked for

these same types of documents relating to Fair Isaac's models:

> ***Equifax's Response:*** Equifax incorporates by reference its General
> Objections. Equifax objects to the request to the extent it seeks information
> revealing the algorithms, specifications, characteristics, attributes, logic,
> leveling, and/or data fields of a confidential, proprietary scoring service.
> This information is irrelevant to the claims and defenses in this case and not
> likely to lead to the discovery of admissible evidence. The requested
> information also constitutes the most valuable assets of Equifax's credit
> risk scoring business, the production of which to the competitors in this
> case would undermine competition in the credit risk scoring industry.

***TransUnion's Response:*** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

***Experian's Response:*** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

***VantageScore's Response:*** In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous and overbroad. VantageScore objects to this document request to the extent that it could be construed to seek documents that are not in VantageScore's possession, custody or control. VantageScore objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to the extent that the requested information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. VantageScore objects to this request to the extent that it seeks information or documents that may reveal the confidential information, including, without limitation, its algorithm, software, data fields, credit risk generic scoring model, and/or any characteristics of a proprietary scoring model. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.

Collyard Decl. Exhs. 5 at 50 (Experian); 6 at 35-36 (TransUnion); 7 at 90-91 (Equifax);

& 8 at 87 (VantageScore).

Similarly, Fair Isaac's Request No. 141 requested production of all the documents

that related to the early stages or versions of VantageScore's model:

***Request No. 141:*** With respect to VantageScore's scores or models, all documents relating to early stages or versions of VantageScore's models.

The defendants each refused to produce documents in response to this request as well:

***Equifax's Response:*** Equifax incorporates by reference its General Objections. Equifax objects to the request to the extent it seeks information revealing the algorithms, specifications, characteristics, attributes, logic,

leveling, and/or data fields of a confidential, proprietary scoring service. This information is not only irrelevant to the claims and defenses in this case, but it also constitutes the most valuable assets of Equifax's credit risk scoring business, the production of which to the competitors in this case would undermine competition in the credit risk scoring industry. Equifax also objects on the grounds the request is overly broad, unduly burdensome, and seeks irrelevant information not likely to lead to the discovery of admissible evidence.

***TransUnion's Response:*** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

***Experian's Response:*** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

***VantageScore's Response:*** In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous and overbroad. VantageScore objects to this document request to the extent that it could be construed to seek documents that are not in VantageScore's possession, custody or control. VantageScore objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to the extent that the requested information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. VantageScore objects to this request to the extent that it seeks information or documents that may reveal the confidential information, including, without limitation, its algorithm, software, data fields, credit risk generic scoring model, and/or any characteristics of a proprietary scoring model. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.

Collyard Decl. Exh. 5 at 49-50 (Experian); Exh. 6 at 35 (TransUnion); Exh. 7 at 90

(Equifax); & Exh. 8 at 86-87 (VantageScore).

Like the defendants, Fair Isaac requested all of the documents relating to

VantageScore's "leveling" of the characteristics in its credit-scoring model and, on this

point too, the defendants failed to recognize the inherent contradiction between their own

requests to Fair Isaac and their responses to Fair Isaac's requests:

> ***Request No. 145:*** All documents relating to VantageScore's characteristic leveling in relation to credit scores and credit scoring models.

> ***Equifax's Response:*** Equifax incorporates by reference its General Objections. Equifax objects to the request to the extent it seeks information revealing the algorithms, specifications, characteristics, attributes, logic, leveling, and/or data fields of a confidential, proprietary scoring service. This information is not only irrelevant to the claims and defenses in this case, but it also constitutes the most valuable assets of Equifax's credit risk scoring business, the production of which to the competitors in this case would undermine competition in the credit risk scoring industry. Equifax also objects on the grounds the request is overly broad, unduly burdensome, and seeks irrelevant information not likely to lead to the discovery of admissible evidence.

> ***TransUnion's Response:*** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

> ***Experian's Response:*** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

> ***VantageScore's Response:*** In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous and overbroad. VantageScore objects to this document request to the extent that it could be construed to seek documents that are not in VantageScore's possession, custody or control. VantageScore objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to the extent that the requested information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. VantageScore objects to this request to the extent that it seeks information or documents that may reveal the confidential information, including, without limitation, its algorithm, software, data fields, credit risk generic scoring model, and/or any characteristics of a proprietary scoring model. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client

privilege, the work product doctrine, the joint-defense privilege and/or any
other privilege.

Collyard Decl. Exh. 5 at 50-51 (Experian); Exh. 6 at 36 (TransUnion); Exh. 7 at 92-93

(Equifax); & Exh. 8 at 88-89 (VantageScore). Fair Isaac's other requests for documents

regarding "leveling" (Request Nos. 146 & 147) or other details about VantageScore's

algorithm and its tests and performance (Request Nos. 62, 133, 134, 135, 136, 137, 138,

139, 143) were met with similar objections from the defendants. *See id.* Exh. 5 at 24, 48-

50 (Experian); Exh. 6 at 18, 34-36 (TransUnion); Exh. 7 at 44, 86-91 (Equifax); & Exh. 8

at 40-41, 82-88 (VantageScore).

     With respect to tests or studies performed on VantageScore's algorithm, the

defendants took the same, contradictory approach to Fair Isaac's document requests.

Even though the defendants had demanded the production of every test or assessment or

validation that Fair Isaac had ever done regarding the performance of its own algorithms

(see discussion above), the defendants refused to produce the same documents for

VantageScore:

> ***Request No. 130:*** All documents relating to any tests of VantageScore's
> scores or models that were performed or are being performed by any
> Defendant or lenders or other organizations or individuals, including but
> not limited to the data or documents that were supplied to the organization
> or person performing the testing, communications relating to the testing,
> and any test results.

> ***Equifax's Response:*** Equifax incorporates by reference its General
> Objections.  Equifax objects to this request to the extent it seeks irrelevant
> information not likely to lead to the discovery of admissible evidence.
> Equifax objects to the request to the extent it seeks the production of
> competitively sensitive or otherwise confidential, proprietary business
> information. Equifax also objects to this request to the extent it seeks the

identification of Equifax customers. This information is not only irrelevant and not likely to lead to the discovery of admissible evidence, but also constitutes a valuable competitive asset of Equifax, the production of which to Equifax's direct competitors in this litigation would threaten the parties' abilities to compete and undermine competition. Equifax further objects to this request because it is overly broad and unduly burdensome.

**Trans Union's Response:** Trans Union will produce all non-privileged, responsive documents, if any, in its possession, custody, or control [subject to TransUnion's "algorithm objection].

**Experian's Response:** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and seeks irrelevant and confidential information not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections or the General Objections [including Experian's "algorithm objection], Experian will produce responsive, non-privileged documents, if any, identified following a reasonable search.

**VantageScore's Response:** In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous and overbroad. VantageScore objects to this document request to the extent that it could be construed to seek documents that are not in VantageScore's possession, custody or control. VantageScore objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to the extent that the requested information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. VantageScore objects to this request to the extent that it seeks information or documents that may reveal the confidential information, including, without limitation, its algorithm, software, data fields, credit risk generic scoring model, and/or any characteristics of a proprietary scoring model. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.

*Id.* Exh. 5 at 47 (Experian); Exh. 6 at 33 (TransUnion); Exh. 7 at 85 (Equifax); & Exh. 8

at 80-81 (VantageScore). Some of Fair Isaac's document requests (Request Nos. 150,

151, 152, 153) were targeted at tests or studies that the defendants had done to support

some of the specific statements they had made in their advertising about the performance of their VantageScore product. To the extent that those requests would require the production of VantageScore's algorithm or documents regarding the development or testing of VantageScore's algorithm, the defendants also refused to produce those documents. *See id.* Exh. 5 at 52-53 (Experian); Exh. 6 at 37-39 (TransUnion); Exh. 7 at 95-98 (Equifax); & Exh. 8 at 91-94 (VantageScore).

During the parties' meet-and-confer, Fair Isaac—in response primarily to the defendants' vagueness objections—provided to the defendants a detailed list of some of the algorithm-related documents that Fair Isaac was seeking in production. This list was broken down into several categories and served as a supplement, so to speak, to Fair Isaac's requests:

1.    All of the datasets used to develop VantageScore's algorithm. These datasets must include, for example, all of the predictive characteristics, performance characteristics, sample weight variables, and control variables (e.g., match key variables, bureau indicator, etc.). The set of predictive characteristics must include all of the variables relevant to VantageScore's segmentation scheme and any scores used in the segmentation as well as the input characteristics necessary to generate the scores used in the segmentation schemes. As part of this, we will also need documentation describing the list of variables found on the development dataset(s). Documentation also has to include a data dictionary to describe the possible values for every attribute for all characteristics or data elements found on each development dataset.

2.    All of the datasets used to validate VantageScore's algorithm(s). These datasets have to include, for example, all of the predictive characteristics, performance characteristics, sample weight variables, and control variables (e.g., match key variables, bureau indicator, etc.). As part of this, we will need documentation describing the list of variables found on the validation dataset(s) and a data dictionary

to describe the possible values for every attribute for all characteristics or data elements found on each validation dataset.

3. All of the reports that show comparisons of VantageScore to any other score. The underlying data used for the creation of these reports must also be provided, as well as the programs (source code) used for the analysis. As part of this, we will need documentation, in addition to the programs used, that defines all parameters used in the analysis (e.g., what records were excluded from the analysis).

4. A list documenting the competing scores that were analyzed, identifying the scores in detail.

5. All of the reports that purportedly validate (or that fail to validate) VantageScore for prospective customers. This includes the underlying data used for the creation of the validations as well as the programs (source code) used for the analysis. As part of this, we will need documentation that defines all parameters used in the validation (e.g., what records were excluded from the validation). The documentation we need must also describe the list of variables found on the prospective client validation dataset(s) and include a data dictionary to describe the possible values for every attribute for all characteristics/data elements found on the prospective client validation dataset(s).

6. The specifications for VantageScore for each bureau—that is, documentation that provides instruction for the calculation of VantageScore's scores. These specifications include, for example, detailed descriptions of characteristic-generation logic, score-exclusion logic, segmentation logic, and weight (point) assignment for all characteristics and attributes used. The documentation for characteristic logic, again, has to include a data dictionary outlining and defining all valid attributes for each characteristic. Specifications also have to include logic to determine the factors (adverse action codes) that are returned in the generation of a Vantage score.

7. All of the documents related to characteristic leveling, including, for example, all datasets used to research characteristic leveling (these datasets have to include versions of characteristics before characteristic leveling) and documents that describe versions of characteristics before characteristic leveling.

8.    All process-flow diagrams of the VantageScore development process and, for each process, documents that list the technologies/ (statistical) methodologies used. The documentation must including technical specifications of any proprietary techniques that were used (outlining the validity).

9.    For each Bureau, a layout of the specific credit report format. And, for each individual Bureau layout, documents sufficient to identify the fields on the credit report that are used in the generation of a Vantage Score.

Collyard Decl. Exh. 10 at 2-4. The defendants responded to this letter by continuing to refuse to produce anything but documents listed in paragraphs 4 and 9 that are "publicly available or non-proprietary" and—to the extent that they have documents that "relate to the validation testing performed on the VantageScore scoring service" —those documents would be produced ("as much as we can") so long as they don't reveal VantageScore's scoring model, algorithm, or source code. *Id.* Exh. 11 at 1. To date, as far as can be determined, the defendants have not even produced those "non-trade-secret" documents.

## Argument

### I.    The federal rules allow for broad discovery, including of trade secrets

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that, in general, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Discoverable information does not have to "be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Discovery rules mandate

liberality in the scope of discoverable material so that all parties have the information essential to the proper litigation of the relevant facts and to eliminate surprise and to promote settlement. *Hoffman v. Delta Dental Plan of Minn.*, 517 F. Supp. 574, 575 (D. Minn. 1981).  "In determining relevancy, a court must consider a discovery request relevant unless it is clear that the information sought has no bearing upon the subject matter of the action." *Mead Corp. v. Riverwood Natural Res. Corp.*, 145 F.R.D. 512, 522 (D. Minn. 1992). The party resisting discovery has the burden of establishing that the discovery seeks information that is irrelevant or that poses an undue burden on the producing party.  *See, e.g.*, *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692, 695 (D. Minn. 1989); *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan. 1997).

Trade secrets and other confidential information are not exempt from discovery. *See* 8 Wright & Miller, *Federal Practice & Procedure* § 2043; *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merill*, 443 U.S. 340, 362 (1979). "[T]he protection afforded is that if the information sought is shown to be relevant and necessary, proper safeguards will attend disclosure." 8 Wright & Miller at § 2043. Protective orders can be used to resolve any concerns about disclosure. *See In re Remington Arms Co.*, 952 F.2d 1029, 1032 (8th Cir. 1991); *see also Fed. Open Mkt. Comm.*, 443 U.S. at 363 n.24 ("[O]rders forbidding any disclosure of trade secrets or confidential information are rare. More commonly, the trial court will enter a protective order. . . . "); *Kramer*, 126 F.R.D. 695 ("[I]nformation which is of a confidential or proprietary nature is not, for that reason alone, outside the parameters of civil discovery. . . . The appropriate means of maintaining a party's

business confidences is by a protective order."). Consequently, "discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary." *Coca-Cola Bottling Co. of Shrevport v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985) (collecting cases).

As long ago as 1920—before the liberal rules of discovery were even in place—Learned Hand recognized that a party will have to produce what it regards as its trade secrets in litigation:

> "It is true that the result may be to compel the defendant to disclose [trade secrets], and that that may damage the defendant. . . . That is, however, an inevitable incident to any inquiry in such a case; unless the defendant may be made to answer, the plaintiff is deprived of its right to learn whether the defendant has done it a wrong."

*Id.* at 293-94 (quoting *Grasselli Chem. Corp. v. Nat'l Aniline & Chem. Co.*, 282 F. 379, 381 (S.D.N.Y. 1920)).

## II.    The documents requested from the defendants are relevant and necessary and can be protected by a protective order

### A.    The documents are highly relevant to Fair Isaac's false-ad, trade-secret, and breach-of-contract claims

VantageScore's algorithm and the documents relating to the planning for and development and testing of the algorithm are highly relevant to Fair Isaac's claims against the defendants. *See generally* Huynh Decl. (scoring scientist describing the likely documents that exist and the relevance or need for those documents). The documents are relevant to Fair Isaac's trade-secret, interference and breach-of-contract claims, and false-advertising claims.

With respect to Fair Isaac's trade-secret, interference, and breach-of-contract claims, Fair Isaac alleges that TransUnion and VantageScore have misappropriated Fair Isaac's specifications and credit-scoring model and used that trade-secret information in the development of VantageScore, in breach of Fair Isaac's agreements with TransUnion. *See, e.g.*, Second Amend. Complaint ¶¶ 149, 152. Given these claims, the defendants simply have no basis for arguing that VantageScore's credit-scoring model or the specifications for its algorithm are not relevant. Fair Isaac's credit-scoring model and specifications are the very trade-secret information that the defendants are alleged to have misappropriated. Fair Isaac cannot develop the evidence it needs to support its claims unless those documents are produced.

With respect to Fair Isaac's false-advertising claim, the defendants have made certain statements about the efficacy and performance of VantageScore's algorithm, and Fair Isaac maintains that those statements are false or misleading. The defendants, for example, have stated (in various ways) that the scores produced by VantageScore's algorithm are more "predictive" than other scores in the marketplace and more "consistent" and that they are based on "state-of-the-art" designs. Fair Isaac intends to prove that advertising statements like those are false, and Fair Isaac will have the burden of proving those facts by a preponderance of credible evidence. *See Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir. 1996). To do this thoroughly and accurately, Fair Isaac will need to run its own tests using the VantageScore algorithm, to prove that VantageScore's credit scores are *not* more

predictive, more consistent, etc.  *See, e.g.,* Huynh Decl. ¶¶ 4, 7-12 (describing the need for algorithm-related documents).

The fact that the defendants believe that there are other ways for Fair Isaac to go about proving its claims—including by simply relying on test results that *they* will provide to Fair Isaac—is an insufficient basis for withholding production of the documents. In *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 163 F.R.D. 329 (N.D. Cal. 1995), for example, the court enforced a subpoena and ordered nonparty Acer America Corporation to produce confidential or trade-secret information about its practice of using recycled parts in "new" computers. Acer argued that Packard Bell did not need this confidential information because it could use an industry expert to establish that use of recycled parts for "new" computers was an industry practice. In ordering the discovery, the court noted that such an expert must have access to Acer's practices to test whether this comports with industry practice and ordered Acer to disclose the information under a protective order. *Id.* at 338.

In a false-advertising case, even if the defendant stipulates to certain facts, courts have held that defendants must disclose their trade secret under a protective order. In *Heublein v. Gallo,* 1995 WL 168846 (S.D.N.Y. Apr. 7, 1995), the plaintiff made a false-advertising claim about Gallo's margarita-flavored wine coolers, claiming that Gallo misled consumers into thinking that the beverages contain tequila. The plaintiff requested that Gallo produce documents showing the ingredients for its margarita flavored coolers. In response, Gallo objected to producing its formula, calling it irrelevant, and stipulated

that the margarita-flavored coolers did not contain any tequila but rather "natural tequila flavorings." The court held that this stipulation was not enough to satisfy the need for the information and ordered Gallo to produce its formula or enter into a stipulation to the plaintiff's satisfaction to avoid disclosing the formula. *Id.* at *3 (copy at Collyard Decl. Exh. 12).

Trade secrets of parties can be the subject of discovery even if the litigation concerns issues other than misappropriation of the trade secrets themselves. In *Coca-Cola Bottling*, Coca-Cola bottlers alleged that the Coca-Cola Company breached a contract requiring them to sell bottlers the syrup for its new Diet Coke product at a pre-determined price. 107 F.R.D. 288. To enable the bottlers to compare the formula of the product against the formula outlined in the contract, the court ordered the Coca-Cola Company to disclose "one of the best-kept trade secrets in the world"—the formula for Coca Cola. *Id.* at 289.

## B.      The documents are also necessary

In addition to being relevant, the documents and materials that Fair Isaac is seeking are also necessary for Fair Isaac to prepare its case for trial. *See Coca-Cola Bottling Co*, 107 F.R.D. at 293. The need test is completely satisfied if the information sought "cannot be derived in any other fashion." *Compaq*, 163 F.R.D. at 743. Here, Fair Isaac needs VantageScore's credit-scoring model to establish its claims of misappropriation, interference, and breach of contract. There is no other way to possibly prove its claim, for example, that TransUnion and VantageScore have misappropriated

Fair Isaac's trade secrets and other proprietary information other than through an examination of what the defendants contend are their own trade secrets. Similarly, the only way for Fair Isaac to conduct a thorough and accurate analysis of the statements made by the defendants about the efficacy and superior qualities of their scoring-model is to have access to all of the materials that the defendants used or developed themselves before they began their advertising campaign.

### C.   Defendants' concerns about their trade secrets are addressed by Fair Issac's proposed Protective Order

Once a proponent of discovery has shown relevance and need, as explained above, "discovery is virtually always ordered." *Coca Cola*, 107 F.R.D. at 292-93; *see also Compaq*, 163 F.R.D. at 338. "Orders forbidding any disclosure of trade secrets or confidential commercial information," as explained above, "are rare." *Federal Open Mkt. Comm.*, 443 U.S. at 363 n.24. The more common practice is for a district court to "enter a protective order restricting disclosure to counsel or to the parties." *Id.*

Here, Fair Isaac has proposed a protective order that provides that algorithm-related trade secrets can only be disseminated to outside counsel and experts and that certain other security measures must also be followed by counsel and experts to ensure that all algorithm-related documents are kept under lock and key, not duplicated unnecessarily, etc. (These provisions will all be set forth in the proposed protective order that the parties have agreed to submit to the Court on Monday, April 30, for consideration at the same time as the hearing on this motion.) Allowing consultants and experts, in addition to outside counsel, to have access to the requested information is allowable. *See*

*Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992); *see also Quotron Sys., Inc. v. Automatic Data Processing, Inc.*, 141 F.R.D. 37, 40 (D.C.N.Y. 1992)("Protective orders that limit access to certain documents to counsel and experts only are commonly entered in litigation involving trade secrets and other confidential research, development, or commercial information.").

### Conclusion

The defendants' refusal to produce VantageScore's algorithm and documents related to the planning for and development and testing of the algorithm is indefensible. The documents and materials that Fair Isaac seeks are both relevant and necessary in this litigation and Fair Isaac has offered an agreement for a protective order that would adequately protect the information sought. The motion to compel the production of the documents and materials should be granted.

Date: April 25, 2007              **Robins, Kaplan, Miller & Ciresi, L.L.P.**


                                  **By:**    s/Randall Tietjen
                                       Michael V. Ciresi (MN Bar #16949)
                                       Ronald J. Schutz (MN Bar #130849)
                                       Randall Tietjen (MN Bar #214474)
                                       Michael A. Collyard (MN Bar # 302569)

                                  2800 LaSalle Plaza
                                  800 LaSalle Avenue
                                  Minneapolis, MN 55402
                                  Tel: (612) 349-8500
                                  Fax: (612) 339-4181

                                  and

Charles F. (Rick) Rule
Ngoc Pham Hulbig
**Fried, Frank, Harris, Shriver & Jacobson LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 639-7000
Fax: (202) 639-7003

**Attorneys for Plaintiffs**