UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


FAIR ISAAC CORPORATION; and                      Case No. 06-4112 (ADM/JSM)
myFICO CONSUMER SERVICES, INC.,

      Plaintiffs,

v.                                                                                    <u>ORDER</u>

EQUIFAX INC.; EXPERIAN
INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
VANTAGESCORE SOLUTIONS, LLC,

      Defendants.

      JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came on before the undersigned upon defendants' Motion for a Protective Order [Docket No. 82] and plaintiff Fair Isaac Corporation's Motion to Compel [Docket No. 93].  Randall Tietjen, Esq., and Michael Collyard, Esq. appeared on behalf of plaintiffs; Jeffrey Keys, Esq., Peter Kontio, Esq., and Teresa Thebaut-Bonder, Esq. appeared on behalf of defendant Equifax Inc.; Jack Pace, III, Esq., Robert Milne, Esq., and Mark Jacobson, Esq. appeared on behalf of defendant Experian Information Solutions, Inc.; James Gardner, Esq. and Lewis Remele, Jr. appeared on behalf of defendant Trans Union, LLC; and Barbara Berens appeared on behalf of defendant Vantage Score Solutions, LLC.

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

**IT IS HEREBY ORDERED:**

1.      Defendants' Motion for a Protective Order [Docket No. 82] is **DENIED**;

2.      Plaintiff Fair Isaac Corporation's Motion to Compel [Docket No. 93] is **GRANTED**; and

3.      Consistent with the Memorandum following this Order, defendants shall provide amended discovery responses and produce responsive information to plaintiffs on or before August 24, 2007.

Dated:          July 27, 2007

                         s/ *Janie S. Mayeron*
                         JANIE S. MAYERON
                         United States Magistrate Judge

**MEMORANDUM**

## I.      FACTUAL BACKGROUND

### A.      General Background

This matter arises out of the creation of a new credit scoring system, VantageScore, by defendant credit bureaus Equifax Information Services LLC ("Equifax"), Experian Information Services, Inc. ("Experian"), and Trans Union LLC ("Trans Union").   This scoring service competes with plaintiff Fair Isaac Corporation's ("Fair Isaac") FICO scoring service.   The FICO credit scoring range is 300-850, while the credit scoring range for VantageScore is 501-990. See Second Amended Complaint, ¶¶ 3, 64; Experian Answer to Second Amended Complaint ("Experian Answer"), ¶ 64; Equifax Answer to Second Amended Complaint ("Equifax Answer"), ¶ 3; Trans Union Answer to Second Amended Complaint ("Trans Union Answer"), ¶ 3.   Both FICO and VantageScore are generic risk scores that cover the whole population. See Transcript of May 9, 2007 Motions Hearing ("Transcript") [Docket No. 140] at p. 6.

Equifax, Experian, and Trans Union had previously licensed credit scoring algorithms or software from Fair Isaac for use with each of the credit bureaus' particular sets of aggregated consumer data.  <u>See</u> Second Amended Complaint, ¶ 2; Experian Answer ¶ 2; Equifax Answer, ¶ 2; Trans Union Answer ¶ 2.

The VantageScore scoring algorithm was created by experts from Equifax, Experian, and Trans Union during the period of July through October of 2005.  <u>See</u> Declaration of Dana Wiklund ("Wiklund Decl."), ¶ 6.  The VantageScore scoring system is touted as "unique" because it allegedly provides a consumer credit score that is consistent across the databases of Equifax, Experian, and Trans Union.  <u>Id.</u>, ¶¶ 4, 7, 10. At the hearing, defendants described the development of the VantageScore model, and stated that it involved the following: taking a sample of consumer credit data; classifying what qualifies as good credit or bad credit; applying filter characteristics to make the scores consistent across the databases of Equifax, Experian, and Trans Union; and identifying segments of the population that should be scored differently (<u>e.g.</u>, bankrupt versus not bankrupt).  Tr. 8-10.  Next, after developing a different scorecard from each of the segmented populations, the scorecards went through a validation process to determine whether they were better at determining whether a consumer is a good credit risk, than what is available.  Tr. 10, 13.  Defendants performed the validation process by taking a present sample of masked consumer data from the credit bureaus, and then classified the consumers within this data set as either good or bad credit risks.  Tr. 13-14.  Then, using the old and new scoring models, the files of these consumers were pulled from the previous two years to see what they would have theoretically scored at that time.  Tr. 14.  The new archived score was then compared to the old score, based

on how the consumers presently performed.  Id.  In other words, both archived scores were examined to determine which is the better predictor of who was a good and bad credit risk.  Id.

As part of this development process, computer algorithms, which are a set of instructions for applying an aggregate scoring model, were created.  Tr. 10-11.  These instructions tell the computer which scorecard to use.  Tr. 11.  In sum, the VantageScore algorithm is a formula that combines optimal individual credit characteristics and their weighting to compose a model, consistent across the three bureaus, that produces a score for associated predicted future credit performance.  See Wiklund Decl., ¶¶ 6, 7.

On October 11, 2006, Fair Isaac initiated the present action against Equifax, Experian, Trans Union, and VantageScore Solutions, LLC, seeking a wide range of relief, including the dissolution of VantageScore.  Counts One through Four, Six and Seven of Fair Isaac's Second Amended Complaint related to the alleged similarity of the credit scoring range for VantageScore of 501-990, to the credit scoring range for FICO of 300-850.  In particular, Fair Isaac alleged that the use of the VantageScore scoring range of 501-990 constituted unfair competition under 15 U.S.C. § 1125(a); infringement of registered trademark under 15 U.S.C. § 1114; trademark infringement under Minnesota common law; passing off under Minnesota common law; deceptive trade practices under Minn. Stat. § 523D.44; and unjust enrichment under Minnesota common law.  See Second Amended Complaint, ¶¶ 177-196, 204-216.  Count Five of the Second Amended Complaint alleged unfair competition and false advertising under 15 U.S.C. § 1125(a).  Specifically, Fair Isaac asserted that defendants made actual and

implied misrepresentations regarding the credit scoring system as advertised, marketed, promoted and sold.  Id., ¶ 198.  Fair Isaac has also alleged that defendants made many misleading and false representations of fact relating to the qualities and characteristics of their credits scores and Fair Isaac's credit scores, despite the fact that defendants never tested their scores against Fair Isaac's credit scores.  Id., ¶ 98.  These alleged misrepresentations pertained to and included statements regarding the following: the reliability and predictive power of the VantageScore algorithm, focusing on its ability to obtain consistent scores across all three credit reporting companies; the superior scoring methodology of VantageScore; VantageScore's ability to allow creditors to evaluate consumer creditworthiness with significant greater precision; and the statistical modeling techniques of VantageScore.  Id., ¶ 99-103.

Counts Eight through Twelve pertain to federal and state law anticompetitive claims.  Count Thirteen is a breach of contract claim against Trans Union, which alleges that Trans Union violated contract provisions obligating it to keep confidential and not to misuse Fair Isaac's confidential property or trade secrets, and required it to act as an agent for Fair Isaac's products and services.  Id., ¶ 260.  In addition, Fair Isaac asserted that as a result of Trans Union's actions in developing, marketing, and selling Trans Union's in-house products, services and in-house scores, and VantageScore's products and services, Trans Union had breached it contractual duties to Fair Isaac.  Id., ¶261.

Count Fourteen alleges misappropriation of trade secrets against Trans Union and VantageScore.  Specifically, Fair Isaac alleged that "on information and belief", employees or agents of Trans Union who had access to Fair Isaac's trade secret information were involved in the development or sales and maintenance of

VantageScore models or scores in such a capacity that use or disclosure of Fair Isaac's trade secrets and confidential information was inevitable. Id., ¶¶ 263-267.  The final Count, Count Fifteen, alleged interference with contract claim against VantageScore for intentionally inducing Trans Union to breach its contractual duties with Fair Isaac, to not use the confidential information, trade secrets and property of Fair Isaac.  Id., ¶¶ 270-275.

### B.    Request for Production of Discovery Relating to the Algorithm

On January 12, 2007, Fair Isaac served 166 document requests on each defendant, which defined the terms "credit model," "credit-score model," "model," and "VantageScore model(s)," as "the algorithm and the software and process used in conjunction with the algorithm to produce a credit score, and also includes the score itself and any number range associated with that score."   See Affidavit of Jay S. Schlosser ("Schlosser Aff."), Ex. A (various discovery requests by Fair Isaac).   These terms were used in approximately 60 of the 166 document requests propounded by Fair Isaac to defendants.  Defendants brought a motion for a protective order seeking an order "protecting the formula used to calculate the VantageScore credit score because it is a trade secret that is irrelevant to Plaintiff's unsupported claims."  See Motion for Protective Order.  In particular, defendants sought to preclude discovery pertaining to the "actual model, design, algorithm, computer program, portions or drafts thereof and numerous other materials that would reveal the actual model, design or computer program (collectively, the 'Algorithm'), used by Defendants in calculating the VantageScore credit score."[1]  See Memorandum in Support of Defendants' Motion for

---

[1]      During the hearing, defendants represented that they have told Fair Isaac how they classify what qualifies as a good credit or bad credit risk and have produced

Protective Order ("Defs.' Mem.") at p. 1.   At the same time, Fair Isaac filed a motion asking for an order compelling defendants to produce documents and electronically stored information "relating to the credit-scoring algorithm and the planning for and development and testing of the algorithm of defendant VantageScore Solutions, LLC." Fair Isaac's Motion Compel [Docket No. 93].

For the purpose of this decision, this Court will refer to the contested discovery collectively as the "Algorithm" or "Algorithm information."

## II.     ANALYSIS

### A.     Standard of Review

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.   Relevant information need not be admissible at the trial if the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence at trial.   See Fed. R. Civ. P. 26(b)(1) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."); see also Minnesota Specialty Crops, Inc. v. Minnesota Wild, 210 F.R.D. 673, 675 (D. Minn. 2002) ("Generally, discovery may inquire into all information, not otherwise privileged, that is relevant to the subject matter of the action, provided that it is reasonably calculated to lead to the discovery of admissible evidence."); Walker v. Northwest Airlines Corp., No. Civ. 00-2604 MJD/JGL, 2002 WL 32539635 at *1 (D. Minn., Oct. 28, 2002) ("In the context of discovery, 'relevant' has been defined as

---

documents regarding how they segmented the populations.  Tr. 12.  Defendants also represented to the Court that they intended to produce documents created or otherwise used by the VantageScore development team, the raw consumer credit data used to create and test the algorithm, and the results of tests conducted.   See Reply Memorandum of Law in Support of Defendants' Motion for Protective Order ("Defs.' Reply") at p. 2; Tr. 12.

encompassing 'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'") (quoting <u>Hickman v. Taylor</u>, 329 U.S. 495, 501 (1947)).

Defendants argued that it would be an undue burden for them to comply with Fair Isaac's demand for discovery related to the Algorithm, as they would be required to disclose trade secret information that is not relevant to or necessary to the resolution of Fair Isaac's claims.

As a preliminary matter, this Court notes, "'there is no absolute privilege [against disclosure] for trade secrets and similar confidential information.'" <u>Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill</u>, 443 U.S. 340, 362 (1979) (quoting 8 Charles Alan Wright et al., Federal Practice and Procedure § 2043).  However, the Eighth Circuit has recognized that "Federal Rule of Civil Procedure 26(c)(7) anticipates that in certain cases, discovery of trade secrets should either be limited or not permitted."  <u>In re Remington Arms Co., Inc.</u>, 952 F.2d 1029, 1032 (8th Cir. 1981).  Rule 26 provides, in relevant part:

> for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> * * *
>
> (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]

Fed. R. Civ. P. 26(c).

In balancing the protection afforded to trade secrets by Rule 26(c)(7) and the right to access relevant discovery, the Eighth Circuit has formulated the following

burden-shifting test: (1) The party opposing discovery must first demonstrate that the information at issue is a trade secret under Rule 26(c)(7) and that its disclosure would be harmful to the party's interest in the property; (2) the burden then shifts to the requesting party to show that the information is relevant to the lawsuit and is necessary to prepare the case for trial; and (3) if the requesting party demonstrates relevance and need, the court must weigh the injury that disclosure might cause against the moving party's need for the information.  See In re Remington Arms Co., Inc., 952 F.2d at 1032 (citations omitted).

For the purposes of these motions, the parties are in agreement that the Algorithm information sought by Fair Isaac is trade secret information under Rule 26(c)(7) and its unfettered disclosure to Fair Isaac would be harmful to defendants.  See e.g., Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Protective Order ("Pl.'s Opp. Mem.") at p. 6 ("The documents that Fair Isaac is seeking—many of which, Fair Isaac acknowledges are trade secrets (although defendants haven't made the case for that in all respects). . . .").  As such, this Court will focus its deliberation on: (1) whether Fair Isaac has adequately shown that the Algorithm information is relevant to its lawsuit and necessary for its preparation at trial; and if so, (2) whether the injury that disclosure might cause defendants outweighs Fair Isaac's need for this information.

### B.    Whether Algorithm Information is Relevant and Necessary

Fair Isaac asserts that the Algorithm information it is seeking is relevant to its trade secret misappropriation claim against Trans Union and VantageScore, the contract claim against Trans Union, the interference with contract claim against

VantageScore, and its false and misleading advertising claims against defendants.  See Pl.'s Opp. Mem. at pp. 7, 15.

1.    Misappropriation of Trade Secret, Breach of Contract, and Interference with Contract Claims

As stated previously, Fair Isaac alleged in its Second Amended Complaint that "on information and belief," employees or agents of Trans Union who had access to Fair Isaac's trade secret information were involved in the development or sales and maintenance of VantageScore models or scores in such a capacity that use or disclosure of Fair Isaac's trade secrets and confidential information was inevitable. Second Amended Complaint, ¶¶ 263-267.  Defendants do not directly challenge the relevancy of the Algorithm information to Fair Isaac's misappropriation of trade secrets claim.[2]   Instead, defendants argued that Fair Isaac is not entitled to Algorithm information because Fair Isaac has not shown a substantial factual basis for its trade secret misappropriation claim.  See Defs.' Mem. at pp. 20-23.  According to defendants, Fair Isaac's speculation regarding misappropriation, as evidenced by its language "on information and belief" in the Second Amended Complaint, should not be allowed to give Fair Isaac's access to its competitor's highly valuable trade secret information.   Id. In support of this proposition, defendants primarily rely on Puritan-Bennett Corp. v. Pruitt, 142 F.R.D. 306 (S.D. Iowa 1992).  In Puritan-Bennett, the plaintiff corporation brought breach of contract and misappropriation of trade secrets claims against one of its former employees for supplying its competitor with proprietary technology.   142

---

[2]    This Court notes that Fair Isaac's breach of contract claim against Trans Union and its interference with contract claim against VantageScore are dependant, at least in part, on Trans Union's alleged misappropriation of scoring trade secrets from Fair Isaac. See Second Amended Complaint, ¶¶ 260-61, 270-75.

F.R.D. at 307.  The discovery dispute involved a challenge to a subpoena directed to a non-party employee of plaintiff's competitor.  Id.  Although the exact request for information set forth in the subpoena was not set out in the decision, plaintiff was apparently seeking discovery of its competitor's trade secrets.  Id. at 309.  The Puritan-Bennett court, relying in a decision out of the District of Massachusetts, concluded that the party requesting discovery of trade secrets "must first provide a substantial factual basis for its claim" based on other evidence it has gathered through discovery.  Id. at 308-09 (citing Microwave Research Corp. v. Sanders Associates, 110 F.R.D. 669, 674 (D. Mass. 1986)).  The court held that in order for a requesting party to obtain discovery of trade secrets, it must (1) make a showing that there is a substantial basis for its claim; (2) establish the relevance of the trade secrets it seeks and a true need for the information; and (3) establish that the potential harm to the producing party is outweighed by the need for the discovery.  Id.[3]

This Court respectfully declines to follow the test articulated in Puritan-Bennett to the extent that it requires the requesting party to articulate a "substantial factual basis" for its trade secrets claim or "a true need" for the information as prerequisites to obtaining trade secrets from its opponent in discovery.  By adding these requirements, the decision is in conflict with the test articulated in In re Remington Arms Co. for the

---

[3]     Puritan-Bennett appears to have extended the holding in Microwave Research, which only found that a requesting plaintiff must provide a substantial factual basis for plaintiff's claim that the defendant has misappropriated its trade secrets when the plaintiff cannot specify the trade secrets or confidential information which it claims were misappropriated.  See Microwave Research, 110 F.R.D. at 674.  This Court also notes that in requiring that the requesting party provide a substantial basis for its misappropriation claim, the Microwave Research court emphasized that the plaintiff's discovery requests pertained to a broad "range of products either in production or under development without regard to whether the products compete with those which it manufactures and sells."  Id.

production of trade secret information.   The Eighth Circuit only requires that the requested trade secret discovery be "relevant" and "necessary to prepare the case for trial", and provides no condition that the plaintiff provide a substantial factual basis for its claim of trade secret misappropriation or a true need for the information before it receives the discovery.  See In re Remington Arms Co., 952 F.2d at 1032; see generally, Kia Motors America, Inc. v. Autoworks Distributing, Civil No. 06-156 (DWF/JJG), 2007 WL 844674 at *1-2 (concluding that the requesting party was entitled to discovery of possible trade secret information, as there is no authority to support an "argument that a plaintiff must first establish its entire case before it is allowed access to Defendants' information.") (citations omitted).  Indeed, in a later case from the Southern District of Iowa, a different judge concluded that "the Court is not convinced that a plaintiff in trade secret litigation must always prove a substantial basis before it is permitted to obtain discovery." Pioneer Hi-Bred Int'l Inc. v. Syngenta Seeds, Inc., No. 4-02-CV-90541, slip op. (S.D. Iowa May 28, 2003) (Magistrate Judge's Order), accepted in part and set aside in part, slip op. (S.D. Iowa Oct. 8, 2003) (District Court's Memorandum Opinion & Order), attached as Exs. 4, 5 to the Declaration of Randall Tietjen ("Tietjen Decl.").

Further, while both Puritan-Bennett and the case upon which it relies, Microwave Research, are silent on the type or quality of evidence (save that it be gathered during the discovery process) that would constitute "a substantial factual basis to support a misappropriation claim", in Microwave Research, the court did indicate that a "substantial factual basis" would be more than what is needed to comply with the good-faith pleading requirements of Rule 11 Federal Rules of Civil Procedure.  110 F.R.D. at

674.[4]  But, the Eighth Circuit has found that a "'[w]rongful taking of a trade secret can be found based on circumstantial evidence.'" Pioneer Hi-Bred Intern. v. Holden Foundation Seeds, Inc., 35 F.3d 1226, 1239 (8th Cir. 1994) (quoting Roger M. Milgrim, Trade Secrets § 15.01[1], at 15-18 n. 10 (1993) (collecting cases)).[5]  Further, the Eighth Circuit has recognized that in some instances under Minnesota trade secret law, "the secret [may be] so unique that the emergence of a similar, slightly altered product gives rise to an inference of misappropriation."  Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 900 (8th Cir. 2005) (citation omitted).   In light of the Eighth Circuit's recognition that that inferences and circumstantial evidence may be adequate to prove elements of a misappropriation claim, this Court finds that these same inferences and circumstantial

---

[4]      Specifically, the court found that:

> In the instant case, it can be argued that there is a 'factual basis' for Microwave's 'fears and suspicions' that Sanders misappropriated its trade secrets, i.e. the 'fact' that Sanders' employees were given access to the information and cancelled (with no good-faith basis for doing so) an agreement for acquisition shortly after gaining access. These circumstances and the inferences which may be drawn from them may be sufficient under the provisions of Rule 11, F.R.Civ.P. (as amended August 1, 1983) to support a 'belief' by the plaintiff which is 'well-grounded in fact' that trade secrets have been misappropriated, although one can certainly question the degree to which the belief is 'well-grounded' as opposed to merely 'grounded' in fact. But before a plaintiff is entitled to the type of broad discovery into a defendant's trade secrets, it must show that other evidence which it has gathered through discovery provides a substantial factual basis for its claim. In my opinion, the plaintiff has failed to make such a showing in this case.

Microwave Research, 110 F.R.D. at 674.

[5]      This Court notes that although Pioneer Hi-Bred Intern. dealt with Iowa trade secret law, the Eighth Circuit has found that Minnesota trade secret law is similar.  See Wyeth, 395 F.3d at 900.

evidence, and no more, are sufficient to support discovery of trade secrets in the possession of the defendants.

Moreover, even if this Court were to require Fair Isaac to present some quantum of evidence to show that its claims of misappropriation of trade secrets, breach of contract, and interference with contract are grounded in fact and are not shear speculation, this Court finds that Fair Isaac's submission in support of its motion to compel is sufficient to establish the type of circumstantial evidence and inferences that could support its claims against these defendants.   First, there is no dispute that Trans Union is aware of the confidential information Fair Isaac claims was misappropriated. Pursuant to the parties' agreements allowing Trans Union to sell and maintain Fair Isaac's credit services and products, Trans Union has had access to the specifications for Fair Isaac's Classic and NextGen scoring models, which included very detailed documents that explicitly described all the processes required to compute a Classic or NextGen score from credit bureau data.   See Second Complaint, ¶¶ 148-49; Trans Union Answer, ¶¶ 2, 148-49; Declaration of Jeffery M. Towne ("Towne Decl."), Exs. 1, 2 (contractual agreements between Trans Union and Fair Isaac); Second Declaration of Frederic Huynh, ("Second Huynh Decl."), ¶ 6.

Second, both Fair Isaac's and VantageScore's scoring systems are generic risk scores that cover the whole population, and both systems segment data into groups, build scorecards for each group, and then "normalize" or scale the scores to ensure that a given score for each subgroup represents the same degree of risk.   See Second Huynh Decl., ¶ 7.   According to defendants, VantageScore was created to compete with Fair Isaac, and what makes VantageScore unique is the leveling process, thereby

implying that there are similarities to Fair Isaac's scoring model.   See Trans Union Answer, ¶ 2; see also Wiklund Decl., ¶ 4.

Third, Trans Union "admits that certain Trans Union employees who had access to Fair Isaac's confidential information participated in the planning of VantageScore. . . ." See Trans Union Answer, ¶ 152; see also Declaration of Jeffery M. Towne ("Towne Decl."), Exs. 5-6.[6]

Fourth, a November 22, 2004 meeting summary, produced by Trans Union to Fair Isaac, pertaining to the creation of a new company and scoring model, provides that there is a need to find people from each credit bureau "who understand scoring". Towne Decl., Ex. 3.   Similarly, a March 31, 2005 draft proposal from a quantitative decision-support firm, produced to Fair Isaac by Equifax, states that one of the "worksteps" for creating a new scoring system would be to find two to three core team members from each credit bureau, that among other capabilities, had "[f]amiliarity with FICO and similar delinquency/default prediction[.]"   See Proposal to help the three major US Credit Bureaus develop a Tri- Bureau Scorecard (TBS) at p. 5, attached to the July 24, 2007 Letter from Randall Tietjen to the Court.[7]

---

[6]     For this reason, defendants' suggestion that they "will identify the Trans Union employees involved in the development of VantageScore and the materials they used in developing the Algorithm, without disclosing the Algorithm itself, to demonstrate that none of these individuals had access to any Fair Isaac property", is rejected.   See Defs.' Mem. at p. 20.

[7]     In response to the March 31, 2005 proposal, defendants submitted a letter to the Court on July 27, 2007 [Docket No. 149], stating that the document was a preliminary proposal.   Defendants attached a redlined version, to show the changes by the three defendant credit bureaus, and a final version of the proposal.   According to defendants, the bureaus took out all references to FICO because "they did not reflect the bureau defendants' intent with respect to the project."   [Docket No. 149]   The redlined language read, "[f]amiliarity with FICO and similar delinquency/default prediction[.]"   The relevant language of the final proposal was as follows, "[f]rom each bureau we will need two to

Finally, the VantageScore scoring model was developed in less than four months.  See Wiklund Decl. ¶ 6.  This short time frame is contrary to independent opinion that "[t]he process of credit score data collection, modeling, and testing can easily take two years or more."  Tietjen Decl., Ex. 8 (Craig Focardi, *What's the Score? New Risks, Credit Scores, and Revenue Opportunities in US Credit Markets* (March 2007)); see also Second Huynh Decl., ¶ 7 (opining that the short time taken to develop VantageScore is a reason for suspecting that defendants used Fair Isaac's trade secrets in the development of the scoring system).  The inference is that if it took such little time to develop a new scoring model, it must have been based, at least in part, on another scoring model, such as Fair Isaac's model.

In summary, based on the information it has garnered to date, Fair Isaac has satisfied this Court that the Algorithm information it is seeking is relevant and necessary to its claims of misappropriation of trade secrets, breach of contract and interference with contract claims against Trans Union and VantageScore.  There is no dispute that members of the VantageScore development team from Trans Union had access to Fair

---

three core team members with the following combined skills or capabilities: . . Familiarity with delinquency/default prediction".  While the word FICO was taken out of the final proposal, the defendants' stated desire to find employees from each of the bureaus who had "[f]amiliarity" with delinquency/default prediction," still supports the inference that defendants were looking for employees who had familiarity with FICO. Stated differently, how can an employee from each of the bureaus have familiarity with delinquency and default prediction if it is not through exposure to the existing competing prediction model that the employee had worked on at their current place of employment, i.e. FICO?  The Court also notes that while the word "FICO" was replaced throughout the final proposal with more generic phrases such as "delinquency/default prediction", "industry standard scores", "other commercially available scores", "other commercially available models", "other industry scores" and "preexisting scores of a similar type", given defendants' intimate involvement with FICO and admission that the "FICO score is the leading financial credit score in the industry" (e.g. Trans Union Answer, ¶ 2), there can be little doubt that these generic descriptions were referencing FICO.

Isaac's trade secrets regarding its scoring model.  These facts, coupled with the stated desire to employ core members from each of the credit bureaus who had familiarity with delinquency and default prediction to create the new system, the inherit similarities between the scoring models, and the fast-track development of VantageScore, provides a sufficient basis to allow Fair Isaac to obtain Algorithm information from defendants to investigate its misappropriation and related claims against them.  Whether at the end of the day, Fair Isaac will prevail on its misappropriation and associated claims against Trans Union and VantageScore, or defendants will establish that those employees who had access Fair Isaac's trade secrets did not use this information on their work on the VantageScore project, is unknown.  However, what this Court does know is that Fair Isaac need not prove its misappropriation claim before it can receive discovery on the claim, any more than it must it have direct evidence of its trade secrets claim before it is entitled to the Algorithm information to prepare the claim for trial.  See generally, Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 107 F.R.D. 288, 298 (D. Del. 1985) (finding that a party was entitled to Coca-Cola's complete formulae in order conduct an adequate cross-examination).

For all the reasons stated above, this Court finds that Fair Isaac has established that the Algorithm information sought by it is relevant and necessary to its misappropriation of trade secrets claims.

2.    Relevance and Necessity of Algorithm Information to False Advertising Claims

Fair Isaac also asserts that Algorithm-related materials are relevant and necessary to its false and misleading advertising claims against defendants.  See Pl.'s

Opp. Mem. at p. 15.   Examples of these alleged misrepresentations include the following statements:

- The "'consistent predictive power of VantageScore'" can "'achieve the most accurate outcome of risk assessment.'"  See Second Amended Complaint, ¶ 99(f), Ex. 18.

- "'No other model does a better job of delivering objective and consistent credit scoring . . . . VantageScore leverages unmatched data and state-of-the-art modeling techniques.  The result: greater predictive power that leads to better risk management and increased profitability.'"  Id., ¶ 101(a), Ex. 21.

- "'Leveling the attributes across the CRCs contributes to the model's predictive power over scores on the market today.'"  Id., ¶ 101(c), Ex. 22.

- The VantageScore's model "'provides Lenders with more accurate tools. . . .'"  Id., ¶ 102(a)(iii).

- VantageScore "'is a decidedly superior scoring methodology that fills a void in the market. . . .'"  Id., ¶ 102(b)(i).

- "It allows credit grantors to evaluate consumer credit worthiness with significantly greater precision. . . .'"  Id., ¶ 102(b)(ii), Ex. 24.

- VantageScore is "'more predictive that what's in the market.'"  Id., ¶ 102(b)(iii), Ex. 25.

- VantageScore's "'[i]nnovative—Patent pending applications of statistical modeling techniques enable enhanced predictiveness and ensure that consumers will receive more appropriate credit terms.'"  Id., ¶ 103(c).

- "'VantageScore is an innovative consumer credit risk score offering greater consistency and predictability to consumers and credit grantors. Its patent-pending development methodologies enable institutions to rank a consumer's credit worthiness more accurately that other scores currently available in the marketplace.'"  Id., ¶ 103(e), Ex. 4.

Defendants contend that the Algorithm information is not relevant to Fair Isaac's false advertising claims because the alleged misrepresentations are non-actionable puffery, and alternatively, even if the statements were not "puffery," the Algorithm information is not needed to the test the truthfulness of these statements.  See Defs.'

Mem. at p. 18; Defs.' Reply at p. 5; Defendants' Response in Opposition to Plaintiff's Motion to Compel ("Defs.' Opp. Mem.") at p. 14 n. 8.

There are two categories of statements that are actionable under section 43(a) of the Lanham Act, 42 U.S.C. § 1125(a): "(1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers."[8] United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998) (citation omitted).   Conversely, statements known as puffery, which include "(1) exaggerated statements of bluster or boast upon which no reasonable consumer would rely; and (2) vague or highly subjective claims of product superiority, including bald assertions of superiority," are not actionable.   American Italian Pasta Co. v. New World Pasta Co., 371 F.3d 387, 390-91 (8th Cir. 2004) (citations omitted).   An actionable statement must be a "'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'"   Id. (quoting Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999)).   This includes, measurable claims of product superiority but not general claims of superiority.   Id.; see also Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1124 (8th Cir. 1999);   United Industries Corp. 140 F.3d at 1180.

For starters, this Court observes that whether the alleged misrepresentations at issue are actionable is a matter of law that is more appropriately addressed by

---

[8]   False advertising claims under Minnesota law require the same analysis as claims under the Lanham Act.   See Daimlerchrysler AG v. Bloom, 315 F.3d 932, 936, n. 3 (8th Cir. 2003); see also Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc., 822 F. Supp. 1437, 1441 (D. Minn. 1993) (finding that analysis of false advertising claims under Minnesota state law under Minn. Stat. § 325D.44, is "substantially similar to that applicable to federal claims under the Lanham Act.").

defendants upon a motion to dismiss, or via a motion for summary judgment, than in a discovery motion.  See LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1489 (D. Minn. 1996) ("[T]he issue of whether a statement is false or misleading, or 'mere puffery,' is one which is appropriate for resolution as a matter of law.") (citation omitted).  Nevertheless, this Court notes that many of the statements at issue are not mere puffery, given defendants' representations that their claims regarding performance can be tested, albeit without the disclosure of the Algorithm.  See Defs.' Mem. at p. 18 ("These alleged statements can be evaluated without using the Algorithm itself."); Defs.' Opp. Mem. at pp. 14-15 ("The statements to which Plaintiff points in support of its false advertising claims are not actionable.  And even if they were actionable, they ultimately relate to the predictive power of the scores generated by VantageScore, *i.e.* the *output* of the algorithm—which Defendants have agreed to produce.") (emphasis in original).  Since, defendants concede that the claims of greater predictiveness are measurable, this Court finds that they are relevant for discovery. [9]

With respect to defendants' assertion that the statements at issue can be evaluated without the use of the Algorithm information, defendants contend that the veracity of the statements regarding VantageScore's performance can be tested by simply looking at data used to create VantageScore and the numerous validations and

---

[9]    This Court observes that claims such "innovative" and "state-of-the-art" (see Second Amended Complaint, ¶¶ 101(a), 103(c)) may be more akin to non-actionable puffery, while the claim that VantageScore is based '[p]atent pending applications of statistical modeling techniques" is a factual claim that can be validated by checking with the Patent and Trademark Office.  See, e.g., LensCrafters, Inc., 943 F. Supp. at 1489 (noting that assertion that claims a company had "the best technology" have been deemed to be mere puffery); Atari Corp. v. 3D0 Co., No. C 94-20298 RMW (EAI), 1994 WL 723601 at *2 (N.D. Cal. 1994) (stating that a manufacturer's slogan that its product was "the most advanced home gaming system in the universe" was non-actionable puffery).

tests performed.   <u>See</u> Wiklund Decl., ¶¶ 17-24.   Stated differently, defendants argue that the predictive output of the VantageScore model (applying the algorithm to credit data), as opposed to what makes the model run (the composition of the Algorithm), is the relevant inquiry as to whether their alleged statements regarding the VantageScore scoring system were false, and therefore, the Algorithm information is not needed to investigate the validity of their advertising claims.

In response, Fair Isaac countered that it needed access to all the data, segmentation methodology, and the Algorithm information to properly examine defendants' claim that VantageScore is a scoring model that outperforms other models on the market.   <u>See</u> Second Huynh Decl., ¶ 4.   Fair Isaac's argument centers on its claim that it cannot perform its own validation of VantageScore's advertised results without the Algorithm information.   <u>Id.</u>   As argued at the hearing by the parties, the issue boils down to this: if a party claims that as a result of its technology, it has created the fastest car, it is defendants' position that you only have to drive the car to validate the claim, while Fair Isaac asserts that you also have to look under the hood to determine whether it was the technology that caused the car to go so fast.   Tr. 14, 15, 42-43.

This Court finds that the Algorithm information sought by Fair Isaac's is necessary to investigate Fair Isaac's false advertising claims.   In a variety of statements, VantageScore has touted its "modeling techniques", "scoring methodology", "[p]atent pending applications of statistical modeling techniques",  and "patent pending development methodologies," as the reason that its scoring system is better at predicting scores.   <u>See</u> Second Amended Complaint, ¶¶ 101(a), 102(b)(i), 103(c), 103(e), Ex. 21.   Fair Isaac should be able to test the veracity of these statements, and

examine the modeling techniques and methodologies that underlie these representations. Therefore, this Court concludes that Fair Isaac should be allowed to obtain the Algorithm information to conduct its own investigation of the truthfulness of defendants' representations regarding the techniques and methodologies that make their scoring system more predictive than other scoring systems. Indeed, defendants have represented that the Algorithm is "the actual means by which it uses credit data to predict creditworthiness. . . ." See Defs.' Mem. at p. 2. For all the reasons stated above, this Court finds that Fair Isaac has adequately established that the Algorithm information sought by it is relevant and necessary to its false advertising claims.

### D.     Injury Versus Need

Fair Isaac has adequately demonstrated the relevance and need of the Algorithm-related discovery. Therefore the Court must now weigh the injury that disclosure might cause defendants against Fair Isaac's need for the information. See In re Remington Arms Co., Inc., 952 F.2d at 1032. Defendants argued that the lack of relevance of the Algorithm information, coupled with the fact that the Algorithm is essentially the only asset of VantageScore and is the only way VantageScore can compete against the "dominant" Fair Isaac in the scoring market, weighs against its disclosure to Fair Isaac. See Defs.' Mem. at p. 23. With regards to the injury that could result if their Algorithm information were disclosed to Fair Isaac, defendants maintain that "[i]f the Algorithm information became public knowledge, then competitors, such as Fair Isaac, could copy or incorporate VantageScore methodologies into their own services." See Wiklund Decl., ¶ 10. Defendants also point out that Fair Isaac has conceded that success in the credit-scoring industry depends on maintaining the

confidentially of their trade secrets.  See Defs.' Opp. Mem. at pp. 18-19 (citing Plaintiffs'

April 30, 2007 Letter Brief to the Court).

In weighing the possible injury from production of the Algorithm information

against the need for it, this Court starts with the premise that "orders forbidding any

disclosure of trade secrets or confidential information are rare."  Federal Open Mkt.

Comm. of Fed. Reserve Sys., 443 U.S. at 363 n. 24.  In fact, "discovery is virtually

always ordered once the movant has established that the secret information is relevant

and necessary." Coca-Cola Bottling Co., 107 F.R.D. at 293 (collecting cases); see also

3M Innovative Properties Co. v. Tomar Electronics, Civil No. 05-756 (MJD/AJB), 2006

WL 2670038 at *10 (D. Minn. Sept. 18, 2006) ("Where information is relevant and

necessary to the presentation of a case the consequence of disclosure of a trade secret

is not a bar to discovery.") (citation omitted).  Even the Eighth Circuit in In re Remington

Arms Co., Inc., found that if the requesting party could show the relevancy and need for

trade secret discovery, then "it is incumbent upon the district court to utilize its authority

to issue an appropriate protective order to safeguard the rights of the parties."  952 F.2d

at 1033.

Defendants rely on the decision on remand from In re Remington Arms Co., Inc.,

for the proposition "courts should err on the side of non-disclosure where the party

seeking discovery is a direct competitor."  See Defs.' Mem. at p. 22 (citing Hartman v.

Remington Arms Co. Inc., 143 F.R.D. 673 (W.D. Mo. 1992)).  In Hartman, the court

concluded that the parties' competing interests weighed in favor of precluding a plaintiff

in a products liability case, from obtaining the designs of defendant's product. 143

F.R.D. at 678.   Defendants would have this Court interpret this case to create a

presumption against discovery of a trade secret every time the litigation is between two industry competitors.   This Court rejects such a suggestion.   Such a finding would severely restrain a party from alleging, much less investigating, and proving up a claim of misappropriation of trade secrets, as most of these cases involve claims against competitors.   Rather, the better view is that when assessing the potential damage to the party resisting discovery, what should be taken into account by a court "is not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." Coca-Cola Bottling Co., 107 F.R.D. at 293.   Therefore, where a party has made a good faith misappropriation claim, and has shown the relevance and need for information bearing on that claim, courts have rejected the suggestion that a party should be precluded from obtaining trade secret information from their opponent in discovery, and instead have permitted discovery of this information subject to a protective order.   See e.g., 3M Innovative Properties Co., 2006 WL 2670038 at *2, *10 (requiring the disclosure of trade secrets to a competitor, given the "attorney-eyes only" designation provide for in an applicable protective order); Heublein, Inc. v. E & J Gallo Winery, Inc., 94CIV.9155 (JFK)(AJP), 1995 WL 168846 at *3 (S.D.N.Y. April 07, 1995) (finding that although the information sought by a competitor was trade secret, its discovery was appropriate in light of the availability of a protective order); Ares-Serono, Inc. v. Organon International B.V., 151 F.R.D. 215, 219-20 (D. Mass. 1993) (acknowledging the danger of providing trade secret information to a competitor, but nevertheless concluding that the existing protective order provided the producing party adequate protection).

Under this Court's Amended Protective Order [Docket No. 144], disclosure of Algorithm information is limited to outside counsel (including their support staff) and outside independent experts and is subject to many other restrictions.  See Amended Protective Order [Docket No. 144], ¶ 21.  Defendants have provided this Court with no evidence to conclude that Fair Isaac's outside counsel or its independent experts would violate the protective order and disseminate this Algorithm information to Fair Isaac or the public, or use it for any other purpose than this litigation.  As such, this Court is satisfied that the protective order will prevent the lawyers and experts from misusing this information.  See Ares-Serono, Inc., 151 F.R.D. at 220 (allowing discovery of trade secret information by a competitor where a protective order limited disclosure to outside litigation counsel, independent experts, paralegals and clerical employees); see also Quotron Systems, Inc. v. Automatic Data Processing, Inc., 141 F.R.D. 37, 40 (S.D.N.Y. 1992) ("Protective orders that limit access to certain documents to counsel and experts only are commonly entered in litigation involving trade secrets and other confidential research, development, or commercial information.") (string citation omitted).

In conclusion, Fair Isaac's need for the Algorithm information to investigate its misappropriation, false advertising, and associated claims, outweighs the alleged harm to defendants from the disclosure to Fair Isaac of their Algorithm information pursuant to the Amended Protective Order.

## III.    CONCLUSION

For all the reasons stated above, this Court denies defendants' Motion for a Protective Order and grants Fair Isaac's Motion to Compel.  All Algorithm information

sought in Fair Isaac's Fair Isaac's Motion Compel [Docket No. 93] shall be disclosed in manner that is consistent with the Amended Protective Order [Docket No. 144].

J.S.M.