**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Fair Isaac Corporation; and myFICO
Consumer Services, Inc.,

                Plaintiffs,

v.

Equifax Inc.; Equifax Information Services
LLC; Experian Information
Solutions Inc.; Trans Union, LLC; and
VantageScore Solutions, LLC ; Does I
through X,

                Defendants.

Civil Action No: 06 CV 4112 DSD/JJG

**Plaintiffs' Memorandum of Law in
Support of their Motion to Compel**

## Introduction

       The defendants have taken an unreasonably narrow and restrictive view of what

constitutes relevant subject matter.  They have made three broad sweeping general

objections to Fair Isaac's document requests that would omit a potentially large volme of

relevant documents from production:  (1) they have refused to search for or produce any

information from their sales force personnel, the very people who are in charge of selling

the credit-scoring products and services at issue in this case; (2) they have refused to

search for and produce information about resellers—organizations who, like financial

institutions, actually buy (and even sell) the products and services at issue; and (3) they

have refused to provide the names and contact information of the individual end

consumers who have purchased credit scoring products or services from defendants. The

defendants have also refused to produce documents in response to specific requests that relate to key pricing information and communications that the defendants have had with others about Fair Isaac and its products and services.  The defendants have also refused to produce "in-house" algorithm information, apparently on "secrecy" grounds.  These and other issues in dispute are all described in detail below.

## Background

Fair Isaac is in the business of developing algorithms and software for generating consumer credit scores for financial institutions, consumers, and others, using data collected by the three defendant credit bureaus (Equifax; Experian; and Trans Union) (the "Bureaus").   The Bureaus license Fair Isaac's scoring system for use with each Bureau's respective data and use Fair Isaac's scoring models to sell credit scores to financial institutions ("lenders"), resellers, individual consumers, and others.  In March 2006, the Bureaus announced that they had formed a joint venture—the defendant VantageScore— and that VantageScore would be offering its own consumer credit scores that the Bureaus would sell to these same customers. This credit scoring system competes with Fair Isaac's credit scoring system.

On October 11, 2006, Fair Isaac brought this lawsuit against the defendants, seeking relief based on many claims.  In particular, Fair Isaac alleged claims:

- that defendants, including their new joint venture (VantageScore),  are infringing Fair Isaac's 300-850® trademarks by using confusing similar credit scoring ranges and credit scores, in violation of Section 43(a) of the

Lanham Act;

- that the defendants have made false and misleading representations of fact about the nature or quality of the credit scores offered by VantageScore, and they have even made misleading statements to lure consumers into buying their in-house credit scores and VantageScore's credit scores while making them think that they were purchasing a Fair Isaac credit score, in violation of Section 43(a) of the Lanham Act;

- that the joint creation and ownership of VantageScore represents an agreement to limit competition among the Bureaus, in violation of Section 1 of the Sherman Act, and an illegal merger or acquisition under Section 7 of the Clayton Act and Section 1 of the Sherman Act; and

- that the defendants' actions represent an attempt to monopolize and a conspiracy to monopolize the market for consumer credit scoring, in violation of Section 2 of the Sherman Act.

Fair Isaac's Second Amended Complaint adds additional instances of trademark infringement by two of the defendants (Experian and TransUnion) for the use of the plaintiffs' FAIR ISAAC® and FICO® trademarks and passing-off allegations against all of the defendants. The Second Amended Complaint also adds claims relating to Trans Union's and VantageScore's misappropriation of Fair Isaac's trade secrets and Fair Isaac's contracts with TransUnion, including claims:

- that TransUnion and VantageScore misappropriated Fair Isaac's trade

secrets and proprietary information, including but not limited to its

algorithms or specifications for its credit-scoring models;

- that TransUnion breached its agreements with Fair Isaac by, among other

things, misappropriating Fair Isaac's trade secrets or other property and by

allowing employees who have had access to Fair Isaac's confidential or

trade-secret information to be involved in the development of

VantageScore's competing algorithm and scoring model; and

- that VantageScore interfered with Fair Isaac's contracts with TransUnion

by inducing TransUnion to breach those contracts.

## Argument

The information that Fair Isaac is seeking in this motion to compel is relevant to

its claims in this lawsuit.  Rule 26(b)(1) of the Federal Rules of Civil Procedure provides

that, in general, "[p]arties may obtain discovery regarding any matter, not privileged, that

is relevant to the claim or defense of any party." Discoverable information does not have

to "be admissible at the trial if the discovery appears reasonably calculated to lead to the

discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Discovery rules mandate

liberality in the scope of discoverable material so that all parties have the information

essential to the proper litigation of the relevant facts and to eliminate surprise and to

promote settlement. *Hoffman v. Delta Dental Plan of Minn.*, 517 F. Supp. 574, 575 (D.

Minn. 1981).  "In determining relevancy, a court must consider a discovery request

relevant unless it is clear that the information sought has no bearing upon the subject

matter of the action." *Mead Corp. v. Riverwood Natural Res. Corp.*, 145 F.R.D. 512, 522 (D. Minn. 1992). The party resisting discovery has the burden of establishing that the discovery seeks information that is irrelevant or that poses an undue burden on the producing party.  *See, e.g.*, *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692, 695 (D. Minn. 1989); *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan. 1997).

The defendants have made general objections that apply to all of Fair Isaac's document requests and they have made objections that apply only to specific document requests.  For defendants' general objections, Fair Isaac does not recite all of the requests or responses that the general objections apply to (this is in accordance with the Court's order dated August, 7, 2007).  Instead, Fair Isaac lists the request numbers that these objections are most applicable to (even though the defendants assert them across the board for all requests).  For defendants' objections to specific requests, Fair Isaac recites those actual requests and provides all of defendants' responses and objections to the requests in accordance with Local Rule 37.

## I.    The Defendants' Three Broad-Sweeping General Objections

### A.    The defendants' general objection to search their sales force files will likely exclude many documents relevant to Fair Isaac's antitrust, false advertising, and trademark claims.

The defendants have refused to search for responsive documents in the files of their sales force people who are in charge of selling the very credit scoring products and services at issue in this case.  The defendants have asserted this general objection to all of Fair Isaac's document requests, but their general objection is most relevant to Fair Isaac's

document request nos. 19, 20, 21, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38,

39, 41, 42, 48, 49, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 64, 65, 66, 68, 71, 72, 77, 80, 81,

82, 83, 84, 85, 88, 89, 90, 91, 94, 95, 100, 101, 102, 103, 107, 108, 110, 111, 112, 113,

114, 115, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 129, 130, 131, 140, 145,

147, 149, 150, 151, 152, 153, 154, and 155 in its first set of document requests to

defendants. *See* Declaration of Mary Kiedrowski ("Kiedrowski Decl."), Exhs. 1-4

(Defendants' Objections to Fair Isaac's First Set of Document Requests).

One of the unique facts in this case is that the Bureau defendants (not Fair Isaac)

sell all of the products and services at issue.  More specifically, they not only sell their

own products and services, and VantageScores' products and services, but, at the same

time, they sell Fair Isaac's products and services, all to the same customers (e.g.,

financial institutions ("lenders"), resellers, each other, and other third parties).  With

respect to Equifax and Trans Union, they sell Fair Isaac's products and services to

individual consumers too.  In fact, for many of the Bureaus' larger lender-type clients and

for nearly all of the Bureaus' smaller lender-type clients, the Bureaus exclusively control

the relationship with those lenders.  For example, with respect to the Bureaus' smaller

lender clients, the Bureaus are the ones who have the day-to-day communications with

the lenders and they are the ones who set the prices that the lenders are charged.  They set

the credit score price, they set the price of the credit data being sold/licensed, and they set

the price of the processing fees that they charge to generate the credit score.

The Bureau defendants rely heavily on their sales force people to make these sales. These are the people in the "trenches," so to speak.  They are the ones who have the conversations with the lenders about the qualities and the characteristics of the scores that they are selling.  And they are the ones who talk with the lenders about pricing and explain which models can best meet their needs.  These sales force people are therefore the ones most likely have information about the key communications that the defendants actually had with lenders about Fair Isaac's and defendants' credit scoring products and services.

These communications will likely include a whole host of relevant information. The following are just a few examples of the types of information that Fair Isaac expects would be found in these files:

- information related to the marketing pitches and sales tactics used to sell VantageScore or Fair Isaac's FICO® credit scores to the various lenders and other consumers

- information related to the communications that the sales people had with the lenders and others about the reasons to purchase or test VantageScore

- information related to the communications that the sales force people had with lenders and others about test results that the sales people are familiar with or that the lenders or others told them about

- information related to the communications that the sales people had with consumers about which scores or models are more predictive or their reasons for why certain models are better or worse for a particular lender

- information related to the communications that the sales people had with lenders or others about pricing, the reasons for certain prices, and the actual or potential prices that were charged for credit scores and credit data

- information related to the communications that lenders and others had with sales force people about the need for a better or more consistent score

- information related to the communications that the sales people had with lenders and others about the scoring ranges used by Fair Isaac and the defendants

- information related to consumer confusion.

This type of information relates to many of the key antitrust, false advertising and trademark issues in this case and is therefore reasonably calculated to lead to the discovery of admissible evidence.  In fact, from the recent meet and confers between counsel, it appears that the defendants themselves do NOT, and cannot, dispute that this type of information is relevant to this case.  But still, the defendants refuse to search for this relevant information and have only agreed to search the files of their "top-level marketing and/or sales employees that are reasonably likely to have responsive documents."

The defendants' sole reason for their limitation to "top-level" people is that they claim that there are "hundreds" of sales force people and the defendants suspect that these people will only have information that is duplicative of the other information that they are gathering.  But the defendants have made no guarantees that this is true, nor can they. Nor have they shown why it would be too burdensome to search for this information, let alone how their burden in searching the sales force files outweighs the importance of this critical information.  Defendants' counsel even told Fair Isaac during its last meet and

confer that they haven't even contacted  these sales force people to see what information they might have or how they could go about gathering information from them.

Any burden that the defendants claim exists in searching the files of their sales force people cannot outweigh the importance of the information requested by Fair Isaac. Indeed, the Bureaus' top-level people are only a small part of the universe of people who will have relevant and responsive information to Fair Isaac's requests.  And the top-level people are not likely to contain all of the information requested by Fair Isaac, let alone even the most critical information sought by Fair Isaac, for the simple reason that, unlike the sales force people, these top-level people are not the ones who have the daily communications with lenders, resellers, consumers, or others during the sale process.

Therefore, any burden that the Bureaus claim they will incur in searching the files of their sales force people is far outweighed by Fair Isaac's need for the information requested and that the sales force people are most likely to have.

**B.      The defendants' general objection to search for information about "resellers" will exclude the same type of information that the defendants have already agreed is relevant to Fair Isaac's antitrust, false advertising, and trademark claims.**

The defendants made a general objection to Fair Isaac's definition of "lender" in its first set of document requests to defendants because it included "resellers" in the definition. The defendants have said that they will NOT actively search for any information about resellers, other than their "pricing tables" for the "sales" that they have made to resellers.  *See* Kiedrowski Decl., Exh. 12 (April 3, 2007 letter from Dao L. Boyle

to Michael A. Collyard, at pp.2-3).  The defendants have asserted this general objection to all of Fair Isaac's document requests, but their general objection is most relevant to Fair Isaac's document request nos. 6, 19, 20, 21, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 41, 42, 48, 49, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 64, 66, 65, 68, 71, 72, 77, 80, 81, 82, 83, 84, 85, 88, 89, 90, 91, 94, 95, 100, 101, 102, 103, 107, 108, 110, 111, 112, 113, 114, 115, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 129, 130, 131, 140, 145, 147, 149, 150, 151, 152, 153, and 154 in its first set of document requests to defendants.  *See* Kiedrowski Decl., Exhs. 1-4 (Defendants' Objections to Fair Isaac's First Set of Document Requests).

Some brief history on who "resellers" are will be helpful to understand Fair Isaac's position.  The Bureau defendants sell credit data and credit scores to many different business consumers, including lenders (e.g., financial institutions that might range from the largest credit companies in the world to the smallest local banks) and "resellers."  Resellers buy credit scores and data from the Bureaus and resell the credit scores and data to other business organizations and consumers in the general public.  And just like with lenders, the Bureaus license the use of their credit data and credit scores to resellers.

Fair Isaac's document requests seek not only the prices that the Bureaus charge for credit scores and credit data, but also the information relating to that pricing and the communications that they had with others about the products and services that they sell. These types of requests call for similar information from lenders and resellers.  So for

simplicity reasons in drafting its document requests, Fair Isaac defined lenders to include resellers. Specifically, Fair Isaac defined the terms "Lender" or "lenders" to be: "a financial institution(s) or other firms(s) in the business of regularly extending credit to consumers (defined below), as well as resellers of credit scores or credit-related data or information about consumers." *See* Kiedrowski Decl., ¶ 3. That way, Fair Isaac wouldn't have to specifically mention both lenders and resellers in every one of its requests. But sometimes, Fair Isaac did refer to "resellers" specifically in its requests. And as Fair Isaac explained many times to defendants in the meet and confers on this subject, this in no way limited Fair Isaac's other requests that mentioned lenders but not resellers.

The defendants appear to base their objection on relevancy and burden grounds. For relevancy, they say that this case is about the Bureaus' interactions with lenders and not resellers. But the defendants are wrong. Resellers are just as relevant to Fair Isaac's antitrust, false advertising, and trademark claims as lenders are because they buy the credit scoring products and services at issue—and they sell them too. And because the defendants have already agreed that the information requested from lenders—which is the same type of information requested from resellers—is relevant to this case, there is no basis for the defendants to claim that the reseller information is not relevant.

For example, with respect to Fair Isaac's false-advertising claims, Fair Isaac needs to know what the defendants have said to customers about their credit-scoring products and services and Fair Isaac's credit-scoring products and services. Just like the

communications that Bureaus would have had with lenders, the Bureaus would have talked with resellers about all of these products and services when they were trying to sell them to the resellers.  These communications would have likely included, among other things, statements the Bureaus made to resellers about the predictiveness of VantageScore's scores compared to Fair Isaac's FICO® credit scores or the Bureaus' in-house scores.

In addition, resellers, like lenders, may also be testing VantageScore's scores and the Bureaus will likely have information about that testing.  This type of information is also relevant to the statements that defendants have made about the features of VantageScore and might even show that the defendants' statements are false.

With respect to Fair Isaac's antitrust claims, more information than just "pricing tables" for the sales to resellers is relevant.  For example, Fair Isaac needs to know not only the prices that appear on defendants' reseller price lists, but the prices that were offered and the prices that were actually charged for credit scores and credit data.  And just like the communications that the defendants had with lenders about prices, they would have had communications with resellers about the actual negotiations of prices for credit scores and credit data and the reasons why resellers were charged the prices that they were charged for these products.  As another example, the Bureaus might have had communications with resellers about what they can and cannot sell to Fair Isaac.  They might have also had communications about the pricing of certain products like 3-in-1 credit reports and the reasons why resellers are able to purchase 3-in-1 credit reports from

the Bureaus but others are not.  All of this information would be relevant to show the defendants' exclusionary conduct and their price manipulation for the products and services at issue in this case.

Reseller documents are also relevant to Fair Isaac's claims that the bureaus are infringing Fair Isaac's 300-850® trademarks.  The Bureaus likely had communications with resellers about the scoring ranges that they use for their credit-scoring products and the scoring ranges used by Fair Isaac. Additionally, because resellers are consumers themselves, and because they interact with other consumers and resell scores to consumers, it is very likely that documents relating to consumer confusion would be found in the reseller documents.   For all of these reasons, the Bureaus' reseller documents are relevant to this case.

With respect to defendants' objection on burden, the only explanation that the defendants have given Fair Isaac is that the reseller documents are not part of the same division of their companies as the lender documents are.  In other words, the defendants would need to search the records of more employees.  This is not a legitimate objection. Whatever burden the defendants can claim to exist here, it is outweighed by Fair Isaac's need for this relevant information.  If anything, it just shows that right now, defendants' productions don't include they key information about resellers and therefore, the defendants need to do a search for this information.

**C.    The defendants' refusal to provide the names or contact information for individual consumers will prevent Fair Isaac from gathering key evidence in this case.**

The defendants have objected to producing any information in response to any of Fair Isaac's document requests that would reveal the identity of any individual consumer. This would include the identity of any person who has either purchased a credit scoring product or service from the defendants, inquired about any defendants' or Fair Isaac's products or services, or had communications with the defendants (or anyone else that the defendants are aware of) that relate to consumer confusion.  Although the defendants have applied this general objection to all of Fair Isaac's requests, the defendants' general objection is most applicable to Fair Isaac's document request nos. 19, 20, 21, 26, 27, 28, 29, 30, 31, 33, 34, 35, 38, 41, 60, 61, 64, 66, 68, 71, 77, 80, 81, 102, 107, 117, 118, 119, 120, 121, 125, 126, 127, 153, and 154 in its first set of document requests and request nos. 13, 14, 15, and 16 in its third set of document requests to Experian and Trans Union. *See* Kiedrowski Decl., Exhs. 1-4; 9-10 (Defendants' Objections to Fair Isaac's First Set of Document Requests and Defendants' Objections to Fair Isaac's Third Set of Document Requests to Experian and Trans Union).

Here, except for request no. 107, in which Fair Isaac seeks the actual customer lists of the defendants, the issue is not whether the defendants have agreed to produce information in response to Fair Isaac's requests, but instead, the issue is whether the defendants can redact the basic information that will identify the name and contact information of the consumer (e.g., the person's telephone number or address) that appears

in the document responsive to Fair Isaac's requests.  For any request calling for a document that contains a consumer's identity, the defendants are redacting that information and producing the responsive document in its redacted form.  The defendants reason for this appears to be two fold: first, they object on the basis that this information is highly sensitive to their business (similar to their "secret-sauce" arguments that they have made in the past) and second, they have taken the position that they can't disclose even the most basic information about a consumer's identity under certain privacy laws. Neither of these reasons justify redacting the basic and necessary information that Fair Isaac is requesting.

To be clear, Fair Isaac understands that under data privacy laws, it is not entitled to certain information about a consumer, for example, the consumer's social security number, credit card numbers, or the consumer's banking information.  And Fair Isaac isn't asking for this type of information. All Fair Isaac is asking for is the basic identification information about the consumer which would include the consumer's name, telephone number, address, or email address, if available.

Fair Isaac needs this information for many reasons.  For example, Fair Isaac needs to know who is purchasing the defendants' credit scoring products and services and why. The only way it can find out this information is by talking with the people who actually purchased the products.  These people will have information about the reasons why they purchased the products, the statements they relied on in doing so, and even information about what they thought they were getting as compared to what they actually got (this

goes to the false-advertising and trademark claims).  Fair Isaac will want to know similar

information for why consumers purchased Fair Isaac's products and services from the

defendants.

   If this type of information were not discoverable, Fair Isaac would not be able to

gather critical evidence that could help prove its claims.  For example, if the defendants

produce a communication with a consumer that showed the consumer was confused, Fair

Isaac would have no way of contacting that person to ask them questions about their

potential confusion or even have enough information to depose them if necessary.  This is

why this type of information is discoverable in trademark cases.  *See Fryer v. Brown*, No.

C04-5481 FDB, 2005 WL 1677940, at *6 (W.D. Wash. July 15, 2005) (concluding that a

protective order could address privacy concerns and "all information related to []

confusion, including customer lists are discoverable" in trademark infringement cases)

(Kiedrowski Decl. Exh. 22).

   Moreover, as the *Fryer* case discusses, this basic information will be protected

under the court's protective order.  Fair Isaac fully expects that any information that is

produced that identifies a consumer will be designated as Attorneys' Eyes Only under the

protective order and nobody at Fair Isaac will have access to that information.

   Accordingly, Fair Isaac requests that defendants be required to produce all of their

price lists responsive to Fair Isaac's Document Request No. 107, and that defendants also

be required to produce the information responsive to Fair Isaac's requests identified

above in a manner that does not redact out the name or contact information (if it exists in

the document) for consumers.

**II.      The Defendants' Objections to Specific Document Requests in Fair Isaac's First Set of Requests to Defendants.**

   **A.      In response to Request No. 38, defendants have refused to produce information about the key communications that they have had with consumers about their prices for Fair Isaac's credit scoring products.**

   **Request No. 38:** All documents relating to your actual or potential price increases to any lender or consumer for Fair Isaac's scores.

**EQUIFAX Response to No. 38:**  Equifax incorporates by reference its General Objections.  Equifax objects to this request to the extent it seeks information related to sales to consumers.  Credit grantors are the primary purchasers of credit risk scoring services, and their purchases are the only ones relevant to the claims and defenses in this case.  Indeed, Equifax does not even offer the VantageScore scoring service or an Equifax scoring service to consumers, but instead only offers to consumers a credit risk scoring service using FICO's scoring algorithm.  To the extent this request seeks information regarding consumers, the request is overly broad, unduly burdensome and seeks irrelevant information not likely to lead to the discovery of admissible evidence.  Equifax objects to this request to the extent it seeks information regarding Equifax's unilateral pricing decisions with respect to its sale of Fair Isaac's scoring services or its own services.  Equifax's unilateral pricing decisions are not at issue in this case.  Equifax further objects to this request because it is overly broad and unduly burdensome.

**TRANS UNION'S RESPONSE:** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**EXPERIAN'S RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**VANTAGESCORE'S RESPONSE:**  In addition to the general objections set forth above, VantageScore objects to this document request to the extent it could be construed to seek documents that are not in the possession, custody or control of VantageScore. VantageScore objects to the assumptions underlying this request.  VantageScore's stated

purpose is to educate the industry and public about its credit risk generic scoring model. VantageScore charges a licensing fee to the Bureaus for use of its model. VantageScore does not sell its credit risk generic scoring model or any credit score. VantageScore objects to this document request as overly broad, unduly burdensome and to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. Vantage Score objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege. Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession at the present time that are responsive to this request.

The Bureaus have only agreed to produce transactional data sufficient to show the prices charged to lenders or consumers for Fair Isaac's scores and their pricing plans and strategies for the scores. *See* Kiedrowski Decl., Exh.14 at p. 4 (July 20, 2007 Letter from Teresa Bonder to Michael Collyard). This limitation excludes many documents that are both relevant and necessary to Fair Isaac's antitrust claims.

One issue related to Fair Isaac's antitrust claims is the Bureaus' ability to price Fair Isaac out of the market. They can do this in many different ways, including setting high prices for the Fair Isaac scores that the Bureaus sell and control the pricing on. For example, Fair Isaac alleged in paragraph 126 of the Second Amended Complaint that Equifax recently raised significantly the price charged to resellers for FICO® Classic credit scores while at the same time offering VantageScore's credit scores for much less. In addition, as Fair Isaac alleged in paragraph 129 of the Second Amended Complaint, the Bureaus have quoted Fair Isaac's NextGen credit scores as much as 500% higher than Fair Isaac's FICO® Classic credit scores and have misled consumers into believing that

the higher cost of NextGen credit scores is the result of Fair Isaac's royalty, rather than the Bureaus' exclusionary manipulation of pricing.

Document Request No. 30 was designed to capture the information that is relevant to the Bureaus' potential and actual price increases.  It is not limited, as the defendants have tried to make it, to the actual prices charged or the pricing policies of the Bureaus. Instead, it seeks much more information than that, including, for example, all of the communications and discussions that the Bureaus have had with consumers about the actual or potential price increases of Fair Isaac's credit scores.  This would include documents showing what the Bureaus told consumers for why they were offering to charge the prices that they were charging for NextGen credit scores and the reasons why the Bureaus raised those prices.  This would also include those communications where the Bureaus blamed the high pricing on Fair Isaac.

The communications that the Bureaus had with lenders and consumers about the actual or potential prices they are charging for Fair Isaac's credit scores are therefore relevant and necessary to Fair Isaac's antitrust claims and Fair Isaac requests that all documents responsive to this request be produced.

**B.      The defendants' have unreasonably refused to produce information responsive Request Nos. 41 and 42 for resellers.**

**Request No. 41:** All documents sufficient to show the amount that you charge to persons or organizations other than Fair Isaac and VantageScore for a consumer credit report or for access to a Bureau's consumer data.

**EQUIFAX Response to No. 41:**  Equifax incorporates by reference its General Objections.  Equifax objects to this request to the extent it seeks information related to sales to consumers.  Credit grantors are the primary purchasers of credit risk scoring services, and their purchases are the only ones relevant to the claims and defenses in this case.  Indeed, Equifax does not even offer the VantageScore scoring service or an Equifax scoring service to consumers, but instead only offers to consumers a credit risk scoring service using FICO's scoring algorithm.  To the extent this request seeks information regarding consumers, the request is overly broad, unduly burdensome and seeks irrelevant information not likely to lead to the discovery of admissible evidence.  Equifax objects to this request to the extent it seeks information related to its consumer credit reporting information business because it seeks irrelevant information not likely to lead to the discovery of admissible evidence.  Plaintiff's claims relate to competition for credit risk scoring services and the new entrant offering such services, VantageScore.  Information related solely to the consumer credit reporting business bears no relevance to the claims or defenses in this action.  Equifax also objects to this request because it is overly broad and unduly burdensome.  Equifax further objects on the grounds that the request is vague insofar as it seeks "all documents sufficient to show."

**TRANS UNION'S RESPONSE:** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**EXPERIAN'S RESPONSE:**  Experian objects to this Request on the grounds that it is vague and ambiguous insofar as it seeks "all documents sufficient to show," and will read it to request "documents sufficient to show" the requested information.  Experian objects to this Request on the grounds that it seeks documents that are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

**VANTAGESCORE'S RESPONSE:**  In addition to the general objections set forth above, VantageScore objects to this document request to the extent it could be construed to seek documents that are not in the possession, custody or control of VantageScore.  VantageScore objects to the assumptions underlying this request.  VantageScore's stated purpose is to educate the industry and public about its credit risk generic scoring model.  VantageScore charges a licensing fee to the Bureaus for use of its model.  VantageScore does not sell its credit risk generic scoring model or any credit score.  VantageScore objects to this document request as overly broad, unduly burdensome and to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature.  Vantage Score objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence.  VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-

client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.  Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession that are responsive to this request.

> **Request No. 42:** All documents sufficient to show the amount that you charge to lenders and organizations for a consumer credit report or for access to a Bureau's consumer data if that lender or other organization reports or supplies data to a Bureau.

**EQUIFAX Response to No. 42:**  Equifax incorporates by reference its General Objections.  Equifax objects to this request to the extent it seeks information related to its consumer credit reporting information business because it seeks irrelevant information not likely to lead to the discovery of admissible evidence.  Plaintiff's claims relate to competition for generic credit risk scoring services and the new entrant offering such services, VantageScore.  Information related solely to the consumer credit reporting business bears no relevance to the claims or defenses in this action.  Equifax also objects to this request because it is overly broad and unduly burdensome.  Equifax further objects on the grounds that the request is vague insofar as it seeks "all documents sufficient to show," and will construe the request as seeking "documents sufficient to show" the requested information.

**TRANS UNION'S RESPONSE:** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**EXPERIAN'S RESPONSE:**  Experian objects to this Request on the grounds that it is vague and ambiguous insofar as it seeks "all documents sufficient to show," and will read it to request "documents sufficient to show" the requested information.  Experian objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**VANTAGESCORE'S RESPONSE:**  In addition to the general objections set forth above, VantageScore objects to this document request to the extent it could be construed to seek documents that are not in the possession, custody or control of VantageScore.  VantageScore objects to the assumptions underlying this request.  VantageScore's stated purpose is to educate the industry and public about its credit risk generic scoring model.  VantageScore charges a licensing fee to the Bureaus for use of its model.  VantageScore does not sell its credit risk generic scoring model or any credit score.  VantageScore objects to this document request as overly broad, unduly burdensome and to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature.  Vantage Score objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to

the discovery of admissible evidence.  VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.  Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession that are responsive to this request.

The defendants have refused to provide information responsive to these requests if that information relates to resellers.  *See* Kiedrowski Decl., Exh.14 at p.5 (July 20, 2007 letter from Teresa Bonder to Michael Collyard).  While these requests apply to Fair Isaac's earlier arguments about defendants' general objection to reseller information, Fair Isaac raises it separately here too because of the contradictory statements that the defendants have made.  As mentioned earlier in this brief, defendants agreed to provide "pricing tables" for the "sales" that they make to resellers.  *See* Kiedrowski Decl. Exh.12 at pp. 2-3 (April 3, 2007 letter from Dao L. Boyle to Michael Collyard). Fair Isaac assumed that this included sales for all of the credit scoring products and credit data products that the Bureaus sold to resellers.  But defendants recently told Fair Isaac that it would not produce information responsive to this request for resellers.  *See* Kiedrowski Decl. Exh.14 at p. 5 (July 20, 2007 letter from Teresa Bonder to Michael Collyard) ("Except with respect to resellers, there does not seem to be a dispute concerning these two requests, as the Bureau Defendants agree to produce documents sufficient to show the actual amounts charged to lenders, consumers and other bureaus for their respective credit reports").

Once again, the prices that the bureaus charge to resellers for credit reports is relevant to this case.  And, there is no reason for the Bureaus to agree to produce this type

of information as it relates to lenders, consumers and the other Bureaus, but not for

resellers.  For similar reasons explained above, Fair Isaac requests that defendants be

compelled to produce the information responsive to Request Nos. 41 and 42 for resellers.

> **C.**     **The defendants won't agree to make a reasonable search of all people who are likely to have documents reflecting their communications with consumers about Fair Isaac and credit scores, responsive to Request No. 68.**

> **Request No. 68:** All documents reflecting communications between a Bureau or VantageScore and a lender regarding Fair Isaac and credit scores.

**EQUIFAX Response to No. 68:**  Equifax incorporates by reference its General Objections.  Equifax objects to this request to the extent it seeks information regarding credit risk scoring services other than generic credit risk scoring services because it seeks irrelevant information not likely to lead to the discovery of admissible evidence. Equifax also objects to this request because it is overly broad and unduly burdensome. Equifax sells Fair Isaac scoring services to its customers.  This request would require the production of every communication with Equifax's thousands of lender-customers regarding sales, marketing, or customer service with respect to Fair Isaac scoring services.

**TRANS UNION'S RESPONSE:** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**EXPERIAN'S RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**VANTAGESCORE'S RESPONSE:**  In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous, overly broad and unduly burdensome and as seeking irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to this document request to the extent it could be construed to seek documents that are not in the possession, custody or control of VantageScore. VantageScore objects to this document request to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature.  VantageScore further objects to this document request to the extent it could be construed to seek documents protected by

the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.  Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession that are responsive to this request.

At first glance, this request might seem broad.  But as Fair Isaac has explained to the defendants, Fair Isaac is only seeking substantive communications that the defendants have had with lenders about Fair Isaac *and* credit scores, and it does not seek basic transactional communications.  Essentially, as Fair Isaac has explained to defendants, this request seeks the following information, which goes to the heart of Fair Isaac's antitrust, false advertising and trademark claims:

- communications about the pricing of Fair Isaac's scores

- communications about Fair Isaac's royalties

- communications about the benefits of VantageScore scores compared to Fair Isaac scores

- communications about the predictiveness of Fair Isaac's models compared to other scoring models

- communications about scoring ranges

- communications about the need for a scoring model other than Fair Isaac's

*See e.g.,* Kiedrowski Decl. Exh.13 at p.3 (July 13, 2007 letter from Michael Collyard to Teresa Bonder).  These are very specific types of communications and defendants can't possibly argue that they are not relevant to Fair Isaac's claims.  Still, the defendants have only agreed to search for these types of communications if they are "contained within the files of employees (1) who have policy-setting and/or supervisory responsibilities related to scoring services and (2) who are likely to have documents responsive to Plaintiff's

other requests." *See* Kiedrowski Decl., Ex.14  at pp. 5-6 (July 20, 2007 letter from

Teresa Bonder to Michael Collyard).  The defendants won't agree to make a reasonable

search of all of the people who are likely to have information responsive to this request.

Fair Isaac understands that the bulk of defendants' objections are that they don't

want to have to search their sales force files for this type of information or search for this

information as it relates to resellers.  But for all of the reasons discussed earlier, Fair

Isaac disagrees with the defendants' rational for not wanting to do this.   Because these

very specific types of communications are relevant to Fair Isaac's claims, Fair Isaac

requests that defendants be compelled to make a reasonable search of all people who are

likely to have information responsive to the very specific communications sought in

Document Request No. 68.

### III.     Experian Must Produce the Algorithm, Specifications, and Planning Documents for its Scorex PLUS Model

At trial, the defendants will likely try to justify their collaboration on

VantageScore by saying that their collaboration was necessary to develop an (allegedly)

innovative product. *See, e.g.,* "Antitrust Guidelines for Collaborations Among

Competitors," Sec. 2.1 (DOJ issued, April 2000); *see also* Declaration of Julia Dayton

Klein ("Klein Decl."), Exh. 1 (TU-FI-0005313) (filed under seal). Fair Isaac believes that

there is no merit to this argument because certain (allegedly) innovative features of

VantageScore's model, including the leveling process and segmentation method, were

already part of a tri-bureau scoring model of Experian's called Scorex PLUS, which

Experian developed several years ago. *See* Kiedrowski Decl., Exh. 20 (webpage from

VantageScore describing "innovative" features of VantageScore's model).

In the publicly available literature on Scorex PLUS, the "innovative features" of

Scorex PLUS about which Experian boasts are Scorex PLUS's attribute leveling process

and segmentation methods, both of which, according to Experian, offered consistency

across the bureaus' data. *See* Kiedrowski Decl, Exh. 17 (Product Sheet for Scorex

PLUS). Indeed, Experian specifically touts its Scorex PLUS model as having a "set of tri-

bureau attribute definitions which are accurately leveled across the three bureaus" and

that use a new segmentation method  *See* Kiedrowski Decl., Exh. 18 (Scorex PLUS

White Paper).  By all appearances, in other words, the "innovative" features that the

defendants would use to justify their collaboration on VantageScore are the very features

of a model that one of them has already developed. *See also* Klein Decl., Exh. 1 (TU-FI-

0005313) (filed under seal). But Fair Isaac needs detailed documents on how Scorex

PLUS works to fully confirm this point.

To this end, on June 22, 2007, Fair Isaac served Experian with a Fourth Set of

document requests seeking documents about certain "in-house" models of Experian,

including Scorex PLUS. The relevant requests (Nos. 1, 2, 4, and 5) and Experian's

responses are listed below.

> **REQUEST NO. 1:**  All algorithms for your in-house credit-score models.
> (Fair Isaac requests that these be produced in native electronic format,
> complete with all existing metadata intact.)

**RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome.  Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 2:**  All drafts or versions or iterations of the specifications for your in-house credit-score models. (Fair Isaac requests that these specifications be produced in their native electronic format, complete with all existing metadata intact, and including any data dictionaries outlining and defining valid attributes for each characteristic.)

**RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome.  Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 4:**  All data and materials—computer specifications or otherwise—that you provided as part of the effort to develop and test what became VantageScore's credit-score model.

**RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Experian further objects to this Request as cumulative and duplicative of other Requests.

**REQUEST NO. 5:**  All of the planning documents that were used to develop your in-house credit-score models, whether they be in the form of flow diagrams, internal memos, reports, or presentations (or some other similar document), including documents that list the technologies or statistical methodologies used and any technical specifications of proprietary techniques that were used for your in-house credit-score models.

**RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome.  Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

*See* Kiedrowski Decl., Exh. 11 (Responses and Objections of Defendant Experian

to Plaintiff's Fourth Set of Document Requests).

In response to Experian's flat refusal to produce anything responsive, Fair Isaac

offered to limit these requests but explained that, at the very least, documents related to

the Scorex PLUS model are relevant given that the Scorex PLUS model contains the

characteristic leveling and allegedly unique segmentation features that the defendants say

are innovative about VantageScore. Experian refused to agree to even this limited

production and offered, instead, to produce product sheets and white papers on Scorex

PLUS—both of which are publicly available and have already been produced—and user

guides, which are widely distributed as part of Experian's Scorex PLUS marketing

efforts. *See* Kiedrowski Decl., Exh.15 (Email string including email from Jack Pace to

Randall M. Tietjen dated August 6, 2007).

Product sheets, white papers, and user guides are not enough for Fair Isaac to

evaluate and compare the features of Scorex PLUS and VantageScore. Experian's Scorex

PLUS product sheet is merely topical in nature, providing a very cursory summary of

Scorex PLUS' features and benefits for marketing purposes. *See* Kiedrowski Decl., Exh.

17. The Scorex PLUS white paper, which is also a publicly available document, simply

describes the features of the model and gives no indication about how the technology

actually works. *See* Kiedrowski Decl., Exh. 18.  In short, the mechanics, not the

marketing, of the score go to the heart of this particular issue.

Fair Isaac maintains that Experian should be compelled to produce the Scorex PLUS algorithm itself, the specifications for Scorex PLUS, and other documents relating to the development of Scorex PLUS. Only through these documents will Fair Isaac be able to test the truth of the defendants' argument that they had to collude to produce a model with characteristic leveling and unique segmentation.[1] Rather than produce these documents, Experian has offered—in addition to product sheets, etc.—to produce "individuals knowledgeable about [the differences between Scorex PLUS and VantageScore] who will be able to testify about them in greater detail than any preexisting material describes them." *See* Kiedrowski Decl., Exh.15 (Email string including email from Jack Pace to Randall M. Tietjen dated August 6, 2007). This is an unacceptable alternative and it exposes the problems with Experian's position.

It is inconceivable, for example, that any witness could testify in more detail about the Scorex PLUS algorithm and specifications than the documents themselves would reveal (no human could memorize the thousands of details in a set of specifications). But more to the point, the detailed documents about Scorex PLUS are necessary for a proper

---

[1] As this Court knows from an earlier motion in this matter, a credit-scoring algorithm is a mathematical formula, embedded in software, that is used to generate a credit score for an individual consumer. *See* Kiedrowski Decl., Exh.19 (Declaration of Freddie Huynh filed earlier with the Court at ¶ 4). The specifications for a credit-scoring model document the procedures the algorithm uses—essentially, the instructions to the computer generating the credit score—about how to perform the necessary calculations. *See id.* at ¶ 5. Development documents memorialize the development process and may show, for example, why one type of methodology was chosen over another. All of these documents are important to see whether the characteristic leveling and segmentation features that the defendants claim they needed to collude to develop were actually in existence all along.

cross-examination of any witness that the defendants will offer on this subject. Indeed, Experian's idea that it should just offer a witness who would be knowledgeable about differences between Scorex PLUS and VantageScore seems to concede that the documents Experian has offered to produce (i.e., product sheets, etc.) will *not* provide sufficiently detailed information to test the defendants' antitrust defense. In short, offering witnesses for cross examination without any way of testing their knowledge through otherwise available documentary exhibits is not an acceptable alternative. All of the documents requested in the scope of the requests quoted above and relating to Scorex PLUS should be produced by Experian.

### IV.   The Defendants Waived Any Privilege For Communications Relating To Their Investigation of Fair Isaac's Trade-Secret and Contract Claims

At the hearing on May 9, 2007, Trans Union's counsel (arguing on behalf of all defendants) argued against Fair Isaac's motion to compel the production of VantageScore's algorithm-related materials and in favor of the defendants' motion for a protective order to protect those documents from production. In the course of that argument, the defendants' counsel—in a calculated effort to persuade the Court to deny Fair Isaac's motion and grant the defendants'—disclosed the defendants' attorney-client communications, with the intent, obviously, that the Court would rely on his representations and deny Fair Isaac the relief that it was seeking. Defendants' counsel told the Court, in effect, that "we've" talked to our client representatives about the development of VantageScore's algorithm and they have reassured us that there is no

basis for Fair Isaac's trade-secret and contract claims:

> They allege in the complaint that Trans Union misappropriated information. ***I raise my right hand, although I'm not under oath, but I say no, that didn't happen. We've spoken to all the people that actually designed this model. They were chosen very specifically because of their lack of knowledge about FICO, and they did not use any FICO confidential information in designing the algorithm***. But you can't possibly decide, nor should you, if he's right or if I'm right. The only thing you have to decide is is it enough for them simply to throw out an allegation and that on the basis of that, we open up the safe. And we disclose our algorithm.

Hearing Tr. 19-20 (argument of James K. Gardner) (Kiedrowski Decl., Exh. 16)

(emphasis added).

        As a result of these representations to the Court, Fair Isaac served the following

document request on the defendants after the hearing:

> **<u>Request No. 1</u>:**  All documents relating to the defendants' investigation of Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contracts (see Counts Thirteen, Fourteen, and Fifteen of the Second Amended Complaint), whether the investigation was conducted before or after the defendants received the Second Amended Complaint, including, for example:
>
> a.      all communications among or between defendants' counsel or any other individuals (e.g. employees of the defendants, consultants, experts) or organizations relating to Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract;
>
> b.      all internal notes and memoranda of defendants' counsel reflecting any research or investigation relating to Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract;
>
> c.      all notes or communications relating to the investigation that the defendants' conducted of Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract, which Trans Union's counsel (speaking on behalf of all defendants) told the Court at

the hearing on May 10, 2007, resulted in individuals
involved in the planning or development of VantageScore's
credit-scoring model assuring defendants' counsel that there
was no factual basis for Fair Isaac's claims ("defendants'
purposeful waiver"); and

d.      all communications after the hearing on May 10, 2007,
among or between defendants' counsel or any other
individuals or organizations relating to the defendants'
purposeful waiver.

All of the defendants responded to this request with lengthy objections, essentially

refusing to produce any responsive documents on the basis of privilege and

refusing to acknowledge that any applicable privilege had been waived. Each

defendant's specific response was as follows:

**TransUnion:** Trans Union objects to this Request to the extent it seeks
information protected from disclosure by the attorney work product
privilege, the attorney-client communication privilege, the joint
defense/community of interest privilege, or any other applicable privilege.
Subject to this objection, Trans Union will produce all non-privileged,
responsive documents in its possession, custody, or control.

**Experian:** Experian objects to this Request and each of its sub-parts on the
grounds that they are vague, ambiguous, overly broad, and unduly
burdensome.  Experian further objects to this Request and each of its sub-
parts on the grounds that they seek documents and information that  are
protected from disclosure by the attorney-client privilege, the work product
doctrine and/or the joint defense/common interest privilege.  Subject to and
without waiver of the foregoing objections or the General Objections, to the
extent that any documents responsive to this Request exist and are not
protected from disclosure by any applicable privilege, Experian agrees to
produce responsive documents identified following a reasonable search.

**Equifax:** Equifax incorporates by reference its General Objections.
Equifax objects to this Request because it seeks information protected from
disclosure by the attorney-client privilege, the attorney work-product
doctrine, and/or the joint-defense/common-interest privilege.  Equifax
objects to the extent the request seeks the production of documents and

materials concerning communications with experts and consultants beyond that required by Federal Rule of Civil Procedure 26(b).  Equifax will produce materials relied upon by expert witnesses that Equifax may use at trial to present evidence in this litigation (if there are any) as required by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Minnesota, and/or any order of the Court.  Equifax further objects because the request is vague, overly broad, and unduly burdensome, and because it is incomprehensible in that it seeks documents relating to Equifax's "investigation of Fair Isaac's claims [in the Second Amended Complaint] for misappropriation of trade secrets, breach of contract, and interference with contracts," *before* Equifax received notice of such claims.  Equifax also objects to the extent the request misrepresents statements or actions that occurred at the hearing on May 10, 2007, and mistakenly claims that Defendants somehow "waive[d]" their rights.  Subject to and without waiving the foregoing objections, to the extent that any documents responsive to this request exist and are not protected from disclosure by any applicable privilege, Equifax agrees to produce responsive documents identified following a reasonable search.

**VantageScore:** In addition to the general objections set forth above, VantageScore objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, and/or joint-defense privilege. Subject to and without waiving any objections, VantageScore will produce all non-privileged, responsive documents, if any, at a time and place to be mutually agreed upon.

*See* Kiedrowski Decl., Exhs. 5-8 (Defendants' Responses and Objections to

Plaintiffs' Second Set of Document Requests.)

Contrary to the defendants' misguided objections, all documents requested by Fair

Isaac should be produced. Any applicable privilege was effectively waived by counsel's

assertions about the substance of attorney-client communications. Counsel's

statements—asserting communications with clients—was provided as evidence of an

essential element of the defendants' defense to the original motion to compel and, thus, of

their defense of the contract and misappropriation claims. Rather than provide supporting

documentary or testimonial evidence, counsel and their clients *made the strategic decision* to disclose the results of client conversations as a factual assertion. That type of voluntary assertion by an attorney—relaying at least part of the substance of otherwise probably privileged communications—to further a client's interests constitutes a waiver of any privilege on behalf of clients. *See, e.g., Sprader v. Mueller*, 121 N.W.2d 176, 180 (Minn. 1963) (stating "all disclosures (oral or written) voluntarily made [by an attorney] to the opposing party or to third persons . . . in the course of taking adverse steps in litigation . . . are receivables as being made under an implied waiver of privilege [authorized by the client]" and holding privilege waived by attorney's action in disclosing client statement to prosecutor when it was done in attempt to advance client's civil case); *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006) (an attorney's factual representation regarding the fruits of client communications effectively waived the attorney-client privilege, noting that it "represents a litigation strategy fraught with obvious risks," and "counsel must have realized that it would be 'pushing the envelope'" regarding attorney-client privilege, while counsel presumably decided "that the rewards outweighed the risks"); *Brackett v. Providian Ins. Group, Inc.*, No. 3:95-cv-616, 1996 WL 785739, at *1 (E.D. Tenn. Nov. 19, 1996) ("By relying on the substantive content of those communications . . . , defendant has waived any claim of attorney-client or work product privilege.") (Kiedrowski Decl., Exh. 21). The defendants' assertions in open court of facts allegedly learned during what might have otherwise been privileged communications waives not only any applicable attorney-client privilege but also any

34

related work-product protection. *See, e.g., Powerhouse*, 441 F.3d at 474; *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 511-13 (S.D. Cal. 2003).

Once privileged conversations have been disclosed, parties cannot later rely on an alleged privilege to preclude examination into those factual disclosures.  Fair Isaac is entitled to discovery to test the accuracy of the alleged "facts" submitted by the defendants' counsel in court. *See, e.g., Langer v. Presbyterian Med. Ctr. of Philadelphia*, 32 Fed. R. Serv. 3d 56 (E.D. Pa. 1995) (vacated on other grounds) (holding that an attorney's affidavit demonstrated that she "was being a factual witness concerning fact issues," and she "cannot foreclose discovery of the factual basis for [her] factual representations in the affidavit anymore than [she] could take the witness stand and testify on direct examination to the factual matters set forth in [the answers] and then preclude cross-examination by invoking the attorney-client privilege") (quoting *Computer Network Corp. v. Spohler*, 95 F.R.D. 500 (D. D.C. 1982) (permitting discovery into attorney representation that client did not commit securities law violations)). The law does not permit a party to voluntarily use a ***portion*** of privileged information offensively, as a sword in the one hand to advance its case, and then use attorney-client privilege as a shield on the other hand, foreclosing the opposing party from making a factual inquiry into the basis for those assertions. *Id.*; *Kintera*, 219 F.R.D. at 511-12. Once privilege is waived, as here, it cannot be "unwaived" as though it is a "handy tool." *CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F.R.D. 176, 179 (D. Del. 2003) (finding waiver because "[i]t would be manifestly unfair to allow a party to use the privilege to shield information

which it had deliberately chosen to use offensively"). The defendants should be ordered to produce all documents responsive to the request quoted above.

## Conclusion

For the reason stated above, Fair Isaac's motion to compel should be granted.


Date: August 8, 2007                **Robins, Kaplan, Miller & Ciresi, L.L.P.**


By: ___s/Randall Tietjen_____
        Michael V. Ciresi (MN Bar #16949)
        Ronald J. Schutz (MN Bar #130849)
        Randall Tietjen (MN Bar #214474)
        Michael A. Collyard (MN Bar # 302569)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Tel: (612) 349-8500
Fax: (612) 339-4181

and

Charles F. (Rick) Rule
Ngoc Pham Hulbig
Joseph J. Bial
**Cadwalader, Wickersham & Taft LLP**
1201 F Street, N.W.
Washington, D.C. 20004
Tel:  (202) 862-2200
Fax:  (202) 862-2400

**Attorneys for Plaintiffs**