UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION; and
myFICO CONSUMER SERVICES, INC.,

Case No. 06-4112 (ADM/JSM)

     Plaintiffs,

v.

ORDER

EQUIFAX INC.; EXPERIAN
INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
VANTAGESCORE SOLUTIONS, LLC,

     Defendants.

     JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came on before the undersigned upon defendants' Motion for to Compel [Docket No. 88]. Randall Tietjen, Esq., and Michael Collyard, Esq. appeared on behalf of plaintiffs; Jeffrey Keys, Esq., Peter Kontio, Esq., and Teresa Thebaut-Bonder, Esq. appeared on behalf of defendant Equifax Inc.; Jack Pace, III, Esq., Robert Milne, Esq., and Mark Jacobson, Esq. appeared on behalf of defendant Experian Information Solutions, Inc.; James Gardner, Esq. and Lewis Remele, Jr. appeared on behalf of defendant Trans Union, LLC; and Barbara Berens appeared on behalf of defendant Vantage Score Solutions, LLC.

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

**IT IS HEREBY ORDERED:**

1.    Defendants' Motion for to Compel [Docket No. 88] is **GRANTED** in part and **DENIED** in part as set fort in the Memorandum below;

2.     Consistent with the Memorandum following this Order, plaintiff shall provide amended discovery responses and produce responsive information to defendants on or before October 17, 2007.

Dated:        October 2, 2007

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

## MEMORANDUM

## I.     FACTUAL BACKGROUND

### A.     General Background

This matter arises out of the creation of a new credit scoring system, VantageScore, by defendant credit bureaus Equifax Information Services LLC, Experian Information Services, Inc., and Trans Union LLC (collectively referred to as "defendants").   This scoring system competes with Fair Isaac Corporation's and its wholly owned subsidiary myFICO Consumer Services, Inc.'s (collectively referred to as "Fair Isaac") credit scoring system (also referred to as "FICO" for the purpose of this Memorandum).

Fair Isaac's Second Amended Complaint asserts that defendants infringed on its trademarks of 300-850.   In particular, Fair Isaac alleged that the use of the VantageScore scoring range of 501-990 constituted unfair competition under 15 U.S.C. § 1125(a), infringement of registered trademark under 15 U.S.C. § 1114, trademark infringement under Minnesota common law, passing off under Minnesota common law, deceptive trade practices under Minn. Stat. § 523D.44, and unjust enrichment under Minnesota common law.   See Second Amended Complaint, ¶¶ 177-196, 204-216.   Fair Isaac also alleged that defendants engaged in unfair competition and false

advertisement, anticompetitive activities in violation of federal and Minnesota antitrust law, and that defendant Trans Union misappropriated trade secrets and breached contractual duties owed to Fair Isaac.  Id., ¶¶ 98-103, 198, 260-61, 264-67.

**B.      Background of the Discovery Dispute Related to Defendants'
Requests for Production of Documents**

On January 17, 2007, defendants served their First Set of Requests for the Production of Documents on Fair Isaac.  See Declaration of Bryan D. Gant ("Gant Decl."), Ex. 1.  On February 16, 2007, Fair Isaac served its Response to Defendants' First Set of Requests for the Production of Documents on defendants.  Id., Ex. 2. Defendants now bring the present motion seeking an order compelling Fair Isaac to produce all documents responsive to Document Request Nos. 5, 29, 52, 62, and 72-75 to defendants' First Set of Requests for the Production of Documents.  At the hearing, the parties represented that Document Request No. 29 had been resolved.  See Transcript of May 9, 2007 Motions Hearing ("Tr.") [Docket No. 140] at 58.  Given this factual backdrop, the Court will now proceed with analyzing the remainder of defendants' motion to compel.

**II.    ANALYSIS**

**A.      Standard of Review**

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.  Relevant information need not be admissible at the trial if the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence at trial.  See Fed. R. Civ. P. 26(b)(1) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."); see also Minnesota Specialty Crops, Inc. v. Minnesota Wild, 210 F.R.D. 673,

675 (D. Minn. 2002) ("Generally, discovery may inquire into all information, not otherwise privileged, that is relevant to the subject matter of the action, provided that it is reasonably calculated to lead to the discovery of admissible evidence."); <u>Walker v. Northwest Airlines Corp.</u>, No. Civ. 00-2604 MJD/JGL, 2002 WL 32539635 at *1 (D. Minn., Oct. 28, 2002) ("In the context of discovery, 'relevant' has been defined as encompassing 'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'") (quoting <u>Hickman v. Taylor</u>, 329 U.S. 495, 501 (1947)).

### B. Request No. 5—Discovery of Negotiation Documents

> **Request No. 5:** All agreements, contracts, and licenses involving or relating Fair Isaac, on the one hand, and Experian, Equifax, Trans Union, and/or VantageScore on the other hand, including documents reflecting the negotiation of same.

> **Response to Request No. 5:** Fair Isaac objects to this Request to the extent it seeks documents protected by the attorney-client privilege or the work-product doctrines and it objects to this Request as overbroad to the extent that it seeks "documents reflecting the negotiation" of agreements or licenses. Despite these objections and without waiving these objections, responsive agreements, contracts, and licenses will be produced. No agreements or licenses between Fair Isaac and VantageScore exist.

<u>See</u> Gant Decl., Ex. 2.

At issue is Fair Isaac's refusal to produce the documents underlying the negotiations of agreements, contracts and licenses between Fair Isaac and each of the defendants.[1]   First, defendants claimed that these documents are relevant to Fair

---

[1]   During the hearing, defendants clarified that they were more interested in internal documents, and less interested in the materials that went between the parties during negotiations.  Tr. 79.

Isaac's claim in its Second Amended Complaint that it was coerced into signing certain agreements with defendants.  <u>See</u> Memorandum of Law in Support of Defendants' Motion to Compel Plaintiff to Produce Documents Responsive to Defendants' First Set of Requests for the Production of Documents ("Defs.' Mem.") at p. 6 (citing Second Amended Complaint, ¶¶ 225-58).  Fair Isaac had represented that it would produce documents that would support that it was coerced into entering into agreements with defendants; defendants took the position they were also entitled to documents that would refute Fair Isaac's claim of coercion.  <u>Id.</u>  However, Fair Isaac represented at the hearing that it had withdrawn Count 12 of its Second Amended Complaint, which alleged an illegal concerted refusal to deal.  Tr. 59.  Thus, defendants conceded that the coercion claim could no longer  serve as a basis for seeking the contract negotiation documents.  <u>Id.</u>

Next, defendants asserted that Fair Isaac's internal documents relating to the negotiations between the parties were relevant to Fair Isaac's antitrust claims as they would provide insights on Fair Isaac's view of the markets at issue in this case, as well as the parties' relative positions in such markets – <u>i.e.</u> what constitutes the appropriate product markets, Fair Isaac's market power, and the various strategies of the credit bureaus with regards to their dealings with Fair Isaac.  <u>See</u> Defs.' Mem. at p. 7. According to defendants, documents that reveal the different and independent strategies of the credit bureaus with respect to their respective dealings with Fair Isaac are relevant to Fair Isaac's claims of collusion by the three credit bureaus in its Second Amended Complaint.  <u>Id.</u>

Fair Isaac countered that it has refused to produce internal documents regarding the negotiation of the agreements because they will not show insights into issues bearing on its antitrust claims, but instead will likely only reflect discussions regarding the language of the agreements.   See Plaintiff Fair Isaac's Opposition to the Defendants' Motion to Compel ("Pls.' Mem.") at p. 5.   Further, Fair Isaac asserted that the information sought by defendants could be garnered through the documents it would be producing in response to Document Request No. 33 which seeks the following:

> **Request No. 33:** All documents relating to markets, market share(s), market position, competitors, competition, potential entrants, purchasers, the power or role of lenders or other financial institutions, barriers to entry, market planning, or strategic planning in respect of the following purported relevant markets, or any segment, niche, subdivision, or submarket contained within such purported relevant markets:
>
> a.       The purported Aggregated Credit Data Market in the United States;
> b.       The purported Credit Scoring Market in the United States;
> c.       Any market for the development, sale, marketing, or licensing of Credit Scoring Services or Scoring Algorithms.
>
> **Response to Request No. 33:** Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine.   Fair Isaac also objects to this request on the grounds that it is overbroad, unduly burdensome, and vague and ambiguous. Despite these objections and without waiving these objections, responsive, non-privileged documents that <u>contain analysis or projections of the Aggregated Credit Data Market, Credit Scoring Market, or any other market for the development, sale, marketing, or licensing of Credit Scoring Services or Scoring Algorithms will be produced, if any exist</u>.

See Gant Decl., Ex. 2 (emphasis added); see also Pl.'s Mem. at pp. 5-6.

Thus, it was Fair Isaac's position that because it had agreed to search for and produce information about markets, market share, barriers to entering markets and strategic planning documents relating to the markets at issue in this case, such documents were much more likely to address defendants' stated need for Fair Isaac's internal negotiation documents than Document Request No. 5.

At the hearing, defendants took issue with Fair Isaac's representation that it would be producing documents bearing on its antitrust claims, in light of its responses to defendants' First Set of Interrogatories, Interrogatory Nos. 3-5, which provided as follows:

> **Interrogatory Nos. 3-5:**
>
> Separately for the purported Aggregated Credit Data Market, the purported Credit Scoring Market, and any market for the development, sale, marketing, or licensing of the algorithms or Credit Scoring Services, identify the market shares, expressed in dollars and units (scores) of every service, algorithm, or scoring product in the purported market, including any estimated market shares for 2006-2007.
>
> **Answer to Interrogatory Nos. 3-5:**
>
> Fair Isaac objects to these Interrogatories on the grounds that they are unduly burdensome and to the extent they seek information that is protected by the attorney-client privilege or work-product doctrine.  Fair Isaac also objects to these interrogatories as premature to the extent they seek information that calls for expert testimony.  Despite these objections, and without waiving these objections, <u>Fair Isaac states that after a good faith investigation, it does not, at this time, have information responsive to these requests</u>.  Fair Isaac reserves the right to supplement its response to these Interrogatories.

(emphasis added).  Consistent with this answer, Fair Isaac stated at the hearing that it was still searching for documents relevant to market share and strategy.  Tr. 77.

Fair Isaac is not claiming that the information regarding appropriate product markets, its market power, and the strategies of the credit bureaus with regards to their dealings with Fair Isaac are not relevant to its antitrust claims against defendants. Instead, Fair Isaac has refused to search its internal documents regarding the negotiation of its agreements with the credit bureaus because it believes that these documents will not likely contain information bearing on its antitrust claims. The fact is that Fair Isaac has not searched its internal negotiation documents for such topics. Thus, it really cannot represent to this Court that these documents do not contain information bearing on product markets, its market power, and the various strategies of the credit bureaus with regards to their dealings with Fair Isaac. Further, given Fair Isaac is still searching for documents relevant to market share and strategy, Fair Isaac cannot state that defendants already have been given the documents that bear on these issues.

Accordingly, Fair Isaac will be required to produce all documents that (1) were sent back and forth between the parties during their negotiations of agreements, contracts and licenses, and (2) all non-privileged internal documents regarding the negotiation of these agreements, contracts and licenses that contain information bearing on the markets at issue in this case, Fair Isaac's market power, and the various strategies of the credit bureaus with regards to their dealings with Fair Isaac.[2] Conversely, Fair Isaac shall not be required to produce internal documents reflecting

---

[2]      To the extent that Fair Isaac asserts that any responsive documents are protected from disclosure by the attorney-client privilege or work product doctrine, and thus will be withheld on that basis, Fair Isaacs is reminded that it must list those withheld documents on its privilege log.

negotiations with defendants to the extent that they do not contain information bearing on these topics.

### C.   Request Numbers 52 and 62 - Documents Related to Trademarks

#### 1.   Request No. 52

> **Request No. 52:** Without regard to the Time Period defined above, all documents relating to consumer and trade advertisements, promotions, and publicity in which the Fair Isaac Designations have been used in connection with Fair Isaac's Credit Risk Scoring Services, including but not limited to all documents concerning the creation or design of such advertising, promotional and publicity material.

> **Response to Request No. 52:** Fair Isaac objects to this Request as overbroad and unduly burdensome. Despite these objections and without waiving these objections, without regard to the Time Period, representative samples of consumer and trade advertisements, promotions, and publicity that have used Fair Isaac's trademarks at issue in this litigation will be produced.

See Gant Decl., Ex. 2.

With regards to Request No. 52, while defendants accepted that portion of Fair Isaac's agreement to produce representative samples of marketing materials and provide information as to where they were published, defendants took issue with Fair Isaac's refusal to provide the marketing, strategy, and internal documents that led to the creation of the sample marketing materials.  See Defs.' Mem. at pp 11-12; Tr. 63. Defendants argued that this information is relevant to Fair Isaac's trademark infringement claim,[3] in that marketing and other internal documents are likely to provide

---

[3]     Counts One through Four, Six and Seven of Fair Isaac's Second Amended Complaint related to the alleged similarity of the credit scoring range for VantageScore of 501-990, to the credit scoring range for FICO of 300-850.  In particular, Fair Isaac alleged that the use of the VantageScore scoring range of 501-990 constituted unfair competition under 15 U.S.C. § 1125(a), infringement of registered trademark under 15 U.S.C. § 1114, trademark infringement under Minnesota common law, passing off under

relevant information regarding the manner in which Fair Isaac has used, and intended to use, the 300-850 scoring range and the strengths and weakness of its trademark.  <u>See</u> Defs.' Mem. at p. 11, Defendants' Reply Memorandum in Support of Defendant's Motion to Compel ("Defs.' Reply") at p. 4.  For example, defendants assert that such internal documents may include documents supporting Fair Isaac's assertion that it intended the credit scoring range for FICO of 300-850 to be used as a trademark, such as documents discussing whether or not to use it in advertising, or whether customers would recognize it as a symbol of Fair Isaac based on the marketing materials.  <u>Id.</u> at pp. 11.  On the other hand, defendants maintained that an absence of such internal documents would support their position that the 300-850 scoring range is purely descriptive, as it would show that there was no consideration by Fair Isaac of using the scoring range as a trademark.  <u>Id.</u> at pp. 11-12.  Defendants also contended that the discovery was relevant to their defenses that a range of numbers, such as 300-850, cannot qualify as trademark as they are purely descriptive and Fair Isaac never took steps to develop a secondary meaning in the 300-850 range in the minds of the consuming public, and that even if the 300-850 range of numbers could be characterized as a trademark, it was abandoned by Fair Isaac.  Tr. 64; Defs.' Reply at pp. 4-5.

In opposition, Fair Isaac maintained that the need for internal documents is irrelevant because their trademark claim is based on its actual use of the 300-850 scoring range, as opposed to its intent to use the scoring range or its belief as to

Minnesota common law, deceptive trade practices under Minn. Stat. § 523D.44, and unjust enrichment under Minnesota common law.  <u>See</u> Second Amended Complaint, ¶¶ 177-196, 204-216.

whether customers may recognize it as a symbol of Fair Isaac.  See Pl.'s Mem.at pp. 7-8, Tr.  72-74.  Additionally, Fair Isaac argued that it would be extremely burdensome for it to search for these internal documents.  See Pl.'s Mem. at p. 8,  see also Declaration of Darcy Sullivan, ¶¶ 5-8.

> **a.    Intent as it Relates to Whether Fair Isaac's 300-850 Scoring Range is a Protectible Trademark**

A trademark is defined by the Lanham Act "as any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish [its] goods . . . and to indicate the source of the goods. . . ."  15 U.S.C. § 1127.  "To determine whether a mark is distinctive and thus entitled to trademark protection, [courts] must first categorize it as generic, descriptive, suggestive, or arbitrary."  Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 974 (8th Cir. 2006) (citations omitted).  While suggestive and arbitrary marks are inherently distinctive and protectible, generic and descriptive marks are generally not protectible.  Id.

A mark is suggestive if it requires imagination to reach a conclusion as to the nature of the good or service.  See Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1329 (8th Cir. 1985).  A mark is arbitrary if common words are applied to goods in an unusual manner.  See Intsy*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 673 n. 10 (8th Cir. 1996) (citation omitted).  Descriptive marks "are generally not protectible because they are needed to describe all goods of a similar nature. Such a term describes the ingredients, characteristics, qualities, or other features of the product and may be used as a trademark only if it has acquired a secondary meaning."  Schwan's IP, LLC, 460 F.3d at 974 (citations omitted); see also Frosty Treats Inc. v. Sony Computer Entertainment America Inc., 426 F.3d 1001, 1005

(8th Cir. 2005) ("A term is descriptive if it conveys an 'immediate idea of the ingredients, qualities or characteristics of the goods,'. . . .") (quoting Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 785-86 (8th Cir. 1995)).  "Secondary meaning occurs when 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  Gateway, Inc. v. Companion Products, Inc., 384 F.3d 503, 508 (8th Cir. 2004) (quoting Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000)); see also Schwan's IP, LLC, 460 F.3d at 974 ("To be afforded protection, then, a descriptive term must be so associated with the product that it becomes a designation of the source rather than of a characteristic of the product.") (citation omitted).

As a starting point, defendants have not cited, nor can this Court find, any case law, which specifically holds that the intent of the trademark holder is relevant to whether a trademark should be characterized as descriptive.  To the contrary, this Court concludes that Fair Isaac's purpose or intent behind using the 300-850 scoring range is irrelevant to determining whether it "conveys an 'immediate idea of the ingredients, qualities or characteristics of the goods' [it represents]."  Frosty Treats Inc., 426 F.3d at 1005 (emphasis added).  In other words, the issue of whether a mark actually conveys to prospective customers an immediate idea of the qualities or characteristics of the goods or services it represents, bears no relation to the intent of trademark holder.

Defendants' reliance on Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2nd Cir. 1995)[4] for the proposition that Fair Isaac's purpose or intent behind using the 300-850

---

[4]     This Court notes that defendants also cited to Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159 (1995) for the proposition that intent plays a role in determining whether a trademark deserves protection.  See Defs.' Reply. at p. 4.  The Qualitex Court, quoted a portion of 15 U.S.C. § 1127, that has since been amended, as follows:

trademark is relevant to the characterization of the trademark, is misplaced.  See Defs.'

Reply at p. 4.  Knitwaves is a trade dress[5] case pertaining to the design of children's

sweaters, particularly the use of "leaf" and "squirrel" designs placed on the sweaters.

The Knitwaves court concluded that when determining whether sweater designs can be

protected as a trademark, the inquiry does not involve whether the trade dress is

"generic," "descriptive," "suggestive," or "arbitrary or fanciful," categorizations which it

found to be inapplicable to product features.  71 F.3d at 1008.  Instead, the inquiry

focused on whether the trade dress identified the source of the product.  Id. (citations

omitted).  The Knitwaves court then found that the test for inherent distinctiveness is

whether the manufacturer "used" or "intended to use" the designs on the sweaters "to

identify the source and distinguish his or her goods."  Id, at 1006-09 (citations omitted).

Based on this inquiry, the court found that, "[a]s plaintiff's objective was primarily

aesthetic, the designs were not primarily intended as source identification."  Id. at 1009.

    This Court notes that subsequent to Knitwaves, the Supreme Court held that in

an action for infringement of trade dress under § 43(a) of the Lanham Act, "a product's

---

> A color is also capable of satisfying the more important part
> of the statutory definition of a trademark, which requires that
> a person "us[e]" or "inten[d]" to use the mark "to identify and
> distinguish his or her goods, including a unique product, from
> those manufactured or sold by others and to indicate the
> source of the goods, even if that source is unknown."

Qualitex Co., 514 U.S. at 162 (quoting 15 U.S.C. § 1127).  However, Qualitex does not
address whether the intent of the mark holder plays a role in determining whether a
trademark is inherently distinctive.  Instead, the focus was on the perception of the
customer and whether a color could even qualify as a trademark.  Id. at 162-64.

[5]      "'Trade dress is the total image of a product, the overall impression created, not
the individual features.'"  Gateway, Inc., 384 F.3d at 507 (quoting Aromatique, Inc., v.
Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994, citing Woodsmith Publishing Co. v.
Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990)).

design is distinctive, and therefore protectible, only upon a showing of secondary meaning." <u>Samara Brothers</u>, 529 U.S. at 216.   In ascertaining whether a mark has acquired a secondary meaning, the Eighth Circuit has held that "'the chief inquiry is <u>whether in the consumer's mind</u> the mark has become associated with a particular source.'" <u>Heartland Bank v. Heartland Home Finance, Inc.</u> 335 F.3d 810, 819 (8th Cir. 2003) (Smith, J., concurring) (emphasis added) (quoting <u>Aromatique, Inc. v. Gold Seal, Inc.</u>, 28 F.3d 863, 871 (8th Cir. 1994)); <u>see</u> <u>also</u> <u>Frosty Treats Inc.</u>, 426 F.3d at 1005 ("Secondary meaning does not require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source.") (citations omitted).   Given this definition of secondary meaning with regards to design trade dress, the <u>Knitwaves</u> decision is consistent with <u>Samara Brothers</u>, to the extent that the inquiry in <u>Knitwaves</u>, as to distinctiveness, focused on whether the trade dress identified the source of the product.  <u>See</u> <u>Knitwaves,</u> 71 F.3d at 1008.

However, this Court finds that the <u>Knitwaves</u> analysis is not applicable to this case, considering that the 300-850 scoring range is being characterized by Fair Isaac as a trademark regarding a good, as opposed to a design trade dress.  As stated previously, to determine whether a mark is distinctive and thus entitled to trademark protection, courts must first categorize it as generic, descriptive, suggestive, or arbitrary, and only then, if the trademark is characterized as descriptive, determine if it has secondary meaning.  <u>See</u> <u>Schwan's IP, LLC</u>, 460 F.3d at 974 (citations omitted). Moreover, with regards to the secondary meaning, the Eighth Circuit has concluded that the focus is on the point of view of the consumer, and that the "desires or intentions of the creator, or even the owner, of a mark are irrelevant."  <u>Co-Rect Products, Inc.</u>, 780

F.2d at 1332.  Therefore, defendants are not entitled to obtain from Fair Isaacs internal documents reflecting its marketing and strategy that led to the creation of the marketing materials.

Defendant also argued that these internal documents would reveal that Fair Isaac did not attempt to develop a secondary meaning for 300-850 scoring range until the VantageScore service was launched.  <u>See</u> Defs.' Reply at p. 4.  Again, this argument misses the mark.  As a general rule, consumer surveys and testimony of consumers are the sole avenue from which direct evidence can be obtained to determine whether a mark has acquired a secondary meaning.  <u>Heartland Bank</u>, 335 F.3d at 819 (Smith, J., concurring) (citing <u>Co-Rect Products, Inc.</u> 780 F.2d at 1330). Circumstantial evidence may also be used to establish secondary meaning, including: (1) exclusivity, length and manner of use of the trademark; (2) amount and manner of advertising; (3) amount of sales and number of customers (4) established place in the market; and (5) proof of intentional copying.  <u>Id.</u> (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Section 15:30 (4th ed. 1999)); <u>see also</u> <u>Frosty Treats Inc.</u>, 426 F.3d at 1005-06 ("Circumstantial evidence such as the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning.") (citations omitted).  Determination of secondary meaning is focused on the outcome of the trademark holder's efforts, <u>i.e.</u>, whether in the consumer's mind the mark has become associated with a particular source.  The determination does not take into account the desires or intentions of the creator or

owner of a mark.  See Aromatique, Inc., 28 F.3d at 871; see also Co-rect Prods. Inc., 780 F.2d at 1332; Black & Decker Mfg. Co. v. Ever-Ready Appliance Mfg. Co., 684 F.2d 546, 550 (8th Cir. 1982) (concluding that the essence of secondary meaning is the association in the mind of the public of particular aspects of trade dress with a particular product and producer, as opposed to focusing upon the intent and actions of the seller of the product).  As such, the internal documents regarding Fair Isaac's intent bear no relevance on the determination of secondary meaning.

**b.    Intent as it Relates to Defendants' Allegations of Abandonment**

Defendants also argued that Fair Isaac's intent is relevant to their defense that Fair Isaac has abandoned any trademark rights in the term "300-850."  See Defs.' Reply at pp. 4-5.

Pursuant to the Lanham Act a mark shall be deemed to be "abandoned" if:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C.A. § 1127. To show abandonment by nonuse, the party claiming abandonment must prove both the trademark owner's (1) non-use of the trademark; and (2) lack of intent by the owner to resume use of the mark.  See ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 147 (7th Cir. 2007) (string citation omitted); Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931, 935-36 (9th Cir. 2006) (citing 15 U.S.C. § 1127).

According to defendants, in answering their claim of abandonment, Fair Isaac will have to put forth evidence that "'the activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.'"  See Defs.' Reply at p. 5 (quoting Imperial Tobacco Ltd. v. Phillip Morris Inc. 899 F.2d 1575, 1581 (Fed. Cir. 1990)).

Defendants' contention fails for two reasons.  First, Document Request No. 52 request pertains to the affirmative use of the trademark – it seeks copies of the actual marketing materials used by Fair Isaacs in connection with its credit risk scoring services that contain the trademarks at issue in the case, and documents relating to the design and creation of those marketing materials.  The request does not seek documents reflecting what Fair Isaac was doing during periods it was  not using the trademark.  Second, defendants' argument presumes that there were gaps in the use of the trademarks, but presently there is no evidence of any gaps in Fair Isaac's use of the trademarks in its marketing.  Neither the request as worded, nor the evidence, provides a basis for obtaining Fair Isaac's internal marketing and strategy documents to address a defense of abandonment.

### c.    Conclusion

In summary, defendants have not satisfied this Court that internal marketing and strategy documents pertaining to Fair Isaac's use of the credit scoring range of 300-850 as a trademark in its advertising materials could lead to admissible evidence relevant to their defenses against Fair Isaac's trademark claims.  Thus, defendants' motion to compel as it relates to Document Request No. 52 is denied.[6]

---

[6]    As this Court has denied the motion to compel based on relevancy, it does not reach Fair Isaac's alternative argument of burden.

2.      **Request No. 62**

**Request No. 62:** Without regard to the Time Period defined above, all documents relating to or constituting communications between Fair Isaac and any other person concerning any of the Fair Isaac Designations, including but not limited to communications between Fair Isaac and any Defendant.

**Response to Request No. 62**: Fair Isaac objects to this Request as overbroad and unduly burdensome. Despite these objections and without waiving these objections communications between Fair Isaac and the Defendants regarding Fair Isaac's trademarks at issue will be produced, in addition to documents responsive to Request Nos. 60 and 61.

See Gant Decl., Ex. 2.

Despite the breadth of the wording of Document Request No. 62, the parties appear to agree that it is seeking documents reflecting Fair Isaac's enforcement activities. Tr. 66, 70, 81. In their opening brief, defendants asserted that this document request sought information relevant to Fair Isaac's attempts to enforce its trademark, which is relevant to the strength and validity of the purported trademark. See Defs.' Mem. at p. 13. According to defendants, evidence of selective enforcement of its trademarks would be highly probative of whether Fair Isaacs treated its alleged 300-850 trademark as a trademark, yet, Fair Isaacs had only agreed to produce documents reflecting communications with defendants, and not with third parties. Id. at pp. 12-13. Consequently, the thrust of defendants' motion was to obtain documents relating to communications with third parties. Id. at p. 12.

In response, Fair Isaac stated that it had agreed to produce all communications it had with defendants and third parties about the enforcement of its trademark, to search for any internal documents relating to communications with defendants about the

enforcement of the 300-850 range, and to produce any cease and desist letters to third parties.  <u>See</u> Pl's. Mem. at pp. 9-10.

In their reply and at the hearing, defendants stated that Document Request No. 62 went beyond requesting documents relating to actual communications that occurred between Fair Isaac and third parties; instead, they argued that it extended to proposed communications, such as cease and desist letters, that were never sent.  <u>See</u> Defs'. Reply at p. 5; Tr. 81.  In this regard, defendants asserted that documents relating to decisions not to enforce alleged trademarks also bore on issues of selective enforcement.  In short, defendants argued that the document request entitled them to communications that never occurred.

Based on a plain reading of Document Request No. 62, the phrase "relating to or constituting communications" limits the request to documents pertaining to actual communications made to defendants and third parties.  There is nothing in this request that seeks internal documents relating to communications to third parties that were never made.  As such, Fair Isaac shall provide defendants with documents regarding communications made to defendants and third parties concerning enforcement of the trademarks at issue, including internal documents relating to those communications. Defendants' motion to compel as it relates to production of internal documents relating to proposed communications that were never communicated to third parties regarding their use of the 300-850 scoring range, is denied.

### D.    Request Nos. 72-75—Documents Related to Injury

> **Request No. 72:** All documents relating to any past, present, or future economic injury to Fair Isaac resulting from the wrongdoing alleged in the Amended Complaint, including

those alleged in Paragraphs 5-7, 100-101, 111, 115-122, 124-125, 171-172, 182-184, 191, 193, 198, and 199.

**Response to Request No. 72**: Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as vague and unduly burdensome. Despite these objections and without waiving these objections, non-privileged documents that support Fair Isaac's claim that it has been injured as a result of the wrongdoing of the Defendants will be produced.

**Request No. 73:** All documents relating to any past, present, or future economic injury to purchasers of credit reports by reason of the formation or operation of the VantageScore joint venture, including, without limitation, injury occurring by reason of an alleged conspiracy to fix prices, coordination of prices, or reduced incentive to innovate.

**Response to Request No. 73**: Fair Isaac objects to this Request as overbroad, unduly burdensome, and vague. Despite these objections and without waiving these objections, documents that support Fair Isaac's claim that it has been injured by reason of the formation and operation of VantageScore will be produced.

**Request No. 74:** All documents relating to any past, present, or future economic injury caused by the formation or operation of the VantageScore joint venture, or any other misconduct alleged in the Amended Complaint, to either potential direct competitors of the Credit Reporting Agencies in the Aggregated Credit Data market, and/or other competitors or potential competitors in the market for algorithm development, or competitors or potential competitors in the Credit Scoring market.

**Response to Request No. 74**: Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as overbroad, unduly burdensome, and vague. Despite these objections and without waiving these objections, non-privileged documents that support Fair Isaac's claim that it has been injured as a result of the wrongdoing of the Defendants will be produced.

**Request No. 75:** All documents relating to any past, present, or future economic injury to Fair Isaac by reason of any alleged trademark infringement by one or more of the Defendants in this action.

**Response to Request No. 75**: Fair Isaac objects to this Request to the extent that it calls for documents protected by the attorney-client privilege or work-product doctrine. Fair Isaac also objects to this Request as unduly burdensome and vague. Despite these objections and without waiving these objections, non-privileged document that support Fair Isaac's claim that it has been injured by reason of any trademark infringement by one or more of the Defendants will be produced.

See Gant Decl., Ex. 2.

Defendants contend that these document requests go to the economic injury suffered by Fair Isaac as a result of the claims it has alleged against defendants in its Second Amended Complaint.  See Defs.' Mem. at p. 15.  Defendants took issue with Fair Isaac's representation that it would produce documents that support its claims that it has been injured by defendants, as opposed to also providing documents that would refute its claims of economic injury.  Id. at p. 16.

During the hearing, Fair Isaac's counsel represented in response to this Court's question regarding Document Request Nos. 72-75 as follows:

THE COURT:  All right.   So right now, the way your responses to document requests 72 to 75 reads is that you're to produce, ah, documents that support your claim for damages on these various, or claims for injuries.  Plaintiff – defendants have come back and said we're not interested in just those that support it.  Basically, were interested in the documents that bear on your claim for injuries.  And what you're telling me is you're going to not limit it to those that just support your claim for injuries but in fact you're going to produce, do a reasonable search to bcate documents that bear on your claim for injuries whether it supports, negates, or is neutral.

> MR. COLLYARD:   That's right, Your Honor.   Before defendants brought this motion we explained that to them.
>
> THE COURT:  But that's what you're agreeing to do.
>
> MR. COLLYARD:  That is right.

Tr. 69-70.

Based on the representations of Fair Isaac's counsel at the hearing on the present motion, this Court grants defendants' motion to compel as to Request Nos. 72-75.  Fair Isaac will conduct a reasonable search for and produce all documents that related to their claim for economic damages against defendants, including documents that support or contradict the amount of economic damages Fair Isaac claims it has suffered.

## III.    CONCLUSION

For all the reasons stated above, this Court grants in part and denies in part defendants' Motion to Compel. Consistent with this Memorandum, Fair Isaac shall provide amended discovery responses and produce responsive documents to defendants on or before October 17, 2007.

J.S.M.