## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Fair Isaac Corporation; and myFICO Consumer Services, Inc., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No: |
| Equifax Inc.; Equifax Information Services LLC; Experian Information Solutions, Inc.; Trans Union LLC; VantageScore Solutions, LLC; and Does I through X, | ) ) ) ) ) ) | 0:06-cv-04112 (ADM/JSM) |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT IN RESPECT OF ANTITRUST CLAIMS**

Table of Contents

Page

INTRODUCTION................................................................................................ 1

ALLEGATIONS OF THE COMPLAINT ............................................................ 5

    A.  Credit Data and Scoring Algorithms ........................................................ 5

    B.  Fair Isaac's Role ...................................................................................... 5

    C.  Formation and Purpose of VantageScore.................................................. 6

    D.  The Purported Relevant Markets............................................................... 7

    E.  The Antitrust Claims................................................................................. 8

ARGUMENT ....................................................................................................... 9

I.      THE ANTITRUST CLAIMS FAIL TO MEET THE SUPREME COURT'S
       PLEADING STANDARD ......................................................................... 9

    A.  Fair Isaac Fails Adequately to Allege Antitrust Injury, and Therefore
         Judgment on the Pleadings Must Be Rendered as to the Antitrust
         Counts ..................................................................................................... 10

        1.  The Antitrust Injury Requirement.......................................................... 10

        2.  Fair Isaac's Claim of Antitrust Injury is Fatally Deficient.................... 13

             a.     Failure to Allege Antitrust Injury: Count Eight – Alleged Antitrust
                     Conspiracy........................................................................... 14

             b.     Failure to Allege Antitrust Injury: Count Nine – Illegal Joint
                     Venture................................................................................. 19

             c.     Failure to Allege Antitrust Injury: Counts Ten and Eleven – Alleged
                     Attempted Monopolization and Conspiracy to Monopolize.................... 20

    B.  Fair Isaac Fails Adequately to Allege Any Agreement Beyond the
         Procompetitive Agreement to Form VantageScore, and Counts Eight,
          Nine, and Eleven are Subject to Judgment on the Pleadings for that
         Reason Too............................................................................................... 21

Table of Contents

Page

II.      FAIR ISAAC HAS FAILED TO STATE A CLAIM OF ATTEMPTED
         MONOPOLIZATION AND THEREFORE COUNT TEN IS SUBJECT TO
         JUDGMENT ON THE PLEADINGS ......................................................................... 22

III.     IN THE ALTERNATIVE, FAIR ISAAC'S OWN PUBLIC STATEMENTS
         ADMIT FACTS SUFFICIENT FOR THE COURT TO GRANT SUMMARY
         JUDGMENT FOR DEFENDANTS ON THE ANTITRUST CLAIMS ........................ 24

CONCLUSION .................................................................................................................... 32

Table of Authorities

Page

## CASES

*ACT, Inc. v. Sylvan Learning Sys.*, 296 F.3d 657 (8th Cir. 2002) ............................................... 11

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992) ................................................... 24

*Ansell Inc. v. Schmid Labs., Inc.*, 757 F. Supp. 467 (D.N.J. 1991) ............................................ 13

*Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328 (1990) ...........................................10, 11

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................*passim*

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ....................................14, 19

*In re Canadian Import Antitrust Litig.*, 470 F.3d 785 (8th Cir. 2006) ........................................ 10

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ..........................................10, 11, 14

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................................ 10

*Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005) .......................13, 17

*In re Elevator Antitrust Litig.*, No. 06-3128-cv, 2007 WL 2471805 (2d Cir. Sept. 4, 2007) ....... 22

*FDIC v. Bell*, 106 F.3d 258 (8th Cir. 1997) ................................................................................ 25

*Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005) ......................... 5

*Hillis v. Equifax Consumer Serv., Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006) .................................... 6

*Levy v. Ohl*, 477 F.3d 988 (8th Cir. 2007) ................................................................................... 9

*Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582
    (8th Cir. 1987) ...................................................................................................................... 16

*In re Marion Merrell Dow Inc. Sec. Litig.*, No. 92-0609-CV-W-6, 1993 WL 393810
    (W.D. Mo. Oct. 4, 1993) ...................................................................................................... 27

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................15, 25

*Midwest Radio Co. v. Forum Publishing Co.*, 942 F.2d 1294 (8th Cir. 1991) ........................... 12

*O.K. Sand & Gravel, Inc. v. Martin Marietta Tech., Inc.*, 36 F.3d 565 (7th Cir. 1994) ............. 12

## Table of Authorities

Page

*Pemstar Inc. Sec. Litig.*, No. Civ. 02-1821 DWFSRN, 2003 WL 21975563
(D. Minn. Aug. 15, 2003) .................................................................................... 27

*Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95 (5th Cir. 1988) ...................... 12

*Roark v. City of Hazen*, 189 F.3d 758 (8th Cir. 1999) .............................................. 25

*Sewell Plastics v. Southeastern Container*, 720 F. Supp. 1196 (W.D.N.C. 1989),
*aff'd*, 912 F.2d 463 (4th Cir. 1990) ...................................................................... 12

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................ 22

*US Airways Group v. British Airways, PLC*, 989 F. Supp. 482 (S.D.N.Y. 1997) ....... 17

*United States v. Marles*, 408 F. Supp. 2d 38 (D. Me. 2006) ................................... 6, 17

*Volmar Distrib., Inc. v. New York Post Co.*, 825 F. Supp. 1153 (S.D.N.Y. 1993) ....... 17

*Westcott v. City of Omaha*, 901 F.2d 1486 (8th Cir. 1990) .......................................... 9

*Weyerhaeuser v. Ross-Simmons Hardware Lumber Co.*, 127 S. Ct. 1069 (2007) ........ 11, 14

*Williams v. City of Carl Junction, Mo.*, 480 F.3d 871 (8th Cir. 2007) ....................... 24

### STATUTES

15 U.S.C. § 77a ............................................................................................................ 25

17 C.F.R. § 240.10b-5 ............................................................................................. 25, 27

Fed. R. Civ. P. 12(c) ............................................................................................. *passim*

Fed. R. Civ. P. 56 ................................................................................................ 1, 4, 24

### TREATISES

ABA Antitrust Law Section, ANTITRUST LAW DEVELOPMENTS 312 (6th ed. 2007) ........ 22, 23, 25

Phillip Areeda *et al.*, ANTITRUST LAW § 782 (2d ed. 2002) ...................................... 19

Table of Authorities

Page

**MISCELLANEOUS**

Public Statements by Corporate Representatives, Securities Act Release No. 6504,
    Exchange Act Release No. 20560, Investment Company Act Release No. 13718
    (Jan. 13, 1984) ................................................................................................................... 25

## INTRODUCTION

In the words of its CFO, plaintiff Fair Isaac Corporation "dominate[s]" the credit scoring business in the United States through its ubiquitous "FICO" credit score.[1] Nonetheless, in this action Fair Isaac has sued a nascent competitor, defendant VantageScore, and the companies that formed it -- defendants Equifax, Experian, and Trans Union -- and accused them of conspiring and attempting to monopolize the very marketplace that Fair Isaac dominates. *See* Second Amended Complaint (the "complaint" or the "SAC") ¶¶ 217-254 (Counts Eight through Eleven) (Tab 1). To protect its dominant position against the only potentially effective competitor the FICO score has ever faced, plaintiffs ask this Court to *dissolve* VantageScore. (SAC Prayer for Relief ¶ 11.) It is black letter law that efforts by competitors, such as Fair Isaac here, to thwart competition through antitrust litigation must be rejected.

Therefore, pursuant to Rule 12(c) or alternatively Rule 56 of the Federal Rules of Civil Procedure, defendants Equifax, Inc. and Equifax Information Services LLC (collectively, "Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union" or "TU"); and VantageScore Solutions, LLC ("VantageScore"), seek judgment in their favor on the antitrust claims asserted by plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc. (collectively, "FI").[2]

---

[1] Decl. of Bryan Gant ("GD") ¶ 9(a).

[2] The complaint also asserts trademark and false advertising claims against all defendants, and certain trade secret misappropriation claims against TU and

Judgment on the pleadings is mandated in light of the U.S. Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  In *Twombly*, the Court made clear that antitrust complaints must satisfy minimum standards of specificity and plausibility and that courts should aim to expose deficiencies "at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 1966.

Even accepting the facts alleged in the complaint as true, FI's antitrust claims fail for at least the following reasons:  <u>First</u>, each claim fails to state a plausible theory as to how FI has or likely will suffer antitrust injury.  This failure mandates judgment as to Counts Eight through Eleven.  <u>Second</u>, to the extent FI alleges illegal combinations or agreements beyond the formation and operation of the VantageScore joint venture itself, such claims also fail to meet the *Twombly* pleading requirements, which disables Counts Eight, Nine, and Eleven.  <u>Third</u>, the attempt-to-monopolize claim (Count Ten) fails to adequately allege a dangerous probability of achieving monopoly, an essential element of the claim.  Judgment on the pleadings as to the antitrust claims is therefore appropriate pursuant to Fed. R. Civ. P. 12(c).

In the alternative, based on a remarkable series of public admissions by FI's senior executives, made in a context where they were legally bound to speak the truth and make no material omissions, defendants are entitled to summary judgment at this juncture as well.  These public admissions -- made to securities analysts and the press -- refute FI's antitrust claims.  To take but a few examples:

---

VantageScore.  Defendants vigorously deny these meritless claims and intend to move for summary judgment on them once discovery is complete.

- Although the complaint alleges that VantageScore could drive FI from the credit scoring marketplace, the FI executives are reporting to securities analysts that FI has not "lost any single customer as a result of those pressures [from VantageScore]," nor do they see VantageScore "impacting our business in any way" in the future.  (GD ¶¶ 3(a), 4(k).)  FI executives also admit that the FICO score has long dominated the credit scoring marketplace -- one characterized FI as "the 800-pound gorilla" of credit scoring -- and that its dominance is firmly entrenched due to the "huge" costs and difficulties for financial institutions to switch from the FICO scoring system to a competitive system.  (GD ¶¶ 9-10.)

- The complaint alleges that the creation and operation of VantageScore is anticompetitive, yet FI's then-CEO stated publicly that the new score represented the defendants "trying another idea, *and that's what competition is all about.*"  (GD ¶ 7(a) (emphasis added).)

These admissions and numerous others -- most made in the context of earnings briefings that were transcribed verbatim -- eliminate any legitimate claim by FI that there is a material fact dispute about FI's alleged antitrust injury.  These undisputed facts puncture FI's conclusory allegation that VantageScore constitutes an anticompetitive presence that, unless dissolved, will drive FI from the marketplace.  Instead, the facts revealed in these admissions demonstrate that VantageScore has introduced legitimate and much needed competition into a marketplace long dominated by the FICO score, and,

while VantageScore does represent competition, it certainly presents no threat, let alone an anticompetitive threat, to FI's survival.[3]

Discovery is not yet complete, and in the usual case defendants would submit evidence from the completed discovery record to support the absence of fact disputes on these key issues.  However, defendants should not have to endure months of additional antitrust discovery and pretrial preparation when FI's representatives are revealing the baselessness of their claims here and now.[4]  FI cannot in good faith disavow the statements of its own executives, delivered under the duties of truthfulness and candor imposed by the federal securities laws.  And, if FI seeks to do so, it should be able to explain *now* why its own statements are inaccurate and how its executives did not violate the securities laws by making such inaccurate or misleading public statements.

Accordingly, the Court should enter judgment on the antitrust claims based on the pleadings alone, pursuant to Rule 12(c) or, in the alternative, grant summary judgment on such claims pursuant to Rule 56.

---

[3] The Antitrust Division of the Department of Justice conducted a review of the competitive impact of the VantageScore joint venture, subpoenaing documents, interviewing witnesses, etc.  After an approximately seven-month inquiry, the Division closed its investigation with no action.  (*See* GD ¶ 2(d).)

[4] The schedule adopted by Magistrate Judge Mayeron calls for the completion of fact and expert discovery by March 1, 2008, and July 15, 2008, respectively, and trial-readiness by February 1, 2009 (GD ¶ 2(b), Tab 3.)  Because defendants seek resolution of these baseless claims as early as possible, we do not seek to stay discovery while this motion is pending.  Judgment on the antitrust claims in the next few months, however, would avoid the substantial burden and expense of remaining expert discovery and trial preparation for these claims.  *Twombly,* 127 S. Ct. at 1967 (meritless antitrust actions must be weeded out as soon as possible in light of unusually high cost of discovery in antitrust cases).

## ALLEGATIONS OF THE COMPLAINT

### A.    Credit Data and Scoring Algorithms

A "Credit Score" is "a representation of an individual consumer's financial creditworthiness that quantifies the risk that a consumer will fail to repay a loan or other credit obligation."  (SAC ¶ 11(c).)  "Credit Scoring" is "the process by which an algorithm, or set of algorithms is applied to Aggregated Credit Data to generate a Credit Score."  (SAC ¶ 11(d).)

The complaint defines "Aggregated Credit Data" as "the historical records of an individual consumer's borrowing and repayment as reported to credit reporting agencies by multiple lenders and servicers of loans."  (SAC ¶ 11(b).)  "Aggregated Credit Data" is separately compiled, reported, and sold by Equifax, Experian, and TU (collectively, "the Bureaus"), with such activity representing the core of their respective businesses.  (SAC ¶¶ 2, 25-27.)  "[C]redit reporting in the United States is entirely voluntary," and, therefore, the Bureaus depend on major financial institutions, other lenders, and merchants to provide data.  (SAC ¶ 25.)

### B.   Fair Isaac's Role

FI readily admits that its "FICO" credit score is the dominant and most well-known consumer credit score in the United States.  *See* SAC ¶¶ 2 (FICO score is "the leading Credit Score in the financial industry today . . ."), 22 (the "most well-known"), 48 ("used by most of the 100 largest financial institutions and by most mortgage loan originators"), 97 ("the most often used, accepted and relied on by lenders."); *see also Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 467 n.6 (3d Cir. 2005)

(FICO is "the industry standard credit scoring system"); *Hillis v. Equifax Consumer Serv., Inc.*, 237 F.R.D. 491, 509 (N.D. Ga. 2006) (FICO is "the most widely used score in lending"); *United States v. Marles*, 408 F. Supp. 2d 38, 40 (D. Me. 2006) ("virtually all commercial lenders" use FICO).

In most cases FI itself does not calculate or provide FICO scores directly to the lenders.  (SAC ¶ 22.)  Rather, FI licenses its algorithms to the Bureaus, which in turn apply their data to the algorithm to generate and sell scores (usually with credit reports) to lenders.  (SAC ¶¶ 2, 44-46.)

## C.    Formation and Purpose of VantageScore

VantageScore is a joint venture formed by Equifax, Experian, and TU to develop a credit scoring algorithm to compete with the dominant FICO score.  "VantageScore" scores became commercially available on March 14, 2006.  (SAC ¶ 63.)

Like FI, VantageScore owns a scoring algorithm that is licensed to the Bureaus for sale.  (SAC ¶ 63.)  Equifax, Experian, and TU compete in marketing VantageScore credit scores, which are calculated by applying the VantageScore algorithm to their individual Aggregated Credit Data.  (SAC ¶¶ 63, 68.)  "[T]he Credit Bureaus do not share Consumer credit information with one another in calculating their . . . Credit Scores." (SAC ¶ 66.)

FI has long owned algorithms that run on each Bureau's credit data.  For example, the complaint alleges that FICO algorithms "provide consistent and highly effective predictive power *regardless of the credit bureau providing the data*."  (SAC ¶ 40 (emphasis added).)  In order to develop algorithms effective across all the Bureaus' data

sets, FI has "collaborated closely" with each Bureau and thus become familiar with the unique organization and attributes of each Bureau's data.  (SAC ¶¶ 29, 40, 101(d).)

Each Bureau has developed its own proprietary scoring algorithms and attempted to sell them in competition with the FICO score; but each Bureau's proprietary algorithms were developed using only that Bureau's data set and thus are most effective on that Bureau's data, not across the data of all Bureaus.  (SAC ¶ 26-27.)

Like FI, VantageScore has had access to all three Bureaus' data, and thus the VantageScore algorithm can be used across the data sets of all three Bureaus.  (SAC ¶ 3.) Since, as the complaint concedes, the individual Bureaus do not have access to the others' data sets outside the joint venture, none of the Bureaus unilaterally could have developed an all-purpose scoring algorithm based on such access.  The VantageScore algorithm thus represents the first serious competition to FI's dominant scoring system.  The complaint makes no allegation that VantageScore has achieved any share, let alone a significant share, of any market.

## D.    The Purported Relevant Markets

The complaint asserts two purported relevant markets, which defendants must accept as true *arguendo* for purposes of this motion.  First, FI identifies a Credit Scoring Market, defined as "the market for Credit Scoring sold to Lenders and to Consumers." (SAC ¶ 11(a)(ii), (d).)  Second, FI identifies an Aggregated Credit Data Market, defined as "the market for Aggregated Credit Data." (SAC ¶ 11(a)(i), (b).)

E.     **The Antitrust Claims**

FI asserts four antitrust counts, which are summarized below:

***Count Eight***.  FI alleges that, through the joint creation and ownership of the VantageScore venture, and possibly other unspecified agreements, the defendants have restrained trade in both the purported Aggregated Credit Data and Credit Scoring Markets, in violation of Section 1 of the Sherman Act.  (SAC ¶¶ 217-229.)

With respect to the Aggregated Credit Data Market, FI alleges: (1) that the creation of VantageScore will reduce the incentive for the Bureaus to compete in the "development and sale" of Aggregated Credit Data (SAC ¶¶ 6, 135-37, 224); and (2) *if* FI exits credit scoring at some future time, then it will no longer be able to serve some kind of "facilitat[ing]" role to unspecified entities seeking entry into the Aggregated Credit Data Market.  (SAC ¶¶ 140, 225.)

With respect to the Credit Scoring Market, FI alleges that the VantageScore venture represents an attempt to leverage the Bureaus' purported shared control of the Aggregated Credit Data Market "to destroy competition in the Credit Scoring Market." (SAC ¶ 225.)  The complaint (1) asserts that the Bureaus are charging less for scores using the VantageScore algorithm than for those using FICO algorithms (SAC ¶¶ 111, 124-28) (but doesn't claim predatory pricing); (2) claims that the advent of VantageScore will result in withdrawal of the Bureaus' individual scoring algorithms (but doesn't allege any withdrawal has actually occurred) (SAC ¶¶ 69, 224) and (3) speculates that the Bureaus might one day deny FI and other third-party scoring vendors access to the Bureaus' credit data and drive FI from the market.  (SAC ¶¶ 130, 221.)

***Count Nine***.  FI alleges that VantageScore is an illegal joint venture, violating both Section 7 of the Clayton Act and Section 1 of the Sherman Act.  (SAC ¶¶ 230-239.)

***Count Ten***.  FI asserts that the defendants are attempting to monopolize the Credit Scoring Market, violating Section 2 of the Sherman Act by using the Bureaus' purported collective market power in the Aggregated Credit Data Market to exclude FI from the Credit Scoring Market, thereby making VantageScore a monopolist in the Credit Scoring Market.  (SAC ¶¶ 240-46.)

***Count Eleven***.  FI alleges that the defendants have conspired to monopolize the purported Credit Scoring Market, also in violation of Section 2 of the Sherman Act. (SAC ¶¶ 247-54.)[5]

## **ARGUMENT**

### I.   **THE ANTITRUST CLAIMS FAIL TO MEET THE SUPREME COURT'S PLEADING STANDARD**

The standards for reviewing motions under Fed. R. Civ. P. 12(c) are identical to those under Rule 12(b)(6).  *See*, *e.g.*, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  In considering a motion pursuant to Rule 12(b)(6), courts must accept as true all well-pleaded factual allegations contained in the complaint and draw all permissible inferences in favor of the non-movant.  *See*, *e.g.*, *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).  "However, the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal." *Id.*

---

[5] Count 12 of the Complaint also sounds in antitrust, but FI has withdrawn this Count.

In *Twombly*, the Supreme Court jettisoned the "no set of facts" criterion of *Conley v. Gibson*, 355 U.S. 41 (1957), and clarified the standard that plaintiffs must satisfy in order to survive a motion to dismiss antitrust claims.  127 S. Ct. 1955 (2007).  The Court ruled that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65.  What is required are plausible "*factual allegations* [which] must be enough to raise a right to relief *above the speculative level*." *Id.* (emphasis added).  Recognizing the "unusually high cost of discovery in antitrust cases," the Court held that district judges must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967.  An antitrust plaintiff must set forth "enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974; *see also id.* at 1968 (referring to the pleading "requirement of plausibility").

> **A.    Fair Isaac Fails Adequately to Allege Antitrust Injury, and Therefore Judgment on the Pleadings Must Be Rendered as to the Antitrust Counts**
>
> **1.    The Antitrust Injury Requirement**

Private antitrust plaintiffs such as FI must plead and prove that they have suffered (or are dangerously likely to suffer) "antitrust injury" as a result of the claimed illegal conduct.  *See, e.g., Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328, 334 (1990); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986); *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).

To constitute antitrust injury, a plaintiff's injury must flow from the *competition reducing* aspects of the challenged conduct.  For example, in *Cargill*, a beef packing company sought to enjoin the merger of the second and third largest competitors in the market, claiming that the merged entity likely would be more efficient, charge lower prices, and gain market share -- all to plaintiff's detriment.  479 U.S. 104.  In rejecting this argument, the Supreme Court warned that a plaintiff seeking relief "must show a threat of antitrust injury, and that a showing of loss or damage due merely to increased competition does not constitute such injury."  *Id.* at 122.

In *Atlantic Richfield*, the Supreme Court held that even plaintiffs asserting *per se* violations of the Sherman Act, such as price fixing, must plead and prove antitrust injury.  495 U.S. at 329.  In that case, the Court found that the plaintiff oil company suffered no antitrust injury where it was claiming lost sales due to low, but non-predatory prices charged by a competitor allegedly pursuant to a price-fixing conspiracy.  *Id.* at 340; *see also Weyerhaeuser v. Ross-Simmons Hardware Lumber Co.*, 127 S. Ct. 1069, 1074 (2007) (Court was "particularly wary" about condemning "above-cost price cutting . . . [because it] directly benefits consumers").

Because competitors have an incentive to try to use the antitrust laws to destroy competition, courts will dismiss competitor claims if the plaintiff bases its claim on (1) conduct that allegedly injures consumers but *helps* the plaintiff, such as higher prices, and/or (2) "injury" flowing from lawful competition, such as lower but non-predatory prices.  *See, e.g., ACT, Inc. v. Sylvan Learning Sys.*, 296 F.3d 657, 669-70 (8th Cir. 2002) (competitor unable to show antitrust injury where alleged damages did not result from

conduct that eliminated competition); *O.K. Sand & Gravel, Inc. v. Martin Marietta Tech., Inc.*, 36 F.3d 565, 572-73 (7th Cir. 1994) ("Clearly, price increases could not be considered an antitrust injury to competitors."); *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988) (Competitor has no automatic right to sue an alleged monopolist; "rather, the plaintiff must show antitrust injury.").

In *Sewell Plastics v. Southeastern Container*, 720 F. Supp. 1196 (W.D.N.C. 1989), *aff'd*, 912 F.2d 463 (4th Cir. 1990), the court rejected an antitrust challenge by an entrenched competitor against a joint venture formed by its customers to introduce new competition.  In that case, Sewell Plastics, the largest manufacturer of plastic soft drink bottles in the U.S., sued a large group of Coca-Cola bottlers in the Southeast that had pooled their resources to build a plastic bottle plant to compete with Sewell.  Prior to the joint venture, Sewell supplied ninety percent of the joint venture owners' plastic bottle needs.  Similar to FI's claims here, Sewell asserted that defendants' "purpose and intent in forming [the competing joint venture] was to lock out Sewell and other plastic beverage bottle suppliers out of the Coke-bottler business in the areas where the bottlers were located." *Id*. at 1216.  Sewell claimed to have been injured principally by (1) the joint venture owners' commitment to purchase eighty percent of their plastic bottle requirements from the joint venture (which necessarily cut off Sewell's ability to compete for such sales) and (2) the lowering of average bottle prices after the joint venture was formed.  The court found that Sewell's claimed injury was a result of increased competition and therefore not actionable under cases such as *Cargill. Id*. at 1199, 1221-22; *see also*, *e.g.*, *Midwest Radio Co. v. Forum Publishing Co.*, 942 F.2d 1294, 1298 (8th

Cir. 1991) (no antitrust liability where alleged monopolist "turn[ed] up the heat of . . . competition"); *Covad Commc'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005) (dismissing claim on pleadings where competitor sued over increased "market rivalry"); *Ansell Inc. v. Schmid Labs., Inc.*, 757 F. Supp. 467, 485 (D.N.J. 1991) ("Plaintiff [Ansell] turns antitrust law on its head by suggesting that Ansell has a right to be protected from the introduction of a competing brand into channels of distribution where Ansell is well-established.").

### 2.     Fair Isaac's Claim of Antitrust Injury is Fatally Deficient

FI alleges various speculative effects arising from the VantageScore venture, but none that support FI's claim of antitrust injury.

For example, the complaint alleges that the Bureaus are charging lower prices for VantageScore than for FICO scores.  (SAC ¶ 126; *see also* SAC ¶¶ 111, 124-128, 242.) The complaint also alleges that the Bureaus wish their joint venture to succeed.  (*See* SAC ¶ 120.)  These paragraphs are incorporated into each of the antitrust counts.  Such conduct, of course, is merely legitimate competition, exactly what the antitrust laws were designed to encourage.  As the Supreme Court held in *Cargill*:

> [T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws.  The kind of competition that [plaintiff-competitor] alleges here, competition for increased market share, is not activity forbidden by the antitrust laws.  It is simply . . . vigorous competition. *To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would*, *in effect*, *render illegal any decision by a firm to cut prices in order to increase market share.  The antitrust laws require no such perverse result.*

479 U.S. 104, 116 (1986) (emphasis added); *see also*, *e.g.*, *Weyerhaeuser,* 127 S. Ct. at 1074.  The Court's concerns noted in *Cargill* are amplified here since, far from a "small business," FI is a *dominant* business seeking protection from competition.

The complaint also alleges, in conclusory fashion, a plethora of speculative "harms" that purportedly might arise from VantageScore's presence.  But, as shown below, even if these are accepted as true (and adequately pled), they amount to potential *lender* or *consumer* harm, or otherwise fail the *Twombly* pleading requirements, and thus are unable to support FI's claimed antitrust injury.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486-87 (1977) (purportedly illegal market presence is not antitrust injury).[6]

### a.   Failure to Allege Antitrust Injury:<br>Count Eight – Alleged Antitrust Conspiracy

With respect to the purported Credit Scoring Market, Count Eight alleges the following types of competitive "harm."  First, it claims that the defendants' alleged conduct "increase[es] the ability and incentive for the Credit Bureaus to profitably raise price . . . and reduce output, quality, service or innovation . . . ." (SAC ¶ 222; *see also* SAC ¶¶ 138, 223.)  As an initial matter, the notion that the entry of a new competitor into a scoring marketplace admittedly dominated by FI is likely to result in higher prices, reduced output, or the like is speculative and implausible in the extreme.  *See Twombly*, 127 S. Ct. at 1965-68 (plaintiff must state claim for relief "that is plausible on its face").

---

[6]  No lender or consumer has made an antitrust claim against defendants concerning VantageScore and, as noted, the Department of Justice concluded its inquiry into VantageScore with no action.

But even assuming *arguendo* that such things were likely to occur due to VantageScore, FI, as a competitor, would actually *benefit* from higher scoring prices, reduced scoring output, reduced quality, etc.  *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) (competitor does not suffer injury, let alone antitrust injury, from actions that raise market prices or limit output, as such actions *benefit* rather than harm competitors).[7]

Second, Count Eight claims that the new VantageScore algorithm "actually reduces predictiveness of creditworthiness."  (SAC ¶ 227.)  But, even accepting this contention as true (as we must for this motion), FI should *benefit* from being able to compete against an inferior competitor and therefore suffers no antitrust injury.

FI's conclusion, also asserted in paragraph 227, that there is no "competitive benefit" to the introduction of a new product that is not superior to the market leader, is incorrect.  Giving customers the option to select products of differing levels of quality and price is procompetitive.  For example, an auto market consisting only of expensive, high performance luxury or sports cars is clearly undesirable from a competition or consumer standpoint.

Third, Count Eight implausibly asserts that defendants' alleged conduct will "eliminate competition for the VantageScore model" and "eliminate third-party vendors of scoring algorithms used to generate competing Credit Scores."  (SAC ¶ 225.)  Again,

---

[7] Moreover, these allegations conflict with FI's claims, discussed above, of the low pricing of VantageScore.

as a competitor in credit scoring, FI would *benefit* from a reduction in competition in that marketplace.

FI does allege that the establishment of VantageScore "threaten[s] to destroy other participants in the market for Credit Scores, in particular *Fair Isaac*." (SAC ¶ 226 (emphasis added).) But, because the antitrust laws protect competition, not competitors, even the alleged elimination of a competitor isn't an antitrust violation if it is due to lawful competition. *See*, *e.g.*, *Lomar Wholesale Grocery*, *Inc. v. Dieter's Gourmet Foods*, *Inc.*, 824 F.2d 582, 597 (8th Cir. 1987) ("Even in a two-firm market, when one of the competitors is eliminated, other factors in the market may indicate that *competition* is not substantially impaired."). As noted above, FI complains about VantageScore's alleged low prices; but if FI lost profits or even was driven from business due to low, but not predatory, pricing by a competitor, antitrust law provides no recourse. FI does not allege predatory pricing.

FI also alleges that the VantageScore venture creates incentives for the Bureaus, at some indeterminate future time, to systematically deny FI the credit data it needs to administer and improve its FICO score, thereby driving it from the scoring business.[8] But the complaint admits that FICO scores have been used for years by almost all major

---

[8]   *See, e.g.,* SAC ¶¶ 130 (The Bureaus "have *the ability* to marginalize and/or exclude [FI] from the market by denying [FI] access on reasonable terms to the Credit Bureaus' Aggregated Credit Data" (emphasis added), 235 ("Because [the Bureaus] . . . together control 100% of the market for Aggregated Credit Data . . . [the Bureaus] have the *incentive and ability* to restrict, if not eliminate [FI's] ability to compete . . . .") (emphasis added); 244 (mere "*dependence*" of FI on access to Aggregated Credit Data allegedly gives rise to "dangerous probability" that VantageScore will secure monopoly power) (emphasis added).

financial institutions.  (SAC ¶¶ 2, 22, 48, 97.)  The FICO score is literally embedded in

the decisioning systems of "virtually all commercial lenders."  *Marles,* 408 F. Supp. 2d at

40.  (*See also* SAC ¶¶ 2, 22, 49, 97.)  The staple of the Bureaus' respective businesses is

their Aggregated Credit Data, and they are completely dependent on lenders for access to

raw credit data.  (SAC ¶ 25.)  The lenders are also the Bureaus' largest customers.  (SAC

¶ 11(a)(i).)  It is implausible to allege, therefore, that any of the Bureaus would likely

antagonize lenders -- upon whom they are almost entirely dependant -- by denying them

improved FICO scores as a result of a hypothetical data embargo imposed on FI.  Such

naked speculation cannot satisfy the *Twombly* plausibility test.  *Twombly,* 127 S. Ct. at

1965-68, 1974 (discussing plausibility requirement), 1971 (plausibility evaluated "in light

of common economic experience"); *see also*, *e.g.*, *Covad,* 398 F.3d at 674 (dismissing

claim due to failure to allege "plausible harm to competition"); *US Airways Group v.

British Airways*, *PLC*, 989 F. Supp. 482, 489 (S.D.N.Y. 1997) ("General conclusions

unsupported by factual allegations do not sufficiently allege the antitrust injury required

for standing."); *Volmar Distrib*., *Inc. v. New York Post Co*., 825 F. Supp. 1153, 1160

(S.D.N.Y. 1993) (same).

    Fourth, Count Eight asserts that the VantageScore venture has the "purpose and

effect" of "in effect" eliminating competition among the Bureaus to develop their own

individual Bureau credit scoring algorithms.  (SAC ¶ 224.)  If, however, the Bureaus

were to stop developing individual credit scoring algorithms that compete against the

FICO algorithm, that would *benefit* FI, not harm it.

Count Eight also asserts various potential harms to the purported Aggregated Credit Data Market allegedly stemming from VantageScore (SAC ¶¶ 224, 225), but these claimed harms also fail to meet the *Twombly* requirements of plausibility and lack of speculation.  First, FI claims that it plays a key role in "facilitating" the entry of new competitors in the Aggregated Credit Data Market and that if some day FI exits the scoring market, this role will be lost, thus increasing entry barriers.  (SAC ¶¶ 140, 142-43, 225.)  As shown above, however, it is highly implausible speculation that FI will be denied access to data and thus driven from the scoring business.

Second, FI claims that the joint aspect of the VantageScore algorithm might reduce the Bureaus' incentives to develop innovations applicable to their respective aggregated data sets, allegedly because such innovations would require disclosure to the other Bureaus for incorporation into the VantageScore algorithm.  (SAC ¶¶ 6, 135-37, 224.)  This claim too is highly implausible.  As an initial matter, the Bureaus' principal businesses are selling aggregated credit data to lenders and others (SAC ¶¶ 11(a)(i), 43); scoring is not the main focus of their businesses.  The idea that the Bureaus would stop innovating or competing on the staple of their respective businesses because of alleged incentives relating to a nascent scoring algorithm defies common sense.  Moreover, the complaint concedes that, because VantageScore uses exactly the same algorithm for all three Bureaus' data, differences in VantageScore scores for individual consumers across the Bureaus can only be attributed to differences in data.  (SAC ¶ 66.)  Since VantageScore actually *exposes* differences among the Bureaus' data, this plainly creates a powerful incentive for each Bureau to maintain data that is as up to date, current, and

innovative as possible.  FI's speculation to the contrary cannot satisfy the standard of

*Twombly*.

In sum, Count Eight alleges no cognizable antitrust injury and therefore is subject

to judgment on the pleadings.[9]

### b.  Failure to Allege Antitrust Injury: Count Nine – Illegal Joint Venture

Count Nine, as noted, challenges the VantageScore venture under Section 7 of the

Clayton Act and Section 1 of the Sherman Act.  Both the Section 7 and Section 1 claims

are subject to the injury requirements discussed above.  *See*, *e.g.*, *Brunswick.*, 429 U.S. at

489 (private Clayton 7 action subject to antitrust injury requirement).

Like Count Eight, Count Nine claims --

- Low pricing of VantageScore.  (SAC ¶¶ 111, 124-28, 242, incorporated by reference in all counts.)

- Purported information exchange leading to greater transparency in costs, prices, and innovations and thus higher prices.  (SAC ¶ 234; *compare* Count 8, SAC ¶ 223.)

- Purported incentives for Bureaus to deny FI access to Aggregated Credit Data. (¶ 235; *compare* Count 8, SAC ¶ 221.)

- Purported "reduce[d] predictiveness" of the VantageScore algorithm.  (SAC ¶ 236; *compare* Count 8, SAC ¶ 227.)

- Purported increased barriers to entry into purported Aggregated Credit Data Market.  (SAC ¶ 234; *compare* Count 8, SAC ¶ 225.)

These claims fail for the reasons discussed above in connection with Count Eight.

---

[9] FI also apparently attempts to convert its trademark and false advertising claims into antitrust claims.  (*See, e.g.*, SAC ¶¶ 1, 9, 242, 250.)  But alleged business torts do not normally rise to the level of antitrust claims.  *See, e.g.*, Phillip E. Areeda *et al.,*

Count Nine claims that the creation of VantageScore "effectively reduces the number of competitors [in Credit Scoring Algorithms] from four to two."  (SAC ¶ 235.) This assumes that the Bureaus will drop their individual scoring algorithms and refuse to sell VantageScore in competition with one another (despite the fact that continued and vigorous competition among the Bureaus is part of the VantageScore structure).  Even accepting these assumptions as true, having fewer competitors would be beneficial for FI and causes it no antitrust injury.

**c.**     **Failure to Allege Antitrust Injury: Counts Ten and Eleven – Alleged Attempted Monopolization and Conspiracy to Monopolize**

Counts Ten and Eleven accuse defendants of, respectively, attempting to monopolize and conspiring to monopolize the purported Credit Scoring Market.  Count Ten alleges that, as a result of defendants' purported misconduct, there is a dangerous probability that VantageScore will attain monopoly power in the purported Credit Scoring Market.  (SAC ¶¶ 242-44.)  The Count alleges no specific "harms" to FI, but incorporates by reference all preceding paragraphs.  Defendants, therefore, incorporate the discussion of the inadequacy of the "harms" claimed above.  Count Eleven alleges the same harms discussed in the prior Counts and is deficient for the same reasons.

*  *  *

At bottom, as the complaint itself alleges, VantageScore offers clients *choice* and *lower prices*, neither of which existed before it came to the market.  Such is the essence

---

ANTITRUST LAW §§ 782a-d (2d ed. 2002) (business torts should give rise to antitrust liability only in "rare and gross cases").

-20-

of legitimate competition.  Because FI cannot establish antitrust injury, all of its federal

antitrust claims -- Counts Eight through Eleven -- fail on this basis alone.

**B.    Fair Isaac Fails Adequately to Allege Any Agreement Beyond the Procompetitive Agreement to Form VantageScore, and Counts Eight, Nine, and Eleven are Subject to Judgment on the Pleadings for that Reason Too**

As noted above, Counts Eight, Nine, and Eleven allege illegal agreements in

violation of Sections 1 and 2 of the Sherman Act.  (SAC ¶¶ 217-39, 247-54.)  The Counts

adequately identify that the Bureaus agreed to form VantageScore, to have certain

common marketing messages for the score, and to work for it to succeed.  As discussed

above, however, such agreement(s) are plainly procompetitive (and cannot plausibly be

depicted as substantially anticompetitive), as shown by the facts alleged in the complaint

itself.  *See supra* 5-7, 13-14, 15-19, 20-21; *see also infra* 23.  To the extent FI contends

that other conspiracies or schemes are alleged in the complaint, however, such

conspiracies are inadequately stated under *Twombly*.

While Count Nine seems to be focused exclusively on the VantageScore joint

venture agreement (SAC ¶¶ 230-39), Counts Eight and Eleven contain allegations that,

because of their vague and conclusory nature, make it difficult to discern whether FI

alleges agreements beyond the joint venture, the common message, and the desire for the

venture to succeed.  If it does, these allegations refer only to unspecified "combinations,

contracts, agreements and conduct" (SAC ¶ 222) and/or an unspecified "conspiracy" to

"use the Credit Bureaus' collective market power over Aggregated Credit Data to move

the financial industry to the jointly owned VantageScore [score]."  (SAC ¶¶ 249-50, 252.)

The 70-odd pages of allegations that precede the Counts provide no additional clarification; as even a cursory reading shows, they consist of speculation, conclusory allegations, and antitrust jargon, often pled on "information and belief." Such allegations fail to meet the *Twombly* standard. *See Twombly*, 127 S. Ct. at 1985 n.9 (even pleadings alleging parallel conduct must allege some "specific time, place, or person involved in the alleged conspirac[y]"); *see also, e.g., In re Elevator Antitrust Litig.*, No. 06-3128-cv, 2007 WL 2471805. at *2 (2d Cir. Sept. 4, 2007).

Counts Eight, Nine, and Eleven therefore fail for the additional reason that they do not adequately allege any agreements beyond the procompetitive agreements to form and operate the VantageScore venture.

## II.   FAIR ISAAC HAS FAILED TO STATE A CLAIM OF ATTEMPTED MONOPOLIZATION AND THEREFORE COUNT TEN IS SUBJECT TO JUDGMENT ON THE PLEADINGS

Count Ten also fails because FI has not adequately alleged attempted monopolization. To establish this violation, FI must plead and prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Allegations in support of each element must be both non-speculative and plausible. *Twombly*, 127 S. Ct. at 1964-68. The complaint is particularly deficient with respect to the third element -- the dangerous probability of achieving monopoly power.

"The principal factor to which the courts look in appraising whether there is a dangerous probability of success is the defendant's share of the relevant market." ABA

Antitrust Law Section, ANTITRUST LAW DEVELOPMENTS ("ALD") 312 (6th ed. 2007). Where market share is less than thirty percent, dangerous probability of success is "virtually never" found.  ALD at 313-14 (collecting cases).

Here, FI fails to allege any market share for VantageScore, whether present or anticipated.  This is not surprising, since doing so would reveal that VantageScore's sales have been a drop in the ocean compared to FI's dominant share.

Nor does FI make any other allegation that remotely supports the dangerous probability element of the attempt offense.  The bankruptcy of FI's claim is underscored by FI's current dominance of the credit scoring marketplace in which it claims to be the target of the monopolistic attempt.  FI asserts that the Bureaus *could* harm FI *if* they refused to do business with it.  (*See, e.g.*, SAC ¶¶ 130, 244.)  But alleging a hypothetical -- particularly one that, as discussed above, is highly implausible -- is no substitute for alleging that some kind of systematic denial either has occurred or is likely to occur.  *See, e.g.*, *Twombly*, 127 S. Ct. at 1967.

At bottom, FI's claim to be the victim of an attempt to monopolize is inherently implausible.  If VantageScore is inferior, as FICO claims (SAC ¶ 67), there is no likelihood at all that the many sophisticated lending institutions that buy credit scores will allow FI to be driven from the marketplace.  If, conversely, VantageScore is superior to, or as good as, the FICO algorithms, customers will now have the choice of a bona fide competitor to FICO.  Should the market ever move toward VantageScore to the detriment of FI, it will be due to competition.

III.   **IN THE ALTERNATIVE, FAIR ISAAC'S OWN PUBLIC STATEMENTS ADMIT FACTS SUFFICIENT FOR THE COURT TO GRANT SUMMARY JUDGMENT FOR DEFENDANTS ON THE ANTITRUST CLAIMS**

As shown above, the complaint fails to articulate a viable antitrust claim and is subject to judgment pursuant to Rule 12(c).  However, summary judgment pursuant to Rule 56 is also appropriate because repeated public statements by FI's senior-most executives over the eighteen months since VantageScore has been on the market -- statements to securities analysts and the press -- demonstrate that even they do not believe the implausible antitrust claims asserted in the FI complaint.  Dismissing the antitrust counts at this point will focus the issues necessary to be resolved on the merits, and thus reduce the burdens and scope of remaining discovery.[10]

Rule 56(c) provides that summary judgment should be granted when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also*, *e.g.*, *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir. 1992).  Where the moving party has satisfied the requirements of Rule 56(c), the non-movant "may not rest upon the mere allegations or denials of his pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "While a court must view the evidence 'in the light most favorable to the non-moving party' . . . the non-moving party 'must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'"  *Williams v. City of Carl Junction, Mo.*, 480 F.3d 871, 873 (8th Cir. 2007)

(quoting *FDIC v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997)); *see also, e.g., Matsushita*, 475

U.S. at 586-87.  "Rule 56(c) does not require the completion of all discovery before a

court may enter summary judgment." *Roark v. City of Hazen*, 189 F.3d 758, 762 (8th

Cir. 1999).

In order to prevail on its antitrust claims, FI must show that the challenged

arrangement is on balance substantially adverse to competition.  ALD at 57-58, 57-78,

449-50 (collecting cases).  As discussed in detail above, FI also must show that it

suffered or is dangerously likely to suffer harm arising from any competition-reducing

aspects of the challenged restraints, *i.e.*, that it suffered antitrust injury.  If undisputed

facts show that either of these requirements is not satisfied, then summary judgment in

defendants' favor should be entered.

The facts admitted by FI's senior executives in the statements outlined below

demonstrate that neither requirement is met.  The statements are entitled to particular

weight since FI is a public company, and the statements were made by senior

management in the context of disclosures to securities analysts and the press.  Section 17

of the Securities Act of 1933 and Section 10(b) of the Exchange Act and the rules

thereunder, particularly Rule 10b-5, impose on representatives of public corporations a

duty to disclose truthful, materially accurate information without material omissions.

15 U.S.C. § 77a, *et seq.*; 17 C.F.R. § 240.10b-5.  These rules are applicable to all

company statements that can reasonably be expected to reach investors.  Public

---

[10] If the Court declines to enter judgment on the antitrust claims at this juncture, however,
defendants reserve the right to supplement their Rule 56 submissions, as well as assert

Statements by Corporate Representatives, Securities Act Release No. 6504, Exchange

Act Release No. 20560, Investment Company Act Release No. 13718 (Jan. 13, 1984).

Even assuming that FI has validly alleged a dangerous probability of monopoly

and antitrust injury, the public statements of the FI executives tell a very different story.

We set forth below the substance of those statements and highlights therefrom.  The full

statements -- both articles and analyst conference transcripts -- are appended to the Gant

Declaration.

First, although the complaint asserts that VantageScore threatens to drive FI from

the scoring marketplace, FI's executives have been telling investors -- both before *and*

after the complaint was filed in October 2006 -- that VantageScore in fact has had no

discernable effect on FICO's market position.  Thus, in July 2006 (several months after

VantageScore's market introduction), then-CEO Tom Grudnowski said of VantageScore

"We haven't seen an impact at all." (GD ¶ 3(e).)  Most recently, on the company's July

25, 2007 quarterly earnings call, CEO Mark Greene stated in response to a question on

the impact of VantageScore, "[T]o our knowledge *I don't think we've lost any single*

*customer* as a result of those pressures . . . ."  (GD ¶ 3(a) (emphasis added); *see also* GD

¶ 3 (gathering statements).)

The FI executives have not offered even the slightest hint in their public

statements that any of the Bureaus have denied or threatened to deny FI access to the data

it needs to maintain and update its FICO scoring algorithms, let alone threatened any

other action likely to force FI's market exit.  FI's securities filings are similarly mute as

additional grounds supporting summary judgment.

to any perceived dangerous probability that it may be driven from the credit scoring business due to defendants' actions.  (GD ¶¶ 2(e)-(r) (gathering filings).)

Nor do FI executives expect future harm from VantageScore.  FI's Vice President in charge of Global Scoring, Ron Totaro, repeatedly represented to the press and investors that FI sees *no threat from VantageScore*.  (*See* GD ¶ 4 (gathering statements).) To take just one example, Mr. Totaro was quoted in March 2006 as follows:  "We've been dealing with folks trying to come up with another type of credit score and it really hasn't impacted us.  We don't see [VantageScore] impacting our business in any way." (GD ¶ 4(k).)  On the contrary, notwithstanding the presence of VantageScore, FI executives have been predicting a robust and healthy future for their scoring business in their statements to the securities community.  (*See* GD ¶ 5 (gathering statements).)

Based on the foregoing, there can be no legitimate dispute that FI does not perceive any significant risk, let alone a dangerous probability, that it would be driven from the marketplace by the Bureaus' actions in respect of VantageScore.  If FI truly perceives a dangerous probability of such harm, it has a duty under the securities laws to disclose it explicitly.  *See, e.g.*, 17 C.F.R. § 240.10b-5; *Pemstar Inc. Sec. Litig.*, No. Civ. 02-1821 DWFSRN, 2003 WL 21975563, at **7-8 (D. Minn. Aug. 15, 2003) (top line disclosure of risk in defendant's SEC filings was insufficient); *In re Marion Merrell Dow Inc. Sec. Litig.*, No. 92-0609-CV-W-6, 1993 WL 393810, at *8 (W.D. Mo. Oct. 4, 1993) (same).  FI, of course, has done no such thing.  For example, when asked at the May 15, 2007 shareholders' meeting whether he saw "any legislative *or other* movements afoot that might limit [FI's] access to data that [it] need[s]," CEO Greene answered in the

negative and did not mention any concern about potential data cutoff by the credit bureaus as a result of VantageScore (as alleged in the complaint), instead focusing on legislative issues.  (GD ¶ 4(b) (emphasis added).)

Expectations aside, actual financial results of FI's scoring business continue to be strong.  (*See* GD ¶ 6 (gathering statistics).)  FI's 2006 Annual Report discloses significant revenue growth for its Scoring Solutions segment:  $142.8 million in 2004; $167.3 million in 2005; and $177.2 million in 2006.  (GD ¶ 6(a).)  In its most recent earnings call, held July 25, 2007, while overall revenues were lower than expected, CFO Osborne reported strong results for the scoring business:  "The scoring revenue for this quarter represents an 8% increase in a year-over-year basis, mainly the result of higher volumes from the credit bureaus."  (GD ¶ 6(c).)  FI's repeated public statements make clear that it has neither suffered nor expects to suffer injury from the entry of VantageScore.

Second, although the complaint depicts VantageScore as anticompetitive, FI's executives have publicly admitted the fundamentally procompetitive nature of VantageScore in statements made both before and after the filing of the complaint.  (*See* GD ¶¶ 7-8 (gathering statements).)  To take a few examples, then-CEO Grudnowski publicly stated in March 2006 that "The other scores [the credit bureaus] have been trying to sell haven't worked.  Now they're trying another idea [VantageScore], *and that's what competition is all about*."  (GD ¶ 7(a) (emphasis added).)  More recently, on a July 25, 2007 earnings call, CEO Greene told securities analysts that, while FICO has not lost a single customer to new competition including VantageScore, it "*has seen some pricing pressure as we engage in proposals*."  (GD ¶ 8(a) (emphasis added).)  Similarly, CFO

Osborne told an investor conference on May 16, 2007 that the company "expect[s] [VantageScore] to be used [by customers] . . . as a competitive threat *perhaps to keep us honest in negotiations on price and otherwise police an area where we dominated for some time*." (GD ¶ 8(c) (emphasis added).) CFO Osborne added that "[W]e think we can carry the day in a competitive arena with or without the lawsuit." *Id.* Not only does FI view VantageScore as competition, it is assuring investors that it expects to prevail in that competition -- not be driven from the market -- regardless of this lawsuit.

Third, while the complaint claims that the Bureaus had no legitimate reason to create VantageScore because individual Bureaus could have competed successfully with their own scores, the FI executives boast that past attempts by the Bureaus to compete against the FICO score with their individually-developed scores have been "wildly unsuccessful." (GD ¶ 12(b); *see also* GD ¶ 12 (gathering statements).)

Thus, the complaint's focus on the potential loss of individual Bureau scores is a strawman. Even if the entry of VantageScore means the exit of individual Bureau scores (and it does not), FI's own statements contradict its claim that the new market with VantageScore is less competitive than the old market with the individual Bureau scores. These statements concede that the individual Bureau scores did not provide effective competition and that VantageScore has forced FI to compete as never before.

Fourth, the FI executives freely admit the reasons why VantageScore is not likely to drive FI from the scoring business: not only is FI dominant in credit scoring but its dominance is exceedingly *well-entrenched*. (GD ¶¶ 9-10 (gathering statements).)

For example, FI Scoring Head Totaro analogized FI's dominant position in scoring to an impregnable "fortress."  (GD ¶ 9(i).)  Likewise, Craig Watts, FI's Public Relations Senior Manager, referred to FI as the "800-pound gorilla" of scoring.  (GD ¶ 9(f).)  FI's dominant position has not changed in the year and a half since VantageScore has been on the market.  As noted, in late July 2007, CEO Greene confirmed to securities analysts that, despite VantageScore's presence in the market: "I don't think we've lost any single customer as a result of those pressures." (GD ¶ 3(a); *see also* GD ¶ 3 (gathering statements).)  The FI executives also boast that the FICO algorithm is deeply embedded in the systems of all major financial institutions, lenders, regulators, and secondary mortgage marketers, thus making prohibitive the costs of switching away from the FICO score.  (GD ¶ 10 (gathering statements).)[11]

FICO's entrenched dominance makes it highly unlikely that VantageScore would or could drive FI from the credit scoring marketplace, or that the Bureaus would risk alienating their major customers by denying FI the data necessary to maintain its ubiquitous score.

Finally, the FI executives admit that, in the years before VantageScore, *i.e.*, during its period of unchallenged dominance in credit scoring, investment in its top products lagged and attention to client service faltered.  (GD ¶ 11 (gathering statements).)

The admitted facts summarized above show that the generic credit scoring business before VantageScore -- the baseline against which the competitive impact of

---

[11] The complaint also acknowledges FICO's dominance in scoring and the substantial costs for clients to switch from one score to another.  (SAC ¶¶ 2, 22, 42, 48, 97.)

VantageScore must be judged -- was dominated by a long-standing, well-entrenched player, that attempts by the Bureaus, acting unilaterally, to launch effective competitive products had failed miserably, and, not surprisingly, that the dominant player had begun to lag in its efforts to innovate, its attentiveness to clients, etc. Such a competitive landscape of course should be a prime candidate for the entry of new competition. VantageScore undeniably represents such new competition.

*  *  *

The facts contained in the admissions above refute the notion that the VantageScore venture has had or probably will have a substantial anticompetitive effect. To the contrary, the admitted facts reveal that VantageScore has injected the first real competition into a market space that FI has dominated for years. Moreover, the admitted facts also illustrate that FI has not been harmed by VantageScore to date, that it faces no significant prospect of harm, and that VantageScore has brought just the type of competitive pressure to the marketplace that the antitrust laws seek to foster. FI can hardly deny these facts, since they come from the mouths of its own senior executives, each of whom was under a duty to be truthful in his public statements. FI should not be permitted to say one thing in litigation and the opposite when trying to convince investors to buy or hold its stock. Summary judgment thus should be granted, dismissing Counts Eight through Eleven.

## CONCLUSION

For the reasons set forth above, the Court should order judgment on the pleadings,

or alternatively summary judgment, in defendants' favor on the antitrust claims.

Respectfully submitted this 4th day of October, 2007.

**Lindquist & Vennum PLLP**

By:  s/ Mark A. Jacobson
        Mark A. Jacobson (MN Bar #188943)
        Mark H. Zitzewitz (MN Bar #0289073)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 371-3211
Fax: (612) 371-3207

– and –

M. Elaine Johnston
Robert A. Milne
Christopher J. Glancy
Jack E. Pace III
**White & Case LLP**
1155 Avenue of the Americas
New York, NY 10036-2787
Tel: (212) 819-8200
Fax: (212) 354-8113

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

**Briggs and Morgan, P.A.**


By:  s/ Jay W. Schlosser
        Jeffrey J. Keyes (MN Bar #55505)
        Jay W. Schlosser (MN Bar #204353)

2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 977-8400
Fax: (612) 977-8650

– and –

Peter Kontio
Michael P. Kenny
Teresa T. Bonder
**Alston & Bird LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777

*Attorneys for Defendants Equifax Inc. and
Equifax Information Services LLC*


**Bassford Remele**


By:  s/ Christopher R. Morris
        Lewis A. Remele, Jr. (MN Bar #90724)
        Christopher R. Morris (MN Bar
        #230613)

33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

– and –

James K. Gardner
Ralph T. Russell
**Neal, Gerber & Eisenberg LLP**
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*


**Kelly and Berens, P.A.**


By:  s/ Justi Rae Miller
          Barbara Podlucky Berens (MN Bar
          #209788)
          Justi Rae Miller (MN Barr #0387330)

3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

*Attorneys for Defendant*
VantageScore Solutions, LLC