UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION; and                       Case No. 06-4112 (ADM/JSM)
myFICO CONSUMER SERVICES, INC.,

      Plaintiffs,

v.                                                                                    ORDER

EQUIFAX INC.; EXPERIAN
INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
VANTAGESCORE SOLUTIONS, LLC,

      Defendants.

      JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came on before the undersigned upon defendants' Motion to Compel Plaintiffs to Produce Documents Responsive to Requests 19 and 25 of Defendants' Second Set of Requests for the Production of Documents [Docket No. 160]; and plaintiffs' Motion to Compel [Docket No. 164].  Randall Tietjen, Esq., and Michael Collyard, Esq. appeared on behalf of plaintiffs; Jeffrey Keys, Esq., Peter Kontio, Esq., and Teresa Thebaut-Bonder, Esq. appeared on behalf of defendant Equifax Inc.; Jack Pace, III, Esq., Christopher Glancy, Esq., and Mark Jacobson, Esq. appeared on behalf of defendant Experian Information Solutions, Inc.; James Gardner, Esq., Chris Morris, Esq. and Dao Boyle, Esq. appeared on behalf of defendant Trans Union, LLC; and Barbara Berens, Esq. And Jusi Miller, Esq. appeared on behalf of defendant Vantage Score Solutions, LLC.

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

**IT IS HEREBY ORDERED:**

1.       Defendants' Motion to Compel Plaintiffs to Produce Documents Responsive to Requests 19 and 25 of Defendants' Second Set of Requests for the Production of Documents [Docket No. 160] is **DENIED** as set forth in the Memorandum below;

2.       Plaintiffs' Motion to Compel [Docket No. 164] is **GRANTED** in part and **DENIED** in part as set forth in the Memorandum below; and

3.       Consistent with the Memorandum following this Order, defendants shall provide amended discovery responses and produce responsive information to plaintiffs on or before January 18, 2008.

Dated:        December 20, 2007

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**MEMORANDUM**

## I.    GENERAL BACKGROUND

This matter arises out of the creation of a new credit scoring system, VantageScore, by defendant credit bureaus Equifax Information Services LLC, Experian Information Services, Inc., and Trans Union LLC (collectively referred to as "defendants").   This scoring system competes with Fair Isaac Corporation's and its wholly owned subsidiary myFICO Consumer Services, Inc.'s (collectively referred to as "Fair Isaac") credit scoring system (also referred to as "FICO" for the purpose of this Memorandum).

Fair Isaac's Second Amended Complaint asserts that defendants infringed on its trademarks of 300-850®.   In particular, Fair Isaac alleged that the use of the VantageScore scoring range of 501-990 constituted unfair competition under 15 U.S.C. § 1125(a), infringement of registered trademark under 15 U.S.C. § 1114, trademark infringement under Minnesota common law, passing off under Minnesota common law, deceptive trade practices under Minn. Stat. § 523D.44, and unjust enrichment under Minnesota common law.  <u>See</u> Second Amended Complaint, ¶¶ 177-196, 204-216.  Fair Isaac further alleged that defendants engaged in unfair competition and false advertisement, and anticompetitive activities in violation of federal and Minnesota antitrust law.  <u>Id</u>. 197-213, 217-258.  Fair Isaac also asserted that Experian and Trans Union engaged in specific instances of trademark infringement by using the , 300-850®, FAIR ISAAC® and FICO® trademarks as paid internet search terms in certain internet search engines to attract customers to websites operated by them, and that defendant Trans Union and VantageScore misappropriated trade secrets and breached contractual duties owed to Fair Isaac.  <u>Id.</u>, ¶¶ 159-76, 180, 187,192, 259-75.

The parties are now before the Court to address their respective motions to compel.  With respect to defendants' Motion to Compel Plaintiffs to Produce Documents Responsive to Requests 19 and 25 of Defendants' Second Set of Requests for the Production of Documents, the parties have represented that they have resolved Request No. 25.  As such, this Court will limit its analysis to the dispute pertaining to Request No 19.  As to Fair Isaac' Motion to Compel, the parties have informed the Court that they have resolved Document Request Nos. 41 and 42.  Given this factual

backdrop, the Court will now proceed with analyzing the remainder of Fair Isaac's and defendants' motions to compel.

## II.    STANDARD OF REVIEW

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.  Relevant information need not be admissible at the trial if the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence at trial.  <u>See</u> Fed. R. Civ. P. 26(b)(1) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."); <u>see</u> <u>also</u> <u>Minnesota Specialty Crops, Inc. v. Minnesota Wild</u>, 210 F.R.D. 673, 675 (D. Minn. 2002) ("Generally, discovery may inquire into all information, not otherwise privileged, that is relevant to the subject matter of the action, provided that it is reasonably calculated to lead to the discovery of admissible evidence."); <u>Walker v.</u> <u>Northwest Airlines Corp.</u>, No. Civ. 00-2604 MJD/JGL, 2002 WL 32539635 at *1 (D. Minn., Oct. 28, 2002) ("In the context of discovery, 'relevant' has been defined as encompassing 'any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'") (quoting <u>Hickman v.</u> <u>Taylor</u>, 329 U.S. 495, 501 (1947)).

## II.    DEFENDANTS' MOTION TO COMPEL

In addition to a trademark infringement claim against all of the defendants for their use of scoring ranges that allegedly infringed on Fair Isaac's trademarked scoring range, Fair Isaac has asserted a separate trademark infringement claim against defendants Trans Union and Experian.  According to Fair Isaac, these two defendants, or their agents, are buying advertising from internet search-engine companies and using

Fair Isaac's 300-850®, FICO®, and FAIR ISAAC® trademarks as keyword search terms in order to attract customers to websites operated by the defendants.  <u>See</u> Second Amended Complaint, ¶¶ 159-76.  In particular, Fair Isaac asserted that Trans Union and Experian have paid internet search engines to display advertisements for Experian and TransUnion web sites on the "results page" when the key words 300-850®, FAIR ISAAC®, or FICO® are used in a search.  <u>Id.</u>, ¶¶ 167-68.  In response to this claim, defendants propounded the following discovery request on Fair Isaac:

<u>**Request No. 19—Discovery of Internet Search Terms**</u>

> **REQUEST NO. 19:** Documents sufficient to identify all paid internet search terms or keywords, as those terms are used in the Second Amended Complaint, used by Fair Isaac to advertise or direct consumer to any website created, maintained or controlled by Fair Isaac.

> **RESPONSE TO REQUEST NO. 19:** Fair Isaac objects to their Request on the grounds that it is overbroad and unduly burdensome.

<u>See</u> Declaration of Bryan Gant ("Gant Decl."), Ex. 2

In addition to the objections of the breadth and burdensomeness of the request, Fair Isaac asserted that Request No. 19 does not seek relevant information.  <u>See</u> Memorandum of Law in Support of Defendants' Motion to Compel Plaintiffs to Produce Documents Responsive to Requests 19 and 25 of Defendants' Second Set of Requests for the Production of Documents ("Defs.' Mem.") at p. 6.

Defendants disagree.  It is their position that at the same time that Fair Isaac claimed that defendants were infringing on its trademarks by using such terms as "FICO" as a paid internet search term or keyword in certain internet search engines to attract customers to websites operated by defendants, Fair Isaac was using the word

"VantageScore" as a paid internet search term to attract customers to Fair Isaac's website.  Id. at p. 5.   As such, defendants argued that the information sought by Request No. 19 was relevant to their claim that paid internet search terms are "a fair and standard practice in the industry", and to their affirmative defense of unclean hands. Id. at pp. 6-7.

Fair Isaac has conceded that one of its affiliate marketing members had purchased the word "VantageScore" for keyword advertising on the internet.  See Fair Isaac's Memorandum of Law in Opposition to Defendants' Motion to Compel Documents in Response to their Second Set of Document Requests ("Pls.' Opp. Mem.") at p. 4.   However, Fair Isaac argued that discovery on its use of VantageScore's trademark, or any other keyword search terms used by it in its internet advertising can not lead to the discovery of admissible evidence because in order to assert the affirmative defense of unclean hands, Fair Isaac's alleged offending conduct must relate to the trademarks that it alleges defendants Trans Union and Experian are infringing. Id. at pp. 4-5.[1]

---

[1]     There is some dispute by the parties as to whether use of another's trademark as a keyword in internet advertising constitutes trademark infringement.  However, for the purpose of the present discovery motion, this Court concludes that using another's trademark to lead customers away from the trademark holder's website to the alleged infringer's website can constitute trademark infringement.  See Gregerson v. Vilana Financial, Inc., Civil No. 06-1164 ADM/AJB, 2007 WL 2509718 at *5 (D. Minn. Aug. 31, 2007) (Montgomery, J.) ("A defendant's use of a plaintiff's trademarks in his metatags for the purpose of diverting internet traffic away from the plaintiff's website and onto the defendant's website can constitute trademark infringement . . . ."); see also Edina Realty v. Themlsonline.com, No. Civ. 04-4371JRTFLN, 2006 WL 737064 at *3 (D. Minn. March 20, 2006) (finding that the purchase of internet search terms that include the trademark at issue constitutes a use in commerce under the Lanham Act.).

The doctrine of unclean hands,[2] it has its roots "in the maxim he who seeks equity must present himself in court with clean hands."   Manhattan Medicine Co. v. Wood, 108 U.S. 218, 225 (1883).   "Unclean hands is a defense to a Lanham Act infringement suit."[3]  Japan Telecom, Inc. v. Japan Telecom America Inc., 287 F.3d 866, 870 (9th Cir. 2002) (citation omitted); see also Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3rd Cir. 2001).   To succeed with the affirmative defense of unclean hands, a defendant must show that the plaintiff committed a wrongdoing that is directly related to the claim which it has asserted.  See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933) ("They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.  They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect  the equitable relations between the parties in respect of something brought before the court for adjudication.") (emphasis added); see also Saxon v. Blann, 968 F.2d 676, 680 (8th Cir. 1992) ("The defense does not apply 'where

---

[2]      While defendants suggested in their opening brief and at the hearing that discovery of Fair Isaac's purchase of internet search terms is relevant to their assertion that there is nothing illegal or inappropriate about such conduct if it is a standard practice in the industry, they cited and the Court has found no law to support such a proposition.  Given that this Court has concluded that the use of another's trademark as a keyword in internet advertising may constitute trademark infringement, the Court assumes that defendants' "everyone is doing it" defense is nothing more than a variation on defendants' unclean hands defense, and will treat it as such.

[3]      False advertising claims under Minnesota law require the same analysis as claims under the Lanham Act.  See Daimlerchrysler AG v. Bloom, 315 F.3d 932, 936, n. 3 (8th Cir. 2003); see also Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc., 822 F. Supp. 1437, 1441 (D. Minn. 1993) (finding that analysis of false advertising

plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts' affect the equitable relations between the parties with respect to the controversy.") (quoting <u>Mitchell Bros. Film Group v. Cinema Adult Theater</u>, 604 F.2d 852, 863 (5th Cir. 1979), <u>cert. denied</u>, 445 U.S. 917 (1980)).

In the trademark infringement context, courts have concluded that the defense of unclean hands is only applicable if a plaintiff's malfeasance was sufficiently related to the trademark that the plaintiff was attempting to enforce.   <u>See</u> <u>e.g.</u>, <u>Worthington v. Anderson</u>, 386 F.3d 1314, 1320 (10th Cir. 2004) (finding that "related conduct" that will permit application of the unclean hands doctrine in a trademark case "arises when the plaintiff has acted inequitably toward the defendant in relation to the trademark."); <u>Japan Telecom, Inc.</u>, 287 F.3d at 870 ("To make out an unclean hands defense, a trademark defendant 'must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'") (quoting <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 847 (9th Cir. 1987)); <u>Trace Minerals Research, L.C. v. Mineral Resources Intern., Inc.</u>, 505 F. Supp.2d 1233, 1244 (D. Utah 2007) ("To succeed on its defense, MRI must show that TMR's alleged inequitable conduct is sufficiently related to the substance of its trademark claim to give rise to an unclean hands defense."); <u>Flow Control Industries Inc. v. AMHI Inc.</u>, 278 F. Supp.2d 1193, 1198 (W.D. Wash. 2003) ("The doctrine of unclean hands would preclude enforcement of a trademark only if plaintiff's wrongdoing related to the getting or using of the trademark rights that plaintiff was attempting to enforce. The fact that plaintiff may have infringed defendants' AMFLOW trademark has nothing to do with the manner in which plaintiff

claims under Minnesota state law under Minn. Stat. § 325D.44, is "substantially similar to that applicable to federal claims under the Lanham Act.").

obtained or used its SKOFLO mark.") (citations omitted); R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., No. 99 C 1174, 2001 WL 747422 at *2 (N.D. Ill. June 29, 2001) ("Where, on the other hand, the unclean hands are only collaterally related to the trademark that is the subject of the lawsuit, the defense does not operate to bar suit for infringement.") (citations omitted); Gidatex S.r.L. v. Campeniello Imports, Ltd., 82 F. Supp.2d 126, 131 (S.D.N.Y. 1999) (citation omitted) (holding that unclean hands defense failed in a trademark infringement suit where the misconduct underlying the defense related to an agreement between the parties, but did not directly relate to the trademark infringement claim).

Defendants' suggestion that the unclean hands doctrine bars a trademark infringement claim where the plaintiffs' inequitable conduct is not related to the trademark at issue, but rather where the plaintiff has engaged in similar type of conduct against the defendant, is not supported by the cases cited by defendants. See Defs.' Mem. at pp. 7-8 citing to Precision Instrument MFG Co. v Automotive Maintenance Machinery, 324 U.S. 806 (1945); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan, 265 F. Supp.2d 440 (D. Vt. 2003); Nikkal Industries, Ltd. v. Salton, Inc., 735 F. Supp. 1227, 1230-32 (S.D.N.Y. 1990); Western Union Telegraph Co. v. MCI Communications Corp., No. 85 Civ. 5800, 1986 WL 2769 (S.D.N.Y. Feb. 26, 1986); Haagen-Dazs v. Frusen Gladje Ltd., 493 F. Supp. 73 (S.D.N.Y. 1980).   In Precision Instrument, the Supreme Court held that Automotive's patents at issue were unenforceable based on the unclean hands doctrine where the history of the patents in issue was steeped in perjury and undisclosed knowledge of perjury. See Precision Instrument, 324 U.S. at 819.  In Merrill Lynch, the court found that the unclean hands defense was appropriate

because the plaintiff had acquired the right upon which it had based its suit, the right to exclusive use of a list of client names, through inequitable conduct.  <u>Merrill Lynch</u>, 265 F. Supp.2d at 443-45.  In  <u>Nikkal Industries</u>, the plaintiff asserted claims under the Lanham Act against defendant for falsely representing that its  product was capable of producing ice cream as firm as that depicted in its marketing photographs.  <u>Nikkal Industries,</u> 735 F. Supp. at 1232, 1235.  The court stated in dicta that it appeared that the plaintiff had also misrepresented that the ice cream initially produced by its product was as hard as the ice cream depicted in its promotional materials.  <u>Id.</u> at 1238.  The court then stated that since the plaintiff appeared "to have engaged in the very same conduct it has challenged, the court would have been hard pressed to grant it any equitable relief, even if the conduct of [the defendant] had violated the Lanham Act."  <u>Id.</u> In <u>Western Union</u>, an unfair competition suit regarding the telecommunications market, the court determined that the unclean hands defense was applicable because the plaintiff had "acquired its very right to enter the telecommunications market" through inequitable conduct.  <u>Western Union,</u> 1986 WL 2769 (S.D.N.Y. Feb. 26, 1986), at *2.  In <u>Haagen-Dazs</u>, the plaintiff claimed that the defendant's packaging of its ice-cream in a fashion meant to trade upon the plaintiff's "unique Scandinavian marketing theme," was a deceptive trade practice because the defendant had packaged its product in a manner that suggested to consumers that its product was of Scandinavian origin, when it was of domestic origin.  <u>Haagen-Daz</u>, 493 F. Supp. at 74-75.  The court found that the unclean hands defense applied because the plaintiff also used packaging in a manner as to suggest to consumers that its product was of Scandinavian origin, when it was of domestic origin.  <u>Id.</u> at 76.

In all of the cases cited by defendants, the courts applied the unclean hands defense because the actions of the plaintiffs directly pertained to the rights they were seeking to prosecute in their lawsuits.   In <u>Precision Instrument</u>, <u>Merrill Lynch</u> and <u>Western Union</u>, the application of the unclean hands doctrine was appropriate because the inequitable conduct committed by the plaintiffs directly related to the right they were prosecuting in their actions.   Similarly, in <u>Nikkal Industries</u> and <u>Haagen-Dazs</u>, the unclean hands doctrine was found to apply because the plaintiffs were engaged in the same misinformation, which harmed the public, which they alleged defendants had committed.   Indeed, in trademark cases, courts have historically recognized two types of "related conduct" that will permit application of the unclean hands doctrine:

> The first involves inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief.
>
> * * *
>
> The second type of related conduct arises when the plaintiff has acted inequitably toward the defendant in relation to the trademark.

<u>Worthington</u>, 386 F.3d at 1320.

Here, it is not alleged that Fair Isaac engaged in some sort of inequitable conduct with regards to the trademarks it is trying to protect.   Nor is it asserted that Fair Isaac has engaged in deceptive practices that have harmed the public as the result of their alleged use of VantageScore as search engine keywords to trigger advertisements for "FICO" or the scoring range of "350-800".

Based on the principles articulated in these cases, this Court finds that Document Request No. 19 seeks information that will not lead to the discovery of admissible evidence bearing on defendants' unclean hands defense because the information is not related to the trademarks that Fair Isaac's is seeking to enforce in this suit.   To the extent that VantageScore[4] contends that Fair Isaac's conduct affected its rights in its trademark VantageScore, VantageScore can always pursue their own claim for trademark infringement.   However, because Fair Isaac's alleged conduct with respect to VantageScore or any other keyword search terms it may have used in its internet advertising is unrelated to the trademark rights asserted in this suit, this conduct cannot form the basis of the affirmative defense of unclean hands.   Consequently, defendants' motion to compel is denied.

## III.    PLAINTIFFS' MOTION TO COMPEL

Fair Isaac propounded 166 document requests on defendants.   In response, each of the defendants generally objected to searching and producing documents from the files of their respective "low level" sales persons, the definition of "lender" used by Fair Isaac to the extent that it included "resellers", and Fair Isaac's attempt to obtain consumer customer lists and contact information for each defendant's individual customers.   Fair Isaac's motion to compel now challenges these general objections.   In addition, Fair Isaac is seeking to compel all defendants to produce documents reflecting communications with lenders and consumers regarding Fair Isaac, including price

---

[4]    This Court notes that defendants have conceded that the VantageScore trademark at issue belongs to defendant VantageScore.   See Defs.' Mem. at p. 5. Therefore, it is observed that the standing of Equifax, Experian and Trans Union to assert a claim based on Fair Isaac's alleged use of the VantageScore's trade mark is questionable.

increases for Fair Isaac's score, and to compel Experian to produce documents reflecting the algorithms, specifications and planning documents for its Scorex PLUS model algorithm.   Finally, Fair Isaac seeks an order compelling defendants to produce certain documents bearing on their investigation of Fair Isaac's claims of misappropriation of trade secrets, breach of contract, and interference with contracts.

**A.    General Objections Pertaining to Searching the Files of Defendants' Sales Personnel**

In response to Fair Isaac's First Set of Requests for Production of Documents, Experian set forth the following general objection to Fair Isaac's requests:

> 12.    Experian objects to the requests to the extent they purport to require a search of the files of each of Experian's employees.    Such Requests are overlybroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and would require production of unreasonably cumulative and duplicative documents.    Experian further objects on similar grounds to these Requests to the extent they purport to require a search of the files of all of Experian's sales persons.   In responding to these Requests, Experian will conduct a reasonable search of the files of those Experian employees whose files are reasonably accessible and who are likely to possess relevant and responsive information.

See Declaration of Mary Kiedrowski ("Kiedrowski Decl."), Ex. 1.  Defendants Equifax and Trans Union also made similar general objections.  Id., Ex. 2, ¶ 4; Ex. 3, ¶ 15.[5]

Fair Isaac claims that the files of defendants' low-level sales personnel should be searched for documents responsive to the requests set out in footnote 7, as it is the defendant credit bureaus that sell Fair Isaac products to lenders, and in many cases, it is defendants' low-level sales personnel who have the direct communications with

---

[5]    According to Fair Isaac, these objections bear on Document Request Nos. 19-22, 25-39, 41, 42, 52 – 61, 64-66, 68, 71, 72, 77, 80-85, 88-91, 94, 96, 100-103, 107, 108, 110-115, 117-127, 129-131, 140, 145, 147, and 149-155.  See Pls.' Mem. at p. 6.

smaller lenders.   See Plaintiffs' Memorandum of Law in Support of their Motion to Compel ("Pls.' Mem.") at pp. 6-7.   Specifically, Fair Isaac asserted that the bureau defendants rely heavily on their sales force personnel to make sales to lenders and are the ones who have conversations with lenders about the quality and characteristics of the scores they are selling, the pricing of models and which model best meets a lender's needs.   Id.   As a result, Fair Isaac claimed that defendants' sales force personnel are the ones who most likely will have information regarding the key communications that defendants had with lenders regarding Fair Isaac's and defendants' credit scoring products and services, all of which are relevant to its antitrust, false advertising and trademark claims.   Id. at pp. 7-8.   In response to defendants' position that they would produce documents from top-level sales people and that a search of their entire sales force would be burdensome, Fair Isaac countered that the top-level sales individuals are only a small part of the individuals who have relevant information, and that defendants have not established that the burden of searching for this information outweighs the relevance of the information sought.   Id. at pp. 8-9.

In opposition to Fair Isaac's motion, each defendant laid out what they had done to obtain responsive documents from their respective sales forces.   Equifax represented that it had interviewed 50 of its sales personnel and determined that the best way to collect sales documents responsive to Fair Isaac's request for documents was to collect documents from all of the sales consultants in the Predictive Sciences Group, as they were the persons most likely to be involved in the substantive discussions and sales of credit scoring services.   See Declaration of Teresa Bonder ("Bonder Decl."), ¶ 10; Declaration of Lorie Couch ("Couch Decl."), ¶¶ 11, 16.   Equifax also stated that it had

produced documents from its sales library (containing training and marketing materials used by the general sales groups to sell Equifax products, including VantageScore and Fair Isaac), the heads of all of such sales groups as National Accounts, Regional Accounts, Inside Sales, Credit Marketing Services and Equifax Mortgage Services, and the heads of all of the general sales groups.  See Bonder Decl., ¶¶ 11, 13; Couch Decl., ¶ 16, Defendants' Response to Plaintiffs' Motion to Compel ("Defs.' Opp. Mem.") at p. 13.  Experian stated that it has searched the files of its employees with decision-making authority as to pricing, strategy and customer relations in the sales groups responsible for selling credit scores and reports.  See Declaration of Greg Roosevelt ("Roosevelt Decl."), ¶¶ 3-4, 9; Defs.' Opp. Mem. at p. 14.  Trans Union collected documents from the President and Vice President of the Sales Operations, the Vice President of Product Development, the vice presidents responsible for the sales groups that sell credit-scoring services, and the custodians responsible for Trans Union's sale of credit scoring services directly.  See Declaration of Dao Lee Boyle ("Boyle Decl."), ¶ 2.

Defendants do not contest Fair Isaac's assertion that the files of their sales personnel may contain information relevant to the instant action.  Nevertheless, they claim that the burden of searching all of their respective sales force files outweighs any marginal benefit of this information to Fair Isaac.  See Defs.' Opp. Mem. at p. 18.  In support of this contention, defendants state that the vast majority of their sales personnel are located throughout the United States and their documents are located on various networks, filing systems, personnel computers, other electronic devices and file drawers. See Couch Decl., ¶ 20; Callaci Decl., ¶ 4; Roosevelt Decl., ¶ 10.  Defendants maintain that a search of all sales persons' files would be very time-consuming and

expensive given that it would require defendants' IT personnel to travel around the country to meet with sales persons to copy their hard drives. Id. Defendants estimate that they would need to spend hundreds of thousands of dollars, not including attorney's fees, and hundreds of hours of time to collect all of the sales force materials, resulting in an increase of the final costs of defendants' document production three-fold. See Couch Decl., ¶ 20; Callaci Decl., ¶ 5; Roosevelt Decl., ¶ 10; Bonder Decl. ¶ 16; Boyle Decl., ¶ 5; Declaration of Jack E. Pace III ("Pace Decl."), ¶ 10.

The fact that the information sought by Fair Isaac is relevant to the issues in the case does not mean that it must ultimately be produced. For example, Rule 1 of the Federal Rules of Civil Procedure dictates that the Rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Consistent with this directive, Rules 30 and 33 set presumptive limits on the number of interrogatories (25, including discrete subparts), the number of persons who can be deposed (ten), and the number of hours for a deposition (seven) which can take place in a case. While these limitations are not cast in stone, they have been imposed on the discovery process to signal that as a general rule, more interrogatories or depositions, or longer depositions, are not always necessary to prepare a case for disposition through motion, trial or settlement.

Similarly, Rules 26(b) and (c) of the Federal Rules of Civil Procedure, confirm that at the end of the day, not all relevant information is discoverable. Rule 26(b)(1) itself states that "all discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)."[6] Rule 26(b)(2)(C) provides in pertinent part:

---

[6] On December 1, 2006, amendments to the Federal Rules of Civil Procedure became effective. As part of these amendments, Rule 26(b)(2) was modified to add a

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c).

(Emphasis added).

Therefore, pursuant to Rule 26(b)(2)(C)(iii), a court may limit discovery if the burden of discovery outweighs its likely benefit. See also Wiginton v. CB Richard Ellis, 229 F.R.D. 568, 571-572 (N.D. Ill. 2004) (identifying general principles limiting discovery under Fed. R. Civ. P. 26); OpenTV v. Liberate Technologies, 219 F.R.D. 474, 475 (N.D.Ca. 2003) (same); Onwuka v .Fed. Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997) (same).

This Court finds that the burden on defendants to search the files of their entire sales force, which is comprised of approximately 1000 persons, (Roosevelt Decl., ¶ 3; Couch Decl., ¶ 3; Callaci Decl., ¶ 4), outweighs the benefit of any possible discovery yielded by such a search, given the shear number of sales people whose computers and files that would need to be searched, the time and expense of the search, and the many other sources from which defendants have already sought and produced responsive documents, including upper level sales personnel.  However, before a final

---

reference to three subsections: (A), (B), and (C).  The reference in Rule 26(b)(1) to Rule 26(b)(2)(i), (ii), and (iii) is now to Rule 26(b)(2)(C)(i), (ii), and (iii).

decision on this issue can be made, and in light of the lack of meaningful evidence before this Court to evaluate the likelihood that a search of all low-level sales persons would yield important information bearing on the issues in this case, this Court will require defendants to conduct a sample search for responsive documents of 10 low-level sales people selected by Fair Isaac for each defendant.  To assist Fair Isaac in making its selection, each defendant shall provide to Fair Isaac a list of their sales force on or before January 11, 2008, stating for each person their name, location, length of service, and a description of the person's duties and the types and number of clients that each person calls on or is responsible to call on for that defendant.  Fair Isaac shall then identify in writing for each defendant the names of the 10 sales people it has selected for that defendant on or before January 18, 2008.  On or before February 8, 2008, each defendant produce relevant and responsive documents from the files of each sales person selected by Fair Isaac.

After this sampling process is completed, if Fair Isaac concludes that documents responsive to its document requests should be obtained from the balance of each defendant's sales force, the parties shall confer as to whether any further search and production from the remainder of the sales force files should take place.  If the parties cannot reach an agreement on whether any further search should be conducted, then Fair Isaac may bring another motion to compel the defendants to search the balance of their respective sales force files for responsive documents.

**B.**   **General Objections Pertaining to Searching for Information Regarding Defendants' Resellers**

In response to Fair Isaac's First Set of Requests for Production of Documents, defendants objected to Fair Isaac's definition of "lender" because it included "resellers"

in the definition. [7]  See Kiedrowski Decl., Ex. 1, ¶ 26; Ex. 3, ¶ 21.  Defendants have also represented they will not actively search for any information regarding resellers, other than for pricing tables.  Id., Ex. 12 (April 3, 2007 Letter for Boyle to Collyard).

According to Fair Isaac, resellers buy credit scores and data from the defendant bureaus and resell the credit scores and data to other business organizations and the consumers in the general public.  See Pls.' Mem. at p. 10.  Fair Isaac maintained that information regarding resellers in defendants' possession is relevant to its claims against defendants.  Id. at p. 11.  Specifically, with respect to their false advertising claims, Fair Isaac asserted that the bureaus would have had to communicate with resellers about the predictive power of VantageScore versus Fair Isaac's FICO scores or the bureaus' in-house scores, including any testing that resellers have done themselves with the various scoring models.  Id. at pp. 11-12.  As to Fair Isaac's antitrust claims, Fair Isaac claimed that information from resellers will include what communications took place between the bureaus and the resellers regarding the negotiation of prices they were charged for credit scores and the reasons why resellers were charged particular prices, all of which Fair Isaac claimed is relevant to its assertion of exclusionary conduct and price manipulation on the part of defendants.  Id. at pp. 12-13.  Finally, Fair Isaac maintained that the reseller documents were relevant to its claims that the bureaus are infringing on its 300-850® trademark, as there may have been communications between the defendant bureaus and the resellers about the scoring ranges used by VantageScore and the scoring range used by Fair Isaac.  Id. at

---

[7]      According to Fair Isaac, these objections bear on Document Request Nos. 6, 19, 21, 22, 25-39, 41, 42, 48, 49, 53-61, 64-66, 68, 71, 72, 77, 80-91, 94, 95, 100-103, 107, 108, 110-127, 129-131, 140, 145, 147, 149-154.  See Pls.' Mem. at p. 10.

p. 13.  Fair Isaac's theory is that because resellers are consumers and also interact with consumers, it is likely that documents relating to consumer confusion can be found in the possession of resellers.  Id.

In opposition, defendants argued that resellers are not relevant to the claims in Fair Isaac's Second Amended Complaint, with the exception of pricing to resellers, because defendants' purported conduct and all of the harm suffered by Fair Isaac focuses on lenders and consumers and not resellers.  See Defs.' Opp. Mem. at p. 20. According to defendants, resellers are merely a distribution channel for the sale of credit data and scores, and do not purchase the scores for their own use, but instead sell scores to smaller lenders who do not have direct relationships with the bureau defendants.  Id. at pp. 21-22.  Defendants also focused on the fact that Trans Union has not sold any VantageScore services to resellers, Equifax has had only $1.20 in VantageScore sales to a single reseller for testing purposes, Experian has had little sales of VantageScore (.04% of its entire sales to resellers), and that 99% of Equifax's scoring sales to resellers are Fair Isaac scores.  See Roosevelt Decl., ¶ 5; Couch Decl., ¶ 8; Callaci Decl., ¶ 8.  Defendants' argument, based on the minimal sales of VantageScore to resellers, is that the discovery requested by Fair Isaac should be denied, given that defendants' reseller sales files are unlikely to contain substantive documents concerning Fair Isaac's claims.  See Defs.' Opp. Mem. at p. 22.

This Court concludes that Fair Isaac is entitled to information regarding resellers in defendants' possession, custody or control, as it relates to communications between defendants and resellers after defendants began selling VantageScore products.   In reaching this conclusion, this Court rejects defendants' assertion that because resellers

were not specifically named in the Second Amended Complaint with respect to the majority of the allegations, Fair Isaac is not entitled to discovery regarding resellers. Considering that complaints are to be read liberally, and the test is whether the discovery sought appears reasonably calculated to lead to the discovery of admissible evidence at trial, this Court will not read resellers out of the Second Amended Complaint.  Both defendants and Fair Isaac have represented that credit data and scores are sold to resellers, thereby making resellers a consumer of the product. Whether they are the end user of the data and scores is irrelevant.  If a reseller decides to buy a VantageScore score, rather than a Fair Isaac score, then the end consumer, smaller lenders, will in many cases be purchasing VantageScore scores instead of Fair Isaac scores.  Further, this Court finds the fact that defendants have had little success selling VantageScore services to resellers does not mean that they are not marketing the services to resellers.  As such, there may be relevant information in defendants' possession regarding the representations made by them to resellers as it relates the scoring ranges of VantageScore verses FICO, as well as documents on why certain prices were offered to resellers for these products that may bear on Fair Isaac's claims of false advertising, anti-competitive activities and trademark infringement.[8]  For all the reasons stated above, Fair Isaac's motion to compel is granted as it relates to resellers.

---

[8]     To the extent that defendants are alleging that producing information regarding resellers would be unduly burdensome, this Court rejects this contention since defendants have not provided this Court with any evidence to substantiate this burden. See Mead Corp. v. Riverwood Natural Resources Corp., 145 F.R.D. 512, 515-16 (D. Minn. 1992) (stating that intoning the "overly broad and burdensome" litany in objecting to a discovery request, without more, does not express a valid objection, and that the party opposing discovery bears the burden of showing that the discovery request is burdensome by alleging facts demonstrating the extent and nature of the burden imposed).

### C.   Contact Information for Defendants' Individual Customers and Customer List

All of the defendants have objected to producing any information responsive to Fair Isaac's document requests that would reveal the identity of any individual consumer, including such persons who purchased credit scoring products or services from the defendants, inquired about the products or services of any defendants or Fair Isaac, or had communications with the defendants (or anyone else that the defendants are aware of) that relate to consumer confusion. See Pls.' Mem. at p. 14.[9]

In addition, defendants refused to provide the requested discovery to the following request related to the production of customer lists:

> **REQUEST NO. 107:**  To the extent available, documents sufficient to identify all current and former customers for Bureau scores or models and VantageScore scores and models, including but not limited to customer mailing list and any roster of internet customers.

See Kiedrowski Decl., Exs. 1-4.

At the hearing, it was clarified that defendants had agreed to produce a list of commercial clients, but did not agree to do so for individual consumers. See Transcript of August 22, 2007 Hearing ("Tr.") [Docket No. 229], 38.  Fair Isaac claimed that it needed basic identification information for defendants' customers, including their name and contact information, whether it be their address, telephone number or email address, in order to determine who is purchasing defendants' credit scoring product services, why, and what statements they relied on in their purchase.  According to Fair

---

[9]      According to Fair Isaac, these objections apply to Document Request Nos. 19-21, 26-31, 33-35, 38, 41, 60, 61, 64, 66, 68, 71, 77, 80, 81, 102, 107, 117-121, 125-127, 153, and 154 in its First Set of Document Requests, and Document Request Nos. 13-16 in its Third Set of Document Requests to Experian and Trans Union.  See Pls.' Mem. at p. 14.

Isaac, this information is relevant to its false advertising and trademark claims.  See
Pls.' Mem. at pp. 15-16.  Specifically, Fair Isaac asserted that it needs this information
to prove that consumers were confused.  Id. at p. 16.  Fair Isaac agreed that the
information produced could be designated as "attorney's eyes only" under the operative
protective order, so that no one at Fair Isaac could have access to the information.  Id.

Defendants argued that the identity and contact information of consumers who
inquire about their credit score constitutes a credit report, under the Fair Credit
Reporting Act ("FCRA"), which cannot be provided to third parties.  See Defs.' Opp.
Mem. at p. 24.  Defendants did concede, however, that a court has the authority to
order production of credit reports under FCRA.  Id. at p. 25.  Nevertheless, given the
privacy concerns at issue with respect to their customers, defendants argued that Fair
Isaac should rely on survey information from the public at large to test their assertions of
confusion, and it should not be permitted to harass their consumer customers and
cause harm to defendants.  Id. at pp. 26-27.

The Lanham Act forbids the use of a mark in connection with goods or services
in a manner that is likely to cause confusion as to the source of the goods or services.
15 U.S.C. § 1125(a)(1).  When determining the likelihood of confusion, the following
factors are to be considered:

> 1) the strength of the plaintiff's mark; 2) the similarity
> between the plaintiff's and defendant's marks; 3) the degree
> to which the allegedly infringing product competes with the
> plaintiff's goods; 4) the alleged infringer's intent to confuse
> the public; 5) the degree of care reasonably expected of
> potential customers, and 6) evidence of actual confusion.

Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir. 2005) (emphasis added) (citing
SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980)).  Nationwide surveys

may serve as evidence of actual confusion.   See e.g., Gateway, Inc. v. Companion Products, Inc., 384 F.3d 503, 510 (8th Cir. 2004);   see also Everest Capital Ltd. v. Everest Funds Management, L.L.C., 393 F.3d 755, 761 (8th Cir. 2005) (noting that survey evidence may substitute for actual confusion).   In fact, "surveys are probably the most accurate evidence of actual confusion necessary for the award of damages. . . ." Woodsmith Pub. Co. v. Meredith Corp., 904 F.2d 1244, 1249 (8th Cir. 1990).   Further, "it would not be necessary for any witness to testify as to instances of actual confusion, for evidence of actual confusion is not necessary to prove a likelihood or probability of confusion.   Thus, the decision-maker can decide the issue by inspection of the conflicting marks and their manner of use."   Heartland Bank v. Heartland Home Finance, Inc., 335 F.3d 810, 821-22 (8th Cir. 2003).

Courts are split as to whether a party is entitled to a list of its competitor's customers in order obtain evidence supporting their claim for relief.   In Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc., 235 F.R.D. 435 (N.D. Ill. 2006), the defendant had asserted counterclaims alleging false advertising, copyright infringement, trademark infringement, unfair competition, and deceptive trade practices. Id. at 438.   The plaintiff sought all of the defendant's customer lists for its defense against defendant's trademark infringement claim, which it claimed were necessary to address the factual issue of potential customer confusion.   Id. at 439.   The court found that one method of demonstrating the existence – or non-existence – of actual confusion was through customer surveys, but that such surveys must target the relevant customer group, thereby making lists of actual customers relevant.   Id. at 441 (citations omitted).   The court found that the customer lists were discoverable, however, given

that the plaintiff was seeking the customer lists of its direct competitor, the court concluded that it should be subject to a protective order ensuring that the plaintiff did not see the customer lists. Id. at 445-46.

The court in Asch/Grossbardt Inc. v. Asher Jewelry Co., Inc., No. 02 Civ. 5914(SAS), 2003 WL 660833 (S.D.N.Y. 2003) also ordered that customer lists be produced subject to an appropriate protective order. The requesting party in Asch, claimed that it needed the customer lists of the opposing party in order to determine whether there had been actual confusion or a likelihood of confusion as it related to its trademark infringement claims. Id. at *2. The court concluded that the customer list was relevant to the issues of actual confusion and likelihood of confusion. Id. Given that the parties were direct competitors and the disclosure of customer lists could potentially result in economic harm to the disclosing party, the Asch court balanced the potential harm of the producing party against the need for the information by the requesting party. Id. The court noted that "[i]n most cases, 'the key issue often is not whether the information will be disclosed, but under what conditions it should be disclosed.'" Id. at *3 (quoting Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc., 200 F.R.D. 255, 260 (M.D.N.C. 2001)). The court ordered the production of the customer lists under a protective order that designated the documents attorney's eyes only and limited its use for litigation purposes only. Id.

On the order hand, the court in Globalaw Ltd. v. Carmon & Carmon Law Office, 452 F. Supp.2d 1 (D.D.C. 2006) noted that in Lanham Act cases, the names of the defendant's customers or clients are rarely – if ever – revealed. Id. at 62 (string citation omitted). The court concluded that to compel the client lists would result in an

unsubstantiated fishing expedition considering that the requesting party could have conducted recognition surveys to support their contention of confusion.  Id.  In addition, the court in Foxworthy v. Sun Art Designs, Inc., 42 U.S.P.Q.2d 1317, 1318 (S.D. Fla. 1997) precluded the discovery of a customer list for the purpose of developing evidence of confusion, in part, on the basis that any evidence of confusion acquired after prompting would be hearsay and lacked foundation.

In this case, defendants argued that the Court should error on the side of non-production of consumer names and contact information on the grounds that to do so would amount to a violation of FCRA, which prohibits them from furnishing consumer reports to third parties, with only a few exceptions.  See 15 U.S.C. § 1681b(a).  Even if defendants are correct in their interpretation of the FCRA,[10] this Court has the authority under FCRA to order defendants to produce lists of its consumer names.  See 15 U.S.C. § 1681b(a)(1) ("Subject to subsection (c) of this section, any consumer reporting agency may furnish a consumer report under the following circumstances and no other .

---

[10]    A consumer report must contain data "bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d).  Courts have concluded that, "'almost any information about consumers arguably bears on their personal characteristics or mode of living.'"  Phillips v. Grendahl, 312 F.3d 357, 365 (8th Cir. 2002) (quoting Trans Union Corp. v. FTC, 245 F.3d 809, 813 (D.C. Cir. 2001), cert. denied, 536 U.S. 915 (2002)).  Under this expansive view of "consumer reports", it could be argued that even producing the names of those who have sought their credit information is tantamount to a consumer report, bearing on their "mode of living", since it set establishes that the consumers have undertaken some sort of financial transaction, whether it be having a line of credit, buying new house, obtaining insurance, or even renting an apartment.  See generally, Phillips, 312 F.3d at 365-66 ("existence of trade lines, even without any details of credit history, satisfies the minimal requirement that information 'bear' on the subject's 'mode of living,' since it shows that he has bothered to establish credit accounts") (citation omitted).

. . In response to the order of a court having jurisdiction to issue such an order, or a subpoena issued in connection with proceedings before a Federal grand jury.").

This Court finds that the particular facts in this case mandate the denial of plaintiffs' motion to compel the contact information from the credit bureaus of their individual customers.  First, the information sought by Fair Isaac regarding confusion, can be gathered using nationwide surveys.  <u>See</u> <u>Gateway, Inc.</u>, 384 F.3d at 510.  As such, Fair Isaac does not need to contact every person who has sought to check their credit score with defendants.  Second, Fair Isaac will have access to defendants' commercial clients, so to the extent that Fair Isaac wishes to inquire about issues relevant to their claims of trademark infringement and false advertising, they will have that opportunity to obtain that information directly from these businesses.  Third, Fair Isaac has stated that once it has the identification information regarding defendants' individual consumers, it intends to contact those customers for the purpose of determining who is purchasing defendants' credit scoring product services, why, and what statements they relied on.  <u>See</u> Pls.' Mem. at pp. 15-16.  In order to obtain this information, Fair Isaac's counsel may seek sensitive information from these individual consumers, over which the Court will have no ability to control.  Further, many of these customers may find it very upsetting to find that, without their consent, a third party has been provided information about their contacts with a particular bureau.  No protective order can prevent the harm to defendants that may occur if their clients blame them for giving out their information to third parties.  In sum, this Court concludes that the need for the information sought by Fair Isaac is outweighed by the harm that will be experienced by defendants and their customers, if this Court requires that defendants

give Fair Isaac the contact information of their individual customers.   The motion to compel this information is denied.

**D.**   **Document Requests Involving Communications by Defendants to Lenders and Consumers Regarding Fair Isaac, Including Price Increases for Plaintiff's Scores**

**REQUEST NO. 38:** All documents relating to your actual or potential price increases to any lender or consumer for Fair Isaac's scores.

**EQUIFAX RESPONSE:**  Equifax incorporates by reference its General Objections.  Equifax objects to this request to the extent it seeks information related to sales to consumers. Credit grantors are the primary purchasers of credit risk scoring services, and their purchases are the only ones relevant to the claims and defenses in this case.  Indeed, Equifax does not even offer the VantageScore scoring service or an Equifax scoring service to consumers, but instead only offers to consumers a credit risk scoring service using FICO's scoring algorithm.  To the extent this request seeks information regarding consumers, the request is overly broad, unduly burdensome and seeks irrelevant information not likely to lead to the discovery of admissible evidence.  Equifax objects to this request to the extent it seeks information regarding Equifax's unilateral pricing decisions with respect to its sale of Fair Isaac's scoring services or its own services.  Equifax's unilateral pricing decisions are not at issue in this case.  Equifax further objects to this request because it is overly broad and unduly burdensome.

**EXPERIAN RESPONSE:**  Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**TRANS UNION RESPONSE:**  Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**VANTAGESCORE RESPONSE:**  In addition to the general objections set forth above, VantageScore objects to this document request to the extent it could be construed to seek

documents that are not in the possession, custody or control of VantageScore.  VantageScore objects to the assumptions underlying this request.  VantageScore's stated purpose is to educate the industry and public about its credit risk generic scoring model.  VantageScore charges a licensing fee to the Bureaus for use of its model.  VantageScore does not sell its credit risk generic scoring model or any credit score. VantageScore objects to this document request as overly broad, unduly burdensome and to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. Vantage Score objects to the extent this document request seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege.  Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession at the present time that are responsive to this request.

**Request No. 68:** All documents reflecting communications between a Bureau or VantageScore and a lender regarding Fair Isaac and credit scores.

**Equifax Response:** Equifax incorporates by reference its General Objections. Equifax objects to this request to the extent it seeks information regarding credit risk scoring services other than generic credit risk scoring services because it seeks irrelevant information not likely to lead to the discovery of admissible evidence. Equifax also objects to this request because it is overly broad and unduly burdensome. Equifax sells Fair Isaac scoring services to its customers. This request would require the production of every communication with Equifax's thousands of lender-customers regarding sales, marketing, or customer service with respect to Fair Isaac scoring services.

**Trans Union's Response:** Trans Union objects to this request in that it is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**Experian's Response:** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad,

unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**VantageScore's Response:** In addition to the general objections set forth above, VantageScore objects to this document request as vague, ambiguous, overly broad and unduly burdensome and as seeking irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. VantageScore objects to this document request to the extent it could be construed to seek documents that are not in the possession, custody or control of VantageScore. VantageScore objects to this document request to the extent that the information sought by this request is competitively sensitive, trademarked, confidential and/or proprietary in nature. VantageScore further objects to this document request to the extent it could be construed to seek documents protected by the attorney-client privilege, the work product doctrine, the joint-defense privilege and/or any other privilege. Subject to and without waiving any objections, VantageScore is unaware of any documents in its possession that are responsive to this request.

See Kiedrowski Decl., Exs. 1-4.

Pursuant to Request No. 38, Fair Isaac sought all of the communications the defendant bureaus had with lenders and consumers regarding the "actual and potential" prices they are charging for Fair Isaac credit scores.   See Pls.' Mem. at p. 19.   Fair Isaac claimed that such information is relevant to its antitrust claims because it pertains to its assertion that the defendant bureaus have the ability to price Fair Isaac out of the market.   Id. at p. 18.   In this regard, Fair Isaac's Second Amended Complaint contains the following allegations of monopolistic and anti-competitive price discrimination on the part of defendants:

- Equifax recently raised the price charged to resellers for the 300-850 classic FICO scores (from 30 to 50 cents), while at the same time offering their 501-990 VantageScore product for much less (20 cents).   See Second Amended Complaint, ¶ 126.

- The bureaus have informed potential customers that they intend to price VantageScore credit scores at a fraction (as little as 20%) of the price they charge for the standardized Fair Isaac FICO score.  Id. at ¶ 128.

- While Fair Isaac licenses its NextGen scoring algorithm for slightly more (approximately 15% higher) than the rate at which the classic FICO score algorithm is licensed, the bureaus have quoted prices for NextGen scores that are as much as 500% higher than those for the 300-850 classic FICO score, and have purposefully misled lenders into believing that the higher cost of NextGen scores is the result of Fair Isaac's royalty, rather than the credit bureaus' exclusionary manipulation of pricing.  Id. at ¶ 129.

Defendants responded that they had sufficiently responded to Request No. 38 by (1) agreeing to produce the transactional data, including the actual prices charged; (2) collecting documents from members of their sales group who are involved in the creation or revision of every pricing policy; and (3) collecting documents from their marketing department and sales materials.  See Defs.' Opp. Mem. at p. 17.

In response to defendants' assertion that they should only have to produce data on actual price increases, Fair Isaac maintained that communications and discussions that the bureau defendants had with consumers and lenders about the actual or potential price increases of Fair Isaac's credit scores was relevant to their antitrust claims, including documents reflecting communications by the bureaus to consumers regarding why they were offering to charge the prices that they were charging for NextGen credit scores, the reasons given as to why the bureaus had raised those prices, and communications where the bureaus blamed the high pricing on Fair Isaac.

Fair Isaac's motion to compel documents responsive to Document Request No. 38 is granted.  Documents responsive to this request are clearly relevant to Fair Isaac's antitrust claims, and defendants have not established that communications regarding actual price increases or potential price increases of Fair Isaac's scores are not

reasonably calculated to lead to the discovery of admissible evidence at trial. Therefore, subject to this Court's ruling regarding the search for documents in the possession of low-level sales personnel, (see Section III.A, supra), defendants shall produce all documents reflecting all documents relating to both actual or potential price increases to any lender or consumer for Fair Isaac's scores since the introduction of VantageScore into the market, including any communications about such actual or potential increases.

As to Request No. 68, Fair Isaac has represented that it only is seeking communications the defendant bureaus had with lenders and resellers central to its antitrust claims: (1) communications about pricing; (2) communications regarding royalties; (3) communications about the benefits of VantageScore as compared to Fair Isaac scores; (4) communications pertaining to the predictiveness of other scoring models as compared to Fair Isaac's models; (4) communications about scoring ranges; and (5) communications about the need for a scoring model other than Fair Isaac's scoring model.   See Pls.' Mem. at p. 24.   Defendants agreed that resolution of this Document Request is governed by this Court's ruling on their general objections to searching and producing documents from low-level sales persons and regarding resellers.  Tr. 53.  Therefore, consistent with this ruling on these general objections, this Court grants Fair Isaac's motion to compel as it pertains to Request No. 68, subject to the decision regarding the search for documents in the possession of low-level sales personnel (see Section III.A, supra).

D. **Discovery of Scorex PLUS Model Algorithm, Specifications and Planning Documents**

Fair Isaac seeks an order from this Court compelling Experian to produce documents responsive to the following document requests relating to the scoring model known as Scorex PLUS, which it developed several yeas ago:

**REQUEST NO. 1:** All algorithms for your in-house credit-score models. (Fair Isaac requests that these be produced in native electronic format, complete with all existing metadata intact.)

**RESPONSE:** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 2:** All drafts or versions or iterations of the specifications for your in-house credit-score models. (Fair Isaac requests that these specifications be produced in their native electronic format, complete with all existing metadata intact, and including any data dictionaries outlining and defining valid attributes for each characteristic.)

**RESPONSE:** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 4:** All data and materials—computer specifications or otherwise—that you provided as part of the effort to develop and test what became VantageScore's credit-score model.

**RESPONSE:** Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Experian further objects to this Request as cumulative and duplicative of other Requests.

> **REQUEST NO. 5**: All of the planning documents that were used to develop your in-house credit-score models, whether they be in the form of flow diagrams, internal memos, reports, or presentations (or some other similar document), including documents that list the technologies or statistical methodologies used and any technical specifications of proprietary techniques that were used for your in-house credit-score models.
>
> **RESPONSE**: Experian objects to this Request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. Experian further objects on the grounds that such information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence.

See Kiedrowski Decl., Ex. 11 (Responses and Objections of Defendant Experian to Plaintiff's Fourth Set of Document Requests).

According to Fair Isaac, it anticipates that defendants will argue in defense to Fair Isaac's antitrust claims that their collaboration on VantageScore was necessary to develop an innovative product.   Id. at p. 25.   However, based on the documents produced or that it has obtained in the public domain, Fair Isaac believes that the innovative features that defendants will use to justify their collaboration on VantageScore – the attribute leveling process and segmentation methods – are the very same features of and derive from Experian's Scorex PLUS model.  Fair Isaac maintains that it needs the Scorex PLUS algorithm, the specifications for Scorex PLUS, and other documents relating to the development of Scorex PLUS in order to determine whether VantageScore's leveling and segmentation features are indeed unique and innovative, or are nothing more than the result of "cribbing" these features from Experian's Scorex PLUS model.  In short, Fair Isaac claims that it is only through these Scorex PLUS documents that will it be able to test the veracity of defendants' anticipated argument

that they had to collude to produce a scoring model with characteristic leveling and unique segmentation.  See Pls.' Mem. at p. 29.

Defendants oppose production the Scorex PLUS algorithm, the specifications for Scorex PLUS, and other documents relating to the development of Scorex PLUS on several grounds.  First, they maintain that Fair Isaac has misstated the applicable legal standard to establish a violation of antitrust law.  See Defs.' Opp. Mem. at p. 29. Second, having conceded that a portion of the technology underlying VantageScore was derived from Experian's Scorex PLUS, and having even expressed a willingness to stipulate to the areas of overlap, defendants contend that Fair Isaac does not need the Scorex PLUS algorithm and related information.  Id. at p. 30; Tr. 79.  Third, defendants argued that Fair Isaac will be able examine for themselves the overlap between the two scoring systems because defendants have and are producing documents and witnesses that will address the extent of the overlap of VantageScore and Scorex PLUS, the reasons Experian decided to join the VantageScore venture despite its development of the Scorex PLUS technology, the areas and features of the VantageScore model that were innovations of and improvements to the Scorex PLUS technology and the creation of data filters and attributes that made VantageScore unique from any scoring service that came before it.  See Defs.' Mem. at pp. 30-32, 36- 40.  Fourth, after describing the highly confidential nature of the Scorex PLUS algorithm and related information, defendants asserted that even if this information was relevant to Fair Isaac's claims, disclosure is not warranted where the need for the information was outweighed by the potential harm from the disclosure.  Id. at pp. 32-35.

In response to defendants' arguments, Fair Isaac contended that it needed to examine the Scorex PLUS algorithm and related information to demonstrate whether defendants' claimed development efforts were primarily the product of Experian's Scorex PLUS, and to determine whether defendants' collaboration amounted to a scheme designed in part to enable reciprocal data-sharing, which would then permit them to strengthen their grip on the aggregate credit data market and drive out competition.  See Pl.'s Reply at p. 3.  In addition, Fair Isaac asserted that disclosure of the Scorex PLUS algorithm was necessary to understand the bases for defendants' claimed need to develop VantageScore rather than continue to compete individually in the credit-scoring market.  Id. at p. 4.  Fair Isaac also stated that if it was found that Experian had disclosed its algorithm in its entirety to VantageScore, then that would suggest that Experian did not intend or could not have continued to be "a vibrant independent competitor in the credit-scoring market", all of which Fair Isaac claimed was relevant to its allegation that VantageScore was formed and operated by defendants for the purpose of reducing competition in the credit-scoring market, and driving out other competing products.  Id. at p. 4.

Finally, Fair Isaac argued that the Scorex PLUS algorithm and related information was relevant to its trade secret claim.  Pointing to defendants' assertion in their brief that "the undisputed fact that VantageScore borrowed substantially form Scorex PLUS underscores the baselessness of the claim that VantageScore was developed using technology Trans Union stole from Fair Isaac" (Defs.' Opp. Mem. at p. 30), Fair Isaac asserted that the only way it could test that assertion was by having the opportunity to review the Scorex PLUS algorithm and specifications.  Tr. 45.

In summary, Fair Isaac maintained that it had to conduct its own side-by-side comparison of the VantageScore and Scorex PLUS algorithms, and that it should not be relegated to relying on defendants' representations or stipulations about the nature, extent and reasons for the overlap between VantageScore and Scorex PLUS.

As stated previously by this Court, "'there is no absolute privilege [against disclosure] for trade secrets and similar confidential information.'" Federal Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340, 362 (1979) (quoting 8 Charles Alan Wright et al., Federal Practice and Procedure § 2043).   However, the Eighth Circuit has recognized that "Federal Rule of Civil Procedure 26(c)(7) anticipates that in certain cases, discovery of trade secrets should either be limited or not permitted."   In re Remington Arms Co., Inc., 952 F.2d 1029, 1032 (8th Cir. 1981).   Rule 26 provides, in relevant part:

> for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> * * *
>
> (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]

Fed. R. Civ. P. 26(c).

In balancing the protection afforded to trade secrets by Rule 26(c)(7) and the right to access relevant discovery, the Eighth Circuit has formulated the following burden-shifting test: (1) The party opposing discovery must first demonstrate that the information at issue is a trade secret under Rule 26(c)(7) and that its disclosure would be harmful to the party's interest in the property; (2) the burden then shifts to the

requesting party to show that the information is relevant to the lawsuit and is necessary to prepare the case for trial; and (3) if the requesting party demonstrates relevance and need, the court must weigh the injury that disclosure might cause against the moving party's need for the information.  See In re Remington Arms Co., Inc., 952 F.2d at 1032 (citations omitted).

For the purposes of this motion, Fair Isaac does not contest that the Scorex PLUS algorithm information is trade secret information under Rule 26(c)(7) and its unfettered disclosure to Fair Isaac would be harmful to defendants.  As such, resolution of its motion must focus on: (1) whether Fair Isaac has adequately shown that the Scorex PLUS algorithm and related information is relevant to its lawsuit and necessary for its preparation at trial; and if so, (2) whether the injury that disclosure might cause defendants outweighs Fair Isaac's need for this information.

At this juncture of the lawsuit, this Court finds that Fair Isaac has not met its burden in showing that Experian's highly confidential Scorex PLUS algorithm and related information is necessary to support its various contentions that bear on its antitrust claims.   First, based on defendants' own admission that a  portion of the technology underlying VantageScore was derived from Experian's Scorex PLUS, their expressed willingness to stipulate to the areas of overlap between VantageScore and Scorex PLUS, and their representations that they have produced documents and will produce additional documents and witnesses that will address the extent of the overlap of VantageScore and Scorex PLUS, the reasons Experian decided to join the VantageScore venture, and the areas and features of the VantageScore model that were innovations of and improvements to the Scorex PLUS technology, this Court is

satisfied that Fair Isaac has sufficient information to test the veracity of defendants' statements about the nature, extent and reasons for the overlap between VantageScore and Scorex PLUS.  Moreover, this Court fails to see how a side-by-side comparison of the VantageScore and Scorex PLUS algorithm (a mathematical formula embedded in software that is used to generate a credit-score), or an examination of the Scorex PLUS specifications (instructions to the computer generating the credit score) and development documents will prove, disprove or lead to the discovery of admissible evidence bearing on the various arguments that Fair Isaac has propounded in support of its request for this information.  Third, to the extent that Fair Isaac argued that it needed the Scorex PLUS algorithm to test defendants' claim that they did not use Fair Isaac's algorithm to develop VantageScore, Fair Isaac has already been given the entire algorithm of VantageScore for the purpose of determining whether its algorithm was incorporated into the VantageScore algorithm.  Therefore, Fair Isaac does not need the Scorex PLUS algorithm to prosecute its trade secrets claims as it relates to VantageScore.[11]

In summary, in light of the representations by defendants regarding the information they have provided and have committed to provide to Fair Isaac, and the minimal, if any, probative value that the Scorex PLUS algorithm and related information on plaintiff's theories, the Court finds that the harm of production of the Scorex PLUS algorithm and related information outweighs any tangential relevancy or need for the

---

[11]   In the event that defendants do intend to introduce or rely on the Scorex PLUS algorithm to counter Fair Isaac's trade secrets claim, this Court will order Experian to produce this algorithm and related information.

information.  For all of these reasons, Fair Isaac's motion to compel Experian's Scorex

PLUS algorithm and related information is denied.

      **E.**     **Waiver of the Attorney-Client Privilege by Trans Union's Counsel Pertaining to Communications Regarding the Investigation of Fair Isaac's Trade Secrets Claim**

During the May 9, 2007 argument by Trans Union's counsel before the Court, its

attorney, James K. Gardner ("Gardner"), stated as follows:

> They allege in the complaint that Trans Union misappropriated information. I raise my right hand, although I'm not under oath, but I say no, that didn't happen. We've spoken to all the people that actually designed this model. They were chosen very specifically because of their lack of knowledge about FICO, and they did not use any FICO confidential information in designing the algorithm. But you can't possibly decide, nor should you, if he's right or if I'm right. The only thing you have to decide is is it enough for them simply to throw out an allegation and that on the basis of that, we open up the safe. And we disclose our algorithm.

Kiedrowski Decl., Ex. 16 (Tr. 19-20) (Portion of the Transcript from the May 9, 2007

Argument of James K. Gardner before the Court).   In response to the statements of

counsel at the May 9, 2007 hearing Fair Isaac propounded the following discovery:

> Request No. 1: All documents relating to the defendants' investigation of Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contracts (see Counts Thirteen, Fourteen, and Fifteen of the Second Amended Complaint), whether the investigation was conducted before or after the defendants received the Second Amended Complaint, including, for example:
>
> a. all communications among or between defendants' counsel or any other individuals (e.g. employees of the defendants, consultants, experts) or organizations relating to Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract;
>
> b. all internal notes and memoranda of defendants' counsel reflecting any research or investigation relating to Fair

Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract;

c. all notes or communications relating to the investigation that the defendants' conducted of Fair Isaac's claims for misappropriation of trade secrets, breach of contract, and interference with contract, which Trans Union's counsel (speaking on behalf of all defendants) told the Court at the hearing on May 10, 2007, resulted in individuals involved in the planning or development of VantageScore's credit-scoring model assuring defendants' counsel that there was no factual basis for Fair Isaac's claims ("defendants' purposeful waiver"); and

d. all communications after the hearing on May 10, 2007, among or between defendants' counsel or any other individuals or organizations relating to the defendants' purposeful waiver.

Each defendant objected to this request, in part, on the grounds that the request sought information protected from disclose pursuant to the attorney-client privilege. See Kiedrowski Decl., Exs. 5-8 (Defendants' Responses and Objections to Plaintiffs' Second Set of Document Requests).

According to Fair Isaac, attorney Gardner's statements regarding his communications with his clients, in opposition to Fair Isaac's motion to compel the VantageScore algorithm, amounted to a waiver of the attorney-client privilege. See Pls.' Mem. at pp. 33-34. Defendants countered that the statements by Gardner during the May 9, 2007 hearing, were nothing more than a recitation of what was already stated in Trans Union's Answer to Fair Isaac's Second Amended Complaint, where it denied that "'it misused or misappropriated Fair Isaac's confidential information and that it "'deliberately chose employees to build the VantageScore scoring model who did not have access to any confidential information about Fair Isaac's scoring.'" Id. at p. 41 (quoting Trans Union's Answer to Second Amended Complaint, ¶ 152).  Defendants

argued that because Gardner's statements during the hearing were a mere recitation of the denial set forth in Trans Union's Answer, his statements did not amount to a waiver the attorney-client privilege.  Id.

In general, confidential communications between individuals and attorneys for the purposes of obtaining or rendering legal advice are privileged.  See Upjohn v. United States, 449 U.S. 383, 394-95 (1981); see also Fisher v. United States, 425 U.S. 391, 403-04, (1976); United States v. Horvath, 731 F.2d 557, 561 (8th Cir. 1984). However, the voluntary disclosure of attorney client communications expressly waives the privilege.  See United States v. Workman, 138 F.3d 1261, 1263 (8th Cir. 1998) (citing Lutheran Medical Center v. Contractors Health Plan, 25 F.3d 616, 622 (8th Cir. 1994); In re Grand Jury Proceedings Subpoena to Testify to Wine, 841 F.2d 230, 234 (8th Cir. 1988)).   Courts typically apply such a waiver to all  communications on the same subject matter.  See PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership, 187 F.3d 988, 992 (8th Cir. 1999) (citation omitted).

This Court does not find that Gardner's statements at the May 9, 2007 hearing amounted to a waiver of the attorney-client privilege on the part of Trans Union, or the other defendants in this case.  As a preliminary matter, this Court observes that these statements closely mirror Trans Union's Answer to the Second Amended Complaint that Trans Union did not misappropriate Fair Isaac's trade secret information and that the employees of Trans Union chosen to work on the VantageScore were selected because they did not have access to confidential information belonging to Fair Isaac.  See Kiedrowski Decl., Ex. 16 (Tr. 19-20); Trans Union's Answer to Second Amended Complaint, ¶ 152.  The only difference between Trans Union's Answer and Gardner's

statements was that Gardner informed the Court that he had received this information from the investigation that he had performed on behalf of his client.  However, the fact that Gardner revealed in court that he had conducted an investigation not only stated the obvious, but it was required.  Rule 11 of the Federal Rules of Civil Procedure dictates that an attorney who makes factual allegations in a pleading, including an answer, must have evidentiary support for those contentions.  <u>See</u> Fed. R. Civ. P. 11(b)(3).  Revealing to the Court or to third parties how the evidentiary support was obtained does not amount to a waiver of the attorney-client privilege.  More critically, an examination of Gardner's statements indicates that he did not reveal the substance of any communications with his client in his comments to the Court.  As Gardner did not disclose a privileged communication, there was no waiver of the attorney-client privilege.

J.S.M.