**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

Fair Isaac Corporation; and myFICO
Consumer Services, Inc.,

                Plaintiffs,

v.

Equifax Inc.; Equifax Information Services
LLC; Experian Information
Solutions, Inc.; Trans Union LLC; and
VantageScore Solutions, LLC; and Does I
through X,

                Defendants.

Civil Action No: 06 CV 4112 ADM/JSM

**Fair Isaac's Memorandum of Law in
Opposition to the Defendants'
Motion to Compel Documents in
Response to their Sixth Set of
Document Requests (Nos. 1-6 and 18-
31)**

---

### Introduction

The defendants' motion to compel Fair Isaac to produce documents should be

denied. In the first part of their motion, defendants seek information on Fair Isaac's

Executive Decision Manager ("EDM") business which—apart from Fair Isaac's scoring

business—encompasses the rest of Fair Isaac's entire business. The defendants have

insisted throughout this suit that discovery must be limited to generic credit risk scores and

that no other products or services are relevant to this case. But now they want to open

discovery on Fair Isaac's entire business and they seek information for the very types of

products and services that they have always maintained are not relevant. Putting aside

defendants' own admissions of irrelevance, the EDM information that defendants seek

pertains to an infinite number of business solutions that essentially have nothing to do with

the credit-scoring or aggregated-credit-data markets that are at issue in this case. But even

more, the search for this information would be a mammoth undertaking and it would likely take Fair Isaac *thousands of hours* to complete—not to mention that it would literally shut down Fair Isaac's finance group for weeks (if not months) on end.  In the second part of their motion, the defendants request that Fair Isaac be sent on a wild goose chase to search for hypothetical documents that show *all* public statements, advertisements, or promotional materials in which Fair Isaac has used *any* form of some nearly two dozen different terms *as well as* the documents that show Fair Isaac's basis for those public statements, advertisements, or promotional materials. The defendants don't cite a single case that shows that they are entitled to this type of information and the burden that Fair Isaac would incur in searching for those documents would be tremendous.

**Argument**

**I.      The defendants' motion to compel documents under Nos. 1-6 should be denied.**

Before this motion, the defendants insisted that discovery in this case must be limited to generic risk credit scores and that no other products or services are relevant. But now the defendants are pursuing discovery requests that seek documents unrelated to and that go far beyond generic risk credit scores. The defendants' requests are irrelevant not only because of the defendants' repeated assertions during discovery, but also because the law does not consider claimed procompetitive benefits that are outside the relevant market in the case. Fair Isaac explained this to the defendants during the meet and confers and also explained that the defendants' requests seek discovery of Fair Isaac's entire business. Collyard Decl. ¶ 3.  Counsel also explained to defendants that their document requests don't make sense when you consider what Fair Isaac's EDM business is and how it works.

*Id.* Defendants admitted during these meet and confers that they didn't understand what EDM is or how it works but their answer to that was: That's what discovery is for. And that appears to be their entire basis for this motion—let's see what we can find. *See id.*

 Fair Isaac objected to each of the defendants' requests as overbroad (i.e., not relevant or reasonably calculated to lead to the discovery of admissible evidence). And because it would require a Herculean effort by Fair Isaac to search for the documents that defendants are requesting, Fair Isaac also objected to defendants' requests as unduly burdensome.

### A.     The defendants seek discovery far beyond the parties' agreement—and defendants' repeated assertions—of what is discoverable in this case.

#### 1.      The parties agreed to limit discovery to generic credit risk scores.

The defendants have repeatedly asserted from the beginning of this case that *all* discovery must be limited to "generic credit risk scores" and no other products or services are relevant to this case. Fair Isaac served its first set of document requests on defendants in January 2006 and soon after that the parties met and conferred to talk about the types of global limitations that they could put on discovery in this case. Collyard Decl. ¶ 2. Defendants insisted at that time that all discovery must be limited to generic credit risk scores.  In a letter to Fair Isaac's counsel on March 22, 2007, defendants' counsel explained:

> As you recall, Defendants proposed in the initial meet and confer on February 20 that all discovery requests be limited to generic credit risk scores, as defined in Defendants' discovery responses.

*Id*. Exh. 1 at 3 (relevant portion highlighted). The parties eventually agreed that all of the discovery in this case would be limited to generic credit risk scores (with a minor

exception for certain information for the parties' custom credit scoring models created for a particular lender or institution). *Id*. ¶ 2.

A generic credit risk score is a credit score that predicts the likelihood that a consumer will repay his or her debts. The parties all sell many different types of scoring products that are of a different nature than generic credit risk scores (e.g., fraud scores or insurance scores) and defendants have maintained that those types of scoring products and services are not subject to discovery. Defendants made these assertions both *before* and *after* they served Fair Isaac with their sixth set of document requests on November 21, 2007. For example, on July 18, 2007, in response to Fair Isaac's third set of document requests, Equifax made the following two general objections to producing information pertaining to anything but generic credit risk scores:

> 2.      Equifax objects to the Requests to the extent they seek documents and information relating to the alleged Aggregated Credit Data Market in general and/or products or services that are not related to the generic credit risk scoring services or the joint venture at issue in this case. To the extent the Requests seek information that is not related to the relevant generic credit risk scoring services or the joint venture at issues in this case, they are overly broad, unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

> 5.      Equifax objects to the Requests to the extent they seek documents and information regarding services other than generic credit risk scoring services. Unlike customized scoring services created for a particular creditor, generic credit risk scoring services, i.e., those scoring services that predict credit risk delinquencies and apply to all industries and applications, are the only services relevant to this case. Both the Plaintiffs' scoring services at issue in this case and the VantageScore scoring model are generic credit risk scoring services. Subject to and without waiver of this or its other objections, Equifax will produce only those non-privileged, responsive documents that concern generic credit risk scoring services.

Collyard Decl., Ex. 2.

And as recently as January 22, 2008, the defendants again asserted in the following Equifax general objection to Fair Isaac's sixth set of document requests, that discovery is limited to generic credit risk scores and nothing else is relevant or reasonably calculated to lead to the discovery of admissible evidence:

> 2.      Equifax objects to the Requests to the extent they seek documents and information relating to products or services that are not related to generic credit risk scoring services or the joint venture in this case. To the extent the Requests seek information that is not related to the relevant generic credit risk scoring services or the joint venture at issues in this case, they are overly broad, unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Collyard Decl., Ex. 3.

Despite the parties' agreement to limit discovery to generic credit risk scores and the defendants' many assertions on this issue, defendants now seek discovery on all of the non-generic credit risk scoring products and services that Fair Isaac offers through its EDM business (i.e., Fair Isaac's entire business).

### 2.      Defendants' requests seek information on products and services far beyond generic credit risk scores.

EDM is not a credit scoring product or service—let alone a generic credit risk score or product. Nor is it a finite set of products or services that Fair Isaac offers. Ron Decl. ¶ 4. EDM is a systematic approach to how Fair Isaac can help clients make better operational decisions. *Id.* It covers all aspects of business decision making, almost all of which have absolutely nothing to do with credit scores. *Id.* These types of systematic solutions and offerings are unique to every client and their particular needs. *Id.* Clients use these solutions and technologies in many different areas, such as:

-Automated customer service
-Fraud detection
-Insurance underwriting
-Mortgage lending
-Debt collection and recovery
-Agency management
-Network integrity assurance
-Medical bill review and repricing
-Customer management and cross selling
-Online recommendations
-Product configuration and design
-Prospect marketing and offer targeting
-Regulatory compliance
-Churn/attrition management
-Credit authorizations
-Retail channels management
-Tax non-filter detection

For example, through EDM, Fair Isaac might help a retailer determine where certain products should be placed on shelves in its stores and what products should be placed next to each other to increase sales. *Id.* As another example, EDM could be used to help insurance underwriters develop internal systems to reduce their time in determining state regulatory compliance issues. *Id.* Fair Isaac's solutions could also help businesses make decisions about how they should handle potential fraudulent activity detected on a customer's credit card. EDM could even help a business make decisions about how it should handle a customer relationship where a customer has been delinquent on a payment. *Id.*

When Fair Isaac works with a client under EDM, it tries to assess all of the decision-making margins that could be reduced to rules and statistical (and other similar rigorous) analyses across a client's entire business. *Id.* ¶ 5. So each of the various services and products that are offered to a client depend on that particular client's needs. *Id.* That

6

means that Fair Isaac could offer analytic services targeted to a client as well as a whole host of other decision and analytic products or services that Fair Isaac sells. *Id.* This is all part of Fair Isaac's EDM business. *Id.*

The following is a list of some of the potential non-credit scoring products and services that Fair Isaac may ultimately offer to a client under its EDM business:

Marketing ................................Fair Isaac MarketSmart Decision System® solution

Originations .............................LiquidCredit® decision engine
LiquidCredit® service
Capstone® Decision Manager
Capstone® Decision Accelerator

Customer Management............TRIAD™ adaptive control system
TRIAD™ Transaction Scores
TelAdaptive® account management service

Fraud.......................................Falcon™ Fraud Manager
Fraud Predictor with Merchant Profiles
Falcon™ ID solution
CardAlert Fraud Manager
Fraud/Risk Analytics for Telecom (including
Revenue and Network Assurance)
RoamEx® Roamer Data Exchanger

Collections & Recovery ..........Debt Manager™ solution
Recovery Management System™ solution (RMS)
ScoreNet® network
PlacementsPlus® service
Placement Optimizer[SM] service

Insurance and Healthcare ........Fair Isaac SmartAdvisor® medical bill review
Payment Optimizer® solution
VeriComp® Fraud Manager
MIRA™ Claims Advisor

Professional Services ...............Solution and technology consulting
                                        Data management services
                                        Industry consulting
                                        Analytic consulting
                                        Fraud consulting
                                        Medical bill review services

Analytic Software Tools ..........Blaze Advisor™ business rules management system
                                        Model Builder for Predictive Analytics
                                        Model Builder for Decision Trees
                                        Decision Optimizer
                                        Vectus® software

*Id.* And none of these EDM products or services are the type of generic credit risk scoring products that the defendants have insisted (and Fair Isaac agreed) that discovery is limited to in this case.

### B.    In addition, none of defendants' requests are likely to lead to the discovery of admissible evidence.

The defendants argue that their EDM requests are relevant to their defenses to Fair Isaac's antitrust claims to the extent "these product offerings were improved or revised (including by means of better prices) as a result of the launch of VantageScore." Defs. Br. at 8. But as explained above, these products and services have nothing to do with the credit-scoring market, which (along with the aggregated-credit-data market) is the only relevant market at issue in this case. *See* Second Amended Complaint. ¶ 11. The products and services at issue in this motion encompass the entirety of decision-making analytics that Fair Isaac offers to its clients and, to the extent the broad analytic capabilities of these services even touch on credit scores, it is only tangential—a single input out of potentially hundreds of variables. *See* Ron Decl. ¶ 6.

Not surprisingly, the defendants' claimed need for these documents is at odds with the law. Courts have long refused to entertain claims by defendants that their combination is defensible on the grounds that it creates procompetitive benefits outside the relevant marketplace, as the defendants would have the Court to do in this case. *See U.S. v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370-71 (1963) (rejecting argument in proposed bank merger that "anticompetitive effects in one market could be justified by procompetitive consequences in another" where purpose of combination was to form a rival to market leader); *Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1089 (8th Cir. 1972) ("anticompetitive effects of an acquisition in one market cannot be justified by procompetitive effects in another market"); *RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979) (same); *cf. U.S. v. Canron, Inc.* (refusing to consider defendants' claim of procompetitive effects because "[p]rocompetitive effects outside the relevant geographic market cannot be used to offset anticompetitive effects in the relevant market").

It is also the policy of the federal agencies in reviewing combinations that "out-of-market efficiencies" such as those claimed by the defendants are not to be considered unless they are "inextricably linked" to the relevant market at issue *and* present "large procompetitive benefits in a large market and a small anticompetitive problem in another, smaller market." *See* Commentary on the Horizontal Merger Guidelines, at 56-57 (2006).[1] The defendants cannot argue that the speculative benefits they claim in the separate market

---

[1] The Horizontal Merger Guidelines are expressly included by reference in the Antitrust Guidelines for Collaborations among Competitors (April 2000) cited by the defendants. *See* Antitrust Guidelines for Collaborations among Competitors, at 5 (competitor collaboration treated as horizontal merger where, as in this case, it has competitive effects like those of a horizontal merger).

in which Fair Isaac's EDM business participates is "inextricably linked" to the actual

relevant market for credit scoring in this case. Indeed, one of the very documents cited by

the defendants—an email from Fair Isaac's Craig Watts to others at Fair Isaac—makes this

point by demonstrating, *from the view of a customer*, that EDM is not inextricably linked

to credit scoring. *See* Gant Decl., Exh. 13 (indicating that customer "wasn't interested in

services [such as EDM and TRIAD] *that removed from tangible risk scores*") (emphasis

added); *see also* Ron Decl. ¶¶ 3-6. Even more, the defendants have set forth the primary

purpose of VantageScore in other briefing in this case, and it obviously had nothing to do

with EDM or the analytics EDM encompasses. *See* Defendants' Response to Plaintiffs'

Motion to Compel, at 31 (Docket Entry #194, filed under seal Aug. 18, 2007). Although

the Court may eventually be called on to determine whether *that* purpose is a legitimate

basis for the defendants' consortium,[2] the burdensome search-and-find mission that the

defendants would impose on Fair Isaac (*see* Section I.C. *infra*) on a mere hope that they

can identify procompetitive benefits *outside the relevant market* is not relevant to their

defense in this case.

     Furthermore, there is simply no reasonable basis for the defendants' claim that Fair

Isaac could "leverage its position" in these unrelated analytic services to sell credit risk

scores. EDM is an "A-to-Z" system-wide approach to converting business decisions to

---

[2] It is worth noting that an agreement among competitors to combine in order to drive a specific competitor from the marketplace and thereby reduce consumer choice only to the collaboration's offering would almost certainly be deemed a "naked restraint of trade" and obviate any further need for the court to weigh anticompetitive effects with claimed procompetitive benefits (in the relevant market). There is already evidence in the record bearing on this issue. *See* Feb. 6, 2008 Letter to The Honorable Ann D. Montgomery from Ronald J. Schutz, Exh. 1 (Docket Entry # 274, filed under seal Feb. 6, 2008) (indicating purpose of VantageScore).

rules and analytics. *See* Ron Decl. ¶ 5. It is not a channel of distribution for credit scores. *Id*. ¶¶ 3, 6. Indeed, in many (if not most) instances, credit scores will not even be included in the EDM solution developed for a client and, where a credit score may be in a solution, it would be one input variable among potentially hundreds. *Id.* ¶ 6. To suggest that EDM would be utilized as a method for distributing FICO scores simply has no basis and (as explained above) wouldn't make sense. *Id.* ¶¶ 5, 6. In short, credit scores are not what EDM—or the other analytics identified in the defendants' requests—are about. For this reason, the "dangerous probability" of the defendants' monopolizing the credit-data market—as a result of their undeniable control of access to data (which remains the case even in those instances where a score may be encompassed in an EDM solution) *and* their control of the primary avenue of distributing Fair Isaac's credit scores as part of the credit-data bundle sold to lenders—is not the least bit undermined, let alone "severely undermined," as the defendants claim in their motion.

Finally, the defendants cite a number of exhibits in their motion that they claim show how EDM could be used by Fair Isaac "to leverage its competitive position" to increase sales of credit scores. These exhibits do not provide support for the defendants' wide-ranging claim for documents related to EDM. For instance, the defendants cite to the transcript of an analyst call that discusses Fair Isaac's "active cross-sell strategy." *See* Gant Decl., Ehx. 8. But it is clear that this strategy is aimed at Fair Isaac's suite of "software products [that] talk to each other," such as those encompassed by EDM and described in Mr. Ron's declaration. *See* Ron Decl. ¶5. There is *no* mention of credit scores in the cited portion of the transcript and certainly no indication that EDM could be used as a method

11

for leveraging the delivery of credit scores. The same is true for the other analyst-call snippets that the defendants cite. *See* Gant Decl., Ex. 9 (describing "holistic approach" to cross-selling EDM suite of products and no mention of credit scoring); Gant Decl. Ex. 10 (describing "holistic" approach that includes "mix of enterprise applications, multi stage, multi period, multi country rollouts" with no mention of credit scoring); Gant Decl. Ex. 11 (describing EDM just as set forth in the attached Ron Declaration and, again, no mention of credit scoring).

The other documents that defendants refer to also do not provide a sufficient basis for the broad-ranging discovery that defendants request. One document recounts a question from a caller during an analyst call about the possibility of Fair Isaac using TRIAD as a "leverage point," but *no* response to the analysts' questions is provided by Fair Isaac in the document. *See* Gant Decl., Ex. 14. Another document (dated *only a month* after VantageScore was introduced to the market) suggests that Fair Isaac did not yet have a plan for incorporating VantageScore into LiquidCredit. *See id.*, Ex. 12.  As discussed at length above, LiquidCredit is only one application that can be offered as part of the A-to-Z analytic solutions Fair Isaac seeks to offer clients as part of EDM. LiquidCredit (like the other applications in the non-scoring business) does not serve as a distribution channel for FICO® credit scores, and credit scores—in those instances where they are included in an application—are only a single input among hundreds. *See* Ron Decl. ¶ 6. The discussion in the document cited by the defendants does not contradict that fact. Indeed, none of these documents would refute the obvious fact that the defendants control access to the primary method of delivering credit scores, and they control access to data. It is that control in the

relevant market in this case, as described at length in the complaint and in Fair Isaac's opposition to the defendants' motion for partial summary judgment, that underlies their anticompetitive conduct and forms the dangerous probability of defendants successfully monopolizing the credit scoring market.

**C.**   **The incredible burden that Fair Isaac would incur to search for this information far outweighs defendants' purported need for it.**

The defendants say in their brief that Fair Isaac has yet to identify what the burden would be to search for the information called for by defendants' requests. But counsel for Fair Isaac explained to them that the only way that Fair Isaac could determine the final prices charged would be to locate every single contract (and all of the addendums to those contracts) for the infinite solutions that Fair Isaac has offered under EDM (this process is explained in detail below).  Collyard Decl. ¶ 4.  So it is disingenuous for defendants to suggest to the Court that Fair Isaac didn't explain to defendants what its burden would be for searching for this information and defendants certainly haven't been left to "guess" what Fair Isaac's burden would be—as they say in their brief. In addition, the defendants' purported "documents sufficient to show" limitation is meaningless because, as Fair Isaac explained to defendants, Fair Isaac would need to go to every contract and addendum to gather the documents sufficient to show the prices charged for Fair Isaac's EDM solutions—so Fair Isaac's burden isn't diminished in any way based on defendants' pretended limitation.

If Fair Isaac is required to search for the information that defendants are requesting, it would literally bring Fair Isaac's finance group to its knees. Ron Decl. ¶ 9. Robert Ron, the Senior Director of Finance at Fair Isaac, estimates that it would take his finance group

at least *thousands of hours* to search for and gather this type of information and he would need to shut down his group for many weeks to focus on this project full-time. *See id.*

Because the systematic solutions that Fair Isaac sells under EDM are unique to every client, and EDM encompasses an infinite arrangement of different types of solutions, there are no standardized prices for them. Ron Decl. ¶ 10. The prices charged are all based on many different factors and circumstances, and the prices (like the products and solutions) are unique to every client. *Id.*

And as Fair Isaac's counsel explained to defendants, the only way that Fair Isaac could even attempt to determine the "final prices charged, per transaction and customer, and any discounts or adjustments to such prices" for its EDM solutions would be to go to the very contracts under which these solutions were sold to a client. *See id.* ¶ 11. That would be a mammoth undertaking because many (if not most) of Fair Isaac's active 2,000 (or so) EDM clients have multiple contracts for the solutions that Fair Isaac provides them. *Id.* And for each one of those different contracts, there are various addendums and other communications that reflect modifications to the contracts that would need to be reviewed to determine the final prices charged. *Id.* Moreover, contracts often provide for options or rights to future services or products, or tiered pricing depending on future or other factors, so what was actually obtained by the client in connection with the entire deal might be only revealed in a multiplicity of communications following the original contract. *Id.* In addition, Fair Isaac doesn't keep its contracts in one central location so it would need to have various people search various files and records in order to first obtain the universe of the many different contracts that would need to be reviewed. *Id.*

To put this into perspective, if it took Fair Isaac only one-half hour per client to locate the final prices from each client's contracts and addendums (and Fair Isaac thinks that it would take much, much longer than that), it would take Fair Isaac 1,000 hours just to obtain the final pricing information on EDM—that's the equivalent of one person's work for over half a year. Ron Decl. ¶ 12. But Fair Isaac believes that this is a low estimate and it would actually take its finance group many times longer than that to obtain the requested information. *Id.*

Defendants' request no. 3 (EDM final prices) encompasses their request nos. 1 (TRIAD final prices) and 2 (LiquidCredit final prices) because TRIAD and LiquidCredit are part of EDM. But since the defendants brought their motion on their separate requests for nos. 1 and 2 for TRIAD and LiquidCredit products, we will explain the burden associated with those specific requests as well. Not surprisingly, the same process described above for searching for EDM final prices would need to be followed to obtain the pricing information for each of the transactions where Fair Isaac sold a TRIAD or LiquidCredit product to a client. Ron Decl. ¶ 13. For example, just as Fair Isaac's pricing for its EDM solutions depends on the client and what the client wants to do with the product, the same is true for the pricing of Fair Isaac's TRIAD products. *Id.* Fair Isaac has approximately 300 to 400 customers for TRIAD and, as with EDM, the only way that Fair Isaac could try to determine the "final prices charged, per transaction and customer, and any discounts or adjustments to such prices" for its TRIAD products, would be to go to the TRIAD contracts and the various addendums and other communications that show the final prices and the adjustments to them. *Id.* It would take Fair Isaac's finance group

*hundreds and hundreds of hours* to search for and gather the documents that show the final prices charged for Fair Isaac's TRIAD and LiquidCredit® products and solutions. *Id.*

Defendants' document request nos. 4 (bundling, tying, co-promoting, co-markteting) and 6 (EDM's compatibility with credit scores) really don't make sense when you consider what EDM is and how it works, as discussed above. Ron Decl. ¶ 14. But if Fair Isaac were required to search for these documents, the only way that Fair Isaac could do this, would be to search through and gather documents relating to all of the contracts and any proposals for all of the EDM solutions that have been offered. *Id.* This, too, could take hundreds of hours and likely much more. *Id.*

## II.  The defendants' motion to compel hypothetical information under Nos. 18-31 should also be denied.

### A.  Neither Fair Isaac's statements nor its basis for making them are relevant to determine whether defendants' advertising is false.

The defendants' requests seek documents sufficient to show *all* public statements, advertisements, or promotional materials in which Fair Isaac has used, in *any* form, nearly two dozen different terms, *as well as* all of the documents that show Fair Isaac's basis for making any such statements or placing any such advertisements. The defendants' requests are another attempt to obtain discovery about Fair Isaac's conduct when they have no justified basis for doing so.  Just like the defendants' last motion to compel—in which this Court rejected defendants' request to discover information about Fair Isaac's Internet key word search terms—the defendants are trying, without any basis in law, to shift the focus of Fair Isaac's claim from defendants' conduct to Fair Isaac's conduct.  But the defendants don't cite a single case that holds that a plaintiff's conduct is relevant to a

defendant's false-advertising defense, nor do defendants have a counterclaim that would put Fair Isaac's conduct at issue.  Fair Isaac's statements about its products and its justification for making those statements are simply irrelevant.

Fair Isaac's false-advertising claims are directed at specific statements that the defendants made in a particular context. But the defendants don't consider this in their requests or in their motion. Instead, they seek all statements that use any form of their listed terms *regardless* of the context in which those statements were made. For example, in their request no. 23, the defendants seek all public statements and advertisements in which Fair Isaac may have used any form of the term "state-of-the-art" to market or promote any Fair Isaac credit risk scoring service.  It doesn't matter to the defendants what Fair Isaac may have been referring to or the context in which Fair Isaac made the statement, defendants want their requested discovery as long as Fair Isaac made the statement. As another example, in their request no. 30, the defendants seek the same type of information for the term "deep knowledge." As long as Fair Isaac used the term "deep knowledge" in any way in any public statement or advertisement, the defendants want discovery on that statement.  But defendants' requests make no sense because Fair Isaac would have used this term to refer to a specific thing in a specific context that wouldn't be relevant to the specific statement or context in which defendants used the term in their VantageScore advertisements.

The defendants' argument for why they think they are entitled to send Fair Isaac on a wild goose chase for hypothetical statements that would only have been made in a particular context is essentially this: FICO® credit scores have been referred to as an

industry standard product (i.e., they are the scores that most lenders use) so whatever Fair Isaac did (or didn't do) to justify making statements about its products, must be acceptable to the entire credit scoring industry as an objective testing mechanism. But none of defendants' cases stand for the proposition that a court looks to a *product* that is generally used in an industry and determines what the seller (or manufacturer) of that particular product did to justify making advertising statements to determine an objective and acceptable industry-wide testing methodology. The cases that the defendants cite simply do not support any theory that Fair Isaac's advertising statements or its basis for making them are relevant to determining whether the defendants' advertising is false.

For example, in the *Rohne-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.* case cited by defendants, the district court simply concluded that the defendant did not engage in false advertising because in making its statements the defendant properly relied on a study that was conducted by a third party and the methodologies (which were used in the testing that the defendant relied on) complied with standards accepted within the scientific community and that were consistent with FDA principles. 93 F.3d 511, 515 (8th Cir. 1996). In other words, the court relied on what the scientific community thought was acceptable and it did not rely on the subjective analysis of a plaintiff.

In the other cases that the defendants cited (e.g., *Hipsaver Co. v. J.T. Posey Co.* and *Castrol Inc. v. Pennzoil Co.),* the courts examined whether the testing complied with methodologies that were already accepted by the industry as being objective tests by which certain measures of performance could be calculated. But none of those courts looked to a party's subjective analyses of a popular product—as the defendants want to do here—to

try and create an acceptable (and objective) industry standard testing methodology. As the court in the *Castrol* case explained: "[i]n order to determine whether a claim is literally false courts have looked to objective industry standards *rather than the subjective standards of the party making the comparison*." 799 F. Supp. 424, 436 (D.N.J. 1992) (emphasis added).

**B.    The burden Fair Isaac would need to in incur to search for this information would be tremendous.**

The defendants once again try to claim that they have somehow minimized Fair Isaac's burden by limiting their requests to "documents sufficient to show." But their limitation really does nothing to limit Fair Isaac's burden since they are asking for "documents sufficient to show *all* public statements, advertisements, or promotional material . . . ."  Defs. Br. at 14 (emphasis added). Counsel for Fair Isaac even asked the defendants during a recent meet and confer if they were limiting their requests to particular statements that defendants could actually show Fair Isaac made and the defendants said that they were *not* limiting their requests in that manner. Collyard Decl. ¶5. The defendants said that they could not limit their requests because they wanted to make sure they got the complete universe of *all* of the statements that Fair Isaac has ever made during the relevant time period.  *Id.*

If Fair Isaac were required to search for the requested information, it could potentially take hundreds of hours to complete and Fair Isaac would need to tie up the resources of multiple people across many different business groups within Fair Isaac. *Id.* ¶ 13.  Fair Isaac does not keep the types of documents that it would need to search for in one central location. Sullivan Decl. ¶ 3. Nor is there any database or other documents that

easily link the statements that Fair Isaac might have made to a document that shows the basis for making them. *Id.*

Fair Isaac has potentially made thousands of public statements about its scoring products over the last 7 years. *Id.* ¶ 4. Indeed, Fair Isaac makes many public statements on a regular basis, in many different ways and to many different audiences. *Id.* Fair Isaac has made public statements, for example, in press releases, newsletters, product release notes, in presentations at industry conferences, in interviews with journalists, during analyst calls, and to customers or potential customers. *Id.* Fair Isaac also advertises its scoring products on various pages on its websites, in brochures, in pamphlets, in television spots, and in other traditional marketing materials. *Id.* Fair Isaac has undoubtedly created hundreds of different marketing materials for its scoring products over the years. *Id.*

In order to search for the information that defendants are requesting, Fair Isaac would need to follow a multi-step process to locate the documents and, each of those steps could, alone, take several days (and potentially hundreds of hours) to complete. *Id.* ¶ 5.

Fair Isaac would first need to gather the universe of the thousands of public statements that it has made and the potentially hundreds of advertising and promotional materials and media that it may have created over the last 7 years. *Id.* ¶ 6. This universe of information is not kept in one central location or easily searchable in electronic form. *Id.* With respect to the marketing-type-documents, it would need to search many different locations from various people across at least three different business groups of the company (i.e., the product management group; the product marketing group; and the corporate marketing group). *Id.* For the potentially thousands of other public statements, Fair Isaac would need to expand its search outside of these groups to many other people

who might have documents that show the statements that were made. *Id.* No single business group within Fair Isaac is the keeper of the potential universe of this information. *Id.* And these searches would probably take many people several days to complete. *Id.*

Then, after Fair Isaac located the universe of marketing materials and media, and the public statements that were made, it would then need to search through all of them to find "all" of the statements that contain "any version" of the nearly two dozen different terms that the defendants listed in their requests. *Id.* ¶ 7. It would need to search through (the equivalent of) many boxes and probably thousands of pages of documents to locate any such statements (to the extent they even exist or existed). *Id.*

Then, if Fair Isaac found "any version" of the referenced terms, it would need to determine what, if anything, Fair Isaac relied on to make those statements. *Id.* ¶ 8. For this step, at least for the statements in the marketing-type-materials that are described above, Fair Isaac would need to search though any marketing files that it may have kept regarding the marketing pieces. *Id.* This would be very difficult to do because Fair Isaac doesn't keep standard files for its marketing materials and the development of any given marketing piece could have involved multiple individuals in at least the three different groups that were mentioned earlier (i.e., the product management group; the product marketing group; and the corporate marketing group). *Id.* So Fair Isaac would need to go back to those many individuals in those groups to see if they have any information about why certain statements were made. *Id.* (And there is no telling whether the people who were involved in the decision to make certain statements are even at Fair Isaac anymore since—as is probably common with many companies the size of Fair Isaac—many if not most of the

relevant people have left those groups over the last 7 years.) Those people would then need to search their individual files (including emails) to see if they have this information. *Id.* This could total many days of work.

For the other avenues of public statements that are described above (e.g., press releases, release notes, newsletters, etc.), Fair Isaac would need to follow a process similar to the one described for the marketing-type-materials; and for the statements that were made by individuals (like statements to the journalists, statements in presentations, statements to analysts, etc.) it would need to go directly to the source of the statement to see what they relied on for making the statement. *Id.* ¶ 9. These steps could also amount to many, many days of work and hundreds of hours. *Id.*

Then, after Fair Isaac obtained the information from the various people about whether they relied on specific information to make the statements, Fair Isaac would need to obtain the documents that show the basis for why we made them. *Id.* ¶ 10. For this step, it would need to have the people who were involved in determining to make the statement (or the people who made the statements) look through their files to see if they had the information that shows the basis for making the statement. *Id.* These people would need to search through their own files and emails to obtain this information. *Id.*

If those people didn't have the information on hand (which is probably the case), or if Fair Isaac wasn't able to determine if it relied on something in particular to make the statements, it would need to search the files of its analytics group to see if they would have the documents to show the basis for making the statements. *Id.* ¶ 11. This step could also take many days (and potentially a week or more) to complete. *Id.*

For this step, the analytics group would need to search through the many analyses for model effectiveness that they did for the given time period in which the statement was made. *Id.* ¶ 12. Any given analyses could consist of hundreds of pages of materials. *Id.* This information would be extremely burdensome to search because there is no central catalogue of this information. *Id.* The analytics group members would need to search through files, emails, and reports to try and locate this information—and like the marketing materials, there are no guarantees that they'll find the information (to the extent it even existed in the first place). In many cases the statements will relate to not one piece of information but a pattern discovered through many, many client validations, which would have to be researched among historical files. *Id.* It would take one person (who really knows what they are looking for) an entire week to look for this information (if not longer depending on how many statements need to be linked to a justification for making them).

## Conclusion

The defendants' document requests nos. 1-6, relating to Fair Isaac's EDM business, are seeking information that is far beyond the generic risk credit scores that the defendants have always maintained are the only products and services that are relevant to this case. Fair Isaac's EDM solutions have nothing to do with the credit-scoring market, which (along with the aggregated-credit-data market) is the only relevant market at issue in this case. The defendants' request nos. 18-31, relating to potential statements that Fair Isaac has made in its advertising, are also not seeking relevant information. And the tremendous burden that Fair Isaac would suffer if it had to search for this information, if it exists, far outweighs any purported need that the defendants might claim they have for the

information. Fair Isaac therefore respectfully requests that the defendants' motion to compel be denied in its entirety.

Date: March 3, 2008          **Robins, Kaplan, Miller & Ciresi, L.L.P.**

                **By:**   /s Michael Collyard

                      Ronald J. Schutz (MN Bar #130849)
                      Randall Tietjen (MN Bar #214474)
                      Michael A. Collyard (MN Bar # 302569)

                2800 LaSalle Plaza
                800 LaSalle Avenue
                Minneapolis, MN 55402
                Tel: (612) 349-8500
                Fax: (612) 339-4181

                and

                Charles F. (Rick) Rule
                Joseph J. Bial
                **Cadwalader, Wickersham & Taft LLP**
                1201 F Street, N.W.
                Washington, D.C. 20004
                Tel: (202) 862-2200
                Fax: (202) 862-2400

                **Attorneys for Plaintiffs**