# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Fair Isaac Corporation and
myFICO Consumer Services, Inc.,

               Plaintiffs,

      v.

Equifax Inc.; Equifax Information Services
LLC; Experian Information Solutions Inc.;
Trans Union, LLC; VantageScore
Solutions, LLC; and Does I through X,

             Defendants.

**MEMORANDUM OPINION AND
ORDER**
Civil No. 06-4112 ADM/JSM

_____

Ronald J. Schutz, Esq., Randall Tietjen, Esq., and Michael A. Collyard, Esq., Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, appeared on behalf of Plaintiffs.

Jeffrey J. Keyes, Esq., Briggs and Morgan, P.A., Minneapolis, MN, and Teresa T. Bonder, Esq., Alston & Bird LLP, Atlanta, GA, appeared on behalf of Equifax Inc. and Equifax Information Services LLC.

Mark A. Jacobson, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, and Robert A. Milne, Esq., and Jack E. Pace, III, Esq., White & Case LLP, New York, NY, appeared on behalf of Experian Information Solutions Inc.

Christopher R. Morris, Esq., Bassford Remele, Minneapolis, MN, and James K. Gardner, Esq., Neal, Gerber, & Eisenberg LLP, Chicago, IL, appeared on behalf of Trans Union, LLC.

Barbara Podlucky Berens, Esq., Kelly & Berens, P.A., Minneapolis, MN, on behalf of VantageScore Solutions, LLC.

_____

## I. INTRODUCTION

On November 20, 2007, the undersigned United States District Judge heard oral argument on the Motion for Partial Judgment on the Pleadings or, Alternatively, for Partial Summary Judgment in Respect of Antitrust Claims [Docket No. 215] brought by Defendants Equifax Inc.; Equifax Information Services LLC (collectively "Equifax"); Experian Information Solutions Inc. ("Experian"); Trans Union, LLC ("Trans Union") (Equifax, Experian, and Trans Union collectively are the "Credit Bureaus"); and VantageScore Solutions, LLC ("VantageScore") (the Credit Bureaus and VantageScore collectively are "Defendants").  In their Second Amended Complaint [Docket No. 81], Plaintiffs Fair Isaac Corporation and its subsidiary myFICO Consumer Services, Inc. (collectively "Fair Isaac"), assert claims under sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section seven of the Clayton Act, 15 U.S.C. § 18.  For the reasons set forth herein, Defendants' Motion is denied in its entirety.

## II. BACKGROUND

The following facts relevant to Fair Isaac's antitrust claims are taken from Fair Isaac's Second Amended Complaint, except where noted otherwise.  The factual allegations in the Second Amended Complaint are assumed to be true for the purpose of Defendants' Motion for Partial Judgment on the Pleadings.  Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990) (noting that motion for judgment on the pleadings is analyzed under same standard as motion to dismiss); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994) (stating that facts alleged in the complaint are taken as true for purpose of motion to dismiss).

A.      **The Market for Aggregated Credit Data**

The Credit Bureaus are the dominant sources of aggregated credit data of consumers in the United States.  2d Am. Compl. ¶ 24.  This aggregated credit data consists of information reported by lenders, such as banks, credit card companies, and residential mortgage companies, regarding a consumer's borrowing and repayment history.  Id. ¶ 11(b).  Credit data reporting in the United States is entirely voluntary.  Id. ¶ 25.  An individual lender may have an agreement to provide consumer credit data to all, some, or none of the Credit Bureaus.  Id.  As a result, the individual Credit Bureaus often have different aggregated credit data for the same consumer.  Id.  Additional variation can result from the different ways the Credit Bureaus organize their data, and from discrepancies and errors in the data aggregated by the Credit Bureaus.  Id.

The Credit Bureaus have a 100% combined share of the national market for aggregated credit data, for which there are no economic substitutes.  Id. ¶ 220.  The barriers to entry in this market are high, as a new entrant must expend considerable time and resources to develop a set of aggregated credit data.  Id.

B.      **Credit Scoring**

The Credit Bureaus market and distribute credit scores, which quantify an individual consumer's financial creditworthiness.  Id. ¶ 11(c).  A credit score is calculated by applying a credit-scoring algorithm to a Credit Bureau's aggregated credit data regarding a particular individual.  Id. ¶ 11(d).  Traditionally, each Credit Bureau has marketed credit scores based on its own in-house algorithms, and based on algorithms that third party vendors have tailored to that Credit Bureau's unique set of aggregated credit data.  Id. ¶ 27.

The dominant credit score is the FICO® Classic score based on algorithms developed by Fair Isaac.  Id. ¶¶ 22, 40.  In collaboration with the individual Credit Bureaus, Fair Isaac has developed variations of its FICO algorithms that are tailored to each bureau's data set.  Id. ¶¶ 29, 40.  Fair Isaac's credit scores use the trademarked scoring range of 300-850, with a score of 300 reflecting the highest level of credit risk and a score of 850 reflecting the lowest level of credit risk.  Id. ¶ 30.  By modifying its FICO algorithm for each Bureau's data set, Fair Isaac tries to ensure that a particular FICO score reflects the same level of credit risk regardless of which Credit Bureau's data set is used.  Id. ¶ 40.  Fair Isaac recently began to offer a more advanced credit score known as NextGen FICO.  Id. ¶ 42.

As noted above, each Credit Bureau has developed and marketed its own in-house scoring algorithms and credit scores for use with its own data set.  Id. ¶ 27.  However, the individual Bureaus' in-house credit scores failed to effectively compete with Fair Isaac's FICO score.  Fair Isaac's Opp'n [Docket No. 227] at 2.

Although Fair Isaac's FICO score has dominated the credit scoring market, Fair Isaac typically does not sell credit scores directly to lenders or consumers because Fair Isaac does not have direct access to the Bureaus' aggregated credit data sets.  2d Am. Compl. ¶¶ 43-45.  Instead, Fair Isaac licenses its algorithms to the Credit Bureaus and the Credit Bureaus pay a royalty for each Fair Isaac credit score sold.  Id. ¶ 44.  The Credit Bureaus then sell the Fair Isaac scores to lenders and other customers, usually as part of a bundle that includes a credit report reflecting the aggregated credit data underlying the credit score.  Id. ¶¶ 23, 125.  The price of such a bundle reflects the cost of the credit score, the aggregated credit data, and processing fees.

Id. ¶ 125.  The Credit Bureaus determine the prices of the bundles of products and services they sell.  Id. ¶¶ 124-25.

Fair Isaac and the individual Credit Bureaus have entered certain agreements that allow Fair Isaac to sell a FICO-score-and-credit-report bundle directly to lenders or consumers. Id. ¶¶ 45-46.  In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer.  Id.  The Credit Bureau applies Fair Isaac's Bureau-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac.  Id.   Fair Isaac then delivers the bundle to the consumer or lender.  Id.  Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle.  Id.

Like the aggregated credit data market, the credit scoring market has a substantial barrier to entry because the sets of aggregated credit data necessary to develop and apply credit scores are controlled exclusively by the Credit Bureaus.  Id. ¶ 221.  Therefore, new entrants in the credit scoring market cannot succeed without cooperation from the Credit Bureaus.  Id.

**C.     VantageScore**

VantageScore is a joint venture created, controlled, and owned by the Credit Bureaus to develop a credit-scoring algorithm to compete with Fair Isaac's products.  Id. ¶ 63. VantageScore credit scores became commercially available in March 2006.  Id.  Like Fair Isaac, VantageScore has had access to all three Credit Bureaus' data.  Id. ¶ 3.  Defendants have asserted that VantageScore credit scores provide greater predictive power than other credit scores because it uses a single algorithm and implements "characteristic leveling" to consistently interpret credit information regardless of which Bureau's data set is used.  Id. ¶ 100(b).

Defendants have also claimed that VantageScore has benefitted from unmatched access to the Credit Bureaus' aggregated credit data sets.  Id. ¶ 101-02.

**D.      Alleged Anticompetitive Conduct**

Fair Isaac alleges that the Credit Bureaus' agreement to jointly create, own, and control VantageScore has the purpose and effect of extending the Credit Bureaus' collective market power in the aggregated credit data market into the credit scoring market.  Id. ¶ 225.  The Bureaus have agreed to engage in anticompetitive behavior to eliminate competition for VantageScore and monopolize the credit scoring market.  Id. ¶¶ 225, 248.  In selling credit scores to lenders, the Credit Bureaus have manipulated the prices of their bundles of products and services so that bundles that include Fair Isaac's credit scores cost considerably more than bundles that include VantageScore.  Id. ¶¶ 124-29.  For example, Equifax recently raised the price of FICO scores from thirty to fifty cents, and is offering VantageScore credit scores for twenty cents.  Id. ¶ 126.  Additionally, although the royalty rate for Fair Isaac's NextGen algorithm is fifteen percent higher than the rate for the classic FICO algorithm, the Credit Bureaus' quoted prices for NextGen scores are 500% higher than the prices they quote for classic FICO scores.  Id. ¶ 129.  Similarly, the Credit Bureaus charge Fair Isaac a significantly higher price for a credit-score-and-credit-report bundle than the Bureaus charge other resellers of credit reports.  Id. ¶ 46.

Since the Credit Bureaus agreed to own and control VantageScore, they have significantly reduced their longstanding collaborations with third-party vendors of scoring algorithms, including Fair Isaac, in developing and marketing new products.  Id. ¶ 121.  For example, although Fair Isaac collaborated with Experian in 2005 to develop a bankruptcy score,

Experian refused to participate in a joint press release when the product launched in April 2006, one month after the Credit Bureaus announced the creation of VantageScore.  Id. ¶ 122. Additionally, Equifax recently canceled a contract under which it distributed Fair Isaac scores generated using Equifax's aggregated credit data.  Id. ¶ 123.  The Bureaus are likely to cease developing and marketing their respective in-house scoring algorithms.  Id. ¶¶ 27, 118.

The Bureaus' joint ownership and control of VantageScore also has the purpose and effect of restricting competition among the Credit Bureaus in the development and sale of aggregated credit data.  Id. ¶ 224.  Before the introduction of VantageScore, each individual Credit Bureau had incentive to innovate in collecting aggregated credit data because the Credit Bureau or Fair Isaac could then tailor a credit-scoring algorithm to generate more predictive credit scores based on the individual Credit Bureau's data set.  Id. ¶ 224.  After the introduction of VantageScore, the Credit Bureaus have a reduced incentive to develop innovations in their aggregated credit data sets because any innovations must be disclosed to the other Bureaus before the VantageScore algorithm is updated to reflect the innovation.  Id. ¶ 137.

The Credit Bureaus' joint ownership and control of VantageScore and their agreements to take anticompetitive measures to promote VantageScore will facilitate the exchange of competitively sensitive information and enable them to raise prices and reduce innovation in both the market for aggregated credit data and the market for credit scoring.  Id. ¶¶ 222-23. There are no offsetting procompetitive benefits from the VantageScore joint venture because the use of a single scoring algorithm and characteristic leveling reduces the predictiveness of VantageScore credit scores.  Id. ¶ 227.

## III. DISCUSSION

**A.       Defendants' Motion for Judgment on the Pleadings**

**1.       Standard of Review**

Rule 12(c) of the Federal Rules of Civil Procedure states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Westcott, 901 F.2d at 1488.  In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm, 15 F.3d at 112; Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief."  A pleading must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).

2.      **Fair Isaac's Antitrust Claims**

a.      **Count Eight**

Count Eight of the Second Amended Complaint asserts that Defendants have violated § 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is . . . illegal."  15 U.S.C. § 1.  Courts interpret § 1 as prohibiting only unreasonable restraints of trade. Craftsmen Limousine, Inc. v. Ford Motor Co., 491 F.3d 380, 386 (8th Cir. 2007).  Defendants argue that Fair Isaac has failed to adequately allege the existence of an illegal agreement.

The Supreme Court's 2007 decision in Bell Atlantic Corp. v. Twombly, addresses the pleading standard for § 1 claims.  The Twombly plaintiffs' allegations of an illegal § 1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers.  127 S. Ct. at 1970.  Before 1996, the defendants had government-sanctioned regional monopolies for local telephone service, but could not compete in the competitive long-distance market.  Id. at 1961.  The Telecommunications Act of 1996, 110 Stat. 56, restructured local telephone markets by imposing duties on the defendants to facilitate new entrants.  Id.  The statute also allowed the defendants to enter the long-distance market and compete in each other's territories.  Id.  The Twombly plaintiffs' § 1 claims rested on the parallel conduct of the defendants in refraining from entering each other's markets and resisting new competition in their respective geographic markets.  Id. at 1970.

In considering whether these claims survived a motion to dismiss, the Supreme Court stated that a § 1 claim must set forth "enough factual matter . . . to suggest that an agreement was made."  Id. at 1965.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will

not suffice." Id. at 1966.  Instead, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely conduct that could just as well be independent action." Id.  Applying this standard, the Twombly plaintiffs' complaint was properly dismissed because defendants' parallel conduct was naturally explainable as the result of each defendant's independent decision to attempt to maintain its regional dominance.  Id. at 1971-72.  The Twombly Court cautioned that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Id. at 1974. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 1965 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Fair Isaac's § 1 claims rest on two main allegations.  First, Fair Isaac alleges that since deciding to jointly create, control, and own VantageScore, Defendants have agreed to decrease competition in the credit-scoring market by manipulating the prices of bundles of aggregated credit data, scoring, and processing.  The bundles that include Fair Isaac's credit scores will now cost significantly more than bundles that include VantageScore's credit scores.  In particular, Fair Isaac alleges that: (1) although the royalty rate for Fair Isaac's NextGen algorithm is fifteen percent higher than the rate for the classic FICO algorithm, the Credit Bureaus' quoted prices for NextGen scores are 500% higher than the prices they quote for classic FICO scores, 2d Am. Compl. ¶ 129; (2) the Credit Bureaus charge Fair Isaac a significantly higher price for a credit-score-and-credit-report bundle than the Bureaus charge other resellers of credit reports used for similar purposes, Id. ¶ 46; and (3) Equifax recently raised the price of FICO scores from thirty to fifty cents and is offering VantageScore credit scores for twenty cents.  Id. ¶ 126.

Fair Isaac's second main allegation of § 1 conspiracy is that the Credit Bureaus have agreed to support VantageScore by limiting Fair Isaac's access to the Credit Bureaus' sets of aggregated credit data.  In support of this claim, Fair Isaac alleges that since the Credit Bureaus agreed to jointly create, control, and own VantageScore, they have significantly reduced their longstanding collaborations with third-party vendors of scoring algorithms, including Fair Isaac, in marketing and developing new products.  Id. ¶ 121.  For example, although Fair Isaac collaborated with Experian in 2005 to develop a bankruptcy score, Experian refused to participate in a joint press release when the product launched in April 2006, one month after the Credit Bureaus announced the creation of VantageScore.  Id. ¶ 122.  A second example is that Equifax recently canceled a contract under which it distributed Fair Isaac scores generated using Equifax's aggregated credit data, even though the contract was profitable for Equifax.  Id. ¶ 123.

Defendants argue that Fair Isaac's allegations of the Credit Bureaus' collusive price manipulation and denial of access to data fail to satisfy the pleading standard of Twombly.  Quoting from footnote 10 in Twombly, Defendants contend that Fair Isaac is required to allege the "specific time, place, or person involved in the alleged conspiracies."  127 S. Ct. at 1971 n.10.  Footnote 10 states in relevant part:

> If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the [defendants] would have given the notice required by Rule 8.  Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred . . . the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies.

Id.  Defendants read this dicta as suggesting that Federal Rule of Civil Procedure 8's notice requirement requires specific pleading of the "who, what, where, when, and how" of a § 1 conspiracy.  However, the first sentence of footnote ten indicates that the Twombly plaintiffs'

explanation that their allegations of agreement were premised on descriptions of parallel conduct was sufficient to give the defendants *notice* of the plaintiffs' § 1 claim.  The defect in the Twombly complaint was not inadequate notice.  Instead, given the characteristics and history of the telecommunications market, the Twombly plaintiffs had failed to provide enough facts to "nudge[] their claims across the line from conceivable to plausible."  Id. at 1974.  The Twombly Court suggested that in other market contexts, allegations of parallel conduct "could very well signify illegal agreement."  Id. at 1972.

In the instant case, the Second Amended Complaint alleges a close temporal proximity between the Credit Bureaus' agreement to jointly create, own, and control VantageScore, and the beginning of the alleged parallel price manipulation and denial of access to the Credit Bureaus' data.  Therefore, Fair Isaac's Sherman Act § 1 claims are distinguishable from those in Twombly, where there was no allegation that the defendants' parallel conduct supported a prior agreement.  The Credit Bureaus' recent agreement to jointly own and control VantageScore places Fair Isaac's allegations of the Credit Bureaus' anticompetitive price manipulation and denial of access "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Twombly, 127 S.Ct. at 1966. Therefore, Fair Isaac has stated a plausible claim of a § 1 violation.

### b.    Count Nine

Count Nine of the Second Amended Complaint asserts that the Credit Bureaus' acquisition of VantageScore violates § 7 of the Clayton Act because the acquisition will substantially lessen competition in the markets for credit scoring and aggregated consumer credit data.  See 15 U.S.C. § 18 ("No person engaged in commerce . . . shall acquire . .. the whole or

any part of the stock . . . of another person engaged also in commerce . . . where in any line of commerce . . . the effect of such acquisition may be substantially to lessen competition . . . ."). To state a claim under § 7, a complaint must allege a relevant market and "a likelihood that competition may be 'foreclosed in a substantial share of . . . [that market].'" United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 595 (1957) (citation omitted).

Fair Isaac alleges that the VantageScore joint venture will substantially lessen competition in the market for credit scoring by creating an incentive for the Credit Bureaus to use their collective control over the aggregated credit data market to reduce Fair Isaac's ability to compete with VantageScore in the market for credit scoring.  2d Am. Compl. ¶ 235.  Fair Isaac asserts that the Credit Bureaus' acquisition of VantageScore will also reduce competition in the market for aggregated credit data because the Credit Bureaus will exchange competitively sensitive information on costs, prices, and innovations.  Id. ¶ 234.

In response, Defendants argue that the VantageScore joint venture is procompetitive because it creates a competitor that, like Fair Isaac, can develop algorithms based on all three Bureaus' aggregated credit data.  Defendants contend that the competitive harms alleged by Fair Isaac are implausible.  Defendants assert it is unlikely that they would antagonize lenders who prefer Fair Isaac's dominant FICO scores by agreeing to limit Fair Isaac's access to aggregated credit data.  Regarding Fair Isaac's allegation of potential reduced innovation in the aggregated credit data market, Defendants argue that VantageScore's characteristic leveling methodology actually exposes differences in the Bureaus' data, creating an incentive for the Bureaus to innovate.  The Court finds that Fair Isaac's claims under § 7 of the Clayton Act adequately allege

substantial competitive harms in both the credit scoring and aggregated credit markets.

Defendants' factual arguments are more appropriate at the summary judgment stage.

      **c.**    **Count Ten**

      Count Ten of the Second Amended Complaint asserts that Defendants have attempted to

monopolize the market for consumer credit scores, in violation of § 2 of the Sherman Act.[1]  "In

order to maintain an attempted monopolization claim under Section 2, [a plaintiff] must prove:

'(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or

anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful

purpose; and (3) a dangerous probability of success.'"  Amerinet, Inc. v. Xerox Corp., 972 F.2d

1483, 1490 (8th Cir. 1992) (quoting Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795,

801 (8th Cir. 1987)).

      Defendants argue Count Ten should be dismissed because Fair Isaac has failed to allege

any Defendant's market share in the credit scoring market.  Defendants contend that an

allegation of a high market share in the market for credit scoring is necessary to plead a

dangerous probability of success.  However, "market share analysis, while essential, is not

necessarily determinative of [the] monopoly power" necessary to show a dangerous probability

of success.  Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 792 (2d Cir. 1987).

"Other market characteristics must also be considered . . . [including] the strength of the

competition, the probable development of the industry, the barriers to entry, the nature of the

anticompetitive conduct, and the elasticity of consumer demand."  Id.

---

[1] Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.

In this case, although the credit scoring market is currently dominated by Fair Isaac's

FICO scores, Defendants control the aggregated credit data necessary to generate credit scores,

and Defendants control the pricing of credit score sales.  Defendants' combined dominance in the

aggregated credit data market and control of the sales of bundles of aggregated credit data and

credit scores could create a dangerous probability that Defendants can install VantageScore as a

monopoly in the credit scoring market if they agree to take anticompetitive measures such as

manipulating the prices of credit scores and denying Fair Isaac access to aggregated credit data.

See Zschaler v. Claneil Enters., 958 F. Supp. 929, 942-43 (D. Vt. 1997) (finding factual dispute

regarding dangerous probability of monopoly power where defendant could use its control of a

central reservations system to steer business to its vacation rental properties).  Therefore, at this

procedural juncture, Fair Isaac has adequately alleged that Defendants have a dangerous

probability of success of monopolizing the market for credit scoring.

       **d.**      **Count Eleven**

Count Eleven of the Second Amended Complaint asserts that Defendants have violated

§ 2 of the Sherman Act by conspiring to monopolize the market for credit scoring.  To state a

claim of conspiracy to monopolize, a plaintiff must allege (1) conspiracy, (2) specific intent to

monopolize, and (3) overt acts in furtherance of the conspiracy.  Baxley-DeLamar Monuments,

Inc. v. Am. Cemetery Ass'n, 843 F.2d 1154, 1157 (8th Cir. 1988).  Fair Isaac's conspiracy-to-

monopolize claim rests on allegations that the Bureaus have conspired to monopolize the credit

scoring market by manipulating prices of credit scores and denying Fair Isaac access to

aggregated credit data.  Defendants again argue Fair Isaac has failed to satisfy Twombly's

plausibility standard for pleading a conspiracy.  Defendants' argument is identical to their argument for dismissal of Count Eight.  For the reasons stated above, the Court finds that Fair Isaac has stated a plausible claim that Defendants have engaged in a conspiracy to monopolize the market for credit scoring.

### e.    Antitrust Injury

Plaintiffs sue for treble damages under § 4 of the Clayton Act[2] and for injunctive relief under § 16.[3]  Because the antitrust laws were enacted for "the protection of competition, not competitors," Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962), a private party can obtain relief under § 4 or § 16 only if it demonstrates an actual (§4) or threatened (§ 16) antitrust injury that reflects "the anticompetitive effect either of the [antitrust] violation or of anticompetitive acts made possible by the violation."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

As previously discussed, Fair Isaac's antitrust claims are premised on two main allegations.  First, Fair Isaac alleges that the Credit Bureaus are colluding to manipulate the prices of bundles of aggregated credit data, scoring, and processing so that bundles that include Fair Isaac credit scores will cost significantly more than bundles that include VantageScore credit scores.  Because the Credit Bureaus are the only sources of the aggregated credit data necessary to generate credit scores, the alleged agreement to manipulate prices will result in decreased sales of Fair Isaac's scoring products as lenders and consumers switch to the

---

[2] Section 4 states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" can sue for treble damages.  15 U.S.C. § 15(a).

[3] Section 16 states that a person may sue for injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

artificially less expensive VantageScore scoring products.[4]  Second, Fair Isaac alleges that the
Bureaus have conspired to create an advantage for VantageScore by limiting Fair Isaac's access
to the Bureaus' sets of aggregated credit data.  If Fair Isaac is denied access to the Bureaus'
aggregated credit data, then Fair Isaac would be unable to update its credit-scoring products and
develop new scoring products, and lenders and consumers would switch to the more current
VantageScore scoring products.

The Second Amended Complaint adequately alleges that Fair Isaac has suffered or is
likely to suffer antitrust injury as a result of Defendants' alleged collusion to manipulate prices
and to deny Fair Isaac access to aggregated credit data.  Defendants' arguments to the contrary
are premised on the Twombly plausibility arguments that the Court has already rejected.
Because the Court has rejected all of Defendants' arguments for dismissal of Fair Isaac's
antitrust counts, Defendants' Motion for Judgment on the Pleadings on Fair Isaac's antitrust
claims is denied.

**B.      Defendants' Motion for Partial Summary Judgment**

In the alternative, Defendants argue for summary judgment on Fair Isaac's antitrust
claims.  Defendants assert that statements by Fair Isaac's executives to securities analysts and
the press demonstrate that Fair Isaac's antitrust claims are baseless.

**1.      Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the
pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[4] Defendants have argued that Fair Isaac is complaining only about procompetitive price
competition.  However, Fair Isaac's allegation of collusive price manipulation is distinct from
price competition.

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### 2.     Fair Isaac's Public Statements

Defendants argue that public statements made by Fair Isaac's executives contradict Fair Isaac's legal arguments that the Credit Bureaus' VantageScore joint venture is anticompetitive and that Fair Isaac has suffered or will suffer antitrust injury. Defendants rely on statements that Fair Isaac's executives made in Securities and Exchange Commission Forms 8-K and 10-Q, earnings conference calls, technology conferences, CEO letters to shareholders, shareholder meetings, and statements attributed to Fair Isaac executives in media articles. 1st and 2d Gant Decls. [Docket Nos. 219 and 234]. Defendants argue the following statements, among others, show that Fair Isaac has not suffered and is unlikely to suffer antitrust injury from VantageScore:

- During an April 16, 2007, preliminary earnings conference call, Fair Isaac's CEO stated that as of that date, VantageScore had "no impact" as a competitive threat to Fair Isaac. 1st Gant Decl. Ex. 28 at 12.

- During an April 25, 2007, earnings conference call, Fair Isaac's CEO stated, "[W]e have not actually seen significant traction to date from the VantageScore offering." Id. Ex. 29 at 9.

- During a May 16, 2007, technology conference, Fair Isaac's CFO stated that because of the high switching costs lenders would experience if they updated their

systems to replace FICO scores with VantageScore credit scores, "we don't believe that there's wholesale substitution [from FICO scores to VantageScore scores] in the works here." Id. Ex. 31 at 7.

- During a July 25, 2007, earnings conference call, Fair Isaac's CEO stated that "to our knowledge I don't think we've lost a[] single customer as a result of those pressures [from VantageScore] although we are seeing this reflect in some pricing pressure as we engage in proposals." Id. Ex. 32 at 9.

The following are examples of statements Defendants rely on to show that Fair Isaac's executives have admitted that VantageScore is fundamentally procompetitive:

- A March 15, 2006, newspaper article quotes Fair Isaac's Vice President of Global Scoring Solutions as stating that the Credit Bureaus "have all had their own credit scores that they have tried to sell against us, and they've been wildly unsuccessful.  [VantageScore] is them trying to take another crack at our fortress." Id. Ex. 37.

- During a May 16, 2007, technology conference, Fair Isaac's CFO stated that Fair Isaac "expect[s] [VantageScore] to be used [by customers] . . . as a competitive threat perhaps to keep us honest in negotiations on price and otherwise police an area where we dominated for some time." Id. Ex. 31 at 7.

- During the same conference, Fair Isaac's CFO stated that "we think we can carry the day in a competitive arena with or without the lawsuit [against the Credit Bureaus and VantageScore]." Id.

Defendants contend that these statements are entitled to great weight because Fair Isaac is a publicly-traded company and its executives are required by federal securities laws to disclose truthful, materially accurate information without material omissions.  See 15 U.S.C. § 77a, et seq.; 17 C.F.R. § 240.10b-5.  Defendants argue that even if Fair Isaac has adequately alleged that the VantageScore joint venture is anticompetitive and will cause antitrust injury to Fair Isaac, Fair Isaac's executives' public statements refute those allegations.

In response, Fair Isaac argues these statements are quoted out of context and some of the statements were made before the anticompetitive effects of VantageScore became apparent.  Fair

19

Isaac has submitted the Declarations of Thomas Quinn, Fair Isaac's Vice President of Scoring, and Charles Osborne, Fair Isaac's Executive Vice President and Chief Financial Officer [Docket Nos. 225-26], which assert that the Credit Bureuas have limited Fair Isaac's access to aggregated credit data since VantageScore was introduced, and that VantageScore has eroded some of Fair Isaac's revenues.

The Court denies Defendants' Motion for Partial Summary Judgment on Fair Isaac's antitrust claims.  After reviewing the public statements relied on by Defendants, and the Quinn and Osborne Declarations and other evidence relied on by Fair Isaac, the Court finds there are genuine issues of material fact in the current record as to whether the VantageScore joint venture is anticompetitive and whether Fair Isaac has suffered or is likely to suffer antitrust injury.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants Equifax Inc.; Equifax Information Services LLC;

Experian Solutions Inc.; Trans Union, LLC; and VantageScore Solutions, LLC's Motion for

Partial Judgment on the Pleadings or, Alternatively, for Partial Summary Judgment in Respect of

Antitrust Claims [Docket No. 215] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 4, 2008.