1                     UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2                        CV 06-4112 (ADM/JSM)

3    Fair Isaac Corporation,

4                                        Plaintiff,

5         vs.                                  Minneapolis, MN

6                                        Courtroom 8E
     Equifax Inc.,
7    Experian Information Solutions, Inc.,   June 25, 2008
     Trans Union, LLC,
8    VantageScore Solutions, LLC,            REDACTED VERSION
     Does 1 through X
9                                        Defendants.

10          *     *     *     *     *     *     *

11                TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE JANIE S. MAYERON
12       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13   APPEARANCES:

14   FOR THE PLAINTIFF:
                         RANDALL TIETJEN
15                       MARY KIEDROWSKI
                         Robins, Kaplan, Miller & Ciresi
16                       2800 LaSalle Plaza
                         800 LaSalle Avenue
17                       Minneapolis, MN  55402

18   FOR THE DEFENDANT EXPERIAN:

19                       MARK A. JACOBSON
                         CHRISTOPHER R. SULLIVAN
20                       Lindquist & Vennum
                         4200 IDS Center
21                       80 South Eighth Street
                         Minneapolis, MN  55402
22
                         ROBERT MILNE
23                       White & Case
                         1155 Avenue of the Americas
24                       New York, NY  10036-2787

25   (Cont'd next page)

1   **APPEARANCES** (Page 2 cont'd)

2   **FOR DEFENDANT TRANS UNION:**

3

4                            **JAMES K. GARDNER**
                             Neal, Gerber, Eisenberg
                             Two North LaSalle Street
5                            Chicago, IL  60602-3801

6

7                            **CHRISTOPHER R. MORRIS**
                             Bassford Remele
                             33 South Sixth Street, Suite 3800
8                            Minneapolis, MN  55402-3707
                                      ,
9   **FOR DEFENDANT VANTAGESCORE SOLUTIONS, LLC,:**

10                           **JUSTI RAE MILLER**
                             Kelly & Berens, P.A.
11                           3720 IDS Center
                             Minneapolis, MN  55402

12

13

14  Reported By:    Maria Weinbeck
                    Official Court Reporter
15                  1005 U.S. Courthouse
                    300 South Fourth Street
16                  Minneapolis, Minnesota  55415

17

18  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              THE COURT:  Thank you.  Good morning

 3   everyone.  I understand you've had the pleasure, some of

 4   you, of running into your former contemporary, now Judge

 5   Keyes.  He came out here, and I'm sure you were all

 6   wondering why he was here, to arraign you all.  No.

 7              All right.  Well, I have to say it's a

 8   pleasure having Judge Keyes on the bench.  He's been a

 9   colleague forever, so we're delighted.  Sorry to take him

10   away from you all.

11              All right.

12              MR. TIETJEN:  That's okay.

13              THE COURT:  Understood.  All right.  We're

14   here this morning in connection with the matter of Fair

15   Isaac Corporation versus -- well, it starts off with this

16   Equifax et al, but we'll have to pull that name off of the

17   title here.  This is Court File No. 06-4112.  If the

18   attorneys could identify themselves.  Let's start first

19   with Fair Isaac.

20              MR. TIETJEN:  Good morning, Your Honor.

21   Randall Tietjen and Mary Kiedrowski from Robins, Kaplan,

22   Miller & Ciresi for the plaintiffs Fair Isaac.

23              THE COURT:  All right.  And on behalf of

24   Trans Union?

25              MR. GARDNER:  Good morning, Your Honor.
```

1   James Gardner and Chris Morris.

2                THE COURT:  And on behalf of Experian?

3                MR. JACOBSON:  Good morning, Your Honor.

4   Mark Jacobson and Chris Sullivan from Lindquist & Vennum

5   and Rob Milne from White and Case.

6                MR. MILNE:  Good morning, Your Honor.

7                THE COURT:  Good morning.  And on behalf of

8   VantageScore?

9                MS. MILLER:  Good morning, Your Honor.

10  Justi Miller from Kelly and Berens.

11               THE COURT:  Did I miss anyone?  This is sad

12  when I know all the parties' names by heart.  I don't even

13  need to look at the docket anymore.

14               We're here this morning to address

15  plaintiff's motion to compel.  Then when we're done with

16  that, we'll go into our off the record, and we will go

17  into our monthly case management conference.  And I know

18  that we have two disputed issues there that the parties

19  are prepared to resolve on an informal basis at that case

20  management conference.

21               But having said that, given we do have a

22  court reporter here, let me ask just in terms of the

23  mechanics, does anyone desire to have the court reporter

24  take down the case management conference and in particular

25  the two disputed issues?

1              MR. TIETJEN:  Fair Isaac would like it

2    recorded, Your Honor.

3              THE COURT:  All right.  Then I think that

4    answers it.  Whether the defendants agree or don't agree,

5    will that work for you, Ms. Court Reporter?

6              COURT REPORTER:  Yes, Your Honor.

7              THE COURT:  All right.  Well, we're here to

8    address plaintiff's motion to compel.  I have the moving

9    papers.  I have defendant's response.  I also received the

10   documents for the in camera inspection.  I've looked at

11   those documents.  I understand there is no reply that was

12   filed, so I'm prepared to hear argument.  Mr. Tietjen?

13             MR. TIETJEN:  Thank you, Your Honor.  If

14   you've had a chance to review the briefs, because I

15   understand time is limited this morning, I will try and

16   just respond to the defendant's argument in their brief.

17             This is a motion to compel production of

18   three documents which in the motion papers as you've seen

19   are referred to as Plaintiff's Deposition Exhibits 150,

20   151, and 160.  Exhibits 150 and 151 are related.  150 are

21   minutes from Project Trident meeting that were prepared by

22   a representative of Mercer, the bureau's consultant on

23   Project Trident.  The gentleman's name is Piyush Tantia.

24             These minutes, the defendants contend,

25   contain legal advice and for that reason they clawed them

1    back during the deposition.  Your Honor may recall all of

2    this because the minutes were filed by my client in

3    support of its last motion to compel.  And the minutes

4    were on file with the court for nine days right up until a

5    few hours before the defendant's response to our motion

6    was due.  And it was on that same day when a colleague of

7    mine who was taking the deposition of Mr. Tantia, and it

8    was during that deposition when we contend that the

9    questioning of Mr. Tantia regarding those minutes made the

10   defendants uncomfortable.  They clawed the document back.

11           The defendants contend that even though

12   they had let the document reside on file with the court

13   for nine days, that doesn't represent a waiver because as

14   they say on page 12 of their motion or their papers,

15   nothing in the record suggests that the defendants were

16   aware of the document any earlier.  Well, and they contend

17   later that essentially they were busy and implying that

18   they didn't see it as part of our motion papers.

19           I have no information and they're correct,

20   no information to counter that.  I've never taken a

21   deposition of any of the defendant's counsel to find out

22   whether they read our motion papers or not, but the fact

23   is that they did reside with the court for nine days and

24   nobody objected to that.

25           But I would like to concentrate more on the

```
1   defendant's claim that the redacted information in those
2   minutes represents attorney-client privileged information.
3                Now the redacted portion of those minutes
4   is essentially a repetition of what the defendants have
5   been calling their meeting guidelines, their antitrust
6   guidelines.  XXX XXX XXXXXXX XXXXXXX XXXX.XXXX XXXXXXX XXX
7   XXXXXXXX XX XXXX XXXXX XXXX XXXXX.  XXXXXXX XXX XXXXXXXX
8   XX XXXX XXXXX XXXXXXX.  XXXXXXX XXX XXXXXXXX XX XXXX XXXXX
9   XXXXXXXXX.  XXX XXXX XXXXX XX XXXX, XX XXXX XXXXXXXX XXX
10  XXX XXXXX XXX XX XX X XXXXXXXXX.
11               The defendants have produced to us several
12  versions of their meeting guidelines, and you'll recall I
13  assume from the last hearing that another version of their
14  meeting guidelines was in dispute then, and the defendants
15  agreed at that hearing to produce it to us.
16               And you, I think it's fair to say,
17  encouraged the defendants to explain to us why they hadn't
18  produced all of their meeting guidelines because they
19  really can't pick and choose which versions of their
20  meeting guidelines they want to produce and which ones
21  they want to claim are attorney-client privilege.  But
22  that's essentially what they're doing here with the
23  meeting minutes.
24               The minutes are nothing but another form of
25  the meeting guidelines.  The defendants contend that they,
```

1  and they say this in their brief, that Mr. Tantia's notes

2  reflect legal advice entirely distinct from the meeting

3  guidelines.  They don't explain how they are entirely

4  distinct, but if you read the meeting guidelines and then

5  read the redacted portion of the meeting minutes, you'll

6  see that the same admonitions are reflected in both.  XXXX

7  XX XXXXX XXXX XXXXX XXXXXXX, XXXXX XXXX XXXXX XXXXXXXXX,

8  XXXXX XXXX XXXXX XXXX XXXXX.

9          Those sentiments are contained in the

10  meeting guidelines as well.  So I don't know how the

11  redacted portion of these minutes are quote entirely

12  distinct from the meeting guidelines.

13          And they don't say, in any event, the

14  defendants don't say how those meeting minutes reflect

15  legal advice.  Mr. Oliai, an employee of Experian, has

16  submitted a declaration in opposition to this motion, and

17  he doesn't say how in his declaration those minutes

18  reflect legal advice.  In fact, in the defendant's brief,

19  they just hypothesize how the minutes could in theory

20  reflect legal advice, and this is at the bottom of page 8

21  in their brief.  The defendants say such communications

22  could have included providing the attorneys'

23  interpretation of the guidelines, explaining the interplay

24  of the guidelines and other applicable laws in answering

25  any questions that the Project Trident team might have

```
 1   had.   Those meeting minutes contain none of that
 2   information, reflect none of that.  This is just a pure
 3   hypothetical that the defendants have invented to support
 4   their argument the minutes shouldn't be produced.
 5              None of this, Mr. Oliai and no other
 6   affiant actually contends that the minutes reflect any of
 7   this thing like discussions about the minutes and the
 8   interpretations of them.  In any event, even if they did,
 9   I don't think they could withhold that information as
10   privileged either.  They can't pick and choose what part
11   of the guidelines -- this is my point -- which part of the
12   guidelines they want to claim is nonprivileged and what
13   they want to claim is privileged.
14              These guidelines are important to them
15   because it is their front, so to speak, that they didn't
16   do anything wrong.  They had these guidelines.  Everybody
17   read them.  Everybody followed them.  So they used this as
18   a defense to our antitrust claims, but they're being very
19   selective about it.  They don't want to face any questions
20   about these guidelines.  They don't want to produce all of
21   the versions of the guidelines.  And we contend the
22   guidelines are a farce.
23              Which leads me to the second part of our
24   motion to compel the production of Exhibit 160.  Exhibit
25   160 is a large set of e-mails, and it's only one in
```

```
 1   particular that's at issue here.  It's from an Experian
 2   employee, again Mr. Stan Oliai, to the same Mercer
 3   employee, Piyush Tantia, informing Mr. Tantia that XX
 4   XXXXXXXX XXXXXX XX XXXXXXXX, XXX XXXX XX XXXXX XXXXX,
 5   XXXXXX XX. XXXXXX XX XXXXXX XX XXXXXX XXXX XXX X XXXXXXX
 6   XX XXXXXXX XXXXXXX XX XXXX XX XXXXXXXX XXXXX XXXX XXX
 7   XXXXXXX XXXXX XX XXXXXXXXXX XXXXX XXX XXXXXXXXX.  XXX
 8   XXXXXXX XX. XXXXX XXXXXX XX XXXXXX XXX XXXXXXX
 9   XXXXXXXXXXXXX.  XX. XXXXXXX XXXXXX XXX XXX XXXX XXXX
10   XXXXXXXX XXXXXXX XXXXX XXX XXXXXXXXX.  He was not given
11   any legal advice of that nature.  XX XXX XXXX XXXXXXXXXXX
12   XXXX XX XXXXXX XX XXXXXXXXX XXXX XX X XXXXX XXX XXXX XXXX
13   XXXX XXXXXX XXXXXXXXXX.  And this is what the defendants
14   argue is legal advice.
15            Now Mr. Engle's declaration says this and
16   only this.  I provided legal advice to Mr. Oliai on the
17   draft agenda.  As if calling it legal advice, that is
18   XXXXXXXXXXX XXXX XX XXXXXX XX XXXX XX XXX XXXXXX made it
19   legal advice.  The defendants claim that this was a
20   legally necessary change.  They call it that on page 15 of
21   their memorandum.
22            And another point in the defendant's
23   memorandum, it is not legal advice.  It is simply XX
24   XXXXXXXXXXX XX XXXXXX XX XXXXXX XXXX XX XXXXX XX XXXX XXX
25   XXXXXX XXXXXXX XXXXX XXX XXXXX XX XX.  And the defendants
```

1   complain in their brief that Fair Isaac should not be

2   quoting from the transcript of the deposition where

3   Mr. Engle's advice is recorded and that that's privileged

4   information.  Actually, the fact that that transcript has

5   been left by the defendants untouched.  They did not ask

6   anyone to seal it, in our view, represents yet another

7   waiver of any claim that they might have to privilege.

8           The testimony in the transcript was left as

9   is by the defendants.  They have made no attempt to seal

10  it as they have in other depositions when what they

11  contend is privileged communications were recorded by

12  transcript.  Instead, they just in their brief complained,

13  and we quoted from it now.

14          We assert that this is an instance of the crime

15  fraud exception to the privilege as well.  And the

16  analysis there is actually quite simple.  The defendants

17  don't accept it, but it is simply this, that on paper they

18  XXXXXXXXXX XXXXXXXXXXX XX XXXXX XXX XXXXXXXXX XX XXXXX

19  XXXXXXX XXXXXXXXXX.  XXXX XXXXXX XXXX XXXXXXX XXX XXXXXX

20  XXXX XXXXX XXXX XXXX XXXXXXXXX XXXXX XXX XXXXXXX XX XX

21  XXXXX XXXXXXXX XX.  XX. XXXXXXX XXXXXX XXX XXX XXXX XXXX

22  XXXXXXXXX XX XXXXXXXXX XXXXX XXX XXXXXXXXX, XXX XXXXXXX

23  XXXX XXXX XXXXXX XXXX XX XXXXXXXXX XXXX.

24          The Court can reasonably infer from that a

25  desire to cover up the discussions that antitrust law by

1    the defendants own position prohibited them from

2    discussing.

3              With that, Your Honor, if you don't have any

4    questions, I'll rest.

5              THE COURT:  Let me see if I have any

6    questions for you.

7              So as to -- I have two questions:  One is

8    to the extent that you referred verbatim to the language

9    in the deposition with respect to the advice that

10   Mr. Engle gave to Mr. Oliai to change the name, your view

11   is that they're asking that that be struck from the brief.

12   And, obviously, now you've just quoted it here during this

13   hearing as well.  Your view is that is an indication of

14   not only should it not be struck; but, number 2, that's

15   indication that they have waived their right to contest

16   even if it was a privileged communication by not taking

17   any steps to seal it, to claw it back.  That that amounts

18   to a waiver, is that right?

19             MR. TIETJEN:  Another instance for waiver.

20   Another basis for it.

21             THE COURT:  And my second question has to

22   do with the fact that as I know you are aware, the rules,

23   Rule 37, the Local Rules, the operative pretrial

24   scheduling order requires a meet and confer before any

25   motions be brought.  Defendants have said there was no

1   meet and confer and cited some cases by my colleagues

2   Magistrate Judge Noel, affirmed by Judge Tunheim, and then

3   by Magistrate Judge Erickson that the failure to meet and

4   confer can be fatal to any motion to compel.  If you could

5   address that issue, please.

6             MR. TIETJEN:  The exchanges between counsel

7   during the deposition, both on the record and off the

8   record, constitute a meet and confer.  And the defendants

9   insisted that these were privileged communications and

10  were not going to produce them.  On Exhibit 150, we had

11  further discussions at the last hearing with the Court and

12  an exchange of correspondence on this subject as well.  We

13  believe that represents the sufficient meet and confer

14  among the parties.  In any event, any further meet and

15  confer, I believe of any other nature would be futile.

16  The defendants are not changing their position on this.

17            THE COURT:  All right.  Those are the only

18  two questions that I had for you.  Thank you.  Who will be

19  arguing on behalf of defendants?

20            MR. JACOBSON:  I will, Your Honor.

21            THE COURT:  Mr. Jacobson.

22            MR. JACOBSON:  Let me start, Your Honor,

23  and I'll tell you I was a bit longwinded the last time

24  around.  I'm going to try to make up for that today.

25            Let me start with Mr. Tietjen's last point.

```
 1   You conceive there's a small portion of that deposition
 2   transcript which unfortunately is in front of Your Honor.
 3   You can judge for yourself whether that constitutes a meet
 4   and confer.  An exchange of correspondence doesn't
 5   constitute a meet and confer.  A meet and confer under the
 6   terms of the rule has to be either face to face or by
 7   phone.  You don't do it by correspondence.
 8                   And, again, Your Honor will, I think, judge
 9   for yourself whether what happened at the hearing
10   concerning solely the question of whether Kiedrowski
11   Exhibit 25, that version of the clawed back document that
12   had been filed with the Court should be destroyed or
13   whether you should hold on to it for further proceedings
14   constituted a meet and confer.  None of that constituted a
15   meet and confer.
16                   In fact, Your Honor, and part of the point
17   here is that a meet and confer would have been a meet and
18   confer over the propriety of the redactions made from
19   those documents.  This motion was filed before Fair Isaac
20   could even receive the redactions.
21                   THE COURT:  On the issue of redactions, let
22   me then raise a question that I have and that goes to
23   Exhibit 160.  And my question there is as I looked at the
24   unredacted version and looked at the redacted version, it
25   appears to me that the defendants have gone ahead and
```

1  redacted basically everything out of Exhibit 160 with the

2  exception of the header e-mail, and so at least that's

3  what I was provided.

4         So my question is why is everything in

5  Exhibit 160 redacted as opposed to that which apparently

6  defendant's claim constitutes the legal advice of Tantia's

7  counsel?

8         MR. JACOBSON:  Sure.  You're right, Your

9  Honor.  There is a top section which is the Oliai e-mail

10  which reflects legal advice.  And then underneath that,

11  that is a reply to, and it incorporates the e-mail of

12  Oliai.  And, in fact, it refers specifically to that

13  e-mail below in the Oliai e-mail that was redacted.  What

14  is below is privileged for two reasons.  One is --

15         THE COURT:  So just so I'm clear, are you

16  taking the position that everything below -- everything

17  that comes from Tantia to a group of people, everything

18  below that which sets out the full agenda, everything

19  there is a privileged communication?

20         MR. JACOBSON:  Yes.

21         THE COURT:  And the basis for that is what,

22  as opposed to the lines that apparently Jason Engle wanted

23  changed?

24         MR. JACOBSON:  Two bases, Your Honor.

25  First is this is part of the message from Stan Oliai.  It

was incorporated into the message by Stan Oliai from Stan

Oliai and referred to in that message conveying Jason

Engle's legal advice, so it's part of the conveyance of

the lawyer's legal advice to the group, so it's privileged

for that reason.

It's also privileged because it was -- this

e-mail was the document that was shown to Jason Engle for

the purpose of obtaining his legal advice.  Now I think

what may be causing difficulties as you think this through

is a concept we talked about actually two hearings ago

about a claw back.  It is possible under some

circumstances that a document that is part of a

communication to a lawyer may be privileged as part of

that communication.  While some other version of the

document that's sitting in somebody else's file and was

sent to somebody else may not be privileged.  And that may

very well be the case.

The real question here is whether the

e-mail that was incorporated by Stan Oliai by reference

into his e-mail to the group transmitting Jason Engle's

advice is part of that message and his privilege for that

reason, and it is, Your Honor.

THE COURT:  Am I correct that the

underlying e-mail, the one that generates the response by

Stan Oliai back to the group with the advice of Jason

1    Engle, the original e-mail meaning the one sent on

2    October 31, 2005, at 9:46 a.m., am I correct that that is

3    already an exhibit?  I think maybe an earlier Exhibit 152

4    or something like that that has not been clawed back or

5    redacted?

6              MR. JACOBSON:  To be honest with you, Your

7    Honor, I don't know.  And I'm not sure whether any of my

8    colleagues do.  I wasn't at that deposition, and I haven't

9    looked at those other exhibits.

10             THE COURT:  All right.  Go ahead.

11             MR. JACOBSON:  As long as we're talking

12   about 160, Your Honor, let's talk about that.  Fair Isaac,

13   it appears to me, really raises two objections, two

14   arguments.  One is they say that our showing is somehow --

15   that this is legal advice is somehow inadequate because we

16   don't explain the ins and outs of precisely what legal

17   advice was given.

18             Your Honor, when the issue is whether our

19   legal advice is protected by privilege, we can't file a

20   declaration saying here is precisely the legal advice I

21   gave.  That's what we're trying to protect.  That's the

22   reason for what Mr. Tietjen calls the hypotheticals.  And

23   that's the reason why the declarations aren't more precise

24   than they are.  And the case law is clear about this, Your

25   Honor.  You're not required to explain the thought process

1    of the lawyer in formulating legal advice.

2              Mr. Tietjen says, well, all Jason Engle

3    said is that you couldn't discuss this item or you had to

4    change the name.  He didn't say anything about you can't

5    discuss it.  Well, the fact is that Mr. Tietjen doesn't

6    know what Jason Engle told Mr. Oliai.  And he can

7    speculate as to, oh, this is all a coverup.  Oh, they're

8    just changing the name.  This is just a whitewash.  But,

9    Your Honor, I suppose that is conceivable that that's

10   true.  Far more likely that you change the agenda because

11   you want to change the things that are going to be

12   discussed.  That's the function of an agenda.  You don't

13   want to put something on there that's not accurate because

14   you don't want to describe something as if it's going to

15   be discussed when what you're really going to be

16   discussing is something else.  But the fact of the matter,

17   Your Honor, is that all of that is speculation.

18             And even, Your Honor, even if it were true

19   that all Jason Engle did was say, "those words could get

20   us in legal trouble, let's change them."  That's still

21   legal advice, Your Honor.  There's no question that that's

22   still legal advice.

23             Now if it is for the purpose of covering up

24   a crime or perpetrating a fraud, then even though it's

25   legal advice, there may be an exception to the rule that

1   says it's privileged.  That's the crime fraud exception.

2   But that's not because it's not privileged.  That's

3   because even though it's privileged, there's a greater

4   societal interest at work here.

5            Fair Isaac cites one case on the crime

6   fraud exception, Your Honor.  But they don't even, they

7   don't really try to make a showing or make an argument on

8   that.  And I think to kind of short circuit that, Your

9   Honor, the best place to look is at Judge Lebedoff's

10  opinion in the Triple Five case which we cited to you

11  where Judge Lebedoff was deciding the issue of whether

12  there should be an in camera review of documents where one

13  side argued that the crime fraud exception applied.  And

14  here's what he said, Your Honor, and I'll quote.  He said

15  there must be, and I quote, "a factual basis adequate to

16  support a good faith belief by a reasonable person that an

17  in camera review may reveal evidence establishing the

18  claim that the exception applies."  That's the standard

19  for in camera review.

20           Now we've given you the documents for in

21  camera review.  Judge Lebedoff makes it clear that there's

22  a greater quantum of proof that applies.  If you're making

23  the substantive decision as to whether that exception

24  applies.  In other words, whether the documents should be

25  produced, not just reviewed in camera.  And he doesn't say

1     what that greater quantum of proof is.  He leaves that for

2     further litigation in that case.  But he does say that the

3     factual showing.  And here's a key, Your Honor, he says

4     the factual showing of a crime fraud exception must relate

5     to a specific cause of action for fraud or a specific

6     cause of action requiring fraud as one of the elements.

7                 This is not a fraud case, Your Honor.  And

8     the case that -- the only case that Fair Isaac cites is

9     the In Re Berkeley case.  That's a criminal case involving

10    a grand jury investigation, Your Honor.  So, clearly, a

11    crime is the issue in that case.  This is not a crime

12    fraud case.  That is an important but narrow exception to

13    the attorney-client privilege, and you have to do more

14    than just sort of throw that idea out on the table.  And

15    you can't combine the argument that a communication even

16    though privileged must be produced under the crime of

17    fraud exception with a notion that somehow because of some

18    vague notion of fraud, the statement isn't privileged to

19    begin with.  They're two completely different concepts,

20    Your Honor.

21                The other issue with respect to 160 is this

22    argument that somehow by failing to claw back the

23    transcript, we failed to claw -- we waived our privilege.

24    Your Honor, we clawed back the underlying document

25    immediately.  The notion that a quote of that document in

1 the transcript isn't included in that claw back is wrong.

2    Now that transcript is attorney's eyes

3 only.  It's not circulating around.  It's not like a court

4 filing where you have to act quickly and dramatically to

5 make sure that the public is not seeing it.  And we will

6 most certainly ensure that the distribution of that

7 transcript gets cleaned up when we get your ruling on this

8 issue, Your Honor.  But the notion that it is a waiver to

9 not have done something further has no basis, and they

10 haven't cited any cases for that.  They haven't even made

11 that argument until today.

12    THE COURT:  Am I correct, and I'm just

13 looking at the plaintiff's memorandum was also and

14 submission was also submitted under seal as well under

15 attorney's eyes only, so to that extent it's under

16 restricted filing with the Court.

17    MR. JACOBSON:  That's absolutely true, Your

18 Honor.  By the terms of the parties amended protective

19 order to which we've greed, all of those filings have to

20 be under seal.  That's part of the protection.  We made

21 sure that we accorded these clawback documents.

22    So that's Exhibit 160, Your Honor.

23    Exhibit 150, again you get the same

24 argument, well, you didn't explain to us exactly how the

25 legal advice was formed and what the precise legal advice

1   is.  Well, of course, we didn't, Your Honor, for all the

2   reasons that I've already discussed.  You just can't lay

3   out the basis for your legal advice and the specifics of

4   your legal advice in a declaration.

5               And they say that we don't want to face any

6   questions about the guidelines themselves.  Well, that's

7   not true.  We've produced the guidelines.  They're welcome

8   to ask questions about those guidelines.  And then they

9   say, well, this is just the guidelines all over again.

10  Well, it's not, Your Honor.

11              If you compare the meeting guidelines which

12  are contained in Mister -- as Exhibit 2, I believe, to

13  Mr. Tietjen's, I'm sorry, Exhibit 1 to Mr. Tietjen's

14  affidavit, you'll see that they're different in many

15  respects.  And, frankly, Your Honor, that's the reason

16  that this is such a big deal.  If it was just another

17  iteration of precisely the same thing, I suspect we

18  wouldn't be in here arguing about it.

19              There are things that in comments, and

20  frankly, Your Honor, you'll see in the in camera version

21  we gave you under legal, the redacted information, there

22  are a bunch of bullet points, then there's a little gap,

23  then there's another bullet point.  The bullet points in

24  that top group, you will see, do not precisely track the

25  meeting guidelines.  And I invite you to just compare the

```
 1   two.
 2                The last bullet point doesn't appear
 3   anywhere in the meeting guidelines.  That's the one
 4   they've emphasized, and that's what they care about.  And
 5   they care about it because it is different from the
 6   meeting guidelines.
 7                And I also want to make clear, Your Honor,
 8   Fair Isaac's argument is not that production of the
 9   meeting guidelines somehow waived any privilege we might
10   have as to this redacted section of Exhibit 150.  Their
11   argument is that somehow it shows that the redacted
12   section of Exhibit 150 is not legal advice.  Well, it's
13   just not true, Your Honor.  The declarations tell you that
14   this records words spoken by a lawyer to the group at this
15   meeting.  It's classic legal advice.
16                I do think it's important, Your Honor, just
17   as a close, I want to make sure, and it sounds as if you
18   have this sort of top of mind, that protecting and clawing
19   back the statements may, the quotations made from these
20   documents be part of any order that you give assuming that
21   you rule that the clawback was proper and that these
22   documents are privileged.
23                Unless you have questions, Your Honor, I
24   have nothing further.
25                THE COURT:  All right.  No, I don't.  Thank
```

1  you.  Anything further, Mr. Tietjen?

2          MR. TIETJEN:  If I could, please.  Defense

3  counsel did not refer to the meeting guidelines in any

4  detail.  He just continues to maintain that it's entirely

5  distinct from what's reflected in those meeting minutes.

6  But if after the hearing you have a moment to look at

7  Exhibit 1 to my declaration, the meeting guidelines

8  themselves, you'll see in paragraph 2 of the meeting

9  guidelines, it says, "participants will not communicate

10  regarding possible marketing, pricing, or distribution of

11  the model."  That's what the meeting minutes reflect.

12          Paragraph 6 of the meeting guidelines,

13  "written agendas will be prepared for all meetings of

14  participants and submitted to designated legal counsel for

15  review in advance of the meeting."  That's what the

16  meeting minutes say.

17          So the defendant's position is apparently

18  that if an attorney writes it down in meeting guidelines,

19  it's not legal advice.  But if an attorney recites this

20  information out loud at a meeting, that is classic legal

21  advice.  I say that makes no sense to me.  It's the same

22  thing.  And as I said before, they cannot claim in one

23  moment that it's legal advice and privileged, and then in

24  the next moment claim that it's not legal advice and not

25  privileged.

1               On the subject of waiver, just because the

2       transcript of the deposition is attorney's eyes only, just

3       because it was filed under seal, does not save them from

4       the waiver.  They have allowed all of outside counsel to

5       have and use that transcript, to quote from it, to cite it

6       to the court.  That is waiver of attorney-client

7       privilege.  If you want to ensure the attorney-client

8       privilege, you have to do more than what they've done.

9               They did not make any effort to have the

10      court reporter seal that transcript.  They've only noticed

11      it or woken up to this fact in connection with this

12      motion.  They're trying to make up for it now and object

13      and say that that should be struck from our brief because

14      they know that to actually do what they're supposed to do

15      now would expose the waiver, many, many days, weeks later

16      ask for the transcript to be sealed.

17              So just as they didn't act with any speed

18      in connection with Exhibit 25 of Kiedrowski's declaration,

19      they haven't acted with any speed in connection with this

20      either.  It is a waiver, Your Honor.

21              THE COURT:  All right.  I have nothing

22      further.  Anything further, Mr. Jacobson?

23              MR. JACOBSON:  No, Your Honor.

24              THE COURT:  All right.  I'm going to issue

25      my ruling here from the bench with respect to this

1    particular motion.  I recognize I still have under

2    advisement the other ones, but this one I am able to

3    address from the bench.

4                    I'm going to be denying plaintiff's motion

5    to compel to this extent, and I will go through it.

6                    First of all, the parties in the past have

7    done a very good job, I think, in terms of having meet and

8    confers and trying to resolve issues.  This one I don't

9    feel met the standard that is required for a meet and

10   confer.  And so one of the reasons, although certainly not

11   the predominant reason that I'm denying the motion to

12   compel is I do feel that there was not an adequate meet

13   and confer on this issue.  You may be right, Mr. Tietjen,

14   at the end of the day.  It may not have changed anybody's

15   mind, but that's not what we judge whether there's been a

16   robust meet and confer, and I don't find that there was

17   one here.

18                    That is one of the reasons I'm denying the

19   motion is it fails to comply with the requirements under

20   Rule 37(a)(1), Local Rule 37.1, and also the operative

21   pretrial scheduling order that all require meet and

22   confers before motions for discovery are brought.

23                    The second reason, however, and going more

24   to the substance of the motions is that I find that based

25   upon the affidavits that were submitted to me and my own

1    in camera review of the documents that the defendants have

2    met their burden in connection with this motion to

3    establish that all three documents contain privileged

4    communications, and that they were appropriate in being

5    called back.

6              I'm going to, however, with respect to

7    Exhibit 160, I'm going to be modifying what the defendants

8    did there, but, generally, what I want to say is that the

9    defendants have met their burden.  They have provided

10   sworn testimony to me regarding the fact that legal advice

11   was given, that what is reflected in these documents is

12   the culmination of that legal advice.  I disagree to the

13   extent plaintiffs are suggesting that they need to share

14   what that legal advice is otherwise there would be a

15   further waiver.  I'm satisfied that the defendants have

16   met their burden to establish that there were privileged

17   communications being communicated in these documents.

18             With respect, specifically, to Exhibit 150

19   and then 151 has to do with the metadata.  First of all, I

20   find based upon my in camera review that the bulleted

21   descriptions in Exhibit 150 are not identical, too, and I

22   cannot conclude that they are merely the repeating of the

23   meeting guidelines which have been produced to plaintiffs.

24             Second of all, by leaving those Exhibit 150

25   in the court file for a period of nine days, I don't find

 1   that that constitutes a waiver either.  The parties

 2   entered into a process by which they would address

 3   inadvertent disclosures and have the ability to claw back,

 4   and I don't have any reason to believe, and your point is

 5   well taken.

 6             Obviously, you would like to think that

 7   when you serve documents and pleadings on your opposition

 8   that they will read all of your submissions, and that

 9   including your exhibits, and that they should have known

10   that included in there was a document that they now

11   consider to be privileged.

12             But I don't have -- that isn't the standard

13   that the parties agreed to in their protective order.  You

14   guys gave yourself a little bit more latitude to address

15   documents that might be inadvertently produced, and I can

16   only imagine part of the reason you did this is because of

17   the sheer volume of documents that both sides are

18   producing was to give yourself a little bit of leeway to

19   address documents that may not come to a parties attention

20   as soon as one side would like.

21             So, I don't find by keeping the Exhibit 150

22   on file with the Court for a period of nine days, that

23   that constituted a waiver under the law.

24             With respect to and the same would be true

25   then with Exhibits 151, I do find that that is a

1    privileged communication.

2              With respect to Exhibit 160, I went back,

3    and I think I answered my own question, Mr. Jacobson.   In

4    the brief submitted by plaintiffs, they talk about how

5    they first questioned Mr. Tantia regarding the October 31,

6    2005, e-mail.  It was part of Exhibit 152 that apparently

7    was a large set of Mr. Tantia's own e-mail communications,

8    and they did question him about the draft meeting agenda

9    which included the language as an item for the business

10   discussion review of technical sales and marketing inputs

11   in the form of documentation.  So, apparently, that shows

12   up in a separate exhibit that was produced to plaintiffs.

13             Obviously, then when he is shown Exhibit

14   160, that's where the issue of the claw back comes.  And I

15   do find that it was appropriate to claw back 160, but only

16   the advice that is reflected in the Exhibit 160 should be

17   redacted, not the entire e-mail.  The fact that, as I look

18   at this e-mail, this e-mail goes out for Mr. Tantia to a

19   group of people.  It's not to lawyers.  At least no one

20   has said it's to lawyers.

21             Apparently, Mr. Oliai shows it to his

22   lawyer, and his lawyer Mr. Engle gives advice on the one

23   agenda item saying change it basically.  And you may

24   redact that piece of it that shows up in Exhibit 160.

25   It's at page 395 of the e-mails, but it's

```
 1   MOW-FICO-00002007.  You may redact the language after the

 2   word, "guys" down to "thanks."  In other words, leave

 3   "guys" in and "thanks" stand.  And the rest may be

 4   redacted which is the legal advice, apparently, that

 5   Mr. Engle was providing to Jason, and Jason was providing

 6   to the group.  The balance of the e-mail including what it

 7   is that Mr. Oliai is responding to I don't find is a

 8   privileged communication.

 9                MR. JACOBSON:  We'll produce a new version

10   of that, Your Honor.

11                THE COURT:  All right.  So to that extent,

12   it needs to be produced in a redacted fashion.

13                On the issue of waiver, the argument by

14   plaintiff that they've cited it in their brief at page 7,

15   it's been in the transcript.  The transcript was never

16   clawed back.  Obviously, the defendants have in the past

17   known to claw back that portion of a transcript that

18   involved apparently what they considered to be

19   communications about a privileged document that they were

20   clawing back that came up, I believe, in the last motion.

21                However, and in some senses, then it is a

22   waiver, but I find that it is inadvertent, and am not

23   going to conclude that therefore what happened is that the

24   defendants waive their right to claw back that document.

25   Clearly, it was their intention.  They exercised it
```

1    immediately to pull back the document.

2              Obviously, what should have happened is

3    they also should have addressed the advice that was stated

4    on the record at that time.  It didn't happen.  And I

5    don't have any reason to believe that it was intentional

6    or that they meant to leave it in in light of the fact

7    they clawed back the document.

8              So I do find that the waiver was

9    inadvertent, and I'm going to order that that portion of

10   the brief at page 7 that quotes the advice from Mr. Engle

11   be stricken from the brief.  And we'll permit defendants

12   to take steps to claw back that portion of the transcript

13   of Mr. Oliai, I believe it's Mr. Oliai, it's either

14   Mr. Tantia or Mr. Oliai, I can't recall, that quotes the

15   language of the advice from Mr. Engle to Mr. Oliai.

16              So that's my ruling with respect to these

17   documents.  I will issue a short order that is consistent

18   here with my ruling from the bench, but you all have the

19   benefit of my reasoning from what I've just stated.

20              In terms of producing the redacted version

21   of 160, I assume that's something that the defendants can

22   do within a day; is that correct?

23              MR. JACOBSON:   Yes, Your Honor.

24              THE COURT:  As a practical matter,

25   plaintiffs already have what that piece is at least to the

1   extent it's part of Exhibit 152 in the e-mails.  They

2   obviously know what that e-mail looks like.

3                  I have nothing further then as it relates

4   to the motion to compel.  Anything further on behalf of

5   plaintiffs on this motion?

6                  MR. TIETJEN:  No, Your Honor.

7                  THE COURT:  Anything further on behalf of

8   defendants?

9                  MR. JACOBSON:  One thing, Your Honor.

10  Maybe I'll come up.  In preparing for this argument last

11  night, I went through the plaintiff's brief pretty

12  carefully.  There are other places in that brief where

13  although there are not quotation marks, the documents that

14  you've ruled are privileged, are essentially quoted.  And

15  maybe the easiest way to do this is for me to talk with

16  Mr. Tietjen afterwards and see if we can resolve it or

17  during a quick break.  If not, I can go through them with

18  you.

19                 THE COURT:  Mr. Tietjen, is this something

20  you'd be willing to meet with Mr. Jacobson on?

21                 MR. TIETJEN:  Sure.

22                 THE COURT:  All right.  Okay.  You know,

23  maybe what we can do is deal with the other issues on an

24  informal basis and take a short break and see if there's

25  an issue here that we need to resolve so that we can get

```
1    this issue put to rest.

2              All right.  Then that concludes the motion

3    to compel.  At this time, then we'll switch hats and go on

4    to the case management conference.

5              All right.  You all are planning on

6    updating me on the schedule for depositions and document

7    production or update me on what's proceeding.  I realize

8    some of this may be tied into the issues with respect to

9    amendment of the pretrial scheduling order and the

10   protective order, but if parties would like to update me

11   first, and then we'll get to the two issues that the

12   parties have asked that I resolve.  Who would like to,

13   Mr. Tietjen, do you want to start with the update?

14             MR. TIETJEN:  Sure.  With respect to

15   documents, the defendants all produced additional

16   documents, at least I can speak for my client, Fair Isaac,

17   by the June 15th deadline and the Court's pretrial

18   schedule.  That was documents, you may recall, actually

19   you recall because it's minutiae.  That was documents that

20   were dated after September 15th of last year up to

21   February 15th of this year.  We were to produce by

22   June 15th.

23             THE COURT:  Okay.  So you're saying you

24   have done that or both sides have done that is your

25   understanding?
```

```
 1              MR. TIETJEN:   We have done it, and I just
 2    assume the defendants can do the same.  So the documents
 3    have been produced, and we are still thick in the throes
 4    of depositions, both sides.  And I don't know that I need
 5    to lay it all out for you who is going be deposed and
 6    when, but we continue taking them.  My colleagues are out
 7    in California now to take some tomorrow.  I was just in
 8    Chicago for the last two days as was Ms. Kiedrowski.   We
 9    are scheduling more into July on a variety of subjects,
10    both party depositions and third-party depositions.  We're
11    working, all working with our calendars to find dates, and
12    so it's coming along.
13              THE COURT:  Tell me, I almost cringe at
14    asking this question, but it will also bear on the issue
15    of the pretrial scheduling order.  Right now under the
16    current scheduling order, it is contemplated that all fact
17    discovery be completed by July 1 and here we are now at
18    June 25th, six days away from that date.
19              What depositions does plaintiff or how many
20    depositions, fact depositions does plaintiff have left to
21    complete?
22              MR. TIETJEN:  How many?  Several are, a
23    couple are of a 30(b)(6) nature.  VantageScore, that was
24    supposed to be Wednesday of last week, I believe.  And
25    VantageScore asked for that to be sometime in July.  It
```

1    was supposed to be today.

2              We have a 30(b)(6) deposition of Experian

3    yet on some trademark and some damages issues.  We have a

4    30(b)(6) Trans Union.

5              THE COURT:  Is that currently scheduled for

6    before the end of June or in July?

7              MR. TIETJEN:  We are anticipating July, if

8    the Court will accept the parties proposal for a three

9    week extension.  It was to be this week as well.  And the

10   same of Trans Union, a 30(b)(6) on some trademark issues

11   and damages issues.  And then on Monday, next week, we

12   will be taking a deposition, Mr. Paul Springman from

13   Equifax.  I guess you would call that now a third party

14   deposition.

15             THE COURT:  Is that one you've noted or

16   defendants have noted?

17             MR. TIETJEN:  Yes, we've noticed it.

18             THE COURT:  Paul Springman from Equifax?

19             MR. TIETJEN:  Yes.

20             THE COURT:  Okay.

21             MR. TIETJEN:  Tomorrow we will be taking

22   the deposition of an Experian employee by the name of

23   Michael Swabb.  Carrie Williams of Experian will be

24   deposed on Monday.  That's out in California, too.

25             THE COURT:  So Swabb is on Monday as well

```
 1   and Williams?

 2              MR. TIETJEN:  Swabb is tomorrow, and

 3   Mr. Williams is on Monday.

 4              THE COURT:  Okay.

 5              MR. TIETJEN:  And then we propose to take

 6   up to five very short maybe one hour third-party

 7   depositions of the consumers confused by the credit score.

 8   Those have not been noticed up yet.

 9              And then, and I have not noticed up this

10   yet either, but it was just yesterday I took the

11   deposition of an individual employee from Trans Union by

12   the name of Jason Wright who was part of the Project

13   Trident team.  He was part of a sub-team responsible for

14   developing their marketing plan.  Mr. Wright, it turns out

15   after taking his deposition, seems to suffer from a case

16   of total amnesia and doesn't remember any e-mails he wrote

17   or any meetings that he attended or any minutes that he

18   received or didn't remember a thing.  So now I'm going to

19   inform TU that we'll have to take the deposition of one of

20   his colleagues who maybe has a better memory than he does,

21   and it will likely be a woman by the name of Kelly Roth.

22              So there's a certain fluidity to it.  Even

23   at this late date we're learning things, and I think that

24   is a complete list.  Is that a complete list, as far as

25   you can recall?  That's a complete list of the names of
```

1    individuals so far.

2               THE COURT:  I know that the five third

3    party depositions, the ones of consumers are short,

4    probably an hour.  Are the rest of them ones that you

5    contemplate will take a full day?

6               MR. TIETJEN:  The 30(b)(6)'s I very likely

7    will.  Mr. Springman probably won't.  Mr. Swabb, I think

8    those are -- we may be able to do most of the depositions

9    in four or five hours.  They're not taking a full seven

10   hours with most of the depositions, so the 30(b)(6)'s are

11   going to be full depositions.

12               THE COURT:  Okay.

13               MR. TIETJEN:  Oh, yeah, there's a 30(b)(6),

14   a 30(b)(6) Equifax, too, that we're going to take, and

15   that was scheduled for Monday.  And Equifax's counsel

16   contacted me yesterday, and the other defendants don't

17   know this yet, I don't think, unless they keep in contact

18   with their former co-counsel, and she said that that

19   witness who was going be the designated counsel, her name

20   is Myra Hart, just returned from a trip, and they would

21   ask for her deposition to be a little later so they have

22   more time to prepare her.

23               THE COURT:  So that's another one.

24               MR. TIETJEN:  That's another one.

25               THE COURT:  Okay.

```
1              MR. TIETJEN:  I think that's it.

2              THE COURT:  So I'm counting you've got

3    eight plus the five consumers.  So approximately 13

4    depositions recognizing they will last different periods

5    of time.

6              MR. TIETJEN:  Yes.

7              THE COURT:  And at this point are the

8    parties double, triple tracking depositions or are you

9    still trying to only be involved as parties in one

10   deposition on a day?

11             MR. TIETJEN:  No, I think we're double

12   tracking.  Yesterday, we were taking depositions in our

13   office, and I was --

14             THE COURT:  I'm just curious how you are

15   trying to get all of this done.  All right.

16             MR. TIETJEN:  It's not easy.  I should say

17   though that this goes to my point that there is a certain

18   fluidity in all of this, and I noted this in our letter to

19   you as well that we do learn a lot in these depositions

20   that and sometimes we don't learn anything and that makes

21   us take another deposition.  The 30(b)(6)'s in particular

22   have been from our perspective a problem in that the

23   defendants have not adequately prepared their witnesses on

24   the designated topics.

25             With each one of these 30(b)(6)
```

```
 1    depositions, we need to assess do we take an individual
 2    now because they're refusing to put up somebody who can
 3    testify on these subjects or do we bring a motion to
 4    compel them to properly prepare a witness on these topics.
 5    So I guess my point is everything I tell you as I stand
 6    here today might be different tomorrow.
 7              THE COURT:  I understand.  All right.   In
 8    terms of update on discovery before we get to the two
 9    issues, if the parties could share with me where, first,
10    where they are on the document production, and I would
11    like to get a handle from the defendants in terms of what
12    they have left to do by way of depositions.
13              MR. JACOBSON:  We are, Your Honor, in the
14    same boat on in terms of document production.  We have
15    finished that June 15th production.  And as usual,
16    documents have been flying around in this case, but I
17    think we're on track and good on all of that.
18              THE COURT:  All right.
19              MR. JACOBSON:  In terms of deposition, our
20    schedule is much less jammed than the plaintiffs.  I think
21    we've got, although, I have to admit it is somewhat fluid.
22    Both sides have been operating on the assumption that
23    we're going to be extending the schedule here, as you can
24    tell.   I think I have probably four or five Fair Isaac
25    employees or former employees scheduled.  And it looks
```

```
 1    like three or four on our third party depositions, maybe
 2    less, and then a couple left to schedule as well.
 3                    THE COURT:  A couple third party?
 4                    MR. JACOBSON:  Yes, third party.
 5                    THE COURT:  So really you have somewhere,
 6    ultimately, you would like to accomplish somewhere between
 7    five to six; is that what you're saying, total third
 8    parties?
 9                    MR. JACOBSON:  I think that's probably
10    right.  And I'm subject to correction if anybody knows
11    better.
12                    THE COURT:  Okay.
13                    MR. JACOBSON:  And it's also possible
14    depending on what happens in these consumer confusion
15    depositions that Fair Isaac has told us about, that there
16    might be some reaction to that, Your Honor.
17                    THE COURT:  What does that mean, "reaction
18    to that?"
19                    MR. JACOBSON:  Well, it's conceivable that
20    we have no idea what's going to happen in those
21    depositions, so it's conceivable that we would need to do
22    a deposition or two in response, but we just don't know
23    until we --
24                    THE COURT:  Of the same individuals or of
25    different ones?
```

1           MR. JACOBSON:  No, I don't think of the

2    same individuals.  We would do that at the time, I assume,

3    Your Honor.

4           THE COURT:  In other words, that may,

5    depending on how those depositions proceed, you may find

6    that you need to add some depositions on the issue of

7    consumer confusion.

8           MR. JACOBSON:  Correct, Your Honor.  And

9    I'm not at all certain that that's going to happen.  I'll

10   just leave that open to possibility.

11          THE COURT:  What about the issue then

12   depositions related to the settlement with Equifax?

13          MR. JACOBSON:  There are a number of

14   Equifax depositions scheduled.  We will take advantage of

15   those.  It's possible that we will have to do another

16   deposition or two.

17          THE COURT:  Okay.  So when you listed that

18   you have four to five Fair Isaac employees and maybe four

19   to five third-party depositions, are you including Equifax

20   in the third party or is that a separate one?

21          MR. JACOBSON:  I'm going to let you guys

22   fire away on this.

23          THE COURT:  You can all come up.

24          MR. MILNE:  Your Honor, Robert Milne for

25   Experian.  With respect to Equifax depositions, there are

```
1    already a number of Equifax depositions that Fair Isaac

2    has noticed.  And depending on --

3              THE COURT:  I'm only showing -- Mr. Tietjen

4    listed Equifax 30(b)(6) and Paul Springman is the only

5    Equifax depositions he indicated.

6              MR. MILNE:  Well, as far as I understand,

7    there is Mr. Springman.  There is this 30(b)(6) witness.

8    And then I understand there's another witness by the name

9    of Wicklund who had, I actually don't know if it's a man

10   or a woman, had his or her deposition taken as a third

11   party, and there was a stipulation entered that because of

12   the settlement, that the defendant's opportunity to

13   cross-examine would be deferred until a later date.  So

14   there is this stump, if you will, of that one Equifax

15   deposition that remains.  I believe that's accurate.

16             MR. TIETJEN:  It's Dana Wicklund.  It's a

17   gentleman.  We completed his deposition.  The defendants

18   wanted to continue it, so that they can do their two hour

19   examination at a later date when they had more experienced

20   attorneys present, and we agreed.

21             MR. MILNE:  Well, and it was more than

22   that, Your Honor.  The Equifax piece here for us is not

23   just trial preservation.  We certainly need to do that

24   because we have no guarantee that these Equifax witnesses

25   will show up at trial.
```

```
1              But, in addition, as the papers you have in

2    front of you get into, we wish to take discovery about the

3    nature of the business agreement that Equifax has entered

4    into with Fair Isaac.  And, you know, we sequentially we

5    would like to get the documents at least on a faster

6    track, the agreements themselves, so that we can use those

7    in the Equifax depositions.

8              And with respect to Fair Isaac, and

9    Mr. Jacobson identified the deposition we've currently got

10   on our plate.  We don't know what we may need to do in way

11   of Fair Isaac depositions on the settlement.  So, for

12   example --

13             THE COURT:  Well, so you're not sure that

14   the four to five that Mr. Jacobson identified will be

15   individuals to whom you would want to direct questions

16   regarding the settlement.  You're saying you may need

17   others?

18             MR. MILNE:  That's correct.  For example,

19   the ones that are already on our plate that I believe are

20   what Mr. Jacobson was referring to, these are witnesses

21   that I would suspect do not have a significant knowledge

22   or any knowledge about the settlement.

23             For example, this Friday, we're taking a

24   former head of scoring, Mr. Tatarro.  He left the company,

25   so that he's necessarily not going to be involved in the
```

1    settlement issues.  So I'm not sure that the current list

2    of Fair Isaac witnesses are going to be the ones we need

3    to cover.  These are depositions that we've had pending,

4    and we thought we were going to get done.  And, indeed, we

5    may have scheduled to be done before the July first cut

6    off.

7              For example, one of the obvious witnesses

8    that we would need back is the CEO Mr. Green, whose

9    deposition was taken about a week ago just after the

10   settlement was entered, and the plaintiffs blocked

11   questioning about anything to do with the settlement at

12   his deposition, so we reserved the right to bring him back

13   once the discovery issue is resolved.

14             So the short of it is that we are not

15   necessarily anticipating with respect to Equifax that

16   there will be more names, but we may have an issue about

17   the timing of the scheduling of these depositions in

18   relation to when we receive documents concerning the

19   settlement.  And then with respect to Fair Isaac, there

20   may be one or two additional depositions, depending on

21   what we see in the documents surrounding the settlement.

22             THE COURT:  All right.  So now going back

23   to how many witnesses, and I recognize that you don't

24   necessarily have a firm number because of these issues

25   related to the settlement, but so far I've got four to

 1    five Fair Isaac employees or former employees who you're

 2    not sure at this point are in a position to address

 3    settlement issues if you want to address it with them and

 4    were permitted to do so.  You've got five to six third-

 5    party depositions of which three to four are scheduled.

 6    You have to return to the Wicklund Equifax deposition.

 7              MR. MILNE:  Correct.

 8              THE COURT:  And that's what I've got so

 9    far.  Were there any others that you know of for certain

10    that you still need to complete?

11              MR. MILNE:  Not that we know of for certain

12    except that I would say Mr. Green, the CEO, is someone we

13    almost certainly would want to have back.

14              THE COURT:  On the issue of settlement?

15              MR. MILNE:  That's correct.

16              THE COURT:  All right.  I just wanted to

17    get a flavor for what you all are dealing with.  Unless,

18    there's anything more to address on updating me on it, we

19    can now, I think, segue way into the issues with respect

20    to the amendment of the pretrial scheduling order.  And I

21    would like to do that first because they're related, and

22    then we can talk about the amendment to the protective

23    order.

24              So, Mr. Tietjen, if you would like to share

25    with me any more information on the amended pretrial

1    scheduling order beyond what you've got in your letter.

2              MR. TIETJEN:  Just a couple words.  There's

3    not actually much of a difference between us on what we're

4    proposing to the Court.  We have agreed on proposing an

5    extension until July 22 on fact discovery.  And we've

6    agreed to allow a four-week cushion after that instead of

7    a two-week cushion before plaintiff's expert report would

8    be due.

9              The only substantive difference between us

10   is whether during this three-week extension of discovery

11   should the Court allow this, we could notice up the

12   plaintiffs, notice up any new party discovery not related

13   to the settlement.

14             Now, as you just surmised, I'm sure, from

15   all of this discussion about the depositions coming up, we

16   are both sides proposing a lot of discovery depositions,

17   party and nonparty, unrelated to the settlement agreement

18   during that three weeks.  What the defendants want to stop

19   is us from taking any other deposition that we haven't

20   identified or noticed up yet.  And that is unduly

21   restrictive especially when we do not know what is going

22   to come out of these depositions.

23             As I mentioned, just yesterday I found that

24   a Trans Union witness who I fully believed would know a

25   lot more than he did could not recall a thing.  And now I

```
1    have to take another deposition so we can get that

2    information.  That's the kind of thing that just comes up

3    by nature in fact discovery, and parties usually always

4    work it out.  I expect that we will, too, without needing

5    to come back to the court to get an exception or another

6    amendment to the scheduling order.  It leaves the Court

7    micro-managing, as I said in my letter.  The parties --

8               THE COURT:  So what your proposal is give

9    us three more weeks for fact discovery, and let the

10   parties use it however they want to use that additional

11   three weeks either to complete scheduled depositions, to

12   note new depositions, but don't hamstring us in terms of

13   how we can use this.

14              MR. TIETJEN:  We're not deposition happy on

15   the plaintiffs side.  We've probably taken half of the

16   depositions that the defendants have taken, and they're

17   not full day depositions.  We're able to do our

18   questioning in five hours or so.  We're not going to be

19   piling on unnecessary depositions.  I'm just -- our view

20   is just that it should remain flexible between the parties

21   and how to use that three weeks and what they can get

22   done.

23              THE COURT:  Who will speak, Mr. Jacobson?

24   Did you get the short end of the stick today or what?

25              MR. JACOBSON:  Apparently, although, as you
```

1    can see, I get help when I need it.

2                    THE COURT:  I can see that.  That is good.

3                    MR. JACOBSON:  Your Honor, I don't think

4    we're really far apart on this at all.  And I have to tell

5    you, Your Honor, I have to apologize in some sense because

6    we're sort of bringing this to you unformed, but this is

7    not a lack of meet and confer.  As you can see, we've met

8    and conferred every conceivable way over the weekend and

9    everywhere else.  We're just scrambling.

10                    THE COURT:  I understand, and I'm fine with

11   that.  But it seems to me that even as I took you through

12   what it is that you're talking about, you have some

13   parties that you haven't yet decided whether you need to

14   do it.  You won't know whether you'll need to do them.

15                    For example, the consumer depositions, you

16   indicate that plaintiff has indicated that they intend to

17   maybe take up to five consumer depositions.  You indicated

18   after you hear what they have to say, you may have to take

19   one or two yourself.  Why not -- so Mr. Tietjen is saying

20   look, these things come up.  Let's not hamstring the

21   parties as to how they use these remaining three weeks.

22   And it seems to me that you're asking for some flexibility

23   on that as well.  So as I hear each side tell me what they

24   want to do during the next three weeks, it seems like

25   you're in agreement that the parties, there should be no

1    limitation placed on the parties in terms of how they use

2    the three weeks.  But if you disagree with that and still

3    think there should be, go ahead and share that with me and

4    tell me why your situation is different than

5    Mr. Tietjen's.

6                    MR. JACOBSON:  Here's our only concern,

7    Your Honor.  Both sides have rescheduled some depositions

8    given this extra time, depositions that have already been

9    scheduled.  And that's fine.  Both sides have a couple of

10   depositions that hadn't yet been scheduled but were in the

11   works.  That's fine.

12                   We have depositions concerning the

13   settlement agreement, and possibly trial depositions to

14   preserve Equifax testimony that may now become necessary.

15   That's a very limited number, but those are directly out

16   of the settlement agreement.

17                   THE COURT:  But you have the possibility

18   that you may need to do a couple of consumers yourself.

19   That you're now foreseeing could come out of the

20   depositions by plaintiff.

21                   MR. JACOBSON:  And on both sides, Your

22   Honor, there is the possibility that as a result of things

23   that happen between now and the end of discovery, there

24   will be a need for something new that we don't now know

25   about.  We don't have any problem with that either.

1              Our only concern is we don't want this to

2    be a period where people say, oh, you know, there's a

3    bunch of party discovery we should have done two months

4    ago, and we never did it.  We didn't think we had time to

5    do it.  Now let's jam it in with everything else.  That's

6    really our concern, Your Honor.

7              And perhaps the way to do this is just to

8    kind of leave it with that understanding, and if it

9    becomes a big problem, we'll do a call with the Court and

10   let you figure it out at the time.  Mr. Tietjen is right.

11   We have been -- we work remarkably well actually to try to

12   sort all of this out to put it together.

13             THE COURT:  Okay.  Anything further on that

14   issue, Mr. Tietjen?  All right.

15             I am, lucky for you all, I am going to go

16   ahead and grant this extension.  Otherwise, you would be

17   truly miserable between now and July 1.  I've been there,

18   so I don't like to -- I will draw on my experience when I

19   think it is helpful to the parties.

20             So I will go ahead and grant the extension

21   allowing the parties to have an additional three weeks.

22   And actually what I'm going to look at is the dates that

23   are in Exhibit 7 of the attachments that were sent to me

24   by White and Case.  Looking at modifying the deadlines so

25   the fact discovery will change to July 22, and I'll push

1   back the expert reports consistent with what is in the

2   stipulation here.

3                I am not going to put a restriction on how

4   the parties use those additional three weeks.  I'm going

5   to trust that was both sides will have good reasons for

6   what they do in terms of perhaps finding a need to add

7   another deponent that hey didn't previously add, and I'm

8   also confident that if you think one side has overstepped

9   their bounds, it's too burdensome, you can always come

10  back to me to resolve that issue for you.

11               But I think both sides need some fluidity

12  here and really just cannot anticipate what will come out

13  in the last, basically, what we have here is less than a

14  month for you all to complete fact discovery.  So I'm not

15  going to put restriction on how you use that time in terms

16  of depositions.

17               Obviously, you've got your own restrictions

18  in terms of the number of depositions, hours of

19  depositions, and that actually acts as a constraint as

20  well.  You know the good news is you decided, you hoped

21  that I would adopt what you are proposing and began to

22  move off some of the dates in anticipation that I would

23  agree with you.  That's the good news.

24               The bad news is I agreed with you, and

25  you've now pushed those dates off.  And it appears to me

 1    you have created just a miserable life for yourselves in

 2    the last month, but that always is what happens.  It

 3    always ends up in the last two minutes of the game, so I

 4    just, you know, I understand that's the way it works.

 5              So I will be putting into place a

 6    scheduling order, a fourth amended scheduling order,

 7    changing these dates.  Now I don't know if there are in

 8    the stipulation whether I look at Exhibit 6 which I think

 9    is the last one that was sent by Mr. Tietjen's office to

10    defendants and then defendants took most of that

11    stipulation and adopted it except made a couple changes

12    here and there.

13              I don't know if there are other issues that

14    you want to make sure that I include in the scheduling

15    order or in the amended scheduling order that are part of

16    your stipulation or not, but my goal will be to amend the

17    scheduling order.

18              So the question is whether there are items

19    in the stipulation you want to make sure that are showing

20    up in the amended scheduling order for all to see that are

21    covered by your stipulation.

22              MR. TIETJEN:  The only thing I just noticed

23    is that although this table at the end of the stipulation

24    --

25              THE COURT:  Are you looking at Exhibit --

```
 1            MR. TIETJEN:  Either Exhibit 7 or.

 2            THE COURT:  I'm looking at Exhibit 7

 3   because there's where Mister -- I don't know if it was

 4   Jacobson or who changed the dates on the rebuttal expert

 5   and completion of expert discovery moving it back a day.

 6            MR. TIETJEN:  Right.  And those changes are

 7   okay because I think he was just saying that that is going

 8   to be 30 days in between there, on November 19th instead

 9   of November 20th.  But the table doesn't include the

10   plaintiffs.

11            THE COURT:  No, I see it up in the body

12   of -- it's in paragraph 1.

13            MR. TIETJEN:  Yeah, that's part of the

14   comparative, yes.

15            THE COURT:  And that will just show up as a

16   change in the fact discovery date.  The question that I

17   have is whether I need to include, for example, in the

18   scheduling order, for example, paragraph what is now

19   numbered -- was paragraph 2 in plaintiff's version and

20   paragraph 3 of defendant's version, about the date by

21   which plaintiff's response to the document requests that

22   were served on the 17th, whether you want that included in

23   the fourth amended scheduling order.

24            MR. JACOBSON:  Your Honor, the answer from

25   our point of view is, yes, and there are really two issues
```

```
 1    there.  One is we want to get all of those documents as

 2    quickly as possible, obviously, and if you -- if we went

 3    with the 30 day period, it just puts us too close to the

 4    end.

 5                THE COURT:  It appears that plaintiffs have

 6    agreed to this.

 7                MR. TIETJEN:  Yes.

 8                THE COURT:  So if you want me to put it in.

 9                MR. TIETJEN:  It doesn't matter to us.  I

10    mean the requests are subject to our objections, and we're

11    going to be working out what or trying to at least what

12    documents we've produced, but it doesn't matter to us

13    whether it's a scheduling order.  It's just an agreement

14    between the parties.

15                MR. JACOBSON:  The other issue, Your Honor,

16    is the settlement agreement itself.  We want to get that

17    in hand as quickly as possible because as we said we want

18    to take depositions concerning the terms of the

19    settlement, and we can't do that until we know the terms

20    of the settlement.   So that one, I mean I assume that's a

21    discreet document or a discreet set of documents.  That we

22    want to get resolved as quickly as possible.  And we had

23    talked about it with Mr. Tietjen about getting that

24    produced within a week, but I'm not sure where we are on

25    that at the moment.
```

```
 1              MR. TIETJEN:  Well, one of the factors of

 2     where we are on that leads to our next subject for the

 3     case management conference, that is our desire for a

 4     protective order regarding document production of that

 5     nature.

 6              MR. JACOBSON:  Maybe we circle around.

 7              THE COURT:  All right.  Well, why don't we

 8     circle back to that issue, but it seems to me that we need

 9     to get this issue of the settlement agreement.  We need to

10     find out whether it's getting produced or not.  If it's

11     not going to be voluntarily produced then teed up

12     immediately for a motion so that that issue can get

13     resolved, if we need to go that route, or whether it can

14     be resolved informally.

15              But why don't we then go to the next issue

16     which has to do with the scope of the protective order

17     whether it needs further amendment and then we'll loop

18     back to the issue of the settlement agreement.

19              MR. TIETJEN:  Sure.  We've told the

20     defendants that subject to our desire for a protective

21     order, we will produce the settlement related agreements.

22              THE COURT:  Right.  As I understand it,

23     what you are proposing is you want to limit who can see

24     it.

25              MR. TIETJEN:  Yes.
```

```
 1              THE COURT:  All right.  And the defendants

 2   are saying you can't limit it.  It goes to the merits of

 3   the matter, and our litigation attorneys who are

 4   addressing the merits need to be also able to talk with

 5   their client about the possibility of settlement, and they

 6   can't ethically do it on a variety of other reasons.  They

 7   can't do that if they're hamstringed from seeing the

 8   settlement agreement.

 9              And you're saying, as I understand it, Fair

10   Isaacs, but if we're going to end up in settlement

11   discussions, we don't want those attorneys to see how we

12   settle with Equifax because that would affect our ability

13   to get the best settlement we could.  Is that the essence

14   of this?

15              MR. TIETJEN:  Yes.  And this is very

16   competitive and sensitive information.  Royalty rates and

17   the amount of the settlement and the terms of it, it's

18   very competitive and sensitive.  And all we are asking is

19   that the outside counsel who are allowed to see that then

20   not be part of the negotiations for the settlement, any

21   settlement between their own clients and Fair Isaac.

22              THE COURT:  And let me just ask this.  You

23   know, I certainly can understand the issues raised by both

24   sides and the concerns, but let me just ask some general

25   questions.  Is the settlement agreement between Equifax
```

1    and Fair Isaacs currently, is there an agreement that is

2    confidential?

3                    MR. TIETJEN:  Yes.

4                    THE COURT:  All right.  So, in other words,

5    it can't be shared with the world?

6                    MR. TIETJEN:  No.  In fact, I think there's

7    also the standard provisions that we need to get

8    permission from Equifax.

9                    THE COURT:  All right.  And so have you

10   already explored, is there a carve out that it could be

11   shown to the defendants in this case or is this something

12   that you would have to go to Equifax and ask them if they

13   would agree to permit the settlement agreement or other

14   discovery related to the settlement agreement to be

15   disclosed to the defendants in this case?

16                   MR. TIETJEN:  There isn't a carve out that

17   I know of in any of the agreements themselves, but I've

18   started that discussion with the Equifax counsel.

19                   THE COURT:  Do you have a sense of -- have

20   they said yes, no?  Have they given you any read on what

21   their position yet is going to be as far as releasing this

22   information?

23                   MR. TIETJEN:  My sense is they know that

24   the settlement related agreements themselves will be

25   produced.  We don't have -- I can't say I have an explicit

1   agreement to that effect yet, but the defendants are

2   asking for a lot more documents beyond that.  And I have

3   no sense that how --

4                THE COURT:  How that's going to play out.

5   All right.  So the point is, at least as you sit here

6   today, Equifax hasn't said no yet to the request that the

7   defendants are making which is that we want to see the

8   settlement agreement?

9                MR. TIETJEN:  No, they haven't said that,

10  no.

11               THE COURT:  All right.  And as I understand

12  what the defendants are arguing is that the settlement

13  agreement bears on their defenses to your clients

14  antitrust claim that it's relevant to it.  So would you

15  agree that it has some relevancy to the merits of the

16  antitrust claims or defenses to the claims?

17               MR. TIETJEN:  No.  But we're not contesting

18  the discoverability of the settlement-related agreements

19  themselves.  I note that in the defendant's letter they

20  want to -- they also wanted to turn the case management

21  conference into yet another motion for summary judgment.

22  They think this takes care of the case.  It doesn't in any

23  respect.

24               THE COURT:  I understand that.  I will take

25  judicial notice that you violently disagree.

```
 1                    MR. TIETJEN:  Well, violently is a little
 2      strong.
 3                    THE COURT:  You disagree.
 4                    MR. TIETJEN:  Yeah.
 5                    THE COURT:  All right.  So you're not
 6      contesting the production of it based on the
 7      discoverability, meaning that it could lead to the
 8      discovery of admissible evidence.  You're not agreeing
 9      that it is going to be ultimately relevant at trial?
10                    MR. TIETJEN:  Right.
11                    THE COURT:  All right.  So if you can then
12      address their concern which is how is it then, if their
13      view is it's relevant to the defenses on the anti-trust
14      claim, that as lawyers they have an obligation to talk
15      settlement with their client who evaluate the pros and
16      cons of a case with their clients.  How is it then that
17      the lawyers who are involved in the litigation who need
18      this for litigation purposes cannot or how can they be
19      precluded from discussing at some level the terms of the
20      settlement with their clients so that they can evaluate
21      the strengths, weaknesses of their case, decide whether to
22      go forward or not, decide whether to engage in Fair
23      Isaacs -- a discussion with Fair Isaac on settlement?
24                    MR. TIETJEN:  Well, as I sat here, I
25      thought what might be a compromise that would satisfy the
```

1    defendants and satisfy my own client's concerns -- I can't

2    speak for Equifax -- there are in these agreements some

3    highly sensitive, competitively sensitive information

4    like, for example, new royalty rates between Fair Isaac

5    and Equifax.

6              Perhaps a solution here is for Fair Isaac

7    to redact from the agreements what it considers this

8    highly competitively sensitive information and that

9    shouldn't have any relevance to what the defendants need

10   those agreements for as they contend.

11             And that might be a way of giving them the

12   documents.  They can take the deposition, but they don't

13   need, for example, to see what the royalty rate is.  And

14   that should satisfy, I would hope, everyone's concern.  As

15   I said, I thought of it just this morning.  And I haven't

16   had a chance to run it by the defendants yet, but maybe

17   that's a solution here that Fair Isaac doesn't have to be

18   too concerned then that it's new royalty rates are somehow

19   even inadvertently in some other way transmitted to the

20   other bureaus.

21             THE COURT:  Are there other items as you

22   think about, have you seen the settlement agreement?

23             MR. TIETJEN:  I have seen parts, the parts

24   that I was involved in, and parts that I wasn't involved

25   in.

```
 1              THE COURT:  So are you able as you stand
 2   here today to know if in fact you were to do what you're
 3   suggesting which is produce the agreement subject to some
 4   redactions of information that your client considers to be
 5   highly competitively sensitive and don't bear on the
 6   claims or defenses, do you have an idea other than royalty
 7   rates what else you're talking about redacting?
 8              MR. TIETJEN:  I can't give you an
 9   exhaustive list as I stand here.  I would have to talk to
10   my client about it.  But royalty rates is one that
11   immediately springs to mind.  The amount of any settlement
12   money involved is another one, but I could confer with my
13   client about that and --
14              THE COURT:  I was just curious to get an
15   idea.  All right.
16              Why don't I hear then from whoever will
17   speak on behalf of defendants.  Mr. Gardner?
18              MR. GARDNER:  I'm giving Mr. Jacobson a
19   break.  You know we had this argument once before right
20   here in this courtroom with respect to the algorithm.  And
21   the issue was could we restrict algorithm-related
22   documents so that outside counsel couldn't see it, and
23   Your Honor ruled that no outside counsel could see it.
24   The problem I'm having is I really don't see how it's at
25   all workable.
```

1              I am the principle lawyer for Trans Union.

2     The information in the settlement agreement is obviously

3     critical to our case.  It establishes access to data and

4     distribution.  If and when we get to any settlement

5     discussions, I will be the one to have to advise my client

6     on whether they should settle.  As Your Honor is well

7     aware, we have attorney's eyes only provisions in this

8     case which have been honored.  So if I saw the terms of

9     the settlement agreement, I am precluded from telling my

10    client what those terms are.  So we believe that the

11    existing attorney's eyes only prohibition or protection is

12    sufficient in this case.

13             With respect to Mr. Tietjen's suggestion,

14    very difficult now to say, well, we're going to give them

15    carte blanch to redact certain portions of the agreement.

16    Royalty rates may become relevant in some respect

17    depending on what they are.  If it's a very high royalty

18    rate or a very low royalty rate, that may have some

19    bearing on our defenses.  So I think at this point we

20    can't be hamstrung to say, well, they get the right, the

21    unfettered right to just redact anything they want.

22             I, and this is true for all of this in this

23    room, those of us that are litigation counsel need to see

24    the documents for purposes of trial preparation.  We are

25    all precluded from discussing what we see with our

1   clients, and that should be enough.

2            THE COURT:  So let me put then the kind of

3   the Hobson's choice to you here.  If you're precluded from

4   discussing what you see in the settlement agreements with

5   your clients because they're going to mark them attorney's

6   eyes only, then why do you need to see them?

7            In other words, if a tree falls in the

8   woods and no one is there to hear it, who cares?  So you

9   have this information, but as litigation counsel what

10  you're telling me is you will be hamstrung.  You can't

11  share that information with your client in order to allow

12  them to take that information into account as to what to

13  do with the case whether to settle, how much to settle it

14  for.  So why do you then -- I can understand why you may

15  need it as litigation counsel to pursue the merits of your

16  claim, but given you can't disclose what is in there for

17  presumably the terms for settlement purposes, why is not

18  Mr. Tietjen's original suggestion make sense?

19           MR. GARDNER:  The reason is is we can't be

20  precluded from or we shouldn't be precluded ethically from

21  discussing a settlement with our client.  And the

22  settlement discussion may have nothing to do and probably

23  won't with whatever the Equifax deal is.  But he, in his

24  suggestion, has a cart blanche statement that we, all of

25  us in this room who are the litigation counsel, if time

1    comes to discuss a settlement with our clients, we're

2    precluded from that discussion.  That's too Draconian.

3              I have to be in a, we clearly need this for

4    litigation as Your Honor has suggested.  It's a critical

5    piece of evidence for the defendants.  So let's put that

6    aside.

7              Now it certainly not right or fair that all

8    of us as litigation counsel now can't discuss settlement

9    with our client.  Chances are whatever deal Equifax and

10   Fair Isaac struck is not something that's going to be that

11   critical to whether or not our clients decide to settle.

12   As I think the parties have recognized from the get-go, to

13   a large extent, this case involves business transactions.

14   Equifax and Fair Isaac have agreed to a business

15   transaction.  It may well be that Trans Union and Fair

16   Isaac or Experian may agree to a business transaction.

17   That transaction will stand on its own in terms of whether

18   or not it is right for those two parties without regard to

19   whatever the Equifax deal is.  So our concern is we can't

20   be precluded.  It isn't in my view a Hobson's choice.  We

21   can't be precluded from at least discussing settlement

22   with our clients.  Do you want to add?

23              MR. MILNE:  Just add a concept here, what,

24   as I think about this, what role clearly the outside

25   counsel's only designation limits us in our ability to

1    share specifics or even generalities about the materials

2    so designated with our clients.  When it comes to

3    settlement, the kinds of discussions that I would imagine

4    will occur will be which is what happens with litigation

5    counsel all the time.

6              You've got a deal on the table.  And the

7    client is looking to litigation counsel to say okay, how

8    should I -- there's this deal.  And what are my litigation

9    chances?  You know, what is the prospect?  How do you

10   place the risk of going to trial, the expense of going to

11   trial, those types of things?  Factoring in necessarily to

12   that litigation assessment will be the relevant evidence

13   that we've seen.  Not that we would be providing the

14   detail of it, not at all.  We can't do that under the

15   existing provisions, but we will give our overall

16   impression.  Yeah, we think it's worth -- it's going to

17   cost you X amount of money to try this case.  We think

18   your chances of winning are whatever they are.  You do

19   that cost benefit type analysis all the time in

20   litigation.

21             This proposal prevents the lawyers, the

22   only lawyers who are really capable of doing that type of

23   risk benefit analysis subject to the protective order,

24   precludes them from having any role whatsoever in advising

25   the client on settlement.  And so that's why for Experian,

```
1    we, you know, we take the position that we do here.  And

2    we think the outside counsel eyes only can work and will

3    work.

4                THE COURT:  Anyone further?

5                MR. JACOBSON:  Your Honor, let me just say

6    that's also why every pretrial order you issue says that

7    trial counsel shall show up at the settlement conference

8    because you have to be there.

9                THE COURT:  Mr. Tietjen?

10               MR. TIETJEN:  Just a couple of points.

11   Mr. Gardener is wrong.  This is not like the algorithm.

12   With the algorithm, the defendants did not want any

13   outside counsel to ever be able to see any of the

14   algorithm-related documents.

15               What we are proposing is option A is that

16   those outside counsel who have access to all of the terms

17   of the settlement agreement by Equifax then not be the

18   same counsel who are participating in any settlement

19   strategy with Fair Isaac.  Their settlement negotiations.

20   That's different.

21               And, too, on option B that I've just

22   proposed, I have not heard much of an explanation at all

23   why they could not live with a redaction of certain

24   competitively sensitive information like royalty rates.

25   Why do they need to know what royalty rate was struck
```

1   between Equifax and Fair Isaac or what the settlement

2   amount is?  It doesn't relate to what they contend they

3   want to use the rates for.  So I think either option

4   works.

5            THE COURT:  All right.  Here's what I'm

6   going do on this issue.  First of all, to the extent that

7   plaintiff is asking that litigation counsel who would

8   review the settlement agreement or settlement related

9   documents not be permitted to be involved in settlement

10  negotiations on behalf of their client, I'm going to deny

11  that request.

12           You know, the starting place of this, and

13  that's why I was asking you, Mr. Tietjen, the starting

14  place is is this settlement agreement, is this, and we

15  don't know what the settlement related documents are yet

16  because, obviously, you're still in conversation with them

17  about the breadth of what they want by way of settlement

18  related documents.  But it appears that Fair Isaac has

19  taken the position the information is discoverable.  That

20  it could lead to the discovery of admissible evidence at

21  trial bearing on the antitrust claims or the defenses

22  related to those claims.  So clearly litigation counsel

23  has to be able to see these documents in order to address

24  the merits of their claims.

25           It is simply not workable, number 1,

 1   reasonable, and I don't think ethical then to say to that
 2   counsel to then to deprive their clients of their
 3   counsel's advice with respect to settlement because they
 4   have in fact seen these documents.  So I'm not going to
 5   require that to the extent litigation counsel, outside
 6   counsel, sees these documents.  I'm not going to say to
 7   prohibit them from being involved in settlement
 8   discussions with Fair Isaac.  In fact, they can be.
 9          Having said that, I think that we can do
10   this one step at a time.  I'm going to require, for
11   example, that the settlement agreement be produced.  I
12   will permit you to redact on behalf of your clients those
13   particular terms that you feel are competitively
14   sensitive.  I'm going to assume the whole thing is
15   competitively sensitive.  It really goes to the issue of
16   whether these terms that you want to redact have no
17   bearing, are not relevant, could not lead to the discovery
18   of admissible evidence.
19          So, for example, you claim that you can't
20   imagine why the royalty would have any bearing on your
21   antitrust claim or the settlement amount.  I have no idea.
22   And I don't know what else it is that you want to redact.
23   And I don't think the issue is teed up by the parties.  It
24   can't be until you make the attempt at redaction.  So I'm
25   going to permit you to redact.

```
 1              What terms you believe rise to that level
 2    of being so competitively sensitive and are not
 3    discoverable because they cannot lead to the discovery of
 4    admissible evidence at trial.  And then I'll allow the
 5    defendants to take a look at it and see what it is you're
 6    redacting, and if you agree, great.  If you disagree, then
 7    you'll bring it back to me either informally or formally,
 8    and we can do it on an expedited basis, so we can get to
 9    the bottom of this issue as to whether they should be
10    entitled to it.
11              I have to tell you though I understand why
12    Fair Isaac doesn't want other parties with whom it may
13    enter into settlement discussions to know about their
14    settlement because it may impact how good of settlement
15    they may get with those other parties.  But at the end of
16    the day, Fair Isaacs gets to say I'll settle with you or I
17    won't.  No one is forcing Fair Isaac to enter into a
18    settlement that they don't want to enter into.  So if the
19    defendants propose a settlement, for example, if in fact
20    they learn all of the terms of the Fair Isaac-Equifax
21    settlement, and the defendants came back and say that
22    should be the ceiling.  We should never have to pay any
23    more than that or agree to a royalty rate, Fair Isaacs
24    gets to say no to that.  No one is going to force them to
25    take a settlement that they don't want to do.
```

```
 1              So I want to caution Fair Isaac about the

 2    balancing that they're asking this Court to try and

 3    protect.  I certainly understand why and I'm willing to

 4    do -- willing to listen to that underlying purpose, but at

 5    the end of the day, if royalty rates or the term of the

 6    settlement in fact can lead to the discovery of admissible

 7    evidence, I will let you know I'm going to permit them to

 8    see those terms, and then they will be bound by the

 9    obligation of the highly confidential outside attorney's

10    eyes only restriction that will not allow them to disclose

11    those terms to their clients, in any event.  Just as

12    happened in other documents.  So I am willing to do this

13    one step at a time.  So I'm giving you the opportunity to

14    redact if you want, and give the defendants an opportunity

15    to look at it.  And if you can't agree, then bring it back

16    to me, and you'll have to tee up for me the issue of why

17    our royalty terms or settlement terms are in fact relevant

18    or could lead to the discovery of admissible evidence at

19    trial.

20              Yes, Mr. Milne?

21              MR. MILNE:  I just wondered if I could ask

22    a question about how this procedure will work, Your Honor.

23    Because, you know, we are concerned about we've given

24    ourselves only three weeks here to deal with whatever

25    remaining discovery there is to be done.  And speaking for
```

1    the defendants, of course, as you know it's been a drum

2    beat for us for a long time.  We want to try to move this

3    case forward and keep the extensions to a minimum.

4            The issue that concerns me here is we seem

5    to be setting up a whole nother round of dispute.  When

6    we're talking about the royalty rate, and we're talking

7    about the amount of any financial compensation that may

8    have gone run, for example, from Fair Isaac to Equifax, I

9    can tell you right now that the defendant's position is

10    that is highly relevant, because and here's very briefly

11    the reason why.

12            THE COURT:  But I'm not going to decide

13    that issue today.  And in all fairness, I'm going to give

14    them in a sense putting Mr. Tietjen on notice.  I

15    understand the issue you're raising on behalf of your

16    client, and I understand they don't want to share the

17    entire terms, but I'm hoping you'll go back to your

18    clients and remind them that if you do, it's under an

19    attorney's eyes only restriction.  The defendants are not

20    permitted to disclose the terms of the settlement to their

21    clients.  That's the whole point of this.  And

22    notwithstanding are they still going to take the position

23    that it is not relevant, could not lead to the discovery

24    of admissible evidence, such that they're going to say

25    redacted.

1              And then I expect we can do this on a very

2    short time frame.  But I think that the parties need to

3    have that dialogue with each other about you say it's

4    relevant and Mr. Tietjen is saying he can't imagine why it

5    is.  I think both sides are entitled to have an

6    opportunity to examine that issue.

7              MR. MILNE:  Your Honor, may I just request

8    that we have a procedure set up where perhaps we do

9    briefing like we did on this particular issue in the form

10   of letter briefs or, you know, short briefs such that we

11   can tee it up for a very expedited hearing or

12   consideration by you because again if we go on the normal

13   schedule, we're already beyond the three weeks before we

14   even get it before you.

15             THE COURT:  I agree.  Let me ask you, Mr.

16   Tietjen, how soon can you produce to them the settlement

17   agreement, and if we're going to redact any piece of it

18   with the redactions?  Because that to me is the initial

19   issue.  It may be that after what has occurred here today,

20   well, a number of things may happen.  Equifax may say no,

21   and then we're going to be in some sort of expedited

22   motion before me because they're a party to this

23   agreement.

24             Number 2, Equifax may say yes, and may say

25   both Equifax and Fair Isaac may say produce it.  We're not

```
 1   redacting, and that will end the issue.  How soon can I
 2   hear back and the defendants hear back?  Today is
 3   Wednesday, the 25th.
 4               MR. TIETJEN:  Today is Wednesday.  I know
 5   that the in-house counsel I generally deal with is out of
 6   town until Monday but then I know that I myself am in
 7   Atlanta taking a deposition on Monday.  So, and then
 8   there's July 4th.  So.
 9               THE COURT:  July 4th is Friday.
10               MR. TIETJEN:  Friday of next week is
11   July 4th.
12               THE COURT:  Yes, it's a week from this
13   Friday.
14               MR. TIETJEN:  So by that following Monday I
15   hope to be able to produce then redacted copies of the
16   agreements to the defendant.
17               THE COURT:  Given that the parties have
18   then that Monday would be the 7th, that leaves the parties
19   basically less than approximately two weeks for me to
20   resolve the issue.  And however it gets resolved, I'm
21   willing to guess what's going to happen is that
22   depositions that bear on settlement is going to get held
23   off until this issue gets resolved.  So I think that we
24   need to be on a faster time line.  I recognize the person
25   you talked to, in-house counsel, is gone.  I'm hoping that
```

1   you're able to reach that person before Monday or someone

2   else can reach that person on Monday.

3                  MR. TIETJEN:  Oh, sure, I can reach her.  I

4   was just hoping to have a chance to sit down with her with

5   the documents and rather than having a telephone call and

6   she doesn't have them in front of her.  Then I'll get

7   someone else in my office while I'm going to work on it

8   with her so then sometime next week we'll try.

9                  THE COURT:  Here's what I'm going, and this

10  isn't going be pretty, but I'm going to require that the

11  settlement agreement in whether redacted or unredacted be

12  produced to the defendants by July 1, Tuesday July 1.

13                 MR. TIETJEN:  Tuesday of next week?

14                 THE COURT:  Of next week.  To the extent

15  that it is your redacting, that in a letter to the

16  defendants with the settlement agreement, you indicate

17  what it is that you are redacting and the basis for the

18  redaction.

19                 In other words, you know what their

20  argument is.  It's not relevant to any of their claims or

21  defenses.  That they don't need to see whatever it is you

22  are going to redact on the merits of the case.  And then

23  I'm going to require the defendants to respond to that by

24  the third.

25                 MR. MILNE:  We're happy to do so.

1          THE COURT:  All right.  And then I think

2    what I'm going to suggest is that the letter to the

3    defendants, if you're redacting, Mr. Tietjen, be copied to

4    me, so it be a letter for the benefit of the defendants

5    and the Court, and that the defendants respond in writing

6    to Mr. Tietjen by the third, copy to the Court addressing

7    why it is that you think they're wrong.

8          And we're going to take a short break, and

9    I'll see what my schedule is then to either do this over

10   the phone with the parties or in person.  Hopefully, that

11   Monday the 7th, Tuesday the 8th, something like that, so

12   that we can get this issue resolved.

13         MR. TIETJEN:  Just so I'm clear, my letter

14   to defendants with the production and copy to the Court,

15   you want me to identify what has been redacted?

16         THE COURT:  Correct.  In other words, we

17   redact the royalty term.  We redacted the settlement.  And

18   then either the policy basis, legal basis, whatever you're

19   going to provide to them and to me as to why it is that

20   that information should be and remain redacted.

21         MR. TIETJEN:  Okay.

22         MR. GARDNER:  May I make just a

23   clarification point?

24         THE COURT:  Yes.

25         MR. GARDNER:  I think we're all on the same

```
 1    page.  It's our understanding based on what we were
 2    allowed to inquire, there is a settlement agreement which
 3    I'm told is probably very short.  But the basic terms are
 4    in another agreement which I don't know what it's called,
 5    some form of business agreement.  So I think we have to be
 6    clear.  And I think Mr. Tietjen contemplated that is that
 7    when we talk about what he has to produce, it's not just
 8    quote/unquote settlement agreement, it is the settlement
 9    agreement and whatever business terms were involved as
10    part of this settlement.
11                  MR. TIETJEN:  No, we're thinking the same
12    thing.
13                  THE COURT:  We'll call it the settlement
14    agreement and business agreement.
15                  MR. GARDNER:  Right.
16                  THE COURT:  All right.  Why don't we
17    take -- unless Mr. Milne, you have something further.
18    Let's take a short recess while I go see what my calendar
19    looks like the week of July 7, earlier rather than later.
20                  In the meantime, if you all want to chat
21    about what it is that you would like to think should be
22    redacted from the plaintiff's brief, you could do that
23    while I'm gone.  I'll be right back.
24                  (Recess.)
25                  THE COURT:  Just to put this piece on the
```

1   record, the parties did agree on what items should be

2   excised from the plaintiff's memorandum as it related to

3   my ruling on privileged communications, and I will insert

4   that in the way in the order that won't go ahead and

5   reveal what it is I excised, so I'll figure that out.  And

6   Mr. Jacobson handed me the brief with those excised --

7   portions to be excised.

8                The entire day is open on July 7th, so we

9   can do this over the phone.  We can do it in person,

10  however the parties want to proceed.  We can set it at a

11  time, and you can let me know what you would like me to

12  do.  Perhaps it won't be necessary but, in any event, what

13  works for the parties?

14               MR. TIETJEN:  I think the option of

15  telephone if necessary given I don't know where I'll be.

16               THE COURT:  Would that work for people?  If

17  we set it for say 10 a.m., does that work or if you are

18  going to be in depositions, do you want to set it at a

19  time when you think you'd be breaking, like noon?  You

20  know, it doesn't matter to me.

21               MR. TIETJEN:  Noon is fine with me.

22               MR. MILNE:  Noon is fine.  I think also if

23  people do decide to fly in, it will allow them to take an

24  early flight to get in that day instead of having to --

25               THE COURT:  All right.  Well, why don't I

1   set it for 12 o'clock then.  And I'm going to assume --

2   well, I won't assume anything.  I'm going to set it for 12

3   o'clock.  I'll get a courtroom for that day, July 7th, and

4   then the parties can let me know whether they would prefer

5   to handle this by phone as we do the other conferences,

6   and I'd be happy to address it by phone.

7                 Okay.  Then 12 o'clock noon on July 7,

8   central standard time.

9                 Anything further with respect to case

10  management issues?  Mr. Tietjen is shaking his head no and

11  defendants are as well.

12                All right.  That concludes this proceeding.

13  Thank you very much.

14                Oh, let me ask one question on the issue, I

15  am obviously going to be issuing an amended scheduling

16  order.  Do the parties want me to put in an order what

17  I've ordered thus far with respect to the settlement

18  agreement which is this process for production and

19  redaction by a certain date or do you not need that in an

20  order?

21                MR. TIETJEN:  I don't need it.

22                MR. JACOBSON:  I think it's helpful, Your

23  Honor, if it's in there.

24                THE COURT:  Pardon?

25                MR. JACOBSON:  We think it's helpful if

```
 1    it's in there.
 2                    THE COURT:  I'll put this piece in an order
 3    then on the settlement agreement plus the business
 4    agreement.  All right.  Thank you very much.
 5                    (End of proceedings.)
 6
 7
 8
 9
10
11
12
13                              *  *  *
14                              -oOo-
15                    I certify that the foregoing is a correct
16    transcript from the record of proceedings in the above
17    matter.
18
19    Date:  July 2, 2008
20                                  _____
21                                  Court Reporter
22
23
24
25
```