1        UNITED STATES DISTRICT COURT
             DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------

4                                    )

5    Fair Isaac Corporation,         )   File No. 06-CV-4112

6                                    )           (DSD/JJG)

7            Plaintiff,              )

8                                    )

9    vs.                             )   St. Paul, Minnesota

10                                   )   June 4, 2008

11   Equifax Inc.; Experian          )   10:30 a.m.

12   Information Solutions, Inc.;     )

13   Trans Union, LLC; and           )

14   VantageScore Solutions, LLC,    )

15                                    )

16           Defendants.             )

17   ------------------------------------------------------------

18

19          BEFORE THE HONORABLE JANIE S. MAYERON

20         UNITED STATES DISTRICT MAGISTRATE JUDGE

21              **(CIVIL MOTION)**

22

23

24

25

1    <u>APPEARANCES</u>

2     For the Plaintiff:        ROBINS, KAPLAN, MILLER & CIRESI,

3                               LLP

4                               MARY E. KIEDROWSKI, ESQ.

5                               RANDALL TIETJEN, ESQ.

6                               800 LaSalle Ave,  #2800

7                               Minneapolis, MN 55402

8

9     For the Defendant         ALSTON & BIRD, LLP

10    Equifax:                  TERESA THEBAUT BONDER, ESQ.

11                              GREGORY B. MAULDIN, ESQ.

12                              1201 W. Peachtree St.

13                              Atlanta, GA 30309-3424

14

15    For the Defendant         LINDQUIST & VENNUM, PLLP

16    Experian:                 MARK A. JACOBSON, ESQ.

17                              80 S. 8th St., #4200

18                              Minneapolis, MN 55402

19

20                              WHITE & CASE, LLP

21                              MARTIN M. TOTO, ESQ.

22                              1155 Avenue of the Americas

23                              New York, NY 10036

24

25    For the Defendant Trans   NEAL, GERBER & EISENBERG, LLP

```
 1     Union:                    JOHN J. SCHARKEY, ESQ.

 2                               Two N LaSalle St.

 3                               Chicago, IL 60602

 4

 5     For the Defendant         KELLY AND BERENS, PA

 6     VantageScore:             JUSTI RAE MILLER, ESQ.

 7                               80 S. 8th St., #3720

 8                               Minneapolis, MN 55402

 9

10     Court Reporter:           DEBRA BEAUVAIS, RPR-CRR

11                               316 N. Robert St., #700

12                               St. Paul, Minnesota 55101De

13

14

15

16        Proceedings recorded by mechanical stenography;

17     transcript produced by computer.

18

19

20

21

22

23

24

25
```

1                         **P R O C E E D I N G S**

2                            **IN OPEN COURT**

3              THE CLERK:  All rise.

4              THE COURT:  Thank you.  You may be seated.  Good

5      afternoon everyone -- or good morning, everyone.  It seems

6      like afternoon.  I am Magistrate Judge Mayeron.  We're here

7      this morning in connection with the matter of Fair Isaac

8      Corporation, et al v. Equifax, et al.  This is Court File

9      No. 06-4112.

10             At this time I would like the attorneys to

11     identify themselves starting first with counsel for Fair

12     Isaac.

13             MR. TIETJEN:  On behalf of the Fair Isaac Randy

14     Tietjen from Robins, Kaplan, Miller & Ciresi, and with me is

15     Mary Kiedrowski.

16             THE COURT:  On behalf of Experian.

17             MR. TOTO:  Martin Toto, and I also have my

18     colleague in the back here, Heather Burke.

19             THE COURT:  All right.  Make sure I find -- it's

20     Heather Burke?

21             MR. TOTO:  Yes.

22             THE COURT:  All right.  All right.  And on behalf

23     of TransUnion?

24             MR. JACOBSON:  And Mark Jacobson for Experian of

25     Lindquist & Vennum.

1          THE COURT:  I'm sorry, Mark.  All right.

2          Anybody else on behalf of Experian?  All right.

3          On behalf of TransUnion?

4          MR. SCHARKEY:  John Scharkey from Neal, Gerber &

5     Eisenberg.

6          THE COURT:  I don't think we -- yes, I do.  Anyone

7     else on behalf of TransUnion?

8          MR. SCHARKEY:  No.

9          THE COURT:  All right.  On behalf of VantageScore?

10         MS. MILLER:  Justi Miller from Kelly Berens.

11         THE COURT:  All right.  And on behalf of Equifax?

12         MS. BONDER:  Good morning, Theresa Bonder and with

13    me is Greg Mauldin, also from Alston & Bird.

14         THE COURT:  All right.  Have I got all the parties

15    then?  I do.

16         We're here this morning to address plaintiff's

17    motion to compel production of the documents clawed back by

18    defendants or alternatively for an in-camera review.

19         Mr. Tietjen or Ms. Kiedrowski, whoever will be

20    arguing on behalf of the plaintiff.

21         MR. TIETJEN:  Thank you, Your Honor.

22         By this motion Fair Isaac seeks production of four

23    documents that were clawed back by the defendants during

24    depositions claiming that the documents reflect privileged

25    communications.

1           After being clawed back, the documents were either

2       then produced in redacted form by the defendants or withheld

3       entirely by the defendants.

4           The documents do not reflect privileged

5       communications and if they do, that privilege was waived by

6       the fact that defendants shared all of these communications

7       among each other and some of them with their consultant,

8       Mercer.

9           I have, Your Honor, for you a single-page timeline

10      which I provided to the defendants at 10:00 to take a look

11      at.  With your permission, I will give you a copy, as well.

12      There are two copies.

13          THE COURT:  All right.  Do you want to provide --

14          MR. TIETJEN:  Sure.

15          This timeline sets forth some of the relevant

16      dates for this motion and in red shows the dates the

17      documents fall in the timeline.  The timeline relates mainly

18      to the defendants' claim for a common interest.

19          So I give it to you now and won't address common

20      interest for a couple of minutes yet.  And it only covers

21      the events in fall of 2004 up to March of 2006.  So it

22      doesn't include, of course, the litigation which began in

23      October of 2006 or any earlier events.

24          The defendants have acknowledged in depositions

25      that they were talking before the fall of 2004, but for

1    purposes of the motion, this is the relevant time period.

2          Now, the defendants make no argument that any of

3    the documents that are at issue in this motion is protected

4    as work product.  It is only privilege that they claim.  And

5    it is the defendants' burden, of course, to establish that

6    the documents at issue reflect privileged communications.

7          Without in-camera review I think it would be very

8    difficult for the Court based only on the briefs to evaluate

9    this argument of whether the documents reflect legal advice

10   or request for legal advice.

11         But I want to point out one fundamental failing in

12   the defendants' record on this motion, and this can alone

13   serve as a basis for granting this motion.

14         For each of the documents at issue the defendants

15   make no effort to identify the attorneys involved with these

16   communications or anyone else who was allegedly involved in

17   the communications or present at the meetings in which the

18   notes, Plaintiff's Exhibit 41, for example, were taken.

19   These documents are not listed on any privilege log that I

20   know of.  They have submitted no affidavit from any party

21   representative or from any lawyer involved in these

22   communications attesting to the privileged nature of these

23   documents, and it is their burden to do this.  And because

24   they have failed to assert even the basic elements of a

25   privileged claim, and for that reason alone, Fair Isaac's

1   motion should be granted.

2           Now, on this subject of whether the documents are

3   privileged, because I say without an in-camera review it's

4   very difficult to make that assessment, I will leave the

5   other arguments to the briefs which I think adequately

6   address it, unless the Court has any questions.

7           THE COURT:  Why don't you go ahead.  I will have

8   questions.

9           MR. TIETJEN:  I will turn to the central portion

10  then of the defendants' opposition to this motion, that is

11  their claim that they had a common legal interest in 2005

12  that protects otherwise, they say, privileged communications

13  that they revealed to each other or that they exchanged with

14  each other, that is, among the bureau of defendants.

15          The Common Interest Doctrine, I'm sure you know,

16  is not an independent basis for withholding information as

17  privileged.  It's rather an exception to the general rule

18  that if you share communications with someone else, with

19  another party, there's a waiver.  So it constitutes an

20  exception to the waiver.

21          Whether parties can claim that they have a common

22  legal interest requires a pretty close factual analysis, and

23  all the cases bear that out.

24          Let's consider some of the basic facts that the

25  case law shows are relevant in considering the defendants'

1    claim that they had a common legal interest.

2            First, did the bureaus share counsel.  This is

3    relevant in much of the case law.  If they did share a

4    single counsel, that would strengthen their claim that they

5    had a common legal interest, but they didn't.  They were

6    each represented by separate counsel through all of 2005 and

7    to this day, and they acknowledge that.  I don't believe

8    it's in dispute.  In fact, the difference between them, the

9    differences between them, they have different ideas about

10   what they want to accomplish in this project is well

11   reflected in Exhibit 12 to Ms. Kiedrowski's declaration.

12   This is an exhibit that's a draft of an agreement that they

13   were going to reach with Mercer.  And you will see in that

14   where each of the bureaus has its own distinct views about

15   what they want to accomplish in this relationship with

16   Mercer and how they want to memorialize it.  Each of their

17   views is listed separately; TransUnion's view is this,

18   Equifax's view is this, Experian's view is this.  It's

19   throughout those pages on Exhibit 12.  You will see not only

20   -- so we have not only their admission that they had their

21   own counsel, but their work separately is reflected in that

22   document.

23           A second factual consideration is whether they had

24   formed a joint venture.  Had the bureaus formed a joint

25   venture or a partnership or any other legal entity in common

1    that would give strength to their argument that they had a

2    common legal interest.  But here again, and the defendants

3    won't dispute this, they had no joint venture.  They had no

4    partnership.  They had no common legal entity.  That wasn't

5    formed, as you will see on the timeline, until February 14

6    of 2006 when VantageScore Solutions, LLC was formed.

7         A third factual consideration in the common

8    interest analysis is whether the parties were anticipating

9    litigation.  If they were reasonably anticipating

10   litigation, this too could strengthen their argument that

11   they had a common legal interest.  Now, here on this point

12   the defendants had to make a pivot.  If they were to argue

13   that they were reasonably anticipating litigation through

14   2005, then they would be in a bind because they would have

15   to explain why they were shredding documents routinely,

16   frequently throughout that summer.  So they made a pivot,

17   and their argument to this Court is we were not anticipating

18   litigation in 2005.  That's their argument.

19        When the day comes for a spoliation motion, I

20   believe we will be able to show in spades that they were

21   anticipating litigation, but that's their position on this

22   motion, we were not anticipating litigation.

23        And if that is their position they certainly,

24   especially in light of they had separate counsel, no joint

25   venture, they had no common legal interest.

1              So what does their argument boil down to for why

2       they had a common legal interest?  They are very vague about

3       this in their brief, at least I believe they are.  But on

4       page 14 they seem to be the most specific about it.  They

5       say on page 14 of their brief, "The bureau of defendants

6       shared a common business interest in developing a general

7       credit risk scoring system and a common legal interest in

8       doing so without violating the anti-trust laws."

9              So let's break that down because that's their

10      whole argument why they have a common legal interest.

11             First, so they say, they shared this common

12      business interest in developing a scoring system.  That is

13      of no consequence to whether they had a common legal

14      interest.  A common business interest doesn't establish a

15      common legal interest.  They are two different things.

16             They seem to acknowledge this themselves later in

17      their brief on page 18, that a common business interest is

18      of no consequence where that case stands for the principle

19      if the parties share only a commercial, not a legal,

20      interest it's not within common legal interest.

21             So then the second part of their argument is they

22      argue that they shared a common legal interest in not

23      violating anti-trust laws.  That's it.  That is their whole

24      argument for why they had a common legal interest.  And the

25      Eighth Circuit has flatly rejected that as a basis for

 1    claiming a common legal interest.

 2              In the grand jury subpoena case, which is cited by

 3    both parties in their brief, it involved a Whitewater

 4    investigation by the Office of Independent Counsel and the

 5    White House made this same -- White House counsel made this

 6    same argument.  They said the communications between White

 7    House counsel and Hillary Clinton should be protected by a

 8    common interest because they all needed a full and accurate

 9    understanding of what was going on in order to appreciate

10    the legal consequences of their actions.  And the Eighth

11    Circuit said -- this is at 112 Federal 3rd at page 922, the

12    Eighth Circuit said that was insufficient.  "The

13    justifications amount to no more than an assertion that we

14    all want to obey the law and we do not believe the Common

15    Interest Doctrine stretches that far."  If that's all you

16    have, is a claim you all just wanted to obey the law, to

17    follow anti-trust law, that's not enough.  It's not enough

18    in the Eighth Circuit, and it's not enough in the Fifth

19    Circuit.

20              I handed to counsel about an hour ago a case from

21    the Fifth Circuit that's a published decision that is in

22    line with the Eighth Circuit's holding, and with your

23    permission I will give you a copy of that, as well.

24              THE COURT:  Yes.  Thank you.

25              MR. TIETJEN:  This is a case involving horizontal

competitors in the offshore drilling business.  And the

plaintiffs were employees for those horizontal competitors,

and they claim that these competing businesses had joined

together and sort of fixed their wages and conspired to not

increase their wages.  If the competing companies shared a

memorandum together that they then refused to give to the

plaintiffs after litigation began and the companies

maintained in that case that they were not anticipating

litigation at the time that they exchanged that memorandum,

they have said they were just trying to be sure that they

didn't violate anti-trust laws, that's the basis for their

common legal interest.  The court found there was no common

interest that protected the exchange of information.  On

that page, page 714 of that decision, the court said -- I

believe the court is quoting from the lower court's decision

here, but in affirming it, "but when the threat of

litigation is merely a thought rather than a palpable

reality, the joint discussion is more properly characterized

as a common business undertaking, which is unprivileged and

certainly not a common legal interest.  There's no

justification within the reasonable bounds of the

attorney-client privilege for horizontal competitors to

exchange legal information which allegedly contains

confidences in the absence of an actual or imminent or at

least directly foreseeable lawsuit."

1          Now, there is one more fact that the defendants I

2     expect will argue distinguishes this case from others, and

3     they will say that they all signed a common interest

4     agreement, is what they call it in their brief, in February,

5     2005.

6          Now, it's interesting, in their brief they say the

7     agreement is irrelevant so I hesitate to even bring it up.

8     They feel it's irrelevant, it's irrelevant, but they haven't

9     produced it.  But, in any event, if their argument is that

10    their only common legal interest was to insure that they

11    didn't violate anti-trust laws, then it doesn't matter if

12    they memorialize that or not and it's not some

13    self-fulfilling prophecy that just because they supposedly

14    said in writing once that they had a common legal interest

15    then it follows they must have a common legal interest.

16    It's really of no consequence if they did sign such an

17    agreement.  Again, they won't produce it and they call it

18    irrelevant.

19          Now, the defendants cite many cases in other

20    circuits involving patent applications where one company is

21    acquiring the assets of another company, and they have

22    discussions regarding the patent application and whether

23    they have common interest since they are acquiring the

24    assets of the other company.  They cite cases where the

25    parties had actually formed a joint venture in which they

1       had a single common legal counsel or cases in which the

2       parties were arguing they were anticipating litigation and

3       that's why they have a common legal interest.

4              The defendants don't say a word about that Eighth

5       Circuit decision, which holds that mere desire to obey the

6       law, to follow the law, that's what your legal interest is

7       is not enough.  They don't say a word about that.  And they

8       don't cite any cases in which a court has allowed horizontal

9       competitors who were not anticipating litigation to hide

10      their business communications under the veil of a common

11      legal interest.  Those are the circumstances in that Fifth

12      Circuit decision.

13             Now, one last point:  In their response the bureau

14      of defendants avoid the fact that they had this policy for

15      Project Trident to shred all documents and that they carried

16      it out, as I said, frequently and routinely.  They seem to

17      no longer assert, as they did in April in this court, that

18      the only documents they shredded were data output or SAS

19      output and I don't think that they could.  Their own

20      consultant, Mercer, has testified that they were routinely

21      shredding draft documents.  Working papers, handwritten

22      notes were shredded.  Instead, they dismiss this whole

23      subject as just irrelevant background in an attempt, they

24      say, by Fair Isaac to sinisterize them.  The subject is not

25      irrelevant.

1          Fair Isaac believes it was the bureau's objective

2     from the outset to make sure that as few pieces of paper as

3     possible survived their project.  And discovery has shown,

4     and we have provided some record of this, that the official

5     electronic versions of what still exists does not match up

6     with the few handwritten notes that survived that summer of

7     2005.  Mr. Tantia for Mercer testified just last week that

8     his handwritten notes not only is talking about subjects he

9     didn't then put into his official meeting minutes, which was

10    what was preserved electronically, the handwritten notes got

11    shredded and what we're left with is some partial, what we

12    believe, sanitized record that was preserved electronically.

13         What this motion is attempting to do is really to

14    reclaim for trial some of these relatively few documents,

15    handwritten notes especially, that escaped the bureau's

16    shredder in 2005.

17         Now, on the other subjects of whether they have

18    waived any right to privilege in these documents by sharing,

19    for example, some of them with their consultant, Mercer, who

20    they didn't even have an agreement with as you will see from

21    the timeline --

22         THE COURT:  Let me make sure I understand that

23    piece of it.  Are you claiming that they shared all four of

24    these documents with Mercer, some of the documents with

25    Mercer or they shared communications with Mercer that end up

 1   being reflected in documents?  It's not clear to me what you

 2   are saying they shared with Mercer and which of the four

 3   documents you are claiming they shared with Mercer.

 4          MR. TIETJEN:  You are right, it's not clear to us

 5   either.  If they had properly asserted the privilege and

 6   listed who were the recipients of these documents and who

 7   were the authors, we would know.  But the only ones we can

 8   know for sure Mercer had access to are the handwritten

 9   notes.

10          THE COURT:  The ones they generated themselves?

11          MR. TIETJEN:  Which Mercer generated themselves.

12          The other points, I believe, are adequately

13   addressed in the brief.  I will rest there.

14          THE COURT:  Let me see what questions I have then.

15          With respect to the draft of the anti-trust

16   guidelines that, apparently, were your seeking the draft

17   that was shared in April of 2005 and, apparently, you are

18   saying that was clawed back; is that right?

19          MR. TIETJEN:  Yes.  I meant to bring that up.

20   They offered in their brief to produce it.  If we have

21   confidential agreement, there is no waiver.

22          THE COURT:  It wouldn't be used, as I interpreted

23   it, to argue that there was a broader waiver than simply

24   providing those draft anti-trust guidelines.  So my first

25   question was, and then tell me where I go with it, is that

1    as to exhibit I think it is 41 (sic), which is -- sorry, not

2    41, it is the draft guidelines -- 69 -- nope, 71.

3              MS. BONDER:   71.

4              THE COURT:   Whether their proposal is satisfactory

5    to you or not?   In other words, is Exhibit 71 still an

6    issue?

7              MR. TIETJEN:   Well, this is just one -- since

8    that's the only draft guidelines that's the subject of this

9    motion, then that's acceptable.   But I would hope the

10   defendants would then produce all of these draft guidelines.

11   There are many more that they are withholding as privileged.

12   If that's their position, is that we can have them if we

13   have an agreement it doesn't represent a waiver, then I

14   believe they should produce all of their draft anti-trust

15   guidelines, not just select this one, which we happened to

16   find among their production and they quickly clawed back.

17   Their privilege log was all kinds of different drafts.

18             THE COURT:   So your view is if they were willing

19   to produce all draft anti-trust guidelines, you are going to

20   argue that by producing those drafts that is broader than

21   simply producing those draft guidelines to you?

22             MR. TIETJEN:   Right.

23             THE COURT:   But if they are only willing to

24   produce Exhibit 71 and they are not willing to produce other

25   draft guidelines, then what is your position?   Do you need a

1     ruling on 71 or you don't?

2          MR. TIETJEN:  We will take what we can get.

3          THE COURT:  All right.

4          MR. TIETJEN:  We will take the document.  I think

5     to be consistent they should have to produce all of them.

6          THE COURT:  All right.  Just so I know, did they

7     claw this back during a deposition or where did they claw

8     this back?

9          MR. TIETJEN:  During a deposition.

10         THE COURT:  Whose deposition was it?

11         MR. TIETJEN:  During the deposition of Peter

12    Carroll, I believe, who is a director of Mercer.  Is that

13    correct?  I might be wrong.  Stan Oliai who is an employee

14    of Experian.

15         THE COURT:  Okay.  So that's where he -- the

16    question regarding Exhibit 71 came up, during his

17    deposition, and at some point they clawed it back?

18         MR. TIETJEN:  Right.

19         THE COURT:  Okay.  And did you get any

20    understanding from that deposition as to the circumstances

21    surrounding the communication of those draft guidelines?  In

22    other words, did you find out if they had been distributed

23    at a meeting or shared with anyone or you just happened to

24    find them in the file and you started to question him and

25    asked him about what they were?  I don't understand the

 1    circumstances of how the draft guidelines were shared.

 2              MR. TIETJEN:  They produced some draft guidelines

 3    to us -- they produced some guidelines to us.  I don't know

 4    that they produced any draft guidelines.  But it's not clear

 5    when it's a draft and when it's a final.  So they produced

 6    some guidelines to us.

 7              THE COURT:  Okay.

 8              MR. TIETJEN:  And they claim those aren't

 9    privileged.

10              THE COURT:  Okay.

11              MR. TIETJEN:  This one, if I remember correctly,

12    was produced to us and it had at the top just the word

13    "draft."  I'm not sure now, but somewhere on the face of the

14    document it said "draft."

15              So when this was placed in front of the witness,

16    it was just clawed back immediately by the defendants.

17    There was no -- other than like with the handwritten notes,

18    I don't believe there was any delay in clawing this one

19    back.

20              The basis for clawing it back -- the grounds for

21    claiming it as privileged were not detailed at that time by

22    the defendants.  In other words, it's not said who wrote it

23    or who had access to it or how widely it was distributed.

24              THE COURT:  So you did not learn whether, for

25    example, these drafts had been -- draft guidelines had been

1    distributed at a meeting of a variety of different people?

2              MR. TIETJEN:  These particular draft guidelines?

3              THE COURT:  Yes, the ones you are seeking.

4              MR. TIETJEN:  No.  I believe these particular

5    draft guidelines had a date on them of April, March or

6    April.  They had meetings before this in which they used

7    other -- what I believe are other versions of anti-trust

8    guidelines.  February, for example, they were meeting, the

9    bureaus were meeting in Texas.

10             THE COURT:  I have notes that you indicated that

11   in February, February 16th, there was a meeting of a variety

12   of representatives of the bureaus as reflected in Exhibit 8.

13   And Exhibit 8 to Ms. Kiedrowski's declaration indicates that

14   guidelines, anti-trust guidelines, were distributed or

15   communicated.

16             MR. TIETJEN:  Yeah, the minutes from that meeting

17   list that they had some anti-trust guidelines.  Whether

18   these are the same anti-trust guidelines that then are dated

19   a couple months later and now are the subject of this motion

20   or not I don't know.

21             THE COURT:  But you haven't been able to develop

22   whether these draft guidelines were distributed as,

23   apparently, some set of draft guidelines were distributed in

24   February of 2005; is that right?

25             MR. TIETJEN:  Right.

```
 1              THE COURT:  Okay.  Let me -- I want to take a look

 2   at your timeline.

 3              My understanding from your memorandum is that some

 4   time in February the bureaus begin the process of

 5   negotiating to retain Mercer as their consultant.  Do you

 6   have an understanding of when that relationship is

 7   formalized with Mercer by agreement?

 8              MR. TIETJEN:  It is listed on the timeline about

 9   two-thirds of the way down.

10              THE COURT:  That's the September 16th date when

11   they formally retain them and enter into some sort of

12   written arrangement?

13              MR. TIETJEN:  Right.  September 16 is the last

14   date on which either one of the bureaus or Mercer signed

15   their agreement.  But then they all agreed that it would be

16   backdated to July 12.

17              THE COURT:  All right.  And then do you have an

18   understanding of when Mercer's involvement with the bureaus

19   ends?

20              MR. TIETJEN:  It faded.  That's our best

21   understanding right now.  It faded either in late 2005 or

22   early 2006.

23              THE COURT:  Okay.

24              MR. TIETJEN:  Their involvement -- the point is

25   self-evident.  It ended much earlier than when their
```

1       agreement was signed.

2              THE COURT:  In Exhibit 40, which is the redacted

3       version of Exhibit 41 that you are seeking, the handwritten

4       notes, at least on the redacted version from time to time in

5       those handwritten notes there appears to be lists of

6       individuals who were in attendance at whatever was happening

7       that's reflected in these notes.

8              Have you been able to establish who was in

9       attendance at these various meetings that communications

10      were discussed that are reflected by the notes?

11             MR. TIETJEN:  No, we haven't.  We only had about

12      15 minutes or so.  The defendants have corrected our time

13      argument.  It is 15 minutes of cross-examination of Mr.

14      Carroll of Mercer on these notes before it was clawed back.

15             THE COURT:  But my understanding is you have since

16      had the opportunity to examine the individual who actually

17      took the notes; is that correct?

18             MR. TIETJEN:  Yes, Piyush Tatian.

19             THE COURT:  And, apparently, from what I can tell

20      from your supplemental submission that came yesterday is,

21      apparently, there is some questioning of him regarding the

22      notes?

23             MR. TIETJEN:  Yes.

24             THE COURT:  As part of that did you learn who are

25      the various participants of these communications that he is

1    reflecting in the notes?

2          MR. TIETJEN:  I don't know if we learned that in

3    any detail or systematic way on this date in this meeting

4    who was present, on this date in this meeting who was

5    present.  I don't believe that we did, not attendance at the

6    deposition.  I don't believe that was done.

7          THE COURT:  One of the documents you are seeking

8    is document Exhibit 69 which, apparently, is a memo drafted

9    by an Equifax attorney dated April 25th of 2005 to Experian

10   regarding setting out some comments that, apparently,

11   according to the defendants, the lawyer had about Mercer's

12   draft proposal.

13         Do I have a copy of the final Mercer proposal in

14   the exhibits?

15         MR. TIETJEN:  Exhibit 12 to Ms. Kiedrowski's

16   declaration is one of the drafts that shows all of their

17   competing visions about what the agreement should include.

18         THE COURT:  Okay.

19         MR. TIETJEN:  I should tell you some time soon --

20   whether there is a final, it was the -- the final was used

21   as an exhibit in depositions.

22         THE COURT:  Okay.  You can let me know that.  Let

23   me just see here.

24         As I referenced, you submitted yesterday a

25   supplemental declaration by Ms. Kiedrowski.  There is no

1   reply memo with it.  I'm trying to understand the relevance

2   of what you submitted to me --

3            MR. TIETJEN:  Oh.

4            THE COURT:  -- why you submitted those.  Do you

5   have some cases and also some deposition testimony?

6            MR. TIETJEN:  I should have submitted a cover

7   letter, but I was out of the office when it was done.  The

8   cases are just the unpublished decision that we cited in our

9   brief.  We should have submitted those with the brief

10  itself, but we just submitted copies of those.

11            And then the other materials attached to the

12  declaration are an excerpt of Mr. Tantia's deposition and

13  two exhibits from that deposition that are referenced in

14  that transcript excerpt that show, among other things, that

15  Mr. Tantia, his notes -- what was said in the meetings do

16  not match up with the official documents that were then

17  created and produced.

18            THE COURT:  Okay.  All right.  Those are the only

19  questions I had.

20            Were you able to --

21            MS. KIEDROWSKI:  The final is not in there.

22            THE COURT:  All right.  Okay.  Let me ask you

23  before I ask you to sit down or before you do sit down,

24  there was a writing exchange between the parties with

25  respect to Exhibit 25 of Ms. Kiedrowski's declaration.  You

1    wanted me to hang on to it.  Defendants have clawed it back.

2    They wanted me to destroy it.  My question is, do you have

3    anything further to say on that issue, other than what's in

4    your letter?

5              MR. TIETJEN:  Well, when the defendants filed a

6    document on my client that we contend is privileged, I

7    believe it is just locked down.  It was not destroyed so

8    that not only the court and you have access to it, which

9    we're fine with because it's the same document, among

10   others, we gave to you for in-camera review.

11             Our position is the same should be done with

12   Exhibit 25, Ms. Kiedrowski's deposition.  From our end we

13   will handle it as we're required to under the protective

14   order.  We will destroy the copies or return them to

15   defendants, but this document now is going to be the subject

16   of another motion I'm nearly certain, and now the Court can

17   have it for in-camera review.  I explained the circumstances

18   in my letter.

19             THE COURT:  Right.  I wanted to know if there was

20   anything further you wanted to say.  All right.

21             Why don't I hear on behalf of counsel for

22   defendants.  Who will be arguing, Ms. Bonder?

23             MS. BONDER:  Yes, Your Honor.  Sorry, I have a

24   little too much to bring up here with me.

25             Would you like me to start by addressing Exhibit

1      25?

2                THE COURT:  If you have anything further to add.

3      What I have done is I have right now segregated it.  I never

4      looked at it.  It is just sitting aside.  Before I decide or

5      inform the parties what I intend to do with it, I at least

6      wanted to find out whether they had anything more they

7      wanted to say, other than what was in the written

8      communications to the Court.

9                MS. BONDER:  I just wanted to note one thing:  The

10     parties and the Court crafted a protective order to handle

11     just this sort of situation and when the -- and it provides

12     for the return of documents that have been inadvertently

13     disclosed after a party requests the return.  When it

14     happened before with Fair Isaac's document, Fair Isaac's

15     counsel called counsel for one of the bureaus and asked us

16     to send a letter to the Court requesting the return of the

17     document.  I have Mr. Morris' document for you, Your Honor,

18     that asks the Court to purge the filing and return it to

19     TransUnion, which is what plaintiffs requested.  So it was

20     not that we asked you to lock it down.  We actually asked

21     you to purge it in return, and that's what we have asked

22     here on our own behalf.

23               THE COURT:  My understanding, just so I'm clear,

24     are you asking that I return it to you or are you asking

25     that I destroy it?

1           MS. BONDER:  We would be happy with either.

2     Whichever the Court prefers.

3           THE COURT:  All right.  Let me just address that.

4     My intention is to destroy it.  I decided before I would do

5     anything further with it I would at least set it aside and

6     see if any of the parties have anything more to say about

7     it.

8           The declaration with the attached exhibits of Ms.

9     Kiedrowski, what it will have is tab 25, and there is a note

10    on it now that says destroyed pursuant to request of

11    defendants' counsel letter citing to the letter of -- the

12    letter, the initial one, that came from the Kelly Berens

13    office.  I will be destroying it after today's hearing.

14          Obviously, the defendants need to retain the

15    document, the original document, so that plaintiff has the

16    opportunity to make whatever motion they want to make with

17    respect to it, but I want to make sure the document is

18    retained by defendants and I'm ordering that, as well.  But

19    I will go ahead and destroy it.

20          There is a mechanism in place.  I recognize

21    plaintiffs will be likely asking for relief on it, but we're

22    going to follow the mechanism in place, and I am not going

23    to hold the document.

24          MS. BONDER:  Thank you, Your Honor.

25          THE COURT:  All right.  Then why don't we then go

 1      to the motion at hand here.

 2               MS. BONDER:  Yes.  Thank you.

 3               This motion, obviously, is about four particular

 4      documents, and I will just introduce them briefly.  We

 5      believe all of them are attorney-client privilege.  They all

 6      contain confidential communications to obtain or provide

 7      legal advice between lawyer and client.  We believe it's

 8      clear from the face of each of those documents that that's

 9      what it is.

10               Exhibit 41 is the notes from Piyush Tantia of MOW.

11      We have only redacted legal discussions, and it shows the

12      participants which include lawyers and it shows --

13               THE COURT:  How would I know that they include

14      lawyers?  In other words, one of the points made by Mr.

15      Tietjen is there is no affidavit that has been submitted to

16      me, as I understand it, or deposition testimony that tells

17      me who the participants of these meetings are, much less

18      what their titles are, their roles.  How would I know that

19      at least looking at the redacted version?  I assume the

20      unredacted version won't help me with that either.

21               MS. BONDER:  Correct.  There may be a case where

22      it does, but I think generally it does not.

23               Mr. Tantia did note, for example, on page 69101

24      that there was outside counsel there.  And then you

25      referred, Your Honor, to Plaintiff's Exhibit 40, which are

1    the typed-up meeting notes from the two meetings on November

2    16th, and it lists people from the bureaus.  It also lists

3    who was outside counsel present and it lists them as outside

4    counsel.

5            THE COURT:  So Exhibit 40 would tell me as to all

6    meetings for which the defendants have redacted information

7    or only certain meetings?

8            MS. BONDER:  As to the November 16th meeting.

9    Some of the redactions are actually requests for legal

10   advice.  So they say things like we need to ask the lawyers

11   about this issue or we need to ask -- so it's not

12   necessarily that a lawyer is present.  It's referring to a

13   request for legal advice.

14           So those pages do not identify to whom that advice

15   was -- I mean to whom the request was directed.

16           Other pages, I believe, do identify lawyers, but I

17   would have to go look page by page and make sure that's

18   correct.  I know it does for the November 16th meetings,

19   which are the primary ones at issue.

20           THE COURT:  All right.

21           MS. BONDER:  And I will get into more detail about

22   all of these once I talk generally about the framework for

23   the common interest as well.  But just on the

24   attorney-client privilege the -- Exhibit 69 is the memo from

25   Shawn Holtzclaw.  He is a lawyer at Equifax.  He is

```
 1    communicating legal advice to his client and Equifax

 2    executives and copies of general counsel of Equifax.  On its

 3    face it's legal advice.  It's interpreting the terms and

 4    revising terms of what will become a legally binding

 5    contract.

 6              THE COURT:  And, again, what facts do I have in

 7    front of me that the author is -- Shawn, I'm sorry,

 8    Holtzclaw, that he is an attorney for Equifax to whom he

 9    sent it?  What's the factual basis for what you just said

10    that I have in front of me?

11              MS. BONDER:  We know it's from Shawn Holtzclaw.

12    I'm looking at the document.  I apologize.

13              THE COURT:  I don't have it.  One of the things

14    you are objecting to is an in-camera review.  So I'm asking

15    what factual basis right now do I have to believe the

16    defendants' communication that in fact -- or argument that

17    this is by an attorney, who the attorney is, to whom it was

18    directed?

19              MS. BONDER:  Would you mind if I hand up the

20    documents to you for in-camera review?

21              THE COURT:  I wouldn't mind.  In fact, I think I

22    was going to order it.

23              MS. BONDER:  I think it would be helpful to our

24    discussion.  I arrived earlier assuming, as we did last

25    time, to give you the documents ahead of time.  I probably
```

1    should have sought you out.

2             Anyway, the Equifax internal memorandum is from

3    Shawn Holtzclaw.  It clearly is legal advice.  I can't tell

4    you right now that it identifies him as a lawyer.  But I can

5    certainly state in my place as an officer of the court that

6    he is a lawyer for Equifax.

7             THE COURT:  In-house or --

8             MS. BONDER:  In-house, inside lawyer.  He is

9    directing the memo to Paul Springman, who is an Equifax CEO,

10   and Ken Mast, and Dana Wiklund.  Ken Mast is the general

11   counsel at Equifax.

12            THE COURT:  Again, I haven't looked at it.

13            MS. BONDER:  It should be the second one in there.

14            THE COURT:  Right.  But, in other words, looking

15   at the document, Mr. Springman, I would not know his title,

16   correct, nor Ken Mast, nor Dana Wiklund?

17            MS. BONDER:  That's true.

18            THE COURT:  Paul Springman is who?

19            MS. BONDER:  CEO/Chief Marketing Officer.

20            THE COURT:  Who is Ken Mast?

21            MS. BONDER:  The general counsel.

22            THE COURT:  Who is Dana Wiklund?

23            MS. BONDER:  He was previously the Vice President

24   of Predictive Sciences.  He is a former employee at this

25   point.  At that point he was Vice President of Predictive

1    Sciences of Equifax.

2              THE COURT:  Predictive Sciences is what?

3              MS. BONDER:  A scoring division within Equifax.

4              THE COURT:  He is an employee in Equifax?

5              MS. BONDER:  Yes.

6              THE COURT:  His role in that division is what?

7              MS. BONDER:  He was in charge of the division that

8    created -- that developed new credit risk scoring models

9    that controls and owns the proprietary Equifax credit

10   scoring models, that develops them, and that consults with

11   the salespeople when they are trying to consider adopting a

12   new credit risk scoring model.

13             He was also one of the team leaders on Project

14   Trident for Equifax or he really was the team leader,

15   actually, for Equifax with Trident on the joint scoring

16   project.

17             The anti-trust guidelines are Exhibit 71.  They

18   are clearly a draft.  It says, "draft."

19             THE COURT:  As I understood defendants' position,

20   they were willing to produce Exhibit 71.

21             MS. BONDER:  So maybe we don't need to discuss it.

22             THE COURT:  I don't think we do.  I would suggest

23   that the defendants think about -- apparently, there are

24   other draft guidelines out there.

25             MS. BONDER:  I don't know one way or the other.

```
1           THE COURT:  All right.  I would certainly suggest

2      that -- let me go beyond suggesting.  With respect to

3      Exhibit 71, I consider that issue resolved --

4           MS. BONDER:  Okay.

5           THE COURT:  -- based on the representations of

6      defendants in their brief and plaintiff's counsels'

7      presentations.

8           Having said that, I am going to require that

9      defendants talk among themselves as to whether there are

10     other draft guidelines that exist that have not been

11     produced and whether defendants are willing to produce

12     those, and if they are not to notify plaintiffs.  And I

13     don't know whether they are on a privilege log or not, but

14     if you are going to say you are not producing them because

15     they somehow contain privileged information, it seems to me

16     that plaintiffs need to understand why it is you are

17     withholding those other draft guidelines, what's the basis

18     in other words.  I think you need to provide them with the

19     date, who drafted them, who received them, if they were

20     distributed, to whom they were distributed.

21          MS. BONDER:  If we have withheld draft guidelines

22     purposefully, as opposed to this one which we meant to

23     withhold and inadvertently produced, they are on a privilege

24     log and should identify those things.  I understand what you

25     are saying.  We will make it happen.
```

1          THE COURT:  It's important for plaintiff to

2     understand and to raise this with the Court, why you are

3     treating this draft guideline differently, in other words,

4     why you are willing to produce this draft guideline and not

5     others as well.

6          MS. BONDER:  I think it will require a

7     document-by-document review exactly what statements are

8     contained in there, what is the privilege there for each

9     statement.  So I just can't do it off the cuff.  I

10    understand.

11         THE COURT:  No, I understand that.

12         MS. BONDER:  Okay.  And then so we have three

13    documents.

14         So the last one, Your Honor, is Exhibit 89, which

15    you should have in front of you.  That is an e-mail chain.

16    In the e-mail Mr. Oliai who is an executive at Experian,

17    says after discussing this with my legal counsel.  So if you

18    refer up, he is referring to facts he told his legal counsel

19    to obtain legal advice.  If you refer down from after

20    discussing this with my legal counsel, he relays the key

21    patents for Project Trident that he received.  I was

22    planning to discuss that in more detail in just a moment.

23    In our view on the face of this document it contains

24    privileged information that was inadvertently disclosed.

25         THE COURT:  And, again, I want to make sure that I

1    understand who the various recipients of this e-mail are or

2    string of e-mails.  I don't believe at least in terms of the

3    factual presentation that the defendants have given me that

4    I would have any understanding of what the various roles of

5    these individuals are.  For example, I don't have an

6    affidavit from Mr. Oliai indicating that he was passing on

7    advice of counsel, who the counsel was, what it was in

8    response to, whatever communication.  I have your brief that

9    says that, but I have no sworn testimony, as I recall, by

10   affidavit, declaration or otherwise to establish those

11   facts.  Am I correct about that?

12            MS. BONDER:  You are correct, Your Honor.  We felt

13   like the privilege was obvious on the face of the document,

14   but we also had a severe time constraint in pulling together

15   the brief.  As you may recall, you were able to give us a

16   two-day extension but not any more.  It was over the holiday

17   weekend.  All of us were on the road in depositions

18   practically every day.  For example, when their motion came

19   in I was in Minneapolis taking a deposition, the next day

20   flew back.  When it was due, I was in Minneapolis for three

21   days.  All of us have been constantly on the road.  So I

22   apologize.  But I hope that you will not let this prejudice

23   our clients' interest.  If you think declarations are

24   necessary, we could get them to you promptly.

25            The defendants, the credit bureaus, were clearly

1    engaged in a common interest.  They had -- the question, in

2    our view, is when did it begin.  The plaintiffs try to claim

3    that there was no common interest until there was a signing

4    of a joint venture agreement.  They mention that as one

5    factor that weighs in favor of a common interest agreement,

6    but in fact they cited no case that says there has to be a

7    joint venture agreement in order for there to be a common

8    interest agreement.  I doubt there is such a case.

9         The plaintiffs' own description of the facts in

10   their brief show that there was a common interest among the

11   credit bureaus throughout 2005 that began discussing joint

12   development in late 2004.  They decided to move forward with

13   the joint development project.  They entered into a common

14   interest agreement which was effective in February of 2005.

15   They held these meetings in February of 2005, February 16th

16   and February 25th, at which -- both of which they affirmed

17   their commitment to this joint development project.  They

18   jointly decided to retain MOW.  They signed a

19   confidentiality agreement with MOW effective February 25th

20   where all the bureaus and M OW agreed to maintain the

21   confidentiality of the development project.

22        THE COURT:  Do I have that confidentiality

23   agreement that was signed by all the parties around that

24   time period as either part of plaintiffs' exhibits or your

25   exhibits?

1          MS. BONDER:  I think the answer is yes.  Let us

2     look for a moment.  I will try to get you the exhibit

3     number, but I believe so.  It is cited in plaintiff's brief

4     so I believe it is an exhibit to their brief.

5          Then the development phase began officially, that

6     is the day-to-day work on the development, began in mid-July

7     of 2005, went through December of 2005.  During that period

8     the credit bureau team members, and there were three from

9     each credit bureau who were assigned to Project Trident,

10    they worked on a daily basis all day in an office obtained

11    in Atlanta just specifically for that purpose.  So they

12    literally were working alongside each other during that

13    entire period.  MOW was also working alongside them during

14    that time period and was clearly a part of that common

15    interest.  Under the Eighth Circuit standard that is a

16    common interest.

17         Mr. Tietjen says that we just ignore the

18    Whitewater-Clinton case, but that's not true.  Our brief is

19    based on the elements of a common interest as set forth in

20    that Eighth Circuit case.

21         THE COURT:  But let me ask you, what you have

22    described -- let's assume there is a common interest, but

23    what you have described is a common business interest, in

24    other words, to develop and determine whether to enter into

25    a joint business venture, a joint commercial venture.

1          What I am not hearing is that there is a common

2     legal interest which, as I recall, is what drives the Common

3     Interest Doctrine in order to determine whether

4     attorney-client communications between and among third

5     parties are going to be -- whether there is going to be a

6     waiver or whether there is going to be -- this is going to

7     be the exception.  I'm not hearing the common legal

8     interest.

9          What I am hearing is a common business and

10    commercial interest.  And certainly if it -- while there may

11    be legal issues that come up from time to time on that

12    commercial venture that's being explored by the bureaus, I'm

13    certainly not hearing that that is the predominate interest.

14    Unlike, for example, if you all, as you have now, been sued

15    clearly you have a common legal interest and I don't have --

16    certainly don't believe that you need a written document to

17    reflect your common legal interest which is to jointly

18    defend against this lawsuit.  But I'm not hearing the common

19    legal interest in terms of the activities of the bureaus

20    during this time period when these four documents are being

21    generated.

22          MS. BONDER:  Well, first, I think Mr. Tietjen is

23    setting forth a false premise that it has to be a legal only

24    interest or primarily a legal interest.  He cites cases

25    outside of the Eighth Circuit for that proposition, but

 1    within the Eighth Circuit the laws *In re Grand Jury Subpoena*

 2    *Duces Tecum*, the *Whitewater* case, and there the court says

 3    the common interest may be either legal, factual or

 4    strategic in character.  That's the standard in the Eighth

 5    Circuit.

 6          There are other cases that talk about how there

 7    can be a commercial side to a common interest, it can be a

 8    commercial venture, you know, outside the Eighth Circuit.

 9    But if it's the proper subject for communication with

10    attorneys for purposes of seeking and obtaining legal

11    advice, then it's a subject of common interest.  Then it is

12    a common interest.

13          I was quoting the *Fresenius* case from 2007 in the

14    Southern District of Ohio.  Here there is no doubt there was

15    a commercial interest among the bureaus to create the new

16    scoring model, but given that it was a collaboration among

17    competitors is not surprising that they also shared a keen

18    legal interest in making sure that there were no violations

19    of the anti-trust laws, that there were no violations of the

20    intellectual property laws, that there were no violations of

21    their property obligations.  This commercial interest was a

22    proper subject for legal advice.  In fact, the bureaus had

23    to have legal advice in connection with their common

24    commercial development project.  When that is the case,

25    courts have held that there is a common interest.  But,

1   again, the case in the Eighth Circuit, the Whitewater case,

2   says it can be legal, factual or strategic in character.

3          Prior to today plaintiff cited only a 1974 South

4   Carolina case on their point that anticipation of litigation

5   is required for a common interest privilege to apply.  Today

6   they have brought the Santa Fe case and I, unfortunately,

7   did not get a chance to read it, but as I understand it,

8   there was no joint activity prior to litigation.  That is,

9   there was no evidence that the parties had engaged in a

10  joint venture or a common endeavor where their interests

11  were aligned.  In fact, the only possible reason for

12  claiming a common interest was the anticipation of

13  litigation.  That's all they had.  And as I understand it,

14  the document in question was created in 1991 and they were

15  claiming anticipation of litigation that wasn't brought

16  until 2000.  So it's not surprising that that common

17  interest didn't work out for them.

18         The majority of cases hold that the common

19  interest is an extension of the attorney-client privilege

20  and because the attorney-client privilege is not limited to

21  litigation or anticipation of litigation but it is much

22  broader for just when you need legal advice, so is the

23  common interest privilege.

24         The Eighth Circuit case that controls on the

25  common interest issue refers to the fact that the Common

 1    Interest Doctrine expands the coverage of the

 2    attorney-client privilege.  It doesn't talk about limiting

 3    it in any way.  The Fourth Circuit in in re --

 4          THE COURT:  The Eighth Circuit case that you are

 5    citing to there is which one?

 6          MS. BONDER:  It is the 1997 In re Grand Jury

 7    Subpoena Duces Tecum.  It is 112 F. 3rd 910, same case that

 8    Mr. Tietjen is referring to.

 9          The Fourth Circuit says the same thing, extends

10    the attorney-client privilege and no anticipation of

11    litigation is required.

12          The Seventh Circuit says the same thing in the

13    case the plaintiffs relied on Sulfuric Acid, which is a

14    district court case, its extension of the attorney-client

15    privilege.  And because the attorney-client privilege is not

16    limited to litigation, neither should its extension be.

17          Finally, another one of plaintiff's cases in the

18    Baxter trial, Nollans, it says although a community of legal

19    interest usually arises between parties engaged in or

20    anticipating imminent litigation, litigation or impending

21    litigation is not a prerequisite for the existence of

22    community of legal interest -- of a community of legal

23    interest.  That is just a false premise.  That is not the

24    law in the Eighth Circuit.  And it may not the law anyplace

25    other than the Fifth Circuit.  I understand they are an

1    outlier on this issue, but I don't know for sure whether

2    others follow that or not.

3           Plaintiffs cite to other non-Eighth Circuit cases

4    about interest being identical.  Here the interests were

5    identical.  That is, the interests were in establishing --

6    developing and then establishing a new credit risk scoring

7    model that was legal.  If there was no legal process and if

8    the output was not legal it, of course, would not be a

9    successful commercial venture.  That was part of their

10   common interest.  And their interest in that joint model was

11   identical.

12          The fact that the bureaus gave comments on an MOW

13   proposal that differed with each other is irrelevant.  They

14   were allowed to discuss with each other what would be their

15   view to MOW, what would be their final jointly delivered

16   comments to MOW.  In fact, they did that in a meeting in

17   June, 2005.

18          Mr. Tietjen or, actually, Mr. Tietjen's partner

19   deposed the MOW partners on that meeting.  One of them was

20   just on Friday regarding that meeting, and the bureaus gave

21   MOW their collective thoughts on the proposal and ultimately

22   a June 15, 2005 proposal resulted, which I have here.  I

23   know you were asking if you had it in connection with the

24   Shawn Holtzclaw memo providing comments on an earlier draft

25   of this.  This is the final.  It has been an exhibit in

```
 1    depositions plaintiffs have taken.  I would be happy to hand

 2    you it.

 3             THE COURT:  It is not currently in submissions of

 4    plaintiffs or defendants, right?

 5             MS. BONDER:  I don't think it is.

 6             What is currently an exhibit is the March 31

 7    proposal that MOW submitted to the bureaus, but it's all

 8    black lined and has, you know, electronic comments in it

 9    from the bureaus to MOW.  That's the collective comments of

10    the group that were delivered to MOW.  This is what resulted

11    from those collective comments.

12             THE COURT:  This is the final verse.

13             MS. BONDER:  This is the final verse, right.

14             THE COURT:  I would like to have a copy.  What is

15    the number in terms of deposition numbers?  It is

16    Plaintiff's Exhibit number -- in whose deposition was it

17    submitted?

18             MS. BONDER:  It was, I believe, in Peter Carroll

19    and Piyush Tantia, the MOW partners.

20             Would you like me to hand it up?  I have two

21    copies.

22             THE COURT:  Sure.

23             MR. TIETJEN:  Can you provide me with the Bates

24    numbers?  I think they are different copies that you just

25    gave, aren't they?
```

1              THE COURT:  This one starts with MOW-FICO 1544.

2              MS. BONDER:  I gave you two different Bates

3      numbers.  I apologize.  There are several different copies

4      of the same documents that are produced, and there were also

5      several different versions.  So it is MOW-FICO-1544.

6              THE COURT:  So is this the final version or is it

7      not?  When you say there is "different versions" --

8              MS. BONDER:  This is the final version.

9              THE COURT:  There are not different versions of

10     the final version?

11             MS. BONDER:  There are.

12             THE COURT:  Okay.

13             MS. BONDER:  I believe there is another version of

14     the final version.  It was a draft and this resulted.

15             THE COURT:  So this is the final final version?

16             MS. BONDER:  That is the final, final, final.

17     That's my understanding.

18             All right.  So with respect to the commonality of

19     interest and having differing views on a particular

20     proposal, that is Equifax's view that this, were it needed

21     to be changed, was not the same word Experian's counsel

22     suggested needed to be changed, that did not render their

23     common interest a divided interest.

24             The McPartlin case, Seventh Circuit, 1979 says the

25     common interest privilege is not limited to situations where

1    the positions of the parties are compatible in all respects.

2    In that case they upheld the privilege even though the

3    co-defendant sought a separate trial due to claimed

4    conflicts of interesting.

5           In re mortgage and realty trust, which is the

6    Southern District of California, 1997 case says the common

7    interest does not require complete unity interest among

8    participants.  The privilege applies where -- even where the

9    -- I apologize.  In re:  Mortgage and realty trust, Central

10   District of California, 1997, it says that it does not

11   require, that is the common interest does not require, a

12   complete unity of interests among the participants.  The

13   privilege applies where the interests of the parties are not

14   identical and it applies even where the parties' interests

15   are adverse in substantial respects.  That case was related

16   to a bankruptcy debtor and creditors' committee having a

17   common interest.  Again, the creation of a joint venture is

18   not required for a common interest.  There is no case that

19   says it was.

20          You know, while there may have been a common

21   interest as of the signing of the joint venture agreement,

22   and we would argue that certainly it extended through and

23   beyond that time period, in 2005 the parties were engaged in

24   a joint development project and that project required joint

25   legal advice to insure the legality of the process, to

 1    structure and plan for a new product launch and to determine

 2    patentability.

 3            THE COURT:  What are you referring to here?  Are

 4    you reading when you talk -- is this --

 5            MS. BONDER:  I am not citing a case.

 6            THE COURT:  You are not citing a case.  Are you

 7    citing some testimony or something out of a document as to

 8    what the purpose of the joint venture was or is it just your

 9    summary of it?

10            MS. BONDER:  It's just my argument.

11            THE COURT:  You refer to this joint venture or

12    some sort of joint commitment agreement or common interest

13    agreement that was entered into by the bureaus, I believe,

14    in the middle of February of 2005.

15            MS. BONDER:  It was effective in February of 2005.

16            THE COURT:  Effective as of that date which, on

17    the one hand, you indicated was irrelevant to my analysis

18    but, on the other hand, offered it for an in-camera review.

19    If you could speak to that issue.

20            MS. BONDER:  Well, I think the point about it

21    being irrelevant is just that you don't need a writing to

22    reflect a common interest agreement.  It can exist without a

23    writing, just like a joint defense agreement can exist

24    without a writing.

25            THE COURT:  Do you have a copy of that with you as

```
 1    well?

 2              MR. MAULDIN:  We do, Your Honor.  I believe it is

 3    Exhibit 10 to the Kiedrowski declaration.

 4              MS. BONDER:  That's the confidential agreement

 5    which I think you asked about.

 6              THE COURT:  I was asking in regard to the common

 7    interest agreement that was signed or entered into by the

 8    parties in which you offered it up as a footnote 7,

 9    defendant's common interest agreement has been withheld from

10    production because it's irrelevant, protected by attorney

11    client and common interest privileges, but you would produce

12    it if I wanted it for an in-camera review.

13              MS. BONDER:  Sure.  We are still, obviously,

14    claiming privilege as to that document.

15              THE COURT:  Yes, I understand.  The record will

16    reflect it has been handed to me, the common interest and

17    joint defense agreement that was entered into as of February

18    15, 2005, a copy of that document along with the other

19    documents which are the subject matter of this motion for

20    relief for an in-camera inspection and have not been

21    provided to plaintiffs at this point.

22              Go ahead.

23              MS. BONDER:  Why don't we, if you don't mind, turn

24    to Exhibit 41 to look at that specifically.  Exhibit 41 are

25    the notes of Piyush Tantia, a partner at MOW who was working
```

1   practically, if not completely, full time on the joint

2   project part of Trident of the bureaus.

3            The document contains notes from various meetings

4   that are not in perfect order clearly.  They are sort of

5   interspersed in places.  And it also contains other

6   documents that are attached; an agenda, e-mail chart.  It's

7   sort of a confusing document.  But the meetings that are

8   reflected in the document run from June, 2005 to November,

9   2005.

10           THE COURT:  All right.  And the redacted version,

11  just so I'm clear, of Exhibit 41 that you then ultimately

12  did provide to plaintiffs is what exhibit number so that if

13  I am comparing the two --

14           MS. BONDER:  I think it is 40.

15           THE COURT:  You refer to Exhibit 40 a little

16  differently.  I wanted to make sure I understood.

17           MS. BONDER:  Sometimes we are referring to

18  plaintiff's Deposition Exhibit 40, which are the

19  non-privileged, produced, typed-up meeting notes of the

20  November 16, 2005 meeting.

21           THE COURT:  All right.

22           MS. BONDER:  That is also attached as Exhibit 4.

23           THE COURT:  Exhibit 4 to which affidavit or

24  declaration?

25           MS. BONDER:  Exhibit 4 -- which did that come

 1    from, plaintiff's?

 2              MR. MAULDIN:  Yeah.

 3              MS. BONDER:  I think it is the plaintiff's motion,

 4    excuse me.

 5              THE COURT:  So Exhibit 4 is Plaintiff's Exhibit 4,

 6    Deposition Exhibit 41 (sic) which is the typed-up version of

 7    the notes?

 8              MS. BONDER:  It is Deposition Exhibit 40, not 41.

 9    That is the one that lists the outside counsel present at

10    those November 16, '05 meetings.

11              And I misspoke.  The redacted version of Exhibit

12    41, that is -- the redacted version of the handwritten notes

13    is Plaintiff's Exhibit 155.  And it is attached as Exhibit 6

14    to plaintiff's motion.  Is that where it's attached?

15              MR. TOTO:  I believe that is the reply.

16              MS. BONDER:  Oh, it must be to the reply.

17              THE COURT:  The supplemental affidavit that was

18    provided to me by Ms. Kiedrowski, is that what you are

19    saying?

20              MS. BONDER:  Yes.  Yes.  I apologize.

21              THE COURT:  All right.  So plaintiff's

22    supplemental Exhibit 6 is the redacted version of the

23    handwritten notes that plaintiffs are seeking as Exhibit 41,

24    correct?

25              MS. BONDER:  Yes.  Yes.  And this is the document

1    that -- or one of the many documents that plaintiff's

2    counsel examined Mr. Tantia, the auther of the notes, about

3    in his deposition last week.

4            THE COURT:  The redacted version?

5            MS. BONDER:  Yes.  Yes.

6            So it's important to note that the defendants have

7    not been trying to go beyond what is clearly attorney-client

8    privileged communications.  That is, you may recall in

9    plaintiff's document where defendants brought a motion to

10   compel a document and we were in front of Your Honor a

11   couple of months ago or on that motion to compel, Fair Isaac

12   was claiming privilege as to all documents related to a

13   particular scoring project that they had.  Regardless of

14   whether the statements actually contained attorney-client

15   privileged statements, they said that all of it was too

16   intertwined, the legal issues were too intertwined with

17   business issues.  And they were claiming privilege on not

18   just that document, but all documents relating to that

19   particular scoring strategy project.  We are not doing that.

20   We are claiming privilege just on the statements that

21   reflect attorney-client privileged communications.  That may

22   be why Mr. Tietjen is focused on a legal basis for a common

23   interest when the Eighth Circuit doesn't require it.  They

24   have gone way beyond just legal, and so they are interested

25   in making sure that there is some ground for the common

 1    interest or else it could be anything.  Here we're only

 2    talking about the legal part of the common interest.  That's

 3    all we're redacting.  In fact, we have produced thousands,

 4    maybe hundreds of thousands of pages related to Project

 5    Trident.  We produced 2.3 terabytes of documents and data

 6    from the development process and that included MOW meeting

 7    notes, draft meeting notes, agendas and their drafts,

 8    presentations to the teams, presentations to more senior

 9    members of the credit bureaus.  It included paper documents

10    and electronic documents.  We were not trying to hide

11    anything, and we have not hidden behind the privilege in

12    that situation.

13         The redacted portions of Mr. Tantia's notes of

14    Exhibit 41 reveal what we consider to be legal advice and

15    those are the only portions that we redacted.  It talks

16    about the LLC structure and role, who should be the owner of

17    the algorithm, the permissible education, sales and

18    marketing of the joint product.  That's all pages 6, 9, 113,

19    69117 to 69118.

20         THE COURT:  Of the unredacted version.

21         MS. BONDER:  That we have handed up in camera.  It

22    talks about intellectual property issues at 69110.  It

23    includes questions from the non-lawyers that are reflected

24    there saying things like what can we legally do, what are

25    the real options.  Those questions are followed by legal

1    advice that clearly touch on matters like anti-trust,

2    intellectual property, contract, Fair Credit Reporting Act

3    issues.  Our view, on its face those portions are

4    privileged.

5         We believe the common interest likewise applies,

6    the common interest being extension of the attorney-client

7    privilege, because it relates to these portions related to

8    legal advice about the joint project.  It's relevant to all

9    the members of the joint project and the project manager so

10   that they can put in place a permissible process, follow

11   through with a legal process and produce a scoring model

12   that doesn't violate the laws, all legal matters common to

13   the Project Trident participants.

14        And, as I have said, plaintiffs have deposed the

15   author of this document.  They have deposed another partner

16   at MOW, Peter Carroll.  They have deposed many of the

17   participants in these meetings that are reflected, and other

18   depositions of the participants in these meetings are to

19   come.  The final meeting notes that are a typed-up version I

20   have mentioned have been produced.  The agendas have been

21   produced.

22        My point is there are a myriad of documents that

23   relate to these meetings.  No one is trying to withhold the

24   facts related to these meetings.  Nobody is trying to

25   withhold what was discussed at these meetings.  They can

 1    obtain that information through the depositions and through

 2    the many other documents that relate to all these different

 3    meetings.  All we're trying to redact are the actual

 4    attorney-client privileged communications.

 5          If you don't have any more questions, I will move

 6    to the next document.

 7          THE COURT:  Let me just see.  No.  Go ahead.

 8          MS. BONDER:  Okay.  I will turn to Exhibit 69,

 9    which is the Holtzclaw memo to Paul Springman and others.

10          What this document reflects is comments, as it

11    says, to the Mercer proposal dated March 31, 2005.  This

12    document is dated April 22, 2005.  It's clearly during the

13    scope of the common interest, and it is an Equifax lawyer

14    giving his comments on a legally-binding contract to Equifax

15    personnel.

16          The June 15th proposal that I have handed up to

17    Your Honor, that was the final of the document that's being

18    commented on here was actually attached to the MOW agreement

19    and the statement of work.  It specifically references the

20    June 15, 2005 proposal and incorporates it herein.  We will

21    find that agreement, but it's in the exhibits that have been

22    produced to you.

23          THE COURT:  Say that again.  Attached to Exhibit

24    69 was what?

25          MS. BONDER:  Exhibit 69 is commenting on a draft

```
1    proposal.

2              THE COURT:  Yes.

3              MS. BONDER:  The final of that proposal, June 15th

4    proposal --

5              THE COURT:  Is the one you have given me.

6              MS. BONDER:  -- was attached and incorporated in

7    reference between the bureaus and MOW.  It became part of

8    that contract.

9              THE COURT:  I see.  All right.

10             MS. BONDER:  My only point there is these are

11   comments on a contract, on what would ultimately be a

12   legally, binding contract.

13             Because commenting on contracts that set forth the

14   rights and obligations of parties is typical of lawyer

15   services, it is attorney-client privileged.  It doesn't

16   include legal research, but that's not the standard for what

17   is legal advice, and there are cases that say that.  The

18   Rossi case, for example, in New York, 1989 says it doesn't

19   -- the fact that it doesn't reflect legal research is not

20   determinative.  Where the communication concerns legal

21   rights and obligations and where it evidences other

22   professional skills, such as lawyer's judgment and legal

23   strategies, it is privileged.

24             And, again, we did not withhold our collective

25   comments.  Plaintiffs make some suggestion that we are
```

1    trying to claim privilege on negotiations with MOW, but in

2    fact we produced our collective comments on their proposed

3    draft that we gave to MOW.

4         The common interest applies because this is part

5    of the bureau's formulating a joint legal strategy for

6    responding to the MOW proposal.  Once they did that they

7    turned over their joint comments to MOW and those were

8    produced.  But this is no different from a contract being

9    circulated internally on a privileged basis with comments,

10   and then once it gets forwarded to the other side, it's

11   produced.  But that doesn't mean that the comments on the

12   contract that were kept internally among the privileged

13   group were somehow waived.

14        In the Weeks case that the plaintiffs cited in the

15   last round of briefing, 1996 Westlaw 2885, a matter

16   committed to a professional legal adviser is prima fascia so

17   committed for the sake of legal advice and is, therefore,

18   within the privilege.  And then there are several cases that

19   we cited in our brief that talk about as long as the legal

20   advice is predominate it doesn't have to be solely legal

21   advice.  Here I think it is solely legal advice.

22        If you don't have any further questions on that, I

23   will turn to the next one.

24        THE COURT:  No, I don't.

25        MS. BONDER:  Okay.  We will skip the anti-trust

1    guidelines and move to Exhibit 89, which is a series of two

2    e-mails.  In this e-mail, as I mentioned earlier, Stan

3    Oliai, who is an executive at Experian, and you can see that

4    from his e-mail address, discusses something at the top and

5    then begins to talk about the patents that the joint

6    venture, that the common project, the Project Trident could

7    obtain on the new scoring -- credit risk scoring model that

8    they had just created.  You will see midway through the

9    redaction it says, "After discussing this with my legal

10    counsel."  If you look above that --

11            THE COURT:  I'm sorry, which page am I on?

12            MS. BONDER:  The -- I'm sorry, the second page of

13    that exhibit.  And the "please let me know your thoughts" is

14    not redacted but the lines above that are.  So if you look

15    above "after discussing this with my legal counsel," it

16    discusses patent ideas and Experian's view of what the joint

17    venture, the project, Trident, could obtain as patents.  And

18    then after that statement, "after discussing this with my

19    legal counsel," he relays the real advice he receives

20    regarding Project Trident's patents.

21            So both of those, before and above that statement,

22    are privileged because they reflect confidential

23    communications to an attorney for purposes of obtaining

24    legal advice and then they relay the legal advice.

25            In the Eighth Circuit under Zion, clients'

 1   statements that disclose legal advice are privileged.  And

 2   this is, obviously, relevant to the common interest because

 3   it's relevant and actually it directly addresses the Project

 4   Trident patents, what can the project, the joint project,

 5   obtain as patents.

 6           THE COURT:  I can see the language on page 5,

 7   68121 that says, "After discussing this with my legal

 8   counsel," and then goes on to express Experian's views on

 9   things, what you are saying is the result of advice by legal

10   counsel; is that right?

11           MS. BONDER:  Yes.

12           THE COURT:  All right.  And then you -- the next

13   piece, as you said, and then it goes on to describe what he

14   intends to do with that legal advice; is that what you are

15   saying?

16           MS. BONDER:  No, I'm saying that after the, "after

17   discussing this with my legal counsel" statement, all of

18   that is relaying what he learned from his legal counsel.

19           THE COURT:  Everything after that?  All right.

20           MS. BONDER:  Yes.

21           THE COURT:  You are saying everything above that

22   line that says, "after discussing this with my legal

23   counsel" -- what are you stating that represents?

24           MS. BONDER:  Do you see where it says, "competes

25   with the new score" at the end of the top paragraph there on

1       the second page?

2                   THE COURT:  Yes.

3                   MS. BONDER:  After that, not including "competes

4       with the new score," but after that, all of that appears to

5       be facts that he told his legal counsel in order to obtain

6       legal advice.

7                   THE COURT:  How would I know that looking at this

8       document?

9                   MS. BONDER:  Well, in my view when he says, "after

10      discussing this with my legal counsel," he is referring to

11      what he said right above.  That's what this refers to.

12                  THE COURT:  Okay.

13                  MS. BONDER:  Okay.  One more thing we have to

14      discuss with respect to Exhibit 41 and that is the role of

15      Mercer Oliver Wyman.  As you mentioned earlier, the Mercer

16      Oliver Wyman is the only one of these documents that's --

17      Exhibit 41 is the only document that has been claimed to be

18      shared by Mercer Oliver Wyman.  In fact, it was created by

19      Mercer Oliver Wyman discussing meetings and rationale for

20      the modeling decision was one of the roles MOW had as

21      project manager for Project Trident.  They were literally in

22      the same room with the development team day after day model

23      building and project management and discussing their

24      expertise in the industry.  Mr. Tantia so testified.  They

25      were obligated to confidentiality, as you have seen in the

1    confidentiality agreement that has been submitted.  And,

2    frankly, we would not have shared these kinds of

3    communications if they weren't necessary to their role for

4    the project.

5            In Exhibit 41 they were given legal advice, along

6    with the development team, because as part of their job they

7    had to implement a process that did not violate the laws;

8    otherwise, they did not produce a successful credit risk

9    scoring model.

10           In re Bieter, an Eighth Circuit case from 1994, is

11    directly on point here.  In that case Klohs, who was not an

12    employee but was a consultant to the company, Bieter, is

13    acting on behalf of the company.  The court noted that he

14    was intimately involved in the company's sole objective,

15    which was the development of a real estate project.  He was

16    involved on a daily basis.  He was an independent contractor

17    just like MOW's agreement says that it is on behalf of the

18    company.  MOW was likewise intimately involved in the sole

19    objective of the project.  And the court said that although

20    he was not an employee of the company, he could be

21    considered a representative of the company for purposes of

22    the anti-trust -- attorney-client privilege, and the court

23    deemed him the functional equivalent of an employee.

24           And a representative of a client for purposes of

25    legal privilege include non-employees who possess a

1    significant relationship to the client and the client's

2    involvement in the transaction that is the subject of legal

3    services.  I'm quoting from the Bieter case.

4         So the Bieter case considered whether the

5    communications at issue were, in fact, legal communications,

6    the provision or obtaining of legal advice, and the court

7    found that the communications at issue were legal advice and

8    it made the statement when a matter is committed to a

9    professional legal advisor, it is prima fascia for legal

10   advice and in the privilege absent showing to the contrary.

11   That is a quote from the Eighth Circuit case.  Here our

12   communications in the three documents are legal

13   communications and the only ones redacted in Exhibit 41 are

14   attorney-client privilege communications.

15        The court assumed that the independent contractor

16   in that case was part of those conversations because it was

17   directed by the superior.  And we can make that same

18   assumption here because MOW was in the room with the credit

19   bureaus hearing the legal advice from the credit bureaus'

20   lawyers as part of his duties.  And that was the next factor

21   that the court considered, is whether the subject of the

22   communications were within the scope of the agent's duties.

23   And the court said, well, because the independent

24   contractors' duties are actually coterminous with the

25   objectives of this company, then they necessarily fall

 1        within the duties.

 2              We have the same situation here.  MOW's duties

 3        were coterminous with the objectives of Project Trident.  So

 4        the communications necessarily fell within their role.  They

 5        were the project manager asked to run the project and make

 6        sure it got done.

 7              And, finally, the court looked at confidentiality

 8        and said the confidentiality requirement exists as an

 9        indication of the intent of the client and the attorney to

10        keep a communication confidential.  And the court concluded

11        that the communications were kept confidential.  There was

12        no evidence that they were not.  It was just that counsel

13        and the company and the independent contractor who were

14        involved in these communications, and the same is true here,

15        it is just the bureaus, and MOW, and the lawyers.  We see

16        that from the face of the document and from Exhibit 40 where

17        it lists again the participants in the meeting.

18              One case that I will also refer to is JP Morgan

19        case, which is a case that the plaintiffs rely on on the

20        common interest.  It is really not relevant to our situation

21        on the common interest issue because in that case they were

22        pre-merger discussions between JP Morgan and Bank One.  They

23        were on opposite sides of the transaction.  The court noted

24        that if one succeeds in getting its best deal, then the

25        other one necessarily suffers and, therefore, their

1    interests are adverse because it's a pre-merger agreement.

2    Then the court said once the parties' interests were aligned

3    so an agreement was signed, then they did share a common

4    interest in insuring that the merger met regulatory

5    conditions and that the merger was approved.  And that was

6    enough of a legal interest for them to share a common

7    interest there.  But the reason I cite it in connection with

8    MOW is because there was a consultant in that case, an

9    investment adviser.  It was another JP Morgan entity, JP

10   MSI.  The court said even if we assume that JP --

11            THE COURT:  Go slower.

12            MS. BONDER:  So if we consider this consultant as

13   an independent third party because it was involved in

14   providing advice that was held in confidence by the proper

15   recipients and its task was to use the knowledge that JP

16   Morgan's attorneys gave to it in order to provide investment

17   advice regarding the merger, it was within the privilege.

18            So that seems directly analogous to MOW's role.

19   They are also within the privilege.  They need this

20   information in order to be able to provide their services to

21   Project Trident.

22            Lastly, Your Honor, the plaintiffs claim that we

23   waived the privilege in Exhibit 41 during a deposition of

24   Mr. Carroll.  I would note that we have a protective order

25   that deals with the inadvertent disclosure of privileged

 1    documents.  It requires a prompt return of the inadvertent

 2    documents that have been disclosed and it requires the

 3    return of the documents.  Once that has been accomplished,

 4    the protective order says specifically there shall be no

 5    waiver or subject matter waiver as a result of the

 6    inadvertent disclosure.  I believe under the protective

 7    order it just was the recall of the document promptly made

 8    upon discovery.

 9            The defense counsel were not expecting Exhibit 41

10    to be presented at Mr. Carroll's deposition.  When they

11    looked at it, they did not immediately recall it.  As you

12    can see, it is a long, handwritten documents.  It's

13    difficult to read.  The dates are on different pages.  The

14    defense counsel tried to read it during the deposition so as

15    not to interrupt the flow, and it took them 15 minutes to

16    make the determination that it was likely privileged.  They

17    then stopped the deposition.  They met for eight minutes.

18    They came back and clawed the document back.  There was

19    certainly no intention of waiving any privilege on Exhibit

20    41.

21            I'm happy to talk about that further if you would

22    like.

23            THE COURT:  No, I don't think it's necessary.

24            MS. BONDER:  Okay.

25            THE COURT:  I would like a copy of that segment of

1    the transcript from, I think it is, Mr. Carroll's deposition

2    where the handwritten notes are discussed before they are

3    clawed back.  My understanding is that segment of the

4    deposition has not been provided --

5         MS. BONDER:  Hasn't been provided to anybody.

6         THE COURT:  -- to anyone.  To the extent I were to

7    determine, for example, that Exhibit 41 was not

8    appropriately clawed back, it seems to me I will also be

9    determining that the testimony that was provided in

10   connection with it until the claw back is also appropriate

11   for plaintiff to have.  In any event, in order to have a

12   context for how this became clawed back, I would like to

13   have a copy of that segment of the deposition.  I don't know

14   if you have that with you or not.

15        MS. BONDER:  We don't have it.  It was never given

16   to defense counsel at all.  We asked the court reporter to

17   maintain it under seal and not give it to anybody.

18        THE COURT:  All right.

19        MS. BONDER:  I assume if I ask they will give it

20   to me.

21        THE COURT:  You tell them I ordered it.

22        MS. BONDER:  That will work.

23        THE COURT:  Let me see if I have any other

24   questions that I want to ask of you.

25        What I would like to do is take a short break.  I

```
 1    have a couple questions, but I need to take a look at the
 2    documents in order to frame the questions, I believe.  So
 3    we're going to just take a short recess and we will come
 4    back.
 5              MS. BONDER:  Your Honor, I wanted to make sure the
 6    sealed portion of the transcript was just for in-camera
 7    review; is that right?
 8              THE COURT:  Yes, that is correct.  Let me make
 9    sure, as I asked the parties to make sure that I was -- when
10    I look at the unredacted notes, which is Exhibit 41, and
11    compare them with the redacted notes, which as I understand
12    it you are now referring me to the supplemental declaration
13    of Mary Kiedrowski, I think Exhibit 6 --
14              MS. BONDER:  Correct.
15              THE COURT:  --  I pulled when I was going through
16    these items Exhibit 20 to Mary Kiedrowski's original
17    declaration which also appeared.  If they are one in the
18    same, I just want to make sure.  That appeared to me to be
19    the redacted version of what is Exhibit 41; is that correct?
20              MR. TIETJEN:  They are the same with the exception
21    that Exhibit 6 to her supplemental affidavit bears the
22    deposition exhibit number so then when it's referred to in
23    the transcript that's also, you know, what they are
24    referring to.
25              THE COURT:  Otherwise, it's one in the same?
```

1          All right.  We're going to take a short recess.

2    Why don't we say five minutes and we will come back.  Thank

3    you.

4          MS. BONDER:  Thank you.

5          (A brief recess was taken.)

6          THE CLERK:  All rise.

7          THE COURT:  Thank you.  You may be seated.  All

8    right.

9          I have no questions, further questions, that I

10   wanted to direct to the defendants.

11          Anything further on behalf of the plaintiffs?

12          MR. TIETJEN:  Thank you, Your Honor.

13          Just a few points:  This is a housekeeping matter,

14   but I quoted from the Eight Circuit case in the Subpoena

15   Duces Tecum how --

16          THE COURT:  In re Grand Jury or --

17          MR. TIETJEN:  I'm sorry, In re Grand Jury, the

18   desire to obey the law is not sufficient to establish a

19   common interest.  That's on page 922.  So 112 F 3rd, page

20   922.

21          THE COURT:  Right.  That's what I wrote down.

22          MR. TIETJEN:  Did I say it already?

23   Unfortunately, I forget what I say.

24          THE COURT:  I wrote it down, in any event.

25          MR. TIETJEN:  I will use it as a transition to my

1    next point.  I still have not heard them state any common

2    legal interest beyond what the Eighth Circuit has recognized

3    is not; that is, just a desire to obey the law.

4         Now, before we get to that, they did say that they

5    all signed a confidentiality agreement and you had asked if

6    it was in the record and it is.  The agreement that they

7    signed with Mercer, it's Exhibit 10 to Ms. Kiedrowski's

8    first declaration.

9         You will see there that it is -- it also doesn't

10   reflect any common legal interest.  It's at best a common

11   business interest.  They just say let's be sure everybody

12   keeps everything secret.  That's the gist of it.  It is a

13   garden variety, common confidentiality agreement.  Everybody

14   keep quiet about this.  Don't tell anybody.  That's not a

15   common legal interest.  That's a common business interest.

16        Now, they have provided to you in camera what

17   apparently is labeled a joint defense and common interest

18   agreement; very interesting.  That's how one of them listed

19   it on their privilege log, too, as a joint defense and

20   common interest agreement.  They are trying to do all they

21   can to avoid disclosure of any evidence that they were

22   actually anticipating litigation.  A joint defense agreement

23   implies just that.  But, again, their position on this

24   motion is that they were not anticipating litigation.

25   That's their position.  What they are left with doesn't

 1    constitute a common legal interest.

 2            Also, I believe that they say the effective date

 3    on that agreement that they have given you in camera was in

 4    February.  I don't know when it was actually signed.  I just

 5    recommend you look at that because I do know from their

 6    agreement with Mercer that they are willing to backdate

 7    things several months before.  So they will sign them later

 8    and they will make them effective several months before that

 9    just because they say it's effective.

10            So their only agreement is -- their only assertion

11    for a common legal interest is that they wanted to obey the

12    law and that is not enough under Eighth Circuit precedent.

13            With respect to the specific exhibits, Exhibit 40,

14    the handwritten notes --

15            THE COURT:  I'm sorry, Exhibit 40?

16            MR. TIETJEN:  Plaintiff's Exhibit 41, the

17    handwritten notes of Mr. Tantia from Mercer.

18            THE COURT:  The ones you are seeking?

19            MR. TIETJEN:  Right, the ones we're seeking.

20    There are many redactions throughout those handwritten

21    notes.  It is not clear when -- if those notes are taken --

22    some places it is very unclear whether the notes are taken

23    out of a particular meeting, if they are Mr. Tantia's notes

24    later from a telephone conversation.  It's not clear from

25    many of those redactions just who was present, what the

 1   legal advice was, who the attorneys were that were conveying

 2   it.  So each of those redactions is something that, again,

 3   the defendants have failed to assert even the basic grounds

 4   for a privilege on.

 5          They only referred to one place, I believe, in the

 6   meeting in the notes that they say lists some of the meeting

 7   participants, but you will see as you go through it

 8   sometimes he doesn't list the participants at all.

 9   Sometimes you are left wondering if it's a telephone

10   conversation or just his own musings.  You just don't know.

11          With respect to Exhibit 69, you will see on

12   Exhibit 1 to Ms. Kiedrowski's declaration at page 356, this

13   is the transcript, at the moment when they clawed this back,

14   that --

15          THE COURT:  I'm sorry, this would be Kiedrowski

16   exhibit --

17          MR. TIETJEN:  Exhibit 1 is the transcript when

18   they clawed back.

19          THE COURT:  All right, at page --

20          MR. TIETJEN:  Exhibit 69 at page 356, that

21   document which they clawed back they had already redacted

22   when we marked it as an exhibit.  So, in other words, they

23   reviewed it, decided whether it's privileged, fine, produced

24   it to us, we put it in front of the witness at a deposition

25   and they said, oh, we're going to take it back again.  They

1   have taken the whole thing back now.   In other words, they

2   want a couple of chances to decide what portions or if all

3   of it was privileged.   Mr. Beehler notes that on the record

4   at that page.   I will just note for the record the document

5   you have just clawed back is already redacted.

6           With that, I will close.

7           THE COURT:   All right.   Anything further on behalf

8   of defendants?

9           MS. BONDER:   May I just take a minute?   I just

10  wanted to address of couple things, if you don't mind.

11          Mr. Tietjen is talking about the lack of legal

12  interest.   As I mentioned, there is a legal interest related

13  to our common interest, but what Mr. Tietjen did not respond

14  to is the fact that the Eighth Circuit, which is the

15  authority here, says that the common interest may be either

16  legal, factual or strategic in character and so I commend

17  you to that case.

18          He also refers to the Eighth Circuit saying that

19  just a desire to obey the law is not sufficient for a common

20  interest privilege.   Here, of course, we don't have just a

21  desire to obey the law in general is what they were talking

22  about in the Whitewater case.   But here we're talking about

23  specific legal advice in a specific factual situation where

24  the legal advice was relevant to each of the members of the

25  joint project.   And what the holding really was in the

1    <u>Whitewater</u> case is not that they didn't have a legal

2    interest in common, but what they said is that Mrs.

3    Clinton's interest was in avoiding prosecution.  The White

4    House doesn't share that interest.  "One searches in vain

5    for any interest of the White House which corresponds to

6    Mrs. Clinton's personal interest in not being prosecuted."

7    So it's not so much that there was a general obey the law

8    interest because the court does not require that there be a

9    legal interest at all.

10           With respect to the anticipation of litigation

11   issue, again, as you know, we're not claiming that as a

12   basis for our common interest.  We knew that Fair Isaac

13   would be upset.  That is, the bureaus knew Fair Isaac would

14   not like having any competition in the credit scoring

15   market.  They were not used to any competition.  They were

16   monopolist for a long time.  We knew they would probably

17   have some reactions, they would probably have some

18   competitive response.  We did not know that the response

19   would be litigation, but we knew that was one of the

20   possibilities.  We thought perhaps there would be a more

21   appropriate competitive response.  But, you know, in fact,

22   it was one of the possibilities just like when you are

23   drafting a contract for a client, you include dispute

24   resolution provisions.  You include an arbitration clause

25   perhaps or a venue provision perhaps.  That does not mean

 1   you are in anticipation of litigation.  There's no notice of

 2   a potential claim at that point.  That's what's required for

 3   anticipation of litigation.

 4        And I wanted to just refer you to footnote 2 of

 5   defendant's brief, the last paragraph and it's the all of

 6   the if's that would have to occur for the defendants to

 7   actually have been anticipating that Fair Isaac would

 8   respond to new competition by filing this lawsuit.  If the

 9   project resulted in a workable credit scoring model and if

10   the defendants then decided to bring it to market and if

11   Fair Isaac then considered the credit risk score a threat to

12   its business, which was not a foregone conclusion given its

13   monopoly power, and if Fair Isaacs had a baseless lawsuit,

14   then there would be litigation.  And that's just too tenuous

15   to constitute anticipation of litigation and, again, it's

16   not required in the Eighth Circuit for a common interest

17   privilege.

18        I think that's all I had, unless you had any

19   questions.

20        THE COURT:  I do not.  All right.  I will take

21   this matter under advisement.

22        As I understand it, the only thing that I ordered

23   the defendants to produce to me that I do not yet have is

24   that segment of the deposition from Mr. Carroll's deposition

25   where the questioning regarding the handwritten notes takes

1    place and then is clawed back, the document is clawed back,

2    and I need that copy of the transcript, that piece of it.

3              MS. BONDER:  We will do that.

4              THE COURT:  All right.  That concludes this

5    proceeding.  Thank you very much.

6              (Court adjourned at 12:40 p.m.)

7                        *     *     *

8

9

10             I, Debra Beauvais, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15             Certified by:  s/Debra Beauvais

16                            Debra Beauvais, RPR-CRR

17

18

19

20

21

22

23

24

25