## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Fair Isaac Corporation; and myFICO
Consumer Services, Inc.,

                Plaintiffs,                Civil Action No. 06 CV 4112 (ADM/JSM)

v.                                    **Third Amended Complaint**

Experian Information
Solutions Inc.; TransUnion, LLC;                ***Demand for Jury Trial***
VantageScore Solutions, LLC, and Does I
through X,

                Defendants.

---

### Table of Contents

I.   Nature of this Action ................................................................. 3

II.  Definitions ............................................................................... 7

III. Parties and Jurisdiction ........................................................... 9

IV. Factual Background ................................................................. 10

     A.   Types and Components of Credit Scores .................... 10

     B.   Fair Isaac and Its Trademarks .................................... 13

     C.   Types of Fair Isaac Credit Scores ............................... 17

     D.   Distribution and Pricing of Fair Isaac Credit Scores ................ 18

     E.   Goodwill in Fair Isaac's Marks ................................. 20

V.   The Defendants' Activities ....................................................... 23

     A.   The Credit Bureau Defendants' Creation of VantageScore and Their Use of
Scoring Ranges Confusing Similar to Fair Isaac's 300-850® Marks ......................... 23

     B.   The Likelihood of Confusion Created by the Defendants' Use of Fair Isaac's 300-
850® Marks ............................................................... 25

C.   Harm Caused by the Defendants' Use of Fair Isaac's Marks ..................................... 34

D.   The Defendants' False and Misleading Representations............................................ 37

E.   Ownership and Control of Consumer Credit Scores .................................................. 49

F.   Elimination of Competition in the Market for Aggregated Consumer Credit Data ... 53

G.   Interstate Commerce ................................................................................................. 59

H.   Damages and Continuing Injury ............................................................................... 59

I.   TransUnion's Contractual Obligations to Fair Isaac, Improper Use of Confidential and Proprietary Information, and Misappropriation of Trade Secrets ...................... 59

J.   Infringement of Fair Isaac's Marks Through the Use of Paid Internet Search Terms   63

Count One: Federal Unfair Competition, 15 U.S.C. § 1125(a) .................................................. 66

Count Two: Infringement of Registered Trademark, 15 U.S.C. § 1114 ..................................... 67

Count Three: Trademark Infringement, Minnesota Common Law ............................................ 68

Count Four: Passing Off, Minnesota Common Law .................................................................. 69

Count Five: Unfair Competition and False Advertising, 15 U.S.C. § 1125(a) .......................... 70

Count Six: Deceptive Trade Practices, Minn. Stat. § 325D.44 .................................................. 70

Count Seven: Unjust Enrichment, Minnesota Common Law ..................................................... 72

Count Eight: Unreasonable and Illegal Restraint of Trade, 15 U.S.C. § 1 ................................ 73

Count Nine: Illegal Merger or Acquisition, 15 U.S.C. §§ 1, 18 ................................................ 75

Count Ten: Attempt to Monopolize, 15 U.S.C. § 2 ................................................................... 77

Count Eleven: Conspiracy to Monopolize, 15 U.S.C. § 2 ........................................................ 78

Count Twelve: Unreasonable and Illegal Restraint of Trade, 15 U.S.C. § 1 ............................ 80

Count Thirteen: Breach of Contract (Against TransUnion) ...................................................... 85

Count Fourteen: Interference with Contract (Against VantageScore) ....................................... 85

Prayer for Relief ......................................................................................................................... 86

_____

In its original complaint, Fair Isaac Corporation ("Fair Isaac") and its wholly-owned subsidiary myFICO Consumer Services, Inc. ("myFICO") brought this suit against the three national credit reporting agencies Equifax Inc. and its wholly owned subsidiary Equifax Information Services LLC ("Equifax"), Experian Information Solutions Inc. ("Experian"), and TransUnion, LLC ("TransUnion"), as well as the joint venture they created and jointly own, VantageScore Solutions, LLC ("VantageScore") (collectively, the "original Defendants").  Fair Isaac entered into a Settlement Agreement with Equifax in June 2008. As used in this Third Amended Complaint, the terms "Credit Bureau" and "Credit Bureaus" and Defendants continue to mean, in this context, one or more of the three national credit reporting agencies and VantageScore and their collective or individual conduct as alleged in this context.  For its Amended Complaint against the Defendants, Fair Isaac states and alleges as follows:

## I.  Nature of this Action

1.      The most important aspect of a consumer's financial profile is his or her credit score.  Lenders, financial institutions, and others use credit scores to determine whether to provide credit (or rent an apartment, or open an account, etc.) and on what terms.  This case will determine whether consumers, lenders, and financial institutions will continue to have the benefit of innovation, choice, and price competition in the collection and scoring of consumer credit information that is aggregated by credit reporting agencies.  It arises out of a conspiracy by the three powerhouse credit reporting agencies ("Credit Bureaus")—Equifax, Experian, and TransUnion—to extend  their collective control of the market for aggregated consumer credit data to dominate and control consumer credit scoring as well.  The Credit Bureaus are not attempting to compete individually through honest hard work, creative development, and competition on the merits, but instead they have embarked on a joint effort (i) to misappropriate the efforts of Fair Isaac, (ii) to trade on its goodwill, (iii) to manipulate their control of access to and pricing over aggregated credit data and consumer credit scores in order to eliminate competition, (iv) to engage in false and misleading representations about competitive products,

and (v) to employ other unfair and anticompetitive practices in order to exclude competition and move the financial industry to their jointly-owned and controlled VantageScore products.

2.      Fair Isaac pioneered credit scoring in the 1950s and continues to be a primary innovator.  Its trademarked 300-850® consumer credit score (the "classic FICO" score) is the leading credit score in the financial industry today due to its reputation for superior predictive value.  Each Credit Bureau has licensed credit scoring algorithms or software from Fair Isaac designed specifically for use with that Credit Bureau's unique aggregated consumer data.  At least until their decision to join forces, each Credit Bureau competed in the collection and reporting of predictive aggregated credit data, the development of scores based on that data, and the sale of those scores to financial institutions and consumers.

3.      In March 2006, however, the three powerhouse Credit Bureaus announced that they now are working closely together to own and control a common risk scoring algorithm through a joint venture called VantageScore.  According to Defendants, the VantageScore scoring model is based on a single "[i]dentical scoring algorithm and leveled [data] characteristics across all three" Credit Bureaus.  On information and belief, "leveling the attributes" across the Credit Bureaus degrades the predictive power of the scores produced by VantageScore's algorithm, as the algorithm must use a common set of data attributes, necessarily requiring the omission of potentially predictive data that is not common to all three Credit Bureaus.  In addition to eliminating the significance of any qualitative differences between the data and scores of the three Credit Bureaus, VantageScore claims to take advantage of "deep knowledge" of each Credit Bureau's independent data set, which they have shared with each other.  *See* www.vantagescore.com.  This "new" offering is based on a scoring range of 501-990 which overlaps Fair Isaac's 300-850® Marks.

4.      Defendants jointly and intentionally created VantageScore's model using a confusingly similar scoring range of 501-990 to trade on Fair Isaac's goodwill.  They also have made numerous false and misleading statements in promotional materials and on their websites that suggest that: (1) the VantageScore model is the first, and only, consistent and objective

4

credit scoring product in the industry; (2) the VantageScore algorithm produces the most accurate and predictive credit scores available; and (3) calculating a particular consumer's credit score using the VantageScore algorithm will result in the same credit score regardless of which Credit Bureau's data is used.  These statements are false and likely will mislead consumers, lenders, and financial institutions to believe that Fair Isaac's credit scores are inferior, inconsistent, and not predictive.  Defendants Experian and TransUnion have also infringed Fair Isaac's trademarks through their use of scoring ranges and credit scores (for their in-house credit scores) that are identical or confusingly similar to Fair Isaac's 300-850® Marks.  And Defendants Experian and TransUnion, together with Does I through X also have infringed Fair Isaac's trademarks through their deceptive Internet and other media advertising.

5.      The joint creation, ownership, control, and false and misleading promotion of VantageScore's products is designed to move the market towards VantageScore products, not through competition on the merits but through anticompetitive conduct that excludes third-party providers of scoring algorithms, like Fair Isaac, from the market.  Moreover, the Credit Bureaus' joint creation and ownership of VantageScore represents a serious anticompetitive threat to the welfare of consumers and financial institutions.  Through VantageScore, the Credit Bureaus not only are able to coordinate strategies and restrain competition among the only three providers of aggregated consumer credit data, which together enjoy a tight oligopoly, but they also can protect that oligopoly from potential competition.

6.      First, through the joint ownership and control of a common algorithm for generating credit scores from aggregated credit data, the only three national Credit Bureaus will have complete transparency into what each pays for this critical input into the credit scoring bundle they sell to lenders and other financial institutions, resulting in reduced price competition.  Moreover, use of an identical algorithm by all three Credit Bureaus is a turnabout from the current competitive status quo in which an individual Credit Bureau works either on its own or in confidence with a third party to tailor algorithms that maximize the predictiveness and accuracy of credit scores generated from its unique set of aggregated consumer credit data.  As a result of

their agreement to create, own, and control a common scoring algorithm, and sharing information to preserve a "leveled" credit score, the Credit Bureaus have agreed to an arrangement that will unreasonably reduce the incentive of each to innovate and develop more accurate and complete credit data from which more predictive credit scores can be generated.  In other words, through their joint ownership and control of VantageScore, each Credit Bureau will have a "window" into the confidential collection and storage practices of its competitors and, on information and belief, will be able to exercise a veto over what characteristics are reflected in the jointly-controlled scoring algorithm.

7.      Second, by jointly owning and controlling an algorithm intended to be relied on by the financial industry to generate Credit Scores, the Credit Bureaus will be able to protect their stranglehold on aggregated consumer credit data against outside competitive forces. Currently, a third-party provider of an industry-recognized scoring algorithm like Fair Isaac can help a potential competitor overcome the high barriers to entry that protect the incumbent Credit Bureaus' oligopoly.  In addition, industry-recognized scoring algorithms that do not use aggregated credit data to evaluate consumer creditworthiness, such as Fair Isaac's Expansion score, can and do act as a catalyst for the development of such sources of information.  These other sources of information are not controlled by the Credit Bureaus and, over time, can develop into a competitive alternative to aggregated consumer credit data.

8.      The Credit Bureaus decided amongst themselves to eliminate the differences in how they assess and report the aggregated credit data that underlies the millions of consumer credit decisions made every day.  Once the Credit Bureaus achieve their objective of imposing, without competition on the merits, VantageScore on the financial industry, they will cement their iron grip on the collection, assessment, and reporting of consumer credit information.  No one will be able to compete against the Credit Bureaus, either in the aggregated credit data market or the credit scoring market, because the Credit Bureaus will control access to both their data and the scoring algorithm.

9.      The Credit Bureaus' joint creation, ownership, control, and false and misleading promotion of their VantageScore products amounts to an anticompetitive and collusive scheme designed to: (1) drive competitors such as Fair Isaac from the marketplace; (2) diminish competition and facilitate collusion between and among the Credit Bureaus; and (3) protect the Credit Bureaus' market power over aggregated consumer credit data and consumer credit scores from emerging competitive threats.  As set forth below, the Credit Bureaus have engaged in a concerted course of action to: (1) confuse and mislead consumers, lenders, and other financial institutions about the source and supposed qualities and characteristics of the Credit Bureaus' jointly-owned credit scoring product; (2) falsely disparage Fair Isaac's scoring algorithms and products; (3) replace the Credit Bureaus' independently-developed and competing "in-house" scoring products with a single, common algorithm; (4) reduce competition between themselves on the quality and predictiveness of their credit data; and (5) exploit their control over aggregated consumer credit data and data processing costs so as to disadvantage Fair Isaac's products, to impair Fair Isaac's ability to compete, and, eventually, to drive Fair Isaac from the relevant markets and eliminate emerging competitive threats.  Far from providing consumers with a competitive alternative, the Defendants have colluded to confuse consumers, steal Fair Isaac's goodwill, and reduce and eliminate choice and competition.  Fair Isaac brings this suit to challenge the Defendants' illegal activities so that consumers, lenders, and other financial institutions will continue to have the benefit of honest competition and innovation.

10.     Fair Isaac's claims against the Defendants, individually or collectively, are based on acts constituting federal unfair competition, trademark infringement, misleading and false advertising, passing off and antitrust violations, as well as deceptive trade practices, unfair competition, trademark infringement, passing off, breach of contract, and interference with contract.

## II.  Definitions

11.     Throughout this Amended Complaint, the following defined terms (among others defined in other parts of the Amended Complaint) are used:

a.    "Relevant Markets" means those product and geographic markets relevant to Fair Isaac's antitrust claims, which are defined as follows:

(i)    Aggregated Credit Data Market—The product dimension of this Relevant Market is no broader than the market for Aggregated Credit Data.  The geographic dimension of this Relevant Market is the United States.  Sellers in this market include the three Credit Bureaus.  Buyers include Lenders, Credit-Scoring firms (such as Fair Isaac) and Consumers.

(ii)    Credit Scoring Market—The product dimension of this Relevant Market is no broader than the market for Credit Scoring sold to Lenders and to Consumers.  The geographic dimension of this Relevant Market is the United States.  Sellers or potential sellers in this market include Fair Isaac, the three Credit Bureaus, and VantageScore.  Buyers include Lenders and Consumers.

b.    "Aggregated Credit Data" means the historical records of an individual Consumer's borrowing and repayment as reported to credit reporting agencies by multiple lenders and servicers of loans among other sources, and does not include credit data relating to commercial institutions.

c.    "Credit Score" means a representation of an individual Consumer's financial credit worthiness that quantifies the risk that a Consumer will fail to repay a loan or other credit obligation.

d.    "Credit Scoring" means the process by which an algorithm, or set of algorithms is applied to Aggregated Credit Data to generate a Credit Score.

e.    "Lender" or "Lenders" means a financial institution(s) or other firm(s) in the business of regularly extending credit to Consumers.

f.    "Consumer" or "Consumers" means any natural person(s) to whom credit is or may be extended by any Lender.

g.    "Consuming Public" means the combination of Lender and Consumer.

### III.  Parties and Jurisdiction

12.     Fair Isaac Corporation is a Delaware Corporation, with its principal place of business in Minneapolis, Minnesota.  myFICO Consumer Services, Inc. is a wholly owned subsidiary of Fair Isaac Corporation.

13.     Equifax Inc. is a Georgia Corporation, with its principal place of business at 1550 Peachtree St. N.W., Atlanta, Georgia 30309.  Equifax Information Services LLC is a wholly— owned subsidiary of Equifax Inc.  Equifax does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

14.     Experian Information Solutions Inc. is an Ohio Corporation, with its principal place of business at 475 Anton Blvd, Costa Mesa, California 92626.  Experian does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

15.     Does I through V are unknown affiliates of Experian who operate, maintain and/or control the various Experian Internet web sites described herein. Together with Experian Information Solutions Inc., these entities are collectively referred to as "Experian."

16.     TransUnion, LLC is a Delaware Limited Liability Company, with its principal place of business at 555 W. Adams St., 6th Fl., Chicago, Illinois 60661-3614.  TransUnion does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

17.     Does VI through X are unknown affiliates of TransUnion who operate, maintain and/or control the various TransUnion Internet web sites described herein. Together with TransUnion LLC., these entities are collectively referred to as "TransUnion."

18.     VantageScore Solutions LLC is a Delaware Limited Liability Company, with its principal place of business in Stanford, Connecticut.  Its members are Equifax, Experian, and TransUnion.  VantageScore's registered agent is Corporation Service Company at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  On information and belief, VantageScore does business in this District and has committed acts of unfair competition, trademark infringement, misleading and false advertising, deceptive trade practices, unreasonable and illegal restraints of trade, and other unlawful acts in this District, and is therefore subject to the jurisdiction of this Court.

19.     This Court has jurisdiction over this Amended Complaint and over this action pursuant to 28 U.S.C. § 1331 in that this action involves questions of federal law; and 28 U.S.C. §§ 1338(a) and 1337(a) in that this action involves claims for federal unfair competition, trademark infringement, passing off, false advertising and unreasonable and illegal restraints of trade all under Titles 15 of the United States Code.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) for claims of unfair competition, deceptive trade practices, trademark infringement, passing off, breach of contract, and interference with contract.

20.     Venue is proper in this District under 28 U.S.C. § 1391(c) and 15 U.S.C. § 22 in that the Defendants are subject to personal jurisdiction in this District.  Some or all of the illegal acts alleged herein were committed by the Defendants in this District, the claims alleged in this action arose, at least in part, in this District, and the Defendants regularly conduct business in this District.

## IV.  Factual Background

### A.     *Types and Components of Credit Scores*

21.     A Credit Score represents a Consumer's financial creditworthiness and quantifies the risk that a Consumer will fail to repay a loan or other credit obligation.  Banks, credit card

companies, residential mortgage lenders, automobile dealerships, and other Lenders use Credit Scores to assess the risk associated with loans and to reduce potential "bad debt" losses. They use Credit Scores, among other reasons, to determine whether to extend credit or issue a loan, to assign interest rates and credit limits, and to manage existing accounts. Institutions that purchase or securitize debt in secondary markets rely on Credit Scores to assess the quality of portfolios of consumer debt.

22.     There are different types of Credit Scores. The most well-known are the credit risk scores developed by Fair Isaac, which are distributed to Lenders and resellers by the Credit Bureaus. In addition the Credit Scores are sometimes distributed directly to Consumers, for example, through myfico.com. Consumers are concerned about and rely on their Credit Scores to negotiate better long-term interest rates. The Credit Bureaus and other third-party developers also offer Credit Scores. In addition, scoring models are developed for use by individual Lenders (either internally or through a third-party provider) and for specific industries (*e.g.*, mortgage, automobile, and telecommunication industries).

23.     A Credit Score is the product of two essential components: (1) Aggregated Credit Data, and (2) a credit scoring algorithm. A Credit Score cannot be generated without access to both. A Credit Score is calculated by applying a scoring algorithm to a Consumer's Aggregated Credit Data, which reflects that Consumer's record of borrowing and repayment as reported to a particular Credit Bureau. That Aggregated Credit Data—which the Credit Bureaus obtain from various public record sources, Lenders, and credit issuers, and which reflects years of information on hundreds of millions of Consumers—is an essential input for the calculation of a Credit Score. The Credit Score almost always is accompanied by a credit report, which is compiled by the Credit Bureau and reflects the underlying Aggregated Credit Data used to calculate the Credit Score.

24.     The three Credit Bureaus control virtually 100% of the market for Aggregated Credit Data in the United States.

25.     Credit reporting in the United States is entirely voluntary.  Creditors, merchants, collection agencies, and other Lenders have agreements to provide Consumer credit data to all, some, or none of the Credit Bureaus.  As a result, the Credit Bureaus often will have collected different credit data for the same Consumer.  Additional variation between and among Credit Bureau Consumer credit files can result from: (1) the collection of credit data from different data sources; (2) the unique ways Credit Bureaus organize their data in a database; and (3) discrepancies and errors in the credit data aggregated by the Credit Bureaus.  According to the Credit Data Information Association, of the 57.4 million credit file disclosures issued to Consumers by the Credit Bureaus in 2003, almost 22% led to a Consumer-initiated reinvestigation by one of the Credit Bureaus.  Variation in Aggregated Credit Data may result in different Credit Scores, irrespective of the particular algorithm used to generate the score.

26.     At least until the development of their VantageScore scoring algorithm, each of the Credit Bureaus competed with the others to make sure that the scoring algorithms applied to its Aggregated Credit Data account for the specific strengths and weaknesses of its data and thereby maximizes the predictiveness of that data.  On information and belief, each of the Credit Bureaus understands that the unique attributes of their data sets are competitively sensitive and their ability to accentuate the strengths of their data (and to minimize the weaknesses) in calculating Credit Scores is an important dynamic to competition among the Credit Bureaus today. Moreover, because of differences among the data sets of the three Credit Bureaus, scores generated from each of those sets—even using an identical scoring algorithm—will usually be different.  This is one reason why Lenders, such as those in the residential lending industry, may require Credit Scores derived from each of the three Credit Bureaus' Aggregated Credit Data before they make a lending decision.

27.     Until their collaboration on VantageScore, the Credit Bureaus invested in developing and marketing their own in-house scoring algorithms and scoring products based on those algorithms.  The Credit Bureaus also market and distribute various Credit Scores generated

by various Fair Isaac algorithms, as well as those generated by other third-party scoring vendors, which are tailored to the particular Credit Bureau's unique data set.

**B.      *Fair Isaac and Its Trademarks***

28.      Fair Isaac pioneered the concept of Credit Scoring more than 50 years ago.  Fair Isaac developed the first-ever Credit Scoring model for American Investment Co., a St. Louis-based finance company, in 1958.  In 1985, Fair Isaac developed Credit Bureau scores which were used for "prescreening" credit applications.  This was followed by the first general-purpose credit risk score for Equifax in 1989, which began to be used for loan originations, account management, and prescreening purposes.  By at least 1991, such general-purpose scoring algorithms developed by Fair Isaac were made commercially available from all three Credit Bureaus.

29.      Since the inception of Credit Scoring using Credit Bureau-aggregated Consumer credit data, Fair Isaac has made significant investments in, and collaborated closely with, each of the Credit Bureaus to develop credit scoring algorithms tailored for each Credit Bureau's proprietary data set.

30.      Fair Isaac uses the trademark 300-850 to uniquely identify its Credit Scores and to distinguish its scores from the scoring models and scores of its competitors.  Under these models, Consumers are rank-ordered according to the likelihood that they will repay their credit obligations.  Higher Credit Scores correspond to lower levels of risk.

31.      Fair Isaac owns common law trademark rights to the mark 300-850 for Credit Scoring products and services.

32.      Fair Isaac also owns at least the following U.S. trademark registrations in connection with its 300-850 Credit Scores.

 

300-850

U.S. Trademark Registration No.
**3,083,563**

U.S. Trademark Registration No.
**3,080,499**

U.S. Trademark Registration No.
**3,121,526**

33.     Fair Isaac owns: (1) U.S. Registration No. 3,083,563 for "credit scoring and credit risk management"; (2) U.S. Registration No. 3,080,499 for "credit scoring services, credit management and risk management services"; and (3) U.S. Registration No. 3,121,526 for "credit risk management and risk management services, credit scoring services."  Copies of the Certificates of Registration for each of these trademarks are attached as Exhibit 1.  Fair Isaac's common law and federally registered trademarks in the mark 300-850 are generally referred to throughout this Amended Complaint as "300-850®,"  the "300-850® Marks" or the "300-850 Marks."

34.     The 300-850® Marks are inherently distinctive and serve to identify and indicate the source of Fair Isaac's products and services to the relevant purchasers and consumers.

35.     Fair Isaac uses its 300-850® Marks on advertising and promotional materials, as well as on its website at www.myFICO.com.  The following are a few examples from Fair Isaac's website showing use of its 300-850® Marks:





*See* Exhibit 2**.**

36.     Since at least 1956, Fair Isaac has continuously used the mark FAIR ISAAC in connection with the promotion and sale of its products and services, including Credit Scores.

37.     In addition to its common law trademark rights to the mark FAIR ISAAC, Fair Isaac owns at least the following U.S. trademark registrations consisting of, or containing, the FAIR ISAAC mark (Fair Isaac's common law and federally registered trademark rights to the FAIR ISAAC marks are collectively referred to as the "FAIR ISAAC Marks"):

FAIR, ISAAC, U.S. Registration No. 1,990,661;

FAIR ISAAC (with design), U.S. Registration No. 2,225,700;

FAIR ISAAC (with design), U.S. Registration No. 2,230,484;

FAIR ISAAC (with design), U.S. Registration No. 2,421,078;

FAIR ISAAC, U.S. Registration No. 2,444,056;

FAIR ISAAC (with design), U.S. Registration No. 2,594,376;

FAIR, ISAAC, U.S. Registration No. 2,597,362;

FAIR, ISAAC SMARTLINK, U.S. Registration No. 2,885,027;

FAIR ISAAC SMARTADVISOR, U.S. Registration No. 2,961,192;

FAIR, ISAAC MARKETSMART DECISION SYSTEM, U.S. Registration No. 2,523,332;

FAIR, ISAAC MARKETSMART DECISION SYSTEM, U.S. Registration No. 2,552,708; and

FAIR ISAAC CONTRACT BUILDER, U.S. Registration No. 3,046,818.

Copies of Certificates of Registration for each of the FAIR ISAAC Marks are attached as Exhibit 27.

38.     Since at least 1995, Fair Isaac has continuously used the mark FICO in connection with the promotion and sale of its products and services, including Credit Scores.

39.     In addition to its common law trademark rights in the mark FICO, Fair Isaac owns at least the following U.S. trademark registrations consisting of, or containing, the FICO mark (Fair Isaac's common law and federally registered trademark rights to the FICO marks are collectively referred to as the "FICO Marks"):

FICO, U.S. Registration No. 2,273,432;

FICO, U.S. Registration No. 2,573,131;

FICO, U.S. Registration No. 2,989,390;

MYFICO, U.S. Registration No. 2, 2714,565;

FICO.ORG: U.S. Registration No. 3, 119, 897; and

FICO EXPANSION:  U.S. Registration No. 3,184,462.

Copies of Certificates of Registration for each of the FICO Marks are attached as Exhibit 28.

C.      *Types of Fair Isaac Credit Scores*

40.      To compute the most predictive Credit Scores, Fair Isaac's 300-850® classic

FICO® score is based on scoring algorithms tailored to the unique data set collected by each

Credit Bureau.  These Credit Bureau-specific algorithms, developed by Fair Isaac, account for the

different types of information collected by each bureau, as well as the particular methodology

used by that bureau to organize and summarize its data.  Fair Isaac's scoring algorithms optimize

the most predictive data elements available to a Credit Bureau in order to maximize the predictive

power that can be generated by that bureau's unique data set.  Fair Isaac works with the Credit

Bureaus to update and refine its algorithms as needed to reflect current Consumer repayment

behavior.  Credit Scores generated using Fair Isaac's unique scoring algorithms thus provide

consistent and highly effective predictive power regardless of the Credit Bureau providing the

data.

41.      Fair Isaac's 300-850® FICO® Expansion score is calculated from nontraditional

credit data (*i.e.*, other credit related data that are usually not reported to Equifax, TransUnion or

Experian, such as deposit account records and rental/utility payments).  The score is designed to

"fill gaps" by generating predictive Credit Scores for Consumers that do not have a 300-850®

classic FICO® score due to "thin" (limited) or even non-existent credit histories at the three Credit

Bureaus.  While at present the FICO® Expansion score and the nontraditional data sources that it

reflects are complements to, rather than substitutes for, a traditional Credit Score (such as classic

FICO®) and traditional Aggregated Credit Data, over time the ability to extract predictive results

from nontraditional sources of data will improve, and those nontraditional sources of information,

together with Credit Scores developed from this data, increasingly will become an alternative or

substitute to the traditional data sources and scores available through the Credit Bureaus.

42.     In 2001, Fair Isaac introduced its NextGen FICO® score as a more advanced alternative to the 300-850® classic FICO® score.  Two major benefits of this model are that (1) it has greater predictive power, and (2) it is able to generate Credit Scores for more people (*e.g.*, for people who cannot receive a classic FICO® score due to limited credit history).  Through the use of enhanced predictive variables, refined performance classification and deeper segmentation, use of the NextGen score permits Lenders to reduce risk and/or increase their loan-approval rate for all Consumers across the score range.  Although the enhanced capabilities of the NextGen score have been tested and validated, approximately only one percent of financial institutions using Fair Isaac Credit Scores have migrated to using the NextGen score.  On information and belief, the low level of migration, or upgrading, is due to significant switching costs and discriminatory high prices charged for NextGen scores since its inception by the Credit Bureaus, which control both end-user pricing for, and the distribution of, most Fair Isaac Consumer Credit Scores to Lenders.

**D.     *Distribution and Pricing of Fair Isaac Credit Scores***

43.     The Credit Bureaus control access to their sets of Aggregated Credit Data and license their use to providers of scoring algorithms, such as Fair Isaac.  They also license the use of the Aggregated Credit Data to resellers of such data, financial institutions that have their own scoring algorithms, and to each other (for the production of "tri-merged" credit reports which are used in the mortgage industry and that merge the Credit Bureaus' data into a single credit report).

44.     The Credit Bureaus are licensed by Fair Isaac to generate and provide Fair Isaac's various Credit Scores directly to Lenders and, in some cases, to Consumers.  Under these agreements, the Credit Bureaus apply Fair Isaac's unique algorithms to their Aggregated Credit Data to calculate Fair Isaac Credit Scores.  After the Credit Bureaus process the scores, they

deliver them directly to Lenders and Consumers.  Currently, Fair Isaac cannot sell its scoring products directly to Lenders without cooperation from the Credit Bureaus.

45.     Even with respect to those Credit Scores that Fair Isaac does sell directly (e.g., PreScore service and FICO Score Delivery service), a Credit Bureau must still process the data and generate the score that will be distributed to the Lender. The algorithm by itself is useless; a Credit Score can only be derived by applying the algorithm to the Aggregated Credit Data for which it has been designed.  Irrespective of whether it is the Credit Bureaus or Fair Isaac who is delivering Fair Isaac's Credit Scores, each Credit Bureau controls access to and pricing of its Aggregated Credit Data and also insists that only the Credit Bureau process the data with the scoring algorithm to generate a Credit Score.  As a result, by manipulating the price of Aggregated Credit Data and processing supplied in connection with Fair Isaac's algorithm (relative to their price when delivered with the Credit Bureaus' in-house algorithms), the Credit Bureaus have the ability to control, or at least heavily influence, the price of Fair Isaac's Credit Scores and thus to disadvantage Fair Isaac's Credit Scores relative to any in-house type Credit Score, including the VantageScore products, marketed by the Credit Bureaus.

46.     In 2001, Fair Isaac began to sell its 300-850® classic FICO® Credit Score directly to Consumers, as permitted under Fair Isaac's license agreements with Equifax, and subsequently the other Credit Bureaus.  Fair Isaac takes the Consumer's purchase order at www.myfico.com, and then requests a Credit Score and credit report from the Credit Bureau selected by the Consumer.  The Credit Bureau generates a 300-850® Credit Score by applying the Fair Isaac scoring algorithm and sends it to Fair Isaac along with a credit report.  Fair Isaac delivers the Credit Score and credit report to the Consumer under an agreement with the Credit Bureau.  Fair Isaac must pay the Credit Bureau a fee for the Aggregated Credit Data, the Credit

Score, and data processing costs.  On information and belief, the fee paid by Fair Isaac to the

Credit Bureau in these circumstances for the credit report and Credit Score is significantly higher

than the fee paid by other resellers for credit reports to be used for similar purposes.

### E.     Goodwill in Fair Isaac's Marks

47.      Fair Isaac has promoted and educated the Consuming Public about its 300-850®

Credit Scores since at least the mid 1990s.

48.      Fair Isaac has developed goodwill in its 300-850® Marks and its 300-850® Credit

Scores.  In fact, Fair Isaac's 300-850® classic FICO score is the premier Credit Score used most

by Lenders today.  This Credit Score is used by most of the 100 largest financial institutions and

by most mortgage loan originators.

49.      Fair Isaac has spent a great deal of time, money, and other resources educating

Consumers about the meaning of their 300-850® Credit Score.  Much of this information has been

made available to the public at no charge.

50.      In addition, when Consumers purchase individual Credit Scores from Fair Isaac,

each score is accompanied by key supplementary information that helps the Consumer understand

and use the score.  This information includes the Consumer's underlying credit report and Fair

Isaac's customized explanation, including where the Consumer's score falls in the 300-850®

Marks, what factors contributed most to their particular score, and what steps the Consumer can

take to manage the score over time.

51.      For example, on January 26, 2003, Fair Isaac promoted awareness of its Credit

Scores in a television commercial during the Super Bowl.  This advertisement highlighted the

importance of Credit Scores in determining Consumer interest rates on loans and referred viewers

to Fair Isaac's website (www.myfico.com) to obtain their score and additional information.

52.     In addition, Fair Isaac encouraged media coverage on the importance of Credit Scores to Consumers and on Fair Isaac's efforts to empower and educate Consumers about their 300-850® credit score.  The media responded very favorably and generated articles and broadcasted coverage in hundreds of outlets including *The Wall Street Journal*, *The New York Times*, *USA Today*, *Newsweek*, *NBC Network News*, *National Public Radio*, and *The Today Show*. Traffic at Fair Isaac's website increased after each significant media event.

53.     Personal finance expert and television personality Suze Orman also has been instrumental in educating Consumers about Fair Isaac's Credit Scores and their importance to Consumers' financial health.  Fair Isaac distributes a Consumer product called the Suze Orman® FICO® Kit that provides Consumers with access to their 300-850® FICO® Credit Scores as well as educational information developed in conjunction with Ms. Orman relating to Credit Scores and personal credit management.  Ms. Orman has promoted this product on public broadcasting stations across the country as well as the QVC shopping channel.

54.     Consumers can attend seminars and read books on how to improve their 300-850® Credit Score in order to arm themselves with more bargaining power in negotiating a loan and obtaining lower interest rates.  Fair Isaac also makes educational materials available for free to Consumers on its website.

55.     Consumers have taken such an interest in knowing their three-digit score that Fair Isaac offers Consumers a service that monitors changes to their 300-850® Credit Score based on Equifax data and notifies them when their score changes.

56.     Information is even available for Consumers to see the interest rates they might qualify for based on their 300-850® FICO Credit Score.  Since 2002, Fair Isaac has offered a free interest-rate table on its website that shows how a Consumer's 300-850® Credit Score could

qualify the Consumer for different interest rates currently charged by Lenders for different types of loans.  This information helps Consumers quickly understand how getting a better score can translate into more attractive credit terms and significant dollar savings over time.

57.     On information and belief, Lenders and Consumers are familiar with the 300-850® Marks and they identify Credit Scores advertised and promoted in association with those marks as coming from Fair Isaac, being affiliated or associated with Fair Isaac, or being sponsored by, endorsed by, or connected with Fair Isaac.

58.     Through experience, care, and skill, Fair Isaac's 300-850® Marks and its 300-850® Credit Scores have become widely known and have acquired a reputation for excellence, consistency, and reliability.  Fair Isaac has consistently and continuously invested significant resources into the development of its scoring models' reputation as high-quality, consistent, and accurate predictors of Consumer credit risk.  As such, Fair Isaac's reputation, goodwill, and trademarks for its 300-850® Credit Scores are valuable assets to Fair Isaac, and it maintains those assets through consistent and continuous delivery of its 300-850® Credit Scores.

59.     As a result of Fair Isaac's long use and promotion of its 300-850® Marks and its 300-850® Credit Scores, the 300-850® Marks and scores have become distinctive and serve to identify Fair Isaac's Credit Scores and high-quality services, and to distinguish Fair Isaac's products and services from those offered or sold by others, and to distinguish the source or origin of Fair Isaac's products and services.  The relevant Consuming Public widely recognizes and associates the 300-850® Marks and Credit Scores with Fair Isaac and its products and services.  In addition, the relevant Consuming Public widely recognizes and associates a three-digit Credit Score falling within the number range 300-850 as coming from a particular source of quality, consistency, and reliability—Fair Isaac.

60.     Fair Isaac similarly has expended substantial effort and expense advertising and promoting its products and services sold in association with the FAIR ISAAC® Marks and the FICO® Marks.

61.     Fair Isaac's efforts to advertise and promote the sale of products and services sold in association with the FAIR ISAAC® Marks and the FICO® Marks has included, among other things, Fair Isaac's advertising, promotion and use of the Internet website www.myfico.com to sell Fair Isaac's Credit Scores and related products directly to consumers.

62.     As a result of Fair Isaac's efforts, the relevant Consuming Public has come to know, rely on and recognize the FAIR ISAAC® Marks and FICO® Marks as identifying the source of Fair Isaac's products and services.

### V.  The Defendants' Activities

**A.     *The Credit Bureau Defendants' Creation of VantageScore and Their Use of Scoring Ranges Confusingly Similar to Fair Isaac's 300-850® Marks***

63.     In March 2006, TransUnion, Equifax, and Experian announced that they jointly created a Credit Score of their own.  The Defendant Credit Bureaus created VantageScore, which owns a scoring algorithm that is marketed and sold through the Credit Bureaus via licensing agreements with VantageScore.  VantageScore is owned by Equifax, Experian, and TransUnion.

64.     VantageScore's model uses the scoring range 501-990.  This number range overlaps Fair Isaac's 300-850® Marks.  And similar to Fair Isaac's Credit Scores, higher scores under the Defendants' 501-990 model represent a lower likelihood of risk.

65.     Defendants' use of VantageScore's overlapping 501-990 scoring range will likely confuse Consumers to believe that their individual Credit Score generated from VantageScore's model is somehow associated or affiliated with Fair Isaac, or that it is the same as a 300-850® FICO® score.  Consumers associate their three-digit Credit Scores within the range 300-850® as

coming from a particular source of quality—Fair Isaac. Individual Consumers are therefore likely to be confused to think that their 501-990 VantageScore Credit Score has the same meaning on Fair Isaac's 300-850® scale as their individual FICO® Credit Score has on Fair Isaac's 300-850® scale. This likelihood of confusion will not only be harmful to Fair Isaac's goodwill, it will also be harmful to individual Consumers because a good score under Fair Isaac's 300-850® FICO® Credit Scoring models might not be a good score under VantageScore's 501-990 model.

66.     On information and belief, the Credit Bureaus do not share Consumer credit information with one another in calculating their 501-990 Credit Scores. Therefore, similar to any other Credit Score, an individual Consumer will have three separate 501-990 Credit Scores—one score based on the differing credit data collected by each Credit Bureau.

67.     Moreover, use of a common algorithm, which by definition cannot be altered to take advantage of a particular Credit Bureau's Aggregated Credit Data set's strengths or correct unique weaknesses in that Credit Bureau's data, will result in a less predictive Credit Score.

68.     On information and belief, each of the Defendant Credit Bureaus offers its 501-990 Credit Score to Lenders. Moreover, Experian offers its 501-990 score directly to Consumers at least at www.experian.com and www.freecreditreport.com, and TransUnion and Equifax announced on their websites that Consumers will be able to purchase their VantageScore Credit Scores on those websites in the near future.

69.     TransUnion and Experian also sell their own in-house Credit Scores that use scoring ranges that are identical or confusingly similar to Fair Isaac's 300-850® Marks. For example, TransUnion's 300-850 scoring range is identical to Fair Isaac's 300-850® Marks, and Experian's current 330-830 scoring range falls within Fair Isaac's 300-850® Marks. And similar to Fair Isaac's Credit Scores, higher scores under these in-house scoring ranges represent a lower

likelihood of risk.  On information and belief, Experian and TransUnion will eventually stop offering their in-house scores to Consumers and Lenders, and will instead only offer their 501-990 scores.

70.     Fair Isaac's 300-850® Marks were distinctive before Defendants began their unauthorized use of any term or mark that is likely to cause confusion with Fair Isaac's 300-850® Marks.

**B.     The Likelihood of Confusion Created by the Defendants' Use of Fair Isaac's 300-850® Marks**

71.     As licensees of Fair Isaac algorithms and authorized distributors of the 300-850® Credit Score, the Defendant Credit Bureaus have an enhanced duty to create clear messages about Fair Isaac's products and services, and to distinguish other products and services from those of Fair Isaac to avoid confusion with Fair Isaac's products, services and technologies, and to avoid disparaging Fair Isaac's Credit Scores and the 300-850® Marks.  Despite their enhanced duty, the Credit Bureaus intentionally sell, advertise and promote their VantageScore product with a confusingly similar scoring range of 501-990.  And TransUnion and Experian intentionally sell, advertise and promote their in-house credit scoring products with scoring ranges that are identical or confusingly similar to Fair Isaac's 300-850® Marks.  Because of the Credit Bureaus' history and status as licensees of Fair Isaac's Credit Scores, their promotion of their VantageScore product and in-house scores with confusingly similar scoring ranges increases the likelihood of confusion among the Consuming Public.

72.     The Defendants advertise and promote their 501-990 score in promotional materials and on their websites.  The following are just a few examples from the Defendants' websites and advertising materials which highlight their use of 501-990:

a.       *Press release by VantageScore, TransUnion, Equifax and Experian:*

"VantageScore uses score ranges from 501-990."

*See* Exhibit 3.

b.       *VantageScore website located at www.vantagescore.com:*

"Easy to understand and apply-Returns a score range of 501-990 (higher scores represent a lower likelihood of risk)"

"Returns a score range of 501-990 (higher scores represent a lower likelihood of risk)"

*See* Exhibit 4.

c.       *VantageScore brochure (obtained from www.vantagescore.com):*

"Uses a common score range of 501-990 (higher scores represent a lower likelihood of risk)"

*See* Exhibit 5.

d.       *Experian brochure:*

"Uses a common score range of 501 to 990 (high scores equal low risk)"

*See* Exhibit 6.

e.       *Experian website located at www.experian.com:*

"VantageScore is easy to understand and apply.  It uses score ranges from 501-990.  Consumers and credit grantors alike will recognize the following logical score groupings that approximate the familiar academic scale:

- A:  901-990  (Super Prime)
- B:  801-900  (Prime Plus)
- C:  701-800  (Prime)
- D:  601-700  (Non-Prime)
- F:  501-600   (High Risk)"

*See* Exhibit 7.

    f.      *Experian press release*:

"VantageScore uses a score range from 501 to 990.  Consumers and credit grantors will recognize the logical score groupings that approximate the familiar academic scale:

   \*   901-990   A
   \*   801-900   B
   \*   701-800   C
   \*   601-700   D
   \*   501-600   F"

*See* Exhibit 8.

    g.      *TransUnion website located at www.transunion.com and press release:*

"VantageScore was developed . . . and uses a score range of 990-501 and score groupings that approximate the familiar academic scale:

   •   901-990   A
   •   801-900   B
   •   701-800   C
   •   601-700   D
   •   501-600   F"

*See* Exhibit 9.

73.    The Defendants' use of their 501-990 Credit Score described above constitutes unauthorized use of Fair Isaac's 300-850® scoring range and its 300-850® Marks, and trades on Fair Isaac's goodwill in its Credit Scores and marks.

74.    The Defendants' use of their 501-990 credit-score range described above is likely to cause confusion and harm to Consumers and Lenders.  For example, mortgage applicants with a 300-850® FICO® Credit Score of 620 or greater are considered less risky and generally require less documentation with their loan submission than applicants with a lower score.  But under the VantageScore model, a Credit Score of 620 apparently translates on its so-called "academic scale" to a "D-."  Lenders likely would want to consider a person with such a grade and score as high-risk and treat them differently from Consumers with a 620 FICO® score.

75.    Similarly, on information and belief, a Consumer with a score of 720, for example, under the Defendants' model, may be hard-pressed to discover the relevance (or

irrelevance) of this score and may make wrong choices based on their misunderstanding of the meaning of their 501-990 score.  "A FICO credit score above 720 means you have decent credit. A VantageScore rating of 720 means your credit isn't so great."  *See* Exhibit 10.

76.     Indeed, Consumer confusion already has happened.  As one example, below is an excerpt from a story that Michelle Singletary wrote for the Washington Post on April 6, 2006:

> "'It appears now that someone with a credit score of, say, 800 under the current system, certainly top of the line since 850 is the current ceiling, would move from top rating to average under the new system,' the reader wrote.
>
> That's an incorrect conclusion.  The two systems are not being merged . . . ."

*See* Exhibit 11.

77.     In the recent months, there have been many articles written about the likelihood of confusion that the Defendants' 501-990 score will cause.  Chip Cummings, a 23-year mortgage-industry veteran and international speaker who has been featured on radio, TV, and print media recently wrote:

> "The new Vantage Credit Scoring system, just released by the three major credit reporting agencies, Equifax, Experian and TransUnion, could cause major confusion in the industry.  What used to be a good credit score, may now be considered 'marginal,' costing Consumers through higher interest rates, shorter credit terms, and increased costs."

*See* Exhibit 12.  In addition, the following excerpts taken from other articles show the industry's fear that the Defendant's 501-990 score will cause confusion among the Consuming Public:

> "As we discuss in Part 4, FICO scores, with a range of 300 to 850, have been the scoring norm.  If VantageScores with a cap of 990 take hold, this is bound to cause consumer confusion.  You might think, for example, that a score of 850 puts you at the top as a credit risk.  You'd be right if your lender used a FICO score.  But, if your lender scores under the VantageScore system, you'll only get a B.  (For a description of VantageScore numerical ranges and how this translates to a letter grade, see Experian's news release, dated March 14, 2006."

*See* Exhibit 13.

"This is because FICO bases their credit ratings on a scale from 300 to 850 and VantageScore bases its credit ratings on a scale from 520 to 990. If you apply with a lender and they turn you down because your credit rating is 650, you may get really confused, not realizing they're not using the FICO model to determine they're [sic] credit ratings. If you want to understand exactly where your credit score stands, you need to know which credit rating system the lender is using."

*See* Exhibit 10.

"However, since the system is new, it will no doubt cause some confusion with lenders who may confuse it with the FICO score, which operates on a scale of 350 to 850, so a good FICO score may not be a good VantageScore."

*See* Exhibit 14.

"'There could be confusion among consumers unless they make it clear that there are two systems,' said Linda Sherry, a spokeswoman for Consumer Action, which is based in San Francisco. 'People have gotten used to thinking a certain number like 700 is a good score. That might be true if it's a FICO, but might not be under the new system.'"

*See* Exhibit 15.

TransUnion and Experian also advertise and promote the scoring ranges for their in-house Credit Scores on their websites and in other media or promotional materials. As one example, TransUnion promotes the scoring range 300-850 for its in-house score on its website, located at www.truecredit.com, as follows:



TransUnion does not sell a Fair Isaac 300-850® FICO® score at this site. Instead, it only sells its 300-850 in-house score.

78.     In addition,  the Credit Bureaus use Fair Isaac's  300-850® Marks in a scheme to lure individual Consumers to their websites so they can later sell those Consumers a non-Fair Isaac score.   For example, Experian posts banner ads on the Internet that read as follows:

"The U.S. average credit score is 678.  What's yours?"

*See* Exhibit 16.  The language "U.S. average credit score" suggests that there is one type of Credit Score that is purchased by Consumers and used most by Lenders.  These ads are likely to confuse Consumers into believing that they can click on the ads and get the Credit Score that is used most by Lenders—i.e., a 300-850® FICO® score—when, in fact, Fair Isaac's scores are not offered there.  These types of ads are also particularly misleading because the posted average score for the type of score advertised—i.e., 678—falls within Fair Isaac's 300-850® Marks.  It is therefore plausible to the Consumer that the average credit score on the 300-850® scoring range could be 678, thereby making it appear even more likely that the Credit Score being advertised is a Fair Isaac Credit Score.  In addition, because Experian is using Fair Isaac's well-known scoring scale to lure individual Consumers to its website, Consumers likely will be confused to believe that the in-house Credit Score and the VantageScore Credit Score offered at the Experian website is somehow affiliated or associated with, or sponsored or approved by Fair Isaac.  Therefore, Experian is trading on the goodwill in Fair Isaac's 300-850® Marks to get Consumers to go to its website and purchase its non-Fair Isaac credit-scoring products.  It is likely that Consumers will do so under the belief that they are purchasing the Fair Isaac Credit Score that is most used by Lenders.

79.     As another example, Experian posts the following banner ad on the Internet:



Like the banner ads in the example above, this banner ad also leads to Experian's website where only Experian's 330-830 in-house score and the 501-990 VantageScore Credit Score are sold. Experian is using this banner ad, which represents Fair Isaac's 300-850® Marks, to sell non-Fair Isaac scores.  This shows once again that Experian is trading off of the goodwill in Fair Isaac's 300-850® Marks in order to lure Consumers to its website to sell them a non-Fair Isaac product. Here, the banner ad represents that a Credit Score of 670 is good (by the smiley face) and a Credit Score of 820 is excellent (by the happy face).  These are true representations of 300-850® FICO® Credit Scores.  Experian also is using this banner ad to sell the Defendants' VantageScore Credit Score even though the ad is not an accurate representation of how scores are viewed by lenders or how Consumers should feel about their scores on VantageScore's Credit-Score range (because a Credit Score of 670 on the VantageScore scoring range is considered very poor and a consumer cannot even get a Credit Score of 450 on VantageScore's scale).  Accordingly, Experian is using Fair Isaac's 300-850® Marks to lure Consumers to its website to sell an Experian in-house Credit Score or a VantageScore Credit Score.

80.     TransUnion and Experian also use Fair Isaac's 300-850® Marks in television commercials to lure Consumers to their websites, once again, to sell them a non-Fair Isaac Credit Score.  One of TransUnion's commercials, for example, features a spoof on gaining weight over the holidays and compares that to Credit Scores.  In doing so, TransUnion uses Fair Isaac's 300-850® Marks.  Specifically, the commercial shows a woman's feet standing on a scale as if she is checking her weight.  Numbers that fall within Fair Isaac's 300-850® Marks are shown digitally on the scale and those numbers continue to increase as the woman stands there (e.g., the scale shows the number 520, then 533, then 632 and then 832, etc.).  As the scores increase, text

31

appears on the Consumer's television screen that reads: "Bigger is better when it comes to your credit score."  "Where do you weigh in?" "Log on to TrueCredit now and get your FREE credit score."  A few representative screen shots from this commercial are shown below:





81.     Likewise, Experian uses Fair Isaac's 300-850® Marks in at least two different television commercials to lure Consumers to one of its websites where no Fair Isaac score is sold.  One commercial focuses in on a plasma television screen that shows the number range 450-850 with a ball that slides back and forth on the range.  A young man, sitting next to that screen, then begins to say: "I'm thinking of a number between 450 and 850, do you know what it is?  It's my credit score."  As he talks, large numbers (that fall within Fair Isaac's 300-850® Marks) appear above the range.  The man then continues to talk about the importance of a Consumer's Credit Score and tells Consumers to go to the freecreditreport.com website to get their free Credit Score.  At the end of the commercial, wording appears that reads: "Get Your

Credit Score and Report Instantly! "What is Your Credit Score?"  A few representative screen shots from this commercial are shown below:

 

The other Experian commercial is similar to the one discussed above, but the scale is shown as "600 700 800" while large numbers (that all fall within Fair Isaac's 300-850® Marks) appear above the scale.  Those numbers continue to increase as a woman talks about the importance of a Consumer's Credit Score (e.g., it shows the number 657, then 732, then 762 and then 837 etc.).  Text also appears on the screen that reads: "See Your Credit Score!" and "Do You Know YOUR Credit Score?"  Like the other Experian commercial, this one also directs Consumers to the freecreditreport.com website where no Fair Isaac Credit Score is sold.  A few representative screenshots from this commercial are shown below:

 

82.     TransUnion's and Experian's commercials suggest to Consumers—by using language like "See Your Credit Score" or "Do You Know Your Credit Score,"—that they have

one particular type of Credit Score that is used most by Lenders and that it is the score that is being sold through the advertisements. These statements are likely to confuse consumers to believe that they are getting the Credit Score that is most often used and accepted by Lenders—i.e., a 300-850® FICO® score. Upon information and belief, this is especially true when these statements are used in conjunction with Fair Isaac's 300-850® Marks because consumers will recognize that the Credit Scores being promoted fall within Fair Isaac's familiar 300-850® Marks.

83.     TransUnion's and Experian's use of Fair Isaac's 300-850® Marks described above constitutes an unauthorized use of Fair Isaac's 300-850® Marks, and trades on Fair Isaac's goodwill in its Credit Scores and marks.

84.     TransUnion's and Experian's use of Fair Isaac's 300-850® Marks described above is likely to cause confusion and harm to the Consuming Public. On information and belief, the likelihood of confusion is increased even more because, for any of the types of advertisements discussed above, Defendants do not reasonably identify the real source or the type of Credit Score that actually is being sold.

## C.     *Harm Caused by the Defendants' Use of Fair Isaac's Marks*

85.     On information and belief, the Defendants' use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, and Credit Scores that fall within Fair Isaac's 300-850® Marks, is deliberate, and the Defendants have used and continue to use these Credit Scores and marks for the purpose of giving the Defendants' Credit Scores and Credit-Scoring services appeal, credibility, and salability.

86.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks, is likely to cause confusion, to cause mistake, or to deceive the Consuming Public, as to affiliation, connection, or association of the Defendants with Fair Isaac, or as to the origin, sponsorship, or approval of the Defendants' products and services. This likelihood of confusion is increased by the fact that the Defendants are licensees and distributors of Fair Isaac's 300-850® Credit Score and offer the 300-850® score directly to Lenders and Consumers.

87.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks in the manner described above, constitutes passing off, falsely designates the origin of their products and services, and falsely and misleadingly describes and represents facts with respect to the Defendants and their products and services.

88.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks in the manner described above, falsely indicates to the relevant Consuming Public that the Defendants' services are affiliated, connected, or associated with Fair Isaac, or are sponsored, endorsed, or approved by Fair Isaac, or are in some manner related to Fair Isaac or its products or services.

89.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks in the manner described above, enables them to trade on and receive the benefit of the goodwill in Fair Isaac's Credit Scores and in its 300-850® Marks, which Fair Isaac has built up at great labor and expense over many years, and to gain acceptance for their products and services not solely on their own merits, but on the reputation and goodwill of Fair Isaac, its Credit Scores, its 300-850® Marks and its products and services.

90.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks, evidences Defendants' intent to trade on the goodwill of Fair Isaac and to pass off their Credit Scores and credit scoring products as Credit Scores or scoring products from Fair Isaac.  Additionally, as discussed below, Defendants' use of Fair Isaac's trademarks as "keyword" search terms on Internet search engines which direct Consumers to Defendants' websites where Fair Isaac's Credit Scores are not sold, increases the likelihood of confusion or deception, and shows even further Defendants' intent to trade on the good will of Fair Isaac and to pass off their Credit Scores and scoring products as Fair Isaac's.

91.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a credit-score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks, unjustly enriches the Defendants at Fair Isaac's expense.

92.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a score range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850 FICO® Marks, removes from Fair Isaac the ability to control the nature and quality of its Credit Scores and the 300-850® Marks.  In addition, it places Fair Isaac's reputation and goodwill at least in part in the hands of the Defendants, over whom Fair Isaac has no control.

93.     The Defendants' unauthorized use of Fair Isaac's 300-850® Marks, or marks substantially similar to the 300-850® Marks, and a scoring range that is either identical to, falls within or overlaps Fair Isaac's 300-850® Marks, or Credit Scores that fall within Fair Isaac's 300-850® Marks, will cause irreparable injury to Fair Isaac and to the public unless restrained by this Court.

94.     The Defendant's acts have been malicious, deliberate, willful, intentional and in bad faith, with full knowledge and conscious disregard of Fair Isaac's rights in the 300-850® Marks, and with an intent to trade on Fair Isaac's vast goodwill in its Credit Scores and the 300-850® Marks, and with the intent to confuse the Consuming Public.

**D.     *The Defendants' False and Misleading Representations***

95.     In addition to trading on Fair Isaac's goodwill by using the 300-850® Marks, and credit-score ranges that fall within or overlap the 300-850® Marks, the Defendants have made many misleading and false representations of fact regarding the qualities and characteristics of their Credit Scores and Fair Isaac's Credit Scores.

96.     As explained above, TransUnion and Experian have made false and misleading representations of fact to Consumers about their in-house Credit Scores that are featured in their advertisements.  Specifically, in many different ways, TransUnion and Experian have suggested

to Consumers that the score being offered for sale is the one score that is purchased by Consumers and used most by Lenders.  Phrases like "Your Credit Score," "What's Your Score," "Do You Know Your Score" and "U.S. Average Credit Score is…What's Yours?" are just a few examples of the types of misleading statements that TransUnion and Experian have made to make these suggestions.

97.     In addition to these misleading statements, Experian also explicitly states on its website at www.creditexpert.com that its in-house score is "the same type of score that lenders see."  Consumers are brought to this statement immediately after they click on a link at www.experian.com that reads:  "Experian credit score and credit report.  The U.S. average credit score is 678.  What's your score."  The statement that the score is "the same type of score that lenders see" falsely and misleadingly suggests to Consumers that they are buying the type of Credit Scores that are used most by Lenders to make decisions about Consumers.  These statements are false and misleading because the non-Fair Isaac scores that are sold at these websites are not the scores generally accepted and relied on by Lenders.  And because Consumers are familiar with Fair Isaac's 300-850® Marks, Experian's use of a 678 Credit Score, for its statement about the average credit score, increases the likelihood that Consumers will believe that they are purchasing the Credit Score that is most often used, accepted and relied on by Lenders—i.e., Fair Isaac's 300-850® FICO® score.

98.     Defendants also have made many misleading and false representations of fact regarding the qualities and characteristics of their Credit Scores and Fair Isaac's Credit Scores.  On information and belief, while the Defendants have made representations of fact about the quality and characteristics of their 501-990 score compared to Fair Isaac's Credit Scores, they have never actually tested their score against Fair Isaac's Credit Scores to determine the

truthfulness of their statements or representations.  Examples of Defendants' false and

misleading statements are discussed below.

### False and Misleading Statements by Experian

99.    The following is not necessarily an exhaustive list of additional misleading and

false statements made by defendant Experian:

a.    "VantageScore was developed jointly by the three national credit reporting
companies and is the credit reporting industry's first scoring model to deliver
consistent, objective scores across their respective databases."

*See* Exhibit 17.  This statement falsely suggests that Fair Isaac's Credit Scores are not consistent

or objective.  It also falsely suggests that VantageScore is the first, and only, scoring model to

generate consistent and objective scores.

b.    "Leveled credit characteristics across all three national credit reporting companies
ensure that any score differences for the same consumer are attributable to content
differences, not the scoring algorithm."

*See* Exhibit 18.  This statement falsely suggests that a Consumer's Fair Isaac Credit Score will

vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and

not because of actual differences in the Credit Bureaus' data for the particular Consumer.  In

addition, this statement falsely suggests VantageScore's product is more predictive than Fair

Isaac's because VantageScore's model applies the same algorithm to each Credit Bureau's data

set in generating Credit Scores.  In fact, the use of the identical algorithm across the different

data sets of the Credit Bureaus makes the resulting Credit Scores less predictive.

c.    "Score differences across the three companies are attributed to content
differences, as opposed to the scoring algorithm itself."

*See* Exhibit 18.  This also falsely suggests that a Consumer's Fair Isaac score will vary for each

Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of

differences in the Credit Bureau's data for a particular Consumer.

     d.      "As a result, it leverages the collective expertise of the industry's leading experts on credit data, scoring and analytics to offer greater predictiveness and consistency."

*See* Exhibit 18.  This representation falsely suggests that the three Credit Bureaus are more knowledgeable about Credit Scoring than Fair Isaac.  It also falsely suggests that the Credit Bureaus have more expertise in developing credit-scoring algorithms than Fair Isaac does and that their algorithm is more predictive and consistent than Fair Isaac's scoring algorithms.

     e.      "Given the lack of scoring solutions in the market today that capitalize on data from all three credit reporting companies, choices were limited to risk decisioning tools to create effective lending strategies.  With VantageScore, you can make the best risk management decisions with improved prediction power that is consistent across all three national credit reporting companies."

*See* Exhibit 18.  This statement falsely suggests that Fair Isaac's Credit Scores cannot be generated from all three Credit Bureaus' data.  It also suggests that Fair Isaac's scores are not consistent.  Moreover, it suggests that financial institutions can better manage risk with the Defendants' model.

     f.      "By combining the consistent predictive power of VantageScore with Experian's robust database, you can achieve the most accurate outcome of risk assessment with the most up-to-date information available on the market today."

*See* Exhibit 18.  This falsely suggests that VantageScore's model uses more accurate and updated information from the Credit Bureaus than Fair Isaac's models.  In calculating a Fair Isaac score, the Credit Bureaus apply their credit data for a particular Consumer to Fair Isaac's algorithm uniquely created for that Credit Bureau.  This data used is the most up to date information the Credit Bureau has on the particular individual Consumer.  This representation by Experian also falsely suggests that the Defendants' model is more accurate than Fair Isaac's models.

     g.      "Unprecedented in implementing the same score at all three national credit reporting companies."

*See* Exhibit 18.  This falsely suggests that with VantageScore's model, a Consumer will always get the same score for each Credit Bureau—even if the Credit Bureaus have different data for the Consumer.

      h.     "VantageScore, which is both used by lenders and now available to Consumers . . . ."

See Exhibit 19.  This statement falsely suggests that Lenders currently use and have accepted the Defendants' VantageScore model as a viable method of determining risk.

### False and Misleading Statements by TransUnion

    100.   The following is not necessarily an exhaustive list of misleading and false statements made by Defendant TransUnion:

      a.     "The score is unprecedented in that it looks at and analyzes data at the same point in time on the same consumer records from all three national credit reporting companies."

See Exhibit 20.  This falsely suggests that Fair Isaac's scoring models do not analyze the Credit Bureaus' data for a particular Consumer for the same time period.

      b.     "'By developing a patent-pending approach to consistently interpret the credit information stored within each credit repository, also referred to as characteristic leveling, any credit scoring differences between the credit reporting companies can be attributed to data differences in a consumer's credit file rather than data interpretation—as is the case in most scoring models today,' said Wiermanski. 'With VantageScore, a significant achievement is accomplished by creating this consistent scaling across the credit reporting companies; an approach we believe is long overdue and will be universally embraced.'"

See Exhibit 9.  These representations falsely suggest that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of differences in the Credit Bureaus' data for a particular Consumer.  They also falsely suggest that Fair Isaac's models do not consistently interpret data.

### False and Misleading Statements by Equifax

    101.   The following is not necessarily an exhaustive list of misleading and false statements made by defendant Equifax:

      a.     "No other model does a better job of delivering objective and consistent credit scoring. Through the unprecedented collaboration of the three major credit reporting companies, VantageScore leverages unmatched data and state-of-the-art

> modeling techniques. The result: greater predictive power that leads to better risk management and increased profitability."

*See* Exhibit 21.  These representations falsely suggest that VantageScore has access to better Consumer data than Fair Isaac does.  They also suggest that the Credit Bureaus share Consumer information among one another and use data to which Fair Isaac does not have access.  Once again, in calculating a Fair Isaac score, the Credit Bureaus apply their Aggregated Credit Data for a particular Consumer to Fair Isaac's algorithm uniquely created for that Credit Bureau.  This data is the most up-to-date information the Credit Bureau has on the particular individual Consumer.  In addition, these statements falsely suggest that the Defendants' scores are better and more predictive than Fair Isaac's scores.  Even further, they falsely suggest that the VantageScore model will lead to better and more profitable decisions for Lenders than Fair Isaac's models.

>    b.   "VantageScore employs the same, consistent scoring algorithm at all three CRCs. So any differences in one consumer's scores across the CRCs would be due to data content differences, not the scoring formula."

*See* Exhibit 22.  This statement falsely suggests that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of the actual differences in the Credit Bureaus' data for a particular Consumer.  It also falsely suggests that Fair Isaac's scoring models are inconsistent.

>    c.   "Leveling the attributes across the CRCs contributes to the model's superior predictive power over scores on the market today. And the VantageScore model is unprecedented in looking at data from all three CRCs at the same point in time."

*See* Exhibit 22.  This statement falsely suggests that Fair Isaac's models do not analyze data from the same time period when generating a Consumer's scores from all three Credit Bureaus.  It also falsely indicates that "leveling" increases a Credit Score's predictiveness when, in fact, leveling reduces predictiveness.

>    d.   "Why Will Lenders Use VantageScore?
>         VantageScore's across-the-board consistency reduces the need for creditors to manually review applications or impose their own personal methods when determining your credit worthiness. As VantageScore becomes the industry

standard, all players in the credit lending market—from consumers to investors— will benefit from increased efficiency and effectiveness."

*See* Exhibit 23.  These representations falsely suggest that the Defendants' VantageScore model will always generate the same score across Credit Bureaus for a Consumer.  They also falsely suggest that Lenders are required to implement their own personal methods of determining creditworthiness of a Consumer when Fair Isaac's scores are used and that Lenders must critically review Fair Isaac's scores, thereby suggesting that Fair Isaac's Credit Scores are not accurate or trustworthy.

### False and Misleading Statements by VantageScore

102.    VantageScore's own President and CEO, Barrett Burns, recently made many false and misleading statements about VantageScore's products.  The following is a non-exhaustive list of such misleading and false statements made by VantageScore through Mr. Burns:

a.    In a television interview on CNBC, Mr. Burns represented that:

(i)    "[A]ll major lenders are testing the score now . . . ."

(ii)    VantageScore's products use only the "freshest data" available "between 2003 and 2005."

On information and belief, the first statement above is false. The second statement falsely suggests that VantageScore has access to better and more updated data than Fair Isaac.  It also suggests that Fair Isaac's products use stale data.  As explained above, however, in calculating a Fair Isaac score, the Credit Bureaus apply Fair Isaac's algorithm, which is uniquely created for that Credit Bureau, to their Aggregated Credit Data for a particular Consumer.  This data is the most up-to-date information the Credit Bureau has on the particular individual Consumer. Consumers will be misled by Mr. Burns's statement to believe that they can only obtain their

newest, most recently-improved score, through a VantageScore product and not through a Fair

Isaac product.  In that same television interview on CNBC, Mr. Burns also stated that:

> (iii)   VantageScore's model "provides Lenders with more accurate tools" based
> on "fresh data."

This falsely suggests that VantageScore's model will be able to produce more accurate Credit

Scores for Consumers than Fair Isaac's models can produce.  It also falsely suggests that Fair

Isaac's products use stale and less-accurate data.  Once again, Fair Isaac's models only use the

most up-to-date information on a particular individual Consumer.

> b.   In other public interviews with the media, Mr. Burns was quoted as saying:

> (i)   The score "is a decidedly superior scoring methodology that fills a void in
> the market by providing lenders with choices in credit scoring."

See Exhibit 24.  This falsely suggests that VantageScore's model is superior to Fair Isaac's

model and that it provides choices to Lenders that Fair Isaac's models cannot provide.  This

statement is also false because there was no void to fill because the Credit Bureaus offered their

own in-house credit Credit Scores to Lenders for many years. Mr. Burns was also quoted as

saying:

> (ii)   "It allows credit grantors to evaluate consumer creditworthiness with
> significantly greater precision, and consumers will be able to more readily
> understand the credit scores and the factors that determine them."

See Exhibit 24.  This falsely suggests that the VantageScore model is more predictive than Fair

Isaac's models.  It also falsely suggests that Consumers cannot understand their Fair Isaac Credit

Scores or the factors that make up those scores.  And Mr. Burns was quoted as saying:

> (iii)   "[VantageScore credit score is] more predictive than what's in the
> market."

See Exhibit 25.  This falsely suggests that VantageScore's credit score is a better, more accurate

score than Fair Isaac's score.

103.   In addition to the statements made by Mr. Burns, the following is a non-exhaustive list of even more misleading and false statements made by VantageScore:

a.   "VantageScore Benefits
Limits score variability across credit reporting companies: Leveled characteristics across Equifax, Experian and TransUnion ensure that any score differences for the same consumer are attributable to content differences, not the scoring algorithm."

*See* Exhibit 5.  This statement falsely suggests that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of differences in the Credit Bureaus' data for a particular Consumer.

b.   "Under the VantageScore modeling system, credit score variance between credit reporting companies is attributed to data differences between the three consumer credit reporting companies and not to the structure of the scoring model or interpretation of the data."

*See* Exhibit 26.  This also falsely suggests that a Consumer's Fair Isaac score will vary for each Credit Bureau because Fair Isaac's scoring algorithms are inferior or flawed and not because of differences in the Credit Bureaus' data for a particular Consumer.

c.   Innovative – Patent pending applications of statistical modeling techniques enable enhanced predictiveness and ensure that consumers will receive more appropriate credit terms"

*See* Exhibit 5.  This falsely represents that Consumers are ensured better credit terms if they purchase Defendants' 501-990 score instead of Fair Isaac's Credit Scores.

d.   "Accurate – Deep knowledge of the data ensures the most accurate scoring algorithm attainable"

*See* Exhibit 5.  This falsely suggests that the Defendants' VantageScore model is the most accurate scoring algorithm available to Lenders and Consumers.  It also suggests that the VantageScore model has more accurate Consumer data available to it than Fair Isaac.  In addition, the statement falsely suggests that only Defendants have "deep knowledge" of their aggregated data when, in fact, Fair Isaac has worked closely with each Defendant over the past 15 years and has intimate knowledge of each Defendant's Aggregated Credit Data.  Indeed, Fair Isaac often has a better understanding of a Credit Bureau's data than the Credit Bureau itself and

is the one to identify credit data with high predictive value to accentuate in the next iteration of Fair Isaac's scoring algorithm built for that Credit Bureau's data set.

> e.    "VantageScore is an innovative consumer credit risk score offering greater consistency and predictability to consumers and credit grantors.  Its patent-pending development methodologies enable institutions to rank a consumer's credit worthiness more accurately than other scores currently available in the marketplace."

*See* Exhibit 4.  These representations falsely suggest that the Defendants' model is more accurate than any other Consumer scoring model available.  They also falsely suggest that both Consumers and Lenders can get more consistent and predictive Credit Scores with the Defendants' VantageScore models than they could get with Fair Isaac's models.  Even more, they falsely suggest that Fair Isaac's scores are not consistent or predictive.

> f.    "However, VantageScore marks the first time that the three companies joined forces to produce a model that scores consumers consistently across the three companies."

*See* Exhibit 26.  This statement falsely suggests that Fair Isaac Credit Scores are not consistent across the Credit Bureaus.  It also falsely suggests that the Defendants' VantageScore model is the first, and only, Credit Score to be consistent.

104.   On information and belief, the Defendants intentionally caused misleading and false representations of fact to be published on their websites and in other media and promotional materials.

105.   On information and belief, the Defendants caused such misleading and false representations of fact to be published with the intent to sell their Credit Scores and to induce Lenders and Consumers to rely on their representations in making decisions about which Credit Score to purchase.

106.   On information and belief, the Defendants either intended, recognized, or should have recognized that their misleading and false representations would result in harm to the pecuniary interests of Fair Isaac by harming its reputation and goodwill in its Credit Scores.

107.   On information and belief, the Defendants intend to continue making these misleading and false representations by publishing these or similar misleading and false representations of fact on their websites and in promotional materials and advertisements.

108.   The Defendants made numerous misleading and false representations of fact through their websites and in advertisements or in other media or promotional materials regarding the nature, characteristics and quality of their Credit Scores and Fair Isaac's Credit Scores.  Consequently, the Defendants' misleading and false representations have directly implicated and caused damage to the pecuniary interest of Fair Isaac by harming Fair Isaac's reputation and its Credit Scores.  The Defendants' misleading and false representations also have harmed the Consuming Public by misleading them to believe that Defendants' Credit Scores contain qualities or characteristics that they do not have and that Fair Isaac's Credit Scores do not have certain qualities and characteristics that they do have.

109.   The Defendants' misleading and false representations of fact have been used in commerce that may lawfully be regulated by Congress.

110.   As described in greater detail above, the Defendants have acted in concert through joint press releases and, in the course of promoting their 501-990 score, have made misleading statements regarding the accuracy and consistency of Fair Isaac scores, as well as Fair Isaac's expertise in Credit Scoring.  The Defendant Credit Bureaus also have made statements, described above, suggesting that their new score is more accurate than Fair Isaac's scores and that their score accesses more accurate and updated information from the Credit Bureaus than Fair Isaac's scores.  Through their misleading statements, the Defendants have suggested that Fair Isaac's scores are less predictive, more inconsistent, and based on inferior credit data as compared to the Credit Bureaus' 501-990 score.

111.   On information and belief, the Credit Bureaus have not validated their claims by testing their 501-990 score against Fair Isaac's scores.  Interested Lenders usually will conduct new score validation testing prior to adopting a new Credit Score based on Aggregated Credit Data.  When conducting a validation, Lenders typically will want to test against all available

Credit Bureau scoring options (including classic FICO® and NextGen FICO®) to understand each scoring solution's predictive power.  As described above, the NextGen score is able to score more Consumers and is a more powerful risk predictor and should be included in a validation testing exercise.  On information and belief, the Credit Bureaus have impeded Lender evaluations of their VantageScore product against the NextGen score by offering their VantageScore product to Lenders free of charge for evaluation and testing purposes, while at the same time failing to offer the opportunity to test against the NextGen score or by charging discriminatory high prices for the evaluation of NextGen scores against the same credit data. The Credit Bureaus thus are denying Fair Isaac the opportunity to compete on the merits of its NextGen score and are denying Lenders equal access to all scoring solutions.

112.   As explained above, the Defendant Credit Bureaus decided to use the scoring range of 501-990 for their VantageScore product, which overlaps and trades on Fair Isaac's established goodwill in its Credit Scores and its trademarks.  In addition to trading on Fair Isaac's goodwill, this unauthorized use of Fair Isaac's Marks and marketing of the overlapping 501-990 scoring range causes Consumer confusion and degrades the value of Fair Isaac's 300-850® Marks.

113.   On information and belief, the pattern of the Credit Bureaus' behavior in misleading and confusing Consumers, and disparaging and degrading Fair Isaac's Credit Scores, reflects an agreement—whether explicit or implicit—to raise Fair Isaac's costs, instill doubt in Fair Isaac's scoring products, to move the credit industry solely to the Credit Bureaus, and to exclude, foreclose, and/or drive out Fair Isaac and other third-party providers of algorithms or Credit Scores.

114.   On information and belief, the Credit Bureaus conspired to raise Fair Isaac's costs and marginalize or exclude Fair Isaac from the Credit Scoring Market.  This was done at least through (1) the Credit Bureaus' campaign to disadvantage and disparage Fair Isaac's scoring products in the course of pushing their new score, (2) the Defendants' joint statements and use of an overlapping scoring range that confuse Consumers and Lenders, and (3) the Credit

Bureaus' agreement to persuade Consumers and Lenders to switch from existing scores to their new Credit Score.

E.      *Ownership and Control of Consumer Credit Scores*

115.    In addition to the inherent unfair and illegal impact of the Defendants' conduct with regard to Fair Isaac, the Defendants' unfair conduct is part of a broader scheme to own and control the algorithm used to generate Credit Scores, to eliminate third-party vendors of algorithms used to derive industry-accepted Credit Scores, such as Fair Isaac, and thereby to reduce competition in the market for Aggregated Credit Data and to protect the Credit Bureaus from new competitive threats to their tight oligopoly over Aggregated Credit Data.

116.    Currently, the three Credit Bureaus together fully control the market for Aggregated Credit Data.  In other words, at present, there is no source of Aggregated Credit Data other than the three Credit Bureaus to which Consumers or Lenders can turn.  Barriers to entry into the market for Aggregated Credit Data are high.  In order to compete with the Credit Bureaus, a new entrant must build a database that is equivalent to the databases built by the Credit Bureaus over decades.  Building such a competitive database involves considerable time and costs to develop the infrastructure, to populate the database with current information and historical data, and to format and store the data (*e.g.*, Experian's FileOne database cost more than $100 million and took four years to develop, despite Experian already having much of the underlying data).

117.    For example, in mid-1997, First Data Corporation acquired a regional Texan credit bureau (renamed "Innovis") with the aim of turning it into the fourth national Credit Bureau.  After 18 months, unable to surmount the considerable barriers to entry, First Data Corporation announced the closure of the business unit because the investment and effort necessary to make Innovis a competitive player in the Aggregated Credit Data Market would not provide the necessary return to investors.  Since then, what is now known as CBC Innovis, on its own, has continued to try to enter the Aggregated Credit Data Market.

118.   The Credit Bureaus formed VantageScore and acquired complete ownership of it in order to own and control the algorithm used to generate Credit Scores and thus to extend their current oligopoly over Aggregated Credit Data to also control the Credit Scoring Market. Having agreed to create and control VantageScore, the Credit Bureaus no longer will compete unilaterally or in collaboration with third-party vendors of algorithms, such as Fair Isaac, to generate competing Credit Scores.  For example, Experian has announced that it no longer is going to make available its in-house Credit Score to Consumers but rather is going to market the VantageScore model instead.

119.   Having acquired joint ownership and control over VantageScore, on information and belief, the Credit Bureaus have agreed to use, and are using, VantageScore as a vehicle to drive competing Credit Scores, including those of Fair Isaac, from the market and to establish the VantageScore model as the monopoly score, not through competition on the merits, but rather through a concerted campaign of exclusionary and discriminatory acts.

120.   On information and belief, the Credit Bureaus have agreed jointly to persuade Consumers and Lenders—*i.e.*, the universe of customers to which Consumer credit reports are sold—to switch to the VantageScore product from all other Credit Scores, including the standard 300-850® classic FICO® score.  To that end, all three Credit Bureaus have used essentially the same marketing pitch for their VantageScore products and have made the same false and deceptive claims about Credit Scores generated from the VantageScore algorithm. Moreover, as described above, all three Credit Bureaus have made false and disparaging claims about Credit Scores generated using Fair Isaac's scoring algorithms.

121.   Also, since they agreed to own and control VantageScore, the Credit Bureaus have reduced significantly their collaborations with third-party vendors of scoring algorithms, such as Fair Isaac, in developing new products.  They even have turned down products and services from Fair Isaac that would make them money.

122.   As another example, Experian asked Fair Isaac in April 2005 to develop a bankruptcy score.  Fair Isaac did so and the product was launched in April 2006, approximately

one month after the Credit Bureaus' announcement of their VantageScore model via a joint press release. Before launching the new bankruptcy score, Fair Isaac requested a joint press release with Experian but Experian refused.

123.   In addition, Equifax recently canceled its contract with Fair Isaac for FICO Score Delivery service, pursuant to which Equifax distributed Fair Isaac scores generated using Equifax's Aggregated Credit Data for existing account management purposes. On information and belief, cancellation of this contract actually required Equifax to forego profits that it could otherwise have enjoyed. Equifax sacrificed these short-term profits, on information and belief, in order to harm and exclude Fair Isaac.

124.   In order to extend their oligopoly in Aggregated Credit Data into the market for Credit Scoring, the Credit Bureaus are using their control over the sale of the bundle of Aggregated Credit Data and Consumer Credit Scores, which includes the fee for usage of a credit scoring algorithm, to shift sales from the Credit Scores of third parties, such as Fair Isaac, to VantageScore. The Credit Bureaus can manipulate the price of the classic 300-850® FICO scores directly and can manipulate data processing costs indirectly to disadvantage third-party providers of Credit Scores, including Fair Isaac.

125.   First, as explained, several important Fair Isaac scoring products such as classic FICO® and NextGen FICO® Credit Scores used for account origination, are currently sold and distributed by the Credit Bureaus directly to Lenders. The price of the bundle (*i.e.*, data plus algorithm plus processing) thus is at the sole discretion of the Credit Bureau. Even if Fair Isaac attempts to lower the royalty it charges for the use of its scoring algorithm, the Credit Bureaus control absolutely whether any of that royalty discount is passed along to Lenders. Thus, the Credit Bureaus have the ability to raise the price charged to Lenders for Fair Isaac scoring products to a level above that which the Credit Bureaus charge for the VantageScore model, and Fair Isaac is powerless to respond.

126.   For example, on information and belief, Equifax recently raised significantly the price charged to resellers for the 300-850® classic FICO® scores in order to convert purchasers to VantageScore.

127.   Second, even with respect to those Fair Isaac scoring products that Fair Isaac sells directly to Lenders—*e.g.*, PreScore service and FICO Score Delivery—the Credit Bureaus can indirectly ensure that Fair Isaac products are not priced competitively relative to the equivalent VantageScore product.  The bundled price given to Lenders and Consumers for a VantageScore or Fair Isaac (or any other) scoring product includes the cost of three elements: the Aggregated Credit Data, the use of the scoring algorithm, and data processing costs.  The cost of the Aggregated Credit Data constitutes the bulk of the bundle price.  The Credit Bureaus thus can manipulate their control over pricing to disadvantage Fair Isaac by increasing the price they charge for the data and processing portions of the bundle when that data and processing are used with Fair Isaac's scoring algorithm.  In theory, they could raise the price of data and processing (and, as a result, the bundle price) so much that they could give the VantageScore product away for free and still increase the overall price of the bundle.  The Credit Bureaus thus can take advantage of their control over pricing of the bundle to induce Lenders and Consumers to use the VantageScore product instead of competing Credit Scores without a concomitant benefit to the Consuming Public.

128.   In addition, on information and belief, the Credit Bureaus have informed potential customers that they intend to price VantageScore Credit Scores at a fraction – as little as 20% – of the price they charge for the standardized Fair Isaac 300-850® classic FICO® score.

129.   The market power of the three Credit Bureaus and VantageScore in the Relevant Markets enables them to engage in monopolistic, anti-competitive price discrimination.  The effect of this price discrimination is to reduce output in the Relevant Markets for Credit Scores.  While Fair Isaac licenses its NextGen scoring algorithm for slightly more – about 15% higher – than the rate at which the 300-850® classic FICO® score algorithm is licensed, on information and belief, the Credit Bureaus are quoting prices for NextGen scores that are as much as 500%

52

higher than those for the 300-850® classic FICO® score.  On information and belief, the Credit Bureaus have purposefully misled Lenders into believing that the higher cost of NextGen scores is the result of Fair Isaac's royalty, rather than the Credit Bureaus' exclusionary manipulation of pricing.

130.   The Credit Bureaus also have the ability to marginalize and/or exclude Fair Isaac from the market by denying Fair Isaac access on reasonable terms to Credit Bureaus' Aggregated Credit Data.  On information and belief, the Credit Bureaus charge Fair Isaac a significantly higher price—approximately three to four times higher—for usage of their Aggregated Credit Data than they each charge each other for the same data.  Moreover, on information and belief, the Credit Bureaus charge other third parties substantially less than Fair Isaac for the same data. In addition, at least one of the Credit Bureaus has flatly denied Fair Isaac access to its credit data with regard to certain credit reports, such as "three-in-one" credit reports that merge credit data from all three Credit Bureaus into a single report.

131.   On information and belief, this coordinated manipulation of pricing and processing costs by the Credit Bureaus, as well as their ability to deny access to their Aggregated Credit Data, has the purpose and effect of excluding Fair Isaac and other competitors from the Credit Scoring Market or Markets without having to compete on the merits.

**F.**   ***Elimination of Competition in the Market for Aggregated Consumer Credit Data***

132.   While the Credit Bureaus have agreed jointly to own and control VantageScore and to use it to extend their collective market power in Aggregated Credit Data in order to eliminate competition for Credit Scores, that is not the sole anticompetitive purpose and effect of their agreement.  Rather, through joint ownership and control of VantageScore and the elimination of competition for Credit Scores, the Credit Bureaus have concocted a scheme to

reduce competition among themselves in the market for Aggregated Credit Data and to protect their tight oligopoly in that market from future competitive threats.

133.   As explained above, the three Credit Bureaus alone control the market for Aggregated Credit Data and they are protected from new competition by high barriers to entry. As economic theory predicts, competition within this tight oligopoly is less than intense. Indeed, the Credit Bureaus largely do not have to compete at all in the sale of Aggregated Credit Data and related Credit Scores to Lenders extending residential mortgage loans because such institutions are required to obtain credit reports from all three Credit Bureaus.

134.   Prior to their creation and ownership of VantageScore, each Credit Bureau competed with the others to develop and price Credit Scores generated from its data.  That rivalry not only has played an important role not only in developing the most predictive, competitively priced Credit Scores, but it also was an important factor in the competition among the Credit Bureaus in the market for Aggregated Credit Data.

135.   Before VantageScore, each Credit Bureau unilaterally developed Credit Scores internally or in collaboration with third-party vendors of scoring algorithms, such as Fair Isaac. The scoring algorithm for each Credit Score was developed and maintained in confidence and was designed to maximize the score's accuracy in predicting a Consumer's creditworthiness from the Credit Bureau's unique set of Aggregated Credit Data. Even with respect to Credit Scores, like the 300-850® classic FICO® score, where the underlying scoring algorithm generates scores based on some common scale, the confidential, unilaterally-developed algorithm was tailored to take full advantage of the strengths (and minimize the predictive weaknesses) of that Credit Bureau's data.  Moreover, to the extent a Credit Bureau developed some innovation in terms of the type of data collected, the way in which the data is stored, and

the like, its unique scoring algorithm could be adjusted to take maximum advantage of the innovation in the Credit Scores generated from the data.  This ability to modify its unique, confidential algorithm without having to disclose such innovations to its competitors serves as an incremental incentive to innovate in the market for Aggregated Credit Data.  VantageScore undermines, if not destroys, that incentive in two ways.

136.   First, by adopting a common "leveled" algorithm, VantageScore requires each Credit Bureau to use the same scoring algorithm.  Based on their own public statements, in forming VantageScore the Credit Bureaus now have disavowed creating specifically tailored algorithms for each Credit Bureau.  Thus, Credit Bureaus will no longer compete to develop a data set and corresponding unique algorithm in order to generate a specially-tailored Credit Score that is capable of superior predictiveness.

137.   Second, as a result of their common ownership of and commitment to VantageScore, a Credit Bureau will have to disclose an innovation in data collection or storage to VantageScore in order to see that innovation reflected in the VantageScore Credit Score and, assuming that VantageScore considers modifying the common, "leveled" algorithm to reflect the innovation, then to the competing Credit Bureaus.  Of course, it is unlikely that the other two Credit Bureaus will agree to a change in the VantageScore product that results in a competitive advantage to the third Credit Bureau.

138.   Similarly, today, an important variable in a Credit Bureau's price to Consumers and Lenders is the price of the Credit Score.  Moreover, because before VantageScore each Credit Bureau procured its algorithm independently and confidentially, a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores.  This uncertainty could be used by Lenders to induce

price competition among the Credit Bureaus.  However, on information and belief, as a result of their common ownership and control of VantageScore, each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others.

139.    Beyond eliminating competition among themselves, the Credit Bureaus' joint ownership and control of VantageScore will allow them to protect their tight oligopoly over Aggregated Credit Data against the entry of new Credit Bureaus and against the development of alternative sources of substitute data that might commoditize their traditional data.

140.    By extending their oligopoly in the market for Aggregated Consumer Credit Data into a monopoly for the VantageScore product in the market for Credit Scores, the Credit Bureaus can eliminate the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus.  Financial institutions must invest in the infrastructure necessary to report credit data securely to the existing Credit Bureaus.  Generally, the Credit Bureaus lower the price of their credit reports for financial institutions that report data to them—in other words, the financial institution gets value back for its credit data contribution.  Convincing a Lender to report to an additional Credit Bureau is difficult, given that the new entrant has less robust data from which meaningful Credit Scores can be generated, and reporting to another Credit Bureau would require developing the necessary infrastructure and dealing with additional related security risks and costs.  The ability to work with a neutral, third-party vendor, such as Fair Isaac, on an industry-accepted scoring algorithm provides an important avenue for a new entrant to more quickly reach critical mass in terms of the robustness of its data and thus to overcome the formidable barriers to entry.

141.   For example, Fair Isaac's willingness to help TransUnion enter the Canadian market in the early 1990s was critical to TransUnion's ability to offer Canadian Lenders a credit bureau alternative to the Equifax Canada monopoly.  TransUnion Canada worked with Fair Isaac to develop a FICO score based on their data as a means to gain credibility and accelerate adoption and use of their credit data by Canadian Lenders.  Fair Isaac developed a series of FICO scores for TransUnion Canada over time as their database developed that, on information and belief, has enabled them to compete effectively against Equifax Canada.  This has created a more competitive environment where Canadian Lenders have benefited through choice and cost reductions.  If TransUnion Canada had been required to obtain the cooperation of the incumbent Equifax to develop a credible Credit Score, TransUnion's ability to enter surely would have been frustrated.  Similarly, in the United States, if potential new entrants into the Aggregated Credit Data Market have to depend on VantageScore in order to become a credible competitive threat to the three Defendant Credit Bureaus, entry into those markets will become much more difficult.

142.   Non-traditional types of Consumer data, such as debit account information, can be used to calculate scores, such as Fair Isaac's Expansion score, for Consumers as to which the Credit Bureaus have collected insufficient credit data.  Currently, such scores based on nontraditional data serve to augment Credit Scores based on traditional Aggregated Credit Data.  Over time, however, with experience and supplemented by additional sources of nontraditional data, these alternative scores—particularly when reported on an industry-recognized credit-score range such as the 300-850® FICO Marks—will increasingly compete with Credit Scores calculated using Credit Bureau data, and the underlying nontraditional data will increasingly

become an alternative to Credit Bureau data, diminishing the value (and placing downward pressure on the price) of the Credit Bureaus' data and VantageScore.

143.    As a result of owning and controlling VantageScore and using their current control over Aggregated Credit Data to eliminate competition for Credit Scores, the Credit Bureaus will make it much more difficult, if not impossible, for these nascent sources of data competition to ever realize their full potential.  If Fair Isaac, as well as any other similar third-party algorithm vendor, is driven out of the market or even severely marginalized, then its role as an agent of procompetitive change will be lost.

144.    The Credit Bureau's joint ownership and control of VantageScore and the extension of their tight oligopoly over Aggregated Credit Data to eliminate competition in the Credit Scoring Market is unreasonably anticompetitive.  To the extent that the purpose is to create a homogenized or leveled Credit Score, that intention too is anticompetitive—not only does it eliminate an important competitive variable among the Credit Bureaus, but it does so at the expense of a score's maximum predictiveness.  To the extent that the purpose of the VantageScore venture is to facilitate the market's adoption of a score that reflects the latest scoring technologies, the Credit Bureaus could do so through less anticompetitive means, such as supporting (rather than frustrating) advanced third-party scoring algorithms, such as Fair Isaac's NextGen score, or working with all interested parties in the industry to develop and promote open standards.

145.    The combinations, contracts, agreements, and conduct of the Defendants alleged above are not necessary to accomplish the procompetitive benefits, if any, of the VantageScore product.  Even if some agreements by, between, and among Defendants were necessary to accomplish the procompetitive benefits, if any, of VantageScore, the combinations, contracts,

agreements, and conduct are significantly more restrictive of competition than necessary to bring about any such procompetitive benefits.

**G.      *Interstate Commerce***

146.    The Defendants' activities affect the flow of interstate commerce.  Equifax, Experian, and TransUnion sell credit reports and Credit Scores throughout the United States and across state lines.  Credit Scores generated using VantageScore's scoring algorithm have been offered for sale throughout the United States and across state lines.  Similarly, Fair Isaac licenses the credit scoring algorithms that are applied to the credit agencies' data to produce Credit Scores that are sold throughout the United States.  Accordingly, the acts alleged herein to have anticompetitive effects have a real, ongoing, and substantial impact on interstate commerce.

**H.      *Damages and Continuing Injury***

147.    The Defendants' acts, practices, and conduct have caused and, unless enjoined, will continue to cause irreparable injury to competition, the public interest, and the business and property of Fair Isaac.  The acts, practices, and conduct alleged herein to be unlawful are continuing and will continue or be renewed unless the Court grants injunctive relief.

**I.      *TransUnion's Contractual Obligations to Fair Isaac***

148.    TransUnion and Fair Isaac have entered into several contracts concerning the joint development, production, marketing, service, and maintenance of credit scoring products and services, as well as the ownership, treatment, and use of certain confidential and proprietary information and trade secrets.  One agreement, for example, is titled "Agreement" and was originally entered into on July 28, 1989, but has been amended on various dates including by an

addendum signed July 25, 2000.  Another agreement, for example, is titled "Agreement for Precision™ Credit Risk Score Services," and was entered into on July 25, 2000.

149.   In order to be able to produce, sell, and maintain services covered by their contracts, certain TransUnion employees or agents had to be given access to certain proprietary, confidential and trade-secret information of Fair Isaac.  As part of Fair Isaac's agreements with TransUnion, TransUnion agreed that proprietary and confidential information and trade secrets of Fair Isaac, including but not limited to specifications, models, documentation, development technology, sales, and marketing strategy information would be held and treated as confidential. This means, for example, that it would only be made available to authorized employees or contractors who are under obligations of confidentiality, that it would not be divulged to any third party for any purpose except as mutually agreed on by both parties, and that if TransUnion developed any products or services that competed with TransUnion, it would not be done by any employees or agents of TransUnion who had access to Fair Isaac's confidential information or trade secrets.

150.   The success of Fair Isaac's business depends on the maintenance of its confidential and proprietary information and trade secrets. Fair Isaac's trade secrets have substantial independent economic value because they are not generally known to, and not readily ascertainable from proper means by, other persons who can obtain economic value from their disclosure or use.

151.   Fair Isaac's trade secrets are the subject of efforts by Fair Isaac that are reasonable under the circumstances to maintain their secrecy.  For example, Fair Isaac's agreements with TransUnion strictly limited access to Fair Isaac's confidential information and trade secrets to

only those persons with a "need to know" the particular information and who agreed to abide by the restrictions of the Agreements.

152.   But some of the same employees of Trans Union who have had access to Fair Isaac's confidential or trade-secret information and who provide support services for lenders using Fair Isaac's products or services also provide support services relating to VantageScore's products and services, putting them in a position to misuse or misappropriate Fair Isaac's confidential information.  And some employees or agents of TransUnion who have had access to Fair Isaac's confidential and trade secret information participated in or contributed to the research, development, and planning for VantageScore's scoring model and scoring products.

153.   Developing a scoring model ordinarily takes an enormous amount of research and development and know-how and, on information and belief, VantageScore's scoring model was developed in an extraordinarily short amount of time.

154.   As part of Fair Isaac's agreements with TransUnion, TransUnion also agreed that many types of information, items, materials, etc. would be Fair Isaac's sole and absolute property and that TransUnion's right to use Fair Isaac's property, if at all, would be limited. TransUnion agreed, for example, that all aspects and contents of Fair Isaac's "Models" (including but not limited to credit scores and any modifications or derivations of those scores or any ideas derived from the scores) would be the sole and absolute property of Fair Isaac and that TransUnion would not use any part of Fair Isaac's Models (including but not limited to Fair Isaac's credit scores and any modifications or derivations of those scores or any ideas derived from the scores) with any computer programs other than Fair Isaac's.

155.   TransUnion is using Fair Isaac's property in ways prohibited by Fair Isaac's agreements with TransUnion and without Fair Isaac's permission.  TransUnion, for example, is

selling in-house scoring products or services and VantageScore's scoring products or services that incorporate aspects of Fair Isaac's Models, including, for example, incorporating Fair Isaac's credit scores or modifications or derivations of those scores or ideas derived from those scores.

156.   As part of Fair Isaac's agreements with TransUnion, TransUnion also agreed to act as an agent of Fair Isaac for purposes of marketing and selling products and services developed under the agreements and to engage in certain marketing and sales activities, including, for example, by positioning the products and services of Fair Isaac in a way that promotes the full range of capabilities for which the products and services were developed, regardless of competing products and services that might share similar capabilities.

157.   On information and belief, TransUnion has breached its marketing and selling duties and obligations under its agreements with Fair Isaac, including but not limited to its duties of good faith and fair dealing, and it has breached its obligation to act as an agent of Fair Isaac for purposes of marketing and selling.  TransUnion, for example, on information and belief, has developed a team of people to meet with lenders to help convince lenders that VantageScore's products or services are superior to Fair Isaac's.  This is in violation of TransUnion's duties and obligations to Fair Isaac.

158.   TransUnion is a member of VantageScore and, on information and belief, shares control of the business and operations of VantageScore.  Because of the intricate relationship between TransUnion and VantageScore, VantageScore knows of TransUnion's contractual obligations to Fair Isaac.

**J.        Infringement of Fair Isaac's Marks Through The Use Of Paid Internet Search Terms**

159.    In furtherance of their efforts to unfairly compete against Fair Isaac and trade upon Fair Isaac's established goodwill, Experian and TransUnion have infringed Fair Isaac's trademarks and service marks, including the 300-850® Marks, the FAIR ISAAC® Marks, and the FICO® Marks, through their Internet advertising.

160.    Each of the major Internet search engines, including Google®, Yahoo®, MSN®, and Ask.com® allow advertisers to display their advertisements alongside search results by purchasing search terms or "keywords."  By using a given term as a paid "keyword," advertisers can display their advertisements alongside the results of searches conducted using the purchased "keyword."

161.    Upon information and belief, Experian maintains or otherwise controls a number of Internet web sites through which it sells various products and services including the Experian Plus brand in-house Credit Score to consumers (collectively the "Experian Web Sites").  Upon information and belief, the Experian Web Sites include:

      a.   www.freecreditreport.com

      b.   www.experiandirect.com

      c.   www.creditreportnow.org

162.    Experian does not sell Fair Isaac's 300-850® FICO® Credit Score, or any other Fair Isaac product or service through the Experian Web Sites.  To the contrary, Experian sells its directly competing in-house Credit Score through the Experian Web Sites.

163.    The Experian Web Sites are not sponsored by, nor otherwise affiliated with, Fair Isaac.

164.   Upon information and belief, TransUnion maintains, operates or otherwise controls one or more Internet websites through which it sells various products and services including the Trans Risk brand Credit Score to Consumers (collectively the "TransUnion Web Sites").  Upon information and belief, the TransUnion Web Sites include www.truecredit.com.

165.   TransUnion does not sell Fair Isaac's 300-850® FICO® Credit Score, or any other Fair Isaac product or service through the TransUnion Web Sites.  To the contrary, TransUnion sells its directly competing in-house Credit Score through the TransUnion Web Sites.

166.   TransUnion Web Sites are not sponsored by, nor otherwise affiliated with, Fair Isaac.

167.   Upon information and belief, Experian and TransUnion have used Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in commerce as paid "keywords" to generate advertisements for the competing Experian and TransUnion Web Sites.

168.   As a result of the use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks, advertisements for the Experian and TransUnion Web Sites appear on the "results" page of Internet search engines when users use these marks as search terms.

169.   Upon information and belief, Experian and TransUnion began use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks with full knowledge of Fair Isaac's prior use of (and registration for) these marks.

170.   Neither Experian nor TransUnion asked for or obtained Fair Isaac's permission to use Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in the manner described above.

171.   Upon information and belief, Experian and TransUnion have used Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in a deliberate attempt to trade upon the good will existing in connection with these marks, or to otherwise lead consumers to believe that there is some connection or affiliation between the products or services sold through the Experian and TransUnion Web Sites and those lawfully sold under the 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks.

172.   The unauthorized use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in the manner described above is likely to cause confusion, to cause mistake, and/or to deceive customers and potential customers of the parties.

173.   The unauthorized use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in the manner described above falsely indicates to the purchasing public that the products and services sold through the Experian and TransUnion Web Sites originate with, or are affiliated, connected or associated with products and services sold under the 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks.

174.   The unauthorized use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in the manner described above falsely designates the origin of Experian and TransUnion's products and services.

175.   The unauthorized use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC®, and/or FICO® Marks in the manner described above enables them to trade on and receive the benefit of goodwill associated with those marks, which Fair Isaac has established at great labor and expense over many years.  This unauthorized use allows Experian

and TransUnion to gain acceptance for their own products, not solely on their own merits, but on the reputation and goodwill of Fair Isaac and its marks.

176.   The unauthorized use by Experian and TransUnion of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks, and/or FICO® Marks in the manner described above deprives Fair Isaac of the ability to control the nature and quality of products and services provided under its marks and places the valuable reputation and goodwill of Fair Isaac in the hands of Experian and TransUnion, over whom Fair Isaac has no control.

## COUNT ONE

### Federal Unfair Competition, 15 U.S.C. § 1125(a)
### (Defendants' Use of Fair Isaac's 300-850® Marks)

177.   Fair Isaac repeats the allegations above as if fully set forth herein.

178.   Lenders and Consumers identify the names and marks FAIR ISAAC, FICO, 300-850, and the scoring range 300-850 and Credit Scores within the range of 300-850 as coming from Fair Isaac or being affiliated, connected or associated with Fair Isaac, or being sponsored, endorsed or approved by Fair Isaac.

179.   Fair Isaac is the owner of common-law trademark rights in and to the 300-850® Marks, FAIR ISAAC® Marks and the FICO® Marks for, among other things, credit scoring products and services.

180.   The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores, or any Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 or 330-830 for their in-house Credit Scores), the use of Fair Isaac's FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, and Defendants' actions in promoting, marketing,

advertising, and/or selling their Credit Scores, constitutes unfair competition, false designation of origin, passing/palming off, and false description or representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

181.   On information and belief, the Defendants' acts described above are willful, wanton, in bad faith and with notice of the valuable goodwill Fair Isaac has established in its 300-850 scoring range, Credit Scores and marks.

182.   On information and belief, the Defendants' acts described above constitute infringement that is willful, wanton, in bad faith, and with notice of Fair Isaac's common-law trademark rights.

183.   In view of the egregious nature of the Defendants' acts, this is an exceptional case pursuant to 15 U.S.C. § 1117.

184.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a result of their infringement, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

## COUNT TWO

### Infringement of Registered Trademark, 15 U.S.C. § 1114

185.   Fair Isaac repeats the allegations above as if fully set forth herein.

186.   Fair Isaac is the owner of the 300-850® Marks, the FAIR ISAAC® Marks, and the FICO® Marks, which are used in connection with its Credit Scores, and related products and services.

187.   The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores and any other Credit Scores or score range

confusingly similar to Fair Isaac's 300-850® Marks, (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), and the use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, constitutes trademark infringement in violation of 15 U.S.C. § 1114(1).

188.   On information and belief, the Defendants' acts described above constitute infringement that is willful, wanton, in bad faith and with notice of Fair Isaac's trademark rights.

189.   In view of the egregious nature of the Defendants' infringement, this is an exceptional case pursuant to 15 U.S.C. § 1117.

190.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a result of their infringement, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

## COUNT THREE

### Trademark Infringement, Minnesota Common Law

191.   Fair Isaac repeats the allegations above as if fully set forth herein.

192.   The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores or any other Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), and the use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, constitutes trademark infringement

in violation of the common law of Minnesota.  On information and belief, such infringement is willful, wanton, in bad faith, and with notice of Fair Isaac's trademark rights.

193.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a result of their infringement, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

### COUNT FOUR

### Passing Off, Minnesota Common Law

194.   Fair Isaac repeats the allegations above as if fully set forth herein.

195.   The Defendants' conduct described above, including without limitation  the use of their 501-990 score range and Credit Scores or any other Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), the use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, and Defendants' actions in promoting, marketing, advertising, and/or selling their Credit Scores constitute passing off in violation of the common law of Minnesota.  On information and belief, Defendants' passing off is willful, wanton and done in bad faith.

196.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

**COUNT FIVE**

**Unfair Competition and False Advertising, 15 U.S.C. § 1125(a)**
**(Defendants' Misleading and False Representations of Fact)**

197.   Fair Isaac repeats the allegations above as if fully set forth herein.

198.   The Defendants' actual and implied misrepresentations about their 501-990 Credit
Score and other Credit Scores advertised, marketed, promoted and/or sold by Defendants
constitute unfair competition and false advertising in violation of Section 43(a), 15 U.S.C. §
1125(a).

199.   The Defendants' actual and implied misrepresentations about Fair Isaac's 300-
850® FICO® Credit Scores constitute unfair competition and false advertising in violation of
Section 43(a), 15 U.S.C. § 1125(a).

200.   The Defendants' actual and implied misrepresentations are likely to influence the
purchasing decisions of Credit Score purchasers.

201.   The Defendants' acts have damaged, and will continue to damage, the pecuniary
interests of Fair Isaac.

202.   If the Defendants are allowed to continue their actual and implied
misrepresentations, Fair Isaac will suffer irreparable harm for which it has no adequate remedy
at law.

203.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to
preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a
result of their unfair competition and false advertising, damages in an amount to be determined
at trial, recovery of all attorneys' fees and costs incurred, and corrective advertising as set forth
in the prayer for relief.

**COUNT SIX**

**Deceptive Trade Practices, Minn. Stat. § 325D.44**

204.   Fair Isaac repeats the allegations above as if fully set forth herein.

205.    The Defendants' actions in Minnesota constitute willful and knowing deceptive trade practices, in violation of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44.

206.    The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores, and Fair Isaac's 300-850® Marks, and any Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), the use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, and Defendants' actions in promoting, marketing, advertising, and/or selling their Credit Scores, have created a likelihood of confusion or of misunderstanding among the Consuming Public as to the source, sponsorship, approval, or certification of their goods or services.

207.    The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores, and Fair Isaac's 300-850® Marks, and any Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), the use of Fair Isaac's 300-850 Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, and Defendants' actions in promoting, marketing, advertising, and/or selling their Credit Scores, have created a likelihood of confusion or of misunderstanding among the Consuming Public as to affiliation, connection, or association with or certification of their goods and services by Fair Isaac.

208. The Defendants' conduct described above, including without limitation the use of their 501-990 score range and Credit Scores, and Fair Isaac's 300-850® Marks, and any Credit Scores or score range confusingly similar to Fair Isaac's 300-850® Marks (such as TransUnion's and Experian's uses of the ranges 300-850 and 330-830 for their in-house Credit Scores), the use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks as paid "keywords" to generate advertisements for the Experian and TransUnion Web Sites, and Defendants' actions in promoting, marketing, advertising, and/or selling their Credit Scores, constitutes passing off.

209. The Defendants have made actual and implied misrepresentations of fact regarding their Credit Scores and Fair Isaac's Credit Scores.

210. The Defendants have made misleading and false representations of fact that disparage the goods and services of Fair Isaac.

211. Not only are the Defendants' deceptive practices potentially injurious to the public, but their actions also damage Fair Isaac's reputation for quality among the Consuming Public and thereby damage Fair Isaac's pecuniary interests.

212. Fair Isaac and the Consuming Public have been, are and will be irreparably injured if such deceptive trade practices are allowed to continue.

213. As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a result of their wrongful conduct, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

## COUNT SEVEN

### Unjust Enrichment, Minnesota Common Law

214. Fair Isaac repeats the allegations above as if fully set forth herein.

215.   The Defendants have been, and continue to be, unjustly enriched by their use of Fair Isaac's 300-850® Marks, FAIR ISAAC® Marks and FICO® Marks, Credit Scores falling within the number range of 300-850 or confusingly similar to Fair Isaac's 300-850® Marks, their passing off, and their misleading and false representations.

216.   As a result of the Defendants' wrongful conduct, Fair Isaac is entitled to preliminary and permanent injunctive relief, recovery of the Defendants' profits obtained as a result of their wrongful conduct, damages in an amount to be determined at trial, and recovery of all attorneys' fees and costs incurred.

### COUNT EIGHT

### Unreasonable and Illegal Restraint of Trade, 15 U.S.C. § 1 (Joint Creation and Ownership of VantageScore and Agreement to Limit Competition among Credit Bureaus)

217.   Fair Isaac repeats the allegations above as if fully set forth herein.

218.   There are two Relevant Markets in which the Defendants and Fair Isaac participate.  Each of these Relevant Markets is relevant to Fair Isaac's antitrust claims set forth in at least Counts Eight, Nine, Ten, and Eleven.  These Relevant Markets are the Aggregated Credit Data Market and the Credit Scoring Market.

219.   By agreeing to create, own, and control a common Credit Score through the commonly-owned VantageScore, Defendants have combined and conspired unreasonably to restrain competition in, *inter alia*, the national markets for Aggregated Credit Data and for Credit Scores in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

220.   The Defendant Credit Bureaus together possess 100% of the national market for Aggregated Credit Data, for which there currently are no economic substitutes.  Further, the market for Aggregated Credit Data is characterized by high barriers to entry.  These entry barriers include the very substantial costs associated with obtaining a sufficiently comprehensive set of Aggregated Credit Data to be a viable competitor.  The entry barriers are sufficiently high that there have been no new successful entrants for many years.

221.   There is also a substantial entry barrier into the Credit Scoring Market.  Although the development of the sophisticated algorithms that are a necessary input for such products is possible due to the availability of the expertise of mathematicians and other experienced and knowledgeable professionals, sellers of Credit Scores are dependent on the availability of comprehensive sets of Consumer credit data.  Because this essential input is controlled by the Defendant Credit Bureaus, successful entry into the Credit Scoring Market likely would require a potential entrant to also successfully enter the Aggregated Credit Data Market as well.

222.   The effects of the combinations, contracts, agreements, and conduct of the Defendants alleged above harm competition and Consumers in each of the Relevant Markets by increasing the ability and incentive for the Credit Bureaus to profitably raise price above, and reduce output quality, service, or innovation below, that which prevails in the absence of the combinations, contracts, agreements, and conduct of the Defendants.  The combinations, contracts, agreements, and conduct of the Defendants will limit independent decision-making regarding price, output, and other competitively-sensitive variables in the Relevant Markets and may otherwise reduce the Credit Bureaus' ability or incentive to compete independently.

223.   The combinations, contracts, agreements, and conduct of the Defendants will also facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure by the Credit Bureaus of competitively-sensitive information and through increased market concentration.

224.   The agreement among Defendant Credit Bureaus to create, own, and control VantageScore has the purpose and effect of restricting competition among the Credit Bureaus in the development and sale of Aggregated Credit Data by, in effect, eliminating competition among Defendant Credit Bureaus unilaterally to develop, market, and sell Credit Scores generated from scoring algorithms that are tailored to maximize the predictiveness of the unique attributes of their representative data sets.

225.   Further, Defendants have agreed to extend the Credit Bureaus' collective market power in the market for Aggregated Credit Data through the joint ownership and control of

VantageScore to destroy competition in the Credit Scoring Market.  The purpose and effect of their agreement is not only to eliminate competition for the VantageScore model but also to eliminate third-party vendors of scoring algorithms used to generate competing Credit Scores. The agreement among the Defendants to eliminate such third-party vendors has the purpose and effect of eliminating a mechanism that could otherwise facilitate the entry of new competition into the market for Aggregated Credit Data.  As a result, any potential competitor in the market will be required simultaneously also to enter the Credit Scoring Market.

226.   The Defendants have agreed to market the VantageScore model and to establish their score as the dominant Credit Score through a series of exclusionary, discriminatory, and unfair acts, as described in paragraphs above.  Those acts threaten to destroy other participants in the market for Credit Scores, in particular Fair Isaac.

227.   The agreement among the Credit Bureaus to create, own, and control VantageScore does not create any offsetting benefit to competition.  The Credit Bureaus' agreement to adopt a common "leveled" scoring algorithm actually reduces predictiveness of creditworthiness.

228.   The activities of the Defendants occurred in or affect interstate commerce.

229.   As a result of Defendants' illegal contracts, combinations, agreements, and conduct, competition in the Relevant Markets has been or is threatened to be restrained in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  Fair Isaac has been injured in its business and property by reason of Defendants' illegal contracts, combinations, agreements, and conduct and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## COUNT NINE

### Illegal Merger or Acquisition under Section Seven
### of the Clayton Act, 15 U.S.C. § 18, and Section One of the Sherman Act, 15 U.S.C. § 1
### (Joint Creation, Ownership, and Operation of VantageScore)

230.   Fair Isaac repeats the allegations above as if fully set forth herein.

231.   The Credit Bureaus currently are the only three competitors in the national market for Aggregated Credit Data.  That market is characterized by high barriers to entry.

232.   The Credit Bureaus' Aggregated Credit Data is currently an essential input into the generation of Credit Scores.  Moreover, prior to their joint creation, ownership, and control of VantageScore, the Credit Bureaus, along with Fair Isaac, were the principal competitors in the national Credit Scoring Market.

233.   By the Credit Bureaus jointly acquiring ownership of VantageScore, the Defendants may substantially lessen competition in the national market for Aggregated Credit Data and in the national Credit Scoring Market in violation of Section Seven of the Clayton Act, 15 U.S.C. § 18, and Section One of the Sherman Act, 15 U.S.C. § 1.

234.   By jointly acquiring ownership of VantageScore, the Credit Bureaus, which constitute 100% of the market for Aggregated Credit Data, have jointly integrated into the adjacent market for Credit Scoring.  As a result of this acquisition of a common supplier of a key input into the creation of Credit Scores, the Credit Bureaus will be able directly and indirectly to exchange competitively sensitive information on costs, prices, and innovations affecting their competition in the market for Aggregated Credit Data.  In addition, by owning and controlling the key input required to generate Credit Scores from Aggregated Credit Data, the Credit Bureaus force potential competitors in the market for Aggregated Credit Data to enter simultaneously both that market and the market for Credit Scores, substantially increasing the costs of, time of, and barriers to entry.

235.   Also, before their creation and acquisition of VantageScore, the Credit Bureaus, along with Fair Isaac, were the principal competitors in the Credit Scoring Market.  Their acquisition of VantageScore effectively reduces the number of competitors from four to two, with Fair Isaac being the only independent competitor remaining in that market.  Moreover, because the Credit Bureaus also together control 100% of the market for Aggregated Credit Data, the essential component in the creation of Credit Scores, and because, as described in paragraphs above, the Credit Bureaus control the pricing of not only their Credit Scores but also

those of Fair Isaac, the Credit Bureaus have the incentive and ability to restrict, if not eliminate, Fair Isaac's ability to compete with the Defendants in the Credit Scoring Market.

236.   The Credit Bureaus' joint ownership and control of VantageScore does not generate any countervailing consumer benefits.  To the contrary, their agreement to use a common, leveled scoring algorithm serves to reduce the predictiveness of their Credit Score.

237.   The activities of Defendants occurred in or affect interstate commerce.

238.   The formation and operation of VantageScore will substantially lessen competition in the Credit Scoring Market, and may substantially lessen competition in the Aggregated Consumer Data Market, in violation of Section Seven of the Clayton Act, 15 U.S.C. § 18 and Section One of the Sherman Act, 15 U.S.C. § 1.

239.   By reason of Defendants' violation of these statutes, Fair Isaac has been injured in its business and property and is entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## COUNT TEN

**Attempt to Monopolize Under Section Two of the Sherman Act, 15 U.S.C. § 2
(Attempt to Monopolize the Market for Consumer Credit Scores)**

240.   Fair Isaac repeats the allegations above as if fully set forth herein.

241.   On information and belief, by 2005 the Defendants attempted to monopolize the Credit Scoring Market in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

242.   Defendant Credit Bureaus are three of the four principal competitors in the Credit Scoring Market.  Moreover, Defendant Credit Bureaus together fully control the Aggregated Credit Data Market, which is currently an essential input in the generation of Credit Scores.  As a result of Defendant Credit Bureaus' joint creation, ownership, and control of VantageScore, they jointly have integrated vertically into the Credit Scoring Market.  On information and belief, Defendants are jointly attempting to leverage the Credit Bureaus' collective market power over Aggregated Credit Data in order to provide VantageScore with monopoly power over the Credit Scoring Market.  Defendants are attempting to make VantageScore a monopolist

77

through various discriminatory and exclusionary means described above including, but not limited to, the use of unfair methods of competition to exclude Fair Isaac from the market and the manipulation of the relative prices of VantageScore Credit Scores and of Credit Scores generated from Fair Isaac scoring algorithms.

243.   Through these discriminatory and exclusionary acts, Defendants specifically intend to monopolize the Credit Scoring Market.

244.   Given the Credit Bureaus' tight oligopoly with regard to Aggregated Credit Data, for which there is currently no substitute in the calculation of Credit Scores, and the dependence of Fair Isaac and other competitors of VantageScore on access to that data, there is a dangerous probability that VantageScore will succeed in acquiring monopoly power in the market for Credit Scoring.

245.   The activities of the Defendants occurred in or affect interstate commerce.

246.   By reason of the Defendants' illegal attempt to monopolize, Fair Isaac has been and is threatened with being injured in its business and property and is entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## COUNT ELEVEN

### Conspiracy to Monopolize Under Section Two of the Sherman Act, 15 U.S.C. § 2
### (Conspiracy to Monopolize the Market for Consumer Credit Scoring)

247.   Fair Isaac repeats the allegations above as if fully set forth herein.

248.   On information and belief, by 2005 the Defendants combined and conspired to monopolize the market for Credit Scoring in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

249.   Credit Scoring requires two essential inputs: (i) Aggregated Credit Data; and (ii) a credit scoring algorithm.  Control of the Credit Scoring Market requires control of both inputs. Prior to the creation of VantageScore, the Credit Bureaus competed in the market for Credit

Scoring.  Defendant Credit Bureaus—which already collectively control the market for Aggregated Credit Data—agreed jointly to create, own, and control VantageScore.  Rather than continuing to compete on the merits, Defendants are conspiring to move the financial industry to the VantageScore Credit Score, to eliminate Fair Isaac and other providers of scoring algorithms, and thereby to make VantageScore the monopolist in the Credit Scoring Market.

250.   On information and belief, Defendants are conspiring to use the Credit Bureaus' collective market power over Aggregated Credit Data to move the financial industry to the jointly-owned VantageScore product with the specific intention of acquiring and maintaining monopoly power over the market for Credit Scoring.  Defendants are seeking to achieve their common objective through various discriminatory and exclusionary means described above including, but not limited to, the use of unfair methods of competition to exclude Fair Isaac from the market and the manipulation of the relative prices of Credit Scores generated by the VantageScore algorithm and those generated using Fair Isaac scoring algorithms.

251.   Through these discriminatory and exclusionary acts, Defendants specifically intend to monopolize the market for Credit Scoring.

252.   These discriminatory and exclusionary acts, as well as the creation of VantageScore itself, are overt acts in furtherance of Defendants' conspiracy.

253.   The activities of the Defendants occurred in or affect interstate commerce.

254.   By reason of the Defendants' illegal conspiracy to monopolize, Fair Isaac has been and is threatened with being injured in its business and property and is entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWELVE

**Unreasonable and Illegal Restraint of Trade, 15 U.S.C. § 1**











**COUNT THIRTEEN**

**Breach of Contract (against TransUnion)**

272.    Fair Isaac repeats the allegations above as if fully set forth herein.

273.    Fair Isaac and TransUnion have entered into valid agreements concerning the joint development, production, marketing, service, and maintenance of credit scoring services, as well as the ownership, treatment, and use of certain confidential and proprietary information. These agreements impose many contractual duties and obligations on Trans Union, including, for example, to keep confidential and not to misuse or misappropriate Fair Isaac's confidential or trade secrets or property, to act as an agent for Fair Isaac in marketing and selling Fair Isaac's products and services, and duties of good faith and fair dealing.

274.    On information and belief, TransUnion has breached its contractual duties and obligations under one or more of its agreements with Fair Isaac as a result of TransUnion's actions in developing, marketing, and selling TransUnion's in-house products and services and VantageScore's products and services and TransUnion's in-house scores.

275.    Fair Isaac has suffered or will suffer both irreparable injury and actual damages as a result of TransUnion's breach(es) of contract.

**COUNT FOURTEEN**

**Interference with Contract (Against VantageScore)**

276.    Fair Isaac repeats the allegations above as if fully set forth herein.

277.    Fair Isaac and TransUnion, as alleged above, have entered into valid agreements concerning the joint development, production, marketing, service, and maintenance of credit scoring services, as well as the ownership, treatment, and use of certain confidential and proprietary information.

85

278.   TransUnion, as alleged above, has breached its obligations under its agreements with Fair Isaac.

279.   TransUnion is a member of VantageScore and, on information and belief, shares control of the business and operations of VantageScore with the other Bureau Defendants. Because of the intricate relationship between VantageScore and TransUnion, VantageScore knows of TransUnion's contractual obligations to Fair Isaac.

280.   VantageScore has intentionally and unjustifiably induced TransUnion to breach its duties and obligations under its agreements with Fair Isaac. This includes, for example, by licensing scoring products to TransUnion (which TransUnion has tried to sell to lenders) that use confidential information, trade secrets, and property of Fair Isaac.

281.   Fair Isaac has suffered or will suffer both irreparable injury and actual damages as a result of VantageScore's conduct.

## PRAYER FOR RELIEF

Fair Isaac requests the following relief:

1.      The Defendants and their agents, servants, employees, or all persons in active concert or participation with the Defendants, be preliminarily and permanently enjoined and restrained from using a score range of 300-850®, any range falling within or overlapping that range, any Credit Score falling within that range, and any Credit Score or score range confusingly similar to that range for Credit Scores;

2.      The Defendants and their agents, servants, employees, or all other persons in active concert or participation with the Defendants, be preliminarily and permanently enjoined and restrained from using the FAIR ISAAC® Marks, FICO® Marks, 300-850® Marks or any other marks that incorporate the use of the Terms, or any confusingly similar variations of such

terms FAIR ISAAC, FICO (unless expressly authorized in writing by Fair Isaac to do so) or any other marks that incorporate the use of 300-850 for Credit Scores or any numbers falling within that range for Credit Scores including but not limited to "501-990," "300-850," "330-830," and any other mark, word, name, symbol or device that is confusingly similar to Fair Isaac's FAIR ISAAC® Marks, FICO® Marks and 300-850® Marks;

      3.      The Defendants and their agents, servants, employees, or all other persons in active concert or participation with them, be preliminarily and permanently enjoined and restrained from publishing, disseminating, or otherwise using the representations in the advertisements and promotional materials complained of herein or similar representations;

      4.      The Defendants and their agents, servants, employees, or all other persons in active concert or participation with them, be required to deliver up and destroy all website pages, advertisements and other promotional materials bearing or using false and misleading representations of fact;

      5.      The Defendants be required to immediately send corrective statements in writing to all persons to whom it made false statements or misleading statements.  The Defendants also be required to place corrective advertisements in all media in which it placed the original statements, including without limitation, on its website and in all publications in which its false representations appeared.  Such statements shall run for an equal number of days as the website advertisement appeared and the same number of publications and number of consecutive issues of the publications and in the same manner and frequency of dissemination as the offending statements appeared;

6.      TransUnion and VantageScore and all those acting in concert or participation with them be preliminarily and permanently enjoined and restrained from unauthorized disclosure or use of Fair Isaac's property;

7.      The Court issue a mandatory injunction that requires TransUnion and VantageScore and all those acting in concert or participation with them be obligated to deliver to Fair Isaac all of Fair Isaac's property (including but not limited to modifications, derivations, duplications, or ideas based on that information or property—e.g., VantageScore's model and algorithm) and that Fair Isaac be declared by the Court as the owner of all such information or property;

8.      The Defendants be ordered to file with the Court and serve upon Fair Isaac within thirty days after the entry and service upon the Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which the Defendants have undertaken to comply and are complying with the Court's injunction;

9.      That Fair Isaac be awarded damages sustained as a result of Defendants' illegal activities and that such damages be trebled where permissible;

10.     An accounting be directed to determine the Defendants' profits resulting from the activities complained of herein, and that those profits be awarded as damages and increased as the Court finds to be just according to the circumstances of this case;

11.     The Defendants be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an unreasonable anticompetitive effect in any market;

12.     An injunction be entered, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from engaging in the activities that violate Section 1 of the Sherman Act;

13.     An injunction be entered, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from engaging in the activities that violate Section 2 of the Sherman Act;

14.     Fair Isaac recover all damages sustained as a result of the Defendants' actions and that those damages be awarded as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

15.     Fair Isaac recover its reasonable attorneys' fees;

16.     Fair Isaac recover the cost of this action, along with post-judgment interest; and

17.     Fair Isaac recover such other relief as the Court may deem appropriate in the circumstances.

**Jury Demand**

In accordance with Fed. R. Civ. P. 38(b), Fair Isaac demands a trial by jury.


Dated:  November 11, 2008                    **Robins, Kaplan, Miller & Ciresi, L.L.P.**


                                     **By:** ___s/Randall Tietjen_____
                                          Michael V. Ciresi (MN Bar #16949)
                                          Ronald J. Schutz (MN Bar #130849)
                                          K. Craig Wildfang (MN Bar #117043)
                                          Randall Tietjen (MN Bar #214474)
                                          Michael A. Collyard (MN Bar # 302569)

                                          2800 LaSalle Plaza
                                          800 LaSalle Avenue
                                          Minneapolis, MN 55402
                                          Tel: (612) 349-8500
                                          Fax: (612) 339-4181

**Of Counsel:**

**Cadwalader, Wickersham & Taft LLP**

Charles F. (Rick) Rule
Joseph J. Bial

1201 F Street, N.W.
Washington, DC 20004
Tel:     (202) 862-2200
Fax:     (202) 862-2400

Attorneys for Plaintiff Fair Isaac Corporation