UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION and                          CIVIL NO. 06-4112 (ADM/JSM)
myFICO CONSUMER SERVICES, INC.

     Plaintiffs,

v.                                                                        <u>ORDER</u>

EXPERIAN INFORMATION
SOLUTIONS INC.; TRANS UNION, LLC; and
VANTAGESCORE SOLUTIONS, LLC,

     Defendants.


The above matter came on before the undersigned on Defendants' Joint Motion in the Alternative for Leave to Amend Answers to Assert Counterclaims for Violations of the Antitrust Laws and Tortious Interference with Contract [Docket No. 485] and Plaintiffs' Motion to Strike Defendants' Filings on December 4, 2008 [Docket No. 491]. Charles Rule, Esq., Randall Tietjen, Esq., Ronald Schutz, Esq. and Joseph Bial, Esq. appeared on behalf of plaintiffs; Mark A. Jacobson, Esq. and Robert Milne, Esq. appeared on behalf of defendant Experian Information Solutions Inc.; James Gardner, Esq. and Christopher Morris, Esq. appeared on behalf of defendant Trans Union, LLC; and Barbara Berens, Esq. appeared on behalf of defendant VantageScore Solutions, LLC.

The Court, upon all of the files, records, proceedings herein, and for the reasons stated at the hearing, now makes and enters the following Order.

IT IS HEREBY ORDERED that:

1.    Defendants' Joint Motion in the Alternative for Leave to Amend Answers to Assert Counterclaims for Violations of the Antitrust Laws and Tortious Interference with Contract [Docket No. 485] is **DENIED**; and

2.      Plaintiffs' Motion to Strike Defendants' Filings on December 4, 2008 [Docket No. 491] is **GRANTED**.

3.      Defendants Experian and Trans Union shall re-file and serve their respective answers and counterclaims to the Third Amended Complaint without the antitrust and tortious interference with contract counterclaims.  VantageScore shall re-file and serve its answer and counterclaim to the Third Amended Complaint without the lack of standing affirmative defense, and shall only allege the laches affirmative defense as it relates to plaintiffs' price-fixing claim.

Dated:      February 9, 2009

                    s/ *Janie S. Mayeron*
                    JANIE S. MAYERON
                    United States Magistrate Judge

**MEMORANDUM**

**I.      INTRODUCTION**

This matter arises out of the creation of the credit scoring system, VantageScore, by credit bureaus Equifax Information Services LLC ("Equifax"), Experian Information Services, Inc. ("Experian"), and Trans Union LLC ("Trans Union"). This scoring system competes with Fair Isaac Corporation's and its wholly owned subsidiary myFICO Consumer Services, Inc.'s (collectively referred to as "Fair Isaac") credit scoring system (also referred to as "FICO" for the purpose of this Memorandum).  The present issues before the Court arise out of the propriety of certain counterclaims and affirmative defenses asserted by defendants Experian, Trans Union and VantageScore on December 4, 2008, to Fair Isaac Third Amended Complaint.

## II.   FACTUAL BACKGROUND

### A.   <u>Initial Action and the Court's Deadlines for Amending Pleadings</u>

On October 11, 2006, Fair Isaac initiated the present action against Equifax and the other defendants.  <u>See</u> Docket No. 1.  Fair Isaac subsequently amended their complaint twice, with the Second Amended Complaint [Docket No. 81] being the operative Complaint in this case prior to the Third Amended Complaint, which led to defendants' addition of the antitrust and tortious interference with contract counterclaims that are the subject of the present motions before the Court.  Counts One through Four, Six and Seven of Fair Isaac's Second Amended Complaint related to the alleged similarity of the credit scoring range for VantageScore (501-990) to the credit scoring range for FICO (300-850).  In particular, Fair Isaac alleged that the use of the VantageScore scoring range of 501-990 constituted unfair competition under 15 U.S.C. § 1125(a); infringement of registered trademark under 15 U.S.C. § 1114; trademark infringement under Minnesota common law; passing off under Minnesota common law; deceptive trade practices under Minn. Stat. § 523D.44; and unjust enrichment under Minnesota common law.  <u>See</u> Second Amended Complaint, ¶¶ 177-196, 204-216. Count Five of the Second Amended Complaint alleged unfair competition and false advertising under 15 U.S.C. § 1125(a).

Count Eight claimed an unreasonable and illegal restraint of trade under Section One of the Sherman Act, 15 U.S.C § 1 for the joint creation and ownership by defendants of VantageScore and the agreement to limit competition among credit bureaus.  Specifically, Fair Isaac alleged that by agreeing to create, own, and control credit scores through the commonly-owned VantageScore, defendants have combined,

conspired and colluded unreasonably to restrain competition in the aggregated credit data and credit scoring markets, in part, by entering into agreements that would limit the credit bureaus' independent decision-making regarding price, output, otherwise reduce the credit bureaus' ability or incentive to compete independently and limited the ability of third-party vendors to compete in the market. See Second Amended Complaint, ¶¶ 222-25.

Count Nine alleged that the creation of VantageScore by defendants gave the bureaus 100% of the market for aggregated credit data and has decreased the competitors in the credit scoring market from four to two, thereby allowing defendants to directly and indirectly exchange competitively sensitive information on costs, prices, and innovations affecting their competition in the market for aggregated credit data and the credit scoring. Id., ¶¶ 233-35. Accordingly, Fair Isaac alleged that the credit bureaus' joint ownership of VantageScore amounted to illegal merger or acquisition under Section Seven of the Clayton Act, 15 U.S.C. § 18, and Section One of the Sherman Act, 15 U.S.C. § 1.

Count Ten asserted that defendants attempted to monopolize the market for consumer credit scores in violation of Section Two of the Sherman Act, 15 U.S.C. § 2. Id., ¶ 241. Specifically, Fair Isaac alleged that defendants are jointly attempting to leverage their collective market power over aggregated credit data in order to provide VantageScore "with monopoly power through various discriminatory and exclusionary means . . . including, but not limited to, the use of unfair methods of competition to exclude Fair Isaac from the market and the manipulation of the relative prices of VantageScore Credit Scores and of Credit Scores generated from Fair Isaac scoring algorithms." Id., ¶ 242.

Count Eleven is a conspiracy to monopolize the market for credit scoring claim under Section Two of the Sherman Act, 15 U.S.C. § 2. Id., ¶ 248. In this regard, Fair Isaac alleged that defendants are conspiring to use their collective market power over aggregated credit data to move the financial industry to the VantageScore product with the intent of acquiring and maintaining monopoly power over the credit scoring market through "the use of unfair methods of competition to exclude Fair Isaac from the market and the manipulation of the relative prices of Credit Scores generated by the VantageScore algorithm and those generated using Fair Isaac scoring algorithms." Id., ¶¶ 249-50.

Count Thirteen is a breach of contract claim against Trans Union, which alleged that Trans Union violated contract provisions obligating it to keep confidential and not to misuse Fair Isacc's confidential property or trade secrets, and required it to act as an agent for plaintiffs' products and services. Id., ¶ 260. The final Count, Count Fifteen, alleged interference with contract against VantageScore for intentionally inducing Trans Union to breach its contractual duties with Fair Isaac. Id., ¶¶ 270- 275.[1]

On January 17, 2007, this Court entered its first pretrial scheduling order, which provided in relevant part that amendments to pleadings were required to be served and filed before April 1, 2007. See Pretrial Scheduling Order [Docket No. 72]. While this Court has issued amendments to the Pretrial Scheduling Order (resulting from the stipulations of the parties), the date by which amendments to pleadings must be served and filed has never changed. See Docket Nos. 72, 207, 245, 267, 374, 400, 433, 518. With respect to deadlines for fact discovery, expert discovery, dispositive motions, and

---

[1]    Counts 12 (state law anticompetitive claims) and 14 (misappropriation of trade secrets) have been dismissed by stipulation of the parties, along with all allegations of misappropriation of plaintiffs' trade secrets by Trans Union and VantageScore Solutions. See June 23, 2008 Order [Docket No. 373].

5

trial, the parties have been operating under the following deadlines since August 19, 2008.

> July 22, 2008 - All fact discovery of any kind shall be commenced in time to be completed by this date.
>
> August 26, 2008 - Expert disclosures by plaintiffs
>
> October 27, 2008 - Expert disclosures by defendants
>
> November 19, 2008 - Rebuttal expert disclosures by plaintiffs
>
> December 19, 2008 - All expert depositions to be completed by this date.[2]
>
> March 1, 2009 - documents dated or created on or after February 16, 2008 and through December 1, 2008 to be produced on or before this date.
>
> April 1, 2009 - All dispositive motions are to be served, filed and heard by this date.
>
> July 1, 2009 – Trial ready date.

Fifth Amended Pretrial Scheduling Order [Docket No. 400].

### B.   Settlement Agreement Between Fair Isaac and Equifax and Defendants' Discovery Directed to this Agreement

On June 6, 2008, Fair Isaac and Equifax entered into a "Technology Development, Distribution and License Agreement" and a "Data License Agreement" as part of a settlement between Fair Isaac and Equifax.  Defendants maintain that they learned of the settlement through a June 10, 2003 email from Fair Isaac' CEO, Dr. Mark Greene, which addressed the partnership with Equifax.  See Memorandum of Law in Support of Defendants' Joint Motion in the Alternative for Leave to Amend Answers to

---

[2]     On November 5, 2008, the Court issued the Sixth Amended Pretrial Scheduling Order that gave Fair Isaac until January 23, 2009 to depose expert Robert Anderson and defendants the right to depose by this same date any expert who submitted a report on behalf of Fair Isaac in response to the Anderson report.  See Docket No. 434.

Assert Counterclaims for Violations of the Antitrust Laws and Tortious Interference with Contract ("Defs.' Mem.") [Docket No. 487] at p. 8; see also Declaration of James K. Gardner [Docket No. 489] ("Dec. 12, 2008 Gardner Decl.") Ex. 4, FIC1397275 (June 10, 2008 Greene email).  Fair Isaac's action against former defendants Equifax and Equifax Information Services LLC, was subsequently dismissed with prejudice, pursuant to a stipulation by the parties.  See June 13, 2008 Order [Docket No. 362].

Defendants immediately propounded discovery on Fair Isaac regarding the settlement, as they believed those settlement documents bore on Fair Isaac' antitrust claims and defendants' defense to these claims.  See June 27, 2008, Order [Docket No. 377] at p. 2.  Fair Isaac, in turn, requested that this Court amend the Amended Protective Order to prohibit any outside litigation counsel for defendants involved in any settlement discussions with Fair Isaac from having access to any Equifax-settlement-related documents or information.  Id. at p. 2.  Alternatively, Fair Isaac proposed that rather than prohibiting outside litigation counsel for defendants from examining the settlement documents in their entirety, it would redact from the settlement materials those terms that Fair Isaac believed were not relevant to the claims or defenses in the suit.  Id. at p. 3.  To address Fair Isaac's request, the Court ordered Fair Isaac to deliver to the Court and defendants, on or before July 1, 2008, the Equifax settlement agreement and related business agreements memorializing the settlement and business relationship between Fair Isaac and Equifax with redactions, and a letter describing the nature of all terms redacted from these documents and the basis for each proposed redaction.  Id. at p. 4.  On July 8, 2008, this Court denied Fair Isaac's request to amend the Amended Protective Order and ordered Fair Isaac to produce to defendants the five documents reflecting the settlement agreement with Equifax and

related business agreements without any redactions.  See July 8, 2008 Order [Docket No. 383].  Defendants received the unredacted settlement agreement and associated agreements on July 10, 2008.  See Declaration of Dao L. Boyle ("Boyle Decl.") [Docket No. 526], ¶ 2, Ex. 1 (July 10, 2008 Letter from Plaintiffs to Defendants Enclosing the Unredacted Agreements); see also Transcript of December 23, 2008 Hearing ("Tr.") [Docket No. 564] at pp. 15-16.

> On June 17, 2008, defendants issued their Tenth Set of Requests for the Production of Documents, which included a request for the projections and analyses pertaining to the Equifax agreement

On September 10, 2008, defendants moved this Court for an order compelling the production of documents responsive to Document Request No. 3 of their Tenth Set of Document Requests to Fair Isaac, including:  the analyses of the impact of the Equifax deal on Fair Isaac; scoring business and/or the scoring marketplace; the analysis or projections and related documents, about which CEO Dr. Mark Greene testified at his deposition; any joint analyses conducted by Equifax and Fair Isaac; and witnesses, including CEO Greene and the head of scoring Lisa Nelson, to testify concerning the above analyses.  See Memorandum of Law in Support of Defendants' Motion to Compel Fair Isaac to Provide Discovery of Non-Privileged Business Analyses Related to Business Agreements between Equifax and Fair Isaac [Docket No. 404] at pp. 4, 9-10; see also November 3, 2008 Order [Docket No. 431].  This Court denied defendants' motion.   November 3, 2008 Order [Docket No. 431] at pp. 16-21. Defendants filed objections to this Court's Order on November 18, 2008.  See Docket No. 437.  On January 22, 2008, United States District Judge Ann D. Montgomery overruled defendants' objections and upheld this Court's November 3, 2008 Order on discovery.  See Docket No. 566.

8

**C.**   **Events Leading to the Filing of the Amended Pleadings**

On August 13, 2008, subsequent to defendants' discovery of the Equifax settlement agreements, defendants brought a Joint Motion (I) to Modify Scheduling Order to Permit Defendants to Move for Leave to Amend Pleadings, and (II) for Leave to Amend Answers to Assert Counterclaims for Cancellation of Registration for "300-850" Trademark [Docket No. 391].   The proposed amended answer only added a counterclaim for the cancellation of Fair Isaac' registration of the "300-850" trademark. Id.  The hearing for the motion was noticed for September 24, 2008.  See Docket No. 392.

On August 28, 2008, Fair Isaac's counsel sent an email to defendants' counsel asserting that Fair Isaac believed that its Second Amended Complaint was sufficiently broad to encompass a claim of a price-fixing arrangement between defendants under Section One of the Sherman Act.  See Dec. 12, 2008 Gardner Decl., Ex. 3 (August 28, 2008, 2:23 p.m. email).   To the extent that defendants did not agree with this assessment, Fair Isaac asked that defendants respond as soon as possible so that Fair Isaac could bring a motion to amend to add the claim.  Id.  Defendants responded by requesting an identification of the portions of the Second Amended Complaint that Fair Isaac believed asserted a price-fixing claim.  Id. (August 28, 2008, 2:25 p.m. email).  In response, Fair Isaac' counsel represented that the Second Amended Complaint contained sufficient allegations for price-fixing under the notice pleading standards, and also stated in relevant part:

> But we would like to know whether your clients will consent to this amendment or whether a motion will be necessary. As amendment would eliminate the need for your clients to go forward with their motion to amend the pleadings, given that they could do so as a matter of right in response to Fair Isaac's amended pleading.

Id. (August 28, 2008, 3:05 p.m. email).  Fair Isaac's counsel sent a subsequent email on September 9, 2008, inquiring whether defendants would accept the proposed amendment without a motion to amend, and attaching the proposed claim for unreasonable and illegal restraint of trade under 15 U.S.C. § 1 (pertaining to defendants' alleged coordination and collusion regarding the pricing of VantageScore and output of in-house credit scores).  See Declaration of Randall Tietjen [Docket No. 493] ("Dec. 12, 2008 Tietjen Decl."), Ex. 3.

This Court denied defendants' motion to amend to add the cancellation of registration for "300-850" trademark counterclaim as moot based on the parties' representations at the September 24, 2008 hearing that they had reached an agreement regarding the issues raised by this motion.  See September 29, 2008 Order [Docket No. 428], ¶ 1.  The parties continued to negotiate the stipulation for amending the pleadings after the September 24, 2008 hearing.  See, e.g., Dec. 12, 2008 Tietjen Decl., Ex. 4 (September 28-29, 2008 email exchange between counsel).  However, it was not until November 5, 2008, that the parties filed a Stipulation, which set forth their agreement to permit Fair Isaac to amend its Second Amended Complaint to assert a price-fixing claim pursuant to 15 U.S.C. § 1, and to permit "[d]efendants [to] answer or otherwise plead in response to Plaintiffs' Third Amended Complaint within twenty days of service of the complaint."  See Docket No. 434.  On November 6, 2008, the Court issued an Order, based on the Stipulation, permitting Fair Isaac to file their Third Amended Complaint and also permitting defendants to "answer or otherwise plead in response to Fair Isaac' Third Amended Complaint within twenty days of service of the complaint."  November 6, 2008 Order [Docket No. 435].

### D.    Defendants' Third Amended Complaint

On November 10, 2008, Fair Isaac filed and served its Third Amended Complaint.  See Docket No. 436.   The Third Amended Complaint added Count Twelve, alleging an unreasonable and illegal restraint of trade claim under Section One of the Sherman Act, 15 U.S.C. § 1, for the coordination and collusion regarding the pricing of VantageScore and output of in-house credit scores.  Specifically, Count Twelve alleged the following: the credit bureaus conspired to phase out their in-house credit scores in order to ensure that the bureaus were jointly promoting VantageScore; targeted large institutional customers in an attempt to deprive Fair Isaac of its largest customer base and to displace Fair Isaac's scores with VantageScore; and priced VantageScore at or above prices charged for certain scores from Fair Isaac in order to avoid price competition between the bureaus themselves on VantageScore.  See Third Amended Complaint, ¶ 256.  In support of these allegations, Fair Isaac alleged that since 2004, the credit bureaus planned to develop a credit score to displace Fair Isaac' score and thereby obtain the royalties they had been paying Fair Isaac for its scoring algorithm.  Id., ¶ 258.  To effectuate this plan, Fair Isaac alleged that the credit bureaus agreed not compete on the price for VantageScore and set a retail price floor below which VantageScore would not be sold.  Id., ¶ 259.  The alleged focus of the credit bureaus was not to use VantageScore to compete with each other in the national market of credit scores.  Id., ¶¶ 260-61.  Count Twelve also alleged that the credit bureaus agreed to phase-out their in-house credit scores and algorithms in order to focus their joint efforts to eliminate Fair Isaac as competition.  Id., ¶ 265.  In addition, Fair Isaac alleged that the credit bureaus agreed to conduct joint validation, marketing and discounted pricing of VantageScore to specific customers and lenders that were Fair Isaac's primary sources of income.  Id., ¶ 266.  In sum, by agreeing to fix the prices of

VantageScore and restraining their separate in-house credit scores, Fair Isaac asserted that defendants have conspired unreasonably to restrain competition in the national market for aggregate credit data and credit scores, thereby resulting in a <u>per-se</u> violation of Section One of the Sherman Act, 15 U.S.C. § 1.  <u>Id.</u>, ¶ 269.

### E.    Defendants' Amended Answers and Counterclaims

On December 4, 2008, defendants served and filed their amended answers and counterclaims to Fair Isaac's Third Amended Complaint.  <u>See</u> Docket Nos. 475, 477, 478.  Both defendants Trans Union and Experian added the agree-upon trademark cancellation counterclaim.  <u>See</u> December 12, 2008 Declaration of Bryan Gant [Docket No. 488], Ex. 1 ("Proposed Experian Answer and Counterclaims") at pp. 50-63; Dec. 12, 2008 Gardner Decl., Ex. 1 ("Proposed Trans Union Answer and Counterclaims") at pp. 32-47.  Experian and Trans Union also asserted two additional counterclaims in their December 4, 2008 pleadings.  In their first counterclaim, Experian and Trans Union alleged anticompetitive conduct on the part of Fair Isaac in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Minnesota antitrust law under Minn. Stat. § 325D.52, and an unfair competition claim under California law.  <u>See</u> Prop. Experian Answer and Counterclaims at pp. 64, 84-85, ¶¶ 1, 63-75; Prop. Trans Union Answer and Counterclaims at pp. 47-70, ¶¶ 1, 77-86.  Relying on the fact that Fair Isaac's scores are entrenched in institutional market and regulatory requirements, statements by industry analysts characterizing Fair Isaac as a monopoly and Fair Isaac's admissions that there is a high barrier into the scoring market, Trans Union and Experian alleged that since 2002, Fair Isaac has achieved a dominant position in the scoring market thereby allowing them to earn monopoly profits.  <u>See</u> Prop. Experian Answer and Counterclaims at pp. 67, 68, 75, ¶¶ 16, 18, 39; Prop. Trans Union Answer and Counterclaims at pp. 50,

51, 58, ¶¶ 14, 18, 39.   Trans Union and Experian further stated that Fair Isaac undertook steps to eliminate the competitive threat from VantageScore by entering into an anticompetitive business arrangement with former defendant Equifax in June of 2008, at which time Equifax received 20 million from Fair Isaac in the form of cash payments, advantageous licensing terms and dismissal of the action against it, in return for Equifax's agreement to engage in certain acts and refrain from other actions.   See Prop. Experian Answer and Counterclaims at p. 64, 79-84, ¶¶ 3, 50-62; Prop. Trans Union Answer and Counterclaims at pp. 47, 64-69 ¶¶ 3, 64-76.   Trans Union and Experian also alleged that Fair Isaac has impermissibly used the present lawsuit to weaken the adoption of VantageScore by clients, in order to maintain control over the credit scoring market.   See Prop. Experian Answer and Counterclaims at pp. 76-78, ¶¶ 43-47; Prop. Trans Union Answer and Counterclaims at pp. 59-61, ¶¶ 43-47.   In addition, Trans Union asserted that Fair Isaac, as part of its Second Amended Complaint, attempted to maintain its dominant position in the scoring market by challenging Trans Union's attempts to sell competing generic scoring models that have features common to Fair Isaac's models, including VantageScore, and thereby blocking Trans Union's essential involvement in VantageScore, by: (1) bringing a misappropriation claim that was subsequently dismissed; and (2) using an impermissible interpretation of a confidentially provision entered into by Trans Union and Fair Isaac.   Id. at pp. 54, 61-63, ¶¶ 26, 48-61.   All of these actions, according to defendants have the effect of enhancing and preserving Fair Isaac's illegal monopoly power.[3]

---

[3]      Included the "antitrust" category of counterclaims is Experian's California Unfair Competition claim.   See Prop. Experian Answer and Counterclaims at pp. 86, ¶¶ 73-75.

The second counterclaim asserted by Trans Union and Experian was a claim of tortious interference with contract, which is also based on the June 2008 agreement between Fair Isaac and Equifax, and which defendants claim was intentionally undertaken by Fair Isaac to interfere with the contractual relationship between the members of the VantageScore joint venture.  <u>See</u> Prop. Experian Answer and Counterclaims at pp. 86-87, ¶ 76-78; Prop. Trans Union Answer and Counterclaims at p. 71, ¶¶ 87-89.

Defendant VantageScore added to its answer the cancellation of the registration for Fair Isaac's "300-850" trademark counterclaim.  <u>See</u> Defendant VantageScore Solutions, LLC's Answer, Affirmative Defenses and Counterclaim to Plaintiffs' Third Amended Complaint ("Prop. VantageScore Answer and Counterclaim") at pp. 40-53. VantageScore also added the affirmative defenses of laches, as to all claims, and based on the Court's June 23, 2008 Order dismissing any allegations of misappropriation of trade secrets, a lack of standing affirmative defense as it related to Fair Isaac's misappropriation or use of its trade secrets claim.  <u>Id.</u> at pp. 36-37.

### F.    <u>December 5, 2008 Hearing</u>

At a hearing on December 5, 2008 to address motions brought by defendants and a third party, the Court learned that Fair Isaac had cancelled scheduled expert depositions because of the antitrust and tortious interference counterclaims served by defendants the previous day, and that Fair Isaac intended to file a motion to strike those counterclaims.  The Court ordered the depositions to proceed, and after expressing concern at the eleventh-hour addition of the antitrust and tortious interference counterclaims, required the parties to formally submit the issue to the Court as either a motion to strike the answers by Fair Isaac or a motion to amend by defendants.  As a

consequent, the Court now has before it Plaintiffs' Motion to Strike Defendants' Filings on December 4, 2008 and Defendants' (Trans Union and Experian) Joint Motion in the Alternative for Leave to Amend Answers to Assert Counterclaims for Violations of the Antitrust Laws and Tortious Interference with Contract.

## III.   PLAINTIFFS' MOTION TO STRIKE

Fair Isaac brought a motion to strike defendants' December 4, 2008 filings pursuant to Federal Rule of Civil Procedure 12(f) on the grounds that Experian and Trans Union impermissibly added antitrust and tortious interference counterclaims, and VantageScore impermissibly added new affirmative defenses.[4]  According to Fair Isaac, the counterclaims and affirmative defenses at issue were filed after this Court's deadlines for amending the pleadings, were filed without leave of the Court, were in breach of defendants' agreement with Fair Isaac, and if permitted, would greatly expand the scope of the suit and discovery, and would delay resolution of the case. Additionally, Fair Isaac submitted that defendants did not meet the standard of good cause required by Rule 16(b) for amending the scheduling order to permit the belated filing of these counterclaims to their answers.

### A.   Standard of Review

Under Federal Rule of Civil Procedure 12(f), a court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Pursuant to Rule 7, pleadings include a complaint and answer. See Fed. R. Civ. P. 7(a).  Judges enjoy liberal discretion to strike pleadings under Rule 12(f), however, striking a party's pleading is an extreme and disfavored measure. See

---

[4]     Fair Isaac did not object to the addition of the agree-upon trademark cancellation counterclaim.  See See Plaintiffs' Memorandum of Law in Support of Motion to Strike Defendants' Filings on December 4, 2008 ("Pls.' Strike Mem.") at p. 2.

BJC Health Sys. V. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007); Stanbury Law Firm, P.A. v. IRS, 221 F.3d 1059, 1063 (8th Cir. 2000).

**B.** **Did Defendants Have a Right to Amend Pursuant to the Parties' November 5, 2008 Stipulation and This Court's November 6, 2008 Order?**

Defendants argued that this Court's November 6, 2008 Order entitled Experian and Trans Union to propound their antitrust and tortious interference counterclaims, as well as VantageScore's additional affirmative defenses, as a matter of right. See Defs.' Mem. at p. 11.  In support of their position, defendants relied on that portion of the Court's Order instructing defendants to "answer or otherwise plead in response to Plaintiffs' Third Amended Complaint within twenty days of service of the complaint." Id.; November 6, 2008 Order [Docket No. 435].  Fair Isaac countered that the Court's Order must be considered within the context of the stipulation that lead to the November 6 Order, which was the parties' agreement to allow defendants to file their trademark cancellation claim outside of the Court's deadline for amending pleadings, in exchange for allowing Fair Isaac to file its price-fixing claim.  See Pls.' Strike Mem. at pp. 12-13.

It is true that the language of the parties' stipulation and this Court's November 6, 2008 Order, did not explicitly restrict defendants to asserting their trademark cancellation counterclaim.  However, this Court agrees with Fair Isaac that the conduct of the parties leading up to the Stipulation and Order establishes that the parties intended the there was a quid pro quo arrangement – i.e. that in exchange for Fair Isaac agreeing to stipulate to defendants' proposed trademark counterclaim without a motion (the "quid"), defendants agreed to the addition of Fair Isaac's per se price-fixing claim without a motion (the "quo").  There is nothing in the record to suggest that by agreeing to stipulate to defendants' proposed trademark cancellation counterclaim that Fair Isaac

agreed that defendants could assert whatever claims they wanted.  The parties had reached an understanding as to what each was going to assert by way of claim and counterclaims, and thus, the extent to which the scope and theory of the case was going to be expanded.  Defendants' answer to Fair Isaac's new counterclaim without leave of court was constrained by that agreement.  It would be both inequitable and inappropriate to allow defendants to unilaterally redefine the bargain they reached with Fair Isaac.  As such, this Court concludes that this Court's November 6, 2008 Order did not entitle Experian and Trans Union to propound their antitrust and tortious interference counterclaims, or VantageScore's additional affirmative defenses, as a matter of right.

### C.   Did Defendants Have the Right to File Their Counterclaims Without Leave of Court Because Fair Isaac's Price-Fixing Claim Changed the Theory or Scope of the Case?

Next, it was defendants' position that they did not need leave from the Court to file their antitrust and tortious interference counterclaims because Fair Isaac's addition of its price-fixing claim, as part of their Third Amended Complaint, changed the theory and scope of Fair Isaac's case.  See Defendants' Response in Opposition to Fair Isaac' to Fair Isaac' Motion to Strike ("Defs' Resp.") at p. 8.  Fair Isaac argued that its Second Amended Complaint was sufficiently broad to encompass the price-fixing claim, and that defendants' affirmative defenses and subsequent discovery pertaining to the Second Amended Complaint, further demonstrated that defendants believed it encompassed a price fixing claim.  See Pls.' Strike Mem. at p. 10.  As such, Fair Isaac submitted that its fully articulated price-fixing claim did not change the theory and scope of their case against defendants.  Id.

Generally, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  See Fed. R. Civ. P. 15(a)(2).  Similarly, Rule 15(d),

addressing supplemental pleadings, requires that a party bring a motion to the Court to seek permission to file the supplementation.  See Fed. R. Civ. P. 15(d); see also Fed. R. Civ. P. 13(e) ("Counterclaim Maturing or Acquired After Pleading.  The court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading.") (emphasis added).  However, there is an exception to this general rule:

> [W]hen a plaintiff files an amended complaint which changes the theory or scope of the case, the defendant is allowed to plead anew as though it were the original complaint filed by the Plaintiff. . . . The obvious corollary is that if an amended complaint does not change the theory or scope of the case, a [defendant] must seek leave of court pursuant to Rule 15(a) before it can amend its answer to assert a counterclaim.

Tralon Corp. v. Cedarapids, Inc., 966 F. Supp. 812, 832 (N.D. Iowa 1997) (quoting Brown v. E.F. Hutton & Co., 610 F. Supp. 76, 78 (S.D. Fla. 1985)), aff'd 2000 WL 84400 (8th Cir. Jan. 21, 2000); see also Intermedics, Inc. v. Cardiac Pacemakers, Inc., Civ. No. 4-95-716 (JRT/RLE), 1998 WL 35253496 at *2 (D. Minn. July 07, 1998) ("Where, as here, an Amended Complaint, or Counterclaim, does not change the theory or scope of the case, then the party, who responds to that amended pleading, must seek leave of the Court, pursuant to Rule 15(a), Federal Rules of Civil Procedure, before it can amend its Answer or Reply.") (citations omitted).

This Court concludes that Fair Isaac's per se price-fixing claim did not change the scope or theory of the case such that defendants were then free allege whatever counterclaims they wanted.  Fair Isaac had already alleged in Count Eight of its Second Amended Complaint an unreasonable and illegal restraint of trade claim under Section One of the Sherman Act, 15 U.S.C § 1, for the joint creation and ownership by defendants of VantageScore and an agreement to limit competition among credit

bureaus.  Specifically, Fair Isaac alleged that by agreeing to create, own, and control a common credit scores through the commonly-owned VantageScore, defendants had combined, conspired and colluded unreasonably to restrain competition in the aggregated credit data market, in part, by entering into agreements that would will limit the credit bureaus' independent decision-making regarding price, limit the bureaus from selling credit scores using other scoring algorithms, otherwise reduce the credit bureaus' ability or incentive to compete independently, and limit the ability of third-party vendors to compete in the market.  See Second Amended Complaint, ¶¶ 222-25.  In addition, Counts Ten and Eleven alleged an attempt and conspiracy to monopolize the market for credit scoring in violation of Section Two of the Sherman Act, 15 U.S.C. § 2 -- they alleged that defendants used their market power over aggregated credit data in order to provide VantageScore with monopoly power through, among other means, the manipulation of the relative prices of VantageScore Credit scores and of credit scores generated from Fair Isaac's scoring algorithm.  See Second Amended Complaint, ¶¶ 241-42; 248-50.  This Court finds that these allegations in the Second Amended Complaint generally encompassed a per se price-fixing claim as alleged by Fair Isaac.

Further, defendants' assertion that the per se price-fixing claim changed the scope or theory of the case lacks merit as evidenced by Experian's and Trans Union assertion of affirmative defenses in their answers to the Second Amended Complaint that any claims of per se violations of antitrust laws are barred.  See Experian Answer to Second Amended Complaint [Docket Nos. 118, 119] at p. 41 ("Insofar as the Second Amended Complaint purports to allege that Experian committed a per se violation of the antitrust laws, such claims are barred . . . ."); Trans Union's Answer to Plaintiffs' Second Amended Complaint [Docket Nos. 123] at p. 31 ("Any affirmative defenses pleaded by

other Defendants and not pleaded by Trans Union are incorporated herein to the extent they do not conflict with Trans Union's affirmative defenses.").  In the same vein, defendants' claim that the price-fixing claim does not relate to the existing case is belied by their own discovery. In their First Set of Document Requests, propounded on January 17, 2007, they made the following request for documents on Fair Isaac:

> 74.    All documents relating to any past, present, or future economic injury to the purchasers of credit reports by reason of the formation or operation of the VantageScore joint venture, including, without limitation, injury occurring by reason <u>of an alleged conspiracy to fix prices, coordination of prices, or reduced incentive to innovate</u>.

<u>See</u> Dec. 12, 2008 Tietjen Decl., Ex. 1 (emphasis added).[5]

More importantly, by the time that Fair Isaac proposed adding the <u>per se</u> price-fixing claim to its complaint (on August 28, 2008), fact discovery was over (fact discovery in this case ended on July 22, 2008).  <u>See</u> Dec. 12, 2008 Gardner Decl., Ex. 3.  Yet defendants never suggested that if the price-fixing claim was going to be part of the case, they needed the opportunity to do more (or any) discovery on it.  This is so, even though the facts underlying Fair Isaac's price-fixing claim changed from Fair Isaac initially claiming that the credit bureaus agreed to sell VantageScore for less than what they were selling Fair Isaac's scores, to Fair Isaac claiming that the credit bureaus agreed to sell their product at or above the prices of Fair Isaac's scores.  <u>Compare</u>, Second Amended Complaint, ¶¶ 45, 111, 124-26, <i>with</i> Third Amended Complaint, ¶¶ 266, 268.

---

[5]     This Court notes that while the Amended Complaint was in effect during the January 17, 2007 First Set of Document Requests, the Amended Complaint already contained essentially the same allegations as those found in the Second Amended Complaint pertaining to unreasonable and illegal restraint of trade claim under Section One of the Sherman Act, 15 U.S.C § 1, and attempt and conspiracy to monopolize the market for credit scoring in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.  <u>See</u> Amended Complaint [Docket No. 9] at pp. 56-62, ¶¶ 166-203.

For all the reasons stated above, this Court finds that the Fair Isaac's addition of the <u>per se</u> price-fixing claim to the Third Amended Complaint did not change the theory or scope of the case so as to allow Experian and Trans Union to serve and file their antitrust and tortious interference counterclaims without leave of the Court.

### D.    <u>VantageScore's Affirmative Defenses</u>

Fair Isaac asked that this Court strike VantageScore's answer because it alleged unspecified "different" affirmative defenses to Fair Isaac's Third Amended Complaint. <u>See</u> Pls.' Strike Mem. at pp. 2, 7.  The only grounds offered by Fair Isaac for striking these portions of VantageScore's answer was that the affirmative defenses asserted did not adhere to the stipulation of the parties or this Court's November 6, 2008 Order.  <u>Id.</u> at p. 2.  As stated previously, VantageScore added the affirmative defenses of laches as to all claims, and a lack of standing as it related to the misappropriation or use of Fair Isaac' trade secrets.  <u>See</u> Prop. VantageScore Answer and Counterclaims at pp. 36-37. Based on the same analysis the Court applied to Experian and Trans Union's antitrust and tortious interference counterclaims, the Court concludes that VantageScore did not have leave of the court to file additional affirmative defenses, and the addition of Fair Isaac' price-fixing claim did not change the scope or theory of the case so as to allow VantageScore to add, without leave of court, the affirmative defenses of laches or the lack of standing.  On this basis, the Court strikes these affirmative defenses.  However, as the laches affirmative defense can pertain to Fair Isaac's price-fixing claim, VantageScore will be allowed to assert this defense in its answer to Third Amended Complaint, as it relates to the <u>per se</u> price-fixing claim.   The Court reaches this conclusion because VantageScore was authorized to respond to Fair Isaac price-fixing claim by this Court's November 6, 2008 Order, and the Federal Rules of Civil Procedure

allow a party to assert an affirmative defense in response to a pleading.  See Fed. R. Civ. P. 8(c).  In other words, VantageScore had the right to assert affirmative defenses that directly bear on Fair Isaac's price-fixing claim.

## IV.   DEFENDANTS' MOTION TO AMEND

Experian and Trans Union have a brought a motion to amend their answers to assert counterclaims for violations of the antitrust laws and tortious interference with contract.  Defendants argued that they did not need leave from the Court to file these counterclaims pursuant to this Court's November 6, 2008 Order, which allowed them to "answer or otherwise plead in response to Plaintiffs' Third Amended Complaint. . . ." See Defs.' Mem. at p. 11.  This Court has already rejected this argument in its analysis of Fair Isaac' motion to strike in this Order.  See Section III, B,C, supra.  Defendants also asserted that they should be given leave to add the counterclaims under Rules 15 and 16 of the Federal Rules of Civil Procedure.  The Court now addresses that argument.

### A.   Standard of Review

The parties are in disagreement as to what section of Rule 15 of the Federal Rules of Civil Procedure applies to defendants' motion for leave.  Defendants asserted that Rule 15(d) apples to their motion.  See Defs.' Mem. at p. 12.  Rule 15(d) provides in relevant part "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fair Isaac countered that defendants' proposed counterclaims are not supplemental and that Rule 15(a)(2) applies to defendants' motion to amend.  See Fair Isaac's Response to Defendants Motion for Leave to Amend ("Pls.' Opp. Mem.") at pp. 9-10.  Rule 15(a)(2) provides in

the relevant part, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."  The distinction between an amended pleading under Rule 15(a) and a supplemental pleading under Rule 15(d) of the Fed. R. Civ. P. has been stated as follows:

> An amended pleading is designed to include matters occurring before the filing of the bill but either overlooked or not known at the time. A supplemental pleading, however, is designed to cover matters subsequently occurring but pertaining to the original cause.

U.S. ex rel. Kinney v. Stoltz, No. Civ. 01-1287 (RHK/JMM), 2002 WL 523869 at *3 (D. Minn. April 05, 2002) (quoting United States v. Vorachek, 563 F.2d 884, 886 (8th Cir. 1977), quoting Berssenbrugge v. Luce Mfg. Co., 30 F. Supp. 101 (W.D. Mo. 1939)). The dispute here is whether the defendants' antitrust and tortious interference counterclaims alleged matters that occurred before or after the Second Amended Complaint.

On the one hand, Experian and Trans Union asserted, as part of their antitrust counterclaims, that since 2002, Fair Isaac has achieved a dominant and entrenched position in the scoring market, thereby allowing them to earn monopoly profits.  See Prop. Experian Answer and Counterclaims at pp. 67, 68, 75, ¶¶ 16, 18, 39; Prop. Trans Union Answer and Counterclaims at pp. 50, 51, 58, ¶¶ 14, 18, 39.  Trans Union and Experian also alleged that Fair Isaac has impermissibly used the present lawsuit to weaken the adoption of VantageScore by clients in order to maintain control the scoring business.  See Prop. Experian Answer and Counterclaims at pp. 76-78, ¶¶ 43-47; Prop. Trans Union Answer and Counterclaims at pp. 59-61, ¶¶ 43-47.  Based on these allegations, it is evident that some of the events leading to the establishment of the

monopoly are, by defendants' own descriptions, based on events that took place well before or with the initiation of the present case. On the other hand, it is also clear the gravamen of and driving force behind Trans Union's and Experian's counterclaims is Fair Isaac's June 2008 agreement with Equifax, which occurred well after defendants' responsive pleadings to the April 2007 Second Amended Complaint and the deadline to amend pleadings. See Prop. Experian Answer and Counterclaims at p. 64, 79-84, ¶¶ 3, 50-62; Prop. Trans Union Answer and Counterclaims at pp. 47, 64-69 ¶¶ 3, 64-76.

Regardless, the distinction as to whether Rule 15(a) or 15(d) applies is largely academic because this Court finds that the good cause requirement articulated in Fed. R. Civ. P. 16(b) applies to both amendments and supplemental pleadings. Trans Union and Experian's counterclaims were filed after this Court's April 1, 2007 deadline for amending pleadings. The Eighth Circuit has held that when a party has filed a motion to amend their complaint after the deadline provided for in a court's pretrial scheduling order, then the court may properly require, pursuant to Federal Rules of Civil Procedure 16(b), that good cause be shown for leave to file a pleading that is out of time with that order. See Freeman v. Busch, 349 F.3d 582, 589 (8th Cir. 2003) (citing In re Milk Prod. Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999)) cert. denied, 529 U.S. 1038 (2000)); see also Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715 (8th Cir. 2008) (summarizing the interplay between Rule 15 and 16). If a court were only consider Rule 15 without regard to Rule 16(b), it "would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." In re Milk Prod. Antitrust Litig., 195 F.3d at 437-38 (citation omitted). However, neither the Eighth Circuit nor courts within this circuit have addressed whether a party seeking to supplement a pleading under Rule 15(d) must

24

meet the good cause standard under Rule 16(b) to modify the scheduling order where the motion to supplement is filed after the deadline for amending the pleadings.  Outside the Eighth Circuit, district courts have disagreed on the relationship between Rules 15(d) and 16(b).  *Compare* Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs, 243 F.R.D. 253, 256 (S.D. W.Va. 2007) (finding Rule 16 does not apply to motions to supplement because Rule 16 does not require courts to set a deadline for supplemental pleadings and the Court did not set such a deadline in the Scheduling Order); Fremont Inv. & Loan v. Beckley Singleton, Chtd., No. 2:03-CV-1406-PMP-RJJ, 2007 WL 1213677 at *7 (D. Nev. Apr. 24, 2007) (same) *with* McGrotha v. Fed Ex Ground Package Sys., Inc., No. 5:05-CV391 (CAR), 2007 WL 640457 at *2 (M.D. Ga. Feb. 24, 2007) ("[w]hen a motion to supplement is filed after the scheduling order's deadline, . . . a party must first demonstrate good cause under Rule 16(b) before a court can consider whether supplementation is proper under Rule 15(d).").

Rule 16(b)(3) describes the "Required Contents" of a pretrial scheduling order as follows, "[t]he scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions."  Fed. R. Civ. P.  16(b)(3).  Similarly, United States District Court Local Rule 16.2 requires that a pretrial schedule include "[a] date by which other parties may be joined and the pleadings may be amended."  The plain language of Rule 16 and Local Rule 16.2 governs any pleading that serves to change or amend the previous pleading.  As such, this Court concludes that Rule 16(b) is equally applicable to supplemental pleadings under Rule 15(d) as it is to amendments under Rule 15(a).  Therefore, defendants must establish good cause for seeking to modify the operative scheduling order to permit the adding of their antitrust and tortious interference counterclaims at this juncture of the case.

B.     <u>Does Good Cause Exist to Add the Counterclaims Now?</u>

Scheduling orders pursuant to Rule 16(b)(1) "assure[ ] that at some point both the parties and the pleadings will be fixed, . . ."   Rule 16(b), Federal Rules of Civil Procedure, *Advisory Committee Notes--1983 Amendment*.   Under Rule 16(b), "[a] schedule shall not be modified except upon a showing of good cause and by leave of [court]."  Fed. R. Civ. P. 16(b).

The Eighth Circuit has described what constitutes good cause under Rule 16 as follows:

> "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." <u>Rahn v. Hawkins</u>, 464 F.3d 813, 822 (8th Cir. 2006); <u>see also</u> Fed. R. Civ. P. 16(b), advisory committee note (1983 Amendment) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. See <u>Bradford v. DANA Corp.</u>, 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling order's] requirements"). Our cases reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order. <u>See, e.g.,</u> <u>Rahn</u>, 464 F.3d at 822 (affirming the district court's denial of Rahn's request for a modification of the scheduling order because the record made clear that Rahn did not act diligently to meet the order's deadlines); <u>Barstad v. Murray County</u>, 420 F.3d 880, 883 (8th Cir. 2005) (affirming the district court's denial of leave to amend the Barstads' complaint under Rule 16(b) because the Barstads had eight months to request an amendment of the scheduling order and "knew of the claims they sought to add when they filed the original complaint"); <u>Freeman v. Busch</u>, 349 F.3d 582, 589 (8th Cir. 2003) (affirming, under Rule 16(b), the district court's denial of Freeman's motion to amend her complaint because she provided no reasons why the amendment could

> not have been made earlier or why her motion to amend was
> filed so late).

Sherman, 532 F.3d at 716-17; see also Scheidecker v. Arvig Enterprises, 193 F.R.D.

630, 632 (D. Minn. 2000) ("the 'good cause' standard [of Rule 16(b)] is an exacting one,

for it demands a demonstration that the existing schedule cannot be reasonably be met

despite the diligence of the party seeking the extension.")  Consequently, a party does

not meet the good cause standard under Rule 16(b) if the relevant information on which

it based the amended claim was available to it earlier in the litigation.  See Parker v.

Columbia Pictures Indus., 204 F.3d 326, 340-41 (2nd Cir. 2000) (citing Sosa v. Airprint

Systems, Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)).   In short, Rule 16(b) focuses on

"the diligence of the party seeking to modify a Scheduling Order, as opposed to the

litany of unpersuasive excuses, inclusive or inadvertence and neglect, which commonly

undergird an untimely Motion to Amend."  Id. n. 1 (citations omitted).  Rule 16(b) does

not look at prejudice to the non-moving party.  See Archer Daniels Midland v. Aon , 187

F.R.D. 578, 581-82 (D. Minn. 1999) (citing Luigino's, Inc. v. Pezrow Cos., Inc., 178

F.R.D. 523, 525 (D. Minn. 1998)).

This Court does not find "good cause" for permitting the addition of Experian's

and Trans Union's antitrust and tortious interference counterclaims in response to the

Third Amended Complaint.   Having found that defendants impermissibly filed their

amended answers and counterclaims on December 4, 2008, the issue is whether

defendants had good cause for bringing their motion for leave to amend on December

12, 2008?  That is, did they act diligently in bringing their motion for leave to amend?

While defendants certainly had good reasons to seek to amend their answer to assert

their antitrust and tortious interference counterclaims after the deadline for motions to

amend the pleadings (April 7, 2007) had expired, as the operative facts driving these

counterclaims did not occur until June 2008 (when Equifax and Fair Isaac settled and entered into a business arrangement), the Court concludes that defendants did not have good cause for waiting 5 months -- until December 2008 -- to spring these new counterclaims on Fair Isaac.   Defendants learned of the Fair Isaac's settlement with Equifax in June 2008; and they received the unredacted settlement agreement and business agreements on July 10, 2008.   See Boyle Decl., ¶ 1, Ex. 1 (July 10, 2008 Letter from Fair Isaac to Defendants Enclosing the Unredacted Agreements); Tr. 15-16. It is these facts that they relied upon in their antitrust and tortious interference counterclaims (and other facts that occurred well before July 2008).   Nonetheless, knowing that the deadline for fact discovery was imminent (July 22, 2008) and that expert discovery was scheduled to begin on August 26, 2008 (date for Fair Isaac's initial expert disclosures) and to be completed on December 19, 2008 (except for expert Anderson), defendants took no steps to address the possibility that they might seek to add the antitrust and tortious interference counterclaims.   They did not move the Court to modify the deadlines for fact or expert discovery; they did not alert Fair Isaac that they might seek to add the claim which would clearly impact the timing, scope and substance of fact and expert discovery.   This is especially concerning to the Court given that in conjunction with defendants' August 13, 2008 motion to add the trademark cancellation claim, defendants touted how they had moved to add the claim as soon as there was sufficient evidence to establish the claim (the last deposition bearing on claim was taken on July 20, 2008, and they moved on August 13), and they went so far as point out that they had filed their motion well in advance of the hearing date in order to give Fair Isaac an additional time to prepare a response.   See Memorandum in Support of Defendants' Joint Motion (I) to Modify Scheduling Order to Permit Defendants to

Move for Leave to Amend Pleadings, and (II) for Leave to Amend Answers to Assert Counterclaims for Cancellation of Registration for "300-850" Trademark [Docket No. 393] at pp. 5-6, 23.  In other words, defendants moved diligently in bringing a new request for relief before the Court on their trademark cancellation counterclaim, and yet failed to do so in conjunction their antitrust and tortious interference with contract counterclaims.

Defendants argued that they did not immediately file the motion for leave to amend upon the discovery of the settlement agreement between Fair Isaac and Equifax because they were diligently attempting to collect the details of the agreement that Fair Isaac refused to produce.  See Defs.' Mem. at p. 13; Defendants' Reply in Support of their Joint Motion in the Alternative for Leave to Amend Answers to Assert Counterclaims for Violations of the Antitrust Laws and Tortious Interference with Contract ("Defs.' Reply") at pp. 4-5.  Defendants pointed to their September 10, 2008 motion to compel documents related to the Equifax agreement, which was not denied by this Court until November 3, 2008, and their November 18, 2008 objections to the Court's Order.  See Reply at p. 5.  Defendants also noted that discovery regarding the Equifax agreement was still ongoing.  Id.  Yet, at the hearing, defendants' counsel represented that the antitrust and tortious interference counterclaims were for the most part, based on those agreements provided to defendants on July 10, 2008, and this was evidence sufficient for defendants to bring their counterclaims under Rule 11 of the Federal Rules of Civil Procedure.  Tr. 16.  The Court then asked defendants' counsel why defendants waited until December 4, 2008 to present their antitrust and tortious interference counterclaims, given fact discovery was done, expert discovery was near completion, and the counterclaims were primarily based on the settlement agreement

between Fair Isaac and Equifax.  Id.  Counsel's response was that they were attempting

to obtain more information regarding the agreements via their failed motion to compel[6]

and that they finally went forward when they did "[b]ecause a time period had come up,

and the time that had come up was an amended complaint."  Tr. 17-18.  In summary,

defendants stated that they waited to file their antitrust and tortious interference with

contract counterclaims until December 4, 2008, as follows:

> Why we waited five months is that it was the time, Your
> Honor.  It was the time to file this Counterclaim based on
> what happened, based on the discussions with the party,
> based on the fact that Your Honor entered an order that said
> by the agreement that we could answer or otherwise plead
> to their amended complaint.

---

[6]      In its November 3 decision, the Court summarized defendants' rationale for
obtaining the projections considered by Fair Isaac in entering into the agreement with
Equifax, despite a finding that they constituted work product:

> Defendants claim that they have substantial need of the
> revenue projections and analyses, uniquely in the
> possession of Fair Isaac, because they are "highly relevant"
> to Fair Isaac's claim in its Second Amended Complaint that it
> will be driven from the scoring industry due to a lack of
> access to credit data and distribution.  See Defs.' Mem. at p.
> 22.  According to defendants, it is unfair for Fair Isaac's
> witnesses to contend that the agreement with Equifax will
> not prevent harm to Fair Isaac's scoring business while at
> the same time not producing the facts, including the
> projections that the witnesses considered in entering into the
> agreement with Equifax.  Id. at pp. 22-23.  In other words,
> defendants' assertion of substantial need is that the
> documents are "highly relevant" and could provide useful
> impeachment material as to Greene, Campbell and Nelson.
> In opposition, Fair Isaac submitted that defendants' experts,
> armed with Fair Isaac's agreements with Equifax, have all of
> the data necessary to perform their own analysis of what
> Fair Isaac's revenue might be under the agreements.

November 3, 2008 Order [Docket No. 431] at p. 17.  The Court notes that defendants
never represented they needed the material to support a potential antitrust or tortious
interference with contract counterclaims.

Tr. 29.

This Court appreciates the fact that defendants may have wanted more facts before they brought their antitrust and tortious interference counterclaims, and wanted to properly analyze the merits of these claims before they brought it into the case. However, at the end of the day, they asserted claims based solely on the facts they possessed as of July 10, 2008, and they could have taken steps to inject the proposed counterclaims into the case long before December 4, 2008. Instead, despite their awareness of their antitrust and tortious interference claims at the time they moved in August to amend their answer to add the trademark cancellation claim, they limited their motion to the trademark cancellation claim. Similarly, as they engaged in discussions with Fair Isaac regarding its potential per se price-fixing claim, defendants made no mention of their potential antitrust and tortious interference counterclaims to Fair Isaac. Then, even after this Court denied their motion for the projections on November 3, 2008, which was two weeks before Fair Isaac's rebuttal expert report was due, they waited until December 4 to assert the antitrust and tortious interference counterclaims for the first time. These are all strategic decisions that parties are within their rights to make. But they are strategic decisions made at their peril, particularly when fact discovery had ended several months before and expert discovery was about to be completed. The timing for defendants' motion to amend their answer to add the antitrust and tortious interference counterclaims was not dictated by the exigencies of the case; it was driven by defendants' own strategic decisions and actions. For all of these reasons, this Court finds that defendants were not diligent in and did not have good cause for their belated effort to amend their answer to add the antitrust and tortious interference counterclaims.

C.      **Did Defendants Met the Rule 15 Standard for Amending Their Answer to Assert the Counterclaims?**

Even if the Court had concluded that defendants had good cause for bringing their belated counterclaims, the Court would still deny the motion to amend or to supplement under Rule 15 based on undue delay and prejudice to Fair Isaac.[7]  Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires."   The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.   See, e.g., Niagara of Wisconsin Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).   The Eighth Circuit has held that "[a]lthough amendment of a complaint should be allowed liberally to ensure that a case is decided on its merits, . . . there is no absolute right to amend."  Ferguson v. Cape Girardeau

---

[7]      Motions to amend under Rule 15(a) and motions to supplement under Rule 15(d) are subject to the same standard.  See Glatt v. Chicago Park District, 87 F.3d 190, 194 (7th Cir. 1996) (standard under Rule 15(d) is the same as under Rule 15(a)) (citations omitted); Roller Bearing Co. of America, Inc. v. American Software, Inc., 570 F. Supp.2d 376, 383 n. 1 (D. Conn. 2008) ("the standards for permitting additional pleading under Rule 15(a) and Rule 15(d) are the same."); Muhammad v. Bonner, No. 05 CV 1851(RJD)(LB), 2008 WL 926574 at *6 (E.D.N.Y. March 31, 2008) ("Whether a motion for leave to amend under Rule 15(a) or under Rule 15(d), the same factors are considered.") (citing Novak v. National Broadcasting Co., 724 F. Supp. 141, 145 (S.D.N.Y. 1984) (same standards apply to motions under Rule 15 subsections (a) and (d)); Estate of Williams-Moore v. Alliance One Receivables Management, Inc., 335 F. Supp.2d 636, 644 (M.D. N.C. 2004) ("Rule 15(d) motions are to be evaluated under the same standards used to evaluate motions to amend pleadings under Rule 15(a), which generally states that leave to amend shall be freely granted when justice requires unless there are valid reasons for denying leave, such as undue delay, bad faith, or futility.") (citing 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice And Procedure § 1504 (2d ed.1990) (discussing Rule 15(d)); Schneeweis v. Northwest Technical College, No. Civ. 97-1742 (JRT/RLE), 1998 WL 420564 at *13 (D. Minn. June 1, 1998) (citations omitted) (finding that central among the factors, which should be considered in the exercise of the court's broad discretion in deciding whether to allow a complaint to be supplemented, is whether "the supplementation would hinder judicial efficiency, prejudice the rights of other parties to the action, or would insert a frivolous claim.").

County, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing Thompson-El v. Jones, 876 F.2d 66, 67 (8th Cir. 1989); Chesnut v. St. Louis County, 656 F.2d 343, 349 (8th Cir. 1981)). Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." Sanders v. Clemco Indus., 823 F.2d 214, 216 (8th Cir. 1987) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

According to defendants, Fair Isaac will not suffer any prejudice by the addition of the two new counterclaims because little, if any, discovery will be necessary to address the new counterclaims, as the parties have already obtained or are pursuing evidence critical to these claims. See Defs.' Mem. at p. 15. Further, defendants claim that the core issues related to the new counterclaims are also at issue in Fair Isaac' antitrust claims including market definitions, relative market power and the ability of the credit bureaus to compete with Fair Isaac. Id. at pp. 15-16. Defendants also maintained that they should be allowed to file the counterclaims in order to save the time, effort and expense that would be expended if they had to file the counterclaims in a separate law suit and subsequently move to consolidate the two actions under Rule 42 of the Federal Rules of Civil Procedure. Id. at pp. 16-17.

Fair Isaac countered that justice will not be served by allowing defendants leave to add their counterclaims because of the prejudice Fair Isaac would experience due to the new theories of recovery asserted and additional discovery it would require so late in this case. See Pls.' Opp. Mem. at p. 17; Pls.' Strike Mem. at pp. 20-21. In particular, Fair Isaac argued that the exclusionary antitrust conduct allegedly undertaken by Fair Isaac in the proposed counterclaims is not related to the exclusionary antitrust conduct allegedly undertaken by defendants as asserted by Fair Isaac. See Pls.' Strike Mem. at

p. 21.   Fair Isaac maintained that it would need to conduct additional discovery pertaining to whether defendants have standing to assert the antitrust counterclaim, i.e., whether defendants suffered an injury-in-fact as a result of the Fair Isaac's conduct; discovery from the parties and third parties into whether Fair Isaac has monopoly power (as opposed to whether defendants' had market power, which had been the previous focus); discovery into how Fair Isaac obtained a dominant market position, which will require production of information prior to the 1998 cut-off for discovery previously agreed to by the parties); discovery into the conduct and effect of the settlement, which occurred after the cut-off for discovery; fact discovery into whether defendants have been overcharged for royalties; retention of experts to address defendants' Section 2 monopolization claims; and investigation and discovery into business justifications.   See Declaration of Charles F. (Rick) Rule, ¶ 6.   Further, Fair Isaac asserted that it will be forced to reopen discovery, including depositions, on issues already addressed, to the extent they may deal with the proposed antitrust counterclaims.   Id., ¶ 4; see also Pls.' Strike Mem. at p. 22.   Fair Isaac maintained that allowing the claims to go forward would mean that the trial of this case could not take place in 2009.   See Pls.' Strike Mem. at p. 1.

For all of the same reasons the Court determined that defendants had not diligently sought to amend their answer, the Court concludes that they engaged in undue delay in moving to amend.   In addition, the Court finds that Fair Isaac would be substantially prejudiced if these claims were allowed to proceed in this case at this late date.   This case has been going on since October of 2006.   The schedule has been modified and extended seven different times.   At the point that defendants moved to amend, fact discovery was completed (except for scheduled supplementation), and

expert discovery was virtually finished.  The parties are about to embark on dispositive motion practice (based on the requirement that all dispositive motions are to be served, filed and heard by April 1, 2009, initial moving papers are due to be filed on or about February 16, 2009 (assuming a hearing date of April 1), and the case is to be trial ready as of July 1, 2009.  Whether the Court believes Fair Isaac's description of what is needed for discovery and its estimate of the time required to complete this discovery or defendants' description and estimate, the Court finds that defendants' additional counterclaims will require additional and significant fact and expert discovery, additional and significant expense, and will further delay the trial of the matter, all to the prejudice of Fair Isaac.  See Dairy Foods Inc. v. Farmers Co-Operative Creamery, 298 F. Supp. 774, 777 (D. Minn. 1969) ("[T]his lawsuit is now within a month of three years old, and hope is held that a trial of one or some of the issues may be possible within the next few months. Discovery and extensive preparation has taken place. The court does not feel that the injection of this new issue even though otherwise appropriate is proper or permissible at this time and to allow such would work prejudice to plaintiff.").  As the Court observed in Intermedics, Inc. v. Cardiac Pacemakers, Inc.:

> [D]iscovery has either been completed, or it is virtually complete, the time to amend the pleadings has long been expired, and the parties are filing their respective dispositive Motions. To wind back the progress of this case, so as to allow new claims to be alleged, discovered, and subjected to Motions, is inconsistent with the mandate of Rule 1, Federal Rules of Civil Procedure, that actions be resolved in a just, speedy, and inexpensive fashion. Absent compelling good cause, the allowance of leave to plead new claims would be the antithesis of Rule 1's command.

1998 WL 35253496 at *3.

Finally, the Court rejects defendants' argument that they should be permitted to proceed with their amended answer because it is likely that the Court would consolidate

any separate action they might bring on the same claims.  It is premature to determine if, and under what circumstances, consolidation would occur, when no separate suit has been filed and no motion for consolidation is before the Court.[8]  If defendants are correct in their prediction that ultimately the cases will be consolidated, such a solution can be considered at such time as it is properly before the Court: after the case has been commenced, the motion has been brought, and the pros and cons of consolidation can properly be considered.[9]   In any event, where, as defendants assert, they can and will pursue their claims in a separate lawsuit, then the prejudice to them by denying their motion for leave to amend is minimal.

---

[8]      Pursuant to Rule 42(a), Federal Rules of Civil Procedure, the Court has broad discretion to consolidate actions that "involve a common question of law or fact." Enterprise Bank v. Saettle, 21 F.3d 233, 235 (8th Cir. 1994).  Rule 42(a) allows a court to "1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."  The purpose of consolidation is to encourage convenience and economy of administration of cases and avoid unnecessary cost or delay, and in considering such a motion, a court should weigh:

> Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources of common factual and legal issues, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

Fratzke v. IC System, Inc., Civil Nos. 05-1115 (JRT/RLE), 06-232 (PJS/RLE), 2007 WL 1114155 at *2 (D. Minn. April 13, 2007) (quoting Chill v. Green Tree Financial Corp., 181 F.R.D. 398, 405 (D. Minn. 1998) (citations omitted).   "The party seeking consolidation bears the burden of showing that it would promote judicial convenience, and economy."  Powell v. National Football League, 764 F. Supp. 1351, 1359 (D. Minn. 1991).

[9]      Presumably any future motion to consolidate will address how a consolidation is merely not an attempt to contravene this Order or the ability of the Court to manage the cases brought before it.

## V.   <u>CONCLUSION</u>

For all of the reasons, this Court grants Fair Isaac's motion to strike Experian's and Trans Union's antitrust and tortious interference counterclaims, and denies Experian's and Trans Union's motion to amend their answers to add these counterclaims.  In addition, Fair Isaac's motion to strike motion VantageScore's laches affirmative defense as to all claims asserted by Fair Isaac, and the lack of standing affirmative defense is granted.[10]   On the other hand, Fair Isaac's motion to strike VantageScore's laches affirmative defense to the extent it applies to Fair Isaac' <u>per se</u> price-fixing claim is denied.   Accordingly, Experian and Trans Union shall re-file and serve their answer and counterclaim to the Third Amended Complaint without the antitrust and tortious interference with contract counterclaims, and VantageScore shall re-file and serve its answer and counterclaim to the Third Amended Complaint without the lack of standing affirmative defense, and shall limit its laches defense to Fair Isaac's <u>per se</u> price-fixing claim.

J.S.M.

---

[10]     This Court notes that defendants' motion [Docket No 485] did not make a request to add affirmative defenses and therefore, the Court does not consider any proposed amendment to allow those defenses to be added to VantageScore's Answer and Counterclaims to the Third Amended Complaint.