1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MINNESOTA

3    ------------------------------------------------

4    Fair Isaac Corporation,

5              Plaintiff,

6        vs.                        File No. 06-CV-04112

7    Equifax, Inc., et al.,

8              Defendants.

9    ------------------------------------------------

10

11            THE HONORABLE JANIE S. MAYERON

12            United States Magistrate Judge

13

14

15                       * * *

16            TAPE-RECORDED HEARING

17            TRANSCRIPT OF PROCEEDINGS

18                       * * *

19

20

21

22            Date:   12-5-08

23            Reporter:   Lisa M. Thorsgaard

24

25

## APPEARANCES

1

2

3          MR. RONALD J. SCHUTZ, MR. MICHAEL A.

4   COLLYARD, and MR. RANDALL TIETJEN, Attorneys at

5   Law, 800 LaSalle Avenue, Suite 2800, Minneapolis,

6   Minnesota 55402-2015, appeared on behalf of

7   Plaintiff.

8

9

10          MR. JACK E. PACE, MR. CHRISTOPHER J.

11   GLANCY and MR. ROBERT A. MILNE, Attorneys at Law,

12   1155 Avenue of the Americas, New York, New York

13   10036, appeared on behalf of Defendant Experian.

14

15

16          MR. CHRISTOPHER R. SULLIVAN, Attorney

17   at Law, Suite 4200, 80 South Eighth Street,

18   Minneapolis, Minnesota 55402, appeared on behalf

19   of Defendant Experian.

20

21

22          MR. CHRISTOPHER R. MORRIS, Attorney at

23   Law, 33 South  Sixth  Street, Suite 3800,

24   Minneapolis, Minnesota 55402-3707, appeared on

25   behalf of Trans Union.

1          <u>APPEARANCES (Cont'd)</u>

2

3          MR. JAMES K. GARDNER and MR. JOHN A.

4  CULLIS, Attorneys at Law, Suite 2200, Two North

5  LaSalle Street, Chicago, Illinois 60602, appeared

6  on behalf of Trans Union.

7

8

9          MS. JUSTI R. MILLER, Attorney at Law,

10  Suite 3270, 80 South Eighth Street, Minneapolis,

11  Minnesota 55402, appeared on behalf of Defendant

12  VantageScore.

13

14

15

16

17

18

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2

3          (NO REPORTER WAS PRESENT – the following

4      transcript of proceedings was prepared from a

5      COPY of the original court tape recording)

6

7                  THE COURT:  We have

8      individuals calling in, so before I have

9      everyone introduce themselves, I'm going to

10     wait for that call to come in, see how this

11     technology works.

12          Hello, Magistrate Judge Mayeron.

13                  MR. GARDNER:  Good afternoon,

14     Your Honor.  Thank you for facilitating this.

15     It's Jim Gardner.

16                  THE COURT:  Mr. Gardner.  I

17     can hear myself very well because I'm on a

18     microphone but I'm having a hard time hearing

19     you.  So just speak a little more and you may

20     have to turn up the volume or we may have to

21     at this end.

22                  MR. GARDNER:  Okay.  Is this a

23     little better?

24                  THE COURT:  Let's see here.

25     Hang on.  Why don't you tell us where you are

1     and what the weather is like.

2                    MR. GARDNER:  Well, the

3     weather here is pretty cold but I don't think

4     it's as cold as it is in Minnesota.

5                    THE COURT:  All right.  And

6     now we've just improved on your volume.  Thank

7     you.

8                    MR. GARDNER:  Good.  But not

9     on the substance.

10                    THE COURT:  Well, we haven't

11     gotten there yet.  All right.  Mr. Gardner's

12     on the phone.  And then who else is on the

13     phone and then I'm going to actually start

14     over to announce the name of the case and all

15     of that?

16                    MR. MILNE:  Your Honor, also

17     on the phone is Robert Milne with White & Case

18     in New York on behalf of Experian.

19                    THE COURT:  All right.

20     Anybody else on the phone?

21                    MR. MILNE:  No.  That's it.

22                    THE COURT:  Mr. Gardner,

23     you're representing?

24                    MR. GARDNER:  Trans Union.

25                    THE COURT:  Trans Union.  All

1    right.  Okay.  We're here in the courtroom

2    this afternoon in -- let me ask if you're

3    having any trouble hearing me or any of the

4    parties as they speak or attorneys, you let us

5    know.  Just jump right in.

6         We're here this afternoon on the matter

7    of Fair Isaac Corporation v. Equifax, et al.,

8    except Equifax is no longer a party but it

9    still shows up as the lead party on the

10   defendants' side of the case.  This is Court

11   File 06-4112.

12        First of all, I'd like to ask the

13   attorneys to the parties to introduce

14   themselves.  And then I know we have third

15   parties who are here as well.

16        Let's start with Fair Isaac

17   Corporation.  Who is here this afternoon on

18   behalf of them?

19             MR. SCHUTZ:  Good afternoon,

20   Your Honor.  Ron Schutz with the Robins,

21   Kaplan firm on behalf of Fair Isaac.  Also in

22   court with me today are my colleagues, Randy

23   Tietjen and Mike Collyard.  Also present,

24   in-house counsel for Fair Isaac, Renee

25   Jackson.

1           THE COURT:  All right.  And

2    let me tell you, as long as your microphones

3    are on, meaning they have a green light on at

4    counsel table, we will be catching you I hope.

5    And we'll see if those on the phone can hear.

6    So let's experiment.

7               UNKNOWN SPEAKER:  We can hear

8    perfectly, Your Honor.

9               THE COURT:  Well, I expect

10   that's right because Mr. Schutz came up to the

11   main podium here.  Now we're going to

12   experiment and see what happens with the

13   microphones at counsel table.

14       Who is here on behalf of Experian

15   besides Mr. Milne?

16               MR. PACE:  Your Honor, this is

17   Jack Pace.  I will take full advantage of the

18   microphone today given my voice.  From White &

19   Case on behalf of Experian.  Also with me in

20   the courtroom is Chris Sullivan from the

21   Lindquist & Vennum firm on behalf of Experian

22   as well as my partner, Christopher Glancy,

23   also from White & Case on behalf of Experian.

24               THE COURT:  All right.  Did

25   you have any trouble hearing, Mr. Pace?

1          MR. PACE:  Not at all.

2          THE COURT:  All right.  Good.

3     Then on behalf of Trans Union, I know we have

4     Mr. Gardner on the phone.  Anyone else here in

5     the courtroom?  Yes.

6          MR. MORRIS:  Yes, Your Honor.

7     Here live is Chris Morris.  And John Cullis

8     from the Neal, Gerber firm in Chicago is also

9     here.

10          THE COURT:  All right.  Okay.

11     And then anyone here on behalf of

12     VantageScore?

13          MS. MILLER:  Good afternoon,

14     Your Honor.  Justi Miller from Kelly and

15     Berens.

16          THE COURT:  All right.  And

17     then we have one of the motions involves a

18     third party, the Olson Company.  And who is

19     here on behalf of them?  If you say it, I will

20     speak for you and then when we do the motion,

21     I'll have you come up.

22          MR. JONES:  Your Honor,

23     Matthew Jones (unintelligible).

24          THE COURT:  All right.

25     Matthew Jones.  All right.  Let me share with

1    what I understand we need to be addressing

2    this afternoon.  There are actually three

3    motions but two are basically the flip side of

4    each other.  One is the motion to compel by

5    defendants against Olson and Company and the

6    motion for protective order by Olson and

7    Company having to do with a subpoena,

8    third-party subpoena that was served on the

9    Olson firm.  The second major motion is

10   defendants' motion to compel against

11   plaintiffs.

12        I also understand that we have two

13   informal issues to address.  One is the

14   privilege log issue that came up last week on

15   the phone and I asked the parties to be

16   prepared to talk today to me about what

17   they're going to propose by way of either

18   joint resolution or separate resolution for

19   that matter.  And then apparently there is an

20   issue that came up with respect to a

21   deposition that I think may be about to take

22   place today or maybe not.  But as I understand

23   it, at least one of the parties wanted to

24   raise it informally this morning.  I wasn't

25   here this morning so we couldn't do it then

1    and I agreed that I would hear it this

2    afternoon, if both sides -- those parties to

3    the dispute were willing to resolve that issue

4    informally as well.

5         With respect to the deposition issue,

6    the request that was communicated to me is if

7    we're going to handle that one informally, we

8    do so first because apparently that may bear

9    on whether this deposition proceeds or under

10   what circumstances and apparently it was

11   scheduled to go forward today.  So my

12   suggestion is we address that issue first.

13        Then my intention was to address the

14   motions surrounding the Olson subpoena so that

15   we can get them out and on their way and they

16   don't have to sit through the motion to

17   compel.  And then finally, the motion to

18   compel by defendants.  And then when we're

19   done with that, we'll address the issue with

20   respect to the privilege log.

21        So I don't know who made the phone call

22   today about the deposition.  Mr. Pace?

23             MR. PACE:  Yes, Your Honor.

24   Jack Pace.  It was one of my colleagues called

25   the court this morning to raise this issue,

1       and it really does relate both to the

2       deposition scheduled for today and I suppose

3       has sort of larger scheduling implication of

4       what happened this morning in terms of the

5       deposition happening.  So if I could and if

6       Your Honor is willing to hear this issue

7       first, I could briefly summarize the issue.

8                       THE COURT:  Well, let me ask,

9       have you had an opportunity to confirm with

10      plaintiff's counsel about this issue, number

11      one.  And number two, are they agreeable to

12      resolving this issue informally over the phone

13      as opposed to through formal motion practice?

14                      MR. PACE:  Well, Your Honor,

15      we've -- I guess we've put the request to the

16      plaintiffs to understand the basis for the

17      cancellation of the motion and how it could

18      get resolved and we haven't heard back in

19      fact.  And I think, as Your Honor will find

20      out today, the -- it all relates to the filing

21      of counterclaims yesterday with the

22      defendants' answer and the issue -- even if

23      the issue -- let me put it this way.  Even if

24      the issue doesn't involve the resolution of

25      the specific deposition that was scheduled for

1   today, we have a related scheduling type

2   question for Your Honor because it affects

3   depositions scheduled tomorrow and next week

4   that we need to get resolved and is the reason

5   for the two individuals on the phone and a

6   number of the lawyers who are sitting in the

7   back of the courtroom today.

8        THE COURT:  All right.

9   Mr. Tietjen or Mr. Schutz, whoever would like

10   to speak on behalf of plaintiffs, my question

11   is are you willing to have the Court take on

12   this issue informally so that we can get to

13   the substance of it or no?

14        MR. SCHUTZ:  You need to get

15   away, Mr. Pace.  You are sick.

16     Your Honor, the -- first, we are not

17   willing to have it done informally.

18        THE COURT:  Okay.

19        MR. SCHUTZ:  But there's a

20   bigger back story that I think you should have

21   for 30 seconds here.

22     Last night, without any previous notice

23   to us, without any previous notice to the

24   Court, without submitting a draft of any kind

25   or a motion, they filed a 78 paragraph, 22

1        page antitrust counterclaim in this case and

2        given for a host of reasons that we're more

3        than happy to get into at least informally so

4        the Court has some idea of the impact that

5        that has on the expert deposition discovery

6        schedule which was to commence today and we've

7        got depositions scheduled next week.  More

8        than happy to get into that as background

9        information.

10            But we intend to move to strike that

11       pleading and seek a protective order with

12       regard to anywhere they intend to go with

13       these expert depositions and that's why the

14       expert deposition was canceled.  We think that

15       that's probably best left with some level of

16       briefing so the Court can get the whole story.

17                    THE COURT:  Let me, again

18       trying to address the logistics here, if it is

19       not going to impact whatever happens in the

20       proceeding of the deposition this afternoon or

21       this expert deposition that was apparently

22       scheduled for today, then what I would like to

23       do is tee up this issue at least to get a

24       better sense of what the issue is at the end

25       of this formal motion so, again, we're not

1      holding up nonparties and then we'll talk

2      about it then.

3           If there was something that was going

4      to affect whether a deposition proceeded this

5      afternoon or not and the parties were in

6      agreement to getting that resolved so it could

7      go forward, I'd hear it now but I think it

8      makes more sense, even in light of

9      Mr. Schutz's comment that he's not willing to

10     informally resolve the issue, I would like to

11     get my heads up on what the issue is but I'd

12     prefer to do it at the end of this hearing

13     when we go into the informal conference.

14                    MR. PACE:  Yes, Your Honor.

15     If I just might very quickly because it does

16     affect the schedule tomorrow.

17                    THE COURT:  I understand.

18                    MR. PACE:  And the reason

19     that -- and the lawyers who are on the phone

20     and those who are in the back of the room who

21     otherwise, depending on what we say right now,

22     will go to the airport and catch flights.  So

23     if I could just briefly, just to respond to

24     what Mr. Schutz said, you know, as -- and the

25     reason why we called Your Honor this morning

1    is because it really is of an extraordinary

2    and unfortunate, in our view, development.

3         As you know, we're trying to pack in a

4    very aggressive expert discovery schedule.  I

5    believe it's something like 11 expert

6    depositions over the course of a three-week

7    time period.  The first one is scheduled to

8    take place today.  Yesterday on the deadline

9    for the defendants to file their answers to

10   the plaintiff's amended complaint, Trans Union

11   and Experian filed answers with counterclaims

12   and got a cryptic message from the plaintiffs

13   last night, and I have copies I can provide to

14   you, saying it's seemingly almost as

15   punishment for the counterclaim that we

16   received your counterclaim and the deposition

17   scheduled for tomorrow and the deposition

18   scheduled for Saturday are not taking place.

19        Now, the counterclaims are nothing to

20   do with the deposition today and the

21   deposition that everyone traveled here for on

22   Saturday.  We have lawyers already in

23   Minneapolis who have incurred flight costs and

24   hotel costs for those depositions and they

25   have nothing to do with the counterclaims that

1    were filed.  We promptly e-mailed the

2    plaintiffs and said what's the basis for this,

3    you know, abrupt cancellation.  It has nothing

4    to do with the counterclaims.  We didn't get

5    an answer.

6         We showed up at the Robins Kaplan law

7    firm this morning for the deposition and were

8    stopped at the door and told the deposition

9    isn't taking place, go.  We asked what's the

10   basis?  It has nothing to do with the

11   counterclaim.  It was Mr. Laris from the

12   Robins firm who answered and said -- wouldn't

13   answer.  He simply said the deposition is not

14   taking place.  We then asked is the witness

15   present so that we can find out if we get a

16   resolution from the judge today should we stay

17   in town so we can start the deposition this

18   afternoon.  He walked away and didn't even

19   answer us.

20        And so we're left with the situation

21   that the plaintiffs didn't seek a protective

22   order last night or this morning to stop the

23   deposition.  They just seemingly, as

24   punishment for us filing these unrelated

25   counterclaims, sought -- basically had

1    self-help.  They just canceled the deposition

2    and stopped us at the door and now we incurred

3    obviously the flight cost, the hotel cost, the

4    court reporter fees, et cetera.

5         And so our main two issues for Your

6    Honor, and we can resolve them whenever is

7    agreeable to everybody, are, number one, we

8    incurred those costs.  The plaintiffs didn't

9    seek a protective order and that was the

10   background and we will be seeking our costs

11   associated with coming out here to the

12   deposition and all the lawyers who did.  And

13   number two, we have depositions scheduled

14   tomorrow and next week.  We have lawyers who

15   are heading out to San Francisco for

16   depositions next week and then others in

17   Chicago next week, two in California and two

18   in Chicago.  So we need to know what happens

19   next.  In other words, we don't think because

20   of the filing of the counterclaims that

21   plaintiffs can unilaterally halt all

22   proceedings in the lawsuit which seems to be

23   what's happening.

24        And so that's the reason for what we

25   think was sort of a pretty emergency request

1   this morning and this afternoon, Your Honor.

2                      THE COURT:  Okay.  Where are

3   the -- today the deposition of the expert

4   apparently isn't going forward.  Individuals

5   flew in for that, I understand.  You talked

6   about that there are lawyers who are about to

7   get on planes today for depositions tomorrow?

8                      MR. PACE:  No, Your Honor.

9   The deposition tomorrow is also supposed to

10  take place in Minneapolis and they're here.

11                     THE COURT:  And the lawyers

12  are here?

13                     MR. PACE:  Yes.

14                     THE COURT:  All right.  So

15  and -- so they're not -- we don't need to

16  decide this issue immediately as it relates to

17  today and tomorrow in the next hour or so in

18  terms of how it affects people's plane plans,

19  other than if they're not taking depositions,

20  I assume they'd like to go home today and not

21  tomorrow.

22                     MR. PACE:  We don't know if

23  the witness of today is here.  Like I said,

24  the plaintiffs didn't tell us, but we were

25  informed it was unilaterally canceled so I

1      suppose you're right, there was nothing going

2      on this afternoon.

3                    THE COURT:  All right.  Here's

4      what I want to do, then, on this issue.  I

5      want to address the Olson motion first

6      because, as I said, we got third parties here,

7      sitting here.  Their motion is actually the

8      first one that was scheduled for today and I

9      want to address their motion.  Then when we're

10     done with that, I want to hear what's going on

11     for today tomorrow even though, and I

12     understand there are larger issues here, and

13     Mr. Schutz you've indicated that you wish to

14     have this resolved by motion practice, but I

15     want to hear more about your response to that

16     but I want to do that after we've at least let

17     those who are parties to this lawsuit go and

18     then we'll get into the motions to compel and

19     the balance of the issue related to the

20     privilege log.

21          So let's do this, then.  We have a

22     motion to compel and then a companion motion

23     for a protective order by the Olson group.

24     I'd like to -- who will be arguing on behalf

25     of the defendants on the motion to compel?

1          MR. JONES:  I will, Your

2     Honor.

3               THE COURT:  It will be

4     Mr. Jones, is that correct, on behalf of

5     Olson?  And I'm assuming both motions could be

6     handled together.  They seem to be the flip

7     side of each other.  All right.

8          I want to let you know just because I

9     am going to control the amount of time that

10    we're expending on all of these matters, with

11    respect to your motion, I'm going to allot a

12    total of a half hour in total on this, 15

13    minutes per side, to address the issue with

14    respect to the subpoena.  Do not feel like you

15    need to use all your time.  That would be fine

16    too.  I've read all the papers on both sides,

17    the reply that was filed by defendants, and

18    the cases that were cited by both sides.  So

19    I'm very familiar as to what's going on.  My

20    law clerk is going to attempt to use the

21    timers here.

22          And so who's -- Mr. Pace, is that you?

23    Apparently down on your podium there, once

24    Steve gets it started, you're going to see

25    presumably a green light and then you're going

1        to see a yellow light.

2                         MR. GARDNER:  Your Honor?

3                         THE COURT:  Yes.

4                         MR. GARDNER:  Your Honor, this

5        is Jim Gardner.  If it's easier for the Court,

6        Mr. Milne and I don't need to be on the

7        phone -- I'm speaking for Mr. Milne but I

8        think this is right -- for any of the motions

9        that were scheduled for today.

10                        THE COURT:  Then we could --

11        if you were to call my chambers and talk to

12        Tara Craft who's the person who transferred

13        you in here, then we could call you when we're

14        ready to get to what I assume you want to be

15        involved in which is this issue regarding the

16        depositions.

17                        MR. GARDNER:  Yeah, that's

18        correct.  And everybody doesn't have to go

19        through all of the microphone stuff for our

20        benefit.  So if it's okay with you, we will

21        hang up now and then do you want us to -- how

22        do you want to do this?  Do you want us to

23        call Tara Craft in your chambers and ask her

24        just to give one of us a call --

25                        THE COURT:  Yes.

```
1                    MR. GARDNER:  -- when we're

2         ready and then I'll connect the other one on?

3                    THE COURT:  That would be

4         fine.  That would be good.  So if you call our

5         main chambers number, the 1190, Tara will

6         presumably answer the phone and you can give

7         her the number where she should call.

8                    MR. GARDNER:  Okay.  Good.  I

9         think that will work out better for everybody.

10                   THE COURT:  Just so you know,

11        I'm estimating, based on the amount of time

12        that I'm allotting for this motion and the

13        other motion to compel, that it will probably

14        be about an hour and a half before we call you

15        back.

16                   MR. GARDNER:  Okay.  Thank you

17        very much.

18                   THE COURT:  All right.  Thank

19        you.

20                   MR. GARDNER:  Bye.

21                   THE COURT:  I assume Mr. Milne

22        was agreeable to that because he just got hung

23        up on.

24                   MR. PACE:  It plays out

25        exactly that way very often, Your Honor.
```

1           THE COURT:  All right.  Do you

2    see somewhere there on the podium there should

3    be a green light or -- it's up there.  All

4    right.  Then do you want to -- will there be a

5    yellow light?

6           UNKNOWN SPEAKER:  A yellow

7    (unintelligible).

8           THE COURT:  So if you want to

9    reserve time, then, and quit earlier, that's

10   fine too.

11          MR. PACE:  Okay.

12          THE COURT:  All right.  Let me

13   just ask a quick question.  I"m using up some

14   of your time but here is my question for you

15   as it related to this motion with respect to

16   Olson.  The issue is compensation, whether

17   they should be compensated or not.  Initially

18   the defendants took the position that all they

19   should be compensated for was copying costs

20   and basically the printing and copying costs.

21   In the reply defendants said no, we're

22   agreeable to pay reasonable, actual costs.

23   And the focus clearly both in your initial

24   moving papers but in the reply was on the fact

25   that they're trying to charge you consulting

1       fees and 100 or $125 an hour for things that

2       appear to be -- certainly some of the events

3       seem very clerical and wouldn't necessarily

4       require someone at 100 or $125 an hour to do

5       them.

6               So my question to you is are the

7       defendants now prepared to pay reasonable

8       actual costs for Olson's review, retrieval,

9       inspection, and production or are you still

10      talking about that the only cost you think you

11      should have to incur are the copying and

12      printing costs?

13                      MR. PACE:  The answer to the

14      first question is yes, Your Honor, but we

15      interpret --

16                      THE COURT:  Yes -- you better

17      tell me what my first question is because I

18      asked multiple questions.

19                      MR. PACE:  Are we willing to

20      pay reasonable, actual costs and we interpret

21      reasonable to mean the way we define them in

22      the papers.  And Your Honor pointed to the two

23      different ways it was put in our opening brief

24      and our reply brief and I can clarify it was

25      not meant to be a difference.  Our position is

1       that whatever the actual costs are that Olson

2       will have to act to spend and by that we would

3       include printing, copying, if there are data

4       retrieval costs, for example, if information

5       is stored on a backup tape, sometimes that

6       needs to be restored and that costs something.

7       You have to get a consultant to do it.

8       Whatever, you know, the data let's say costs,

9       whatever those hard actual costs are, we --

10      the defendants are willing to pay.  To the

11      extent --

12                      THE COURT:  Well, let me -- go

13      ahead.

14                      MR. PACE:  I'm sorry, Your

15      Honor.  To the extent that Olson is seeking us

16      to pay anything above that that would include

17      the hourly rates, the standard hourly rates,

18      however discounted slightly for

19      their employees, that their employees would

20      effectively charge their clients to spend time

21      moving around and finding documents and

22      complying with the subpoena, we are not

23      willing at this time to pay those costs.  We

24      believe that the obligation to pay costs comes

25      up only if the costs are significant.  We

1      don't think these costs are significant under

2      the rules and we think that we're required to,

3      when we lived up to this obligation, to take

4      reasonable steps to minimize the burden.

5                    THE COURT:  All right.  Let me

6      make sure I'm being explicit when I talk about

7      what you're willing to pay for.  You did talk

8      about data retrieval apart and in addition to

9      copying and printing.  Let's assume that as

10     part of the retrieval and review process they

11     need to use a lawyer to look through the

12     documents to make sure that they are

13     responsive to the subpoena, make sure that

14     they are relevant, make sure that they are not

15     privileged, for example.  In your response

16     when you say you're willing to pay reasonable

17     costs, would that include reasonable

18     attorney's fees, for example, in the review

19     process or review for -- or maybe they need to

20     mark it confidential, something like that

21     where a lawyer or some outsider gets involved?

22                    MR. PACE:  The answer is no,

23     it wouldn't include that, Your Honor,

24     primarily because that hasn't been part of the

25     discussions at all to date.  I mean, the

1    proposal from Olson was that the costs that

2    they would incur would be essentially the

3    revenue they wouldn't be able to collect

4    because their employees, not hiring a lawyer

5    to look at documents or anything else, but

6    they would be their employee time to go and

7    spend time gathering documents and identifying

8    them.

9              THE COURT:  And this would be

10   employee time.  Let's assume you're right,

11   that they're going to use in-house people.

12   It's employee time, not lawyer time.  And

13   these presumably are employee time that would

14   be revenue generating if they were doing

15   something other than answering your subpoena.

16   You're saying you shouldn't be obligated to

17   pay any portion of that even the underlying

18   costs without a mark up for profit.  Is that

19   what you're saying?

20              MR. PACE:  Yes, Your Honor.

21   We don't believe that the position taken by

22   Olson up to this point was with the exception

23   of their request for attorney's fees in

24   connection with that motion.

25              THE COURT:  Right.  Separate

1    from that.

2                    MR. PACE:  Separate from that

3    has been at the time of issue here, the part

4    we're disputing is the time that their

5    attorney -- their employees would need to

6    spend identifying responsive documents, that

7    time which their employees couldn't spend

8    doing other presumably revenue generating

9    things.  It's our position that that is not

10   covered.  That's not provided for by the rules

11   and we do not need to cover those expenses if

12   they are not significant expenses.  And we

13   think in light of the case law that they're

14   not significant.

15                    THE COURT:  All right.

16                    MR. PACE:  And that generally

17   does summarize our position, Your Honor.  The

18   two primary issues are, in our view, are the

19   costs significant and -- because it's only if

20   they're significant under the rules and the

21   case law that we would be required to

22   reimburse them for those costs and we think

23   here they are not in light of the cases that

24   we cite and they cite.  And particularly

25   because of the fact that this is not a

1          situation like pretty much every case that's

2          been cited where we have an overbroad subpoena

3          or anything like that.  Here we've taken many,

4          several steps to adequately limit the scope of

5          the subpoena by time, custodian and subject

6          matter.

7              And the second issue is whether they're

8          entitled to attorney's fees.  And I think the

9          cases, particularly the cases that they cite,

10         the Green Tree case which Judge Erickson is

11         very clear that even in that case attorney's

12         fees are provided for if there's some type of

13         breach of responsibility for a party to take

14         reasonable steps to minimize the burden of the

15         subpoena or the word misuse is used in the

16         practice commentary that they cite.  If

17         there's some type of misuse of the subpoena

18         power, if that happens, then you may be

19         entitled, the third party may be entitled to

20         attorney's fees.  And that is clearly --

21         there's nothing in the record that shows

22         anything like that, particularly in light of

23         our efforts to narrow these requests.

24             A few words briefly on the responses

25         from Olson to our motion and their affirmative

1       motion for protective order.  The only case

2       they cite that comes anywhere close to this

3       amount of money being determined as

4       sufficiently significant to be -- to require a

5       cost shifting to the subpoenaing party is the

6       Williams v. Dallas case cited in their -- in a

7       few places but in particular in their

8       opposition to our brief.  And I think in that

9       case the costs were about -- it was ten years

10      ago but the costs were about $10,000 or $9,000

11      similar to the costs here I think.  But there

12      were few very significant differences in that

13      case.  That was the case about the NFL player,

14      just things going on in the courthouse

15      today --

16                  THE COURT:  I had to look to

17      see if it was the same one.  Apparently so.

18                  MR. PACE:  And I think Eric

19      Williams was the Cowboys lineman there who was

20      suing a number of entities and on its -- he

21      subpoenaed a number of lawyers who represented

22      parties for the other side and the court went

23      out of its way to mention up front and

24      throughout the opinion that the subpoena

25      was -- the words it used were overbroad on its

1    face and deposition and documents from two

2    individuals.  And in light of the overbreadth

3    of the subpoena and what it would cost these

4    two individual lawyers, they determined that 9

5    or $10,000 in expenses was significant,

6    sufficiently significant that they shouldn't

7    have to pay those costs and order the

8    subpoenaing party to bear those costs.

9         Here we think that's significantly

10   different than the situation here.  We're not

11   obviously talking about two individuals.  We

12   cited briefly I realize but briefly some

13   material in our opening brief about Olson as a

14   company and $170 million in revenue recently.

15   And certainly they're more capable of covering

16   the cost than the two individuals were in the

17   Williams case.

18        And in addition, another factor that

19   the court relied on in Williams was, again, it

20   goes to was there a misuse of the subpoena

21   power.  How overbroad, how overreaching was

22   the subpoenaing party being.  There the

23   court -- the subpoena there specifically

24   sought and Williams went after privileged

25   documents.  I mean that was one of the reasons

1    they went after attorneys.  He was asking

2    specifically for privilege documents.  And the

3    court, perhaps offended by that or not,

4    factored into that the decision about whether

5    cost shifting was appropriate.

6         And then very briefly, Your Honor,

7    Olson also relies on three orders from --

8    three unpublished orders from this court.

9    Different judges in the District of Minnesota

10   in support of their opinion.  And just briefly

11   on those, the Green Tree decision which they

12   talk about the most from Judge Erickson, again

13   similar to the points I made above.  You know,

14   in setting up the decision on page 2, Judge

15   Erickson said, according -- you know, while

16   KPMG contends that the subpoena is overly

17   broad and that owing to that overbreadth, the

18   plaintiff should reimburse KPMG for its costs.

19   In other words, it's in part a function of

20   exactly how reasonable has the subpoenaing

21   party been in trying to narrow -- in seeking

22   documents in the first place and seeking to

23   narrow the burden on the third party.  And

24   that's clearly a different situation from what

25   we have here.  I think we put this in our

1       reply brief that in KPMG there were at least

2       53 document requests being interpreted

3       broadly.  Here we have one and we've limited

4       it to -- we've limited the time period

5       dramatically.

6              We've taken a guess, it's imperfect,

7       but we took the people who we knew from Olson

8       who we thought worked on the project, we gave

9       the names to Olson and said if this looks

10      right to you, search these nine people's files

11      for this one project, the Fair Isaac project,

12      which, by the way, is probably why they don't

13      need lawyers to review the documents because

14      our request is simply who worked on the Fair

15      Isaac project relating to VantageScore,

16      identify those documents.  There may be a

17      privilege review or something but I'm not

18      sure.  And that's what you produce.  So it's

19      significantly different than the cases cited

20      by the plaintiff.  Judge Erickson goes through

21      the Rule 45(C)(1) analysis in his opinion in a

22      way that I think is very relevant.  He cites

23      45 -- Rule 45(C)(1) and specifically says that

24      subpoenaing party shall take reasonable steps

25      to avoid imposing due burden and that if the

1      court on behalf of which the subpoena issued

2      shall enforce this duty and impose upon the

3      party or attorney in breach of this duty, so

4      it has to be -- there must be a breach of the

5      duty of being reasonable to trigger the

6      responsibility to pay expenses in the first

7      place.  And that's not what we have here.

8           And the Court goes on to cite the

9      language from the rule that says such an order

10     to compel production shall protect any person

11     who is not a party or an officer of the party

12     from significant expense.  Again, this whole

13     analysis is triggered only if the court

14     determines that the expenses are significant.

15          And finally, on Green Tree, the court

16     in Green Tree also mentioned that the revision

17     to Rule 45 did not change the prior rule that

18     still exists.  And this is on page 6 of the

19     court's decision under which a nonparty still,

20     even in light of Rule 45(C)(1) and the change

21     in the protections incorporated therein and

22     which a nonparty can still be required to bear

23     some or all of its expenses where the equities

24     of a particular case demand it.

25          And so if that's the case, then, Your

1    Honor still -- then they still may be entitled

2    to -- they still may be required to pay all of

3    their expenses and yet we're offering to pay

4    the reasonable actual expenses limited to

5    copying, printing, and data costs.

6         The same issue -- I won't go into

7    detail.  I know my time is short but the same

8    issue is --

9              THE COURT:  If you want time

10   to respond, you may -- I see you're already

11   into your four minutes.  You may choose to --

12   I have read these cases extensively so you may

13   want to hear from Mr. Jones and then use the

14   time in rebuttal.

15             MR. PACE:  Okay, Your Honor.

16   The only other thing I'll note just quickly,

17   then, is that with respect to -- it's similar

18   with respect to request for attorney's fees

19   and the Linder factors but I guess I'll use my

20   last couple minutes in reply.

21             THE COURT:  All right.

22             MR. PACE:  Thank you, Your

23   Honor.

24             THE COURT:  All right.  Thank

25   you.  Mr. Jones.

1          MR. JONES:  Thank you, Your

2     Honor.

3                    THE COURT:  While Mr. Cottris

4     is setting you up here on the time, let me

5     tell you the question that I have for you

6     which is you lay out an itemization of what

7     your client estimates to be hours associated

8     with various parts of this search and

9     retrieval and production but it doesn't appear

10    to me that it would be appropriate even if I

11    were to grant some relief, that I would be

12    ordering them to pay 100 or $125 for at least

13    some components of this production which

14    clearly appear to me to be clerical in nature

15    whether it be making copies or printing.  This

16    is something one of our interns could be

17    doing.  So I want to make sure you're

18    addressing for me what it is -- how they

19    set -- I want to understand how they set 100

20    and 125 an hour.

21                    MR. JONES:  I can address that

22    simply, Your Honor.  I agree that standing in

23    front of a copying machine making copies, you

24    shouldn't get paid $100 an hour to make

25    copies.  We estimated the general amount of

1        time that we thought we could undertake the

2        task that was being asked of us.  And a

3        significant amount of that time is spent

4        trying to make sure that we identify actual

5        relevant documents, you know, through -- and

6        retrieve housed data documents and not

7        involving actual spending time copying the

8        documents.

9              All we ask for is to be reimbursed for

10       the time that we spent trying to comply with

11       their subpoena.  We didn't ask for an

12       exorbitant amount of money.  We didn't ask

13       for, you know, crazy amount of hours.  But it

14       does take a significant amount of time to do

15       the work that they're asking us to do.

16                    THE COURT:  Who is going --

17       when you say it's going to take a significant

18       amount of time for us to do the work, who is

19       going to be doing the work?

20                    MR. JONES:  Employees of Olson

21       will be doing the work.

22                    THE COURT:  All right.  So

23       they're going to be the ones who are going to

24       look at the subpoena and go make the effort to

25       retrieve the information sought by the

1          subpoena and review what's pulled up and

2          decide if it's responsive to the subpoena and

3          they will be the ones doing the copying or

4          printing and production and lawyers will not

5          be involved?

6                        MR. JONES:  We have not been

7          charged with any task in making sure that the

8          documents comply with the subpoena.

9                        THE COURT:  And where does the

10         100 or a hundred and a quarter per hour come

11         from?  Where is that -- what's the basis of

12         that figure?

13                        MR. JONES:  Olson has a wide

14         range of fees that they charge for tasks.  The

15         low end of what Olson charges is between 100

16         and $125 an hour.  This is, you know, bargain

17         rate.

18                        THE COURT:  What would they

19         normally be charging someone -- what kind of

20         services would they be performing in their

21         regular ordinary course of business for 100 or

22         a hundred and a quarter an hour?

23                        MR. JONES:  Basically it would

24         be comparative to what the particular project

25         was being asked to do.  If the task is

1       recreating, you know, documents and data

2       that's on a file, you know, computer people

3       that, you know, work in-house for Olson to do

4       that or, you know, people that are low end

5       account people that can review various

6       documents to make sure that they are related

7       to the actual Fair Isaac project.  It's --

8       we're not going to take John Olson of Olson

9       and company and his rate and have him review

10      the documents.  That's not --

11                      THE COURT:  I bet he wouldn't

12      agree to.

13                      MR. JONES:  Probably wouldn't.

14      And so we tried to, you know, we tried to

15      limit the amount of money.  We tried to

16      resolve it.

17          And basically from my understanding

18      that the project -- this is just -- Olson was

19      never actually employed by Fair Isaac.  There

20      was a request for proposal or an RFP where

21      Olson went up and they said can you put

22      something together for us.  We put something

23      together for us and we were never hired.  That

24      proposal that was created was actually -- has

25      already been provided to the defendant.  Now

1    defendants want to go on a fishing expedition

2    to determine what maybe was said between Olson

3    internally in creating this project, I don't

4    know.  They're entitled to go on their fishing

5    expedition.  We don't care.  We're not arguing

6    that it's irrelevant.  We're not making --

7    saying that there's not a responsibility to

8    provide this document -- these documents to

9    them.  But it's not -- I don't believe that

10   the rules are set up for us to subsidize their

11   fishing expedition.  I think that's the point

12   of Rule 45.  And the changes of Rule 45 are

13   simply that, that it, you know, pay for what

14   you want and we'll give it to you.

15              THE COURT:  Let me ask a

16   question.  I assume the hourly rates that

17   Olson charges for these types of individuals

18   to perform these types of duties have built in

19   some sort of profit margin.

20              MR. JONES:  I'm sure that they

21   have some.  I don't have any idea what those

22   are or what they would be.

23              THE COURT:  Okay.

24              MR. JONES:  And I have not

25   asked for that material.  There's a couple

1     comments that were made by Mr. Pace that I'd

2     like to address.

3                    THE COURT:  Certainly.

4                    MR. JONES:  Quickly.  One, he

5     made a comment about Olson has $175 million in

6     revenue and that's false.  Olson has had -- if

7     he knows anything about the advertising

8     business, Olson has $175 million in billings.

9     And what that means simply is that companies

10    that Olson created the advertising for spent

11    that much money on advertising.  They paid it

12    to NBC or CBS or print.  Olson doesn't --

13    that's not their revenue.  That's billings and

14    that's a much different thing than a

15    $2 billion corporation versus something very

16    significantly less than, you know,

17    $10 million.  And so I think that's

18    inaccurate.

19          Second, he's made --

20                    THE COURT:  Are you prepared

21    to share with the Court what Olson's revenues

22    indeed are if their 170 million number isn't

23    correct?

24                    MR. JONES:  Today I am not

25    prepared to share that number with the Court

1        because I don't know it.

2                    THE COURT:  All right.

3                    MR. JONES:  Second, he made --

4        he stated the reasonable steps that the

5        defendants took to limit the subpoena.  Their

6        limitations are illusory limitations.  Limit

7        your scope of the documents to the time that

8        you worked on the project versus infinity.

9        Limit the amount of -- limit your production

10       of documents for people who -- to people who

11       worked on the project as opposed to infinity.

12       I mean, that's not a real limitation.  I mean,

13       limiting, you know, data retrieval, you know,

14       there are real limitations to complying with

15       the subpoena.  None of them were made by

16       defendants in this case.  I mean, it's just

17       not true that there was any meaningful

18       limitation to any of the requests that was

19       made.

20            All we want is simply to be reimbursed

21       at a reasonable amount for the time that we

22       spent.  And reasonable is something more than

23       the cost, the hard costs for creating a

24       printed piece of paper.  There is time that is

25       spent and required and I think it's only fair

1      and only reasonable in a case where we're not

2      involved in the litigation.  We're not

3      employed by Fair Isaac.  We're not continuing

4      to work for Fair Isaac.  We have no interest

5      at all in what happens in this litigation to

6      be reimbursed for a reasonable time and

7      reasonable costs for producing those

8      documents.  Now, that's all we ask for.

9           We even voluntarily offered to decrease

10     the amount that we would be charging them by

11     25 percent which was, you know -- which offer

12     was blown off by defendants.  And they said

13     we'll pay you for your copying costs.  Well,

14     what -- I mean, we're going to have to spend

15     100 hours of time to complete this project and

16     defendants say, well, that's not significant,

17     $12,000 is not significant amount of costs.

18     Well, I think that $12,000 is significant.  My

19     client thinks that $12,000 is significant.

20     There's no equitable reason for us to be

21     involved in this case that would justify us

22     paying any of those costs.

23          I just simply wish the Court to issue

24     an order saying that we should get paid

25     reasonable time that we -- for the reasonable

1    time that we spend going for, looking through

2    the documents, retrieving the documents and

3    providing those documents to the defendants.

4    Should we get paid by the hour at $100 for

5    standing in front of a copying machine making

6    copies?  No.  And I simply ask that the Court

7    allow Olson its costs more than just the

8    copying cost for complying with the subpoena.

9              THE COURT:  Okay.  Thank you

10   very much.  Mr. Pace, anything further?

11             MR. PACE:  Yes, Your Honor.

12   Very briefly.  With respect to -- just to

13   clarify the record.  With respect to the

14   limitations imposed or offered by the

15   defendants in Olson's compliance with the

16   subpoena, I mean, we certainly didn't mean

17   them to be illusory.  I mean, by limiting the

18   time period we were clarifying it to the

19   specific time period of the life of

20   VantageScore after March of 2006.  And to the

21   extent -- because our initial subpoena was

22   broader than that, if that didn't have any

23   affect on the -- on the actual scope of

24   documents in Olson's possession, this is the

25   first we're hearing of it.  But we did limit

1      the time period.  We did limit the topics of

2      the subpoena.  It's one request.  And

3      significantly we limited the custodians.  I

4      mean, we made very clear that while on the one

5      hand a discovery request in litigation

6      generally and a subpoena would call for a

7      search throughout, you know, potentially

8      throughout a company, we made clear that we

9      would be more than happy to have an

10     identification of the handful of employees who

11     actually worked on the project so we don't

12     have to get into some type of broad searching

13     of e-mail files or central files.  Identify

14     who worked on the project and we'll agree with

15     you.  We'll take your word for it and you can

16     search those individuals' files.

17           In response to the general point

18     about -- which, again, is sort of the first

19     we're hearing of this, that oh, you really

20     shouldn't worry about this problem generally

21     because we actually weren't really hired.  We

22     didn't really do anything.  There were

23     recommendations in several of the documents

24     and work done that are attached to our opening

25     motion, recommendations made by Olson which we

1          know were acted upon and are part of the Fair

2          Isaac strategy in advertising tactics in this

3          case which are central issues in the case.

4          And whether or not that was all sort of part

5          of some informal relationship such that there

6          was never a contract, I don't know, but we

7          identified documents that we've seen that have

8          actual recommendations that relate to key

9          issues in the case that we think are relevant.

10         And I guess that's probably supported, if it

11         takes -- if it's going to take them a hundred

12         hours to sort of search for this stuff, that

13         would seem to suggest there might be something

14         out there.  I guess Mr. Jones did also confirm

15         that the rates that he was quoting were the

16         rates charged to clients with a profit margin

17         and that's what we've been saying all along.

18              And finally, we haven't really focused

19         on it but I just want to say for the record

20         that the request for attorney's fees for the

21         briefing, for anything else, you know, is

22         really extraordinary and just something should

23         be said about it.  There -- you know, as I

24         said briefly at the beginning, attorney's fees

25         can be called for if a party breaches its

1     duty.

2            And Judge Erickson put it very well,

3     breaches its obligation to be reasonable and

4     doesn't narrow its request, misuses a

5     subpoena.  The cases say that.  Olson's

6     opposition to our motion makes clear their

7     basis for their fee request.  It's at page 8

8     of their brief, the second half of that

9     paragraph.  Defendants have refused any

10    attempt at compromise.  The record rebuts that

11    directly but I'll go on.  Refused any attempt

12    to compromise and have forced Olson to bring a

13    motion for protective order, I'm not sure

14    about that, and respond to this motion to

15    compel.  Because of defendants intransigence,

16    Olson should be awarded its attorney's fees

17    and costs.  In other words, their whole basis

18    for their fee request is that we -- they think

19    we're wrong, I guess, and we disagree with

20    them and we think that's certainly not

21    provided for by Rule 45.

22                    THE COURT:  Okay.  Thank you.

23                    MR. PACE:  Thank you.

24                    MR. JONES:  May I respond

25    to --

1                    THE COURT:  Yes.

2                    MR. JONES:  -- something

3      Mr. Pace said?

4                    THE COURT:  Yes.

5                    MR. JONES:  Mr. Pace just made

6      a comment which I found extraordinary.  He

7      said that it was the first time that he's ever

8      heard that their limitations wouldn't have

9      anything to do with limiting the scope of

10     responding to the subpoena.  If you look at

11     Exhibit F to our initial motion, it's an

12     e-mail to Bryan Gant of his law firm and

13     Mr. Pace where it actually says, as I have --

14     as -- they've informed me, as I suspected,

15     that the definition you furnished does not

16     appear to limit the scope or the search that

17     they will have to make.  What he just said was

18     not true.

19          And as far as our request for

20     attorney's fees goes, there just seems to be a

21     pattern and practice from the defendant of

22     offering something that is nothing and saying

23     that it's reasonable and forcing these issues

24     to a head which seems like in -- where normal

25     people should be able to respond and work them

1      out.   We're forced to come and deal with this

2      issue because defendant would not respond to

3      our, you know, I think pretty simple request

4      to be, you know, reimbursed for the time we

5      spent on this in responding to the subpoena.

6              So I think that there is a breach of

7      the subpoena power and there's a bully aspect

8      to the subpoena power being used by the

9      defendants and bully aspect to the litigation

10     process that's being used, and I do think

11     those are the significant reasons to be

12     awarded attorney's fees.

13                     THE COURT:   All right.   I'm

14     going to issue my order here from the bench.

15     It will be followed up in a written order.

16     I'm going to be -- I suppose what I would say

17     is granting each motion in part and denying

18     each motion in part.

19              So the decision is this.   I do find

20     that the expenses that this subpoena on Olson

21     will cause them to incur significant expenses

22     and that these are expenses that should be

23     reimbursed by the defendants.   And so my

24     decision is that the defendants will bear the

25     costs of the production of what they refer to

1        as their limited subpoena for costs associated

2        and that the Olson firm will incur for

3        retrieval, identification, review and

4        production of documents which are responsive

5        to the limited subpoena.

6              That will include reasonable costs for

7        not only retrieval, that is computerized

8        retrieval but people involved in the

9        retrieval, the actual review of the documents

10       by individuals at Olson to make sure that

11       those documents are responsive to the

12       subpoena.  It will involve their production

13       and collating, printing those costs as well.

14             So it will include, just so I'm clear,

15       not only the hard costs as defendants refer to

16       it but the time associated with this process

17       that Olson will incur that they would

18       otherwise be incurring on revenue generating

19       activities.

20             Having said that, as part of the

21       decision for reasonable rate, the hourly rate

22       that Olson will be permitted to submit as

23       reasonable costs will not include a profit

24       margin.  And so, Mr. Jones, you will need to

25       explore with your client but I'm talking about

1           the basic costs and not the additional profit

2           margin that they would otherwise be charging

3           to their clients.  I will not set an amount in

4           advance or a fixed amount that the Olson firm

5           is going to incur basically because I don't

6           think I have adequate information to do that.

7           I recognize the rules would permit it but I

8           really find at this point that while I

9           appreciate the effort thus far that the Olson

10          firm is trying to estimate the time it will

11          take them, I find it more in the form of a

12          guesstimate than a really good estimate.  And

13          so I'm not going to fix a particular amount.

14              I am going to do what Magistrate Judge

15          Erickson did in his case and that is require

16          that after Olson retrieves and produces the

17          information, that they submit a bill to

18          defendants with an itemization of their hours,

19          their costs without profit, and the services

20          that they -- a description of the services

21          associated with those hours and costs to

22          defendants.  If defendants, after reviewing

23          that bill, determine that they believe it's

24          reasonable, then they'll pay it.  If they

25          believe it's not reasonable or any portion of

1    it isn't reasonable, then the parties will

2    confer to try and resolve the dispute.  And if

3    you can't resolve the dispute, then,

4    Mr. Jones, you'll bring the matter to my

5    attention and I will resolve what is a

6    reasonable amount of reimbursement to your

7    client.  You can submit that in the form of a

8    formal motion or it can also be submitted by

9    the parties through letter submissions to the

10   court with attachments so as to encourage the

11   parties to spend any more time or attorney's

12   fees on resolving this issue of what's

13   reasonable.

14        I am not going to award any attorney's

15   fees to the Olson firm for bringing their

16   motion for a protective order or defending the

17   defendants' motion.  Here the defendants

18   offered some relief, obviously not the relief

19   that the Jones firm wanted.  I don't find it's

20   adequate and I am giving them what I do think

21   is adequate but they did offer some relief.

22        And I also find, to be honest, that the

23   Olson firm or response that we're entitled to

24   100 or $125 an hour for items that clearly no

25   one is going to be billing that kind of time

1   for copying, printing, a lot of those issues

2   could have been resolved without having to

3   bring that matter to the court, so I'm not

4   going to award attorney's fees to the Jones

5   firm for bringing their motion for a

6   protective order or defending the defendants'

7   motion.

8     Just so I'm clear, the basis of this is

9   under Rule 45(C)(2)(b).  That rule provides

10   that the third party cannot be made to bear

11   significant expenses.  I find that this amount

12   of time that the Jones firm is being asked to

13   incur is significant.  I recognize that the

14   advisory comments and cases suggest that

15   sometimes the producing party can be asked to

16   bear some of the expense or all of the

17   expense, but I think the Exxon Valdez case is

18   clear is that you can ask the party to do so

19   if the equities would suggest that it would be

20   more fair to ask the producing party who's not

21   a party to the litigation to bear some or all

22   of those expenses.  And I don't find any of

23   those factors to be present here that are

24   articulated in the Valdez case or the Linders

25   case that picks that up as well.  The Olson

1      firm is a nonparty.  It doesn't have any

2      interest in this litigation or the outcome of

3      the litigation.  This isn't a situation where

4      they can better accommodate the cost than the

5      defendants whether they're a multi-million

6      dollar company or a multi-billion dollar

7      company.  It's clear to me both sides can

8      certainly bear the expense.  That's not going

9      to be a driving force.  And while I'm sure the

10     parties think this litigation is of public

11     importance, I don't think that this was the

12     driving issue, that that is an issue that will

13     resolve this matter.  So I don't find any of

14     the equities present to ask the Olson firm to

15     pick up the costs of the subpoena.

16          Again, the rules do allow me to set a

17     set amount or fixed amount in advance.  I

18     don't find that that would be appropriate here

19     and I don't find that an award of attorney's

20     fees is appropriate in this situation.  So for

21     all of those reasons, I am granting your

22     respective motions in part and denying them in

23     part.  And as I said, I'll be issuing an order

24     consistent with this ruling.

25          That said, Mr. Jones, do you want to

1    come up to the podium.  Can you share with us

2    when -- how soon your client can respond to

3    the subpoena?

4                   MR. JONES:  I don't have a

5    very good answer.  We estimated it would take

6    us two to three weeks when we initially got

7    the subpoena.  I assume that's still true.

8    The only concern I have right now is we have

9    two holidays that are showing up and holidays

10   that are Wednesday and Thursday.  Most people

11   are having those Fridays off as well during

12   that time period.  So two to three weeks is

13   probably still accurate.  I don't know if this

14   two to three weeks is probably the best -- the

15   best two to three weeks to make that -- you

16   know, the middle of January is probably, you

17   know, is probably enough time to get the

18   documents together.

19                   THE COURT:  All right.

20   Mr. Pace, any comment on the timing of that?

21                   MR. PACE:  No, Your Honor.

22   (unintelligible) provide, of course, Your

23   Honor's schedule.  We have a deadline of

24   January 5 for hearing dates on nondispositive

25   motions and while I, hearing everything I've

1   heard today, certainly don't expect any future

2   disputes with respect to this production, if,

3   as a technical matter, if it comes in after

4   January 5, of course, if there are follow-up

5   issues required, then --

6                    THE COURT:  You can bring them

7   to my attention.  And obviously, I would

8   expect the bill would come with the production

9   and that if there are issues, that would be

10  probably after the date as well and I would

11  certainly entertain that issue at that time.

12         Well, I'm going to order, then -- today

13  is the 5th of December so I'm going to order

14  that they -- let's see.  Do you have the

15  calendars?

16                    MR. JONES:  I have a calendar,

17  Your Honor.

18                    THE COURT:  Good.  I'm glad

19  you do.  What's that -- the Monday around like

20  the 8th of January, somewhere there?

21                    MR. JONES:  The 8th is a

22  Thursday.  The 12th is a Monday.

23                    THE COURT:  All right.  Let's

24  do the 9th of January, then, so that gives

25  your client basically a little over a month

1    taking into account the holidays here.

2    Obviously, if they can get it done sooner, I

3    would encourage them to do so because a lot

4    of -- there's a lot of things that are

5    happening with these parties.  The sooner it

6    gets in their hands, the sooner they'll know

7    what they need to do with it.

8                    MR. JONES:  I appreciate that,

9    Your Honor.  And just to be clear, do you want

10   me to send those documents to you Mr. Pace or

11   to local counsel?

12                    MR. PACE:  You can send them

13   to local counsel.

14                    MR. JONES:  Okay.  Great.

15   Thanks.

16                    THE COURT:  All right.  Thank

17   you very much.  Actually, I think that what I

18   had said may have been inaccurate.  When we

19   had Mr. Gardner and Mr. Milne on the phone, I

20   think I said that we would do this in an hour

21   and a half and I think I was thinking I would

22   do the defendants' motion next as opposed to

23   the informal issue with respect to the

24   depositions.  But I'm still not hearing that

25   it will affect anything that happens today.

1      It's really what happens tomorrow.  So let's

2      go forward and hear the defendants' motion to

3      compel.

4           Let me share with you how I want to

5      address the timing of this issue and how I

6      actually want to approach generally hearing

7      the motion.  What I want to do is, my

8      intention is to have each document request or

9      group that belongs grouped together addressed

10     first by defendants, then by plaintiffs.  So,

11     for example, first we're going to address

12     document request No. 8 out of the seven set of

13     document requests.  I'm going to hear

14     defendants on it, plaintiffs until we're done

15     hearing about that.  I'm going to hopefully

16     rule at that time.

17          We're going to go on to, then, document

18     request 11, 30, 35 of the seventh set of

19     document requests.  Then we'll move to the

20     ninth set and I will -- I'm going to address

21     document request 1 to 3 as one group, document

22     request 10 to 12 as the second group, and

23     document request 5 to 7 as a third group where

24     I'll hear both sides and then hopefully be

25     able to issue an order at the conclusion of

1      hearing argument with respect to those

2      document requests.

3            Again, I want to control the amount of

4      time that gets spent on this because I want to

5      encourage you to focus on issues that are not

6      in your papers.  I've read them.  I've read

7      your exhibits, and so I may have questions for

8      you.  But in other words, I don't want you to

9      spend your time repeating what you've already

10     written to me.

11           So for document request 8 and 11 and 30

12     I'm going to let you each spend five minutes a

13     piece on those document requests.  With

14     respect to document request 35 of the seventh

15     set and then the last three sets, categories

16     of document requests of the ninth set, I'm

17     going to allow you to spend ten minutes on

18     each side for each one of those document

19     requests.  So document request 1 to 3 of the

20     ninth set defendants get ten minutes,

21     plaintiff gets ten minutes.  Same with

22     document request 10 through 12 and document

23     request 5 through 7 having to do with the

24     Blaze Advisor.  So Steve will be keeping track

25     here.

1          Why don't we start, then, with document

2     request No. 8.  Who will be arguing on behalf

3     of defendants?  Well, you sure got the short

4     end of the stick, Mr. Pace.

5               MR. PACE:  I'm losing my

6     voice.

7               THE COURT:  Yeah, right.

8               MR. PACE:  Your Honor, if I

9     might suggest, you know, one possibility.  The

10    way -- and this might be evident or this might

11    be hinted at by some of the briefs, a couple

12    of the issues have been sufficiently narrowed

13    that the amount of time that I likely would

14    spend -- I can't speak for the plaintiff -- on

15    some of these issues would be, you know, like

16    on request No. 8, may literally be a minute

17    and request 11.  And so, for example --

18               THE COURT:  I was trying to be

19    generous by telling you you had five minutes.

20    So I think that the issues have been teed up

21    for me but I wanted to give both sides an

22    opportunity to add anything if they wanted to.

23               MR. PACE:  Absolutely.  And I

24    guess all I'm possibly proposing is that

25    potentially if -- I mean, I could group 8, 11

1      and 30 together.

2                     THE COURT:  That would be

3      fine.

4                     MR. PACE:  This way we don't

5      have to get up three times, if that's okay

6      with plaintiffs.

7                     MR. COLLYARD:  That's fine,

8      Your Honor.

9                     THE COURT:  All right.

10                    MR. PACE:  Okay.  Your Honor,

11     as you saw, the parties spent a lot of time in

12     the correspondence, the e-mails, the briefs

13     pointing fingers at each other and identifying

14     who was right and who should have been

15     withdrawing their motion or produced documents

16     earlier.  I won't do that here.  I think you

17     have the whole record.  And I'm sure you enjoy

18     it even less than we do reading this stuff.

19          What are the opening issues.  The open

20     issues, each request that we're going to talk

21     about today does have -- does still have some

22     open issue even if it's been substantially

23     narrowed by the requests.  For example, even

24     if a particular agreement has been reached

25     after a motion to compel has been filed, what

1    we're talking about is potentially something

2    as simple as having the plaintiff identify

3    where the responsive documents were because we

4    didn't see them in the first place and maybe

5    they're there.

6            The first one is request No. 8.  These

7    are the documents that relate to the

8    relationship with the Magnum firm.  And very

9    simply, Your Honor, as papers make clear,

10   prior to the motion, we simply had one

11   difference of position.  The plaintiffs

12   were --

13            THE COURT:  Okay.  And they

14   said they produced it and now the issue is

15   you're saying you can't find it and will they

16   identify the Bates number, correct?

17            MR. PACE:  Yeah.  And it

18   relates, just so the record is clear, a

19   particular category of documents, prior to the

20   motion, the plaintiffs were agreeing to

21   produce documents relating to, and I hope this

22   isn't an -- this is what we were basing it on.

23   They were saying they would produce documents

24   relating to the decision to hire or the

25   decision to do with Magnum and they left out

1     and would not agree to produce, before our

2     motion, the documents relating to the plans

3     and strategies for actually going forward.

4     That was the disconnect.  That appears now to

5     have been resolved.  And so our only open

6     issue is either they should, you know, be --

7     they should produce it or if they've already

8     produced it, they just identify those

9     documents.

10                    THE COURT:  All right.  So I'm

11    clear, the only issue you're not confident

12    that they've produced is the planning

13    documents.  You want to know have they

14    produced them.  If so, you're saying you can't

15    find them so give us the Bates number or order

16    them to produce them.

17                    MR. PACE:  Correct, Your

18    Honor.

19                    THE COURT:  All right.  I

20    understand that issue.  Let's go to No. 11.

21                    MR. PACE:  No. 11 is the

22    document that relates to special pricing.  And

23    in other words, diversions from standard

24    pricing.  And the only open issue prior to the

25    filing of our motion was what happens before

1    2003.  After 2003, the plaintiffs represented

2    that every special pricing request was

3    memorialized in a spreadsheet that they were

4    producing to us and that was satisfactory to

5    us.  And so the only question was how do we

6    get at special pricing request prior to 2003

7    and going back to 2001.  After we filed our

8    motion, the plaintiffs now say that they have

9    produced those documents.  However, they cited

10   in their brief -- they cite two examples and

11   we know there are certainly more than two.

12   And so we'd like them to be ordered to produce

13   those documents.

14        I'll make clear one thing.  Their

15   papers suggest that we would -- the defendant

16   bureaus necessarily would have this very same

17   type of information in their own files and

18   that isn't the case, unfortunately.  We're

19   willing and we'll take full advantage of the

20   information in our files but there are two

21   exceptions.  One is there are special pricing

22   requests that from time to time get

23   communicated initially from a lender and

24   sometimes it gets memorialized and goes back

25   through a bureau but sometimes it gets

1       initiated by a lender and in that case we

2       might not be privy to it.

3              And then, of course, the other obvious

4       category is Equifax.  If there are documents,

5       special pricing requests made through Equifax

6       over the years, they're not a party anymore

7       and those are not documents that we can

8       control and get, necessarily get unless we --

9       I suppose we could subpoena Equifax.  So if

10      indeed the plaintiffs have produced already

11      the documents from 2001 to 2003 reflecting

12      every special pricing request --

13                    THE COURT:  Well, that's what

14      they've said several times to you.  So the

15      question is -- and then I saw where

16      Mr. Collyard used by way of example they were

17      attached to his declaration as Exhibits 3 and

18      4, two letters by way of example, although the

19      November 20, '08 e-mail from Nelson to Chris

20      Sullivan which was Collyard declaration 2 said

21      they had produced them as well.

22             Are you saying you want to know if

23      these two letters are it or if there's more,

24      you're saying you can't find them and give us

25      the ID numbers?

1          MR. PACE:  Correct, Your

2     Honor.

3          THE COURT:  All right.  Let's

4     move on to document request 30, then.

5          MR. PACE:  And 30 is the

6     documents relating to statements made by their

7     COO and very --

8          THE COURT:  They said they've

9     produced, they've produced, they produced.

10         MR. PACE:  Our problem before

11    the motion was simply that they were saying

12    they produced documents and it was limited

13    to -- there was a limitation.  You know, I

14    think it was limited to, quote-unquote, broad

15    based scoring --

16         THE COURT:  They said now they

17    didn't restrict it that way.

18         MR. PACE:  Absolutely.  And

19    this is one we spent some time the last few

20    days looking and haven't seen anything.

21         THE COURT:  So you want them

22    to identify the documents by Bates number.

23         MR. PACE:  Yes, Your Honor.

24    And in fact, if the issue is now they haven't

25    said this, if the issue is we've looked and

1   there's nothing, well, I guess I hope that's

2   not the situation because I at least took from

3   their answer is that they had something and

4   they actually produced it and that wasn't sort

5   of a backward way of saying that there isn't

6   actually any documents.  But whatever it is,

7   you're right, Your Honor.  The question is

8   they should simply identify it.

9                    THE COURT:  All right.

10                    MR. PACE:  If you'd like, I

11   can stop or I can go on to 35.

12                    THE COURT:  No.  Let's stop

13   here.  Mr. Collyard, I'll give you 15 minutes

14   to address those three.

15                    MR. COLLYARD:  I only need

16   about 15 seconds.

17                    THE COURT:  Oh, good.

18                    MR. COLLYARD:  I'm not going

19   to talk about any of the events that led up to

20   the motion.  I'm sure you sensed my

21   frustration in the briefing.

22                    THE COURT:  Yes, I did.

23                    MR. COLLYARD:  And I made

24   this -- I tried to make this very, very, very

25   easy for you.  And what the defendants have

1    done here is entered into a practice of

2    bringing a motion.  We say we produced it.

3    They say well, we can't find the documents,

4    make them identify them for us.  With these

5    three particular requests we went ahead and

6    did that.  And we sent Jack Pace an e-mail I

7    believe sometime around, I don't know, 12:30,

8    1:00.  So we didn't know if we'd be able to

9    get it done before the hearing.  We did it

10   so --

11                  THE COURT:  So you've

12   identified by Bates number the responsive

13   documents to document requests 8, 11 and 30.

14                  MR. COLLYARD:  That's right.

15                  THE COURT:  All right.  And

16   your position is that everything has already

17   been produced and now here's the Bates

18   numbers.

19                  MR. COLLYARD:  Exactly.

20                  THE COURT:  All right.

21                  MR. COLLYARD:  Yep.  We just

22   wanted to not even make this an issue, Your

23   Honor.

24                  THE COURT:  You're right.

25   Pretty close to 15 seconds there.

1              MR. COLLYARD:  Thank you.

2              THE COURT:  All right.

3      Mr. Pace, anything else on document request 8,

4      11 and 30?

5              MR. PACE:  No, Your Honor.

6      With that representation on the record, I'll

7      take it.

8              THE COURT:  All right.  Well,

9      with respect to document request 8, 11 and 30,

10     my order was going to be that the plaintiff

11     identify by Bates number those documents that

12     were responsive to those document requests as

13     agreed to by the parties as to what was going

14     to be produced.  And if indeed Mr. Collyard's

15     office has already done that, then you've just

16     complied with my order.

17          All right.  Let's move on to document

18     request No. 35 which has to do with the

19     documents used by the Fair Isaac's employees

20     for these various public statements that were

21     the subject matter of the requests for

22     admissions, the second set of requests for

23     admissions.

24              MR. PACE:  And, Your Honor, I

25     think at issue here --

1           THE COURT:  And here you're

2      getting ten minutes for this one.

3           MR. PACE:  Okay.  Thank you.

4      I won't need anywhere close to that.

5           I think there are really four documents

6      at issue.  It's two press releases and two

7      earnings call transcripts.  And I believe the

8      only dispute that sort of surfaced as a result

9      of the briefing was that the plaintiffs were

10     offering to -- indicating that they would

11     agree to identify documents used by the

12     individual -- individual employees if they

13     happen to have been identified in a

14     particular, by name, in one of these press

15     releases or transcripts.  And our only

16     difference was that we didn't accept that

17     limitation because in a number of cases we

18     didn't know -- for example, a press release is

19     a good example or statement where we

20     understand that there may be a lot of people

21     working behind the scenes to support a

22     statement made by the COO or the CEO.  And so

23     that limitation we don't know all the Fair

24     Isaac employees who were involved in putting

25     out a public statement.  And from our

1      perspective the limitation was that I'm sure

2      this is easy -- maybe I'm wrong.  We are

3      assuming, and I could be wrong, that this was

4      relatively straightforward for them to find

5      out whoever, for these four documents, whoever

6      the employees were who were responsible for

7      putting together those statements, the two

8      press releases and the statements made on the

9      two earnings calls, whoever they were, just

10     what documents did they use in making those

11     statements.

12                    THE COURT:  Let me make sure I

13     understand what you're asking them to produce

14     because this isn't clear to me for me.  Are

15     you seeking to have them produce -- I'm going

16     to call this -- this is my term, not one you

17     all used, either side -- the source documents

18     for these four -- the two press releases and

19     the two statements or are you asking them to

20     produce the source documents for the

21     statements which are the subject of your

22     request for admissions?

23                    MR. PACE:  The former, Your

24     Honor.  The source documents for the

25     statements in the press releases and the two

1     earnings call transcripts.

2                    THE COURT:  No.  I want to

3     make sure I'm clear about it.  Your request

4     for admission says we're referring to this

5     press release, we're going to ask you now

6     request for admissions regarding it, and then

7     you go through line by line as to what -- a

8     statement that you pull out of a particular

9     press release or statement that you want them

10    to admit is true.  And I'm assuming that this

11    is not every statement, every sentence that

12    was in those respective documents, those four

13    documents.  Am I right?

14                    MR. PACE:  Correct.

15                    THE COURT:  All right.  So

16    what I ask you, are you asking them to provide

17    the source documents for the statements that

18    you wanted them to admit in your request for

19    admissions or are you asking them to provide

20    the underlying source documents for those

21    four, the two public -- or I'm sorry, press

22    releases and the other two documents?

23                    MR. PACE:  It's those

24    statements from those four documents that were

25    identified in our request for admissions.  So

1    it's -- we've narrowed it and identified the

2    statements.

3                    THE COURT:  All right.  And

4    then at one point it sounds like there was --

5    I don't know if the plaintiffs were offering

6    this as a solution but I saw that the

7    defendants rejected it but I want to make

8    sure.  If they were to produce all documents

9    that were relied upon by whatever employees

10   made those statements that are the subject of

11   your request for admissions, relied upon by

12   them, and produce those documents, would that

13   be adequate?

14                    MR. PACE:  It would, Your

15   Honor.  Just --

16                    THE COURT:  Whoever those

17   employees are because apparently you don't

18   know the names of all the employees who made

19   the statements that show up in the press

20   releases or these other statements.

21                    MR. PACE:  Yes, Your Honor,

22   whether or not named.  With that addition,

23   we're -- that would be satisfactory.

24                    THE COURT:  So if they were to

25   produce -- whether the employee was named or

1       not, they can find out what employees made

2       those statements.  If they were to produce the

3       documents relied upon by those named or

4       unnamed employees to make the statements that

5       are the subject matter of your request for

6       admission, that would be adequate for you?

7                       MR. PACE:  That would be, Your

8       Honor, yes.

9                       THE COURT:  All right.

10      Anything else that you wanted to add?

11                      MR. PACE:  No, Your Honor.

12      Not on 35.

13                      THE COURT:  All right.  Why

14      don't I hear, then, from Mr. Collyard on that.

15                      MR. COLLYARD:  You had the

16      same exact confusion that I had.

17                      THE COURT:  All right.  We've

18      cleared it up.

19                      MR. COLLYARD:  You probably

20      saw that in my e-mail to Mr. Pace, but I still

21      don't know if I understand exactly what's at

22      issue here.  Because I asked -- you know, I

23      asked Mr. Pace in my e-mail if they were

24      limiting it to the particular statements in

25      the --

1          THE COURT:  He said -- now he

2     said yes.

3          MR. COLLYARD:   -- confirm

4     that.

5          THE COURT:  Yes.

6          MR. COLLYARD:  Now, the only

7     misunderstanding that I still have is, is it a

8     document -- let me step back.  Okay?  There

9     have been many document requests in this case

10    where this type of thing has come up about the

11    statements that people have made.  And for

12    each of those we've limited it to the actual

13    documents that the people actually relied on

14    when making those statements.  I just want to

15    make sure I understand that what is meant by

16    the underlying source documents.  So if it is

17    actually a document that, let's say, for

18    example, Mark Green, the CEO of Fair Isaac had

19    when he was making a statement, if he was

20    looking at that, relying on that to make that

21    particular statement, that is what I was

22    offering to produce in the first instance.

23    And I just want to make sure to see if I have

24    the same understanding that you have now.

25          THE COURT:  Well, let me

1    ask -- I would prefer to ask Mr. Pace if

2    that's what he meant before I give my

3    understanding of this.

4                    MR. PACE:  No, Your Honor.

5    That -- that points to one slight disagreement

6    that we had.  We didn't -- we were concerned

7    in the negotiations that this was being

8    limited to, let's say a statement made about

9    profit margins in an earnings call and, you

10   know, new information to us, we see it for the

11   first time in an earnings call.  So we would

12   like some document establishing that, whatever

13   the source material for it is.  The way it was

14   being articulated to us in the negotiations

15   and the way it was just articulated by

16   Mr. Collyard, I believe, was if it so happens

17   that Mark Green had a piece of paper in his

18   hand and he was relying on a particular

19   document to make that statement, then we'll

20   give it to you.  But if not, if instead, it

21   was based on just information -- you know,

22   something other than that specific precise

23   document, then there's nothing to give you.

24           And I guess the reason that wasn't

25   satisfactory to us was because we were

1     envisioning several scenarios where there

2     might be other documents that would fall

3     outside of that definition that we would be

4     missing.  You know, for example, if he gets

5     regular briefings from his executive team

6     with, you know, the results projections, et

7     cetera, and based on that information he

8     makes -- he goes and makes a statement on an

9     earnings call that's newsworthy, then under

10    that articulation, we don't get that source

11    material even if it's one document because

12    it's not the specific thing he relied on.

13                    THE COURT:  Is that how

14    your -- is that what you were proposing, so

15    I'm clear?

16                    MR. COLLYARD:  What I was

17    proposing is that it's a document that the

18    speaker actually used, actually relied on,

19    speaking statement --

20                    THE COURT:  Let's use, then,

21    the example Mr. Pace used.  So Mr. Green has

22    briefing with a number of employees about a

23    particular item that he's going to speak on in

24    a public matter and he gets briefed and they

25    hand him different -- he reads a bunch of

1       different materials or they report to him

2       orally from a bunch of different materials and

3       from that he gets up and makes a public

4       statement for which he has clearly relied on

5       materials prepared by others in order to make

6       those statements.  Under what you're proposing

7       defendants wouldn't get that document?

8                       MR. COLLYARD:  That's right

9       because think about how I have to go about

10      searching for this, Your Honor.  We've got 77

11      of these different statements and it's not

12      just one statement in a statement.  It's lines

13      of statements.  I would then have to go to

14      Dr. Green and say, all right, now think about

15      these 35 statements that they have listed for

16      you.  Each and every one of these we have to

17      figure out if you've ever used anything at

18      all, whether you were briefed on any of these,

19      how did you come to learn this information

20      because now we got to figure out the

21      underlying information that gave you the

22      knowledge.  That becomes impossible to search

23      for, Your Honor.

24                      THE COURT:  All right.  Then

25      I'll continue to hear your argument and we'll

1    get back to you, Mr. Pace.

2                    MR. COLLYARD:  That is the

3    only argument that I want to make on this,

4    Your Honor.

5                    THE COURT:  All right.  Well,

6    then let me ask a question because in your --

7    the way I read your statement -- the way I

8    read your client's response to the request for

9    admission, I'm going to use this word in

10   quotes, my word not yours or the other side's,

11   they equivocated.  In other words, they say --

12   they don't just admit the statement is true.

13   The way the statement is propounded or the

14   request for admission is admit that this

15   particular sentence is true as of this date

16   and your client doesn't say admit, what they

17   would say generally is in the context of which

18   that statement was made they believed it to be

19   true as of this date.

20                    MR. COLLYARD:  Right.

21                    THE COURT:  Which suggests to

22   me some equivocation which is driving why the

23   defendants want to get at the equivocation.

24   So I want to get back to what was going on

25   there with what I'm calling the equivocation

1   or some wiggle room, creation of some wiggle

2   room here.

3                    MR. COLLYARD:  See, this is

4   why it's hard to talk about this in a vacuum.

5   I don't know that that was done for each and

6   every one of these 77 statements that they've

7   cited and you got to consider what the actual

8   statement is.  So certain things are dated

9   back in time.  Their actual request for

10  admission is admit that it's true.  Okay.

11  Does that mean that it's true today?  Did that

12  mean that it's true back then.  Okay.  A lot

13  of these things are just statements, people

14  talking.

15                   THE COURT:  When I went

16  back -- I will admit that I didn't go read all

17  of them but the ones I all read all said admit

18  that this particular statement true as of the

19  date it was made, this as of February 2, 2005.

20  Didn't say is it true today.  The next

21  companion request for admission is did your

22  client -- did you ever retract it.  Answer,

23  no.

24                   MR. COLLYARD:  But you got to

25  remember on those particular statements

1        it's -- some of those things are not things

2        that you could just actually admit as being

3        true.  It's someone just talking.  Did that

4        particular person believe that it was true at

5        the time that it was made.  That's what we're

6        saying in those particular statements.  Some

7        of those you cannot just come out and say yes,

8        that was absolutely true.  We have no reason

9        for knowing that, Your Honor.  That was what

10       was so difficult about that and we tried to

11       explain that to the defendants.

12                    THE COURT:  All right.

13       Anything further on behalf of your clients on

14       No. 35.

15                    MR. COLLYARD:  No, Your Honor.

16                    THE COURT:  All right.

17       Mr. Pace, anything further that you want to

18       add on this?

19                    MR. PACE:  No, Your Honor.

20                    THE COURT:  All right.  I'm

21       going to take that one under advisement at

22       least for while we're here.  I'm hoping I will

23       issue an order on it before we leave here but

24       I need to think a little bit more about what

25       to do with document request No. 35.  So I'm

1       going to move on at this point to the ninth

2       set of document requests.

3            And the first ones I want to address

4       are document requests 1 to 3 related to FICO

5       2008 having to do with, as I understand it,

6       the date by which plaintiffs need to produce

7       documents through.  Mr. Pace.

8                    MR. PACE:  Your Honor

9       identified the open issue with respect to 1 to

10      3.  It's actually a similar issue with respect

11      to 10 through 12 and that is just what's the

12      cutoff date.  There's an agreement to produce

13      documents and the question is how hard do they

14      have to produce documents.

15           For the FICO '08 documents, as we set

16      forth in the papers that I won't repeat, our

17      basis for asking for documents prior to the

18      motion -- prior to filing of our motion, the

19      plaintiffs were offering to produce documents

20      up to February 15.  We didn't think that was

21      sufficient because the reasons we cite.  We

22      attached a press release I think and some

23      other things.  There's been significant

24      marketing activity, communications with

25      clients and other things with FICO '08.  It's

1      going to affect the future of VantageScore

2      which is the central question in the antitrust

3      claims and as a result it was -- that was the

4      basis for our request for information

5      post-February 15.

6              After the motion, the plaintiffs agreed

7      to produce the documents up to May 28, I

8      think, which I believe was the date of our

9      requests and I think the only difference was

10     that --

11                     THE COURT:  At some point I

12     think it's Sullivan declaration Exhibit 16

13     and, in fact, that at some point defendants

14     did agree to produce it through the date of

15     the request.

16                     MR. PACE:  That's right.  And

17     that may have been --

18                     THE COURT:  So why if it was

19     good then, why isn't that a good agreement

20     today?

21                     MR. PACE:  I guess because it

22     may have been closer to the date of the

23     request.  In other words, at the time -- and

24     you know, certainly time has passed and there

25     are a lot of discovery issues that it appears

1     both sides are raising that with the deadline

2     coming up for nondispositive motions are sort

3     of coming up now, and just given the passage

4     of time, it took us a couple of months to

5     negotiate it and then there were a few months

6     between the end of negotiations on this I

7     think, too, maybe and then the time we filed

8     our motion.  We certainly understand that the

9     basis for a limitation of produce documents up

10    to the date of the request is generally that

11    it just makes sense to have a fixed time so

12    that you don't have to keep going back.  It

13    doesn't appear that the plaintiffs have done

14    that.  It doesn't appear, for example, that

15    they said we've already produced documents up

16    through a particular -- you know, up through

17    May.  So by your asking us to go to the

18    present or, you know, November 24 I think was

19    another alternative we put in our papers, that

20    they would have to go back and do for a second

21    time that which they've already done once.

22    Rather, this is simply what we were treating

23    as sort of a continuation of that sentiment.

24    A continuation of the sentiment behind a sort

25    of date of the request type of cut off.  So

1    it's simply reflecting the passage of time

2    that it took to negotiate the request and get

3    the motion on file.  And I think the offer was

4    initially made closer to the date of the

5    request and now we're in --

6              THE COURT:  It was made on

7    August 8, 2008 by Mr. Sullivan and

8    Mr. Collyard is when that offer was made

9    through May 28.

10             MR. PACE:  So it's your

11   position now that simply, you know, just given

12   the passage of time and that we haven't been

13   told by the plaintiffs that they would incur

14   any additional expense by having to go back

15   twice.  In other words, they've already done a

16   search through May and now they have to go

17   back and do it.  We thought if they're going

18   to be doing the search, then given the fact

19   that this is a current topic that's ongoing

20   and changing, they should just do it as of the

21   current -- you know, up to the present time.

22   That was the entire basis for the request,

23   Your Honor.

24             THE COURT:  Okay.

25   Mr. Collyard, I'm assuming it's you until

1   somebody else hops up from your --

2                    MR. COLLYARD:  It's going to

3   be me for a while, Judge.

4                    THE COURT:  All right.

5   They're all grinning.  They're all loving the

6   fact that they don't have to come up here.

7   All right.

8                    MR. COLLYARD:  Let me just

9   show you the fundamental flaw in Mr. Pace's

10  argument.  Okay.  It means that I could bring

11  a motion here in the next three weeks for some

12  dispute what we've had going way back and I'd

13  say, Judge, because it was way back when, now

14  I'm entitled to all of the documents up to the

15  present.  And as I explained in the brief,

16  that would completely eviscerate the whole

17  rationale for agreeing to what we were calling

18  an ongoing document request in which you put

19  forth in your scheduling order.

20                   THE COURT:  All right.  Let me

21  ask you a question, though.  I understand from

22  your brief that you have, in fact, produced

23  the documents requested by 1 through 3 with

24  the agreed upon limitations through

25  February 15, 2008.

1           MR. COLLYARD:  That's right.

2           THE COURT:  All right.  And

3     with respect -- have you to date produced any

4     documents generated post-February 15, 2008?

5     In other words, did you produce --

6           MR. COLLYARD:  The answer to

7     that is yes but have we made a complete

8     production of these particular documents up to

9     May 28?  No, we haven't.  And just let me back

10    up and explain to you why is because during

11    our negotiations, and this is probably clear

12    in the brief, but during our discussions on

13    these, we always thought that they were

14    considering these to be ongoing document

15    requests.  And I kept telling Mr. Pace during

16    these conversations it appears that the only

17    reason why you have served these documents

18    which were consumed by other document requests

19    on May 28 is so that we would have to somehow

20    make some type of production before the

21    ongoing document request production is due in

22    March of 2009.  So for the first time in their

23    motion did I learn that they really did not

24    consider these to be ongoing requests.  I had

25    been treating them as if they were ongoing

1      requests.

2                      THE COURT:  Okay.  So you get

3      the letter from Mr. Sullivan on August 8 and

4      he proposes through May -- that you produce

5      documents through May 28, 2008 and then

6      there's no response until right -- until this

7      motion is filed.

8                      MR. COLLYARD:  No because even

9      when I got Mr. Sullivan's letter that is the

10     same argument that we had before, I had

11     thought and they never told me otherwise that

12     they were considering these to be ongoing

13     document requests.  And that was the

14     fundamental disagreement that we had on these

15     particular requests.  So when I got their

16     motion and they come out and say we are not at

17     this time claiming that these are ongoing

18     requests, that is when I said hey, if you're

19     not claiming that these are ongoing requests,

20     then, of course, we will produce the documents

21     up to May 28.  But what I do not want to have

22     happen, Your Honor, is for them to then come

23     back to you next week and say well, Judge, now

24     that they've agreed to produce them up to

25     May 28 and you've made them do that, now we

1     want these to also be considered ongoing

2     documents requests.  Because then we're back

3     into the same position and the same discussion

4     that Mr. Pace and I have already had numerous

5     times now.

6                    THE COURT:  Okay.  Anything

7     further you want to add on that?

8                    MR. COLLYARD:  No, Your Honor.

9                    THE COURT:  All right.

10    Mr. Pace, anything further you want to add on

11    document request 1 through 3.

12                    MR. PACE:  No, Your Honor.

13                    THE COURT:  All right.  With

14    respect to document request 1 through 3, I'm

15    going to order that those documents responsive

16    to those requests as agreed to with the

17    limitations be produced through August 8, 2008

18    which is the date that was communicated by

19    defendants to plaintiffs that they would limit

20    the production through that date.  I'm not

21    going to order it through today.  Obviously

22    defendants could have brought this motion to

23    compel several months ago and particularly

24    when they got no response back from the

25    plaintiffs on this.  But I am going to order

1       that they be produced through that date, the

2       date when it was offered by defendants and

3       then no response came back from plaintiffs.

4       Just so I'm clear, this is not right now

5       governed by any ongoing production.  If you're

6       going to get into that, you're going to have

7       to have your meet and confer and tee that up

8       for me as to whether one side or another

9       thinks this should be subject to ongoing

10      production.  This is obviously -- I viewed

11      this as a new request.  I didn't read the

12      correspondence as defendants taking this

13      position, this was part of ongoing

14      productions.  But nonetheless, I'll make it

15      perfectly clear this is not subject to the

16      ongoing production that we've already got in

17      place under the scheduling order.

18          All right.  Let's go to document

19      requests 10 through 12.  This has to do with

20      the deterioration of Fair Isaac's credit

21      restoring.  And let me ask a question for you,

22      Mr. Pace.  The scenario I got here is that

23      Mr. Collyard has put in a signed declaration

24      and we have another declaration by another

25      individual as well saying that you had agreed

1     that if they would go back to 2003, that the

2     cutoff would be February 15, 2008.  Ms. Nelson

3     from plaintiff's office confirms that in an

4     August 29 letter, which is Sullivan

5     Exhibit 17, there's nothing in there where

6     defendants ever said no in response to that

7     letter.  In fact, Exhibit 16 dated August 8

8     from defendants seems to be suggesting the

9     same solution.  Your brief suggests that you

10    told plaintiffs you rejected the whole

11    proposal that it wasn't acceptable.  You say

12    that in your reply that these compromises were

13    rejected.  There was no cite in your reply so

14    I confined anything where defendants ever even

15    responded to the August 29, 2008 letter.  It

16    appears to me there was agreement of the

17    parties to go back to 2003 and through

18    February 15, 2008 and now defendants don't

19    want to live with that agreement.  That's what

20    it looks like to me.

21               MR. PACE:  Okay.  I

22    understand, Your Honor.  And I will say I

23    don't -- while when we were preparing these, I

24    personally didn't specifically recollect the

25    making the offer of February 15 except I don't

1      dispute anything in their declarations, I take

2      them at their word.  The reason that we at

3      this point were seeking any documents after

4      February 15 was that -- I guess just to step

5      back for a second, the context of that

6      particular meet and confer, as with many of

7      these meet and confers, is that we have a

8      laundry list of many, many requests where

9      we're going through one at a time making

10     suggestions, making proposals.  And in this

11     particular request what I understand took

12     place, and this is consistent with what the

13     declarations say, is that I told them

14     basically, look, this is what we're looking

15     for here.  And as of this time, based on the

16     information that I have available to me, if

17     you -- our offer will be, along with all the

18     other things we're making an offer of

19     compromise for, we'll cut off -- we'll do a

20     cutoff of February 15.

21          Now, that was one of many compromise

22     offers made in that particular phone call

23     which was followed by a letter from the

24     plaintiffs that effectively rejected many,

25     many, many of the things that we offered

1       during that call.  Now, I guess the reason

2       that we're even here today still seeking

3       documents after February 15 was that we

4       thought that it was sort of unfair for them --

5       for us to make a number of proposals which are

6       sort of based contingent on an agreement and

7       them to say we're rejecting a lot of these but

8       we're going to pick and choose a couple and

9       agree the limitations that are favorable to

10      us, pick and choose those and agree and then

11      live by those so at least we've now cut the

12      universe and you can continue to negotiate

13      with yourself, defendants, and just come back

14      and as long as you move closer to us, we're

15      not going to move closer to you.  And so we

16      saw that letter as really a rejection of a lot

17      of the things we were doing and that's why we

18      made the offer here today.

19              I will say, though, Your Honor, so it's

20      clear, I have no interest in sort of going

21      back on anything that we understood that they

22      understood to be in agreement.  And if Your

23      Honor perceives it that way, I'm happy to live

24      with the February 15 cutoff.  But just to be

25      clear, we saw that as really, their letter, as

1    a rejection of a lot of offers of compromise

2    by us such that we didn't think it was really

3    fair for us to have to be held to the one or

4    two that they latched on to which happened to

5    be favorable to them.

6                    THE COURT:  Okay.

7    Mr. Collyard.  Let me ask a question.  With

8    respect to these document requests 10 through

9    12, have plaintiffs produced the documents up

10   through February 15 that are responsive to

11   these document requests.

12                   MR. COLLYARD:  We did, Judge,

13   and we actually did it a long time ago.

14                   THE COURT:  Okay.  All right.

15   I just wanted to clarify that.  All right.

16   Anything that --

17                   MR. COLLYARD:  The only thing

18   that I'll even -- that I even think I need to

19   respond to is obviously we didn't think that

20   there was any condition on our agreement.  We

21   didn't think it was if we agreed to all of

22   these issues today, then we'll live by this

23   agreement.

24       Mr. Pace knows this.  Every meet and

25   confer we have we negotiate each document

1    request individually and that's how these were

2    taken.  I have nothing further, Your Honor.

3                    THE COURT:  All right.

4    Anything further, Mr. Pace, on document

5    requests 10 through 12?

6                    MR. PACE:  No, Your Honor.

7    Thank you.

8                    THE COURT:  All right.  I'm

9    going to deny the motion on that.  I do find

10   that the parties had reached an agreement as

11   of August 28 that the defendants would produce

12   documents responsive to these document

13   requests through February 15, 2008 and I do

14   agree that at least as I have read through

15   your various letters back and forth and as I

16   would expect there will be negotiations as you

17   go through each of these various discovery

18   requests, some of which you'll reach agreement

19   on, others you won't but I've never gotten the

20   sense that it was an all or nothing bundling

21   of either take everything or we're going to

22   assume everything's off the table.  And I

23   certainly don't see, for example, defendants

24   moving on everything that were the subject

25   matter of various letters that went back and

1    forth between the parties.  So in any event, I

2    am denying the motion with respect to document

3    requests 10 through 12 of the ninth set.

4         All right.  Let's address, then, the

5    Blaze Advisor or document requests 5 through

6    7.

7                   MR. PACE:  Finally, Your

8    Honor, with respect to 5 through 7, the simple

9    issue is why are we still talking about EDM.

10   We had a motion on it.  We have an agreed on

11   protocol and then -- and we thought that was

12   really the end of it.  And then following the

13   entry of that order, and I won't go through

14   this in details, this is all in our papers,

15   but following the entry of that order, then we

16   listened in on another earnings call from the

17   plaintiff where Mark Green, their CEO stepped

18   back and said I'm going to discuss our EDM

19   strategy.  We're an EDM company now and I'll

20   start with it all runs through Blaze Advisor.

21                   THE COURT:  All right.  And I

22   read that and read the annual report from 2005

23   and all of that and granted I am, as you all

24   know, not savvy in this area but it certainly

25   appears to me and what I see from the

1      declaration provided by Mr. Caretta, that it

2      looks like to me that a Blaze Advisor is

3      basically a computer software program that is

4      licensed out to third parties to -- in which

5      they're putting in their data and I don't see

6      the connection to what is at issue in this

7      lawsuit which is the ability -- which is the

8      FICO scores and the ability to -- whether

9      there's a monopoly or not or are there

10     distribution channels or are there not.  I

11     just don't see, even if you assume that you

12     were misled about what Blaze Advisor is, I

13     don't see whether it falls under an EDM

14     solution.  It looks like an underlying

15     software program from what I've been able to

16     glean from what's been provided to me by the

17     parties, including the various documents that

18     you cited to me as well.

19              MR. PACE:  Okay.  Your Honor,

20     that's our understanding as well that it's an

21     underlying software program that clients use

22     to help make their business decisions.  And I

23     think this really is the same issue that was

24     before the court with respect to the prior EDM

25     solutions.  In connection with that, Your

1        Honor got a very similar declaration that said

2        we don't -- we, Fair Isaac, don't explicitly

3        market these particular programs, Triad, other

4        things, with scores.  We don't specifically

5        say here, client, we're going to sell you this

6        in a specific bundle.  So what do we do about

7        it?  And so our answer last time was the same

8        answer this time.  How does that explain the

9        public statement saying that they're going to

10       leverage their abilities in one area, EDM,

11       Blaze Advisor, et cetera, to stabilize their

12       other areas like scoring.  And the only way

13       that that makes any sense is to the documents

14       that we cited to the Court in connection with

15       the last motion, they're internal documents

16       that talk about EDM more generally, that --

17       excuse me.  I profess another reason why I'll

18       stop soon.  I promise.  That while the

19       information and the products or services

20       aren't explicitly comarketed even if they're

21       not, that the fact is that once you have one

22       client signed up for one underlying

23       decisioning service like EDM, then it's all

24       the more -- it's a lot easier to get them to

25       subscribe to or buy FICO scores because

1    they're already involved, they're already

2    using our solutions, they're already using our

3    systems and it's a lot easier now for us to --

4    for them to use FICO scores that are

5    automatically compatible with and as inputs or

6    otherwise into the underlying software EDM or

7    otherwise.  And so even though -- and that's

8    what the document said.  The document said

9    we'll leverage EDM solutions to sell more

10   scores even though none of those particular

11   programs were specifically marketed together.

12   And that's supported by the documents that we

13   subsequently got pursuant to the Court's

14   order.

15        The documents that we got show a

16   tremendous overlap between the client scores

17   and the clients for EDM solutions.  Now, that

18   could be for a number of reasons.  That could

19   be because Fair Isaac is dominant in both and

20   so that's just necessarily going to be the

21   case.  And if that's the answer, then I

22   suppose that's the answer.  But we were

23   submitting that consistent with those

24   documents and the public statements from their

25   CEO, that that meant that getting people

1  subscribed to the Fair Isaac system in one

2  area just made it easier and facilitated the

3  purchase of scores or other things in another

4  area.  That was the only basis for the EDM

5  motion in the first place.

6      So I agree, I haven't seen something

7  specifically saying, and their declarations

8  certainly don't say this, that the Blaze

9  Advisor program is something that comes with

10 FICO scores.  I haven't seen that.  We didn't

11 see that before either and yet we sought all

12 those documents discussing leveraging one

13 versus the other.  So it's really the same

14 issue as before, Your Honor.

15          THE COURT:  All right.  Thank

16 you.  Mr. Collyard.

17          MR. COLLYARD:  Thank you, Your

18 Honor.  Mr. Pace said that out of the

19 documents that we produced from your March 20,

20 2008 order that he saw the clients were

21 clients that were scoring clients and clients

22 that were also EDM clients so there's some

23 connection.  Of course, that's the case, Your

24 Honor, because as you made a limitation in

25 your order, you said that we only had to

1   produce documents from our top ten scoring

2   clients.  So we do have those clients who are

3   scoring clients and who, with completely

4   separate and apart items in their business,

5   use EDM.

6       Now, Mr. Pace talks about references to

7   cross selling and things like that.  Those

8   statements are made in connection with the

9   overall EDM business.  Cross sell use EDM

10  applications to get more EDM applications.

11      But what I absolutely need to highlight

12  for you, Judge, and this may have been clear

13  from Mr. Caretta but it's so important that

14  understand that why this doesn't make sense

15  and why Fair Isaac could never use Blaze

16  Advisor as a separate distribution channel for

17  FICO scores is because we got to step back and

18  look at FICO scores.  Okay.  All we have is an

19  algorithm.  That algorithm is housed with the

20  bureaus.  They have it.  We can do nothing

21  without the bureau's credit data.  They

22  actually take that data, apply it to the

23  algorithm.  They do this.  They process it.

24  They make the score and then they themselves

25  distribute the score.  In every instance in

1    which a client of anybody's gets a score, it

2    comes from the bureaus, not Fair Isaac.   That

3    is why Mr. Caretta says that we could never

4    use Blaze Advisor for a separate distribution

5    channel for FICO scores.

6         Now, I also want to point out too that

7    when we talked about EDM last time, you found

8    some very minimal relevance and because of the

9    overwhelming burden in going out and getting

10   these things, you tailored your order to a few

11   particular things.   One of those things,

12   though, was all of the contracts and the

13   statements of work from 2005 up to

14   September 15 of 2007.   Fair Isaac has

15   produced, Your Honor, somewhere around 540

16   contracts and statements of use for that time

17   period and that includes every single Blaze

18   Advisor contract or statement of use --

19                THE COURT:   Why would they

20   have produced the Blaze Advisor contracts or

21   statement of use if, in fact, Blaze Advisor

22   wasn't covered by --

23                MR. COLLYARD:   It was covered

24   because it was out of -- out of all of the EDM

25   products.   You produce all those contracts for

1    that time period.  And so we produced every

2    single Blaze Advisor statement of work that we

3    had for that time period.  Now, this was back

4    in -- I can't remember when our production

5    was.  Your order was March 20 so I think our

6    production was somewhere around April-ish.

7    Okay.  And that was on the eve of when we

8    really started getting into all these

9    depositions and not once, Your Honor, in

10    defending 30 of these depositions did I ever

11    see the defendants mark a single document

12    pertaining to EDM.  They never noticed up a

13    Rule 30(b)(6) notice on this issue.  They've

14    done nothing on this issue and it's gone

15    nowhere, Your Honor.  Their economist expert,

16    as I pointed out in the brief, has never even

17    given an opinion as to how EDM or Blaze

18    Advisor specifically could be used as some

19    type of separate distribution channel.  These

20    documents simply are not relevant, Your Honor.

21    And Mr. Caretta explains that in detail.

22        But on top of that, Your Honor, not

23    only do they have the 540 contracts for EDM

24    and the statements of use that describe in

25    detail exactly the statements of use, exactly

1    what is being done, they've never said why

2    isn't that enough.  They have all the Blaze

3    Advisor stuff.  Why should we have to go and

4    get more.  And as Mr. Caretta talks about, it

5    would be a significant burden to go and do so.

6    He talks about six different divisions of

7    people that we would have to go and search.

8    These are hundreds of people.  We have nearly

9    350 Blaze Advisor clients that we'd have to

10   have these people look for.  It would be an

11   enormous burden.  As he says, it would take

12   hundreds upon hundreds of hours to do so.  We

13   request that their motion be denied, Your

14   Honor.

15              THE COURT:  Let me see if I've

16   got any other questions for you.  I'm still

17   not clear if -- I understood the position you

18   were taking in your response is that Blaze

19   Advisor is not part of the EDM solutions and

20   that by agreement of the parties, Blaze

21   Advisor wasn't one of the solutions that you

22   had to produce documents on.  And in looking

23   at my order with respect to document request 4

24   and 6 -- well, with 1 through 3 you were to

25   produce the final contracts and statements of

1     work for the EDM solutions that were purchased

2     from plaintiffs to the extent the documents

3     exist.  In agreement with respect to document

4     request 4 and 6 is that you would produce any

5     final presentations for Triad or Liquid Credit

6     applications.  In addition, you would produce

7     the user guides for the following EDM

8     solutions that were marketed or sold by them

9     to the extent any such user guides exist for

10    Triad, Liquid Credit, Capstone, Falcon and

11    Debt Manager.

12                    MR. COLLYARD:  Right.

13                    THE COURT:  In other words,

14    Blaze Advisor wasn't listed.

15                    MR. COLLYARD:  Right.  So let

16    me --

17                    THE COURT:  So where is it

18    that -- just so I'm clear, I thought you were

19    saying it's not an EDM solution but you're

20    saying you produced it as part of the EDM

21    solutions, the contracts and the statements of

22    work.

23                    MR. COLLYARD:  So let me

24    explain that for you.  Blaze Advisor is one of

25    the numerous applications that are part of

1      Fair Isaac's EDM business.  Remember, Fair

2      Isaac has its EDM business and then it has its

3      scoring business.

4                    THE COURT:  Yes.

5                    MR. COLLYARD:  Separate and

6      apart from its scoring business is the rest of

7      its business which Fair Isaac refers to as its

8      EDM business.  As part of that EDM business,

9      Blaze application falls within that.  So on

10     your order on all the contracts and statements

11     of work, we produced all the contracts we have

12     for Triad, Liquid Credit, Blaze Advisor,

13     anything that's considered to be an EDM

14     solution.  Now, where we got down on the

15     particulars was in the final presentations.

16     Okay.  So when you gave your order and

17     Mr. Pace and I talked about what final

18     presentations do we need, he chose Triad, he

19     chose Liquid Credit as being part of the -- as

20     being part of those EDM applications.  Same

21     with the user guides.  And so what they're

22     saying, Judge, they're saying well, we really

23     would have chosen Blaze Advisor instead of one

24     of these if you hadn't tricked us.  And that's

25     how the they tricked us argument comes in.

1        And I don't even need to go to that.

2                    THE COURT:  All right.

3        Mr. Pace, anything further?

4                    MR. PACE:  Yes, Your Honor.

5        Very briefly.  Just in response to the

6        argument about how this doesn't make any sense

7        because the CRAs are our distributors after

8        all and all we do is make an algorithm and

9        then something happens, I mean, obviously if

10       that was the end of the story, then none of

11       the other documents about, you know,

12       leveraging scores and other services would

13       make any sense.

14           I mean, all of the -- Fair Isaac

15       regularly meets with, and there are many

16       documents that have been produced in the FICO

17       '08 context, for example, where they are

18       regularly meeting with customers, clients

19       talking about FICO scores.  They're out there

20       marketing and selling FICO scores.  Granted,

21       in most cases it's the bureau who ultimately

22       sells it but it's not true at all -- I mean,

23       I'm not saying he was saying that but to the

24       extent Mr. Collyard could be heard to be

25       suggesting or the declarations could be

1      suggesting that Fair Isaac has nothing to do

2      with being out there pushing its scoring

3      services in the marketplace, that's certainly

4      not true at all.

5           With respect to have we used the

6      documents, we have used the documents.

7      They're fairly straightforward.  They're

8      admissible evidence and they're going to see

9      them in a few weeks in our summary judgment

10     papers.  The fact that we haven't used them in

11     a deposition because they were coming in while

12     depositions were ending has really -- is

13     really here nor there.

14          And finally, with respect to the

15     burdens associated with the production,

16     Mr. Collyard is right.  The Blaze Advisor

17     stuff was included in the contracts that we

18     got as a result of Your Honor's order.  And so

19     our requests 5 through 7 were specifically

20     intended to track the remainder of the order

21     that didn't cover contracts and we thought

22     were narrowly tailored to get at the types of

23     things that we thought actually weren't going

24     to be that burdensome.  Presentations, white

25     papers, handouts used in connection with the

1    marketing or sale of Blaze Advisor, user

2    guides and then documents sufficient to show

3    market share.  That last one could be a single

4    document.  So the user guides and the

5    presentations from the negotiations with the

6    plaintiffs before we were told or at least we

7    came to understand that these were sort of

8    standard sets of materials that were used that

9    were often very duplicative that you didn't

10   have to go to six divisions and a hundred

11   employees to possibly get.  If we're wrong

12   about that, I suppose that's a conversation we

13   probably should have had a few months ago

14   about the burden but that's I guess why we're

15   here today.

16       All we're looking for are those

17   presentations, user guides in connection with

18   Blaze Advisor.  If Your Honor would like us to

19   negotiate a limitation on that such that they

20   don't have to go through six divisions and all

21   those people to get, we're certainly happy to

22   do that.  Maybe standard user guides, if

23   there's one, you know, if there's one that

24   they use, the standard presentation, the

25   standard white paper.  Again, it was our

1    understanding that that's how the business

2    worked.  So what we were asking for here was

3    probably only a handful of documents.

4                    THE COURT:  All right.

5    Mr. Collyard, anything further?

6                    MR. COLLYARD:  No, Your Honor.

7                    THE COURT:  All right.  With

8    respect to document request 5 through 7 of the

9    ninth set of document requests, I'm going to

10   deny the defendants' motion for those

11   documents related to Blaze Advisor.  I'm going

12   to do so for several reasons.

13        First of all, I believe that that

14   request was subsumed within document request

15   No. 6 -- sorry.  The six sets of documents

16   that were the subject matter of ultimately a

17   meet and confer by the parties and then what

18   ended up being memorialized in my order of

19   March 20, 2008.  I find from the evidence that

20   was presented to me by the parties in

21   connection with their declarations and

22   affidavits that the defendants were made aware

23   of plaintiff's position on Blaze Advisor as of

24   November 20, 2007.  They responded by saying

25   they disagreed with the position that

1      plaintiffs were taking about Blaze Advisor

2      being -- that they disagreed and they would

3      follow up with it in connection with the sixth

4      set of document requests.  They issued their

5      sixth set of document requests and ultimately

6      negotiated a resolution to it that took into

7      account Blaze Advisor.  I don't find that

8      there is evidence that the defendants were

9      somehow tricked into thinking that Blaze

10     Advisor was something other than what

11     plaintiffs represented it to be in their

12     various documents that defendants have had

13     access to.

14          Second of all, to be honest, you know,

15     all things could have some relevance but I

16     really find that the relevance of Blaze

17     Advisor is, at best, marginally relevant and

18     certainly the burden of searching for those

19     documents greatly exceeds any tangential

20     relevance that this particular EDM solution

21     would have in this case.  I just think it is

22     way too far afield.

23          So on that basis, based on that I think

24     it's governed by my March 20, 2008 order, the

25     relevance in this case is, at best, marginal

1    and certainly the burden well exceeds the

2    benefit that could be obtained from obtaining

3    the documents sought by document request 5

4    through 7.  I'm denying defendants' motion

5    with respect to that document -- those

6    document requests.

7           With that, we're going to just take a

8    short recess so that I can come back and give

9    my ruling on document request No. 35 of the

10   seventh set of document requests and then

11   we'll go into the informal motion practice and

12   get the others on the phone.  So we'll take a

13   five-minute recess.  Thank you.

14

15          (A break was had in the proceedings)

16

17               THE COURT:  You can be seated.

18   Sorry.  Thank you.  With respect to document

19   request No. 35 of the seventh set of the

20   document request, I'm going to -- just a

21   moment, please.

22        Hello, Magistrate Judge Mayeron.

23               MR. GARDNER:  Good afternoon

24   again, Your Honor.  This is Jim Gardner for

25   Trans Union.

1          THE COURT:  All right.

2          MR. MILNE:  This is Robert

3     Milne again for Experian.

4          THE COURT:  Okay.  I'm just

5     going to have you sit in on the balance, the

6     tail end of the motion to compel by

7     defendants.  I'm just issuing a ruling on one

8     of the document requests and then we'll be

9     going into the informal motions.  So bear with

10    us here.

11         With respect to document request

12    No. 35, I am going to grant the defendants'

13    motion in part and I'm going to do it to this

14    extent.  The plaintiffs will be ordered to

15    produce the documents sought by those document

16    requests.  To the extent that the speaker of

17    those two press releases, and I think the

18    other two were year-end statements or

19    quarterly statements, to the extent that the

20    speakers had -- were relying on documents as

21    they were making those statements, in other

22    words had them in their presence while they

23    were making those statements, those documents

24    will be produced.

25         But to the -- I am denying the motion

1       to the extent it's asking the plaintiffs to go

2       back and find all documents that could support

3       those statements basically because -- for two

4       reasons.  One is it's just an incredibly

5       burdensome request to do.  And second, I weigh

6       that burden against the nature of the

7       plaintiff's responses.  And while the

8       plaintiffs do not outright admit these various

9       document requests, I think that they are

10      sufficiently admitted that defendants will be

11      able to use their responses along with the

12      fact that they also admitted they didn't

13      retract those statements effectively at trial.

14      So the burden is just too great, though, to

15      ask the plaintiffs to go back and find

16      sentence by sentence all of the documents that

17      could have or did in fact support those

18      statements.  But to the extent that the

19      speaker had documents in front of them that

20      they were relying on to make those statements

21      whether it be in a file or they were reading

22      from them, have them in their presence, I

23      don't want to say literally in their hand,

24      Mr. Collyard, that I am going to order that

25      those documents be produced.  I think that

1       those speakers should know what they

2       physically had in their possession as those

3       statements were made and that can lessen the

4       burden significantly for plaintiffs.  So

5       that's my ruling with respect to document

6       request No. 35.

7              Now, as I understand it, then, with

8       respect to the seventh set of document

9       requests, plaintiffs have already complied

10      with document -- the order on document request

11      8, 11 and 30, that the letter has already been

12      sent.  For document request 35 I am ordering

13      some relief and I'm also ordering relief on

14      document request 1 through 3 of the ninth set

15      of document requests.

16             When do plaintiffs believe they can get

17      those documents to defendants?

18                    MR. COLLYARD:  Your Honor, I

19      would propose that it happen -- remember

20      there's a searching process and processing is

21      (unintelligible).  With the holidays, I would

22      propose sometime in middle of January.

23                    THE COURT:  Well, I have Olson

24      producing their documents on January 9 which

25      is a little over a month from now.  Would that

1    be acceptable, doable?

2                    MR. COLLYARD:  Yeah.  Can we

3    do it like this, Judge?  We'll do it and if a

4    problem arises --

5                    THE COURT:  Then bring it to

6    my -- then have a meet and confer with

7    defendants?

8                    MR. COLLYARD:  Yes.

9                    THE COURT:  And if you can't

10   resolve it, then bring it immediately to my

11   attention.  But let's have those documents in

12   hand by January 9.

13        All right.  Anything further on the

14   motion to compel by defendants before we go

15   into an informal conference and I release the

16   court reporter?

17                    MR. PACE:  Just for the

18   record, Your Honor, with respect to the 8, 11

19   and 30 that I believe the way Your Honor just

20   put it, plaintiffs have complied with --

21                    THE COURT:  They represented

22   that an e-mail has been sent to you with those

23   Bates numbers.

24                    MR. PACE:  Just for the

25   record, I think it came when we were in the

1        car on the way to the courthouse today and I

2        notice that it came in but we haven't, of

3        course, had a chance to review it, see if

4        there are --

5                THE COURT:  I'm ordering that

6        the Bates numbers to those documents be

7        produced to you.  And those it seems to me can

8        be done forthwith if they haven't.

9                MR. COLLYARD:  They have been,

10       Judge.

11               THE COURT:  And the

12       representation is that it's already been

13       complied with.

14               MR. COLLYARD:  If Mr. Pace

15       wants to pull up his Blackberry and read it

16       over the next five minutes, feel free --

17               THE COURT:  I don't know.  I

18       would prefer he not do that right now.  But in

19       any event, you're ordered to do it and if it

20       hasn't been complied with, then you need to

21       immediately do so.  With that, then, I can let

22       the court reporter go.

23          Now, let me ask a question.  We still

24       have the ability to record this matter if the

25       parties wish it and Mr. Cotras will remain

1    here.  Is there desire to record the informal

2    motion?

3                        UNKNOWN SPEAKER:  Yes, there

4    is, Your Honor.

5                        THE COURT:  All right.  Then

6    let's address first the issue with respect to

7    the deposition and then we'll address the

8    issue about the privilege log.

9         Mr. Schutz, why don't you tell me why

10   the -- the picture defendants have painted is

11   unilaterally you canceled depositions, you

12   didn't bring a motion for protective order,

13   and you had no right to do so.

14                       MR. SCHUTZ:  That's correct,

15   Your Honor, in terms of what they said.

16                       THE COURT:  Right.  I'm not

17   saying you agree with it but that's what they

18   said.

19                       MR. SCHUTZ:  So here are the

20   facts.  Let me just paint the facts for you,

21   Judge, and then we'll go from there.  At I

22   believe it was 5:00 last night, it was either

23   TU or Experian, one of them came later, but

24   the first notice we got was at

25   5:00 electronically that a counterclaim had

1    been filed.

2                   THE COURT:  All right.  Now,

3    let me back up.  You all filed an amended

4    complaint.

5                   MR. SCHUTZ:  We filed an

6    amended complaint and that process went

7    through motion putting a draft forward.

8    Everybody knew what the amended complaint was

9    going to be.  And then there were also

10   negotiations about their being able to file an

11   amended counterclaim related to cancellation

12   of a trademark.  And what it was basically was

13   taking a defense that they had alleged and

14   turning it into an affirmative counterclaim.

15   Really didn't expand the scope of the case.

16   There's been discovery on it, expert reports

17   on cancellation of the counterclaim.  Nothing

18   unusual there.

19                   THE COURT:  And I need to back

20   up one more second.

21                   MR. SCHUTZ:  Sure.

22                   THE COURT:  Remind me what the

23   amendment to the complaint was substantively.

24   What did it add?

25                   MR. SCHUTZ:  Our substantive

1    amended -- what was our substantive amended

2    complaint?

3                     UNKNOWN SPEAKER:  The best way

4    to describe it was it made explicit that we

5    have a --

6                     MR. SCHUTZ:  Oh, yes, that's

7    right.  I'm sorry.

8                     UNKNOWN SPEAKER:  -- a per se

9    antitrust claim.

10                    MR. SCHUTZ:  That's right.

11   Okay.  That's correct.  We had a per se price

12   fixing claim I believe is what it was.  And so

13   but everybody knew that.  I mean, it was

14   exchanged up front.  We had negotiations about

15   that, including not a surprise to everybody we

16   made the appropriate motion.  So last night

17   what we expected to get was the final version

18   of the draft trademark cancellation claim that

19   had been exchanged by the parties and I think

20   the Court may have in fact seen that or it was

21   done pursuant to stipulation rather.  And what

22   we get is that plus a 22 page, 78 paragraph

23   section to monopolization claim against Fair

24   Isaac.  No warning about that, nothing.  So

25   that happens at 5:00.  We get together.  We

1       have a conference about wow, what does this

2       mean?  What do we do?  We've got these

3       depositions coming up and we're in the process

4       of going -- and by the way, our client still

5       has not seen this.

6              We asked for permission earlier today

7       and perhaps even last night for our client to

8       be able to see this because it was filed under

9       seal and last night we did not get permission

10      to do that nor today up until I asked Mr. Pace

11      in the courtroom today and he said for

12      Experian it would be okay if our client looked

13      at this.

14                     THE COURT:  All right.  Let me

15      just stop you so I want to make sure I

16      understand the lay of the land as you've

17      presented it.  You -- there's a discussion or

18      plaintiff's approached defendants about

19      amending their complaint to add a per se price

20      fixing --

21                     MR. SCHUTZ:  Right.

22                     THE COURT:  -- antitrust

23      claim.

24                     MR. SCHUTZ:  Right.

25                     THE COURT:  And as part of

1    those discussions, defendants -- and they're

2    asking you to stipulate because the time to

3    amend the complaint or amend the pleadings has

4    long since passed --

5                    MR. SCHUTZ:  That's correct.

6                    THE COURT:  -- under the

7    scheduling order.  And you have discussions

8    with the defendants and they or as part of

9    those discussions are looking to add a

10   counterclaim with respect to trademark,

11   correct?

12                   MR. SCHUTZ:  Cancellation of

13   the mark, yes.

14                   THE COURT:  And the parties,

15   because I didn't hear a motion, I know you

16   ultimately agreed.  You submitted it to me by

17   stipulation.

18                   MR. SCHUTZ:  Correct.

19                   THE COURT:  And what I

20   remembered was that the parties agreed that

21   the plaintiffs could file their amended

22   complaint.

23                   MR. SCHUTZ:  Yes.

24                   THE COURT:  Now, are you

25   saying that part of the stipulation which I

1      don't recall reading was that they also could

2      file an amended counterclaim without bringing

3      a motion to do so because the time had passed?

4                    MR. SCHUTZ:  Right.  And that

5      amended -- our understanding, clear

6      understanding and the documents going back and

7      forth support that that counterclaim was for

8      cancellation of trademark.

9                    THE COURT:  Okay.

10                   MR. SCHUTZ:  Because, again,

11     this is, you know --

12                   THE COURT:  So what you were

13     expecting to come in with their answer was

14     denying your new claim.

15                   MR. SCHUTZ:  Right.

16                   THE COURT:  Having to do with

17     the per se price fixing and to add the

18     trademark claim.

19                   MR. SCHUTZ:  Right.  And the

20     reason it wasn't a big deal for each party to

21     stipulate to that at this late stage of the

22     proceeding is they were tied up.  I mean, the

23     same operative set of facts that have been

24     litigated throughout this case and on which

25     discovery has been taken form the basis of

1    these additional claims, our per se claim and

2    their cancellation claim because they had a

3    cancellation affirmative defense and so it was

4    all up there.

5                    THE COURT:  Okay.  And now

6    you're saying all of a sudden you had a new

7    claim comes in.

8                    MR. SCHUTZ:  Brand new claim

9    comes in.  It's antitrust claim under Section

10   2 against Fair Isaac.  It's a standalone claim

11   and it comes in last night at 5:00.  And

12   before I get to the discovery aspects in just

13   a moment, I think it's helpful to step back

14   and say, all right, what does that mean and

15   what are the ramifications of this.  Setting

16   aside the dispute that we've got here about

17   expert discovery, what happens with this if

18   this claim were not stricken and allowed to go

19   forward.  Well, one way to look at it is what

20   if they filed it as a new suit, just filed an

21   antitrust suit against Fair Isaac.  That's

22   something that probably would result in a year

23   and a half to two year discovery schedule.  I

24   mean, these Section 2 monopolization claims

25   are very complicated.  Well, what does it mean

1     for this case?  Certainly the whole schedule

2     is blown up by filing -- if this claim is

3     allowed to stay in this case and is not

4     stricken.  It's going to require separate

5     damage experts.  It's going to require new

6     opinions on antitrust and economics and market

7     share or all the acts.  I mean, it goes on for

8     70 paragraphs.

9          So keeping that as background, the

10    first thing we do when we look at this we see

11    paragraph No. 1, quote, Fair Isaac Corporation

12    currently is and has been for many years a

13    virtual monopolist in the credit scoring

14    industry.  So that's how they start out

15    charging us with being a monopolist.

16    Paragraph 2 starts out, while ostensibly

17    directed to the recent launch of the

18    VantageScore credit scoring services, this

19    lawsuit is, in fact, the culmination of

20    several years worth of efforts by Fair Isaac

21    to fraudulently obtain through, the federal

22    trademark registration process, exclusive

23    rights and in numerical range 300 to 850 for

24    the purpose of maintain its dominant position

25    in the credit scoring industry, and it goes

1       on.

2               So it appears, what appears to us is

3       happening is they filed this antitrust

4       counterclaim without seeking permission,

5       without -- past the April 1, 2000 deadline for

6       filing an amended claim and it's 5:00 the

7       night before they're to take the trademark

8       expert in our case and it's clear that they

9       are tying that in now to our monopolization

10      claim because paragraph 1 calls us

11      monopolists.  Then they talk about how we used

12      our 300, 850 score and the trademark

13      registration process to cement our dominant

14      position and it goes on and on, of course.

15              So we're being sandbagged.  We're

16      absolutely being sandbagged here.  There's

17      been no report by them on this.  Our expert

18      hasn't done anything with regard to how that

19      might tie into cementing a dominant position.

20      So we said wait a minute.  There isn't going

21      to be a deposition go forward until we're able

22      to sort this out.  They said well, we're going

23      to get a hold of the court 9:00 tomorrow

24      morning.  We said fine, we'll bring it up

25      then, at which point we fully intended to seek

1    a protective order.  And for some reason the

2    call didn't take place.  As I understand now,

3    Your Honor was not available but we made it

4    clear, you know, get us in on the call, we'll

5    gladly talk to the Court about this and go

6    through the process of seeking a protective

7    order.  And the first thing I said when I

8    walked in here today, of course, was two

9    things we wanted to bring up in addition to

10   the discovery motions, strike this complaint

11   and protective order on the deposition.

12            So that's the setup, Judge, and that's

13   why we did what we did.

14                     THE COURT:  Okay.

15                     MR. SCHUTZ:  I suppose, all

16   else being equal, we could have had somebody

17   stay up until 3:00 in the morning trying to

18   get a piece of paper on file but I think

19   that's unreasonable given that we've really

20   been sandbagged here.

21                     THE COURT:  All right.  Who

22   wants to speak to this issue on behalf of

23   defense?

24                     MR. PACE:  Your Honor, if I

25   could briefly and then Mr. Gardner or

1      Mr. Milne --

2                    THE COURT:  All right.  Let me

3      ask a question as you're coming up here.  So

4      the picture that Mr. Schutz has painted is you

5      have filed an unauthorized counterclaim,

6      meaning the deadline to amend the pleadings to

7      add claims or parties was April 1, 2007 and so

8      the time has passed to add one without a

9      motion to this Court and establishing good

10     cause to bringing the motion at this time.  So

11     before I address, then, the fact that they

12     didn't bring a motion for protective order,

13     what basis, given apparently there was,

14     according to them and you'll correct them if

15     they're wrong, no agreement to add this

16     counterclaim, there was only an agreement to

17     add this trademark counterclaim.

18                    MR. PACE:  I will correct them

19     because they are wrong about this.  But we

20     believe the counterclaim is proper, that we

21     have a right to file it in response to their

22     new complaint and that in any event, it's

23     beside the point at the moment if they want to

24     file a motion to strike, they certainly can

25     but it has nothing to do with the depositions

1     going on. Mr. Schutz went through and

2     cited -- read from the first couple paragraphs

3     of our antitrust counterclaim. It has nothing

4     to do with the trademark claims. We make no

5     mention at all of -- the only trade -- the

6     only counterclaim that talks about their fraud

7     on the patent office in obtaining the 300, 850

8     scoring range --

9              THE COURT: The patent office

10    or trademark office?

11              MR. PACE: The patent and

12    trademark office, PTO. Sorry, Your Honor.

13              THE COURT: Okay.

14              MR. PACE: Is the claim that

15    they've not only seen for months but they've

16    also submitted an expert report on. So that

17    one they've known about forever.

18     The history, Your Honor, just so we're

19    clear, is several months ago, as Mr. Schutz

20    mentioned or may have -- or actually, as Your

21    Honor mentioned, the defendants, when it was

22    revealed in discovery that the -- that the

23    plaintiffs had obtained their registration for

24    the numeric scoring range, 300, 850, we

25    thought, based on a fraud on the PTO, we file

1    a motion for a leave to amend our complaint to

2    assert the trademark counterclaim.  That was

3    step one.  That's what came first.  This was

4    before any word of any new complaint by them.

5    That came first.  Then after that the

6    plaintiffs proposed to us that oh, by the way,

7    we're filing an amended complaint anyway.  And

8    in an e-mail that we got from the plaintiffs

9    on August 28, after our motion was filed and

10   they -- and this was in the context of their

11   draft new antitrust count, the first count

12   that the plaintiffs were talking about that

13   they sent us, and we were talking about what

14   do we do with our existing motion for leave,

15   they said we'd like to know whether your

16   clients will consent to this amendment, their

17   amendment to their complaint or whether a

18   motion will be necessary.  An amendment to

19   their complaint would eliminate the need for

20   your clients to go forward with their motion

21   to amend the pleadings given that you could

22   too so as a matter of right in response to

23   Fair Isaac's pleading.  Please let me know the

24   position of your clients.

25           So then what happened next was -- and

1    while all of this is going on, as Your Honor

2    knows, the discovery of the Equifax settlement

3    which only happened over the summer,

4    continued.  And as Your Honor also knows,

5    that's not even resolved yet.  You know we

6    still have a privilege log.  And that's the

7    next item for Your Honor coming on some of the

8    documents relating to the Equifax settlement.

9    We think, they may not agree, but we think

10   it's a obviously a key issue that changes the

11   case.  And so that discovery is going on while

12   all this is happening up until this week and

13   including this week, Your Honor.

14          And so while all this is going on, we

15   then, as a result of the plaintiff's proposal,

16   we enter into a stipulation.  And Your Honor

17   signs an order that speaks generally about the

18   deadline for amended complaints and answers

19   and it provides a deadline for within three

20   business days of -- this is Your Honor's order

21   on November 6.  Within three business days of

22   the order, the plaintiffs are to file their

23   third amended complaint.

24          Then, number two, the defendants must

25   answer or otherwise plead in response to the

1    plaintiffs third amended complaint within 20

2    days of service of the complaint.  There were

3    no restrictions on what we could say in

4    response to their complaint.  Perhaps

5    following the e-mail we got from the

6    plaintiffs on August 28 it was an answer and

7    counterclaims made as a right.

8         And then number three, the plaintiffs

9    must file any answer or other pleading in

10   response to the defendants' responsive

11   pleading within 20 days.  In other words, it

12   was obviously specifically contemplated that

13   they might be responding to whatever

14   counterclaims we filed.

15        Now, we added -- it's true.  I assume

16   they didn't know about our antitrust

17   counterclaim until we filed it.  This is a new

18   issue, Your Honor.  This is the -- the Equifax

19   settlement is something that just happened a

20   couple months ago and as to which we've gotten

21   some discovery but we're still seeking

22   discovery.  And the primary basis for our

23   antitrust counterclaim is the Equifax

24   settlement.  I have a copy -- I think Your

25   Honor got a courtesy copy yesterday of ours

1 for Experian but we can go through it.  I

2 mean, the primary basis for that counterclaim,

3 there's lots of other facts in there but a

4 primary basis is the Equifax settlement.  And

5 so that's the reason why it was filed

6 yesterday.  Yesterday being our next

7 opportunity to file an answer and any

8 counterclaims.

9  But I guess I just return to the point

10 of what does the antitrust counterclaim have

11 to do with the depositions that were going on

12 today and tomorrow and what happens next.  Are

13 the plaintiffs simply able to, because of the

14 existence of a counterclaim, that if they want

15 to move to strike they may?  Do they have the

16 ability to just unilaterally halt all

17 proceedings in the lawsuit and say okay, we're

18 just going to do nothing until we resolve this

19 issue about your counterclaim?

20  We think obviously -- we respectfully

21 suggest that they don't have the ability to do

22 that.  We were on a schedule.  Your Honor set

23 a schedule that had a very tight expert

24 deposition schedule over the next few weeks.

25 We worked very hard to schedule 11 depositions

1       over the course of three weeks.  We all made

2       travel plans.  We all booked experts, court

3       reporters, et cetera, and on the day before

4       the very first deposition, the whole thing

5       gets called off.  And that's why we wanted to

6       bring it to Your Honor's attention today.

7            I don't know if Mr. Gardner or

8       Mr. Milne has anything to add --

9                      THE COURT:  Let me ask.  You

10      understand there's a deposition tomorrow

11      somewhere?  Is that right?  On Saturday?

12                      MR. PACE:  Correct.  In

13      Minneapolis.

14                      THE COURT:  All right.  And

15      that's of an expert or what?

16                      MR. PACE:  An expert

17      designated by the plaintiffs, Younger, Michael

18      Younger.

19                      THE COURT:  All right.  And

20      then what's happening next week?

21                      MR. PACE:  Next week there are

22      several depositions.  There's a deposition of

23      Roger Knoll, the plaintiff's economist, the

24      Meyer deposition, plaintiff's damages expert.

25      Phil Johnson, one of the defendants' trademark

1    experts and survey experts and Kevin Murphy,

2    the defendants' economist.  Did I miss one

3    next week?

4                    THE COURT:  And are you saying

5    that none of these depositions, either theirs

6    or yours, would be affected by this

7    counterclaim, your antitrust counterclaim?

8                    MR. MILNE:  Your Honor, if I

9    might.  This is Robert Milne for Experian.  To

10   answer your question, I mean, all of these

11   expert depositions relate to the long pending

12   claims asserted by Fair Isaac.  They -- that

13   is the subject matter of these depositions.

14   There are expert reports that have gone in,

15   rebuttal reports have gone in and they all

16   pertain to those existing claims.

17        And I wanted, if I might also to just

18   comment on one other thing that Mr. Schutz was

19   describing.  He made it sound as though this

20   new antitrust counterclaim was a brand new

21   thing that if we started this case from all

22   over, they'd get two years of discovery in,

23   that we'd have to kind of start all over here

24   because of this.

25                    Now, as Mr. Pace mentioned, the

1      gravamen of that antitrust claim is what we

2      think is the anticompetitive agreement that

3      Fair Isaac entered into with Equifax.  The

4      background to it, the relevant market, all of

5      that sort of material is material which is --

6      it has been developed in the discovery process

7      that has occurred in the existing matter.  So,

8      you know, we are not embarking on some

9      completely new tangent, but there is a new

10     development and recent development, that is

11     this agreement, that we think brings --

12     crosses the line and warrants this claim.

13                THE COURT:  All right.  Here

14     is what I'm going to do on this issue.  I

15     am -- we need to tee up this issue about the

16     propriety of the counterclaim, whether it's

17     teed up as a motion to strike it or a motion

18     to amend to add it.  Obviously, defendants

19     think they had no obligation to bring a

20     motion.  I suspect plaintiffs will disagree or

21     may disagree about that.  In any event, you've

22     indicated, Mr. Schutz, that you're going to

23     bring a motion to strike.

24        That said, this case is going to

25     proceed as it is currently postured, meaning

1    that until a decision is made on that

2    counterclaim, I'm not going to hold up any

3    discovery on this case, expert discovery or

4    otherwise.  If that counterclaim remains in

5    the case, then I will cross that bridge at

6    that time as to what impact that has on the

7    case and whether parties should be able to

8    seek costs or reimbursement on one side or the

9    other for having been put through the exercise

10   if the counterclaim is in or if it's not in.

11        But to be honest, given the lateness of

12   bringing that counterclaim, however it came to

13   pass, has the potential of having an enormous

14   impact on this case and certainly one that

15   needs to be fleshed out by the parties, but I

16   don't want to stop this case right now from

17   proceeding as it is currently postured,

18   meaning the day before that antitrust

19   counterclaim was made.

20        So I want those depositions to go

21   forward tomorrow and the ones that are

22   scheduled next week.  I also want to get this

23   issue teed up on an expedited basis if it's

24   going to be framed as a motion to strike the

25   counterclaim or if defendants do decide

1     that -- whatever they want, however they want

2     to posture it, but I want to tee up this issue

3     as to whether that claim is going to be in or

4     out of the case on an expedited basis.  So

5     that means getting briefs and responses to me

6     on a very quick turnaround.  We just can't let

7     that one languish while you all are continuing

8     to do this expert discovery which is

9     unfortunate because this always happens right

10    at the holiday time.

11         So I guess I'm going to say to

12    plaintiffs who have said they're going to be

13    bringing a motion to strike how soon can you

14    get that motion teed up to me and then we're

15    going to need a quick response by defendants?

16    Can you get it teed up by Wednesday?

17                    MR. SCHUTZ:  I'm sorry, Your

18    Honor?

19                    THE COURT:  By this coming

20    Wednesday which would be -- well,

21    Steve stepped out.  There you are.

22                    MR. SCHUTZ:  Your Honor, one

23    of the problems that we have is we have depos

24    and prep and we have a lot of key people that

25    are --

1        THE COURT:  I understand.

2        MR. SCHUTZ:  I mean, if we

3    could have until Friday to get

4    (unintelligible) that's a week from today.

5        THE COURT:  Which would mean

6    the 12th.

7        MR. SCHUTZ:  Yeah.  We've got

8    people in the throws of appearing for these

9    depositions.

10        THE COURT:  All right.  And if

11    I were to do that and defendants respond by

12    the 19th, that will give you a week.  If you

13    decide to bring your own motion for whatever

14    motion you might want to bring that has to do

15    with this issue, it will be due on the 12th as

16    well.  Otherwise, your response to their

17    motion to strike would be on the 19th.  And

18    then we will -- I'll have to check my calendar

19    and we'll get a date out tomorrow as to when

20    the hearing will be but it will be that next

21    week somewhere between Monday through

22    Wednesday.  So one of those days.  And if you

23    want to appear by phone, that's fine.  If you

24    want to come in, that's fine as well but we

25    need to address that issue.

1          But in the meantime, we're not going to

2     stop these depositions from going forward.

3     And I will have to deal with what relief is

4     appropriate after I decide the motion to

5     strike.

6               MR. SCHUTZ:  One concern from

7     the trenches, Judge, as we go into these

8     depositions, I mean, one of the concerns we've

9     got, notwithstanding, you know, the comments

10    by Mr. Milne, we were sandbagged with this.

11    We think that the defendants are going to try

12    to use these expert depositions to support

13    this counterclaim in which case we think

14    that's where they're going.  We may be back to

15    the court in the middle of these depositions

16    seeking a protective order for them going

17    outside the allowed claims at this point and

18    trying to actually use the expert depositions

19    as a subterfuge to gain further support for

20    their counterclaim.  That's our big concern

21    here, Judge.

22               THE COURT:  I guess we're

23    going to have to cross that bridge.  You know,

24    you're always free to call me during a

25    deposition.  You're always free to make a

1    record of what your objection is.  I would

2    expect that the depositions at this point are

3    going to be confined to the amended complaint

4    as agreed to by the parties which was to add

5    your price fixing claim and the trademark

6    counterclaim.  That's going to be the four

7    corners of what's going to be explored.

8    Obviously the expert reports that go with all

9    those claims and defenses.  Clearly it

10   wouldn't surprise me if some of what they do

11   may, at the same time, in light of what

12   Mr. Milne said, also support a new suit or

13   a -- their antitrust counterclaim.  It may

14   serve a dual purpose.  As long as it serves a

15   dual purpose -- as long as it serves the

16   purpose of the amended complaint and the

17   amended counterclaim with the trademark

18   that -- you're going to be within your rights

19   to explore those areas.  If it looks like it's

20   going well outside it, I expect the parties

21   will raise that issue.

22                  MR. MILNE:  And, Your Honor,

23   may I raise one question, just point of

24   clarification because I could imagine that

25   might come up next week?

1          THE COURT:  Very quickly,

2     Mr. Milne.  I have to leave here in 17 minutes

3     and so --

4          MR. MILNE:  This will be very,

5     very short.

6          THE COURT:  And we have to

7     address the privilege log issue.

8          MR. MILNE:  We certainly

9     expect, as part of the expert depositions next

10    week, that the subject of the Equifax

11    agreement will come up because we think it

12    goes directly to issues in the existing case

13    concerning the long-term viability of Fair

14    Isaac in the marketplace and which goes

15    directly to the claims that Fair Isaac has

16    made against the defendants.  And so we

17    certainly do intend to get into issues around

18    the Equifax -- the experts' analysis of that

19    agreement and I wouldn't -- pursuant to what

20    you just said, you know, I think it clearly

21    goes to the issues in the case and just wanted

22    to put that out as a point of clarification.

23         THE COURT:  Well, I'm not

24    going to give you an advisory opinion on

25    whether that's covered or not.  I certainly

1  know that the Equifax agreement with

2  plaintiffs is an issue in this case.  How it

3  fits with the claim before this antitrust

4  counterclaim was served last night I can't

5  opine on that at this point but your point is

6  taken and I think we're just going to have to

7  see how these depositions go.  Your experts

8  have issued reports and presumably that's what

9  you're going to be questioning them about.

10  But I don't want to -- I can't give guidance

11  at this point on it other than to say I'm

12  going to be looking at the deposition to be

13  taken as the way this case looked before that

14  antitrust counterclaim was served.

15          MR. SCHUTZ:  And that's the

16  way we would expect it to be taken, Judge.

17  But based on Mr. Milne's statement, they're

18  going right to the antitrust counterclaim they

19  filed against Fair Isaac.

20          MR. MILNE:  That is -- Your

21  Honor, that is certainly not the intent and we

22  will be focusing on the issues in the case.

23          THE COURT:  All right.  Okay.

24  Well, we need -- as I said, we're not going to

25  stop the discovery and we need to get the

1    issue teed up quickly.  So I will -- actually

2    not tomorrow.  Tomorrow is Saturday.  On

3    Monday we'll send out a date for the hearing

4    time and date for the hearing.  It will be

5    that Monday through Wednesday before

6    Christmas.

7         All right.  Let's address, then, the

8    issue of the privilege log.  You all were

9    going to confer about how to read what the

10   obligations of the parties were.  Did you come

11   to any resolution on this?

12                  MR. PACE:  We did, Your Honor.

13                  THE COURT:  All right.

14                  MR. PACE:  And just very

15   quickly.  The one issue is with -- the one

16   final issue on the counterclaim is I guess we

17   still have a question about what happens with

18   the deposition that got canceled today.

19                  THE COURT:  It's going to have

20   to get rescheduled.

21                  MR. PACE:  Okay.

22                  THE COURT:  Obviously it's --

23                  MR. SCHUTZ:  We'll work with

24   them, Judge.

25                  THE COURT:  You're going to

1      have to work with them to get this

2      rescheduled, and if there were -- if there are

3      issues with that or there are costs that were

4      incurred as a result of that cancellation that

5      you feel defendants shouldn't have to bear,

6      you can take it up with me but understand now

7      I have a better understanding of that it took

8      two to tango as usual that created the issue

9      here before me.  But in any event, it needs to

10     be scheduled.

11                    MR. SCHUTZ:  Yes.

12                    MR. PACE:  Okay.  With respect

13     to the privilege logs, we did reach an

14     agreement, Your Honor.  We both went back to

15     our clients and looked at the documents that

16     would be affected and agreed, and Mr. Tietjen

17     certainly should correct me if I get any of

18     this wrong, that we -- the parties would

19     continue to act as they have been acting in

20     interpreting the Court's -- the provision in

21     the scheduling order with respect to a

22     privilege log cutoff.  In other words, with

23     the exception of two categories I'm about to

24     identify, the parties would continue to treat

25     the language in the Court's order that said

1          the parties shall not be required to log work

2          product materials or attorney-client

3          privileged communications relating to the

4          claims and defenses in this lawsuit.  After a

5          certain date, the parties would treat that

6          language as just a general cutoff for both

7          sides for privilege logs based on the

8          respective cutoff dates, June '06 for the

9          plaintiffs, October '06 for the defendants.

10              However, as a compromise, both sides

11         agreed to identify a category of issues that

12         the parties believed were kind of more current

13         issues that for -- that weren't litigation

14         type documents, weren't pleadings, client

15         updates, et cetera, but that were the types of

16         documents that were more substantive on

17         current issues for which a privilege log might

18         be helpful.

19              And we have a stipulation that we're

20         going to just review one last time and sign

21         and submit to Your Honor that identifies the

22         two sets of requests of the defendants.  It's

23         the tenth set of requests that plaintiffs will

24         identify -- will log documents responsive to

25         those and -- for the plaintiffs they've

1    identified and for the defendants we will log

2    documents responsive to the request 1 through

3    8 of their eighth set of requests to Experian

4    and Trans Union or to VantageScore.  That's

5    the sixth set of requests.

6         So we've come up with a compromise that

7    identifies more recent issues that we will

8    log.  Otherwise, we will continue to act as we

9    will.  The stipulation that we'll submit will

10   include the language in Your Honor's scheduled

11   order and the way that we think it could be

12   revised slightly to allow for this probability

13   and make it consistent with practice.

14              THE COURT:  All right.

15   Mr. Tietjen, does that accurately reflect your

16   agreement?

17              MR. TIETJEN:  Well, it was

18   nice of Mr. Pace to state it more

19   (unintelligible) than it actually was.  They

20   said you give us a log on that tenth set but

21   we're going to make you log everything and if

22   you want something in return, you can have it.

23   So we said okay, we'll give you a little

24   longer on the tenth set if it means so much to

25   you and we'll ask for a log, then, on all

1       communications regarding your shredding of

2       documents and that's --

3                    THE COURT:  Okay.  And so the

4       point is you reached an agreement.

5                    MR. TIETJEN:  That's right.

6                    THE COURT:  All right.  And I

7       assume that that stipulation will come to me

8       next week, then, for modification of the

9       scheduling order.

10                   MR. PACE:  Yes, Your Honor.

11                   THE COURT:  And so just so I'm

12      clear, then, what the parties are agreeing is

13      if a document was generated that's either work

14      product or attorney client after those cutoff

15      dates, you don't have to log it anymore unless

16      they fall into these two groups.  All right.

17      So it sounds like there's several places in

18      the scheduling order that it needs to be

19      cleaned up I would suggest as you look through

20      it.

21          All right.  Then unless the parties

22      have anything further, that concludes our

23      informal conference as well.  I don't see

24      anybody has anything further.  Anything

25      further on the phone?

1            UNKNOWN SPEAKER:   No.   But

2     just thank you, Your Honor, for facilitating

3     our ability to participate on the phone given

4     the fact that we didn't realize a lot of this

5     was going to come up today.

6            THE COURT:   Sure.   Not a

7     problem.   Thank you very much everyone.   Have

8     a good weekend and a good holiday.

9

10                    *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF MINNESOTA   )
                         ) ss.
2   COUNTY OF WASHINGTON)

3

4           BE IT KNOWN, that I transcribed the

5   electronic recording relative to the matter

6   contained herein;

7

8

9           That the proceedings were recorded

10  electronically and stenographically transcribed

11  into typewriting, that the transcript is a true

12  record of the proceedings, to the best of my

13  ability;

14

15

16          That I am not related to any of the

17  parties hereto nor interested in the outcome of

18  the action;

19

20

21          IN EVIDENCE HEREOF, WITNESS MY HAND.

22

23
                    s:/ Lisa M.Thorsgaard
24

25