UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION; and         CIVIL NO. 06-4112 (ADM/JSM)
myFICO CONSUMER SERVICES, INC.,

        Plaintiffs,

v.                                         <u>ORDER</u>

EXPERIAN INFORMATION SOLUTIONS, INC.;
TRANS UNION, LLC; and
VANTAGESCORE SOLUTIONS, LLC,

        Defendants.

JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came on before the undersigned upon plaintiffs' Amended Motion to Compel an In-Camera Review of Documents and for Appointment of Special Master [Docket No. 504]; defendants' Motion to Compel Plaintiffs to Produce Certain Documents Withheld on the Basis of Attorney-Client Privilege [Docket No. 499]; and on defendants' Motion to Compel Plaintiffs to Produce Documents that Plaintiffs are Withholding as Privileged Without Basis [Docket No. 506].  Charles Rule, Christopher Larus, Michael Collyard, Ronald Schutz, Randall Tietjen, and Joseph Bial appeared on behalf of plaintiffs; Robert Milne Bryan Gant, Mark Jacobson and Christopher Sullivan appeared on behalf of defendant Experian Information Solutions, Inc.; Dao Boyle and Christopher Morris appeared on behalf of TransUnion, LLC; and Justi Miller appeared on behalf of VantageScore Solutions, LLC.

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

**IT IS HEREBY ORDERED:**

1.     Plaintiffs' Amended Motion to Compel In Camera Review of Documents and for Appointment of Special Master [Docket No. 504] is **DENIED**.

2.     Defendants' Motion to Compel Plaintiffs to Produce Certain Documents Withheld on the Basis of Attorney-Client Privilege [Docket No. 499] is **DENIED**.

3.     Defendants' Motion to Compel Plaintiffs to Produce Documents that Plaintiffs are Withholding as Privileged Without Basis [Docket No. 506] is **GRANTED** in part and **DENIED** in part as forth in the Memorandum below.

4.     Consistent with the Memorandum, plaintiffs shall produce to defendants the documents governed by this Order on or before **April 10, 2009**.

Dated:        March 23, 2009

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


## MEMORANDUM

## I.     INTRODUCTION

This matter arises out of the creation of a new credit scoring system, VantageScore, by credit bureaus Equifax Information Services LLC, Experian Information Services, Inc., and Trans Union LLC (collectively referred to as "Bureaus"). This scoring system competes with Fair Isaac Corporation's and its wholly owned subsidiary myFICO Consumer Services, Inc.'s (collectively referred to as "Fair Isaac") credit scoring system (also referred to as "FICO" for the purpose of this Memorandum).

Fair Isaac initiated the present action on October 11, 2006.  Among its numerous claims against defendants, Fair Isaac alleged that defendants had engaged in anticompetitive activities in violation of federal law.  Fair Isaac has also suggested that

defendants' destruction of documents prior to the present suit amounts to spoliation. The present disputes before the Court center on certain documents that both sides have refused to produce to each other on the basis of attorney-client privilege or work product doctrine.

## II.   PLAINTIFFS' MOTION TO COMPEL BASED ON THE CRIME-FRAUD EXCEPTION

Plaintiffs have moved this Court for an order requiring defendants Experian Information Solutions Inc. ("Experian") and Trans Union, LLC ("Trans Union") to provide the Court for an in-camera review by the Court or a special master (a) all documents that are listed on the privilege logs of Experian and Trans Union that are dated between January 1, 2004 and March 14, 2006,[1] and that reflect communications relating to a joint credit score by Experian, Trans Union, or Equifax; (b) all documents that are listed on the privilege logs of Experian and Trans Union that are undated and that reflect communications relating to a joint credit score by Experian, Trans Union, or Equifax; and (c) all documents that are on the privilege log of their consultant Mercer Oliver Wyman ("Mercer").[2]  Plaintiffs have requested an in camera review of these privileged communications to determine whether the crime-fraud exception applies, so that any unprotected documents can be produced to them.  In particular, plaintiffs asserted that defendants were engaged in antitrust violations and spoliation of evidence and that the attorney communications at issue were in furtherance of that conduct.

---

[1]   At the hearing on this motion, Fair Isaac appeared to limit its request to an in camera review of documents generated between the second half of 2005 and the early part of 2006.  See Transcript of January 6, 2009 Hearing ("Tr.") 6.  The Court notes that the product launch of VantageScore ultimately occurred on March 14, 2006.

[2]   Mercer was not served with this motion, nor did it respond or appear at the hearing.  Therefore, any motion seeking relief against Mercer is denied on this basis.

A.    <u>**Factual Background**</u>

1.    **Collaboration by the Bureaus**

In the early part of 2004, the bureaus discussed the possibility of developing a joint industry score that would compete with Fair Isaac.  In particular, Trans Union and Experian executives had a meeting in late 2003 or early 2004 to discuss the development of a tri-bureau score.  <u>See</u> Declaration of Randall Tietjen [Docket No. 507] ("Tietjen Decl."), Ex. 4 (Hellinga Dep.) at p. 27.[3]  A March 2, 2004 internal email from Trans Union shows that officials had scheduled a meeting to "discuss feasibility and strategy around the development of an industry score by the three bureaus."  <u>Id.</u>, Ex. 14.  This internal meeting by Trans Union officials was to take place after the discussions with Experian about a tri-bureau score.  <u>Id.</u>, Ex. 4 (Hellinga Dep.) at pp. 107-08.  At Equifax, an internal appointment email between Equifax officials, with the subject matter of "Project Fog," set a meeting for March 3, 2004 "to lay out strategy for killing Beacon."[4]  <u>Id.</u>, Ex. 15.[5]  In addition, an internal email between Experian officials, dated March 22, 2004, reflects communications between it and Equifax regarding a tri-bureau score and that there was agreement that there was a "market demand for an alternative to the Fico score. . . ."  <u>Id.</u>, Ex. 17.  One of the issues that Don Robert, Experian's Chief Executive Officer, raised in the email was that there would need to be

---

[3]    Jeffery Hellinga was employed by Trans Union as its President of U.S. Information Services.

[4]    According to plaintiffs, "Beacon" is the term that Equifax uses for Fair Isaac's "Classic" Credit Score.  <u>See</u> Fair Isaac's Memorandum of Law in Support of its Motion to Compel In-Camera Review of Documents and If Appropriate, for Appointment of a Special Master to Conduct the Review ("Pls.' Mem.") at p. 5.

[5]    An Equifax official, Lisa Zarikian, testified that Project Fog was Equifax's attempt to determine how to market and promote its internally developed analytics; she could not recall if Project Fog involved developing a tri-bureau score.  <u>See</u> Tietjen Decl., Ex. 16 (Zarikian Dep.) at pp. 20, 23.

an agreement by the bureaus to discontinue existing bureau scores: "Planned obsolescence of existing bureau score is important to adoption of the new score/so we would need to agree on what gets obsoleted and by when?" Id. However, in response to plaintiffs' motion, Robert represented he never participated in Project Trident[6] and this idea was never communicated to any other bureau. See Declaration of Don Robert, ¶¶ 4-5; see also Declaration of Kerry Williams [Docket No. 548] ("K. Williams Decl."),[7] ¶ 11 (the President of Experian's Credit Information Services stating that he had never discussed with Robert the possibility of sunsetting or retiring Experian's in-house scores).

A November 22, 2004 internal memo by Trans Union set forth a plan that involved creating an entity owned by the credit bureaus with regards to the new industry score to be developed, in which each of the bureaus would pay a royalty to this entity and share operating expenses. See Tietjen Decl., Ex. 21. The memo also provided, "replace FICO everywhere they appear-B2B and Consumer; everyone would see the same score." Id. This memo was never shared with Experian or Equifax. See Declaration of Jeffery Hellinga [Docket No. 550] ("Hellinga Decl."), ¶ 4.

A January 2005 Scoring Strategy Alternatives Summary by Experian forecasted approximately $27 million in royalties to FICO and that for every 1% of the market captured from FICO in the scoring market, Experian would realize royalty savings of $270,000 annually. See Tietjen Decl., Ex. 23, EXP0307848. The summary also indicated that "Experian should move forward with engaging the other bureaus in high-

---

[6]    Prior to the formation and launch of VantageScore by the bureaus, they referred to the potential joint venture as "Project Trident."

[7]    Kerry Williams was employed by Experian as the Group President of Credit Services and Decision Analytics.

level discussions around a tri-bureau score strategy" as an alternative to FICO or in an area not dominated by FICO.  Id.  Presentation materials from Equifax dated January 25, 2005, regarding a tri-bureau risk model described the idea at issue as a "[g]eneric tri-bureau risk model to displace FICO models."  Id., Ex. 22 ("Tri-bureau Risk Model Decision Wheel"), EQX-FICO-01311161.  The reason given for Equifax's participation in such an endeavor was to (1) increase bottom-line revenue; (2) meet customer demand; and (3) improve market standing.  Id.  The issues listed in the Equifax materials pertaining to the tri-bureau risk model included anti-trust issues.  Id., EQX-FICO-01211166.  At the same time, in January 2005, Trans Union had contemplated discounting the new score by 50% to the price charged for FICO.  Id., Ex. 93, TU-FI-0006701 (Trans Union Industry Risk Model Business Plan Outline).

On February 16, 2005, the bureaus, including their legal counsel, met regarding the new credit risk scoring model and reached a consensus as to the nature and the scope of the project and the next steps to be taken with the "potential" joint venture named "Project Trident".  See Tietjen Decl., Ex. 24 (Project Trident Meeting Minutes), EXP0008171.  The meeting began with the distribution and review of written anti-trust guidelines.  Id.  The parties agreed to the guidelines and that they could be modified to the extent the project went forwarded.  Id.  The bureaus agreed that the way to initially proceed was to focus on a generic bureau risk score.  Id., EXP0008172.  The bureaus also discussed market barriers.  Id.

During this February 16, 2005 meeting, a document titled "Industry Risk Model Business Plan Outline, drafted by Trans Union, was distributed.  Id., Ex. 4 (Hellinga Dep.) at pp. 224-25.  The parties gave their opinions on the subjects set forth in this document.  Id., at pp. 224-25.  The comments of the bureaus were not reflected in the

meeting minutes.  Id. at p. 225; Ex. 24.   The strategy set forth in the Business Plan Outline was to establish a new independent business that would create, commercialize and maintain a predictive credit risk model.  Id., Ex. 25 (Project Trident Industry Risk Model Business Plan Outline).   The success factors listed in the Outline for the new credit risk model included building a model that outperformed any other available model, creating acceptance for the model and operating at a profit.  Id., TU-FI-0034725.   The performance standard of the model needed to be high in order to encourage customers to switch.  Id., TU-FI-0034726.  The Outline noted that while any single model created by a bureau could be more predictive than the new model jointly developed by the bureaus, the new model was to be more predictive than any other third-party model.  Id. In an earlier version of the outline, handwritten remarks were made by an unnamed person at Trans Union, including the following: "[a]gree to 'agree' to eliminate each CRA's own option."  Id., Ex. 63, TU-FI-0006720 (Industry Risk Model Business Plan Outline, December 6, 2004 handwritten comments).   Trans Union asserted that this comment referred to developing an exit plan whereby if one bureau left the group, they could not stop the others from continuing the project.  Id., Ex. 4 (Hellinga Dep.) at pp. 179-81; see also Hellinga Decl., ¶ 5.

As for market penetration, the goal set forth in the Outline was to capture 35% of the business-to-business scoring model transactions and 60% of the business-to-consumer scoring model transactions.  See Tietjen Decl., Ex. 25, TU-FI-0034726.  The competition would include the bureaus and FICO.  Id.  Sales and marketing were to be handled by the new company with ultimate distribution by the participating bureaus.  Id. With regards to pricing, the individual credit bureaus were to establish retail pricing, while the new company would handle wholesale pricing.  Id.  The risks listed in the

Outline for the endeavor included: the level of trust needed by the credit bureaus; acceleration of the decline in market price on generic risk models; FICO could react by increasing royalties or by introducing a rebate program; and agency regulators would not approve the use of the product. Id., TU-FI-0034728.

A slide from a portion of a presentation by Equifax dated June 29, 2005, again reiterated the proposal that wholesale pricing be dealt with by the new company, while the individual credit bureaus were to establish retail pricing. See Tietjen Decl., Ex. 69 ("Project Trident 'Common Score' Approach" Slide). The slide also stated that the new company was to govern testing, trial uses of the model and "loss leader pricing." Id. Further, the slide indicated that the bureaus' "competitive strategies will drive retail market pricing" and that a "[r]etail pricing 'floor' will be explored." Id. Dana Wiklund, former Equifax Senior Vice President of Predictive Services, testified that he did not recall any discussion of setting a retail floor and that the new company was never going to have any governance over pricing. Id., Ex. 70 (Wiklund Dep.) at pp. 61-63. Paul Springman, a Rule 30(b)(6) deponent for Equifax, reiterated the proposition that there was no agreement on "loss leader pricing" and that the bureaus priced VantageScore independently. See Declaration of Bryan Gant ("Gant Decl."), Ex. 8 (Springman Dep.) at pp. 64-65.[8]

On July 12, 2005, the bureaus held a Kick-off and Design Meeting, in which they discussed the objectives of the joint project and how to proceed with the design of the new credit scoring model. See Tietjen Decl., Ex. 49, MOW-FICO-00004483 (Mercer Meeting Notes for Project Trident "Kick-Off and Design Meeting"). Present at the

---

[8]     Paul Springman was employed by Equifax as its Chief Marketing Office, and served as Equifax's business leader for Project Trident.

meeting were representatives from all three bureaus, including Dana Wiklund from Equifax, Chet Wiermanski[9] from Trans Union and Stan Oliai[10] from Experian.[11]   During the meeting, Wiklund, from Equifax, indicated that the objective of the project was to build a model that meets or beats the models customers were presently using.   Id. Wiklund inquired as to what products were already available and whether the bureaus could exceed the quality provided by the existing products.   Id.   Wiklund believed that the bureaus could "each beat" what was available in the market, so the issue was the usability of the new model across the three bureaus.   Id.   Oliai, from Experian, noted that bureaus needed to recognize the huge market that existed for the scoring model, as well as the huge costs that it would take for a new model.   Id.

Following the kick-off meeting, Oliai sent an email to various officials at the bureaus and Mercer regarding taking a two-model approach, one for dealing with existing accounts and another for new accounts.   See Tietjen Decl., Ex. 55, TU-FI-1174863 (July 28, 2005 email from Stan Oliai).   Oliai made this suggestion based on his belief that a one-model approach would reduce the bureaus' ability to outperform the "incumbent."   Id.   Oliai believed that a one-model-"me too" offering would not likely prove sufficiently compelling to get their clients to switch and he was not concerned about the marketability of a two-model solution.   Id.   Oliai then stated: "Now that I have not adhered to the legal agreement and have discussed product marketability and

---

[9]     Chester ("Chet") Wiermanski was the Trans Union team leader for Project Trident and is presently the Group Vice President of Analytical Services for Trans Union.

[10]     Stan Oliai was the Vice President of Experian's Decision Analytics and Experian's project leader during Project Trident in 2005.   Oliai is presently the Senior Vice President and General Manager, Fraud Identity Solutions for Experian.

[11]     It is unclear which attorneys were present at this meeting although portions were redacted for privilege.

acceptance, I feel that our focus needs to be on developing (via this assessment process) a tool designed to be best in class." Id. Oliai testified during a Rule 30(b)(6) deposition for Experian that this comment was an attempt at humor regarding product design considerations and that at no time did he believe that he was not adhering to the meeting guidelines when he made this statement. See Gant Decl., Ex. 7 (Oliai Dep.) at pp. 407-09.

Later in 2005, Equifax identified other risks as VantageScore came to fruition, including that FICO could lower its prices, which would "disrupt" the messaging of VantageScore as an alternative and would reduce the value proposition for VantageScore. See Tietjen Decl., Ex. 75 (2005 Equifax Presentation Slide Labeled "VantageScore Scenarios"). As of August 22, 2005, Equifax believed that there was a "medium risk" that Fair Isaac would file an antitrust complaint seeking an injunction preventing market introduction of VantageScore and "low" risk that a bureau would undercut on pricing of VantageScore. See Supplemental Declaration of Randall Tietjen [Docket No. 561] ("Supp. Tietjen Decl."), Ex. 99, EQX-FICO-01003550-51 (August 22, 2005 from Wiklund attaching Project Trident Risk Assessment Matrix); see also Tietjen Decl., Ex. 86 (same). Suggested mitigation regarding undercutting was to gain an agreement early that "price loss leading" would not occur with regards to the final product. Id., EQX-FICO-01003551 (Project Trident Risk Assessment Matrix).

On October 18, 2005, a meeting regarding Project Trident was attended by representatives from all three bureaus, including Wiklund from Equifax, Wiermanski from Trans Union, and Oliai from Experian. Id., Ex. 71 (October 15, 2005 Project Trident—Product Development Discussion). In addition, Jason Engel, an attorney for Experian, was present and read the guidelines during the meeting and provided the

bureaus with legal advice concerning legal compliance as it related to business issues. Id.; see also Declaration of Jason Engel, ¶¶ 9-10.  As part of the October 18, 2005, meeting regarding Project Trident, a presentation was prepared by Matt Schwab of Experian that identified five major strategic goals that were to be discussed during the meeting: (1) the score range of the new product should be different than those currently used in the market place; (2) a "BIG" communication plan involving advertising, press releases and sales training; (3) the new score should be imbedded into internal products before going live with the product; (4) clients and markets should be identified and penetrated as much as possible before going live; and (5) a flexible start date.  See Tietjen Decl., Ex. 50, EXP0122116 (October 14, 2005 email Chain from Matt Schwab). Schwab noted that references to FICO in the PowerPoint presentation needed to be made generic.  Id., EXP0122115.   The minutes from the October 18, 2005 meeting show that the objectives of the meeting were to discuss product development for the Trident model and actions based on business preferences, and then have an attorney "review and suggest alternatives where the desired action is legally unsuitable."  Id., Ex. 71, EXP0106225.

On November 3, 2005, another Project Trident product development meeting took place attended by representatives from the bureaus including Wiermanski from Trans Union and Oliai from Experian.  See Tietjen Decl., Ex. 97, MOW-FICO-00069112 ("Trident Prod. Devel." November 3, 2005 Handwritten Meeting Notes).  There was no indication whether a representative from Equifax was present or whether any legal counsel was present.  The handwritten notes of Oliai from Experian stated that each of the bureaus had a "good feeling" for the following compelling messages: stability, pricing, competition and choice, transparency and dissatisfaction with current provider.

Id.  In response to plaintiffs' motion, Oliai represented that the term "pricing" referred to the benefits VantageScore could provide to lenders, as they would be better able to price their loan products if they purchased a more predictive score.  See Declaration of Stanley Oliai [Docket No. 544] ("Oliai Decl."), ¶ 19.

The typed minutes prepared by Piyush Tantia (from Mercer) regarding the November 3, 2005 meeting provided as follows:

- Key messages (ultimately to be decided by each CRA)
  — Stability
  — Transparency
  — Choice vs. competition
  — Dissatisfaction with current market providers

Id., Ex. 73, MOW-FICO-00000007.[12]  While the typed version lacked any mention that the bureaus had a "good feeling" for the message regarding "pricing", Tantia testified that he was never told not put in the word "pricing" in the meeting notes.  Id., Ex. 74 (Tantia Dep.) at p. 172.  He was not able to testify as to why the reference to "pricing" was omitted from his typed notes.  Id. at pp. 170-71.

Another meeting was held on November 16, 2005, which was attended by representatives from all three bureaus.  See Tietjen Decl., Ex. 97, MOW-FICO-00069101 ("TRIDENT—Final Mtg." November 16, 2005 Handwritten Notes).  In addition, outside counsel identified as "Mark" was present.  Id.  During the meeting it was stated that "Team 2" dealing with marketing, should continue to develop materials.  See Tietjen Decl., Ex. 97, MOW-FICO-00069104.

---

[12]    Mercer employee Tantia testified that he took handwritten notes of joint meetings, which were then used by him and other personnel at Mercer to develop a final version of the meeting notes.  See Tietjen Decl., Ex. 74 (Tantia Dep.) at pp. 167-171.  Tantia stated he did not transcribe the handwritten notes.  Id., at p. 172. Tantia also testified that the bureaus did review the typed-up notes.  Id. at p. 171.

As part of their collaboration, the bureaus created a Project Trident "Branding Sub-team" made up of various members of each of the bureaus.  See Tietjen Decl., Ex. 57, TU-FI-0597131 (Trident Branding Sub-team Notes dated December 21, 2005).  At a meeting on December 21, 2005, the Branding Team discussed the money available for the advertising budget, developing a brand name for the new scoring product (including logo), marketing themes for the product, the need for buying keywords for placement within search engines, the need of the three bureaus to pull together to work on the marketing plan, and the need to work on educational materials.  Id., TU-FI-0597132. The Branding Team also had a meeting on January 4, 2006 where the group discussed the advertising budget, how to talk with regulators and consumer advocate groups, and brand name development.  Id., Ex. 56, TU-FI-0425451-52 (January 4, 2006 Branding and Communications Meeting Minutes).

In terms of differentiating themselves from the other bureaus with regards to VantageScore, Experian noted at a 2006 Sales Summit that Experian should position itself as the "thought leader" of the group given is technical contribution to VantageScore, including Scorex PLUS and the leveraged STAGG IP process.  See Tietjen Decl. Ex. 52, EXP0020605 (Experian PowerPoint Presentation regarding a Sales Summit for VantageScore).  Experian also believed that it provided the highest quality data, that VantageScore was integrated with other core products and provided unmatched decision support.  See Gant Decl., Exs. 65, EXP0002114 (March 2006 Presentation to Citigroup--"Why Choose VantageScore at Experian").  Equifax's pitch for choosing VantageScore from Equifax included the quality of its data and its customer service.  See Gant Decl., Exs. 64, EQX-FICO-HC-00000456 ("Why Choose Equifax for VantageScore?").

The Bureaus also shared forecasts of generic unit sales by application, with a suggestion by Trans Union, after consulting with its legal department, that the bureaus should focus on estimating model unit sales by estimating product adoption and growth rates, as opposed to offering any type of revenue forecasts.  <u>See</u> Tietjen Decl., Ex. 58, EXP0118952 (December 6, 2006 email from Wiermanski to Wiklund, Hiq and Oliai).

Further internal discussions by the individual bureaus focused on the "value" of VantageScore, as opposed to mere discounting of the score relative to FICO.  <u>Id.</u>, Ex. 77, EXP0158278 (May 8, 2006 Experian Email from Oliai).   To this extent, Oliai communicated to an Experian official that they should not discount VantageScore over FICO; instead Experian should "promote the value of the new score and help them build a business case in which cost savings to the bureaus is not a factor."  <u>Id.</u>, EXP0158278. Oliai later testified that he meant that cost savings to Experian was not a factor, as opposed to not being factor for all of the bureaus.  <u>Id.</u>, Ex. 2 (Oliai Dep.) at pp. 806-07. In addition, according to Experian, prior to the launch of VantageScore, Experian did not know what the other bureaus were going to charge for VantageScore, it informed its sales force that pricing was going to be handled individually by each bureau, and that the market was going to dictate pricing.  <u>See</u> Gant Decl., Ex. 21, EXP0021725-26 (February 7, 2006 Experian Internal Status Meeting report); Ex. 22, EXP0482984 (Berardi March 14, 2006 email); Ex. 23, EXP0009110-11 (Experian March 13, 2006 Sales Training report); Ex. 24, EXP0497616 (Experian VantageScore Media Prep Guide).  Oliai testified that the general rule at Experian was that if a customer wanted to switch from FICO there would be no "price change" unless it was first authorized by a senior vice president.  <u>See</u> Tietjen Decl., Ex. 2 (Oliai Dep.) at pp. 783-84; Ex. 83, EXP0009130 (VantageScore Pricing Sheet).  At Experian, a Vice President of sales

could authorize a 50% discount, a Regional Sales Director was authorized to make a 40% adjustment to price and an Account Executive was authorized to make a 30% discount.  Id., Ex. 83, EXP0009130.

The Trans Union's 30(b)(6) deponent testified that "value pricing" meant that because VantageScore represented a better value than other scores, a higher price would be charged; but if it did not provide a greater value, then another score would be offered.  See Tietjen Decl., Ex. 85 (Callaci Dep.) at p. 138-141.  The Trans Union deponent also testified that the "retail pricing guidelines for VantageScore" was to add 5 cents to the FICO Classic price and that the pricing of VantageScore was not used to compete with other scores.  Id. at pp. 180-81.  With regards to this testimony, the Trans Union deponent stated in response to plaintiffs' motion that he was not referring at his deposition to all of the bureaus, but only that Trans Union did not compete on price with FICO.  See Declaration of Robert Callaci, ¶ 6.  The Trans Union deponent also noted that he could not recall any high volume lender, except for American Express, who received a discount from Trans Union on VantageScore in comparison to that offered for FICO.  See Gant Decl., Ex. 17 (Callaci Dep.) at pp. 174-75.

According to the bureaus' expert Kevin Murphy, Equifax's sales people could offer discounts of VantageScore to large customers with approval of senior managers, and Trans Union allowed discounts (to list prices not negotiated by contract) authorized by a team Vice President, who could discount the price of VantageScore down to zero.  See Gant Decl., Ex. 12, ¶ 233 (Corrected Expert Report of Kevin M. Murphy).[13]  Murphy

---

[13]     The Court notes that executives and experts from Fair Isaac, including its Chief Executive Officer, Mark Greene, stated that the bureaus were offering VantageScore at very low levels compared to FICO Classic, in some cases giving it to clients for free for indefinite periods of time.  See Gant Decl., Exs. 18, ¶ 109 (Report of Fair Isaac's Expert Paul K. Meyer); 19 (Greene Dep.) at pp. 5, 140; 20 (Kramers-Dove Dep.) at p. 761.

opined that based on a sample of contracts, final pricing by Equifax for VantageScore tended to be lower than pricing for FICO, Experian's pricing for VantageScore tended to be equal or greater than the pricing for FICO, and Trans Union's pricing showed no pattern.  Id., ¶ 237.  In Murphy's opinion, setting different real prices does not evidence a pricing agreement by the bureaus.  Id., ¶ 231.

### 2.    Contributions by the Bureaus to VantageScore Technology

In 2003, Experian released an algorithm called Scorex PLUS, capable of calculating a score based on any of the three bureaus' data.  See Tietjen Decl., Exs. 5, EXP0256196 (Experian's Proposed Bureau Score Strategy); 6 (Experian's Scorex PLUS Product Brochure); Ex. 7, MOW-FICO-00000070 (Experian Presentation at "Vision" Conference).  Experian considered its Scorex PLUS algorithm to be "one of the most important intellectual property assets owned by [it]."  Id., Ex. 34, ¶ 5 (Declaration of Chuck Robida [Docket No. 182]).  Experian contributed its Scorex PLUS product to Project Trident which became a significant basis for the scoring model that was to become VantageScore.  Id., Exs. 2 (Oliai Dep.) at p. 512; 33 (Defendant's response to Plaintiffs' Motion to Compel [Docket No. 194]) at p. 30.  Experian also provided the use of its scoring attribute product referred to as "STAAG", to be used in the development of VantageScore, as it related to conducting a segmentation analysis.  Id., Ex. 2 (Oliai Dep.) at pp. 512-13.

Equifax and Trans Union contributed to VantageScore specifications and advanced modeling segment attributes as well as what constituted best practices in terms of productiveness and ideas for industry definitions.  Id., Ex. 16 (Zarikian Dep.) at pp. 96-97.

### 3.    Promotion of VantageScore by the Bureaus

An internal Experian email from Steve Robles dated May 30, 2006, stated to the marketing department that Experian would be encouraging Scorex PLUS users to switch to VantageScore and that it would take some time to sunset the model along with another model marketed by Experian known as "NRM".   <u>See</u> Tietjen Decl., Ex. 67, EXP0122987.   Despite this communication, the Rule 30(b)(6) deponent for Experian testified that neither Scorex PLUS nor NRM had been discontinued as of April 2008. <u>See</u> Gant Decl., Ex. 7 (Oliai Dep.) at p. 479; <u>see</u> <u>also</u> K. Williams Decl., ¶¶ 8-10.  While VantageScore was considered the "premier" offering, Scorex PLUS was offered to an Experian client if VantageScore was not suitable to the client's needs.  <u>See</u> K. Williams Decl., ¶ 8; <u>see</u> <u>also</u> Gant Decl., Ex. 25, EXP0000409 (Scorex PLUS Position Paper). According to Experian, Scorex PLUS continues to be revalidated so as to ensure continued predictiveness for clients.  <u>See</u> K. Williams Decl., ¶ 8.  In addition, Experian's PLUS score, aimed at consumers, continues to be promoted and sold by Experian.  <u>See</u> Declaration of David Williams [Docket No. 547] ("D. Williams Decl."), ¶ 6.[14]

Trans Union re-released a new version of its proprietary generic risk scoring model, TransRisk on July 10, 2008; its redevelopment began in August of 2005.  <u>See</u> Hellinga Decl., ¶ 15.  Trans Union is actively selling and marketing TransRisk.  <u>Id.</u>

On the other hand, the head of VantageScore, Barrett Burns, stated in a September 26, 2006 article in the New York Sun that the VantageScore's results were so compelling that the bureaus would not longer be offering their own proprietary scores.  <u>See</u> Tietjen Decl., Ex. 66, VAN 0018506 (September 26, 2006 Article "FICO's Domination of Credit Scoring under Siege).  In his deposition, Burns testified that these

---

[14]    David William was employed by Experian as Vice President Strategic Projects.

were not his words and that the reporter had reached this conclusion on her own and attributed them to him.   Id., Ex. 65 (Burns Dep.) at pp. 268-73.   Additionally, Wiklund, from Equifax, opined in his deposition that given VantageScore, "[t]here really should be no reason for any one bureau to want to use an independent risk score."   See Supp. Tietjen Decl., Ex. 98 (Wiklund Dep.) at pp. 123-24.

### 4.   Representations to the Department of Justice and Guidelines

In 2006, the bureaus met with the Antitrust Division of the Department of Justice. See Tietjen Decl., Ex. 37 (Hellinga Dep.) at pp. 13-14.   At this presentation to the DOJ, the bureaus represented that VantageScore would be pro-competitive because it was the first model in the position to challenge FICO's dominance and it was a better product producing more predictive scores.   Id., Ex. 38 (Presentation to the Department of Justice), TU-FI-0005314.   According to the presentation, the VantageScore scoring model drew on the bureaus' "data and analytical expertise. . . ."   Id. TU-FI-0005300. The presentation also provided that the bureaus would price VantageScore independently, the bureaus would continue to compete on the robustness of credit data, and the bureaus would retain the right to sell their own generic score models in competition with VantageScore.   Id. TU-FI-0005315.   Further, the presentation listed the antitrust guidelines followed by the bureaus, which included that the communications among the bureaus were limited to the development of the model, licensing the model and general education of regulators, credit guarantors and consumers.   Id., TU-FI-0005316.   The presentation also stated that the following categories of communications between the bureaus were prohibited by the guidelines: communications regarding marketing, pricing, or distribution of credit scores; communications regarding current or future development of credit scoring algorithms; communications regarding dealings

with third party providers of scoring algorithms, including Fair Isaac; communications regarding a bureau's or their competitors' products and services, including pricing, terms of sales, and strategies; and communications pertaining to plans to deal or not deal with any particular or category of reseller, supplier or customer. Id. Other portions of the guidelines presented to the DOJ included requiring the presence of legal counsel from each bureau to review meeting agendas, reading the antitrust guidlines before every meeting and conforming the meeting to the guidelines, and on-going monitoring of VantageScore by legal counsel. Id., TU-FI-0005317. In addition, the presentation provided that there would be no competitive restraints among the bureaus by virtue of VantageScore, and there were to be no restrictions on the bureaus from making data available to developers, selling their own or other third party credit risk scores, or developing scoring models, and the bureaus were to compete in the sale of credit reports. Id., TU-FI-0005318.[15]

---

[15]     The Court notes that the February 7, 2005 meeting guidelines provided the following: all meetings should have an agenda vetted by an attorney; legal counsel should attend all meetings; legal counsel should formulate the only minutes of the meeting, with no note-taking by participants; there should be no discussions regarding policies taken or that should be collectively taken towards Fair Isaac, and no discussions that could be construed as limiting credit data to Fair Isaac or impeding its ability to compete in the scoring market; communications regarding pricing by the bureaus for any credit score were prohibited; discussions regarding any bureau's strategy for development, sales or marketing of any generic or other credit scores in the period prior to the establishment of the joint venture, including the discussions regarding pricing, bundling with other products, development of new products, particular customers targeted or strategic plans were prohibited; no discussions were to occur regarding non-public information relating to non-scoring products developed or sold by any bureau; and no discussions should occur pertaining to non-scoring products and relating to pricing, sales, marketing, development of new products, customers targeted, and contracts being negotiated. See Tietjen Decl., Ex. 39 (Guidelines for Meetings Among Experian, Equifax and Trans Union to Discuss Potential Joint Venture in Credit Scores). Subsequently, there were at least seven additional versions of meeting guidelines issued by the bureaus in conjunction with their collaboration. Id., Exs. 40-46. These guidelines varied in incorporating the February 7, 2005 meeting guideline requirements – in some instances they also included the following requirements: no

     **5.**     **Mercer's Involvement in Joint Venture and Facts Bearing on Claim of Spoilation**

On February 28, 2005, Kerry Williams of Experian called John Dryzyk at Mercer to determine if Mercer would be interested in working on the development of Project Trident. <u>See</u> Tietjen Decl., Ex. 27 (Williams Dep.) at pp. 211, 214-16. On March 31, 2005, Mercer provided a "Proposal to help the three major US Credit Bureaus develop a tri-bureau scorecard." <u>Id.</u>, Ex. 48. The proposal included a background on the goals of the bureaus and what Mercer perceived to be its role in Project Trident. <u>Id.</u> The proposal also contained recommended edits by each of the bureaus. <u>Id.</u> These edits included recommendations by the bureaus to delete references to FICO, including any mention of it as the industry standard, and deletion of any suggestions regarding speaking with key customers. <u>Id.</u>, EXP0157235-37, 0157241-0157242, 0157245-0157249.

According to Williams, Mercer's role was to play referee among the three credit bureaus during the project and provide oversight to the extent the bureaus were deadlocked on how to proceed. <u>See</u> Tietjen Decl., Ex. 27 (Williams Dep.) at pp. 211-12. Mercer was also retained because of their expertise in building models. <u>Id.</u> at p. 211.

---

discussion on conditions or selling the new product including volume requirement or restriction on resale or sublicensing; the bureaus were to contract with the joint venture but were also required to not exclusively deal with the joint venture and could not require the customer to use their scoring system; the bureaus were allowed to independently develop or market their own scoring solutions or those of others, including Fair Isaac's scoring solutions; no discussion of any bureaus' future products was to occur; any plans submitted by the bureaus were to be vetted by counsel beforehand; no discussion of the bureaus' customers, resellers, product markets, geographic markets or distribution channels was to take place; discussion of plans of the bureaus not to deal with any category of customer, reseller, supplier or competitor was prohibited; how to educate regulators, credit grantors or consumers on the new scoring model was allowed, but discussion about possible marketing, pricing or distribution of models was prohibited. Id.

Mercer understood its role to be one of oversight and facilitation between the credit bureaus and did not include helping the bureaus to avoid antitrust violations, creating the new model or dealing with marketing.  See Tietjen Decl., Ex. 29 (Carroll Dep.) at pp. 78, 118, 200-01;[16] Ex. 48, EXP0157248 (Mercer's Proposal to help the three major US Credit Bureaus develop a tri-bureau scorecard).   Equifax noted that Mercer was doing a "nice job" coordinating the bureaus and stepping back to allow the experts from the bureaus to run much of the design sessions.  Id., Ex. 47 (July 14, 2005 email from Wiklund at Equifax to Springman at Equifax).  Mercer described the bureaus' project as "only trying to replace the traditional FICO score."  Id., Ex. 32 (March 18, 2005 email from Michael Poulos at Mercer).  Mercer recognized the need to stay away from the antitrust implications raised by the project, especially in the area of talking about marketing with the bureaus, and asked for indemnification from any significant lawsuits arising from the tri-bureau score.  Id., Ex. 29 (Carroll Dep.) at pp. 75-76, 198-200; 242-43.

Given the high concern with data security, it was Mercer's understanding that it would maintain the official records of all final versions of documents from the project, but that all working documents, drafts and superfluous documents would be shredded. Tietjen Decl., Ex. 29 (Carroll Dep.) at pp. 55-57; see also Gant Decl., Ex. 6 (Tantia Dep.) at p. 120-21.  This included the shredding of documents generated by Mercer. See Tietjen Decl., Ex. 29 (Carroll Dep.) at pp. 69-70, 252.  Mercer shredded documents throughout the life of the project.  Id. at p. 60.  Indeed, Mercer's own recommendations for security of data and hardware included to "[s]hred all papers documents if possible. Consider storing all remaining paper documents at Iron Mountain.  Any paper document

---

[16]      Peter Carroll is Mercer's Director.

retained onsite must be locked up." Id., Ex. 60, MOW-FICO-00000405 (November 16, 2005 Mercer Business Leader Update).   In addition, Mercer's recommendations included how to preserve and protect electronic data, as Mercer was tasked with "making sure that key files, documents, data, etcetera, would properly be archived." Id.; see also Gant Decl., Ex. 6 (Tantia Dep.) at p. 122.   Mercer's recommendations regarding document retention came from Teresa Wong at Experian. See Supp. Tietjen Decl., Exs. 101 (Tantia Dep.) at pp. 117-18; 102, MOW-FICO-00002921 (Mercer Document-General and Mercer specific security recommendations from Theresa Wong).   The security measures were based on the International Organization for Standardization. See Declaration of Teresa Wong [Docket No 549], ¶ 9.

These points regarding security of data were discussed with the bureaus and agreed upon by them. See Tietjen Decl., Ex. 101 (Tantia Dep.) at pp. 118-119.   The bureaus' representatives maintained that the discarded documents primarily consisted of output of technical processes related to model development, which for the most part could be reproduced electronically. See Oliai Decl., ¶ 24; Declaration of Charles Robida (for Experian) [Docket No. 541], ¶ 9; Declaration of Luz Torrez (for Experian) [Docket No. 546], ¶ 9; Declaration of Chester Wiermanski (for Trans Union) [Docket No. 552], ¶ 6.

At one point, Mercer took the documents shredded and made a snowman out of them; however, the deponent for Mercer stated that the documents depicted in the picture were "most certainly" working documents. See Tietjen Decl., Exs. 29 (Carroll Dep.) at pp. 55; 60 MOW-FICO-00000376 (November 16, 2005 Mercer Business Leader Update-showing picture of the Snowman made out of shredded documents).

B.    **Analysis**

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.  See Fed. R. Civ. P. 26(b)(1).  "The party asserting the attorney-client privilege or the work-product doctrine bears the burden to provide a factual basis for its assertions."  Triple Five of Minnesota, Inc. v. Simon, 212 F.R.D. 523, 528 (D. Minn. 2002) (citing Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985)); see also In re Grand Jury Proceedings, 791 F.2d 663, 666 (8th Cir. 1986).

As stated previously, plaintiffs have requested an in camera review by the Court or a special master of thousands of documents[17] listed on the privilege logs of Experian and Trans Union that reflect communications prior to March 14, 2006 relating to a joint credit score between Experian, Trans Union, or Equifax for the purpose of determining whether the crime-fraud exception applies to any of the withheld documents, and if so, to order production of those documents. In particular, plaintiffs asserted that defendants were engaged in antitrust violations and spoliation of evidence and that the attorney communications at issue were in furtherance of that conduct.

The crime-fraud exception to otherwise privileged attorney-client communications applies to "communications made for the purpose of getting advice for the commission of a fraud or crime." United States v. Zolin, 491 U.S. 554, 563 (1989) (quotation omitted).  In In re BankAmerica Corp. Sec. Litig., the Eighth Circuit explained the basis for the crime-fraud exception and set forth in detail the procedure outlined in Zolin for

---

[17]    By way of example, Fair Isaac has provided this Court with 372 pages of Trans Union's privilege logs for January of 2004 through March 2006 (including undated documents), which provide any where from 10 and 30 entries per page.  This amounts to thousands of entries for review just from Trans Union alone.  See Teitjen Decl., Ex. 20.

deciding motions to compel production of allegedly privileged documents under the

crime-fraud exception:

> The attorney-client privilege encourages full and frank communication between attorneys and their clients so that clients may obtain complete and accurate legal advice. But the privilege protecting attorney-client communications does not outweigh society's interest in full disclosure when legal advice is sought for the purpose of furthering the client's on-going or future wrongdoing. Thus, it is well established that the attorney-client privilege "does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (quotation omitted).
>
> In Zolin, the Supreme Court clarified the procedure that district courts should adopt in deciding motions to compel production of allegedly privileged documents under the crime-fraud exception. First, the Court resolved a conflict in the circuits by holding that the district court has discretion to conduct an in camera review of the allegedly privileged documents. Second, concerned that routine in camera review would encourage opponents of the privilege to engage in groundless fishing expeditions, the Court ruled that the discretion to review in camera may not be exercised unless the party urging disclosure has made a threshold showing "of a factual basis adequate to support a good faith belief by a reasonable person" that the crime-fraud exception applies. Zolin, 491 U.S. at 572, 109 S.Ct. 2619. Third, if the party seeking discovery has made that threshold showing, the discretionary decision whether to conduct in camera review should be made "in light of the facts and circumstances of the particular case," including the volume of materials in question, their relative importance to the case, and the likelihood that the crime-fraud exception will be found to apply. Id. at 572, 109 S.Ct. 2619.
>
> Prior to Zolin, it was settled in this circuit that a party seeking discovery of privileged communications based upon the crime-fraud exception must make a threshold showing "that the legal advice was obtained in furtherance of the fraudulent activity and was closely related to it." Pritchard-Keang Nam Corp. v. Jaworski, 751 F.2d 277, 283 (8th Cir.1984); see In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir.1986). A moving party does not satisfy this threshold burden merely by alleging that a fraud

occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud. See Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 566 (8th Cir.1997); United States v. Jacobs, 117 F.3d 82, 88 (2d Cir.1997). Because the attorney-client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown. See, e.g., In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir.1995). Both the attorney's intent, and the attorney's knowledge or ignorance of the client's intent, are irrelevant. See In re Grand Jury Proceedings, 87 F.3d 377, 381 (9th Cir.1996); cf. In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1041 (2d Cir.1984).

270 F.3d 639, 641-42 (8th Cir. 2001) (footnote omitted) (emphasis added);[18] see also Kilpatrick v. King, 499 F.3d 759, 766 (8th Cir. 2007).

Thus, Zolin created a two-part procedure to establish the applicability of the crime-fraud exception.  It required "the proponent of the exception to make a 'threshold showing' before a court may conduct an *in camera* review and an 'ultimate showing' that the exception applies."  Triple Five of Minnesota, 213 F.R.D. at 326 (citing Zolin, 491

---

[18]    In In re BankAmerica Corp. Sec. Litig., the district court had granted plaintiffs' motion to compel production of eleven documents for which defendants had asserted the attorney-client privilege based on the crime-fraud exception.  The district court reached this result without conducting an in camera review of the eleven documents. On a writ of mandamus, the Eighth Circuit vacated the district court's order and remanded the matter back to the district court with the following direction:

> [T]he district court is directed to determine, separately for each document, whether plaintiffs have made the threshold showing required in Zolin—"a factual basis adequate to support a good faith belief by a reasonable person" that the Bank was engaged in intentional fraud and communicated with counsel in furtherance of the fraud. 491 U.S. at 572, 109 S.Ct. 2619. Then, exercising the discretion described in Zolin, the court may review in camera any documents as to which the requisite threshold showing has been made to determine whether the crime-fraud exception applies.

270 F.3d at 644 (emphasis added).

U.S. at 564, 570).  The Supreme Court confirmed that the threshold showing required that "before a district court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability." Zolin, 491 U.S. at 574-75.  While a "lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege" (Id. at 572), at the same time, the Supreme Court cautioned that "[a] blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk."  Id. at 571.

Based on these principles, this Court rejects Fair Isaac's motion for what is essentially a request for a wholesale in camera inspection of potentially thousands of documents listed on the privilege logs of Experian and Trans Union that reflect communications prior to March 14, 2006 relating to a joint credit score between Experian, Trans Union, or Equifax.  First, Fair Isaac has failed to make any showing, much less the requisite threshold showing, for each document it is asking this Court perform an in camera review.  In fact, at the hearing on its motion, Fair Isaac admitted that it could not point to any particular document on the privilege logs at issue that Fair Isaac wanted reviewed; instead it requested the Court simply review all the privileged documents that relate to Project Trident from the second half of 2005 to the first part of 2006.  Tr. 6-8.  According to Fair Isaac, the rationale for this global request was necessitated in part on what Fair Isaac characterized as very general descriptions used by Experian or Trans Union to support their claims of privilege for each document, and Fair Isaac's belief that defendants had listed on their logs "a lot of documents that aren't

privileged" which defendants had yet to produce to Fair Isaac.  Tr. 6.  To address these deficiencies, Fair Isaac suggested that the Court or a special master could work with defendants "to get a better idea of, . . . which documents you want to focus on," or the Court could require defendants "to produce for in camera review and inspection those documents that based on the description [in their logs] refer to Project Trident, VantageScore," after they "clean up their log[s] and produce all the documents that they don't think" are privileged.  Tr. 6-7.

While this Court can certainly sympathize with Fair Isaac's frustration with the general descriptions used by defendants in their privilege logs to support the invocation of privilege or with defendants' failure to produce non-privileged documents, the appropriate course of action for addressing such conduct is a motion to compel more complete descriptions or a motion to compel documents that have been improperly withheld.  In any event, this alleged conduct by defendants does not support a carte blanche request for an in camera inspection of all documents generated within a particular time period, to determine the applicability of the crime-fraud exception as to any particular document.  Moreover, even if Fair Isaac had made the appropriate threshold showing for one document – i.e. had presented "a factual basis adequate to support a good faith belief by a reasonable person" that the bureaus were engaged in activities violative of antitrust laws or the spoliation of evidence, and had communicated with counsel in furtherance of these illegal activities, this showing certainly would not meet the threshold showing mandated for the in camera review for the scores of documents listed on defendants' privilege logs generated over a two-year to determine if the crime-fraud exception applies.  See In re BankAmerica Corp. Sec. Litig., 270 F.3d

at 644 (finding that the threshold showing must be made "separately for each document.")

In sum, Fair Isaac's failure to make the threshold showing required by <u>Zolin</u> for each document it is asking this Court to perform an <u>in camera</u> review, is fatal to its motion to compel.  As the Supreme Court observed in <u>Zolin</u>, "[t]here is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents."  491 U.S. at 571.  Unfortunately, Fair Isaac's request is tantamount to a fishing expedition of extraordinary scope and size.  On this basis alone, this Court denies Fair Isaac's motion for an <u>in camera</u> review.

Second, even if Fair Isaac had performed the required document-by-document analysis, and this Court agreed that Fair Isaac had made the requisite showing to establish that the bureaus had engaged in illegal activities during the time period that Fair Isaac was seeking the privileged documents, Fair Isaac did not present evidence (as opposed to argument) to support the second prong of the threshold showing – that Experian and Trans Union had communicated with counsel in furtherance of the alleged illegal activities.  Fair Isaac argued "that there is every reason to believe that documents the bureaus are withholding will likely show that the bureaus' communications with counsel furthered the bureaus' illicit agreements and spoliation.  <u>See</u> Pls.' Mem. at p. 38.  According to Fair Isaac, the support for this proposition is evident from the bureaus' antitrust guidelines which dictated regular involvement by attorneys and the extensive number of privileged documents that were generated during Project Trident.  <u>Id.</u> at pp. 38-39.  Reduced to its essence, Fair Isaac's argument is this: Because it has presented evidence of violations of antitrust laws and spoliation of evidence, and because the

bureaus' attorneys were intimately involved in the project throughout this period, then the attorneys must have been involved in communications in furtherance of illegal activity. However, mere allegations or suspicion are insufficient to invoke the crime-fraud exception. See In re Heritage Bond Litig., Case No. CV 20-1475-DT, 2004 WL 1970058 at *4 (C.D. Cal. July 23, 2004) (citing United States v. Chen, 99 F.3d 1495, 1502 (9th Cir.), cert. denied, 520 U.S. 1167 (1997)). Further, as the moving party, Fair Isaac cannot merely claim that illegal activities have occurred and that disclosure of any privileged communications surrounding the time period of these activities may help prove that the conduct is indeed illegal. "There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud." In re BankAmerica Corp. Sec. Litig., 270 F.3d at 642.

Fair Isaac's only proof of attorney involvement as it related to collusion by the bureaus to violate antitrust laws are the meeting minutes for the October 18, 2005 meeting in which representatives from all three bureaus were present, including Jason Engel, attorney for Experian. See Pls.' Mem. at p. 26 (citing Teitjen Decl., Ex. 71); , Declaration of Jason Engel, ¶¶ 9-10. These minutes stated that the objectives of the meeting were product development for the Trident model. Id., Ex. 71, EXP0106225. The objectives also stated: "[m]eeting participants should discuss actions based on business preferences; lawyers will then review and suggest alternatives where desired action is legally unsuitable." Id. Fair Isaac seized on this language to support its assertion that the bureaus were able to reach "illicit" agreements, which they were then able to hide or clean up through their attorneys. See Pls.' Mem. at pp. 26, 39. Fair Isaac characterized this objective as a "perverse procedure [that] allowed the project

participants to discuss whatever they deemed appropriate, with the attorney weighing in after-the-fact."[19] Id. at p. 26.

This Court disagrees with this assessment.  Documents that pertain to attorney advice regarding the legality of business ideas of their clients are not automatically subject to the crime-fraud exception.  To the contrary, one of the purposes of obtaining advice from counsel is to insure that one is not engaging in illegal actions.  "'The attorney-client privilege is strongest where a client seeks counsel's advice to determine the legality of conduct before taking action.'"  In re BankAmerica Corp. Sec. Litig., 270 F.3d at 643 (quoting United States v. Jacobs, 117 F.3d 82, 88 (2d Cir. 1997)).  Under Fair Isaac's logic, a party could only avoid imposition of the crime-fraud exception to its communications with counsel by seeking advice from a lawyer regarding the legal implications of matter that the client knew did not violate any civil or criminal laws.  Such a holding would eviscerate the entire rationale behind the attorney-client privilege, and is not one this Court will adopt.

Similarly, with regards to its claim of spoliation of evidence, Fair Isaac has not provided the Court with any evidence that the spoliation of evidence relating to Project

---

[19]      Defendants only point to the handwritten notes of Mercer officials, Tantia, as an example of this "clean up" procedure.  See Pls. Mem. at p. 26.  During a November 2005 Project Trident product development meeting, Tantia took handwritten notes, which stated that each of the bureaus had a "good feeling" for the following compelling messages: stability, pricing, competition and choice, transparency and dissatisfaction with current provider.  Id., Ex. 97, MOW-FICO-00069112.  These handwritten notes were then converted into a final typed version of the notes, which made no mention of "pricing".  Id., Ex. 73, MOW-FICO-00000007; Ex. 74 (Tantia Dep.) at pp. 167-171. Tantia testified that the bureaus reviewed the typed-up notes.  Id. at p. 171.  Tantia also testified that he was never told not put in the word "pricing" in the final typed version, however, he  was not able to testify as to why the reference  to pricing was omitted.  Id., Ex. 74 (Tantia Dep.) at pp. 172, 174.  There is no evidence that any attorneys were involved in excising any language from the handwritten notes.  Further, the handwritten notes were never withheld from Fair Isaac under the guise of the attorney-client privilege.

Trident was furthered by communications by their attorneys.   The only evidence Fair

Isaac submitted to the Court on this topic was a November 16, 2005 meeting, attended

by representatives from all three bureaus and an attorney named "Mark", where

shredding of documents was an item for discussion.   See Pls.' Mem. at p. 39; Teitjen

Decl., Ex. 60 (November 16, 2005 Mercer Business Leader Update).   The fact that an

attorney attended a meeting where shredding was discussed, particularly when litigation

was not commenced by Fair Isaac until nearly a year later, is not evidence that the

spoliation of evidence was furthered by communications by their attorneys.   Indeed, the

available evidence shows that it was Mercer's and Experian's recommendations for

security of data and hardware that included among many methods, shredding of paper

documents.   See Tietjen Decl., Ex. 60, MOW-FICO-00000405 (November 16, 2005

Mercer Business Leader Update); Gant Decl., Ex. 6 (Tantia Dep.) at p. 122; Supp.

Tietjen Decl., Exs. 100 (Tantia Dep.) at pp. 117-18; Ex. 102, MOW-FICO-00002921

(Mercer Document-General and Mercer Specific security recommendations from

Theresa Wong); Wong Decl.,  ¶ 9 (the security measures were based on the

International Organization for Standardization).

In short, there is no evidence that the bureaus' attorneys were involved in

effectuating some nefarious scheme to destroy documents during the period of January

1, 2004 through March 16, 2006, in anticipation of litigation, especially given the volume

of documents that were produced or logged on privilege logs for this time period.

For all these reasons, this Court denies Fair Isaac's motion for an in camera

inspection of documents listed on Experian's and Trans Union's privilege logs that

reflect attorney-client communications relating to a joint credit score during the period

January 1, 2004 and March 14, 2006, for the purpose of determining whether these

documents should be produced to Fair Isaac based on the crime-fraud exception.  Fair

Isaac has failed to make the threshold showing of a factual basis adequate to support a

good faith belief by a reasonable person that the crime-fraud exception applies to any of

the documents listed on the privilege logs by Experian and Trans Union, and that

Experian and Trans Union communicated with counsel in furtherance of the alleged

illegal activities.[20]

### III.   DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE CERTAIN DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE [DOCKET NO. 499]

Defendants have brought a motion seeking the production of certain documents

that Fair Isaac is withholding on the basis of the attorney-client privilege on the grounds

that they are they are not privileged or that the communications were made in

furtherance of Fair Isaac's fraudulent conduct before the United States Patent and

Trademark Office ("PTO"), thereby making them subject to the crime-fraud exception to

attorney-client privilege.   See Defendants' Motion To Compel Plaintiffs to Produce

Certain Documents Withheld on the Basis of Attorney-Client Privilege [Docket No. 499].

### A.   Factual Background

#### 1.   Documents Identified in Fair Isaac's Second Amended Privilege Log Entry as Priv. Doc # 7170 and 7171

On May 2, 2008, Fair Isaac "clawed back" several documents it had produced to

defendants on the grounds that they were protected from disclosure by the attorney-

---

[20]     Since the Court has already concluded that Fair Isaac failed to make a specific
showing as to the application of the crime-fraud exception and also failed to show
evidence of an attorney-client communication being made in the furtherance of any
crime or fraud, it is not necessary that it address whether there is reasonable evidence
of antitrust violations or spoliation of evidence.   See Pritchard-Keang Nam Corp. v.
Jaworski, 751 F.2d 277, 283 (8th Cir. 1984) (concluding that a report should not be
produced under the crime-fraud exception, because while the document might have

client privilege, but had been inadvertently produced.  <u>See</u> Declaration of Jack E. Pace III ("Pace Decl.") [Docket No. 502], Ex. 1.  These clawed back documents included documents later indentified in Fair Isaac's Second Amended Privilege Log Entry 7170 and 7171 (FIC090341-45 and FIC090348-53).   These documents related to communications between in-house counsel at Fair Isaac and its employees regarding defendant Trans Union's "Perfect 850 Score" contest.  <u>See</u> Memorandum in Support of Defendants' Motion to Compel Plaintiffs to Produce Certain Documents Withheld on the Basis of Attorney-Client Privilege [Docket No. 501] ("Defs.' Mem.") at pp. 3-4; Fair Isaac's Memorandum of Law in Opposition to Defendants' Motion to Compel Privileged Documents [Docket No. 534] ("Pls.' Opp. Mem.") at p. 23.  Log entries 7170 and 7171 provided that the author of these email chains was Careen Foster and the recipients were Andrew Jolls, David Munn, Carol Dietrichs, Cheryl St. John, Craig Watts, Keri Kramers-Dove, and Shawn Butler.  <u>See</u> Pace Decl., Ex. 2 (Excerpt from Plaintiffs' Second Amended Privilege Log). The description for these two sets of documents was that they were an "[e]-mail chain reflecting confidential communication between an attorney and employees for a client for the purposes of providing legal advice to the client regarding Trans Union's perfect score contest." <u>Id.</u>

On May 8, 2008, defendants stated that they would comply with Fair Isaac's request to destroy all copies of the documents, but noted that they did not believe that the documents were privileged.  <u>See</u> Pace Decl., Ex. 3 (May 8, 2008 Email from Gant to Collyard).

---

helped "prove that a fraud occurred does not mean that it was used in perpetrating the fraud.").

> **2.** **Documents Identified in Fair Isaac's Second Amended Privilege Log Entry as Priv. Doc # 1777 and 1778**

On May 15, 2008, Fair Isaac "clawed back" additional documents it had produced to defendants on the grounds that they were protected from disclosure by the attorney-client privilege, but had been inadvertently produced. See Pace Decl. Ex. 4. The documents bore the Bates numbers FIC 0963100 – FIC 0963106 and FIC 0963107 – FIC 0963115. Id. On June 19, 2008, some of these clawed back documents were reproduced in a redacted form, including documents later indentified in Fair Isaac's Third Supplemental Privilege Log Entry 1777 (FIC 0961648-653) and 1778 (FIC 0963107-115). Id., Ex. 6 (June 19, 2008 E-Mail from Towne to Defendants' Counsel). Defendants asserted that these documents related to the creation of the "FICO Score Range Seal" and "merchandizing efforts." See Defs.' Mem. at p. 4. Log entries 1777 and 1778 provided the documents were two email chains ranging in date from February 5, 2004 through February 19, 2004 and their description provided that they "reflected confidential communications between attorney and employees of client requesting and relaying legal advice from David Munn regarding trademark application." See Declaration of Michael A. Collyard ("Collyard Decl.") [Docket No. 535], Ex. 6 (Fair Isaac's Privilege Log for Purpose of Motion to Compel).

> **B.** **Analysis**

At the hearing, defendants' counsel clarified that defendants were challenging the invocation of the attorney-client privilege as it related to the redacted portions of documents identified in Fair Isaac's Third Supplemental Privilege Log Entry 1777 (FIC 0961648-653) and 1778 (FIC 0963107-115). Tr. 77-78; see also Defs.' Mem. at pp. 8-9. With regards to the documents identified in Fair Isaac's Second Amended Privilege Log Entry 7170 and 7171, defendants not only argued that the documents at issue were not

privileged communications, but even if they were attorney-client communications, the documents should be produced under the crime-fraud exception to the attorney-client privilege.  Tr. 77-78; see also Defs.' Mem. at pp. 7, 9-16.

Fair Isaac responded that the motion to compel should be denied because defendants had failed to engage in a proper meet-and-confer prior to bringing their motion to compel, and on the merits, that defendants' motion to compel should be denied on the basis that the withheld communications are privileged.  See Pls.' Opp. Mem. at pp. 2-4, 23-36.

### 1.    Meet-and-Confer

As part of their motion, defendants' counsel certified that they, in good faith, conferred with other affected parties but were unable to resolve this matter without court action.  See Docket No. 499.  According to Fair Isaac, the first time that defendants made any mention to Fair Isaac about bringing a motion to compel the production of privileged documents was in conjunction with Fair Isaac's meet-and-confer in relation to its motion to compel based on the crime-fraud exception.  See Collyard Decl., ¶ 2.  No specifics were provided by defendants during that the meet-and-confer regarding what they were seeking in their motion; instead they stated that they would let Fair Isaac know.  Id., ¶ 4.  On December 9, 2008, defendants sent an email to Fair Isaac's counsel that the claw-backed documents should be produced because they were not privileged or on the basis of the crime-fraud exception to the attorney-client privilege. Id., Ex. 1 (December 9, 2008 email from Gant to Collyard).  The letter identified the bates numbers of the documents listed in Fair Isaac's Privilege Log Entries 1777, 1778 7170 and 7171 and defendants' reasons for believing that the attorney-client privilege was inapplicable.  Id.  The email noted that defendants would move on these documents if

the issues were not resolved.  Id.  Fair Isaac's response letter, dated December 12, 2008, noted that it stood by its privilege claim on these documents and others.  See Pace Decl., Ex. 7.  Defendants did not set up any telephone conference to address the issues raised by the present motion to compel.  See Collyard Decl., ¶ 4.  Although the meet-and-confer process did not involve a substantive conversation about the documents at issue, as Fair Isaac had indicated that it was not going to deviate from its assertion that the attorney-client privilege applied to these documents, the Court finds that no further telephonic conference or in-person conversation would have led to a different outcome.  Thus, the Court rejects Fair Isaac's contention that defendants' motion to compel should be denied because there was not an adequate meet-and-confer.

### 2.    Privilege Log Entries 1777 and 1778.

Defendants argued that the redacted portions of Privilege Log Entries 1777 and 1778 do not contain or reflect legal advice or requests for legal advice.  See Defs.' Mem. at p. 8.  According to defendants, the redacted portions of these documents are by a non-lawyer Andy Jolls, the General Manager of myFICO.com, regarding patent protection for the FICO Scoring Range Seal.  Id.  Defendants maintain that Jolls' statement is not entitled to protection because it was not legal advice provided by a lawyer.  Id.  Rather, it constituted a non-lawyer's lay opinion about using a logo, and that merely copying in-house counsel, David Munn, did not serve to make the document a privileged communication.  Id.  In addition, defendants asserted that while Fair Isaac's in-house counsel, Munn, was copied on the email, Jolls' communication was not directed to Munn for the purpose of seeking legal advice, nor did it contain or refer to any legal advice.  Id. at pp. 8-9.

Fair Isaac countered that the redacted portions of Privilege Log Entries 1777 and 1778 reflected the request for and content of legal advice provided by Fair Isaac's counsel.  See Pls.' Opp Mem. at p. 23.  In support of this contention, Munn represented that in February 2004, he was involved in providing legal advice to Fair Isaac personnel, including Jolls, regarding the legal implications of seeking federal registration of Fair Isaac's marks.  See Declaration of David Munn, ("Munn Decl."), ¶ 6.  According to Munn, Privilege Log Entries 1777 and 1778 reflect communications from Jolls to other Fair Isaac personnel on which he was directly copied, and in which Jolls sought legal advice from him (as reflected by the redacted portions of FIC0961649 and FIC0963108), and relayed Munn's legal advice (as reflected by the redacted portions in FIC0961654 and FIC0963113).  Id., ¶ 7.

The Court denies defendants' motion to compel the documents reflected at Privilege Log Entries 1777 and 1778 for two reasons.  First, defendants have given the Court nothing but speculation to overcome the Munn's declaration. That failure alone requires the rejection of the request.  See Rabushka ex rel. U.S., 122 F.3d at 565 (citation omitted) (the Eighth Circuit concluded that speculative assertions that a document is not covered by the attorney-client privilege is not enough to overcome a privilege log and accompanying explanatory affidavit of counsel).

Second, having reviewed the documents, in conjunction with Munn's declaration, the Court finds that the redactions were proper.[21]

### 3.    Privilege Log Entries 7170 and 7171

With respect to the emails contained in privilege log entries 7170 and 7171 (dated February 15, 2005 through February 17, 2005), defendants argued that while

some of the emails may contain privileged communications, other emails discussed non-privileged communications such as how other credit scoring services used the 300-850 scoring range, a Trans Union Press release, or the non-legal impact of Trans Union's perfect score contest.  <u>See</u> Defs.' Mem. at p. 7.  In opposition, Fair Isaac asserted that the documents reflected in entries 7170 and 7171 constitute Fair Isaac's request to attorney Munn for legal advice relating to Trans Union's 2005 promotional campaign, Fair Isaac's investigation into that campaign at the direction of Munn, and Munn's subsequent legal advice.  <u>See</u> Pls.' Opp. Mem. at pp. 25-26.  To this end, Munn represented that in February 2005, he was contacted by Fair Isaac personnel regarding a promotional campaign by Trans Union, which rewarded consumers with a perfect credit score, and was asked to determine its potential impact on Fair Isaac's legal rights.  <u>See</u> Munn Decl., ¶ 3.  In response to this request for legal advice, Munn provided direction to Fair Isaac personnel regarding the additional information he required to be gathered to allow him to render the legal advice subsequently given.  <u>Id.</u>  Munn asserted that privilege log entries 7170 and 7171 consisted of the requests for legal advice from Fair Isaac relating to the Trans Union promotional campaign, his legal advice, and communications among Fair Isaac personnel regarding his legal advice.  <u>Id.</u>, ¶ 4.

Like Privilege Log Entries 1777 and 1778, defendants provided no evidence to overcome Fair Isaac's position that the emails contain attorney-client communications. Moreover, having reviewed <u>in camera</u> the submissions (FIC-In Camera review Nos. 229 and 233) pertaining to privilege log entries 7170 and 7171, this Court concludes that

---

[21]     The Court obtained copies of the documents at issue from Fair Isaac for an <u>in camera</u> inspection.

these email chains are protected by the attorney-client privilege.[22]  The documents all relate to the receiving and asking for legal advice from Dunn regarding Trans Union's 2005 promotional campaign.

Defendants also claimed that even if this Court concluded that the documents reflected in Privilege Log Entries 7170 and 7171 contained attorney-client communications, these documents should be produced per the crime-fraud exception. In this regard, defendants have alleged, as part of their counterclaims, that Fair Isaac made a series of misrepresentations to the Patent and Trademark Office ("PTO") during its prosecution of Reg,. No. 3,083,563 ("300-850 Application") that dealt with registering the term "300-850" as a trademark in connection with credit scoring.  <u>See</u> Experian's Answer to Third Amended Complaint and Counterclaim for Cancellation of Trademark Registration due to Fraud on the PTO ("Experian Counterclaim") [Docket No. 620] at p. 56, ¶¶ 31-32; Defendant VantageScore Solutions, LLC's Answer to Plaintiffs' Third Amended Complaint and Counterclaim for Cancellation of Registration for "300-850" Trademark ("VantageScore Counterclaim")  [Docket No. 621] at p. 49, ¶¶ 29-30; Defendant Trans Union LLC's Answer to Plaintiffs' Third Amended Complaint and Counterclaim for Cancellation of Registration for "300-850" ("Trans Union Counterclaim") [Docket No. 622] at pp. 43-44,  ¶¶ 31-32.  These alleged misrepresentations included a Declaration by Cheryl St. John, Fair Isaac's Vice President for Global Scoring and Consumer Solutions, to the PTO, dated February 28, 2005, that contained the representation that only the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores.  <u>See</u> Experian Counterclaim,

---

[22]     Fair Isaac asserted that although defendants have failed to make the "threshold showing" necessary to warrant an <u>in</u> <u>camera</u> review, it had "nothing to hide" and

pp. 57-58, ¶¶ 34-35; VantageScore Counterclaim, pp. 49-50, ¶¶ 34-35; Trans Union

Counterclaim, pp. 44-45, ¶¶ 34-35.

The facts and events leading up to the St. John Declaration are as follows: In the

February 2004 trademark application, Kevin Baxter, Vice President for Fair Isaac, and

Laura Guftason, attorney for Fair Isaac, as part of the application acknowledged in

relevant part that:

> [H]e/she believes applicant to be entitled to use such mark in
> commerce; to the best of his/her knowledge and belief no
> other person, firm, corporation, or association has the right
> to use the mark in commerce, either in the identical form
> thereof or in such near resemblance thereto as to be likely,
> when used on or in connection with the goods/services of
> such other person, to cause confusion, or to cause mistake
> or to deceive. . . .

See Collyard Decl., Ex. 11, FIC 0000073 (Fair Isaac Trademark/Service Application).

On August 28, 2004, the PTO issued an "Office Action" that refused the

registration of the "300-850" mark on the grounds that the mark merely described "a

feature of applicant's good/services."  Collyard Decl., Ex. 12, FIC 0000059-60 (August

28, 2004 PTO "Office Action").  St. John's February 28, 2005 Declaration was submitted

as part of Fair Isaac's response to the August 28, 2004 PTO Office Action.  Id., Ex. 13

(Fair Isaac's Response to Office Action, Ex. 1), FIC 0000038-40 (hereinafter "St. John

Decl.").  In her Declaration, St. John represented under oath that "[t]o the best of my

knowledge, only FICO score uses the 300-850 range as a unique identifier for credit

bureau risk scores."  St. John Decl., ¶ 12.  St. John also asserted that "[c]ompetitors in

the credit score market do not have a need to use the 300-850 range, and in fact have

published other ranges."  Id., ¶ 13.

---

voluntarily agreed to submit the documents at issue to the Court for in camera review.
See Defs.' Opp. Mem. at p. 28.

Defendants asserted that contrary to these representations, Fair Isaac knew that other entities, including Trans Union and Experian, were using identical or substantially similar numerical scoring ranges, thereby making these misstatements, including those by St. John, material to the PTO's decision to issue the registration for the "300-850" range.  <u>See</u> Defs.' Mem. at pp. 13-14; <u>see</u> <u>also</u> Pace Decl., Ex. 10, ¶¶ 55, 57-58, 62 (Expert Report of Robert M. Anderson).  With regards to the emails identified in entries 7170 and 7171, dealing with Trans Union's perfect score contest, defendants claim that any communications between clients and counsel or legal opinions made in furtherance of Fair Isaac's fraudulent conduct before the PTO should be disclosed pursuant to the crime-fraud exception.  <u>See</u> Defs.' Mem. at pp. 14, 16.

In response, Fair Isaac argued that the alleged misrepresentations made to the PTO were not material to the issues pending before it and therefore cannot constitute fraud.  <u>Id.</u> at p. 34.  In addition, Fair Isaac asserted because the existence of third party usage of the "300-850" mark occurred after the initial application to the PTO, it had no duty to disclosure the usage.  <u>Id.</u> at p. 35.  Further, it is Fair Isaac's position that even if it made knowing misrepresentations to the PTO in connection with St. John's Declaration, the communications in the 7170 and 7171 emails did not further such alleged misrepresentations, regardless of whether the emails contained evidence of fraud.  <u>Id.</u> at pp. 32-33.

As stated previously, the analysis pertaining to the crime-fraud exception requires (1) a "threshold showing" before a court may conduct an <u>in</u> <u>camera</u> review and (2) an "ultimate showing" that the exception applies.  <u>See</u> <u>Triple Five of Minnesota, Inc.</u>, 213 F.R.D. at 326.

In order to make the "ultimate showing" that the crime-fraud exception applies, the party seeking the use of the exception to obtain discovery must make a "'prima facie showing that the legal advice was obtained in furtherance of illegal or fraudulent activity.'"  Pritchard-Keang Nam Corp. v. Jaworski, 751 F.2d 277, 281 (8th Cir. 1984) (quoting In re Berkley & Co., 629 F.2d 548, 553 (8th Cir. 1980)); see also Triple Five of Minnesota, Inc., 213 F.R.D. at 326-27 (requiring that a "prima facie" showing that the client was engaged in criminal or fraudulent activity when he sought the advice of counsel and a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity).  "Because the attorney-client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown."   In re BankAmerica Corp. Securities Litigation, 270 F.3d at 642 (citation omitted). Accordingly, "[b]oth the attorney's intent, and the attorney's knowledge or ignorance of the client's intent, are irrelevant."  Id. (citations omitted).

When a party claims that the "declaration in another's application for registration was executed fraudulently in that there was another use of the same or confusingly similar mark at the time the declaration was signed, the party must allege particular facts which, if proven, would establish that: (1) there was in fact another use of the same or a confusingly similar mark at the time the oath was signed. . . ."  Ohio State University v. Ohio University, 51 U.S.P.Q.2d 1289, 1999 WL 517202 at *4 (T.T.A.B. 1996) (citing Intellimedia Sport Inc. v. Intellimedia Corp., 43 U.S.P.Q.2d 1203, 1206 (TTAB 1997)); see also J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 31:75 (4th Ed.).

The emails allegedly containing proof that Fair Isaac knew about other use of the "300-850" were dated February 15-17, 2005.   The initial trademark application with

accompanying declarations by Kevin Baxter, Vice President for Fair Isaac, and Laura Guftason dealing with any other use of the mark were made approximately a year earlier in February 2004.  In other words, defendants cannot argue that the applicants knew about Trans Union's alleged use of the mark in conjunction with its perfect score contest at the time of the February 2004 application, especially when the press release for the contest was December 16, 2004 and the emails at issue were generated in February 2005.   However, the representation in St. John's February 28, 2005 Declaration that "[t]o the best of my knowledge, only FICO score uses the 300-850 range as a unique identified for credit bureau risk scores" (St. John Decl., ¶ 12) was made after the February 15-17, 2005 emails at issue.  Considering that the trademark had not yet been issued to Fair Isaac by the PTO, and Fair Isaac was still in the application process at the time St. John made her declaration, this Court cannot withhold discovery by making a finding that Fair Isaac had no duty to tell the truth to the PTO.  See Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 48 1 U.S.P.Q.2d 1483 (Fed. Cir. 1986) ("Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application.") (emphasis added).  Indeed, "[a] single false statement of material fact, made with a deliberate attempt to mislead the Trademark Office, and which would have affected the Trademark Office's action on a registration, constitutes fraud."   Prince Lionheart, Inc v. Halo Innovations, Inc., Civil Action No. 06-cv-00324-WDM-PAC, 2007 WL 1346578 at *4 (D. Colo. May 07, 2007) (citing General Car and Truck Leasing Systems, Inc. v. General RentACar, Inc., 17 U.S.P.Q.2D (BNA) 1398, 1990 U.S. Dist. LEXIS 12749 (S.D. Fla. 1990)).

Nevertheless, this Court finds that the crime-fraud exception is not applicable to the 7170 and 7171 emails.  According to defendants, the emails included an email by a non-lawyer that indicated the belief that Fair Isaac had the opinion of counsel that that obtaining federal registration of the 300-850 mark would be difficult because Fair Isaac had allowed others to use the same mark.  Further, defendants asserted that a separate email by attorney Munn stated that Trans Union's use of 300-850 range would be relevant to St. John's Declaration to the PTO and included the representation that "we don't want Cheri to go to jail."  See Defs.' Mem. at p. 15.  According to defendants, these emails were made in furtherance of Fair Isaac's fraud on the PTO.  Id. at p. 16.  Munn stated in his Declaration that his reference in one of the emails regarding St. John's upcoming declaration was intended to be "tongue and cheek" and underscored Fair Isaac's desire to ensure that St. John's declaration was truthful.  See Munn Decl., ¶ 5.  The Court's in camera review of the 7170 and 7171 emails shows no evidence of any comment by either counsel or Fair Isaac officials that their knowledge of other uses of the mark should not be disclosed to the PTO.  If anything, the emails reveal a desire by Fair Isaac to be forthright to the PTO and do not provide any indication that St. John should or was going to make any misrepresentations to the PTO.  As such, this Court cannot conclude that the communications at issue were made in furtherance of fraud upon the PTO so as to require their production.  Stated otherwise, even if the emails contained relevant information regarding Fair Isaac's knowledge of other uses of the 300-850 range prior to St. John's declaration, this alone would not support the invocation of the crime-fraud exception, as evidence supporting a claim of fraud, with no showing that the communication at issue furthered the fraud, does not satisfy the necessary threshold for production.  See In re BankAmerica, 270 F.3d at 642 ("A

moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud.") (citations omitted); <u>Rabushka ex rel. U.S.</u>, 122 F.3d at 566 ("Rabushka merely offered his general theory that a fraud occurred and asserted that any communications made aided that fraud, a showing that does not satisfy the requirements of the crime-fraud exception."); <u>Pritchard-Keang Nam Corp.</u>, 751 F.2d at 283 (concluding that a report was not producible under the crime-fraud exception, because while it might have helped "prove that a fraud occurred does not mean that it was used in perpetrating the fraud."). Further, even if this Court was to construe Munn's statement regarding St. John going to jail as an attempt by him to suggest concealment of Fair Isaac's knowledge, which it does not, the Court would still not find the crime-fraud exception applicable, as Munn's intent as the attorney is irrelevant to the analysis.   <u>See</u> <u>In re BankAmerica Corp. Securities Litigation</u>, 270 F.3d at 642.

For all of these reasons, and based on this Court's <u>in</u> <u>camera</u> review emails at issue, this Court finds that the crime-fraud exception to the attorney-client privilege is inapplicable privilege log entries 7170 and 7171.   As such, defendants' Motion to Compel Plaintiffs to Produce Certain Documents Withheld on the Basis of Attorney-Client Privilege [Docket No. 499] is denied.

## IV. DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE DOCUMENTS THAT PLAINTIFFS ARE WITHHOLDING AS PRIVILEGED WITHOUT BASIS [DOCKET NO. 506]

Defendants have moved for the production of a number of  communications that Fair Isaac has asserted are protected from disclosure, on the grounds that the

communications deal with Fair Isaac's business strategy in response to the release of VantageScore. See Memorandum of Law in Support of defendants' Motion to Compel Plaintiffs to Produce Documents that Plaintiffs are Withholding as Privileged Without Basis ("Defs.' 2nd Mem.") at pp. 8-12.[23]   In the alternative, defendants have requested that the Court conduct an in camera inspection of the documents to determine which of the documents are not privileged and should be produced. Id. at p. 12. Fair Isaac provided the Court with the Declaration of Renne L. Jackson [Docket No. 536] ("Jackson Decl."), which sets forth the basis of the privilege of the documents at issue.

The attorney-client privilege is a "long established rule that confidential communications between an attorney and his client are absolutely privileged from disclosure against the will of the client." Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 601 (8th Cir. 1977). "Communications made by and to in-house lawyers in connection with representatives of the corporation seeking and obtaining legal advice may be protected by the attorney-client privilege just as much as communications with outside counsel." Boca Investerings Partnership v. United States, 31 F. Supp.2d 9, 11 (D.D.C. 1998) (citing Upjohn Co. v. United States, 449 U.S. 383, 389-97 (1981)) (citations omitted). However, the party asserting the attorney-client privilege cannot rest on conclusory arguments in their memorandum of law in support of their invocation of

---

[23]    At the hearing, defendants represented that a number of documents that were subject to their motion had been resolved. Tr. 84-98. Further, after the hearing, defendants sent a letter to the Court indicating that they were no longer seeking to compel the production of certain other documents. See January 12, 2009 letter From Jack E. Pace, III. Thus, this Order only addresses the documents that have not been resolved by the parties. In addition, defendants also argued for the first time at the hearing that inconsistencies in Fair Isaac's privilege log entitled them to the production of those documents, regardless of the assertion of any privilege. Tr. 93-94. Given this requested relief was asked for the first time at the hearing and not included in any of the motion's supporting materials, the issue is not being properly before the Court. This Court notes that it did perform an in camera inspection of the documents at issue.

the attorney-client privilege, but instead must rely on competent evidence, such as the explanatory affidavit from counsel setting forth facts under oath establishing the privileged nature of a communication.  See Triple Five of Minnesota, Inc., 212 F.R.D. at 528 (citing Rabushka ex rel., 122 F.3d at 565) (finding that burden of supporting a finding of privilege is met when the party asserting the privilege submits an explanatory affidavit from counsel setting forth facts under oath establishing that the communication met the requirements for a privileged communication); see also Cobell v. Norton, 213 F.R.D. 16, 23 (D.D.C. 2003) (quoting Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 302 (S.D.N.Y. 1991)) (internal citation omitted) ("The privilege must be shown 'by competent evidence and cannot be 'discharged by mere conclusory or ipse dixit assertions.'").   Further, the attorney-client privilege applies only to confidential communications made to facilitate legal services, and does not apply where a lawyer acts as a scrivener or business advisor.  See United States v. Horvath, 731 F.2d 557, 561 (8th Cir. 1984) (citations omitted); see also Simon v. G.D. Searle & Co., 816 F.2d 397, 403 (8th Cir. 1987) (finding that the attorney-client privilege does not protect client communications that relate only to business information); Boca Investerings Partnership, 31 F. Supp.2d at 11 ("By contrast, communications made by and to the same in-house lawyer with respect to business matters, management decisions or business advice are not protected by the privilege.") (citation omitted).  For the attorney-client privilege to apply, the legal advice must predominate over the business advice, and not be merely incidental.  See In re Universal Service Fund Telephone Billing Practices Litigation, 232 F.R.D. 669, 675 (D. Kan. 2005) ("Legal advice must predominate for the communication to be protected. The privilege does not apply where the legal advice is merely incidental to business advice."); see also North Pacifica, LLC

v. City of Pacifica, 274 F. Supp.2d 1118, 1127 (N.D. Cal. 2003) ("In general, legal advice is implicated 'if the nonlegal aspects of the consultation are integral to the legal assistance given and the legal assistance is the primary purpose of the consultation.'") (quoting 1 Paul R. Rice, Attorney-Client Privilege in the United States § 7:3, at 39 (2d ed. 1999)); Neuder v. Battelle Pacific Northwest Nat'l Lab., 194 F.R.D. 289, 292 (D.D.C. 2000) (citing Great Plains Mutual Ins. Co. v. Mutual Reinsurance Bureau, 150 F.R.D. 193, 197 (D. Kan. 1993)) (finding that where business and legal advice are inextricably intertwined, the legal advice must predominate over the business advice, and not be merely incidental, for the communications to be protected by the attorney-client privilege).  Given this authority, the Court proceeds to examine whether the documents at issue are protected from disclosure.[24]

### A. Communications Made to or from an Attorney: Second Amended Privilege Log 833 and 2464; First Supplemental Privilege Log 186; and Redacted Documents FIC0787321, FIC818970, FIC0892431, FIC0994025, FIC0994222

Rene Jackson, Associate General Counsel for Fair Isaac, asserted that the following documents consisted of communications by or to legal counsel pertaining to legal advice:

- First Supplemental Privilege Log 186 is a copy of a memo drafted by Fair Isaac's outside counsel, which was circulated to Jackson and other Fair Isaac employees reflecting legal advice regarding the DOJ's inquiry of VantageScore.  See Jackson Decl., ¶ 3.1.[25]

---

[24] Fair Isaac again argued that defendants failed to meet and confer on this motion. However, all the documents at issue in this motion (except for FIC0226851) were addressed by the December 9, 2008 email from defendants and Fair Isaac's response stating that it stood by its claim of privilege regarding these documents.  See Collyard Ex. 1; Pace Decl., Ex. 7.  This Court does not believe that any further meet-and-confer would have resolved the discovery issues presented by this motion

[25] While Jackson generally stated in her Declaration that all of "documents are protected by the attorney-client privilege and/or the work product doctrine" (Jackson Decl., ¶ 1), this Court will only consider and analyze the privilege listed for the

- Second Amended Privilege Log 833 was a memo drafted by Fair Isaac's outside legal counsel regarding legal advice given immediately following the launch of VantageScore.  <u>See</u> Jackson Decl., ¶ 3.2.  The memo was sent to in-house counsel and executives at Fair Isaac.  <u>Id.</u>

- Second Amended Privilege 2464 consisted of a redacted portion of an email from a Fair Isaac employee to in-house counsel, Tammy Farrier, requesting an interpretation of terms in a contract with Trans Union, the negotiation of those terms and seeking legal advice.  <u>See</u> Jackson Decl., ¶ 3.4.

- FIC0787321-22 is an email chain that has one portion of it redacted, which consists of a request for legal advice to Jackson and other in-house counsel at Fair Isaac regarding the use of intellectual property.  <u>See</u> Jackson Decl., ¶ 3.7.

- FIC0818970-74 is an email chain that contains redactions regarding a request by Fair Isaac employees to in-house counsel seeking legal advice about a proposed agreement with CitiCard.  <u>See</u> Jackson Decl., ¶ 3.9.

- FIC0892431-33 is a compilation of emails, one of which was redacted to omit options for the ongoing negotiations between Fair Isaac and a potential business partner.  <u>See</u> Jackson Decl., ¶ 3.10.  The redacted email was from Ron Totaro to then CEO Tom Grudnowski.  General counsel, Andrea Fike, was copied on this redacted email.  Fike was principally involved in giving legal advice regarding the negotiations for the terms of the proposed agreement.  <u>Id.</u>

- FIC0994025-26 contains a redacted email where a Fair Isaac executive relayed legal advice given to him by in-house counsel, including Jackson, and asked counsel to confirm the advice given.  <u>See</u> Jackson Decl., ¶ 3.12.

- FIC0994222-24 is an email to various recipients, including attorneys, that contains redactions regarding legal advice received by in-house and outside counsel relating to VantageScore.  <u>See</u> Jackson Decl., ¶ 3.13.

---

documents at issue in the privilege logs.  In this regard, the Court has reviewed privilege log for the documents at issue and determined that all of the documents at issue only assert the attorney-client privilege, except for FIC0745955, which asserts both the attorney-client privilege and the work product doctrine.  <u>See</u> Collyard Decl., Ex. 6.

Defendants argued that these documents either "appear to relate to Fair Isaac's business decisions and strategy in the wake of the resale of VantageScore®" or "appear to relate to business matters, not legal advice" that at best only tangentially involved lawyers. See Defs.' 2nd Mem. at pp. 8, 11.

Based on the applicable law, the privilege log entries and Jackson's Declaration, the Court finds that defendants have not met their burden to show that attorney-client privilege does not apply because they have given the Court nothing but speculation to overcome the Jackson's Declaration. See Rabushka ex rel. U.S., 122 F.3d at 565 (citation omitted) (the Eighth Circuit concluded that speculative assertions that a document is not covered by the attorney-client privilege is not enough to overcome a privilege log and accompanying explanatory affidavit of counsel). Second, having reviewed the documents, the Court finds that the invocation of the attorney-client privilege for the withheld and redacted communications was proper for all withheld documents or redactions, except FIC0892431, because they either only pertained to legal matters or the legal advice predominated over the business matters at issue in the communications.

As to FIC0892431, the Court finds that it should be produced to defendants as it only discusses the business concerns regarding a proposed business partnership with another party. While it is true that in-house counsel Andrea Fike was copied on the redacted portion of the email, there is no request for legal advice made or legal advice given the email. See Diversified Indus., Inc., 572 F.2d at 602 ("A communication is not privileged simply because it is made by or to a person who happens to be a lawyer.") (citations omitted). This email is a business evaluation of a proposed business deal and

does not qualify for protection under the attorney-client privilege.  Therefore, it must be produced in an unredacted form.

For all of the reasons stated above, this Court grants defendants' motion to compel as it relates to FIC0892431 and denies the motion compel as it pertains to Second Amended Privilege Log 833 and 2464; First Supplemental Privilege Log 186; and Redacted Documents staring at FIC0787321, FIC0818970, FIC0994025 and FIC0994222.

B. **Email Strings Containing Communications Involving a Lawyer and Communications between Non-Lawyers: Second Amended Privilege Log 4736; Second Supplemental Privilege log 1719; and Redacted Document FIC0990125**

According to Rene Jackson, the following documents consisted of communications by or to legal counsel pertaining to legal advice or encompassing legal advice as follows:

- Second Amended Privilege Log 4736 is an email chain between outside counsel, Jackson and a Fair Isaac employee giving and responding to legal advice about the DOJ, including an email from a Fair Isaac executive Keri Kramers-Dove to counsel regarding information gathered at counsel's direction. See Jackson Decl., ¶ 4.3. The email chain also contains an email from Kramers-Dove to another employee who was helping Kramers-Dove gather the information requested by counsel. Id.

- Second Supplemental Privilege Log 1719 is an email chain between in-house counsel David Munn and other Fair Isaac employees, including emails sent by employees to Dunn and others for the purpose of seeking legal advice. See Jackson Decl., ¶ 4.4.  Another part of the string is between Fair Isaac employees Cheri St. John and Careen Foster involving their discussion of an action item upon which Munn had provided legal advice on. Id.

- FIC0990125 is an email chain between Fair Isaac executives that include redacted emails containing a request for legal advice from Fair Isaac's in-house counsel regarding the interpretation of a contract. See Jackson Decl., ¶ 4.5.

Defendants argued that these documents appear to involve business matters or branding efforts.  See Defs.' 2nd Mem. at pp. 8-10.  Log entry 4736 involves an attorney rendering legal advice in conjunction with a response to the DOJ and communications between non-attorney employees made in response to the direction of legal counsel.  Communications among non-attorney employees of a corporation may be protected under the attorney-client privilege if made at the direction of in-house counsel, to gather information to aid counsel in providing legal services.  See Cuno, Inc., v. Pall Corp., 121 F.R.D. 198, 201-02 (E.D.N.Y. 1988); see also Minnesota Mining and Manufacturing Co. v. North American Science, 189 F.R.D. 406, 408 (D. Minn. 1999) ("Documents gathered from notebooks and monthly reports for the purpose of providing information to attorneys to obtain legal opinions on patentability are protected by the attorney-client privilege.").  This Court finds, based on its in camera inspection, that log entry 4376 is protected from production under the attorney-client privilege.

As for log entry Second Supplemental Privilege Log 1719, this Court concludes that the emails comprising this entry are a portion of the same email chain included in Entry 7170 and 7171 of the Second Amended Privilege Log.  As such, they and are privileged for the reasons stated forth for Entry 7170 and 7171, supra, and Jackson's Declaration (stating that employees provided information to Dunn in the email chain for the purpose of seeking legal advice and included a discussion between St. John and Careen Foster on an action item for which Munn had provided legal advice).  See Jackson Decl., ¶ 4.4.

Based on Jackson's representations and the Court's review of the unredacted FIC0990125, this Court concludes that the redacted emails are reiteration of requests for legal advice made by Fair Isaac executives regarding the interpretation of a contract.

As such, the redacted portions of FIC0990125 are protected from disclosure under the attorney-client privilege.

**C.** **Communications Between Non-Lawyers: Second Amended Privilege Log Entries 494, 829, 4415, 4533, 4459, 4664, 4670, 4687; and Redacted Documents FIC0745955, FIC0943714, FIC0226851, FIC0991206, FIC0993792**

According to Rene Jackson, the following documents are privileged:

- Second Amended Privilege Log Entry 829 contains notes regarding a meeting held with Fair Isaac employees in which Jackson was asked to give legal advice about VantageScore after its launch. See Jackson Decl., ¶ 5.4. The notes reflected her thoughts and legal advice that Jackson relayed during the meetings. Id.

- Second Amended Privilege Log entries 494, 4415, 4459, 4664 and 4670 (which are all copies of the same document--although 4664 lacks certain dates and is in different format) contain a redacted portion that was created with Jackson's assistance, input and at her direction. See Jackson Decl., ¶ 5.2. Jackson asserted that the redacted portion contained information about which she gave legal advice, conveyed action items that she advised Fair Isaac should be done, discussed action items that were done at her direction, and conveyed characterization of certain events and information. Id.

- FIC0745955-63 is a PowerPoint Presentation which was produced in a redacted form. See Jackson Decl., ¶ 5.6. According to Jackson, the redacted portions discussed the present lawsuit and information that was created for Rene Jackson and other in-house counsel in order to provide legal assistance. Id.

- FIC0943714-15 includes a redacted portion of an email containing legal advice that Andrew Jennings, Vice President of Fair Isaac, received from in-house counsel and relayed to Fair Isaac's CEO and other executives for a briefing. See Jackson Decl., ¶ 5.9.

- FIC0988305-310 is an attachment to FIC0922651 that has redacted from it a list of requests for legal advice to in-house counsel. See Jackson Decl., ¶ 5.12.

- FIC0991206 contains a redacted portion of an email chain that included legal advice Susan Blue Hitt received from inside counsel Steve Hoge regarding intellectual property, which she relayed to other employees. See Jackson Decl., ¶ 5.10.

- FIC0993792 contains a reiteration of a request for legal advice that Ron Totaro made to in-house counsel Jim Woodward and Rene Jackson.  See Jackson Decl., ¶ 5.11.

With respect to Second Amended Privilege Log Entry 829, this Court concludes that the "legal options" portion of the notes from the March 22, 2006 meeting reflect legal advice being given to the employees present at the meeting.  The question then becomes whether the dissemination of corporate legal advice to non-attorney employees waives the privilege.  The dissemination within a corporation of legal advice received from counsel does not, by itself, waiver the attorney-client privilege.  See Upjohn, 449 U.S. at 391-92.  The Supreme Court has rejected the proposition a "control group test" whereby the only senior management can be said to possess an identity analogous to the corporation as a whole for the purposes of the attorney-client privilege. Id.  The Eighth Circuit has concluded that a privileged communication in the corporate context does not lose it privileged status if it "is not disseminated beyond those persons who, because of the corporate structure, need to know its contents."  Diversified Indus., Inc., 572 F.2d at 609.  Similarly, other courts have concluded that corporate privileged communications retain their privileged status within a corporation if an employee conveys legal advice received from counsel to other employees or officers of the corporation on a "need to know basis."  See, e.g., Southeastern Pennsylvania Transp. Authority v. Caremarkpcs Health, L.P., 254 F.R.D. 253, 262 (E.D. Pa. 2008) ("As the memorandum was only disseminated to those corporate employees in a 'need to know' position, the privilege was not waived."); Scholtisek v. Eldre Corp., 441 F. Supp.2d 459, 464 (W.D.N.Y. 2006) ("In general, whether the dissemination of privileged communications to corporate employees vitiates the privilege is decided by applying a "need to know" standard. . . ."); Deel v. Bank of America, N.A., 227 F.R.D. 456, 460

(W.D. Va. 2005) ("A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege."); F.C. Cycles Intern., Inc. v. Fila Sport, S.p.A., 184 F.R.D. 64, 71 (D. Md. 1998) ("The communications retain their privileged status if the information is relayed from a non-lawyer employee or officer to other employees or officers of the corporation on a need to know basis."); Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 174 F.R.D. 609, 633 (M.D. Pa. 1997) ("Communications between corporate counsel and company personnel . . . retain their privileged status if the information is relayed to other employees of officers of the corporation on a need to know basis."). An employee is on a need to know basis, so as to preserve the attorney-client privilege, if he is a policymaker for the corporation (i.e., an executive) or is responsible for the specific subject matter at issue in the communication. See Scholtisek, 441 F. Supp.2d at 464 (quoting Verschoth v. Time Warner Inc., No. 00CIV1339, 2001 WL 286763 at *2 (S.D.N.Y. Mar. 22, 2001)); see also Andritz Sprout-Bauer, Inc., 174 F.R.D. at 633 ("Only when the communications are relayed to those who do not need the information to carry out their work or make effective decisions on the part of the company is the privilege lost.") (citing In re Grand Jury, 758 F. Supp. 1411 (D. Colo. 1991)); Deel, 227 F.R.D. at 460 ("The Court will assume that the executives, Nichols, Boswell, and Ryan, needed to know of the communications, thus BOA did not waive its privilege by sending these documents to the executives.").

In this case, the author of this document is Thomas Quinn, Vice President Global Scoring for Fair Isaac. See Collard Decl., Ex. 6. The recipients were Fair Isaac executive Kramers-Dove and Collin Matthews, who was identified as a "Fair Isaac

employee." <u>See</u> Collard Decl., Ex. 6; Jackson, Decl., ¶ 3.9.  Mary M. Busch is also listed a recipient in the email but there is no indication as to her position at Fair Isaac. Further, as to Matthews and Busch, there is no indication in Jackson's Declaration or in the body of the notes as to why they needed to know the legal advice contained in the notes.  Since Fair Isaac did not provide a basis for the Court determine why Matthews and Busch needed to know this information in conjunction with their employment, this Court concludes that Fair Isaac has waived the privilege as to Second Amended Privilege Log Entry 829.  For all the reasons stated above, this Court finds that Fair Isaac will be required to provide defendants with an unredacted copy of entry 829.

This Court finds that the redacted portions in Second Amended Privilege Log entries 494, 4415, 4459, 4464 and 4670 dealing with the first topic point are privileged based on Jackson's representations (<u>see</u> Jackson Decl., ¶ 5.2) and the Court's <u>in camera</u> review from which the Court concludes that the redacted portions deal predominately with legal advice.  However, the recipients of these documents includes Totaro, Kramers-Dove, both Fair Isaac executives, and Matthews who is only identified as an employee.  <u>See</u> Collyard Decl., Ex. 6 (Excerpts for Fair Isaac's Second Amended Privilege Log).  As to Matthews, there is no indication in Jackson's Declaration or in the body of the documents why he needed to know the legal advice contained in the entries.  Since Fair Isaac did not provide a basis for the Court determine why Matthews needed to know this information in conjunction with his employment, this Court concludes that Fair Isaac has waived the privilege as to Second Amended Privilege Log entries 494, 4415, 4459, 4464 and 4670.  Further, the Court finds that the information listed under the topic "2." does not reflect any legal advice.  As such, Fair Isaac will be

required to produce unredacted copies of Second Amended Privilege Log entries 494, 4415, 4459 and 4670.

The Court's <u>in camera</u> inspection reveals that the redacted portions of FIC0745955, from a PowerPoint Presentation, generated well after the commencement of this action, provides a breakdown of the present suit and settlement possibilities. These communications are predominately legal in nature and were created at in-house counsel's direction and with her input.   <u>See</u> Jackson Decl., ¶ 5.6.   Further, the information redacted was either legal advice or contained information that was complied for counsel to provide legal advice.   <u>Id.</u>   Since the slides were generated in order to provide legal advice, this Court finds that all of the redacted portions are protected from disclosure under the attorney-client privilege, except for a portion of FIC0745963, which this Court finds is protected from disclosure under the work product doctrine.

The work-product doctrine protects materials that are: 1) documents and tangible things; 2) prepared in anticipation of litigation or for trial; and 3) by or for another party or by or for that other party's representative.   <u>See</u> <u>Onwuka v. Fed. Express Corp.</u>, 178 F.R.D. 508, 512 (D. Minn. 1997) (citing Fed. R. Civ. P. 26(b)(3)) (citations omitted). The "scope of the work-product protection is broader than that of the attorney-client privilege since items protected by the work-product doctrine are not confined to confidential communications between an attorney and a client, but extends protection to all 'documents and tangible things' that have been prepared in anticipation of litigation, or for trial." <u>Onwuka</u>, 178 F.R.D. at 512 (citation omitted).   While historical facts are not protected from production, "when those facts are collated or categorized by legal counsel they may well be entitled to protection from disclosure under the work-product doctrine.'" <u>Lumber v. PPG Industries, Inc.</u>, 168 F.R.D. 641, 646 (D. Minn. 1996) (citing

Shelton v. American Motors Corp., 805 F.2d 1323, 1326 (8th Cir. 1986)).  On the other hand, the Eighth Circuit has instructed there is no work-product protection for documents prepared in the regular course of business even where litigation is anticipated.  See Simon v. G.D. Searle & Co., 816 F.2d 397, 401 (8th Cir. 1987).  Yet, courts have concluded that the process by which an attorney uses to arrive at the settlement is protected by the work product doctrine.  See e.g, General Elec. Co. v. Johnson, No. Civ.A.00-2855(JDB), 2006 WL 2616187 at *11 (D.D.C. Sept. 12, 2006) (citations omitted) ("The term "litigation" is interpreted broadly to encompass not only trials and other judicial proceedings, but also adversarial administrative matters, settlement negotiations, and the avoidance of anticipated litigation.") (emphasis added); In re Subpoena Duces Tecum Served on Rosenman & Colin, No. M8-85 (RLE). 3:92 CV 00301-WWE, 1996 WL 527331 at *5 (S.D.N.Y. Sept. 16, 1996) ("Similarly, the attorneys' drafts, notes and research concerning the settlement are protected by the work product privilege and, if involving the client, may also be protected by the attorney-client privilege."); Koch Industries, Inc. v. Columbia Gas Transmission Corp., Civ. A. 89-2156, 1990 WL 72789 at *2 (E.D. La. May 29, 1990) ("Magistrate Chasez was not "clearly erroneous" when she granted Koch's protective order forbidding Columbia from the discovery of information used to determine whether to settle and the processes used by Koch to determine whether to settle. The information Koch considered important and the processes it used to settle the case are covered by the work product privilege.").  In addition, the generation of facts for counsel in order to determine how to proceed with settlement, in this case data regarding business information, may enjoy the protection from disclosure under the work product doctrine.  See In re Grand Casinos, Inc., 181 F.R.D. 615, 622 (D. Minn. 1998) (quoting Lumber, 168 F.R.D. at 646)

("'Plaintiffs may lawfully assert a privilege as to a chart or other compilation of facts, that was specifically generated to respond to a specific request from legal counsel. . . .'").

Given that the business information was provided in conjunction with a request by counsel in order to determine how to proceed with litigation, including possible settlement, this Court finds that the information contained in FIC074593 is protected from disclosure under the work product doctrine.[26] The remaining redacted portions are protected from disclosure under the attorney-client privilege.

The Court has conducted an in camera review of FIC0943714-15 and determined it is protected from disclosure under the attorney-client privilege. The redacted portion specifically conveys legal advice given to Andrew Jennings Vice President of Fair Isaac to Fair Isaac's CEO Mark Greene and executives Larry Rosenberger, Matthew Kreutzmann and Ronald Totaro (Jackson Decl., ¶ 5.9). See Deel, 227 F.R.D. at 460 ("A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege.").

FIC0988305-310 is an attachment that "contains a list of requests for legal advice that were made to in-house counsel. . . ." See Jackson Decl., ¶ 5.12. The Court has reviewed the unredacted portion of the document and concludes that the redacted portion raises legal concerns and questions. Based on Jackson's representation and the Court's review of the unredacted document, this Court concludes that FIC0226851

---

[26] Defendants have not provided the Court with any argument that they have a substantial need of the materials in the preparation of their case and that they are unable without undue hardship to obtain the substantial equivalent of the materials by other means. See Fed. R. Civ. P. 26(b)(3).

is a client communication to an attorney for the purposes of seeking legal advice.  As such, it is protected from disclosure under the attorney-client privilege.

The redacted portion from the March 21, 2006 email from Susan Blue Hitt to Thomas Quinn and Keri Kramers-Dove in FIC0991206 is protected by the attorney-client privilege, as it contains legal advice received from inside counsel Steve Hoge regarding intellectual property.  Further the recipients, Quinn and Kramers-Dove are both executives at Fair Isaac giving them a need to know the information.  As such, defendants' motion to compel as it relates to FIC0991206 is denied.

Finally, this Court has reviewed the unredacted FIC0993792 (May 10, 2007 email) and has determined that it contains a request for legal advice made by Totaro to in-house counsel Jim Woodward and Jackson that is protected by the attorney-client privilege.

**D.**   <u>**Conclusion**</u>

In summary, this Court grants defendants' motion to compel as it relates to, Second Amended Privilege Log entries 494, 829, 4415, 4459, 4464 and 4670; and redacted document FIC0892431.  The remainder of defendants' motion to compel is denied.

J.S.M.