# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fair Isaac Corporation and
myFICO Consumer Services, Inc.,

Plaintiffs,

v.

**MEMORANDUM OPINION AND
ORDER**
Civil No. 06-4112 ADM/JSM

Experian Information Solutions Inc.;
Trans Union, LLC; VantageScore
Solutions, LLC; and Does I through X,

Defendants.

---

Charles F. Rule, Esq., Joseph J. Bial, Esq., Cadwalader, Wickersham & Taft, LLP, Washington, D.C., and Ronald J. Schutz, Esq., Randall Tietjen, Esq., Michael A. Collyard, Esq., Christopher K. Larus, Esq., David W. Beehler, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, on behalf of Plaintiffs.

Mark A. Jacobson, Esq., Mark H. Zitzewitz, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, and M. Elaine Johnston, Esq., Robert A. Milne, Esq., Christopher J. Glancy, Esq., Jack E. Pace, III, Esq., Bryan D. Gant, Esq., White & Case LLP, New York, NY, on behalf of Experian Information Solutions Inc.

Lewis A. Remele, Jr., Esq., Christopher R. Morris, Esq., Bassford Remele, Minneapolis, MN, and James K. Gardner, Esq., Ralph T. Russell, Esq., Dao L. Boyle, Esq., Neal, Gerber, & Eisenberg LLP, Chicago, IL, on behalf of Trans Union, LLC.

Barbara Podlucky Berens, Esq., Justi Rae Miller, Esq., Kelly & Berens, PA, Minneapolis, MN, on behalf of VantageScore Solutions, LLC.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge on the following

motions: Defendant Trans Union, LLC's ("Trans Union") Motion for a Separate Trial on

Plaintiffs' Breach of Contract Claim [Docket No. 572]; Trans Union and Defendant

VantageScore Solutions, LLC's ("VantageScore") Motion for Summary Judgment Dismissing

Contract-Related Counts [Docket No. 575]; Defendant Experian Information Solutions Inc. ("Experian"), Trans Union, and VantageScore's (collectively "Defendants") Motion for Summary Judgment Dismissing Trademark-Related Counts [Docket No. 579]; Defendants' Motion for Summary Judgment Dismissing Antitrust Counts [Docket No. 585]; Defendants' Motion for Summary Judgment Dismissing False Advertising Counts [Docket No. 594]; and Plaintiffs Fair Isaac Corporation and myFico Consumer Services, Inc.'s (collectively "Fair Isaac") Motion to Strike [Docket No. 659]. For the reasons set forth herein, Trans Union and VantageScore's Motion for Summary Judgment Dismissing Contract-Related Counts is granted, Trans Union's Motion for a Separate Trial is denied, Defendants' Motion for Summary Judgment Dismissing Antitrust Counts is granted, Defendants' Motion for Summary Judgment Dismissing Trademark-Related Counts is denied, Defendants' Motion for Summary Judgment Dismissing False Advertising Counts is granted; and Fair Isaac's Motion to Strike is denied.

## II. BACKGROUND[1]

### A.     Aggregated Credit Data and Credit Scoring

The three major credit bureaus in the United States—Trans Union, Experian, and Equifax (collectively "the Credit Bureaus")—are the dominant sources of aggregated credit data of consumers in the United States, capturing a 100% combined share of the market for such data. 3d Am. Compl. [Docket No. 436] ¶¶ 24, 220. Aggregated credit data consists of information reported by banks, credit card companies, mortgagees, and other lenders regarding a consumer's borrowing and repayment history. Id. ¶ 11(b); Gant Decl., Jan. 30, 2009 [Docket No. 588], Ex.

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

1(a) (Noll Decl.) at 6.  The Credit Bureaus use the aggregated credit data to generate consumer credit reports, which they sell to lenders who then use the information in deciding whether to extend credit to a consumer.  Noll Decl. at 6.  Credit data reporting is entirely voluntary, and individual lenders may have an agreement to provide consumer credit data to all, some, or none of the Credit Bureaus.  3d Am. Compl. ¶ 25.  Consequently, each individual bureau often reports aggregated credit data that is different from the other two bureaus' aggregated credit data on the same consumer.  Id.

In the 1980s, Fair Isaac developed a credit scoring model that applies quantitative algorithms to the aggregated credit data to calculate a credit score for a consumer.  Noll Decl. at 6-7.  As with the credit reports themselves, banks, credit card companies, mortgagees, and other lenders use credit scores to evaluate an individual consumer's financial credit-worthiness and the risk that the consumer will default on a credit obligation.  Id.; 3d Am. Compl. ¶¶ 21-22.  Fair Isaac's credit scores ("FICO scores") quickly became dominant in the credit scoring market, and in 2005, 2006, and 2007, FICO scores represented, respectively, 78.1%, 78.3%, and 74.2% of all segments of the credit scoring market and more than 94% of the business-to-business segment of the market.[2]  Noll Decl. at 7, 72.  However, Fair Isaac typically does not sell FICO scores directly to lenders or consumers because Fair Isaac does not have direct access to the Credit Bureaus' aggregated credit data.[3]  3d Am. Compl. ¶¶ 43-45.  Instead, Fair Isaac enters into

---

[2] The dominant credit score is Fair Isaac's FICO® Classic score.  3d Am. Compl. ¶¶ 22, 40.  In collaboration with the individual Credit Bureaus, Fair Isaac developed variations of its FICO algorithms tailored to each bureau's data set.  Id. ¶¶ 29, 40.

[3] Pursuant to agreements with each bureau, however, Fair Isaac does occasionally sell FICO scores, bundled with a bureau's credit report, directly to lenders or consumers in exchange for an access fee to the bureaus.  3d Am. Compl. ¶¶ 45-46.

"scoring agreements" with the Credit Bureaus that allows the Credit Bureaus to sell FICO scores to lenders and consumers—typically as part of a bundle that includes a credit report containing the aggregated credit data underlying the credit score—in exchange for a royalty payment for each FICO score sold. Id. ¶¶ 23, 44, 125; Noll Decl. at 7; Boyle Decl., Jan. 30, 2009 [Docket No. 578], Exs. 1, 2.

Because the royalties paid to Fair Isaac represent a significant component of each of the Credit Bureaus' costs of business, the Credit Bureaus independently developed their own in-house credit scoring models to reduce their reliance on, and royalties paid to, Fair Isaac. Noll Decl. at 7. The Credit Bureaus were largely unable to convince lenders to switch from FICO scores to their in-house scoring models. Id. at 8. Lenders prefer the "tri-bureau" nature of FICO scores, which account for the previously mentioned differences in the aggregated credit data maintained by each bureau,[4] over the Credit Bureaus' in-house scoring models, which do not account for the differences. Id. Although the Credit Bureaus sought to convert their in-house scores into tri-bureau scores, they were unable to do so because each bureau was unwilling to share its aggregated credit data with the other bureaus. Gant Decl., Jan. 30, 2009, Ex. 3(b) (Noll Reply Decl.) at 40.

B.    **The Credit Bureaus' Joint Venture**

In late 2003 or early 2004, representatives from Trans Union and Experian, including Trans Union CEO Harry Gambill and Experian CEO Don Roberts, met to discuss jointly developing a tri-bureau score. Bial Decl. [Docket No. 629], Ex. 188 (Hellinga Dep.) 26:19-

---

[4] Because Fair Isaac modifies its algorithm for each bureau's data set, FICO scores are reputedly a better reflection of credit risk regardless of which bureau's data set is used. 3d Am. Compl. ¶ 40.

31:12.  Trans Union emails suggest that by March 2004, Trans Union was scheduling internal meetings to "discuss [the] feasibility and strategy around the development of an industry score by the three bureaus."  Id., Ex. 18.  In a March 2004 email chain between Experian executives, Experian's vice president wrote:

> I finally had a chance to speak with Paul Springman, Chief Marketing Officer[] at Equifax . . . .  The idea behind the conversation was to ascertain if an interest exist[s] to cooperate in some fashion to provide a tri-bureau risk score. . . .  He is personally in favor of exploring options . . . .  The decision whether or not to move forward would need to be made by Chapman[, CEO of Equifax]. [Springman] will be sending a note to Chapman.

Id., Ex. 21.  In response, Experian's CEO wrote:

> [T]he only way I'm interested is if a totally new score is created . . . and owned/endorsed by the 3 of us.  That presents a challenging set of assumptions, that you and your gang at the other bureaus would have to agree on.  I would say that if you can get the[] preliminary issues worked out, it would be easier for Chapman[,] Gambill[,] and I to deal with."

Id.  At a November 22, 2004 meeting among Trans Union representatives, one individual wrote that the plan was for each bureau, Trans Union, Equifax, and Experian, to share ownership in a new company that would develop a new credit score with the goal of competing with FICO scores.  Id., Ex. 26.  Fair Isaac alleges that the goal was not merely to compete with FICO scores but to eliminate FICO scores from the credit scoring market entirely.  This proposed joint venture between the Credit Bureaus became "Project Trident" and ultimately lead to the formation of VantageScore and the VantageScore credit scoring model.  See Hellinga Decl., Jan. 30, 2009 [Docket No. 593] ¶ 3; Torrez Decl. [Docket No. 598] ¶ 3; Wiermanski Decl., Jan. 30, 2009 [Docket No. 590] ¶¶ 2-4.

On February 16, 2005, representatives from the Credit Bureaus met in Texas to discuss Project Trident.[5] Hellinga Dep. 202:6-9. A second meeting was held nine days later on February 25, 2005. Bial Decl., Ex. 37. Also in February 2005, Experian approached a consulting firm, Mercer Oliver Wyman ("Mercer"), about providing assistance on Project Trident. Id., Ex. 38. Mercer created a document that suggests that through the joint venture, the Credit Bureaus could build their own scoring model and transfer Fair Isaac's revenue entirely to themselves. Id., Ex. 41. A primary risk facing the joint venture, however, was that if one bureau acted alone in attempting to convince the market to switch from FICO scores to the Credit Bureaus' jointly developed score, there would be a serious risk that its customers would switch to the other two bureaus to retain access to FICO scores. Id. Mercer recommended that this particular risk could be minimized if the three bureaus "act in concert." Id.

The Credit Bureaus formed a project team of representatives from each bureau. Oliai Decl., Jan. 29, 2009 [Docket No. 600], ¶ 9. The team began work on Project Trident in July 2005. Id. ¶ 10. The team first worked on developing algorithms for what ultimately became the VantageScore scoring model, and, in doing so, they relied on the algorithms in Experian's own in-house, tri-bureau scoring model, which Experian had made available to the team. Id. ¶¶ 5, 11. The team next worked on determining an appropriate business structure for running the new credit scoring model and ultimately decided on creating VantageScore as a joint venture in which each bureau would hold an equal, one-third ownership interest. Id. ¶ 14. The team concluded its tasks by January 2006. Id. ¶ 10.

---

[5] The Credit Bureaus' joint venture is sometimes referred to as Project Trident and at other times, Operation Triad. For convenience, the Court will uniformly refer to the joint venture as Project Trident.

The Credit Bureaus announced the VantageScore scoring model, the result of Project Trident, in March 2006. 3d Am. Compl. ¶¶ 3, 63. An agreement between the Credit Bureaus and the newly-formed VantageScore provided that each Credit Bureau pay a $300,000 annual licensing fee to VantageScore in exchange for global, royalty-free, perpetual, and irrevocable licenses for the use of the VantageScore scoring model. Gant Decl., Jan. 30, 2009, Ex. 38 (IP Agreement) §§ 4.1, 4.9. Like Fair Isaac, VantageScore has access to all three Credit Bureaus' aggregated credit data sets. 3d Am. Compl. ¶ 3. Defendants have claimed that VantageScore credit scores provide greater predictive power than other scores, including FICO scores, because VantageScore (1) uses a single algorithm rather than the modified algorithms for each bureau that Fair Isaac employs and (2) implements "characteristic leveling" to consistently interpret credit information regardless of which bureau's data set is used. Id. ¶ 100(b). Defendants also claim that VantageScore has benefitted from unmatched access to the Credit Bureaus' aggregated credit data sets. Id. ¶ 101-02.

## C.    Fair Isaac Files Suit

On October 11, 2006, Fair Isaac initiated this action, alleging that the Credit Bureaus' joint development of VantageScore violated antitrust laws that prohibit unreasonable and illegal restraints on trade, illegal mergers and acquisitions, attempts to monopolize, and conspiracies to monopolize. See Compl. [Docket No. 1] at 163-199. In addition, Fair Isaac asserted claims that (1) the 501-990 scoring range used in the VantageScore scoring model is confusingly similar to Fair Isaac's trademarked credit scoring range of 300-850 and constitutes trademark infringement, unfair competition, and deceptive trade practices; and (2) certain statements by the Credit

Bureaus regarding the FICO credit scores and the VantageScore credit scores constitute unfair competition, false advertising, and deceptive trade practices. Id. ¶¶ 26-32, 127-43, 151-59.

In April 2007, Fair Isaac filed its Second Amended Complaint [Docket No. 81], adding (1) a claim under Minnesota law that the 501-990 scoring range used in the VantageScore scoring model constitutes "passing off" of Fair Isaac's trademarked scoring range; (2) a claim that Trans Union's involvement in the development of VantageScore breached contractual obligations; (3) a claim of misappropriation of trade secrets against Trans Union and VantageScore; and (4) a claim of interference with contract against VantageScore. 2d Am. Compl. ¶¶ 194-96, 259-75.

After Magistrate Judge Janie S. Mayeron ordered [Docket No. 304] that Fair Isaac "specifically identify in writing" the trade secrets that were allegedly misappropriated, Fair Isaac decided not to pursue the misappropriation of trade secrets claim. Gant Decl., Jan. 30, 2009, Ex. 16(r). The Court later dismissed the claim with prejudice on June 23, 2008.[6] June 23, 2008 Order [Docket No. 373].

Also in June 2008, the Court dismissed all of Fair Isaac's claims against Equifax with prejudice consistent with the confidential settlement negotiated between Fair Isaac and Equifax. Stipulation [Docket No. 354]; June 13, 2008 Order [Docket No. 362]. Fair Isaac filed its Third (and final) Amended Complaint on November 10, 2008. The Third Amended Complaint added a claim that Defendants engaged in "price fixing," in violation of antitrust laws. 3d Am. Compl. ¶¶ 255-275. The Motions currently before the Court followed.

---

[6] By agreement of the parties, the June 23, 2008 Order also dismissed Fair Isaac's state law claim of "illegal concerted refusal to deal."

## III. DISCUSSION

**A.      Motions for Summary Judgment**

**1.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**2.      Breach of Contract and Tortious Interference with Contract Claims**

Fair Isaac maintains scoring agreements with the Credit Bureaus.  Pursuant to its scoring agreements with Trans Union, Fair Isaac develops scoring models, Trans Union uses those scoring models to generate and sell FICO scores to lenders and consumers, and Trans Union then submits a royalty payment to Fair Isaac.  One of the scoring agreements concerns Fair Isaac's FICO® Classic score, and another governs Trans Union's use of Fair Isaac's third generation credit score known as the NextGen score.  See Boyle Decl., Jan. 30, 2009, Ex. 1 ("Classic Agreement"), Ex. 2 ("NextGen Agreement").  A third scoring agreement relates to Fair Isaac's bankruptcy score known as "Horizon."  See Tietjen Decl., March 5, 2009 [Docket No. 624], Ex.

5 ("Horizon Agreement"). Fair Isaac alleges that Trans Union breached the scoring agreements by (1) implementing non-trade-secret aspects and concepts employed in Fair Isaac's scoring models into both its own in-house scoring model and the VantageScore scoring model and (2) participating in the development of the VantageScore scoring model with the goal of replacing FICO scores with VantageScore scores and eliminating Fair Isaac from the credit scoring market entirely.

### a. Alleged Implementation of Aspects of Fair Isaac's Scoring Models

The scoring agreements provide that Fair Isaac shall remain the owner of its "property," which is defined as:

> (a) all Model(s), and the ideas, concepts[,] and know-how embodied in the Model(s) as well as all ideas, concepts, know-how[,] and trade secrets relating to the Model(s);
>
> (b) . . . any modifications, adaptations[,] or translations and changes made to the [scoring models], any documentation and materials developed by Fair[] Isaac . . . as well as . . . any works derived therefrom even if created by or at the request of Trans Union.

Classic Agreement, Addendum §§ 7.22.2(a)-(b), FIC 0010585; NextGen Agreement § 8.2(a)-(b); Horizon Agreement, Addendum § 8.1.2(a)-(b), TU-FI-1259982. The term "Model(s)" means "all aspects and contents of the Model(s), score weights, algorithms, characteristics, attributes, attribute breakouts, list of characteristics . . ., scores, any specifications, . . . documentation, any modifications or derivatives thereof, and any ideas derived from any of the foregoing." Classic Agreement, Addendum § 7.22.2, FIC 0010586; NextGen Agreement § 8.2; Horizon Agreement, Addendum § 8.1.2, TU-FI-1259983. The scoring agreements further provide that Trans Union shall not "modify, copy, reproduce, remanufacture, translate, disassemble, decompile or in any way duplicate, or merge with or incorporate the Model(s), in whole or in part, with any [other]

computer programs." Classic Agreement, Addendum § 7.22.4(a), FIC 0010586; NextGen Agreement § 8.4(a); Horizon Agreement, Addendum § 8.1.4, TU-FI-1259983.

Fair Isaac asserts that the above-quoted language of the scoring agreements prohibits Trans Union from developing and marketing scoring models that include or rely on any aspects, concepts, or ideas derived from Fair Isaac's scoring models, "regardless of whether those concepts[,] . . . aspects[,] or ideas are publicly known or maintained as trade secrets." Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Contract Related Counts [Docket No. 625] at 9. According to Fair Isaac, the VantageScore scoring model (1) "uses the same process of credit scoring that [Fair Isaac's] models use"; (2) "has the same model structure"; (3) "predicts risk in the same manner as [Fair Isaac's] models"; (4) "has the same multiple score-card design, the same segmentation, [and] the same construction of characteristics"; (5) "uses the same process for multiple de-duplication"; (6) "uses similar adverse-action codes"; (7) "uses the same concept and ideas for a scoring range"; and (8) "uses a three-digit score that is blatantly derived from [Fair Isaac's] model." Id. at 8. Thus, Fair Isaac claims, Trans Union breached the scoring agreements by its participation in the development of the VantageScore scoring model. Trans Union responds that the scoring agreements do not prohibit it from independently developing and marketing scoring models that include publicly-known features not amounting to trade secrets. In support, Trans Union cites several provisions:

- "The parties acknowledge that both parties may offer additional scoring products, other than those contemplated by this Agreement and developed by or for other parties . . . ." Classic Agreement § 6.05;

- "Nothing contained within this [scoring agreement] is intended to prevent Trans Union from obtaining products or services of a similar nature to those defined by this [scoring agreement] from parties other than Fair Isaac." Id. § 7.06; NextGen Agreement § 12.1; Horizon Agreement § 12.1, TU-FI-1260027;

- "[N]either party shall have any obligation . . . with respect to information that . . . was or becomes generally available to the public other than as a result of disclosure by the receiving party [or] . . . was independently developed by employees or agents of a party who had no access to the confidential information." NextGen Agreement § 9.4(a), (c); Horizon Agreement § 9.4(a), (c), TU-FI-1260023.

It is agreed that Trans Union's in-house scoring model and the VantageScore scoring model employ some standard, publicly-available concepts also employed by Fair Isaac's scoring models. See Mem. in Supp. of Summ. J. Mot. Dismissing Contract Related Counts [Docket No. 577] at 4. Thus, the issue for the Court is one of contract interpretation: whether the scoring agreements prohibit Trans Union from developing competing scoring models that use publicly-available concepts and ideas—that is, concepts and ideas that do not amount to trade secrets—also found in Fair Isaac's scoring models.

Whenever possible, conflicting provisions of a contract should be given a harmonious interpretation. Barker v. Cerdian Corp., 122 F.3d 628, 637 (8th Cir. 1997); Wolfensberger v. Eastwood, 889 N.E.2d 635, 643 (Ill. App. Ct. 2008) ("A court will not interpret a contract in a way that will render any provision meaningless."); Estate of Petersen, 34 Cal. Rptr. 2d 449, 458 n.4 (Cal. Ct. App. 1994) ("Contradictory or inconsistent provisions of a contract are to be

reconciled by interpreting the language in such a manner that will give effect to the entire contract.").[7]  If the scoring agreements were interpreted to prohibit Trans Union from developing scoring models based on publicly available, non-trade-secret aspects and ideas employed in Fair Isaac's scoring models, the provisions expressly permitting Trans Union to develop and obtain other scoring models would be rendered meaningless.  One of the provisions that would be rendered meaningless is expressly titled, "Competing Products."  As Trans Union argues, the interpretation argued by Fair Isaac would, for example, prohibit Trans Union from employing such commonly-known aspects as a "standard statistical method" and "logistic regression" to build a competing model.  Mem. in Supp. of Summ. J. Mot. Dismissing Contract Related Counts at 7.  It would also prohibit Trans Union from considering attributes commonly known and employed throughout the credit scoring industry such as the number of times an individual has been more than 90 days overdue on a debt obligation, how many credit card accounts an individual has, and how much outstanding debt the individual has incurred.

Effect is given to the provisions allowing Trans Union to develop, obtain, and provide "competing" scoring models of a similar nature to Fair Isaac's products only when the prohibition in the scoring agreements on "modify[ing], copy[ing], reproduc[ing], remanufactur[ing], translat[ing], disassembl[ing], decompil[ing] or in any way duplicat[ing] . . . the Model(s), in whole or in part," is read as not extending to the use of publicly available information.  Classic Agreement, Addendum § 7.22.4(a), FIC 0010586; NextGen Agreement § 8.4(a); Horizon Agreement, Addendum § 8.1.4, TU-FI-1259983.

---

[7] The Classic Agreement and the Horizon Agreement are governed by Illinois law, whereas the NextGen Agreement is governed by California Law.  Classic Agreement § 7.17; Horizon Agreement § 13.13; NextGen Agreement § 13.13.

Fair Isaac maintains the asserted contradiction between the provisions recognizing Fair Isaac's ownership rights and the provisions allowing Trans Union to develop competing scoring models is illusory. To support this argument, Fair Isaac cites the August 26, 2008 report of expert David Hand, in which he opines that there are many alternative ways Trans Union could have developed a credit scoring model that did not employ the standard, publicly known aspects and concepts employed in Fair Isaac's scoring models. Hand theorized that a credit scoring model could be developed based on the relationship between income and expenditures or characteristics such as type of employer and level of education instead of on an individual's past behavior with financial products, which is the basis of Fair Isaac's scoring models. Trans Union rebuts this argument by citing Hand's admission that his alternative bases for scoring models have never actually been tried in a commercial scoring model and even if they had been, "convinc[ing] the regulatory authorities that the new approaches satisfied regulations [that] have been built over the past 40 years . . . would be a non-trivial task." Boyle Decl., Jan. 30, 2009, Ex. 9 (Hand Report, Aug. 26, 2008) at 7-10; Ex. 10 (Hand Dep.) 25:12-30:16. Significantly, there is nothing in the record to suggest that there is any demand in the credit scoring industry for the alternative scoring models hypothesized by Hand. Thus, the ability to develop untested, theoretical, alternative scoring models does not harmonize or provide meaning to the conflicting provisions; Fair Isaac's interpretation still leaves the provisions allowing Trans Union to develop competing scoring models without meaning or effect.[8]

---

[8] The difficulties posed by Fair Isaac's breach of contract claim flow from the trade-secrets claim having been withdrawn and dismissed. Fair Isaac argues that "[t]here are many alternative approaches, as Professor Hand explains in his expert report, that [Trans Union] and the other bureaus could have used to construct a scoring model," but, "[i]nstead, they chose to copy [Fair Isaac's] approach." Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Contract Related Counts at 10. This argument appears to be an attempt to masquerade a trade-

The decisions cited by Fair Isaac in support of its position are inapposite. In <u>Sunds Defibrator AB v. Beloit Corp.</u>, the court held that a defendant violated a license agreement by *using* publicly available information to compete with the plaintiff outside of North America even though the license agreement permitted the defendant to *disclose* such publicly available information. 930 F.2d 564, 565-66 (7th Cir. 1991). The contract in <u>Sunds</u> contained a covenant not to compete that prohibited the licensee from using technical information derived from the relationship outside of North America. <u>Id.</u> Here, by contrast, the scoring agreements do not include a covenant not to compete and do not expressly restrict the use of publicly available information; rather the scoring agreements expressly permit both competition and the use of publicly available information. <u>Universal Gym Equipment, Inc. v. Atlantic Health & Fitness Products,</u> 229 U.S.P.Q. 335, 346, 1985 WL 72675 (D. Md 1985), <u>aff'd</u> in <u>part</u>, 827 F.2d 1542 (Fed. Cir. 1987), is likewise inapposite as the contract in that case also contained a noncompete covenant and an unqualified prohibition on the use of information.

### b. Alleged Goal of Eliminating FICO Scores

---

secret claim as a breach of contract claim. Either the characteristics of the VantageScore scoring model are so similar to the unique, confidential characteristics of Fair Isaac's scoring models that there has been a misappropriation of a trade secret, or the characteristics of VantageScore are similar to those of Fair Isaac simply because those characteristics are matters of common knowledge in the credit scoring industry. Fair Isaac declined, whether for business reasons, strategic litigation reasons, or otherwise, to identify the precise trade secret that was allegedly misappropriated and, consequently, withdrew the trade-secret claim. To hold Fair Isaac to this decision, the aspects and concepts in the VantageScore scoring model that are similar to those in Fair Isaac's scoring models must be viewed as being commonly known to the trade rather than confidential, trade secrets. Whether Fair Isaac may even contractually prohibit Trans Union from competing through the use of non-confidential information is not clear. <u>Cf.</u> <u>Am. Credit Indem. Co. v. Sacks,</u> 262 Cal. Rptr. 92, 99 (Cal. Ct. App. 1989) (I]n the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect . . . against competition from former employees.").

Fair Isaac emphasizes that the scoring agreements specify that Trans Union is to act as an "agent" of Fair Isaac solely for "purposes of marketing and selling" the services developed jointly under the agreements, namely, the FICO scores.  See Classic Agreement, Addendum § 1.05, FIC 0010583; NextGen Agreement § 12.2.  Fair Isaac argues that these provisions gave rise to an agency relationship requiring Trans Union to exercise a duty of good faith and fair dealing to its principal, Fair Isaac.  Fair Isaac alleges that Trans Union violated these duties by participating in Project Trident with the goal of replacing FICO scores with VantageScore scores, thus eliminating Fair Isaac from the credit scoring market.  Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Contract Related Counts at 11-12.

Trans Union argues that the plain language of the scoring agreements limits the scope of the agency relationship *solely* to the marketing and sale of FICO scores and that Trans Union's duties are expressly set forth in various provisions of the scoring agreements:

> Both parties shall provide adequate staffing and resources to facilitate the marketing and sale of the Joint Services covered by this agreement.
>
> . . . .
>
> Trans Union shall prepare and place advertisements as deemed appropriate by Trans Union to create a reasonable product awareness among the companies comprising Trans Union's traditional market.
>
> . . . .
>
> Each party shall make a good faith effort to provide its sales staff with  sales guides, sales literature, price and terms information, education and training.
>
> . . . .

The parties agree to position the Joint Services developed under this Agreement in a way [that] promotes the full range of capabilities for which the products and services were developed, regardless of competing products and services [that] may share similar capabilities. Such positioning will be reflected in sales, advertising, marketing, and user materials, to the extent reasonably practicable.

Classic Agreement §§ 6.01, 6.02, 6.04, 6.05. Trans Union asserts that Fair Isaac has not alleged a breach of any of these expressly identified contractual duties. Trans Union's royalty payments to Fair Isaac on the sale of FICO scores increased from $40 million prior to the introduction of VantageScore to $44 million after the introduction of VantageScore, which Trans Union argues is strong evidence of its compliance with the contract. See Boyle Decl., Jan. 30, 2009, Ex. 8. Trans Union concludes that there has been no breach of its specified contractual obligations in the scoring agreements and Fair Isaac cannot predicate a breach of contract claim on general duties of good faith under principles of agency law.

The Court agrees with Trans Union that Fair Isaac's failure to identify a breached provision in the scoring agreements is fatal to the breach of contract claim. Even if it were found that Trans Union participated in Project Trident and the development of the VantageScore scoring model with the purpose of eliminating Fair Isaac from the credit scoring market, such finding would not sustain Fair Isaac's breach of contract claim. The scoring agreements themselves do not expressly impose on Trans Union an obligation to act in good faith and fair dealing on *all matters* concerning the credit scoring industry. Fair Isaac's argument ignores the scope of the agency relationship established by the scoring agreements. "'The existence and extent of the duties of an agent to the principal are determined by the terms of the agreement between the parties . . . .'" Carleton v. Tortosa, 17 Cal. Rptr. 2d 734, 740 (Cal. Ct. App. 1993)

(quoting Restatement (Second) of Agency § 376 (1958)); see also State Sec. Ins. Co. v. Frank B. Hall & Co., 630 N.E.2d 940, 947 (Ill. App. Ct. 1994) (citing § 376).  The scoring agreements between Trans Union and Fair Isaac expressly limit the agency relationship to the marketing and sale of FICO scores developed jointly under the agreements.  The agreements also explicitly anticipate competition between agent and principal in areas other than marketing and sales.  If the basis for Fair Isaac's claim—Trans Union's participation in Project Trident with the alleged goal of replacing FICO scores—were permitted to support a breach of contract claim, the scope of the agency relationship would be greatly expanded beyond the marketing and sale of FICO scores.  This contract interpretation would effectively prohibit Trans Union from engaging in any effort in the credit scoring industry adverse to Fair Isaac's interests, including mere competition.  "*Unless otherwise agreed*, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."  Restatement (Second) of Agency § 393 (1958) (emphasis added); see also id. § 394 ("*Unless otherwise agreed*, an agent is subject to a duty not to act or agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed.") (emphasis added); Restatement (Third) of Agency § 8.06 cmt. e (2006) ("The extent of an agent's duty . . . to refrain from competition with the principal may be defined by the agreement between them."). In the instant case, however, Fair Isaac and Trans Union expressly agreed in the scoring agreements that they were permitted to act adversely to each others' interests by offering and developing competing products themselves or in association with other parties.

Gentieu v. Tony Stone Images/Chicago, Inc., is particularly instructive in this context. 255 F. Supp. 2d 838 (N.D. Ill. 2003).  In Gentieu, the plaintiff, a photographer, and the

defendant, a photography agency, agreed by contract that the defendant would act as the plaintiff's agent with respect to photographs created by the plaintiff, thereby placing on the defendant a "fiduciary duty to treat [the plaintiff] with the utmost candor, rectitude, care, loyalty, and good faith." Id. at 844-46, 865 (quotation omitted). The plaintiff claimed that the defendant breached that fiduciary duty by inducing and participating in the creation of photographs in the plaintiff's style by other photographers to take the place of the plaintiff's images in the defendant's collection. Id. at 865. In concluding that the defendant did not breach its duties as plaintiff's agent, the court noted that it was undisputed that the plaintiff was aware that the defendant would represent and accept photographs from photographers other than the plaintiff. Id. (relying on Restatement (Second) of Agency § 394 cmt. b (1958), which provides that "an agent commits no breach of duty by acting for competitors if, at the time of his employment, the principal[] [has] reason to know that the agent believes that he is privileged to do so").[9] Similarly, the undisputed evidence in this case shows that Fair Isaac was fully apprised that Trans Union was permitted to "offer additional scoring products, other than those contemplated by this Agreement and developed by or for other parties" and that nothing in the scoring agreements prevented Trans Union from "obtaining products or services of a similar nature to those defined by this [scoring agreement] from parties other than Fair Isaac." Classic Agreement §§ 6.05, 7.06; NextGen Agreement § 12.1; Horizon Agreement § 12.1, TU-FI-1260027. In short, Fair Isaac's allegations regarding Trans Union's goal in participating in Project Trident and the development of VantageScore fail to support a breach of contract claim.

_____

[9] The court determined that the plaintiff's separate breach of contract claim (based on the theory that the nature of the contractual relationship imposed a "best efforts" obligation) "echoe[d]" the breach of fiduciary duty claim and failed for the same reasons. Id. at 867-68.

Because Trans Union is entitled to summary judgment on Fair Isaac's breach of contract claims, Fair Isaac's claim against VantageScore for tortious interference of contract necessarily fails.[10]  See General Citrus Int'l v. Remien, No. 04 C 6402, 2009 WL 483855, at *15 (N.D. Ill. Feb. 26, 2009) (holding that a plaintiff cannot maintain a tortious interference claim when there has been no breach of contract); Randall v. Campbell, No. H025938, 2005 WL 44920, at *10 (Cal. Ct. App. Jan. 11, 2005) ("To support a claim for interference with contract, the plaintiff must prove the 'actual breach or disruption of the contractual relationship . . . .'") (quoting Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 480 (Cal. 1994)); Bebo v. Delander, 632 N.W.2d 732, 738-39 (Minn. Ct. App. 2001) ("A district court does not err by concluding a tortious-interference-with-contract claim fails when the plaintiff has not shown breach of contract.").  The grant of summary judgment on the contract claims renders moot Trans Union's Motion for a Separate Trial.

**3.      Antitrust Claims**

Fair Isaac's Third Amended Complaint asserts that the Credit Bureaus' creation and establishment of VantageScore give rise to the following claims for violations of antitrust laws: unreasonable and illegal restraint of trade, in violation of 15 U.S.C. § 1 (Count Eight); illegal merger or acquisition, in violation of 15 U.S.C §§ 1, 18 (Count Nine); attempt to monopolize the credit scoring market, in violation of 15 U.S.C. § 2 (Count Ten); conspiracy to monopolize the credit scoring market, in violation of 15 U.S.C. § 2 (Count Eleven); and illegal agreement to fix prices and reduce output, in violation of 15 U.S.C. § 1 (Count Twelve).   Fair Isaac seeks

---

[10] Fair Isaac does not contend that the tortious interference claim can be maintained independently of a viable breach of contract claim.  See Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Contract Related Counts at 12.

damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26. Defendants argue that all of Fair Isaac's antitrust claims fail as a matter of law.

Defendants argue that "Fair Isaac does not have standing to assert any of its antitrust claims." Defs.' Mem. in Supp. of Mot. for Summ. J. Dismissing Antitrust Counts [Docket No. 587] at 13. To have standing to seek damages under § 4 of the Clayton Act, Fair Isaac must establish that it suffered antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [D]efendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). The same principle applies to claims for injunctive relief under § 16 of the Clayton Act: "[A] private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113 (1986) (quotation omitted). "[I]f there is no showing of injury, or if the injury alleged or proven is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." Midwest Commc'ns v. Minnesota Twins, Inc., 779 F.2d 444, 450 (8th Cir. 1985).

When evaluating whether a plaintiff has established antitrust standing, a court is to consider factors that "illuminate the character of the plaintiff's harm, the defendant's alleged wrongdoing, and the relationship between them." Id. at 450 n.6 (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 538-45 (1983). The Eight Circuit has listed the following factors to consider in the analysis:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury

21

was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicative recoveries or complex damage apportionment.

McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir. 1983).[11]

### a. Damages under § 4 of the Clayton Act

Fair Isaac describes the theory of its antitrust claims as follows: "Defendants adopted a per se illegal strategy to prevent the outbreak of competition ('loss leading') among themselves" by agreeing to fix prices for VantageScore credit scores at approximately the same level as FICO scores and cease offering their in-house credit scores, while at the same time conspiring to "target and convert to VantageScore a select group of important lenders" through temporary price discounts on VantageScore. Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Antitrust Claims [Docket No. 628] at 10-22, 26. In the Third Amended Complaint, Fair Isaac alleges it "has been injured in its business and property" by reason of Defendants' alleged antitrust violations. 3d Am. Compl. ¶¶ 229, 239, 246, 254, 271. Although these allegations are sufficient to survive a motion for judgment on the pleadings for lack of standing, see March 4, 2008 Order [Docket No. 294] at 16-17, more than plausibility under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), is required to survive summary judgment. See Lyons v. Potter, 521 F.3d 981, 983 (8th Cir. 2008); see also United States v. SCRAP, 412 U.S. 669, 689, n.15 (1973) (holding that pleadings alleging a specific and perceptible harm were sufficient to survive

---

[11] The standing principles for damages under § 4 are slightly different from those for injunctive relief under § 16. See Midwest Commc'ns, 779 F.2d at 450. For example, given the nature of an injunction, there is no risk of duplicative recoveries, and thus, the consideration of that factor is not relevant to evaluating standing under § 16. See Cargill, 479 U.S. at 111 n.6. Accordingly, the Court will address the standing issue regarding the two types of relief separately, although much of the analysis of § 4 relief applies to the analysis of § 16 relief also.

a motion to dismiss for lack of standing, but that summary judgment would be warranted on the standing issue if it were demonstrated that the allegations in the pleadings were without support and raised no genuine issue of fact).

Professor Roger Noll concludes that Fair Isaac suffered injury because the creation and operation of VantageScore created anticompetitive incentives for customers to reduce their purchases of Fair Isaac credit scores.  Noll Decl. at 91.  Thus, because these incentives were created and switching from Fair Isaac credit scores to VantageScore credit scores did occur, the alleged antitrust violations thereby caused damage to Fair Isaac.  Id.  Another of Fair Isaac's experts, Paul Meyer, quantifies the claimed damage caused by the alleged antitrust violations in terms of lost profits that Fair Isaac would have realized if Defendants had not offered VantageScore credit scores and if Fair Isaac had not been forced to reduce prices on sales to certain lenders as a result of VantageScore entering the market.  Gant Decl., Jan. 30, 2009, Ex. 27(a) (Meyer Report) at 14-16.  Defendants argue that Fair Isaac does not have standing to recover damages for such lost profits (requested in all five of its antitrust claims) because the lost profits resulted from an increase in competition rather than a reduced ability to compete.

Because "[i]t is inimical to [the antitrust] laws to award damages for losses stemming from continued competition," Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (alterations in original) (quotation omitted), "the antitrust injury requirement precludes recovery for losses resulting from competition, even though such competition was actually caused by conduct violating the antitrust laws,'" Applera Corp. v. MJ Research, Inc., No. 3:98cv1201, 2004 WL 5683983, at *4 (D. Conn. Dec. 17, 2004) (quoting II Areeda & Hovenkamp, *Antitrust Law* ¶ 337a (2d ed. 2000)).  Thus, although a plaintiff has antitrust

standing when, for example, the claimed injury is lost profits caused by a reduced ability to compete, a plaintiff lacks standing when the claimed injury is lost profits caused by increased competition in the market. William C. Holmes, *Antitrust Law Handbook* § 9.8 (2008). In Matsushita Electric Industrial Co. v. Zenith Radio Corp., the Supreme Court held that the plaintiffs lacked standing to "recover damages for any conspiracy by [defendants] to charge higher than competitive prices," even though such conduct would violate antitrust laws, because the conspiracy would not injure the plaintiffs who stood to gain from any conspiracy by its competitors', the defendants, agreement to raise prices. 475 U.S. 574, 582-83 (1986). Four years later, in Atlantic Richfield, the Court held that a competitor lacks standing to assert an antitrust claim for a conspiracy to lower prices unless it results in predatory pricing,[12] even though such a conspiracy is unlawful under § 1 of the the Sherman Act, reasoning that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." 495 U.S. at 339-40. In short, "[w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of the defendant's conduct." Id. at 340-41.

The Court concludes that Fair Isaac lacks antitrust standing to recover damages under § 4 of the Clayton Act for the claimed lost profits sustained as a result of Defendants' alleged antitrust violations. If in creating VantageScore, Defendants agreed to artificially set the price of VantageScore higher than the price dictated by market forces reflecting perceived value, consumers would reject VantageScore in favor of FICO scores since FICO scores would

---

[12] There is no allegation of predatory pricing here.

represent a greater value than VantageScore. Fair Isaac would therefore benefit—or, perhaps more appropriately, not be harmed—by VantageScore since consumers would choose FICO scores priced more competitively given their quality. Alternatively, if market forces dictate that the prices set for VantageScore present a greater value proposition to consumers, who then choose VantageScore credit scores over FICO credit scores, then Fair Isaac can reposition FICO Scores to recapture sales lost to VantageScore.[13] The antitrust laws certainly are not designed to protect a competitor from having to compete with a new entrant to the market on the basis of price. The offering of temporary discounts on VantageScore to certain important lenders does not change the analysis; such tactics are routinely employed when engaged in competition.

Fair Isaac further argues, however, that it has standing because it was the target of the alleged conspiracy and that the purpose of the conspiracy was to drive Fair Isaac out of business. In a case involving similar issues, the plaintiff argued that it had standing to claim an alleged antitrust conspiracy aimed at driving the plaintiff out of business as part of an overall scheme to protect the conspiracy. Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc., 802 F. Supp. 1544,

---

[13] There is evidence in the record suggesting that on a single occasion, Equifax raised the price charged to one lender for FICO scores. See, e.g., Bial Decl., Ex. 201 (Kramers-Dove Dep., June 11, 2008) 762:11-763:20. Fair Isaac cites this incident in support of the claim that Defendants engaged in efforts to convince lenders to switch to VantageScore. It is disputed whether this claimed incident of raising FICO scores prices actually occurred. See id., Ex. 199 (Noll Dep.) 272:14-275:18. There also appears to be a dispute about what inferences may be drawn from suggestions that certain credit bureaus independently decided to limit Fair Isaac's access to certain credit data and its significance to the antitrust claims. See Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Antitrust Claims at 21, 27, 29; Defs.' Mem. in Supp. of Mot. for Summ. J. Dismissing Antitrust Counts at 30-32. Even viewing the evidence of raising FICO scores prices and limiting access to data in the light most favorable to Fair Isaac, standing is still lacking. Fair Isaac's expert on damages, Meyer, opined that VantageScore's presence in the marketplace caused Fair Isaac to suffer lost profits, but he did not establish a causal link that Fair Isaac's lost profits were attributable to the claimed instance of raising FICO scores prices and limiting Fair Isaac's access to data. See Meyer Report at 14-16.

1548 (S.D. Tex. 1991). The court responded that the "overall scheme theory does not provide support for the proposition that [the plaintiff] has standing" because "[a] private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing injury causally linked to an illegal presence in the market." Id. at 1549; Ronald W. Davis, Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury, 70 Antitrust Law Journal 697, 745 (2003) ("Antitrust injury . . . never arises from a competitor's mere presence in the market, without more, even though there may be a colorable claim that the competitor's presence is somehow 'illegal.'"). Therefore, the court concluded, that the plaintiff was the "target of the conspiracy" did not establish that an antitrust injury had been suffered. Id. The same is true in this case. There may be a colorable claim that VantageScore constitutes an illegal presence in the market because of the purpose behind its formation (aiming to eliminate FICO scores), the parties involved in its formation, the sharing of information during its formation, and the alleged agreement by the Credit Bureaus to eliminate their in-house scores and not to compete on prices of VantageScore. Nonetheless, merely showing that VantageScore targeted and caused injury to Fair Isaac is insufficient to show an antitrust injury necessary to establish antitrust standing. Nor does the fact that the alleged goal of the conspiracy was to "eliminate" Fair Isaac from the credit scoring industry automatically establish injury of the type the antitrust laws are designed to prevent. See Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 823 (6th Cir. 1982) ("Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor.").

Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268 (3d Cir. 1999), relied on by Fair Isaac, is inapposite. Angelico involved a conspiracy among rival physicians conspiring with

hospitals to prevent the plaintiff from entering the market and competing with them by boycotting him from the cardiothoracic surgery market entirely. Id. at 273. Here, Fair Isaac maintains a dominant presence in the credit scoring market, and the alleged goal of eliminating Fair Isaac from the credit scoring market is not accomplished through an anticompetitive boycott, as was the case in Angelico. Rather, the alleged goal of eliminating Fair Isaac is accomplished, if at all, by (1) persuading consumers—specifically a select group of important lenders—that VantageScore credit scores are as good or better than FICO scores and (2) employing temporary price discounts to entice those lenders to switch to VantageScore, which in turn will lead to the rest of the market also switching. A strategy of persuading the market that one product is equal or superior to another product and that the price of the first product presents a higher value proposition than does the second is the very nature of competition. The performance of the products as they compete in the market will determine which product prevails.

Professor Noll's opinion that the alleged conduct by Defendants had and will continue to have anticompetitive effects on the market such as "causing higher prices[] and lower quality in databases[] and that these harms were caused by the structure and operation of the VantageScore joint venture" does not create antitrust standing. Noll Decl. at 91, 93-96. The anticompetitive effects of Defendants' alleged conduct on the market goes to the ultimate question of whether Fair Isaac has established the elements of its antitrust claims under the Sherman Act, not to the question of whether Fair Isaac has standing to assert such a claim. As the Supreme Court has instructed, "[t]he antitrust injury requirement cannot be met by broad allegations of harm to the market as an abstract entity." Atlantic Richfield, 495 U.S. at 339 n.8; see also Doctor's Hosp. of

Jefferson, Inc. v. Se. Med. Alliance, Inc., 123 F.3d 301, 305 (5th Cir. 1997) (holding that antitrust injury for standing purposes "must be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition"); Angelico, 184 F.3d at 275 n.2 (explaining that the district court erred by incorporating the issue of anticompetitive market effect into the standing analysis, confusing antitrust injury with an element of a claim under § 1); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 448 (2d Cir. 2005) (Katzmann, J., concurring in part and dissenting in part) (maintaining that issues involving anticompetitive market effect are "classic 'rule of reason' questions, distinct from the antitrust standing question").

Fair Isaac's next argument is that Defendants' decision to set prices based on what they perceived to be VantageScore's value instead of on costs shows that the pricing of VantageScore was anticompetitive and caused Fair Isaac to suffer an antitrust injury. Again, market forces will determine whether Defendants priced VantageScore competitively, and Fair Isaac is free to avail itself of those same market forces to position its FICO scores more competitively. Fair Isaac's claim of a price-fixing conspiracy overlooks a critical distinction that illustrates the difference between injury and antitrust injury and reveals why Fair Isaac's antitrust claims suffer from a fundamental, indeed fatal, flaw. The alleged conspiracy does not employ tactics that seek to destroy or cut off competition *before it even has a chance to take hold*; rather, the alleged conspiracy is dependent on convincing the market (particularly, certain key lenders) that greater value can be realized by switching from FICO scores to VantageScore credit scores. This is the very essence of competition.

Fair Isaac argues, however, that the issue of antitrust standing should not be evaluated without considering the evidence of Defendants' alleged "bad acts," namely, the use of "disinformation" and false statements,[14] and the ability to manipulate the price of FICO scores relative to VantageScore credit scores by controlling the aggregated credit data and the sale of credit scores. Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Antitrust Claims at 26-28. Even after considering this evidence, Fair Isaac has failed to establish antitrust standing. Cf. Re/Max Int'l v. Realty One, 900 F. Supp. 132, 159 (D. Ohio 1995) (holding that "allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent," and thus fail to state an antitrust claim upon which relief can be granted), aff'd 173 F.3d 995, 1024 (6th Cir. 1999); see also Associated Gen. Contractors, 459 U.S. at 526-27 (holding that allegations that defendants employed deception to divert business from plaintiffs might constitute common-law fraud or deceit but are not subject to review under the federal antitrust laws); Asa Accugrade, Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 217, n.5 (D.D.C. 2005) (holding that allegations of defamation and tortious interference failed to support an antitrust claim because such allegations do not demonstrate conduct that is "'manifestly anticompetitive'" or "'always tend[ing] to restrict competition'") (quoting Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1058 (8th Cir. 2000)); Santana Prods. Inc. v. Bobrick Washroom Equip., Inc., 249 F. Supp. 2d 463, 513-15 (M.D. Pa. 2003) (concluding that the

---

[14] The portions of the record that Fair Isaac cites in support of its argument fail to show that Defendants made remarks about FICO scores that could properly be viewed as being misleading, false, or disparaging. For example, Fair Isaac relies on the following entries of Trans Union employee's call logs with customers: (1) "Explaining FICO away by saying it is a business score and TC is consumer score"; (2) "Customer wants FICO, told her she does NOT NEED IT"; and (3) "[Customer] upset that we don't use the FICO score, I explained benefits of [VantageScore] and told him FICO SCORES ARE VERY EXPENSIVE." Bial Decl., Ex. 182, entry nos. 1267647, 1268411, 1271913.

allegation, even if true, that a defendant "joined together with others to criticize [the plaintiff's] products falsely" did not constitute an unreasonable restraint of trade entitling a plaintiff to redress under § 1 of the Sherman Act and that plaintiff was free to counter alleged misrepresentations about its product), affirmed in part, vacated in part, and remanded by 401 F.3d 123 (3d Cir. 2005); Bushnell Corp. v. ITT Corp., 973 F. Supp. 1276, 1284-85 (D. Kan. 1997) (holding that although the "logical and stated result" of a defendant contacting a plaintiff's customers and vendors, defaming the plaintiff, using the plaintiff's trade secrets and proprietary information, marketing products in competition with the plaintiff, and seting prices barely above the plaintiff's costs was to reduce the plaintiff's ability to compete in the market, "[s]uch injury is not an antitrust injury"); Laurie Visual Etudes, Inc. v. Chesebrough-Pond's, Inc., 473 F. Supp. 951, 960 (S.D.N.Y. 1979) (holding that "the sum and substance of plaintiff's case," is not an antitrust injury, meaning an "injury of the type that antitrust laws were intended to prevent; it is more accurately characterized, as [the plaintiff] does in its complaint, as allegations of state law 'fraud and deceit, unethical conduct, misuse of trade secrets, and unfair competition.'").

The Eighth Circuit's decision in International Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255 (8th Cir. 1980), cited by Fair Isaac, supports the position that there may be cases in which a defendant's use of deception and misrepresentations to exclude a competitor from the market can form the basis of an antitrust injury. But the circumstances here are significantly different. First, antitrust standing apparently was not in dispute in International Travel, as the Eighth Circuit's opinion does not even address the matter. Second, in International Travel, the defendant that allegedly employed misrepresentation and deception did so with the aim of preventing the plaintiff at the outset from becoming a competitive threat to the

defendant's monopoly.  Id. at 1257-58.  In contrast, the disparagements here were allegedly made by a new entrant to the market (VantageScore) with the apparent aim of enhancing its ability to compete with the company occupying the dominant position in the market (Fair Isaac). See id. at 1267 ("Davids can engage in many kinds of conduct in the marketplace that are forbidden to Goliaths.") (quotation omitted).  Third, the causal connection between the advertisements containing the allegedly misleading or deceptive statements and the claimed effect of reducing competition was established in International Travel.  See 623 F.2d at 1260-63. Here, the record lacks evidence to show that Fair Isaac suffered injury (lost profits) flowing from a *reduction in competition* caused by Defendants' alleged use of deception and false or misleading statements.

Importantly, International Travel was decided prior to the cases holding that disparagement or deception regarding a competitor's product fails to give rise to antitrust injury. Even the International Travel court anticipated, however, future limitation in permitting allegations of deceptive and misleading business practices to be sufficient to show antitrust injury.  The court conceded that the conduct in that case, including the deceptive statements about the plaintiff's product, was not a "conventional restraint of trade, i.e., a tie-in, price fixing or territorial division."  Id. at 1267.  "It is, in fact," the court explained, "a form of competition and because competition is the object sought to be preserved by the antitrust laws, we must be careful in [distinguishing] between fair competition, unfair competition and competition that is so unfair as to rise to the level of an unreasonable restraint of trade."  Id.

Fair Isaac has failed to show that it has standing to seek damages under § 4 of the Clayton Act for the alleged antitrust violations.

### b. Injunctive Relief under § 16

Unlike the standing requirement to pursue damages under § 4 of the Clayton Act, which requires a showing of actual antitrust injury, standing to seek injunctive relief under § 16 of the Clayton Act requires that Fair Isaac demonstrate a *threatened* antitrust injury, meaning an injury of the type the antitrust laws are intended to prevent. See Cargill, 479 U.S. at 113. Much of the threatened injury Fair Isaac alleges, similar to the actual injury alleged in seeking damages under § 4, is lost profits Fair Isaac will realize in the future as a result of having to compete with VantageScore. The same principles, discussed in the preceding analysis, that a plaintiff lacks antitrust standing to remedy injuries caused by increased competition, are equally applicable to the standing analysis for injunctive relief. See Campos v. Ticketmaster Corp., 140 F.3d 1166, 1172 (8th Cir. 1998) (citing Cargill, 479 U.S. at 114-15).

A predominant theme throughout Fair Isaac's antitrust claims is that Defendants' efforts were designed to replace FICO scores with VantageScore credit scores everywhere FICO scores appear and drive Fair Isaac out of the credit scoring industry entirely. In the March 4, 2008 Order, the Court explained:

> Defendants' combined dominance in the aggregated credit data market and control of the sales of bundles of aggregated credit data and credit scores could create a dangerous probability that Defendants can install VantageScore as a monopoly in the credit scoring market if they agree to take anticompetitive measures such as manipulating the prices of credit scores and denying Fair Isaac access to aggregated credit data.

March 4, 2008 Order at 15-17. Defendants contend that circumstances have changed and that Fair Isaac cannot show that there continues to be a sufficiently impending threat to warrant a finding that Fair Isaac has standing to seek injunctive relief under § 16 of the Clayton Act.

The Eighth Circuit has had few opportunities to elaborate on the "threatened injury" requirement of antitrust standing to seek injunctive relief under § 16. In <u>Midwest Communications</u>, however, the court did approve of a district court's conclusion that a plaintiff lacked standing when there had been no showing of an "*impending* antitrust injury." 779 F.2d at 452 (emphasis added). Other courts have explained that the requirement of threatened injury "dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate,' not 'conjectural' or 'hypothetical.'" <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 14 (1st Cir. 2008) (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974)) (internal quotation omitted). Simply stated, "[t]here must be some immediacy or imminence to the threatened injury." <u>Id.</u> (quotation omitted).

Fair Isaac does not face a sufficiently impending or imminent threat to satisfy the standing requirement of § 16. As Defendants emphasize, VantageScore has been on the market for three years and has garnered only 5.7% of the credit scoring market while Fair Isaac's dominant position has experienced very little change. <u>See</u> Noll Decl. at 72. By Professor Noll's estimate, the most recent numbers show that Fair Isaac still captures more than 74% of the market share for total revenue from all segments of the credit scoring industry, only a 4% decline from its position in the year prior to the introduction of VantageScore. <u>Id.</u> In the market segment that generates that most revenues, business-to-business or "batch," Fair Isaac's share decreased less than 1% in the first two years of VantageScore's existence. <u>Id.</u> In the consumer-direct segment, the only segment in which VantageScore has made any significant in-roads (16.2% of the market share in 2007), Fair Isaac's share increased more than 5% in the first year

of VantageScore's existence and then declined 2% in the second year; thus, two years into VantageScore's existence, Fair Isaac's share of the consumer-direct segment increased 3% from the year prior to the introduction of VantageScore.  Id.  When deposed, Professor Noll described the effect that VantageScore has had on the credit scoring market:

> Well, there is no evidence that it has had an effect, but I would say that what it's long-run effect will be—we have learned something in these years, which is that VantageScore isn't very successful.
> . . . .
>
> Now, whether that's because it's inherently unsuccessful, that it was a bad idea to begin with, or due to the presence of this litigation the full-blown effort to replace FICO with VantageScore is in abeyance, we don't know that either.  But the reality is, it hasn't had much success in penetrating the market.  It hasn't—it's had a small effect on Fair Isaac's market share, but not a very large effect, and there doesn't appear to be any systematic across-the-board difference in prices due to its introduction.

Gant Decl., Jan. 30, 2009, Ex. 35 (Noll Dep.) 122:1-19.

Fair Isaac responds that the purpose of § 16's injunctive relief is to avoid having to "wait for the dead bodies on the floor."  Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Antitrust Claims at 31.  But the argument that a private party should not have to wait until its been eliminated (or "killed" as Fair Isaac puts it) as a result of alleged antitrust violations does not negate the legal requirement of immediacy for antitrust standing to seek injunctive relief.  Nor is there any evidence to support the theory that Defendants have simply halted their plans temporarily during the pendency of this lawsuit.  Even if Fair Isaac is correct in its speculation that Defendants will resume their efforts when this lawsuit is over and "the Court is not looking," Fair Isaac can presumably take action at that time to protect itself.  In sum, the Court is not convinced that evidence suggesting that Fair Isaac may have indeed lost some small amount

of business to VantageScore makes the requisite showing to establish antitrust standing to seek injunctive relief.

The Court also finds persuasive Defendants' argument that Fair Isaac's entrance into a "preferred partnership with Equifax" in connection with a settlement agreement of the claims between Fair Isaac and Equifax in this matter ensures that Fair Isaac will have access to data and distribution channels. Defs.' Mem. in Supp. of Mot. for Summ. J. Dismissing Antitrust Counts at 16-18. This development casts serious doubt on the assertion that VantageScore and the alleged antitrust scheme pose a real and immediate threat of driving Fair Isaac from the credit scoring market entirely. Fair Isaac's own arguments on other issues reinforce this conclusion. For example, Fair Isaac argues that basic principles of economics demand the inference that a conspiracy existed—a conspiracy to prevent the outbreak of competition among the Credit Bureaus through agreements to fix prices for VantageScore and by discontinuing their in-house credit scores, while at the same time colluding to target and convert to VantageScore a select group of important lenders through temporary discounts on VantageScore, misleading information, and price manipulation of FICO scores. The success of such a conspiracy, Fair Isaac has argued, depended on the participation of *all three* bureaus, thus negating the notion that the Credit Bureaus acted independently. See, e.g., Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Antitrust Claims at 5, 7, 10, 12-13, 32-33, 36-37.

Fair Isaac has failed to carry its burden of proof of antitrust standing to seek either damages under § 4 or injunctive relief under § 16 for the alleged antitrust violations by

Defendants.  Accordingly, Defendants are entitled to summary judgment on Fair Isaac's antitrust claims.[15]

### 4.    Lanham Act and Related State-law Claims

Defendants also move for summary judgment on Fair Isaac's claims arising under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a); Minnesota common law; and the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44.  The parties discuss the claims by dividing them into essentially two groups.  The first group is based on allegations that Defendants infringed on Fair Isaac's trademarks and includes Fair Isaac's claims of unfair competition and trademark infringement under the Lanham Act (Counts One and Two); trademark infringement, "passing off," and unjust enrichment under the common law (Counts Three, Four, and Seven); and violations of the MDTPA (Count Six).  The second group involves allegations that Defendants made literally false and misleading statements in advertising and includes Fair Isaac's claims of false advertising under the Lanham Act (Count Five); violations of the MDTPA (Count Six); and unjust enrichment under the common law (Count Seven).  The claims based on the common law and the MDTPA are "coextensive" with the federal claims under the Lanham Act, and, for that reason, the Court analyzes all the claims together, using the same standards.  See DaimlerChrysler AG v. Bloom, 315 F.3d 932, 936, n.3 (8th Cir. 2003); Rainbow Play Sys., Inc. v. GroundScape Techs., LLC, 364 F. Supp. 2d 1026, 1032, 1039 (D. Minn. 2005); Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc., 822 F. Supp. 1437, 1441 (D. Minn. 1993).  To the extent that subtle differences have been recognized between

---

[15] In light of the grant of summary judgment, the Court will not address Defendants' arguments that there is a failure of proof on the substantive elements necessary to prove the alleged antitrust violations.

what is actionable under the MDTPA as opposed to the Lanham Act, see United HealthCare Ins. Co. v. AdvancePCS, No. Civ. 01-2320, 2002 WL 432068, at *14 n.17 (D. Minn. Mar. 18, 2002), such differences do not impact the analysis of the issues raised by Defendants' motion for summary judgment.

### a.     Claims Based on Alleged Infringement

Fair Isaac owns several trademark registrations for the numerical range of 300-850 as it relates to credit scoring, credit risk management, and credit scoring services (hereinafter referred to as the "300-850 mark"). See 3d Am. Compl. ¶¶ 32-33. Fair Isaac asserts that Defendants adopted scoring ranges for their credit scores that copied or were confusingly similar to the 300-850 mark.

To establish claims of trademark infringement and unfair competition under 15 U.S.C. §§ 1114, 1125(a), a plaintiff must prove that (1) it owns a valid, distinctive trademark that is entitled to protection and (2) the defendant's use of a similar mark was likely to confuse consumers about the source of the defendant's product. See Jeld-Wen, Inc. v. Dalco Indus., Inc., No. 99-1005, 1999 WL 1024002, at *2 (8th Cir. Nov. 10, 1999) (citing Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999)); Eniva Corp. v. Global Water Solutions, Inc., 440 F. Supp. 2d 1042, 1049, n.3 (D. Minn. 2006). Defendants' motion for summary judgment challenges Fair Isaac's claims on the first element, arguing that Fair Isaac's 300-850 mark is not entitled to trademark protection because it is not distinctive.

### (i)     Suggestive or Descriptive

Registered trademarks "are presumed to be distinctive." Aromatique, Inc. v. Golden Seal, Inc., 28 F.3d 863, 869 (8th Cir. 1994). The presumption, however, is rebuttable. WSM,

Inc. v. Hilton, 724 F.2d 1320, 1326 (8th Cir. 1984). "To determine whether a mark is distinctive and thus entitled to trademark protection, [a court] must first categorize it as generic, descriptive, suggestive, or arbitrary." Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 974 (8th Cir. 2006). Generic and descriptive marks are generally not protectible, whereas suggestive and arbitrary marks are inherently distinctive and protectible. Id. (citing Frosty Treats Inc. v. Sony Computer Entm't Am. Inc., 426 F.3d 1001, 1005 (8th Cir. 2005)). A mark is descriptive if it designates the characteristics, qualities, or features of the product and is entitled to trademark protection only if it is shown to have acquired a secondary meaning. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Another way of expressing this concept is that a descriptive mark is one that conveys an "immediate idea of the ingredients, qualities or characteristics" of the product. Frosty Treats, 426 F.3d at 1005. Suggestive marks, on the other hand, "require imagination, thought, and perception to reach a conclusion as to the nature of the goods" and are entitled to protection regardless of whether they have acquired a secondary meaning. Id. Whether a mark is merely descriptive as opposed to suggestive or arbitrary is typically a question of fact. See WSM, Inc., 724 F.2d at 1326 ("The correct categorization of a given term is also a factual issue.") (citing Soweco, Inc. v. Shell Oil, 617 F.2d 1178, 1183 n.12 (5th Cir. 1980)).

"The lines of demarcation between merely descriptive and suggestive marks is admittedly hazy and can be difficult to discern." Tumblebus Inc. v. Cranmer, 399 F.3d 754, 763 (6th Cir. 2005). As one jurist commented: "[I]t is often a difficult distinction to draw and is, undoubtedly, often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation." Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 379 (7th Cir. 1976). One

test that has been employed to distinguish between descriptive and suggestive marks considers "how immediate and direct is the thought process from the mark to the particular product." Loegering Mfg. v. Grouser Prods., Inc., 330 F. Supp. 2d 1057, 1069-70 (D.N.D. 2004) (quotation omitted). Whereas suggestive marks "subtly indicate something about the product," a descriptive mark "*immediately* conveys characteristics, qualities or other features of a product." Woodroast Sys. v. Restaurants Unlimited, 793 F. Supp. 906, 911-12 (D. Minn. 1992) (emphasis added), aff'd, 994 F.2d 844 (8th Cir. 1993).

Defendants argue that the term 300-850 is merely descriptive and, thus, not entitled to protection. In support, Defendants cite the deposition testimony of a former executive of Fair Isaac who agreed that the numerical range of 300 to 850 "conveys . . . the approximate range of what the . . . score range [for FICO credit scores] falls into." McCurdy Decl., Jan. 30, 2009 [Docket No. 584], Ex. 1 (St. John Dep.) 103:8-105:12. Another employee of Fair Isaac indicated that the range 300 to 850 was chosen, in part, because that range "approximated the scale that [Fair Isaac was] using for the Classic FICO score." Id., Ex. 2 (Kramers-Dove Dep., May 7, 2008) 54:22-55:2. Furthermore, Defendants claim that their argument is reinforced by the way Fair Isaac uses 300-850, which is to inform consumers that their credit scores will fall within that range of numbers. See, e.g., id., Ex. 9 ("A FICO score is a 3-digit number ranging from 300-850 that represents your credit rating."); Ex. 11, FIC 0308866 ("FICO scores range from about 300 to 850."). Defendants conclude, therefore, that "[i]t is beyond dispute that the term '300-850' describes a characteristic of [Fair Isaac's] scoring services: the lower and upper boundaries of the range of possible [FICO scores]." Defs.' Mem. in Supp. of Mot. for Summ. J. Dismissing Trademark-Related Counts [Docket No. 582] at 8.

Fair Isaac argues in response that the term 300-850 is not the "actual scoring range for any of [Fair Isaac's] classic FICO credit scores. The actual scoring range for the first FICO score developed for Trans Union is 397-871, for Experian is 368-839, and for Equifax is 407-829. Every version of these scores has a different range—none of which is 300-850." Id. at 15. The Court is not persuaded. While 300-850 does not articulate the precise scoring range of FICO scores, it is a bracket that nearly encompasses all three actual scoring ranges. Nor is the Court persuaded that the term 300-850 is more than merely descriptive simply because the range of 300-850 applicable to FICO scores was chosen arbitrarily and any other range of numbers could just have easily been selected. Whether or not the scoring range was chosen arbitrarily, the pivotal question is whether the term was chosen arbitrarily in light of the nature, ingredients, qualities, and characteristics of the product.

Fair Isaac next argues that the term 300-850 is not merely descriptive because "[i]t's simply a numeric string that, on its own, does not convey any specific information about Fair Isaac's products or services. Without reference to . . . credit-scoring products or services, 300-850 has no meaning at all." Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Trademark-Related Counts [Docket No. 626] at 14-15. Fair Isaac's position that the term 300-850 must be viewed without reference to the type of product or service to which it relates, finds some support in the law. In Tumblebus, the Sixth Circuit held:

> Although the word "tumble" does describe a subset of the activities which occur inside Tumblebus Inc.'s "bus," the connection between "tumble" and "bus" is not so obvious that a consumer seeing TUMBLEBUS in *isolation* would know that the term refers to mobile-gymnastics instruction, and not, for instance, a mobile laundry service using tumble-dryers.

399 F.3d at 763.  Thus, the <u>Tumblebus</u> court concluded that the district court did not err in classifying the mark "Tumblebus" as inherently distinctive and suggestive.  <u>Id.</u>  The greater weight of authority, however, holds that context should not be ignored when determining whether a term is descriptive or suggestive.  <u>See</u> <u>Thompson Med. Co., Inc. v. Pfizer Inc.</u>, 753 F.2d 208, 213 (2d Cir. 1985) ("[T]he determination of whether a mark is descriptive or suggestive cannot be made in a vacuum; it is necessary to surmise the mental processes of those in the marketplace at whom the mark is directed.").  The court in <u>Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.</u>, illustrated the importance of context in the following example: "whereas an air conditioning company placing a penguin on its products has selected a suggestive mark, a publishing company with the same logo has an arbitrary mark."  280 F.3d 619, 636 (6th Cir. 2002); <u>see also</u> <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9, n.6 (2d Cir. 1976) (highlighting the importance of context through the example of the term "Ivory," which "would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap").

Here, 300-850, considered in isolation, a vacuum, or "without reference" to credit-scoring products or services, has no particular meaning and may be suggestive or even arbitrary.  But when considered in the context in which the term is used, the credit-scoring industry, the term directly conveys an "immediate idea of the ingredients, qualities or characteristics" of Fair Isaac's credit-scoring products and services, namely, an approximate numerical range in which Fair Isaac's FICO scores will fall.  <u>See</u> <u>Frosty Treats</u>, 426 F.3d at 1005.  Therefore, the 300-850 mark is descriptive and, as such, is entitled to trademark protection only if it has acquired secondary meaning.

### (ii)   Secondary Meaning

"Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product."  Frosty Treats, 426 F.3d at 1005 (quotation omitted).  Secondary meaning is established "by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others."  B & B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 389 (8th Cir. 2009) (quotation omitted).  "Secondary meaning does not require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source."  Frosty Treats, 426 F.3d at 1005.  Although direct evidence such as consumer testimony or surveys is most probative, secondary meaning can also be proven through circumstantial evidence, such as "the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying."  Id.

Defendants argue that the 300-850 mark has not acquired secondary meaning.  In support, Defendants stress that Fair Isaac has not conducted any consumer surveys to determine whether consumers identify or associate the 300-850 mark with Fair Isaac.  Defendant also claim that Fair Isaac has not promoted the 300-850 mark as a brand.  Further, Defendants contend that a survey conducted by their expert, Phillip Johnson, shows that only about 2% of survey respondents associated the 300-850 mark with a single source.  See McCurdy Decl., Jan. 30, 2009, Ex. 28 (Johnson Report) ¶¶ 37-38.

Fair Isaac responds that secondary meaning can be inferred from Defendants' decision to "mimic" Fair Isaac's FICO scores by adopting three-digit scoring ranges similar to the scoring range described by the 300-850 mark. See Collyard Decl., Mar. 5, 2009 [Docket No. 627], Ex. 1 (Bokhart Dep.) 268:1-271:3; Ex. 3. Secondary meaning can also be inferred, Fair Isaac claims, by the evidence tending to show that consumers confused Defendants' credit scores with FICO scores. Records from Trans Union and Experian show that customers complained when they realized the credit score they had purchased was Trans Union's or Experian's in-house score or a VantageScore credit score rather than a FICO score.[16] See, e.g., Collyard Decl., Mar. 5, 2009, Ex. 5 (Danaher Dep.) 275:20-276:1; Ex. 6, TU-FI-126879; Ex. 35.

The evidence identified by Fair Isaac lends support to the inference that Defendants intentionally copied Fair Isaac's 300-850 mark and that consumers confused Defendants credit scores with FICO credit scores as a result. As the Eighth Circuit has recognized, evidence of intentional copying is a factor to consider in determining whether a mark has acquired secondary

[16] In their reply brief, Defendants advance a two-fold attack on the evidence Fair Isaac presents to demonstrate confusion. Defs.' Reply Mem. in Supp. of Mot. for Summ. J. Dismissing Trademark-Related Counts [Docket No. 637] at 5-6. First, they argue that the evidence, although it shows confusion generally regarding credit scores, fails to show that the confusion was caused by Defendants' credit scores employing scoring ranges similar to the 300-850 range. Fair Isaac's expert, James Berger, opined, however that there was a "direct correlation between the level of consumer confusion" and the similarity of the numeric range employed in Defendants' credit scores to Fair Isaac's 300-850 mark. Collyard Decl., Mar. 5, 2009, Ex. 36 (Berger Report) ¶ 51. Defendants' contention that causation has not been adequately proved and their criticisms of Berger's methodology in conducting the survey are weight-and-credibility matters for the factfinder. Defendants' second argument, that the confusion evidence is "classic hearsay and cannot be used to defeat [summary judgment]," lacks merit. Defs.' Reply Mem. in Supp. of Mot. for Summ. J. Dismissing Trademark-Related Counts at 5. Both Fair Isaac and Defendants are likely to offer consumer information at trial. Defendants first raised the hearsay argument in their reply brief and failed to provide a meaningful explanation of why such evidence is hearsay (offered for the truth of the matter asserted) and, if so, why it is inadmissible hearsay. Given the absence of adequate briefing, Defendant's hearsay issue will be determined, if necessary, at a later time.

meaning.  See Frosty Treats, 426 F.3d at 1005.  Evidence of actual confusion also is relevant to determining whether secondary meaning has been established.  See 3M Co. v. Intertape Polymer Group, Inc., 423 F. Supp. 2d 958, 964 (D. Minn. 2006); see also Best Buy Warehouse v. Best Buy Co., Inc., 920 F.2d 536, 537 (8th Cir. 1990) (McMillan, J., dissenting) (stating that courts consider evidence of actual confusion in determining whether secondary meaning has been established).

Genuine issues of material fact persist on the issue of secondary meaning.  Accordingly, the Court need not address Fair Isaac's alternative argument that Trans Union and Experian should be deemed licensees of Fair Isaac's 300-850 mark and, for that reason, be estopped from challenging the validity of the 300-850 mark.

### (iii)    Keyword Advertising

Fair Isaac bases its claims, in part, on Defendants' purchase of internet search engine "keywords" containing Fair Isaac's trademarks.  Defendants argue that, as a matter of law, no infringement occurred given that none of their sponsored search advertisements actually include Fair Isaac's trademarks in the text.[17]   See Defs.' Mem. in Supp. of Mot. for Summ. J. Dismissing Trademark-Related Counts at 12-13; Defs.' Reply Mem. in Supp. of Mot. for Summ. J. Dismissing Trademark-Related Counts at 7.

This Court has previously held that purchasing keywords containing a trademark to generate advertising from internet searches constitutes "use in commerce" as required to maintain a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1127.  See

---

[17] Defendants also argue that the claim against Trans Union fails because Trans Union purchased the keywords in carrying out its contractual obligation to Fair Isaac to market FICO scores.  But, as Fair Isaac argues, fact issues remain regarding whether Trans Union used the keywords in connection with websites that did not offer FICO scores.

Hysitron Inc. v. MTS Sys. Corp., No. 07-1533, 2008 WL 3161969, at *4-6 (D. Minn. Aug. 1, 2008). Whether Defendants' sponsored advertisements actually include Fair Isaac's trademarks in the text is not determinative of whether there has been any infringement. The Second Circuit recently explained this point in Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127-31 (2d Cir. 2009). The court concluded that using a keyword that includes a trademark to generate advertising through internet searches is actionable under the Lanham Act. Id. at 130-31. The court further explained that the question of the likelihood of confusion turns on the particular circumstances surrounding the manner in which the allegedly infringing website is presented to the consumer:

> We have no idea whether Rescuecom can prove that Google's use of Rescuecom's trademark in its AdWords program causes likelihood of confusion or mistake. Rescuecom has alleged that it does, in that would-be purchasers (or explorers) of its services who search for its website on Google are misleadingly directed to the ads and websites of its competitors in a manner which leads them to believe mistakenly that these ads or websites are sponsored by, or affiliated with Rescuecom. This is particularly so, Rescuecom alleges, when the advertiser's link appears in a horizontal band at the top of the list of search results in a manner which makes it appear to be the most relevant search result and not an advertisement. What Rescuecom alleges is that by the manner of Google's display of sponsored links of competing brands in response to a search for Rescuecom's brand name (which fails adequately to identify the sponsored link as an advertisement, rather than a relevant search result), Google creates a likelihood of consumer confusion as to trademarks. If the searcher sees a different brand name as the top entry in response to the search for "Rescuecom," the searcher is likely to believe mistakenly that the different name which appears is affiliated with the brand name sought in the search and will not suspect, because the fact is not adequately signaled by Google's presentation, that this is not the most relevant response to the search.

Id. at 130-31. To the extent that two district courts have reached seemingly different conclusions,[18] the Court declines to follow the reasoning employed by those courts.

A factfinder will need to decide whether Defendants' purchase of keywords including Fair Isaac's trademarks, which caused Defendants' websites to appear on the results page when a consumer ran an internet search consisting of those keywords, created a likelihood of confusion. Fair Isaac's expert, Berger, opined that such a likelihood of confusion existed. See McCurdy Decl., Jan. 30, 2009, Ex. 29 (Berger Report) ¶¶ 7-10. Defendants' argument that the methodology of Berger's survey was so fundamentally flawed that it deserves no weight is a matter better suited for a future motion in limine or for the factfinder assessing the weight and credibility of the evidence.

In sum, genuine issues of material fact preclude summary judgment on Fair Isaac's claims based on allegations that Defendants infringed on Fair Isaac's trademarks.

### b.      False Advertising

Fair Isaac asserts additional claims under the Lanham Act, the MDTPA, and the common law based on allegations that Defendants made literally false and misleading statements in advertising. To establish a claim of false advertising under either the Lanham Act or MDTPA, a plaintiff must demonstrate that: (1) the defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material; (4) the

---

[18] J.G. Wentworth, S.S.C. Ltd. P'Ship v. Settlement Funding LLC, No. 06-0597, 2007 WL 30115, at *6-8 (E.D. Pa. Jan. 4, 2007) (concluding that because a link to a defendant's website appears on the search results page as one of many choices for the potential consumer to investigate, no "likelihood of confusion" existed as a matter of law); Gov't Employees Ins. Co. v. Google, Inc., No. 1:04CV507, 2005 WL 1903128, at * (E.D. Va. Aug. 8, 2005) (same).

defendant caused its false statement to enter into interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a loss of goodwill associated with its product. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998). Fair Isaac's claims are premised on statements by Defendants concerning (1) the extent to which lenders actually use Trans Union's and Experian's in-house credit scores and VantageScore credit scores in making lending decision and (2) VantageScore's predictive ability compared to other scores on the market. See Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Trademark-Related Counts at 34-38, 41-42.

In claiming that Defendants made false statements about the use of in-house scores and VantageScore by lenders, Fair Isaac focuses on statements by Trans Union and Experian that, in Fair Isaac's view, suggest that "an appreciable number of lenders" use the in-house scores or VantageScore in making lending decisions. Fair Isaac contends that what the evidence actually shows is that less than one percent of lenders used Trans Union's in-house score, no lender used Experian's in-house score, and no lender used VantageScore credit scores when the statements at issue were made. See Collyard Decl., Mar. 5, 2009, Ex. 19, TU-FIO-009592; Ex. 11 (Williams Dep.) 101:2-4; Ex. 51. Therefore, Fair Isaac concludes, the statements are literally false or literally false by necessary implication because, at the time the statements were made, few if any lenders used the in-house scores or VantageScore.

The Court agrees with Defendants that the statements on which Fair Isaac relies fail to convey the implied message that an appreciable number of lenders use the in-house scores of VantageScore in making lending decisions. The statements at issue regarding the in-house

scores and VantageScore are generally of the following nature: "Most lenders would view your creditworthiness as very poor," "Know where you stand no matter which credit bureau your lender checks," "the same type of score that lenders see," and "Most lenders offer their 'good' rates to consumers in this category." <u>See</u> Fair Isaac's Mem. in Opp'n to Mot. for Summ. J. Dismissing Trademark-Related Counts at 34-35. Contrary to Fair Isaac's contention, these and other similar statements do not explicitly or implicitly convey that "most lenders" or "an appreciable number of lenders" (or any lender at all for that matter) actually rely on Defendants' scores to arrive at an assessment of the consumer's creditworthiness. Rather, they simply convey that the score shown to the consumer is indicative of how lenders would assess creditworthiness. At the very least, the statements are susceptible of more than one reasonable interpretation and, therefore, cannot be literally false.

With regard to statements about VantageScore's predictiveness as compared to other scores on the market, the specific statements at issue claim, for example, that the VantageScore credit score "allows credit grantors to evaluate consumer creditworthiness with significantly greater precision," is "more predictive than what's in the market," is "the most accurate scoring algorithm attainable," and is based on the "most up-to-date information available." 3d Am. Compl. ¶¶ 99-103. Fair Isaac contends the statements convey the message that VantageScore is more predictive, more accurate, more consistent, and based on superior credit data than FICO scores. Fair Isaac challenges the truth of these statements with evidence showing that FICO scores sometimes outperformed VantageScore in head-to-head testing and that some tests showed that more often than not, there is no significant difference between the performance of VantageScore and other scores on the market. <u>Id.</u>, Exs. 47, 49.

The Court is of the view that the statements are vague, subjective representations of product superiority or "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely"—in other words, "puffery" or "puffing," which is not actionable under the Lanham Act.[19] See United Indus., 140 F.3d at 1180 (quotation omitted). The statements are general claims that VantageScore is better than other credit scores (or even the best in the industry) because it uses better technologies and methodologies. Courts routinely find such claims of superiority to amount to mere puffery. See, e.g., LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1489 (D. Minn. 1996) (noting that courts have found statements employing comparative phrases such as "the best technology," "better customer service," and "the most cost-effective prices," to be mere puffery); Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 498-99 (5th Cir. 2000) (holding that the slogan "Better Ingredients. Better Pizza." was not actionable under the Lanham Act); In re Boston Beer Co., 198 F.3d 1370, 1372 (Fed. Cir. 1999) (holding that the claim "The Best Beer in America" amounted to mere puffery); Atari Corp. v. 3DO Co., No. C 94-20298, 1994 WL 723601, at *2 (N.D. Cal. May 16, 1994) (holding that the claim that a product was "the most advanced home gaming system in the universe" was non-actionable puffery).

For these reasons, Fair Isaac's claims based on allegations of false advertising fail as a matter of law. Defendants are therefore entitled to summary judgment on the false advertising claims.

**B.     Motion to Strike**

---

[19] The are no allegations that the claims of product superiority made any reference to scientific testing, which require only proof that the tests relied upon were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited. See United Indus., 140 F.3d at 1182 (quotation omitted).

After nearly 300 pages of briefing and close to ten thousand pages of declarations and exhibits filling more than nine bankers boxes, we come to the final issue, Fair Isaac's Motion to Strike exhibits 49 and 50 of the March 20, 2009 Reply Declaration of Bryan Gant [Docket No. 645]. Fair Isaac complains that exhibits 49 and 50 are nothing more than additional defense arguments about the evidence in the record and the inferences that can be drawn from that evidence. Fair Isaac requests, therefore, that the exhibits be stricken as exceeding the 26,000 word-limit previously imposed, see Jan. 5, 2009 Letter [Docket No. 562], or that Fair Isaac be allowed an equivalent number of words for a "sur-reply memorandum of law." Fair Isaac's Mem. in Supp. of Mot. to Strike [Docket No. 661].

On a related matter, counsel for Experian complained at oral argument about two declarations—the March 27, 2009 Supplemental Declaration of Michael Collyard [Docket No. 668] and the March 30, 2009 Supplemental Declaration of Joseph Bial [Docket No. 669]—that Fair Isaac filed just days before the April 1, 2009 hearing. Counsel explained that although the declarations were submitted in the guise of providing corrections to the record, they also included 26 new exhibits that were not submitted in support of Fair Isaac's initial opposition briefs to the various motions currently before the Court.

The Court has reviewed the material in exhibits 49 and 50 of the Reply Declaration of Bryan Gant, as well as the material in the last-minute supplemental declarations filed by Fair Isaac, and concludes that (1) the majority of the material pertains to matters that are already covered in other portions of the record; and (2) none of the materials has an appreciable impact on the analysis of the issues presented by the current motions. None of the parties, therefore, appear to be prejudiced by the inclusion or exclusion of the materials. As was explained at oral

argument, the Court is of the view that much of the back-and-forth declarations that have been filed in this matter by both sides are really just an attempt to get around the word limit, and, for that reason, the Court has not relied on the materials in arriving at its decision. Fair Isaac's Motion to Strike and Defendants' complaints at oral argument regarding the supplemental declarations of Collyard and Bial are moot.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Trans Union and VantageScore's Motion for Summary Judgment Dismissing Contract Related Counts [Docket No. 575] is **GRANTED**, and Counts Thirteen and Fourteen of the Third Amended Complaint [Docket No. 436] are **DISMISSED**;

2. Trans Union's Motion for a Separate Trial on Plaintiffs' Breach of Contract Claim [Docket No. 572] is **DENIED**;

3. Defendants' Motion for Summary Judgment Dismissing Antitrust Counts [Docket No. 585] is **GRANTED**, and Counts Eight, Nine, Ten, Eleven, and Twelve of the Third Amended Complaint [Docket No. 436] are **DISMISSED**;

4. Defendants' Motion for Summary Judgment Dismissing Trademark-Related Counts [Docket No. 579] is **DENIED**;

5. Defendants' Motion for Summary Judgment Dismissing False Advertising Counts [Docket No. 594] is **GRANTED**, Count Five of the Third Amended Complaint [Docket No. 436] is **DISMISSED**, and the aspects of Counts Six and Seven of the

Third Amended Complaint [Docket No. 436] based on allegations of false and misleading statements in advertising are **DISMISSED**; and[20]

6.      Fair Isaac's Motion to Strike [Docket No. 659] is **DENIED**.


                              BY THE COURT:


                              _____s/Ann D. Montgomery_____
                              ANN D. MONTGOMERY
                              U.S. DISTRICT JUDGE

Dated:  July 24, 2009.

---

[20] For clarity, the surviving claims are Counts One, Two, Three, Four, and those aspects of Counts Six and Seven that relate to the alleged infringement, unfair competition, and passing off.