UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION, and      )  CIVIL ACTION
myFICO CONSUMER SERVICES, INC.   )  NO. 06-4112 (ADM/JSM)
                                 )
            vs.                  )
                                 )
EXPERIAN INFORMATION SOLUTIONS,  )
INC.; TransUnion, LLC; and       )    Courtroom 13 West
VantageScore SOLUTIONS, LLC; and )  Wednesday, April 1, 2009
DOES I through X                 )   Minneapolis, Minnesota

---

**H E A R I N G   O N**

**TransUnion's MOTION TO BIFURCATE FOR A SEPARATE TRIAL ON
PLAINTIFFS' BREACH OF CONTRACT CLAIM
[ DOCKET NO. 572 ]**

**VantageScore's and TransUnion's MOTION FOR SUMMARY JUDGMENT
DISMISSING CONTRACT-RELATED COUNTS (COUNTS 13 AND 14)
[ DOCKET NO. 575 ]**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING
TRADEMARK-RELATED COUNTS (COUNTS 1-4, 6 AND 7)
[ DOCKET NO. 579 ]**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING ANTITRUST
COUNTS (COUNTS 8-12)
[ DOCKET NO. 585 ]**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING
FALSE ADVERTISING COUNTS (COUNTS 5-7)
[ DOCKET NO. 594 ]**

**PLAINTIFFS' MOTION TO STRIKE EXHIBITS 49 AND 50 OF
BRYAN GANT'S REPLY DECLARATION
[ DOCKET NO. 659 ]**

BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter - United States District Court
1005 United States Courthouse - 300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S :**


For the Plaintiffs:         **CADWALADER, WICKERSHAM & TAFT, LLP**
                            By:  CHARLES F. RULE, ESQUIRE
                                 JOSEPH J. BIAL, ESQUIRE
                            1201 F Street N.W.
                            Washington, D.C.  20004


                            **ROBINS, KAPLAN, MILLER & CIRESI, LLP**
                            By:  RONALD J. SCHUTZ, ESQUIRE
                                 RANDALL TIETJEN, ESQUIRE
                                 MICHAEL A. COLLYARD, ESQUIRE
                                 CHRISTOPHER K. LARUS, ESQUIRE
                            800 LaSalle Avenue – Suite 2800
                            Minneapolis, Minnesota  55402-2015



For defendant **Experian**
 **Information Solutions,**
  **Inc.:**                 **WHITE & CASE, LLP**
                            By:  ROBERT A. MILNE, ESQUIRE
                                 JACK E. PACE, III, ESQUIRE
                                 CHRISTOPHER J. GLANCY, ESQUIRE
                                 BRYAN D. GANT, ESQUIRE
                            1155 Avenue of the Americas
                            New York, New York  10036-2787


                            **LINDQUIST & VENNUM, PLLP**
                            By:  MARK A. JACOBSON, ESQUIRE
                            4200 IDS Center
                            80 South Eighth Street
                            Minneapolis, Minnesota  55402


For defendant
 **TransUnion, LLC:**       **NEAL, GERBER & EISENBERG, LLP**
                            By:  JAMES K. GARDNER, ESQUIRE
                                 DAO L. BOYLE, ESQUIRE
                            Two North LaSalle Street
                            Chicago, Illinois  60602-3801

**A P P E A R A N C E S (Continued):**

For defendant
 **TransUnion, LLC:**          **BASSFORD REMELE, P.A.**
                             By:  LEWIS A. REMELE, JR., ESQUIRE
                             33 South Sixth Street – Suite 3800
                             Minneapolis, Minnesota  55402-3701


For defendant
 **VantageScore Solutions,**
  **Inc.:**                   **KELLY & BERENS, P.A.**
                             By:  BARBARA PODLUCKY BERENS, ESQ.
                                  JUSTI RAE MILLER, ESQUIRE
                             3720 IDS Center
                             80 South Eighth Street
                             Minneapolis, Minnesota  55402


                        *  *  *  *  *

1     (9:00 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4          THE COURT:   Thank you.  Good morning.  Please be

5     seated.

6          THE CLERK:   The matter before the Court is Fair

7     Isaac Corporation, et al. v. Experian Solutions, Inc., et al.

8          Counsel, would you please note your appearances for

9     the record.

10         MR. SCHUTZ:   Good morning, your Honor.  Ron Schutz

11    of the Robins, Kaplan, Miller & Ciresi law firm on behalf of

12    the plaintiffs.

13         In the courtroom today also on behalf of the

14    plaintiffs are Rick Rule and Joe Bial from the Cadwalader law

15    firm in Washington, D.C.

16         At the second counsel table we've got Randy

17    Tietjen, Mike Collyard, and Chris Larus.

18         Also in the courtroom today, your Honor, is the

19    general counsel of Fair Isaac, Mark Scadina, right back

20    there, and Renee Jackson, in-house counsel for Fair Isaac.

21         Thank you.

22         THE COURT:   All right.  Thank you.

23         Counsel?

24         MR. MILNE:   Good morning, your Honor.  Robert

25    Milne with the White & Case law firm on behalf of Experian,

1    and with me today from White & Case are my colleagues Jack

2    Pace, Chris Glancy, and Brian Gant at the second table.

3              And also with me today is Ann Sterling, in-house at

4    Experian, in the back row.

5              Thank you.

6              THE COURT:  Mr. Jacobson.

7              MR. JACOBSON:   And, your Honor, Mark Jacobson from

8    Lindquist & Vennum for Experian as well.

9              THE COURT:  All right.  Counsel?

10             MR. GARDNER:   Good morning, your Honor.  My name

11   is Jim Gardner.  I represent TransUnion.  With me is my

12   partner Dao Boyle and my trusty guide Lew Remele, and John

13   Blenke, who is the general counsel of TransUnion who's here

14   today.

15             THE COURT:  All right.  Does that conclude

16   appearances?

17             Ms. Berens?

18             MS. BERENS:   It just goes on and on, your Honor.

19             THE COURT:  I know.

20             MS. BERENS:   Barbara Berens and Justi Miller on

21   behalf of defendant VantageScore Solutions, LLC.

22             THE COURT:  Good morning.  Does that conclude the

23   appearances?

24        (No response)

25             THE COURT:  Well, it was one of the most elaborate

1    April Fools' jokes I've ever seen for you all to come here

2    and gather just to tell me you've resolved this case.

3         (Laughter)

4              THE COURT:   But perhaps not.

5              All right.   We'll proceed first, as I understand

6    the parties have agreed, with arguments on the antitrust

7    claims.   That's counts 8, 9, 10, 11, and 12.   I guess we've

8    allotted 30 minutes of argument for each side on those

9    cases.

10             MR. MILNE:   Yes, that's correct, your Honor.

11             THE COURT:   And then I intend to take a break for

12   about ten minutes and then we'll move on to the trademark

13   claims, 20 minutes per side, and finally with what I've

14   called the contract claims at ten minutes per side.

15             MR. MILNE:   Your Honor, Robert Milne again for

16   Experian.

17             I will be handling the antitrust claims for the

18   defendants, but before we start the argument there is a

19   preliminary matter that we wish to at least raise with the

20   Court, and that is the issue of these supplemental

21   submissions that came in from the plaintiffs, one on Friday

22   and the second one in the late afternoon on Monday.  And it

23   was unclear to us whether that material was -- your Honor was

24   contemplating that it would be fair game for oral argument

25   today, just to take the antitrust submission, which is the

1    one that came in, as I say, late afternoon as we were getting

2    on planes to head out here.  That submission, you know, and

3    basically in the guise of providing corrections to the

4    record, what the plaintiffs did was to submit 26 new

5    exhibits, 20 of which don't even purport to be corrections to

6    anything in their brief, and included among that material is

7    two whole deposition transcripts without any citation,

8    pinpoint citation, as well --

9              THE COURT:  Well, let's not use up argument time

10   on this.  It's my intent to decide this case on the briefs

11   that have been submitted.  If it turns out that I have to

12   refer and look to the declarations that are submitted after

13   the fact, then I'll let you know and we'll figure out what we

14   do about it, but I think we have an abundance of material and

15   briefing on the main issues and there's been a lot going on

16   before -- after the briefs have been submitted that I choose

17   to just ignore, so let's get to the argument on the antitrust

18   claims.

19             MR. MILNE:  Okay.  Thank you, your Honor.  And

20   actually, we wish to make use of your courtroom technology

21   here --

22             THE COURT:  Okay.

23             MR. MILNE:  And I have some PowerPoint slides and

24   I have hard copies of these which I can hand up.

25             THE COURT:  All right.

1          (Documents handed to the Court)

2          MR. MILNE:   And I'll just note for the record that

3    I offered the plaintiffs a copy if they would be willing to

4    exchange with us theirs and they declined.

5          THE COURT:   Surprise, surprise.

6          MR. MILNE:   Yes.

7          THE COURT:   All right.  Let's just move ahead

8    today.

9          MR. MILNE:   Okay.  And also, your Honor, I'd like

10   to reserve ten minutes of my 30 for rebuttal if that --

11         THE COURT:   You may as long as it comes out of

12   your 30.

13         MR. MILNE:   Okay.

14         THE COURT:   John, I'm going to ask you to keep an

15   eye on the time.

16         MR. MILNE:   Okay.  Well, your Honor, to get to the

17   argument here, at the outset, what I'd like to emphasize here

18   and to ask the Court to keep in mind as you consider these

19   antitrust claims, that what Fair Isaac is attempting to do

20   here really is to subvert and pervert the antitrust laws on

21   multiple levels.

22         Number one, what you have here is a long-time,

23   well-entrenched monopolist that is claiming that a competitor

24   that over a three-year period has managed only to gain a few

25   points of market share nonetheless somehow stands a dangerous

1   probability of monopolizing that same market.

2           Number two, you have a plaintiff that is coming in

3   here and claiming injury based on the fact that it had to

4   lower its prices to respond to low-price offers from the

5   competitor defendant, and the plaintiff is asking you to put

6   a stop to that low-price competition.

7           And number three, you have a plaintiff that is

8   coming in here and claiming to be a champion for consumers,

9   for customers, when at the same time that plaintiff is asking

10  you to dissolve the only new competitor that has offered

11  choice to customers that's come along in years and in a

12  situation where customers are delighted to have that choice.

13          I put up on the slide here just some of what we

14  obtained in third-party discovery here from customers and

15  from Fair Isaac, and it's crystal clear from that discovery

16  that customers are happy that VantageScore has been there to

17  offer choice and to give them the ability to leverage lower

18  prices.  Fair Isaac itself received feedback like that from

19  customers.  So it's important to keep these issues in mind as

20  we think about the antitrust claims here.

21          Now, time isn't going to permit me to cover the

22  detail of what's in the extensive briefs, but today what I'd

23  like to do is first of all answer any questions that your

24  Honor may have, but in addition to focus on three major

25  themes or issues that we think really compel summary judgment

1   here.

2          The first is the absolute lack of standing, the

3   failure to establish antitrust injury; number two, the

4   failure of proof on the merits; and number three is the sort

5   of really remarkable existence of evidence that actually

6   affirmatively contradicts the plaintiffs' claims of

7   wrongdoing here.

8          So I'll start with standing.  And as we've said

9   from the beginning of this case, your Honor, there is

10  something perverse about a long-time monopolist coming in and

11  suing a start-up company and accusing it of monopolization.

12  It would be as though Microsoft turned around and sued a

13  small start-up operating system developer and accusing it of

14  monopolizing the market.

15         THE COURT:  But isn't there also something pretty

16  unusual about cooperation among the three bureaus and the

17  relationship in the field?  I mean, there aren't that many

18  players in this field.

19         MR. MILNE:  Well, your Honor, a couple things

20  there.  Nothing unusual at all about cooperative joint

21  ventures.  Those are ubiquitous in the industry.  There's

22  nothing inherently problematic about companies coming

23  together, especially when they are coming together to form a

24  new competitor.  I mean, it's undisputed here that for years

25  the only effective three-bureau competitor in this space was

1    Fair Isaac.  The only entities really capable of coming in

2    and offering effective competition were the three bureaus.

3         The thing that Plaintiffs have raised in the past

4    is this whole idea that if you add up the market shares of

5    the three bureaus in respective data, that they control all

6    of the data, and when we were before you earlier on the

7    motion, the 12(c) motion, they were at that time claiming a

8    conspiracy with respect to data.  They were claiming a

9    boycott.  They were saying that the bureaus had conspired

10   with one other to deny access to data.  Now that claim has

11   gone away.  There's no possible basis for such a claim.  The

12   facts as we set forth in the brief make clear that, number

13   one, Equifax has entered into this preferred partnership

14   arrangement with Fair Isaac where they are now working

15   together arm in arm to develop new scores and to distribute

16   existing scores and to give long-term access to data, and the

17   two -- the other two, Experian and TransUnion, continue to

18   distribute the Fair Isaac scores to lenders.  They continue

19   to work with Fair Isaac to improve their existing scores.  So

20   the idea that there's something about the fact that the

21   bureaus control an input, there's no basis to that, and so

22   there's nothing about that that makes this case somehow

23   different.

24        Now, as I say here, you know, the plaintiffs are in

25   here and again a long-time monopolist is suing a start-up

 1     company.  Antitrust is very suspicious of lawsuits --

 2     antitrust suits by competitors against one another and

 3     there's a good reason for that, and that's because

 4     competitors have an incentive to use the antitrust laws to

 5     thwart competition and not to protect competition.  And that

 6     suspicion is embodied in the antitrust injury doctrine which

 7     we submit applies with a vengeance in this case, and it

 8     applies both with respect to damages and with respect to

 9     injunctive relief.  And let me first talk about damages.

10            Now, let's go to the first slide there, Bryan.

11            The Supreme Court has made clear in the **Atlantic**

12     **Richfield** case and other cases that a competitor plaintiff

13     cannot sue based on the consequences of nonpredatory

14     low-price competition.  There's no claim of predatory pricing

15     in this case, your Honor.  That's crystal clear from the

16     Supreme Court's teachings.  Fair Isaac's damage model here is

17     based in large part on that basic theory.  Their expert,

18     their damages expert, calculates damages on the basis that

19     Fair Isaac had to lower its prices to its customers in

20     response to low-price offers from VantageScore.  And the

21     right-hand side of this slide, your Honor, has some quotes

22     from their expert's report, and it's clear that that's what

23     he's doing.  So in other words, the theory of damages here is

24     that if it hadn't been for VantageScore, Fair Isaac would

25     have been able to charge more to its customers and therefore

1    they're entitled to recover that additional profit as

2    damages.  That stands antitrust injury on its head and it's

3    flatly barred by the Supreme Court case law.

4         In addition to that, the entirety of Fair Isaac's

5    damage model is predicated -- and let's go to the next slide

6    here.  This is another quote from their damages expert -- is

7    predicated entirely on the assumption that VantageScore would

8    never have been introduced.  In other words, they are basing

9    damages on the idea that had there -- but for VantageScore,

10   they would have made more money.  They are seeking damages on

11   the basis of increased concentration and lessened

12   competition.  That is forbidden under the **Brunswick** case,

13   under the **Cargill** case and others that we've cited in our

14   papers.  It's just flatly forbidden.  So the bottom line is

15   that Fair Isaac's damage theory fails and summary judgment is

16   appropriate as to that, which cuts across all of their

17   antitrust claims.

18        The same goes for Fair Isaac's claim for injunctive

19   relief to the extent -- and remember, they're seeking

20   dissolution here, dissolution of VantageScore.  It cannot

21   claim injunctive relief on the fear that in the future it may

22   lose sales or lose profits because of the continued presence

23   in the marketplace of VantageScore.  That same kind of

24   reasoning is what's barred in cases like **Cargill** and

25   **Brunswick** and the like.  But in addition to that, the case

law requires -- and this isn't disputed -- that Fair Isaac

has to show -- to qualify for injunctive relief, Fair Isaac

has to show a real and immediate threat of harm, competitive

harm, antitrust injury, and Fair Isaac can't come close to

doing that here.

Number one, VantageScore has been on the market for

three years now and it has not even come close to denting

Fair Isaac's monopoly position, so where is the immediate

threat?  What has changed that would say that Fair Isaac

faces a threat in anything like the near term of -- or at any

point from being driven from the marketplace?  As I mentioned

before, Fair Isaac continues to have access to data and

distribution three years down the road.  Fair Isaac has

entered into this preferred partnership arrangement with

Equifax which makes it a preferred -- they're working arm in

arm on a long-term basis.  And Fair Isaac's chief executive

-- and we cited these quotes in our brief, the opening brief

at page 11 -- told the public that this arrangement is

going -- will secure our long-term future.

And Fair Isaac's economist, their expert Professor

Noll, said that because of this preferred partnership, that

the very fact that Equifax is now committed to cooperate with

Fair Isaac going forward will necessarily undermine the

long-term prospects for VantageScore.  And since VantageScore

is the supposed agent of Fair Isaac's harm, the idea that

1    VantageScore is impaired going forward again undercuts any

2    kind of argument that Fair Isaac faces a real or immediate

3    threat of harm.

4         And then finally you have -- and let's go to the

5    quote here.  As recently as a couple of weeks ago,

6    Fair Isaac's chief executive is telling investors publicly

7    that he continues to be optimistic about the company's

8    future, no suggestion of a threat of being driven out of the

9    marketplace or impairment to his business as a result of

10   competition from VantageScore or the activities of the credit

11   bureaus.  Now, Fair Isaac can't tell investors one thing and

12   this Court another thing.

13        So, basically for those reasons and others in the

14   brief, their claim for injunctive relief fails as well, and

15   without a valid claim for damages, without a valid claim for

16   injunctive relief, they simply have no standing.  That cuts

17   across all of the antitrust claims.

18        So, briefly, Judge, I want to turn to my second two

19   themes -- the second of my three themes, which is the failure

20   of proof.  We get into the detail in the briefs.  I'd like to

21   just focus to give you a flavor, your Honor, on their claim

22   -- as you know, they claim that there is a conspiracy between

23   the credit bureaus to impose a price floor, to increase

24   artificially the price of VantageScore to a level -- not

25   lower than the price a bureau was charging for the FICO

1    score.

2           Under controlling summary judgment case law,

3    including the **Matsushita** case, including the **Blomkest** case

4    from the Eighth Circuit that we cite in the briefs,

5    Fair Isaac has the burden on summary judgment of presenting

6    evidence that tends to exclude even the possibility of

7    independent conduct.  They can't come close to doing that

8    here.

9           Most importantly, when you look at the evidence

10   that they submit, they have none that shows that the

11   bureaus communicated -- sure they were communicating with

12   each other.  They had a joint venture.  But after extensive

13   discovery, they have not been able to come forward with any

14   evidence showing that the bureaus actually communicated on

15   the subjects of the supposed conspiracy:  price floors, some

16   of the other conspiracy claims that they make and that are

17   detailed in the briefs.  When you look at the evidence,

18   you'll see that their claims, the things they sort of

19   articulate as fact, are not borne out by the evidence that

20   they cite.

21          So on the one hand what Fair Isaac tries to do is

22   they try to sinisterize perfectly routine joint venture

23   communications, and again, when you look at that evidence I

24   think you'll see that.  But then on the other hand what they

25   do is they take purely internal credit bureau documents,

 1    internal deliberations of a particular bureau on things like

 2    prices, things like market conditions or expectations about

 3    what the market may do with no suggestion, no linkage that

 4    any such internal deliberations were communicated among the

 5    bureaus.  The essence of this claim is agreement and they

 6    have not come close to establishing agreement here.

 7         And just to give a flavor for the ways in which

 8    they take liberties with the evidence, I want to focus on two

 9    things.

10         On the slide here is an excerpt from their

11    opposition brief and they're discussing the minutes of an

12    early joint venture meeting in 2005, and they say:  "When

13    [those] are read together with a written business plan that

14    was distributed at the meeting, they show ... that the

15    bureaus discussed ... pricing."  And the clear tenor of all

16    of this was that this was supposed to have been a

17    conspiratorial price discussion about the price floor, what

18    they're claiming here.  They didn't submit the actual

19    business plan to the Court.  They submitted the minutes.  The

20    minutes don't talk about pricing, but they didn't submit the

21    written business plan.  That business plan we attached and

22    you can see what it says about pricing.  Yes, the word

23    "pricing" appears, but it says that retail pricing will be

24    established by the individual credit bureaus.  CRA stands for

25    Credit Reporting Agency.  So it says the opposite of what

1  they would in effect have the Court believe it says.

2       Okay.  The second one I want to focus on -- these

3  are really their two big pieces of evidence on the existence

4  of some kind of price floor conspiracy and these are these

5  handwritten notes from the consultant, Mercer, Oliver &

6  Wyman, and they say in their brief that it reveals a

7  discussion about pricing, again creating the impression that

8  it was a discussion about a price floor conspiracy.

9       What the notes show is that the subject of the

10  discussion was a Washington, D.C. presentation that was made

11  to regulators shortly after the launch of VantageScore.  And

12  you can see from the notes here that when you work down,

13  they're talking about the subject of the presentation and

14  then underneath it is -- subheading one is the structure of

15  the presentation, and then underneath that is "key messages"

16  for the presentation, "Each bureau [will have a] good feel,"

17  and then it goes through some of the aspects of VantageScore:

18  stability, the fact that it provides choice in competition,

19  pricing is referenced there, dissatisfaction with current

20  provider and transparency.

21       Now, Fair Isaac would have the Court draw an

22  inference that the discussion here of the key messages for a

23  public presentation was this nefarious price floor

24  conspiracy.  That is not a reasonable inference to be drawn

25  from this document, and again, they have to exclude the

1    possibility of independent explanations, have to exclude the

2    possibility, for example, that that reference to pricing was

3    not a reference to the fact that the bureaus were going to

4    price independently or was a reference to the fact that

5    VantageScore provides lenders with a more refined ability to

6    price loan products.

7            And actually, one of the attendees at that meeting,

8    Mr. Oliai, can't recall specifically what that reference was,

9    but in his declaration indicated that's what he believes it

10   is.  Again, the evidence that Fair Isaac has to submit here

11   must tend to exclude the possibility of independent conduct.

12   This evidence does not do that, your Honor.

13           And I just also want to make a brief note -- it's

14   covered in more detail in the briefs -- on the alleged

15   unilateral acts.  They allege the conspiracies which we

16   detail in the briefs, but then they allege certain unilateral

17   acts that they say are anticompetitive, alleged price hikes

18   on FICO after VantageScore was launched -- how that coincides

19   with the conspiracy to price VantageScore no lower than FICO

20   I don't exactly know -- and the curtailing of access to data.

21           These claims, first of all, have no factual support

22   on the access to data.  As we said, the access continues.

23   There's a preferred partnership, the other bureaus continue

24   to work with Fair Isaac.  And again, since they are not

25   claiming conspiracy here with respect to data and no bureau

1    is a monopolist over its own data, as the Supreme Court

2    clearly held in the **linkLine** case that came down just a few

3    weeks ago, a monopolist has no duty to deal with anyone, let

4    alone on terms that are congenial to a plaintiff.  And so

5    there's -- you know, there's no basis for antitrust liability

6    based on unilateral conduct like that.

7              I know I'm running up against my 20 minutes here.

8    Just briefly to the last theme, which is sort of the evidence

9    that contradicts the claimed wrongdoing.  We have next to

10   nothing, really nothing with respect to the claims --

11   suggesting agreement, and as against that you have

12   affirmative evidence to the contrary, whereas Fair Isaac

13   claims a conspiracy to price VantageScore high in comparison

14   to FICO.  Their own expert, their own expert found that there

15   was wide low pricing on VantageScore offered by the bureaus.

16   Whereas Fair Isaac claims a conspiracy among the bureaus to

17   offer preliminary discounts to only 12 large financial

18   institutions, their own expert found over 300 financial

19   institutions that were the beneficiaries of low price --

20   low-price VantageScore from the credit bureaus.

21             Quickly with respect to the documents.  They claim

22   that there is a conspiracy among the credit bureaus to

23   abandon the in-house bureau scores.  Again, that hasn't

24   happened in three years, but there's no communication among

25   the bureaus on that subject, no evidence of that.  The only

1    evidence that we were able to find in the record to reflect a

2    discussion among the bureaus about what to do with their

3    internal scores reflects the opposite, and that's this

4    document that we attached as Exhibit 30-F to the Gant

5    declaration, and this is notes from the bureau, a joint

6    venture meeting, and it says the intent is to add to, not

7    replace, what's available at the individual credit bureaus.

8    That's what the truth is here.

9           And then finally what you have here is the sworn

10   statements of the credit bureau executives that were

11   submitted in connection with this motion.  They have come

12   before this Court and under oath said:  We didn't do these

13   things.  And given the absence of evidence here that any

14   wrongdoing occurred, those declarations are entitled to great

15   weight here.  Now, Fair Isaac just wants to brush those under

16   oath statements aside and say, well, they must -- of course

17   they're lying, of course they're committing perjury, but they

18   can't do that on summary judgment.

19          So, your Honor, whichever way you cut this, whether

20   it's a lack of standing, which itself is sufficient to grant

21   summary judgment, failure of proof, the existence of contrary

22   evidence, their claims fail here and summary judgment is

23   appropriate across all of the counts.

24          The last slide here is just kind of a bird's-eye

25   view of the specific counts and the various ways in which

1  summary judgment is appropriate as to each.

2         Thank you.

3         THE COURT:  All right.  Thank you.

4         MR. RULE:  Your Honor, I guess -- let me just give

5  a couple of hard copies of my presentation to Mr. Milne.  My

6  only objection was giving it to him before I started and I

7  have no problem giving it to him and to you, obviously, now.

8         Your Honor, good morning.  It's an honor to be

9  here.  Let me start -- and I'm just only going to touch very

10  briefly on the motion to strike and I hear your Honor very

11  loudly and clearly.

12         As we indicated, I think that the gist of what one

13  should take from what they have filed is that in fact there

14  are disputed issues of material fact and that that's

15  something appropriate for the jury to resolve as Judge Kyle

16  stated in the opinion that we gave you.  I will say, however,

17  on behalf of myself and my colleagues, if your Honor would

18  like, we would love the opportunity to respond to their

19  Exhibits 49 and 50 --

20         THE COURT:  No, I've got plenty of material to

21  decide this case.  These declarations that go on and make

22  charts and graphs of it, to me, it is just a back-door way of

23  extending the word "limit" and getting more briefing in and

24  I'm going to do my best to ignore them and that's kind of

25  where we stand.

1      MR. RULE:  Okay.  Well, your Honor, there are a

2  few things there I probably am going to call your attention

3  to, because they actually, I think, are relevant and help us.

4      But at the outset, your Honor, I'm going to speak

5  to the antitrust claims and I want to just say at the outset

6  that a great deal of what the defendants did in their opening

7  brief and what Mr. Milne did here this morning is focus on

8  Fair Isaac and its position in the marketplace, and I just

9  want to start off by saying that, and frankly, the bulk of

10 what they put in the record is really irrelevant as we

11 pointed out in the **Kiefer-Stewart** case and everything else.

12 Regardless of what our position is, that does not excuse an

13 antitrust violation or conduct that amounts to a boycott on

14 steroids against us.

15     It's interesting that Mr. Milne would mention

16 another of my clients, Microsoft, which I am acutely aware of

17 what happened with them.  But if you go back and look at the

18 case that was against Microsoft, it was basically Microsoft

19 going in and engaging in what the court found to be illegal

20 behavior to displace Netscape, which at the time of its

21 conduct had like a 90 percent market share in the browser

22 market.  So the fact that somehow the law lets the defendants

23 do whatever they want just because we're big is entirely

24 wrong.  However, I think it gives you a little bit of a

25 window into their soul, your Honor.

1          I think that they really did believe -- they were

2     certainly frustrated that Fair Isaac was in the marketplace

3     and earning the profits it had and I think there was a sense

4     of entitlement and right to basically do whatever it took to

5     displace Fair Isaac, and I think that's important to keep in

6     mind.

7          THE COURT:   But at some point I do have to look to

8     the dangerous probability of success and I think that's where

9     market share all comes into play.

10         MR. RULE:   Well, I think, your Honor, one thing

11    that I would say on that is I would invite your Honor to look

12    at **General Dynamics**, the **U.S. v. General Dynamics** case, the

13    **U.S. vs. Continental Can** case -- and we can discuss this

14    more -- essentially where the court warns -- this is the

15    Supreme Court -- warns that evidence during the pendency of

16    litigation is often misleading, because parties often

17    withhold their most egregious acts until after the litigation

18    is over.

19         I think it's kind of astounding -- we certainly

20    have not abandoned our claim about their control over data,

21    their control over pricing, and I think the fact that their

22    frustration has bubbled up an Experian decision to stop

23    selling FICO scores hung on Experian data to consumers.  I

24    think that's pretty clearly a shot across the bow, an

25    indication of what they can do when this Court is not

1    watching.

2            But let me start, your Honor, with the fact that

3    when we began --

4            THE COURT:   I'm not sure I understood that.  Would

5    you say that again?  You lost me someplace.

6            MR. RULE:   What I said was that if you -- they

7    basically in the last year cancelled the right to sell

8    Experian FICO scores to consumers that is hung on their data.

9    They point out that they did extend the agreement with

10   business lenders, but they prevented consumers from basically

11   getting FICO scores with Experian data.

12           Now, the fact that they could do that I think is an

13   indication of the power that they have over the control of

14   the data that's absolutely essential to get a score to the

15   marketplace and the fact that they have control over the

16   distribution channel.  While they may have refrained from

17   doing anything particularly egregious during the course of

18   this litigation, I think that's, as I say, a warning shot

19   across our bow that once this is over, they're going to be in

20   a position to essentially use that power to displace us from

21   the marketplace.  But if I can go through, I'll show you some

22   of the evidence, your Honor.

23           When we started off we were focused on a

24   rule-of-reason case.  We did that because we felt that when

25   you get three -- the only three bureaus together that have a

1    hundred percent market share in a concentrated industry and

2    an oligopoly, that it threatened us, threatened to exclude us

3    and threatened to harm consumers in data markets.  That was

4    the case.  That was what your Honor looked at in the first

5    hearing here.

6              THE COURT:  But that's changed as the case has

7    gone on.

8              MR. RULE:  Absolutely.  And the reason is, your

9    Honor, at the time, as it's now become clear -- it hasn't

10   been easy to do this and I'll show you -- there was a smoke

11   screen of disclaimers, basically destruction of documents and

12   even frankly outright dissembling, to basically hide the true

13   nature of this.  And what we found as a result of looking at

14   this is that there was a conspiracy very -- in a very

15   targeted way to go after Fair Isaac, to displace Fair Isaac,

16   and to do it in a way that they could take intact the profits

17   that Fair Isaac was earning and appropriate them to

18   themselves, much more invidious, much more pernicious, and

19   they could do that because their power over data and

20   distribution allowed them to do that.

21             But basically what they've agreed to do is not to

22   compete amongst themselves and they basically sat around and

23   targeted the most important customers for Fair Isaac and

24   basically said we'll go after them with temporary discounts,

25   if necessary, and there are certainly some of those.

1          Second, they got together at the same time and

2     said:  Look, you know, we're like the three musketeers, one

3     for all, all for one, so let's make sure we're not selling

4     our own tri-bureau scores that they were developing.

5          THE COURT:   One of the musketeers has defected,

6     apparently.

7          MR. RULE:   Well, your Honor, normally you would

8     think when a musketeer defects that's pretty much an

9     admission that they are a musketeer, and frankly, I find it

10    somewhat interesting that a settlement is being used as

11    evidence that there wasn't an agreement.  Moreover, I find it

12    interesting that they're particularly up in arms about a

13    settlement that essentially guarantees Fair Isaac fair

14    treatment.  That's what -- when you get right down to what

15    the agreement says, it allows us to have a relationship with

16    them and -- so again, fair treatment in a settlement doesn't

17    seem to me to disprove the existence of a conspiracy, and at

18    any rate, the conspiracy existed before whatever settlement

19    there was.  But at any rate -- so the second thing was to get

20    rid of their tri-bureau scores.

21         And the third -- and this is the real key, your

22    Honor -- was essentially to agree not to compete among

23    themselves.  They understood -- and I'll explain why this is

24    clearly rational.  If left to their own devices, each of them

25    would engage in loss leading with this product, the

1    VantageScore.  They had it at a zero marginal cost, there are

2    absolutely no capacity constraints, and it's the identical

3    product.  Remember, they've gone out to the market and

4    they've said VantageScore is the same whether you buy it from

5    Experian, TU, or Equifax.  So common sense tells you that in

6    that kind of situation, competitors left to their own devices

7    will compete against each other, loss lead to try to get more

8    market share in their underlying data products.  They

9    understood that that was a problem and so what they agreed to

10   was this notion of value proposition pricing, so they agreed

11   to valued proposition pricing.

12          And the interesting thing is, your Honor, whereas

13   they told you before that what this was all about were low

14   prices, in fact now -- and again, this is something I would

15   call your attention to -- in their declarations, they've

16   submitted two declarations that essentially admit that three

17   years after they are engaged in value proposition pricing.

18          First, Mr. Callaci  from TU, basically in

19   responding to his statement on deposition record that:  "'We

20   don't compete on price' with Fair Isaac," explains that what

21   he meant was:  "[B]ecause we (TransUnion) have attempted to

22   price VantageScore as a premium score rather than discounting

23   the score relative to the Fair Isaac scores we sell."

24          And then they submitted a declaration from

25   Experian, Mr. Reeves.  Mr. Reeves tells you that he too --

1    that is, Experian -- "[W]e believe that VantageScore brings

2    more value to customers than the market-leading FICO score

3    based on its greater predictive power and other benefits and

4    that therefore a fair pricing approach for VantageScore would

5    be to price it around the price of FICO scores."

6         So they've admitted that they're engaged even today

7    in this value proposition pricing.

8         THE COURT:   But there's no loss leading that

9    actually happens, though, because the floor is set, correct?

10        MR. RULE:   Correct.  And let me just show you one

11   thing.  This is a pretty astounding document from Mr. Oliai.

12   He basically says -- this is, you know, several months after

13   the score had been launched in response to a question about

14   giving a price break in response to a request from a large

15   lender.  He says:  "I advise you against discounting

16   VantageScore relative to FICO.  We should promote the value,"

17   your Honor.  He says:  "We should promote the value of the

18   new score and help them build" -- them.  Who knows?  I assume

19   the bureaus -- "a business case in which cost savings to the

20   bureaus is not a factor."

21        Now, that's very interesting.  He's saying we've

22   got to sell on value.  We can't sell on cost.  Well, I'll

23   tell you what, your Honor.  There's a very important case

24   that I think you -- I'm sure you've read but you ought to

25   focus on, and that's Judge Posner's decision in the **High**

1    **Fructose Corn Syrup** case.  What he says there is:  "In a

2    competitive market, price is based on cost rather than on

3    value."  He was confronted with the similar kinds of

4    arguments that these folks are saying, that, well, gee,

5    pricing on value is really independent behavior, and he

6    rejected that because he noted that in a competitive market,

7    price is based on cost.  We have both of our experts agreeing

8    with that concept, both Murphy and Noll, and I would say that

9    given what the defendants had said prior to these

10   declarations, they also at least had to recognize the logic

11   of that position.

12        But just to give your Honor a sense that this

13   strategy was accepted, here's another statement from Randy

14   Baker, the manager of strategic pricing at Experian:  "I

15   appreciate your pricing strategy" he tells one of his

16   lower-level people, "However, it is a business decision to

17   price FICO Classic and VantageScore at the same price point."

18        So then just to show how irrational this is if

19   everybody's acting unilaterally, the lower-level person says:

20   "So we'd rather pay FICO royalties than get a hundred percent

21   of the revenue that we could get from VantageScore?"  That

22   doesn't make sense to me."  What doesn't make sense to me

23   doesn't make sense to economists, because that's not what you

24   would see if people were truly acting independently.

25        And then we go, your Honor, to a truly amazing

document that Equifax produced at about the time of the

launch, and this is an internal sales document.  This is what

they're telling their internal salespeople, your Honor:

"Target and execute on sales cycles with these customers with

a 'swap out' objective, not using VantageScore to take core

market share away from" the other two musketeers, "Experian

or TU."

Then we go on to another document, another Equifax

document.  This is right before launch where they're talking

about potential market scenarios, and you'll notice that

Smooth Sailing involves no loss-leading pricing, but

apparently loss-leading pricing in this document is

irrational behavior.  Again, it's only irrational if there's

an agreement.

You'll also note that Armageddon, the worst case

scenario, would be that the CRAs would basically get confused

on the strategy.  Well, why is one CRA basically saying we

should have, you know, solidarity and there shouldn't be

confusion on strategy just because there's an agreement?

Now we flip ahead to September and we see the same

sort of analysis from Equifax saying that it's Smooth

Sailing, that the best case scenario is playing out.  That

means no loss leading.  Clearly they're looking at the

marketplace.  This is an internal document, your Honor, but

this is an internal document that's very probative, because

1    it's an observer in the market looking at what his

2    competitors are doing.

3           Your Honor, I want to take you through the events

4    here.  You see the yellow line is sort of a discussion, a

5    lead-up.  I'm not going to really take you through much of

6    the evidence there, but it's very clear that throughout that

7    period there was a sense of, again, frustration that Fair

8    Isaac was doing so well, very little in terms of, gee, we

9    need a new score for the market, a lot about our profits.

10          You'll also see at the --

11          THE COURT:  Remind me when the complaint was filed

12   here, early '06?

13          MR. RULE:  No, no, your Honor.  It was filed in

14   October of '06.

15          But if you begin, you see that there were some --

16   what we have listed at the top here are the scheduled

17   meetings and scheduled conference calls.  There were

18   relatively few scheduled ones.  There was a meeting in early

19   2004 where the idea of a tri-bureau score jointly created was

20   discussed, but it finally sort of reached a climax towards

21   the end of 2004, beginning of 2005, where the bureaus got

22   together and decided, yes, we're going to get into a venture,

23   and, yes, we're going to figure out a way to get these

24   profits from Fair Isaac.

25          And what did they do?  One of the first things they

1  did was go out and hire this independent consultant, Mercer

2  Oliver Wyman.  They basically told them what they wanted to

3  do and Mercer Oliver Wyman's individual, Peter Carroll, put

4  together this memo.  It's called the Operation Triad, your

5  Honor, and this basically is the blueprint.  This is what he

6  was told they wanted to achieve.  This is what he was

7  suggesting be done.

8       So first he says:  "The bureaus wish to reduce the

9  rent derived from this business relationship by Fair Isaac,

10 believing that the current arrangement over-rewards

11 Fair Isaac for what they bring to the table."

12      Next he says:   "Opportunity.  We are told that

13 Fair Isaac has a $160 million business related to these

14 scores.  In principle, the bureaus could build their own

15 scorecard(s) and transfer this revenue entirely to

16 themselves -- and do so at relatively low incremental

17 expense."

18      Well, they continued to cite that $160 million --

19 basically 167, which was Fair Isaac's profits -- even at the

20 time of launch.

21      Then he goes on to say:  "Risks to the bureaus."

22 If one bureau tries to do this, it won't work because

23 basically the lenders will switch to the other bureaus.

24      And then he says:  "The banks are likely to want a

25 period of dual-score availability, if not indeed a permanent

choice" of Fair Isaac.  "If the three bureaus act in concert,
as 'Triad,'" he calls them -- it subsequently became
Trident -- "this particular risk is minimized."

And then he goes on to say:  "If customers believe
the FICO scores to be superior" -- and of course, again, we
think the evidence shows that the VantageScore is not
superior, even though they presented it that way.  But even
if customers believe that our score is superior, "they would
be very upset with the bureaus but [they'd] Have little power
to force the bureaus to deal [fairly] With Fair Isaac."

And then finally, your Honor, he notes, undoubtedly
based on his conversations:  "Fair Isaac could be expected to
explore legal avenues to defend their rents, perhaps
including claims of monopoly power on the part of the Triad."

So even in early March, your Honor, they understood
that they were playing with fire and that they were running
the risk of antitrust litigation.  And what did they do?
They basically gave directions to Mercer Oliver Wyman and
everybody else to shred all documents.  And while there's
some dispute about what was shredded -- and fortunately I
think for this Court and us a lot did survive and we can
prove our case, but the fact is that a lot of documents were
destroyed, a lot of things you would normally expect to see
are not there.  Basically for the most part what has survived
are pristine, sort of cleaned up documents, but the raw

 1    material, the raw notes, there are some exceptions, but

 2    they're largely missing.

 3         THE COURT:  Are there any raw notes of meetings

 4    that are missing, of meetings that occurred subsequent to the

 5    filing of the lawsuit?  It's my understanding what you're

 6    claiming is missing is all from the early stages, is that

 7    right?

 8         MR. RULE:  It's missing from the early stages, but

 9    quite frankly, we don't have -- the meetings still go on and

10    they continue to this day as we showed on the timeline, so

11    they had plenty of opportunity for monitoring.  We don't have

12    those because of the discovery cutoff, but at any rate, very

13    few of those documents survive.

14         Very early on after that Triad memo they're already

15    talking about price.  Piyush Tantia, who was the person in

16    charge day to day for Mercer Oliver Wyman, in writing to

17    Peter Carroll says this should be the same price for this

18    tri-bureau score as a single-bureau FICO score.

19         Now, I want to say, your Honor, Mr. Milne got up

20    here and said there's no evidence of pricing and he pointed

21    to the document from TU from February of 2005.  And what he

22    didn't tell you and what they don't tell you and what you're

23    going to have a hard time seeing in their call-out is the

24    block that they quoted.  It says:  "Retail pricing will be

25    established by the individual CRAs."  But then the next

1    sentence is very interesting:  "Wholesale pricing will be

2    agreed upon by the board of NewCo and will take the form of a

3    royalty on each score delivered to customers."

4          What that reflects, your Honor, and what they've

5    actually admitted if you go to Exhibit 50 and the bottom of

6    page 4 is that, yes, there were discussions on pricing.  They

7    have to admit that because there are some notes from

8    Mr. Tantia, handwritten notes, some that survived, which are

9    at Exhibit 217 -- it's MOW-FICO 00069102 -- where basically

10   Equifax's lawyer, antitrust lawyer, says, you know, if you're

11   going to have a wholesale price or royalty, it's got to be

12   very low.  They were continuing to discuss this sort of

13   wholesale price arrangement all the way through, and if you

14   look at the bottom of that exhibit, they admit that they did

15   talk about that price.  I mean, there's no question, your

16   Honor, that they talked about price, it may have been a

17   wholesale price, and ultimately we believe they abandoned

18   that because the lawyers told them it was too easy a target

19   and they ultimately settled on value proposition pricing, but

20   no question they talked about price.  But this concept of

21   having sort of agreed to price floor value proposition began

22   as early as Piyush Tantia's mail here.

23         Now, this is a very interesting document,

24   interesting because MOW basically put together a sort of

25   plan.  Part of it was how to develop the score, but they also

1   went further and put in a business plan, and part of that

2   business plan says that it would focus on pricing of the

3   tri-bureau score, including introductory demonstration prices

4   to encourage adoption, essentially what has ultimately been

5   done here.

6       Now interestingly, Experian says:  No, let's delete

7   that right now.  Right now is not the time to talk about that

8   marketing plan, that business plan, but it may be appropriate

9   for the next step to include value proposition.  So keep that

10  in mind, your Honor.  As early as March they're talking about

11  value proposition and as a concept, as an alternative, as a

12  buzz word, if you will, for pricing.

13      Then we go forward, your Honor -- meetings all

14  along here -- to June, and right about -- one of the days of

15  the meetings we have this document that Equifax produced.

16  And again, you'll notice in this document that there's this

17  wholesale price on the left, on the right there's a concept

18  of a retail price, and you'll notice that the price for all

19  the bureaus is the same.  And then under that they call out,

20  they say:  "Retail pricing 'floor' will be explored.  LLC

21  governance over testing, trial uses and loss leader pricing."

22  Now, it's true it's an internal document, your Honor, but

23  it's inconceivable that Equifax was not putting this together

24  to basically reflect what they thought was going to be

25  discussed at these meetings.

1          Then you go to August and this is a very important

2   document.  Their basic response to this document -- it's an

3   internal document by a low-level official.  Well, let's look

4   who did it.

5          It's Dana Wiklund, basically the number two guy,

6   senior vice president for analytics, writing to his boss, the

7   chief marketing officer at Equifax, and this is the day

8   before the following day on 8-23 when there's going to be a

9   meeting, and he's basically showing him what the state of

10  play is, what the risks are that are confronting these folks

11  and how they're going to deal with it.

12         And first -- and I'll come back to this -- he talks

13  about the need to obsolete existing tri-bureau scores and

14  focuses specifically on the tri-bureau score of Experian.

15         Next he says:  "A CRA" -- this is the risk -- "a

16  CRA undercuts pricing on the final model and loss leads with

17  it," points out that that's damage to future valuation for

18  all three companies working on the project.  How are you

19  going to deal with that?  "Gain agreement that price loss

20  leading will not happen with this project deliverable."

21         And then we see down here a recognition of a risk

22  that FICO files a lawsuit, "could be a legal issue that could

23  stop the thing in its tracks."  How are we going to deal with

24  that?  Are we going to go to the lawyers and ask them:  "Gee,

25  can we do all these things I just mentioned?"  No, we're

1     going to go to the lawyers and "work with legal [] to make

2     sure that we have covered the bases from an antitrust

3     perspective."  That sounds a little cynical to me, your

4     Honor.

5            Then we go to October 7th.  This is important, your

6     Honor, because on October 18th there's a go/no-go meeting.

7     So they're putting together the agenda for this meeting and

8     the first agenda comes out.  Kerry Williams, high-level

9     individual at Experian, basically says:  "[J]ust so we are

10    clear ... this [agenda] does not cover the market strategy []

11    we will be presenting."  Experian was going to present market

12    strategy work -- and we'll talk about that in a minute -- and

13    he gets an answer back:  "That is correct.  I have advised

14    Mercer Oliver Wyman to put that agenda together as well" and

15    it's going to deal with this marketing.  And look what's

16    there on number 4, your Honor:  "Communications Plan –

17    Initial and ongoing messaging to the market (value

18    proposition)."  So, remember they said in March:  Let's take

19    it off for now, but we'll come back to it in value

20    proposition.  Here it is.  It shows up on the agenda for this

21    meeting.

22           Then on October 14th we have -- there are two

23    documents that -- I'm only going to show you the external

24    documents.  There are two versions of this document that look

25    like what's going to be presented at the meeting on

1    October 18th.  There's an internal version.  Here's the

2    external version, your Honor, and let's just see what they

3    say.  "Expected Competition Reaction."  Do they have the

4    CRAs? Do they have other people on there?  No, it's FICO.

5    FICO is the competition.  And then what do they say?  Matt's

6    going to talk about pricing, okay?

7           Then we go to October 18th, the go/no-go meeting,

8    and the sanitized, officially blessed deck has in the

9    communications consideration:  "To the market.  Establish a

10   clear and consistent value proposition."  That's there.  Now,

11   we don't know what was discussed.  That was what was on the

12   deck.  We don't know what was discussed.  There are minutes

13   of this meeting, very short, typically, of these folks, but

14   the place where this would have been discussed?  Guess what?

15   It's redacted, your Honor.  So we don't know what they

16   actually discussed because they've chosen to redact that

17   portion of the minutes.

18          Now, your Honor, we go to the Piyush Tantia notes

19   that Mr. Milne referred to.  If you go to the bottom, here's

20   what it says.  Now, I will tell you that their *post hoc*

21   explanation of this is just completely faulty.  I'm going to

22   let you look at the two documents that are relevant here, but

23   it's clear that the materials they were putting together for

24   the Government were clearly different from this.  But here's

25   what he writes:

1        "Key messages.  Each CRA has a good feel for the

2   messages."  "Pricing" is there.  And I also call your

3   attention to "Dissatisfaction with current provider."  No "s"

4   on that.

5        Then it gets written up subsequently, again as a

6   separate bullet, separate from the discussion of putting

7   together the materials for the regulators, and now "Each CRA

8   has a good feel for the messages" is gone, and "ultimately"

9   -- now it says:  "ultimately to be decided by each CRA."

10  Those are completely opposite concepts.  "Pricing" is missing

11  and "providers" now has an "s."  So I think that that shows

12  that pricing probably -- almost certainly was discussed, that

13  Fair Isaac was discussed, but then afterwards in the official

14  documents that were to survive the shredding, basically it

15  was sanitized.

16        THE COURT:   Okay.  You only have a couple minutes

17  left --

18        MR. RULE:   Okay.

19        THE COURT:   -- and I want to make sure that I get

20  a chance to have you explain to me your damages.

21        MR. RULE:   Okay.  Well, let me just -- here's

22  another internal document referring to value proposition with

23  overall value.

24        I'm also going to show you -- there are three

25  documents in the deck that show the sort of commitment to

1   value proposition pricing as late as 2007 around the time of

2   one of these meetings.  Here's one on the 17th, here's one on

3   the 19th, and then here's one on February 1st, all of them

4   from each of the different bureaus.

5           Then I want to also show you, your Honor, there's a

6   statement here about discounts and basically we've heard a

7   lot about discounts, but all it says is put in place

8   discounts that sort of match FICO and Experian.

9           So -- and in fact there is some evidence -- now,

10  frankly, Meyer did not look at those 300 entries.  he

11  excluded them.  There's a lot of problems with the data.

12          But the fact of discounting, if you look at Judge

13  Posner's decision, is, frankly, he takes it as evidence of a

14  conspiracy because you don't see that kind of price

15  discrimination in a competitive market.  Moreover, all it

16  really shows is that there was a differential between the

17  Fair Isaac price and the price charged for VantageScore and

18  in some cases in some of the things that they've submitted

19  suggest that maybe the Fair Isaac price was increased.

20          Your Honor, I'm going to try to go through this

21  pretty quickly.  This is also the deck where --

22          THE COURT:  Is this your damage theory?  You're

23  really about at the end of your time, so I want a few minutes

24  of your damage theory.

25          MR. RULE:  Okay.

1          THE COURT:  You're going to have to rely upon

2     what's in here --

3          MR. RULE:  And you can look at that and you will

4     see the evidence of talking about marketing and talking about

5     obsolescence of scores.  The one thing, your Honor -- let me

6     just say this:

7               In terms of the damages theory, the fact is that to

8     the extent that they have engaged in illegal activity to

9     essentially put us out of the market and that has adversely

10    affected -- we basically lost profits.  The normal measure of

11    damages in a boycott case or a monopolization case are lost

12    profits.  I mean, that's just the way -- that's what usually

13    it is, and what this case is really about is a boycott case

14    and we point out some of those cases.

15              And I should also say we're not asking to dissolve

16    VantageScore.  Perhaps that would be an appropriate remedy,

17    but what we've said is, look, just divest it.  Send it off on

18    its own.  Have it owned by a third party.  The harm here is

19    the fact that they own it and so that's the problem.

20              Your Honor, I want to show you one other slide.  I

21    just can't -- I have to show you this because I think it

22    really proves one of the issues here that's very

23    disconcerting, and that is this slide show that they

24    presented to DOJ.  And they basically touted Mercer Oliver

25    Wyman as managing the process, and again, the evidence shows

1    that they in fact didn't.  They were kept in the dark much of

2    the time.  It also said no, it will not lead to price

3    coordination.  We've shown that it has.  CRAs retain the

4    right to market their own scores.  Again, they had an

5    agreement on obsolescence.

6          But then -- this is particularly interesting.  They

7    point out their guidelines and again use that as a screen,

8    but the fact is they violated each one of them.

9          "Communications regarding marketing, pricing."

10   We've shown that.

11         "Communications regarding current or future

12   development."  They basically had this agreement and

13   discussed Scorex PLUS and other tri-bureau scores.

14         "Communications regarding dealings with third-party

15   providers of scoring algorithms, including Fair Isaac."

16   Well, this was all about going after Fair Isaac and it's in

17   document after document.

18         "Communications regarding members' or other []

19   products."  They basically used each other's products in

20   creating the score.

21         And then communications to deal or not to deal with

22   a particular category of customers.  We've shown that.

23         Here's the conspiracy evidence, your Honor.  We

24   think that this is -- I basically argued **Matsushita** for the

25   Government in support of the position that the Government

1    accepted and I can tell you this is no **Matsushita** case.  This

2    is an entirely plausible conspiracy with evidence.

3           With respect to the injury to us, your Honor, these

4    are three documents starting from the bottom with a Mercer

5    Oliver Wyman, basically:  "Only trying to replace the

6    traditional FICO score"; TU:  "Replace FICO anywhere [it

7    appears]"; Experian:  "Wanted to make sure that we

8    aggressively pursue opportunities to displace FICO"; and then

9    Equifax:  "Do we shoot or milk the cash cow ...?"  Well,

10   replace, displace or shoot, your Honor, they're all the same.

11   It indicates that the conspiracy was focused against us and

12   that we have standing to challenge it.

13          And, your Honor, I just would leave you with these

14   cases and particularly the **ES Development** case from the

15   Eighth Circuit.  Very much on point.  It involved a bunch of

16   competitors getting together to exclude somebody from the

17   marketplace, hired a lawyer, tried to engage in things that

18   they could on their own, but the court said that that was an

19   illegal conspiracy and found accordingly.

20          This is some evidence of the adverse effect on

21   competition, the importance of data competition, an

22   indication of the importance of scores generating data

23   competition, and finally the notion -- and this is in the

24   Robida deposition -- that the parties went through and

25   discussed their black box, their deepest, darkest secrets.

 1            And I'd also ask your Honor to look at their IP

 2    agreement, where they basically -- even those are the

 3    deepest, darkest secrets, justified unusual security

 4    precautions, basically they expressly reserve the right for

 5    each of them after looking at the deepest, darkest data

 6    secrets to take it back to their own shop and use it.  It

 7    expressly says you can take that data -- you can't give it to

 8    a third party, but you can take it back to your own operation

 9    and use it.  So it's like Coke and Pepsi getting together,

10    sharing their formulas with the cooks, the head chefs, soda

11    chefs, and then basically allowing them to go back to their

12    respective venues and use that information.  It's clearly

13    anticompetitive.

14            We've got some of the statements about what they

15    shared and about the fact that any changes in the score

16    basically requires unanimity, which means that if I come up

17    with a new data element that I want to include in the

18    VantageScore, my other two competitors can prevent me from

19    using it.

20            Finally, this NAMB letter, your Honor, I just would

21    call your attention to it, because it talks about some of the

22    concerns that National Association of Mortgage Brokers, one

23    of the principal consumers or trade groups, had with this

24    arrangement, basically indicating that:  "whether the change

25    is designed to eliminate or replace the current use of

1    Classic FICO scores or whether it represents a better" score.

2    That was unclear to them.

3         But what's most important, your Honor, is this

4    statement:  "Most significantly, it is unclear what benefit

5    is gained by consumers in having this new System, which is

6    perceived to simply repackage an existing product and injects

7    uncertainty and confusion into the market."

8         THE COURT:  Okay.  I think you're beyond your

9    time.

10        MR. RULE:  Okay.  Thank you, your Honor.

11        THE COURT:  I'll hear from Mr. Milne ten minutes

12    with regard to his reserve time.

13        MR. MILNE:  Yes.  Thank you, your Honor.

14        Boy, Mr. Rule talks fast and I think there's a lot

15    of double talk in there, but let me just -- let me just start

16    with -- he said a lot of things.

17        I didn't hear him answer your question about

18    damages because I don't think there is an answer.

19        I don't think I heard him answer the question of

20    how there is any kind of real or immediate threat to

21    Fair Isaac's continued corporate existence.  No answer to

22    that because there isn't one.  We're not using the Equifax

23    preferred partnership as proof of the lack of conspiracy.

24    There's no evidence of conspiracy.

25         The significance of that agreement is the fact that

1    it preserves Fair Isaac's future.  The very things they say

2    they're threatened by as a result of this collaboration,

3    things like not having access to data and the like, those

4    things are -- first of all, it's preserved by the Equifax

5    agreement and he didn't come up here and say that there was

6    any real threat to them going forward except to say, oh,

7    well, maybe, just maybe in the future once the lawsuit is

8    over they may change their conduct.  But it's very clear in

9    the cases that we cite in our brief, Judge, that speculation

10   about the future is not enough to grant summary judgment, or

11   to defeat summary judgment.

12         And, you know, he talked about the Experian

13   cancellation of a consumer agreement.  Well, yes, they did

14   that.  That was a small business dealing in terms of the

15   overall relationship between those companies and Experian

16   renewed the major distribution agreement between the two

17   companies despite the lawsuit and TransUnion has continued on

18   throughout this process with a very cooperative relationship

19   with Fair Isaac.  And so there's just no basis to believe --

20   first of all, the bureaus are acting in very different ways,

21   so the suggestion that their activities with respect to data

22   or distribution are somehow evidence of some kind of

23   coordinated conduct or, as Mr. Rule just said at the end,

24   some kind of coordinated conspiracy to kill Fair Isaac, it

25   just doesn't make sense.  They're all over the place in terms

1    of their individual activities, which you would expect in a

2    competitive environment.

3           Now, one thing that's also worth observing here

4    about what Mr. Rule said is, the basic thesis here is that

5    the bureaus somehow have it out for Fair Isaac and they're

6    going to drive it out of business in some way, shape or form.

7    How is that likely to be achieved where there's no allegation

8    of conspiracy with respect to denial of data, where the data

9    dealings continue, and where the basic thesis of the

10   conspiracy is we're going to price VantageScore high in

11   relation to the FICO score?  I mean, it's undisputed in this

12   record that lenders do not switch and it's lenders that drive

13   this marketplace.  The consumer business is really a

14   follower.  It's where -- the money is where the lenders are

15   and that's what drives the business.

16          How is it -- and it's undisputed that lenders will

17   not make a switch without extensive testing.  They're not

18   going to switch to a new scoring system without doing these

19   extensive statistical tests.  Everybody recognizes that.  So

20   if VantageScore isn't as good as Fair Isaac, it's not going

21   to get accepted, and if it's priced too high, it's much, much

22   less likely to be accepted by lenders.  So what kind of

23   conspiracy to kill Fair Isaac is this, a conspiracy to price

24   VantageScore high?  It just doesn't make sense.

25          And the idea that -- you know, Mr. Rule got up here

1    and said it was completely irrational that the bureaus would

2    not have in effect given away -- because the marginal cost of

3    this scoring product is basically zero once you develop the

4    algorithm.  You know, it doesn't cost much to generate each

5    incremental score.  So his basic position is that absent

6    conspiracy you would see the bureaus giving it away.  He

7    says, he concedes that what we're talking about here -- first

8    of all, that just doesn't make sense from a business

9    perspective and you can't rule out the possibility of

10   independent conduct, that an individual bureau looking at

11   this would say:  Hmm, you know, we have what we think is a

12   good score here.  We think it outperforms the FICO score and

13   the FICO score is the benchmark out there in the marketplace.

14   Well, let's see if we can price it at around that level and

15   then we'll tell customers:  Look, you're getting more for it.

16   It's more predictive.  It's a good deal for you.  Is that

17   irrational?  That's commonsense business conduct.  It's

18   hardly irrational.  And because we're talking about a

19   relatively concentrated market with only three sellers, the

20   cases -- and we cited them, including the **Blomkest** case --

21   talk about how it is expected in a concentrated market that

22   pricing will not mirror a marginal cost, that it will be

23   higher than marginal cost, without conspiracy, without any

24   illegality.

25        He talked a lot about value proposition.

1   Basically, in the absence of evidence of actual agreement,

2   what they're stretching for is to find some link -- and

3   before I even get into that, I just want to make clear:  You

4   can and you should grant summary judgment on the failure with

5   respect to damages and injunctive relief.  Customers --

6   customers aren't in here suing.  They include some of the

7   most sophisticated financial institutions in the world.  The

8   Government is not in here suing on behalf of some public

9   interest.  The DOJ actually did look at this arrangement and

10  concluded its investigation with no action.

11          So what you have is a competitor here.  They

12  haven't satisfied the requirements for antitrust injury, they

13  have no standing, and so you never even need to get to the

14  next level, but there is an absolute failure of proof on the

15  issue of agreement.  Where is the evidence?  Where is the

16  evidence that value became some kind of code not just for

17  price, but for a price floor on VantageScore?  Not a

18  scintilla.

19          And when you look at the documents, when you look

20  at the documents -- they have two categories of, quote,

21  unquote, value documents that they include in their papers.

22  One is the category of documents that reflect the joint

23  venture discussions.  And again, they're in a collaborative

24  venture to have a new product.  You have a new product,

25  you're going to talk about -- you have to have a message for

what that product does.  What is it?  Is it a better product?
What does it do?  What are its attributes?  And when you look
at the documents that talk about value proposition, that's
what they're talking about.  They are talking about the
attributes of the score.  That's category one.

The other category is the internal bureau documents
and we just talked about that.  The idea that a bureau
internally would say to itself:  Hmm, I have a score, it's
got these attributes.  How am I going to price it?  And yes
indeed it's true.  This isn't something that's problematic,
that some of the bureaus had independently reached a decision
that they at least aspired to have a price that would come
close to the FICO score and that would mirror the value --
it's common sense -- would mirror the value of the product.

But what's key here is, you know, if there really
was a price fixing conspiracy to set a floor for VantageScore
pricing, you would expect to see -- first of all, you'd
expect to see some indication that they were enforcing the
agreement and all these low prices.  You didn't hear him
dispute the existence of all these low prices and how they
were extended to lots and lots of customers, somebody saying,
"Hey, what's happening here?  The conspiracy, nobody's
following it.  It's breaking down."  Nothing like that.  You
don't see that.

But the other thing you would not expect to see

1   would be -- it's an absolute floor, remember?  You wouldn't

2   expect to see policies that would allow for discounting, and

3   we attached the documents to our papers.

4        In the case of Experian, they had a policy that

5   gave even field sales level individuals the freedom to offer

6   30 percent discounts on VantageScore without getting

7   anybody's approval.  You could get a 40 percent discount just

8   with a district manager's approval, and if you wanted to go

9   to 50 percent, yes, at that point you had to go to a vice

10  president.

11       THE COURT:  Okay.  I think that's going to be the

12  final word on the antitrust.

13       MR. MILNE:  Okay.  I would just add, your Honor,

14  we put the detail -- the whole issue of shredding, we address

15  it in the brief.  They haven't even attempted to satisfy the

16  requirements for an adverse inference and it's not even close

17  on each level of the test for that.

18       THE COURT:  All right.  I think any remaining

19  questions I have will be answered by reference to the briefs,

20  so we'll take a ten-minute break and then move ahead to the

21  trademark claim.

22       (Recess taken at 10:15 a.m.)

23                          * * * * *

24       (10:30 a.m.)

25                     IN OPEN COURT

1              THE COURT:  All right.  Please be seated and we'll

2       proceed to talk about the trademark claims, which are Counts

3       1, 2, 3, 4, 5, 6 and 7.

4              And let's see.  I guess --

5              MR. GLANCY:  Good morning, your Honor.

6              THE COURT:  And you're Mr. Glancy, is that --

7              MR. GLANCY:  Glancy, yes.  Christopher Glancy from

8       White & Case and I'm here to speak on behalf of all

9       defendants in support of Defendants' motion for summary

10      judgment on both the trademark infringement claims and the

11      false advertising claims.  I'll address first the trademark

12      infringement claims.

13             There are two essential elements in every trademark

14      infringement case, and that is that the plaintiff must prove

15      ownership of a valid trademark and likelihood of confusion.

16             Now, with respect to the claims that are based on

17      the 300 to 850 score range, we have moved only with respect

18      to the first element, ownership of a valid trademark.  We

19      contend that they do not own a valid trademark.  I'll address

20      separately later on the keyword advertising claims.

21             Trademark protection is only afforded to

22      distinctive marks and there's a good reason for this.  No

23      company should be allowed to monopolize common descriptive

24      terms and prevent competitors from using those same terms to

25      fairly describe their own products, or else otherwise

1    companies could lay claim to all the words in the dictionary

2    or, as here, to entire ranges of numbers and prevent

3    competitors from using those terms or those numbers to fairly

4    describe their own products.

5            Now, the determination of validity here is really a

6    two-step process.  First is determining whether or not where

7    300 to 850 belongs on the so-called "spectrum of

8    distinctiveness."  Your Honor may be familiar with it.  The

9    low end is generic marks, which are not protectable, then

10   descriptive marks, which are not inherently distinctive, then

11   suggestive marks and arbitrary marks and fanciful marks.

12           Now, descriptive marks are -- the courts are very

13   clear about this -- a term that immediately describes the

14   ingredients, qualities, characteristics, effects or other

15   features of the goods or services at issue.  A descriptive

16   term doesn't need to bring to mind the nature of the goods or

17   services.  It just needs to describe a particular

18   characteristic or feature of that service.

19           So with those definitions in mind, let's take a

20   look at the facts in this case.

21           And Bryan, if you could show the first slide.

22           This is a screen shot of the Fair Isaac web site,

23   and if I may approach, I have hard copies for the Court.

24           THE COURT:  Okay.  Please.

25           MR. GLANCY:  And one for opposing counsel.

1          This is a screen shot of the myFICO web site which

2     shows that -- exactly how Defendants use 300 to 850.

3          Toward the bottom in small type there, you can see

4     it says:  "FICO scores are your credit rating.  They range

5     from 300 to 850, higher is better."  So the question before

6     the Court then is are Plaintiffs using 300 to 850 to describe

7     a feature of their services, and I submit to you that there's

8     only one possible answer:  Of course they are.  No reasonable

9     jury could conclude otherwise.  It is a descriptive term.

10         Now, in response to this the plaintiffs have relied

11    on their trademark registration which they secured from the

12    Trademark Office, but does the fact of a registration defeat

13    summary judgment here?  No.  The cases that we've cited in

14    our brief clearly support that.

15         And indeed, it's important to see that the

16    trademark examiner initially rejected the 300 to 850

17    application on the ground that it was descriptive.  That was

18    a proper objection.  But what did Fair Isaac do in response?

19    They hoodwinked the trademark examiner basically in an

20    exercise of misdirection.  Fair Isaac argued that this was

21    not descriptive, this was arbitrary, and why?  Because the

22    mark was arbitrarily selected.  But that's a specious

23    argument.  It matters not to any consumer how the mark was

24    actually selected.  The question is what is the relationship

25    of the mark to the goods or services at issue, and here it is

1    clearly being used in a descriptive fashion to describe a

2    feature of Plaintiffs' service.

3         Now, it should be noted as well that Plaintiffs

4    hardly chose this mark arbitrarily.  It wasn't plucked out of

5    thin air.  They had these algorithms that spit out a result

6    that range between 300 and 850 generally.  It is an apt

7    descriptor of the actual results from those algorithms.

8         Now, the second step in this analysis is, because

9    it's a descriptive mark, the question becomes, well, have

10   they demonstrated or can they demonstrate secondary meaning.

11   That is to say, can they demonstrate that consumers have come

12   to associate 300 to 850 exclusively with Fair Isaac and view

13   it as a trademark and not merely a description of a feature

14   of the service.  Without secondary meaning, the trademark

15   isn't valid.  Plaintiffs have produced no evidence of

16   secondary meaning.

17        Now, Plaintiffs could have gone out into the

18   marketplace and done a secondary meaning survey.  They could

19   have randomly selected consumers from around the country and

20   asked them:  What do you think this -- what's the

21   significance of this 300 to 850 range to you, but they

22   didn't.  Defendants did and Defendants have produced their

23   own secondary survey and that survey clearly shows that only

24   two percent of customers even recognized or thought that it

25   was a -- that a score with that range originated from a

single source, and only two out of 300 respondents identified

Fair Isaac as that source.

Now, I did want to turn briefly to keyword

advertising as well.  Keyword advertising your Honor may be

familiar with.  It's a common advertising practice where

advertisers purchase keywords, which can be common terms or

trademarks, in the hopes that when search engine users type

in the keyword into a search engine, that their ad will

appear on the screen next to the natural results of the

search, and it's usually in a part of the screen that is set

off to the side and is identified as advertisements or

sponsored links.

How common is this practice, really?  Well, it's so

common that Fair Isaac has purchased Experian's trademark and

TransUnion's trademark and VantageScore's trademark and

Equifax's trademark.

And Brian, can you show that screen?

This is a list of key words that were purchased by

Fair Isaac to promote their own services and you can see all

of the trademarks of the defendants here.  And on the next

screen in the middle there, it's a little bit hard to make

out, but there's a keyword purchase for "vantagescore fair

isaac."

Now, the facts on the keyword advertising issue are

not in dispute either.  For a time TransUnion and Experian

1    both purchased FICO as a keyword.  Neither one of them used

2    FICO in the visible text of the ad that was linked to the

3    keyword.  So the question for the Court is whether under

4    these circumstances as a matter of law there can be no

5    liability for trademark infringement.  Two courts have

6    addressed this issue and determined that under these facts

7    there is no liability for trademark infringement.  No court

8    has ever found liability under those facts and circumstances.

9          And before I move on now to false advertising, if

10   your Honor has no further questions -- no questions, I'll

11   move on.

12         THE COURT:  No, I think you can move on.

13         MR. GLANCY:  Okay.  Thank you.

14         Now, with respect to the false advertising claims,

15   as we set forth in our brief, Plaintiffs have not opposed

16   many of the claims that -- Defendants' motion with respect to

17   many of the advertising statements that they initially

18   alleged in their complaint, so as to those statements there

19   should be no question summary judgment is appropriate.  What

20   remains in the case are three categories of statements and

21   I'll walk through them for you in a moment.

22         The first category is that VantageScore is, quote,

23   more predictive, close quote, than other scores.  The second

24   is that VantageScore is, quote, used by lenders, close quote.

25   And the third is really a group -- large group of statements

1    that Plaintiffs contend all convey the message separately,

2    that Experian's PLUS score and TransUnion's TransRisk and

3    VantageScore are used by most lenders.

4         Now an essential element to any false advertising

5    claim is, it's axiomatic that the defendants have made a

6    false statement of fact, and there are two -- the courts are

7    very clear on this.  There are two types of false statements.

8    There are literally false statements and then there are

9    implicitly false statements, false statements that although

10   literally true or ambiguous convey a misleading message.

11        Now, the plaintiffs have alleged that these

12   statements are literally false and literal falsity can be

13   decided as a matter of law.  There are no material facts in

14   dispute here.  So let me walk through these three categories.

15        First, the more predictive claim.  Now, the burden

16   is on the plaintiff to show that that is a false statement.

17   That is to say that VantageScore is not more predictive than

18   other scores in the marketplace.  As I say, the facts aren't

19   in dispute.  Both the plaintiffs and the defendants rely on

20   the exact same evidence.  We're both looking toward these

21   validation studies, many, many validation studies done by the

22   defendants and done by lenders out there in the marketplace

23   comparing VantageScore with other scores.

24        Now, Defendants' expert concluded that these tests

25   show that VantageScore is overwhelmingly more predictive.

1    Lenders have done their own tests.  They've concluded the

2    same thing, that VantageScore is more predictive.  Plaintiffs

3    hired their own expert and Plaintiffs' expert couldn't say

4    whether or not it was more predictive, so that testimony

5    doesn't get them where they need to be.  That testimony

6    doesn't say that VantageScore is not more predictive than

7    other scores.  And in fact, he acknowledged twice in his

8    expert report that on their face the results of those tests

9    demonstrate that VantageScore is more predictive.  So

10   curiously, or perhaps not so curiously -- oh.  I should

11   mention there's no dispute also that these scores measure

12   predictiveness, that the tests were accurate -- were properly

13   done and that the results were accurately reported.  All of

14   that is not in dispute.

15            So, as I was saying, perhaps not surprisingly, the

16   plaintiffs in their paper do not rely on their expert to try

17   to defeat Defendants' motion.  Instead, they attach to an

18   attorney declaration some excerpts from some of these tests,

19   and these excerpts, sure enough, show that VantageScore is

20   not more predictive than every other score in the marketplace

21   in all circumstances.  But that is not ever what any of the

22   defendants have ever claimed.  We never claimed that

23   VantageScore was the most predictive score.  We never claimed

24   that the VantageScore will always beat every other score in

25   every circumstance.  We just say that generally speaking it

1    is more predictive.

2            THE COURT:   Than what?

3            MR. GLANCY:   Than other scores in the marketplace.

4            And to the extent that there's an ambiguity about

5    whether or not we're comparing it to all other scores or some

6    other scores or most other scores, well, that ambiguity means

7    that this statement is not literally false.  It means that

8    it's misleading and it was incumbent upon the plaintiffs to

9    come to court with a survey and they didn't do it.  They had

10   two and a half years to do it and they didn't do it.

11           THE COURT:   What's your authority that they're

12   required to have expert surveys in this area?

13           MR. GLANCY:   Well, in the cases, **United Industries**

14   and the other cases we cited in our brief, it makes it clear

15   that when a statement is ambiguous it is, quote, critical,

16   close quote, from **United Industries**, that Plaintiffs

17   demonstrate that the, quote, advertising actually conveyed

18   the implied message and thereby deceived a significant

19   portion of the recipients.

20           THE COURT:   Doesn't say expert survey, however.

21           MR. GLANCY:   The cases say that this is usually

22   accomplished through survey evidence.  It doesn't foreclose,

23   I suppose, other forms of evidence, but they haven't come

24   forward with any evidence that a significant portion of

25   recipients perceived the message that they allege and then

1   were deceived by it, and that's their burden.  So the facts

2   aren't in dispute and it's just a failure of proof on this

3   issue and summary judgment is warranted.

4        Now, briefly turning to the used-by-lenders

5   statement, I think this is easily disposed of.  They just

6   haven't pointed to any evidence that shows that VantageScore

7   wasn't used by lenders when that statement was made in

8   October of 2006, and nobody disputes the statement is true

9   now.  VantageScore is used by many lenders.

10        Now, the third category, finally, is the claims

11   that are made about TransRisk and PLUS scores and

12   VantageScore that Plaintiffs argue all mean that these

13   scoring services are used by an appreciable number of

14   lenders.

15        Now, what are the accused statements at issue?

16   There are numerous statements alleged in the complaint.  The

17   ones they've called out in their brief I suppose are the ones

18   they view as the most significant, so I'll turn to those.

19        At page 34 and 35 of their brief they accuse TU's

20   statement that:  "Most lenders would view your

21   creditworthiness as" such and such.  And they accuse

22   Experian's statement that:  "Know where you stand no matter

23   which credit bureau your lender checks."  And they accuse

24   VantageScore's statement that:  "Most lenders offer their

25   good rates to consumers in this category," referring to a

1    particular scoring category of VantageScore.

2            Now, none of those statements say that our score is

3    used by an appreciable number of lenders or used by most

4    lenders.  Their allegation with respect to what is insinuated

5    has changed over time and I invite the Court to review the

6    statements and we have a couple here on slides.

7            And, Bryan, if you can -- this is Experian's web

8    site.  They say that -- when we say:  "Do you know your

9    credit score?" what that really says is:  "Our score is used

10   by most lenders."

11           Bryan, can you show the next one?

12           This is a page from Experian's PLUS score

13   purchasing page where on the top it says:  "See the score" --

14   "See the same type of score that lenders see."  That's true.

15   These are three-digit credit scores that tell you what your

16   creditworthiness is and there's just nothing false in that

17   statement.

18           Now, if -- again, the plaintiffs were required to

19   come to court with actual evidence of consumer deception,

20   which they haven't done.  They haven't done a survey to show

21   that people were misled by this, so we feel that summary

22   judgment on this issue is warranted.  Again, it's a failure

23   of proof.

24           Thank you, your Honor.

25           THE COURT:  Before you sit down, I would like you

1　　to address a couple remarks, backing up to the world of

2　　trademark for just a second, on the estoppel argument as it

3　　relates to Experian and TransUnion as licensees and what your

4　　reaction is to that.

5　　　　　　MR. GLANCY:  Well, first of all, VantageScore --

6　　nobody I think can contest that VantageScore is not estopped

7　　to raise the argument.

8　　　　　　With respect to TU, they have a written license

9　　agreement that does not estop them.  The plaintiffs are

10　　claiming that there is an implied license, but the terms of

11　　the license agreement itself sort of forecloses the idea of

12　　an implied license, and not only an implied license to use

13　　the range, but then an implied promise not to challenge the

14　　range is just not sustainable.

15　　　　　　And then finally with respect to Experian, it's

16　　true they snuck into an addendum this 300 to 850 scoring

17　　range as -- into the master agreement.  No additional

18　　compensation was paid for this.  It was registered as an

19　　optional trademark, optional for Experian to use.  It was

20　　part of an addendum that addressed other issues.  It was

21　　really sort of just slipped in there, we believe, to support

22　　their litigation but certainly well after they claimed to

23　　have had trademark rights in 300 to 850.

24　　　　　　THE COURT:  All right.  Thank you.

25　　　　　　MR. GLANCY:  Thank you.

1            THE COURT:  Mr. Schutz, I'll hear you with regard

2       to the plaintiffs' position on the Lanham Act issues.

3            MR. SCHUTZ:  Your Honor, I have a couple slide

4       decks.  May I approach?

5            THE COURT:  Okay.  You both chose blue backings to

6       further confuse me.

7            MR. SCHUTZ:  It's a popular color, Judge.

8            THE COURT:  All right.  It's been tested to be

9       soothing or something?

10           MR. SCHUTZ:  I guess so, persuasive and soothing.

11        (Laughter)

12           THE COURT:  Oh.  All right.

13           MR. SCHUTZ:  Counts I through VII are at issue

14      here, Judge, and we'll just start with an overview of what

15      those counts are so that we've got the 30,000 foot view.

16           What's important here and I'll get to in a minute

17      is, of these seven counts, there is absolutely no attack on

18      the passing off counts, and I'll talk about that next.  It's

19      important to understand what the defendants do not argue.

20           They are not challenging and they submit no basis

21      for dismissing our passing off, the deceptive trade practices

22      count or the unjust enrichment counts, 4, 6 and 7.

23           They also, as counsel has admitted, don't challenge

24      the trademark case on the likelihood of confusion aspect.

25      It's centered solely on whether the mark is valid, in other

1   words, whether it's a descriptive mark.

2         And on the false advertising, they don't challenge

3   whether that advertising has actually misled consumers.  They

4   just go to the falsity prong.

5         So, what do we need to defeat this motion here,

6   Judge?  Here's what we need on each of the aspects.

7         On the 300 to 850 marks, all we need to show is

8   that there are material issues of fact as to whether they are

9   material descriptive, but we've got several fire walls in

10  this trademark count, Judge.  In fact, we've got three

11  separate fire walls here:  the descriptive firewall, we've

12  got the secondary meaning firewall, and then we've got the

13  estoppel firewall.

14        On the false advertising, these claims are

15  literally false, and even if they're not literally false, we

16  have another firewall, and that's that there are material

17  issues of fact as to whether they are misleading.

18        On the keyword advertising, the issue here is

19  whether they're used to generate advertisements in commerce

20  and then with regard to the advertising claims about

21  VantageScore attributes and usage, there are clearly material

22  fact issues on whether they were literally false.

23        You will see, Judge, as we walk through the

24  evidence here that there is a pattern of deceptive conduct

25  that is present in almost everything the defendants do and it

1   overlays all the causes of action here in Counts 1 through 7.

2   They intentionally copied our marks, they prominently use

3   this numerical content, they make false statements about

4   their own scores, they use our terms for paid Internet terms,

5   and then they fail to disclose the true nature of their own

6   credit scores.

7          Let's cue now to this ad.

8      (Video played)

9          MR. SCHUTZ:   Judge, that is an ad by Experian, and

10  it's just one example that hits all these areas of this

11  pattern of deceptive conduct here.  It's an intentional

12  copying of our 300 to 850 mark.  They said, you know, 450 to

13  850.  That's certainly confusingly similar to our mark,

14  constitutes trademark infringement.

15         They prominently use that numerical content.

16         They also include false statements about their own

17  credit scores.  The numeric reference cannot be to their

18  advertised PLUS score, because what they do is, when you

19  click and you go to that web site for Experian,

20  freecreditreport.com, it's the PLUS score, Experian's PLUS

21  score that they try to sell you.  It doesn't go to 850, so

22  they mislead on that.

23         THE COURT:   Would this be a different case if

24  their scores were 30 to 85?

25         MR. SCHUTZ:   If their scores were 30 to 85, Judge,

1    we wouldn't be here.

2              THE COURT:   Okay.

3              MR. SCHUTZ:   At 30 to 85, it doesn't overlap the

4    range, doesn't have that, but that's not what they chose to

5    do and we'll get to why they explicitly chose to do what we

6    do.  Let's talk about the passing off claim.

7              THE COURT:   Do FICO scores ever end in, the three

8    digits, in anything other than zero?  Do they make a

9    gradation beyond the 10?

10             MR. SCHUTZ:   You mean like 721, for example?

11             THE COURT:   Yes, as opposed to 720.

12             MR. SCHUTZ:   I believe so.  I don't think there's

13   any -- I guess the technical question I would have to look

14   into, but I don't think there's any reason why they couldn't

15   add in something less than zero.

16             On the passing off claim, Judge, the Minnesota

17   Deceptive Trade Practices Act has several provisions, four of

18   which we've cited here, that they violate.

19             It's also important to note that for the Deceptive

20   Trade Practices Act claim, there's no requirement that we

21   have a trademark.  I mean, it can just be the activities that

22   are described here.  It's a very broad, protective statute.

23   And even though there's some overlap with the Lanham Act,

24   there's no requirement for a trademark here and they don't

25   address that at all, so that claim survives this hearing no

1    matter what happens on everything else.

2         Let's now talk about their infringement of the 300

3    to 850 marks.  Again, it's based solely on the fact that they

4    think the marks are descriptive.  Let's look at what they do

5    here, Judge.

6         If you take a look at this particular document,

7    which I think comes from TransUnion, they are using our mark.

8    I mean, this is the scale that they put out there.  They

9    aren't even trying to tweak it at all so it doesn't hit 300

10   to 850.  They put the 300 to 850 mark right out there.

11        Here's another document from Truecredit, which is

12   again a TransUnion document.  They've got the scale set forth

13   here again.

14        If we go to an Experian document, what we see is

15   Experian's in-house score range, 330 to 830, and you'll see

16   some documents that will come up here in a minute as to why

17   they chose that range, but 330 to 830 is certainly

18   confusingly similar to our 300 to 850 marks.

19        We've got some further evidence of the way that

20   Experian uses its marks on the next slide here, Judge, again,

21   all within the 300 to 850 marks.

22        Now let's go right to the heart of the issue of

23   descriptiveness.  Counsel set forth what's a pretty standard

24   designation of how marks are classified.  The focus here is

25   on the **Woodroast** -- Shelly's **Woodroast** case on what's a

1    descriptive mark.  A descriptive mark according to that

2    court, quote:  "immediately conveys the characteristics,

3    qualities or other features of a product ...."  Well, our

4    marks are not descriptive.  We have four registered

5    trademarks.  They're deemed to be inherently distinctive and

6    thus qualify for trademark protection.  And in fact, the

7    issue that came up in the Patent Office, in the Patent and

8    Trademark Office when these marks were under consideration,

9    the Patent and Trademark Office initially rejected the marks

10   on the basis that they were descriptive, and that argument

11   was overcome and it wasn't overcome by hoodwinking the

12   trademark examiner whatsoever if the Court goes -- and it's

13   part of the record -- and looks at the prosecution history of

14   those marks.  So we have valid marks where this issue was

15   addressed and rejected.

16         Defendants' contention boils down to this, Judge:

17   They say that it's beyond dispute that 300 to 850 describes a

18   characteristic.  Which characteristic?  Upper and lower

19   boundaries.  Well, that's simply not accurate.  Three hundred

20   to 850 does not describe the upper and lower boundaries of

21   our range of possible scores.  Mr. Collyard in his exhibit

22   lists several -- an exhibit to his affidavit lists several

23   different types of the various Fair Isaac scores and the

24   ranges are not 300 to 850.  They lap over the ends on both

25   sides.

1          The defendants admit that the numeric scale is

2    merely cosmetic.

3          And -- this is important, Judge, and we're going to

4    explore this next -- there's no competitive need to use 300

5    to 850.  So from a public policy standpoint in terms of the

6    public policy of giving a mark to someone that would put a

7    competitor at a disadvantage or pull something out of the

8    public domain that couldn't -- like the term "apple" for "red

9    fruit," for example, that's not what was done here.

10          This is a slide that Defendants used claiming that

11   we're using our mark in a descriptive context.  Well, that's

12   simply not true, Judge.  If you look at the entirety of this

13   ad, you see where the arrow is there's a reference to 300 to

14   850, but you will also see that our trademark is very

15   prominent in here.  And when we filed on the first

16   application, which is 300 to 850, without any adornment or

17   seal, it was an intent-to-use application and the evidence of

18   the use of that without any adornment -- you'll see coming up

19   here on the screen.  This is in fact what we showed the

20   Patent Office for what I'll call the naked 300 to 850 without

21   any adornment, was in fact this one with the seal as the

22   intent to use.  So the seal is not required.  We have a

23   trademark simply without the seal.

24          So let's look at some additional case law and some

25   examples of what are descriptive marks and what are not

1    descriptive, all right?

2            Again, from the Shelly's **Woodroast** case:

3    "Descriptive marks immediately convey the 'characteristics,

4    qualities or other features of a product'...."

5            Here are examples from McCarthy's treatise on

6    trademark law on descriptive marks, okay:  Frosty Treats,

7    Beer Nuts, Car-Freshener, Bed & Bath, Honey Roast, Itool,

8    Raisin Bran.  I mean, Frosty Treats for frozen desserts and

9    ice cream, Frosty Treats immediately brings to mind frozen

10   desserts and ice cream, Beer Nuts for salted nuts,

11   et cetera.

12           Let's now look, Judge, at what have been viewed as

13   not descriptive, marks that are not descriptive:  Roach Motel

14   for an insect trap, Dial-A-Mattress for mattress sales,

15   Florida Tan for suntan lotion, Action Slacks for pants.  I

16   mean, Action Slacks for pants, there's a much better argument

17   that that is a descriptive mark than 300 to 850 for credit

18   scores.  Three hundred to 850 doesn't meet the Shelly's

19   **Woodroast** test of immediately bringing to mind the

20   characteristics, qualities or other features of the product.

21   Action Slacks arguably does more so.  It has been held to be

22   found not descriptive, as are all the other marks here on

23   slide number 20.

24           Here's another example from the **Tanel** case, your

25   Honor, involving the mark 360° for I believe it was

1   basketball shoes.  Again, it's a number mark and even though

2   it describes the circular shape of the cleat on the shoe

3   being sold here, the court in that case found that it doesn't

4   meet the criteria to be descriptive and that trademark was

5   allowed as valid.

6        Then, Judge, we get to the second firewall here on

7   the trademark case, which is that even if the Court were to

8   have some concern that the marks were merely descriptive,

9   there are certainly then material issues of disputed facts as

10   to whether they've acquired secondary meaning.  There are

11   many ways you can show secondary meaning in the case law.

12   You do not have to use a survey.  You can use defendant's

13   intentional copying, for example, and evidence of consumer

14   confusion, both of which we've done in the brief and I'll

15   show you here.

16        THE COURT:  Doesn't evidence of consumer confusion

17   require some sort of survey or expert, though?

18        MR. SCHUTZ:  You can show that by a survey or you

19   can show it by direct actual evidence and we have direct

20   actual evidence that we're going to get to here in a minute,

21   your Honor.

22        On the issue of copying, if we look, these are

23   documents from each of the defendants here and they're

24   referenced, the Court can look them up, but what did each of

25   the defendants do here?  Let's look at the first call-out:

1   "I think we should use the range 300-850 to be completely

2   compatible with the FICO scale (which is what we are trying

3   to mimic)."  There is no statement here they picked, one of

4   the bad guys picked 300 to 850 because they needed it for

5   competitive purposes.  They basically wanted to rip

6   Fair Isaac off and that's what they did.

7          The next document:  "Simplify wording, mirror FICO

8   for ease of adoption, or as agreed by team."  Again,

9   intentional copying.

10          Then we go down to the next call-out:  "FICO's

11   score range is 350-850.  We wanted to keep it close, but not

12   exactly like FICO's."  I believe that's from the Experian

13   documents, your Honor.  Remember that their PLUS score is 330

14   to 830.  So they looked at that, they didn't want to copy it

15   exactly, but they wanted to be close.  And they didn't want

16   to be close for any competitive reasons.  They wanted to be

17   close because they wanted to trade on Fair Isaac's goodwill

18   and the fact that people associate 300 to 850 with

19   Fair Isaac.

20          And of course, same Experian document here:  "Based

21   on the new score model the lowest and highest possible score

22   is 424 to 818," so they picked the range again not

23   descriptive of anything, not of their actual scores, but 330

24   to 830 because it was close to Fair Isaac.

25          We've got another document here, Judge, that

1    illustrates in as clear a way as you can that there's no need

2    to pick 300 to 850 for competitive purposes.  This is a

3    document that shows what a score is, but if you want to see

4    it on a zero to 100 scale, it's on a web site, you can click

5    here and you can get a zero to 100 scale.  So there are

6    clearly other scales that the defendants know about,

7    considered, and rejected.

8         Let's now go -- there's some additional information

9    here, Judge.  Did I jump ahead too far?  Zero to 100.

10        Then we go to Project Trident, Judge.  One of the

11   things that happened with regard to Project Trident was a

12   survey, a poll, rather, gathered by the Gallup organization

13   to determine what score range should we pick.  And they

14   conducted this poll and Question 2 was:  "As you may know, a

15   person's official credit score goes from a low of 330 to a

16   high of 830.  Would you find it more useful for the score to

17   go from 0 to 100, would you prefer the score remain as it

18   is," does it matter to you, et cetera.  "More consumers

19   prefer the 0-100 scale."  So notwithstanding the results of

20   what consumers would rather prefer and that you can in fact

21   use zero to 100, there's no competitive reason to go 300 to

22   850.  They chose a score range that's confusingly similar to

23   our mark.

24        Now, we've also got evidence of consumer confusion,

25   Judge.  This document is a script from Experian that they

1    gave to the people operating their -- at the customer call

2    center because they'd gotten so many questions regarding

3    confusion about the FICO score with their own score that they

4    had to come up with a script for their people to use.  And as

5    you can see here, you know, they were getting calls and they

6    are anticipating -- not anticipating.  They'd gotten so many

7    calls about the confusion that they had to come up with a

8    script for their people to use on how to address that.

9           Here's another piece of evidence, Judge, briefly,

10   on the consumer confusion that talks about most of the time

11   when people are calling they're not asking about the Experian

12   score, but FICO comes up a lot.

13          Further evidence of consumer confusion from

14   TransUnion.  This is again out of Exhibit 6 of Mr. Collyard's

15   declaration.  It has a lot of excerpts showing what happens,

16   what kind of calls they're getting:  "Customer thought it was

17   a FICO score," "TransRisk vs. FICO, thought he bought FICO

18   from us, referred him to [different] website."  VantageScore,

19   same type of evidence, Judge.  And we just pulled a couple

20   excerpts out here.  There's a lot more in the exhibits.

21          Then we have a document from TransUnion that

22   basically admits that there's an incomplete description of

23   the scoring offered on their site.  "Some customers believe

24   that the score that they are receiving is the Fair Isaac ...

25   score."

1          THE COURT:   I think I better move you to false

2     advertising.

3          MR. SCHUTZ:   I think so, Judge.  I think the point

4     here remains.  Let's move on to -- briefly on the estoppel

5     issue, Judge, because you asked opposing counsel about that.

6     There's a contract with Experian.  There's an implied license

7     with TransUnion.  We talked about that in the slides and in

8     the brief.

9          Now, with regard to VantageScore, we haven't found

10    any case law on this one way or the other, but there's a

11    matter of equity.  Someone's agent -- in other words,

12    VantageScore is nothing more than a joint venture between all

13    these parties.  They should not be able to create a joint

14    venture what they themselves do not do, so they should be

15    estopped.  So that's the three firewalls.

16         Let's go to the false advertising, Judge.  It's on

17    slide 35.

18         The advertising claims in fact are literally false,

19    and if not, there's certainly a question of fact as to

20    whether they're misleading.

21         The test here, of course, involves falsity by

22    implication, but let's go on to see the different types of

23    claims that we're talking about.  We've got the lender

24    claims.

25         So here's an example of a document where they say

1  the score that helps lenders decide whether they can give you

2  a loan.

3          We have the same thing from another Experian

4  document, same type of score that lenders see.

5          And we've got another document here from -- I

6  believe this is from TransUnion again saying this is from the

7  lender's perspective.

8          Another document, this one I believe from Experian,

9  same thing, the lender's check.  We can go through these

10  quite quickly.  We put several of these examples up here,

11  Judge, where they are basically saying our scores, "our"

12  being the defendants, in-house scores are what lenders use,

13  and we've cited to the brief evidence that that's just simply

14  not the case and lenders don't use that.  In fact, I believe

15  the Experian score is not used by any lenders and the

16  TransUnion score is used by like one percent.

17          And with regard to the VantageScore, at the time

18  the statements we allege were made, VantageScore was in fact

19  not being used by any lenders.  It is today, but at the time

20  the statements were made it was not.

21          And I've got a few minutes left, Judge, so let's

22  move ahead in the interest of my being cognizant of the

23  Court's time briefly on the keyword advertising.

24          It's undisputed here that, you know, Experian has

25  used the FICO mark and Fair Isaac in its keyword advertising.

1   And there are some material issues of fact regarding

2   TransUnion's use of the FICO mark, but it's undisputed they

3   use 850 as a keyword.

4        The cases in this area -- and the Court's aware of

5   this from reading it and I know the Court had the Hysitron

6   case.  Around the country they're breaking down to two camps.

7   If you buy keywords, is it use in commerce?  And at least two

8   courts, I would submit, in this district, two judges in this

9   district have said yes, and there are some other districts

10  around the country where the courts have said no.  If you

11  come down that's a use in commerce, they've in fact done

12  that, and we cite a lot of evidence -- some of it's in the

13  deck here, Judge -- where we show -- this is, for example,

14  the documents that we got from Google showing what Experian

15  bought, they bought these marks.  We've got TransUnion in

16  fact buying some keyword advertising here.  You can see a

17  screen shot that the FICO score is put in and what comes up

18  on the screen is a paid link to a TransUnion site.

19        Now, they've made an argument in the brief -- it's

20  kind of subtle and I'll just touch on it briefly -- that

21  there's a TransUnion site that actually sells a FICO score

22  and that therefore they have authority to, you know, buy our

23  mark to use to sell in fact a FICO score on their site.

24  While that may be true, that's not the case for this

25  particular site, which is, if I can read this right,

1   truecredit.com.  There's another site -- and I can't

2   remember, it ends in .cs, I think -- where they sell FICO

3   scores, but not on this site.  This link is to in fact try to

4   sell a TransUnion score.  And then we have the evidence here

5   of the keywords that they actually purchased.

6          VantageScore attributes, Judge.  Very briefly

7   finishing up on just the last couple of points here on

8   predictiveness.  It's the last slide.

9          On the comparative predictiveness of VantageScore,

10  they are literally false.  I mean, the statement is -- and I

11  wanted to make sure I've got it right.  This is another -- to

12  quote the record here, this is from Exhibit 25 of the --

13         MR. SCHUTZ:   Is this in the complaint, Mike?

14         And there's a statement, one of the things we

15  quote, where Barrett Burns, who's the CEO of VantageScore,

16  said:  "The new score has the advantage of being based on

17  fresh data making it more predictive than what's in the

18  market."  So that's what they claim.

19         There are 232 tests, however, showing either FICO

20  or a bureau in-house score beating VantageScore.  We cite the

21  record on that, so the statement is in fact literally false

22  and was literally false when made.

23         With regard to the used-by-lender statement, as I

24  mentioned earlier, at the time the statement was made it was

25  false because the first national lender did not adopt it till

 1   2007.

 2          I think I hit about 20 minutes, Judge.  Thank you.

 3   Unless you have any questions, thank you very much.

 4          THE COURT:   No, that's fine.

 5          Mr. Glancy, I think you have a few minutes left in

 6   rebuttal.

 7          MR. GLANCY:   By my count I have about four or five

 8   minutes left.  Thank you.

 9          Just to briefly address false advertising, because

10   I didn't hear anything in there that was different from what

11   are in the briefs, but on the question of estoppel and

12   whether VantageScore is estopped by virtue of its

13   relationship with the other defendants.  There is no

14   allegation here that there's any privity with respect to any

15   contractual relationships between the other defendants and

16   Fair Isaac and certainly they've made no effort to pierce the

17   presumption of corporate separateness that attaches to every

18   corporation.

19          Now, turning to the trademark infringement claims,

20   the emphasis, really, for them is on the fact that the

21   defendants copied the scoring range, but the argument is

22   really circular.  If there's nothing protectable in the

23   scoring range, of course the defendants are free to copy it.

24   In fact, competition encourages copying of unprotectable

25   matter.  It's the essence of fair competition, not unfair

1    competition.  So to say that because we copied it it must be

2    protectable is really putting the cart before the horse.

3          Now, you mentioned 30 to 85, would that be an

4    acceptable scoring range.  It would not be a possible scoring

5    range because simply lenders or computer systems are geared

6    toward three-digit ranges, and of course three-digit --

7          THE COURT:  30.0?

8          MR. GLANCY:   30.0 puts a decimal point in there.

9    And certainly a three-digit range gives you a greater degree

10   of precision and having a 721-type score.

11         Now, with respect to the descriptiveness of the

12   mark, it should be pointed out that the seal marks, nobody's

13   alleged that we are doing anything like a seal here, and the

14   fact that they put their descriptive mark in a seal of course

15   doesn't make it protectable either.  They put other things in

16   there, in that seal, like "officially certified."  Is that

17   now a trademark of Fair Isaac?  They take other words and put

18   them in bold, like "free."  That doesn't afford them

19   trademark protection.  The question is whether or not as

20   applied to these services it is descriptive.  It is

21   unquestionably a description of the scoring range of the

22   service and for them to suggest that it's not because

23   somewhere back in the back room the scientists can tell that

24   the absolute minimum and absolute maximum don't exactly match

25   300 to 850 is really specious.  Consumers don't know what's

1    in the back room at Fair Isaac.  Consumers see what they're

2    doing with the mark and they see them describing their

3    scoring range as 300 to 850, and that's all that matters here

4    is what consumers perceive the mark to be, not what somebody

5    in the back room at Fair Isaac says.

6          Their 360 degree case, just a brief comment on

7    that.  The product at issue there was a shoe.  It wasn't the

8    cleat of the shoe.  So 360, circular, the shoe wasn't a

9    circle, so it wasn't descriptive of the product.

10          Now, with respect briefly to the consumer confusion

11    evidence, if you take a look closely at that evidence, not

12    only is it hearsay for the reasons we stated in our brief.

13    It is extremely hard to say exactly what's causing this

14    confusion.  There's an awful lot of confusion out there about

15    credit scoring generally.  Because Fair Isaac is the dominant

16    player in the market, it's not surprising that some people

17    would expect to get a FICO score when they go someplace else.

18    But how is a competitor to compete?  How is a new entrant to

19    come into the market and say, "Here we are.  We can give you

20    a credit score too" without risking some level of confusion?

21    But their assumption here is that the confusion is caused by

22    the scoring range and there's just absolutely -- that's

23    speculation.  There's absolutely no evidence to support it.

24    Now, a survey could have done that, but they didn't do a

25    proper survey, an admissible survey, to show that the

1  confusion is caused by the scoring range and not by some

2  preconceived misconceptions or general confusion, which is

3  not actionable.

4         Now, finally with respect to keyword advertising --

5  briefly with respect to the passing off claim, passing off

6  requires conduct that's likely to cause confusion or

7  deception.  The conduct that they've alleged is the trademark

8  infringement and the false advertising.  I have never heard

9  them say -- and it's not in their complaint -- that there's

10  some separate conduct that constitutes passing off.  So if

11  we're not infringing their trademark and we're not false

12  advertising, then we're effectively competing, and that's

13  what the law encourages.

14         And lastly with respect to the keyword advertising,

15  the issue here is not use in commerce.  That's a smoke

16  screen.  That's a red herring.  The cases we've cited say

17  clearly after doing an analysis of the use-in-commerce issue

18  that the likelihood of confusion on the trademark, there is

19  no likelihood of confusion in this circumstance and I think a

20  fair look at their printout of the web page which shows the

21  ad that comes up that's associated with the keyword really

22  demonstrates why.  You take a look at that and you see on the

23  page there natural results that aren't linking to Fair Isaac

24  and you see that there are some ads that do and some ads that

25  don't link to Fair Isaac.  Consumers don't necessarily expect

1    that everything that they get back in a search hit list is

2    going to relate -- is going to be exactly identical to what

3    they searched for, so there's some amount of discerning that

4    goes on here.  Courts have found that unless there's

5    something explicitly misleading in the visible text, that

6    there can be no likelihood of confusion based on simply

7    buying a trademark as a keyword.

8              And I have nothing further.  Thank you, your Honor.

9              THE COURT:   Thank you.  That brings us to

10   Counts 13 and 14, the contract claims and bifurcation.  Let's

11   see.  I'm going to hear from Mr. Gardner, I believe, on that.

12             MR. GARDNER:   Hopefully we're closer to the end

13   than the beginning.  I'm going to do this the old-fashioned

14   way, Judge.  I don't have a PowerPoint to hand up, so I'm

15   going to stand here and talk and hope that --

16             THE COURT:   It's not going to prejudice you, I can

17   assure you.

18             MR. GARDNER:   -- you will follow me.  I've got ten

19   minutes to do all this.  I'm going to try to get through the

20   first part in about six or seven and hold three or four at

21   the end if I don't go over my time limit.

22             This claim is solely against TransUnion and it's a

23   breach-of-contract claim, although it has very similar

24   attributes to it as the rest of the case.  There are certain

25   common threads that run through this case and they're shown

1    also in the breach-of-contract case.

2         Now, it arises because Fair Isaac sends the

3    specifications to TransUnion for its algorithm on paper.

4    They give us, for lack of a term, the secret sauce.

5    TransUnion then has programmers that program those

6    specifications into TransUnion's computer system and then as

7    a result of that that algorithm gets matched with the data in

8    the computer system, generates a score, in this case a FICO

9    score.

10        Now, because of that situation it was very

11   important that the parties, particularly for Fair Isaac, that

12   they provide some mechanism to ensure that TransUnion doesn't

13   misuse that data, but at the same time, TransUnion also, in

14   addition to selling FICO scores, sells other scores, so the

15   contract really has two stages to it.

16        The first stage is we get this data and we have to

17   protect it.  It is their secret sauce.  There's no question

18   about it.  But on the other hand, we do our own credit score.

19   So the contracts specifically contemplate and allow

20   TransUnion to compete against TransUnion and they allow

21   TransUnion to use information that is available publicly and

22   to produce their own scores.

23        Now, how do we get to where we are today?

24   Actually, this is really the third act in a play and the

25   first two acts didn't come out so well for them.

1           The first act, and when we were in front of you the

2    last time, although this wasn't part of what was here, the

3    major part of this case at the time seemed to be a claim that

4    VantageScore could not have been developed in the lightning

5    speed, they claim, that it was developed in, so TransUnion

6    must have misappropriated FICO's information, and that was a

7    central part of their case.  That was act one.

8           We had a lot of discovery, we produced the

9    algorithms, their experts looked at it, our expert looked at

10   it, and we finally said to them, "Tell us what it is.  What

11   have we taken?  What are the trade secrets?"  And Magistrate

12   Judge Mayeron said, "Okay, FICO.  May 15th is the date by

13   which you have to tell everybody what it is that they did

14   wrong."  Well, May 15th came and you know what they did?

15   They gave up.  They said, "We don't have nothing.  We've got

16   nothing to demonstrate that you misused any of our" --

17   "misappropriated any of our confidential information."  They

18   dismissed that claim with prejudice.  That's key to where we

19   are now.

20          Then what happens next?  Next they say:  Well, we

21   can't establish that our claim was based on misappropriation,

22   so now let's say that we misused their information.

23          We take the deposition of their expert, and this is

24   on page 7.  I'm going to try to combine here a little bit our

25   separate trial arguments with the breach of contract,

1    although I will say just in passing, your Honor, the separate

2    trial is a double "what if."  It's what if this case is still

3    going and what if we don't get summary judgment here, and we

4    can talk about that.

5         THE COURT:   But if we get there, wouldn't it be

6    nice to do this twice.

7         (Laughter)

8         MR. GARDNER:   Well, it depends -- no, it would be

9    horrible to do it twice, but the problem is, what they want

10   to do is, they want to try their case twice and we want to

11   try our case once.  I mean, we've got a breach-of-contract

12   case and we've got an antitrust case.  Let's not try the

13   antitrust case, assuming there is one, in the

14   breach-of-contract case.

15        So what do we say about misuse, their expert?

16        Our question:   "Do you have any reason to believe

17   that the VantageScore model development team used any

18   information that was confidential to Fair Isaac?

19        "Answer:   I have no reason to believe that they

20   used such information."

21        Okay.  So, act two.  That's gone.  So now we're

22   back to -- we've gone to our bench and now we're on the third

23   string, and the third string is, okay, maybe here we can make

24   an argument out of the contract.  We've got no wrongful

25   conduct.

 1            Now, that's what we're here today to decide, but

 2    it's very important, your Honor, to put this in perspective.

 3    It's another example of how this case evolves.  It's a much

 4    different case than it was when it started and this is a

 5    perfect example of it.

 6            Now, what you have to look at in the contract

 7    initially is the definition of FICO property.  There's a very

 8    broad definition of FICO property and it basically includes

 9    their recipe, their secret sauce.  And we don't dispute that

10    the contract says what it says.  The question, though, your

11    Honor, is not what that says, but what are TU's obligations.

12    That's what you have to decide, what are TU's obligations

13    under the contract.

14            Now, they want you to decide that obligation by

15    only looking at one provision of the contract, the contract

16    that says this is our stuff and we own it all.  However, they

17    don't want you to look at two very important provisions of

18    the contract.

19            The first one, I quote -- this is on page 3, page 2

20    and 3 of our opening brief:  "The parties acknowledge that

21    the jointly developed scoring products and services will

22    compete with other non-Fair Isaac developed scoring

23    products."

24            The second one is:  "The contract specifically

25    excludes from confidentiality obligations information

1    'generally available to the public or independently developed

2    by employees of TransUnion.'"

3           So here we have this tension here.  The tension is,

4    yes, we have to keep their stuff confidential, but what are

5    our obligations in light of the fact that we are producing

6    scores and were we're permitted to do so?  The problem with

7    their interpretation -- well, there's two problems with it.

8           First, as your Honor well knows in deciding a

9    number of contract cases, when construing a contract you got

10   to look at the whole document.  You can't just look at the

11   section that they want to look at.  You got to look at it all

12   to see what the parties' intent was.  So when you look at it

13   all you can see that, sure, they had to protect their

14   property, but on the other hand, we had the right to compete.

15          Now, their argument basically taken to its point is

16   basically absurd.  What they're saying essentially is -- not

17   essentially, they say it.  They say we can't use TransUnion

18   data to do a score.  We can't use a statistical regression

19   analysis to do a score.  Well, that can't be right.  I mean,

20   it's as if they -- and I hate to use this example, because I

21   think it demeans the sophisticated nature of what we have

22   here, but I was thinking about it last night.  It's like

23   they've got a recipe for a spaghetti sauce and we're making

24   their spaghetti sauce.  They've got a great recipe and we

25   can't take their recipe and use their recipe to make our own

1   spaghetti sauce, and we didn't.  In fact, the proof is all to

2   the opposite.  They abandoned their misappropriation claim,

3   and their own expert, the only people that could see these

4   algorithms, said, well, there's no reason to believe that we

5   misused any of their information.  So what are they saying

6   now?  Yeah, go ahead.  You can make a spaghetti sauce, but

7   you can't use tomatoes.  Well, that's the absurdity of their

8   argument.  They're basically saying we can compete against

9   them, but we can't compete against them with the essential

10  nature of what it takes to compete.

11       Now, what they're also trying to do here -- and

12  this is kind of cute -- is, they're attempting to expand some

13  implied duty of good faith and fair dealing to say, well,

14  what's really going on here, TransUnion is trying to drive us

15  out of business.  Well, they've got that in the antitrust

16  case.

17       In the contract case there are specific elements

18  that are obligations of TransUnion in the contract case.

19  Those obligations set the parties' obligations, the ones we

20  just talked about, about competing, holding their information

21  confidential.  There are other obligations and here's there's

22  a total failure or lack of proof that we did anything to not

23  market their scores properly.  We sell -- we being TransUnion

24  -- sells more FICO scores than any other score.  Those sales

25  have increased since VantageScore.  So they don't even argue

```
 1    this in their brief in terms of arguing with respect to the

 2    specific provision.  They're trying to take this concept,

 3    this elusive concept of good faith and fair dealing and

 4    overriding everything.

 5            I'm sure -- and I haven't been keeping track, your

 6    Honor, but I'm reasonably sure I probably went over my six

 7    minutes.

 8            MR. SCHUTZ:   I'm positive.

 9            THE COURT:   All right.

10            MR. GARDNER:   And I apologize for that.  With your

11    Honor's indulgence, if I have some time --

12            THE COURT:   I was listening and I lost track of

13    time as well, but I agree.  You've used it up and we'll give

14    Mr. Schutz a couple minutes extra in response.

15            MR. GARDNER:   Okay.  Thank you.

16            MR. SCHUTZ:   Judge, I have a couple of -- a deck.

17    May I approach the bench?

18            THE COURT:   Yes.

19            MR. SCHUTZ:   The only thing that Mr. Gardner and I

20    do agree on is that he's old-fashioned.

21        (Laughter)

22            THE COURT:   That's not a bad thing.

23            MR. GARDNER:   Is there something wrong with that?

24            THE COURT:   I was going to say not in my book.

25    That's fine.
```

1          MR. SCHUTZ:   Well, it depends.

2          Judge, contract claims.  Fairly simple.  We've got

3     two sophisticated parties here that negotiated a contract and

4     all we are coming to court and saying is they should be held

5     to the benefit of their bargain and meet their contractual

6     obligations, and at the summary judgment stage to argue that

7     there is no disputed issue of material fact regarding these

8     contractual provisions, I submit that that's simply not the

9     case.  So it comes down to a couple of issues.

10          The first issue is a couple things.  TU does not

11    dispute that the VantageScore model includes some concepts

12    and aspects that are the same as Fair Isaac's models.  They

13    also don't dispute that these are our property.  The only

14    issue is that can the contracts be prohibited -- interpreted

15    as prohibiting TransUnion from using this in the VantageScore

16    model.  The answer is yes.  There's certainly a fact issue on

17    this.  When you start looking at the contract language which

18    we'll do here in just a minute, you can't get to the answer

19    no.

20          The second issue, they don't dispute again that

21    they agreed to act as our agent in marketing and selling and

22    that as our agent they have a duty of good faith and loyalty

23    here.  The only issue again is does the evidence show that

24    TransUnion's trying to destroy our scoring business

25    sufficient to show a material issue of fact and the answer is

1    yes.  I mean, we spent tons of time on the antitrust part.

2    Their goal is to put us out of business and that's totally

3    inconsistent with being our agent and acting in that

4    capacity.  So let's just take a quick look at the --

5              THE COURT:   Is there any evidence that they've

6    sold less FICO scores?

7              MR. SCHUTZ:   You know, that's really not the issue

8    and it's a red herring, Judge, and here's why:  It's absent

9    any evidence of what they might have done had they not been

10   trying put us out of business, make these other statements,

11   trade off on everything that we've said.  They said they've

12   sold more in I think '07 than they did in '06 and '05, but if

13   they hadn't done these, maybe they'd have sold an additional

14   50 percent more.  They simply can't prevail at the summary

15   judgment stage by making that statement.  It's an incomplete

16   argument on their part.

17             So if we look at the language, this again

18   sophisticated contracting party that talks about what's our

19   property, they agree and acknowledge -- it's fairly broadly

20   written -- as to what our property is here and that we own

21   it.  And if we go on to -- and it includes models, okay, and

22   we're the sole and absolute owners of the existing and future

23   versions of the models and all proprietary rights in such

24   items, et cetera.

25             Now, if we go to the next section that defines

1    "model," it's very broadly defined.  It's not limited to --

2    this is just by way of example what's set forth in here.

3    It's score weights, algorithms, characteristics, attributes,

4    attribute breakouts, et cetera, et cetera, very broadly

5    defined, and they agreed to that, Judge.

6           And we go to the next statement.  It's also clear

7    here, next part of the contract, that this is not limited to

8    trade secrets.  This is a case where the parties agreed to

9    respect certain property even if it did not meet the

10   definition of trade secrets.  So as much as Mr. Gardner might

11   have wanted to argue the trade secret case, that's not what

12   we're dealing with here, Judge, and we have protection that

13   is different from this contract than what we had under the

14   trade secret laws.

15          Now, what did TransUnion agree to do after we go

16   through the contract and we see they acknowledge that the

17   model is our property, the model is very broadly defined?

18   What do they agree?  They agreed that they shall not copy,

19   reproduce, or in any way duplicate the models, in whole or in

20   part, with any other computer programs, and what is it that

21   they in fact have done?

22          I don't believe, your Honor, that we put in the

23   briefs anywhere that we said they can't use their own data.

24   I think that's simply not correct, but we have listed here on

25   slide 8 at least five bullet points that show what aspects of

1    the VantageScore scoring model represent a breach of their

2    agreement with us.

3              VantageScore model, again, based on many of the

4    same development concepts, in other words, designed to

5    predict the likelihood of serious delinquencies of 90 days

6    late or more within a 24-month period.  They didn't have to

7    do that.  They could have, you know, picked any other period.

8    They could have picked a delinquency of 60 days, 120 days, it

9    could have been 18 months, could have been 30 months, all

10   kinds of other options they had, but they did what we do.

11             They also use the same attributes.  They use

12   multiple inquiry de-duplication, a log-odds approach.

13             They also have a scoring range that low is bad and

14   high is good.

15             THE COURT:  Tell me what an attribute is.

16             MR. SCHUTZ:  The attribute, Judge, if we go to --

17   a characteristic is -- I can give you an example.  A

18   characteristic is --

19             THE COURT:  Maybe just giving me an example would

20   help.

21             MR. SCHUTZ:  Yeah, I will.  That's what I'm going

22   to do.

23             THE COURT:  Oh.  All right.

24             MR. SCHUTZ:  A characteristic is a trade account,

25   okay?  A trade account is a credit card account.  An

1    attribute is a number for that characteristic, two credit

2    cards, three credit cards --

3          THE COURT:   Is this a number that goes into the

4    formula?

5          MR. SCHUTZ:   Yup.  That's what it is.  They use a

6    three-digit score again and they use similar adverse action

7    codes.  An adverse action code is if you're denied credit,

8    you know, what changes that.

9          So it comes down to, quite frankly, a classic fact

10   question.  We're not here arguing that we win the case.

11   We're arguing that we're entitled to go to a jury on the

12   case.  That's the procedural posture.

13         And again, their whole argument boils down to

14   another provision in the contract, the confidentiality

15   provision, and they are trying to argue that the

16   confidentiality provision trumps the provisions that I've

17   just talked about and that's certainly not the case, in our

18   view, and certainly it's an issue for the jury to decide down

19   the road.

20         Now, moving to just the last two points, your

21   Honor, on the issue of TransUnion agreeing to act as our

22   limited agent for purposes of marketing and selling, you

23   know, here's the contractual language that we're talking

24   about.  They agreed that for those purposes they will in fact

25   act as our agent and what have they done, how have they

1    breached those agency duties.

2         Well, they're obligated to act in good faith and

3    with loyalty and they don't deny this, but what they've done

4    is they've engaged in these conspiratorial acts against us in

5    violation of the antitrust laws, violation of contractual

6    duties.

7         And the whole purpose -- and this is from

8    TransUnion's meetings notes.  You can see the last bullet

9    points on the page.  What do they say?  "Replace FICO

10   anywhere they appear; B2B" -- which means business to

11   business -- "and Consumer; everyone would see the same

12   score."  That's TransUnion meeting notes on Project Trident.

13   So this is our agent out to sell stuff and what they're

14   saying is they want to put us out of business.  They want to

15   replace every score with a VantageScore.  The fact that they

16   might not have done it yet doesn't change the fact that it's

17   still their goal.  I don't think they're backing away with

18   trying to have VantageScore replace them in the marketplace.

19        And finally, this is just a follow-on, the

20   interference-with-contract claim.  They basically say if you

21   get rid of the breach-of-contract claim, you got to get rid

22   of the interference-with-contract claim.  Again, that's a

23   circular argument.  We don't think the first should be

24   dismissed and therefore the latter survives.

25        And I don't know -- I guess we -- I don't know if

1     we addressed the issue of separate trials or not.  I just

2     have one slide that we've thrown in there.  The evidence is

3     so overlapping, your Honor, it doesn't seem to make any sense

4     to us if the case proceeds forward to have a separate trial

5     on a breach-of-contract claim separate and apart from the

6     main case because the facts are so intertwined.

7          Thank you very much.

8          THE COURT:  All right.

9          Mr. Gardner, I think you will be in pain if I don't

10    give you a minute or two to make your rebuttal argument

11    before you get on the airplane.

12         MR. GARDNER:  Thank you.  A couple things.

13         We're not just relying on trade secrets.  We're

14    saying that they abandoned their trade secret claim.  To the

15    extent that there's any claim that we've misused their

16    property, their evidence has come up with zero, so there's no

17    evidence that we've misused their property.

18         Now, as far as the contracts are concerned, they

19    can't say that we didn't do a good job selling their score.

20    They can't say that.  We did.  It's the most popular score in

21    the market.  It's the biggest score that we sell.  So when we

22    look at the contract, we fulfilled all our contract

23    obligations as their agent.  We did a darn good job as their

24    agent.  Now, they have complaints about us with respect to

25    VantageScore, but that's not in the breach-of-contract case.

1    I mean, that's part of what's happening here is, they're

2    trying to meld all this together.

3         Now, Mr. Schutz said a couple times, well, let's

4    let a jury decide that.  Well, a jury isn't going to decide

5    it, because as your Honor is aware, the two contracts that

6    are really at issue in this case, the generic credit scoring

7    cases, have jury waivers, so the trier of fact in those cases

8    is you.  So this is not -- there aren't issues of fact here

9    that we believe are left to a jury.  These are

10   interpretations of a contract which we think your Honor --

11   which your Honor can decide.

12        And I think in conclusion what I'd like to say is,

13   the theme that runs throughout this case is Fair Isaac has

14   had kind of a charmed life.  They've had the majority of

15   their business life without competition.  And they may have

16   been entitled to rely on the fact that they were the first

17   ones there and they are the language.  FICO is to credit

18   scoring as Kleenex is to tissues.  And then one day what

19   happens is competition shows up at their door.  Well,

20   naturally they're not going to like it.  And their reaction

21   to that competition is, one, this lawsuit, but two, it's what

22   you see through every one of these claims in terms of the

23   progression of how they start and where they are today with

24   their antitrust claims, with the continuing theory changes,

25   with their intellectual property claims, and now at the

1   bottom -- and I hope we think it's at the bottom -- is their

2   claims against TransUnion.  They failed on claim one, they

3   failed on claim two, let's try this one and see if it works,

4   and you ought not let them get away with it.

5          Thank you for your patience, your Honor.

6          THE COURT:  All right.  Well, I've heard excellent

7   arguments by quality lawyers.  I have an abundance of

8   briefing that's been done in this case.

9          I want no further submissions.  The only thing that

10  I would entertain by way of a post-hearing submission is a

11  U.S. Supreme Court case that's right on point or an Eighth

12  Circuit case.  Beyond that, I don't want to hear from you

13  until I rule.

14         All right.  Court is in recess.

15     (Proceedings concluded at 11:40 a.m.)

16                    *  *  *  *  *

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter – U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108