**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| Fair Isaac Corporation; and myFICO | ) | |
| Consumer Services, Inc.; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No: |
| | ) | 0:06-cv-04112 (ADM/JSM) |
| Experian Information Solutions, Inc.; | ) | |
| TransUnion LLC; VantageScore | ) | |
| Solutions, LLC; and Does I through X | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EXPERT
<u>TESTIMONY OF JAMES T. BERGER REGARDING HIS SURVEYS</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

    Study A:  The Credit Scores Survey…………………………………… …… 3

    Study B:  The Keyword Ad Survey…………………………………………  6

FACTUAL BACKGROUND ................................................................................... 2

ARGUMENT......................................................................................................... 10

I.    THE COURT SHOULD EXCLUDE THE BERGER SURVEYS
    BECAUSE THEY ARE SO FUNDAMENTALLY FLAWED,
    THEY ARE UNRELIABLE AND IRRELEVANT UNDER DAUBERT............ 11

    A.    The Berger Surveys Are Unreliable and Irrelevant Because
    Berger Failed to Control For Alternative Explanations for
    the Respondents' Answers ........................................................................ 12

        1.    A Control is Necessary to Establish Causation................................ 12

        2.    Berger Failed to Use A Control to Rule Out Alternative
        Explanations for the Respondents' Answers.................................... 15

        3.    Berger Did Not Even Consider Using a Control Group
        Because He Is Unfamiliar With Basic Survey Methodology .......... 17

        4.    The Berger Surveys Were Not Otherwise Designed
        To Test for the Cause of Any Alleged Confusion ........................... 20

    B.    The Berger Surveys Are Irrelevant and Unreliable
    Because the Questions are Ambiguous, Leading and Biased ..................... 21

        1.    Question 8 in Study A is Ambiguous, Leading and Biased............. 21

        2.    Questions 4 and 5 in Study B are Leading and Irrelevant ............... 23

    C.    Berger's Opinions Are Unreliable Because They are
    Not Supported by the Data ........................................................................ 24

        1.    Berger Improperly Excluded Qualified Respondents
        Who Were Not Confused ................................................................ 24

2.      Berger Improperly Ignored The Verbatim Responses
        Which Demonstrate Only De Minimus Confusion .......................... 24

CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*America Home Products Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739
(D.N.J. 1994) .................................................................................................. 15

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384
(D.N.J. 2009) .................................................................................................. 14

*Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561
(E.D.N.Y. 1999) ............................................................................................. 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................................. 10

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ............................................. 10

*Government Employees. Insurance Co. v. Google, Inc.*, No. 1:04CV507, 77
U.S.P.Q. 2d 1841, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005) .................. 7, 8,
9, 14,
16, 18

*Johnson & Johnson  Merck Consumer Pharm. Co. v. Smithkline Beecham
Corp.*, 960 F.2d 294 (2d Cir. 1992) ................................................................ 12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................... 10

*Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* No. Civ.
00-2317, 2002 WL 1763999 (D. Minn. July 26, 2002) .................................. 12

*Owner-Operator Indep. Drivers Association, Inc. v. Supervalu, Inc.*, No.
05-2809, 2009 WL 799614 (D. Minn. Mar. 24, 2009) ............................. 11, 12,
21

*Pharmacia Corp. v. Alcon Laboratories*, 201 F. Supp. 2d 335 (D.N.J.
2002) ....................................................................................................... 14, 25

*Polski v. Quigley Corp.*, 538 F.3d 836 (8th Cir. 2008) ......................................... 10

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL
897254 (E.D. Mich. April 5, 2006) ........................................................... 11, 23

*Procter & Gamble Pharm., Inc. v. Hoffman LaRoche Inc.*, No. 06-0034,
   2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006).............................................. 14, 18
                                                                              21, 23

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004)............ 21

*Scotts Co. v. United Industrial Corp.*, 315 F.3d 264 (4th Cir. 2002)............... 21, 23

*Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642
   (N.D. Ill. Jan. 24, 2003) ........................................................... 11, 23,
                                                                                 24

*Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D.
   Ind. 2000) .......................................................................... 15, 19

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-
   Merck Consumer Pharmaceuticals Co.*, No. 01 Civ. 2775, 2001 WL
   588846 (S.D.N.Y. June 1, 2001)...................................................... 14

*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980) ..................................... 22

*Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999)................................. 11

*Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203, 2005 WL
   2371958 (E.D.N.Y. 2005)......................................................... 11, 14,
                                                                                 17, 18

*Watec Co. Ltd. v. Liu,* No. CV 00-10893, 2002 WL 34373489 (C.D. Cal.
   May 21, 2002)...................................................................... 24

*Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich.
   2003) ........................................................................... 12, 14,
                                                                                 23

## STATUTES

15 U.S.C. § 1125(a) ............................................................................ 20

Fed. R. Evid. 403............................................................................. 2, 11

Fed. R. Evid. 702.......................................................................... 2, 10, 20

**MISCELLANEOUS**

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
(2009) ................................................................................................ 13, 14,
19, 22,
24, 25

Jacob Jacoby, *Experimental Design and the Selection of Controls in
Trademark and Deceptive Advertising Surveys*, 92:4 Trademark Rep.
890 (2002) ......................................................................................... 13, 14,
15

Martin T. Orne & Wayne G. Whitehouse, *Demand Characteristics, in* 2
*Encyclopedia of Psychology*, 469-70 (Alan E. Kazdin ed. 2000) ................... 19

Shari S. Diamond, *Reference Guide on Survey Research, in Reference
Manual on Scientific Evidence 2d* 229-76 (2000) .................................... 13, 15,
17, 18,
21, 23

Itamar Simonson, Trademark Infringement from a Buyer's Perspective:
Conceptual Analysis and Measurement Implications, in Journal of
Public Policy & Marketing, Fall 1994, at 181-99……………………............19

Defendants Experian Information Solutions, Inc. ("Experian"), Trans Union LLC ("TU"), and VantageScore Solutions, LLC ("VantageScore") (collectively, "Defendants") submit this memorandum of law in support of their motion *in limine* to exclude Plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc. (collectively, "Plaintiffs" or "FI") from presenting testimony of James T. Berger ("Berger") regarding his surveys.

## INTRODUCTION

Berger's two consumer surveys suffer from a host of infirmities, but there are three fundamental flaws that – independently and together – render them completely unreliable and irrelevant.  First, and perhaps most egregiously, the surveys did not use a control, an essential survey method in likelihood-of-confusion surveys that is used to rule out alternative explanations for, or causes of, the respondents' answers.  As a result, Berger cannot draw any conclusion about the *cause* of the purported results.  Indeed, the surveys did not even test for *the only relevant issue here*:  whether Defendants' use of numeric scoring ranges or FICO as a keyword *caused* confusion as to the source or sponsorship of Defendants' services.

Second, the surveys' critical questions were so ambiguous, biased and leading that the responses cannot be reasonably interpreted as indicating confusion as to the source or sponsorship of Defendants' services caused by the use of certain scoring ranges or keywords.  Third, Berger misrepresents the actual data from the surveys.  When properly analyzed and reported, the data shows that, whatever its cause, very few respondents were confused.

As a result, Berger's surveys are so unreliable and unconnected to the facts and issues in this case that they will not assist the jury in understanding the evidence or determining a fact in issue, as required by Fed. R. Evid. 702, and their admission would be highly prejudicial under Fed. R. Evid. 403.  They must be excluded.[1]

## FACTUAL BACKGROUND

In the Complaint, Plaintiffs allege two categories of trademark infringement:  (1) that Defendants' use of certain scoring ranges in connection with their respective credit scoring services infringes FI's purported "300-850" trademark; and (2) that Experian and TU's purchase of the terms "FICO" or "Fair Isaac" as a search term (or "keyword") on Internet search engine websites infringes FI's trademarks.  Plaintiffs bear the burden of proving that Defendants' conduct at issue – the use of certain scoring ranges or the purchase of certain keywords – is likely to cause a significant portion of the relevant population to be confused as to the source or sponsorship of Defendants' respective credit scoring services.

FI commissioned Berger, a self-described marketing executive, to design and conduct two consumer surveys relating to these claims (the "Berger Surveys"), and to prepare an expert report (the "Berger Report").[2]  One survey, Study A, purports to address trademark infringement and false advertising issues, while the second survey,

---

[1] This motion concerns only the Berger Surveys.  Defendants do not move to preclude Berger from testifying in rebuttal to Defendants' survey expert, Philip Johnson, without reference to the Berger Surveys.

[2] A copy of the Research Report of James T. Berger dated August 25, 2008 ("Berger Rep.") is attached as Exhibit A to the Declaration of Meghan McCurdy, dated September 21, 2009 ("McCurdy Declaration").

Study B, purports to address Plaintiffs' keyword advertising claim.  Both Berger Surveys were so-called "mall intercept" surveys in which consumers at various shopping malls were shown materials (or "stimuli") and questioned by interviewers.

**Study A:  The Credit Scores Survey**

Berger's stated objective for Study A was to determine "whether or not consumers are confused regarding the credit scores available through the studied websites."[3] (Berger Rep. ¶ 40; Berger Dep.[4] 263:22-266:19.)  Significantly, Berger did not set out to test the *cause* of any purported confusion, or more specifically, whether Defendants' use of certain scoring ranges actually caused consumer confusion as to the source or sponsorship of Defendants' services.

Study A consisted of three cells (or groups of respondents) of approximately 200 interview respondents each.  (Berger Rep. ¶ 3.)  Respondents in each cell were shown different stimuli.  In Cell 1, respondents were shown printouts from Experian's National Score Index website and the myFICO.com website.  (*Id.* ¶¶ 18-19, Exs. C, D.)  In Cell 2, respondents were shown printouts from TU's TrueCredit website and the myFICO.com website.  (*Id.* ¶¶ 18, 23, Exs. C, E.)  In Cell 3, respondents were shown printouts from an Experian website that offers VantageScore and the myFICO.com website.  (*Id.* ¶¶ 18, 28, Exs. C, F.)

---

[3] The two other objectives of Study A relate exclusively to Plaintiffs' now-dismissed false advertising claims.

[4] Excerpts from the transcript of the deposition of James T. Berger taken on December 17, 2008 ("Berger Dep.") are attached as Exhibit B to the McCurdy Declaration.

Berger did not use a control group or any control mechanism in Study A to rule out alternative explanations for, or causes of, the responses given.

The interviewers asked each respondent in all three cells a series of questions that improperly called attention to the object of the survey:  comparing credit scores.  Survey A begins with the following introduction:

> This research involves having you view computer screens from two different Web sites that focus on personal credit scores.  After you have reviewed these screens you will be asked a series of questions.

(*Id.* Ex. K.)  Question 3 asks "Do the products or services through WEBSITE X [a Defendant website] include credit scores?" and Question 7 asks "Do the products or services offered through WEBSITE Z [the myFICO.com home page] include credit scores?"

The interviewer then asked Question 8, the one question Berger relies on to measure consumer confusion:

> Now we would like to understand how you *compare the credit scores* offered on WEBSITE X and WEBSITE Z.  Regardless of other products or services available through WEBSITE X and WEBSITE Z, *do you believe that the same credit scores available on WEBSITE X are available on WEBSITE Z?*

(*Id.* (emphasis added).)  Each respondent was then asked a probe question, "Why?", and their verbatim responses were recorded.[5]

Berger concluded that every person who answered "Yes" to Question 8 was confused "regarding the nature of the credit scores" available through the sites, regardless of the reason given in response to the probe question.  (*Id.* ¶ 50.)  Berger reported that the

---

[5] The remaining questions in Study A were addressed to Plaintiffs' now-dismissed false advertising claims.

alleged "confusion" rates were 62.3% for Cell 1, 63.2% for Cell 2 and 50.8% for Cell 3.

(*Id.* ¶¶ 49-50)  Berger asserted that his conclusion "is further supported by the verbatim

answers provided by respondents in all three Cells" because *some* respondents in all three

Cells

> . . . expressly referenced similarities in the 'range,' 'scale,' and 'look' of the
> credit scores displayed on the studied websites to those of the
> www.myfico.com website as the reason why they (incorrectly) believed
> that the same credit scores were available through the two websites they
> were shown.

(*Id.* ¶ 54.)  Tellingly, however, Berger did not report the actual number of respondents

who referred to the scoring range as a reason for their mistaken belief, nor did he analyze

the verbatim responses to determine that number.  (Berger Dep. 203:9-208:14.)

Defendants' survey expert, Dr. Jacob Jacoby, analyzed the actual verbatim

responses and concluded that *virtually none* of the respondents mentioned the range,

scale or look of the credit scores as the reason for their purported confusion.  (Jacoby

Rep.[6] ¶¶ 59-65, Appx. D.)  As demonstrated in Appendix D to Dr. Jacoby's report, only

3.5% of respondents in Cell 1 (7 out of 201), 1.5% of respondents in Cell 2 (3 out of 202)

and 3.5% of respondents in Cell 3 (7 out of 198) expressly mentioned the "range,"

"scale" or "look" of the credit scores.  Berger does not dispute Dr. Jacoby's calculations.

(Berger Rebuttal Rep.[7] ¶ 50.)

---

[6] Excerpts from the Expert Report of Jacob Jacoby, Ph.D. dated October 27, 2008
("Jacoby Rep.") is attached as Exhibit C to the McCurdy Declaration.

[7] A copy of the Expert Rebuttal Report of James T. Berger Regarding Expert Report of
Jacob Jacoby dated November 21, 2008 is attached as Exhibit D to the McCurdy
Declaration.

In addition, when calculating the rate of alleged "confusion" in Cell 1, Berger improperly removed 23 qualified respondents from the base of 201 respondents because they answered "don't know" to the critical Question 8, and he improperly removed another 10 because they did not understand that the studied websites offered credit scores. Therefore, Berger calculated confusion on the reduced base of 168 respondents rather than all 201 who qualified for the survey. Berger did the same thing in Cells 2 and 3, using artificially reduced bases of 151 and 144 respondents, respectively. (Jacoby Rep. ¶¶ 55-58.) Berger does not dispute Dr. Jacoby's calculations in this regard. (Berger Rebuttal Rep. ¶ 48.)

**Study B:  The Keyword Ad Survey**

Study B relates to Plaintiffs' keyword advertising claim. Berger designed Study B to determine "(1) whether or not consumers are confused regarding the use of Fair Isaac's FICO® trademark as a paid search term to generate a sponsored link to the studied websites on the results page of an Internet search engine; and (2) whether or not any confusion caused by such use is cured when consumers access the studied websites accessed through such sponsored links." (Berger Rep. ¶ 40; Berger Dep. 266:21-268:16.) As with Study A, the first objective of Study B was to test whether confusion exists, but not the *cause* of that confusion. The second objective simply assumes that confusion exists and that it is caused by the websites.

Study B consisted of two cells of approximately 200 survey respondents each. (Berger Rep. ¶ 39.) Respondents in Cell 1 were shown a Google Internet search engine results page purportedly generated using the search term "FICO score". (*Id.* ¶¶ 31-32,

Ex. G.)  The page displays two paid ads on top of the page, the first one for CreditReport.com and the second one for Trans Union's TrueCredit.com website.  (*Id.* Ex. G.)  The page also displays eight other paid ads on the right side of the page all linked to the keyword FICO or FICO SCORE.  All of the paid ads are labeled "Sponsored Links" and ads at the top of the page appear in a colored box to distinguish them from the natural (or "organic") search results.[8]  The page also displays 10 organic listings that link to various websites, including those of FI, Equifax, Experian, Providian Bank, and About.com.  (*Id.*)

Respondents in Cell 2 were shown a Google Internet search engine results page purportedly generated using the search term "FICO".  (*Id.* ¶¶ 33-34, Ex. H.)  That page displays two paid ads on top of the page, the first for FI's own myFICO.com website and the second for Experian's FreeCreditReport.com website.  (*Id.* Ex. H.)  On the side of the page are eight additional paid ads placed also linked to the keyword FICO.  All of the paid ads on this page are clearly labeled "Sponsored Links."  The page also displays 10 organic search results that link to various websites, including four FI websites, as well as Wikipedia and BankRate.com.

As with Study A, no control was used in Study B to rule out alternative explanations for, or causes of, the responses given.

Respondents in both cells were asked the following questions:

---

[8] A "search engine compares the search terms entered by a user with databases of Web sites and generates a listing of the sites matching those terms.  The results of these searches are known as 'organic listings.'"  *Gov't Empl. Ins. Co. v. Google, Inc.*, No. 1:04CV507, 77 U.S.P.Q.2d 1841, 2005 WL 1903128, at *2 (E.D. Va. Aug. 8, 2005) [hereinafter GEICO].

1.     To begin, please review this Google Search Engine Page generated by the key word: [FICO SCORE or FICO]. Do you believe any of the links that result on this page would take you to an Internet Website where you could obtain a FICO brand credit score?

\*        \*        \*

2.     Please use the mouse to point to the *link or links* that you would try first to obtain a FICO brand score.

     a.     Why did you point to that link?

3.     Please use the mouse to point to *any other links* that you would use to obtain a FICO brand score.

     a.     Why did you point to these other links.

4.     If you were to click on the link [www.truecredit.com or www.freecreditreport.com], do you believe that it would or would not take you to a Website where you could obtain a FICO brand score? . . .

(Berger Rep. Ex. K ("Google 1" Questionnaire) (emphasis added).)

Respondents in both cells were then shown a second stimulus. Cell 1 respondents were shown a printout of the homepage of TU's TrueCredit.com website, and Cell 2 respondents were shown a printout of the homepage of Experian's FreeCreditReport.com website. (*Id.*) Respondents were then asked:

5.     This next screen shows you the Home Page of the Website you would actually access if you were to click on the link [www.truecredit.com or www.freecreditreport.com]. Do you believe that you could or could not obtain a FICO brand credit score from this Website? . . . .

(*Id.*)

Berger reported that over 65% of respondents in both cells answered "yes" to Questions 4 and 5, and concluded – *from that data alone* – that "a very high percentage of relevant consumers were confused by the use of the FICO mark as a paid search term."

(*Id.* ¶¶ 69-70.)  Berger, however, ignored responses to Questions 2 and 3, which clearly indicated that very few respondents would actually click on Defendants' ads to obtain a FICO score, even after having multiple chances to do so.

Dr. Jacoby analyzed the responses to Questions 2 and 3 and determined that only 8% (Cell 1) and 22.5% (Cell 2) would click on a Defendant's ad to get a FICO score, a fact Berger does not dispute.  (Jacoby Rep. ¶ 84; Berger Rebuttal Rep. ¶ 61).  Because only those people who would have clicked on Defendants' ads can be considered as *potentially* confused by the keyword purchase, Dr. Jacoby recalculated Berger's results from Question 4 using only those respondents as a base.  (Jacoby Rep. ¶ 86.)  Only 6% (Cell 1) and 19% (Cell 2) responded that they believed they could get a FICO score on the sites linked to Defendants' ads, a fact Berger does not dispute.  (*Id.* ¶ 86; Berger Rebuttal Rep. ¶ 61.)

As in Study A, Berger also improperly excluded from his calculations qualified respondents from the respondent universe in Study B who were clearly not confused. This includes people who (i) did not believe that one could purchase a FICO score at any of the links (Question 1), (ii) did not point to any link in response to Question 3, or (iii) did not believe that clicking on Defendants' ad would take them to a site where they could get a FICO brand credit score (Question 4).  (Jacoby Rep. ¶ 80.)  This resulted in reducing the base in Cell 1 from 200 to 190, and in Cell 2 from 200 to 176, a fact Berger does not dispute.  (*Id.*; Berger Rebuttal Rep. ¶ 60.)

## ARGUMENT

Under Federal Rule of Evidence 702, trial judges must act as gatekeepers to "ensure that any and all [expert] testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Relevance requires that there be "a valid scientific connection" or "fit" between the issues in the litigation and the testimony. *Daubert,* 509 U.S. at 591-92. A trial court should exclude opinion testimony when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Reliability requires that the expert's testimony be grounded in "methods and procedures" and not be mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90. Factors to be considered by a court in evaluating an expert's methodology include: (1) whether the methodology can be tested; (2) whether it has been subjected to peer review; (3) its known potential rate of error and whether it is governed by applicable standards; and (4) its general acceptance within the scientific community. *Id.* at 593-94. Other factors courts have recognized include (5) whether the expertise was developed for litigation or naturally flowed from the expert's research; (6) whether the proposed expert ruled out other alternative explanations; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008). The party offering the expert testimony bears the burden of proving that the opinions are both relevant and reliable. *Id.* at 841.

**I.    THE COURT SHOULD EXCLUDE THE BERGER SURVEYS
        BECAUSE THEY ARE SO FUNDAMENTALLY FLAWED,
        THEY ARE UNRELIABLE AND IRRELEVANT UNDER *DAUBERT***

Where a trademark survey expert's opinion "is so fundamentally unsupported that it can offer no assistance to the jury," it must be excluded.  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.,* No. 05-2809, 2009 WL 799614, at *5 (D. Minn. Mar. 24, 2009) (Tunheim, J.) (quoting *Bonner v. ISP Techs.*, 259 F.3d 924, 929-30 (8th Cir. 2001)) (excluding report based upon faulty questionnaire where the flaws in the report were "significant").

Particularly in a jury trial, a fundamentally flawed survey must be excluded under Fed. R. Evid. 403 if its probative value is substantially outweighed by the risk of unfair prejudice, wasting time, and most importantly, confusing the jury.  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 298 (2d Cir. 1999); *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642, at *1 (N.D. Ill. Jan. 24, 2003).  Indeed, two courts have excluded Berger's surveys on that basis.  *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 897254, at *4 (E.D. Mich. April 5, 2006) ("[T]he jury likely would be confused as to the survey's relevance and improperly rely on Berger's conclusions as evidence of actual or likelihood of confusion to demonstrate infringement."); *Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203, 2005 WL 2371958, at *7 (E.D.N.Y. 2005) ("[T]he survey conducted by Berger is flawed to the

point that its probative value is substantially outweighed by the survey's potential for

unfair prejudice and confusion.").[9]

Here, the Berger Surveys are unreliable and irrelevant for three independent but

related reasons:  (1) Berger failed to use a control to rule out alternative explanations for

the observed effect; (2) Berger's questions were so ambiguous, leading and biased that

the answers cannot be interpreted as evidencing confusion; and (3) Berger's own data

does not support his conclusions.

### A.    The Berger Surveys Are Unreliable and Irrelevant Because Berger Failed to Control For Alternative Explanations for the Respondents' Answers

#### 1.    A Control is Necessary to Establish Causation

In consumer surveys that test a causal proposition, such as whether a party's

trademark use is likely to cause confusion, a control is essential to "adjust for so-called

'background noise,' *i.e.*, extrinsic factors, pre-existing beliefs, general confusion or other

factors, other than the stimulus at issue, that contribute to a survey's results."  *Wells*

*Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 768 (E.D. Mich. 2003); *see also*

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960

F.2d 294, 301 (2d Cir. 1992) (concluding that where a portion of the survey population

may have held extrinsic beliefs prior to viewing an advertisement, "a control would likely

---

[9] While "*technical* flaws in consumer confusion studies should bear on the weight accorded them, not on their admissibility," *see Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* No. Civ. 00-2317, 2002 WL 1763999, at *2 (D. Minn. July 26, 2002) (emphasis added), the flaws in the Berger Surveys are fundamental, not technical, and render his opinions completely unreliable, not merely less reliable.  *See Supervalu, Inc.,* 2009 WL 799614, at *5.  There are no shades of gray here.

be indispensable"); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574

(E.D.N.Y. 1999) ("In a test of a causal proposition the appropriate use of controls is

crucial."); *see generally* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* [hereinafter *McCarthy*] § 32:187 (2009).

As explained in the Federal Judicial Center's *Reference Guide on Survey*

*Research*,

> **By adding an appropriate control group, the survey expert can test**
> **directly the influence of the stimulus.**  In the simplest version of a survey
> experiment, respondents are assigned randomly to one of two conditions.
> For example, respondents assigned to the experimental condition view an
> allegedly deceptive commercial, and respondents assigned to the control
> condition either view a commercial that does not contain the allegedly
> deceptive material or do not view any commercial.  Respondents in both
> the experimental and control groups answer the same set of questions. The
> effect of the allegedly deceptive message is evaluated by comparing the
> responses made by the experimental group members with those of the
> control group members.  If 40% of the respondents in the experimental
> group responded with the deceptive message (e.g., the advertised product
> has fewer calories than its competitor), whereas only 8% of the respondents
> in the control group gave that response, the difference between 40% and
> 8% (within the limits of sampling error) can be attributed only to the
> allegedly deceptive commercial.  **Without the control group, it is not**
> **possible to determine how much of the 40% is due to respondents'**
> **preexisting beliefs or other background noise (e.g., respondents who**
> **misunderstand the question or misstate their responses).**  Both preexisting
> beliefs and other background noise should have produced similar response
> levels in the experimental and control groups.  In addition, if respondents
> who viewed the allegedly deceptive commercial respond differently than
> respondents who viewed the control commercial, the difference cannot be
> the result of a leading question, because both groups answered the same
> question.

Shari S. Diamond, *Reference Guide on Survey Research*, *in Reference Manual on*

*Scientific Evidence 2d* 229, 257-58 (2000) (emphasis added).  *See also* Jacob Jacoby,

*Experimental Design and the Selection of Controls in Trademark and Deceptive*

13

*Advertising Surveys*, 92:4 Trademark Rep. 890 (2002) (discussing need for controls when designing a survey to test for cause of alleged confusion or deception).

Survey experts adjust for background noise and pre-existing beliefs by subtracting the level of confusion found in the control group from the level of confusion found in the test group.  The result is "net confusion" or the level of confusion that may be fairly attributable to the use of the accused trademark.  *See Pharmacia Corp. v. Alcon Labs.*, 201 F. Supp. 2d 335, 366 (D.N.J. 2002); Jacoby, 92:4 Trademark Rep. at 905; *GEICO*, 2005 WL 1903128, at *5 (control group is like placebo used in medical research); 6 *McCarthy* § 32:187 (same).

When a consumer survey that tests a causal proposition fails to include a proper control, courts find them unreliable under *Daubert* and routinely exclude them.  *See*, *e.g.*, *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 447 (D.N.J. 2009) (excluding survey; "survey needed control mechanisms to be reliable"); *Procter & Gamble Pharm., Inc. v. Hoffman LaRoche Inc.*, No. 06-0034, 2006 WL 2588002, at *25, *27 (S.D.N.Y. Sept. 6, 2006) (excluding survey; lack of control was "marked departure from generally accepted market research practices"); *Vista*, 2005 WL 2371958, at *6-7 (excluding Berger survey due to, among other things, lack of control); *Wells Fargo & Co.*, 293 F. Supp. 2d at 768-69 (survey was unreliable under *Daubert*; "Had [the survey expert] used a control group, he might have been able to make a 'causal inference' that was 'clear and unambiguous.'") (quoting 6 *McCarthy* § 32:187); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, No. 01 Civ. 2775, 2001 WL 588846, at *12 (S.D.N.Y. June 1, 2001) (lack of control

group was "fatal flaw"); *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d

1033, 1048 (S.D. Ind. 2000) ("the absence of adequate controls to test for legally relevant

confusion provides another independent reason for excluding the results of" plaintiff's

survey); *Am. Home Products Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 762

(D.N.J. 1994) (survey was unreliable due to lack of control group).[10]

### 2.    Berger Failed to Use A Control to Rule Out Alternative Explanations for the Respondents' Answers

Berger concedes he did not use a control group in either Study A or Study B.

(Berger Dep. 217:6-15.)  The use of such control groups would have allowed one to

determine the extent to which factors other than Defendants' scoring ranges or keyword

purchases – such as pre-existing beliefs about credit scores, FICO or the credit scoring

market, or the highly leading, biased and ambiguous nature of the survey questions –

caused respondents' answers.

For example, in Cell 1 of Study A, Berger showed all respondents a printout from

Experian's National Score Index website.  Berger did *not* show a separate group of

respondents a control stimulus that replicated the actual National Score Index website but

substituted an indisputably non-infringing scoring range, like 100-300, for the accused

scoring range, 330-830.  *See* Diamond, *Reference Guide on Survey Evidence, supra,* at

---

[10] In his rebuttal report, Berger misleadingly asserts that "[e]ven Dr. Jacoby himself has observed that the use of control groups is not necessary in every case," citing Dr. Jacoby's 2002 article in the Trademark Reporter on the use of controls in survey design. (Berger Rebuttal Rep. ¶ 24.)  That article, however, describes three specific instances where a control is not necessary, none of which apply here.  Jacoby, 92:4 Trademark Rep. at 903-04.  At his deposition, Berger declined to identify which instance described in Dr. Jacoby's article applies here.  (Berger Dep. 198:10-16.)  Simply, there is nothing in Dr. Jacoby's article that remotely suggests that a control is not necessary in this case.

258 ("[T]he expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.").

Similarly, in Study B, Berger did *not* show a separate group of respondents a control stimulus nearly identical to the actual Google search results pages used, but that omitted FICO as a keyword and substituted a non-infringing term, like "credit score." *GEICO* is instructive.  In *GEICO*, the court concluded that plaintiff's survey used the wrong control to measure confusion caused by advertisers' purchase of "GEICO" as a keyword on Google's search engine.  2005 WL 1903128, at *5.  The control group was shown a Google printout that substituted the advertisers' car insurance ads with ads for NIKE apparel.  The control group stimulus, however, retained the keyword GEICO, the same keyword shown on the test group stimulus.  The court concluded that the "control did not successfully demonstrate the source of the test's confusion" because (a) it "retained the use of GEICO as a keyword, which itself was alleged to be a source of confusion," and (b) it "removed all references to car insurance [in the ads] and replaced them with clearly unrelated NIKE ads."  *Id.*  The court held that "the survey did not produce evidence that the use of 'GEICO' as a keyword, without more, causes respondents to be confused by the appearance of the Sponsored Links."  *Id.*

Here, no control – not even an improper one – was used.[11]  Thus, it is "not possible to determine" the cause of respondents' answers.  *See* Diamond, *Reference Guide on Survey Research, supra,* at 257.

### 3. Berger Did Not Even Consider Using a Control Group Because He Is Unfamiliar With Basic Survey Methodology

Berger never even considered using a control group.  (Berger Dep. 259:12-16.)  As he testified:  "I really don't know how a control group would work in a survey like this."  (Berger Dep. 255:10-16.)  This admission is remarkable in light of the fact that another court recently excluded his survey for the *same failure*.  *See Vista*, 2005 WL 2371958, at *6-7.

Even more troubling, in *Vista,* Berger provided false testimony.  In *Vista*, Berger prepared and signed an expert report that stated unequivocally that a "sample of 75 people was selected because it enables one to reliably and accurately study the market."  (Berger Dep. 274:1-11; McCurdy Decl. Ex. E. at 5)  That report was admitted into evidence, and the court criticized Berger for using a sample size that was too small.  *Vista*, 2005 WL 2371958, at *7.  In his deposition in this case, Berger admitted that his representation regarding sample size was false, and that he knew it was false when he

---

[11] In his deposition, Berger mischaracterized several aspects of his survey methodology as "controls," including that the results were validated by post-survey telephone calls, that the interviewers were trained, that the interviewers asked respondents to base their answers on the questions asked, and that he did a post-survey "Chi-square" analysis of the data.  (Berger Dep. 219:3-221:10.)  None of these procedures constitute a valid and scientifically accepted method for ruling out alternative explanations for the respondents' answers, such as background noise, pre-existing beliefs or general confusion.  *See* discussion *supra* at 12-15.  When asked, Berger could not cite any authority whatsoever to support his contention that any of the above qualifies as a bona fide "control."  (Berger Dep. 229:3-231:17; 239:22-240:16; 245:13-246:9.)  Defendants have found none either.

signed the report.  (Berger Dep. 105:14-106:17; 271:13-275:3.)  When asked why he would make a false statement in his expert report, Berger responded:  "Because the attorney needed something very quickly and he asked me to do it that way."  (*Id.* 274:12-275:3.)

Berger's complete disregard for the basic requirements of survey design stems from his lack of education, training and experience in proper survey methodology or consumer psychology.  He meets almost none of the criteria for a qualified survey expert set forth in the Reference Manual on Scientific Evidence.  *See* Diamond, *Reference Guide on Survey Research, supra,* at 238.  He does not consider himself a scientist; he considers his specialty to be "marketing, which is a business discipline more than a scientific discipline."  (Berger Dep. 235:24-236:19.)  He has never taken any courses on survey design, and does not know if those courses are even offered.  (*Id.* 236:21-237:12.)  He has never taught courses on survey design.  (*Id.* 39:19-40:2; 40:16-42:3.)  He does not read scientific literature on survey design.  (*Id.* 235:11-20; 245:20-246:23.)  He has never been published in a peer-reviewed journal, nor has he authored any books.  (*Id.* 30:20-31:4; 33:16-20.)

Significantly, he is completely unfamiliar with such basic concepts of consumer psychology as "demand effects," and does not even believe the phenomenon exists.  (*Id.* 234:2-235:10.)  "Demand effects" or "yea saying" results "when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants."  *GEICO*, 2005 WL 1903128, at *6; *see also Proctor*

& *Gamble Pharm*, 2006 WL 2588002, at *23; *Simon Property Group*, 104 F. Supp. 2d at 1048.  Its impact on psychological research is widely accepted in the scientific community.  *See, e.g.,* Martin T. Orne & Wayne G. Whitehouse, *Demand Characteristics, in* 2 *Encyclopedia of Psychology*, 469-70 (Alan E. Kazdin ed. 2000); Itamar Simonson, *Trademark Infringement from the Buyer Perspective:  Conceptual Analysis and Measurement Implications, in Journal of Public Policy & Marketing*, Fall 1994, at 181-99.

Berger is also not familiar with basic survey design formats approved by the courts, such as the standard *Everready* format.  *See* 6 McCarthy § 32:174.  (Berger Dep. 260:1-261:24.)  As he testified, "[a]s an expert in my field and being a non-lawyer, I do not have the information about cases like that that would enable me to design or not design surveys based on those kinds of protocols."  (*Id.* 261:12-24.)  His purported "expertise" is derived solely from his own prior experience in designing and critiquing surveys:

> My knowledge of survey design is limited to the surveys that I design myself in the very specific areas in which I get involved, and it's also limited to my work in designing or in critiquing the work of other experts. That's where my knowledge is.  I'm not a student of the social sciences or scientific survey study.  That's just not my field.

(*Id.* 246:10-23.)  In other words, Berger's "training" in survey design is his own "on the job experience."  (*Id.* 25:13-23.)

In sum, Berger is not constrained by the rules of scientific survey design because he is completely unaware of them.  This ignorance enables Berger to craft his surveys in any manner he chooses, as he admits he did in this case:

> [T]his is a very unusual survey and this is very unusual work and this is not the kind of thing that you see every day on the street.  It's not your garden variety survey.  So therefore you have to kind of invent your own rules as you go along.

(Berger Dep. 240:10-16.)

Without a control group, Berger cannot testify that a *single* respondent was actually confused because of Defendants' use of certain scoring ranges or purchase of certain keywords.  If he is allowed to testify, the jury would be compelled to speculate about the reasons for the answers respondents gave.  Any testimony that impels the jury to improperly speculate does not "assist the trier of fact to understand the evidence or to determine a fact in issue."  *See* Fed. R. Evid. 702.  Berger's "invented" methodology is utterly lacking in scientific support.  On this basis alone, the Berger Surveys must be excluded.

### 4.    The Berger Surveys Were Not Otherwise Designed To Test for the Cause of Any Alleged Confusion

The only relevant question here whether Defendants' use of certain scoring ranges or purchase of certain keyword is "likely to *cause* confusion."  *See* 15 U.S.C. § 1125(a).  In Study A, Question 8 is designed to measure the existence of confusion, but not its cause.  It simply asks whether respondents believe that "the same credit scores are available" on the two websites.  Although the interviewer asked each respondent "Why?", Berger ignores those answers, which indisputably demonstrate that an insignificant number of people indicated the scoring range.  Similarly, none of the Study B questions attempt to measure whether Defendants' keyword purchases actually *caused* anyone to think that FICO scores are available on Defendants' websites.  Indeed, the

stated objectives in the Berger Report make clear that Berger was testing whether

confusion – whatever its source – exists, not its cause.  (Berger Rep. ¶ 40.)

### B.     The Berger Surveys Are Irrelevant and Unreliable Because the Questions are Ambiguous, Leading and Biased

A survey is irrelevant and unreliable where the survey questions themselves are

ambiguous.  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 279 (4th Cir. 2002)

(answers to ambiguous questions "provide no evidence of consumer confusion on the

critical issue"); *Supervalu, Inc.*, 2009 WL 799614, at *5 ("More importantly, some of the

survey's questions were so ambiguous that any 'report' on or analysis of answers to those

questions is unreliable and untrustworthy."); Diamond, *Reference Guide on Survey*

*Research, supra,* at 248 ("If the crucial question is sufficiently ambiguous or unclear, it

may be the basis for rejecting the survey.").  A survey is also not reliable if the questions

are "inherently suggestive and invite guessing by those who did not get any clear

message at all."  *Procter & Gamble Pharm.,* 2006 WL 2588002, at *23; *see also Scott*

*Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) ("A survey

question that begs its answer by suggesting a link between plaintiff and defendant cannot

be a true indicator of consumer confusion.").

### 1.     Question 8 of Study A is Ambiguous, Leading and Biased

The key question in Study A – the only one that purports to measure confusion – is

Question 8, which asked:

> Now we would like to understand how you *compare the credit scores*
> offered on WEBSITE X and WEBSITE Z.  Regardless of other products or
> services available through WEBSITE X and WEBSITE Z, *do you believe*

> *that the same credit scores available on WEBSITE X are available on WEBSITE Z?*

(Berger Rep. Ex. K (emphasis added).)  The question is highly ambiguous.  What did respondents understand the interviewer to mean by "same credit scores"?  Did they understand the phrase to mean "the same *type* of credit scores," i.e., a score designed to measure a person's creditworthiness based on credit bureau data?  Did they understand it to mean "the same *actual* credit scores," i.e., one can get a score of 720 from both websites?  Were they confused by the question itself and just guessing?  None of these plausible interpretations of Question 8 relates to source confusion.  Because of the inherent ambiguity of Question 8, the respondents' answers are meaningless.

Berger never asked respondents the unambiguous (although still somewhat leading) questions:  "Do you believe that the credit scores on these two websites are put out by the same company, are not put out by the same company, or do you not have an opinion on the matter?  What makes you think so?"  This form of questioning is widely known as the *SquirtCo* format, and was approved by the Eighth Circuit in *SquirtCo* v. *Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980).  Nor did Berger use the "now-standard *Everready* format," 6 *McCarthy* § 32:174, and simply show respondents a printout from a Defendant's website and ask the unbiased, open-ended questions:  "Who do you think puts out this credit scoring service?  What makes you think so?"  As discussed above, Berger is unfamiliar with these formats.  (Berger Dep. 260:1-261:11.)

Question 8 also improperly implies that there is a connection between the two websites.  Indeed, it might not have even occurred to the respondents that "the same

credit scores" – whatever that means – might be available on both websites.  *See Wells Fargo,* 293 F. Supp. 2d at 767-68; *Powerhouse Marks LLC,* 2006 WL 897254, at *4 (excluding Berger survey where questions "clearly led respondents to find" a business connection); *Sears, Roebuck*, 2003 WL 168642, at *2 (survey question "suggested the similarity to respondents rather than testing whether respondents perceived it themselves").

This problem is exacerbated by the fact that the structure of the question is biased in favor of a "yes" response.  That is, respondents were not expressly given the option of saying they do *not* have such a belief, or that they "don't know" or have no opinion on the matter.  "Such questions screen out respondents who may truly not have an opinion on the issue under investigation and minimize guessing."  *Procter & Gamble Pharm.,* 2006 WL 2588002, at *23; *see also* Diamond, *Reference Guide on Survey Research, supra,* at 250; *Scotts Co.*, 315 F.3d at 280 (failure to include "not sure" response option renders survey unreliable).

## 2.    Questions 4 and 5 in Study B are Leading and Irrelevant

In Study B, Berger relies on the responses to Questions 4 and 5 to conclude that there is confusion.  These questions, however, improperly suggest a connection between Defendants' websites and FICO scores, a connection that may not have occurred to the respondents before.  *See Wells Fargo,* 293 F. Supp. 2d at 767-68; *Powerhouse Marks LLC,* 2006 WL 897254, at *4; *Sears, Roebuck*, 2003 WL 168642, at *2.  Moreover, Questions 1-3, which repeatedly ask about FICO scores, improperly signal to the respondents that the purpose of the interview is to find a connection between FICO scores

and the listings on the page, further suggesting that the "right" answer to Question 4 is

"yes".  As discussed above, because no control group was used, no one can say that it

was Defendants' purchase of FICO as a keyword, and not demand effects caused by the

survey's leading and biased questions or the respondents' pre-existing beliefs, that caused

the respondents' answers.

>    **C.    Berger's Opinions Are Unreliable Because They are
>            Not Supported by the Data**

>    **1.    Berger Improperly Excluded Qualified Respondents
>            Who Were Not Confused**

It is absurd that 23 people who said "I don't know" in response to Question 8 of

Study A were not counted *at all* in Berger's estimation of the rate of "confusion".  These

respondents were clearly *not* confused as to the source or sponsorship of Defendants'

services and excluding their responses was improper.  Particularly in Study A, excluding

these respondents artificially inflated the percentage of "confused" respondents.

>    **2.    Berger Improperly Ignored The Verbatim Responses Which
>            Demonstrate Only *De Minimus* Confusion**

"[Likelihood of confusion] questions should be followed up by the important

question: 'Why do you say that?' Often, an examination of the respondent's verbatim

responses to the 'why' question are the most illuminating and probative part of a survey,

for they provide a window into consumer thought processes in a way that mere statistical

data cannot."  6 *McCarthy* § 32:175.  Without such a follow-up question, the cause of any

confusion will not be apparent and therefore the survey will be unreliable.  See*, e.g.,*

*Sears, Roebuck,* 2003 WL 168642, at *3; *Watec Co. Ltd. v. Liu*, No. CV 00-10893, 2002

WL 34373489, at *1 (C.D. Cal. May 21, 2002) (excluding survey in part because expert failed to consider answers to "why?" question).

Here, Berger asked the "Why?" question in Study A; he just did not count the answers. The verbatim answers, however, show that only 1.5% to 3.5% of respondents indicated they were *possibly* confused because of the scoring range. This level of purported confusion – and because no control was used, no one can say whether this confusion was caused by Defendants' scoring ranges – will not support a finding of a likelihood of confusion. *See, e.g.*, 6 *McCarthy* § 32:188; *Pharmacia Corp.*, 201 F. Supp. 2d at 373.

In Study B, Berger never even asked the "Why?" question after Questions 4 and 5, so the results are uninterpretable.[12] Very few respondents, however, pointed to Defendants' links as a place to obtain a FICO brand score, even after given multiple opportunities to do so, and even fewer went on to answer "yes" to the leading and biased Questions 4 and 5. Because Berger failed to use a control group, there is no data to reflect how many respondents were actually confused by the use of the FICO keyword.

---

[12] Curiously, Berger *did* ask "why" after questions 2 and 3, but not for the critical questions 4 and 5.

## CONCLUSION

For the reasons set forth above, the Court should exclude Berger's testimony regarding his surveys.

Respectfully submitted this 21 day of September, 2009.

**Lindquist & Vennum PLLP**

By:   /s/ Mark A. Jacobson
Mark A. Jacobson (MN Bar #188943)
Christopher Sullivan (MN Bar #0343717)
LINDQUIST & VENNUM, P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 371-3211
(612) 371-3207 (facsimile)

M. Elaine Johnston
Robert A. Milne
Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
(212) 354-8113 (facsimile)

*Attorneys for Defendant Experian
Information Solutions, Inc. (and authorized
to sign on behalf of all Defendants)*

Lewis A. Remele, Jr. (MN Bar #90724)
Christopher R. Morris (MN Bar #230613)
BASSFORD REMELE
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

James K. Gardner
Ralph T. Russell

Dao L. Boyle
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*

Barbara Podlucky Berens (MN #209788)
Justi R. Miller (MN #0387330)
KELLY & BERENS
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

Attorneys for Defendant
VantageScore Solutions, LLC

1