# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION and,                )
myFICO CONSUMER SERVICES, INC.             )
                                           )
            Plaintiff,                     )
                                           )
            v.                             )   Civil Action No.  06-cv-4112-ADM/JSM
                                           )
EXPERIAN INFORMATION SOLUTIONS             )
INC.; TRANS UNION LLC; and                 )
VANTAGESCORE SOLUTIONS, LLC                )
                                           )
            Defendants.

### Defendants' Joint Statement of the Case

Defendants Experian Information Solutions, Inc. ("Experian"), Trans Union LLC ("TU"), and VantageScore Solutions, LLC ("VantageScore Solutions") (collectively, the "Defendants") submit the following Statement of the Case.

After the Court's extensive summary judgment decision, only two of Fair Isaac Corporation ("Fair Isaac") and myFICO Consumer Services, Inc.'s (collectively, "Plaintiffs") allegations of wrongdoing remain for trial: the claim that Defendants infringed Plaintiffs' claimed "300-850" trademark by using overlapping ranges for their own credit scoring services and the claim that Defendants Experian and TU infringed Plaintiffs' "FICO," "FAIR ISAAC," and "300-850" trademarks by using those terms as keywords on internet search engines such as Google or Yahoo.  Defendants have asserted the counterclaim that Fair Isaac committed fraud on the U.S. Patent and Trademark Office (the "PTO") in procuring the registration for "300-850."

This Statement of the Case summarizes (1) Plaintiffs' inability to support its claims based on its alleged "300-850" mark (the "300-850 Claims"), (2) Plaintiffs' inability to support its Internet search engine keyword claims ("Keyword Claims"), (3) a summary of Defendants' counterclaim and affirmative defenses, (4) the flaws in Plaintiffs' measure of damages, (5) the remaining substantive, evidentiary, and procedural disputes, and (6) trial logistics.

## I.   Plaintiffs Cannot Support Their 300-850 Claims.

"To establish claims of trademark infringement and unfair competition under 15 U.S.C. §§ 1114, 1125(a), a plaintiff must prove that (1) it owns a valid, distinctive trademark that is entitled to protection and (2) the defendant's use of a similar mark was likely to confuse consumers about the source of the defendant's product." (July 24, 2009 Memorandum Opinion and Order at 37 [Docket No. 694] ("SJ Opinion").)  With regard to the term "300-850," Plaintiffs will not be able to prove either element at trial.  To the extent that Plaintiffs are asserting infringement of their other purported trademarks that are seal-like logos containing the term "300-850" (the "Seal Logos"), shown below, there can be no likelihood of confusion because Defendants have not used any kind of seal to identify their credit scoring services.

    

## A.    Trademark Validity/Secondary Meaning

While there is a rebuttable presumption that registered trademarks are valid, "the 300-850 mark is descriptive and, as such, is entitled to trademark protection only if it has acquired secondary meaning."  (SJ Opinion at 41.)  Fair Isaac never submitted evidence of secondary meaning to the PTO in securing its registration to the alleged 300-850 mark, and therefore there can be no presumption attached to that registration.  To establish secondary meaning, Plaintiffs must prove, by a preponderance of the evidence, that through long and exclusive use in the sale of their credit scoring service, the term "300-850" has become so associated in the public mind with Plaintiffs' credit scoring service that its primary significance is to identify the source of the services and to distinguish FI's services from the services of others.  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982).  Thus, for "300-850" to have acquired secondary meaning, a significant number of the consuming public must associate the "300-850" term with Plaintiffs.  *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1332-33 (8th Cir. 1985).

### 1.    Survey Evidence

Ordinarily, secondary meaning is established by conducting a survey to show that consumers associate the alleged trademark with a single source.  *Frosty Treats, Inc. v. Sony Computer Enter. Amer., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  However, Plaintiffs did not conduct a survey probative of secondary meaning.

Defendants, on the other hand, did conduct a survey to determine whether the term "300-850" has secondary meaning, and it conclusively determined that consumers do not associate the term with any particular source of credit scoring services.  While 24% of those surveyed stated that the term "300-850" told them something about the source, only 2% of those surveyed answered that the term "300-850" originated from a single source, as required to demonstrate secondary meaning.  When a survey reveals a positive response as low as that of Defendants' survey, the issue of secondary meaning typically does not even reach a jury.  *See, e.g., Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137 (D. Mass. 2003) ("No reasonable jury could infer from identification figures as low as 0 to 2.73 % that consumers identify [the mark] as indicating a single source of origin . . . .").  Defendants' survey, as well as other evidence to be presented at trial, demonstrates that the term "300-850" has no significance whatsoever in the minds of consumers as an indicator of source or origin and therefore has not acquired secondary meaning.

### 2.   No Inference of Secondary Meaning from So-Called "Confusion" Evidence

Plaintiffs will attempt to offer a relative handful of complaints from consumers who thought they were buying a FICO score from Experian or TU.  None of these complaints, however, indicate that the consumers thought they were buying a FICO score because of a Defendant's use of its score ranges.  These complaints therefore fail to demonstrate that these consumers associated "300-850" with Plaintiffs.  When viewed in the context of the number of scores sold per year by each of Experian and TU, the

consumer complaints or statements that Plaintiffs will put forth as evidence are *de minimis* and cannot support a finding of a secondary meaning.  In any event, as several courts have held in trademarks cases such as this, these complaints are inadmissible hearsay as demonstrated in a separate motion *in limine* being filed today.

Plaintiffs will argue that they can rely on the purported likelihood of confusion survey of the self-described marketing executive, James Berger.  As explained in a separate motion *in limine* filed today, Plaintiffs should be precluded from presenting any such purported survey evidence given the many violations of basic survey procedure, including Mr. Berger's failure to provide a control group of any kind.  In any event, as also explained in Defendants' motion, the purported survey fails to demonstrate relevant confusion, let alone direct evidence of secondary meaning.

### 3.    No Inference of Secondary Meaning from Defendants' Alleged Copying.

Plaintiffs will argue "that secondary meaning can be inferred from the Defendants' decision to 'mimic' Fair Isaac's FICO scores by adopting three-digit scoring ranges similar to the scoring range described by the 300-850 mark."   (SJ Opinion at 43.) Competitors may freely copy unprotectable features. *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 875 (8th Cir. 1994). "Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiffs." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995); *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 497 (8th Cir. 1998).

As they will demonstrate at trial, Defendants chose a feature of their services – the numeric range – to compete with Plaintiffs.  The use of ranges similar to Plaintiffs' 300 to 850 score range (not any purported trademark) was standard in the credit scoring industry.  As a result, to the extent that any of the Defendants wanted to offer a competing service to Plaintiffs' credit scoring service, it made good business sense to use the scoring range of the industry standard FICO score.  Furthermore, the evidence will show that in the 2002-2003 time period, each of Experian and TU were already offering credit scoring services to consumers that used a scoring range similar to 300 to 850 prior to launching the PLUS Score and TransRisk credit scoring services.  Plaintiffs never complained about the range of those services.  The evidence will also demonstrate that Plaintiffs did not provide any notice in the 2001-2003 time period that it considered the term "300-850" to be a trademark, so neither Experian nor TU knew, while they were developing its credit scoring service and score range feature in 2003, that Plaintiffs claimed any such rights.  In short, there is simply no evidence that Experian or TU chose their respective range of possible scores with the intent to confuse or mislead consumers.  If there was any "copying," it was of a feature, not a trademark.  Similarly, with regard to the VantageScore credit scoring service, there is no evidence that Defendants sought to use a scoring range that was similar to 300 to 850.

Lastly, when Defendants use their range descriptively, they prominently feature their own trademarks.  As such, inferring secondary meaning is inappropriate.  *MSP Corp. v. Westech Instruments*, 500 F. Supp. 2d 1198, 1214 (D. Minn. 2007) ("courts will

not infer secondary meaning where the defendant conspicuously uses its own trademark").

### 4. Plaintiffs' Burden to Show Secondary Meaning Prior to Defendants' First Use

Moreover, as to each Defendant, Plaintiffs bear the burden of showing that the term "300-850" acquired secondary meaning *before* that Defendant first used any allegedly infringing mark. *Aromatique, Inc.,* 28 F.3d at 870; *Co-Rect Products*, 780 F.2d at 1332. Experian has offered its PLUS Score service to consumers, which uses a scoring range of 330 to 830, to consumers since October 2003. (For a few weeks at the launch of the PLUS Score service, the service used a scoring range of 300 to 900.) Similarly, since December 2003, TU has offered consumers its own consumer score, which uses a range of 300 to 850. Furthermore, Experian, TU, and several other companies offered credit scoring services in the 1990s that used scoring ranges that overlapped with 300 to 850 (and which would be considered infringing uses under Plaintiffs' flawed theory.) The evidence will show that Plaintiffs cannot establish that "300-850" acquired secondary meaning prior to October and December of 2003, much less during the 1990s as they are required to prove.

### B. Likelihood of Confusion

Assuming that the term "300-850" is a valid trademark, and that the term "300-850" acquired secondary meaning before Defendants' first use of their scoring ranges, Plaintiffs must next demonstrate that a Defendant is using a similar or identical term as a trademark (that is, to identify the source of a product or service). *DaimlerChrysler AG v.*

7

*Bloom,* No. 00-325 DSD/JMM, 2001 WL 1640139 at *3 (D. Minn. Oct. 9, 2001) (confusion requires predicate proof of "use"). Plaintiffs' contention that Defendants "used" the mark "300-850" by using a three-digit numeric range of scores is incorrect. A trademark in a numeric symbol does not create a preemptive right to exclude others from using a range of numbers to communicate information about their services.

Plaintiffs must also demonstrate that this trademark use is likely to cause confusion as to source, origin, sponsorship or affiliation of that Defendant's credit scoring service. Plaintiffs' survey purportedly showing likelihood of confusion is fundamentally flawed and does not demonstrate that any confusion was actually *caused* by a Defendant's use of a mark as the Lanham Act requires. Plaintiffs' "evidence" of actual confusion - consumer emails, entries on particular TU logs, and statements on the myFICO.com website - demonstrates that people have misunderstandings about credit scoring generally, which is hardly surprising as credit reports and credit score have only been marketed to consumers since 2001. Plaintiffs are trying to bootstrap mistaken beliefs and factual inaccuracies into actionable Lanham Act confusion. As previously stated, the handful consumer complaints does not reveal a single consumer that is confused as to the source of the credit scoring service because of the score ranges used by Defendants.

Plaintiffs also claim that Defendants' score ranges (300 to 850, 330 to 830, and 501 to 990) infringe Plaintiffs' Seal Logos. There is no dispute, however, that Defendants do not use any logo that has a seal or resembles the Seal Logos. The only arguable point of similarity is Defendants' use of score ranges that overlap 300 to 850 in

a descriptive sense to explain the range of possible outcomes for their respective services. Because "300-850" is merely descriptive and not protectable as a trademark and because the ranges and logos are otherwise completely dissimilar, Defendants' scoring ranges cannot infringe the Seal Logos as a matter of law. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1564 (Fed. Cir. 1987); *American Cyanamid Corp. v. Connaught Labs, Inc.*, 800 F.2d 306, 309 (2d Cir. 1986); *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 25 (1st Cir. 2008).

## II.   Plaintiffs Cannot Support Their Keyword Claims

Plaintiffs claim that TU and Experian have infringed Plaintiffs' trademarks "FICO" and/or "FAIR ISAAC" by purchasing one or more of these terms as keywords and that TU has infringed Plaintiffs' claimed trademark "300-850" by purchasing the terms "850 credit score" and "850 credit scores" as keywords from Google, MSN, Yahoo, Ask.com or AOL for use in connection with those companies' Internet search engines.

Plaintiffs will not be able to offer reliable evidence that Experian and TU's use of certain trademarks as keywords are likely to cause confusion as to the source or origin of Defendants' credit scoring services.  Moreover, Plaintiffs cannot offer any evidence of actual confusion with respect to Experian's and TU's keyword advertising to support any claim for actual damages.

Furthermore, TU did not purchase any of Plaintiffs' trademarks in connection with the sale of its *own* consumer scoring service.  To the extent that TU purchased keywords that included "FICO" or "FAIR ISAAC," it did so in connection with its website that

sells FICO scores, which was permitted by contract.  While TU did buy "850 credit score" and "850 credit scores" as keywords in connection with the sale of its own services, even if Fair Isaac had a trademark for "300-850," it did not have a trademark for "850."

In addition, as explained further below, Plaintiffs cannot enforce their claims related to Defendants' use of the terms "FICO" and "FAIR ISAAC" as keywords due to their unclean hands.

## III.   Defendants' Counterclaim and Affirmative Defenses

### A.   Fair Isaac's Fraudulent Submissions to the PTO

Defendants have brought a counterclaim against Fair Isaac for fraud on the U.S. Patent and Trademark Office.  Fraud in the procurement of a trademark registration exists where an applicant or registrant makes a statement that is (1) false, (2) made knowingly, and (3) a material misrepresentation.  *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986).  "[T]he obligation which the Lanham Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration."  *Id.* (emphasis in original) (citation omitted).  Furthermore, the omission of material information may also constitute fraud.  *See, e.g., Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1210 (11th Cir. 2008) (stating that "[p]urposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark.").  Deceptive intent can be inferred from indirect and circumstantial evidence.  *In re Bose Corp.*, Case No. 2008-1448, 2009 U.S. App.

LEXIS 19658 *10 (Fed. Cir. Aug. 31, 2009).  In addition, intent to deceive may be inferred from the failure to disclose known information that is relevant to the PTO's decision.  *Specialized Seating, Inc. v. Greenwich Indus., L.P.*, 472 F. Supp. 2d 999, 1017 (N.D. Ill. 2007).

During the course of its prosecution of the "300-850" application, Fair Isaac deliberately deceived the PTO by making the following statements that it knew were false or misleading:

- "[O]nly the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores."

- "300-850 was initially selected by Fair Isaac to uniquely identify and differentiate Fair Isaac's credit bureau risk scoring models from other scoring models."

- "Fair Isaac arbitrarily selected the 300-850 score range based on a number of market and marketing factors to uniquely identify Fair Isaac's credit bureau risk scoring products (FICO scores)."

- "Competitors in the credit scoring market do not have a need to use the 300-850 range, and in fact have published other ranges."

- "300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for other types of credit scoring products that the Applicant develops, or even other credit bureau-based risk products that competitors develop."

- "Applicant's mark, 300-850, without further context, does not immediately describe Applicant's services; it is a numeric string that, on its own, does not convey any specific information about Applicant or its products."

- "Without reference to Applicant's credit bureau risk scoring products, 300-850 has no specific meaning at all."

The evidence will demonstrate that Fair Isaac knew that the statements and omissions in its submissions to the PTO were false or misleading, that the statements and

omissions were material to the PTO's decision to issue registration for "300-850," and that Fair Isaac intentionally made such misrepresentations and omitted material information for the purpose of obtaining a registration for 300-850 to which Fair Isaac was not entitled.

### B.     Affirmative Defenses

#### 1.     Fair Use

Even if they own a valid trademark in "300-850," which they do not, Plaintiffs cannot preclude a Defendant from using the term "300-850" or purportedly similar terms in good faith to describe a feature or characteristic of its services.   15 U.S.C. § 1115(b)(4).  The evidence will show that all of Defendants' uses of their scoring ranges are good faith descriptive uses.

#### 2.     Laches/Waiver and Acquiescence

Defendants will demonstrate at trial that Plaintiffs were well aware that both Experian and TU used similar or identical scoring ranges for their credit scoring services sold to consumers.  Plaintiffs discussed these services at length, yet took no action against either Experian or TU.  Plaintiffs have extensive and ongoing business dealings with both Experian and TU (and have been for nearly 20 years); Plaintiffs had every opportunity to address any infringement concerns, but Plaintiffs never did so with respect to Experian's and TU's consumer credit scoring services until several years after the launch of the services.  Plaintiffs waited until 2006, after VantageScore was introduced, to take issue with TU's use of 300 to 850 and Plaintiffs first complained about Experian's use of 330 to 830 in the Second Amended Complaint in April 2007 – six months into this litigation

and three and a half years after Experian introduced its PLUS Score service.  Defendants will  show that many other credit scoring services with similar scoring ranges co-existed in the credit scoring industry for several years and that Plaintiffs took no action against those companies either.  Defendants will further show that the inexcusable delay of nearly four years has unduly prejudiced them as Defendants continued to invest in developing a market for their services.

### 3.    Functionality

Items that are a "functional" aspect of a product or service cannot be legally protected.  Therefore the use of such functional items by others cannot constitute trademark infringement.

A feature is functional if granting a trademark for the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.  *Gateway Inc. v. Companion Products, Inc.*, 384 F.3d 503, 508 (8th Cir. 2004) (*citing Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995)); *Homebuilders Association of Greater St. Louis v. L & L Exhibition Mgmt.*, 226 F.3d 944, 948 n.5 (8th Cir. 2000); *Rainbow Play Systems, Inc. v. Groundscape Techologies, LLC*, 364 F. Supp. 2d 1026, 1037 (D. Minn. 2005); *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1049 (D. Minn. 2003).

The issue of functionality typically arises where a plaintiff claims exclusivity in a non-word symbol or style of presenting a product or service.  In this case, Plaintiffs contend that their claimed "300-850" trademark gives them not only the right to prevent competitors from using a mark that is similar to "300-850," but also to prevent them from

using the entire range of numbers between 300 to 850 in the realm of credit scoring services.  The evidence will show that the term "300-850" is not a valid trademark because, among other reasons, the use of a three-digit range of numbers to provide a credit score is simply "functional;" that is, it provides the effective means by which a consumer can be provided with a concrete and universally understood numeric score.  Furthermore, providing Plaintiffs with the exclusive use of the range of numbers 300 to 850 in the credit scoring industry would hinder competition and impinge the rights of Defendants to effectively compete in the realm of credit scoring services.  Because the term "300-850" is functional, Defendants were free to adopt a 300-850 scoring range without liability for trademark infringement.

### 4.    Release with Respect to TU

Fair Isaac released and discharged TU from the pending claims in (1) a limited release within a business agreement executed on March 19, 2004 and (2) a general release in a settlement agreement executed on September 30, 2005.

### 5.    Unclean Hands

"Trademark law's unclean hands defense springs from the rationale that 'it is essential that the plaintiff should not in his trademark or his advertisements and business, be himself guilty of any false or misleading representation." *JapanTelecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 870 (9 Cir. 2002).  Moreover, "[t]o make out an unclean hands defense, a trademark defendant 'must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."

*Id.*, citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

The evidence will show that Plaintiffs have engaged in the exact same conduct with respect to keywords for which it now complains – Plaintiffs have purchased many keywords that are Defendants' trademarks, including EXPERIAN and VANTAGESCORE. Therefore, Plaintiffs' unclean hands bar them from now claiming trademark infringement for the same conduct.

## IV.   Damages

Plaintiffs' damages expert, Paul K. Meyer, fails to isolate actual damages caused by claimed unlawful activity from conduct held to be lawful, which runs afoul of the controlling standard for measuring damages in the Eighth Circuit. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). For this and other reasons, Defendants have filed a motion *in limine* to exclude his testimony. In addition, because they will be unable to demonstrate any actual confusion due to trademark infringement, Plaintiffs are not entitled to actual damages.

Furthermore, Meyer calculates an accounting of Experian and TU's profits. However, "[a]n accounting of profits is available in a trademark infringement case only if the plaintiff proves 'willful, deliberate infringement or deception.'" *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, No. Civ. 00-2317 JRT/FLN, 2002 WL 1763999, at *9 (D. Minn. June 26, 2002) (citing *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994)). Thus, even if the jury finds that Defendants' use of their scoring ranges are likely to cause confusion (or have caused

confusion) and that none of Defendants' defenses apply, because the evidence will show that Defendants did not intend to confuse or mislead consumers, Plaintiffs are not entitled to an accounting of profits.

## V.    Matters in Dispute

The most important issues to be decided before Plaintiffs' opening are whether Plaintiffs should be able to introduce irrelevant and highly prejudicial evidence such as a meaningless trademark registration, a fundamentally-flawed survey, and purported evidence of antitrust violations and document destruction.  Many of these issues are described in separate motions *in limine* but they are highlighted here with the hope that they can be addressed before Plaintiffs taint the disposition of the jurors.

### A.    Substantive Disputes

First, as described in this Court's summary judgment decision, the primary substantive dispute is whether the term "300-850" has acquired secondary meaning, and if so, when.  The parties also dispute whether a Defendant's use of its score ranges has caused or is likely to cause confusion as to the source of that Defendant's credit scoring service.

With regard to the keyword claims, the parties dispute whether TU purchased any keywords containing Plaintiffs' trademarks in connection with the sale of TU's own consumer score and whether the purchase by either TU or Experian of keywords is likely to cause confusion as to the source of a Defendant's credit scoring service, especially given that no trademark owned by Plaintiffs appears in the text of the relevant sponsored links offered by TU or Experian.

16

With regard to Defendants' defenses and counterclaim, the parties do not dispute how and when Defendants' uses of the scoring ranges appear, but the parties dispute whether Defendants' use of its score ranges constitutes fair use.  The parties do not dispute what language appeared in the contracts, but the parties dispute whether Fair Isaac waived any right to enforce their alleged "300-850" trademark and released TU from infringement liability.  The parties do not dispute what language appears in Fair Isaac's submissions to the PTO, but the parties do dispute whether those representations were false, whether Fair Isaac omitted material information, whether Fair Isaac knew they were false, and whether the PTO relied on such representations or omissions in allowing the registrations to issue.

### B.    Evidentiary Disputes

Plaintiffs revealed in their exhibit list that intend to introduce several improper categories of evidence, which are addressed in separate motions *in limine* and include: (1) documents relevant only to the dismissed antitrust or false advertising claims, or no claims in this case at all, (2) fundamentally-flawed survey evidence, (3) fundamentally-flawed "lost profits" damage calculations, (4) the improper suggestion of spoliation, (5) the inadmissible hearsay of consumers who will not be available for cross-examination, and (6) the inadmissible and irrelevant trademark registrations.

With regard to the parties' objections to individual proposed trial exhibits, the parties met and conferred five times over the course of three weeks concerning proposed trial exhibits.  Certain objections remain.[1]

### 1.      Plaintiffs' Exhibits.

With respect to Plaintiffs' proposed exhibits, Defendants assert a number of objections in addition to those at issue in Defendants' motions in *limine* described above. Those objections include:  1) relevance objections to documents not bearing on any issue in the case, or which would be overly prejudicial compared to any minimal relevance, 2) authenticity objections to documents of unknown origin or which do not appear to be what Plaintiffs claim them to be, 3) hearsay objections to documents containing out of court statements (generally by third parties) being offered for the truth of the matter asserted, and 4) objections to documents that would confuse or mislead the jury by introdon issues not properly before them.

### 2.      TU's Exhibits.

Although numerous objections were resolved, Plaintiffs maintain a number of hearsay and authenticity objections to TU's proposed exhibits. Plaintiffs' hearsay objections generally fall into the following categories: hearsay within TU's business records, third-party documents, and news articles. Plaintiffs' authenticity objections generally relate to third-party documents, but Plaintiffs also assert authenticity objections

---

[1] With regard to the many foundation objections raised by Plaintiffs, Plaintiffs explained that they were simply trying to preserve the right to object to a witness's ability to testify on a particular exhibit.  Defendants contend that such an objection here is unnecessary.

to certain TU business records and business records of their own, although they have provided no underlying basis to question the authenticity of the documents.

### 3. Experian's Exhibits.

Plaintiffs maintain hearsay and authenticity objections to Experian's proposed exhibits similar to those described above with respect to the TU exhibit list.  In addition, Plaintiffs refuse to withdraw their authenticity objections to EX0322, EX0323, EX0347, EX0374 and EX0387, which are webpage printouts of mostly Experian-owned websites gathered using the Internet Archive website ("Wayback Machine"). Numerous courts have held that webpages retrieved through the Wayback Machine are admissible if accompanied by an affidavit from an Internet Archive representative with personal knowledge of the contents of the Internet Archive website and how information is collected through the Wayback Machine. *See*, *e.g.*, *Masters v. UHS of Del., Inc.*, No. 4:06-CV-1850, 2008 WL 5600714, at *2 (E.D. Mo. Oct. 21, 2008) (citing *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02-C-3293, 2004 WL 2367740, at *16 (N.D. Ill. Oct. 15, 2004));  *Lorraine v. Market Am. Ins. Co.*, 241 F.R.D. 534, 553 (D. Md. 2007); *St. Luke's Cataract & Laser Institute, P.A. v. Sanderson*, No. 8:06-CV-223, 2006 WL 1320242, at *1-2 (M.D. Fla. May 12, 2006).  Defendants have provided Plaintiffs with such an affidavit.  (EX0387 ¶¶ 1-5.)  Experian also has an employee witness who will testify about the contents of the Experian-owned websites over the span of years reflected in the webpages retrieved using the Wayback Machine.

Notably, Plaintiffs' own exhibit list includes websites retrieved from the Wayback Machine, and Plaintiffs' expert, Michael Younger, relies heavily on this and similarly

obtained material in his report.   Plaintiffs claim that they are objecting to these documents in part because they were not produced prior to the close of discovery (even though they do not come from Experian's files).   Plaintiffs, however, recently supplemented their own exhibit list with multiple documents that were not produced prior to the close of discovery and to which Experian has not objected to the authenticity of those documents.

### 4.     VantageScore Solutions' Exhibits.

Although numerous objections were resolved, Plaintiffs maintain a small number of hearsay and authenticity objections to VantageScore proposed exhibits. Plaintiffs' hearsay objections generally fall into the following three categories: hearsay within VantageScore's business records, Fair Isaac's business records and third-party documents produced by Fair Isaac's advertising group, Olson.   Plaintiffs' authenticity objections only remain for third-party documents from the Olson Group.

### C.     Jury Instructions and Legal Standards.

The parties have several disputes with regard to the jury instructions, which are set out in the joint set of jury instructions being submitted today.   While some of these disputes can be handled at a later date, Defendants respectfully request that the Court resolve two related disputes prior to Plaintiffs' opening.   Plaintiffs should be barred from

arguing to the jury that they have separate and independent claims based on passing off or that Defendants are estopped from challenging the purported 300-850 trademark.[2]

### 1.    Passing Off, Unjust Enrichment and Minnesota Deceptive Trade Practices Act.

Among the issues to be addressed by the Court, Defendants anticipate an issue related to Plaintiffs' passing-off claim (Count IV), unjust enrichment claim (Count V) and Minnesota Deceptive Trade Practices Act ("MDTPA") claim (Count VI) (collectively, the "State Law Claims").  In its summary judgment decision, this Court concluded that Plaitniffs' "claims based on the common law and the MDTPA are 'coextensive' with the federal claims under the Lanham Act, and, for that reason, the Court analyzes all the claims together, using the same standards."  (SJ Opinion at 36.)  If Plaintiffs fail to prove their Lanham Act claims, they cannot prove their State Law Claims.  *See, e.g., DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 n.3 (8th Cir. 2003); *MSP Corp. v. Westech Instruments*, 500 F. Supp. 2d 1198, 1217 (D. Minn. 2007). Indeed, to the extent that Plaintiffs' State Law Claims were in some way predicated upon alleged false advertising, those claims have been dismissed.  (SJ Opinion at 49.)  And Plaintiffs have never alleged any conduct other than trademark infringement and false advertising to support their State Law Claims.

---

[2] In addition, many of the issues raised in Defendants' in *limine* motions should be resolved prior to opening statements if possible, including the motions directed at Plaintiffs' proposed experts and Plaintiffs' attempt to inject a baseless spoliation theory into the trademark trial.

Therefore, Defendants request that the Court preclude Plaintiffs from arguing that if the jury determines that Plaintiffs' Lanham Act claims fail (*i.e.* the term "300-850" is not a valid trademark or Defendants' uses of their respective scoring ranges are not likely to cause confusion as the source of Defendants' credit scoring services, or that any of Defendants' affirmative defenses apply), the jury may still find in Plaintiffs' favor on their State Law Claims.  Specifically, if the Court were to allow Plaintiffs to argue their State Law Claims separately and distinct from their Lanham Act claims, it would certainly invite jurors to speculate that some unspecified conduct – other than trademark infringement – could support a finding of "passing off" or "unfair competition."  To avoid this speculation, the Court should bar Plaintiffs from presenting their State Law Claims as separate and distinct issues to the jury, whether in opening argument, closing argument, or jury instructions.

### 2.    Licensee Estoppel.

Defendants also anticipate disputes arising from Plaintiffs' proposed jury instructions with respect to the application of the licensee estoppel doctrine.  Specifically, Plaintiffs' proposed instruction states that a trademark licensee "cannot challenge the validity of the licensed trademark" and instructs the jurors that if they "find that a defendant is a licensee of Fair Isaac's 300-850 mark, [they] must find that defendant is prohibited from claiming that Fair Isaac's trademark is invalid."  Plaintiff's licensee estoppel argument rests on (i) Restated Addendum No. 1 to the Master Agreement for Decision Products and Services between Fair Isaac and Experian, in which FI purportedly licensed to Experian the "optional" trademark "300-850™ score range" and (ii) that TU

somehow has an implied license to the term "300-850," despite its several agreements over the years with respect to Plaintiffs' credit scoring services, including a trademark licensing agreement in 2004, that identified all of the licensed trademarks without listing the claimed "300-850" trademark.   Neither theory of licensee estoppel applies in this case.

### a.      Experian Is Not Estopped From Challenging Validity.

The doctrine of licensee estoppel is "equitable in nature" and is "not subject to rigid application." *Martha Graham School & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d 512, 520 (S.D.N.Y. 2001); *Westco Group, Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1090 (N.D. Ohio 2001).   When deciding whether to apply the doctrine of licensee estoppel to bar a licensee from challenging the validity of a trademark, courts are "free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license."   Restatement (Third) Unfair Competition §33 comment d (1995).   As it is an equitable doctrine, licensee estoppel is an issue for the Court to decide.

In *Lear, Inc. v. Adkins*, the Supreme Court held that the doctrine of licensee estoppel does not apply in patent cases because of the "strong federal policy favoring the full and free use of ideas in the public domain."   395 U.S. 653, 674 (1969).   The Court found that this public interest, when balanced against the competing demands of common law contracts, favored allowing patent licensees to freely challenge the validity of the licensed patents.   *Id.* at 670-71.   The *Lear* Court reasoned:

> Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting *full and free competition* in the use of ideas *which are in reality a part of the public domain*. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification.

*Id*. (emphasis added). S*ee also State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 715-18 (9th Cir. 2005) (refusing to apply licensee estoppel where doing so would undermine the policy of "protect[ing] the market players from the influence of the certification mark owner [and] ensur[ing] the broadest competition" within the market); *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 138-39 (2d Cir. 2003).

Courts have extended the application of the *Lear* test to other types of intellectual property, including trademarks. *See, e.g. Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973); *see also M & M,* 335 F.3d at 137; *C.B.C. Dist. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 443 F. Supp. 2d 1077, 1104-05 (E.D. Mo. 2006); *see generally Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1328 (Fed. Cir. 2008) (noting that courts have recognized the public interest in ensuring trademark validity and have applied the *Lear* balancing test to trademark licenses). Indeed, the *Lear* public policy analysis has been applied even to licenses that include an express no-challenge provision. *See, e.g.*, *M & M*, 335 F.3d at 137 (noting *Lear* recognized that federal policy embodied in the law of intellectual property can trump even explicit contractual provisions). Even where courts have not expressly invoked the *Lear* analysis, they have recognized that licensee estoppel should not apply where the result would be

inequitable under the circumstances. *See, e.g.*, *Martha Graham*, 153 F. Supp. 2d at 520 (holding that applying licensee estoppel to trademark license would be inequitable).   In this case, the circumstances warrant permitting Experian to challenge the validity of Fair Isaac's "300-850" mark.

In addition, where, as here, the registration of the trademark that is the subject of a license agreement was fraudulently obtained, the licensee should not be estopped from challenging the validity of that trademark. *See Martha Graham*, 153 F. Supp. 2d at 521. Where a trademark is obtained by fraud, applying the licensee estoppel doctrine to bar the defendant from challenging the validity of the trademark would create an inequitable result. *Id.* at 520-21

Furthermore, prohibiting a licensee to challenge the validity of a trademark is less equitable in cases where the license was short-lived, as opposed to "those instances in which the licensee had implicitly acknowledged the validity of the trademarks over an *extended* licensing relationship." *Martha Graham*, 153 F. Supp. 2d 512 (refusing to apply licensee estoppel where license had been in effect for only ten months) (emphasis added).   A survey of the relevant case law reveals that, where courts have applied licensee estoppel in the trademark context, those cases involved licenses that had been in effect for substantial periods of time. *See, e.g.*, *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275 (8th Cir. 1977) (35 years); *Smith v. Dental Prods. Co.*, 140 F.2d 140 (7th Cir. 1944) (17 years); *Prof'l Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665 (5th Cir. 1975) (9 years); *Bandag, Inc. v. Lewis Gen. Tires, Inc.*, No. 76-541,

1980 WL 30328 (W.D.N.Y. Mar. 24, 1980) (12 years). Here, at the time this lawsuit was commenced, Experian had been a purported licensee for about nine months.

Moreover, a party may not license intellectual property it does not own. A licensor attempting to invoke the affirmative defense of licensee estoppel must prove, as a threshold matter, that it owned the trademark at issue because "without ownership, there can be no license." *ConsumerInfo.com, Inc. v. Money Mgmt. Int'l, Inc.*, No. CV 07-04275 SJO, 2008 WL 4183928, at *6 (C.D. Cal. Sept. 2, 2008). Where a party purports to license a trademark to which it does not own trademark rights, that party may not enforce a no-challenge provision, nor should the licensee be estopped from challenging the validity of the trademark.

Fair Isaac purported to license to Experian the trademark "300-850™ score range." (PX995) However, Fair Isaac does not own a trademark in the term "300-850™ score range." Rather, Fair Isaac was granted a trademark registration in the term "300-850." Because Fair Isaac attempted to license a trademark in which it does not hold any ownership rights, any purported license that exists between Fair Isaac and Experian is invalid. In addition, as described above, this Court has already determined that the term "300-850" is a descriptive one and Plaintiffs only have a valid trademark if they can prove that the term acquired secondary meaning. The evidence will show that Plaintiffs do not own a valid trademark in "300-850" because the term has not acquired secondary meaning.

### b.    TU Is Not Estopped From Challenging Validity.

Plaintiffs' argument that TU is somehow an implied licensee is similarly without merit.  TU's agreements with FI clearly define those marks that constitute "Fair Isaac marks" and none of those agreements includes the term "300-850."  Indeed, even in the Trademark Licensing Agreement between Fair Isaac and TU, "300-850" is notably absent from this list of "FIC marks."  Moreover, the existence of an implied license is a question of law that is not submitted to the jury; thus, the portion of Plaintiffs' instruction referencing implied licenses is improper and must be stricken.  *See Travelers Express Co. v. Am. Express Integrated Payment Sys. Inc.*, 80 F. Supp. 2d 1033, 1038 (D. Minn. 1999).

### c.    VantageScore Is Not Estopped From Challenging Validity

In any event, VantageScore Solutions LLC, which is not a licensee of any kind, cannot be estopped from challenging the validity of the term "300-850."  J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:63 (4th ed. 2009) ("Other parties, even those closely affiliated with the licensee, are not foreclosed" from challenging the validity of the licensor's purported trademark by virtue of the licensee estoppel doctrine.)  No court has applied the licensee estoppel doctrine to a party who is not a licensee, regardless of that party's relationship to the licensee.  *See, e.g., Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 658-59 (7th Cir. 1965) (agent)); *Papercraft Corp. v. Gibson Greeting Cards, Inc.*, 515 F. Supp. 727, 728 (S.D.N.Y. 1981) (parent corporation).

### D.    Procedural Disputes.

There are currently no procedural disputes.

**VI.    Trial Logistics.**

This is a Jury Trial.  Defendants estimate that it will take two weeks.  Lead trial

counsel for Defendants are as follows:

*For Experian Information Solutions, Inc.:*
        Robert A. Milne, WHITE & CASE LLP

*For Defendant Trans Union LLC:*
        Lewis A. Remele, Jr., BASSFORD REMELE

*For Defendant VantageScore Solutions, LLC:*
        Barbara Podlucky Berens, Kelly & Berens P.A.

Respectfully submitted this 21st day of September, 2009.

**Lindquist & Vennum PLLP**

By:         /s/   Mark A. Jacobson
        Mark A. Jacobson (MN Bar #188943)
        Mark H. Zitzewitz (MN Bar #0289073)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 371-3211
Fax: (612) 371-3207

– and –

M. Elaine Johnston
Robert A. Milne
Christopher J. Glancy
Jack E. Pace III
**White & Case LLP**
1155 Avenue of the Americas
New York, NY 10036-2787
Tel: (212) 819-8200
Fax: (212) 354-8113

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

**Bassford Remele**

By:      /s/ Christopher R. Morris
            Lewis A. Remele, Jr. (MN Bar #90724)
            Christopher R. Morris (MN Bar
            #230613)

33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

– and –

James K. Gardner
Ralph T. Russell
Dao L. Boyle
**Neal, Gerber & Eisenberg LLP**
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*
*(Authorized to sign on behalf of all Defendants)*

**Kelly & Berens P.A.**


By:     /s/ Justi R. Miller

       Barbara Podlucky Berens (MN Bar #209788)
       Justi R. Miller (MN #0387330)

3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

*Attorneys for Defendant*
VantageScore Solutions, LLC


NGEDOCS: 1657931.2