# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fair Isaac Corporation and myFICO   )
Consumer Services, Inc.;   )
   )
      Plaintiffs,   )
   )
v.   )
   )   Civil Action No:
Experian Information Solutions, Inc.;   )   0:06-cv-04112 (ADM/JSM)
Trans Union LLC; VantageScore   )
Solutions, LLC; and Does I through X;   )
   )
      Defendants.   )
_____)

## THE PARTIES' JOINT PROPOSED JURY INSTRUCTIONS

Pursuant to the Court's Amended Notice of Assignment for Case for Trial, dated August 11, 2009, Plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc. (collectively, the "Plantiffs") and Defendants Experian Information Solutions, Inc., Trans Union LLC, and VantageScore Solutions, LLC (collectively, the "Defendants") hereby submit their joint proposed jury instructions for trial in the above-captioned proceeding, which is scheduled to start on October 6, 2009.

The joint proposed jury instructions are in the sequence indicated by the following Table of Contents.  Where the parties have agreed on the language of that instruction, the instruction is set forth without further comment.  Where the parties have not been able to agree on the language of a particular instruction, or whether a particular instruction is necessary for inclusion at all, the parties have set forth their respective proposed instructions or indicated one party's objection to the proposed instruction.


Dated:          September 21, 2009

Robins, Kaplan, Miller & Ciresi, L.L.P.

By: _____
Ronald J. Schutz (130849)
Randall Tietjen (214474)
Christopher K. Larus (226828)
Michael A. Collyard (302569)
Laura E. Nelson (342798)
Mary E. Kiedrowski (346378)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Tel: (612) 349-8500

NEWYORK 7309435 (2K)

Attorneys for Plaintiffs

**Lindquist & Vennum PLLP**

By:   /s/ Mark A. Jacobson
Mark A. Jacobson (MN Bar #188943)
Mark H. Zitzewitz (MN Bar #0289073)
LINDQUIST & VENNUM, P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 371-3211
(612) 371-3207 (facsimile)

Robert A. Milne
Christopher J. Glancy
Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
(212) 354-8113 (facsimile)

*Attorneys for Defendant Experian
Information Solutions, Inc.*

**BASSFORD REMELE**
*A Professional Association*

By
Lewis A. Remele, Jr. (License #90724)
Christopher R. Morris (License #230613)
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota  55402-3707
(612) 333-3000
(612) 333-8829 -- Fax
cmorris@bassford.com

and

James K. Gardner
Ralph T. Russell
Dao L. Boyle
NEAL, GERBER & EISENBERG LLP
Two N. LaSalle St., Suite 2200
Chicago, IL  60602-3801
(312) 269-8000
(312) 578-2803  Fax

*Attorneys for Trans Union, LLC*

**Kelly & Berens**

By: _____
Barbara Podlucky Berens (MN Bar #209788)
Justi R. Miller (MN #0387330)

3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

*Attorneys for Defendant*
*VantageScore Solutions, LLC*

## Table of Contents

Page

I.   GENERAL INSTRUCTIONS AT THE OUTSET ..................................................1

    A.   THE INSTRUCTIONS ON WHICH THE PARTIES AGREE ..................2

            EVIDENCE; LIMITATIONS................................................................3
            BENCH CONFERENCES AND RECESSES ......................................4
            NO TRANSCRIPT AVAILABLE; NOTE-TAKING...........................5
            CONDUCT OF THE JURY .................................................................6

    B.   PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTIONS................8

            GENERAL:  NATURE OF CASE; BURDEN OF  PROOF; DUTY
            OF JURY; CAUTIONARY...................................................................9
            OUTLINE OF TRIAL .......................................................................11
            PRELIMINARY INSTRUCTION ON LEGAL TERMS IN THE
            TRIAL..............................................................................................12

    C.   DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTIONS...........14

            GENERAL:  NATURE OF CASE; BURDEN OF  PROOF; DUTY
            OF JURY; CAUTIONARY.................................................................15
            OUTLINE OF TRIAL .......................................................................17
            PRELIMINARY INSTRUCTION – TRADEMARK .........................18

II.   INSTRUCTIONS FOR USE DURING TRIAL ....................................................20

    A.   INSTRUCTIONS ON WHICH THE PARTIES AGREE.........................21

            DEMONSTRATIVE SUMMARIES NOT RECEIVED AS
            EVIDENCE ......................................................................................22
             DUTIES OF JURY:  RECESSES......................................................23
             JUDICIAL NOTICE..........................................................................24
            EVIDENCE ADMITTED AGAINST ONLY ONE PARTY.............25
            EVIDENCE ADMITTED FOR LIMITED PURPOSE.......................26
            RULE 1006 SUMMARIES ...............................................................27

    B.   PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTION.................28

            DEPOSITION TESTIMONY.............................................................29

    C.   DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTION.............30

            DEPOSITION TESTIMONY.............................................................31

i

Table of Contents
(continued)

Page

III.   INSTRUCTIONS FOR USE AT CLOSE OF TRIAL ..........................................32

       A.    INSTRUCTIONS ON WHICH THE PARTIES AGREE........................33

                   JUDGE'S OPINION..........................................................34
                   LIABILITY OF CORPORATION ......................................35
                   EQUAL STANDING ........................................................36
                   DIRECT AND CIRCUMSTANTIAL EVIDENCE ............37
                   THE COURT'S RULING ON OBJECTIONS.....................38
                   DUTIES AS JURORS .......................................................39
                   NOTES............................................................................40
                   WHAT IS EVIDENCE.....................................................41
                   LAWYER STATEMENTS ................................................42

       B.    PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTIONS..............43

                   GENERAL EXPLANATION OF CLOSING INSTRUCTIONS .......44
                   BURDEN OF PROOF .......................................................45
                   USE OF DEPOSITIONS ..................................................46
                   CREDIBILITY OF WITNESSES ......................................47
                   PRIOR INCONSISTENT STATEMENT ...........................48
                   OPINION EVIDENCE (EXPERT WITNESSES) ..............49
                   SPOLIATION..................................................................50
                   PRIOR SWORN STATEMENT .......................................51

       C.    DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTIONS...........52

                   GENERAL EXPLANATION OF CLOSING INSTRUCTIONS .......53
                   BURDEN OF PROOF .......................................................54
                   ADDITIONAL INSTRUCTION REGARDING BURDEN OF
                   PROOF............................................................................55
                   CONSIDER ONLY EVIDENCE ......................................56
                   DEPOSITION TESTIMONY............................................57
                   CREDIBILITY OF WITNESSES ......................................58
                   IMPEACHMENT ..............................................................59
                   DIRECT CAUSE..............................................................60
                   INFERENCES - DEFINED...............................................61
                   TWO OR MORE DEFENDANTS ....................................62

IV.    INSTRUCTIONS FOR PLAINTIFFS' CLAIMS, THE DEFENDANTS'
       DEFENSES, AND DAMAGES ..........................................................63

NEWYORK 7309435 (2K)

Table of Contents
(continued)

Page

A.   TRADEMARK INFRINGEMENT, UNFAIR COMPETITION,
     DECEPTIVE TRADE PRACTICES, AND PASSING OFF CLAIMS ....64

     1. PLAINTIFFS' PROPOSED INSTRUCTIONS....................................65

          TRADEMARK DEFINED ....................................................66
          OBTAINING A TRADEMARK ...........................................68
          REGISTERING TRADEMARKS..........................................69
          TRADEMARK INFRINGEMENT: BURDEN OF PROOF.............71
          THE "FAIR ISAAC" AND "FICO" MARKS ....................73
          LICENSEE ESTOPPEL ......................................................74
          THE "300-850" MARKS AND SECONDARY MEANING..............76
          THE LIKELIHOOD OF CONFUSION ...................................81
          "INITIAL INTEREST" AND "POINT-OF-SALE" CONFUSION....86
          SURVEYS .....................................................................87
          INTENT NOT REQUIRED AND GOOD
          FAITH NOT A DEFENSE .................................................88
          PASSING-OFF DEFINED ...................................................89
          WILLFULNESS ...............................................................91

     2. DEFENDANTS' PROPOSED INSTRUCTIONS................................94

          DEFINITION OF A TRADEMARK ....................................95
          ELEMENTS OF TRADEMARK INFRINGEMENT CLAIM ..........96
          VALIDITY OF THE TRADEMARK ...................................98
          DISTINCTIVENESS:  SPECTRUM OF MARKS .............................99
          SECONDARY MEANING ...............................................101
          METHODS OF SHOWING SECONDARY MEANING.................103
          SECONDARY MEANING MUST BE  ACQUIRED BEFORE
          DEFENDANTS' FIRST USE .............................................105
          REVOLUTIONARY GOODS OR SERVICE ...............................106
          ADVERTISING..............................................................107
          COPYING......................................................................109
          CONSUMER TESTIMONY ..............................................111
          LENGTH OF USE............................................................112
          EXPERT TESTIMONY ...................................................113
          SURVEYS ....................................................................114
          SUMMARY OF PROVING SECONDARY MEANING.................116
          LIKELIHOOD OF CONFUSION – FACTORS ..............................117
          LIKELIHOOD OF CONFUSION FACTOR:  STRENGTH OF
          CLAIMED MARK .........................................................119

iii

Table of Contents
(continued)

Page

SIMILARITY OF PLAINTIFFS' AND
DEFENDANTS' USE OF "300-850" TERM ..................................120
DEGREE TO WHICH GOODS AND SERVICES  ARE SOLD IN
SAME CHANNELS ........................................................................121
INTENT TO CONFUSE ..................................................................122
ACTUAL CONFUSION ..................................................................123
PURCHASING PUBLIC..................................................................125
SURVEYS ......................................................................................126
SUMMARY OF CONFUSION ELEMENTS....................................128
TRADEMARK INFRINGEMENT - KEYWORDS ..........................129
SAME STANDARD FOR ALL PLAINTIFFS' CLAIMS ..............131

B.      DEFENSES........................................................................................133

        1. DEFENDANTS' PROPOSED INSTRUCTIONS..............................134

           DEFENSES....................................................................................135
           DEFENSE – FUNCTIONAL VERSUS NONFUNCTIONAL.........136
           DEFENSE – CLASSIC FAIR USE....................................................138
           DEFENSE – NOMINATIVE FAIR USE..........................................140
           DEFENSE – EQUITABLE PRINCIPLE OF WAIVER ....................142
           DEFENSE – EQUITABLE PRINCIPLE OF ACQUIESCENCE.....143
           DEFENSE – EQUITABLE PRINCIPLE OF UNCLEAN HANDS .144
           DEFENSE - RELEASE ....................................................................146

        2. PLAINTIFFS PROPOSED INSTRUCTIONS[*]..................................147

           FUNCTIONAL VERSUS NONFUNCTIONAL ..............................148
           CLASSIC FAIR USE .......................................................................150
           NOMINATIVE FAIR USE ..............................................................152
           WAIVER ........................................................................................153
           ACQUIESCENCE............................................................................154
           PROGRESSIVE ENCROACHMENT .............................................156
           UNCLEAN HANDS........................................................................158
           RELEASE .......................................................................................161

---

[*] By including these counterproposal instructions relating to the defendants' proposed instructions for affirmative defenses, Fair Isaac is not necessarily agreeing that the defendants are entitled to any of these instructions at trial.

NEWYORK 7309435 (2K)

Table of Contents
(continued)

Page

C.   DAMAGES .......................................................................................163

1. PLAINTIFFS' PROPOSED INSTRUCTIONS...................................164

DAMAGES OVERVIEW ....................................................165
ACTUAL DAMAGES: GENERALLY ............................167
ACTUAL DAMAGES: LOST PROFITS ........................169
ACTUAL DAMAGES: REASONABLE ROYALTY ....................170
DEFENDANTS' PROFITS ................................................172

2. DEFENDANTS' PROPOSED INSTRUCTIONS..............................173

DAMAGES..........................................................................174
DAMAGES – ACTUAL OR STATUTORY NOTICE ....................175
DAMAGES – ACTUAL COMPENSATORY DAMAGES ..............176
CALCULATING ACTUAL DAMAGES .........................177
DAMAGES – REASONABLE ROYALTY ......................178
DAMAGES – ACCOUNTING OF A DEFENDANT'S PROFITS..180
WILLFUL INFRINGEMENT ............................................181

V.   DEFENDANTS' COUNTERCLAIM ................................................182

A.   DEFENDANTS' PROPOSED INSTRUCTION......................................183

COUNTERCLAIM – FRAUD ON THE PTO ..................184

B.   PLAINTIFFS' PROPOSED INSTRUCTIONS........................................186

FRAUD ON THE UNITED STATES
PATENT AND TRADEMARK OFFICE .........................187

CLEAR-AND-CONVINCING EVIDENCE DEFINED...................191

VI.   CONCLUDING INSTRUCTIONS .....................................................193

A.   INSTRUCTION ON WHICH THE PARTIES AGREE .........................194

ELECTION OF FOREPERSON; DUTY TO DELIBERATE;
COMMUNICATIONS WITH COURT; CAUTIONARY;
UNANIMOUS VERDICT; VERDICT FORM ..................195
DUTIES AS JURORS .......................................................197

v

# I.     GENERAL INSTRUCTIONS AT THE OUTSET

NEWYORK 7309435 (2K)

## A.    THE INSTRUCTIONS ON WHICH THE PARTIES AGREE

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 1

## <u>EVIDENCE; LIMITATIONS</u>

I have mentioned the word "evidence." "Evidence" includes the testimony of witnesses; documents and other things received as exhibits; any facts that have been stipulated - that is, formally agreed to by the parties; and any facts that have been judicially noticed—that is facts which I say you must accept as true.

Certain things are not evidence. I will list those things for you now:

1.  Statements, arguments, questions and comments by lawyers are not evidence.

2.  Exhibits that are identified by a party but not offered or received in evidence are not evidence.

3.  Objections are not evidence. Lawyers have a right to objectwhen they believe something is improper. You should not be influenced by the objection. If I sustain an objection to a question, you must ignore the question and must not try to guess what the information might have been.

4.  Testimony that I strike from the record, or tell you to disregard, are not evidence and must not be considered.

5.  Anything you see or hear about this case outside the courtroom is not evidence, unless I specifically tell you otherwise during the trial.

Furthermore, a particular item of evidence is sometimes received for a limited purpose only. That is, it can be used by you only for one particular purpose, and not for any other purpose. I will tell you when that occurs, and instruct you on the purposes for which the item can and cannot be used. You should also pay particularly close attention to such an instruction, because it may not be available to you in writing later in the jury room.

Finally, some of you may have heard the terms "direct evidence" and "circumstantial evidence." You are instructed that you should not be concerned with those terms, since the law makes no distinction between the weight to be given to direct and circumstantial evidence.

<u>Source</u>:       *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil § 1.02 (2008).*

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 2

## BENCH CONFERENCES AND RECESSES

During the trial it may be necessary for me to talk with the lawyers out of your hearing, either by having a bench conference here while you are present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is to decide how certain evidence is to be treated under the rules of evidence, and to avoid confusion and error.  We will, of course, do what we can to keep the number and length of these conferences to a minimum.

Source:      *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil § 1.03 (2008).*

4

## JURY INSTRUCTION NO. 3

## NO TRANSCRIPT AVAILABLE; NOTE-TAKING

At the end of the trial you must make your decision based on what you recall of the evidence.  You will not have a written transcript to consult, and it may not be practical for the court reporter to read back lengthy testimony.  You must pay close attention to the testimony as it is given.

If you wish, however, you may take notes to help you remember what witnesses said.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  And do not let note-taking distract you so that you do not hear other answers by the witness.  The Clerk will provide each of you with a pad of paper and a pen or pencil.  At each recess, leave them _____.

When you leave at night, your notes will be secure and not read by anyone.

Source:      *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil § 1.04 (2008).*

5

## JURY INSTRUCTION NO. 4

## <u>CONDUCT OF THE JURY</u>

Finally, to ensure fairness, you as jurors must obey the following rules:

*First*, do not talk among yourselves about this case, or about anyone involved with it, until the end of the case when you go to the jury room to decide on your verdict.

*Second*, do not talk with anyone else about this case, or about anyone involved with it, until the trial has ended and you have been discharged as jurors.

*Third*, when you are outside the courtroom, do not let anyone tell you anything about the case, or about anyone involved with it, until the trial has ended and your verdict has been accepted by me.  If someone should try to talk to you about the case during the trial, please report it to me.

*Fourth*, during the trial you should not talk with or speak to any of the parties, lawyers, or witnesses involved in this case – you should not even pass the time of day with any of them.  It is important not only that you do justice in this case, but that you also give the appearance of doing justice.  If a person from one side of the lawsuit sees you talking to a person from the other side – even if it is simply to pass the time of day - an unwarranted and unnecessary suspicion about your fairness might be aroused.  If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator or the like, remember it is because they are not supposed to talk or visit with you either.

*Fifth*, do not read any news stories or articles about the case, or about anyone involved with it, or listen to any radio or television or Internet reports about the case or about anyone involved with it.

*Sixth*, do not do any research or make any investigation about the case on your own.  By way of examples, that means you must not consult a dictionary, textbook, encyclopedia, go to the Internet or consult any other sources of information about some issue or person in this case.  You learn about this case from the evidence you receive here at the trial and apply it to the law as I give it to you.

*Seventh*, cell phones are not permitted in the jury room during deliberation.

*Eighth*, do not make up your mind during the trial about what the verdict should be.  Keep an open mind until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence.

6

<u>Source</u>:       *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil*
              *§ 1.05 (2008)*.

## B.    PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTIONS

8

## JURY INSTRUCTION NO. 5

## GENERAL:  NATURE OF CASE; BURDEN OF PROOF; DUTY OF JURY; CAUTIONARY

Ladies and gentlemen: I will take few moments now to give you some initial instructions about this case and about your duties as jurors. At the end of the trial I will give you further instructions. I may also give you instructions during the trial. Unless I specifically tell you otherwise, all such instructions—both those I give you now and those I give you later—are equally binding on you and must be followed.

This is a civil case brought by Fair Isaac Corporation and its subsidiary corporation myFICO Consumer Services, Inc. I will generally refer to both of these companies together as Fair Isaac or, simply, as the plaintiff. Fair Isaac originally brought this case against four companies: Equifax, Inc.; Experian Information Solutions Inc., which I'll refer to as Experian; Trans Union, LLC, which I'll refer to as Trans Union; and VantageScore Solutions, LLC, which I'll refer to as VantageScore Solutions or VantageScore. Fair Isaac has settled its claims against Equifax, Inc. So Experian, Trans Union, and VantageScore Solutions are the remaining defendants. I will refer to each of them by their names or, simply, as the defendants.

Fair Isaac is in the business, among other things, of making what are often called credit-scoring models and providing consumer credit scores to consumers. Credit-scoring models include complex algorithms that use consumer credit data to calculate credit scores. Experian, Trans Union, and Equifax collect consumer credit data and use that data with Fair Isaac's scoring models to generate credit scores for consumers. The defendants also use their own scoring models—not just Fair Isaac's—to provide consumer credit scores to consumers.

In this lawsuit, Fair Isaac claims that it has trademark rights in variations of the following terms for credit scores: "300-850," "Fair Isaac," and "FICO." Fair Isaac claims what is known as common-law trademark rights in each of those terms and it owns federal trademark registrations for each of those terms. Fair Isaac claims that the defendants are infringing Fair Isaac's 300-850 trademarks and passing off non-Fair Isaac credit scores to consumers as Fair Isaac credit scores by using scoring ranges and numbers in advertisements identical or confusingly similar to Fair Isaac's 300-850 marks. Fair Isaac also claims that Experian and TransUnion are infringing Fair Isaac's trademarks and passing off their credit scores as Fair Isaac's by, among other things, using the terms "Fair Isaac," "FICO," and "850" as paid Internet search terms on Google and other Internet search engines. According to Fair Isaac's allegations, these paid Internet search terms generate links on a search-results page that lead to Experian or TransUnion's websites, where the defendants sell their own credit scores and other

9

related products but not Fair Isaac's credit scores. Fair Isaac alleges that through these actions the defendants have committed trademark infringement, unfair competition, deceptive trade practices and passing off.

The defendants deny Fair Isaac's claims and they have countersued, alleging that Fair Isaac's federal registration of the 300-850 trademark should be cancelled because Fair Isaac procured the registration through fraud on the United States Patent and Trademark Office. Fair Isaac denies that it procured its trademark registration by fraud.

It will be your duty to decide from the evidence whether Fair Isaac is entitled to a verdict against the defendants and whether Fair Isaac's 300-850 trademark is valid. From the evidence, you will decide what the facts are. You are entitled to consider the evidence in the light of your own observations and experiences in the affairs of life. You will then apply those facts to the law that I give you in these and in my other instructions, and in that way reach your verdict. You are the sole judges of the facts; but you must follow the law as stated in my instructions, whether you agree with it or not.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it.

In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any motives they may have for testifying a certain way, their manner while testifying, whether they said something different at an earlier time, the general reasonableness of their testimony and the extent to which their testimony is consistent with other evidence that you believe.

Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

You should not take anything I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

**Authority:**

- *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 1.01 (2008) (without the description of the nature of this case, of course).

10

**JURY INSTRUCTION NO. 6**

## OUTLINE OF TRIAL

The trial will proceed in the following manner:

First, Fair Isaac's attorney may make an opening statement.  Next, each of the defendants' attorneys may make an opening statement. An opening statement is not evidence but is simply a summary of what the attorney expects the evidence to be.

Fair Isaac will then present evidence and counsel for the defendants may cross-examine. During Fair Isaac's case, the defendants may present evidence in their defense and Fair Isaac's counsel may cross-examine. After Fair Isaac is finished presenting its evidence, the defendants will present their evidence in defense against Fair Isaac's claims and in support of their counterclaim, and during this defense, Fair Isaac's counsel may cross-examine. After the defendants are finished presenting their defense, Fair Isaac may present evidence in rebuttal and, again, the defendants' counsel may cross-examine.

After the presentation of evidence is completed, the attorneys will make their closing arguments to summarize and interpret the evidence for you. As with opening statements, closing arguments are not evidence. The court will instruct you further on the law. After that you will retire to deliberate on your verdict.

**Authority:**

- *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 1.06 (2008) (modified to reflect that the defendants' evidence in their defense is presented during Fair Isaac's case).

11

## JURY INSTRUCTION NO. 7

## <u>PRELIMINARY INSTRUCTION ON LEGAL TERMS IN THE TRIAL</u>

To help you understand the evidence that will be presented in this case, I will explain some of the legal concepts you will hear about during the trial.

*Trademark:* A trademark is a word, name, symbol, device, or a combination of these items that indicates the source or origin of goods. The owner of a mark has the right to prevent others from using the same mark or a similar mark that is likely to cause confusion in the marketplace.

*How a Trademark Is Obtained:* A person acquires the right to prevent others from using the same mark or a similar mark that is likely to cause confusion in the marketplace by being the first to use it in the marketplace as an indicator of source or origin. The owner of a trademark has the right to prevent others from using the same mark or a similar mark that is likely to cause confusion in the marketplace.

*Secondary Meaning:* One of the issues you will need to consider at the end of the trial is whether Fair Isaac's 300-850 trademarks for credit scores have secondary meaning. To determine whether a mark has secondary meaning, the ultimate inquiry is whether in the consumer's mind the trademark has become associated with a particular source or origin. If it has, then the trademark has secondary meaning. For purposes of secondary meaning, the consumer does not need to know the identity of the particular source, just that the mark is associated with a single source.

*Trademark Registration:* The owner of a mark under the common law can apply to obtain a certificate of registration issued by the United States Patent and Trademark Office by submitting an application showing use of the mark in commerce or showing a *bona-fide* intent to begin such use and then in fact using the mark in commerce. After obtaining a trademark registration certificate, the owner, in an action for infringement, may rely on the certificate to create a presumption that the mark is valid, that the registrant owns it, and that the owner has the right to prevent others from using the same mark or a similar mark that is likely to cause confusion in the marketplace in connection with the type of goods specified in the certificate.

*Likelihood of Confusion:* To prove infringement, Fair Isaac must prove by what is known as the greater weight of the evidence a defendant, without Fair Isaac's consent, used in commerce a reproduction, copy, counterfeit, or colorable imitation of Fair Isaac's mark in connection with the distribution or advertisement of goods, such that the defendant's use of the mark is likely to cause confusion about the source, sponsorship, or affiliation of the goods. It is not necessary that the mark used by a defendant be an exact copy of Fair Isaac's mark. Rather, Fair Isaac must demonstrate that, when viewed in its entirety, the mark used by a

12

defendant is likely to cause confusion in the minds of reasonably prudent purchasers or users as to the source of the product in question.

*Passing Off:* Fair Isaac also alleges that the defendants violated the law by passing off their goods or services as those of Fair Isaac's. You do not need to find that Fair Isaac holds a valid trademark to find passing off. "Passing off" is conduct that deceives or is likely to deceive a customer exercising ordinary care in purchasing a product and that induces the customer to purchase a defendant's product in the belief that they are purchasing the plaintiff's product.

*Burden of Proof:* Fair Isaac has the burden of proving by the greater weight of the evidence that Fair Isaac is the owner of a valid trademark and that a defendant infringed that trademark. The greater weight of the evidence means that the evidence persuades you that the fact is more probably true than not true. The defendants contend that the registration of one of Fair Isaac's registered trademarks is invalid because it was procured by fraud on the United States Patent and Trademark Office. Fair Isaac denies this. The defendants have the burden of proving that the federally registered mark is invalid by what is known as clear-and-convincing evidence (which is more than the greater weight of the evidence).

**Authority:**

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at 141-43 (ABA Publishing, 2008) (proposing some similar language).

13

## C.   DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTIONS

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 8

## **GENERAL:  NATURE OF CASE; BURDEN OF PROOF; DUTY OF JURY; CAUTIONARY**

Ladies and Gentlemen:  I will take a few moments now to give you some initial instructions about this case and about your duties as jurors.  At the end of the trial I will give you further instructions.  I may also give you instructions during the trial.  Unless I specifically tell you otherwise, all such instructions – both those I give you now and those I give you later - are equally binding on you and must be followed.

This is a civil case brought by Plaintiffs against Defendants.  Plaintiffs are Fair Isaac Corporation and myFICO Consumer Services, which are corporate affiliates, and which will be referred to together as Fair Isaac.  Defendants are Experian Information Solutions, Inc., which I shall refer to as Experian; Trans Union LLC, which I shall refer to as Trans Union or TU; and VantageScore Solutions, LLC.  I will collectively refer to Experian, TU, and VantageScore LLC as the Defendants.  A corporation is a person as that term is used in these instructions.  Thus the term person can apply to all parties in this case.

Plaintiffs allege that Fair Isaac owns a trademark in the term "300-850" (pronounced "300 dash 850"), which is the scoring range for its FICO credit score scoring service.  Plaintiffs allege Defendants unlawfully infringed this trademark through Defendants' marketing, advertising, and sales of their own credit scoring services.  Defendants deny these allegations.

Defendants allege a counterclaim against Plaintiffs, claiming Fair Isaac's "300-850" registration issued by the United States Patent and Trademark Office should be canceled because it was obtained through Fair Isaac's fraud on the United States Patent and Trademark Office.  Fair Isaac denies this allegation.

It will be your duty to decide from the evidence whether a party is entitled to a verdict against another party.

From the evidence you will decide what the facts are.  You are entitled to consider that evidence in the light of your own observations and experiences in the affairs of life.  You will then apply those facts to the law that I give you in these and in my other instructions, and in that way reach your verdict.  You are the sole judges of the facts; but you must follow the law as stated in my instructions, whether you agree with it or not.

15

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness says, or only part of it, or none of it.

In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any motives they may have for testifying a certain way, their manner while testifying, whether they said something different at an earlier time, the general reasonableness of their testimony and the extent to which their testimony is consistent with other evidence that you believe.

Do not allow sympathy or prejudice to influence you.  The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

You should not take anything I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

Source:        Eighth Circuit Model Jury Instruction 1.01.

16

## JURY INSTRUCTION NO. 9

### <u>OUTLINE OF TRIAL</u>

The trial will proceed in the following manner:

First, the Plaintiffs' attorney may make an opening statement.  Next, the Defendants' attorney may make an opening statement.  An opening statement is not evidence but is simply a summary of what the attorney expects the evidence to be.

The Plaintiffs will then present evidence and counsel for the Defendants may cross-examine.  Following the Plaintiffs' case, the Defendants may present evidence and Plaintiffs' counsel may cross-examine.

After presentation of evidence is completed, the attorneys will make their closing arguments to summarize and interpret the evidence for you.  As with opening statements, closing arguments are not evidence.  The Court will instruct you further on the law.  After that you will retire to deliberate on your verdict.

<u>Source</u>:        Eighth Circuit Model Jury Instruction 1.06.

17

## JURY INSTRUCTION NO. 10

## **PRELIMINARY INSTRUCTION – TRADEMARK**

Plaintiffs seek damages against Defendants for trademark infringement and unfair competition.  Defendants contend the claimed trademark is invalid and not protectable, and, even assuming it is valid, deny infringing the trademark.  To help you understand the evidence that will be presented in this case, I will explain some of the legal terms you will hear during this trial.

A trademark is a word, a name, or a symbol, or a combination thereof, that indicates the source of goods or services.  The owner of a valid trademark has the right to exclude others from using that trademark.

A person acquires the right to exclude others from using a trademark by being the first to use it in the marketplace.  Rights in a trademark are obtained only through commercial use of the mark.  The owner of a trademark has the right to exclude others unless the trademark has been abandoned.

A valid trademark owner may enforce the right to exclude others from using the trademark in an action for infringement.

In this case, Fair Isaac contends that Defendants have infringed its alleged trademark of "300-850."  Plaintiffs have the burden of proving by a preponderance of the evidence that the term "300-850" is a valid trademark.  Plaintiffs also have the burden of proving by a preponderance of the evidence that Defendants infringed Fair Isaac's claimed trademark and that any such infringement caused damage to the Plaintiffs.  Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that a defendant infringed Fair Isaac's trademark.

Defendants assert the following defenses:

1.   **Functional versus nonfunctional:**  That the term "300-850" is functional and therefore not protected;

2.   **Fair Use:**  That Defendants fairly used their own scoring ranges to describe their goods or services, not as trademarks;

3.   **Waiver:**  That Plaintiffs waived their claims by delaying for an inexcusably long time before taking action against alleged infringers to enforce their claimed trademark;

18

4.   **Acquiescence:**  That Plaintiffs, through actions or words, gave Experian and Trans Union their effective consent for Experian and Trans Union to use Plaintiffs' claimed trademark;

5.   **Unclean Hands:**  That Plaintiffs engaged in unfair conduct related to their trademark claims; and

6.   **With respect to Defendant Trans Union only, Release:**  Trans Union asserts that Plaintiffs have released it from liability for its use of the term "300-850."

Defendants have the burden of proving these defenses by a preponderance of the evidence.

Defendants also assert a counterclaim against Plaintiffs.  Defendants claim that Fair Isaac's trademark registration for "300-850" should be canceled because it was obtained as a result of Fair Isaac's fraud on the United States Patent and Trademark Office.   Defendants have the burden of proving this counterclaim by a preponderance of the evidence.

<u>Source</u>:      Ninth Circuit Model Civil Jury Instructions 15.0 (2007).

19

## II.    INSTRUCTIONS FOR USE DURING TRIAL

20

## A.    INSTRUCTIONS ON WHICH THE PARTIES AGREE

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 11

## <u>DEMONSTRATIVE SUMMARIES NOT RECEIVED AS EVIDENCE</u>

Certain charts and summaries have been shown to you in order to help explain the facts disclosed by the books, records, or other underlying evidence in the case. Those charts or summaries are used for convenience. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the books, records or other underlying evidence.

<u>Source</u>:         *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 2.10A (2008).

22

## JURY INSTRUCTION NO. 12

### DUTIES OF JURY:  RECESSES

We are about to take a recess and I remind you of the instruction I gave you earlier.  During this recess or any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  If anyone tries to talk to you about the case, please let me know about it immediately.  [Do not read, watch or listen to any news reports of the trial.]  Finally, keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

I may not repeat these things to you before every recess, but keep them in mind throughout the trial.

Source:          Eighth Circuit Model Jury Instruction 2.01.

23

## JURY INSTRUCTION NO. 13

### <u>JUDICIAL NOTICE</u>

I have decided to accept as proved the following fact[s]: _____.
You must accept [this] [these] fact[s] as proved.

<u>Source</u>:        Eighth Circuit Model Jury Instruction 2.04.

24

## JURY INSTRUCTION NO. 14

### <u>EVIDENCE ADMITTED AGAINST ONLY ONE PARTY</u>

Each party is entitled to have the case decided solely on the evidence which applies to that party.  Some of the evidence in this case is limited under the rules of evidence to one of the parties, and cannot be considered against the others.

The evidence you [are about to hear] [just heard] can be considered only in the case against _____.

<u>Source</u>:        Eighth Circuit Model Jury Instruction 2.08A.

25

## JURY INSTRUCTION NO. 15

### **EVIDENCE ADMITTED FOR LIMITED PURPOSE**

The evidence [(you are about to hear) (you have just heard)] may be considered by you only on the [(issue) (question)] _____.  It may not be considered for any other purpose.

<u>Source</u>:        Eighth Circuit Model Jury Instruction 2.08B.

26

## JURY INSTRUCTION NO. 16

### RULE 1006 SUMMARIES

You will remember that certain [schedules] [summaries] [charts] were admitted in evidence.  You may use those [schedules] [summaries] [charts] as evidence, even though the underlying documents and records are not here. [However, the [accuracy] [authenticity] of those [schedules] [summaries] [charts] has been challenged.  It is for you to decide how much weight, if any, you will give to them.  In making that decision, you should consider all of the testimony you heard about the way in which they were prepared.]

Source:      Eighth Circuit Model Jury Instruction 2.10B.

27

**B.     PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTION**

28

## JURY INSTRUCTION NO. 17

## <u>DEPOSITION TESTIMONY</u>

Testimony will now be presented to you in the form of a deposition. A deposition is the recorded answers a witness made under oath to questions asked by lawyers before trial. The deposition testimony to be offered [was recorded in writing and now will be read to you] [was electronically videotaped and that recording now will be played for you]. You should consider the deposition testimony, and judge its credibility, as you would that of any witness who testifies here in person. [You should not place any significance on the manner or tone of voice used to read the witness's answers to you.].

**Authority:**

• *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 2.12 (2008).

29

## C.    DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTION

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 18

## **<u>DEPOSITION TESTIMONY</u>**

You are about to be presented with testimony by playing video-taped depositions, consisting of sworn recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case.  The testimony of a witness who, for some reason, cannot be present to testify from the witness stand may be presented in writing under oath or on a video recording played on a television set.  Such testimony is entitled to the same consideration, and is to be judged as to credibility, and weighted, and otherwise considered by the jury, in so far as possible, in the same way as if the witness had been present, and had testified from the witness stand.

Source:     *Hounsell v. Farmers Cooperative Co.*, Jury Instructions, May 15, 2009, Civ. No. 07-2557 (ADM/JSM) (Docket #67)

31

## III.    INSTRUCTIONS FOR USE AT CLOSE OF TRIAL

NEWYORK 7309435 (2K)

## A.    INSTRUCTIONS ON WHICH THE PARTIES AGREE

33

## JURY INSTRUCTION NO. 19

### **JUDGE'S OPINION**

Neither in these instructions nor in any ruling, action, or remark that I have made during the course of this trial have I intended to give any opinion or suggestion as to what your verdicts should be.

[*If applicable*: During this trial I have occasionally asked questions of witnesses in order to bring out facts not then fully covered in the testimony. Do not assume that I hold any opinion on the matters to which my questions related.]

**Authority:**

• *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 3.02 (2008).

34

## JURY INSTRUCTION NO. 20

## <u>LIABILITY OF CORPORATION</u>

Under the law, a corporation considered to be a person. A corporation can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

**Authority:**

• *Ninth Circuit Manual of Model Jury Instructions: Civil* § 4.2 (2007).

35

## JURY INSTRUCTION NO. 21

## <u>EQUAL STANDING</u>

This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as a private individual. All persons, including corporations, partnerships, unincorporated associations, and other organizations, stand equal before the law, and are to be dealt with as equals in a court of justice.

<u>Source</u>:      *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM); 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions – Civil* § 103.12 at 117 (5th ed. 2000).

36

## JURY INSTRUCTION NO. 22

## **DIRECT AND CIRCUMSTANTIAL EVIDENCE**

There are, generally speaking, two types of evidence from which you may properly find the truth as to the facts of a case.  One is direct evidence – such as the testimony of any eyewitness.  The other is indirect or circumstantial evidence – the proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that you find the facts in accordance with a preponderance of all the evidence in the case, both direct and circumstantial.

Source:       *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM). *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.1 (2000 edition) (same language); *Ninth Circuit Manual of Model Jury Instructions: Civil* § 1.9 (2007) (similar statement of principles); 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 101.42 at 54 (5th ed. 2000) (similar statement of principles).

37

## JURY INSTRUCTION NO. 23

## THE COURT'S RULING ON OBJECTIONS

Lawyers have a duty to object to evidence that they believe has not been properly offered. You should not be prejudiced in any way against lawyers who make these objections or against the parties they represent. If I have sustained an objection, you must not consider that evidence and you must not speculate about whether other evidence might exist or what it might be. If I have overruled an objection, you are free to consider the evidence that has been offered.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

**Authority:**

- *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.4 (2000 edition) (same language);

- *Ninth Circuit Manual of Model Jury Instructions: Civil* § 1.10 (2007) (similar statement of principles and including the last paragraph verbatim);

- 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 101.49 at 66 (5th ed. 2000) (similar statement of principles).

38

## JURY INSTRUCTION NO. 24

## <u>DUTIES AS JURORS</u>

Now that you have heard the evidence and the argument, it becomes my duty to give you the instructions as to the law applicable to this case.

It is your duty as jurors to follow the law as I shall state it to you, and to apply that law to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by me.

Counsel have quite properly referred to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case, or what that opinion is. It is not my function to determine the facts, but rather yours.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be governed by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

<u>Source</u>:     *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 25

## <u>NOTES</u>

You have been allowed to take notes during the course of the trial, and you may take these notes with you to the jury room.  You should not consider these notes binding or conclusive, whether they are your notes or those of another juror. The notes should be used as an aid to your memory and not as a substitute for it. You should not give greater weight to a particular bit of evidence solely because it has been reduced to writing.  I want to make clear to you that it is your recollection of the evidence that should control, and you should disregard anything contrary to your own recollection that may appear from your own notes or those of another juror.

<u>Source</u>:    *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 26

## <u>WHAT IS EVIDENCE</u>

Statements and arguments of counsel are not evidence in the case.  When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as proved.

Unless you are otherwise instructed, the evidence in the case always consists of the sworn testimony of the witnesses, regardless of who may have called them; and all exhibits received in evidence, regardless of who may have produced them; and all facts that may have been admitted or stipulated.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.

<u>Source</u>:        *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

41

## JURY INSTRUCTION NO. 27

## <u>LAWYER STATEMENTS</u>

If a lawyer asks a witness a question that contains an assertion of fact, you may not consider the assertion as evidence of that fact.  The lawyers' statements are not evidence.

<u>Source</u>:     *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

42

## B.    PLAINTIFFS' ADDITIONAL PROPOSED INSTRUCTIONS

43

## JURY INSTRUCTION NO. 28

## GENERAL EXPLANATION OF CLOSING INSTRUCTIONS

Members of the jury, the instructions I gave at the beginning of the trial and during the trial remain in effect. I now give you some additional instructions.

You must, of course, continue to follow the instructions I gave you earlier, as well as those I give you now. You must not single out some instructions and ignore others, because *all* are important. This is true even though some of those I gave you at the beginning of trial and during trial are not repeated here.

The instructions I am about to give you now as well as those I gave you earlier are in writing and will be available to you in the jury room. I emphasize, however, that this does not mean they are more important than my earlier instructions. Again, *all* instructions, whenever given and whether in writing or not, must be followed.

I will start by giving you some instructions regarding the evidence and guides for your consideration of the evidence. After those instructions, I will give you some lengthy instructions about the parties' claims, defenses, damages, and counterclaim and defenses.

**Authority:**

- *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 3.01 (2008) (same as above except for the addition of the last paragraph).

44

## JURY INSTRUCTION NO. 29

### <u>BURDEN OF PROOF</u>

In these instructions you are told that your verdict depends on whether you find certain facts have been proved. The burden of proving a fact is on the party whose claim depends on that fact, unless I instruct you otherwise.

The party who has the burden of proving a fact must prove it by the greater weight of the evidence, unless I instruct you otherwise. To prove something by the greater weight of the evidence is to prove that it is more likely true than not true. This is determined by considering all of the evidence and deciding which evidence is more believable.

The greater weight of the evidence is not necessarily determined by the greater number of witnesses or exhibits that a party has presented.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard that applies in criminal cases. It does not apply in civil cases such as this. You should, therefore, put it out of your mind.

**Authority:**

- *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 3.04 (2008) (modified slightly to allow for later instruction on the burden clear-and-convincing evidence).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 30

## <u>USE OF DEPOSITIONS</u>

As I explained in my instructions before this trial began, some testimony is in the form of sworn recorded answers to questions asked of a witness before the trial. This is known as deposition testimony. This kind of testimony is used when a witness, for some reason, cannot be present to testify in person. You should consider and weigh deposition testimony in the same way as you would the testimony of a witness who has testified in court.

**Authority:**

- *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.5 (2000 edition) (same language)

- 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 105.02 at 167 (5th ed. 2000) (similar statement of principles).

46

## JURY INSTRUCTION NO. 31

## <u>CREDIBILITY OF WITNESSES</u>

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of it, or none of it.

In deciding what testimony to believe, you may consider the witness's intelligence, the opportunity the witness had to see or hear the things testified about, the witness's memory, any motives the witness may have for testifying a certain way, the manner of the witness while testifying, whether the witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

**Authority:**

- *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil* § 3.03 (2008).

47

## JURY INSTRUCTION NO. 32

## <u>PRIOR INCONSISTENT STATEMENT</u>

A witness may be discredited by evidence contradicting what that witness said, or by evidence that at some other time the witness has said or done something, or had failed to say or do something, that is inconsistent with the witness's present testimony.

It's up to you to determine whether a witness has been discredited, and if so, to give the testimony of that witness whatever weight that you think it deserves.

**Authority:**

• *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.3 (2000 edition) (same language);

• 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 105.09 at 174-75 (5th ed. 2000) (similar statement of principles).

48

## JURY INSTRUCTION NO. 33

## <u>OPINION EVIDENCE (EXPERT WITNESSES)</u>

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

**Authority:**

- *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.10 (2000 edition) (same language);

- *Ninth Circuit Manual of Model Jury Instructions: Civil* § 2.11 (2007) (similar principles).

49

## JURY INSTRUCTION NO. 34

## SPOLIATION

There is evidence from which you can conclude that Experian or Trans Union or both intentionally or recklessly destroyed relevant evidence, including written communications and notes regarding the scoring range for VantageScore or customer confusion regarding credit scores. In your deliberations, if you conclude that this is the case—that is, that the loss of any of these items was due to the intentional or reckless conduct of Experian or Trans Union or both, or that the loss occurred after this lawsuit was filed—then you may conclude that the missing evidence would have been unfavorable to Experian or Trans Union or both.

**Authority:**

- *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.17 (2000 edition) (similar language);

- *Stevenson v. Union Pacific R. Co.,* 354 F.3d 739, 746-48 (8th Cir. 2004) (an adverse inference is warranted when relevant evidence is destroyed when a party knew or should have known it had an obligation to preserve);

- *Lexis-Nexis v. Beer,* 41 F. Supp.2d 950, 954-55 (D. Minn., 1999) (obligation to preserve evidence starts from moment party knows or reasonably should know that litigation is reasonably foreseeable);

- *E*Trade Securities LLC v. Deutsche Bank AG,* 230 F.R.D. 582, 589 (D. Minn. 2005) (there is no need to show bad faith if the destruction of evidence occurs after litigation is imminent or has begun).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 35

## PRIOR SWORN STATEMENT

If you find that a witness made an earlier sworn statement that conflicts with the witness's trial testimony, you may consider that contradiction in deciding how much of the trial testimony, if any, to believe. You may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact or a small detail; whether the witness had an explanation for the inconsistency; and, whether that explanation made sense to you.

Your duty is to decide, based on all the evidence and your own good judgment, whether the earlier statement was inconsistent; and if so, how much weight to give to the inconsistent statement in deciding whether to believe the earlier statement or the witness's trial testimony.

**Authority:**

- *Pattern Jury Instruction for Civil Practice in the Superior Court of the State of Delaware* § 23.2 (2000 edition) (same language);

- 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 105.04 at 168-69 (5th ed. 2000) (similar statement of principles).

51

**C.    DEFENDANTS' ADDITIONAL PROPOSED INSTRUCTIONS**

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 36

### GENERAL EXPLANATION OF CLOSING INSTRUCTIONS

Members of the jury, the instructions I gave at the beginning of the trial and during the trial remain in effect. I now give you some additional instructions.

You must, of course, continue to follow the instructions I gave you earlier, as well as those I give you now. This is true even though some of those I gave you at the beginning of trial are not repeated here.

The instructions I am about to give you now are in writing and will be available to you in the jury room. I emphasize, however, that this does not mean they are more important than my earlier instructions. Again, all instructions, whenever given and whether in writing or not, must be followed.

Source:    *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

53

## JURY INSTRUCTION NO. 37

## <u>BURDEN OF PROOF</u>

The burden is on the plaintiff in a civil action, such as this, to prove every essential element of the claim by a preponderance of the evidence.  If the proof should fail to establish any essential element of Plaintiffs' claim by a preponderance of the evidence in the case, the jury should find for Defendants as to that claim.

To establish a claim by a preponderance of the evidence means to prove that something is more likely so than not so.  In other words, the greater weight of the evidence in the case means such evidence as, when considered and compared with that opposed to it, has more convincing force, and produces in your minds the belief that what is sought to be proved is more likely true than not true.  This rule does not, of course, require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, the jury may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

<u>Source</u>:      *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 38

## ADDITIONAL INSTRUCTION REGARDING BURDEN OF PROOF

When I say in these instructions that a party has the burden of proof on any proposition, or use the expression "if you find," or "if you decide," I mean you must be persuaded, considering all the evidence in the case, that the proposition is more probably true than not true.

Source:    *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 39

## <u>CONSIDER ONLY EVIDENCE</u>

You are to consider only the evidence in the case.  But in your consideration of the evidence you are not limited to the bald statements of the witnesses.  In other words, you are not limited to what you see and hear as the witnesses testify.  You are permitted to draw, from facts that you find have been proved, such reasonable inferences as seem justified in the light of your experience.

Inferences are deductions or conclusions that reason and common sense lead you to draw from facts that have been established by the evidence in the case.

You will make your decision based on what you recall of the evidence.  You will not have a written transcript to consult.

<u>Source</u>:       *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

56

## JURY INSTRUCTION NO. 40

## **DEPOSITION TESTIMONY**

During the trial, certain testimony was presented to you by playing video-taped deposition, consisting of sworn recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys for the parties to the case.  The testimony of a witness who, for some reason, cannot be present to testify from the witness stand may be presented in writing under oath or on a video recording played on a television set.  Such testimony is entitled to the same consideration, and is to be judged as to credibility, and weighted, and otherwise considered by the jury, in so far as possible, in the same way as if the witness had been present, and had testified from the witness stand.

Source:     *Hounsell v. Farmers Cooperative Co.*, Jury Instructions, May 15, 2009, Civ. No. 07-2557 (ADM/JSM) (Docket #67)

57

## JURY INSTRUCTION NO. 41

## CREDIBILITY OF WITNESSES

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character of the testimony given, or by evidence to the contrary of the testimony given.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to show whether a witness is worthy of belief. Consider each witness's intelligence, motive and state of mind, and demeanor or manner while on the stand. Consider the witness's ability to observe the matters as to which the witness has testified, and whether the witness impresses you as having an accurate recollection of these matters. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such weight, if any, as you may think it deserves.

You may, in short, accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or non-existence of any fact. You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

Source:     *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

58

# JURY INSTRUCTION NO. 42

# **IMPEACHMENT**

A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something, or has failed to say or do something that is inconsistent with the witness' present testimony.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

An act or omission is "knowingly" done, if voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

Source:     *Atrix International, Inc., et al. v. Associated Financial Group, LLC*, Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D. Minn.) (ADM/JSM).

59

## JURY INSTRUCTION NO. 43

## <u>DIRECT CAUSE</u>

A "direct cause" is a cause that had a substantial part in bringing about the injury.

Source:        *Atrix International, Inc., et al. v. Associated Financial Group, LLC*,
               Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D.
               Minn.) (ADM/JSM).

60

## JURY INSTRUCTION NO. 44

## <u>INFERENCES - DEFINED</u>

During the trial you may have heard the attorneys use the term "inference," and in their arguments they may have asked you to infer, on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical conclusion that a disputed fact exists on the basis of another fact that has been shown to exist.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence. Both sides have asked you to draw a set of inferences. It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion that you, the jury, are permitted to draw – but not required to draw – from the facts that have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

So, while you are considering the evidence presented to you, you are permitted to draw, from the facts that you find to be proven, such reasonable inferences as would be justified in light of your experience.

<u>Source</u>:   Moore's Modern Federal Jury Instructions, Instructions 75-1 (vol. 4 2008).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 45

## <u>TWO OR MORE DEFENDANTS</u>

There are three defendants in this lawsuit.  Answer the questions for each defendant as though the lawsuits were being tried separately.  Each defendant must be judged separately.  Do not let your judgment about one defendant influence your judgment about the others.  View these instructions as they apply individually to Trans Union, Experian, and Vantage Score.

Source:     4 Minn. Prac. Jury Instr. Guides (CIVJIG 15.15 (5th ed.)) (2009);
            *Ruberg v. Skelly Oil Co.*, 297 N.W.2d 746, 752 (Minn. 1980);
            *Matthew v. Mills*, 288 N.W.2d 841, 844 (1970).

NEWYORK 7309435 (2K)

# IV. INSTRUCTIONS FOR PLAINTIFFS' CLAIMS, THE DEFENDANTS' DEFENSES, AND DAMAGES

NEWYORK 7309435 (2K)

A.     **TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, DECEPTIVE TRADE PRACTICES, AND PASSING OFF CLAIMS**

64

1.     **PLAINTIFFS' PROPOSED INSTRUCTIONS**

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 46

## **TRADEMARK DEFINED**

I will now give you some instructions concerning trademark law and the particular questions of trademark law that you will be asked to consider.

A "trademark" or "mark" can be any word, name, symbol, or device, or any combination of words, symbols, or devices, used by a company to identify and distinguish goods or services from those manufactured or offered by others and to indicate the source of the goods, even if that source is generally unknown.

A "service mark" is the same thing as a trademark except that trademarks are for goods and service marks are for services. The term trademark or mark, as used in these instructions, means both trademark and service mark.

A trademark can be almost anything at all that is capable of identifying source, such as a word, a particular shape, a particular sound, or numbers. Fair Isaac's claims in this case are based on both numbers (300-850) and words ("Fair Isaac" and "FICO").

Authority:

- 15 U.S.C. § 1127 (defining the term "trademark" as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown");

- 15 U.S.C. § 1053 (service marks can be registered and "shall be entitled to the protection provided in this chapter in the case of trademarks");

- *Ninth Circuit Manual of Model Jury Instructions: Civil* § 15.0 (2007) (providing for a preliminary trademark instruction that include a definition of trademark);

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* §§ 159.40, 159.41 at 845-46 (5th ed. 2000) (defining mark and service mark similarly);

66

- *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985) (defining the word "trademark" by quoting from 15 U.S.C. § 1127);

- *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162, 163-64 (1995) (noting that courts and the PTO "have authorized for use as a mark a particular shape (of a Coca-Cola bottle), a particular sound (of NBC's three chimes), and even a particular scent (of plumeria blossoms on sewing thread)");

- *Tanel Corp. v. Reebok Intern., Ltd.*, 774 F.Supp. 49, 52 (D. Mass., 1990) (concluding that registered trademark "360°" for shoes is a suggestive mark);

- *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 53 (2nd Cir. 1997) (noting that "409" is a famous trademark owned by Clorox Co.);

- *Coca-Cola Co. v. Purdy*, 2003 WL 202582, *2 (D. Minn., Jan. 23, 2003) (noting that "McDonalds" is a famous or distinctive trademark owned by McDonalds Corporation).

## JURY INSTRUCTION NO. 47

## OBTAINING A TRADEMARK

The first person to use a trademark in the marketplace in a manner to identify source or origin acquires the right to prevent others from using the same mark or a similar mark that is likely to cause confusion in the marketplace. Rights in a trademark are obtained only through commercial use of the trademark. Rights in a trademark can be acquired in this manner under the common law and without registration of the trademark with the United States Patent and Trademark Office.

A trademark owner does not need to use any abbreviation or symbol with its products or services—such as TM or SM or ®—to preserve its rights in a mark that is not registered or not yet registered as a trademark with the United States Patent and Trademark Office. There is also no requirement that a trademark owner use any abbreviation or symbol with its products or services *after* a mark is federally registered.

Authority:

- 15 U.S.C. § 1114(1) (allowing for a civil action against any infringer of a registered mark), § 1125 (allowing for civil action against any infringer of an unregistered mark);

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 159.02 at 816 (5th ed. 2000) (recommending some similar language);

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at 149 (ABA Publishing, 2008) (proposing some similar language);

- *Trademark Manual of Examining Procedure* § 906 (5th ed.).

68

## JURY INSTRUCTION NO. 48

### REGISTERING TRADEMARKS

It is not necessary for a trademark owner to obtain a federal registration of its mark to assert or protect its rights in the mark. But registration of a trademark provides certain additional rights and benefits to the owner.

To obtain a federal trademark registration, the owner of the mark has to file an application with the United States Patent and Trademark Office. If the Patent and Trademark Office determines that the legal requirements for registration have been met (including that the mark is distinctive), the mark will be published by the Patent and Trademark Office so that anyone who opposes the registration of the mark has an opportunity to do so. If no one opposes the application, the mark will then become registered.

Here, the parties agree that Fair Isaac owns four federal trademark registrations that consist of or incorporate the term 300-850 for credit-scoring services. Fair Isaac filed each of its applications for registration of these marks with the United States Patent and Trademark Office on February 4, 2004. They were published by the Patent and Trademark Office at different times and no one opposed any of the applications.

The four registrations for these applications then issued as follows: U.S. Registration Number 3,080,499 issued on April 11, 2006; U.S. Registration Number 3,083,563 issued on April 18, 2006; U.S. Registration Number 3,121,526 issued on July 25, 2006; and U.S. Registration Number 3,194,885 issued on January 2, 2007.

Fair Isaac's four federal trademark registrations are prima-facie evidence that the 300-850 marks are valid and that Fair Isaac has the exclusive right to use the 300-850 marks on or in connection with credit-scoring services. If something is "prima facie," it means that it is presumed to be true unless it is otherwise disproved by sufficient evidence to the contrary.

Fair Isaac also owns federal trademark registrations for the "Fair Isaac" and "FICO" marks. The parties agree that each of those trademarks is valid and protectable.

Authority:

69

- 15 U.S.C. § 1051(a)(1) (providing for registration as an option)

- 15 U.S.C. § 1057(b) (registration is "prima-facie evidence of the validity of the registered mark and of . . . the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate"), § 1115(a) ("Any . . . mark registered on the principle register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to sue the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations state there");

- 15 U.S.C. § 1062(a) (describing publication process), § 1063 (describing opposition process and registration issuance after the publication process);

- *Everest Capital, Ltd. v. Everest Funds Mgmt. L.L.C.*, 393 F.3d 755, 759 (8th Cir. 2005) ("[S]ection 43 of the Lanham Act grants to qualifying unregistered marks comparable protection from infringement and unfair competition") (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992));

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at 159 (ABA Publishing, 2008) (instruction on same general subject matter);

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 159.03 at 817 (5th ed. 2000) (instruction on same general subject matter).

NEW YORK 7309435 (2K)

## JURY INSTRUCTION NO. 49

## **TRADEMARK INFRINGEMENT: BURDEN OF PROOF**

With respect to Fair Isaac's claim for trademark infringement, Fair Isaac has the burden of proving three points by the greater weight of the evidence:

1.  that the trademark under consideration—whether it's one of Fair Isaac's "300-850" marks or the "Fair Isaac" or "FICO" trademarks—is a valid trademark;

2.  that Fair Isaac owns that trademark; and,

3.  that a defendant used that trademark in a manner that is likely to cause confusion among ordinary consumers regarding the source of its products or services.

If you find that Fair Isaac has proven each of these elements by the greater weight of the evidence with respect to a particular defendant, your verdict should be for Fair Isaac against that defendant. If you find that Fair Isaac has failed to prove any of these elements with respect to a particular defendant, your verdict should be for that defendant.

I will now instruct you on how to apply each of these elements to the evidence before you.

Authority:

-   15 U.S.C. § 1114(1) (setting forth the elements above for proving infringement of a registered mark), 1125(a) (allowing civil action for infringement);

-   Minn. Stat. § 325D.43 et seq.;

-   *Woodroast Sys. v. Restaurants Unlimited*, 793 F. Supp. 906, 917-18 (D. Minn. 1992) (describing the elements);

-   *Conopco, Inc. v. May Dept. Stores Co.*, 784 F. Supp. 648, 669 (E.D. Mo. 1992) (trademark owner had the burden of proving infringement by a preponderance of the evidence) (citing *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380-81 (8th Cir.1965));

-   *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 398 (8th Cir. 1987) (describing the likelihood of confusion factor);

71

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions--Civil* at 858, § 159.60 (5th ed. 2000) (instruction on same subject matter).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 50

### THE "FAIR ISAAC" AND "FICO" MARKS

There are three sets of marks involved in Fair Isaac's claims. With respect to two sets of those marks—the "Fair Isaac" and "FICO" marks—there is no dispute that Fair Isaac owns the marks and that the marks are valid. Therefore, with respect to those two sets of marks, you must find that Fair Isaac owns those marks and that the marks are valid trademarks.

73

## JURY INSTRUCTION NO. 51

## <u>LICENSEE ESTOPPEL</u>

A trademark licensee—including any joint venture or other organization of which the licensee is a controlling member—cannot challenge the validity of the licensed trademark. Here, Fair Isaac asserts that this principle of law prohibits the defendants from challenging the validity of Fair Isaac's 300-850 marks.

A licensor-licensee relationship can be created one of two ways: expressly or impliedly. An express license is one that is created by an oral or written agreement with terms that directly authorize one party to the agreement to use a trademark of another party. An implied license is one that is not express but, instead, that can be presumed from the actions of the parties.

The actions of the parties and the circumstances of their relationship determine whether an implied license exists. Factors to consider in this determination include but are not limited to whether:

1. the licensor permitting the licensee to use the mark;

2. the parties having engaged in a close working relationship;

3. the licensor provided the licensee with samples of the mark;

4. the licensee provided samples of marketing materials using the mark to the licensor for review; and,

5. the parties justifiably relied on each other's familiarity with the standards and procedures of the other to ensure consistent quality use of the mark.

If you find that a defendant is a licensee of Fair Isaac's 300-850 mark, you must find that defendant is prohibited from claiming that Fair Isaac's trademark is invalid.

Authority:

- *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279-80 (8th Cir. 1977) (upholding trial court's order for dismissal because licensee's trademark claims attempted to question the validity of its licensor's trademark);

74

- *Lutheran Assoc. of Missionaries and Pilots, Inc. v. Lutheran Assoc. of Missionaries and Pilots, Inc.*, 2004 WL 2730104, *8 (D. Minn., Nov. 19, 2004) ("The existence of an implied license depends on the objective conduct of the parties");

- *Northwest Airlines, Inc. v. NWA Federal Credit Union*, 2004 WL 1968662 at *5 (D. Minn., Sept. 2, 2004) (implied license found where licensee provided sample marketing material to licensor for review and the licensor provided samples of the mark);

- 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:1 (West, 2009) (a trademark license is a limited permit to another to use the mark); *id.* at § 18:43.50 ("Some courts will imply both a trademark license and a requirement for quality control from the dealings of the parties"); *id.* at § 18:63 ("a number of cases have held that a trademark licensee is estopped from challenging the validity of the licensor's mark");

- 3 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:54 (4th Ed. 2007) ("A trademark license gives one party the right to use another party's mark . . . [b]ut a trademark license need not be in writing; it can be implied by the conduct of the parties.");

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at 152-53 (ABA Publishing, 2008) (proposing a similar definition of trademark license).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 52

### THE "300-850" MARKS AND SECONDARY MEANING

With respect to the 300-850 set of marks, there is no dispute that Fair Isaac owns those marks as well. Therefore, I instruct you to find that Fair Isaac owns those marks. But the defendants do dispute whether the 300-850 marks are valid.

Because Fair Isaac's 300-850 marks are federally registered, you must presume that those trademarks are valid and have acquired secondary meaning, which is a concept I will explain to you in a moment. Therefore, the defendants have the burden of proving by the greater weight of the evidence that the 300-850 marks have *not* acquired secondary meaning.

A trademark acquires secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective purchasers is not the product or service itself, but the identification of the product or service with a single source. The consumer does not need to know the name or identity of the particular source, just that the mark is associated with a single, albeit anonymous, source.

There are no particular requirements that need to be proven to show secondary meaning but in determining whether Fair Isaac's 300-850 marks have acquired secondary meaning, you can consider a number of factors including:

1.   any deliberate copying of the marks by the defendants;

2.   any evidence of actual confusion among consumers;

3.   the results of consumer surveys;

4.   Fair Isaac's advertising featuring the trademarks; and,

5.   any anecdotal evidence showing consumer identification of the mark with its source.

With respect to evidence of deliberate copying, you can infer that a trademark has secondary meaning from evidence that the mark was deliberately copied by others.

With respect to actual confusion among consumers, evidence of actual confusion is evidence of secondary meaning. Actual confusion can be shown through direct evidence—that is, statements from actual or

76

potential consumers—or through consumer survey evidence that shows a likelihood of confusion among consumers.

Other factors bearing on secondary meaning include the length of time during which the owner of a trademark has used the mark and whether the use has been exclusive and continuous. No absolute time span of use is required to establish secondary meaning; a trademark can achieve secondary meaning almost immediately upon its first use. The use by the owner does not need to be exclusive but instead can be "substantially exclusive," if the use by others during that time was inconsequential or infringing.

In addition, the size of a company and its sales figures are relevant evidence from which to infer the existence of secondary meaning. The relative market dominance of a trademark holder versus copiers supports an inference of secondary meaning.

Authority:

*Presumption of validity*

- 15 U.S.C. §§ 1057(b) and 1115(a);

- *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir. 1984) (registration of a trademark under the Lanham Act creates a presumption of validity and secondary meaning);

- *Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co.*, 199 F.2d 407, 414 (8th Cir. 1952) (same);

- *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992) (same);

77

*Defining secondary meaning*

- *Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330-33 (8th Cir. 1985) ("[s]econdary meaning is an association formed in the minds of the consumers between the mark and the source of origin of the product");

- *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) (similar discussion);

- 15 U.S.C. § 1127;

*Secondary-meaning factors in general*

- *Stuart Hall,* 51 F.3d at 789 ("There are, however, a range of factors that can contribute to a determination of secondary meaning including consumer survey, deliberate copying of the mark, advertising featuring the trade dress at issue, expenditure of such advertising, and anecdotal evidence showing consumer identification of the trade dress with its source.");

- 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §§ 15:11, 15:36, 15:37 (West 2009) (setting out secondary meaning factors);

*Deliberate copying*

- *Ballistic Prods. v. Precision Reloading*, 2003 WL 21754816 at *6 (D. Minn. July 28, 2003) ("The existence of secondary meaning of a mark may be inferred from evidence of deliberate copying of that mark.");

- *Animal Fair, Inc. v. AMFESCO Industries, Inc.*, 620 F. Supp. 175, 190 (D. Minn. 1985) ("An inference of secondary meaning arises when a defendant copies a plaintiff's design.");

- *Frosty Treats Inc. v. Sony Computer Entertainment America Inc.*, 426 F.3d 1001, 1005-06 (8th Cir. 2005) ("the existence of intentional copying could also establish secondary meaning");

NEWYORK 7309435 (2K)

*Actual confusion and survey evidence*

- 3 *McCarthy* § 15:37 ("evidence of actual confusion is strong evidence of secondary meaning");

- *Heartland Bank v. Heartland Home Finance, Inc.,* 335 F.3d 810, 819 (8th Cir. 2003) ("Generally, consumer surveys and testimony of consumers may be only *direct evidence* of secondary meaning and should be considered in determining whether a mark has acquired such meaning.");

- *Minnesota Specialty Corps v. Minnesota Wild Hockey Club*, 2002 WL 1763999 at *7 (D. Minn. July 26, 2002) (the court can consider a consumer survey on likelihood of confusion as evidence of secondary meaning);

*Length and exclusivity of use*

- *Stuart Hall*, 51 F.3d at 789-90 ("length and exclusivity of continuous use is a factor bearing on secondary meaning");

- 3 *McCarthy* § 15:53 (same);

*First use*

- *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1130 (Fed.Cir.1993) (secondary meaning can be rapidly achieved upon exposure through modern communications media);

- *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 731 (7th Cir. 1998) (Wood, J., dissenting) ("With the advent of massive advertising campaigns on television and in national news magazines, a new trademark may achieve wide usage and 'secondary meaning' within a matter of days or weeks, compared to the many years required in the days of more leisurely advertising.");

*Substantial exclusivity*

- *L.D. Kichler Co. v. Davoil, Inc.,* 192 F.3d 1349, 1352 (Fed. Cir. 1999) (standard of substantially exclusive use "makes allowance for use by others which may be inconsequential or infringing");

- *Trademark Manual of Examining Procedure* § 1212.05(b) (5th ed.);

*Size of company or dominance of the mark*

79

- 3 *McCarthy* § 15:49 ("the size of a company and its sales figures are relevant evidence from which to infer the existence of secondary meaning");

- *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp.2d 1121, 1130 (N.D.Cal. 2009) (a comparative market share of sales is relevant to secondary meaning).

80

## JURY INSTRUCTION NO. 53

## <u>THE LIKELIHOOD OF CONFUSION</u>

Next, you must consider whether the defendants used Fair Isaac's "300-850" marks, "FICO" mark, and "Fair Isaac" mark in a manner that is likely to cause confusion among ordinary consumers regarding the source, sponsorship, or affiliation of their products or services. Whether there is a "likelihood of confusion" is a common-sense question that you should answer based on a consideration of all the evidence. The factors that you can consider in determining whether confusion is likely include:

1. *The strength or weakness of a mark—that is, the level of its recognition in the relevant marketplace.* The more the consuming public recognizes a Fair Isaac mark as an indication of origin for Fair Isaac's goods, the more likely it is that consumers would be confused about the source of a defendant's goods if a defendant used similar numbers or terms in connection with the sale or promotion of its goods.

2. *The similarity of Fair Isaac's mark and the numbers or terms used by the defendants.* If the overall impression created by a Fair Isaac mark in the marketplace is similar to that created by a defendant's use of numbers or terms similar in appearance, there is a greater chance that consumers are likely to be confused by the defendant's use of such numbers or terms.

3. *The degree to which the products compete with each other.* If Fair Isaac used a mark and a defendant used numbers or terms on the same, related, or complimentary kinds of goods, there could be a greater likelihood of confusion about the source, sponsorship, or affiliation of the goods than otherwise would exist.

4. *A defendant's intent.* If you find that a defendant intended to pass off its goods as Fair Isaac's, you can infer a likelihood of confusion. But it is not necessary for Fair Isaac to prove that a defendant intended to pass off its goods as Fair Isaac's to show infringement. Evidence of an intention to pass off is strong evidence that confusion is

81

likely, but the absence of such an intention does not necessarily mean that confusion is unlikely.

5. *Incidents of actual confusion.* Fair Isaac does not have to prove that actual confusion has occurred; it is enough if Fair Isaac proves that confusion is likely to occur. But manifestations of actual confusion serve as strong evidence of a likelihood of confusion and can, in fact, be the best evidence of a likelihood of confusion.

6. *The type of product, its costs, and conditions of purchase.* The more sophisticated the potential buyers of goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution might be. Likewise, the less sophisticated the potential buyers of goods or the less costly the goods, the less careful and less discriminating the reasonably prudent purchaser exercising ordinary caution may be.

In light of these considerations and your common experience as citizens of the community, you must determine if relevant consumers—neither overly careful nor overly careless—would be confused about the source or origin of credit-scoring products or about whether one company's products were affiliated with or sponsored or endorsed by another company when they encounter credit scoring products in the marketplace.

No one factor is decisive. You should consider each factor and give it the weight you believe it deserves, based on the evidence presented. Also, these are not necessarily the only factors that might be relevant in a particular case. The ultimate inquiry always is whether, under all the circumstances, there exists a likelihood of confusion between Fair Isaac's trademarks and the allegedly infringing uses. Remember, likelihood of confusion is a common-sense issue and you should be guided by your own reaction to the evidence. The factors listed above are meant to help you in your analysis, not to replace your own perspective.

Finally, because there is a strong risk of customer confusion where licensees or distributors of a trademark use marks or terms similar to the trademark in promoting their own products, licensees and distributors have an affirmative obligation to use sufficiently different terms in order to avoid confusion.  If you find that Experian or Trans Union were licensees or distributors of Fair Isaac's trademarks and breached that obligation,

82

then there is more of a likelihood of consumer confusion about the source, sponsorship, or affiliation of the defendant's goods.

Authority:

*In general*

- Gateway, *Inc. v. Companion Prods.*, 384 F.3d 503, 509 (8th Cir. 2004) (describing the likelihood of confusion factors);

- *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir. 1996) (same);

- *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987) (same);

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* § 159.25 at 830 (5th ed. 2000).

*Strength or weakness of the mark*

- *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1428 (D. Minn. 1989) ("the strength of a mark depends on two factors—the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class");

- *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one.");

83

*Similarity*

- *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 761 (8th Cir. 2005) (in assessing the similarity of marks, the fact-finder "must look to the overall impression created by the marks and not merely compare individual features");

- *Eniva Corp. v. Global Water Solutions, Inc.*, 440 F. Supp.2d 1042, 1050 (D. Minn., 2006) ("In analyzing the similarity of the marks, a court must look to the overall impression created by the marks, not to the individual features of the marks.");

*Degree of competition*

- *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005) ("Where products are related, however, it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely.");

- *J & B Wholesale Distributing, Inc. v. Redux Beverages, LLC*, 621 F. Supp.2d 678, 685-686 (D. Minn. 2007) ("In assessing [the degree of competition], the court should consider "the extent to which the products differ in content, geographic distribution, market position and audience appeal.");

*Defendant's intent*

- *Squirtco*, 628 F.2d at 1091 ("intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement");

- *Northland Ins. Companies v. Blaylock*, 115 F. Supp.2d 1108, 1121 (D. Minn. 2000) (same);

*Incidents of actual confusion*

- *Mutual of Omaha*, 836 F.2d at 400 ("manifestations of actual confusion serve as strong evidence of a likelihood of confusion, . . . and may, in fact, be the best such evidence");

*Sophistication of the consumer*

84

- *Kemp*, 398 F.3d at 1058 ("actual confusion existed among sophisticated professional buyers, supports a finding of actual confusion");

- *Northland*, 115 F. Supp.2d at 1122 ) ("the court considers such factors as the type of product involved, its cost, the conditions of purchase, and the degree of care to be exercised by potential customers in making their purchasing decision");

*Licensee/distributor duty to avoid confusion*

- *Country Inns & Suites By Carlson, Inc. v. Two H.O. Partnership,* 2001 WL 1587903, *2 (D. Minn. Nov. 19, 2001) (the "quantum of proof necessary to establish a likelihood of confusion" can be less in cases involving former licensees than in cases involving non-licensees and that "common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks");

- *Downtown/Passport Internat'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214, 219 (8th Cir. 1988) (same);

- *E.G.L. Gem Lab Ltd. v. Gem Quality Instit., Inc.* 90 F. Supp.2d 277, 300 (S.D.N.Y. 2000) ("[A] licensee that wishes to create rights in a mark separate from the licensed mark has an affirmative obligation to choose a mark sufficiently different from the licensed mark to avoid confusion—'[t]he licensee trades upon the good will of the licensor at the licensee's peril.'");

- *Arnar-Stone Laboratories, Inc. v. Medical Supply Co.*, 1966 WL 7670, at *1 (N.D. Ill., Dec. 13, 1966) (finding distributor had particular duty to adopt a mark sufficiently distinct from the established product so as to avoid all possible confusion);

- *Cyclonaire Corp. v. United States Systems, Inc.*, 209 U.S.P.Q. 310, 314 (D. Kan. 1980) ("A party with a prior relationship with the first mark has a greater duty to adopt a clearly distinguishable mark than does a mere stranger");

- 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25.31 (West 2009) ("a former licensee who continues use of a mark not identical, but confusingly similar to, the formerly licensed mark is trying to convey the false message of continued affiliation and commits infringement").

85

## JURY INSTRUCTION NO. 54

### "INITIAL INTEREST" AND "POINT-OF-SALE" CONFUSION

The likelihood-of-confusion in Fair Isaac's trademark-infringement claims is based on what is called initial-interest confusion and point-of-sale confusion. I will now explain each of these concepts to you.

Initial-interest confusion occurs when someone uses a confusingly similar imitation of another's trademark in a manner calculated to capture initial-consumer attention. Even though no actual sale is finally completed as a result of the confusion, there still can be infringement. Initial-interest confusion exists, for example, when a consumer is mistakenly led to a defendant's website.

Point-of-sale confusion occurs when someone uses a confusingly similar imitation of another's trademark in a manner that influences consumers potential or actual purchasing decisions.

Authority:

- Northland *Ins. Companies v. Blaylock*, 115 F.Supp.2d 1108, 1120-21 (D. Minn. 2000) (setting out initial-interest definition);

- *Planned Parenthood Fed'n of Am. Inc. v. Bucci*, 1997 WL 133313 at *12 (S.D.N.Y. Mar.24, 1997) (same), *aff'd*, 152 F.3d 920 (2d Cir.1998);

- *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996) (setting out point-of-sale definition).

86

## JURY INSTRUCTION NO. 55

## SURVEYS

Because evidence of actual confusion is often not available, a consumer survey conducted according to accepted survey principles is often used as a proxy for evidence of actual confusion. These surveys measure the subjective mental associations and reactions of prospective consumers to the goods at issue. While survey evidence can indicate whether there is a likelihood of confusion, survey evidence differs from evidence of actual confusion because survey evidence is not necessarily generated in real-world settings. The results of a consumer survey are entitled to the weight you decide to give them.

Authority:

- *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (discussing use of survey evidence to show confusion);

- *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, LP*, 2002 WL 1763999, *7 (D. Minn., Jul. 26, 2002) (same).

87

## JURY INSTRUCTION NO. 56

## <u>INTENT NOT REQUIRED AND GOOD FAITH NOT A DEFENSE</u>

Good faith is no defense to trademark infringement. Likewise, trademark infringement does not depend on proof of wrongful or fraudulent intent. The presence or absence of wrongful intent is relevant to infringement only because if one is found to intend to use a confusingly similar mark, it supports a likelihood of confusion.

Authority:

- *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1121 (6th Cir. 1996) ("However, a 'defendant's good intentions do not in any way preclude a finding of likely confusion . . . .[A]bsent . . . a showing [of intentional infringement], intentions are irrelevant.'");

- *Fuji Photo Film Co. v. Shinohara Shoji Kabaushiki Kaisha*, 754 F.2d 591, 596-97 (5th Cir. 1985) ("Good faith is not a defense to trademark infringement"; "Bad faith, may, however, without more, prove infringement");

- *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F. Supp. 1003, 1015 (E.D. Pa. 1976) ("action for trademark infringement does not depend on proof of wrongful or fraudulent intent and that good faith is no defense");

- *Motor Master Prods. Corp. v. Motor Masters Warehouse, Inc.*, 463 F. Supp. 232, 238 (E.D. Pa. 1978) ("Further, an action for trademark infringement or unfair competition does not depend on proof of wrongful or fraudulent intent.").

88

## JURY INSTRUCTION NO. 57

## **PASSING-OFF DEFINED**

Fair Isaac also alleges that the defendants violated the law by passing off their goods or services as those of Fair Isaac's. You do not need to find that Fair Isaac holds a valid trademark to find passing off.

"Passing off" is conduct that deceives or is likely to deceive a customer exercising ordinary care in purchasing a credit-scoring product and that induces the customer to purchase a defendant's credit-scoring product in the belief that they are purchasing a credit scoring product from another source.

To find passing off, you do not need to find that a defendant intended to deceive customers or that a defendant made affirmative misrepresentations to customers.

You also do not need to find that a misunderstanding occurred or that customers were actually confused by a defendant's conduct. Proof of a likelihood of confusion or misunderstanding is sufficient.

Authority:

- Minn. Stat. § 325D.43 et seq.;

- *Winston & Nowell Co. v. Piggly Wiggly Northwest*, 22 N.W.2d 11, 16 (Minn. 1946) (defining passing off under common law as a party "adopt[ing] a dress for his goods simulating that of plaintiff, the resemblance must be so close that it deceives, or is likely to deceive, a customer exercising ordinary care in the making of a purchase of the particular goods, and induces him to purchase defendant's goods in the belief that they are those of plaintiff");

- *United Healthcare Ins. Co. v . AdvancePCS*, 316 F.3d 737, 742-44 (8th Cir. 2002); (the definition of passing off under the Minnesota Deceptive Trade Practices Act was adopted from the common law as articulated in *Winston & Nowell Co. v. Piggly Wiggly Northwest*);

- *United Healthcare Ins. Co. v . AdvancePCS*, 2002 WL 432068 at *14 n.17 (D. Minn. 2002) (a claim of passing off does not require proof of a valid mark) *aff'd*, 316 F.3d 737 (8th Cir. 2002);

NEWYORK 7309435 (2K)

- *Minnesota State Archery Association I, Inc. v. Minnesota State Archery Association, Inc.*, 2003 WL 1589868 at *7 (D. Minn. 2003) (citing *Universal Healthcare's* definition of the MDTPA's passing off provision).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 58

### **WILLFULNESS**

Fair Isaac asserts that the defendants' infringement of its "300-850," "FICO," and "Fair Isaac" marks was willful. If you find that a defendant infringed any of these marks, you must determine whether the defendant's actions were done willfully. That means you must determine whether the defendant willfully intended to confuse consumers about the source or origin of their products or trade on Fair Isaac's reputation.

Intent to confuse consumers and to appropriate the goodwill symbolized by trademarks can be proved by direct, indirect, or circumstantial evidence. If a defendant was aware of an existing mark of Fair Isaac's and nonetheless choose to use a mark that is identical or confusingly similar to that existing mark, you can infer a wrongful intent on the part of that defendant to trade on Fair Isaac's goodwill or reputation.

In determining whether a defendant or its predecessor intended to trade on Fair Isaac's goodwill or reputation, you can also infer intent from the degree of similarity between Fair Isaac's marks and the numbers and terms used by a defendant, from any prior or current business relationship that a defendant has with Fair Isaac, and from the credibility of a defendant's explanations for the resemblance between the marks.

Authority:

*In general*

- 15 U.S.C. § 1125(c)(2);

*Direct, indirect, or circumstantial evidence*

- *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1121 (6th Cir. 1996) (an "intent to infringe can be shown by circumstantial evidence" and "use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement");

*Inferring willfulness*

91

- *Am. Dairy Queen Corp. v. NewLine Prods., Inc.*, 35 F. Supp. 2d 727, 731 (D. Minn. 1998) (intent can be inferred if defendant chose "a mark similar to that mark from the infinite number of possible marks.");

- *Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F. Supp. 906, 915 (D. Minn. 1992) ("if an alleged infringer chooses a similar mark armed with knowledge of the prior mark, such knowledge may raise an inference of an intent to trade upon a plaintiff's good will");

- *Aveda Corp. v. Evita Marketing, Inc.*, 706 F. Supp. 1419, 1429 (D. Minn. 1989) (an inference of an intent to trade on the plaintiff's good will arises if the defendant, "with knowledge of plaintiff's mark, chose a mark similar to that mark from the infinite number of possible marks.") (*citing Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963));

- *Aveda*, 706 F. Supp. at 1429-30 ("It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.");

- *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258-59 (2d Cir. 1987) ("[A]ctual or constructive knowledge [of another's prior registration of a mark] may signal bad faith. Indeed, '[i]n this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'");

- *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996) ("We also observe that the inference of intent is strengthened when the parties have had                          '[s]uch a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill.'");

- *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 927-28 (10th Cir. 1986) ("deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion.  The inference of intent is especially

92

strong when the parties have had a prior relationship. Such a relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill");

- *E.G.L. Gem Lab Ltd. v. Gem Quality Instit., Inc.* 90 F. Supp.2d 277, 300 (S.D.N.Y. 2000) ("a licensee that wishes to create rights in a mark separate from the licensed mark has an affirmative obligation to choose a mark sufficiently different from the licensed mark to avoid confusion-'[t]he licensee trades upon the good will of the licensor at the licensee's peril.'");

- *Teaching Company Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F. Supp. 2d 567, 583 (E.D. Va. 2000) ("The law provides that a junior user of a mark has an affirmative duty to select a mark that is not confusing." "When a defendant adopts a mark with full knowledge of the plaintiff's mark, intent is inferred.").

93

## 2.     DEFENDANTS' PROPOSED INSTRUCTIONS

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 59

## **DEFINITION OF A TRADEMARK**

The term "trademark" includes any word, name, symbol, or device, or any combination thereof, adopted and used by a person or business to identify and distinguish its goods or services and indicate the source of the goods or services, even if that source is generally unknown.  The law entitles the owner of a trademark to permit or exclude others from using that trademark.  The owner of a trademark may enforce the right to exclude others in an action for trademark infringement.

The main function of a trademark is to identify and distinguish goods or services as belonging to a particular trademark owner and to protect the owner's value and business goodwill against the sale of another's goods or services as its own.

A trademark is also a merchandising symbol that helps a prospective purchaser to select the goods or services the purchaser wants.  A trademark signifies that all goods or services bearing the mark derive from a single source and are equivalent in quality.  There is therefore a public interest in the use of trademarks.

Source:   15 U.S.C. §§ 1114(1), 1125(a), 1127, 1129; Moore's Modern Federal Jury Instructions, Instructions 86A-1, 86A-2 (vol. 4 2008) (the above instruction is based on Moore's model instructions); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F. 2d 1324, 1329 (8th Cir. 1985); ABA (IP Litig. Section), Model Jury Instructions, Copyright, Trademark and Trade Dress Litigation §§ 2.2.2, 2.2.3 (2008) (Trademark and Service Mark defined).

## JURY INSTRUCTION NO. 60

## ELEMENTS OF TRADEMARK INFRINGEMENT CLAIM

Plaintiffs claim Defendants infringed their alleged trademark "300-850." To prevail on their claim for trademark infringement, Plaintiffs have the burden to prove the following three elements by a preponderance of the evidence as to each of the individual Defendants:

(1)     First, that the term "300-850" is a valid, distinctive trademark that is entitled to protection;

(2)     Second, if it is a valid mark, that a Defendant has used a same or similar trademark in connection with offering its credit scoring services; and

(3)     Third, that a Defendant's use of the same or a similar trademark without Plaintiffs' consent is likely to cause consumer confusion about the source or sponsorship of that Defendant's credit scoring services.

Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the term "300-850" is a valid trademark, and that a Defendant infringed the trademark.  If, on the other hand, Plaintiffs have failed to prove any of these elements against a Defendant or Defendants by a preponderance of the evidence, your verdict should be for that Defendant or those Defendants on the trademark infringement claim.

To prevail against any one of the Defendants, Plaintiffs must prove each and every one of the three elements of a trademark infringement claim by a preponderance of the evidence.

I will now instruct you on each of these three elements.

Source:      *Fair Isaac Corp. v. Experian Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *18 (D. Minn. July 24, 2009); 15 U.S.C. § 1114(1); ABA (IP Litig. Section), Model Jury Instructions, Copyright, Trademark and Trade Dress Litigation § 2.4.1 (2008) (Trademark and Service Mark defined)(Infringement Elements); Devitt and Blackmar, Federal Jury Instructions and Practice, Civil, § 98.05 (4th ed. 1990)(modified); Daimler Chrysler AG  v. Bloom, Civil No. 00-325 DSD/JMM, 2001 WL 1640139 at * 3-4 (D. Minn Oct. 9, 2001) (use of plaitniffs' trademark or misleading

96

representation of it is prerequisite to finding of Lanham Act violation); Moore's Modern Federal Jury Instructions, Instr. 86A-9 (vol. 4 2008); Ninth Circuit Model Civil Jury Instructions 15.5 (2007).

## JURY INSTRUCTION NO. 61

## **VALIDITY OF THE TRADEMARK**

For Plaintiffs to prevail in their trademark infringement claim, they must prove by a preponderance of the evidence that the term "300-850" is a valid trademark.

A valid trademark is a word, name, symbol, or device that is either:

1. inherently distinctive; or

2. descriptive, but has become distinctive through the acquisition of "secondary meaning."

A mark is descriptive if it immediately describes the characteristics, qualities, or features of the product or service. The Court has already determined that the term "300-850" is descriptive because it immediately describes a feature of Plaintiffs' credit scoring services – namely, the range of scores available. Therefore, it can be a valid trademark only if it has acquired secondary meaning.

Only a valid trademark can be infringed. Only if you determine Plaintiffs proved by a preponderance of the evidence that the term "300-850" is a valid trademark, should you consider whether Defendants' use of a same or similar term infringed it.

Source:   Ninth Circuit Model Civil Jury Instructions 15.8 (the above instruction is based on the Ninth Circuit model instructions); *Fair Isaac Corp. v. Experian Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *21 (D. Minn. July 24, 2009); Moore's Modern Federal Jury Instructions, Instr. 86A-10 (vol. 4 2008).

98

## JURY INSTRUCTION NO. 62

## <u>DISTINCTIVENESS:  SPECTRUM OF MARKS</u>

Trademark law provides great protection to strong trademarks.  Conversely, trademarks that are not as distinctive or strong are called "weak" trademarks and receive less protection from uses of similar marks.  Trademarks that are not distinctive are not entitled to any trademark protection.  Trademarks are grouped into four categories according to their relative strength.  These four categories are, in order of strength or distinctiveness:  arbitrary or fanciful (which is inherently distinctive), suggestive (which also is inherently distinctive), descriptive (which is protected only if it acquires "secondary meaning" in consumers' minds), and generic terms (which are entitled to no protection).  In this case, as the Court has already determined, the term "300-850" is descriptive because it describes a feature of the FICO credit scoring service, namely the range of possible scores a consumer can receive.

**Arbitrary Trademarks.**  The first category is "inherently distinctive" trademarks. They are considered strong marks and are clearly protectable.  They involve the arbitrary, fanciful or fictitious use of a word to designate the source of the goods or services.  Such a trademark is a word that in no way describes or has any relevance to the particular goods or services it is meant to identify.

**Suggestive Trademarks.**  The next category of marks is suggestive trademarks. These trademarks are also inherently distinctive but are considered weaker than arbitrary trademarks.  Unlike arbitrary trademarks, which are in no way related to what the goods or services are or their components, qualities, or characteristics, suggestive trademarks imply some characteristic or quality of the goods to which they are attached.  If the consumer must use imagination or any type of multi-stage reasoning to understand the trademark's significance, then the trademark does not describe the good's features, but suggests them.  A suggestive use of a word involves consumers associating the qualities the word suggests to the goods to which the word is attached.

Suggestive marks are entitled to broad trademark protection.

**Descriptive Trademarks.**  The third category of marks is descriptive trademarks.  Descriptive marks directly identify or describe some aspect, characteristic, quality, or feature of the goods to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.

For instance, the word "apple" is descriptive when used in the trademark "Cran-Apple" to designate a cranberry-apple juice.  It directly describes an

ingredient of the juice.  Other common types of descriptive trademarks identify where goods or services come from, or the name of the person who makes or sells the goods or services.  Thus, the words "Apple Valley Juice" affixed to cider from the California town of Apple Valley is a descriptive trademark because it geographically describes where the cider comes from.  Similarly, a descriptive trademark can be the personal name of the person who makes or sells the goods or services.  So, if a farmer in Apple Valley, Judy Brown, sold her cider under the label "Judy's Juice" (rather than Cran-Apple) she is making a descriptive use of her personal name to indicate and describe who produced the apple cider and she is using her first name as a descriptive trademark.

The term "300-850" is a descriptive term.  Descriptive terms qualify as trademarks only after taking on secondary meaning as distinctive of the particular source of the good or service.  If there is secondary meaning, the owner of the mark has an exclusive right not in the original, descriptive meaning of the term, but only in the secondary meaning associated with the owner's goods or services.


Source:    Ninth Circuit Model Civil Jury Instructions 15.9 (the above instruction is based on the Ninth Circuit model instructions); Moore's Modern Federal Jury Instructions, Instr. 86A-11 (vol. 4 2008) *Fair Isaac Corp. v. Experian Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *21 (D. Minn. July 24, 2009); *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004) ("The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first . . . . This right to describe is the reason that descriptive terms qualify for registration as trademarks only after taking on secondary meaning as distinctive of the [source's] goods.").

100

## JURY INSTRUCTION NO. 63

## <u>SECONDARY MEANING</u>

"Secondary meaning" is used generally to indicate that a mark has come through use to be uniquely associated with a specific source.  A term acquires a "secondary meaning" when it has been used in such a way that its primary significance in the minds of the prospective purchasers is not the goods or services themselves, but the identification of the goods or services with a single source, regardless of whether consumers know who or what that source is.

To establish secondary meaning, Plaintiffs must prove that through long and exclusive use in the sale of their credit scoring services, the term "300-850" has become so associated in the public mind with Plaintiffs' credit scoring services that its primary significance is to identify the source of the services and to distinguish its services from the services of others.  A significant number of the consuming public must associate the "300-850" term with a single source, in order for you to find that "300-850" has acquired secondary meaning.

The mere fact that Plaintiffs are using the term "300-850," or if Plaintiffs began to use it before Defendants used it, does not establish secondary meaning.  Similarly, the mere fact that the term "300-850" may be unique is not enough to establish secondary meaning.  Nor is mere popularity of the FICO credit scoring service sufficient to show secondary meaning in the term "300-850."

As to each Defendant, Plaintiffs must show that the term "300-850" acquired secondary meaning, that is, became so associated in the public mind with the source of the Plaintiffs' credit scoring services that the term serves to identify the source of the services, before Defendants first used any allegedly infringing mark.  Even if you find that the term "300-850" has acquired secondary meaning, but find that it acquired secondary meaning after a Defendant first used any allegedly infringing term, then you must find in favor of that Defendant on Plaintiffs' "300-850" infringement claim.

Plaintiffs have the burden of proving secondary meaning by a preponderance of the evidence.

<u>Source</u>:        Moore's Modern Federal Jury Instructions, Instr. 86A-12 (vol. 4 2008) (the above instruction is based on Moore's model instructions); Ninth Circuit Model Civil Jury Instructions 15.10; *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004) (markholder has "an exclusive right not in the original, descriptive sense, but only in the secondary one associated with the markholder's goods"); *Fair Isaac Corp. v. Experian*

101

*Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *21 (D. Minn. July 24, 2009) ("Secondary meaning is established 'by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.'") (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009)); *Inwood Laboratories, Inc. v. Ives Labatories, Inc.*, 456 U.S. 844, 851 n.11 (1982) (to prove secondary meaning, the person claiming the trademark must show that "in the minds of the public, the primary significance" of the trademark is to identify its owner "as the source of the product, rather than the product itself"); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F. 2d 1324, 1332-33 (8th Cir. 1985) (in determining whether there is secondary meaning, "the chief inquiry is whether in the consumer's mind the mark has become associated with a particular source"; listing secondary meaning factors); *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 870 (8th Cir. 1994) (to prevail against a competitor who was in the market prior to the effective date of the registration, the owner of a descriptive mark must establish that the mark had secondary meaning prior to its first use by the challenger); ABA (IP Litig. Sect.), Model Jury Instructions Copyright, Trademark Trade Dress Litigation, § 2.3.6 (2008).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 64

## METHODS OF SHOWING SECONDARY MEANING

A trademark owner is permitted to show secondary meaning in a number of ways. The presence or absence of any of these factors should not necessarily resolve whether there is secondary meaning, because you must consider all relevant evidence to make this determination. You must determine whether as a whole Plaintiffs have established secondary meaning by a preponderance of the evidence. I will instruct you on each of the relevant factors for making this determination.

You may consider the following factors when you determine whether the term "300-850" has acquired secondary meaning:

1. **Purchaser Perception.** Whether the people who purchase the goods or services that bear the term associate the term with the owner;

2. **Advertising.** To what degree and in what manner the owner may have advertised under the claimed trademark;

3. **Demonstrated Utility.** Whether the owner successfully used the claimed trademark to increase the sales of its goods or services;

4. **Extent of Use.** The length of time and manner in which the owner used the claimed trademark;

5. **Exclusivity.** Whether the owner's use of the claimed trademark was exclusive;

6. **Copying.** Whether Defendants intentionally copied the owner's claimed trademark with the intent to confuse consumers as to the source or sponsorship of Defendants' credit scoring services;

7. **Actual Confusion.** Whether Defendants' use of the claimed trademark or a confusingly similar term has led to actual confusion as to the source or sponsorship of Defendants' credit scoring services;

8. **Consumer Surveys.** Surveys may show secondary meaning, or a lack of secondary meaning;

9.      **Other Promotion.**  Other efforts made by Plaintiffs to promote the connection between the claimed trademark and the Plaintiffs; and

10.     **Consumer testimony.**  Testimony from consumers as to the identity of the source of goods or services displaying the claimed trademark.

Source:      *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 871-73 (8th Cir. 1994) (Circumstantial evidence can include exclusivity, length and manner of use, amount and type of advertising, media coverage, and sales volume and market share, but these things alone cannot establish secondary meaning); *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985); *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.,* 426 F.3d 1001, 1005-06 (8th Cir. 2005) (listing secondary meaning factors); *Shade's Landing, Inc. v. Williams*, 76 F. Supp. 2d 983, 989-90 (D. Minn. 1999) (addressing factors relevant to secondary meaning); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (same); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 65

## SECONDARY MEANING MUST BE
## ACQUIRED BEFORE DEFENDANTS' FIRST USE

As to each Defendant, if you determine that Plaintiffs have not proved, by a preponderance of the evidence, that the term "300-850" acquired secondary meaning before that Defendant first began using terms similar to "300-850," then you must find for that Defendant on Plaintiffs' claims relating to "300-850," as there can be no trademark infringement.

Source:          Moore's Modern Federal Jury Instructions, Instr. 86A-14 (vol. 4 2008); *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 870 (8th Cir. 1994) (to prevail against a competitor who was in the market prior to the effective date of the registration, the owner of a descriptive mark must establish that the mark had secondary meaning prior to its first use by the challenger); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F. 2d 1324, 1332 (8th Cir. 1985).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 66

## <u>REVOLUTIONARY GOODS OR SERVICE</u>

The sudden and substantial success of goods or services after introduction does not by itself establish secondary meaning.  The issue is not whether the goods or services are new or unusual, but whether a significant number of the consuming public believes that they come from a single source due to the use of the claimed trademark.

<u>Source</u>:     *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 872-73 (8th Cir. 1994) ("sudden and substantial success of its . . . products . . . may not provide the basis for an inference of secondary meaning because something other than the secondary meaning of the [trademark] may have been responsible for the success of the product").

106

## JURY INSTRUCTION NO. 67

## <u>ADVERTISING</u>

The amount of money that Plaintiffs spent on advertising featuring the claimed trademark may be relevant to secondary meaning.  Dollar volume of advertising by itself is insufficient; it is not the amount of advertising, but the effectiveness of the advertising in leading consumers to identify the claimed mark with the holder that is determinative.  If Plaintiffs engaged only in leisurely advertising, it can take many years to develop secondary meaning.

Advertisements that focus on familiarizing the public with some other aspect of the goods or services or some other trademark rather than the claimed mark are not relevant and cannot establish secondary meaning.  Advertisements that do not use the claimed mark are not relevant and cannot establish secondary meaning, either.  To be relevant, the advertising must feature the claimed trademark at hand, and not be cluttered with the producer's other marks.  Even advertising that is uncluttered with other marks is relevant for secondary meaning only if it has induced in the minds of a majority of the consuming public that goods bearing the trademark come from a single source.

It is up to you to determine whether Plaintiffs' advertising featured the mark or was cluttered with Plaintiffs' other marks, and whether the volume of advertising was such that it is reasonable to infer that a significant number of segment of the consuming public would have believed that all of the goods bearing the mark came from a single source.

Source:    *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 871-72 (8th Cir. 1994) (Advertisements cannot establish secondary meaning when they do not separate the claimed trade dress of the products from the other marks that serve to identify the products as those of the plaintiff. Similarly, advertisements that focus on familiarizing the public with some other aspect of the product rather than the claimed mark are not relevant and cannot establish secondary meaning.); 2 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. 2005 §15:56 (any years required to establish secondary meaning if the holder uses only "leisurely advertising"); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* Civil No. 00-2317, 2002 WL 1763999, at *9-10 (D. Minn. July 26, 2002) (quoting *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985)) (dollar volumes of advertising by themselves are insufficient; it is not the amount of advertising, but

107

the effectiveness of the advertising in leading consumers to identify the mark to the holder that is determinative).

108

## JURY INSTRUCTION NO. 68

## <u>COPYING</u>

Copying may be relevant to the issue of secondary meaning.  A defendant's copying of a valid trademark may suggest that the defendant did so because its competitor's mark has secondary meaning.

But not all copying gives rise to this inference.  If Defendants' goods or services are accompanied by Defendants' own conspicuously-labeled trademarks, the distinguishing marks must be seen as an attempt to distinguish the goods or services from those of Plaintiffs, not as an intent to confuse consumers as to the source or sponsorship of Defendants' credit scoring services.  Such use does not give rise to an inference of secondary meaning.

Similarly, trademark law recognizes that in many instances there is no prohibition against copying features of a competitor's goods or services.  Where there is a demand for a type of product, capitalizing on that demand by copying does not itself suggest that the alleged trademark has secondary meaning.  It is not the intent to compete, but the intent to confuse that is relevant to finding secondary meaning.

<u>Source:</u>    *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (copying is not always discouraged or disfavored by the laws which preserve our competitive economy); *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 870 (8th Cir. 1994) ("Where there is a demand for a type of product, capitalizing on that demand by copying does not necessarily indicate that the original product secondary meaning," and if defendant's product is accompanied by the defendant's own conspicuously-labeled trademarks, the distinguishing marks "must be seen as an attempt to distinguish" the product, not as an intent to pass of or confuse); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* Civil No. 00-2317, 2002 WL 1763999, at *9-10 (D. Minn. July 26, 2002) ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's."); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987) (knowledge of and intent to compete with another's product is not equivalent to an intent to cause consumer confusion); *Tie Tech v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) ("there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws"); *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir.

NEWYORK 7309435 (2K)

1995) ("when competitors are barred from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source, competition is unduly hindered").

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 69

## <u>CONSUMER TESTIMONY</u>

Testimony from the consuming public can be evidence of secondary meaning.  To be relevant, you must find that the testimony is from a member of the relevant consuming public.  You must also find that the testimony relates to a time period at or prior to the entry into the market by competitors.

<u>Source</u>:      *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 870-71 (8th Cir. 1994) ("testimony of consumers . . . may be the only direct evidence of secondary meaning and should be considered in determining whether a mark has acquired secondary meaning"; to prevail against a competitor who was in the market prior to the effective date of the registration, the owner of a descriptive mark must establish that the mark had secondary meaning prior to its first use by the challenger); Moore's Modern Federal Jury Instructions, Instr. 86A-14 (vol. 4 2008); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F. 2d 1324, 1332 (8th Cir. 1985); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985).

111

## JURY INSTRUCTION NO. 70

### **LENGTH OF USE**

Plaintiffs' exclusive use of the term "300-850" over an extended period of time may indicate secondary meaning.  To be relevant, the use must be exclusive and must be of such an extended period of time that it is reasonable to infer that the majority of the consuming public would have believed that all of the goods or services bearing the mark came from a single source.  Length of time alone, however, is not sufficient to establish secondary meaning.

Source:      *Fair Isaac Corp. v. Experian Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *21 (D. Minn. July 24, 2009) ("Secondary meaning is established 'by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.'") (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009)); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) ("it is the *effect* of such advertising that is important, not its extent") (emphasis in original) (citing *Security Center, Ltd. v. First Nat'l Sec. Centers*, 750 F.2d 1295, 1302 (5th Cir. 1985) for the proposition that two years of exclusive use is insufficient time to acquire secondary meaning)); *Bank of Texas v. Commerce Southwest, Inc*., 741 F.2d 785, 788 (5th Cir. Tex. 1984) (Nine years was insufficient to establish secondary meaning).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 71

## **EXPERT TESTIMONY**

Expert testimony may provide evidence of secondary meaning or a lack of secondary meaning.  To be relevant, the expert must have a reasonable basis to testify as to the beliefs of a significant number of the consuming public as of the date that competitors entered the market.

Source:          *Gateway, Inc. v. Companion Prods.,* 384 F. 3d 503, 508 (8th Cir. 2004) (expert testimony can indicate secondary meaning); *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.,* 426 F.3d 1001, 1006 (8th Cir. 2005) (expert testimony can prove lack of secondary meaning).

113

## JURY INSTRUCTION NO. 72

## <u>SURVEYS</u>

Surveys may show secondary meaning, or a lack of secondary meaning.  To show secondary meaning, a survey must show that a significant segment of the consuming public associates the claimed trademark with a single source.  If a survey shows that 50% or more of the consuming public associate a trademark with goods or services coming from a single source, and you find the survey to be credible, then this is evidence of secondary meaning.  The converse is also true.  If a survey shows less than 30% of the public associates a trademark with goods or services from a particular source, and you find the survey to be credible, then this suggests there is no secondary meaning.

When a plaintiff has not conducted a secondary meaning survey, then you are permitted, but not required, to infer that the survey would have been unfavorable to the plaintiff.

Source:     *Spraying Systems Co. v. Delavan, Inc.*, 975 F. 2d 387, 394 (7th Cir. 1992) ("While a 50% figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* Civil No. 00-2317, 2002 WL 1763999, at *9-10 (D. Minn. July 26, 2002) (survey ostensibly conducted for likelihood of confusion can show lack of secondary meaning); *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F. 3d 175, 183 n.5 (1st Cir. 1993) (describing a positive response rate of 36% as "hardly overwhelming"); *Spraying Systems Co. v. Delavan, Inc*., 762 F. Supp. 772, 779 n.6 (N.D. Ill.1990) (surveys must show a significant level of association to establish secondary meaning), *aff'd*, 975 F. 2d 387 (7th Cir. 1992); *Pharmacia Corp. v. Alcon Labs, Inc.,* 201 F.Supp. 2d 335, 373 (D.N.J. 2002) ("The Court is aware that Pharmacia is not legally required to conduct a confusion survey.  But under the circumstances of this case, Pharmacia's failure to conduct any confusion survey weighs against its request for a preliminary injunction.  Such a failure, particularly when the trademark owner is financially able, justifies an inference that the plaintiff believes the results of the survey will be unfavorable.") (internal quotations omitted); *Information Clearing House, Inc. v. Find Magazine* (492 F. Supp. 147 (S.D.N.Y. 1980) (Finding it "significant that plaintiff, though possessed of the financial means, did not undertake a survey of public consumer reaction to the products under actual marketing conditions" where parties made concurrent use of marks for two

114

months) (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441
F.Supp. 1220, 1230-1 (S.D.N.Y. 1980)); *Eagle Snacks, Inc. v.
Nabisco Brands, Inc.*, 625 F.Supp. 571, 583 (D.N.J. 1985) ("Failure
of a trademark owner to run a survey to support its claims of brand
significance and/or likelihood of confusion, where it has the
financial means of doing so, may give rise to the inference that the
contents of the survey would be unfavorable, and may result in the
court denying relief.") (citing *Mushroom Makers*); *King-Size, Inc. v.
Frank's King-Size Clothes, Inc.*, 547 F.Supp. 1138, 1162 (S.D. Tex.
1982) ("Plaintiffs did not present to the Court a survey or any other
direct evidence of actual confusion.  The Court views these
omissions as both suspect and significant.") (citing *Mushroom
Makers*); *see also* Sandra Edelman, "Failure to Conduct a Survey in
Trademark Infringement Cases:  A Critique of the Adverse
Inference," 90 TMR 746, 752 (September-October 2000) (surveying
case law applying adverse inference and noting that the Second
Circuit "is not treating the absence of survey evidence neutrally, but
is instead considering it to be a negative against the plaintiff's
case"); *Nikon, Inc. v. Ikon Corp.*, 803 F.Supp. 910, 922 (S.D.N.Y.
1992) (stating that plaintiff's "failure to undertake a consumer
survey to demonstrate actual confusion" favored defendant); *GMA
Accessories, Inc. v. Croscill, Inc.,* No. 06 Civ. 6236, 2008 WL
591803 at *8 (S.D.N.Y. March 3, 2008) (citing *Nikon*).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 73

### <u>SUMMARY OF PROVING SECONDARY MEANING</u>

Each of the methods that I have described for you is a permitted way to show secondary meaning.  Plaintiffs have the burden of proving secondary meaning by a preponderance of the evidence.  Plaintiffs must also prove, as to each Defendant, that they acquired secondary meaning in "300-850" prior to that Defendant's first use of the accused scoring range.  If you find that Plaintiffs have not met this burden, then you must find for Defendants on Plaintiffs' claims of trademark infringement related to the term "300-850."  If you find that Plaintiffs have established secondary meaning before a Defendant's first use of its scoring range, then you still must determine whether that Defendant's use of the claimed trademark "300-850" or any other similar mark is likely to cause confusion as to the source or sponsorship of that Defendant's credit scoring services.

116

## JURY INSTRUCTION NO. 74

## <u>LIKELIHOOD OF CONFUSION – FACTORS</u>

If you find that the term "300-850" has acquired secondary meaning before a Defendant used the claimed trademark, then as to that Defendant you must consider whether that Defendant used Plaintiffs' trademarks in a manner likely to cause confusion about the source or sponsorship of that Defendant's credit scoring service. You may find infringement of a trademark only if an appreciable number of the consuming public is likely to be confused as to the source of Defendants' credit scoring services. In other words, you must find that ordinary purchasers of credit scores, buying them under usual conditions and exercising ordinary care, would be likely to purchase a Defendant's credit scoring service in the belief that they were purchasing Fair Isaac's credit scoring service, of that the service was sponsored or approved by Fair Isaac. The confusion must be as to the source of the services, not general confusion about the credit scoring industry or how credit scoring services work.

There must be a substantial likelihood that the public will be confused as to the source of the services. Actual confusion is not essential to a finding of infringement. The mere possibility of confusion, however, is not enough.

I will suggest some factors that you should consider in deciding whether there is a likelihood of source confusion. The presence or absence of any particular factor should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this. As you consider the likelihood of confusion you should examine the following:

1. **Strength or Weakness of Fair Isaac's Claimed Trademark.**

2. **Similarity of Plaintiffs' and Defendants' Marks.**

3. **Degree of Competition.**

4. **Defendants' Intent.**

5. **Actual Confusion.**

6. **Type of Goods or Services, Their Costs, and Conditions of Purchase.**

7. **Degree of Care Likely to Be Used by Purchasers.**

8. **Consumer surveys.**

117

NEWYORK 7309435 (2K)

9. **Other Factors.**  Any other factors about Plaintiffs' and Defendants' respective terms that would tend to increase or reduce the likelihood that purchaser would be confused about the source or origin of the parties' services.

These factors do not operate in a mathematically precise formula; instead, the relative weight of the factors depends on the facts of the individual case.

In light of these factors and your common experience, you must determine if ordinary consumers, neither overly careless nor overly careful, would be, upon encountering Defendants' score ranges, confused about the source, sponsorship, approval, or affiliation of the parties' credit scoring services.  The likelihood of confusion means that confusion must be probable, not simply a possibility.

I will now explain each of these factors in more detail.

Source:      Moore's Modern Federal Jury Instructions, Instr. 86A-15, 86A-16 (vol. 4 2008) (the above instruction is based in part on Moore's model instructions); Ninth Circuit Model Civil Jury Instructions § 15.16 (the above instruction is based in part on the Ninth Circuit model instructions); 15 U.S.C. § 1114(1), 1125(a); *Children's Factory v. Benee's Toys*, 160 F.3d 489, 494 (8th Cir. 1998) ("In order to find a likelihood of confusion, this court has stated that '[t]here must be a substantial likelihood that the public will be confused.'") (citations omitted); *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991) (Lanham Act does not protect "against confusion generally."); *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2006) (likelihood of confusion factors); *Everest Capital Limited v. Everest Funds Management LLC*, 393 F.3d 755, 759-60 (8th Cir. 2005) (same); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990) (same); *First Nat'l Bank, v. First Nat'l Bank,* 153 F.3d 885, 888 (8th Cir. 1998).

## JURY INSTRUCTION NO. 75

## LIKELIHOOD OF CONFUSION FACTOR: STRENGTH OF CLAIMED MARK

How strongly a trademark indicates that a good comes from a particular source even if unknown is an important factor to consider for determining whether the marks used by Defendants create for consumers a likelihood of confusion about the source of Defendants' goods or services.

Trademark law provides greater protection to distinctive or strong trademarks. Conversely, trademarks not as distinctive or strong are called "weak" trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection. For deciding trademark protectability, trademarks are grouped into four categories according to their relative strength. As I have previously stated, these four categories are, in order of strength or distinctiveness:

1.    arbitrary or fanciful,

2.    suggestive,

3.    descriptive, and

4.    generic.

As I have previously instructed you, the Court has determined that Fair Isaac's "300-850" term is a descriptive term; it is not arbitrary, suggestive, or generic.

Source:        Moore's Modern Federal Jury Instructions, Instr. 86A-17 (vol. 4 2008); Ninth Circuit Model Civil Jury Instructions § 15.17.

NEWYORK 7309435 (2K)

**JURY INSTRUCTION NO. 76**

**SIMILARITY OF PLAINTIFFS' AND
DEFENDANTS' USE OF "300-850" TERM**

Another factor that you may consider is the degree of similarity between Plaintiffs' term "300-850," and the use by a Defendant of its scoring range or ranges.  You should look at not only the similarity or differences of their use of their score ranges as compared to Plaintiffs' claimed mark, but you should also look at the overall impression of the goods and services offered to see if there is differentiation in packaging, advertising, marketing and pricing.

Source:      Ninth Circuit Model Civil Jury Instructions § 15.16 (the above
             instruction is based in part on the Ninth Circuit's model
             instructions);*Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir.
             2006); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir.
             1990); Ninth Circuit Model Civil Jury Instructions § 15.17.

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 77

### DEGREE TO WHICH GOODS AND SERVICES ARE SOLD IN SAME CHANNELS

If Plaintiffs' services are likely to be sold in the same or similar stores or outlets as a Defendant's services, then this increases the potential for likelihood of confusion.  On the other hand, to the extent that the parties sell their services in different channels or venues, this decreases the likelihood of confusion.

Source:       Ninth Circuit Model Civil Jury Instructions § 15.16 (the above instruction is based in part on the Ninth Circuit's model instructions); *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2006); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990).

121

## JURY INSTRUCTION NO. 78

## <u>INTENT TO CONFUSE</u>

You may consider whether a Defendant used its scoring range or ranges with the intent of deceiving purchasers into believing that Defendants' credit scoring services were associated with Plaintiffs.  If a Defendant intended to cause confusion through the use of its scoring range or ranges as to the source of that Defendant's goods or services, then this would suggest a likelihood of confusion. If, however, you find that a Defendant's credit scoring service was distinctly marked with words, names, or symbols showing their source or that a Defendant sold its credit scoring service with an intent only to compete with Plaintiffs' credit scoring services, then this would suggest the absence of an intent to confuse.

Source:      *Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2006) ("This [intent to confuse] factor weighs in favor of the [Defendants] as there is no evidence in the record that the [Defendants] intended to confuse the public. Although proof of bad intent is not required for success in a trademark infringement or unfair competition claim, the absence of such intent is a factor to be considered."); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990) ("Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement."); *Children's Factory v. Benee's Toys*, 160 F.3d 489, 495 (8th Cir. 1998) (no intent to confuse where the defendant "clearly represents to the ultimate consumer that [defendant] manufactures its own products").

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 79

## **ACTUAL CONFUSION**

If any Defendant's use of a valid trademark belonging to Plaintiffs has led to actual confusion as to the source or sponsorship of that Defendant's credit scoring service, then this may suggest a likelihood of confusion. However, actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, a Defendant's use, if any, of Plaintiffs' claimed trademark may still be likely to cause confusion. As you consider whether the terms used by a Defendant create for consumers a likelihood of confusion as to the source or sponsorship of a Defendant's credit scoring services, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been frequent, this may suggest that likelihood of confusion. If, by contrast, there is a very large volume of sales or a long period of coexistence in the marketplace, but only a few isolated instances of actual confusion, this may suggest that there is no likelihood of confusion.

Only actual confusion as to the source of the goods or services is relevant; general confusion about credit scoring services or the credit scoring market or how credit scoring services work is irrelevant.

Because Fair Isaac chose a descriptive mark, there may be some inherent confusion as to the source of the goods or services as a result of the descriptiveness of its mark even if the mark has acquired secondary meaning. The existence of such inherent confusion is insufficient by itself to establish trademark infringement.

Source:      Ninth Circuit Model Civil Jury Instructions § 15.16 (the above instruction is based in part on the Ninth Circuit's model instructions); *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004) ("The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first. . . . If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase. . . . It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair."); *Davis v. Walt Disney Co.*, 430

NEWYORK 7309435 (2K)

F.3d 901, 903 (8th Cir. 2006); *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.,* 426 F.3d 1001, 1005 (8th Cir. 2005) ("Frosty Treats's survey provides no basis to conclude that the respondents associated the van with a single source as opposed to simply a generic ice cream truck."); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990) ("actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion"); *Platinum Home Mortg. Corp. v. Platinum Fin. Group*, 149 F.3d 722, 729 (7th Cir. 1998) ("*de minimus* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion").

124

## JURY INSTRUCTION NO. 80

## <u>PURCHASING PUBLIC</u>

The more knowledgeable the potential buyers and the more costly the goods, the more careful and discriminating the buyers may be.  Knowledgeable buyers may be less likely to be confused by similarities in the marks.

<u>Source</u>:        *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2006);
               *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990).

125

# JURY INSTRUCTION NO. 81

## SURVEYS

Surveys of consumers are one way to show a likelihood of confusion, or a lack of a likelihood of confusion, as to the source of the goods or services. When a plaintiff has not conducted a likelihood of confusion survey, then you are permitted, but not required, to infer that the survey would have been unfavorable to the plaintiff.

Source:    *Pharmacia Corp. v. Alcon Labs, Inc.,* 201 F. Supp. 2d 335, 373 (D.N.J. 2002) ("The Court is aware that Pharmacia is not legally required to conduct a confusion survey. But under the circumstances of this case, Pharmacia's failure to conduct any confusion survey weighs against its request for a preliminary injunction. Such a failure, particularly when the trademark owner is financially able, justifies an inference that the plaintiff believes the results of the survey will be unfavorable.") (internal quotations omitted); *Information Clearing House, Inc. v. Find Magazine* (492 F. Supp. 147 (S.D.N.Y. 1980) (Finding it "significant that plaintiff, though possessed of the financial means, did not undertake a survey of public consumer reaction to the products under actual marketing conditions" where parties made concurrent use of marks for two months) (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F. Supp. 1220, 1230-1 (S.D.N.Y. 1980)); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) ("Failure of a trademark owner to run a survey to support its claims of brand significance and/or likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief.") (citing *Mushroom Makers*); *King-Size, Inc. v. Frank's King-Size Clothes, Inc.,* 547 F. Supp. 1138, 1162 (S.D. Tex. 1982) ("Plaintiffs did not present to the Court a survey or any other direct evidence of actual confusion. The Court views these omissions as both suspect and significant.") (citing *Mushroom Makers*); *see also* Sandra Edelman, "Failure to Conduct a Survey in Trademark Infringement Cases: A Critique of the Adverse Inference," 90 TMR 746, 752 (September-October 2000) (surveying case law applying adverse inference and noting that the Second Circuit "is not treating the absence of survey evidence neutrally, but is instead considering it to be a negative against the plaintiff's case"); *Nikon, Inc. v. Ikon Corp.*, 803 F. Supp. 910, 922 (S.D.N.Y. 1992) (stating that plaintiff's "failure to undertake a consumer

126

survey to demonstrate actual confusion" favored defendant); *GMA Accessories, Inc. v. Croscill, Inc.,* No. 06 Civ. 6236, 2008 WL 591803 at *8 (S.D.N.Y. March 3, 2008) (citing *Nikon*).

127

## JURY INSTRUCTION NO. 82

## <u>SUMMARY OF CONFUSION ELEMENTS</u>

You are to consider all of the evidence of likelihood of confusion about the source or sponsorship of Defendants' credit scoring services, with no one factor necessarily having a greater weight than another. Plaintiffs have the burden of proving that there is a likelihood of confusion about the source or sponsorship of the Defendant's credit scoring service.

<u>Source</u>:  *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2006);
*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1990).

128

## JURY INSTRUCTION NO. 83

## **TRADEMARK INFRINGEMENT - KEYWORDS**

Plaintiffs claim that Trans Union and Experian have infringed Plaintiffs' trademarks "FICO" and/or "FAIR ISAAC" by purchasing one or more of these terms as keywords and that Trans Union has infringed Plaintiffs' claimed trademark "300-850" by purchasing the terms "850 credit score" and "850 credit scores" as keywords from Google, MSN, Yahoo, Ask.com or AOL for use in connection with those companies' Internet search engines.  To prevail on this claim, Plaintiffs have the burden of proving by a preponderance of the evidence the following three elements as to each asserted trademark:

1.  that Plaintiffs' claimed marks are valid trademarks, which I defined for you earlier.  The terms "FICO" and "Fair Isaac" are valid trademarks owned by Fair Isaac.  You must determine whether the term "300-850" is a valid trademark based on the factors I described earlier;

2.  as to each of Experian and Trans Union, that the Defendant purchased one of Plaintiffs' trademarks as a keyword from Google, MSN, Yahoo, Ask.com or AOL for use in connection with those companies' Internet search engines; and

3.  that such use of the trademark by that defendant is likely to cause confusion among ordinary consumers, or to deceive them, as to the source, sponsorship or affiliation of that defendant's services.

To prevail against Trans Union, Plaintiffs must also prove that, as a result of Trans Union's purchase of the asserted marks keywords, advertisements for the Trans Union websites that sell Trans Union's own TransRisk score rather than the FICO score appear on the "results" page of Internet search engines.

Source:     *Fair Isaac Corp. v. Experian Information Solutions Inc., et al.*, 2009 WL 2252583, No. 06-4112, at *18 (D. Minn. July 24, 2009); 15 U.S.C. § 1114(1); ABA (IP Litig. Section), Model Jury Instructions, Copyright, Trademark and Trade Dress Litigation § 2.4.1 (2008) (Trademark and Service Mark defined) (Infringement Elements); Devitt and Blackmar, Federal Jury Instructions and Practice, Civil, § 98.05 (4th ed. 1990)(modified); Daimler Chrysler AG  v. Bloom, Civil No. 00-325 DSD/JMM, 2001 WL 1640139 at * 3-4 (D. Minn Oct. 9, 2001) (use of plaitniffs' trademark or misleading representation of it is prerequisite to finding of Lanham Act violation); Moore's Modern Federal Jury Instructions, Instr. 86A-9

(vol. 4 2008); Ninth Circuit Model Civil Jury Instructions 15.5 (2007).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 84

## SAME STANDARD FOR ALL PLAINTIFFS' CLAIMS

Plaintiffs have alleged several claims, including trademark infringement under the federal Lanham Act, unfair competition under the Lanham Act, trademark infringement under Minnesota common law (common law refers to the development of the law through cases), passing off under Minnesota common law, unjust enrichment under Minnesota common law, and deceptive trade practices in violation of the laws of the State of Minnesota. The test I described above for Plaintiffs' trademark infringement claim applies to all of Plaintiffs' claims. The ultimate questions are the same for all of Plaintiffs' claims whether the violation is called trademark infringement, unfair competition, passing off, unjust enrichment, or deceptive trade practices.

First, do Plaintiffs own a valid trademark? You must determine whether the "300-850" term acquired secondary meaning and, if so, whether Plaintiffs acquired secondary meaning in that term before each Defendant first used its scoring range. As to the terms "FICO" and "FAIR ISAAC," that question has already been answered: they are valid trademarks.

Second, did any of the Defendants use a valid trademark belonging to Plaintiffs in a manner that is likely to cause confusion as to the source or sponsorship of a Defendant's credit scoring services? In answering the second question, you must apply the same multi-factor test for likelihood of confusion that I described earlier.

If you determine the term "300-850" is not a valid trademark, you need not answer the second question regarding confusion as it relates to any of Defendants' uses of the term "300-850" or any similar term.

Source:      15 U.S.C. 1125; Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, § 30:27:41 (1998 supp.) (citing *Westinghouse Electric v. General Circuit Breaker*, 41 USPQ2d 1741 (9th Cir. 1997)); *Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.*, 226 F.3d 944, 950 (8th Cir. 2000) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION §16 (1995)); *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 n.3 (8th Cir. 2003) (where common law unfair competition claims and MDTPA claims are based solely upon unauthorized use of a trademark under the Lanham Act, these claims do not require separate analyses); *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217 (D. Minn. 2007) (same); *Rainbow Play Sys., Inc. v. GroundScape*

131

*Techs., LLC*, 364 F. Supp. 2d 1026, 1032, 1039 (D. Minn. 2005) (same); *Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc.*, 822 F. Supp. 1437, 1441 (D. Minn. 1993) (same).

132

**B.     DEFENSES**

NEWYORK 7309435 (2K)

1.    **DEFENDANTS' PROPOSED INSTRUCTIONS**

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 85

### **DEFENSES**

Defendants assert several defenses to Plaintiffs' claims.  If you determine that Plaintiffs have proven their claims by a preponderance of the evidence, you must consider these defenses.

Source:        Ninth Circuit Model Civil Jury Instructions 15.0 (2007).

135

## JURY INSTRUCTION NO. 86

## <u>DEFENSE – FUNCTIONAL VERSUS NONFUNCTIONAL</u>

In this case, Defendants claim that the non-word term "300-850" is functional.  Defendants contend that the term "300-850" does not prohibit Defendants from using a similar or overlapping range of numbers to describe the services the Defendants provide.

Under trademark law, items which are "functional" cannot be legally protected.  That is, use of such items cannot constitute trademark infringement.  For Plaintiffs to prove liability in this case, you therefore must find that the term "300-850" is "non-functional."

In deciding whether the term "300-850" is non-functional, you must evaluate whether the range of numbers "300-850" has any purpose other than identification of the services provided by Fair Isaac.  You must determine whether the range of numbers "300-850" is substantially related to its value as a product or service, in other words, if the range of numbers "300-850" is part of the "function" served, or whether the primary value of the range of numbers from 300 to 850 is the identification of the services provided by Plaintiffs.

A feature of goods or services may be functional because it contributes to efficiency or economy in manufacturing the goods or services or in handling them through the marketing process.  A term may also be functional because it contributes to the utility, durability, or to effectiveness or to ease with which it serves their function or is handled by users.  A feature that adds to the utility or the style and attractiveness may also be functional.  A feature is functional if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.  In other words, a non-word symbol or feature of services is "functional" if it significantly disadvantages another seller or servicer from effectively competing, disregarding any disadvantage which relates to reputation.  If you find from the evidence that the Plaintiffs' term "300-850" substantially contributes to the usefulness, utility or practicality of the services provided, then you must find that the term "300-850" is functional and the Defendants were free to copy or simulate it.

A feature is non-functional if, when it is omitted, nothing of substantial value in the goods is lost.  A feature which merely associates goods with a particular source may be a substantial factor in increasing the marketability of the goods.  But if that is the entire significance of the feature, it is non-functional because its value then lies only in the demand for goods associated with a particular source.

136

   If you find that Defendants have proven this defense by a preponderance of the evidence, then you must find for Defendants on all of Plaintiffs' claims related to Defendants' use of the term "300-850" or any similar term.

Source:     ABA, Model Jury Instructions for Business Tort Litigation, § 4.3.9 (4th ed. 2005) (modified); *Gateway Inc. v. Companion Products, Inc.,* 384 F.3d 503, 508 (8th Cir. 2004) (if term or feature is functional if it puts a competitor at a significant non-reputation-related disadvantage) (*citing Qualitex co. v. Jacobson Products Co.,* 514 U.S. 159, 165 (1995)); *Homebuilders Association of Greater St. Louis v. L & L Exhibition Mgmt.,* 226 F.3d 944, 948 n. 5 (8th Cir. 2000) (trademark law aimed at protecting a firm's reputation; not aimed to inhibit legitimate competition by allowing producer to control a useful or functional product feature); *Rainbow Play Systems, Inc. v. Groundscape Techologies, LLC,* 364 F. Supp.2d 1026, 1037 (D.Minn. 2005) (feature is functional if protection of that feature would hinder competitors or would impinge upon the rights of others to compete effectively); *Goddard, Inc. v. Henry's Foods, Inc.,* 291 F.Supp.2d 1021, 1049 (D.Minn. 2003) (trade dress is functional if protection of feature would hinder competition or impinge on rights of others to compete effectively).

## JURY INSTRUCTION NO. 87

## <u>DEFENSE – CLASSIC FAIR USE</u>

Defendants assert a defense called classic fair use.  The owner of a trademark cannot exclude others from making a fair use of that word or term.  A defendant makes fair use of a mark when the defendant uses it as other than a trademark to accurately describe the defendant's own goods or services.

Defendants contend that they fairly used their scoring ranges to describe a feature of their credit scoring services.  Defendants have the burden of proving their fair use of the term "300-850" or similar terms by a preponderance of the evidence.

Defendants make fair use of a trademark if they:

1.       did not use the term as a trademark;

2.       used the term in a descriptive way, that is, to describe a quality, characteristic or feature of Defendants' goods or services; and

3.       used the term fairly and in good faith.

The purpose of the fair use defense is to ensure that descriptive terms that may be protected in a registered trademark will not be absolutely withdrawn from the vocabulary of commerce.  A party may use a term or terms in good faith to describe its own goods or services if the terms are not used in a trademark sense.

If you decide that "300-850" has acquired secondary meaning and is valid, then because the mark is descriptive there may be some inherent confusion as a result of its descriptiveness.  Defendants' fair use defense may apply even if some inherent confusion exists as a result of Fair Isaac's choosing a descriptive mark.  Fair use of a descriptive mark that has acquired secondary meaning can occur along with some degree of confusion.

If you find that a Defendant has proven this defense by a preponderance of the evidence, then you must find for that Defendant on all of Plaintiffs' claims related to that defendant's use of the term "300-850" or any similar term.

<u>Source:</u>       Ninth Circuit Model Civil Jury Instructions § 15.22 (the above instruction is basedon the Ninth Circuit model instructions); 15 U.S.C. § 1115(b)(4); *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004) ("The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally

NEWYORK 7309435 (2K)

descriptive term was selected to be used as a mark not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first. . . .   If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase. . . .   It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair."); *Edina Realty, Inc. v. TheMLSonline.com*, 2006 WL 737064, *6 (D.Minn. Mar 20, 2006) ("Fair use can occur along with some degree of confusion."); *National Federation of the Blind v. Loompanics Enterprises, Inc.*, 936 F. Supp. 1232, 1239 (D.Md. 1996) ("The purpose of the fair use defense is to ensure descriptive terms that are protected in a registered mark not be absolutely withdrawn from the lexicon of commerce.").

139

## JURY INSTRUCTION NO. 88

## DEFENSE – NOMINATIVE FAIR USE

Another defense that Defendants Experian and Trans Union assert is called nominative fair use.  Defendants contend that their use of the terms "FICO" and "FAIR ISAAC" as keyword search terms on Internet search engines was a nominative fair use.  Defendants assert their defense of nominative fair use only with respect to their use of the terms "FICO" and "FAIR ISAAC" as keyword search terms on Internet search engines.  Defendants do not assert the defense with respect to Plaintiffs' allegations regarding Defendants' alleged uses of the term "300-850."  This defense does not apply to VantageScore Solutions, LLC.

Defendants contend that they did not infringe Plaintiffs' trademarks because the alleged infringement was a nominative fair use of the trademarks to describe Plaintiffs' credit scoring services, even if the Defendants' ultimate goal was to describe their own credit scoring services or other services.  Defendants have the burden of proving their nominative fair use of the mark by a preponderance of the evidence.

Defendants make nominative fair use of a trademark if they:

   1.   Used the trademark to identify or refer to Plaintiffs' credit scoring service, which was not readily identifiable without use of that trademark;

   2.   Used only so much of the trademark as was reasonably necessary to identify or refer to Plaintiffs' credit scoring service; and

   3.   Did not do anything that would in connection with the trademark suggest sponsorship or endorsement of a Defendant's product or service by the Plaintiffs.

A service cannot be effectively identified without use of its trademark when there would be no other effective way to compare, criticize, refer to or identify it without using the trademark.

The fact that a Defendant's use of the trademark may bring that Defendant a profit or help in competing with the mark owner does not mean the use was not a nominative fair use.

If you find that a Defendant has proven this defense by a preponderance of the evidence, then you must find for that Defendant on all of Plaintiffs' claims

140

related to that defendant's use of the terms "FICO" and "FAIR ISAAC" as keyword search terms on Internet search engines.

Source:          Ninth Circuit Model Civil Jury Instructions 15.23 (2007) (the above instruction is based on the Ninth Circuit model instructions); *Edina Realty, Inc. v. TheMLSonline.com*, 2006 WL 737064, *6 (D. Minn. Mar 20, 2006) ("Where a defendant uses a mark to describe a plaintiff's product, rather than its own, defendant is entitled to a nominative fair use defense provided the following three requirements are met: '(1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services.'") (quoting *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 222 (3rd Cir. 2005)).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 89

## DEFENSE – EQUITABLE PRINCIPLE OF WAIVER

Defendants Experian and Trans Union assert as a defense that Plaintiffs have waived their claims related to the term "300-850" because Plaintiffs delayed for an inexcusably long time before taking action to bring this lawsuit, and that Defendants have been unduly prejudiced by that delay.

To sustain its waiver claim, Experian and Trans Union must prove by a preponderance of the evidence the following as to each Defendant:

1.  Plaintiffs had knowledge of a Defendant's or other third party's use of the "300-850" mark;

2.  After acquiring that knowledge, Plaintiffs inexcusably delayed in taking action with respect to such use by that Defendant; and

3.  The Defendant was unduly prejudiced or harmed by such delay.

If you find that a Defendant has proven this defense by a preponderance of the evidence, then you must find for that Defendant on all of Plaintiffs' claims related to that Defendant's use of the term "300-850" or any similar term.

Source:    Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, § 30:70:03 (1998 supp.); 2 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. 2005 § 31:1; *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999); *3M v. Beautone Specialties*, 82 F. Supp. 2d 997, 1003 (D. Minn. 2000); *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408-12 (6th Cir. 2002), *cert. denied*, 538 U.S. 907 (2003) (if the plaintiff's delay exceeds the relevant statute of limitations period, the plaintiff should bear the burden of proving that its delay was not unreasonable and that defendant did not suffer prejudice, and unavailability of important witnesses, dulling of memories of witnesses, and loss or destruction of relevant evidence all constitute prejudice); *McFarland v. E&K Corp.*, Civ. No. 4-89-727, 1991 WL 13728, at *3 (D. Minn. Jan. 17, 1991).

NEWYORK 7309435 (2K)

# JURY INSTRUCTION NO. 90

## DEFENSE – EQUITABLE PRINCIPLE OF ACQUIESCENCE

Defendants Experian and Trans Union assert that the equitable defense of acquiescence applies here.  This defense does not apply to VantageScore Solutions, LLC.  Defendants allege that Plaintiffs have by actions or words communicated to Defendants their consent to use the term "300-850." Communication of consent can be either express or implied.  Plaintiffs cannot indicate at one time to Defendants that their acts are acceptable and then later sue Defendants after Defendants acted in reliance on Plaintiffs' actions or words.

To prove this defense, both Experian and Trans Union must show by a preponderance of the evidence that: (1) Plaintiffs represented by their actions or words that they would not assert a right or claim over the term "300-850"; (2) the delay between Plaintiffs' representation to this effect and the later assertion of their rights over the term "300-850" was unreasonable; and (3) the Defendant will be unfairly harmed if Plaintiffs are permitted to assert their rights over the term "300-850" now.

If you find that a Defendant has proven this defense by a preponderance of the evidence, then you must find for that Defendant on all of Plaintiffs' claims related to that Defendant's use of the term "300-850" or any similar term.

Source:    2 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. 2005 §§ 31:41, 31:42; *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* Civil No. 00-2317, 2002 WL 1763999, at *9-10 (D. Minn. July 26, 2002).

## JURY INSTRUCTION NO. 91

## <u>DEFENSE – EQUITABLE PRINCIPLE OF UNCLEAN HANDS</u>

Another defense that Defendants Experian and Trans Union assert is called unclean hands. Defendants contend that the doctrine of unclean hands bars Plaintiffs' claims related to Defendants' use of the terms "FICO" and "FAIR ISAAC" as keyword search terms on Internet search engines. Defendants do not assert unclean hands as a defense to Plaintiffs' "300-850" trademark infringement claims. This defense does not apply to VantageScore Solutions, LLC.

To prove the defense of unclean hands, Defendants must prove that Plaintiffs have engaged in unfair conduct related to Plaintiffs' trademark infringement claims. Defendants allege that Plaintiffs used Defendants' trademarks as keywords in Internet searches, and thus cannot now claim trademark infringement for the same conduct.

If you find that Plaintiffs unfairly used a Defendant's trademark or trademarks as keywords, then you may find that Plaintiffs cannot assert a claim of trademark infringement for the same conduct.

<u>Source</u>:      Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, § 30:70:23 (1998 supp.); *Manhattan Medicine Co. v. Wood*, 108 U.S. 218, 225 (1883); *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992); *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 870 (9th Cir. 2002); *Haagen-Dazs v. Frusen Gladje Ltd.*, 493 F. Supp. 73 (S.D.N.Y. 1980) (denying preliminary injunction where plaintiff was "guilty of the same deceptive trade practices of which it accuses Defendants" because, "since plaintiff's hands are similarly unclean, they may not secure equitable relief simply because Defendants' hands may be a shade or two less clean."); *Precision Instr. Mfg. Co. v. Automotive Maintenance Mach.*, 324 U.S. 806, 815 (1945) ("Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim . . . .") (emphasis added); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Callahan*, 265 F. Supp. 2d 440, 444-45 (D. Vt. 2003) (denying preliminary injunction sought by plaintiff to prevent defendant from soliciting plaintiff's clients because plaintiff "seeks to enjoin the same behavior in which it engages as a matter of company policy"); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1227, 1238 (S.D.N.Y. 1990) ("Since Donvier appears to have engaged in the very same conduct it has challenged [false advertising], the court

144

would have been hard pressed to grant it any equitable relief, even if the conduct of Salton had violated the Lanham Act."); *Western Union Telegraph Co. v. MCI Communications Corp.*, No. 85 Civ. 5800, 1986 WL 2769, at *1-2 (S.D.N.Y. Feb. 26, 1986) (granting motion to compel materials relevant to unclean hands defense where defendant, who plaintiff alleged improperly diverted international telex traffic, claimed that plaintiff offered bribes to public officials to divert telex traffic).

145

**JURY INSTRUCTION NO. 92**

**DEFENSE - RELEASE**

Trans Union asserts that by virtue of an Agreement dated March 19, 2004 and a Confidential Settlement Agreement dated September 30, 2005, Plaintiffs released and discharged Trans Union from any and all claims that Plaintiffs then had against Trans Union.

If you find that Plaintiffs' claim related to Trans Union's use of the term "300-850" was released by virtue of the March 19, 2004 Agreement or the September 30, 2005 Confidential Settlement Agreement, then you must find in favor of Trans Union.

SOURCE:   O'MALLEY, *FEDERAL JURY PRACTICE AND INSTRUCTIONS*, SECTION 155.53 (5TH ED. 2001) (FEDERAL EMPLOYERS LIABILITY ACT RELEASE INSTRUCTION MODIFIED)

146

## 2.     PLAINTIFFS PROPOSED INSTRUCTIONS

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 93

## FUNCTIONAL VERSUS NONFUNCTIONAL

Each of the defendants assert a functionality defense, claiming that Fair Isaac's "300-850" marks are functional and therefore not eligible for trademark protection. The defendants have the burden of proving by the greater weight of the evidence that the "300-850" marks are functional.

A product feature is functional if it is essential to the use or purpose of the product or if it affects the cost or quality of the product. For a defendant to succeed with this defense, that defendant must do more than demonstrate that Fair Isaac's "300-850" marks serve some function; the defendant must prove that it cannot compete effectively unless it uses Fair Isaac's "300-850" marks.

Authority:

- *Fair Isaac Corporation et al. v. Equifax, Inc. et al.*, No. 06-CV-4112, Order Denying Defendants' Motion to Compel at 14 (D. Minn. October 10, 2007) (Magistrate Judge Mayeron holding in this case that the analysis set forth in a trade-dress case is inapplicable to this case "considering that the 300-850 scoring range is being characterized by Fair Isaac as a trademark regarding a good, as opposed to a design trade dress");

- *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782 (9th Cir. 2002) ("The relationship between the trademark protection and functionality is well established: 'the physical details and design of a product may be protected under the trademark laws only if they are nonfunctional . . . .'");

- *Home Builders Assoc. of Greater St. Louis v. L & L Exhibition Mgmt, Inc.*, 226 F.3d 944, 948 (8th Cir. 2000) ("In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article;" "A feature is functional 'if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage" "the fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be necessary to afford a competitor the means to compete effectively.");

- *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (holding that owner of a registered trademark "is entitled to the

148

presumption that the marks are valid" and therefore does not have the burden to prove functionality.) ("Every trademark, by definition, performs a function, namely that of identifying the source of the goods bearing the mark.");

- *Ott v. Target Corp.*, 153 F. Supp.2d 1055, 1063 (D. Minn. 2001) (defining functionality in a trade-dress case and stating "in determining functionality, the Court must view the design elements as a whole, not individually" "if a feature or a combination of features of a product is functional, it is not protected and may be copied by competitors in the marketplace . . ." "if a competitor can effectively compete without copying a particular feature or combination of features, the trade dress is nonfunctional.");

- *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 160 (U.S. 1995) (there is no competitive need to use a symbol such as a color if other colors are equally usable.).

149

## JURY INSTRUCTION NO. 94

## <u>CLASSIC FAIR USE</u>

As another defense against Fair Isaac's claim that the defendants infringed Fair Isaac's "300-850" marks, the defendants assert that their use of the "300-850" marks was a fair use. Fair Isaac cannot prevent the defendants from making a fair use of the "300-850" marks. But a defendant cannot pursue this defense if you find that the defendant willfully infringed on Fair Isaac's "300-850" marks.

If you find that a defendant did not willfully infringe on Fair Isaac's "300-850" marks, this defense is available only if the defendant proves all of the following by the greater weight of the evidence:

1. the defendant used Fair Isaac's marks only to describe the defendant's own goods or services;

2. the defendant used Fair Isaac's marks fairly and in good faith; and,

3. the defendant did not use the marks as a trademark.

*Fairly.* In determining whether the defendant's use of Fair Isaac's marks was made fairly, you can consider any number of factors that you believe are relevant, including:

1. any evidence of likelihood of confusion resulting from the use;

2. the defendant's commercial justification for using the marks; and,

3. the strength of the marks.

*Good faith.* If you find that equally useful alternatives were available to a defendant but the defendant intentionally used Fair Isaac's marks, then the defendant did not act in good faith. If you find that a defendant shifted from some other descriptive term to a term more similar to Fair Isaac's "300-850" marks after Fair Isaac adopted "300-850" as a mark, then the defendant also did not act in good faith.

Authority:

- 15 U.S.C. § 1115(b)(4) (reference to fair-use defense);

150

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at § 2.5.10 (ABA Publishing, 2008) (proposing similar language as a general instruction for actual damages);

- *Restatement (Third) of Unfair Competition* § 28 (1995) (commenting on the issue of bad faith: "[I]f the evidence establishes that the subsequent user intends to trade on the good will of the trademark owner by creating confusion as to source or sponsorship, the use is not in good faith." "Use by the actor of the precise form of the descriptive term adopted by the trademark owner can be evidence of bad faith when equally useful alternative forms are available." "Similarly, a shift by the actor form other descriptive words to the trademarked terms after another's adoption of the term as a trademark can also indicate bad faith.");

- *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 23 (2004) ("It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair.").

## JURY INSTRUCTION NO. 95

## <u>NOMINATIVE FAIR USE</u>

Another defense that the defendants Experian and Trans Union assert is called nominative fair use. Experian and Trans Union assert this defense only with respect to their use of Fair Isaac's "FICO" and "Fair Isaac" marks as keyword search terms on Internet search engines; Experian and Trans Union do not assert this defense with respect to Fair Isaac' allegations regarding their alleged uses of Fair Isaac's 300-850 trademarks. This defense does not apply to VantageScore Solutions, LLC.

To successfully assert a defense of nominative fair use, Experian and Trans Union must prove by the greater weight of the evidence that they could not have advertised their products and services without using the "FICO" and "Fair Isaac" marks; the defendants must prove, in other words, that they had to use "FICO" and "Fair Isaac" in their advertising—that they could not have advertised by using keyword search terms such as "credit score" or "credit scoring" or "consumer credit score."

If you find that the defendants have proven that they could not have advertised their products and service without using the "FICO" and "Fair Isaac" marks, the defendants must also prove, by the greater weight of the evidence, (1) that they only used as much of those marks as was necessary to describe Fair Isaac's products or services and (2) that the defendants' conduct or language in using Fair Isaac's marks reflected the true and accurate relationship between Fair Isaac's products or services and their own.

If you find that the defendants have failed to prove even one of these three elements, then this defense must fail.

Authority:

- *Edina Realty, Inc. v. TheMLSonline.com*, 2006 WL 737064, *6-7 (D. Minn. Mar 20, 2006) (the defendant used the "Edina Realty" mark as a paid Internet search term and asserted that its use was nominative fair use; the Court dismissed the defense as a matter of law because the defendant was not *required* to use the mark in its search-term advertising; the defendant could have relied on other search terms, such as "Twin Cities real estate," to generate its advertisement).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 96

## <u>WAIVER</u>

Trans Union and Experian each assert that Fair Isaac waived its right to claim trademark infringement relating to its "300-850" marks because Fair Isaac delayed for too long before bringing its claim. To establish that Fair Isaac waived its trademark-infringement claim, Experian and Trans Union must prove by the greater weight of the evidence that Fair Isaac voluntarily and intentionally relinquished its rights to bring these trademark-infringement claims.

Authority:

- *Haghighi v. Russian-American Broadcasting Co.*, 173 F.3d 1086, 1088 (8th Cir. 1999) ("Waiver requires evidence of a voluntary and intentional relinquishment or abandonment of a known right."); *accord Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club*, Civil No. 00-2317, 2002 WL 1763999 at *10 (D. Minn. July 22, 2002);

- *Klipsch, Inc. v. WWR Technology, Inc.*, 127 F.3d 729, 737 (8th Cir. 1997) ("[W]aiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it.").

153

## JURY INSTRUCTION NO. 97

## ACQUIESCENCE

Trans Union and Experian assert that Fair Isaac is barred from enforcing its "300-850" marks by the doctrine of acquiescence. To succeed with this defense, a defendant, by the greater weight of the evidence, must show:

1.  that Fair Isaac actively represented to the defendant that it would not assert a trademark-infringement claim against the defendant;

2.  that the delay between Fair Isaac's representation and the filing of this lawsuit was not excusable; and,

3.  that the defendant suffered undue prejudice because of the delay.

If you find that a defendant failed to prove even one of these elements, then the defense of acquiescence does not apply.

Authority:

- 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:41 (4th ed. 1998);

- *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club*, Civil No. 00-2317, 2002 WL 1763999 at *11 (D. Minn. July 22, 2002) ("The defense of acquiescence requires proof of three elements (1) that [plaintiff] actively represented that it would not assert a right or a claim; (2) that the delay between [plaintiff's active representation and assertion of its right or claim was not excusable; and (3) that the delay caused defendant undue prejudice.");

- *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991) (defendant must prove that plaintiff "actively represented that it would not assert a right or claim.");

- *Hogdon Powder Co. v. Alliant Techsystems, Inc.*, 396 F. Supp. 2d 1262, n.6 ("acquiescence denotes active consent to use of a mark.");

- *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1334 (11th Cir. 1996) ("Upon a showing that inevitable confusion arises from the continued dual use of the marks, a senior user's claim may be

154

revived . . . the purpose of such revival is to vindicate the public interest in avoiding inevitable confusion in the marketplace.");

- *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463 (4th Cir. 1996) (public policy requires that estoppel by acquiescence "not be rigidly applied in cases like this one, where the likelihood of confusion is apparent.").

155

## JURY INSTRUCTION NO. 98

### PROGRESSIVE ENCROACHMENT

If you find that Fair Isaac delayed asserting its claims against a defendant but the delay was excusable, then the defendant cannot succeed with the defense of acquiescence. The owner of a trademark has no obligation to sue until the likelihood of confusion looms large and the owner's right to protection of its mark has clearly ripened. The time of any alleged delay is measured, therefore, not from when the trademark owner first learned of the potentially infringing conduct but from when the infringement became actionable and provable.

In determining whether Fair Isaac delayed in bringing its claim, you should also consider whether Experian and Trans Union altered or expanded their marketing efforts or changed the nature of their infringing use over time, so that their uses became more confusingly similar or more directly competitive with Fair Isaac. If you find this to be the case, then you can conclude that any alleged delay by Fair Isaac in asserting its claims is excused.

Regardless of whether Trans Union and Experian prove the three factors required for acquiescence, if it is apparent that Trans Union and Experian's use of Fair Isaac's "300-850" marks will cause inevitable consumer confusion, then the defendants cannot succeed with an acquiescence defense.

Authority:

- *Champagne Louis Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 859 (8th Cir. 2009) ("the time of delay is to be measured not from when the plaintiff first learned of the potentially infringing mark, but from when such infringement became actionable and provable;" "the doctrine of progressive encroachment makes sense . . . [o]therwise, trademark holders would be hoisted upon the horns of an inequitable dilemma-sue immediately and lose because the alleged infringer is insufficiently competitive to create a likelihood of confusion, or wait and be dismissed for unreasonable delay.") (citation omitted);

- 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:19 (4th ed. 1998) (owner of a mark "has no obligation to sue until

156

the likelihood of confusion looms large" and "cannot be guilty of laches until his right ripens into one entitled to protection");

- *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008) (applying the doctrine of progressive encroachment to acquiescence defense) (cited with approval by *Champagne Louis Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 859 (8th Cir. 2009.));

- *Kellogg v. Exxon Corp.*, 209 F.3d 562, 570-71 & 573-74 (applying doctrine of progressive encroachment to Acquiescence defense) (under the doctrine of progressive encroachment, plaintiff's claim was not ripe until defendant expanded use into new consumer market-from the petroleum market to convenience stores-to more directly compete with plaintiff.);

- *SCI* Systems, *Inc. v. Solidstate Controls, Inc.*, 748 F. Supp. 1257, 1262 (S.D. Ohio 1990) (doctrine of progressive encroachment applied when defendant "expanded its line and entered into new marketing areas [, and] . . . changed the appearance of its mark.").

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 99

### UNCLEAN HANDS

The defendants contend that the doctrine of unclean hands bars Fair Isaac's claims related to the defendants' use of "FICO" and "Fair Isaac" as keyword search terms. The defendants do not assert unclean hands as a defense to Fair Isaac's trademark-infringement claims for the "300-850" marks, so those claims of Fair Isaac are unaffected by this defense.

To meet their burden on showing "unclean hands" with respect to Fair Isaac's claims for infringement of its "FICO" and "Fair Isaac" marks, the defendants must show by the greater weight of the evidence that Fair Isaac committed misconduct directly related to its "FICO" and "Fair Isaac" marks. Any conduct of Fair Isaac relating to any trademarks of the defendants has absolutely no bearing on this issue and should be disregarded by you.

Authority:

- *Fair Isaac Corporation et al. v. Equifax, Inc. et al.*, No. 06-CV-4112, Order Denying Defendant's Motion to Compel and Granting in Part and Denying in Part Plaintiffs' Motion to Compel, at 5-12 (D. Minn., December 20, 2007) (Magistrate Judge Mayeron, in this very case, denying on relevance grounds defendants' motion to compel production of documents showing the keywords that Fair Isaac uses: "To succeed with the affirmative defense of unclean hands, a defendant must show that the plaintiff committed a wrongdoing that is directly related to the claim which it has asserted"; "In the trademark infringement context, courts have concluded that the defense of unclean hands is only applicable if a plaintiff's malfeasance was sufficiently related to the trademark that the plaintiff was attempting to enforce"; denying Defendants' motion to compel the production of documents showing Fair Isaac's own keyword purchases and explaining, with respect to five of the cases Defendants' cite in their proposed jury instruction, that "Defendants' suggestion that the unclean hands doctrine bars a trademark infringement claim where the plaintiffs' inequitable conduct is not related to the trademark at issue, but rather where the plaintiff has engaged in similar type of conduct against the defendant, is not supported by the cases cited by defendants.");

158

- *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933) ("They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.");

- *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992) ("The defense does not apply 'where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts' affect the equitable relations between the parties with respect to the controversy.");

- *Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004) (affirming a finding of unclean hands where the "related conduct" that will permit application of the unclean hands doctrine in a trademark case "arises when the plaintiff has acted inequitably toward the defendant in relation to the trademark.");

- *Japan Telecom, Inc. v. Japan Telecom America, Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (district court erred in finding that Japan Telecom had unclean hands because its trade name is primarily geographically deceptively mis-descriptive: "To make out an unclean hands defense, a trademark defendant 'must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.'") (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987);

- *Trace Minerals Research, L.C. v. Mineral Resources Intern., Inc.*, 505 F. Supp.2d 1233, 1244 (D. Utah 2007) ("To succeed on its defense, MRI must show that TMR's alleged inequitable conduct is sufficiently related to the substance of its trademark claim to give rise to an unclean hands defense.");

- *Flow Control Industries Inc. v. AMHI Inc.*, 278 F. Supp.2d 1193, 1198 (W.D. Wash. 2003) ("The doctrine of unclean hands would preclude enforcement of a trademark only if plaintiff's wrongdoing related to the getting or using of the trademark rights that plaintiff was attempting to enforce. The fact that plaintiff may have infringed

159

defendants' AMFLOW trademark has nothing to do with the manner in which plaintiff obtained or used its SKOFLO mark.");

- *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174, 2001 WL 747422 at *2 (N.D. Ill. June 29, 2001) ("Where, on the other hand, the unclean hands are only collaterally related to the trademark that is the subject of the lawsuit, the defense does not operate to bar suit for infringement.");

- *Gidatex S.r.L. v. Campeniello Imports, Ltd.*, 82 F. Supp.2d 126, 131 (S.D.N.Y. 1999) (holding that unclean hands defense failed in a trademark infringement suit where the misconduct underlying the defense related to an agreement between the parties, but did not directly relate to the trademark infringement claim);

- *Consumerinfo.com, Inc. v. Money Management International, Inc.*, No. CV 07-04275, 2008 WL 4183928, at *6-7 (C.D. Cal. Sept. 2, 2008) (Experian's sister company, Consumerinfo.com (aka, Experian Consumer Direct), sued for trademark infringement of its "My Score PLUS" mark and succeeded in having the defendant's unclean-hand defense dismissed because Experian's mark was not involved in the alleged unclean-hands conduct);

- *Mytee Prods., Inc. v. H.D. Prods., Inc.*, No. 05CV2286 R(CAB), 2007 WL 1813765, at *8 (S.D. Cal. June 22, 2007) ("Here, defendants have failed to present any evidence from which a factfinder could find that Mytee 'dirtied its hands' acquiring the trademark rights it now seeks to assert. Accordingly, Mytee is entitled to summary judgment with respect to defendants' defense of unclean hands.");

- 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:51 (4th ed. 1998) ("Unclean hands must relate to the getting or using the alleged trademark rights.").

# JURY INSTRUCTION NO. 100

## RELEASE

Trans Union asserts that Fair Isaac contractually released and discharged Trans Union from the claims involved in this lawsuit. Releases in contracts are interpreted and applied narrowly against the benefitting party, which, in this instance, would be Trans Union. A release, to be effective, must spell out the intention of the parties with great particularity. General release language—including language like "all disputes arising from or related to"—does not cover claims that the parties did not mutually intend to be covered. Claims that were not contemplated by the parties at the time the release was signed are not covered by general release language in a contract. A release, in other words, will not be construed to defeat a valid claim that was not within the contemplation of the parties at the time the agreement was executed, and general words of release are inapplicable to unknown claims.

Authority:

- *Fuller Family Holding, LLC v. Northern Trust Co.*, 863 N.E.2d 743, (Ill. App. Ct. 2007), *appeal denied*, 875 N.E.2d 1111 (Ill. 2007) ("General words of release are restrained in effect by the specific recitals contained in the document. Releases are strictly construed against the benefitting party and must spell out the intention of the parties with great particularity. The intention of the parties controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement. Where a releasing party was unaware of other claims, Illinois law restricts the release to the particular claims that are explicitly covered by the agreement. Therefore, a release will not be construed to defeat a valid claim that was not within the contemplation of the parties at the time the agreement was executed, and general words of release are inapplicable to unknown claims.");

- *In re Estate of Gallagher*, 890 N.E.2d 1249, 1253-54 (Ill. App. Ct. 2008) (stating "[i]n executing the settlement agreements here, petitioners agreed to release Gallagher, both individually and as managing partner of G & H Entities, 'from any and all claims . . . arising out of [petitioners'] ownership interest in any of the G & H [Entities] . . . provided, however, that this release does not extend to any claims

161

arising out of or related to the rights and obligations reflected in this [settlement] [a]greement or documents created in connection with it," and finding that "[a]lthough it is undisputed that the promissory notes were created in connection with the settlement agreements," the releases do not extinguish Gallagher's individual liability on the notes);

- *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 762 (Ill. App. Ct. 2003) ("A release, however, will not be construed to include claims not within the contemplation of the parties. In many cases, a release makes clear on its face what claims were within the contemplation of the parties at the time the release was given. In other instances, the release provides very general language that does not indicate with any clear definition what claims were within the contemplation of the parties. In such cases, the courts will restrict the release to the thing or things intended to be released and will refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties. In other words, general releases do not serve to release unknown claims, which the party could not have contemplated releasing when it gave the release.") (internal quotations and citations omitted);

- *Carlile v. Snap-on Tools*, 648 N.E.2d 317, 321 (Ill. App. Ct. 1995)("[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties.") (internal quotations and citations omitted);

- *Pennwalt Corp. v. Metropolitan Sanitary Dist. of Greater Chicago*, 368 F. Supp. 972, 979 (N.D. Ill. 1973) ("The law in Illinois and in other jurisdictions is clear that a release, no matter how broad its terms, does not include claims not within the contemplation of the parties. As early as the nineteenth century, the Illinois Supreme Court held that a general release is inapplicable to unknown claims. It is well settled that a court of equity will not allow the releasee to take advantage of the general words of a release to defeat the collection of a demand not then in the minds of the parties. Since the release that the Sanitary District imposed on Pennwalt was intended to cover only 'performance of the contract' it would not be construed under Illinois law to cover an unrelated matter such as use tax liability.") (internal quotations and citations omitted).

162

## C.    DAMAGES

NEWYORK 7309435 (2K)

1.     **PLAINTIFFS' PROPOSED INSTRUCTIONS**

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 101

### DAMAGES OVERVIEW

If you find that any defendant has infringed a trademark of Fair Isaac's or passed off its products or services for Fair Isaac's, then you can award damages to Fair Isaac. "Damages" means an amount of money that will reasonably and fairly compensate Fair Isaac for any injury caused by a defendant's infringement or passing off.

Fair Isaac must prove the amount of its damages by the greater weight of the evidence. It is not necessary for Fair Isaac to prove that a defendant acted willfully to recover actual damages.

Damages in this case would fall into one or both of two categories: (1) an amount that is referred to as "lost profits" or in amount that is referred to as "reasonable royalties"—both of which are called "actual damages"; and (2) "disgorgement" in the amount of the defendant's ill-gotten gains or profits from its infringement or passing off. I will instruct you further on the requirements for each of these two categories of damages and I will provide you with guidance on how to calculate an award.

Authority:

- 15 U.S.C. § 1117(a) (a plaintiff who has established a violation of rights is entitled to recover the "defendant's profits" and "any damages sustained by the plaintiff," in addition to "the costs of the action");

- Minn. Stat. §§ 325D.45, subd. 3 (2008) ("the relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state.");

- 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:75 (West, 2009) (stating "no wrongful intent or state of mind is needed for recovery of actual damages");

- *Metric & Multistandard Components Corp. v. Metric's, Inc.*, 635 F.2d 710, 716 (8th Cir. 1980) (in addition to governing damages for violations of registered marks, Section 1117(a) governs damages in cases involving violation of unregistered trademarks under 15 U.S.C. §1125(a));

- *Wildlife Research Center, Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005) ("For violations of the Lanham Act based

165

on false advertising, a plaintiff's recovery may include both actual damages and the defendant's profits.").

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 102

## ACTUAL DAMAGES: GENERALLY

If you find that Fair Isaac has proven infringement or passing off and that infringement or passing off caused Fair Isaac damages, then you must determine the amount of Fair Isaac's "actual damages." Fair Isaac has presented two different grounds for actual damages, including:

1. "lost profits" that Fair Isaac would have earned from additional sales of Fair Isaac's credit scores to consumers were it not for the defendants' infringement of Fair Isaac's marks or passing off; and

2. a "reasonable royalty" for the defendants' use of Fair Isaac's marks or goodwill (or both) to sell, advertise, and promote sales of the defendants' non-Fair Isaac products.

I will now provide more details on each of these two grounds for actual damages.

Authority:

- 15 U.S.C. § 1117(a) (a plaintiff who has established a violation of rights is entitled to "any damages sustained by the plaintiff");

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at § 2.8.3 (ABA Publishing, 2008) (proposing similar language as a general instruction for actual damages);

- *Ninth Circuit Manual of Model Jury Instructions: Civil* § 15.25 (2007) (some similar language and structure);

- *Cashman v. Allied Prods. Corp.*, 761 F.2d 1250, 1252-53 (8th Cir. 1985) (Minnesota law provides for the recovery of lost profits so long as the damages are not speculative, remote or conjectural);

- *Masters v. UHS of Delaware*, 2008 WL 5586244 at *3 (E.D. Mo. Oct. 20, 2008) (actual damages in a trademark-infringement case can include reasonable royalties; "similar to *Sands, Taylor & Wood*, in this case the most exact measure of plaintiff's actual damages, if ascertained with reasonable certainty, is the cost of a reasonable royalty");

- *Obear-Nester Glass Co. v. United Drug Co.*, 149 F.2d 671, 674 (8th Cir. 1945) ("Damages recoverable may include all elements of injury to the

167

NEWYORK 7309435 (2K)

business of the trademark owner proximately resulting from the infringer's wrongful acts, such as profits on lost sales, loss from reduction in the price of goods due to the infringing competition, damage to the reputation of the trademark owner's goods or business, and expenses incurred in preventing purchasers from being deceived by the infringer's wrongful conduct.").

168

## JURY INSTRUCTION NO. 103

## ACTUAL DAMAGES: LOST PROFITS

In arriving at the amount of the award, you should include any damages suffered by Fair Isaac because of lost profits—that is to say, profits that Fair Isaac would have made but for the unlawful conduct of a defendant.

If you find that the weight of the evidence shows that a loss in Fair Isaac's profits was caused by a defendant's trademark infringement or passing off but that the precise amount of Fair Isaac's damages are difficult to ascertain, this should not affect Fair Isaac's recovery, particularly if the defendant caused the difficulty in determining the precise amount.

On the other hand, Fair Isaac is not to be awarded purely speculative damages. You can only make an award of lost profits if there is some reasonable basis to determine that Fair Isaac has, in fact, suffered a loss of profits, even though the amount of the loss might be difficult to determine.

In determining the amount of any lost profits, you are entitled to consider any past earnings of Fair Isaac in the credit-scoring business, as well as any other evidence in the case bearing on the issue.

Authority:

- 3 Kevin F. O'Malley et al., *Federal Jury Practice and Instructions--Civil* at 474-75, § 129.30 (5th ed. 2000) (similar to the above but not in plain English) (citing *Cashman v. Allied Products Corp.*, 761 F.2d 1250, 1252-53 (8th Cir. 1985)).

- *Cashman v. Allied Products Corp.*, 761 F.2d 1250, 1252-53 (8th Cir. 1985) (Minnesota law provides for the recovery of lost profits so long as the damages are not speculative, remote, or based on conjecture).

## JURY INSTRUCTION NO. 104

## <u>ACTUAL DAMAGES: REASONABLE ROYALTY</u>

Fair Isaac is also seeking actual damages in the form of a reasonable royalty, as an alternative to lost profits. A royalty is a payment made to the owner of a trademark or the holder of goodwill by a non-owner for the right to use the trademark or goodwill.

A reasonable royalty is the royalty that would have resulted from a hypothetical negotiation between Fair Isaac and a company in the position of the defendant, taking place just before the trademark infringement or passing-off began. In the case of a reasonable royalty for trademark infringement, you should assume that both parties to that hypothetical negotiation understood the trademark to be valid.

The following factors can be considered in determining a reasonable royalty rate:

1.   royalty rates received in earlier licenses by Fair Isaac for the mark;

2.   earlier rates paid by the defendant for use of comparable marks;

3.   the nature and scope of the license, such as exclusive or non-exclusive;

4.   Fair Isaac's established policy and marketing program to maintain its exclusive use by not licensing others;

5.   the commercial relationship between Fair Isaac and the defendant, such as whether they are competitors;

6.   the special value of the mark to the defendant;

7.   the duration of the trademark and term of the license;

8.   the profitability of the product marked with the trademark, its commercial success; and its current popularity;

9.   the utility and advantages of the trademark over earlier marks;

10.  the nature of the trademarks and the benefits to those who have used the trademark;

11.  the extent to which the defendant has used the mark;

12.  reasonable royalties within the industry;

170

13. the portion of realizable profits that should be credited to the trademark as distinguished from other elements;

14. opinion testimony by experts; and,

15. the amount that the defendant and Fair Isaac would have agreed on in voluntary negotiations.

Authority:

- *A & L Labs, Inc. v. Bou-Matic, LLC*, 2004 WL 1745865 at *2 (D. Minn. August 2, 2004) ("Generally, reasonable royalties are awarded as a measure of damages for infringement of a patent or trademark"; listing the fifteen factors above to aid in a royalty determination) (citing *Georgia Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) and *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340 (7th Cir. 1994)), *aff'd*, 429 F.3d 775 (8th Cir. 2005);

- *Ramada Inns, Inc. v. Gadsen Motel Co.*, 804 F.2d 15562, 1565 (11th Cir. 1986) (royalties normally received for the use of a mark are the proper measure of damages for the misuse of the mark);

- *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 967 F. Supp. 1457, 1479 (E.D.Pa.,1997) ("the most appropriate and accurate damages remedy [in this case] would be to award Plaintiffs a reasonable royalty");

- 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:85-87 (West, 2009) (explaining when a reasonable royalty is an appropriate measure of damages in trademark-infringement cases).

## JURY INSTRUCTION NO. 105

## **DEFENDANTS' PROFITS**

In addition to actual damages, Fair Isaac is entitled to disgorgement of any profits earned by a defendant that are attributable to the infringement or passing off. But you cannot include in any award of profits any amount that you included in determining actual damages.

A defendant's profit is determined by deducting all expenses from gross revenue. Gross revenue consists of all money derived by the defendant from the sale of any product that infringed Fair Isaac's mark or that the defendant passed off as Fair Isaac's product. Fair Isaac has the burden of proving the defendant's gross revenue by the weight of the evidence.

"Expenses" are all operating and production costs incurred in producing the gross revenue. The defendant has the burden of proving the expenses and the portion of the profit attributable to factors other than use of the infringed trademark by the weight of the evidence.

Unless you find that a portion of the profit from a defendant's sale is attributable to factors other than use of the trademark or as a result of passing off, you must find that the total profit is attributable to the infringement or passing off.

Authority:

- 15 U.S.C. § 1117(a) (entitling a plaintiff to recover a defendant's profits);

- 3A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions—Civil* at 895-96, § 159.92 (5th ed. 2000) (similar to the proposed instruction above);

- *Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793, 794 (8th Cir. 1986) ("The defendant bears the burden in calculating profits of proving any operating costs to be deducted from sales revenue it realized during the period of trademark infringement.");

- *Wildlife Research Center, Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005) ("the interests of justice support the monetary relief requested by [Plaintiff] which includes the full amount of [Defendant]'s profits attributable to the Lanham Act violations").

172

## 2.   DEFENDANTS' PROPOSED INSTRUCTIONS

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 106

## **DAMAGES**

If you find for Plaintiffs on their claims and find that Plaintiffs were injured as a result of a Defendant's conduct, and you do not find for Defendants on their defenses, you may determine Plaintiffs' damages, if any.  Plaintiffs have the burden of proving damages by a preponderance of the evidence.

Damages consist of Plaintiffs' direct economic losses and out-of-pocket expenses resulting from the effect of a Defendant's conduct.  In other words, damages means the amount of money that will reasonably and fairly compensate Plaintiffs for any injury you find was caused by any Defendant's infringement of a valid trademark owned by Plaintiffs.  The basic question for your consideration is: What amount of money is required to right the alleged wrong done to Plaintiffs by a Defendant?

When considering damages, you must not over-compensate.  If you find that Plaintiffs are entitled to a verdict in accordance with these instructions, but you do not find that the evidence before you is sufficient to show that Plaintiffs have sustained any damages, then you may return a verdict for Plaintiffs but award no damages.

Source:     Moore's Modern Federal Jury Instructions, Instr. 86A-22 (vol. 4 2008) (the above instruction is based on Moore's model instructions); Ninth Circuit Model Civil Jury Instructions § 15.25; *Minn. Pet Breeders. Inc. v. Schell & Kampeter. Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994); *Lutheran Ass'n of Missionaries and Pilots. Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.*, 2005 WL 629605, at *5-7 (D. Minn. Mar. 15, 2005); American Bar Ass'n, Section of Litigation, *Model Jury Instructions: Business Torts Litig.* § 4.03[9], at 177-78 (3d ed. 1996); 2 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. 2005 § 30:74; Moore's Modern Federal Jury Instructions, Instr. 86A-22 (vol. 4 2008); Ninth Circuit Model Civil Jury Instructions § 15.25.

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 107

### DAMAGES – ACTUAL OR STATUTORY NOTICE

In order for Plaintiffs to recover damages for their federal trademark infringement claims under the Lanham Act, Plaintiffs have the burden of proving by a preponderance of the evidence that a Defendant had either statutory or actual notice that Fair Isaac's valid trademark was registered.

Defendant had statutory notice if:

1.      Plaintiffs displayed with the trademark the words "Registered in U.S. Patent and Trademark Office," or

2.      Plaintiffs displayed with the trademark the words "Reg. U.S. Pat. & Tm. Off.," or

3.      Plaintiffs displayed the trademark with the letter R enclosed within a circle, thus ®.

Source:      15 U.S.C. § 1111; Moore's Modern Federal Jury Instructions, Instr. 86A-21 (vol. 4 2008) (the above instruction is based on Moore's model instructions); Ninth Circuit Model Civil Jury Instructions § 15.24.

175

## JURY INSTRUCTION NO. 108

## DAMAGES – ACTUAL COMPENSATORY DAMAGES

Plaintiffs are entitled to actual compensatory damages only if they prove that there was actual confusion caused by a Defendant's use of the term "300-850" or a similar mark in connection with its credit scoring service.  You may not award Plaintiffs any actual damages unless you find that there was actual confusion caused by a Defendant's use of the term "300-850" or a similar term in connection with its credit scoring service.

Source:        *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F. 2d 1324, 1330 (8th Cir. 1985) ("If . . . the use of that mark by another violates either prohibition and causes actual confusion, the owner is entitled to damages."); *St. Croix Printing Equipment, Inc. v. Debbie Sexton*, 578 F.Supp. 2d 1195, 1199 (D. Minn. 2008) ("because [plaintiff] seeks money damages for the alleged violations of the Lanham Act and related state statutes, Shinohara must establish actual confusion"); *Lutheran Ass'n of Missionaries and Pilots. Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.*, 2005 WL 629605, at *5-7 (D. Minn. Mar. 15, 2005) ("Under the Lanham Act, an award of actual damages depends on the existence of actual confusion.") (citing *Co-Rect Products, Inc.*, 780 F. 2d at 1330).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 109

## <u>CALCULATING ACTUAL DAMAGES</u>

Plaintiffs have the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate Plaintiffs for any injury you find was caused by a Defendant's infringement of Plaintiffs' trademark.

You should consider the following:

1.  The injury to Plaintiffs' reputation;

2.  The injury to Plaintiffs' goodwill, including injury to Plaintiffs' general business reputation; and

3.  The lost profits that Plaintiffs would have earned but for a Defendant's infringement.  Profit is determined by deducting all expenses from gross revenue.

Difficulty in ascertaining the precise amount of damage is no bar to recovery.  You may not, of course, base a damage award on mere speculation or guesswork.  However, a party is not required to prove the amount of its damage with mathematical certainty.  Where the wrongdoer's act has caused the difficulty of showing the exact amount of damage, the law permits you, as jurors, to make a just and reasonable estimate of the amount of damage, based upon the evidence which has been placed before you.

<u>Source</u>:    15 U.S.C. § 1117(a); Moore's Modern Federal Jury Instructions, Instr. 86A-23 (vol. 4 2008); Ninth Circuit Model Civil Jury Instructions § 15.25; 15.25; Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, § 30:80:04 (1999 supp.) ("You may not award a specific dollar amount of damages based upon mere speculation or guesswork.  However, the plaintiff is not required to prove the amount of damage with mathematical certainty.") (quoting *Chronicle Publishing Co. v. Legrand*, 24 USPQ2d 1881 (N.D. Cal. 1992)..

# JURY INSTRUCTION NO. 110

## DAMAGES – REASONABLE ROYALTY

As an alternative theory of damages, Plaintiffs allege that they are entitled to a reasonably royalty.  If you award Plaintiffs lost profits, then they are not entitled to a reasonable royalty.

A reasonable royalty in this case is the amount of money that would be agreed to in a hypothetical arms length negotiation between the owner of a trademark and a third party for the right to use the trademark, with both operating under the assumption that the negotiated trademark is valid and would be infringed without a license.  You can award a reasonable royalty to Plaintiffs only if you find that Plaintiffs intended to license their trademark and are able to calculate the amount with reasonable certainty.  You can award Plaintiffs a reasonable royalty only for past infringement you may find, and shall not award any damages for any possible future infringement.

In determining a reasonable royalty, you should place yourself at the point in time at which you believe the arms length negotiation that I just referred to would have been likely to have occurred.  This is typically just before any liability for infringement first occurred.

You should also assume that both Plaintiffs and Defendant knew all pertinent information at the time of the hypothetical negotiations.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for the infringing use of the trademark, including the opinion testimony of experts.

In calculating the reasonable royalty, you may consider the following factors:  (1) royalty rates received in prior licenses by the licensor; (2) prior rates paid by the licensee; (3) the nature and scope of the license, such as exclusive or non-exclusive; (4) the licensor's licensing policies; (5) commercial relationship between the licensor and licensee; (6) special value of the mark to the infringer; (7) duration of the trademark and term of the license; (8) profitability of the trademark; (9) utility and advantages of the trademark over prior marks; (10) benefits to those who have used the trademark; (11) the extent to which the infringer has used the mark; (12) reasonable royalties within the industry; (14) opinion testimony by experts; and (15) the amount that the licensor and licensee would have agreed upon in voluntary negotiations.

Source:        5 McCarthy § 30:85 ("Usually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a

mark after a license ended and damages were measured by the royalty rate the parties had agreed on. . . .  The imposition of a compulsory license, permitting the infringer to continue by paying a court-determined royalty to the trademark owner is not a proper remedy."); *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1350 (7th Cir. 1994) ("one measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [the trademark owner] the cost of a reasonable royalty"); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.*, 606 F.Supp.2d 571, 584 (M.D.N.C. 2009) (courts have recognized that where damages are difficult to measure, "a plaintiff may alternatively recover damages . . . [through an] approximation of the royalties" the defendant would have had to pay, "had it recognized the validity of [the plaintiff's] claims"); *The Apollo Theater Foundation, Inc. v. Western Intern. Syndication*, No. 02 Civ.10037, 2005 WL 1041141 at *13-14 (S.D.N.Y. May 5, 2005) ("One seldom-used method for computing trademark damages is a royalty. A royalty is a measure of compensation for *past* infringement based on the reasonable value of a license to use the trademark that the infringing defendant should have paid"; stating that one should not confuse "the notion of a 'compulsory license' for future trademark usage with a reasonable royalty as a measure of damages for past trademark infringement") (emphasis added); *A & L Laboratories, Inc. v. Bou-Matic, LLC*, No. Civ.02-4862, 2004 WL 1745865 at *2 (D. Minn. Aug. 2, 2004) (listing factors to consider in calculating reasonable royalty, and citing trademark infringement cases, although the court found there was a license and no infringement); *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094, 2000 WL 709149, at *15-18 (C.D.Cal. May 24, 2000) ("The Ninth Circuit Does Not Recognize Reasonable Royalties as a Measure of Damages Where There Is No Evidence That a Party Intended to License Their Trademark").

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 111

## <u>DAMAGES – ACCOUNTING OF A DEFENDANT'S PROFITS</u>

Plaintiffs may be entitled to any profits earned by a Defendant that are attributable to the infringement, which Plaintiffs must prove by a preponderance of the evidence.  You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

Plaintiffs are entitled to a Defendant's profits only if you find that Plaintiffs have proved by a preponderance of the evidence that the Defendant willfully infringed, that is that the Defendant intended to cause consumer confusion as to the source or sponsorship of that Defendant's services.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of a Defendant's receipts from using Fair Isaac's "300-850" trademark in the sale of a good or service.  Plaintiffs have the burden of proving a Defendant's gross revenue by a preponderance of the evidence.

Expenses are all operating and production costs incurred in producing the gross revenue.  Defendants have the burden of proving their expenses by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of a Defendant's credit scoring service using any of Plaintiffs' trademarks is attributable to factors other than use of the trademarks, you shall find that the total profit is attributable to the infringement.

Source:      15 U.S.C. § 1117(a); Moore's Modern Federal Jury Instructions, Instr. 86A-24 (vol. 4 2008) (the above instruction is based on Moore's model instructions); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club,* Civil No. 00-2317, 2002 WL 1763999, at *9-10 (D. Minn. July 26, 2002) ("An accounting of profits is available in an trademark infringement case only if the plaintiff proves 'willful, deliberate infringement or deception.'") (quoting *Minn. Pet Breeders. Inc. v. Schell & Kampeter. Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994)); *Lutheran Ass'n of Missionaries and Pilots. Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.*, 2005 WL 629605, at *7-8 (D. Minn. Mar. 15, 2005); Restatement (Third) of Unfair Competition § 37 cmts. e, f.; O'Malley, Grenig, Lee, § 159.92; Ninth Circuit Model Civil Jury Instructions § 15.26.

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 112

## <u>WILLFUL INFRINGEMENT</u>

If you find that a Defendant infringed any of Fair Isaac's trademarks, you must also determine whether that Defendant willfully infringed Fair Isaac's trademarks in order to determine whether Plaintiffs are entitled to that Defendant's profits. Willful infringement must be deliberate and with the knowledge that the use constitutes infringement. Willful infringement carries a connotation of deliberate intent to deceive.

Knowledge of another's services and an intent to compete with those services, however, is not equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion and therefore does not constitute willful infringement.

<u>Source</u>:        15 U.S.C. § 1117(b); *General Mills, Inc.* v. *Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987); *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993) (concluding that defendant's actions were not "willfully calculated to exploit the advantage of an established mark"); *Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 870 (8th Cir. 1994) ("Where there is a demand for a type of product, capitalizing on that demand by copying does not necessarily indicate that the original product secondary meaning," and if defendant's product is accompanied by the defendant's own conspicuously-labeled trademarks, the distinguishing marks "must be seen as an attempt to distinguish" the product, not as an intent to pass of or confuse); *Tie Tech v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) ("there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws"); *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir. 1995) ("when competitors are barred from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source, competition is unduly hindered"); *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, LP*, Civil No. 00-2317 (JRT/FLN), 2002 WL 1763999 (D. Minn. July 26, 2002) (not awarding accounting of profits where defendant believed in good faith that its use of marks would not infringe); Moore's Modern Federal Jury Instructions, Instr. 86A-25 (vol. 4 2008); Ninth Circuit Model Civil Jury Instructions § 15.27.

181

## V.    DEFENDANTS' COUNTERCLAIM

NEWYORK 7309435 (2K)

## A.  DEFENDANTS' PROPOSED INSTRUCTION

NEWYORK 7309435 (2K)

# JURY INSTRUCTION NO. 113

## COUNTERCLAIM – FRAUD ON THE PTO

Defendants assert a counterclaim that Fair Isaac committed fraud on the United States Patent and Trademark Office during the prosecution of its trademark application for "300-850."  Defendants have the burden of proving fraud on the Patent and Trademark Office.

A company requesting a federal registration must make an oath that, to the best of its knowledge and belief, no other person or company has the right to use the term in interstate commerce in either the identical form or in a form so similar that, when it is used on the goods or services of the other person or corporation, it is likely to cause confusion.  The representation must be truthful.

In order to find that the registration was obtained by a material misrepresentation to the Patent and Trademark Office, you must find, by a preponderance of the evidence, that Fair Isaac, through one of its officers or attorneys, made a material misrepresentation of fact that it knew to be false to the Patent and Trademark Office, or knowingly omitted a material statement of fact, that it did so with an intent to mislead that office, and that the Office relied on the misrepresentation when it granted Fair Isaac's "300-850" registration.

Defendants say the following false statements were made by Plaintiffs:

1.    "[O]nly the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores."

2.    "300-850 was initially selected by Fair Isaac to uniquely identify and differentiate Fair Isaac's credit bureau risk scoring models from other scoring models."

3.    "Fair Isaac arbitrarily selected the 300-850 score range based on a number of market and marketing factors to uniquely identify Fair Isaac's credit bureau risk scoring products (FICO scores)."

4.    "Competitors in the credit scoring market do not have a need to use the 300-850 range, and in fact have published other ranges."

5.    "300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for other types of credit scoring products that the Applicant develops, or even other credit bureau-based risk products that competitors develop."

184

6.      "Applicant's mark, 300-850, without further context, does not immediately describe Applicant's services; it is a numeric string that, on its own, does not convey any specific information about Applicant or its products."

7.      "Without reference to Applicant's credit bureau risk scoring products, 300-850 has no specific meaning at all."

To prevail on its counterclaim, Defendants must prove by a preponderance of the evidence that at least one of these statements was false, that the officers and agents of Plaintiffs actually knew that the statement was false at the time it was made, that the statement was made with an intent to mislead the PTO, and that the PTO relied on the false statement when it granted Fair Isaac's "300-850" registration.

If you find that Defendants have established that Fair Isaac's trademark registration was obtained fraudulently, then you must find for Defendants.

Source:      Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, §§ 30:25:05, 30:71:11 (1998 supp.) (citing *V&V Food Products, Inc. v. Cacique Cheese Co., Inc.*, 683 F. Supp. 662 (N.D. Ill. 1988)); Burton, D., *Jury Instructions in Intellectual Property Cases*, vol. II, §§ 30:25:05, 30:71:11 (2008 supp.); *International Mobile Machines Corp. v. International Telephone & Telegraph Corp.*, 800 F.2d 1118, 1119 (Fed. Cir. 1986).

NEWYORK 7309435 (2K)

**B.    PLAINTIFFS' PROPOSED INSTRUCTIONS**

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 114

### FRAUD ON THE UNITED STATES
### PATENT AND TRADEMARK OFFICE

As a partial defense to Fair Isaac's trademark-infringement claim, the defendants assert that Fair Isaac fraudulently obtained one of its registrations for its 300-850 mark from the United States Patent and Trademark Office. The one registered mark at issue is U.S. Registration No. 3,083,563 ("the '563 Registration").

If the defendants have proven by clear-and-convincing evidence— which I will define for you in a moment—that Fair Isaac obtained this trademark registration through fraud on the United States Patent and Trademark Office, then you must find that the defendants are not liable to Fair Isaac for infringement of the '563 Registration (but the defendants can still be liable for passing off and trademark infringement of Fair Isaac's other marks, including for infringement of Fair Isaac's common-law marks and other federally registered 300-850 marks).

To prevail on their counterclaim that Fair Isaac fraudulently obtained its registration, the defendants must prove by clear-and-convincing evidence the following elements:

1. Fair Isaac made a false representation or a material omission regarding a material fact in obtaining the '563 Registration from the Patent and Trademark Office;

2. Fair Isaac knew or believed that the representation or omission was false;

3. Fair Isaac intended to induce the Patent and Trademark Office to act in reliance on the misrepresentation or omission;

4. the Patent and Trademark Office reasonably relied on the misrepresentation or omission; and,

5. that the registration issued because of the misrepresentation or omission.

Regarding the first element, to make a "misrepresentation" simply means to state as a fact something that is false or untrue. To make a

187

"material omission" is to omit or withhold the statement of fact, knowledge of which is necessary to make other statements not misleading.

For the defendants to prove that Fair Isaac fraudulently obtained its trademark registration, the defendants must prove that the false representation related to a material fact. A material fact is one that was required for the registration to be issued.

Mistakes resulting from inadvertence or ignorance of the law of trademark do not constitute fraud. Furthermore, a statement in an application or representation may be "false" without being "fraudulent." Statements of honest but incorrect beliefs or innocently made inaccurate statements of fact do not constitute "fraud." Fraud arises only if the defendants prove by clear-and-convincing evidence that Fair Isaac made the false statement of fact knowing or believing that the fact was false.

The defendants' contend that Fair Isaac's alleged fraud occurred in connection with Fair Isaac's response to the Patent and Trademark's initial rejection of Fair Isaac's application to register the "300-850" mark that issued as the '563 Registration. It is not uncommon for trademark applications to be initially rejected by the Patent and Trademark Office for various reasons, and the fact that the application was initially rejected, in and of itself, has no bearing on the validity of the '563 Registration.

As part of an application to register a trademark with the Patent and Trademark Office, the party applying to register a mark submits a declaration in its application and states that to the best of its own knowledge and belief, no other firm, corporation, or association has the right to use the mark in commerce, either in identical form or in such near resemblance as to be likely when used on or in connection with the goods or services of such other person to cause confusion, mistake or to deceive.

The applicant has no duty to search for any other uses of the same or similar marks, and has no duty to disclose to the Patent and Trademark Office possible uses of the same or similar term unless such uses reflect use of the same or similar term as a trademark and the applicant believes the other user has superior rights in the mark. Put another way, the applicant has no duty to disclose uses of a same or similar mark by a party whom the applicant believes is infringing its mark. After it submits its application, the applicant has no duty to supplement its disclosure in connection with this declaration, whether or not it learns of additional third party uses

188

After an application is filed with the United States Patent and Trademark Office, the application is assigned to an examining attorney, who must perform a complete examination to determine whether the application meets the various requirements for federal registration of the mark. If the examining attorney determines that the application does not meet one or more legal requirements for registration, the examining attorney must identify the specific statutory basis that the examining attorney believes was not met and cite the appropriate section of the Trademark Act. In this case, the only basis cited by the examining attorney for initially rejecting Fair Isaac's application was that the "300-850" mark was descriptive of Fair Isaac's services.

After an initial rejection by the examining attorney, Fair Isaac had a six-month period in which to respond to the examining attorney's rejection. In its response, Fair Isaac had no obligation to address any issues not directly related to the examining attorney's rejection for descriptiveness. The existence of any alleged third-party uses of the "300-850" mark was not material to the question of whether the "300-850" mark was descriptive of Fair Isaac's services.

Authority:

- 15 U.S.C. § 1115(b)(1) (fraud in obtaining registration of a trademark is a defense to a claim of infringement of the trademark);

- *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* at 250-51 (ABA Publishing, 2008) (proposing a similar style of instruction for a defense alleging fraud in obtaining trade-dress registration);

- In re *Bose Corp.*, --- F.3d ----, 2009 WL 2709312 at *2 (Fed. Cir. Aug. 31, 2009) (mere negligence or even gross negligence does not justify an inference of an intent to deceive: "Subjective intent to deceive, however difficult to prove, is an indispensable element in the analysis.");

- *3M Co. v. Intertape Polymer Group, Inc.*, 423 F. Supp.2d 958, 961-62 (D. Minn., 2006) ("The party seeking cancellation for fraudulent procurement 'must prove the alleged fraud by clear and convincing evidence.' Further, because the oath required by a trademark applicant is phrased in terms of a subjective belief, it is a defense to a claim of fraudulent procurement that the affiant had an honestly held, good faith believe that the statements in the oath were true.");

189

- *Intellimedia Sports, Inc. v. Intellimedia Corp.*, 43 U.S.P.Q.2d 1203, 1997 WL 398344 at *3 (TTAB, May 20, 1997) ("[T]he Board frequently has held that an applicant's failure to disclose to the PTO the asserted rights of another person is not fraudulent unless such other person was known by applicant to possess a superior or clearly established right [e.g., by court decree] to use the same or a substantially identical mark for the same or substantially identical goods or services as those in connection with which registration is sought.");

- *Trademark Manual of Examining Procedure* § 705.01 (5th ed.) (examining attorneys of the PTO are directed to couch any statutory language of the section of the Trademark Act that is the basis for the refusal, and to cite the appropriate section of the Trademark Act).

190

## JURY INSTRUCTION NO. 115

### <u>CLEAR-AND-CONVINCING EVIDENCE DEFINED</u>

With respect to the defendants' charge of fraud by Fair Isaac on the Patent and Trademark Office, there is no room for speculation, inference or surmise, and any doubt must be resolved against the defendants. A party making a claim of fraud on the Patent and Trademark Office is under a heavy burden to prove its charge by clear-and-convincing evidence.

"Clear-and-convincing evidence" is evidence that produces in your mind a firm belief or conviction about the matter at issue. Clear-and-convincing evidence involves a greater degree of persuasion than is necessary to meet the preponderance-of-the-evidence standard. This standard does not require proof to an absolute certainty; proof to an absolute certainty is seldom possible in any case.

Authority:

- *3M Co. v. Intertape Polymer Group, Inc.*, 423 F. Supp.2d 958, 962 (D. Minn., 2006) ("A party making a claim of fraud on the PTO is under a 'heavy burden.'") (quoting *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q.2d 1321, 1328 (T.T.A.B. 1992).

- In re *Bose Corp.*, --- F.3d ----, 2009 WL 2709312 at *2 (Fed. Cir. Aug. 31, 2009) ("Indeed, 'the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.") (quoting *Smith Int'l Inc. v. Olin Corp.*, 209 U.S.P.Q. 1033, 1044 (T.T.A.B. 1981);

- 3 Kevin F. O'Malley et al. *Federal Jury Practice and Instructions: Civil* § 104.02 (West, 5th ed., 2000) (offering nearly the same language used in the second paragraph above).

NEWYORK 7309435 (2K)

## VI.    CONCLUDING INSTRUCTIONS

NEWYORK 7309435 (2K)

## A.    INSTRUCTION ON WHICH THE PARTIES AGREE

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 116

### ELECTION OF FOREPERSON; DUTY TO DELIBERATE; COMMUNICATIONS WITH COURT; CAUTIONARY; UNANIMOUS VERDICT; VERDICT FORM

In conducting your deliberations and returning your verdict, there are certain rules you must follow.

*First*, when you go to the jury room, you must select one of your members as your foreperson. That person will preside over your discussions and speak for you here in court.

*Second*, it is your duty, as jurors, to discuss this case with one another in the jury room. You should try to reach agreement if you can do so without abandoning your individual judgment, because a verdict must be unanimous.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with your fellow jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or simply to reach a verdict. Remember at all times that you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

*Third*, if you need to communicate with me during your deliberations, you may send a note to me through the marshal or bailiff; signed by one or more jurors. I will respond as soon as possible either in writing or orally in open court. Remember that you should not tell anyone—including me—how your votes stand numerically.

*Fourth*, your verdict must be based solely on the evidence and on the law that I have given to you in my instructions. The verdict must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be—that is entirely for you to decide.

*Finally*, the verdict form is simply the written notice of the decision that you reach in this case. The form reads: [read form]. You will take this form to the jury room, and when each of you has agreed on the verdicts, your foreperson will fill in the form, sign and date it, and advise the marshal or bailiff that you are ready to return to the courtroom.

195

**Authority:**   *Eighth Circuit Manual of [Proposed] Model Jury Instructions: Civil*
§ 3.06 (2008) (but using the word "abandoning" instead of "doing
violence to" in the third paragraph).

NEWYORK 7309435 (2K)

## JURY INSTRUCTION NO. 117

## <u>DUTIES AS JURORS</u>

Your duty is to both Plaintiffs and Defendants.  They all have a right to expect that you will see that justice is done.  Your responsibility should be borne courageously and without fear or favor.  It is not an arbitrary power, but one that must be exercised with fairness, sincere judgment and sound discretion.

The final test of the quality of your service will lie in the verdict you return to the Court, not in the opinions any of you hold as you retire from the case. Remember, you are not partisans nor advocates but triers of fact.


<u>Source</u>:         *Atrix International, Inc., et al. v. Associated Financial Group, LLC*,
            Jury Instructions, May 23, 2008, Civil No. 06-4140 (Docket #84) (D.
            Minn.) (ADM/JSM).

NEWYORK 7309435 (2K)

Counsel, do either of you wish to call to the Court's attention any errors, omissions or corrections in the charge? If so, would you please come forward to the Bench.

The Court Security Officer will be sworn.

198