**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| Fair Isaac Corporation; and myFICO Consumer Services, Inc.; | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Experian Information Solutions, Inc.; Trans Union LLC; VantageScore Solutions, LLC; and Does I through X; | ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No:
0:06-cv-04112 (ADM/JSM)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY
OF DEFENDANTS' SURVEY EXPERT PHILIP JOHNSON**

# **TABLE OF CONTENTS**

                                                                                                                **Page**

ARGUMENT ................................................................................................................... 2

I.      THE JOHNSON SURVEY IS RELEVANT AND RELIABLE ............................ 2

         A.      The Johnson Survey Tested the Relevant Population ................................... 3

         B.      The Johnson Survey Used Standard Secondary Meaning Survey Questions and a Control to Eliminate Background Noise ........................... 7

CONCLUSION .............................................................................................................. 11

## **TABLE OF AUTHORITIES**

### **CASES**

Page

*A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F. Supp. 1081 (N.D. Ill. 1985) ...................... 8

*Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*,
    402 F. Supp. 2d 1312 (D. Kan. 2005) ................................................................... 5

*Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*,
    780 F. 2d 1324 (8th Cir. 1985) ............................................................................ 2

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982) .................................................. 2

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................... 5

*Microsoft Corp v. Lindows.com, Inc.*, No. C01-2115C, 2002 WL 31499324
    (W.D. Wash. Mar. 15, 2002) ............................................................................... 8

*Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925 (7th Cir. 1984) ................................... 5

*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980) ..................................................... 5

*Whirlpool Props., Inc. v. LG Elec. U.S.A., Inc.*, No. 1:03 CV 414,
    2006 WL 62846 (W.D. Mich. Jan. 10, 2006) ....................................................... 7

### **MISCELLLANEOUS**

6 J. Thomas McCarthy, *McCarthy on Trademarks and
    Unfair Competition,* § 32 ............................................................................. 2, 3, 8, 10

Shari S. Diamond, *Reference Guide on Survey Research*, in *Reference
    Manual on Scientific Evidence* 2d 229 (2000) ..................................................... 3, 9, 10

Vincent N. Palladino, *Surveying Secondary Meaning,* 84 Trademark Rep.
    155 (1994) ........................................................................................................... 7

Defendants Experian Information Solutions, Inc., Trans Union LLC, and VantageScore Solutions, LLC (collectively, "Defendants") hereby submit this memorandum of law in opposition to Plaintiffs Fair Isaac Corporation's and myFICO Consumer Services, Inc.'s ("Plaintiffs" or "FI") Motion *In Limine* to Exclude the Testimony of Defendants' Survey Expert Philip Johnson.

## INTRODUCTION

Plaintiffs' motion to exclude Defendants' survey expert, Philip Johnson, is a transparent effort to persuade the Court that all survey flaws, including those in the Berger Surveys, go to weight, not admissibility. Indeed, Plaintiffs' emphasis on this point seems out of place in a motion to exclude a survey expert. Plaintiffs apparently expect this Court to throw up its hands, declare a "battle of the experts," and allow both Berger and Johnson to testify. The Court should not be deceived. The Berger Surveys stand in stark contrast to the Johnson Survey, as demonstrated below.[1]

Johnson designed and conducted a secondary meaning survey (the "Johnson Survey") using a court-approved and generally accepted question format. It showed, scientifically, that the vast majority of relevant consumers do not associate 300-850 with a single source, let alone Fair Isaac. Plaintiffs' motion does not come close to stopping his testimony at the *Daubert* toll gate.

---

[1] In their brief, Plaintiffs dismiss "Defendants' attacks" on the Berger Surveys as lacking merit. But Plaintiffs' and Defendants' briefs were filed simultaneously. This boilerplate argument, therefore, was made *before* Plaintiffs had even read Defendants' arguments concerning the Berger Surveys. (FI Mem. 1-2.)

# ARGUMENT

## I.  THE JOHNSON SURVEY IS RELEVANT AND RELIABLE

To establish secondary meaning, FI must prove[2] that through long and exclusive use in the sale of their credit scoring services, the term "300-850" has become so associated with Plaintiffs' credit scoring services that "in the minds of the public, the *primary significance*" of the term is to identify FI as "the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982) (emphasis added); *see Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F. 2d 1324, 1332-33 (8th Cir. 1985); Docket No. 694, at 42.

Secondary meaning, or the lack thereof, can be established through consumer surveys. Generally, a survey that shows at least 50% of the public perceive the "primary significance" of the descriptive term as identifying the source of the product, and not a feature, quality, or characteristic of the product, is sufficient to establish secondary meaning. 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* [hereinafter *McCarthy*] § 32:190 (2009). Surveys that show less than 30% generally are held insufficient as a matter of law to support a finding of secondary meaning. *Id.*

The results of the Johnson Survey are clear and compelling. Only 2% of those surveyed believed that the score range 300-850 indicates a single source of the credit score. (Johnson Rep. ¶¶ 35, 37.[3]) Only two out of 300 respondents mentioned FI as that

---

[2] FI bears the burden of proving secondary meaning. *See* Mem. Supp. Defs.' Mot. Exclude Trademark Validity, Docket No. 760.

[3] The Expert Report of Philip Johnson (without appendixes) ("Johnson Rep.") is attached as Exhibit A to the Declaration of Christopher J. Glancy dated September 28, 2009

source. (*Id.* ¶ 21.) These results are not disputed. This is hardly surprising given FI's purely descriptive, non-trademark uses of the term over many years (and many other parties' descriptive, non-trademark uses of similar ranges over many years), and FI's lack of any effort to develop "300-850" as a brand.

Plaintiffs criticize the Johnson Survey on two grounds: (1) the selection of the universe, and (2) the wording of the questions. Both are unavailing.

### A.    The Johnson Survey Tested the Relevant Population

"A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant . . . . More commonly, however, the sampling frame is either underinclusive or overinclusive relative to the target population." Shari S. Diamond, *Reference Guide on Survey Research*, *in Reference Manual on Scientific Evidence 2d* 229, 241 (2000). Unlike Berger's failure to use a control, which is widely recognized as a truly fundamental and fatal flaw because without a control it is "not possible" to determine causation (*id.* at 257-58), the "[s]election of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility." 6 *McCarthy* § 32:162. Moreover, "[e]ven if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it is intended." *Id*.

Here, the Johnson Survey used a sample consisting of people who (a) are over age 18; (b) are involved in financial decisions made for his/her household; and (c) either (i)

---

("Glancy Decl."). The full report with appendixes is attached as Exhibit 18 to Plaintiffs' Nelson Declaration.

applied for or plan to apply for a loan which included getting a current credit report, or (ii) ordered or plan to order their own credit reports. (Johnson Rep. ¶ 9.) Plaintiffs incorrectly argue that this population is not "legally relevant." (FI Mem. 4.) Plaintiffs concede that Johnson surveyed the market of "current or potential *credit report* purchasers," but they chide Johnson for not honing in on "potential purchasers of *credit scores*." (*Id.* 6 (emphasis in original).) Plaintiffs make no attempt, however, to identify any relevant distinction between the two populations. Plaintiffs do not contend that people who buy credit reports are not interested in their credit scores, or vice versa. Plaintiffs do not argue that the two populations are somehow likely to perceive FI's alleged trademark differently. Nor could they: in its complaint, FI admits that the sale of a credit score is "almost always is accompanied by a credit report." (Docket No. 436 (Third Amended Complaint) ¶ 23; *see also* Williams Dep. 135:9-20.[4]) Moreover, credit reports are typically sold with a credit score. In fact, consumers are almost always given the option to purchase a credit score at the time of obtaining a credit report – even when they are obtaining a free credit report. (*See* Williams Dep. 120:12-20, 122:25-124-3.) Thus, consumers always make a purchase decision about their credit score when they obtain a credit report. In sum, it is far from "*undisputed* that Mr. Johnson failed to direct his survey to consumers of *credit scores*," as Plaintiffs assert. (FI Mem. 5.)

      Plaintiffs have no evidence – or even a rational argument – that the population Johnson surveyed is not firmly within, if not identical to, the class of consumers who

---

[4] Excerpts from the transcript of the deposition of David Williams, taken on July 10, 2008, are attached as Exhibit B to the Glancy Declaration.

purchase or are likely to purchase credit scores.  They merely cavil that some purchasers of credit reports might not see a score, but they already have conceded in their complaint that credit scores and credit reports are "almost always" sold together.  Moreover, there is no logical reason to believe that buyers of credit reports are not also interested in (and therefore potential purchasers of) credit scores.

      Next, Plaintiffs argue that the survey universe was improper because it included people who received a credit report from a lender and may not have had any influence on the lender's choice of provider.  (FI Mem. 6.)  But people who take out loans and receive credit reports are precisely the people to whom FI markets its services, and they are the people most likely to be concerned about their credit scores.  Courts do not exclude surveys that capture the target market of the trademark owner merely because some participants have not directly purchased the product or service at issue.  In *SquirtCo*, for example, the Eighth Circuit upheld a survey as valid despite criticism that the survey failed to consider whether the interviewees had any interest in buying the kinds of products put out by the litigants and despite its having been conducted in a city where products of one of the litigants were not available or advertised.  *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1089-90 n.4 (8th Cir. 1980); *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930-31 (7th Cir. 1984) (in a confusion survey concerning airplane parts, court found that the universe of all owners of private airplanes, regardless of whether they did their own repair work or would purchase airplane parts, was proper).[5]

---

[5] *Louis Vuitton* is inapposite.  In *Louis Vuitton*, the court found that the universe was improper because the survey failed to segregate past purchasers from potential future

Plaintiffs also ignore that Johnson separately screened for actual and prospective purchasers of credit reports. (Johnson Rep. ¶ 10; Glancy Decl. Ex. C (Johnson Code Deck), at 3.) "An overinclusive universe generally presents less of a problem in interpretation than does an underinclusive universe. If the survey expert can demonstrate that a sufficiently large (and representative) subset of respondents in the survey was drawn from the appropriate universe, the responses obtained from that subset can be examined, and inferences about the relevant universe can be drawn based on that subset." Diamond, *Reference Guide on Survey Research*, at 242.

In the Johnson Survey, 44.7% of all respondents actually obtained a credit report in the last 12 months, and an *additional* 28.7% of respondents said they intended to do so in the next 12 months. (Johnson Rep. Code Deck, at 3.) Thus, 73% of all respondents are actual or potential purchasers of credit reports, and almost half of all respondents had recently purchased an actual credit report. (Given FICO's market dominance and the fact

---

purchasers of the parties' products. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007). Professor McCarthy has called this criticism "extraordinarily myopic" and based on an incorrect assumption that past purchasers are not also potential future purchasers. 6 *McCarthy* § 32:161. Regardless, Plaintiffs make no such criticism of the Johnson Survey.

*Big Dog Motorcycles* is easily distinguished. In *Big Dog*, defendant's survey expert failed to test the proper universe of actual and potential purchasers of plaintiffs' products, who were motorcycle enthusiasts likely to buy T-shirts and caps at motorcycle dealerships. *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005). Instead, the expert tested a universe of prospective purchasers of all T-shirts and caps and conducted the survey at malls that do not have motorcycle dealerships. *Id.* Thus, defendants surveyed a "wholly irrelevant universe," *see* Diamond, *Reference Guide on Survey Research,* at 241, because there was no reason to believe that the survey captured anyone within the relevant universe. Here, there is no dispute that people who buy credit reports also buy credit scores, and that they are "almost always" sold together.

that credit scores and credit reports go hand-in-hand, it is highly likely that those respondents also received a FICO score in the range of 300 to 850.)

It is mathematically impossible for this 73% subset to be significantly different from the overall population. Assuming the respondents who gave a "secondary meaning" response (2% of the total population, a fact FI does not dispute) are *all* within this 73% subset (the subset that FI concedes is "legally relevant"), the maximum level of consumer recognition of "300-850" as a brand is 2.7% (2% x 100/73). That level is still miniscule and far, far short of the 50% threshold necessary to support a finding of secondary meaning.

### B. The Johnson Survey Used Standard Secondary Meaning Survey Questions and a Control to Eliminate Background Noise

Unlike Berger who "invent[ed] his own rules" in designing his surveys and is completely unfamiliar with generally accepted survey formats (*see* Mem. Supp. Defs.' Mot. Exclude Berger Surveys, Docket No. 718, at 19-20), Johnson used a court-approved, standard question format for testing secondary meaning. A widely cited authority on the subject explained the "basic approach" for testing secondary meaning:

> In order to track the accepted definition of secondary meaning, including the anonymous source rule, a proper question should seek to determine whether or not a claimed trademark . . . is associated with plaintiff's product without asking respondents to give plaintiff's name.
>
> Without endorsing any specific language, the question could be:
>
>> 'Do you associate [claimed trademark] with [product identification] of one, or more than one, company?'
>
> . . .

> When that question is put to respondents, one could urge that secondary meaning will be inferred if over half of the respondents say 'the product of one company' and will not be inferred if over half say 'the product of more than one company.'

Vincent N. Palladino, *Surveying Secondary Meaning,* 84 Trademark Rep. 155, 165, 178 (1994).  This format (unlike Berger's made-up format) has been approved by the courts for decades.  *See Whirlpool Props., Inc. v. LG Elec. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *6 (W.D. Mich. Jan. 10, 2006) (approving Johnson secondary meaning survey that asked "Do you believe that a washer [dryer] that uses these words, 'Whisper Quiet [Quiet Operation],' comes from, is associated with, or is put out by one company only? or More than one company?'"); *Microsoft Corp v. Lindows.com, Inc.*, No. C01-2115C, 2002 WL 31499324, at *14 (W.D. Wash. Mar. 15, 2002); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F. Supp. 1081, 1093 (N.D. Ill. 1985).

The Johnson Survey used this standard format and asked respondents whether they believed that there is "one company or source who creates, sponsors, or provides a credit score for credit reports which use [the] range [300 to 850]," more than one company that does so, or did not know.  (Johnson Rep. ¶ 13.)  The Johnson Survey also asked respondents another, broader secondary meaning question:  whether a credit score range of 300-850 would or would not tell them anything about the company or organization responsible for creating or producing the credit score.  (*Id.*)  Thus, respondents were given two opportunities to indicate that the scoring range has some source-identifying meaning.  After each question, all respondents were probed twice with the questions "What makes you say that?" and "Anything else?"  (*Id.*)

Although Plaintiffs argue that the phrases "creates, sponsors or provides" and "creating or producing" are ambiguous, these terms are far more specific than "associates" or "puts out," terms that have been approved by the courts for decades for use in trademark surveys. *See SquirtCo*, 628 F.2d at 1089 n.4 (approving question "Do you think SQUIRT and QUIRST are put out by the same company or by different companies?"); 6 *McCarthy* § 32:174 (The "now-standard [*Everready*] format" asks respondents "Who do you think puts out the [product]?"). Indeed, had Johnson used the terms "associates" or "puts out," no doubt Plaintiffs would still complain that respondents might "associate" CREST®-brand toothpaste with a particular retail store rather than a single manufacturer or believe that the store, not the manufacturer, put it out on the shelves. (FI Mem. 9.)

Moreover, the terms "creates," "sponsors," and "provides" are mutually reinforcing in their meaning and are preceded by the term "source," further underscoring that the focus of the question is on the origin of the credit score, not every retail outlet through which the credit score might flow to consumers. Plaintiffs cherry-pick from the definitions of these terms to find meanings in their favor. (FI Mem. 8-9.) Plaintiffs ignore that "create" also means "to bring into existence" and that "produce" similarly means "to manufacture" or "to cause to have existence." Plaintiffs altogether ignore the definition of "sponsor," which is "to assume responsibility for some other person or thing." *Merriam-Webster Dictionary* (2009) *available at* http://www.merriam-

webster.com/dictionary. The meaning of the word "provides" is informed by the meaning of these other terms.[6]

Plaintiffs argue that Johnson should have used the "straightforward" word "source" instead. According to Plaintiffs, Johnson should have asked whether the range "tells [you] anything at all about *source*" and do credit scores with that range "come from a single *source*." (FI Mem. 7 (emphasis added).) Plaintiffs' suggestion is no better, and arguably far worse, than the terms Johnson used. That is, a consumer would be just as likely to think that a retail store is the "source" of CREST® toothpaste as the "producer" of CREST® toothpaste. It is highly unlikely, however, that any consumer would think the retail store "created" or "sponsored" CREST® toothpaste. Moreover, consumers do not commonly use the term "source" – a Lanham Act term – when describing companies that provide trademarked goods and services, so the word standing by itself would be more likely to be misunderstood.

More significantly, unlike Berger, Johnson used a control group to account for precisely this kind of background noise. *See* Diamond, *Reference Guide on Survey Research*, at 257-58 (control group adjusts for "preexisting beliefs or other background noise (e.g., *respondents who misunderstand the question* or misstate their responses)" (emphasis added)). Respondents who misunderstood the question should be represented in equal numbers in the test and control groups. *Id.* ("Both preexisting beliefs and other

---

[6] The familiar canon of statutory and contract construction *ejusdem generis* has some application here. That canon, based on common sense, says that when a general term follows a list of specific terms, the general term is limited to the type of thing specified in the particular. *Black's Law Dictionary* 422 (abr. 7th ed. 2000).

background noise should have produced similar response levels in the experimental and control groups."). Subtracting the control group results from the test group results eliminates the effect of such background noise. *Id.*

Furthermore, the Johnson Survey probed each respondent *twice*. These probe questions illuminate the respondents' understanding of the question. 6 *McCarthy* § 32:175. Plaintiffs have not pointed to a single verbatim response that indicates that any respondent interpreted the questions as Plaintiffs suggest. Again, Johnson's adherence to standard survey methodology stands in stark contrast to Berger, who did not ask the "why?" question in Survey B, and did not consider the answers to the "why?" question in Survey A. (*See* Mem. Supp. Defs. Mot. Exclude Berger Surveys, Docket No. 718, at 24-25.)

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion *in limine* to exclude the testimony of Defendants' secondary meaning survey expert, Philip Johnson.

Respectfully submitted this 28th day of September, 2009.

**Lindquist & Vennum PLLP**

By:  /s/ Mark A. Jacobson
Mark A. Jacobson (MN Bar #188943)
Christopher Sullivan (MN Bar #0343717)
LINDQUIST & VENNUM, P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 371-3211
(612) 371-3207 (facsimile)

M. Elaine Johnston

> Robert A. Milne
> Christopher J. Glancy
> Jack E. Pace III
> WHITE & CASE LLP
> 1155 Avenue of the Americas
> New York, NY 10036-2787
> (212) 819-8200
> (212) 354-8113 (facsimile)
>
> *Attorneys for Defendant Experian Information Solutions, Inc. (and authorized to sign on behalf of all Defendants)*
>
> Lewis A. Remele, Jr. (MN Bar #90724)
> Christopher R. Morris (MN Bar #230613)
> BASSFORD REMELE
> 33 South Sixth Street, Suite 3800
> Minneapolis, MN 55402
> Tel: (612) 376-1601
> Fax: (612) 333-8829
>
> James K. Gardner
> Ralph T. Russell
> Dao L. Boyle
> NEAL, GERBER & EISENBERG LLP
> Two North LaSalle Street, Suite 2200
> Chicago, IL 60602
> Tel: (312) 269-8030
> Fax: (312) 269-1747
>
> *Attorneys for Defendant Trans Union LLC*

        Barbara Podlucky Berens (MN #209788)
        Justi R. Miller (MN #0387330)
        KELLY & BERENS
        3720 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402
        Tel: (612) 349-6171
        Fax: (612) 349-6416

        *Attorneys for Defendant*
        *VantageScore Solutions, LLC*