IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Fair Isaac Corporation; and myFICO Consumer Services, Inc., | No: 06 CV 4112 ADM/JSM |
| Plaintiffs, | |
| v. | Fair Isaac's Offer of Proof Regarding the Defendants' Destruction of Documents |
| Experian Information Solutions Inc.; Trans Union, LLC; and VantageScore Solutions, LLC; and Does I through X, | |
| Defendants. | |

Fair Isaac makes this offer of proof under Rule 103 of the Federal Rules of Evidence to show what the evidence regarding Experian and Trans Union's destruction of documents would tend to prove.[1]

1.  The testimony of Peter Carroll and Piyush Tantia relating to Experian and Trans Union's destruction of documents would show:

    (a)  that Carroll and Tantia are principals or employees of what was known in 2005 as Mercer Oliver Wyman (or "Mercer" or "Oliver Wyman")[2];

    (b)  that Mercer was hired by Experian, Trans Union, and Equifax to be an on-site consultant for "Project Trident," which is the code name that

---

[1] See Fed. R. Evid. 103; *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988) ("A party offering proof which is excluded at trial preserves the record on appeal by telling the court what the evidence will tend to prove ....").

[2] See, e.g., Carroll depo. 8:08-17; Tantia depo. 5:18-6:05.

1

Experian, Trans Union, and Equifax called their joint efforts to develop a credit score to replace Fair Isaac's scores[3];

(c) that Project Trident included approximately six months of joint work by employees of Experian, Trans Union, and Equifax in rented office space in Atlanta, Georgia, in the second half of 2005[4];

(d) that Tantia was present for much of the day-to-day work of Project Trident in Atlanta and that Carroll was present for some of the work of Project Trident in Atlanta[5];

(e) that Experian and Trans Union shredded documents as part of Project Trident[6];

(f) that the participants in Project Trident were under a directive from Experian, Trans Union, and Equifax to "shred all paper documents, if possible" and that "all of the documents that were produced in the course of the project were subject to that guideline"[7];

(g) that the shredding of documents took place throughout the entire time period for Project Trident and no records of what was shredded were kept[8];

---

[3] *See, e.g.,* Carroll depo. 22:14-16; Tantia depo. 6:22-7:03; 7:11-17; 188:12-19.
[4] *See, e.g.,* Tantia depo. 6:22-7:03; 7:11-25.
[5] *See, e.g.,* Carroll depo. 51:16-18; Tantia depo. 9:06-20.
[6] *See, e.g.,* Carroll depo. 48:20-49:03; 53:14-16; 53:19-21; Tantia depo. 121:04-23.
[7] *See, e.g.,* Carroll depo. 66:18-20; 66:23-25; Tantia depo. 120:21-121:12; Fair Isaac Exh. Nos. 22 ("Shred all paper documents if possible"); & 154 ("Shred all paper documents if possible").
[8] *See, e.g.,* Carroll depo. 59:11-21; Tantia depo. 123:02-12.

2

81050867.1

(h) that the shredding or other destruction of documents was done deliberately[9];

(i) that Fair Isaac's Exhibit No. 22 is a slideshow presentation that was primarily authored by Piyush Tantia in November 2005, that was distributed to Experian, Trans Union, and Equifax representatives working on Project Trident, and that was used in a meeting of those representatives on November 16, 2005[10];

(j) that a depiction of some of the shredded documents from Project Trident is found in Fair Isaac's Exhibit No. 22, in a photo that shows plastic bags of shredded documents stacked on top of each other in the form of a snowman[11];

(k) that Fair Isaac's Exhibit No. 22 — the very document that shows bags of shredded documents — contains statements about why Experian, Trans Union, and Equifax chose the scoring range of 501 to 990 for what became the credit score of VantageScore Solutions, LLC[12];

(l) that among the express reasons why Experian, Trans Union, and Equifax chose the scoring range of 501 to 990 was that they wanted to "mimic"

---

[9] *See, e.g.,* Tantia depo. 118:22-120:09.
[10] *See, e.g.,* Carroll depo. 50:06-51:08; 53:14-21; Tantia depo. 124:24-135:25.
[11] *See* Fair Isaac Ex. No. 22 at MOW-FICO-00000376.
[12] *See, e.g., id.* at MOW-FICO-00000399.

3

81050867.1

    Fair Isaac's score (albeit not "exactly") and make it "similar" to Fair Isaac's scoring range[13];

(m) that it is reasonable to infer from Fair Isaac's Exhibit No. 22 that documents were destroyed during Project Trident that included information that would show Experian and Trans Union's intent to copy or base their scoring range for what became "VantageScore" on Fair Isaac's scoring range of 300 to 850 and, hence, their intent to infringe Fair Isaac's trademark and their recognition that Fair Isaac's trademark had obtained secondary meaning;

(n) that the participants in Project Trident—including Experian and Trans Union--"were hyper-sensitive on confidentiality" as they did their work because they were "certain that FICO [i.e., Fair Isaac] [would] try to frustrate them by bringing a lawsuit and yelling 'collusion,'" from which one can infer that the participants in Project Trident were reasonably anticipating litigation[14];

(n) that the participants in Project Trident—including Experian and Trans Union—were cognizant of not copying Fair Isaac's scoring range "exactly," from which one can reasonably infer that their concern with

---

[13] *See id.*
[14] *See, e.g.*, Tantia depo. 184:18-185:19; Fair Isaac Exh. No. 159 (Mercer email).

4

81050867.1

copying the scoring range exactly arose from a fear of litigation relating to the scoring range[15];

(o) that the rare set of notes from Project Trident, which were taken by Piyush Tantia, show that the "Risk of lawsuit" was one of the "cons" that the Defendants discussed in choosing their scoring range and that the Defendants noted, in the context of discussing the new score, that one of the "Lawsuit issues" would be whether they had "Stole someone's IP [i.e., intellectual property]"[16];

(p) that Mercer sought indemnification from Experian, Trans Union, and Equifax in the event that litigation arose from Project Trident, from which one can reasonably infer that the participants in Project Trident were reasonably anticipating litigation[17];

(q) that when documents were destroyed as part of Project Trident, Experian and Trans Union were reasonably anticipating litigation related to Project Trident, including litigation relating to the scoring range for VantageScore[18]; and,

---

[15] See Fair Isaac Exh. No. 22 at MOW-FICO-00000399 ("Cannot mimic competitor scores exactly").

[16] See, e.g., Fair Isaac Exh. No. 155 (unredacted version later produced under Court Order) at MOW-FICO-0006911 ("Risk of lawsuit") & MOW-FICO-00069118 ("Lawsuit issues: - Stole someone's IP").

[17] See, e.g., Tantia depo. 187:13-189:19; Fair Isaac Exh. No. 37 (Mercer email seeking indemnification).

[18] This conclusion is also supported by other documents that are on file with the Court in opposition to the Defendant's motion in limine to exclude evidence of spoliation. These include (1) an excerpt of Trans Union's privilege log, which shows that Experian, Trans Union, and

5

2. **The testimony of David Williams relating to Experian's destruction of documents would show:**

    (a)    that one of the places at which Experian receives communications from consumers regarding their credit scores is known as Experian's "National Consumer Assistance Center" (or "NCAC");

    (b)    that according to an internal poll of Experian's employees at the NCAC, the NCAC receives 800 to 1,000 calls from consumers each day relating to credit scores (not just credit reports) and that 50 to 70% of those calls were not asking about Experian's own score but about other scores, including Fair Isaac's and VantageScore's scores;

    (c)    that Experian did not put a document hold in place for the NCAC until after its corporate representative (David Williams) testified by deposition on July 31, 2008, during which deposition he acknowledged that he had earlier seen a document discussing the internal poll of Experian employees at the NCAC;

    (d)    that by the time that Experian put a document hold in place for the NCAC (after David Williams testified), Experian was only able to preserve

---

Equifax entered into a "Joint Defense Agreement" in February 2005, from which one can infer that they were anticipating litigation arising from Project Trident, *see* Second Decl. of Laura Nelson (filed Sept. 28, 2009) Exh. No. 16; (2) an excerpt of Equifax's privilege log, which asserts work-product protection for all of its Project-Trident-related documents, as far back as January 2005, and which shows, therefore, irrefutably, that the credit bureaus were anticipating litigation (a party cannot assert work-product protection without reasonably anticipating litigation), *id.* Exh. 17; and (3) a marketing plan from Trans Union for Project Trident that shows Trans Union's realization of the "threat" that "Fair Isaac may sue for preliminary injection [*sic*]," *id.* Exh. 18 at TU-FI-0122537.

81050867.1

        documents going back to January 2008 (everything else had been destroyed);

(e)    that even the sample of surviving documents from the NCAC that Experian was willing to review for production—the equivalent of less than one day's worth of consumer inquiries—showed evidence of relevant consumer confusion;

(f)    that one can reasonably infer from the above that if Experian had properly preserved, reviewed, and produced documents from the NCAC relating to relevant consumer confusion, many instances of relevant and otherwise admissible consumer confusion would have been discovered by Fair Isaac.

Date: November 2, 2009        **Robins, Kaplan, Miller & Ciresi, L.L.P.**

By: _/s/ Randall Tietjen_
Ronald J. Schutz (130849)
Randall Tietjen (214474)
Christopher K. Larus (226828)
Michael A. Collyard (302569)
Laura E. Nelson (0342798)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Tel: (612) 349-8500
Fax: (612) 339-4181

**Attorneys for Plaintiffs**

81050867.1