Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

# Fair Isaac v Experian et al

 **Carroll, Peter (Vol. 01) - 04/08/2008**                                             1 CLIP  (RUNNING 00:23:31.307)

 Do you know if it went to the credit ...

| CARROLL | 74 SEGMENTS  (RUNNING 00:23:31.307) |  |
|---|---|---|

**1. PAGE 6:17 TO 6:23 (RUNNING 00:00:14.733)**

```
        17    Q.    Please state your name.
        18    A.    Peter Carroll.
        19    Q.    Mr. Carroll, where do you reside?
        20    A.    New York City.
        21    Q.    By whom are you employed?
        22    A.    A company that today is called Oliver
        23  Wyman Financial Services.
```

**2. PAGE 7:04 TO 7:06 (RUNNING 00:00:06.600)**

```
        04    Q.    Put it this way:  Oliver Wyman was
        05  formerly known as Mercer Oliver Wyman?
        06    A.    Correct.
```

**3. PAGE 8:08 TO 8:17 (RUNNING 00:00:17.867)**

```
        08          You worked for Mercer Oliver Wyman back
        09  in 2005, correct?
        10    A.    Correct.
        11    Q.    That entity is known as Oliver Wyman now?
        12    A.    Correct.
        13    Q.    If I refer to it as Oliver Wyman during
        14  this deposition, will you understand that I am
        15  referring to the entity you used to work for and
        16  now still do under a different name?
        17    A.    Yes, I will.
```

**4. PAGE 22:14 TO 22:16 (RUNNING 00:00:06.200)**

```
        14    Q.    Oliver Wyman was hired as a paid
        15  consultant by those three credit bureaus, weren't
        16  they?
```

**5. PAGE 22:18 TO 23:05 (RUNNING 00:00:27.967)**

```
        18    A.    Yes.
        19    Q.    And do you understand, if I use the
        20  term "credit bureaus" or "credit reporting
        21  agencies," you understand those terms to be
        22  synonymous?
        23    A.    Yes.
        24    Q.    And you understand that I am referring
        25  to Experian, TransUnion and Equifax?
  00023:01
        02    A.    Yes.
        03    Q.    And you used similar terms back in 2005
        04  to describe those three entities, right?
        05    A.    Yes.
```

**6. PAGE 25:02 TO 25:04 (RUNNING 00:00:06.633)**

```
        02    Q.    How much was Oliver Wyman paid by the
        03  credit bureaus for the work that was done back in
        04  2005?
```

**7. PAGE 25:09 TO 25:12 (RUNNING 00:00:12.167)**

```
        09    A.    My recollection was that we were paid
```

```
         10    somewhere between $800,000 and a million dollars
         11    inclusive of what we would call professional fees
         12    and expenses.
```

### 8. PAGE 41:03 TO 41:05 (RUNNING 00:00:09.300)

```
         03      Q.    Can you tell me how it was that the
         04    credit bureaus first came to Mercer Oliver Wyman
         05    to discuss hiring you folks for this project?
```

### 9. PAGE 41:11 TO 41:19 (RUNNING 00:00:23.100)

```
         11      A.    I think the first contact was between
         12    Kerry Williams of Experian and John Drzik of
         13    Oliver Wyman.
         14      Q.    And why do you think that was the first
         15    contact?
         16      A.    I have some recollection that that was
         17    explained to me.
         18      Q.    By Mr. Drzik?
         19      A.    Either by Mr. Drzik or by Mr. McIntyre.
```

### 10. PAGE 42:10 TO 42:16 (RUNNING 00:00:13.434)

```
         10            You understood that Kerry Williams from
         11    Experian contacted your organization to begin
         12    this thing, correct?
         13      A.    Correct.
         14      Q.    And who was that contact with?
         15      A.    I think it was between Kerry and John
         16    Drzik.
```

### 11. PAGE 49:09 TO 49:10 (RUNNING 00:00:05.033)

```
         09      Q.    Mr. Carroll, I have handed you now
         10    what's been marked as Plaintiffs' Exhibit 22.
```

### 12. PAGE 49:14 TO 49:17 (RUNNING 00:00:11.233)

```
         14            Do you see that that is a document that
         15    has a production number in the corner?  Do you
         16    see that MOW-FICO and then a numerical figure?
         17      A.    Yes.
```

### 13. PAGE 50:06 TO 51:08 (RUNNING 00:01:01.800)

```
         06      Q.    And if you look over, it is actually an
         07    MOWdoc from your computer file; isn't it, sir?
         08            Do you see that?
         09      A.    Yes.
         10      Q.    You recognize this Plaintiffs' Exhibit
         11    22 to be a document that Mercer Oliver Wyman put
         12    together shortly before November 16, 2005,
         13    correct?
         14      A.    Yes.
         15      Q.    Were you the primary author of this
         16    document?
         17      A.    No.
         18      Q.    Who was?
         19      A.    Probably Piyush Tantia.
         20      Q.    What was Mr. Tantia's role generally
         21    for this project for the credit bureaus?
         22      A.    He was, from the Oliver Wyman side, he
         23    was the project leader.
         24      Q.    What was your role then, sir?
         25      A.    I was the project overseer.
00051:01
         02      Q.    Can you distinguish between project
         03    leader and overseer for me?
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

# Fair Isaac v Experian et al

```
            04     A.   The leader was going to spend more
            05   time, a higher percentage of his time.
            06     Q.   Is it fair to say Mr. Tantia, then, was
            07   the day-to-day contact with the credit bureaus;
            08   is that what you are trying to describe to me?
```

**14. PAGE 51:11 TO 51:11 (RUNNING 00:00:01.166)**

```
            11     A.   Yes.
```

**15. PAGE 51:16 TO 51:18 (RUNNING 00:00:08.267)**

```
            16     Q.   How often were you there generally on
            17   site?
            18     A.   Probably once every two weeks.
```

**16. PAGE 52:18 TO 53:03 (RUNNING 00:00:30.633)**

```
            18     Q.   Do you understand that this document
            19   was given to any of the credit bureaus?
            20     A.   It was given to the members of the team.
            21     Q.   Which included members from all three
            22   credit bureaus, correct?
            23     A.   Yes.  Though I'm not sure, you know,
            24   what their status was, whether they were
            25   technically employees of the bureaus or employees
   00053:01
            02   of Vantage, but what we would think of as people
            03   from the bureaus.
```

**17. PAGE 53:07 TO 53:12 (RUNNING 00:00:08.900)**

```
            07     Q.   You weren't hired by VantageScore
            08   Solutions to do this work, were you?
            09     A.   I don't think so, no.
            10     Q.   You were hired by the three credit
            11   bureaus, correct?
            12     A.   I think so, yes.
```

**18. PAGE 53:14 TO 53:16 (RUNNING 00:00:08.833)**

```
            14          And so this Plaintiffs' Exhibit 22, to
            15   your understanding, was being given to the
            16   individual credit bureaus, correct?
```

**19. PAGE 53:19 TO 53:21 (RUNNING 00:00:06.100)**

```
            19     Q.   I am asking for your understanding.
            20     A.   To the members of the team who were
            21   from the three bureaus, yes.
```

**20. PAGE 53:22 TO 53:24 (RUNNING 00:00:06.700)**

```
            22     Q.   Do you know if it went to the credit
            23   bureaus' lawyers, do you know?
            24     A.   I don't know.
```

**21. PAGE 77:19 TO 77:23 (RUNNING 00:00:08.766)**

```
            19          Mr. Tantia is saying that you've got a
            20   benefit to tell clients that you managed the
            21   project to build a FICO replacement.
            22          Do you see that language?
            23     A.   I do.
```

**22. PAGE 78:02 TO 78:04 (RUNNING 00:00:07.033)**

```
            02     Q.   You understood the FICO replacement to
            03   refer to what would become known as VantageScore,
            04   correct?
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

# Fair Isaac v Experian et al

23. **PAGE 78:07 TO 78:07 (RUNNING 00:00:02.567)**

```
07    A.    Yes.
```

24. **PAGE 78:12 TO 78:23 (RUNNING 00:00:34.400)**

```
12    Q.    Sir, did you in fact engage in
13 marketing discussions with the credit bureaus
14 during the course of your work for them on this
15 project?
16    A.    No.
17    Q.    Did you at any time engage in marketing
18 discussions with the credit bureaus about
19 VantageScore or any of its predecessor names?
20    A.    No.
21    Q.    Do you have any knowledge of anyone
22 from Mercer having such discussions?
23    A.    No.
```

25. **PAGE 110:05 TO 110:12 (RUNNING 00:00:21.700)**

```
05    Q.    I'm not asking you whether it was
06 highly effective, okay?  We will get into that a
07 little later.
08          I want to know, when you finished your
09 work on behalf of Mercer Oliver Wyman, did you
10 understand that the credit bureaus had in fact
11 determined to come out and market a new credit
12 scoring model --
```

26. **PAGE 110:14 TO 110:15 (RUNNING 00:00:03.100)**

```
14    Q.    -- or did that take place after the
15 conclusion of your work?
```

27. **PAGE 110:18 TO 110:20 (RUNNING 00:00:08.967)**

```
18    A.    My recollection is that that decision
19 was either made later or if it had already been
20 made, I was not aware of that.
```

28. **PAGE 135:16 TO 136:06 (RUNNING 00:00:19.500)**

```
16              (Plaintiffs' Exhibit 31, documents
17          bearing production Nos. MOW-FICO-00001598
18          through MOW-FICO-00001600, marked for
19          identification, as of this date.)
20    Q.    Mr. Carroll, I am handing you what's
21 been marked as Plaintiffs' Exhibit 31, correct?
22    A.    Yes.
23    Q.    This is a document that came from
24 Mercer's files, correct?
25    A.    Yes.
00136:01
02    Q.    Is this a document that you reviewed
03 yesterday with the various credit bureau lawyers
04 and your lawyer?
05    A.    Yes.
06    Q.    What did they ask you about it?
```

29. **PAGE 136:09 TO 136:21 (RUNNING 00:00:36.167)**

```
09    A.    If I wrote it, if I recognized it, if I
10 wrote it and when I wrote it.
11    Q.    And what did you tell them?
12    A.    I didn't initially recall it, but I
13 then, upon rereading it, I concluded that I
14 indeed wrote it and I wrote it, I think it was
15 referenced in an e-mail, so I wrote it in sort of
16 early to mid-March of 2005.
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

# Fair Isaac v Experian et al

```
        17     Q.   Did they show you the e-mail -- did
        18  these lawyers from the credit bureaus show you
        19  the e-mail where it was referenced yesterday as
        20  well?
        21     A.   I believe so.
```

### 30. PAGE 136:23 TO 137:02 (RUNNING 00:00:07.633)

```
        23     Q.   And so the document, the e-mail that
        24  they showed you refreshed your recollection that
        25  you, in fact, were the author of Exhibit 31,
    00137:01
        02  correct?
```

### 31. PAGE 137:04 TO 137:22 (RUNNING 00:01:21.267)

```
        04     A.   And in particular the timing of when it
        05  was written, yes.
        06     Q.   What else did they ask you about this
        07  document?
        08     A.   There were some specific questions
        09  around items like where we learned of the $160
        10  million number in section 1 and what had
        11  motivated in my own mind what I wrote in section 2.
        12     Q.   What did you tell them?
        13     A.   I told them broadly that this is a
        14  document that I prepared as an internal Oliver
        15  Wyman document for discussion with colleagues,
        16  primarily Mike Poulos and Alan McIntyre, and that
        17  its underpinnings were a mixture of what I had
        18  been told thus far about what Experian or other
        19  credit bureaus had in mind but my own speculation
        20  about what the business issue might really be or
        21  might -- how we would characterize the business
        22  issue.
```

### 32. PAGE 138:18 TO 139:03 (RUNNING 00:00:13.867)

```
        18     Q.   Let's take it from the top.
        19          Looking at Exhibit 31, sir, are you the
        20  author of this document?
        21     A.   Yes.
        22     Q.   Was it made while you were an employee
        23  of Mercer Oliver Wyman?
        24     A.   Yes.
        25     Q.   Was it part of your regular job to
    00139:01
        02  create documents like this?
        03     A.   Yes.
```

### 33. PAGE 139:06 TO 139:10 (RUNNING 00:00:11.033)

```
        06     Q.   Excuse me, you said yes?
        07     A.   I did.
        08     Q.   You made this document based upon the
        09  proposed assignment as you understood it at that
        10  time, correct, sir?
```

### 34. PAGE 139:13 TO 139:19 (RUNNING 00:00:19.167)

```
        13     A.   I created this document based in part
        14  on my understanding of what had been specifically
        15  outlined or requested and I supplemented that
        16  with my own speculation about what the business
        17  issue might be.
        18     Q.   Sure, but you made the document --
        19     A.   Yes.
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

## Fair Isaac v Experian et al

**35. PAGE 143:20 TO 144:03 (RUNNING 00:00:25.900)**

```
20     Q.   And based upon what you had been
21  informed either by Mr. Drzik or Mr. McIntyre,
22  that is what led you to begin authoring this
23  document, correct?
24     A.   Well, as I said before, this document
25  is based partly on that and partly on my own
00144:01
02  speculation about what the full scope of the
03  issue might be.
```

**36. PAGE 144:19 TO 145:19 (RUNNING 00:00:44.867)**

```
19          (Plaintiffs' Exhibit 32, documents
20      bearing production Nos. MOW-FICO-00001040
21      through MOW-FICO-00001043, marked for
22      identification, as of this date.)
23     Q.   Handing you what's been marked as
24  Exhibit 32, in reference to your last question,
25  do you see this front cover, it says, "Peter
00145:01
02  Carroll's E-Mail Exchanges, Project Trident,
03  March 7, 2005 through December 21, 2005"?
04          Do you see that, sir?
05     A.   I do.
06     Q.   And that's a document produced to us by
07  Mercer, right?
08     A.   Yes.
09     Q.   And just because you asked, on the very
10  first page, do you see an e-mail to you dated
11  March 14, 2005 from Michael Poulos?
12     A.   Mm-hm.
13     Q.   Do you see that, sir?
14     A.   Yes, yes.
15     Q.   And you see that there was an
16  attachment entitled "Triad.doc"?
17     A.   Yes.
18     Q.   And do you believe that that attachment
19  is in fact Exhibit 31?
```

**37. PAGE 145:22 TO 145:22 (RUNNING 00:00:01.633)**

```
22     A.   It certainly seems possible.
```

**38. PAGE 189:23 TO 191:15 (RUNNING 00:01:04.167)**

```
23     Q.   Sir, I've handed you what's been marked
24  as Exhibit 33.
25          Do you see that?
00190:01
02     A.   I do.
03     Q.   This is additional e-mails produced to
04  us from Mercer Oliver Wyman, right?
05     A.   Yes.
06     Q.   And this particular one starts with an
07  e-mail from Michael Poulos, your colleague,
08  correct?
09     A.   Yes.
10     Q.   Dated March 18, 2005 to you and to
11  Mr. McIntyre, right?
12     A.   Yes.
13     Q.   And Mr. Poulos is telling you that he
14  sees three pieces to the proposal, right?
15     A.   Correct.
16     Q.   That would be the proposal that would
17  ultimately be given to the credit bureaus, that's
18  the proposal he's talking about, right?
```

```
       19     A.    Yes.
       20     Q.    The first piece was data analysis work,
       21  right?
       22     A.    Yes.
       23     Q.    You never did any data analysis work
       24  for the credit bureaus, did you?
       25     A.    No.
00191:01
       02     Q.    The second piece was strategy or
       03  tactics around making the business work.
       04           Do you see that, sir?
       05     A.    I do.
       06     Q.    Did you ever do that for the credit
       07  bureaus?
       08     A.    No.
       09     Q.    The third point is packaging of
       10  analysis into a proto-pitch document.
       11           Do you see that, sir?
       12     A.    I do.
       13     Q.    Did you ever do that for any of the
       14  credit bureaus?
       15     A.    No, we didn't.
```

**39. PAGE 191:24 TO 192:08 (RUNNING 00:00:22.933)**

```
       24     Q.    Looking -- continuing to look at this
       25  e-mail of Mr. Poulos, about halfway down do you
00192:01
       02  see the heading "Strategy/tactics around making
       03  the business work"?
       04     A.    Yes.
       05     Q.    It says that Kerry, quote, "Said that
       06  they've only had one 90-minute conference call."
       07           Do you see that?
       08     A.    I do.
```

**40. PAGE 193:09 TO 193:12 (RUNNING 00:00:14.833)**

```
       09     Q.    You understood that Mr. Williams had
       10  told someone at Mercer Oliver that he had only
       11  had a 90-minute conference call in relation to
       12  the other credit bureaus, correct?
```

**41. PAGE 193:14 TO 193:19 (RUNNING 00:00:20.533)**

```
       14     Q.    That's how you understood it?
       15     A.    That's how I understand it.
       16     Q.    Did they ever tell you, sir, that they
       17  had had -- the credit bureaus had met all day on
       18  February 16th at the Hyatt?
       19     A.    Not that I recall, no.
```

**42. PAGE 193:23 TO 194:08 (RUNNING 00:00:23.600)**

```
       23     Q.    Looking at Exhibit 33, the very first
       24  page, the beginning of this e-mail that we've
       25  been looking at, okay --
00194:01
       02     A.    Yes.
       03     Q.    -- Mr. Poulos says they have described
       04  an adequately constrained project scope.
       05           Do you see that, sir?
       06     A.    Yes.
       07     Q.    Who is the, quote, "they," unquote,
       08  that you understood Mr. Poulos to be referring to?
```

**43. PAGE 194:11 TO 194:20 (RUNNING 00:00:32.933)**

```
       11     A.    Well, I assume now, looking at it, and
```

```
        12   I probably assumed then that the "they" was
        13   either Kerry speaking and/or Kerry representing
        14   the views of the three bureaus.
        15       Q.   And that either Kerry, speaking of
        16   Kerry Williams, or Kerry Williams speaking on
        17   behalf of the bureaus, that they were, quote,
        18   only trying to replace the traditional FICO
        19   score, end quote.
        20            Do you see that, sir?
```

**44. PAGE 194:25 TO 195:23 (RUNNING 00:01:05.500)**

```
        25       A.   Well, I see the words.  I can't
00195:01
        02   remember the real specifics of your question, but
        03   the question in part was -- is that a verbatim
        04   quote of what Kerry said, I don't think that's
        05   probably true, so -- I am sorry, but perhaps you
        06   could just ask the question again.
        07       Q.   Sure, I will clarify.
        08            Michael Poulos writes that they are --
        09   and all I was doing was quoting his e-mail --
        10   quote, "only trying to replace the traditional
        11   FICO score," end quote.
        12            That's what he said, right?
        13       A.   No.  What he said is they described a
        14   constrained project scope and then he is giving
        15   his interpretation of what the scope is.
        16       Q.   And he uses the words "only trying to
        17   replace the traditional FICO score," that's the
        18   e-mail he sent you?
        19       A.   He uses those words, yes, that's true.
        20       Q.   And you know by this time that he has
        21   either spoken to Kerry Williams or its
        22   information being conveyed from John Drzik as to
        23   what Kerry Williams had said, right?
```

**45. PAGE 196:04 TO 196:11 (RUNNING 00:00:33.734)**

```
        04       A.   Yeah, so he -- he is basing this, what
        05   he wrote, on information that he either got by
        06   talking to Kerry on the phone or by talking, I
        07   suppose, to Drzik or McIntyre, if he did.
        08       Q.   If you can turn over to the next page
        09   underneath the heading "Strategy Tactics,"
        10   Mr. Poulos speaks of, quote, "displacing FICO as
        11   the market standard," end quote, correct?
```

**46. PAGE 196:13 TO 196:17 (RUNNING 00:00:16.133)**

```
        13       A.   I don't see it yet.
        14       Q.   The second paragraph under "Strategy
        15   Tactics," do you see Mr. Poulos is describing
        16   displacing FICO as the market standard?
        17       A.   Yes.
```

**47. PAGE 197:21 TO 197:24 (RUNNING 00:00:09.500)**

```
        21            Are you suggesting that displacing FICO
        22   as the market standard was something that
        23   Mr. Poulos came up with as his own speculation?
        24       A.   Easily could have been.
```

**48. PAGE 202:17 TO 202:19 (RUNNING 00:00:15.133)**

```
        17       Q.   Handing you what has been marked as
        18   Plaintiffs' Exhibit 34, do you see Plaintiffs'
        19   Exhibit 34 is a March 31, 2005 letter from you?
```

## Fair Isaac v Experian et al

**49. PAGE 202:23 TO 202:23 (RUNNING 00:00:00.900)**

```
23      A.      Yes.
```

**50. PAGE 203:02 TO 203:13 (RUNNING 00:00:42.466)**

```
02      Q.      And this Exhibit 34 is from you to
03 Mr. Kerry Williams of Experian, correct?
04      A.      Yes.
05      Q.      And it encloses, if you look, the
06 attachment, a March 31, 2005, quote, "proposal to
07 help the three major U.S. credit bureaus to
08 develop a tri-bureau scorecard," unquote.
09      A.      Yes.
10      Q.      And do you see this document is
11 produced from Mercer Oliver Wyman's files
12 consecutively numbered 1382 through 1396?
13      A.      Yes.
```

**51. PAGE 203:17 TO 203:19 (RUNNING 00:00:10.300)**

```
17      Q.      Do you recognize the handwriting that
18 appears on the attached proposal, for instance,
19 page 1389?
```

**52. PAGE 203:20 TO 203:20 (RUNNING 00:00:03.233)**

```
20      A.      No. It's not mine.
```

**53. PAGE 203:24 TO 204:07 (RUNNING 00:00:22.000)**

```
24      Q.      Does that lead you to believe it in
25 fact was sent out to Kerry Williams?
00204:01
02      A.      It -- well, a document was sent out.
03 Whether this was the final version or not is, you
04 know, at issue because it seems to have some
05 proposed edits on it which are not in my
06 handwriting, so there may have been another
07 version.
```

**54. PAGE 207:09 TO 207:12 (RUNNING 00:00:13.666)**

```
09              Could you turn, sir, to page 1387.
10              By the way, are you the author of this
11 document?
12      A.      Yes, substantially.
```

**55. PAGE 207:14 TO 208:06 (RUNNING 00:00:25.300)**

```
14              Looking at page 1387, do you see the
15 heading "Calibrate to FICO"?
16      A.      Yes.
17      Q.      Those are words you used, right?
18      A.      Yes.
19      Q.      And it says, quote, "The TBS score" --
20              Do you see that, sir?
21      A.      I do.
22      Q.      That's the tri-bureau score that you
23 are talking about, right?
24      A.      Yes.
25      Q.      -- "would only conform to the current
00208:01
02 FICO range by accident."
03      A.      Yes.
04      Q.      Those are the words you chose to use,
05 correct, sir?
06      A.      Correct.
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

## Fair Isaac v Experian et al

**56. PAGE 208:16 TO 209:02 (RUNNING 00:00:51.134)**

```
16    Q.    What did you mean when you said the TBS
17 score would only conform to the current FICO
18 range by accident?
19    A.    What I meant was that the score, when
20 it was constructed and built, would output a
21 range of numbers.  It could be in different forms
22 but the chance that if you built it in isolation
23 that the numbers used to describe the range would
24 exactly correspond to those that define the
25 classic FICO score range, you know, would be very
00209:01
02 remote and therefore by accident.
```

**57. PAGE 211:16 TO 211:20 (RUNNING 00:00:10.334)**

```
16    Q.    Do you see there's a reference in the
17 handwriting, it says, dash, "mutually defined by
18 team."
19          Do you see those words?
20    A.    I do.
```

**58. PAGE 211:25 TO 212:08 (RUNNING 00:00:13.167)**

```
25    Q.    And it says, "One company prohibited
00212:01
02 from directly calibrating to FICO."
03          Is that how you interpret that
04 handwriting?
05    A.    Yes.
06    Q.    Do you have an understanding of what
07 that means?
08    A.    No.
```

**59. PAGE 220:21 TO 220:23 (RUNNING 00:00:09.793)**

```
21    Q.    And it was certainly agreed that the
22 references to FICO or Fair Isaac should be
23 deleted, correct?
```

**60. PAGE 221:02 TO 221:05 (RUNNING 00:00:15.380)**

```
02    A.    I think that -- yeah, the standard
03 feeling was that this was about what would become
04 Vantage, it wasn't about Fair Isaac or any
05 industry reference by name.
```

**61. PAGE 221:24 TO 222:03 (RUNNING 00:00:05.567)**

```
24          Sir, you sent out a proposal that had
25 numerous references to FICO and Fair Isaac,
00222:01
02 correct?
03    A.    Correct.
```

**62. PAGE 222:13 TO 222:17 (RUNNING 00:00:11.067)**

```
13    Q.    Is it your recollection that TransUnion
14 recommended deleting those references to Fair
15 Isaac and FICO in your proposal?
16    A.    TransUnion and the other two bureaus,
17 yes.
```

**63. PAGE 225:05 TO 225:06 (RUNNING 00:00:04.667)**

```
05    Q.    Would you turn to page 69140.
06    A.    Yes.
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

## Fair Isaac v Experian et al

**64. PAGE 225:12 TO 226:09 (RUNNING 00:00:48.300)**

```
12     Q.     And Experian is -- this is under the
13 heading, quote, "Predict What," unquote, right?
14     A.     Yes, yes.
15     Q.     And that's a section that you wrote
16 talking about what this tri-bureau score was
17 exactly going to try to predict, right?
18     A.     Yes.
19     Q.     And Experian, you're saying there are
20 theoretical issues with predicting default as
21 default is an outcome driven by lenders'
22 inconsistency --
23     A.     Inconsistently.
24     Q.     -- inconsistently, thank you, as
25 opposed to severe delinquency, which is a
00226:01
02 function of consumer behavior; that's the first
03 line Experian says, right?
04     A.     Yes.
05     Q.     And then they say, "Simplify wording,
06 mirror FICO for ease of adoption as agreed by
07 team."
08            Do you see that, sir?
09     A.     Yes.
```

**65. PAGE 226:10 TO 226:16 (RUNNING 00:00:24.800)**

```
10     Q.     What did you understand "mirror FICO
11 for ease of adoption" to mean?
12     A.     Given the context, it would appear to
13 mean opt for a dependent variable which is not a
14 default event but a serious delinquency event of
15 some kind: 60 days, 90 days, 120 days or some
16 such.
```

**66. PAGE 227:19 TO 227:23 (RUNNING 00:00:15.367)**

```
19     Q.     I'm just asking you how you interpreted
20 then this "for ease of adoption."
21            Did you understand that Experian was
22 saying that FICO should be mirrored so that it
23 would be more easily adopted in the marketplace?
```

**67. PAGE 228:05 TO 228:09 (RUNNING 00:00:15.200)**

```
05     A.     In the context of what I remember from
06 the discussion of this document and its edits, I
07 don't remember any specific discussion about that
08 line, and so I think your question becomes what
09 would I now think it was.
```

**68. PAGE 228:24 TO 229:04 (RUNNING 00:00:09.166)**

```
24     Q.     Do you see right under it the reference
25 or suggestion from TransUnion?
00229:01
02     A.     Yes.
03     Q.     They wanted to remove the FICO
04 reference, right?
```

**69. PAGE 229:08 TO 229:13 (RUNNING 00:00:12.834)**

```
08     A.     Well, it says, "remove FICO reference,"
09 so yes.
10     Q.     So Experian said mirror FICO for ease
11 of adoption and TransUnion was saying remove the
12 FICO reference on this point; is that right?
13     A.     Correct.
```

Case Clip(s) Detailed Report
Tuesday, November 10, 2009, 5:46:44 PM

## Fair Isaac v Experian et al

**70. PAGE 233:02 TO 233:04 (RUNNING 00:00:08.900)**

```
02     Q.   Calibrated to the current industry
03  model meant FICO, as you understood those folks
04  were using the term, correct?
```

**71. PAGE 233:06 TO 233:06 (RUNNING 00:00:00.800)**

```
06     A.   No.
```

**72. PAGE 285:24 TO 286:13 (RUNNING 00:00:37.700)**

```
24          I hand you what has been marked as
25  Exhibit 42.
00286:01
02          Do you see that that's a document
03  produced by Equifax FICO -- I am sorry, do you
04  see it was a document produced by Equifax, by
05  looking at the production number?
06     A.   Yes.
07     Q.   In fact, sir, are you the author of the
08  Trident methodology document in part?
09     A.   Not me personally.
10     Q.   Do you know who was?
11     A.   This was probably, again, a combination
12  of Piyush Tantia and David Goldberg.  It says MOW
13  document.
```

**73. PAGE 304:18 TO 304:20 (RUNNING 00:00:08.767)**

```
18     Q.   I would like to turn your attention
19  back to Plaintiffs' Exhibit 31, which is the
20  operation Triad document.
```

**74. PAGE 305:08 TO 305:18 (RUNNING 00:00:37.267)**

```
08     Q.   Mr. Carroll, can you just describe what
09  this document is?
10     A.   Yes.  It's a what I would call a
11  thought piece or a memo, slash, thought piece
12  that I created to prompt a discussion about what
13  we understood the situation and request from
14  Experian to be and that conversation was with
15  Michael Poulos and Alan McIntyre.
16     Q.   Was this document ever sent to the
17  credit bureaus?
18     A.   I certainly don't think it was.
```

> TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:23:31.307)