# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Fair Isaac Corporation and myFICO Consumer Services, Inc.; | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No: |
| Experian Information Solutions, Inc.; Trans Union LLC; VantageScore Solutions, LLC; and Does I through X; | ) ) ) ) ) | 0:06-cv-04112 (ADM/JSM) |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW OF EXPERIAN INFORMATION SOLUTIONS, INC. AND TRANS UNION LLC IN SUPPORT OF THEIR MOTION FOR A JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.     LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW .............................................................................................. 3

II.    PLAINTIFFS FAILED TO PRESENT ANY EVIDENCE THAT THEIR ALLEGED MARK "300-850" IS VALID .............. 4

A.    Plaintiffs Must Establish Secondary Meaning ...................... 4

B.    No Reasonable Jury Could Find That "300-850" Acquired Secondary Meaning Prior to 2004 ......................... 6

    1.    Plaintiffs Had Not Used "300-850" as a Trademark by 2004 ................................................... 7

    2.    There is No Evidence of the Extent of Plaintiffs' Advertising ............................................. 10

    3.    There Is No Evidence of the Public's Perception of Plaintiffs' Advertising Material as of Mid-2004 ...................................................................... 11

    4.    The Evidence of FICO Score Sales Is Not Probative of Whether Consumers Associate "300-850" with Plaintiffs ......................................... 12

    5.    There Is No Relevant Survey Evidence That Demonstrates That Consumers Associated "300-850" with Plaintiffs in 2003 or 2004 ............... 13

    6.    Plaintiffs' Use of a Scoring Range of 300-850 with Credit Scores Has Not Been Exclusive ............ 13

    7.    Neither Experian Nor TU Copied Plaintiffs' Scoring Range with the Intent to Confuse Consumers ............................................................ 14

C.   No Reasonable Jury Could Find That "300-850"
Acquired Secondary Meaning Prior to the Launch of
the VantageScore Credit Scoring Service in March
2006 ................................................................................... 19

    1.   As of March 2006, Plaintiffs Still Did Not Use
"300-850" as a Trademark, and Consumers Still
Did Not Associate "300-850" with Plaintiffs ............ 19

    2.   Neither Experian Nor TU Copied A Trademark
with the Intent to Confuse Consumers ...................... 20

III.   PLAINTIFFS FAILED TO PRESENT EVIDENCE  THAT
DEFENDANTS' USE OF SCORING RANGES OR
NUMBERS ARE LIKELY TO CAUSE CONFUSION ................. 22

A.   "300-850" is a Weak Descriptive Term ............................... 23

B.   The "Marks" Are Not Similar ............................................. 24

C.   Plaintiffs Failed to Prove that Defendants Intended to
Confuse the Public .............................................................. 25

D.   Plaintiffs Failed to Present Any Evidence of Actual
Confusion .......................................................................... 26

IV.   PLAINTIFFS FAILED TO PRESENT SUFFICIENT
EVIDENCE TO PROVE THAT DEFENDANTS' USE OF
SCORING RANGES OR NUMBERS ARE LIKELY TO
CAUSE CONFUSION WITH PLAINTIFF'S "SEAL
LOGOS" ..................................................................................... 28

V.   PLAINTIFFS FAILED TO PROVE THAT EXPERIAN'S
USE OF CERTAIN KEYWORDS IN INTERNET SEARCH
ENGINES ARE LIKELY TO CAUSE CONSUMER
CONFUSION .............................................................................. 29

VI.   PLAINTIFFS FAILED TO PROVE THAT DEFENDANTS
INTENDED TO PASS OFF THEIR SERVICES AS
PLAINTIFFS .............................................................................. 30

VII.   PLAINTIFFS HAVE NO CLAIMS AGAINST ANY OF
DEFENDANTS' SCORING SERVICES SOLD TO
LENDERS ................................................................................... 34

CONCLUSION ................................................................................................. 34

NEWYORK 7396970 (2K)

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Aloe Creme Labs., Inc. v. Milsan, Inc.*,
    423 F.2d 845 (5th Cir. 1970) ................................................................... 11

*Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*,
    494 F.2d 3 (5th Cir. 1974) .................................................................. 9, 11

*Aromatique, Inc.* v. *Golden Seal, Inc.*,
    28 F.3d 863 (8th Cir. 1994) .................................... 4, 7, 10, 12, 15, 18, 33

*Atlantis Silverworks Inc. v. 7th Sense Inc.*,
    1997 WL 128403, 42 U.S.P.Q.2d 1904 (S.D.N.Y. 1997) ........................ 12

*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*,
    781 F.2d 604 (7th Cir. 1986) .................................................................. 15

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*,
    716 F.2d 854 (11th Cir. 1983) ...........................................................12, 15

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
    434 F.2d 794 (9th Cir. 1970) .................................................................... 6

*Cicena, Ltd. v. Columbia Telecomm. Group*,
    900 F.2d 1546 (Fed. Cir. 1990) .............................................................. 16

*Co-Rect Prods., Inc.* v. *Marvy! Adver. Photography, Inc.*,
    780 F.2d 1324 (8th Cir. 1985) .............................................4, 5, 6, 11, 13, 15, 22, 33

*DaimlerChrysler AG v. Bloom*,
    315 F.3d 932 (8th Cir. 2003) .................................................................. 30

*Davis v. Walt Disney Co.*,
    430 F.3d 901 (8th Cir. 2005) .................................................................. 25

*Duluth News-Tribune* v. *Mesabi Publ'g Co.*,
    84 F.3d 1093 (8th Cir. 1996) ...........................................................22, 26, 28

*Exquisite Form Indus., Inc.* v. *Exquisite Fabrics of London*,
    378 F. Supp. 403 (S.D.N.Y. 1974) .......................................................... 33

*Fair Isaac Corp.* v. *Experian Info. Solutions Inc.*,
    No. 06-4112, 2009 WL 2252583 (D. Minn. July 24, 2009) ................. 4, 31

*Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*,
   426 F.3d 1001 (8th Cir. 2005) ...........................................................................4, 5, 8

*Gov't Employees, Ins. Co.* v. *Google, Inc.*,
   No. 1:04CV507, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005).................................. 29

*Graham Webb Int'l v. Helene Curtis Inc.*,
   17 F. Supp. 2d 919 (D. Minn. 1998)...............................................................10, 24

*Hopper* v. *Hallmark Cards, Inc.*,
   87 F.3d 983 (8th Cir. 1996) ...................................................................................... 3

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*,
   182 F.3d 598 (8th Cir. 1999) ................................................................................... 22

*Inwood Labs., Inc.* v. *Ives Labs., Inc.*,
   456 U.S. 844 (1982) ................................................................................................... 5

*J.G. Wentworth, S.S.C. LP* v. *Settlement Funding LLC*,
   No. 06-0597, 2007 WL 30115 (E.D. Pa. Jan. 4, 2007)............................................ 29

*Jeld-Wen, Inc. v. Dalco Indus., Inc.*,
   No. 99-1005, 1999 WL 1024002 (8th Cir. Nov. 10, 1999).................................. 3, 23

*KP Permanent Make-Up v. Lasting Impressions, Inc.*,
   543 U.S. 111 (2004) .............................................................................................24, 26

*Lang* v. *Ret. Living Publ'g Co.*,
   949 F.2d 576 (2d Cir. 1991) .................................................................................... 26

*M2 Software, Inc. v. Madacy Entm't*,
   421 F.3d 1073 (9th Cir. 2005) ................................................................................... 3

*McGreevy* v. *Daktronics, Inc.*,
   156 F.3d 837 (8th Cir. 1998) ..................................................................................... 3

*MicroStrategy Inc. v. Motorola, Inc.*,
   245 F.3d 335 (4th Cir. 2001) ................................................................................. 8, 9

*Microware Systems Corp. v. Apple Computer, Inc.*,
   238 F.3D 989 (8th Cir. 2001) .................................................................................. 24

*MSP Corp. v. Westech Instruments, Inc.*,
   500 F. Supp. 2d 1198 (D. Minn. 2007) .................................................................. 30

*Munsingwear, Inc. v. Jockey Intern., Inc.,*
  No. 4-93-538, 1994 WL 422280 (D. Minn. Apr. 21, 1994)...................................... 26

*Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,*
  149 F.3d 722 (7th Cir. 1998) ....................................... 8

*Schwan's IP, LLC v. Kraft Pizza Co.,*
  379 F. Supp. 2d 1016 (D. Minn. 2005) .................................... 13

*Skinner Mfg. Co. v. Kellogg Sales Co.,*
  143 F.2d 895 (8th Cir. 1995) ................................... 24

*Squirtco v. Seven-Up Co.,*
  628 F.2d 1086 (8th Cir. 1980) ................................. 22

*Thomas & Betts Corp. v. Panduit Corp.,*
  65 F.3d 654 (7th Cir. 1995) .................................... 5

*Wrist-Rocket Mfg. Co. v. Saunders Archery Co.,*
  578 F.2d 727 (8th Cir. 1978) ................................... 11

*Yoo-hoo Chocolate Beverage Corp. v. A.J. Canfield Co.,*
  No. 85-3701, 1986 WL9720, at *13 (D.N.J. Apr. 1, 1986) .................................15, 16

## OTHER AUTHORITIES

9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 (1971) ....................... 4

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* .............5, 6, 7

Fed. R. Civ. P. 50(a)(1)(B) .................................................................1, 3, 34

Fed. R. Evid. 801................................................................................... 33

Defendants Experian Information Solutions, Inc. ("Experian") and Trans Union LLC ("TU") (collectively, "Defendants") submit this memorandum of law in support of their motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1)(B), dismissing all claims against Defendants.

## INTRODUCTION

"300-850" is not a trademark.  It is a scoring range.  Simply telling people that "your score may range between 300 and 850" – which is all Plaintiffs have done with these numbers – does not transform "300-850" into a trademark.  That is not *trademark* use of the numbers; it is *descriptive* use.  Like the words "credit score," "300-850" informs consumers about a characteristic or feature of the credit scoring service, not who performs it.  And repeating the range in textual paragraphs of webpages and brochures does not create trademark rights in the range.  No amount of descriptive use can create secondary meaning.  Plaintiffs do not sell a "300 to 850 score *range*" nor do they sell a "300-850 Score."  They sell a *FICO* Score.  FICO is the trademark for the product.

By this lawsuit, Plaintiffs attempt to monopolize a *feature* of credit scoring services commonly used for decades in the industry not just by Defendants, but by numerous third parties.  Plaintiffs have not presented any evidence upon which a reasonable jury could find that "300-850" acquired secondary meaning at any time, let alone before Experian and TU launched their PLUS Score and TrueCredit credit scoring services in the fall of 2003 or the VantageScore credit scoring service in March 2006. Without a valid trademark, all of Plaintiffs' claims fail as a matter of law.

Plaintiffs also have failed to present sufficient evidence of a likelihood of confusion. Missing from Plaintiffs' case is evidence that any Defendant used its scoring range as a trademark. Such trademark use is a *sine qua non* of likelihood of confusion. Plaintiffs' infringement claims based on their registration of certain "Official FICO Seal" logos are also unsupported by the evidence. Plaintiffs' only employee witness admitted that none of the Defendants use anything that looks like the "Official FICO Seal" logos, and those logos do not grant trademark significance to the term "300-850" as a matter of law.

Plaintiffs' keyword advertising claims are also not supported by the evidence. Plaintiffs have now abandoned their keyword advertising claim against TU, but persist in the claim against Experian. As to that claim, there is no evidence that the use of FICO as a keyword that brings up an Experian ad as one of *ten* paid ads and *thousands* of organic links, many of which link to sites that do not sell FICO scores, is likely to confuse consumers as to the source or sponsorship of scores sold by Experian.

Plaintiffs' passing off claim also fails. To the extent Plaintiffs' passing off claim is coextensive with its trademark infringement and false advertising claims, Plaintiffs have failed to prove trademark infringement, and their false advertising claims have been dismissed. To the extent that the claim is premised on a convoluted theory that consumers (a) actually believe that the FICO score is used by most lenders, (b) perceive Defendants' websites as implicitly (not explicitly) conveying the message that their scores are used by most lenders, (c) put the two thoughts together to form a belief that

Defendants' scoring services are put out by Plaintiffs, and (d) made a purchasing decision based on that mistaken belief, the theory is not supported by any evidence whatsoever.

Finally, Plaintiffs have conceded that a large segment of the relevant consuming public – lenders – would never be confused because they are sophisticated purchasers who routinely encounter credit scoring services from other sources that use the same or similar scoring ranges as the FICO score.  As to lenders, there can be no infringement.

If ever there were a case ripe for judgment as a matter of law, this is it.

## ARGUMENT

## I.     LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW

Where a plaintiff has rested and "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the plaintiff on an essential element of plaintiff's claims, "the court may … grant a motion for judgment as a matter of law" against the plaintiff on those claims.  Fed. R. Civ. P. 50(a)(1)(B).  Judgment as a matter of law is proper in trademark infringement cases where the plaintiff failed to present sufficient evidence of secondary meaning or likelihood of confusion.  *See Jeld-Wen, Inc. v. Dalco Indus., Inc.*, No. 99-1005, 1999 WL 1024002, at *5 (8th Cir. Nov. 10, 1999); *see also M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1086 (9th Cir. 2005).  Although the nonmovant is entitled to all reasonable inferences, it must not be accorded unreasonable inferences.  *See McGreevy* v. *Daktronics, Inc.*, 156 F.3d 837, 840-41 (8th Cir. 1998) (plaintiff not entitled to inferences in conflict with uncontested facts); *Hopper* v. *Hallmark Cards, Inc.*, 87 F.3d 983, 988 (8th Cir. 1996) (a reasonable inference is one "which may be drawn from the evidence without speculation").  "The question is not

whether there is literally no evidence supporting the [nonmoving] party … but whether there is evidence upon which the jury could properly find [for that party]." 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524, at 543 (1971).

## II.   PLAINTIFFS FAILED TO PRESENT ANY EVIDENCE THAT THEIR ALLEGED MARK "300-850" IS VALID

### A.   Plaintiffs Must Establish Secondary Meaning

This Court already has determined that the term "300-850" is descriptive of Plaintiffs' credit scoring services and, therefore, the term is entitled to trademark protection only if it has acquired secondary meaning. *Fair Isaac Corp.* v. *Experian Info. Solutions Inc.*, No. 06-4112, 2009 WL 2252583, at *21 (D. Minn. July 24, 2009) (Docket No. 694). Secondary meaning is established "by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Id.* The evidence must show that the alleged mark acquired secondary meaning *before the first use of the same or similar mark by an alleged infringer. Co-Rect Prods., Inc.* v. *Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) ("the expression [must have] acquired a secondary meaning before [defendant] began using the [same] expression"); *see also Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Aromatique, Inc.* v. *Golden Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994) (timing of acquisition of secondary meaning is "crucial").

To establish secondary meaning, a plaintiff must present evidence that, in the minds of a significant portion of consumers, the trademark's "primary significance" is to identify its owner as the source of the product, rather than to identify the product itself. *Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982); *see also Co-Rect*, 780 F.2d at 1330; 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (hereafter "*McCarthy*") § 15:5, at 15-9 (emphasis in original) (West 2009) ("[t]he prime element of secondary meaning is a *mental association* in buyers' minds between the alleged mark and a single source of the product."). Direct evidence like consumer testimony or surveys is most probative of secondary meaning, but secondary meaning can also be proven circumstantially, by evidence of exclusivity, length, and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying. *Frosty Treats,* 426 F.3d at 1005; *Co-Rect*, 780 F.2d at 1333 n.9. "[T]he ultimate inquiry is whether in the consumer's mind the mark denotes a 'single thing coming from a single source.'" *Co-Rect*, 780 F.2d at 1330 (internal citations omitted).

"Use of a term in its descriptive sense or in a non-trademark sense is not evidence of secondary meaning." 2 *McCarthy* § 15:52, at 15-83; *see also Frosty Treats*, 426 F.3d at 1005; *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995) (advertising a product feature as being useful rather than as an indicator of source "is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding").

Furthermore, use by competitors of similar terms dilutes consumer recognition and association of that term with the alleged owner, and therefore evidences a lack of secondary meaning, particularly when the other uses generated no complaints from the purported trademark owner. *See Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). Proof that other sellers are using a disputed term in its descriptive sense also evidences a lack of secondary meaning. *See* 2 *McCarthy* § 15:27, at 15-42.

As set forth below, Plaintiffs have failed to prove that the term "300-850" has acquired secondary meaning and therefore cannot establish that "300-850" is a valid trademark.

### B.   No Reasonable Jury Could Find That "300-850" Acquired Secondary Meaning Prior to 2004

The undisputed evidence shows that Experian began to sell its PLUS Score service with the scoring range 300-900 in October 2003 and that TU began to sell its TrueCredit scoring service with the scoring range 300-850 in December 2003.[1] Therefore, to succeed on their trademark claims, Plaintiffs must demonstrate that the term "300-850" acquired secondary meaning *before* October 2003 as to the PLUS Score service and December 2003 as to the TrueCredit scoring service.[2] *Co-Rect*, 780 F.2d at 1332; *see*

---

[1] Tr. 911:9-14; Tr. 1968:4-7.

[2] Here, Plaintiffs apparently seize on the change in range of the PLUS Score service – from 300-900 to 330-830 – that occurred in the spring of 2004. (Tr. 945:17-20; 1766:1-8; EX0502; PX0505; EX0214; EX0347.) This is perplexing in that, under Plaintiffs' theory, 300-900 should be every bit as infringing as 330-830. Nonetheless, as discussed in detail below, there is no more evidence that "300-850" acquired secondary meaning in mid-2004 than in late 2003.

*also Aromatique*, 28 F.3d at 870; *2 McCarthy* § 15:4, at 15-8.2.  Plaintiffs presented *no* such evidence.

### 1.    Plaintiffs Had Not Used "300-850" as a Trademark by 2004

Plaintiffs' entire evidence of purported trademark use of "300-850" was the testimony and documents presented by Keri Kramers-Dove, Fair Isaac's Vice President of Scoring.  As the Court will recall, this evidence consisted entirely of sentences and phrases from websites and brochures that were generally to the effect of "The FICO score ranges from 300 to 850."  No reasonable jury could find that such "use" amounts to trademark use.  It is plainly *descriptive* use.  This is especially true through mid-2004.  Every use in the record by Plaintiffs (which consists of only brochures and web pages, none of which are the home page of www.myfico.com) of "300-850" in their advertising or marketing materials created or distributed prior to 2005 shows descriptive use:

- "Most U.S. consumers score between 300 and 850" (2000, 2001);[3]
- "It's a number—between 300 and 850 – that says how likely you are to make your credit payments on time." (2002);[4]
- "Based on a scale of 300-850, there are three FICO® scores" (2002);[5]
- "FICO scores range from about 300 to 850" (2002);[6]
- "FICO scores range between 300 and 850" (2002, 2003, 2004);[7]
- "FICO scores range from 300 to 850" (2003);[8]

---

[3] PX0907 ("Sample Score Power Analysis"); PX0932 at FIC0364843 ("Introducing MyFICO.com and Score Power"); PX0953 ("FICO Guide Analysis").
[4] PX0851 ("Make Your FICO Score Work for You").
[5] PX0914 ("Paint Your Complete Credit Picture").
[6] EX0056 ("Understanding Your Credit Score" brochure).
[7] PX0906 (Score Power Report); PX0913; PX0915; EX0079.
[8] PX0916.

None of these uses of "300-850" does anything more than describe a feature or characteristic of Plaintiffs' FICO scoring service, namely the range of possible outcomes. In fact, Ms. Kramers-Dove repeatedly conceded that Plaintiffs used "300-850" to identify their *product* – not the *source* of their product.[9]  As a matter of law, such "product-identifying" use will not establish secondary meaning.  The evidence shows that Plaintiffs have n*ever* used the phrase the "300-850 Score" to promote their services.[10]  In short, Plaintiffs never used the term "300-850" in a trademark manner, *i.e.*, to designate the source of the scoring service.

Moreover, the alleged trademark "300-850" was not featured prominently or emphasized in any of Plaintiffs' advertising or promotional materials.  *See Frosty Treats*, 426 F.3d at 1005-06 ("Frosty Treats does not even prominently display the 'Frosty Treats' mark on its street-vending vans, which according to its brief is the primary way that it advertises the phrase."); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 342 (4th Cir. 2001) ("MicroStrategy has not consistently placed 'Intelligence Everywhere' on a particular part of the page, or in a particular type, or labeled it with a 'TM,' or consistently used a distinctive font, color, typeset or any other method that makes 'its nature and function readily apparent and recognizable without extended analysis.'"); *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998) ("Evidence of advertising and sales . . . does not necessarily indicate

---

[9] Tr. 347:22-348:1, 359:15-22, 402:14-17, 532:6-7, 617:23-618:1.
[10] Tr. 508:5-12.

that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark.").

In addition, "300-850" was always used in a textual sentence in regular or smaller font and always accompanied by one or more of Plaintiffs' distinctive marks, such as FICO, FAIR ISAAC, or myFICO, or one of Equifax's distinctive trademarks, such as BEACON or SCORE POWER.[11] Moreover, with one exception, the pre-2005 uses set forth above are not even uses of the mark for which Plaintiffs ultimately received a federal registration – "300-850." Ms. Kramers-Dove, Plaintiffs' only employee witness, conceded that Plaintiffs do not have a trademark in "from 300 to 850" or "between 300 and 850" or individual numbers within the 300-850 scoring range.[12] Not only is such non-trademark use not evidence of secondary meaning, but it directly undermines it. *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 12 (5th Cir. 1974); *MicroStrategy*, 245 F.3d at 342.

Furthermore, in violation of their own trademark guidelines,[13] Plaintiffs never used the "TM" or "SM" symbol next to "300-850" at all (let alone prior to Experian or TU's first use of an allegedly infringing range in October or December 2003 or April 2004) to provide notice to third parties that "300-850" was their trademark.[14] In fact, the

---

[11] *See, e.g.*, PX0408; PX0851; PX0898; PX0906; PX0907; PX0913; PX0914; PX0915.
[12] Tr. 478:6-9, 482:7-10, 509:23-510:12-14, 532:24-533:5, 729:7-730:3. This repeated deviation from or modification of the alleged mark "300-850" violates Plaintiffs' own internal trademark usage guidelines. (PX0947 at FIC0982065.)
[13] EX0137, at 0039 ("The first usage of a trademark in a document should include both the symbol (®, ™, or SM) and the descriptor.")
[14] Ms. Kramers-Dove testified that Plaintiffs "didn't put that – the TM in documents before, like I said, either I think it was late 2004 or 2005." (Tr. 497:10-14.) No

evidence shows that "TM","SM", or ® were used with *other* Fair Isaac marks side-by-side with uses of the unmarked term "300-850,"[15] a fact that evidences a lack of secondary meaning for the undesignated mark. *Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 928 (D. Minn. 1998).[16]

### 2.    There is No Evidence of the Extent of Plaintiffs' Advertising

While the record may include the web pages, brochures, and pamphlets promoting Plaintiffs' credit scoring services that include the term "300-850," it is completely devoid of evidence indicating the extent of Plaintiffs' advertising.  There is no evidence demonstrating (i) any marketing plans or budgets related to the promotion of "300-850" as a brand, (ii) the amount of money spent on advertising or promoting the alleged "300-850" mark, (iii) the number of consumers who actually received Plaintiffs' brochures, (iv) data concerning the traffic to those webpages on www.myfico.com that mention "300-850."[17]  There is simply no evidence of any effort on behalf of Plaintiffs to take a

---

marketing, advertising, or promotional material in evidence, however, supports that testimony.

[15] *See, e.g.,* PX0851, PX0906, PX0907, PX0915, PX0916, PX0932, and PX0953.

[16] Even if Plaintiffs had used a "TM" or "SM" symbol next to "300-850," however, such notice does not transform the descriptive term "300-850" into a trademark indicating source or origin. *In re Volvo Cars of N. Am.*, 46 U.S.P.Q.2d 1455, 1998 WL 239298, at *6 (T.T.A.B. 1998).

[17] Plaintiffs' statistics regarding the "media attention" around the launch of myFICO.com say nothing about how many consumers actually viewed any advertising or promotional material that contained the alleged mark.  (PX0932; Tr. 391:18-25.)  Furthermore, that the term appeared descriptively in articles does not mean that consumers actually read the articles or made any association between "300-850" and Plaintiffs. *See, e.g., Aromatique*, 28 F.3d at 872 (articles do not reflect the minds of consumers to establish the necessary connection between the mark and the source).

term describing a product feature and turn it into a corporate brand, let alone a successful

effort.

### 3. There Is No Evidence of the Public's Perception of Plaintiffs' Advertising Material as of Mid-2004

Plaintiffs have presented no evidence, like consumer perception surveys or

anecdotal testimony, of the effect of their purported advertising described above. *See Co-*

*Rect*, 780 F.2d at 1332 ("Although it is true that advertising is a relevant factor in

determining whether a mark has acquired secondary meaning, it is the *effect* of such

advertising that is important, not its extent."); *see also Wrist-Rocket Mfg. Co. v. Saunders*

*Archery Co.*, 578 F.2d 727, 732 (8th Cir. 1978) ("common-law trademark rights cannot

be established by advertising alone"); *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d

845, 850 (5th Cir. 1970) (affirming finding of no secondary meaning although plaintiff

spent $3 million to place ads in national publications and sponsored in-store promotions).

To be effective, advertising must cause the public to equate the mark with the source of

the product. *Co-Rect*, 780 F.2d at 1332; *Am. Heritage Life Ins.*, 494 F.2d at 13 (uses of

mark must be before the buying public and "secondary meaning can hardly arise without

public awareness and acceptance of the mark"). Ms. Kramers-Dove testified that

Plaintiffs did not test the impact of any its promotional materials, and Plaintiffs have

offered no evidence showing any public perception equating the term "300-850" with

Plaintiffs created by their advertising prior to 2005 or at any time.[18]

---

[18] Tr. 503:4-504:2.

### 4.   The Evidence of FICO Score Sales Is Not Probative of Whether Consumers Associate "300-850" with Plaintiffs

Plaintiffs have presented no evidence demonstrating that consumers have purchased the FICO score *because* of the use of the alleged "300-850" mark.  While Ms. Kramers-Dove testified that Plaintiffs sold 5.3 million FICO scores to consumers from 2001 to 2003,[19] those sales do not establish secondary meaning.  *Aromatique*, 28 F.3d at 873 ("Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product . . ., sales figures alone are inadequate to establish a connection between a product and its source"); *Atlantis Silverworks Inc. v. 7th Sense Inc.*, 1997 WL 128403, 42 U.S.P.Q.2d 1904, 1908 (S.D.N.Y. 1997).  Those sales say nothing about whether consumers associate "300-850" with Plaintiffs, especially where several trademarks other than "300-850," such as FICO or myFICO, are used to promote and sell FICO scores.  *Aromatique*, 28 F.3d at 873.  The sales could be caused by something entirely unrelated to trademarks or brands, such as an increased interest in credit scores generally.  *See, e.g., Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983) (noting that "the growth in Brooks' sales during the late 1970's may have been attributable in large part to the increased interest in running and jogging during the same period").

---

[19]  Tr. 474:4-9.

### 5.   There Is No Relevant Survey Evidence That Demonstrates That Consumers Associated "300-850" with Plaintiffs in 2003 or 2004

Ms. Kramers-Dove conceded that she was aware of no contemporaneous surveys or other tests inquiring whether consumers are familiar with credit scores in general or associate the term "300-850" with a single source.[20]   Nor does the testimony of Plaintiffs' expert James T. Berger help Plaintiffs here.   First, Mr. Berger conducted the survey in 2008, and therefore, the survey says nothing about whether the term "300-850" had acquired secondary meaning any time prior to that date.[21]   *See Co-Rect*, 780 F.2d at 1333; *Schwan's IP, LLC* v. *Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024 (D. Minn. 2005) (noting that a survey conducted months after defendant's mark entered the market is irrelevant for the establishment of secondary meaning).   Second, the survey was not designed to test, and did not test, whether the term "300-850" had acquired secondary meaning.   Indeed, Mr. Berger did not even used "300-850" (or any variation of it) in his survey.[22]   Third, the Berger survey failed to test whether consumers were confused by Defendants' use of any particular scoring range.[23]

### 6.   Plaintiffs' Use of a Scoring Range of 300-850 with Credit Scores Has Not Been Exclusive

Plaintiffs' use of the 300-850 scoring range has been far from exclusive.[24]   The record includes undisputed evidence of 33 credit risk scores that use ranges overlapping

---

[20]   Tr. 493:15-18, 500:1-9; 503:13-504:2.
[21]   Tr. 1390:17-21.
[22]   PX1506; Tr. 1261:4-1262:14; 1341:22-1342:17.
[23]   *See* section III.D, *infra*.
[24]   EX0501; EX0380; EX0590; EX0014.

300 to 850, with approximately 26 of those scores in existence by the spring of 2004.[25]

Many of these scores pre-dated Plaintiffs' claimed first use of "300-850" as a trademark

in March 2001.  For example, it is undisputed that Experian has been selling its National

Equivalency Score (score range: 360-840) to lenders since 1993 and sold its National

Consumer Score to consumers (score range: 340-820) from 2000 to 2003.[26]  There is no

evidence in the record that any of the companies used their scoring range as a trademark

to identify their credit scoring services or that Plaintiffs notified any of the companies

using such overlapping ranges that those ranges infringed Plaintiffs' claimed trademark.[27]

This pervasive use of overlapping scoring ranges defeats the claim of secondary meaning

in "300-850."  Moreover, Plaintiffs have no explanation for why they never tried to stop

others from using overlapping ranges.

### 7.    Neither Experian Nor TU Copied Plaintiffs' Scoring Range with the Intent to Confuse Consumers

Lastly, a reasonable jury could not find that Defendants copied Plaintiffs' scoring

range with the intent to cause trademark confusion.[28]  The record is undisputed that, in

2003, when Experian determined the range for its scoring service, Plaintiffs were not

using "300-850" as a trademark and had done nothing to put Experian or TU (or anyone

else) on notice that they would ever claim trademark rights in a score range.[29]  The record

shows that Experian, TU, and other companies had been marketing scores with

---

[25] EX0501; Tr. 927-63.
[26] EX0501.
[27] Tr. 967:6-12.
[28] Tr. at 912:1-17 (Experian never "selected a score range in an effort to trick or deceive clients into believing that what Experian was selling was a FICO score"), 997:18-998:1.
[29] *See* section II.B.1, *supra.*

overlapping ranges since the mid-1990s with no complaint from Plaintiffs.  Copying is

evidence of secondary meaning only if the defendant's intent in copying a trademark is to

confuse consumers and pass off its product as that of plaintiff.  *Aromatique*, 28 F.3d at

871; *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986)

(copying of a descriptive term is "consistent with an inference that the copier wanted

merely to inform consumers about the properties of his own product or service"); *Yoo-*

*hoo Chocolate Beverage Corp. v. A.J. Canfield Co.*, No. 85-3701, 1986 WL9720, at *13

(D.N.J. Apr. 1, 1986) ("Copies of what is, at best, a merely descriptive term, is not

equivalent to secondary meaning").  Such intent can hardly be present where there is no

awareness of a trademark.

Indeed, "there is absolutely nothing legally or morally reprehensible about exact

copying of things in the public domain."  *Brooks*, 716 F.2d at 860 ("close copying does

not necessarily indicate that the defendant has attempted to capitalize on the secondary

meaning of plaintiff's trademark or trade dress because 'there may have been many other

motivations for defendant's actions.'"); *Co-Rect*, 780 F.2d at 1332.  Even in instances of

deliberate copying, however, courts will not infer secondary meaning when a defendant

conspicuously uses its own trademark to identify the product.  *Aromatique*, 28 F.3d at

871 (holding that "[t]here is no doubt that Gold Seal deliberately copied Aromatique's . .

. *products*.  Gold Seal's products, however, were consistently and clearly labeled with

Gold Seal's own trademarks.").

Furthermore, competitors may intentionally copy product features that are entirely

functional and perceived as lacking any secondary meaning because of those features'

intrinsic economic benefits or consumer-desirability.  *See Cicena, Ltd. v. Columbia Telecomm. Group*, 900 F.2d 1546, 1552 (Fed. Cir. 1990) (concluding that defendant's entry into the market was to capitalize consumer demand rather on any alleged secondary meaning developed by plaintiff); *Yoo-Hoo*, 1986 WL 9720 at *14 (concluding that "[i]t cannot be disputed that Yoo-Hoo adopted the designation, 'chocolate fudge' for its entry into the carbonated soft drink business because of the substantial publicity and consumer demand created by defendant's chocolate fudge soft drink.  But such actions on behalf of Yoo-Hoo do not constitute bad faith, but merely are the exercise of a competitor's right to compete openly and fairly for the public's interest in a new product, albeit the demand for such product was created by Canfield").  The record shows that lenders viewed a three-digit score range in the vicinity of 300 to 900 to be desirable and Plaintiffs concede that there is spill over between the lender and consumer markets.  As Mr. Oliai said, there would be no consumer market for scores without the lender market.[30]

There is no evidence in the record that Plaintiffs provided any notice that they claimed trademark rights in "300-850" at the time when Experian and TU chose their scoring ranges.[31] and there is no evidence in the record upon which a reasonable jury could infer that Experian or TU intentionally copied a trademark in an effort to confuse consumers, trade upon Plaintiffs' goodwill, or pass off their services as Plaintiffs' services.[32]  In fact, the testimony is entirely to the contrary.

---

[30] Tr. 817:6-14.
[31] Tr. 909:5-22; 911:18-25; 1647:2-1648:10. Tr. 1996:21-1997:1; 2031:10-14.
[32] Tr. 912: 1-5; Tr. 1966:18-22.

For example, Plaintiffs' exhibit PX0505, an internal Experian email that states, "FICO's score range is 350-850.  We wanted to keep it close, but not exactly like FICO's," refers to the FICO score's *range*, but not any intent to trick or confuse consumers by copying a trademark.[33]  This makes sense, as Plaintiffs had done nothing to put others on notice of their claimed trademark rights.  As Mr. Oliai testified, Experian was surprised that anyone considered the range of scores to be a source-identifying trademark.[34]  Experian decided to modify the scoring range to make the service "more attractive" to consumers.[35]  That sentiment evidences an intent to compete by including a feature that consumers may desire or demand, not an intent to trick consumers into purchasing a scoring service on the pretense that the PLUS Score is the FICO score.  No reasonable jury could conclude otherwise under the circumstances.

Similarly, Plaintiffs' exhibits PX0326 and PX0645, internal TU emails, state that "I think we should use the range 300-850 to be completely compatible with the FICO scale (which is what we are trying to mimic) . . . ."  TU adopted that standard range to compete – the 300-850 scale was the commonly used score range in the industry.[36]  In fact, in a related email conversation, TU explains that "[w]hile there is little score 'brand' recognition, there is frequent reference made in the personal finance press (and thus a

---

[33] PX0505; Tr. 975:18-976:13.
[34] *Id.*
[35]  PX0505; Tr. 864:16-865:1.
[36] Tr. 1851:25-1852:3; 1966:1-1967:14.

dim recognition in the minds of consumers) about score ranges and what is considered to be a 'good' credit score."[37]

Furthermore, all of the evidence of Defendants' use of their scoring ranges in connection with the promotion of their credit scoring services makes clear that Defendants always prominently display their identifying trademarks (such as EXPERIAN, NATIONAL SCORE INDEX, FREECREDITREPORT.COM or TRUECREDIT) on those websites or materials that use the score range.[38]  For example, on October 18, 2003, Experian's website, www.nationalscoreindex.com, contained Experian trademarks NATIONAL SCORE INDEX and EXPERIAN in addition to a descriptive use of range of the PLUS Score credit scoring service.[39]  Indeed, even Experian's banner ads, which Plaintiffs made so much of, almost always utilize Experian source-identifying trademarks and brands.[40]  Similarly, the TrueCredit score explanation page that can be accessed through www.truecredit.com displays the TRUECREDIT trademark and describes the service's scoring range.[41]  The Defendants' conspicuous use of their own identifying trademarks is a deliberate effort to distinguish their services from the services of Plaintiffs or other companies, which militates against an inference of an intent to confuse consumers.  *Aromatique*, 28 F.3d at 871.

---

[37] PX0646.

[38] EX0502; EX0503; PX1157-A-20.

[39] EX0503 ("It can range from 300 to 900, with a higher score indicating lower credit risk.")

[40] *See, e.g.*, PX1079.

[41] PX1157-A-20

If Experian and TU copied anything at all, they copied a common, functional

feature of numerous credit scoring services already in the market – a three digit score that

falls within a scoring range.[42]   Therefore, given the absence of any other evidence

indicating that consumers associate "300-850" with Plaintiffs, no reasonable jury could

find that Plaintiffs are entitled to an inference of secondary meaning for "300-850" prior

to Experian's and TU's use of their allegedly infringing scoring ranges.[43]

C.     **No Reasonable Jury Could Find That "300-850"
       Acquired Secondary Meaning Prior to the Launch
       of the VantageScore Credit Scoring Service in March 2006**

The evidence is undisputed that Experian and TU began selling the VantageScore

service with an allegedly infringing score range (501-990) in March 2006,[44] and Plaintiffs

have not presented any evidence that "300-850" acquired secondary meaning prior to that

time.

1.     **As of March 2006, Plaintiffs Still Did Not
       Use "300-850" as a Trademark, and Consumers
       Still Did Not Associate "300-850" with Plaintiffs**

As with the pre-2004 uses, every use of the alleged term "300-850" by itself (*i.e.*,

excluding use in the seal logos) in Plaintiffs' advertising or promotional material from

2004 to 2006 plainly shows descriptive use:

- "FICO scores range from 300-850, and most people score in the 600s and
  700s (higher FICO scores are better)." (2005);[45]

---

[42] EX0501.

[43] Plaintiffs' purported evidence of so-called "actual confusion" is irrelevant to the secondary meaning inquiry here to the extent that the communications from consumers occurred after the launch of the allegedly infringing scoring services. *See, e.g.,* PX1044

[44] Tr. 951:16-19.

[45] EX0064-0001.

- "FICO score from Equifax, Experian and/or TransUnion: 300-850" (2005);[46]
- "FICO scores range from 300 to 850" (2005).[47]

Such use merely describes a feature of Plaintiffs' credit scoring services, namely, the upper and lower boundaries of the scoring range, not the source of those services.  As with the pre-2004 uses, Plaintiffs did not present any evidence from the 2004 to 2006 period in which they used the "TM" or "SM" symbol next to "300-850" in its marketing materials to provide notice to third parties that "300-850" was their trademark.[48] Meanwhile, Plaintiffs continued to use "TM" or "SM" symbols with other trademarks in their materials that also contained uses of the term "300-850."[49]  Plaintiffs have not presented any evidence concerning the advertising or promotional material prior to 2006 that demonstrates (i) the amount of money spent on advertising the purported "300-850" mark, (ii) the number of consumers who actually received any advertising materials or viewed any website pages, (iii) the effect or impact of such materials, (iv) that, because of the materials, consumers associated "300-850" with Plaintiffs, or (v) that consumers who actually purchased the FICO score did so because of the term "300-850."

### 2.    Neither Experian Nor TU Copied A Trademark with the Intent to Confuse Consumers

Just like with the PLUS Score and TrueCredit scoring services, there is no evidence in the record that Experian or TU copied Plaintiffs' purported trademark when

---

[46] EX0064-0002.

[47] PX0412 at 8 (brochure entitled "Understanding Your FICO Score").

[48] Ms. Kramers-Dove's testimony stating that Plaintiffs did use "TM" with "300-850" in 2005 is not supported by the documentary evidence.

[49] *See, e.g.,* PX0412, EX0064, and PX0895.

they chose the scoring range feature for the VantageScore service.  There is no evidence in the record that Experian or TU knew that Plaintiffs claimed trademark rights in "300-850" in late 2005,[50] or that Fair Isaac applied for a federal registration for "300-850."  As of 2005, Plaintiffs used "300-850" only descriptively in all of their printed materials and websites and did not use a "TM" or "SM" symbol next to "300-850."[51]  Many companies co-existed in the credit scoring industry using overlapping scoring ranges without complaint from Plaintiffs.  Moreover, there is simply no evidence in the record that Experian or TU intentionally copied a *trademark* in an effort to confuse consumers, trade upon Plaintiffs' goodwill, or pass off their services as Plaintiffs' services.[52]  Simply put, none of the documents that Plaintiffs will cite as "evidence" of an intent to confuse have anything to do with a trademark.  For example, Plaintiffs exhibit 398 speaks of "mimicking the currently used score range," not Plaintiffs' alleged "300-850" trademark.[53]  A common, functional feature such as scoring range and a trademark are two separate things.

*     *     *

Plaintiffs have presented no evidence that the term "300-850" ever acquired secondary meaning at any time, much less before any Defendant began using its alleged infringing score ranges.  Therefore, a reasonable jury could conclude only that "300-850" is a descriptive term, not a protectable trademark.  Without a valid trademark, Plaintiffs

---

[50] Tr. 967:6-969:8.
[51] *See, e.g.*, PX0412.
[52] Tr. 912:1-5.
[53] PX0398 at EXP0106228.

cannot prevail on their trademark infringement, unfair competition, and Minnesota statutory and common law claims. Accordingly, the Court should dismiss all claims based on the alleged "300-850" mark.

### III. PLAINTIFFS FAILED TO PRESENT EVIDENCE THAT DEFENDANTS' USE OF SCORING RANGES OR NUMBERS ARE LIKELY TO CAUSE CONFUSION

As an independent grounds for dismissal, Plaintiffs failed to present evidence upon which the jury could find that Defendants' use of scoring ranges or other numbers in their advertising are likely to cause confusion as to the source or origin of Defendants' credit scoring services. To determine whether a likelihood of confusion exists, a court weighs the following factors, none of which is dispositive: (1) the strength of the owner's mark, (2) the similarities between the owner's mark and the alleged infringer's mark, (3) the degree to which the products compete with each other, (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner, (5) incidents of actual confusion, and (6) the type of products, its costs and conditions of purchase. *Co-Rect*, 780 F.2d at 1330 (*citing Squirtco* v. *Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). Resolution of the likelihood of confusion issue does not hinge on a single factor but on a balancing of the factors overall. *See Duluth News-Tribune* v. *Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996) (citing *Squirtco*, 628 F.2d at 1091). The ultimate inquiry is whether, in consideration of all the circumstances, a probability exists that consumers will be confused about the source of the allegedly infringing product. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).

A.    "300-850" is a Weak Descriptive Term

Because this Court determined that "300-850" is descriptive, it is an inherently

weak mark.  *See Jeld-Wen*, 1999 WL 1024002 at *4.  None of Plaintiffs' evidence would

lead a reasonable jury to conclude that the mark is strong or that this factor weighs in

favor of Plaintiffs.  First, the evidence shows that there are (and have been for years)

numerous other credit scoring services in the market with ranges that overlap 300-850.[54]

Such third party use decreases the strength of Plaintiffs' mark.  *See Jeld-Wen*, 1999 WL

1024002 at *4.

Second, Plaintiffs' failure to enforce its alleged trademark militates in favor of the

conclusion that "300-850" is a weak mark.  Experian and TU marketed to consumers

their PLUS Score and TrueCredit credit scoring services that used identical or

overlapping ranges for more than three years before Plaintiffs ever complained.[55]  In fact,

Plaintiffs first demanded that Experian stop using its 330 to 830 range in April 2007,

nearly four years after it launched the PLUS Score service in 2003.[56]  Similarly, Plaintiffs

first complained about TU's use of 300 to 850 as the scoring range for the TrueCredit

service in April 2006, nearly two and a half years after TU launched the service.[57]

Despite the plethora of credit scoring services on the market with ranges that overlap

---

[54] EX0501.
[55] Tr. 971:7-11; PX0950; Tr. 1968:4-7; 2000:24-2001:3; PX1157A-20.
[56] PX0950; Tr. 586:7-588:8.
[57] Tr. 1968:4-7.

300-850, Plaintiffs have not sued any company other than Defendants for using an overlapping range.[58]

Furthermore, Plaintiffs' consistent failure to use the "TM" or "SM" symbol next to any use of "300-850" or any phrase including the numbers 300 and 850, in violation of its own trademark guidelines, demonstrates that "300-850" is a descriptor and not a trademark.[59] *See Graham Webb*, 17 F. Supp. 2d at 928.

Because Plaintiffs have presented no evidence that "300-850" is a strong mark, no reasonable jury could find that this factor weighs in Plaintiffs' favor.

### B.     The "Marks" Are Not Similar

While the numbers used by some of the functional scoring ranges at issue are similar, Plaintiffs failed to present any evidence that demonstrates that any of the Defendants use their scoring ranges as trademarks.  Where there is no trademark use by an alleged infringer, there can be no trademark infringement.  *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004) ("the defendant has no independent burden to negate the likelihood of any confusion in raising the affirmative defense that a term is used descriptively, not as a mark, fairly, and in good faith"); *Microware Systems Corp. v. Apple Computer, Inc.*, 238 F.3D 989 (8th Cir. 2001) (use of "OS 9" was descriptive fair use and any confusion was minimal); *Skinner Mfg. Co. v. Kellogg Sales Co.*, 143 F.2d 895, 898 (8th Cir. 1995) ("The use of a similar name by another to truthfully described his own product does not constitute a legal or moral

---

[58] Tr. 526:21-527:4.
[59] PX0851; EX0056; PX0914; EX0079; PX0412; EX0064; EX0109; PX1107 at FIC0003542-0003543; PX0914.

wrong, even if its effect be to cause the public to mistake the origin or ownership of the product").

The evidence shows that Defendants used 330-830, 300-850, and 501-990 to describe the range of scores available to consumers, not as a trademark.[60]   Experian has never claimed any trademark rights in its scoring ranges or any scoring numbers.[61]   At all times, Experian used other trademarks or brands on its materials and webpages that contained the descriptive use of its scoring ranges.[62]   Similarly, TU identified its brand in every instance that showed its scoring range.[63]

### C.   Plaintiffs Failed to Prove that Defendants Intended to Confuse the Public

Although proof of bad intent is not required for a finding of likelihood of confusion, the absence of such an intent is relevant. *Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2005).  Because there is no evidence that Defendants intended to confuse the public by using their respective scoring ranges, and Defendants always prominently display their brands on all of their websites,[64] a reasonable jury could find only that this factor weighs in favor of Defendants.

---

[60] *See, e.g.*, EX0187; EX0214; EX0245; EX0269; EX0270; EX0272; EX0273; EX0285; EX0299; EX0300; EX0347; EX0424; EX0502; EX0503; PX1124; PX1157A-24; TX0243
[61] Tr. 1648:11-17.
[62] EX0187; EX0214; EX0245; EX0269; EX0270; EX0272; EX0273; EX0285; EX0299; EX0300; EX0347; EX0424; EX0502; EX0503; PX1124; PX1157A-24.
[63] PX1125; PX1157A-20; PX1157A-26; PX1198; PX1201; PX1518; TX0241.
[64] *Id.*; Tr. 1649:3-6 ("We heavily promote our brands, really freecreditreport.com, Experian, those brands.  We want people to know who we are.").

**D.     Plaintiffs Failed to Present Any Evidence of Actual Confusion**

Plaintiffs offered no evidence of actual, relevant consumer confusion – where consumers were confused as to the *source* of Defendants' credit scoring services because of the scoring range. *See, e.g., Lang* v. *Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (relevant confusion is that which affects the purchasing and selling of the goods in question and not "confusion generally"). Rather, Plaintiffs offered unreliable and speculative evidence concerning consumers who, if confused at all, were confused as to the general concepts of credit scoring. None of the consumer declarants embedded in certain Experian emails and TU's call logs are available for cross examination, and therefore it is impossible to determine the cause of their purported confusion. But in light of the undisputed evidence that Plaintiffs have used "300-850" only descriptively and not as a trademark, no reasonable jury could conclude that the use of any particular scoring range *caused* any trademark confusion.

Even if probative of confusion actionable under the Lanham Act, the evidence is *de minimis* and cannot form the basis of a finding of likelihood of confusion. *See KP Permanent Make-Up*, 543 U.S. at 122-23 (allowing some "tolerance of a certain degree of confusion . . . [where] an originally descriptive term was selected to be used as a mark . . . [because] [i]f any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase"); *Duluth News*, 84 F.3d at 1098 (finding that a claim of actual confusion through misdirected mail and phone calls is de minimis evidence that fails to raise a genuine factual issue of actual confusion); *Munsingwear, Inc. v. Jockey Intern., Inc.*, No. 4-93-

538, 1994 WL 422280, at *5 (D. Minn. Apr. 21, 1994) ("Actual confusion requires more than *de minimis* proof."). Thus, a reasonable jury could find only that this factor weighs in favor of Defendants.

Furthermore, the Berger survey is so unreliable and irrelevant that it cannot support a jury verdict in Plaintiffs' favor. Credibility issues aside, Mr. Berger testified that he designed the survey to test for the *existence* of confusion "regarding credit scores," not whether confusion is *caused* by *scoring ranges*.[65]   He conceded that the key question in Survey A, Question 8 – which asked whether respondents thought they could get the "same credit scores" on the parties' respective websites -- was so ambiguous that "anybody could have a different interpretation" of the question, and that the answers to Question 8 were "just all over the place."[66]   He also admitted he did not use a control group to rule out alternative explanations for the answers given to Question 8.[67]   Thus, the Berger Survey has nothing to say about whether Defendants' use of certain scoring ranges causes anything. Thus, putting aside all of the substantial flaws in the survey, the results do not support Plaintiffs' claim.

Based on the foregoing, after analyzing the relevant likelihood of confusion factors, no reasonable jury could conclude that Plaintiffs have proven that Defendants' use of numerical scoring ranges or numbers in connection with their credit scoring services is likely to cause confusion as to the source or origin of Defendants' credit scoring services. Therefore, Plaintiffs cannot prevail on their trademark infringement,

---

[65]   Tr. 1341:20-1342:4.
[66]   Tr. 1359:7-21.
[67]   Tr. 1365:9-12.

unfair competition, and Minnesota statutory and common law claims, and the Court

should dismiss all claims based the alleged "300-850" mark.

IV.    PLAINTIFFS FAILED TO PRESENT SUFFICIENT
       EVIDENCE TO PROVE THAT DEFENDANTS' USE
       OF SCORING RANGES OR NUMBERS ARE LIKELY
       TO CAUSE CONFUSION WITH PLAINTIFF'S "SEAL LOGOS"

       Plaintiffs also assert that Defendants' descriptive use of their ranges 300 to 850,

330 to 830, and 501 to 990 or use of other numbers in their advertising infringe the

following three seal logos:

      

       Plaintiffs presented no evidence that Defendants use any trademark that is similar

in sight, sound, or meaning to Plaintiffs' logos.  Indeed, Ms. Kramers-Dove admitted that

she was aware of no instance where Defendants used a design similar to the seal logos.[68]

When determining the similarity of the marks, the Court must evaluate the impression

that each mark in its entirety is likely to have on the purchaser.  *Duluth News*, 84 F.3d at

1097.  The Defendants' descriptive uses of their scoring ranges and Plaintiffs' elaborate

seal logos create vastly different commercial impressions.  Because the parties' marks are

completely dissimilar when viewed in their entirety, the similarity of the marks factor

decisively weighs in Defendants' favor.

---

[68] Tr. 479:5-481:16.

Similarly, there is no evidence of (i) any intent by the Defendants' to confuse consumers with the use of their scoring ranges or numbers in their advertising (*see* section II.B, *supra*) or (ii) any incidents of actual confusion as to the source of Defendants' credit scoring services (*see* section III.D, *supra*).  For the reasons outlined above, the Berger survey is similarly irrelevant and unreliable with respect to any infringement claims based upon Plaintiffs' seal logos.

Based on the evidence, no reasonable jury could find that Defendants' scoring ranges are likely to cause confusion with Plaintiffs' seal logos.  Accordingly, this Court should grant Defendants' motion and dismiss all claims against Defendants based upon the seal logos.

## V.   PLAINTIFFS FAILED TO PROVE THAT EXPERIAN'S USE OF CERTAIN KEYWORDS IN INTERNET SEARCH ENGINES ARE LIKELY TO CAUSE CONSUMER CONFUSION

Plaintiffs did not present a scintilla of evidence that Experian has infringed Plaintiffs' FICO and FAIR ISAAC trademarks by purchasing terms containing "FICO" as internet search engine keywords.[69]  It is undisputed that none of Experian's sponsored search advertisements contained "FICO" or "FAIR ISAAC" in the text of the ads.[70]  Courts have held there is no likelihood of confusion where a defendant purchases the plaintiff's trademark as a keyword but does not use that trademark in the text of the sponsored ad link.  *J.G. Wentworth, S.S.C. LP* v. *Settlement Funding LLC*, No. 06-0597, 2007 WL 30115, at *7 (E.D. Pa. Jan. 4, 2007); *Gov't Employees, Ins. Co.* v. *Google, Inc.*,

---

[69] In the initial jury instruction conference on November 11, 2009, Plaintiffs indicated that they were dropping the keyword advertising claims against TU.

[70] PX 1157 A-89; Tr.1734:1-6.

No. 1:04CV507, 2005 WL 1903128, at *7 (E.D. Va. Aug. 8, 2005). Defendants have not located any case where a party was found liable for trademark infringement in these factual circumstances. There is also no evidence that Experian's use of certain keywords causes trademark confusion. Mr. Berger testified that he designed his survey to "determine consumer perceptions of sponsored links," not to determine the *cause* of those perceptions.[71] If consumers would not click on the ad, they are not confused. Plaintiffs did not present evidence of even a single instance in which a consumer clicked on a sponsored link, purchased a credit score, and later claimed that she thought that she was buying a FICO score from the company who posted the sponsored link.

No reasonable jury could find a likelihood of confusion due to Experian's purchase of "FICO" or "FAIR ISAAC" as a keyword in internet search engines. Accordingly, this Court should dismiss the keyword advertising claim against Experian.

## VI.   PLAINTIFFS FAILED TO PROVE THAT DEFENDANTS INTENDED TO PASS OFF THEIR SERVICES AS PLAINTIFFS

The Eighth Circuit has made clear that where common law unfair competition claims and Minnesota Deceptive Trade Practices Act ("MDTPA") claims are based solely upon unauthorized use of a trademark under the Lanham Act, these claims do not require separate analyses. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 n.3 (8th Cir. 2003); *see also MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217 (D. Minn. 2007). This Court determined that Plaintiffs' passing off claim was related to and

---

[71] Tr. 1305:6-19.

co-extensive with their trademark infringement claims under the Lanham Act. *Fair*

*Isaac*, 2009 WL 2252583 at *18.

Unbowed, Plaintiffs have interjected a new theory of passing-off in this case,

which, according to Plaintiffs' counsel, goes like this: "So you get a customer, goes to a

TU website, orders a product, gets it, finds out it's not the score that lenders use, and they

were deceived and misled into thinking it was the score that lenders use," and that must

mean they believed they were really getting a FICO product. (Final Pretrial Conf.

10/20/09 Tr. at 65:5-8 (R. Schutz).) The logical syllogism underpinning that theory is as

follows:

(1)   consumers believe that FICO scores are the scores most lenders use;

(2)   consumers perceive Defendants' websites as implicitly (but not explicitly)
      conveying a message that Defendants' scores are the scores most lenders use;

(3)   consumers conclude *from that message* that Fair Isaac must be the
      *source* of Defendants' scores; and

(4)   in reliance on that conclusion, consumers purchase Defendants' scores.[72]

Plaintiffs have produced no evidence to support any of these four necessary

predicate facts. They have offered no evidence – survey or otherwise – showing that any

consumers *actually believe* that FICO scores are used by most lenders, or that consumers

_____

[72] Alternatively, Plaintiffs have suggested that their "passing off" claim is just a
repackaged false advertising claim. As Plaintiffs' counsel put it, "We'll also show at trial
that the way you order scores are going onto websites, and if you go on the TU website,
they've got what we are alleging is *misleading advertising, deceptive and confusing way
that they present what it is they're selling* such that people who buy it think they – they're
passing off their score as a FICO score . . .." (Final Pretrial Conf. 10/20/09 Tr. at 66:12-
17 (R. Schutz)) (emphasis added). This Court dismissed all false advertising claims,
including MDPTA and common law claims, in its summary judgment order. (Docket
No. 694, at 49, 51-52.)

*actually perceive* Defendants' websites as implicitly stating that the scores sold thereon are used by most lenders.  In fact, this Court expressly held in its summary judgment opinion that Defendants' websites do *not* suggest that their scores are used by most lenders, or *any lender at all*.  (Docket No. 694, at 47-48 ("Contrary to Fair Isaac's contention, these and other similar statements do not explicitly or implicitly convey that 'most lenders' or 'an appreciable number of lenders' (*or any lender at all for that matter*) actually rely on Defendants' scores to arrive at an assessment of the consumer's creditworthiness.  Rather, they simply convey that the score shown to the consumer is indicative of how lenders would assess creditworthiness.") (emphasis added).)  There is also no evidence that even a single consumer put the two thoughts together and concluded that Plaintiffs are the *source* of Defendants' scores – an essential element of a passing off claim.

Plaintiffs will apparently contend that their own marketing materials and press releases demonstrate that consumers know (and have known) that the FICO score is the score that most lenders use because there are statements in those documents claiming that.[73]  These self-serving, and largely self-produced, materials, however, do not establish the fact that consumers believe that the FICO score is the score most used by lenders.

---

[73] *See, e.g.*, PX0851 (Fair Isaac brochure, "Make Your FICO® score work for you"), PX0893 (myFICO.com webpage), PX0897 (Fair Isaac brochure "Understanding Your FICO® Score"), PX0898 (Consumer Federation of America and Freddie Mac brochure, "Know Your Score"), PX0914 (Fair Isaac brochure), PX0915 (myFICO.com Sample Score Power Report), PX0916 (myFICO fact sheet), PX0921 (Fair Isaac press release), PX0923 (Fair Isaac press release), PX0953 (Fair Isaac FICO Guide™ Analysis), PX1076 (Fair Isaac press release), PX1077 (Fair Isaac and TU press release), PX1081 (Fair Isaac press release), and PX1123 (myFICO.com webpage).

*See, e.g., Aromatique*, 28 F.3d at 862 (noting that articles do not reflect the minds of consumers and do not establish the necessary connection between source and the mark); *Co-Rect Prods.,* 780 F.2d at 1332; *Exquisite Form Indus., Inc.* v. *Exquisite Fabrics of London,* 378 F. Supp. 403, 411 (S.D.N.Y. 1974) ("a mere showing of advertising does not provide a basis for determining the extent of customer awareness").  Moreover, any statements in Plaintiffs' marketing materials that consumers recognize the FICO score as "the score lenders use" is inadmissible hearsay as to that assertion.  Fed. R. Evid. 801. As stated above, Plaintiffs presented no evidence whatsoever that any consumer actually received or viewed any brochure, website, or press release.  Any conclusion that a significant portion of the consuming public viewed the materials and formed any belief is pure speculation.

From a broader perspective, Plaintiffs have not offered any evidence that Defendants marketed their credit scoring services under the pretense that they are Plaintiffs' services.  All of the evidence demonstrates that when advertising their services, Defendants clearly indicate the source of the services.[74]  Furthermore, neither Experian nor TU tells consumers – explicitly or implicitly – that the PLUS Score service or TrueCredit service is used by lenders.[75]  There is no evidence that Defendants copied the "look-and-feel" of Plaintiffs' website, myFICO.com.  Therefore, Plaintiffs have failed to offer any proof that Defendants have passed off their services as those of Plaintiffs.

---

[74] EX0187; EX0214; EX0245; EX0269; EX0270; EX0272; EX0273; EX0285; EX0299; EX0300; EX0347; EX0424; EX0502; EX0503; PX1124; PX1157A-24; PX1157A-24.
[75] Tr. 1658:23-25; 1660:23-1661:12; EX0273; PX1198; PX1157A-20.

Accordingly, this Court should grant Defendants' motion and dismiss this claim against Defendants.

## VII.   PLAINTIFFS HAVE NO CLAIMS AGAINST ANY OF DEFENDANTS' SCORING SERVICES SOLD TO LENDERS

During the course of the trial, Plaintiffs have stated that they are not suing Defendants with respect to any credit scoring services sold to lenders. (Tr. 1006:7-18.) Plaintiffs, however, have not made any formal filing to that effect, and Plaintiffs' prayer for relief in the Third Amended Complaint still seeks an injunction that would enjoin Defendants from using a scoring range that overlaps with "300-850" regardless of whether the service is offered to lenders or consumers. There is no dispute that lenders are not, and cannot be, confused. Lenders and their thousands of employees are sophisticated purchasers of credit scoring services. Moreover, lenders are fully aware of numerous non-FICO credit scores that use 300-850 or overlapping ranges, including scores developed by the lenders themselves.

## CONCLUSION

Based on the forgoing, no reasonable jury could find that Plaintiffs have provided a legally sufficient evidentiary basis to support any of their claims against Defendants in this matter. Therefore, this Court should grant Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1)(B) and dismiss all claims against Defendants.

Respectfully submitted: November 13, 2009

**Lindquist & Vennum PLLP**

By:    /s/ Mark A. Jacobson
Mark A. Jacobson (MN Bar #188943)
Christopher Sullivan (MN Bar #0343717)
LINDQUIST & VENNUM, P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 371-3211
(612) 371-3207 (facsimile)

M. Elaine Johnston
Robert A. Milne
Christopher J. Glancy
Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
(212) 354-8113 (facsimile)

*Attorneys for Defendant Experian
Information Solutions, Inc. (and authorized
to sign on behalf of all Defendants)*

Lewis A. Remele, Jr. (MN Bar #90724)
Christopher R. Morris (MN Bar #230613)
BASSFORD REMELE
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

James K. Gardner
Ralph T. Russell
Dao L. Boyle
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602

Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*