## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION and
myFICO CONSUMER SERVICES, INC.

Civil Action No. 06-cv-4112
(ADM/JSM)

                    Plaintiffs,

          v.

EXPERIAN INFORMATION SOLUTIONS
INC.; TRANS UNION LLC; and
VANTAGESCORE SOLUTIONS, LLC

                    Defendants.

**VANTAGESCORE SOLUTIONS,
LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION
FOR JUDGMENT AS A MATTER
OF LAW**

## INTRODUCTION

VantageScore Solutions, LLC ("VSS") moves for Judgment as a Matter of Law

("JAML") on Fair Isaac Corporation and myFICO Consumer Services, Inc.'s,

(collectively "FICO") remaining claims against VSS.  FICO has failed to meet its burden

in support of these claims, and thus VSS seeks JAML and dismissal of these claims.[1]

## ARGUMENT

### I.    Standard.

Under Fed. R. Civ. P. 50(a)(1), if the Court concludes "that a reasonable jury

would not have a legally sufficient evidentiary basis to find" for a party on an issue, the

Court may:  (a) "resolve the issue against the party;" and (b) "grant a motion for

judgment as a matter of law against the party on a claim or defense that, under the

controlling law, can be maintained or defeated only with a favorable finding on that

issue."  Fed. R. Civ. P. 50 (a)(1).  In considering such a motion, the Court must view the

---

[1] To the extent not set forth in this Memorandum, VSS also expressly incorporates herein
the arguments set forth in Experian and Trans Union's Motion for JAML.

evidence in the light most favorable to the non-movant and draw all reasonable

inferences in its favor. *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir.

2007). "However, when the record contains no proof beyond speculation to support the

verdict, then judgment as a matter of law is appropriate." *Hinz v. Neuroscience, Inc.*, 583

F.3d 979, 984 (8th Cir. 2008)(quotation omitted). Thus, the non-movant is "not given the

benefit of unreasonable inferences or those at war with the undisputed facts." *Concord*

*Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000)(reversing district

court for failing to enter Rule 50 JAML on Clayton Act claim)(quotation omitted).

## II.   **FICO Has Not Met Its Burden on Several Essential Elements of Its Claims Against VSS.**

In its Order on Defendants' motion for summary judgment, this Court stated:

> To establish claims of trademark infringement and unfair competition under 15 U.S.C. §§ 1114, 1125(a), a plaintiff must prove that (1) it owns a valid, distinctive trademark that is entitled to protection and (2) the defendant's use of the same or a similar mark was likely to confuse consumers about the source of the defendant's product.

Mem. & Order at 37 (D. Minn. Jul. 24, 2009)[Docket No. 694] ("SJ Order"). FICO's

failure of proof on even one of these elements warrants entry of JAML in favor of VSS.

*See Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1123 (8th Cir. 2006)(affirming JAML

on fraud claim against corporate defendant where individual defendants were found not

liable); *Kent v. United of Omaha Life Ins. Co.,* 484 F.3d 988, 996-97 (8th Cir. 2007)

(affirming JAML on breach of fiduciary duty claim after plaintiff failed to prove an

essential element of the claim, i.e., the existence of a fiduciary relationship).

Because FICO has failed to meet its burden of proof on several of these elements, the Court should enter JAML in favor of VSS.

**A.      FICO Has Failed to Prove It Has a Valid Trademark in "300-850."**

This Court ruled in the SJ Order that "the 300-850 mark is descriptive and, as such, is entitled to trademark protection only if it has acquired secondary meaning."  (SJ Order at 41.)  Although the Court admitted FICO's trademark registrations for limited purposes, those registrations do not entitle FICO to a presumption of validity where the Court has already found that the "300-850" mark is descriptive.  *Id.*

**1.  FICO Did Not Meet Its Burden as to Secondary Meaning.**

In the absence of any presumption of validity, FICO bears the burden of proving that the term "300-850" has acquired secondary meaning.  FICO has failed to prove that the term "300-850" has become so associated with FICO's credit score that it identifies the source of the services and distinguishes FICO's services from the services of others. *See Inwood Labs, Inc. v. Ives Labs, Inc*., 456 U.S. 844, 851 n.11 (1982)(To establish secondary meaning, a manufacturer must show that in the minds of the public the primary significance of a product feature or term is to identify the source of the product rather than the product itself.")(citation omitted.)  In fact, the evidence, demonstrates the reverse -- that the consuming public does not identify the "300-850" term with a single source. *Co-Rect Products, Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1332-33 (8th Cir. 1985).

### a. FICO Failed to Offer Evidence Showing that Consumers Associate "300-850" with a Single Source.

The evidence makes clear that prior to 2006, FICO used the term "300-850" merely to describe a feature or characteristic of FICO's credit score (i.e., a numeric label for the range in the output of FICO's scoring algorithms).[2]  Keri Kramers-Dove, FICO's Vice President of Scoring and primary fact witness, repeatedly conceded that FICO used "300-850" to identify its *product,* and not the *source* of its product.[3]  As a matter of law, such "product-identifying" use will not establish secondary meaning.

### b. FICO Failed to Offer a Viable Survey Showing that Consumers Associate "300-850" with a Single Source.

Secondary meaning may also be established by conducting a viable survey to show that consumers associate the alleged trademark with a single source.  *See, e.g., Frosty Treats, Inc. v. Sony Computer Enter. Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  FICO, however, failed to offer a viable survey to show that consumers associate the term "300-850" with a single source.  Kramers-Dove conceded she was not familiar with any surveys or other tests to ascertain whether consumers are either familiar with credit scores in general or associate the term "300-850" with a single source.[4]

James Berger, FICO's survey expert, also failed to carry FICO's burden in this

[2] Indeed, VSS contends that FICO failed to show that it has *ever* used the phrase "300-850" to do anything more than describe a characteristic of its credit score, i.e., a description of the output of its scoring algorithms.

[3] *See, e.g.*, Tr. at 347:22-348:1, 359:15-22, 369:2-4, 402:13-17, 405:9-15,  501:16-502:22, 532:6-9, 617:12-618:1.

[4] Tr. at 493:15-18, 500:1-9, 503:13-504:2.

regard.  Berger readily admitted that he viewed his role as doing what he was asked to by the attorneys who retained him (including making false statements in one of his reports[5]) and his survey herein, which purported to show consumer confusion (and thereby the existence of secondary meaning), was fatally flawed in a number of respects.

*First*, Berger failed to use a control group or control questions in his survey, rendering his survey unreliable.[6]  *Second*, Berger failed to survey the relevant population and his questions were leading and ambiguous.[7]  *Third*, Berger's conclusions about certain websites (*none* of which belonged to VSS[8]) are irrelevant to the question of the existence of secondary meaning because he elicited responses in 2008, which say nothing about whether the term "300-850" had acquired secondary meaning prior to March 2006.[9]  *Fourth*, Berger's survey was not even designed to test whether the term "300-

---

[5] Tr. 1325:13-1327:20.

[6] *See, e.g., Bracco Diagnostics, Inc. v. Amersham Health, Inc.,* 627 F. Supp. 2d 384, 447 (D.N.J. 2009)("survey needed control mechanisms to be reliable); *Procter & Gamble Pharm., Inc. v. Hoffmann LaRoche Inc.*, No. 06-Civ.-0034, 2006 WL 2588002, at *25 (S.D.N.Y Sept. 6, 2006)(lack of control was "marked departure from generally accepted market research practices"); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm.* Co., No 01 Civ. 2775, 2001 WL 588846, at *12 (S.D.N.Y. June 1, 2001)(finding the lack of control group was "fatal flaw").

[7] *See Owner-Operator Indep. Drivers Ass'n v. SuperValu, Inc.,* No. 05-2809, 2009 WL 799614, at *5 (D. Minn. Mar. 24, 2009)(holding that "survey's questions were so ambiguous that any 'report' on or analysis of answers to those questions is unreliable and untrustworthy"); *Louis Vuitton Malletier v. Dooney & Burke, Inc.,* 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007)(excluding similarly flawed survey).

[8] Tr. 1392:20-22.

[9] *See, e.g., Co-Rect Products*, 780 F.2d at 1330("The user must also show that secondary meaning existed prior to the date on which the defendants commenced using the same or similar mark"); *Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 1024 (D. Minn. 2005)(noting that a survey conducted months after defendant's mark entered the market is irrelevant for the establishment of secondary meaning).

850" had acquired secondary meaning.[10]  Rather, it was designed to test consumer's

perceptions relating to the defendants' websites, *id.*; in other words, Berger only tested

whether or not consumers were confused regarding the credit scores available on the

websites, and not about the scoring ranges of any particular credit score.[11]

*Finally*, Berger's survey failed to test whether consumers were confused by VSS's

use of a particular scoring range and the survey failed to ask any particular questions

regarding the scoring ranges at issue.[12] [13]

The Court should thus reject Berger's flawed survey as evidence of either

secondary meaning or the existence of alleged consumer confusion between the phrase

"300-850" and VantageScore's range of 501 to 990 with associated letter "grades."

### c.   FICO Failed to Demonstrate that Its Advertising or Promotional Efforts Established Secondary Meaning.

Nor did FICO present any evidence, such as consumer perception surveys or

anecdotal evidence, to show that its advertising had established secondary meaning of the

phrase "300-850."  Kramers-Dove testified that FICO does not do mass marketing; rather

FICO's "strategy is to really reach as many media outlets as we can to get our message

out there that 300 to 850 is associated with the FICO score."[14]  The Court, however,

---

[10] PX1506; Tr. 1260:24-1262:12; 1341:20-1342:17.
[11] PX1506 [Slide 7]; Tr. 1341:14-1342:17.
[12] Tr. 1342:5-17, 1437:17-1438:4.
[13] *See, e.g., Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 663 (7th Cir. 1995) (ruling that survey which purported to demonstrate secondary meaning and confusion "worthless" because it measured consumer's response to overall product, including merely functional features, rather than isolating consumer response to product feature at issue).
[14] Tr. 471: 14-22.

properly excluded such news media and newspaper articles as irrelevant to the

establishment of secondary meaning, noting there is no Eighth Circuit precedent for

admitting such articles for that purpose.[15]

FICO has presented no evidence showing that it tested the impact of any of its

promotional materials or "collateral" on consumers, and thus such materials fail to

establish the existence of secondary meaning.  *See, e.g., Aloe Creme Labs., Inc. v.

Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970)(stating that "the question is not the extent

of the promotional efforts, but their effectiveness").  Indeed, contemporaneous notes of

interviews of key FICO employees, conducted by Olson & Company in 2006,

demonstrate FICO's understanding that consumers had virtually *no* familiarity with

FICO's brands.[16]  Accordingly, FICO failed to demonstrate that its use of mass media

promotion or promotional materials established secondary meaning for the phrase "300-

850."  *See, e.g., Co-Rect Products*, 780 F.2d at 1332 ("Although it is true that advertising

is a relevant factor in determining whether a mark has acquired secondary meaning, it is

the *effect* of such advertising that is important, not its extent.")(*citation omitted); id.*

(stating that "[t]o be effective… advertising must cause the public to equate the mark

with the source of the product"); *see Wrist-Rocket Mfg. Co.* v. *Saunders Archery Co.*, 578

F.2d 727, 732 (8th Cir. 1978)(noting that "common-law trademark rights cannot be

established by advertising alone").

---

[15] Tr. 457:7 – 458:19.

[16] EX0309, EX0310, EX0316. The Court indicated that the Olson documents would be officially admitted after the close of Plaintiffs' case. (Tr. 2300: 17-20.) VSS recognizes it is in the Court's discretion whether or not to consider Olson documents for the motion at this time.

### d.  The Volume of Sales of FICO Scores Also Fail to Demonstrate the Existence of Secondary Meaning.

FICO also introduced the volume of FICO score sales to consumers, apparently as evidence of secondary meaning.  For example, Kramers-Dove testified that since 2001, FICO has sold 30 million FICO scores to consumers.[17]  The sales of FICO scores to consumers over eight years do not, however, demonstrate that consumers associate "300-850" with FICO, especially where FICO has used a number of trademarks to promote and sell FICO scores to consumers, including the marks Fair Isaac, FICO, BEACON and MYFICO.  *Aromatique, Inc. v. Gold Seal, Inc*., 28 F.3d 863, 873 (8th Cir. 1994) (concluding that "[b]ecause the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product…sales figures alone are inadequate to establish a connection between a product and its source")(citations omitted); *Atlantis Silverworks Inc. v. 7th Sense Inc.*, 42 U.S.P.Q.2d 1904, 1908 (S.D.N.Y. 1997)(stating that "[p]laintiff's evidence [of sales] does not establish secondary meaning; it establishes merely that plaintiff's product, seed bead rings, was popular.").  The number of FICO score sales to consumers alone is insufficient to establish secondary meaning.  *See, e.g., Aromatique* at 873.

### e.  There Can Be No Reasonable Inference of Secondary Meaning from the "Confusion" Evidence Introduced by FICO.

FICO also offered a handful of customer complaints or inquiries (which were hearsay within hearsay) to demonstrate the existence of consumer "confusion."  The

[17] Tr. 474:19-24.

Court should reject FICO's effort to establish secondary meaning through such "confusion" evidence.  This evidence (which relates solely to consumer sales by Experian or TransUnion because VSS does not sell credit scores to anyone), may, at best, suggest the existence of some general confusion about credit scores and scoring, but sheds no light on the issue at hand, that is, whether the allegedly confused consumers associated a "300-850" mark with a single source.  Such customer inquiries do not support a reasonable inference that consumers thought they were buying a FICO score because of any confusion caused by the VantageScore score range.  *See, e.g., Children's Factory, Inc. v. Benee's Toys, Inc.,* 160 F.3d 489, 496 (8th Cir. 1998)(dismissing warranty calls as evidence of confusion because vague evidence of misdirected phone calls and mail is hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason for confusion).

Moreover, when the number of consumer complaints or inquiries offered by FICO is viewed in context of the millions of consumer credit scores sold each year by Experian and TransUnion (and the millions of customer inquiries received by TransUnion on its call lines[18]), the number of such alleged consumer complaints are *de minimis* and fail to support a finding of a secondary meaning.  *Liberty Mut. Ins. Co.,* 486 F.3d at 422 (if record has no proof beyond speculation, judgment as a matter of law is appropriate); *see Co-Rect Products,* 780 F.2d at 1333 (reversing district court's finding of secondary meaning because plaintiff's "self-serving testimony" about his customers' alleged confusion was insufficient to establish necessary consumer association).

---

[18] Tr. 1951:5-12.

**B.**      **FICO Failed to Meet Its Burden of Showing that the VantageScore Score Range Was Used in a Manner that Infringed on the Phrase "300-850."**

FICO offered no evidence to show that VSS actually used the VantageScore score range in a manner that infringed FICO's alleged mark in "300-850" or the Seal Logos as shown below:

  

As a threshold matter, FICO introduced no evidence showing that VSS ever "used" FICO's alleged marks, or any logo that included a seal or otherwise resembled the Seal Logos.  Rather, FICO's claims are based on the notion that there is infringement merely because VSS's scoring range overlaps a portion of the numbers that fall between 300 and 850.  Such an overlap, however, is simply not an actionable "use" of the phrase "300-850."

"[I]n analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features."  *Gen. Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir 1987). Here, VantageScore's numerical score range of 501 to 990 bears little similarity to the phrase "300-850."  Moreover, for consumers the VSS credit score number is used in conjunction with a letter designation which tracks the academic grading scale (i.e., a

score of 990 is associated with a letter "grade" of "A"[19]).  Indeed, Kramers-Dove

conceded at trial that:  (1) Fair Isaac claims *no* trademark on any of the individual

numbers that fall between 300-850, but only claims a right in the phrase "300-850"

itself;[20]  and (2) Fair Isaac has never used a score range of 501 to 990.[21]  Because VSS's

501 to 990 range (accompanied by a letter "grade") and the "VantageScore" logo are

completely dissimilar to the phrase "300-850," VSS's use of an overlapping scoring

range to numerically describe the output of its algorithm does not infringe the "300-850"

or Seal Logos as a matter of law.  *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531

F.3d 1, 25 (1st Cir. 2008); *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306,

309 (2d Cir. 1986); *Sweats Fashions,* 833 F.2d at 1564.

　　　FICO has also failed to show that VSS uses its scoring range of 501 to 990 as a

trademark (that is, to identify the source of VSS's credit score).  VSS uses the numbers

between 501 and 990 merely to describe the numerical output of its scoring model, a fact

conceded by Kramers-Dove.[22]  Such a use is not actionable.[23]  Indeed, trademark law

makes clear that a competitor "must be able to describe his goods as what they are."

*Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974-95 (8th Cir. 2006)(affirming

---

[19] See, e.g., VX0058, PX1126.
[20] Tr. 478:2-9, 481:20-483:9, 509:23-25, 510:12-14, 532:24-533:3, 729:7-730:3.
[21] Tr. 483:25-484:13.
[22] Tr. 729:7-9 (agreeing that VSS uses its scoring range of 510 to 990 to *describe* its product).
[23] *See, e.g., Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986) (copying of a descriptive term is "consistent with an inference that the copier merely wanted to inform customers about the properties of his own product or service").

district court's grant of summary judgment based on ruling that "Brick Oven" was generic term to describe pizza baked in brick oven).

Even in cases where defendants who compete in the same market have used the exact same words as those in the trademark at issue, courts do not find "similarity" if the defendants are using those words in a descriptive manner. For example, in *Louiginos, Inc. v. Stouffer Corp.,* 170 F.3d 827 (8th Cir. 1999), the Eighth Circuit affirmed the district court's entry of summary judgment in defendants' favor, ruling that defendants' use of the words "Lean 'N Tasty" in the name of their product did not infringe upon the mark of "Lean Cuisine." In so ruling, the Court stated that "[t]he use of identical dominant words does *not* automatically mean that two marks are similar." *Id*. at 830 (emphasis added). The Court should thus conclude that the mere overlap of VSS's scoring range is insufficient to support a finding of infringement.

### C.   **FICO Failed to Meet Its Burden As to Consumer Confusion.**

FICO has also failed to meet its burden on the element of consumer confusion, which requires a showing that VSS has used a similar or identical term in a manner likely to cause confusion among consumers as to source. First, FICO has failed to show that VSS uses its 501 to 990 range in the trademark sense, a prerequisite to a showing of consumer confusion. *See, e.g., DaimlerChrysler AG v. Bloom,* No. 00-325 DSD/JMM, 2001 WL 1640139, at *3 (D. Minn. Oct. 9, 2001)(holding that consumer confusion requires predicate proof of "use")(citing *Holiday Inns., Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir. 1996)).

Moreover, FICO has failed to demonstrate that the mere overlap of the VantageScore score range of 501 to 990 with the phrase "300-850" is likely to cause confusion among consumers as to source, origin, sponsorship or affiliation.  As set forth above, Berger's survey fails to demonstrate the existence of any consumer confusion regarding the two score ranges.

Nor is there any evidence that Defendants knew that FICO was claiming any rights in the phrase "300-850" when the scoring range for VantageScore was chosen by mid-November 2005 before the close of Project Trident.[24]  In her testimony, Kramers-Dove conceded that through the end of 2005, "there was never a time…when the company used the TM symbol in either its website or any of its published material" for the "300-850" mark.[25]  The evidence shows that the VantageScore score range of 501 to 990 was chosen *before* FICO began asserting any alleged right in the phrase "300-850." Indeed, it was only *after* the formal introduction of VantageScore in March 2006 that FICO began to use a "TM" or "SM" symbol next to the phrase "300-850," and even at that point, such designations were used infrequently in public documents.[26]

The evidence further demonstrates that Defendants, rather than attempting to confuse consumers, have made substantial effort to differentiate the VantageScore from FICO's products and scoring range.  Among other things, Defendants have done so by: (a) using a scoring range 501 to 990 that tracks the academic grading scale (i.e., A = 901

---

[24] Tr. 909:5-9, Tantia Dep. Vol. I 5/3/08 7:19-25, PX0042(p. 41), PX0333(p. 23), PX0400.

[25] Tr. 621:16-24. *See also* EX0064-0001, EX0064-0002 (2005 public FICO document showing failure to use TM symbol with "300-850").

[26] Tr. 496:18-24, 526:5-13, 621:17-24, PX0897, PX0955, PX0975, PX1107.

and above, B = 801 and above, etc.); (b) identifying clearly on consumer web pages and score results that the credit score being provided is a VantageScore; (c) using the word "VantageScore" each time the 501 to 990 score range is mentioned in advertising and web materials; and (d) using the A-F grading scale along with the scoring range and a particular grade for each score report provided to a consumer.[27]

### D.   FICO Has Failed to Demonstrate Any Viable Theory or Reason Why VSS Should Be Held Liable for Any Conduct of Either Trans Union or Experian.

VSS does not sell credit scores to consumers (or to anyone else, for that matter).[28] VSS owns and licenses its mathematical algorithm to the three credit bureaus (Experian, Trans Union and Equifax) who in turn must plug in one or more of the bureaus' credit information to generate a VantageScore credit score.[29]  VSS, however, never creates or sells credit scores to anyone. [30]  In the absence of such evidence, FICO's claims against VSS fail as a matter of law because FICO has failed to demonstrate the requisite "use" of the phrase "300-850."

Nor has FICO presented any evidence or viable legal theory to justify why VSS should be held vicariously or derivatively liable for Experian or TransUnion's actions. Minnesota law sets a high standard that FICO must clear in order to pierce the corporate veil under *Victoria Elevator Co. v. Meriden Grain Co., Inc.,* 283 N.W.2d 509 (Minn. 1979).  *See, e.g., Gregerson v. Viana Fin. Inc.,*2007 WL 2509718, at *3 (D. Minn. Aug.

---

[27] Tr. 951:17 – 952:7, VX0058, VX0065, PX1126, PX1209.
[28] Burns Dep. Vol. I 10/11/07, 26:9-20, PX0049 (Ex. A) .
[29] *Id*.
[30] *Id.*

31, 2007)(when granting summary judgment in favor of defendant on trademark claims, finding no grounds to pierce corporate veil under *Victoria Elevator*).

Under *Victoria Elevator*, a party seeking to pierce the corporate veil must first show that the challenged business did not operate as a separate legal entity.  Factors that may demonstrate the requisite lack of independence include "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, non-function of other officers and directors, absence of corporate records and existence of corporation as merely façade for individual dealings."  *Victoria Elevator,* 283 N.W.2d at 512; *see also Malcom v. Franklin Drywall, Inc.,* No. 06-4155 (PAM/JSM), 2009 WL 6900082, at *1 (D. Minn. Mar. 12, 2009)(entering JAML for defendant after bench trial and finding no evidence that corporations was alter ego of shareholder).

The second prong requires showing that injustice or fundamental unfairness will result from permitting the challenged entity from relying on the corporate veil.  *Minn. Power v. Armco, Inc.,* 937 F.2d 1363, 1367 (8th Cir.1991)(citing *Victoria Elevator*, 238 N.W.2d at 512.)

In order to pierce a subsidiary's corporate veil (or vice versa) the Court must find a "unity of interest and ownership between the parent and subsidiary such that their separate personalities no longer exist."  *Tamko Roofing Products Inc. v. Smith Eng. Co.*, 450 F.3d 822, 827 (8th Cir. 2006)(affirming district court's entry of JAML refusing to pierce corporate veil of parent company).  There is a general presumption that "absent

fraud or bad faith, a corporation will not be held liable for the acts of its subsidiaries."
*Assoc. of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.,* 553 N.W.2d 446, 449 (Minn.
Ct. App. 1996), *rev. denied* (Minn. Nov. 20, 1996); *accord U.S. v. Bestfoods,* 524 U.S.
51, 61 (1998).

The fact that the three competing credit bureaus are the shareholders of VSS
provides no basis to disregard VSS's status as a distinct and independent company.  The
evidence reflects that VSS is a legal separate entity with its own independent accounting,
and its own independent officers and employees to run the business.[31]  Nor has FICO
introduced any evidence to show that it would be unjust to uphold the corporate veil.
FICO has thus failed to demonstrate any viable justification for holding VSS liable for
any acts of Trans Union or Experian.

E.      **FICO Has Abandoned Any Damages Claim Against VSS.**

Paul Meyer, FICO's damages expert, confirmed during his trial testimony that
FICO is seeking no damages award from VSS.[32]  The Court should thus grant VSS's
motion for JAML to the extent that FICO's claims seek some award of damages from
VSS.  (VSS also disputes FICO's right to any type of injunctive relief because FICO's
claims against VSS fail for all the reasons set forth herein.)

F.      **FICO Failed to Meet Its Burden on Its State Law Claims of Passing
Off, Unjust Enrichment and under the Minnesota Deceptive Trade
Practices Act.**

In its summary judgment decision, this Court concluded that FICO's "claims

---

[31] PX0065, PX0971.
[32] Tr. 2181:5-19, 2232:20-25.

based on the common law and the MDTPA are 'coextensive' with the federal claims under the Lanham Act, and, for that reason, the Court analyzes all the claims together, using the same standards." (SJ Order at 36.) Because FICO failed to prove its Lanham Act claims for the reasons set forth above, its state law claims must be dismissed as well. *See, e.g., DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 n.3 (8th Cir. 2003); *MSP Corp. v. Westech Instruments*, 500 F. Supp. 2d 1198, 1217 (D. Minn. 2007).

## III.   VSS Has Met Its Burden on Its Affirmative Defenses.

### A. Fair Use.

Even if FICO were to establish its right to a trademark in the phrase "300-850," the existence of that trademark does not prevent VSS from using the range of 501 to 990 to describe its services in good faith. 15 U.S.C. § 1115(b)(4). In certain cases, the use of another party's trademark can be a non-trademark or "fair" use, a defense available to a defendant whose use of a plaintiff's mark is only "to describe the goods or services of [a] party, or their geographic origin." 15 U.S.C. § 1115(d)(4). The fair use doctrine thus exempts a party from liability where its use of another party's trademark is not for the purposes of source-identification. Here, Kramers-Dove agreed that the score range of 501 to 990 described VantageScore's product.[33] FICO further failed to show evidence that VantageScore's range was used in any manner other than as a description of the numeric output of VSS's algorithm. *See supra*. And, where there is no trademark use by an alleged infringer, there can not be trademark infringement. *KP Permanent Make-Up v. Lasting Impressions, Inc.*, 543 U.S. 111, 122-23 (2004)("the defendant has no

---

[33] Tr. 729:7-9.

independent burden to negate the likelihood of any confusion in raising the affirmative defense that a terms is used descriptively, not as a mark, fairly, and in good faith"); *Skinner Mfg. Co. v. Kellogg Sales Co*., 143 F.2d 895, 898 (8th Cir. 1995)("The use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin or ownership of the product"). Thus, the Court should find that any alleged infringement on the phrase "300-850" is non-actionable because of VSS's fair use.

### B.  Functionality.

The issue of functionality typically arises where a plaintiff claims exclusivity in a non-word symbol or style of presenting a product or service.  In this case, FICO contends that the phrase "300-850" gives them not only the right to prevent competitors from using a mark that is similar to "300-850," but also prevent a competitor from using any number which falls within the range 300 to 850.

The evidence shows, however, that the term "300-850" is not a valid trademark because, among other reasons, the use of a range of three-digit numbers to describe a credit score is simply "functional;" that is, it merely provides an effective means by which a consumer may obtain a concrete and universally understood numeric credit score.  Moreover, Kramers-Dove admitted that FICO has no trademark in the individual numbers that fall between 300 and 850, and that FICO claim a right solely to the phrase "300-850."[34]  Because the use of a range of numbers which overlaps the numbers falling between the "300-850" range is simply descriptive and functional, the Court should find

---

[34] Tr. 478:2-9, 481:20-483:9, 509:23-25, 510:12-14, 532:24-533:3, 729:7-730:3.

that VSS is not liable for using its range of 501 to 990 to describe the output of its

algorithm. *See, e.g., Gateway Inc. v. Companion Prods., Inc.,* 384 F.3d 503, 508 (8th

Cir. 2004)(citation omitted); *Homebuilders Ass'n v. L & L Exhibition Mgmt.,* 226 F.3d

944, 948 n.5 (8th Cir. 2000); *Rainbow Play Sys.,* 364 F. Supp. 2d at 1037; *Goddard, Inc.*

*v. Henry's Foods, Inc.,* 291 F. Supp. 2d 1021, 1049 (D. Minn. 2003).

### C. Unclean Hands.

Evidence supports the unclean hand defense and that FICO committed fraud on

the Patent and Trademark Office ("PTO"). Fraud in the procurement of a trademark

registration exists where an applicant or registrant makes a statement that is:  (1) false, (2)

made knowingly, and (3) a material misrepresentation. *See, e.g., Torres v. Cantine*

*Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986).  "The obligation which the Lanham

Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly*

misleading statements in the verified declaration forming a part of the application for

registration." *Id.* (citation omitted).  Deceptive intent can be inferred from indirect and

circumstantial evidence. *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009).  In

addition, and intent to deceive may be inferred from the failure to disclose known

information that is relevant to the PTO's decision. *Specialized Seating, Inc. v. Greenwich*

*Indus., L.P.*, 472 F. Supp. 2d 999, 1017 (N.D. Ill. 2007).

The evidence admitted at close of Plaintiffs' case has shown that during the course

of its prosecution of the "300-850" trademark application, FICO deliberately deceived the

PTO by making the following false or misleading statements:

- "[O]nly the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores." [35]

- "300-850 was initially selected by Fair Isaac to uniquely identify and differentiate Fair Isaac's credit bureau risk scoring models from other scoring models."[36]

- "Fair Isaac arbitrarily selected the 300-850 score range based on a number of market and marketing factors to uniquely identify Fair Isaac's credit bureau risk scoring products (FICO scores)." [37]

- "Competitors in the credit scoring market do not have a need to use the 300-850 range, and in fact have published other ranges." [38]

The Court should find any alleged infringement on the phrase "300-850" as futile due to unclean hands.

### D. **Waiver**.

FICO's trademark infringement claims rely on its ability to prove that it holds a valid trademark to "300-850" and that it provided notice to the public (and competitors) that it was claiming a trademark on "300-850", however as shown above, FICO can do neither. FICO failed to take even the basic steps to protect an alleged claim to "300-850" prior to VantageScore's introduction to the marketplace in March 2006. FICO provides this Court and the jury no proof that prior to VantageScore, FICO actually gave notice of such claim via contract (or other) discussions with the credit bureaus, letters to these same competitors, or use of the TM symbol on the FICO scoring range in public or private documents. *See supra* §2.B. Thus, the Court should find that any alleged infringement on the phrase "300-850" is non-actionable due to waiver.

---

[35] EX-0001-0038 (¶12).
[36] EX-0001-0038 (¶6).
[37] EX-0001-0038 (¶7).
[38] EX-0001-0038 (¶13).

**E.  The Court Should Reject the Application of Licensee Estoppel to VSS.**

FICO's licensee estoppel argument rests on a contract and addendum to which VSS was not a party.  FICO has not argued, nor presented any evidence, that VSS' corporate veil should be pierced for purposes of imposing the licensee estoppel defense on VSS.   As set forth above, there is no basis to pierce VSS' corporate form and impose vague contract terms on VantageScore from contracts to which it was never a party.

**CONCLUSION**

Based on the forgoing, no reasonable jury could find that Plaintiffs have provided a legally sufficient evidentiary basis to support any of their claims against VantageScore Solutions, LLC in this matter. Therefore, this Court should grant Defendant's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1) and dismiss all claims against Defendant VantageScore Solutions, LLC.

Respectfully submitted November 15, 2009

**Kelly & Berens P.A.**

By:    /s/ Justi R. Miller

Barbara Podlucky Berens (MN #209788)
Justi R. Miller (MN #0387330)
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

***Attorneys for Defendant***
***VantageScore Solutions, LLC***

21