## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Fair Isaac Corporation and myFICO    Case No. 06-cv-4112 (ADM-JSM )
Consumer Services, Inc.;

        Plaintiffs,

v.

Experian Information Solutions Inc.;
Trans Union, LLC; VantageScore
Solutions, LLC; and Does I through
X;

        Defendants.

### Fair Isaac's Memorandum in Opposition to Experian and Trans Union's Motion for Judgment as a Matter of Law

Experian and Trans Union's brief in support of their motion for judgment as a matter of law might serve as a script of sorts for their final argument to the jury. But it does not represent an adequate legal argument for judgment as a matter of law. Experian and Trans Union overlook and simplify a great deal of evidence to force the conclusion urged by their motion. They also misconstrued and overlook some pertinent case law. This relatively short (and quick) memorandum can only highlight a few of the many problems with the defendants' motion.

## I. The defendants have not and cannot meet their burden under Rule 50(a) for judgment as a matter of law

In their brief, Experian and Trans Union gloss over the demanding standard for a motion under Rule 50(a). Judgment as a matter of law is proper only when there is a complete absence of probative facts to support a reasonable juror's finding for the non-movant.[1] The Court is not free to weigh the parties' evidence or decide the reasonable inferences that the jury might draw from the evidence. The Court cannot evaluate the credibility of the evidence or the witnesses.[2] The Court, in short, cannot substitute its judgment of the evidence or the facts for that of the jury.[3] Determining the facts is the exclusive province of the jury.[4]

## II. There can be no judgment as a matter of law regarding secondary meaning

The defendants' motion contends that there is no evidence that allows the jury reasonably to conclude that Fair Isaac has proved secondary meaning in its "300-850"® trademark before the defendants began their infringing uses. The defendants' arguments are without merit: their brief ignores a great deal of

---

1. *Eich v. Board of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003).

2. *Garcia v. City of Trenton*, 348 F.3d 726, 727 (8th Cir. 2003) ("When the Court entertains a motion for judgment as a matter of law, it considers all of the evidence presented, draws all reasonable inferences in favor of the non-moving party, and may not make credibility determinations or weigh the evidence.").

3. *See Ryther v. Kare 11*, 864 F. Supp. 1510, 1519 (D. Minn.1994), *aff'd*, 108 F.3d 832 (8th Cir.) (en banc).

4. *See United States v. White Horse*, 807 F.2d 1426, 1431 (8th Cir. 1986).

evidence and, with respect to the evidence that they are willing to acknowledge, the defendants will only allow one inference (in their favor, of course). Fair Isaac has presented more than enough evidence for the jury to find that its "300-850"® mark acquired secondary meaning before the defendants' infringing uses.

**A.     Experian and Trans Union are express licensees of Fair Isaac's mark and they should be estopped, therefore, from challenging its validity**

The first problem with the defendants' motion on secondary meaning is that it overlooks an important doctrine of law that sweeps away their attack on Fair Isaac's mark: the doctrine of licensee estoppel. The undisputed evidence at trial shows that Experian, on March 6, 2006, executed an addendum to its master contract with Fair Isaac and that this addendum contains an express trademark-licensing provision that granted Experian a license to use Fair Isaac's 300-850® trademark in its promotion or sale of Fair Isaac's credit scores.[5] The undisputed evidence also shows that Trans Union, onAugust 31, 2006, executed an agreement with Fair Isaac and WaMu that, similarly, contains an express trademark-licensing provision to use Fair Isaac's 300-850® trademark in the promotion or sale of Fair Isaac's credit scores.[6] The undisputed evidence, in other

_____

5. *See* PX0995 (Fair Isaac and Experian Licensing Agreement) at 0006.
6. *See* PX0975 (Agreement between Fair Isaac and Trans Union and WAMU) at 0006; PX0975-0012.

words, shows that Experian and Trans Union are licensees of Fair Isaac's "300-850"® trademark.

Under the doctrine of licensee estoppel, these undisputed facts preclude any challenge to the validity of Fair Isaac's mark by the defendants. If someone has a license for another person's trademark, then the licensee effectively admits the validity of that mark and the doctrine of licensee estoppel bars the licensee from disputing the mark's validity.[7] This is true regardless of whether (1) a licensing agreement is found enforceable or not, (2) the licensing agreement contains a no-contest provision, or (3) there is an express agreement between the licensing parties.[8] The existence of a licensing agreement simply and unqualifiedly prevents a licensee from contesting the validity a licensor's trademark.

---

7. *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279-80 (8th Cir. 1977) (upholding trial court's order for dismissal because local distributor's trademark claims attempted to question the validity of its licensor's trademarks); *see* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:63 (West 2009) ("a number of cases have held that a trademark licensee is estopped from challenging the validity of the licensor's mark").

8. *See Heaton Dist. Co. v. Union Tank Car. Co.*, 387 F.2d 477, 482 (8th Cir. 1967) (licensee estoppel applies even in the absence of a contractual provision not to contest trademark validity); *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp.2d 1090, 1097 (D. S.D. 2000) (admission of the licensor's trademark ownership, payment of royalties and inclusion of disclaimer on advertising estopped defendant and the subsequent purchaser of defendant from contesting trademark validity); and *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000) (defendant barred from asserting trademark invalidity by abandonment, despite the absence of formal, express licensing agreement and the ongoing disagreement over licensing between the parties).

## B.     The Court has already held that evidence of actual confusion and intentional copying raises a fact issue for the jury

The defendants do not mention anywhere in their brief that this Court, in denying the defendants' motion for summary judgment before trial, already held that evidence of actual confusion and evidence that the defendants intentionally copied Fair Isaac's mark create a genuine issue of fact for the jury on the question of secondary meaning:

> The evidence identified by Fair Isaac lends support to the inference that Defendants intentionally copied Fair Isaac's 300-850 mark and that consumers confused Defendants credit scores with FICO credit scores as a result. As the Eighth Circuit has recognized, evidence of intentional copying is a factor to consider in determining whether a mark has acquired secondary meaning. Evidence of actual confusion also is relevant to determining whether secondary meaning has been established. . . . Genuine issues of material fact persist on the issue of secondary meaning.[9]

The jury has now heard the same evidence of copying and confusion (and more) and, thus, for the same reason that the Court denied the defendants' earlier motion for summary judgment, the Court should deny this motion for judgment as a matter of law. The jury has a legally sufficient basis to decide the secondary-meaning issue in Fair Isaac's favor.[10]

---

9. Memorandum Opinion and Order, July 24, 2009, at 43-44 (citations omitted).

10. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986) (the standard for a motion for summary judgment mirrors the standard for (what was then known as) a motion for a directed verdict: "[T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

**C.      The evidence that the jury heard also goes far beyond what served as a basis for denying summary judgment to the defendants**

Fair Isaac has presented the jury with more than sufficient evidence to establish that its 300-850® trademark acquired secondary meaning before the defendants' first infringing uses—even beyond what was presented in opposition to the defendants' motion for summary judgment:

- The jury has heard and seen evidence that Fair Isaac launched its myFICO.com website in 2001, in conjunction with Equifax, and that Fair Isaac, at approximately the same time, began prominently displaying its scoring range of 300 to 850 on its website—calling out the numbers, for example, as a bulleted item for visitors to the site.[11] When Fair Isaac entered the consumer market with its score, Fair Isaac's score and range had a long-established identification in the lending industry, and the launch of myFICO.com for consumers received a great deal of attention in the press,.[12] Many affiliates were involved in Fair Isaac's marketing efforts to consumers and the jury heard undisputed testimony that five million of Fair Isaac's scores using 300 to 850 were sold to consumers by 2003.[13] The defendants' only response to this evidence of substantial and significant early

---

11. *See e.g.*, Testimony of Keri Kramers Dove (Tr. 373:23-25; 374:15-18; 402:13-17).
12. *Id.* at Tr. 470:10-474:4.
13. *See e.g., id.* at Tr. 387:12-392:19; 474:4-13, and PX0932.

use is to wave it aside as "not amount[ing] to trademark use," arguing that it represents nothing but a "feature or characteristic" of Fair Isaac's scoring service. Whether Fair Isaac's prominent use of 300 to 850 on its website and other materials constitutes trademark use represents a classic fact issue for the jury.

- Fair Isaac presented essentially undisputed evidence to the jury that Experian and Trans Union deliberately copied Fair Isaac's scoring range. The defendants could have chosen an infinite number of scoring ranges but they chose to intentionally copy Fair Isaac's 300-850® trademark—to "mimic" its mark.[14] The defendants' changes to their scoring ranges—to more closely match or mirror Fair Isaac's mark—had nothing to do with improving the quality or reliability of the defendants' scoring services. The jury can reasonably infer that the defendants "mimicked" Fair Isaac's mark because they knew that Fair Isaac's scoring range had secondary meaning with consumers; and, because they knew that other ranges had no cachet with consumers, they did not use any of the infinite number of distinctly different scoring ranges available. The case law on this point is clear—in addition to this Court's own order denying

14. *See e.g.*, PX0326; Testimony of John Danaher (Tr. 1856:13-1857:18).

summary judgment to the defendants on this ground: the existence of secondary meaning can be inferred from evidence of deliberate copying of the mark.

- The fact that the defendants *knew* early on that a scoring range had protectable intellectual-property value—and that Fair Isaac was using 300-850, in particular, as a trademark—was not only admitted by Trans Union's Wiermanski (who acknowledge that he had seen the use of "TM" in connection with Fair Isaac's score range very early on) but can also be reasonably inferred from the fact that Experian and Trans Union, as early as 2005, were working among themselves to ensure that the scoring range for what became VantageScore would be acknowledged by all of the participants in Project Trident as *their* "intellectual property" (i.e., their trademark).[15] The jury would be well within its rights to reject outright the argument of the defendants today that they never could have dreamed that Fair Isaac's scoring range was being used or was protectable as a trademark. Experian and Trans Union's own actions in the past speak louder than their words at trial.

---

15. DKT. 919 (deposition testimony of Chet Wiermanski) at 146:18-149:23; PX0030 (Vantage Score Intellectual Property Agreement) at 0004.

- The evidence of actual consumer confusion that Fair Isaac presented to the jury has been even stronger at trial than the evidence that Fair Isaac presented to the Court in opposition to the defendants' motion for summary judgment. At trial, Fair Isaac presented substantial evidence that many consumers have purchased scores thinking they were purchasing a FICO or Fair Isaac score.[16] Indeed, Trans Union's Danaher *admitted* that there has been actual consumer confusion.[17] Fair Isaac also presented evidence that shows the defendants actually train their call-center employees to handle calls from consumers who are confused into thinking that they had purchased a FICO score or the score used by most lenders.[18] The Court itself, in a Memorandum Opinion and Order on August 31, 2009, suggested, with respect to the evidence against Experian, that the consumer emails and call-center scripts was all the confusion evidence that Fair Isaac would need at trial. Any more evidence, according to the Court, would be "cumulative."[19]

---

16. *See e.g.*, PX0667; PX0667A.; Testimony of John Danaher (Tr. 1945:1-1947:15).
17. *See e.g.*, Testimony of John Danaher (Tr. 1945:7-10).
18. *See e.g.*, PX0433.
19. Memorandum Opinion and Order at 9-10 n.2 (August 31, 2009).

- Fair Isaac also presented survey evidence to the jury, through its expert James Berger, from which the jury can infer that Fair Isaac's mark acquired secondary meaning before any of the defendants' infringing uses. The law is well settled that a fact finder can consider a secondary-meaning survey conducted at the time of litigation in determining whether secondary meaning existed at the time of the alleged infringement. In doing so, the fact finder can take into consideration the strength of the recognition of the mark at the time of the survey in light of the amount of time passed between the date of the survey and the date of infringement.[20]

- Experian and Trans Union—from the beginning of their infringing uses—have advertised or marketed their infringing scores using Fair Isaac mark prominently in their advertising or marketing materials. Trans Union prominently features a graph ranging from 300 to 850 on its website.[21] Indeed, Trans Union even purchased "850" as a keyword for its Internet advertising.[22] Experian, too, uses scores alone prominently—flooding the Internet with advertising that features numeric scores within the 300 to 850 range without

---

20. *See General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006).
21. *See e.g.*, Testimony of John Danaher (Tr. 1893:10-13); PX1157-A20.
22. *See e.g.*, PX0990; Testimony of John Danaher (Tr. 1912:4-1913:22).

identifying the score that is being advertised.[23] Indeed, Experian's own witness (David Williams) could not tell what score Experian was promoting in its Internet banner advertising.[24] From all of these efforts, the jury can reasonably infer that there must have been a secondary meaning in Fair Isaac's mark.

• The defendants presented an array of irrelevant scoring products to the jury, mainly through Experian's Stan Oliai, in an effort to persuade them that Fair Isaac was not the exclusive user of 300 to 850 because many other scores have "overlapped" 300 to 850. Fair Isaac has never tried to claim any use of a number in the range of 300 to 850 represents an infringement. But just as importantly, the defendants did not present any evidence that the other scores that were the subject of Oliai's testimony have been advertised or sold to consumers or to anyone in any market other than the business-to-business or lender markets.[25] The defendants also did not present any evidence that a score has been sold to consumers before their infringing use that promoted a range of 300 to 850, other than Fair Isaac's score; indeed, Trans Union's TransRisk score is the only

---

23. *See e.g.*, PX0419; PX0420; PX0421; PX1079.
24. *See e.g.*, Testimony of David Williams (Tr. 1584:24-1585:1).
25. Testimony of Stan Oliai (Tr. 841:2-844:13).

consumer score that promotes the exact range of the FICO score.[26]
The defendants also presented no evidence that those other scores
were even advertised to consumers or that consumers would have
been aware of the irrelevant scores that Oliai testified about (unlike
FICO's scores using 300 to 850, which were long used by lenders,
including in the mortgage business, before they were even offered to
consumers).

- Finally, Experian and Trans Union make the incorrect and irrelevant
argument that "FICO is the trademark for [Fair Isaac's] product,"
not 300-850. The defendants would have the Court assume that a
product can only bear one mark, which is obviously not true. A
product can bear more than one mark (indeed, the defendants'
products are marketed under more than one mark each), and the
fact that a product bears more than one mark does not mean that
each mark cannot be a valid, independent mark.[27]

---

26. Testimony of John Danaher (Tr. 1863:5-10).

27. *See Layton Pure Food Co. v. Church & Dwight Co.*, 182 F. 24, 28-28 (8th Cir. 1910)
("A manufacturer or merchant may secure the right to be complainant registered one or
more of these representations as its trade-marks did not necessarily work an
abandonment of the others, nor did it deprive the complainant of its right to be
protected in their use. protected in the exclusive use of as many separate trade-marks as
he adopts and so uses that they become to purchasers and those who intend to purchase
distinguishing marks of the goods he makes or sells."); *Old Dutch Foods, Inc. v. Dan Dee
Pretzel & Potato Chip Co.*, 477 F.2d 150, 154 (C.A.1973) ("the fact that a product bears
more than one mark does not mean that each can not be a valid trademark"); *Sands,*

## III.     The jury must decide whether there is a likelihood of confusion

The defendants acknowledge in their motion that the jury will be instructed to consider a variety of factors—no one of which is determinative—in deciding whether a probability exists "that consumers will be confused about the source [sponsorship, or affiliation] of their allegedly infringing products." Defs' Memo. at 22. But the defendants mistakenly claim that there is no reasonable way in which the jury could conclude that they have used Fair Isaac's "300-850" marks in a manner that is likely to cause this type of confusion. As with secondary meaning, the defendants are overlooking and minimizing the evidence:

- Experian and Trans Union argue that Fair Isaac's 300-850 marks are "inherently weak" because "the evidence shows that there are (and have been for years) numerous other credit scoring services in the market with ranges that overlap 300-850." Defs' Memo. at 23. This argument fails for the same reason that the defendants' similar argument regarding secondary meaning fails: the defendants presented no evidence that "numerous" other scoring services with "overlapping" ranges have ever been advertised or sold to

---

*Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 954 (7th Cir. 1992) ("the fact that the Gatorade trademark always appears in Quaker's 'Thirst Aid' advertisements does not preclude a finding that those advertisements also use 'Thirst Aid' as a trademark."); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 160-161 (9th Cir. 1963).

consumers or to anyone in any market other than the business-to-business or lender markets. The other scoring services to which the defendants refer could have no "weakening" effect on Fair Isaac's marks because consumers would have never seen or heard of those other scoring services.

• The defendants also assert that Fair Isaac's marks are "weakened" because Fair Isaac supposedly did not demand until "April 2007" that Experian stop infringing and did not demand until "April 2006" that Trans Union stop infringing. The argument regarding Experian is blatantly incorrect; the very exhibit that the defendants' cite for the "April 2007" proposition is a cease-and-desist letter from Fair Isaac to Experian in *June 2006*.[28] But more to the point, the defendants do not cite any cases (nor could they) that stand for the proposition that there can be no consumer confusion as a matter of law because a registered trademark owner served cease-and-desist letters and sued within two years after the infringing uses began. The defendants, after all, are not moving for JMOL on a laches defense. An owner of a trademark, moreover, has no obligation to sue until the likelihood of confusion looms large and the owner's

---

28. *See* PX0950.

right to protection of its mark has clearly ripened.[29] The jury, in reaching its decision, will be free to consider the fact that Experian and Trans Union expanded and increased their marketing efforts over time, so their uses became more confusingly similar.

- If a trademark owner does not use a "TM" notice for a common-law trademark, this is not evidence that the owner is using the mark in a non-trademark manner.[30] The defendants' argument, therefore, that Fair Isaac's failure to consistently use the "TM" or "SM" symbol next to uses of 300 to 850 necessarily weakens the mark is without merit and no ground for judgment as a matter of law on the issue of likelihood of confusion.

- Contrary to the defendants' assertion in their brief, the law does not require Fair Isaac to prove, as a separate element of the likelihood of confusion, that the defendants used scoring ranges as a trademark (although the defendants' Intellectual Property Agreement for

---

29. *See Champagne Louis Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 859 (8th Cir. 2009) (explaining the doctrine of progressive encroachment); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:19 (4th ed. 1998) (owner of a mark "has no obligation to sue until the likelihood of confusion looms large" and "cannot be guilty of laches until his right ripens into one entitled to protection").

30. *See, e.g., Arrow Fastner Co. v. Stanley Works*, 870 F. Supp. 427, 428 (D. Conn. 1994) ("Arrow has not used a "TM" notice of a common law trademark, a matter of no negative significance."), *rev'd on other grounds*, 59 F.2d 384 (2d Cir. 1995).

VantageScore certainly shows that they consider their own scoring range to be a trademark). *See* Defs' Memo. at 24-25. Any use of numbers by a defendant that is likely to cause confusion is an infringement of Fair Isaac's trademarks. For example, Fair Isaac does not need to show that Experian is using "675" as a trademark when it uses that number as a means of advertising its scoring product; instead, all that Fair Isaac needs to show—and all that the jury needs to reasonably infer—is that that use is likely to cause confusion about the source, sponsorship, or affiliation of the product being sold.

- Fair Isaac's expert James Berger testified that his survey demonstrated that the defendants' use of numeric ranges similar or identical to Fair Isaac's "300-850" mark clearly caused confusion. As Berger explained and as reflected in his demonstrative exhibits[31], the levels of confusion increased in direct correlation to the similarity between the numeric range advertised by the defendants and the 300-850 mark.[32] The defendants contend that the confusion was simply due to general confusion about credit scores, the ubiquity of

---

31. *See* PX1506 at 0009.
32. *See id.* at PX1506-0012.

the FICO credit score, or even the nature of the questions asked in the Berger survey.  But Berger testified that his analysis clearly disproved these alternative hypotheses.[33]  If these were the cause of the confusion, then the levels of confusion would have been the same across each of the three test cells.[34]  Berger's survey showed that levels of confusion actually increased as the similarity to the "300-850" mark increased—and that these differences were "extremely statistically significant."[35]

• Repeating earlier failed arguments, the defendants also contend that Mr. Berger's survey was somehow flawed because it did not ask specific questions about scoring ranges but instead asked whether the same credit scores were available through the tested websites and the myFICO.com site. Given that the products at issue are credit scores, the phrasing of Berger's question was entirely appropriate, and the results of Berger's survey rebut the assertion that the confusion was the result of some ambiguous phrasing of his questions.  Again, because respondents in all three cells were asked identical questions, one would expect the randomly assigned

---

33. *See* Testimony of James Berger, (Tr. 1293:10-1301:1).
34. *See id.* at Tr. 1297:24-1301:1.
35. *See id.* at Tr. 1297:24-1299:6.

respondents to provide identical answers.[36]  But they did not do this and, instead, showed increasing rates of confusion as the tested websites approached Fair Isaac's "300-850" mark.

## IV. There is no basis for judgment as a matter of law on what the defendants refer to as Fair Isaac's "seal" trademarks

Experian and Trans Union argue that the Court should dismiss the trademark-infringement claims that are based on what the defendants' call the "seal" trademarks. The defendants contend that Fair Isaac did not present any evidence that the defendants' "scoring ranges are likely to cause confusion with [Fair Isaac's] seal logos." Defs' Memo. at 29. In their argument, the defendants are ignoring the most prominent feature of what they call the "seal" trademarks—which is "300-850." Fair Isaac's expert (James Berger) used one of Fair Isaac's "seal" trademarks as the basis for his survey, and he came to the conclusion that the defendants' uses were likely to cause confusion.[37] The defendants are simply wrong to argue that there is no evidence of a likelihood of confusion.

---

36. *See id.* at 1298:2-1299:23.
37. *See* PX1123.

## V.   Experian's use of Fair Isaac's trademarks as keywords is not a subject for judgment as a matter of law

With respect to Fair Isaac's claim regarding the defendants' keyword purchases, the defendants argue that the Court should dismiss Fair Isaac's claim as a matter of law because their purchase of Fair Isaac's trademarks as keywords does not constitute trademark use. They say that their use does not constitute trademark use because they do "not use that trademark in the text of the sponsored ad link." Defs' Memo. at 29. The defendants—shaving the line between truth and fiction very closely—state that they have not found "any case where a party was found liable for trademark infringement in these factual circumstances." *Id.* at 30. The defendants might be hoping that this Court does not remember its own recent decision in *Hysitron Inc. v. MTS Sys. Corp.*, 2008 WL 316169 (D. Minn. Aug. 1, 2008), in which the Court rejected the same argument that the defendants' are making now.

In *Hysitron*, the defendant argued that it was entitled to summary judgment because it did not display or reproduce the plaintiff's trademark in a sponsored link that was generated from purchasing the trademark as a keyword. *Id.* at *2. The Court rejected that argument and concluded that "a company's use of a trademark to generate advertising is 'use in commerce,' even when the customer never sees the mark." *Id.* While it might be true, as a technical matter, that *Hysitron* does not show that "a party was found liable" in the same

19

circumstances as this case (*Hysitron* involved denial of summary judgment), it does show without a doubt that the defendants' argument that the trademark has to be used in the text of the sponsored link is baseless.[38]

The defendants also argue that Fair Isaac failed to present any evidence that the defendants' use of Fair Isaac's trademarks as advertising causes trademark confusion. Mr. Berger testified though that his survey and his analysis of its data allowed him to conclude that the use of FICO as a paid search terms did, in fact, cause confusion.[39] The point of Mr. Berger's testimony was that a very high percentage of people who click on a sponsored link do so in the mistaken belief that it will lead them to a site where they can purchase FICO scores and that when they get to the freecreditreport.com homepage, their confusion is not cured.[40]

## VI.   The defendants continue to try to conflate Fair Isaac's trademark claim with its passing-off claim

The defendants argue that Fair Isaac's passing-off claim should be dismissed as a matter of law because it represents nothing more than Fair Isaac's trademark claim under a difference label. This is an erroneous argument. Unlike

---

38. In a footnote of their brief, the defendants state that Fair Isaac said in the initial jury instruction conference that Fair Isaac "indicated that they were dropping the keyword advertising claims against TU." Defs' Memo. at 29. What Fair Isaac actually said was that it was not claiming that TU used FICO or Fair Isaac. Trans Union did, admittedly, purchase the keyword "850."

39. Testimony of James Berger (Tr. 1262:2-1262:9); PX1506.

40. *Id.*

Fair Isaac's trademark claims, neither common-law passing-off nor the

Minnesota Deceptive Trade Practices Act (MDTPA) require Fair Isaac to prove

that it has a valid mark.[41] Fair Isaac is only required to show conduct by a

defendant that deceives, or is likely to deceive, a customer exercising ordinary

care in purchasing credit-scoring products and that induces the customer to

purchase a defendant's credit-scoring products in the belief that they are

purchasing Fair Isaac's credit-scoring products.[42]

The defendants cite the Eighth Circuit's decision in *DaimlerChrysler AG v.*

*Bloom*[43] as supposed support for their argument that Fair Isaac cannot prove its

state-law passing-off claims if the jury does not find trademark infringement. But

the plaintiff in *DaimlerChrysler*, as the court emphasized, did *not* plead an

independent claim of passing off.[44] *Fair Isaac did.* In fact, this case is much more

analogous to the passing-off that the Ninth Circuit addressed in *Coca-Cola v.*

---

41. *See United Healthcare Ins. Co. v . AdvancePCS*, 2002 WL 432068 at *12-14 n.17 (D. Minn. 2002) (a claim of passing off does not require proof of a valid mark and a claim need not be supportable under the Lanham Act to be actionable under the MDTPA), *aff'd,* 316 F.3d 737 (8th Cir. 2002).

42. *See Winston & Nowell Co. v. Piggly Wiggly Northwest*, 22 N.W.2d 11, 16 (Minn. 1946) (defining passing off under the common law); *United Healthcare Ins. Co. v . AdvancePCS*, 316 F.3d 737, 742-44 (8th Cir. 2002) (finding the definition of passing off under the Minnesota Deceptive Trade Practices Act was adopted from the common law as articulated in *Winston & Nowell Co.*); *Minnesota State Archery Association I, Inc. v. Minnesota State Archery Association, Inc.,* 2003 WL 1589868 at *7 (D. Minn. 2003) (same).

43. 315 F.3d 932 (8th Cir. 2003).

44. *Id.* at 937.

*Overland,*[45]—the very case that *DaimlerChrysler* distinguishes.

In *Coca-Cola,* restaurant patrons seeking Coca-cola were given Pepsi-cola instead. The court found passing off and ordered that the restaurant had to inform consumers that they were receiving Pepsi, not Coke.[46] This Court's decision in *MSP Corp. v. Westech Instruments*[47]—the only other case that the defendants cite—similarly provides no support for the defendants' argument. In *MSP Corp* ., the parties *agreed* that the claims under Minnesota law and the Lanham Act were coextensive.[48] Here, the parties have no such agreement. In fact, to the contrary, Fair Isaac has consistently maintained that its common-law claims are not predicated on a finding of trademark validity.[49]

The defendants have engaged in a deliberate campaign to "mimic," "match," and "mirror" Fair Isaac's successful credit-scoring products in an effort to pass their products off as the FICO score—the one that lenders use.[50] Knowing this, the defendants are now trying (disingenuously) to couch their arguments about Fair Isaac's passing-off claims as concern that the claims are nothing but

---

45. 692 F.2d 1250 (9th Cir. 1982).

46. *Id.* at 1252.

47. 500 F. Supp. 2d 1198 (D. Minn. 2007).

48. *Id.* at 1217.

49. Fair Isaac's Memo at 12 ("Significantly, this Court doesn't need to consider the validity of the 300-850® marks for FIC to prevail on these claims").

50. Mimic: *see e.g.*, Testimony of John Danaher (Tr. 1845:19-1864:21); PX0326; PX0643; PX0646. Mirror: *see e.g.* PX0164; PX0070. Match: *see e.g.* Testimony of John Danaher (Tr. 1866:18-1867:2; 1873:1-3; 1876:20-1877:6).

trademark or false-advertising claims (the latter of which were dismissed by summary judgment). The defendants are misconstruing the law. Fair Isaac's passing-off claim is well supported by the evidence and should be presented to the jury for consideration along with Fair Isaac's other claims.

### Conclusion

The defendants' motion for judgment as a matter of law should be denied.

Date:   November 16, 2009          **Robins, Kaplan, Miller & Ciresi, L.L.P.**

**By:**   /s/ Randall Tietjen
          Ronald J. Schutz (130849)
          Randall Tietjen (214474)
          Christopher K. Larus (226828)
          Michael A. Collyard (302569)
          Laura E. Nelson (342798)
          Mary E. Kiedrowski (346378)

          2800 LaSalle Plaza
          800 LaSalle Avenue
          Minneapolis, MN 55402
          Tel: (612) 349-8500
          Fax: (612) 339-4181

          **Attorneys for Plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc.**