## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Fair Isaac Corporation and myFICO    Case No. 06-cv-4112 (ADM-JSM )
Consumer Services, Inc.;

                Plaintiffs,

v.

Experian Information Solutions Inc.;
Trans Union, LLC; VantageScore
Solutions, LLC; and Does I through
X;

                Defendants.

### Fair Isaac's Memorandum of Law in Support of its
### Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate when there is a complete absence of probative facts to support a reasonable juror's finding for the non-movant. Here, with respect to the application of licensee estoppel and the defendants' counterclaim and affirmative defenses, there is a complete absence of probative facts to support a finding for the defendants, and judgment as a matter of law should be entered for the plaintiffs, Fair Isaac.

**I.**     **The doctrine of licensee estoppel precludes, as a matter of law, the defendants' challenges to the validity of Fair Isaac's marks**

The undisputed evidence at trial shows that Experian, on March 6, 2006, executed an addendum to its master contract with Fair Isaac and that this

addendum contains an express trademark-licensing provision that granted Experian a license to use Fair Isaac's 300-850® trademark in its promotion or sale of Fair Isaac's credit scores.[1] The undisputed evidence also shows that Trans Union, on August 31, 2006, executed an agreement with Fair Isaac and WaMu that, similarly, contains an express trademark-licensing provision to use Fair Isaac's 300-850® trademark in the promotion or sale of Fair Isaac's credit scores.[2] The undisputed evidence, in other words, shows that Experian and Trans Union are licensees of Fair Isaac's "300-850"® trademark. The undisputed evidence also shows that VantageScore is wholly owned by and under the absolute control of the credit bureaus.

Under the doctrine of licensee estoppel, these undisputed facts preclude any challenge to the validity of Fair Isaac's mark by the defendants. If someone has a license for another person's trademark, then the licensee effectively admits the validity of that mark and the doctrine of licensee estoppel bars the licensee from disputing the mark's validity.[3] This is true regardless of whether (1) a

---

1. *See* PX0995 (Fair Isaac and Experian Licensing Agreement) at 0006.
2. *See* PX0975 (Agreement between Fair Isaac and Trans Union and WAMU) at 0006; PX0975-0012.
3. *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279-80 (8th Cir. 1977) (upholding trial court's order for dismissal because local distributor's trademark claims attempted to question the validity of its licensor's trademarks); *see* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:63 (West 2009) ("a number of cases have held that a trademark licensee is estopped from challenging the validity of the licensor's mark").

licensing agreement is found enforceable or not, (2) the licensing agreement contains a no-contest provision, or (3) there is an express agreement between the licensing parties.[4] The existence of a licensing agreement simply and unqualifiedly prevents a licensee from contesting the validity a licensor's trademark. (The issue of licensee estoppel has been more fully briefed in Fair Isaac's related motion in limine; Fair Isaac incorporates those points and authorities and will not repeat them here.)

## II.   The defendants' counterclaim of fraud on the PTO should be dismissed as a matter of law

Given the testimony of the defendants' own paid expert, the defendants have not met their burden to prove by clear-and-convincing evidence that Fair Isaac committed fraud on the United States Patent and Trademark Office. This issue is ripe for judgment as a matter of law.

---

4. *See Heaton Dist. Co. v. Union Tank Car. Co.*, 387 F.2d 477, 482 (8th Cir. 1967) (licensee estoppel applies even in the absence of a contractual provision not to contest trademark validity); *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp.2d 1090, 1097 (D. S.D. 2000) (admission of the licensor's trademark ownership, payment of royalties and inclusion of disclaimer on advertising estopped defendant and the subsequent purchaser of defendant from contesting trademark validity); and *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000) (defendant barred from asserting trademark invalidity by abandonment, despite the absence of formal, express licensing agreement and the ongoing disagreement over licensing between the parties).

The defendants have alleged that Fair Isaac committed fraud on the PTO in connection with its application to register the mark "300-850."[5] To prevail on their claim, the defendants bear the burden to prove by clear-and-convincing evidence the Fair Isaac made a false, material representation of fact in connection with the application.[6] "Indeed, 'the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.'"[7]

The defendants must also prove that Fair Isaac *intended* to mislead the PTO.[8] There is no evidence that Fair Isaac intended to deceive the USPTO. In fact, Mr. Anderson, the defendants' PTO expert, explicitly admitted that he was not opining that Fair Isaac intended to deceive the trademark office.[9]

The defendants contend that Fair Isaac committed fraud on the PTO when Cheryl St. John submitted a declaration in response to the office action that stated: "To the best of my knowledge, only the FICO score uses the 300-850 range

---

5. The defendants have acknowledged the validity of Fair Isaac's other registrations that incorporate the term "300-850" and those marks are not subject to the defendants' counterclaim.

6. *In re Bose Corp.*, ---F.3d. ---, 2009 WL 2709312, at *2 (Fed. Cir. 2009) (*citing Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)).

7. *Id.* (*citing Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (T.T.A.B. 1981)).

8. *Id.* ("absent a showing of intent to mislead the PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation") (*citing King Auto., Inc. v. Speedy Muffler King. Inc.*, 667 F.2d 1008, 1011 n.4 (CCPA 1981)).

9. Tr. 2535:2-4.

as a unique identifier for credit bureau risk scores."[10] The defendants have

offered no evidence to prove this statement is fraudulent. To the contrary, the

testimony of the defendants' own witnesses demonstrates that this statement is

entirely true. The defendants expert, Mr. Anderson, admitted that he was not

aware of any other party that has ever used 300-850 as a unique identifier for

credit bureau risk scores.[11] This is completely consistent with Mr. Danaher's

testimony that he does not think that TransUnion uses 300-850 to identify the

source of its score and that he does not know of any other scoring product (other

than the FICO score) that is marketed with a 300-850 range.[12] Given this

testimony, the defendants cannot prove that Ms. St. John's declaration reflected a

materially false statement, let alone one made with an intent to defraud the PTO.

The defendants have similarly failed to show that the legal argument

submitted in connection with Fair Isaac's "Response To Office Action" contained

any materially false statements. Specifically, the defendants claim that Fair

Isaac's attorneys incorrectly asserted that there were no other entities using 300-

850 as a credit scoring range. The evidence at trial fails to clearly and

convincingly demonstrate that Fair Isaac was aware of Trans Union's infringing

use of the 300-850 mark at the time of Fair Isaac's February 2005 Office Action

---

10. PX0006-0039, ¶ 12.
11. Tr. 2622:23-2623:1.
12. Tr. 1875:9-19; 1863:1-10.

Response. But it is undisputed that any such statements regarding third-party uses were not material to any issue pending before the PTO.

As defendants' expert Mr. Anderson explained, a trademark applicant has no duty to investigate whether there are third party uses of the mark.[13] Moreover, a trademark applicant has no duty to disclose to the United States Patent and Trademark Office uses that the applicant believes are infringing uses.[14]

As Mr. Anderson testified, the only issue before the PTO at the time Fair Isaac submitted its response was whether the 300-850 mark was merely descriptive of Fair Isaac's services.[15] Accordingly, Fair Isaac had no reason to address any other issues at that time.[16] Moreover, Mr. Anderson admitted that the existence of third party uses would not have any bearing on whether or not the designation 300-850 is merely descriptive of Fair Isaac's services.[17] Accordingly, as a manner of law, the defendants cannot demonstrate that any of the statements by Fair Isaac's lawyers were material. [18]

---

13. Tr. 2605:3-6.

14. Tr. 2605:7-11.

15. Tr. 26:12-16:2613:12. Mr. Anderson testified that the PTO had also raised an issue with Fair Isaac's description of its services which Mr. Anderson acknowledged was fully resolved and is not material to the Defendants' challenge to the validity of the 300-850 trademark registration.

16. Tr. 26:12-16:2613:12.

17. Tr. 2637:16-2638:1.

18. *In re Bose Corp.*, ---F.3d. ---, 2009 WL 2709312, at *2.

Finally, the defendants contend that Fair Isaac's Statement of Use supporting registration of the 300-850 mark was somehow improper. Again, the defendants' have failed to proffer any evidence that Fair Isaac made any misrepresentation in connection with its Statement of Use, let alone any misrepresentation that was material and made with an intent to mislead the PTO. As Mr. Anderson testified, Fair Isaac was not required to submit a specimen showing how the mark was first used in commerce; rather, Fair Isaac was only required to submit a specimen showing some example of how the mark had been used up through the time of the 2006 Statement of Use.[19] There is no evidence in the record that Fair Isaac failed to meet this obligation. Moreover, Fair Isaac's statement that it had first used the 300-850 mark in commerce at least as early as March 2001 was both true and—as Mr. Anderson admits—not material to any issue before the PTO.[20] Accordingly, as a matter of law, Fair Isaac's Statement of Use submitted in connection with the 300-850 mark cannot support the defendants' fraud claim.

In short, the defendants have not submitted any evidence on which a reasonable jury could find fraud. Thus, the defendants' counterclaims should be dismissed as a matter of law.

---

19. Tr. 2642:1-21.
20. Tr. 2643:23-2644:16.

III.    **The defendants' functionality defense should be dismissed as a matter of law**

The defendants claim "functionality" as an affirmative defense to Fair Isaac's trademark-infringement claims and, under this label, they would have the Court tell the jury that the defendants are free to use "300-850" any way they want if the jury finds that their use "substantially" contributes to the utility of their products.[21] This is not only a misstatement of the law regarding functionality (in the Eighth Circuit, a "feature must be *necessary* to afford a competitor the means to compete effectively," not just a "substantial contribution" to its utility).[22] But the idea of using a functionality defense in this case is akin to trying to force a square peg into a round hole. "Functionality" is a trade-dress concept by nature and it does not properly belong in a trademark-infringement case that has nothing to do with design elements.

In a trade-dress case, a court often has to view the design elements or features of the product as a whole or in combination to determine if a competitor could effectively "compete without copying a particular feature or combination

---

21. Proposed Jury Instruction No. 86 (Defense—Functional versus Nonfunctional) ("If you find from the evidence that the Plaintiffs' term "300-850" substantially contributes to the usefulness, utility or practicality of the services provided, then you must find that the term "300-850" is functional and the Defendants were free to copy or simulate it.").

22. *Home Builders Assoc. of Greater St. Louis v. L & L Exhibition Mgmt, Inc.*, 226 F.3d 944, 948 (8th Cir. 2000) ("[T]he fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be *necessary* to afford a competitor the means to compete effectively.") (emphasis added).

of features."[23] If a competitor could compete without copying a particular feature or combination of features, then "the trade dress is nonfunctional."[24] This concept has no application to this matter. There are no design elements or features of the product at issue. What's at issue here is the manner in which the defendants advertise and promote their allegedly infringing products.

If the Court finds, for some reason, that a "functionality" defense could, in theory, have a place in this case, then the Court should still dismiss the defense as a matter of law. Under the defendants' own characterization of the law (which is inaccurate), the defendants would have the burden of presenting evidence that "300-850" "substantially contributes to the usefulness, utility or practicality" of their "services." Here, the defendants have admitted they could have used an infinite number of scoring ranges or scores for their consumer products—and that score ranges are "merely cosmetic."[25] (The subject of what would be "acceptable" to lenders is irrelevant with respect to Experian and Trans Union because their scores at issue are not sold to lenders.)

If scoring ranges are "merely cosmetic," then no reasonable jury could conclude that the particular scoring ranges that the defendants use

---

23. *Ott v. Target Corp.*, 153 F. Supp.2d 1055, 1063 (D. Minn. 2001).
24. *Id.*
25. *See, e.g.*, Testimony of Stan Oliai, Trial Trans., Nov. 3, 2009, at 806:17-21 (Q: "A credit score scale and range are merely cosmetic, . . . and you agree with that statement, right, sir?" A. Yes, I do." Trans., Nov. 3, 2009, page 806:17-21); *see also* PX0340).

"substantially" contribute to the utility of their products. To admit, in one breath, that scoring ranges are "merely cosmetic" and then to claim, in the next breath, that the particular scoring range that you use is necessary or "substantially contributes" to the utility of your product is an inherent and insoluble contradiction—one that no reasonable juror could reconcile.

## IV. The defendants' waiver defense should be dismissed as a matter of law

In their pleadings and in their proposed jury instructions, the defendants assert "waiver" as an affirmative defense to Fair Isaac's claim that the defendants infringed Fair Isaac's "300-850" marks. In their proposed jury instruction, the defendants misstate the legal basis for waiver and suggest that waiver results from "delay" and "undue prejudice by that delay." Waiver, in fact, requires that the defendants prove by the greater weight of the evidence that Fair Isaac voluntarily and intentionally relinquished or abandoned its right to bring its trademark claims.[26]

On that question—as properly framed under the law of waiver—the defendants have offered no evidence, either directly or by reasonable inference,

---

26. *See, e.g., Haghighi v. Russian-American Broadcasting Co.*, 173 F.3d 1086, 1088 (8th Cir. 1999) ("Waiver requires evidence of a voluntary and intentional relinquishment or abandonment of a known right."); *accord Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club*, Civil No. 00-2317, 2002 WL 1763999 at *10 (D. Minn. July 22, 2002); *Klipsch, Inc. v. WWR Technology, Inc.*, 127 F.3d 729, 737 (8th Cir. 1997) ("[W]aiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it.") .

to show that Fair Isaac voluntarily and intentionally relinquished or abandoned its right to sue for infringement. To the contrary, the evidence showed that as soon as the United States Patent and Trademark Office certified Fair Isaac's trademarks, Fair Isaac put the defendants on notice of Fair Isaac's claims and shortly thereafter sued the defendants for infringement.

## V.     The defendants' fair-use defense should be dismissed as matter of law

The defendants' fair-use defense should also be dismissed as a matter of law. The defendants have asserted that their use of the "300-850" marks (or confusingly similar advertisements) was fair use under 15 U.S.C. § 1115(b)(4). This defense is available only if the use was not willful infringement of Fair Isaac's marks *and* if a defendant proves all of the following by the greater weight of the evidence:

1.     the defendant used Fair Isaac's marks only to describe the defendant's own goods or services;

2.     the defendant used Fair Isaac's marks fairly and in good faith; and,

3.     the defendant did not use the marks as a trademark.[27]

---

27. *See* 15 U.S.C. § 1115(b)(4).

Here, there is significant evidence in the record to support a finding that the infringement was willful.[28] But setting that aside, the defendants have not provided evidence to meet their burden on any of the three required elements.

The evidence is undisputed that the defendants' use of Fair Isaac's marks is not limited to describing their own goods and services. Experian's use, for example, is not *only* describing its own goods—in fact it does not actually even describe its own goods. Experian promotes the PLUS Score with a prominent use of three-digit numbers, including 450-850 (even though even they do not claim a score range to 850), and an advertised score range of 330-830.[29] But a true description of the PLUS score is that it has a range of 428 on the low end to 818 on the high end.[30] Experian admits that it uses 330-830 for "marketing" and that it selected that range because it wanted to "keep it close, but not exactly like FICO's."[31] This is *not* classic fair use.

The evidence is equally undisputed that Trans Union has not used Fair Isaac's marks fairly or in good faith. Trans Union intentionally calibrated its TransRisk New Account Model from approximate 150 on the low end to 950 on

---

28. Mimic: *See e.g.* Testimony of John Danaher (Tr. 1845:19-1864:21); PX0326; PX0643; PX0646.  Mirror: *See e.g.* PX0164; PX0070. Match: *See e.g.* Testimony of John Danaher (Tr. 1866:18-1867:2; 1873:1-3; 1876:20-1877:6).
29. PX0425A (Experian's "I'm Thinking of a Number" commercial); *see also* PX1079.
30. Testimony of Stan Oliai (Tr. 864:3-865:10); PX0505.
31. Testimony of Stan Oliai (Tr. 864:3-870:7); PX0505.

the high end to directly mimic Fair Isaac's "300-850" marks. This admitted shift by Trans Union from other descriptive terms to Fair Isaac's marks indicates bad faith.[32] This bad-faith use precludes Trans Union from relief under a classic fair-use defense. Vantage Score's defense suffers from a similar infirmity—the scoring model for VantageScore was chosen with the FICO score in mind. The members of Project Trident explicitly discussed calibrating the model to the FICO score and mimicking the range as close as possible.[33] Like TransUnion's admitted copying, this is uncontradicted evidence of bad faith and precludes a finding of fair use.

## VI. The defendants' nominative-fair-use defense should be dismissed as a matter of law

The Court has informed the parties that the Court alone will decide the claims regarding the defendants' use of keyword advertising. As part of the Court's consideration of that claim, the Court should give no attention to the defendants' defense of "nominative fair use." As a matter of law, that defense has no application to this case.

"Nominative fair use" requires that the defendants prove by the greater weight of the evidence that, among other things, they could not have advertised their products and services without using the "FICO" and "Fair Isaac" marks—

---

32. *Restatement (Third) of Unfair Competition* § 28 (1995).
33. PX0070; PX0022.

that they could not, for example, have advertised their products or services by using keyword search terms such as "credit score" or "credit scoring" or "consumer credit score." The defendants have offered no evidence to prove this (nor could they). Consequently, the Court should not give any consideration to this defense.

## VII.   The defendants' acquiescence defense should be dismissed as a matter of law

Fair Isaac also moves for judgment as a matter of law on the defendants' affirmative defense of "acquiescence." The defense of acquiescence requires the defendants to proof three elements by the greater weight of the evidence: (1) that Fair Isaac actively represented that it would not assert a right or a claim; (2) that the delay between Fair Isaac's active representation and assertion of its right or claim was not excusable; and (3) that the delay caused the defendants unfair prejudice.[34]

Acquiescence denotes active consent to use of a mark.[35] Here, the defendants have presented no evidence that Fair Isaac ever actively told Experian or Trans Union that they could use Fair Isaacs' 300-850® marks in connection with their own products. No witness's testimony and no exhibits

---

34. Minnesota *Specialty Crops, Inc. v. Minnesota Wild Hockey Club*, Civil No. 00-2317, 2002 WL 176399 at *11 (D. Minn. July 22, 2002).
35. *Hogdon Powder Co. v . Alliant Techsystems, Inc.*, 396 F. Supp. 2d. 1221, 1262 n.6 (D. Kan. 2007).

could be reasonably construed as asserting or showing that Fair Isaac actively

represented to any of the defendants that it would not asserts its trademark

rights or that it would not pursue the trademark claims it is now pursuing in this

litigation. Given this total absence of proof, the Court should hold as a matter of

law that the defendants have not met their burden of proving their affirmative

defense of acquiescence.

## VIII.  Trans Union's release defense should be dismissed as a matter of law

In the defendants' proposed jury instructions, Trans Union maintained

that Fair Isaac had released Trans Union from the claims in this lawsuit "by

virtue of an Agreement dated March 19, 2004 and a Confidential Settlement

Agreement dated September 30, 2005."[36] But during trial, Trans Union

introduced no evidence of a Confidential Settlement Agreement dated

September 30, 2005. Any such agreement, therefore, cannot, as a matter of law, be

a basis for a finding of release.[37] An Agreement between Fair Isaac Corporation

and Trans Union Consumer Solutions LLC ("TCS") dated March 19, 2004, was

received as an exhibit (PX961) (the "Agreement"). But the unambiguous

---

36. Proposed Jury Instruction No. 92 ("Defense—Release").
37. The reasons why the agreement dated September 30, 2005, cannot, as a matter of law, be a basis for release are explained, nonetheless, in Fair Isaac's Motion in Limine to Exclude Evidence Regarding a Purported Release of Fair Isaac's Claims Against Trans Union [Docket No. 748] (filed Sept. 21, 2009), which Fair Isaac hereby incorporates.

language of the Agreement shows that there was no release of any of the claims

being tried in this Court.[38]

The Agreement includes a "Limited Mutual Release" as an Exhibit D, but

that release—unambiguously—is limited to claims arising from an earlier

agreement between the parties, in 2002, that simply established the terms under

which the parties would collaborate to provide an Internet-based service through

which consumers could buy their FICO score and obtain their credit report from

Trans Union:

> 2.  Fair Isaac Release of TCS. . . . Fair Isaac . . . hereby release[s] and
> completely discharge[s] TCS . . . for any loss, suit or claim arising
> from or relating in any way to the business relationship between
> TCS and Fair Isaac arising from the April, 2002 Agreement . . . .[39]

The earlier agreement, in 2002, was also introduced as an exhibit (TX0036).

Here, in this lawsuit, Fair Isaac's claims against Trans Union do not arise

from the sale by TU of FICO scores on Trans Union's website. The claims in this

lawsuit arise, at least in part, from the advertising and promotion of Trans

Union's own in-house scoring product for consumers (which is known as

"TransRisk").

---

38. If for some reason the Court views the language of this Agreement as ambiguous, Trans Union still offered no parol evidence—testimony or otherwise—that the language of the Agreement represented a released of any of the claims being tried in this Court.

39. PX961 at FIC0649366.

This reading and application of the unambiguous language of the limited mutual release in the Agreement in 2004 is supported by another provision in the Agreement that expressly limits the scope of the release further. That provision states that the release is not intended to release any party from any obligation that survived the (then) terminated agreement in 2002:

> 3.  <u>Limitations</u>. Nothing herein is intended to release either party from obligations that survive the termination of the April, 2002 Agreement . . . .[40]

The Agreement in 2004—which, again, is directed to the parties' relationship in collaborating to provide FICO scores with credit report from Trans Union—specifically provides that the Agreement does not prevent either party from providing competing products on their own or jointly with third parties:

> 14.  <u>Competition</u>. Subject to the parties Intellectual Property Rights, this Agreement does not prevent either party from providing products, services, or both, that are similar to the Service, either alone or jointly with third parties.[41]

This language shows, too, that Trans Union's in-house scoring products are *not* the subject of the Agreement. In fact, it shows unambiguously that in offering any competing in-house scores, the parties had an on-going obligation to respect either other's intellectual-property rights. By the clear and unambiguous language of the Agreement, in other words, there was no intent to release

---

40. PX961 at FIC0649367.
41. PX961 at FIC0649345 (Sec. 14)

intellectual-property-related claims regarding competitive in-house scores but rather an agreement that there was no release regarding intellectual-property rights in the offering of competing scoring products.

The Agreement in 2004 and the agreement in 2002 each contain provisions that provide the agreement will be governed by and construed in accordance with the laws of Delaware.[42] The law of releases in Delaware is not at all unusual, and supports the above analysis of the plain, unambiguous language of the Agreement. Delaware courts make clear, for example, that releases have to be "crystal clear and unequivocal" if a party is to claim the benefits of a release successfully: "[P]ublic policy abhors relief of a party from its legal obligations unless contractual language makes it crystal clear and unequivocal that the contracting party would be relieved of its own defaults."[43] Here, there is no question that the Agreement in 2004 does *not* release Trans Union from the claims involved in this trial, and it is certainly not "crystal clear and unequivocally" in Trans Union's favor.

## Conclusion

The doctrine of licensee estoppel precludes, as a matter of law, the defendants' challenges to the validity of Fair Isaac's marks and there is a

---

42. *See* PX961 at FIC0649357 (Sec. 31(a)); TX36 at 0023 (Sec. 20(a)).
43. *Egan & Sons Air Conditioning Co. v. General Motors Corp.*, 1988 WL 47314 at *3 (Del. Sup. 1988).

complete absence of probative facts to support a reasonable juror's finding for

the defendants with respect to their counterclaim and affirmative defenses. For

those reasons, as explained above, judgment as a matter of law should be entered

for Fair Isaac.


Date:   November 18, 2009          **Robins, Kaplan, Miller & Ciresi, L.L.P.**


**By:**    /s/ Randall Tietjen
            Ronald J. Schutz (130849)
            Randall Tietjen (214474)
            Christopher K. Larus (226828)
            Michael A. Collyard (302569)
            Laura E. Nelson (342798)
            Mary E. Kiedrowski (346378)

            2800 LaSalle Plaza
            800 LaSalle Avenue
            Minneapolis, MN 55402
            Tel: (612) 349-8500
            Fax: (612) 339-4181

            **Attorneys for Plaintiffs Fair Isaac
            Corporation and myFICO Consumer
            Services, Inc.**