# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Fair Isaac Corporation and myFICO
Consumer Services, Inc.;

               Plaintiffs,

v.                                Case No. 06-cv-4112 (ADM-JSM )

Equifax Inc.; Equifax Information
Services LLC; Experian Information
Solutions Inc.; Trans Union, LLC;
VantageScore Solutions, LLC; and Does
I through X;

               Defendants.

**Fair Isaac's Memorandum of Law in Support of its Post-Trial Motions for an
Amended Judgment, Judgment as a Matter of Law, and a New Trial,
or, in the Alternative, Findings of Fact**

# Table of Contents

Summary of Argument ................................................................................ 1

Argument ................................................................................................... 2

I.   The standards and burdens governing these motions ............................ 2

II.  The Court should grant judgment as a matter of law or a new trial
     on the defendants' affirmative defense and counterclaim of fraud
     on the PTO ......................................................................................... 4

     A.   Special Verdict Question No. 9 ..................................................... 6

          1.   As a matter of law, there cannot be fraud because the
               defendants admitted that St. John's statement was true .......... 7

          2.   There was no clear-and-convincing evidence that outside
               counsel's statement to the PTO was false ............................. 9

     B.   Special Verdict Question No. 10 ................................................. 11

          1.   No competent evidence showed that St. John or Gustafson
               knowingly made a false representation with the intent to
               deceive ................................................................................. 11

          2.   Nor can the defendants impute Gustafson's statement to
               Fair Isaac ............................................................................. 14

     C.   Special Verdict Question No. 11 ................................................. 15

          1.   No evidence shows that the statements were material ......... 15

          2.   Neither of the statements were material as a matter of law .... 16

     D.   The Court erred in denying Fair Isaac's motion to exclude the
          testimony of Robert Anderson ................................................... 18

III. Applying licensee estoppel, the Court should amend its partial summary
     judgment or enter JMOL and order a new trial on infringement alone ........... 19

     A.   Licensee estoppel should have precluded the defendants from
          challenging the validity of the 300-850 mark ............................. 20

B.   The Court received *undisputed* evidence that Experian and TU
are licensees of Fair Isaac's 300-850 mark ...................................... 21

C.   In the alternative, the Court should make detailed findings
of fact to explain its decision not to apply the doctrine of licensee
estoppel ................................................................................................. 25

IV.   The Court should amend its partial summary judgment and grant
a new trial that recognizes Fair Isaac's mark as inherently distinctive ............... 25

V.   The Court should grant judgment as a matter of law and a new trial
because no reasonable fact finder could find an absence of secondary
meaning ........................................................................................................ 29

A.   The evidence of secondary meaning was overwhelming ........................... 29

B.   Although his opinions did not overcome the great weight of the
evidence, Johnson's testimony still should have been excluded .............. 31

C.   The Court should also grant a new trial with an instruction that
Fair Isaac's mark is presumed to have acquired secondary meaning ...... 31

VI.   The Court should grant a new trial on Fair Isaac's common-law
passing-off claim ........................................................................................... 33

A.   Fair Isaac has a passing-off claim under the common law and
relief is not limited to injunctive relief ............................................. 33

B.   The Court should grant JMOL in favor of Fair Isaac or, in the
alternative, a new trial on Fair Isaac's MDTPA passing-off claim .......... 34

VII.   The Court should grant a new trial that allows evidence of spoliation
and an adverse-inference instruction for spoliation ............................... 36

VIII.   The Court should amend its partial summary judgment and grant
a new trial that allows the jury to decide Fair Isaac's false-advertising
claim .......................................................................................................... 38

Conclusion ................................................................................................................. 41

# Table of Authorities

## Cases

*3M Co. v. Intertape Polymer Group*, 423 F. Supp.2d 958 (D. Minn. 2006) ...................................... 6

*Agassiz & Odessa Mut. Fire Ins. v. Magnusson*, 136 N.W.2d 861 (Minn. 1965) .......................... 34

*Americana Trading v. Russ Berrie & Co.,* 966 F.2d 1284 (9th Cir. 1992) ....................................... 32

*Arabian Agric. Services v. Chief Indus.*, 309 F.3d 479 (8th Cir. 2002) ................................. 2

*Birthright v. Birthright, Inc.*, 827 F. Supp 1114 (D.N.J. 1993) ......................................... 24

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008) .......................... 3

*Creative Gifts v. UFO*, 235 F.3d 540 (10th Cir. 2000) ...................................................... 21

*Dennis Simmons v. Modern Aero*, 603 N.W.2d 336 (Minn. Ct. App. 1999) .................................. 34

*Dillon v. Nissan Motor Co.*, 986 F.2d 263 (8th Cir.1993) ................................................. 36

*eCash Technologies, Inc. v. Guagliardo,* 127 F. Supp.2d 1069 (C.D. Cal. 2000) ................... 6, 15, 17

*Fought v. Hayes Wheels Int'l,* 101 F.3d 1275 (8th Cir.1996) .............................................. 2

*Frosty Treats,* 426 F.3d 1001 (8th Cir. 2005) ................................................................ 29

*Gilbert/Robinson v. Carrie Beverage-Missouri*, 989 F.2d 985 (8th Cir. 1993) .................................. 16

*Hana Fin. v. Hana Bank,* 500 F. Supp.2d 1228 (C.D. Cal. 2000) ....................................... 17, 18

*Heaton Dist. v. Union Tank Car.*, 387 F.2d 477 (8th Cir. 1967) .................................... 21

*In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009) .................................................. passim

*Innovative Home Health Care, Inc. v. P.T.-O.T. Associates of the Black Hills,*
    141 F.3d 1286 (8th Cir. 1998) ................................................................ 4

*Insty* Bit v. Poly -Tech*, 95 F.3d 663 (8th Cir. 1996) ....................................................... 27

*Iowa Farmers Union v. Farmers' Educational and Co-operative Union,*
    247 F.2d 809 (8th Cir. 1957) ................................................................ 33

*J.C. Penney v. H. D. Lee Mercantile,* 120 F.2d 949 (8th Cir. 1941) .................................................... 34

*Lutheran Ass'n of Missionaries. v. Lutheran Ass'n of Missionaries and Pilots,*
    2004 WL 2730104 (D. Minn. Nov. 19, 2004) ......................................................... 24

*Midwest Plastics v. Protective Closures,* 285 F.2d 747 (10th Cir. 1960) ............................................. 34

*Minnesota Mining & Mfg. Co. v. Shurtape Technologies Inc.,* 2002 WL 1000089
    (D. Minn., Mar. 14, 2002) ......................................................... 19

*Nissan Motor Co. v. Nissan Computer Corp.,* 2002 WL 32006514
    (C.D. Cal. Jan. 7, 2002) ......................................................... 16

*RFE Industries v. SPM Corp.,* 105 F.3d 923 (4th Cir. 1997) ......................................................... 26

*S.S. Kresge Co. v. Winget Kickernick Co.,* 102 F.2d 740 (8th Cir. 1939) ......................................... 34

*Shaffer v. Wilkes,* 65 F.3d 115 (8th Cir. 1995) ......................................................... 3

*Seven-Up Bottling Co. v. Seven-Up Co.,* 561 F.2d 1275 (8th Cir. 1977) ................................... 20, 21

*Sturgis Area Chamber of Commerce v. Sturgis Rally & Races,*
    99 F. Supp.2d 1090 (D. S.D. 2000) ......................................................... 21

*Tanel Corp. v. Reebok,* 774 F. Supp. 49 (D.Mass 1991) ......................................................... 28

*United Fire & Cas. Ins. Co. v. Garvey,* 419 F.3d 743 (8th. Cir. 2005) ......................................... 2

*United Healthcare Ins. v . AdvancePCS,* 316 F.3d 737 (8th Cir. 2002) ....................................... 35

*United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175 (8th Cir. 1998) ......................................... 39

*Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769 (9th Cir. 1981) ......................... 33

*Walker Mfg. v. Hoffmann,* 261 F. Supp.2d 1054 (N.D. Iowa 2003) ......................................... 34

*White v. Pence,* 961 F.2d 776 (8th Cir. 1992) ......................................................... 3

*Winston & Nowell Vo. v. Piggly Wiggly,* 22 N.W.2d 11 (Minn. 1946) ......................................... 35

*Woodroast Sys. v. Restaurants Unlimited,* 793 F. Supp. 906 (D. Minn. 1992),
    *aff'd,* 994 F.2d 844 (8th Cir. 1993) ......................................................... 25

*Zip Dee, Inc. v. Dometic Corp.,* 900 F. Supp. 1004 (N.D. Ill. 1995) ......................................... 16

**Other**

15 U.S.C. § 1057(b) ........................................................................................................ 32

15 U.S.C. § 1115(a) ........................................................................................................ 32

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (West 2009) .......... passim

## Summary of Argument

The Court should grant judgment as a matter of law in Fair Isaac's favor on the defendants' affirmative defense and counterclaim that Fair Isaac committed fraud on the PTO. This defense and counterclaim had to be proven by clear-and-convincing evidence and, as the Federal Circuit recently emphasized in *In re Bose Corp.*, there "is no room [in such a claim] for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party."[1] Here, the record contains no proof beyond speculation to support the verdict. There is no evidence that any statements that Fair Isaac made to the PTO were false, that they were made with deceptive intent, or that they were material to the outcome. The jury's findings could only have been the result of surmise, conjecture, and misleading arguments. The Court has a duty under Rule 50 to correct this verdict in light of the clear law and actual evidence.

Indeed, the Court should not have allowed any attack on the validity of Fair Isaac's 300-850 trademark under the doctrine of licensee estoppel and because of Experian's specific agreement not to contest Fair Isaac's mark. The Court erred as a matter of law in its decision to not apply licensee estoppel and in not holding Experian to its undisputed promise. The Court compounded that error when it removed from the jury's consideration, at summary judgment, without analysis, the factual issue of whether the 300-850 mark was inherently distinctive or descriptive, and when the Court removed the presumptions to which registered marks are appropriately and statutorily entitled. These errors confused the jury and prejudiced Fair Isaac in its proof of secondary meaning. Coupled closely to these

---

1. 580 F.3d 1240, 1243 (Fed. Cir. 2009).

legal errors was the Court's exclusion of Fair Isaac's false-advertising and passing-off claims.

Finally, the evidence that the defendants intentionally destroyed documents after they

anticipated litigation was kept from the jury and no adverse inference was given to replace

this destroyed evidence. The exclusion of evidence and of Fair Isaac's meritorious claims

resulted in an erroneous and skewed version of the issues before the jury. For these and

many other reasons, an amended judgment or judgment as a matter of law on several issues

and a new trial are warranted.

## Argument

### I.   The standards and burdens governing these motions

*JMOL.* Judgment as a matter of law should be granted under Rule 50 when "a party

has been fully heard on an issue and there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue."[2] In applying this standard, the Court

must "draw all reasonable inferences in favor of the nonmoving party without making

credibility assessments or weighing the evidence."[3] "A reasonable inference is one 'which

may be drawn from the evidence without resort to speculation.'"[4] The Court may not give

the non-moving party "'the benefit of unreasonable inferences, or those at war with the

undisputed facts.'"[5] "'A mere scintilla of evidence is inadequate to support a verdict,' and

---

2. *Arabian Agric. Services v. Chief Indus.*, 309 F.3d 479, 482 (8th Cir. 2002); *see also* Fed.R.Civ.P. 50(a)(1).

3. *Arabian Agric. Services*, 309 F.3d at 482.

4. *Fought v. Hayes Wheels Int'l,* 101 F.3d 1275, 1277 (8th Cir.1996) (quoting *Sip-Top, Inc. v. Ekco Group,* 86 F.3d 827, 830 (8th Cir.1996)).

5. *United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir. 2005) (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651-52 (8th Cir. 1989)).

judgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict."[6]

*New Trial.* A different standard applies to a motion for new trial under Rule 59(a). The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."[7] In evaluating a motion for a new trial, the "key question is whether a new trial should have been granted to avoid a miscarriage of justice."[8] When analyzing a motion for new trial because the verdict goes against the greater weight of the evidence, "'the trial court can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'"[9] But "[t]he district court's discretion is not boundless, for the court cannot simply 'reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'"[10] When analyzing whether a new trial is warranted due to a substantive problem with the jury instructions, the Court determines "whether the

---

6. *Id.* (quoting *City of Omaha*, 883 F.2d at 651-52).

7. Fed. R. Civ. P. 59(a).

8. *Capitol Records, Inc. v. Thomas*, 579 F.Supp. 2d 1210, 1213-14 (D. Minn. 2008).

9. *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (quoting *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir.1984)).

10. *Shaffer v. Wilkes*, 65 F.3d 115, 118 (8th Cir. 1995) (quoting *White*, 961 F.2d at 780) (affirming district court's order granting a new trial).

instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury."[11]

*Amended partial summary judgment.* A motion under Rule 59(e) allows a court "to correct its own mistakes in the time period immediately following entry of judgment," including if a district court discovers that it had erred in an earlier partial summary judgment before trial.[12] A motion under Rule 59(e) serves the function, therefore, of "correcting 'manifest errors of law or fact or to present newly discovered evidence.'"[13]

## II.   The Court should grant judgment as a matter of law or a new trial on the defendants' affirmative defense and counterclaim of fraud on the PTO

As a matter of law, there was a lack of evidence from which the jury could find—based on *clear-and-convincing* evidence—the answers it did in response to question nos. 9 through 11 on the Special-Verdict form, finding that Fair Isaac committed fraud in obtaining its registration for its 300-850 mark. The Court must set aside that verdict and enter judgment in favor of Fair Isaac or, at a minimum, grant a new trial in its favor.[14]

The defendants based their counterclaim of "fraud" exclusively on two statements made to the PTO—one by a former employee in a declaration and one by Fair Isaac's

---

11. *Capitol Records,* 579 F.Supp.2d at 1214.

12. *See, e.g., Innovative Home Health Care, Inc. v. P.T.-O.T. Associates of the Black Hills*, 141 F.3d 1286 (8th Cir. 1998) (district court amended its earlier summary judgment on an indemnification counterclaims after most facts had been developed and the court understood better the complex issues facing the court).

13. *Id.*

14. The defendants' counterclaim only pertains to Fair Isaac's U.S. Registration No. 3,083,563. The defendants have acknowledged the validity of Fair Isaac's other registrations that incorporate the term "300-850" and those marks are not subject to the defendants' counterclaim.

outside counsel in her legal brief in response to the PTO's office action. Rather than using the actual words used by these individuals, the defendants repeatedly argued to the jury that Fair Isaac fraudulently represented "that no one else was using the score range 300-850" during the time period that Fair Isaac filed its registration.

The jury's findings with respect to this fraud claim must be overturned as a matter of law and because of a complete lack of proof. What Fair Isaac and its outside counsel actually said was literally true. These individuals asserted that only Fair Isaac was using 300-850 to uniquely identify the source of its products and that 300-850 was not a standard range used throughout the industry as a whole. That was true. As the evidence showed, TU was the only other entity using 300-850 to market a credit score. But TU admitted that it never used 300-850 to identify itself and that it was using at least *three* different scoring ranges—at the same time—for that particular score. There was no basis to allow the jury to answer special-verdict question number 9 because the statements actually made to the PTO were undisputedly true.

In addition, no competent evidence was introduced showing that the individuals who made the statements to the PTO either "knew" such statements were false or had an intent to deceive the PTO in making them. In addition, as a matter of law, neither of the statements made to the PTO can be considered "material" in any way to the registration process.

There was no competent evidence introduced at trial, much less the heightened standard of evidence, required to prove fraud. As the Federal Circuit recently confirmed in the *In re Bose* case, the defendants had the heavy burden to prove by *clear-and-convincing* evidence that Fair Isaac *knowingly* made a false and *material* representation of fact in

connection with its trademark application and that Fair Isaac *intended to mislead* the PTO in making the statement.[15] As the Federal Circuit explained, "the very nature of the charge of fraud requires that it be proven '*to the hilt*' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.'"[16] The standard is so high that fraud in trademark registration procurement is rarely, if *ever*, proven.[17]

This case is certainly *not* one of those rare cases. The defendants' claims are based entirely on misleading attorney argument, speculation and surmise, and not the actual facts or evidence at trial.

**A.**    **Special Verdict Question No. 9: The finding that Fair Isaac made a false representation of fact during the application process to the PTO**

It was apparently defendants' theory that they should be allowed to claim fraud by arguing that St. John and Gustafson knew, from emails from Fair Isaac employee Craig Watts, that TU was using 300-850 and falsely represented to the PTO that no one else was using it.

---

15. *In re Bose Corp.*, 580 F.3d. 1240, 1243-45 (Fed. Cir. 2009) ("Thus, we hold that a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO."); *see also 3M Company v. Intertape Polymer Group*, 423 F.Supp.2d 958, 961 (D. Minn. 2006) ("Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application.").

16. *In re Bose Corp.*, 580 F.3d at 1243.

17. *eCash Technologies, Inc. v. Guagliardo*, 127 F.Supp.2d 1069, 1079 n.13 (C.D. Cal. 2000) (*citing McCarthy on Trademarks and Unfair Competition,* § 31:68 ("[F]raud in trademark registration procurement, though often alleged, is seldom proven.")).

Even if this Court assumes, for purposes of this motion, that St. John and Gustafson knew about TU's use, there still cannot be fraud as a matter of law. St. John's declaration—irrespective of whatever knowledge she had or didn't have—cannot be twisted into anything other than a statement that Fair Isaac was the sole party using 300-850 to identify itself. That was admitted to be true by the defendants. This leaves only the Gustafson statement. But what Gustafson argued, even if ambiguous or vague when the accused sentence is parsed from its context (as the defendants have done), cannot as a matter of law be read only as a single statement in order to adjudge truth or falsity. Taken alone, Gustafson's statement is grammatically awkward. But placed in the context of saying the industry was not using the scale generally and with the express citation to the St. John declaration, it cannot be declared to be "false."

### 1.   As a matter of law, there cannot be fraud because the defendants admitted that St. John's statement was true

The defendants claimed that Fair Isaac committed fraud on the PTO when St. John submitted a declaration in response to the office action that stated: "To the best of my knowledge, only the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores."[18] The defendants offered no evidence to prove that this statement was false. To the contrary, the testimony of the defendants' witnesses demonstrates that St. John's statement was entirely true. The defendants' own expert, Robert Anderson, admitted that to his knowledge, no other party has ever used 300-850 as a unique identifier for credit bureau risk scores:

---

18. PX0006-0023, ¶ 12.

Q: Sitting here today, are you aware of any other party that has ever used 300 to 850 as a unique identifier for credit bureau risk scores?

A: No.[19]

Likewise, TU executive John Danaher testified that TU did not use 300-850 as a unique identifier and that he does not know of any other scoring product (other than the FICO score) that is marketed with a 300-850 range.[20] Finally, the defendants' counsel admitted to the jury in closing that they never used 300-850 as a "unique identifier":

> Well, of course you know we [TU] weren't using it as a trademark. Experian wasn't using it as a trademark. . . . *So of course we weren't using it as a unique identifier.* We were using it as a speedometer.[21]

Given the testimony at trial and this admission, the defendants failed to prove by clear-and-convincing evidence that St. John's declaration reflected a false statement.

Knowing St. John's statement was *true*, the defendants made every attempt to have the jury ignore what she actually said. The defendants told the jury to focus instead on what Fair Isaac's lawyer said, in an apparent attempt to skew St. John's statement into some misrepresentation by Gustafson that no one else was using 300-850:

> Now, you're going to hear an argument that what she said in paragraph 12 was to best of her knowledge, nobody else used 300 to 850 as a unique identifier, and that's the finesse you're going to hear from the lawyer about why she wasn't really—why she wasn't really lying or not telling the truth. **Well here's what they said in the body of the actual submission that the lawyers gave to the Trademark Office. . . .** So don't fall for, oh, she didn't really say

---

19. TT2622-23.

20. TT1875, 1863.

21. TT2848-49.

it was only–nobody was using 300 to 850, because this unique identifier, what it's buzz words for, using it as a trademark. . . .[22]

This misleading argument was completely improper under *Bose*, which required the defendants to prove by *clear-and-convincing* evidence that the statement St. John actually made was false—with any doubt resolved in Fair Isaac's favor.[23] The defendants did not do that at trial. Because the only evidence in the record shows that the actual statement that St. John made was *true*, and the defendants told the jury to disregard St. John's actual statement and to instead consider some other statement she didn't make, defendants' claim based on St. John's statement fails as a matter of law.

### 2. There was no clear-and-convincing evidence that outside counsel's statement to the PTO was false

The defendants claim that Fair Isaac committed fraud on the PTO through a statement that Fair Isaac's outside counsel, Laura Gustafson, made in her legal argument in response to the PTO's office action. Here, the defendants merely cherry picked *one* sentence from Gustafson's ten-page brief, which stated that "300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop."[24] In doing so, they completely ignored the context in which the statement was made. But again, the defendants did not prove by clear-and-convincing evidence that this statement was false.

---

22. TT2848.

23. *Bose*, 580 F.3d at 1243-45 ("Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application";"[A]ny doubt must be resolved against the charging party").

24. PX0006-0015.

Although this statement by itself is vague, when considering the entire paragraph and context in which Gustafson made it, is clear that it is a rewording of the St. John declaration–that only Fair Isaac was using 300-850 to uniquely identify its product–and a clarification that 300-850 was not a common scoring range used by the industry as a whole. Gustafson's statement, in its entire context, reads:

> The examiner asserts that "the term 300-850 refers to a main feature of credit scoring . . . 300-850 is the recognized credit scoring scale." In fact, 300-850 identifies Applicant's credit bureau-based scoring product, but is not a main feature of credit scoring generally and is far from the exclusive credit scoring scale in the industry. . . . 300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop. It is not a common scale used by the industry as a whole. See attached Declaration. Thus, while it is true that 300-850 is recognized to identify Applicant's credit bureau risk scoring product, 300-850 is not, per se, descriptive of credit scoring generally, or even bureau risk scoring generally. 300-850 is a trademark that identifies Applicant's products.

Indeed, in the two sentences immediately after the accused language, Gustafson clarified that 300-850 "is not a common scale used by the industry as a whole" and that this is supported by St. John's declaration ("See attached Declaration"). Considering Gustafson's statement in its context, it is clear that her statement was *true*. As the defendants admitted at trial, the only entity other than Fair Isaac that marketed a scoring range of "300-850" for a credit-scoring product was TU for its TransRisk score.[25] But consistent with Gustafson's statement, TU was using at least *three* different scoring ranges to market its TransRisk score at that time, including 150-950 for the lender market and 400-925 in the consumer market.[26]

---

25. TU did not offer any dated websites at trial that actually show when or how TU first started using 300-850 on its websites.

26. TT1842-45, 1872-75 (Danaher).

Under *Bose*, it is legal error to parse out one sentence from the context of a lawyer's argument that references a truthful underlying declaration and declare that one sentence to be false. Considering Gustafson's statement as whole, there was not clear-and-convincing evidence to conclude that Fair Isaac made a false statement to the PTO.

**B.      Special Verdict Question No. 10: The finding that Fair Isaac knew the representation was false when it made it and intended to deceive the PTO**

**1.      No competent evidence showed that St. John or Gustafson knowingly made a false representation with the intent to deceive**

There is no evidence that St. John or Gustafson's statements were false. But likewise, there was no evidence—much less the *clear-and-convincing* evidence required by *Bose*—that either individual knowingly made a false statement with an intent to deceive the PTO. Even had the defendants proved falsity, the defendants needed to separately prove a subjective intent to deceive, and this they did not do.

As the Federal Circuit underscored in *Bose, "*there is a material legal distinction between a false representation and a fraudulent one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like."[27] "In other words, the deception must be willful to constitute fraud."[28] But "[t]here is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or an inadvertence without willful intent to deceive."[29] Indeed,

---

27. *Bose.*, 580 F.3d at 1243.

28. *Id.*

29. *Id.* at 1246.

"inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement."[30] In this case, there is no evidence that either Gustafson or St. John *knew* either was making a false statement.

Given that Gustafson's accused statement specifically refers to St. John's declaration, which the defendants admit is true, there cannot be clear-and-convincing evidence of intent to deceive by Gustafson. It is pure surmise and speculation to conclude that her intent was to mislead given her openness in citing St. John's declaration and the surrounding indisputably accurate statements regarding the industry. The jury's answer to this question is what *Bose* declared to be *legal error*.

Likewise, there is no clear-and-convincing evidence that St. John intended to deceive the PTO. She couldn't have possibly intended to deceive the PTO because the defendants themselves admit what she said was true.

Knowing this, the defendants resorted to making misleading arguments to the jury that St. John wasn't telling the truth in paragraph 12 of her declaration because when she was asked questions about that paragraph during her deposition, "she couldn't look at the camera."[31] Defendants told the jury that this meant that "she wasn't telling the truth."[32] But this argument was completely misleading because the only question the defendants asked St. John about that statement was, "What point were you trying to make for – to the Trademark Office by making that statement?" to which St. John answered, "The point that's here is

---

30. *Id.* at 1245.

31. TT2847.

32. *Id.*

that–what it says: To the best of my knowledge, only the FICO score uses this range as a unique identifier."[33] But because the defendants admitted that statement was true, it was misleading and improper for them to tell the jury—in essence—that they should find that St. John's truthful statement was actually a lie because she didn't look at the camera during her deposition. That argument falls far short of the clear-and-convincing standard set out in *Bose*.

Nor is there evidence that St. John (or any other Fair Isaac employee) intended to deceive the PTO with respect to Gustafson's statement. The defendants never asked St. John what she believed Gustafson's statement meant, or whether she believed Gustafson's statement was false. And the defendants offered no evidence at all as to what Gustafson believed. They didn't call her as a witness at trial or take her deposition and they never presented any testimony about what she believed or intended.

Furthermore, even if defendants could somehow show that Gustafson failed to disclose that TU was using 300-850 as one of at least three different scoring ranges for its TransRisk score, or that she misunderstood what St. John was saying in her declaration, or that her drafting was not as precise as it could have been, *that* is not enough to prove fraudulent intent under the heightened standard of *Bose*. Under *Bose*, even a materially false misrepresentation is not enough to constitute fraud if it "is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive."[34] The defendants presented no evidence at trial that shows that Gustafson or St. John didn't believe their statements were truthful. And even if the statements were false, which they are not, there is

---

33. TT2659 (St. John page 122).

34. *Bose*, 580 F.3d at 1243.

no evidence that Gustafson or St. John didn't make the statements with an honest misunderstanding or inadvertence. Therefore, irrespective of defendants' proof of falsity, their mere speculation and surmise is not enough to satisfy the clear-and-convincing standard required to establish a fraud claim under *Bose*.

Because there is no evidence that either Gustafson or St. John made their assertions with a willful intent to deceive the PTO, and no reasonable jury could conclude otherwise, Fair Isaac should be granted JMOL or a new trial on this issue.

### 2.    Nor can the defendants impute Gustafson's statement to Fair Isaac

Even if the Court disagrees and concludes that somehow a reasonable jury could find that Gustafson made a knowingly false statement with an intent to deceive the PTO, Fair Isaac cannot be held responsible for her independent actions. As the Federal Circuit held in *Bose*, "a trademark is obtained fraudulently under the Lanham Act only if the *applicant* or *registrant* knowingly makes a false, material representation with the intent to deceive the PTO.[35] Gustafson was neither the *applicant* nor the *registrant* in this instance; she was merely Fair Isaac's outside counsel.

Ethical rules of the PTO and applicable bar associations exist to handle an attorney's conduct, and those sanctions should not affect the client. As Anderson testified, a response to an office action is a legal memoranda that is not signed under oath, but "the attorney can be held responsible for misstatements made in the document under the PTO's rules of

---

35. *Id.* at 1245.

ethics."[36] So to the extent that Gustafson acted inappropriately in any way—and there is absolutely no evidence that she did—her actions should be dealt with through the rules of ethics, and Fair Isaac should not have the stigma of a fraudulent act it didn't commit, or lose its federal trademark registration rights because of its attorney's independent actions. Holding Fair Isaac responsible for its attorney's independent actions—one grammatically awkward sentence in the midst of an accurate paragraph that cites specifically to a true declaration of Fair Isaac—is unfair, unjustified, and unprecedented.

### C.      Special Verdict Question No. 11: The finding that the PTO relied on the false representation in deciding to issue the registrations

Neither of the statements that the defendants claim were "fraudulent" could have been material to the PTO's office action. Even if a statement was false and deceptively made, it must still have been a "material" statement "in the sense that without it, the registration would not have issued."[37] In this case, the verdict must be set aside for two separate, fundamental reasons.

### 1.      No evidence shows that the statements were material

The defendants never proffered any evidence that the PTO issued the registration to Fair Isaac based only on an erroneous belief that TU was not using 300-850 as one of its credit scoring ranges. Far from the required *clear-and-convincing* evidence necessary to prove this under *Bose*, defendants simply had their expert opine that it would have been

---

36. TT2619.

37. *eCash Technologies,* 127 F.Supp.2d at 1079 (*citing* McCarthy § 31:67).

"important" to a reasonable examiner.[38] But under Eighth Circuit precedent, to prove

materiality, evidence that it was important to an examiner is not enough.[39] Accordingly,

Anderson's opinion that it would have been important to a reasonable trademark examiner

to know whether or not "others were using 300 to 850 as a scoring scale for credit-bureau

risk products" is deficient as a matter of law."[40]

### 2.   Neither of the statements were material as a matter of law

But there is an even more basic reason why the alleged statements cannot be material.

The existence of third-party uses has no bearing on whether the mark is descriptive. Indeed,

as the defendants' expert admitted, *no* third-party uses would have any bearing on whether

the designation 300-850 is merely descriptive of Fair Isaac's services.[41] Thus, the *only* way

that TU's use could have possibly been material to the registration process is if TU actually

had *superior trademark* rights to the 300-850 mark *and if* Fair Isaac actually *knew* that. But there

is no dispute that TU did not have trademark rights to 300-850, let alone superior rights to

Fair Isaac. It is undisputed that no one believed TU had trademark rights, let alone superior

rights to Fair Isaac.

---

38. TT2571-72.

39. *Gilbert/Robinson v. Carrie Beverage-Missouri*, 989 F.2d 985, 992 (8th Cir. 1993) (the district court erred in defining "a material nondisclosure as one involving information the PTO would have considered significant in deciding whether to grant registration;" the correct standard is that "the mark would not have been registered absent the fraud"); *Zip Dee, Inc. v. Dometic Corp.*, 900 F. Supp. 1004, 1010; 1012 (N.D.Ill.,1995) (standard for materiality is a "but-for test"); *eCash Technologies,* 127 F. Supp. 2d at 1079; *Nissan Motor Co. v. Nissan Computer Corp.*, 2002 WL 32006514, at *3 (C.D.Cal., Jan. 7, 2002) ("the allegedly fraudulent misrepresentation must be 'material,' in the sense that without it the registration would not have issued").

40. TT2571-72.

41. TT2637-38.

Fair Isaac had no duty to disclose TU's use to the PTO even if it had known about TU's use. Third-party use is not required to be disclosed because a "registration applicant has no duty to investigate or report to the PTO all other possible users of the same or a similar mark."[42] Similarly, a senior user does not need to identify junior users in the oath underlying an application for registration.[43] TU never claimed at trial that its use predated Fair Isaac's, and the evidence at trial showed that TU did not start using 300-850 until years after Fair Isaac started using it.

"[M]ere knowledge of another's actual use of the mark is insufficient to constitute fraud."[44] "The applicant need not disclose those persons whom he may have heard are using the mark if he feels that the rights of such others are not superior to his."[45] Again, it is undisputed that no third party had superior trademark rights to Fair Isaac for the 300-850 mark. So even if one erroneously assumes that Fair Isaac represented to the PTO that no one else was using the mark, TU's use of 300-850 cannot be material since TU admitted it *never used the scale as a mark*—let alone that such use acquired trademark rights superior to Fair Isaac's. As Anderson testified, "uses that are not trademark uses of a mark are not relevant to determining whether to register the mark."[46] Therefore, defendants' premise that there

---

42. *eCash Technologies,* 127 F. Supp. 2d at 1079. The defendants' expert, Anderson, also testified that a trademark applicant has no duty to investigate whether there are third party uses of the mark. TT2605.

43. *See eCash Technologies,* 127 F.Supp.2d at 1079.

44. *Hana Fin. v. Hana Bank,* 500 F.Supp.2d 1228, 1235 (C.D. Cal. 2000).

45. *Id.*

46. TT2606.

could be fraud based upon not disclosing TU's use fails as a matter of law.

A "fraud claim must consist of more than a mere conclusory allegation that the [party] knew about a third party's superior rights in the mark. It is only when another's *rights*, not just *use*, are clearly established," that the use needs to be disclosed.[47] There is no evidence that could make the claimed statements material since no party asserted that TU had superior trademark rights over Fair Isaac. Fair Isaac has always maintained that TU's infringing uses began after Fair Isaac started using its 300-850 mark. And as Anderson admitted, a trademark applicant has no duty to disclose to the PTO uses that the applicant believes are infringing.[48]

Because Fair Isaac had no duty to disclose TU's use of 300-850, the defendants cannot claim that such use was material. The defendants have submitted no evidence on which a reasonable jury could find fraud. Thus, the defendants' counterclaims should be dismissed as a matter of law, or in the alternative, Fair Isaac should be granted a new trial on the fraud issue.

### D.   The Court erred in denying Fair Isaac's motion to exclude the testimony of Robert Anderson

Over Fair Isaac's objection, the Court allowed Anderson to testify regarding what he believed would have been "important" to a reasonable trademark examiner. But Anderson's testimony could only have misled the jury because, as discussed above, the standard for materiality is not whether it is important to a reasonable examiner but whether the

---

47. *Hana Fin.,* 500 F.Supp.2d at 1236 (emphasis added); *see also Rosso & Mastracco v. Giant Food,* 720 F.2d 1263, 1266 (Fed. Cir. 1983).

48. TT2605.

registration would not have issued *but for* the accused statement.

The Court's ruling allowing Anderson to testify regarding materiality was based on a misplaced reliance on patent law.[49] As Judge Davis discussed in detail in *Minnesota Mining & Mfg. Co. v. Shurtape Technologies Inc.*, "[r]eliance on patent cases with respect to fraud in the procurement of a trademark registration is misplaced" because

> [t]he law of fraud in the trademark registration context has taken a very different direction that than the law of fraud in the patent procurement process, and for very good reasons. The fact that the U.S. Patent and Trademark Office (PTO) both grants patents and registers trademarks is a historical development doubtless fascinating to the student of the federal bureaucracy. But it is a non sequitur to conclude from the coincidental fact that the PTO performs both roles that therefore the law of "fraud" is identical in both contexts. It is quite different.[50]

The burden of disclosure on a patent applicant is considerably greater than that on a trademark applicant.[51] Therefore, Anderson's testimony was based on an erroneous standard of materiality and should have been excluded. Fair Isaac should be granted a new trial because of this error.

**III.    Applying licensee estoppel, the Court should amend its partial summary judgment or enter JMOL and order a new trial on infringement alone**

The Court heard *undisputed* evidence that both Experian and TU are licensees of Fair Isaac's 300-850 mark—and that Experian had expressly agreed it would never challenge the validity of that mark. Under the well-established doctrine of licensee estoppel, the existence of the licenses alone precludes the defendants from challenging the validity of Fair Isaac's

---

49. TT2561.

50. 2002 WL 1000089, at *1 (D. Minn., Mar. 14, 2002).

51. *Id.*

mark. At trial, the Court sua sponte rejected Fair Isaac's request that the Court apply the doctrine of licensee estoppel, without any findings or explanation.[52] Fair Isaac now respectfully requests that the Court (1) amend its partial summary judgment (where the Court declined to consider the doctrine before entertaining the defendants' challenge to the validity of Fair Isaac's mark) or (2) enter judgment as a matter of law on this point for Fair Isaac. Either ruling precludes the defendants from challenging the validity of Fair Isaac's mark. The Court also should grant Fair Isaac a new trial, at which the defendants are precluded from presenting evidence and seeking findings that challenge the validity of the mark to which they are licensees. This would include challenges to the strength and secondary-meaning in the mark (both the common-law mark and the federally registered mark), Fair Isaac's uses of the mark, and the defendants' defenses and counterclaim regarding the federal registration. Allowing the defendants to present their myriad invalidity and fraud issues tainted the jury's deliberations and requires a new trial.

### A.      Licensee estoppel should have precluded the defendants from challenging the validity of the 300-850 mark

Under the long-standing doctrine of licensee estoppel, if someone has a license for another person's trademark, the licensee effectively admits the validity of that mark and the doctrine bars the licensee from disputing the mark's validity.[53] Licensees benefit from the

---

52. TT2727-28 (the Court stated that by denying Fair Isaac's motion for JMOL on the issue of licensee estoppel it had actually found—although the defendants made no motion to this effect— that there is no licensee estoppel as a matter of law).

53. *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279-80 (8th Cir. 1977) (upholding trial court's order for dismissal because local distributor's trademark claims attempted to question the validity of its licensor's trademarks); *see* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:63 (West 2009) ("a number of cases have held that a trademark licensee is estopped from challenging the validity of the licensor's mark").

rights granted by license agreements and, as a matter of equity, they are not allowed to challenge the validity of the mark from which they have benefitted. This is so regardless of whether (1) a licensing agreement is found enforceable or not, (2) the licensing agreement contains a no-contest provision, or (3) there is an express agreement between the licensing parties.[54]

The existence of a licensing agreement unqualifiedly prevents a licensee from contesting the validity of the licensor's mark. In other words, if the existence of a license agreement is firmly established—as it is here—the Court cannot by-pass this well-established doctrine. As the Eighth Circuit explained in *Seven-Up Bottling Co.*, the existence of a license represents an "insuperable bar" for the licensee who wants to challenge to the validity of the licensor's mark.

**B.    The Court received *undisputed* evidence that Experian and TU are licensees of Fair Isaac's 300-850 mark**

***Experian.*** At trial, Fair Isaac's evidence included a copy of an agreement that Experian signed effective February 28, 2006, which is still in effect today, that expressly and specifically includes a license provision allowing Experian to use Fair Isaac's 300-850 trademark as an option in promoting and selling Experian and Fair Isaac's joint scoring services and products:

---

54. *See Heaton Dist. v. Union Tank Car.*, 387 F.2d 477, 482 (8th Cir. 1967) (licensee estoppel applies even in the absence of a contractual no-contest provision); *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races*, 99 F.Supp.2d 1090, 1097 (D. S.D. 2000) (admission of the licensor's trademark ownership, payment of royalties and inclusion of disclaimer on advertising estopped defendant and later purchaser of defendant from contesting validity); *Creative Gifts v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000) (defendant barred from asserting invalidity by abandonment, despite the absence of express licensing agreement and the ongoing disagreement over licensing).

**5.4 Trademarks.** The parties shall use the following Required Trademarks in connection with the promotion and sale of the Experian/Fair, Isaac Risk Model Service: . . . <u>Fair Isaac Optional Trademarks</u>: 300-850™ score range.[55]

This agreement—signed by Experian before this lawsuit began and effective before Fair Isaac's mark was registered—was an addendum to the parties' Master Agreement the year before.[56] The Court heard undisputed testimony from Fair Isaac that this license agreement went through many drafts before it was finally signed by the parties; those drafts all included the license provision and Experian never expressed any concern over that license.[57] This license agreement also contained an express no-contest provision, by which Experian specifically agreed that it would not "challenge the validity of Fair Isaac's exclusive rights" to its trademarks, including the 300-850 mark.[58]

At trial, Experian never disputed any of this evidence and never made any argument why the Court should ignore this evidence, including Experian's express agreement that it would never challenge the validity of Fair Isaac's mark. Experian's strategy at trial was to ignore the subject. During the entire trial, Experian never elicited one word of testimony or other evidence—not a thing—that challenged or contradicted the fact that Experian had expressly agreed to license Fair Isaac's 300-850 mark. And Experian said nothing about the irony that just two weeks before Experian signed its license agreement with Fair Isaac,

---

55. PX0995-0006 (License Addendum); *see also* PX1074-0009 (defining an "Optional Trademark" under the Master Agreement).

56. TT-429-31 (Kramers Dove); TT770-76 (Kramers Dove); PX1074 (Master Agreement).

57. TT-770-72 (Kramers Dove).

58. PX1074-0027-28 at ¶7.9.2.

Experian and TU had entered into a similar license agreement with VantageScore, acknowledging that the scaling parameters for VantageScore's scoring model (i.e., 501 to 990) are the "intellectual property" (i.e., the trademark right) of VantageScore Solutions, LLC.[59] (This fact, too, was undisputed.)

**_Trans Union._** Fair Isaac's evidence included a "Marketing Alliance Agreement" effective August 31, 2006, in which Fair Isaac agreed to allow TrueLink, Inc. (TU's wholly owned subsidiary) and Washington Mutual Bank ("WaMu") to use Fair Isaac's recently registered 300-850 score range in displaying FICO scores to WaMu's customers based on TU's data (defined as "TU FICO Scores").[60] TU and WaMu specifically agreed as part of this contract that they would not use Fair Isaac's registered mark "in advertising or other promotional material or activity (including Internet web sites) without first obtaining [Fair Isaac's] written permission."[61] This license agreement was signed by TU's John Danaher, TU's sole trial witness testifying against Fair Isaac's trademark rights.

At trial, TU's Danaher made what might have been a faint-hearted attempt to dispute this licensee agreement by testifying about a draft of the agreement, but his effort made no sense on direct examination and made less sense on cross examination when he admitted that he had never even seen such a draft.[62] The language of the agreement that Danaher

---

59. PX30-0004 (Defendants' Intellectual Property Agreement for VantageScore, February 14, 2006); TT830-34 (Oliai).

60. PX0975—0006 at ¶7.3.

61. PX0975—0007 at ¶7.4.

62. TT2031, 2050-51.

signed in August 2006 unambiguously shows that TU is a licensee of Fair Isaac's 300-850 mark. The Court, therefore, should not have considered (if it did) Danaher's vague hearsay testimony, such as it was, about a possible earlier draft that he never saw and that TU never produced.

In addition to these express license agreements, the evidence also showed that TU and Experian were and are implied licensees of Fair Isaac's 300-850 trademark, which also precludes them from challenging the validity of Fair Isaac's mark. Whether an implied license exists depends on the objective conduct of the parties.[63] An implied license does not require formalized control by the licensor; rather, "only minimal control is required to make the trademark license valid."[64] Here, both TU and Experian have used the 300-850 mark for many years in promoting products with Fair Isaac, at the request and direction of Fair Isaac.[65] Their objective conduct has thus created an implied license.

***VantageScore.*** The Court heard undisputed evidence that VantageScore is under the absolute control of the credit bureaus; indeed, the CEO of VantageScore admitted this.[66]

---

63. *See* 3 *McCarthy* § 18:43.50; *see also Lutheran Ass'n of Missionaries. v. Lutheran Ass'n of Missionaries and Pilots*, 2004 WL 2730104 at *8 (D. Minn. Nov. 19, 2004); *Birthright v. Birthright, Inc.*, 827 F. Supp 1114, 1134 (D.N.J. 1993) (an "implied license in fact arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached").

64. *Lutheran Ass'n* at *9 ("Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, the lack of formalized control does not negate the existence of an implied license").

65. *See, e.g.*, TT1833-41, 1874 (Danaher); TT1793 (Wiermanski, pages 128-30, 140-41); TT874 (Danaher); TT1515 (Hartwig, pages 28-29, 51-55); PX-1157A-68 (TransunionCS.com); PX-1157A-7A (same); PX-1157A-7B (same).

66. TT1511 (Burns, pages 22-23).

- 24 -

Whether viewed as simply a control issue or a question of agency, Experian and TU, as a matter of equity, should not be allowed to use VantageScore to challenge the validity of the marks they have licensed when they are prohibited by licensee estoppel from challenging the validity of the marks.

### C.     In the alternative, the Court should make detailed findings of fact to explain its decision not to apply the doctrine of licensee estoppel

If the Court does not amended its partial summary judgment or enter judgment as a matter of law for Fair Isaac *and* grant a new trial, Fair Isaac respectfully requests that the Court issue detailed findings of fact explaining why the doctrine of licensee estoppel does not bar the defendants in this case from challenging the validity of Fair Isaac's mark. In Fair Isaac's view, detailed findings and conclusions of law—which Fair Isaac seeks under Rules 52(a)(1), 52(b), and 59(a)(2)—are required on a matter of this nature and especially warranted in light of the undisputed evidence of licenses. Detailed findings will enable the appellate court to review the sufficiency of this Court's position.

### IV.     The Court should amend its partial summary judgment and grant a new trial that recognizes Fair Isaac's mark as inherently distinctive

This Court's summary judgment finding that Fair Isaac's mark was merely descriptive erroneously stripped the jury of its fact-finding role. The categorization of a trademark is ordinarily a factual determination.[67] The Court's finding cannot be reconciled with the record, which was strengthened at trial. The evidence elicited at trial showed that—at a minimum—there was a question of fact about the strength of Fair Isaac's mark, and that

---

67. *Woodroast Sys. v. Restaurants Unlimited,* 793 F.Supp. 906, 911 (D.Minn. 1992), *aff'd,* 994 F.2d 844 (8th Cir. 1993).

summary judgment was inappropriate. The Court should amend its partial summary judgment and grant a new trial, allowing the reasonable possibility that Fair Isaac's mark is inherently distinctive.

The PTO made four separate determinations that the 300-850 mark is not descriptive.[68] The Court offered no findings on why these determinations did not, at a minimum, create a question of fact.[69] The Court instead found that the mark—when considered in the "context . . . [of] the credit-scoring industry"—is "an approximate numerical range in which Fair Isaac's FICO scores will fall" and therefore immediately conveys qualities and characteristics of Fair Isaac's services.[70] That ruling relies on a faulty assumption that the correct "context" is the credit-scoring industry. There is no requirement that credit evaluations be expressed as a numeric score; this is simply a decision that Fair Isaac made. Credit evaluations are also expressed in terms of letters (such as the academic A-F; or bond credit ratings AAA-D), percentages (0-100%), and words (excellent-poor, etc.). It is within this larger context that Fair Isaac's mark should be considered. And within this larger context, it is apparent that Fair Isaac's mark does not convey an immediate idea of the characteristics of the product, rather it requires some degree of imagination or thought on the part of the consumer. Thus, it is inherently distinctive.

---

68. *See* PX0001; PX0002; PX0003; PX0004.

69. *See RFE Industries v. SPM Corp.*, 105 F.3d 923, 926 (4th Cir. 1997) (reversing summary judgment and remarking that because the PTO's registration of a term without requiring secondary meaning "is powerful evidence" of a lack of descriptiveness, "[i]t must by now be apparent that a district court should not freely substitute its opinion for the PTO's").

70. Order at 41.

Even looking at the narrow context of the credit-scoring industry, the evidence at trial from the defendants' own witness conclusively illustrates the error and undercuts this Court's conclusion that the mark is descriptive. Danaher—TU's in-house expert in the credit-scoring industry—testified that 300-850 "doesn't describe, that doesn't tell the consumer what it is. It doesn't even tell the consumer that it's a credit score. It just tells them that it's a 300 to 850 score."[71] Further, the evidence showed that when Fair Isaac chose the mark 300-850, it had no meaning in the industry, so a consumer necessarily had to use some imagination or thought to understand what the term meant in the context of Fair Isaac's services.[72] St. John testified, without dispute, that when Fair Isaac selected 300-850, it did so to differentiate its scores from lender-created scores and custom models—the main competition.[73] Those scores had ranges of approximately 100 to 300.[74] Oliai testified for Experian that the MDS Bankruptcy Model—the only broad-based model in the industry when Fair Isaac selected its scoring range—had a range first of 51 to approximately 1300, and later of 100 to 1200.[75] At either range, MDS varied significantly from Fair Isaac's 300-850.

---

71. TT1991.

72. *See Insty* Bit v. Poly -Tech*, 95 F.3d 663, 673 n.11 (8th Cir. 1996) (a suggestive mark "requires some measure of imagination to reach a conclusion regarding the nature of the product"). The context of Fair Isaac's 300-850 mark must be considered at the time that Fair Isaac arbitrarily chose and used the mark. *See McCarthy* § 15:1.50 (inherently distinctive marks are given legal protection immediately upon first use).

73. TT2659 (St. John at 18-21, 26-27).

74. *Id.*

75. TT929.

When there is no competitive need to use a term and other equally effective terms are available, the mark is not descriptive.[76] Fair Isaac offered strong evidence demonstrating that the defendants had no competitive need to use 300-850. For example, Oliai's testimony regarding MDS proves that ranges can include negative numbers, one-digit numbers, two-digit numbers, or four-digit numbers. Oliai also admitted that a scoring range is merely cosmetic and, from a technical standpoint, there are no limitations.[77] Even if the Court were to conclude that there were competitive benefits to using a three-digit range, the evidence at trial showed that there is no competitive need to use 300-850. Indeed, the defendants' own evidence showed that TU has been the *only* other entity offering scores to consumers using a score range of 300-850.[78]

That Fair Isaac's use of 300-850 was an arbitrary decision was strengthened by the testimony of the defendant's third-party witness, James Christiansen. He testified that when a model is developed, its output is a decimal between zero and one and that the developers then make a decision to scale it to an arbitrary range.[79] Although Christiansen chose 450 to 850 for his score, he agreed he could have chosen, 1 to 400, or 2 to 400.[80] He also agreed it was not necessary to copy the range that Fair Isaac has marketed to be compatible with

---

76. *Tanel Corp. v. Reebok,* 774 F.Supp. 49, 51 (D.Mass 1991) (defendant had no need to use plaintiff's mark "360'" to describe a circular pivot device on its athletic shoe, particularly where other terms were available to convey the shoe's pivotability).

77. TT795, 806; *see also* PX0513; PX0430.

78. TT1861-63.

79. TT2364-65.

80. TT2365-66.

industry systems.[81] (Of course, the needs or limitations of lender systems are irrelevant in the context of the defendants' infringing uses because the defendants admit they do not sell their scores in question to lenders.[82])

Finally, the evidence at trial proved that Fair Isaac's use of 300-850 is not descriptive because it does not actually describe the scoring ranges of the FICO Classic score.[83] There are different FICO scores at each of the credit bureaus.[84] The actual scoring range for the first FICO score developed for Experian, for example, has an actual minimum and maximum score that differs from 300-850. [85] Fair Isaac chose to use 300-850 as a consistent unique identifier for each of its Classic FICO scores—regardless of the bureau—for marketing purposes.[86] By using 300-850 consistently to market scores when that does not reflect the actual operational range of the score, Fair Isaac's mark does not convey an immediate idea of the characteristics of the score but, instead requires imagination and thought on the part of the consumer to reach a conclusion regarding the nature of the score.[87]

---

81. TT2366.

82. TT1020, 1684, 1869.

83. TT2490 (Sullivan at 98-101).

84. TT2659 (St. John at 21-22).

85. TT976-977.

86. *See, e.g.,* PX0929; TT357-359.

87. *See Frosty Treats v. Sony Computer,* 426 F.3d 1001, 1005 (8th Cir. 2005) (descriptive marks convey an immediate idea of the characteristics of the product, while suggestive marks require imagination and thought to reach a conclusion regarding the nature of the product).

**V.      The Court should grant judgment as a matter of law and a new trial because no reasonable fact finder could find an absence of secondary meaning**

**A.      The evidence of secondary meaning was overwhelming**

The Court submitted a special-verdict form to the jury that asked the jury to decide whether "300-850 [had] acquired secondary meaning," without regard to *when* secondary meaning was acquired. The jury's finding is contrary to the great and overwhelming weight of the evidence:

- 300-850 has been consistently used as a brand for the FICO score;[88]

- Fair Isaac sells ten to twelve *billion* scores each year, all having a score range of 300-850;[89]

- Fair Isaac's Classic score, sold in association with the 300-850 mark, is the industry standard and the most widely-used score in the industry;[90]

- TU copied Fair Isaac's 300-850 score range for its own TransRisk score;[91]

- Experian changed its score range to 330-830 to keep it close but not exactly like Fair Isaac's;[92]

- VantageScore was scaled similarly to the FICO score to "mimic" the FICO score;[93] and

---

88. TT347-48, 357-62, 397, 759-60, 1860-61; PX0929; PX0934; PX0408; TT1515 (Hartwig at 59-65); TT1790 (Roth at 25-29); TT1793 (St. John at 108-09); TT2489(Sullivan at 36-40); TT1793 (Wiermanski at 146-57).

89. TT362-63, 373, 475, 822; PX0955; PX0397.

90. TT1515 (Hartwig at 123-26); PX0034-0005; PX0955.

91. TT1845-65; PX0646; PX0643; PX0326; PX0647.

92. TT861-70; PX0505.

- Experian and TU have both signed licenses to use Fair Isaac's 300-850
  mark; each of the three bureaus have long sold the FICO score with
  300-850; and, they use 300-850 in their marketing of Fair Isaac's scores
  and use numbers within the 300-850 range in their advertising;[94]

In the end, the evidence of secondary meaning was overwhelming, and no reasonable jury could find that the 300-850 mark has no secondary meaning *at any time*. For this reason, Fair Isaac should receive a new trial.

### B.    Johnson's opinions did not overcome the great weight of the evidence and should have been excluded

Over Fair Isaac's objections, the Court allowed the defendants' expert, Johnson, to testify regarding whether Fair Isaac's mark acquired secondary meaning among purchasers of credit reports. Johnson's opinions were unsupported under Rule 702 of the Federal Rules of Evidence and should have been excluded. Johnson did not survey actual or potential purchasers of credit scores.[95] Instead, he directed his survey to persons who had acquired *credit reports*.[96]

---

93. TT808, 859; PX0340; PX0379; PX0034; PX0102; PX0044; PX0165; PX0338; PX0022; PX0038; PX0070; PX0505; TT1509(Carroll at 194-96, 202-09, 226); TT1793 (Wiermanski at 231-33); TT1514 (Williams at 218-21).

94. TT355-57, 384-85, 427-32, 1744-45, 1833-41, 1874, 1898-99, 1902, 1905-06; PX0975; PX1074; PX0419; PX0420; PX0421; PX0425A; PX0426; PX1157A-68; PX1157A-7A; PX1157A-7B; PX1198; PX1201; PX1518.

95. TT1192-94.

96. *Id.*

**C.      The Court should grant a new trial with an instruction that Fair Isaac's mark is presumed to have acquired secondary meaning**

The Court erred in instructing the jury that Fair Isaac's "registrations and certificates should not be considered as evidence of secondary meaning in the term '300-850.'" The Court should have instead instructed the jury that the certificates of registrations (1) create a rebuttable presumption that the marks have acquired secondary meaning; and (2) that they are evidence of secondary meaning. The Lanham Act provides that "*any* registration issued . . . or registered on the principal register . . . and owned by a party to an action *shall be admissible as evidence and shall be prima facie evidence of the validity* of the registered mark."[97]

The leading authority on trademark law explains that the vast majority of courts have held that registration of a mark "entitles [a plaintiff in litigation] to a strong prima facie presumption that its registered mark is either not 'merely descriptive' or 'if descriptive,' that secondary meaning is presumed, which usually amounts to the same thing." [98]

Courts have found that trademarks not registered under Section 2(f) were entitled to a presumption. For example, in *Americana Trading v. Russ Berrie & Co.*, the PTO registered the disputed mark without requiring proof of secondary meaning under Section 2(f).[99] The parties agreed the mark was descriptive, but the Ninth Circuit overturned the district court because it did not afford a presumption of secondary meaning based on the mark's non-2(f)

---

97. 15 U.S.C. § 1115 (a) (2009) (emphasis added); *see also* 15 U.S.C. § 1057(b) ("[a] certificate of registration of a mark upon the principal register provided by the Act shall be prima facie evidence of the validity of the registered mark and of the registration of the mark . . . .").

98. *McCarthy*, § 15:34.

99. 966 F.2d 1284, 1287 (9th Cir. 1992).

registration, despite its descriptiveness.[100] The Ninth Circuit explained that "[a]s applied to a descriptive mark such as [the plaintiffs], the registration carries a presumption of secondary meaning."[101]

This presumption of secondary meaning—even for descriptive marks not under Section 2(f)—has been upheld in the Eighth Circuit for more than fifty years.[102] It was error to not instruct the jury on this presumption, and the jury—not the Court—should have decided if the defendants rebutted the presumption.[103]

By instructing the jury that it could not consider the certificate of registration as evidence of secondary meaning, the Court took away the jury's ability to use the certificate of registration as evidence of validity of the mark. Fair Isaac should be granted a new trial based on this clear error.

## VI. The Court should grant JMOL or, in the alternative, a new trial on Fair Isaac's common-law passing-off claim

### A. Fair Isaac has a passing-off claim under the common law and relief is not limited to injunctive relief

The Court erred by dismissing, in effect, Fair Isaac's common-law passing-off claim over Fair Isaac's objection. The Court's sole stated reason for the dismissal was: "I haven't seen anything that indicates it's still a common law claim since the inception of the

---

100. *Id.*

101. *Id.*

102. *See Iowa Farmers Union v. Farmers' Educational and Co-operative Union*, 247 F.2d 809, 817 (8th Cir. 1957) (secondary meaning among four presumptions arising from registration of a mark, including a non-2(f) registered mark).

103. *See Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 776 (9th Cir. 1981) (burden of proof by a preponderance of the evidence is on party asserting invalidity).

Deceptive Trade Practices Act."[104] This is not the applicable standard. Minnesota statutes do not preempt common law absent express preemption language.[105] There is no language in the MDTPA that repeals or restricts passing-off at common law. Absent this, the common law survived the inception of the MDTPA.

Fair Isaac was entitled to a jury trial on its common-law passing-off claim. Passing-off under the common law entitles injured parties to damages in addition to potential injunctive relief.[106] The Court's reliance on *Dennis Simmons v. Modern Aero* to limit relief under the MDTPA to injunctive relief is inapplicable.[107] The court in *Dennis Simmons* explicitly limited its holding to the statute: "the sole *statutory* remedy for deceptive trade practices is injunctive relief."[108] The Court should grant Fair Isaac a new trial on its common-law passing-off claim.

---

104. TT2731.

105. *See Agassiz & Odessa Mut. Fire Ins. v. Magnusson*, 136 N.W.2d 861, 868 (Minn. 1965) ("ordinarily statutes are presumed not to alter or modify the common law unless they expressly so provide").

106. *See generally, S.S. Kresge Co. v. Winget Kickernick Co.,* 102 F.2d 740, 741 (8th Cir. 1939) (affirming damages for passing-off and unfair competition); *J.C. Penney v. H. D. Lee Mercantile,* 120 F.2d 949, 958 (8th Cir. 1941) (acknowledging damages as available for passing-off but reversing award based on lack of factual findings); *Midwest Plastics v. Protective Closures*, 285 F.2d 747, 750 (10th Cir. 1960) (ordering an accounting of profits after a finding of passing-off); *Walker Mfg. v. Hoffmann*, 261 F.Supp.2d 1054, 1086 (N.D. Iowa 2003) (discussing reasonable royalty as appropriate remedy for business torts).

107. 603 N.W.2d 336, 339 (Minn.Ct.App. 1999)

108. *Id.* (emphasis added).

**B.      The Court should grant JMOL in favor of Fair Isaac or in the alternative a new trial on Fair Isaac's MDTPA passing-off claim**

The Court did not recognize the clear weight of the evidence in finding that Fair Isaac had not proved its passing-off claim. A claim of passing-off under the MDTPA requires a showing that the defendant(s) adopted a dress for its goods that was close enough to Fair Isaac's that it deceives, or is likely to deceive, a customer exercising ordinary care and induces him to purchase the defendant's goods in the belief that they are Fair Isaac's.[109]

Fair Isaac presented substantial evidence that consumers were deceived and purchased the defendants' products believing them to be FICO scores.[110] Fair Isaac presented further evidence that consumers purchased the defendants' scores believing them to be the scores that lenders use.[111] The undisputed evidence proved that neither Experian's PLUS score nor TU's TransRisk New Account score has ever been sold to lenders, but the Fair Isaac FICO score is used by most lenders and is marketed to consumers as such.[112] The undisputed evidence also showed that the defendants prominently advertised their non-lender scores, with references to lenders and the scores that lenders see.[113] The evidence also showed, and TU flatly admitted, that TU deliberately copied Fair Isaac's scoring range when

---

109. *See United Healthcare Ins. v . AdvancePCS,* 316 F.3d 737, 742-44 (8th Cir. 2002); *Winston & Nowell Co. v. Piggly Wiggly*, 22 N.W.2d 11, 16 (Minn. 1946).

110. *See, e.g.,* TT1945-47; PX0667; PX0667A; PX0433; PX1044; PX0462; PX0021.

111. *See, e.g.,* PX0667; PX0667A.

112. *See, e.g.,* TT1020, 1684, 1837-40, 1869, 1894; PX1157A-68.

113. *See, e.g.,* TT1889-92; PX1079; PX1157A-20; PX1198; EX0347.

marketing its consumer scores and that it knew since at least 2004 that some of its consumers are confused and believe they are purchasing FICO scores.[114]

In light of this record, the Court's conclusion that confusion is based on general unfamiliarity with credit scoring is against the weight of the evidence and should be reversed. The Court should grant JMOL, or in the alternative, a new trial on Fair Isaac's passing-off claim.

## VII. The Court should grant a new trial that allows evidence of spoliation and an adverse-inference instruction for spoliation

In *Dillon v. Nissan Motor Co.*, the Eighth Circuit explained that "[s]anctions may be imposed against a litigant who is on notice that documents and information in his possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information."[115] Here, the Court correctly found that Experian and TU were reasonably anticipating litigation arising out of their efforts in Project Trident, including antitrust and trade-secret litigation.[116] And there was no doubt, as the Court explained, that the bureau defendants destroyed documents during Project Trident—that fact, the Court noted, is "not disputed."[117]

But the Court held that Fair Isaac had failed to make "a sufficient showing that the

---

114. *See*, *e.g.*, PX0326; TT1855-57.

115. 986 F.2d 263, 266 (8th Cir.1993).

116. TT1471-72 (the Court finding that "antitrust" and "misappropriation of trade secrets" litigation was "clearly envisioned" by the bureau defendants).

117. TT1471 ("The documents that were destroyed during Project Trident, I think it's not disputed that documents were shown."); *see* Amended Offer of Proof at 2.

- 36 -

[documents that were destroyed] include[d] various pieces of evidence which would be relevant to the issues to be tried in this litigation."[118] In particular, the Court held that Fair Isaac had not shown any evidence that the defendants were anticipating *trademark* litigation when they destroyed documents.[119] The Court further concluded that even if documents relevant to trademark litigation had been destroyed, there was "lots of evidence" that "the defendants [had made] an attempt to mimic or calibrate or mirror or somehow model their product after Fair Isaac's 300 to 850 scoring range," so Fair Isaac had not shown that it was prejudiced by the destruction of documents.[120]

The Court erred in its analysis. Despite a directive to "shred all paper documents, if possible," evidence exists showing that the defendants anticipated litigation relating to their scoring range. It is reasonable to infer that the score-range litigation the defendants were anticipating would be based on trademark because during Project Trident (and earlier) they were concerned about not copying Fair Isaac's scoring range "exactly."[121] The necessary inference is that the defendants knew they faced legal restrictions against copying Fair Isaac's range. Indeed, the few handwritten notes that survived the shredder (and which the defendants tried unsuccessfully to clawback ) showed anticipated "Lawsuit issues" as

---

118. *Id.*

119. TT1472.

120. TT1472-73.

121. PX0042-0041; *see also, e.g.*, PX0052-0024 (stating that Experian "worked with Experian legal to determine" our "options with alignment (or a transition table) to the FICO score" for its own score); PX0507-0001 (email explaining that Experian "made a conscious effort not to use FICO [score range] during the development [of its in-house score], due to the chance of litigation" and preference "that no reference (direct or 'masked') is made in our internal documentation.").

including "Stole someone's IP."[122] At this same time, the defendants were negotiating an intellectual-property agreement among themselves in which they agreed that the scoring range for their model was protected intellectual property. The form of that intellectual property was no doubt a trademark right (the defendants could not claim patent, trade-secret, or copyright in their scoring range).

Even from this scant record that survived the shredder, the Court can reasonably conclude that Fair Isaac was prejudiced by the destruction of documents relating to their choice of a scoring range. As the Court noted, there was evidence that the defendants were trying to mimic and copy 300-850. Given the objective to mimic Fair Isaac's scoring range, the defendants likely had more documents that referred to *why* they wanted to copy Fair Isaac's scoring range, including consumer's association with 300-850 as secondary meaning.

The Court also erred in not allowing evidence of Experian's destruction of confusion evidence during the litigation and for not giving an adverse-inference instruction on that ground. This spoliation was detailed in Fair Isaac's offer of proof but was rejected without comment by the Court.[123] A new trial is necessary for this error, too, especially given the jury instruction that a "significant" number of the consuming public was needed to find secondary meaning established.[124]

---

122. PX1007-0021; *see also* PX610-0003 ( "risks" of the project was that FICO would sue for "IP infringement").

123. *See* Amended Offer of Proof at 2 (emphasis added).

124. Instruction 22.

**VIII.   The Court should amend its partial summary judgment and grant a new trial that allows the jury to decide Fair Isaac's false-advertising claim**

Experian and TU engaged in a pattern of conduct which misleads consumers into believing the credit scores that they sell are actually used by most lenders, when no lender uses them. This is false advertising. Use by most lenders is a material characteristic, established over decades, of the FICO score alone. The Court erred in not allowing the jury to hear the significant evidence of this claim.

False statements of fact in commercial advertisements about one's own product that actually or have the tendency to deceive are actionable under the Lanham Act.[125] At summary judgment, the Court addressed only whether the advertising by the defendants was literally false. Given the admissions at trial by Experian and TU, defendants' advertising was conclusively shown to be literally false.[126] There is no dispute that neither the PLUS score nor the consumer TransRisk model is sold to any lenders.

Experian's advertising emphasizes "your credit score" to drive customers to sites to purchase the PLUS score.[127] On these sites, customers are told, to "keep in mind that your credit score is just one factor used in the application process,"[128] and that "your credit score helps potential lenders."[129] The use of advertising like "your credit score" when describing

---

125. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).

126. TT1869, 1684, 1020.

127. *See, e.g.,* TT1565, 1589-90, 1743-45; PX1079; EX0347.

128. *See, e.g.,* EX0347; TT1564.

129. *See, e.g.,* TT1021, 1557-59, 1568-69, 1576-79, 1754-57; EX0272; EX0285.

what a lender uses is misleading. As Experian's David Williams admitted, even he—an executive in the consumer products division—was *not sure* what score Experian is referring to in those ads.[130] What is clear is that it is not the PLUS score—the only score sold on these sites—because PLUS is not used by any lenders.

Similarly, TU's advertisements refer to how lenders use or perceive the scores sold through TU's Truecredit.com website—despite that no lenders use this score. These statements include:

- "Your 3 scores are an **essential** part of your finances, since many lenders look at all three scores when making loan decisions."[131]

- "Credit scores are used by lenders, creditors and insurers to quickly evaluate your financial risk. Usually on a scale of **300-850**, credit scores above 650 will help you qualify for standard loans and credit cards."[132]

- "**When a lender evaluates your credit,** they look at your credit score as well as your credit report to see how financially responsible you've been in the past."[133]

- "most lenders would view your creditworthiness as" and "based on your credit score this is how you may be viewed from a lender's perspective."[134]

---

130. TT1571-73.

131. PX1205.

132. PX1198.

133. PX1518-0004.

134. *See, e.g.,* PX1125; PX0642.

Contrary to this advertising, TU admitted that its TransRisk score promoted by these statements is not the basis for *any* lender determinations or perspectives about *any* customer's credit worthiness.

The evidence at trial showed that Experian and TU's advertising claims are literally false and, at the very least, misleading. The court's summary judgment order erroneously did not address the potential misleading nature of these claims, which became even clearer at trial. Given the undisputed evidence elicited at trial of no lender use of the defendants' scores, the defendants' prominent reference to lenders in their ads, and testimony showing the defendants' inability to explain to what "credit score" their advertisements refer, the Court should amend its partial summary judgment and grant a new trial on Fair Isaac's false-advertising claim.

## Conclusion

For the reasons stated above, Fair Isaac's motion for judgment as a matter of law, an amended judgment, and a new trial should be granted.

Date: December 10, 2009              **Robins, Kaplan, Miller & Ciresi, L.L.P.**

By:\_\_\_\_\_s/Randall Tietjen_____
   Ronald J. Schutz (130849)
   David W. Beehler (190792)
   Randall Tietjen (214474)
   Christopher K. Larus (226828)
   Michael A. Collyard (302569)
   Laura E. Nelson (342798)
   Mary E. Kiedrowski (346378)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Tel: (612) 349-8500
Fax: (612) 339-4181

**Attorneys for Plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc.**