**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| FAIR ISAAC CORPORATION and,<br>myFICO CONSUMER SERVICES, INC.<br><br>Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS<br>INC.; TRANS UNION LLC; and<br>VANTAGESCORE SOLUTIONS, LLC<br><br>Defendants. | Civil Action No.  06-cv-4112-ADM/JSM |

**MEMORANDUM OF LAW IN SUPPORT OF
TRANS UNION LLC'S REQUEST FOR ATTORNEY FEES AND COSTS
INCURRED DEFENDING AGAINST THE BREACH OF CONTRACT CLAIM**

This Memorandum is submitted on behalf of Defendant Trans Union LLC ("TU") in support of its motion for an award of attorneys' fees and costs pursuant to its contracts with the Plaintiffs.

**I.     INTRODUCTION**

TU requests reimbursement from Fair Isaac Corporation and myFICO Consumer Services, Inc. (together "FI") of the attorney fees and costs incurred defending against FI's contract related claims, in accordance with the parties' contractual agreement that the prevailing party shall be entitled to attorney fees and costs incurred in connection with such actions.  TU prevailed on FI's contract claims when this Court granted summary judgment in TU's favor.  As explained herein, TU requests the Court award it attorneys' fees of $861,914 and costs and disbursements of $674,732.37 incurred in connection with the breach of contract claims.

## II.     BACKGROUND

### A.     Procedural History

On October 11, 2006, FI filed this lawsuit against TU, the other two credit bureaus and VantageScore Solutions, LLC, alleging various antitrust claims and infringement of its intellectual property.  (Docket #1.)  While the case was pending, FI initiated the dispute resolution procedures required by the TU/FI contracts; and, on March 14, 2007, TU and FI met telephonically in accordance with that procedure.  (Declaration of James K. Gardner ("Gardner Dec.") at ¶5.)   They were unable to resolve the dispute and FI immediately moved to amend its complaint.  On April 18, 2007, FI filed its Second Amended Complaint ("SAC"), adding, among other additions, a breach of contract count against TU.  FI re-plead these same allegations in its Third Amended Complaint on November 11, 2008.  (Docket #436.)  In its Answer, TU denied "that Plaintiffs are entitled to any relief and pray[ed] that the Court, in accordance with terms of the contract at issue, award Trans Union the attorney fees it incurred defending against Plaintiffs' Breach of Contract claims . . . ."  (Docket #478.)

On July 24, 2009, this Court granted summary judgment in favor of TU and dismissed the breach of contract count, along with the antitrust and false advertising claims.  (Docket #694.)  On August 10, 2009, TU filed its Notice of Intent to Claim an Award of Attorneys' Fees under the fee shifting provisions of the relevant contracts. (Docket #702.)  By agreement, a briefing schedule was deferred until after final judgment was entered. (Docket #707.)  On November 25, 2009, the Clerk of the Court entered final

judgment (Docket #971), and thereafter the Court set a briefing schedule on TU's request for fees and costs.

### B.     Relevant Facts

#### 1.     TU's Defense of FI's breach of contract claim

When the case was filed in 2006, it involved alleged antitrust and intellectual property violations relating to the creation of VantageScore.  But when FI filed its SAC on April 18, 2007 adding a breach of contract claim against TU, it became clear that TU had now become a "target" in the litigation.  FI claimed that TU (and only TU) breached its contractual obligations "to keep confidential and not to misuse or misappropriate Fair Isaac's confidential or trade secrets or property."  (SAC ¶260.)  It also alleged that TU breached its contractual obligations for marketing FI's services.  (SAC ¶260.)  The SAC specifically listed the parties' contract titled "Trans Union LLC and Fair, Isaac and Company, Inc. Agreement for Precision Credit Risk Score Services," dated July 25, 2000 ("Precision Agreement").  (SAC ¶148.)

In light of the serious nature of the allegations against TU (e.g., that it shared FI confidential trade secret information with the VantageScore developers), TU counsel was required to dedicate a substantial amount of time assessing TU's contractual obligations and investigating the inner-workings of credit scoring models.  FI's breach of contact claim was broader than the traditional misappropriation claim – FI alleged that TU's competing credit scoring models could not share any concept in common with the FI models.  But, as the Court recognized in its Summary Judgment decision, the contracts specifically allowed TU to compete with FI and to use concepts that were public or

independently developed.  To counter FI's assertions, TU's counsel had the burdensome tasks of identifying which features the FICO, TU and VantageScore models shared and assessing whether these common features were publicly known and/or independently developed.

In order to do so, TU's counsel had to learn (1) how credit scoring models are built and how they work, (2) how the bureaus built the VantageScore model, (3) how TU maintained FI's confidential information, and (4) how TU marketed FI's models and its own models.  It was therefore necessary to study the specifications of the credit scoring models and to research texts and FI documents to identify FI's model features that were publicly available.  Counsel met often with TU's statisticians and retained two scoring experts, John Coffman and Lyn Thomas, both of whom were deposed in this case.  (Gardner Dec. ¶7)  TU counsel also deposed FI's statistician, Fredrick Huynh, and FI's statistician expert, David Hand.  (Gardner Dec. ¶¶6,8)

Much of this highly technical and complicated work was required because FI refused to identify the trade secrets that it alleged TU misappropriated or misused in violation of the parties contracts.  TU propounded interrogatories seeking this information but FI claimed that it could not respond because a company representative was not able to verify answers to interrogatories, as the protective order barred FI employees from viewing the VantageScore model design.  (Gardner Dec. ¶9)  Given FI's "Catch-22" response, TU then served FI with a set of requests to admit that identified every feature of the VantageScore model and requested FI to admit that each feature was not FI's property.  FI refused to answer those requests as well and TU had to file a

4

motion to compel. Magistrate Mayeron granted that motion and required FI to identify the allegedly misappropriated trade secrets by May 15, 2008. (Docket #304.)

FI failed to identify any trade secrets by that date; instead, in classic "never mind" fashion, typical of FI's approach to this entire litigation, FI dismissed its misappropriation count against TU with prejudice. (Docket #372.) However, the breach of contract allegations regarding the misuse of confidential information remained in the complaint, leaving TU to guess about the nature of the surviving breach of contract claim. (Docket #436.)

Finally, after completing expert reports and preparing TU's experts for their depositions, FI's statistician expert admitted in his deposition that he had no reason to believe TU misused any FI confidential information. (Gardner Dec. ¶10) TU then filed its motion for summary judgment on the basis of that deposition, which challenged FI's claim that TU could not use publicly available concepts in its own models or in the VantageScore model when the contracts provided to the contrary. (Docket #575-Motion; #577-Mem.) This Court agreed with TU and dismissed FI's breach of contract claim. (Docket #694.)

FI's breach of contract claim also included an assertion that TU had violated the marketing obligations in the parties' contracts by promoting TU's own credit scores, including VantageScore, and by failing to adequately market FI's services. (SAC ¶156-157.) To defend against this claim, TU's counsel had to spend additional significant time and effort assessing TU's advertising and marketing and the relevant contract provisions. The details of this work are interspersed with other non-contract related activity, and in

5

an effort to avoid asking the Court to attempt to allocate time split between contract and antitrust claims, TU is not seeking its fees for this work.

### 2. Relevant Contractual Provisions

The relevant section of the Precision Agreement provides as follows: "13.8 Attorney's Fees and Prejudgment Interest. If a provisional or ancillary remedy or legal action is commenced in connection with the enforcement of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements incurred in connection with such action as determined by the court." (Gardner Dec. 11)[1]

### C. Fees and Costs Sought

As part of the efforts that led to the dismissal of FI's breach of contract claim, TU incurred attorney fees and expenses in at least six discrete categories. First, TU counsel had to assess the breach of contract claim and related allegations in the SAC and develop an answer and defense strategy. Second, once these allegations were added to the SAC, FI was able to obtain a court order requiring Defendants to produce the most sensitive details of the VantageScore model, which, in turn, required a costly debate over how to adequately protect the extremely confidential VantageScore algorithm through an appropriate protective order. Third, TU was required to propound interrogatories and requests to admit and then bring a motion to compel FI to identify the trade secrets that

---

[1] Additionally, in response to TU's Motion for Summary Judgment, FI also referenced the parties' contract governing the FI bankruptcy score, commonly known as the "Horizon Agreement." That contract states as follows: "13.8 Attorney's Fees. If a provisional or ancillary remedy, legal action or arbitration proceeding is commenced in connection with the enforcement of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements incurred in connection with such action or proceeding, as determined by the court or arbitrator."

6

TU had allegedly misused. Fourth, TU counsel had to review thousands of pages of documents, interview several TU witnesses, research credit scoring models, and take a highly technical deposition of FI's statistician. Fifth, TU had to disclose, prepare, and present two experts and depose FI's expert. Sixth, TU counsel briefed and argued the motion for summary judgment. (Gardner Dec. ¶6) TU is also seeking the fees it incurred preparing this fee petition.

There were several other tasks undertaken by TU's counsel that were part of TU's efforts to defend itself against the breach of contract claim. These tasks include the review of thousands of documents related to TU's marketing of FI's credit scores and the preparation of TU deponents who might be asked questions related to the breach of contract claims, just to name a couple of examples. Arguably, at least part of each of these tasks was required in order to defend against the other claims brought against TU. So, to avoid essentially re-trying this case in the process of allocating various fees, TU has limited the fees it is seeking to the above six categories. For ease of review, TU has attached a summary table of each category of fees for which it is seeking reimbursement. (Gardner Dec. ¶16) TU will also submit its supporting billing entries to the Court *in camera.* (Gardner Dec. ¶16)

TU is also seeking reimbursement of the court reporter and videographer costs for the depositions of the three scoring experts and Fair Isaac's in-house statistician and the fees charged by the two experts it had to hire, Lyn Thomas and John Coffman. Thomas, who had similar academic credentials to FI's expert, served to call into question the conclusions of FI's expert. For example, FI's expert argued that VantageScore could

7

have used certain scoring model features that were not in common with FI's models and Thomas argued that those alternatives were not feasible. Coffman, who has previously developed credit scoring models and in fact developed the first credit bureau model, was able to walk through the VantageScore development process to confirm that it was done independently and without the use of FI trade secrets.

### III.  ARGUMENT

#### A.  Minnesota Law Applies to TU's Request for Attorney Fees

Federal courts have determined that a party's right to attorney fees raises a substantive question that is generally governed by state law under *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). *Ferrell v. West Bend Mutual Insurance Co.,* 393 F.3d 786, 796 (8th Cir. 2005). Federal Courts exercising diversity or supplemental jurisdiction over state claims therefore apply the choice-of-law analysis of the forum state to determine which state's law applies to a request for attorney fees. *Id. (diversity jurisdiction); America Online, Inc. v. National Health Care Discount, Inc.,* 121 F.Supp.2d 1255 (N.D. Iowa 2000) (*supplemental jurisdiction*).

Here, the Precision Agreement contains choice-of-law provisions that identify California. (Gardner Dec. ¶11) "But this general contractual choice-of-law provision does not replace Minnesota's procedural law." *Bannister v. Bemis Co., Inc.,* 2008 WL 2002087 *1 (D. Minn., May 6, 2008); *citing, U.S. Leasing v. Biba Info. Processing Servs., Inc.,* 436 N.W.2d 823, 825-26 (Minn.Ct.App.1989) (holding Minnesota's procedural law governed statute-of-limitations conflict despite choice-of-law provision designating Massachusetts law to govern the parties' dispute). While the issue of

attorney fees is considered substantive for purposes of *Erie*, this determination does not resolve the question of whether the attorney-fees issue is procedural or substantive for purposes of the forum state's conflict-of-laws analysis. *Ferrell* 393 F.3d at 796 (*citations omitted*).

The first step under the Minnesota choice-of-law analysis is to determine whether there is an actual conflict of laws. *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins.,* 604 N.W.2d 91, 93-94 (Minn. 2000). "If an actual conflict is detected, the court's next step is to determine whether the law involved is procedural or substantive. *Honeywell, Inc. v. Ruby Tuesday, Inc.,* 43 F.Supp.2d 1074, 1077 (D. Minn., 1999); *citing, Gate City Fed. Sav. & Loan Ass'n,* 410 N.W.2d 448, 450 (Minn. App. 1987). "If the court concludes that the law involved is procedural, then it will apply the law of the forum, i.e., Minnesota law, without further analysis. *Honeywell, Inc.,* 43 F.Supp.2d at 1077; *citing, Davis v. Furlong,* 328 N.W.2d 150, 153 (Minn. 1983) ("[Minnesota follows] the almost universal rule that matters of procedures and remedies [are] governed by the law of the forum state.").

The laws of Minnesota and California do not conflict with each other with regard to the general rule that reasonable attorney fees are available when they are specifically provided for by contract. *Compare, Northfield Care Center, Inc. v. Anderson,* 707 N.W.2d 731 (Minn. App. Ct. 2006); West's Ann.Cal.Civ.Code § 1717 (2009). But to the extent that the court decisions from the two states vary in their analysis of whether attorney fees are "reasonable," for example, Minnesota law controls. While the "Minnesota Supreme Court has not specifically addressed whether an award of attorney's

9

fees is substantive or procedural for choice-of-law purposes . . .", the issue appears to be considered procedural under Minnesota law. *Bannister v. Bemis Co., Inc.,* 2008 WL 2002087 *3 (D. Minn., May 6, 2008). The Court should therefore apply Minnesota law in determining the attorney fees to which TU is entitled under this request.

> **B.     TU Should Be Awarded Its Fees and Costs Incurred Defending Against the Breach of Contract Action**

Minnesota law allows for the award of reasonable attorney fees when provided for by contract. *See, e.g., Northfield Care Center, Inc. v. Anderson,* 707 N.W.2d 731 (Minn.App.Ct. 2006); *Norwest Bank Minnesota, N. A. v. Sween Corp.,* 916 F.Supp. 1494 (D. Minn. 1996).

> **1.     The fees and costs sought by TU are reasonable.**

"The starting point for determining the fee award [under Minnesota law] is the number of hours reasonably expended on the case multiplied by a reasonable hourly rate." *Kennedy Building Associates v. Viacom, Inc.*, 375 F.3d 731, 748 (8th Cir. 2004); *citing, Musicland Group, Inc. v. Ceridian Corp.,* 508 N.W.2d 524, 535 (Minn. App. Ct. 1994). The Minnesota Supreme Court described the appropriate analysis as follows in *Milner v. Farmers Insurance Exchange,* 748 N.W.2d 608 (Minn. 2008):

> In determining the reasonableness of the hours and the reasonableness of the hourly rates, the court considers "all relevant circumstances." *State v. Paulson*, 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971). Factors considered in determining reasonableness include "the time and labor required; the nature and difficulty of the responsibility assumed; the amount involved and the results obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel and the client." *Id.* at 373, 188 N.W.2d at 426.

Given the complex nature of the subject matter of the lawsuit (credit scoring algorithms), the seriousness of the allegations (misuse of confidential information), and the high stakes of FI's prayer for relief (elimination of the VantageScore model), expending fewer than two thousand attorney and paralegal hours over a two and a half year period dedicated to defending TU against the breach of contract claim was reasonable. It should also be noted that a substantial portion of this time would not have been spent if FI had (1) agreed to identify the trade secrets that it were misappropriated or misused when TU requested it to do so and/or (2) revealed sooner that it did not have reason to believe that TU had incorporated any confidential information into the VantageScore model. Finally, the rates used to calculate the requested fees are based on rates commonly charged in the community in which TU principally operates and where the millions of pages of documents that had to be collected are housed. (Gardner Dec. ¶12)

With regard to the fees of the scoring experts, John Coffman charged $350/hour and Lyn Thomas charged $350/hour, which was substantially less than the £500/hour rate that FI's expert, David Hand, charged. Coffman, a former credit score developer who developed has substantially more industry experience than Hand and Thomas has similar academic credentials to Hand's. (Gardner Dec. 13). Additionally, TU is seeking the court reporter and videographer costs of the depositions of these three experts and FI's statistician. The relevant contract provision clearly provides for these expert and deposition expenses as "costs and necessary disbursements incurred in connection with such action . . . ." (Gardner Dec. 11).

### 2. TU is seeking to recover only fees and costs incurred in defending against claims related to FI's breach of contract theory.

TU is not seeking all or even a substantial fraction of the attorney fees it incurred successfully defending against all of the claims in this case. (Gardner Dec. ¶14) Instead, TU seeks to recover those fees that were clearly incurred in defeating the allegations underlying the breach of contract claim and otherwise successfully defending against that claim. To the extent that the requested fees overlap with fees incurred in successfully defending against the misappropriation claim or the claimed breach of a contract without an attorney fee provision, no apportionment is necessary because the claims share a common core of facts.

In cases involving both claims for which fees are recoverable and claims for which they are not, no apportionment is necessary if the claims share a common core of facts. *See Kennedy Building Associates v. Viacom, Inc.,* 375 F.3d 731, 748 (8th Cir. 2004) (holding that proper determination for court when fees are sought on some claims while other claims failed was whether the claims involve a common core of facts and were based on related legal theories); *Salitros v. Chrysler Corp.,* 306 F.3d 562, 577 (8th Cir. 2002) (upholding finding that claims under Americans with Disabilities Act and state law claims shared a common core of facts and therefore the fees should not be reduced for failure to prevail on every theory); *Musicland Group, Inc. v. Ceridian Corporation,* 508 N.W.2d 524, 535 (Minn.App.Ct. 1994) (holding that apportionment was not necessary between successful and unsuccessful claims when all of the legal theories depended on proving a common core facts and the claims were intertwined).

Here, FI plead together the allegations concerning "TransUnion's Contractual Obligations to Fair Isaac, Improper Use of Confidential and Proprietary Information, and Misappropriation of Trade Secrets."  (SAC ¶¶148-155.)  Even after FI dropped the misappropriation count, it continued to make the same trade-secret allegations that had supported its misappropriation count; FI simply continued to allege that TU violated its contractual obligations with regard to FI's trade secrets.  (TAC ¶¶148-155.)  In other words, the misappropriation theory was a subset of the breach of contract theory and clearly relies on a common core of alleged facts.  Additionally, to the extent FI had breach of contract claims based on contracts other than the Precision Agreement, those claims were not separately alleged and also clearly rely on a common core of alleged facts.

TU is also seeking the fees and costs incurred deposing FI's statistician, Frederick Huynh.  Huynh was deposed twice, once in his individual capacity and once under Federal Rule of Civil Procedure 30(b)(6).  While counsel for TU asked him questions relevant to the breach of contract claims in both depositions, counsel also asked him questions relevant to other claims.  TU is therefore only seeking to recover its fees and costs from the deposition of Huynh in his individual capacity.  The primary purpose of this deposition was to discover the basis of FI's breach of contract claim.  While other FI employees involved in the development of the FI credit scores were deposed, Huynh was deposed by TU because he was the author of multiple declarations stating that there was reason to believe that the VantageScore development team used FI modeling concepts.

Huynh also verified the answers to TU's interrogatories that asked FI to identify the trade secrets that were allegedly misappropriated. (Gardner Dec. ¶8)

With regard to the expert fees, FI will undoubtedly argue that these experts served multiple purposes, some of which had to do with claims other than the breach of contract claims, which is true. On the other hand, TU's primary need for these experts was to defeat the breach of contract allegations. From TU's perspective, Coffman was hired to investigate the VantageScore development process and confirm that it was done independently, without use of FI's trade secrets. Again, from TU's perspective, one of Thomas's primary purposes was to respond to Hand's argument about the alternative modeling concepts that could have been employed rather than those standard industry concepts that FI considers to be its "property." More importantly, more than a third of these experts' time was spent on these tasks. Given that TU is only asking for less than a third of these experts' fees, because the other defendants paid for the rest, TU's request for these expert's fees is reasonable.

TU is also seeking one-third of the costs it incurred from the use of an electronic discovery vendor and the use of contract attorneys to review the documents collected by that vendor. FI's contract-related allegations expanded the investigation and search for responsive documents exponentially. First, documents from several custodians would not have even been produced if it were not for FI's claim that TU had mishandled FI's trade secrets or otherwise confidential information. TU counsel was required to review the records of the TU employees who handled this information, which was otherwise irrelevant to the rest of the case. Second, TU counsel had to broaden its search of the

documents of the otherwise relevant custodians in order to search for documents related to the contract claims.  Ultimately, TU produced over a million and a half pages of documents as a result of FI's "war of attrition."  Among the three categories of claims involved in the litigation, i.e., antitrust, intellectual property, and contract, the contract claims represent at least one-third of the charges from the electronic discovery vendor and contract attorney time to review documents. (Gardner Dec. ¶16)

Finally, TU is also seeking to recover the cost of preparing the fee petition.  The bulk of the time spent preparing this petition was dedicated to culling down the millions of dollars of bills that TU paid over the course of this litigation. (Gardner Dec. ¶6)  The Eighth Circuit has held that the fees for preparing a petition should be recoverable because to hold otherwise could defeat the purpose of providing for the recovery of the fees.  *Jones v. MacMillan Bloedel Containers, Inc.*, 685 F.2d 236, 239 (8th Cir. 1982).

## IV.   CONCLUSION

TU could have taken a more blunt approach and asked for a quarter or third of its total fees.  Instead, with the hope of recovering the total requested amount, TU has winnowed down the fees it is seeking to less than 5% of the total attorney hours for which TU has paid. (Gardner Dec. ¶14)  The recovery of all of the requested fees and costs is permitted by the parties' contract, as they were necessary in defending against the action brought under that contract.

Respectfully submitted this 18th day of December, 2009.

**Bassford Remele**

By: /s/ Christopher R. Morris
Lewis A. Remele, Jr. (MN Bar #90724)
Christopher R. Morris (MN Bar #230613)

33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

– and –

James K. Gardner
Ralph T. Russell
Dao L. Boyle
**Neal, Gerber & Eisenberg LLP**
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*

NGEDOCS: 1678435.2