## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Fair Isaac Corporation and myFICO Consumer Services, Inc.; | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No: |
| Experian Information Solutions, Inc.; Trans Union LLC; VantageScore Solutions, LLC; and Does I through X; | ) ) ) ) | 0:06-cv-04112 (ADM/JSM) |
| Defendants. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR ATTORNEYS' FEES
## PURSUANT TO SECTION 35 OF THE LANHAM ACT

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT.....................................................................................................1

THE COURT SHOULD AWARD THE PREVAILING  DEFENDANTS THEIR
REASONABLE ATTORNEYS' FEES.................................................................1

   A.   Fair Isaac's Fraudulent Procurement of Its Federal  Trademark Registration Makes This
Case "Exceptional"...........................................................................................2

   B.   Fair Isaac's Groundless, Unreasonable, and Vexatious  Infringement Claims Make This
Case "Exceptional"...........................................................................................9

   C.   Defendants' Attorneys' Fees Are Reasonable ...............................................15

      1.   Attorney Rates Are Reasonable ...................................................16

      2.   The Hours Included in This Motion Are Reasonable ..............................16

         (a)   Experian...........................................................................16

         (b)   Trans Union ......................................................................17

         (c)   VantageScore.....................................................................18

CONCLUSION.................................................................................................19

## TABLE OF AUTHORITIES

### CASES

*A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307 (Fed. Cir. 1988) .....................................................4

*A.V. by Versace, Inc. v. Gianna Versace S.p.A.*, 96 Civ. 9721, 2002 WL 1046705 (S.D.N.Y. May 23, 2002)..................................................................................................................................16

*Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 484 F.2d 1237 (8th Cir. 1973)...........................4

*Ale House Mgt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137 (4th Cir. 2000) ...............................2

*Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir. 1994) .............................................1-3, 9

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370 (Fed. Cir. 2001)............................4

*Bristol-Myers Squibb Co. v. Rhône-Poulenc Rorer, Inc.*, No. 95 Civ. 8833, 2002 WL 109573 (S.D.N.Y. Jan. 25, 2002) ..............................................................................................................4

*Clairol, Inc. v. Save-Way Indus., Inc.*, 211 U.S.P.Q. 223 (S.D. Fla. 1980) ....................................16

*Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324 (8th Cir. 1985).............10

*Colortronic Reinhard & Co., K.G. v. Plastic Controls, Inc.*, 668 F.2d 1 (1st Cir. 1981).................4

*Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001 (8th Cir. 2005)..................9

*Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117 (8th Cir. 1987)................................................2, 9

*Hughes v. Novi Am., Inc.*, 724 F.2d 122 (Fed. Cir. 1984)...............................................................4

*IMAF, S.p.A. v. J.C. Penney Co., Inc.*, 810 F. Supp. 96 (S.D.N.Y. 1992)....................................8, 9

*K-Jack Eng'g Co. v. Pete's Newsrack Inc.*, 209 U.S.P.Q. 386 (C.D. Cal. 1980)...........................13

*Orient Express Trading Co., LTD. v. Federated Dep't Stores, Inc.*, No. 84 Civ. 5964, 1988 WL 3385 (S.D.N.Y. Jan. 8, 1988), *aff'd* 842 F.2d 650 (2d Cir. 1988).............................................2, 12

*Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654 (7th Cir. 1995).............................................9

*U.S. Securities and Exchange Comm'n v. Petters*, No. 09-1750 ADM/JSM, 2009 WL 3379954 (D. Minn. Oct. 20, 2009) (Montgomery, J.)..................................................................................16

*Vital Pharmaceuticals, Inc. v. American Body Bldg. Products, LLC*, 510 F. Supp. 2d 1043 (S.D. Fla. 2007) .......................................................................................................................8, 10, 14

NEWYORK 7451731 (2K)

## STATUTES AND RULES

15 U.S.C. § 1117(a) ............................................................................................................... 1, 8

35 U.S.C. § 285........................................................................................................................ 3

Minn. Stat. § 325D.45(2) ........................................................................................................ 14

## MISCELLLANEOUS

2 *McCarthy* § 15:52, at 15-83................................................................................................ 9

James M. Koelemay, Jr., *A Practical Guide to Monetary Relief in Trademark Infringement Cases* 3

Robert L. Rossi, 1 *Attorneys' Fees*, § 10:44, at 10-180 (3d ed. 2002) ............................................ 2

Trademark Rep. 263, 302 (May-June 1995) ................................................................................ 3

## PRELIMINARY STATEMENT

Fair Isaac committed fraud on the Patent and Trademark Office ("PTO") and procured a trademark registration to which it was not entitled.  Then Fair Isaac sued Defendants for infringement of its fraudulently-obtained registration, advancing baseless arguments, claiming half-a-*billion* dollars in damages, and causing Defendants to incur substantial attorneys' fees that they would not have incurred but for Fair Isaac's fraud. The jury saw through Fair Isaac's sham and properly found not only that the scoring range 300-850 never acquired secondary meaning – because Fair Isaac never once used 300-850 *as a trademark* – but also that Fair Isaac obtained its registration by knowingly misrepresenting and knowingly misleading the PTO with the intent to deceive.

The Lanham Act says that prevailing parties, including prevailing defendants, are entitled to attorneys' fees in "exceptional cases."  If ever there was an "exceptional case" under the Lanham Act, this is it.

## ARGUMENT

### THE COURT SHOULD AWARD THE PREVAILING DEFENDANTS THEIR REASONABLE ATTORNEYS' FEES

Under Section 35 of the Lanham Act, courts may award reasonable attorneys' fees to the prevailing party, including a prevailing defendant, "in exceptional cases." 15 U.S.C. § 1117(a); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 877 (8th Cir. 1994).  An exceptional case "is one in which the plaintiff's action was groundless, unreasonable, vexatious, or pursued in bad faith."  *Aromatique*, 28 F.3d at 877 (citing *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 123 (8th Cir. 1987)).  "Succinctly put,

an exceptional case within the meaning of Section 35 is one in which one party's

behavior went beyond the pale of acceptable conduct." *Id.* Bad faith, however, is not a

prerequisite to an award of attorneys' fees. *Hartman*, 833 F.2d at 123; *accord Ale House

Mgt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000) ("exceptional"

cases include "something less than bad faith") (citations omitted); Robert L. Rossi, 1

*Attorneys' Fees*, § 10:44, at 10-180 (3d ed. 2002) ("most courts have rejected bad faith as

the applicable standard, concluding that something less than bad faith is sufficient to find

that a case is 'exceptional'").

Courts have considered the following factors in determining whether a case is

"exceptional" under Section 35:  (1) economic coercion, (2) groundless arguments, (3)

failure to cite controlling law, (4) the motivation of the parties, (5) the objective

reasonableness of the legal and factual positions advanced, (6) the need in particular

circumstances to advance considerations of compensation and deterrence, and (7) any

other relevant factor presented. *See, e.g.*, *Ale House Management, Inc.*, 205 F.3d at 144

(citations omitted). Courts have broad discretion in determining what constitutes an

"exceptional" case. *See Hartman*, 833 F.2d at 123.

**A.    Fair Isaac's Fraudulent Procurement of Its Federal
       Trademark Registration Makes This Case "Exceptional"**

In Lanham Act cases, where a plaintiff alleges infringement of a fraudulently-

obtained trademark registration, the case is exceptional and justifies the award of

attorneys' fees to a prevailing defendant. *See Aromatique*, 28 F.3d at 878-79; *Orient

Express Trading Co., LTD. v. Federated Dep't Stores, Inc.*, No. 84 Civ. 5964, 1988 WL

3385, at *16-17 (S.D.N.Y. Jan. 8, 1988) ("Plaintiffs' filing of false affidavits and

applications for registration at the time they learned of defendants' train, behavior

designed to create a basis for subsequent trademark litigation, is such an exceptional

circumstance."), *aff'd* 842 F.2d 650 (2d Cir. 1988); James M. Koelemay, Jr., *A Practical*

*Guide to Monetary Relief in Trademark Infringement Cases*, 85 Trademark Rep. 263, 302

(May-June 1995) (grounds for award of attorneys' fees include "bad faith in bringing

suit, fraud in procuring registration or other 'egregious conduct'" (citing *Aromatique*, 28

F.3d at 877)).

In *Aromatique*, the Eighth Circuit, in a split decision, reversed the lower court's

finding of trade dress infringement and ruled that plaintiff's alleged trade dress did not

acquire secondary meaning and was therefore invalid.  28 F.3d at 870.  The majority

further split on the issue of defendant's entitlement to attorneys' fees under Section 35 of

the Lanham Act.  Judge Arnold concluded that the plaintiff had obtained its federal

registration through fraud on the PTO, and on that basis alone would have awarded

attorneys' fees to the defendant under Section 35.  *Id.* at 877-79.  Judge Hansen, however,

was not convinced that the plaintiff committed fraud and therefore concluded that an

award of attorneys' fees was not warranted.  *Id.* at 879-80.  Although the *per curiam*

decision in *Aromatique* denied the defendant's motion for attorneys' fees, the

concurrence suggests that had there been a finding of fraud on the PTO, as there is here,

attorneys' fees would have been awarded.

Moreover, in the analogous patent infringement context, where attorneys' fees are

similarly awarded to prevailing defendants in "exceptional cases," *see* 35 U.S.C. § 285,

courts routinely award attorneys' fees to defendants when the plaintiff's patent-in-suit was obtained through fraud on the PTO. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) ("Exceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee in procuring the patent."); *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1312-13 (Fed. Cir. 1988); *Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 484 F.2d 1237, 1239 & n.2 (8th Cir. 1973) ("Fraud on the patent office is an exceptional case.") (citation omitted); *see also Hughes v. Novi Am., Inc.*, 724 F.2d 122, 125 (Fed. Cir. 1984); *Colortronic Reinhard & Co., K.G. v. Plastic Controls, Inc.*, 668 F.2d 1, 8 (1st Cir. 1981) ("We find that the above facts, even were they not sufficient to support a finding of actual fraud, would be sufficient to demonstrate that Colortronics showed a reckless disregard for the integrity of the patent application process which would be enough to make this case 'exceptional.'") (citation omitted); *Bristol-Myers Squibb Co. v. Rhône-Poulenc Rorer, Inc.*, No. 95 Civ. 8833, 2002 WL 109573, at *1-2 (S.D.N.Y. Jan. 25, 2002) (noting cases not awarding attorneys' fees that were cited by plaintiff did not involve fraud on the PTO).

Here, Fair Isaac committed fraud on the PTO, as the jury correctly found.  Fair Isaac's trademark application was initially rejected by the Examining Attorney on the grounds that "300-850" merely describes a feature or characteristic of Fair Isaac's services.  Tr. 696; PX0006.  At that point, under PTO rules, Fair Isaac had two options if it wanted to obtain a federal registration on the Principal Register:  (1) admit that the term is descriptive and attempt to show that it had acquired secondary meaning, or (2) argue that the term is not descriptive but instead is inherently distinctive.  This put Fair Isaac on

the horns of a dilemma.  On the one hand, it lacked any evidence of trademark use to

support a finding of secondary meaning.  On the other hand, it could not credibly argue

that the term was suggestive or arbitrary under PTO standards.  Undeterred, Fair Isaac set

out to mislead and deceive the PTO about the state of the marketplace and the nature of

its use of "300-850."

Fair Isaac knew that many other companies were using the scoring range 300-850

or substantially overlapping ranges for their credit scoring services, and had been doing

so for decades.[1]  Yet on February 28, 2005, Fair Isaac represented to the PTO that no

other company used 300-850 as a scoring range for credit scoring services.  Specifically,

Fair Isaac falsely represented that "300-850 is the credit scoring scale *only* for Applicant's

credit bureau-based risk products and *not for other types of credit scoring products the*

*Applicant develops, or even other credit bureau-based risk products that competitors*

*develop*."  EX0001 at 0030, 0036 (emphasis added).  Fair Isaac's Vice President for

Global Scoring and Consumer Solutions, Cheryl St. John, also stated in a sworn

declaration that "To the best of my knowledge, *only the FICO score uses the 300-850*

*range* as a unique identifier for credit bureau risk scores."[2]  EX0001 at 0037-39, ¶ 12

---

[1] TX0043; TX0058; EX0013-0016; EX0051 at FIC0288408; EX0056 at 16; EX0063;
EX0086; EX0092; EX0096; EX0104; EX0106; EX0380; EX0501; Tr. 559-78, 583-86,
588-89, 927-63, 600-04, 762-64.

[2] To the extent Fair Isaac contends that the carefully crafted phrase "unique identifier"
saves them from a finding of fraud, they are wrong.  It is beyond dispute that Fair Isaac
only used 300-850 descriptively to identify its scoring range, the exact same way its
competitors used numbers to identify their own scoring ranges for decades.  *See, e.g.,*
PX0851 ("Make Your FICO Score Work for You"); PX0907 ("Sample Score Power
Analysis"); PX0913 (myFICO web page); PX0914 ("Paint Your Complete Credit
Picture"); PX0915 ("Sample Score Power Report"); PX0916 ("Your Credit Risk Score");

(emphasis added).  Yet she was clearly aware that Trans Union was using 300-850 and that Experian was using 330-830 at that time.

In an act of misdirection, Fair Isaac compounded its misrepresentations by repeatedly, and misleadingly, arguing that the term "300-850" was "unique" to Fair Isaac and was "arbitrarily selected" to identify Fair Isaac's services, when neither fact was true. And, indeed, as Fair Isaac's trademark attorney surely knew, the manner in which 300-850 was selected is entirely irrelevant to the distinctiveness inquiry.  All the while, Fair Isaac never disclosed to the Examining Attorney the indisputable fact that it *only* ever used "300-850" to *describe* the scoring range for the FICO score and not as a trademark.[3] Fair Isaac never sold or promoted a "300-850 credit score," never used the term "300-850" in a source-identifying manner, and made absolutely no effort to develop trademark rights in the term.[4]

---

PX0932 at FIC0364843 ("Introducing MyFICO.com and Score Power"); PX0953 ("FICO Guide Analysis"); PX0906 (Score Power Report); EX0056 ("Understanding Your Credit Score" brochure); EX0079 (myFICO web page).  Assuming "unique identifier" was intended to mean "trademark," the statement was plainly false.  If the term "unique identifier" was intended to mean something else, the statement was equally false because the manner of Fair Isaac's use was exactly the same as all of its competitors. The jury saw right through this canard.

[3] Although Fair Isaac may argue that it was not expressly required by PTO rules to show evidence of its use in commerce in its Office Action Response because its application was filed on an "intent to use" basis, Fair Isaac had a duty of candor in its dealings with the PTO.  *Aromatique*, 28 F.3d at 877-78.  Fair Isaac's deliberate choice to withhold this critical information while materially misrepresenting the nature of its use of the term and the state of the marketplace shows that its scheme was intentional.

[4] Ms. Kramers-Dove repeatedly conceded that Plaintiffs used "300-850" to identify their *product* – not the *source* of their product.  Tr. 347:22-348:1, 359:15-22, 402:14-17, 532:6-9, 617:23-618:1.  The evidence shows that Plaintiffs have *never* used the phrase the "300-850 Score" to promote their services.  Tr. 508:5-12.  In addition, "300-850" was

These misrepresentations were designed to convince the Examining Attorney that no other company would be harmed if she withdrew her descriptiveness refusal and allowed the registration to issue.  But Fair Isaac's plan was to use its ill-gotten registration to keep other companies from effectively competing in the credit scoring market by locking up not only the range 300-850, but *any* three-digit range that overlapped 300-850.  As Fair Isaac knew full well, lenders' systems are designed to handle three-digit scores and lenders require a certain level of granularity in the scoring range.  It is a mathematical impossibility to have a three-digit range with a spread of 500 data points without overlapping 300-850.  So by tricking the Examining Attorney into believing that issuance of the registration would not harm other companies, Fair Isaac was able to obtain a powerful weapon to stifle competition and cause Defendants to incur millions of dollars defending this lawsuit.

The jury correctly found that Fair Isaac's representations were false, that Fair Isaac knew they were false when made, that they were made with the intent to deceive the PTO, and that the PTO relied on these misrepresentations in issuing the registration for "300-850."  Tr. 2975-76; Docket No. 970.

That Fair Isaac managed to prevail at the summary judgment stage does not affect Defendants' entitlement to attorneys' fees.  Especially in trademark cases, where factual findings are often necessary to resolve the case, a plaintiff's avoidance of summary

---

always used in a textual sentence in regular or smaller font and always accompanied by one or more of Plaintiffs' distinctive marks, like "FICO" or "Fair Isaac," which identified the source of the score.  PX0851; PX0898; PX0906; PX0907; PX0913; PX0914; PX0915.

judgment simply reflects the bar against courts making factual determinations, rather than an assessment of the strength of plaintiff's case.  *See Vital Pharmaceuticals, Inc. v. American Body Bldg. Products, LLC*, 510 F. Supp. 2d 1043, 1048 (S.D. Fla. 2007); *IMAF, S.p.A. v. J.C. Penney Co., Inc.*, 810 F. Supp. 96, 99 (S.D.N.Y. 1992) ("[T]he fact that plaintiff managed to bring these claims to trial is of little relevance as a general principle.  Attorneys' fees have been awarded to a defendant under § 1117(a) after a trial has been completed."); *Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983)).  Indeed, here, in opposing Defendants' summary judgment motion, Plaintiffs relied on the very same fraudulently-obtained trademark registration as evidence of the mark's validity.  Docket No. 626 at 1, 3, 12-15, 18, 32-34.

Fair Isaac also may assert that it did not need a federal trademark registration to file suit, and could have sued for violation of its purported common law rights in the term "300-850."  That argument is belied by the fact that Fair Isaac waited until the registrations issued before bringing suit.  The evidence established that Fair Isaac was well aware of Defendants' uses of the same or overlapping ranges as early as 2003 (and uses by many others before that)[5] but waited until after the trademark registration issued in 2006 before publicly asserting any rights in its scoring range.  Plaintiffs never even sent anyone a cease and desist letter asserting a claim of infringement until June of 2006, two months after its registration issued.  PX0950; Tr. 526:21-527:4; 586:7-588:8; 1968:4-7.

---

[5] *Supra* n.1.

**B.    Fair Isaac's Groundless, Unreasonable, and Vexatious
        Infringement Claims Make This Case "Exceptional"**

In addition to Fair Isaac's fraudulently obtained registration, other facts amply

demonstrate that this trumped-up infringement claim was not pursued to vindicate an

established trademark right, but rather to harass Defendants and stifle competition in the

credit scoring industry.  As such, Fair Isaac's trademark infringement claims were

groundless, unreasonable, vexatious, and pursued in bad faith.  *Aromatique*, 28 F.3d at

877; *Hartman*, 833 F.2d at 123.

First, after three years of litigation, Fair Isaac failed to introduce any evidence at

trial that it had *ever* used 300-850 as a trademark, much less that the term had acquired

secondary meaning.  *IMAF, S.p.A.*, 810 F. Supp. at 100 (awarding fees in light of

plaintiffs' "absolute failure to make a sincere attempt validly to establish an essential

element" of its Lanham Act claim).  Instead, all of Fair Isaac's marketing materials –

primarily brochures and website printouts – showed that Fair Isaac used "300-850" only

to describe a feature or characteristic of its scoring services, namely, the scoring range.[6]

There is no case law to support the theory, relied on by Fair Isaac, that repeatedly using a

word or term in a purely descriptive manner constitutes evidence of secondary meaning.

The law is the opposite.[7]  Fair Isaac never even introduced any evidence to show the

---

[6] *Supra* n.2.

[7] 2 *McCarthy* § 15:52, at 15-83 ("Use of a term in its descriptive sense or in a
nontrademark sense is not evidence of secondary meaning."); *Frosty Treats, Inc. v. Sony
Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005); *Thomas & Betts Corp.
v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995) (advertising a product feature as being
useful rather than as an indicator of source "is not only not evidence that the feature has
acquired secondary meaning, it directly undermines such a finding").

extent to which these marketing materials were disseminated to and viewed by consumers, or any evidence showing the effect of these materials on consumers' perceptions of the term. *See Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985) ("Although it is true that advertising is a relevant factor in determining whether a mark has acquired secondary meaning, it is the *effect* of such advertising that is important, not its extent.") (emphasis in original).  Most unusual for a trademark infringement plaintiff, Fair Isaac never produced evidence at trial of advertising expenditures or a marketing plan to build consumer recognition of "300-850."[8]

Second, Fair Isaac never conducted a secondary meaning survey, even though it had ample time and resources to do so. *Vital Pharm.*, 510 F. Supp. 2d at 1049 (awarding attorneys' fees; "despite the fact that courts have held survey evidence to be the most persuasive in establishing secondary meaning, Plaintiff intentionally chose not to present survey evidence").  Fair Isaac spent millions to pursue this litigation but chose not to conduct a secondary meaning survey, even though it knew that trademark validity was a critical issue in the case.  From this fact, the Court may infer that Fair Isaac knew the results of any such survey would be disastrous to its case.  Indeed, given the purely descriptive uses of "300-850" it is difficult to imagine that any properly designed and

---

[8] Plaintiffs' statistics regarding the "media attention" around the launch of myFICO.com say nothing about how many consumers actually viewed any advertising or promotional material that contained the alleged mark.  PX0932; Tr. 391:18-25.  Furthermore, that the term appeared descriptively in articles does not mean that consumers actually read the articles or made any association between "300-850" and Plaintiffs.  *See, e.g.*, *Aromatique*, 28 F.3d at 872 (articles do not reflect the minds of consumers to establish the necessary connection between the mark and the source).

conducted survey would show that anything more than a trivial number of consumers recognized 300-850 as a trademark.

Third, the only survey Fair Isaac proffered was conducted by James T. Berger whom the court found "lacks credibility." Docket No. 969 at 3. To recap, Berger failed to use a control to rule out alternative explanations for the answers given by respondents (Tr. 1365:9-12); used blatantly biased, leading and ambiguous questions in an obvious attempt to generate data favorable to Fair Isaac (Tr. 1359:7-21 ("answers just all over the place")); and misrepresented the actual data which showed that *at most* – and ignoring all flaws in the survey design and implementation – only 2-3% of respondents were confused because of the Defendants' scoring ranges (Tr. 1360-61, 1437-38). Berger himself acknowledged that he tries his best to design surveys to win for the attorneys who hire him, and in at least one case lied in his expert report in order to satisfy the demands of the attorney who hired him (Tr. 1325:19-1327:20, 1332:2-1333:19). The utter worthlessness of the Berger survey would have been obvious to any competent trademark attorney, and should have been (and no doubt was) obvious to Fair Isaac's counsel. Given the time and resources Fair Isaac expended on this case, it is revealing that the only survey expert they could get to support their claims was Mr. Berger. That survey in itself was "beyond the pale of acceptable conduct" in a trademark litigation.

Fourth, Fair Isaac's own actions demonstrated that it did not believe that "300-850" was a trademark. Fair Isaac did not list "300-850" in its internal list of trademarks. EX0098; Tr. 755. The company never sold or promoted a "300-850 credit score." It never used the "tm" symbol or "®" symbol prior to 2006 to put the world on notice that

the company thought it had a trademark.  It did not even bring to court a Fair Isaac

employee responsible for advertising and promotional efforts.  It never sued anyone else

for using overlapping ranges or even sent them a cease and desist letter.  *See Orient*

*Express*, 1988 WL 3385, at *12 ("Also of significance in this regard is the fact that

plaintiffs have not actively sought to protect their alleged trademark from use by other

third parties using the name 'Orient Express' in connection with products originating in

the Orient.").  It waited more than three years to accuse the TransRisk and PLUS scores

of infringement.  Second Amended Complaint, Apr. 18, 2007 (Docket No. 81).  Fair

Isaac submitted no evidence of any marketing plan to promote "300-850" as a trademark.

In fact, there was no evidence that Fair Isaac made any effort to establish "300-850" as a

brand.  These facts were true when Fair Isaac filed suit in 2006, and they were true when

the case was submitted to the jury in 2009.

Moreover, even when Fair Isaac filed suit in October 2006, it claimed only that the

*VantageScore* scoring range of *501-990* – a range that is completely dissimilar to 300-

850 – infringed its purported trademark.  Fair Isaac did not claim that Experian's PLUS

scoring service or Trans Union's TransRisk scoring service infringed its purported

trademark, even though these products had been on the market and widely promoted for

*three years*.  In fact, Fair Isaac did not assert claims against these services until it filed its

*Second* Amended Complaint in April 2007.  Fair Isaac's claims are so devoid of merit

that it did not occur to them to assert claims against the PLUS and TransRisk services

until seven months into the litigation.  This shows that Fair Isaac's true purpose in

pursuing this lawsuit was to hinder its new competitor, VantageScore, not to protect its purported trademark.

Fifth, Fair Isaac sought an unconscionable $322 million in damages, as well as injunctive relief that would have been devastating to Defendants' businesses.  Tr. 2131-33.  This is a clear case of economic coercion.  Fair Isaac abandoned its claim for Defendants' profits halfway through trial, and settled on a "reasonable royalty" theory of damages, claiming that Defendants would have agreed to an astounding *40%* royalty for the use of a scoring range that had absolutely no value as a trademark.  Fair Isaac's royalty claim was not supported by law or fact.

Sixth, evidence not admitted during trial reveals that Fair Isaac pursued this litigation for the vexatious purpose of stifling competition.  *See* Declaration of Bryan D. Gant ("Gant Decl."), Ex. 1 ("Could spend $6mm suing or $6mm kicking their ass"); Gant Decl., Ex. 2 at FIC0893646 ("Sue CRAs over Vantage.  Would cause lender concern re long term viability of score"); Gant Decl., Ex. 3 at 1 ("Where do we want to spend the money suing them or [competing against them]?") (brackets in original).

Trademark cases have been deemed "exceptional" under Section 35 in circumstances less egregious than those found here.  In *K-Jack Eng'g Co. v. Pete's Newsrack Inc.*, 209 U.S.P.Q. 386 (C.D. Cal. 1980), the court awarded attorneys' fees to the defendant where the plaintiff sued for trademark infringement under the following facts:  (1) an invalid registration – not even one procured through fraud – of a descriptive mark that had no secondary meaning, (2) the mark had become a generic term in the industry, and (3) there was no evidence of any infringement.

In *Vital Pharm., Inc. v. American Body Bldg. Prod., LLC*, 510 F. Supp. 2d 1043, 1048 (S.D. Fla. 2007), the court found that plaintiff's trademark infringement claim was pursued in bad faith where (1) the mark at issue was inherently descriptive, (2) plaintiff chose not to conduct a secondary meaning survey, (3) plaintiff's purported secondary meaning evidence consisted of advertisements that did not always display the claimed trade dress and the testimony of one biased witness, and (4) plaintiff had no evidence showing the effectiveness of the advertisements on consumers. *Id.* at 1048-49. Also, the testimony of the CEO was "unconvincing," "evasive[]," and totally lacking in credibility. *Id.* at 1049. The court also found bad faith in the plaintiff's claims of a likelihood of confusion where the defendant's use of the alleged trade dress was completely different from the alleged trade dress and the defendants prominently displayed their own source identifying trademarks. *Id.* at 1051. Lastly, the court found that "[t]he [p]laintiff's motivation in bringing suit seemed to be an effort to utilize the Lanham Act as a tool to stifle legitimate competition, rather than to protect a valid trade dress." *Id.*

For the same reasons, Defendants are also entitled to recover attorneys' fees as the prevailing party on Plaintiffs' Minnesota Deceptive Trade Practices Act claim. Minn. Stat. § 325D.45(2) ("The court may award attorneys' fees to the prevailing party if . . . the party complaining of a deceptive trade practice has brought an action knowing it to be groundless . . . ."). Those claims are coextensive with Plaintiffs' Lanham Act claims, and Plaintiffs never articulated a supportable theory otherwise. Indeed, Plaintiffs' proposed jury instruction on the issue was untethered to any established case law.

Finally, Defendants are also entitled to recover their reasonable attorneys' fees as the prevailing party on Plaintiffs' keyword advertising claims.  Plaintiffs made no effort to introduce any competent evidence on this make-weight claim.  The only evidence provided by Plaintiffs was the testimony of Berger, which the Court found was not credible.

**C.**     **Defendants' Attorneys' Fees Are Reasonable**

In defending this litigation – which if successful could have exposed Defendants to half-a-*billion* dollars in damages and forced Defendants to pull their scoring services from the marketplace – Defendants have paid millions in attorneys' fees.  By this motion, however, Defendants are seeking only their attorneys' fees incurred as a direct result of Plaintiffs' pursuit of their trademark infringement and passing off claims.  Accordingly, Defendants are seeking fees and costs relating to the trial that were incurred from August 1, 2009 (after the Court's summary judgment decision dismissing all but the trademark and passing off claims) to date, and before that, fees and costs arising from work relating *only* to the trademark infringement and passing off claims.  This is an extremely conservative approach:  Defendants are not seeking to apportion attorneys' fees attributable to document production and review, even though a large number of documents related primarily or solely to the trademark infringement claims.  Nor are Defendants seeking an apportionment of attorneys' fees for time spent taking and defending numerous depositions that involved multiple topics including trademark-related issues.  Instead, Defendants are seeking attorneys' fees related only to depositions that were primarily or entirely trademark-related.

1.    **Attorney Rates Are Reasonable**

In general, the starting point in determining the lodestar rate is the "ordinary fee for similar work in the community" in which the court sits.  *U.S. Securities and Exchange Comm'n v. Petters*, No. 09-1750 ADM/JSM, 2009 WL 3379954, at *3 (D. Minn. Oct. 20, 2009) (Montgomery, J.) (citing *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir. 1982)).  That rate may be adjusted upward for cases that require expertise in an area of substantive law.  Courts have acknowledged that trademark litigation is a "particularly difficult field of specialization and is recognized as meriting greater than average rates of pay."  *A.V. by Versace, Inc. v. Gianna Versace S.p.A.*, 96 Civ. 9721, 2002 WL 1046705, at *2 (S.D.N.Y. May 23, 2002); *Clairol, Inc. v. Save-Way Indus., Inc.*, 211 U.S.P.Q. 223, 225 (S.D. Fla. 1980).

This Court recently approved rates for lead counsel that ranged from $400 to $550 per hour, disallowing a rate of $875, in a case that required expertise in the area of complex commercial litigation.  *Petters*, 2009 WL 3379954, at *3.  Indeed, it appears that Plaintiffs' lead trial counsel, Ron Schutz of Robins, Kaplan, had a billing rate of $550 per hour in 2005, a rate which is no doubt higher today.  Gant Decl., Ex. 4 at 2, 9. Accordingly, despite that Defendants actually incurred substantially higher fees, Defendants seek fees ranging from $375 to $550 per hour for partners, $350 per hour for senior associates, and from $200 to $300 per hour for mid-level and junior associates.

2.    **The Hours Included in This Motion Are Reasonable**

(a)    **Experian**

For Experian, the case was tried by Robert A. Milne as lead trial counsel and

Christopher J. Glancy as lead trademark counsel.  Given that Experian counsel took the lead on most joint defendant tasks, as well as the number of documents on Plaintiffs' exhibit list (1,213), the number of witnesses Plaintiffs planned to call (20), the number of depositions submitted into evidence (17), the length of the trial (3 weeks), the number of expert witnesses (7), the number of in limine motions (15), the high number of disputed proposed jury instructions, and the bet-the-company stakes of the litigation, it was necessary to bring to trial several additional lawyers who had been involved in the case and who were familiar with the facts and issues, including, at various times, Jack Pace, Meghan McCurdy, Bryan Gant, David Suggs, Megan DePasquale, and Heather Burke.  It was also necessary to engage local counsel to assist in the effort, including Mark Jacobson and Christopher Sullivan of Lindquist & Vennum.  Responsibilities, rates and total hours are set forth in the accompanying declaration of Robert A. Milne.

> **(b)    Trans Union**

For TU, the case was tried by Lewis A. Remele, Jr. of Bassford Remele, P.A. and James K. Gardner of Neal, Gerber & Eisenberg LLP ("NGE").  Mr. Remele took the lead at trial for the defendants in establishing the elements of the Defendants' counterclaim. Mr. Gardner took the lead at trial on presenting the Defendants' survey evidence and challenges to FI's damages calculations.  Given the complexities, breadth, and seriousness of this litigation as described above, lead trial counsel was assisted by several additional lawyers who had been involved in the case and who were familiar with the facts and issues, including, at various times, Chris R. Morris of Bassford Remele and the following attorneys from NGE:  Ralph T. Russell, Dao L. Boyle, Robert E. Browne, John

A. Cullis, Jenny S. Kim, and John J. Scharkey.

The position, role, and rates for each of the attorneys and paralegals is set forth as an exhibit to the Declaration of James K. Gardner.  In general, Lew Remele and James Gardner were the lead trial attorneys and Ralph Russell and Dao Boyle were the supporting attorneys at trial.  The bulk of the pre-trial work was done by Ralph Russell, Dao Boyle, and James Gardner, with assistance from their partner, John Cullis, associate, John Scharkey, and paralegal, Christy Dickman.  Other associates assisted in the pre-trial filings and preparation.  The only attorneys for whom TU is seeking fees prior to the pre-trial activities, are Robert Browne and John Cullis, who were the primary trademark counsel for TU on this case.

### (c)    VantageScore

Attorneys Barbara Berens and Justi Miller were principal trial counsel for VantageScore.  Attorney Paul Hannah assisted with trial preparation, including the preparation of motions in limine.  Attorneys Tracey Baubie, Erin Lisle, Stephanie Albert and Max Kieley assisted with the preparation, review and revision of various motions.  Attorneys Catherine McEnroe and Heather Podlucky assisted at trial, with Renee Schaaf and Kathy Bitterly providing paralegal support both in preparing for and during the trial.

Although counsel for Experian and Trans Union took the lead on most pre-trial motions, counsel for VantageScore was responsible for representing VantageScore's perspective and interests in all pretrial and trial matters.  For example, VantageScore's counsel prepared its own trial exhibits and deposition designations, its objections to plaintiffs' trial exhibits and deposition designations, and its potential witnesses.

Attorneys for VantageScore were also prepared to carry the ball at trial in the event that Experian and Trans Union settled either before or during trial.  Responsibilities, rates and total hours for VantageScore's attorneys are set forth in the accompanying Affidavit of Barbara Berens.

## CONCLUSION

For the foregoing reasons, the Court should award Defendants their attorneys' fees and costs related to Plaintiffs' trademark infringement and passing off claims.

Respectfully submitted this 18th day of December, 2009.

**Lindquist & Vennum PLLP**

By:   /s/ Mark A. Jacobson
Mark A. Jacobson (MN Bar #188943)
Christopher Sullivan (MN Bar #0343717)
LINDQUIST & VENNUM, P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 371-3211
(612) 371-3207 (facsimile)

Robert A. Milne
Christopher J. Glancy
Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
(212) 819-8200
(212) 354-8113 (facsimile)

*Attorneys for Defendant Experian*
*Information Solutions, Inc. (and authorized*
*to sign on behalf of all Defendants)*

Lewis A. Remele, Jr. (MN Bar #90724)
Christopher R. Morris (MN Bar #230613)

BASSFORD REMELE
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Tel: (612) 376-1601
Fax: (612) 333-8829

James K. Gardner
Ralph T. Russell
Dao L. Boyle
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL 60602
Tel: (312) 269-8030
Fax: (312) 269-1747

*Attorneys for Defendant*
*Trans Union LLC*

Barbara Podlucky Berens (MN #209788)
Justi R. Miller (MN #0387330)
KELLY & BERENS
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 349-6171
Fax: (612) 349-6416

*Attorneys for Defendant*
*VantageScore Solutions, LLC*