# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fair Isaac Corporation and
myFICO Consumer Services, Inc.,

          Plaintiffs,

    v.

Experian Information Solutions Inc.;
Trans Union, LLC; VantageScore
Solutions, LLC; and Does I through X,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Civil No. 06-4112 ADM/JSM

---

Ronald J. Schutz, Esq., Randall Tietjen, Esq., Michael A. Collyard, Esq., Christopher K. Larus, Esq., David W. Beehler, Esq., Laura A. Nelson, Esq., and Mary E. Kiedrowski, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, on behalf of Plaintiffs.

Mark A. Jacobson, Esq., Mark H. Zitzewitz, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, and M. Elaine Johnston, Esq., Robert A. Milne, Esq., Christopher J. Glancy, Esq., Jack E. Pace, III, Esq., Bryan D. Gant, Esq., White & Case LLP, New York, NY, on behalf of Experian Information Solutions Inc.

Lewis A. Remele, Jr., Esq., Christopher R. Morris, Esq., Bassford Remele, Minneapolis, MN, and James K. Gardner, Esq., Ralph T. Russell, Esq., Dao L. Boyle, Esq., Neal, Gerber & Eisenberg LLP, Chicago, IL, on behalf of Trans Union, LLC.

Barbara Podlucky Berens, Esq., Justi Rae Miller, Esq., Kelly & Berens, PA, Minneapolis, MN, on behalf of VantageScore Solutions, LLC.

---

## I. INTRODUCTION

On February 23, 2010, the undersigned United States District Judge heard oral argument on five post-trial motions: (1) Plaintiffs Fair Isaac Corporation and myFICO Consumer Services, Inc.'s (collectively "Fair Isaac") Motion for Judgment as a Matter of Law, a New Trial, or Detailed Findings [Docket No. 986]; (2) Defendants Experian Information Solutions, Inc.

("Experian"), Trans Union, LLC ("Trans Union"), and VantageScore Solutions, LLC's ("VantageScore") (collectively "Defendants") Motion to Amend the Judgment to Order Cancellation of Trademark Registration [Docket No. 983]; (3) Trans Union's Motion for Attorneys' Fees and Costs [Docket No. 976] relating to the breach of contract claim; (4) Defendants' Motion for Attorneys' Fees and Related Expenses [Docket No. 978] relating to the Lanham Act claims; and (5) Defendants' Motion to Strike [Docket No. 1046]. For the reasons set forth below, Fair Isaac's motion is denied, Defendants' motion to amend is granted, Defendants' motion for attorneys fees relating to the Lanham Act claims is denied, Trans Union's motion for attorneys' fees relating to the contract claim is granted in part, and Defendants' motion to strike is denied.

## II. BACKGROUND

The factual and procedural background of this litigation is set forth in the Court's previous orders and will not be repeated here. See July 24, 2009 Order [Docket No. 694], Fair Isaac Corp. v. Experian Information Solutions, Inc., 645 F. Supp. 2d 734 (D. Minn. 2009); March 4, 2008 Order [Docket No. 294]. By way of summary, Fair Isaac asserted claims against Defendants for antitrust violations, trademark infringement of its "300-850" trademarks, unfair competition, deceptive trade practices, false advertising, passing off, breach of contract, interference with contract, and misappropriation of trade secrets. Fair Isaac abandoned its claim for misappropriation of trade secrets, and, in July 2009, the Court granted summary judgment in favor of Defendants on Fair Isaac's claims based on antitrust violations, breach of contract, interference with contract, and false advertising. Fair Isaac, 645 F. Supp. 2d at 764. The

remaining trademark-related claims, as well as Defendants' counterclaim for fraud on the United

States Patent and Trademark Office ("PTO"), proceeded to trial on October 29, 2009.

After a three week trial, the Court ruled at the close of evidence that because two of Fair

Isaac's claims—the keyword advertising claim and the passing off claim—would, if successful,

entitle Fair Isaac to equitable relief only, there was no right to a jury trial on those claims and

they would therefore be decided by the Court.  <u>See</u> Trial Tr. at 2702-2704.  On November 20,

2009, the jury returned a verdict on the remaining claims in favor of Defendants, finding that

Fair Isaac's "300-850" trademarks, which the Court previously ruled were descriptive, had not

acquired secondary meaning.  Special Verdict [Docket No. 968] at 1.  The jury also found in

favor of Defendants on the counterclaim for fraud on the PTO.  <u>Id.</u> at 4.  On November 25, 2009,

the Court ruled that the credible evidence adduced at trial failed to prove Fair Isaac's equitable

claims relating to keyword advertising and passing off.  November 25, 2009 Order [Docket No.

969] at 3-4.

### III.  DISCUSSION

**A.      Standards for Post-Trial Motions**

The parties' post-trial motions request amendment of the judgment, judgment as a matter

of law, and a new trial.  Judgment as a matter of law under Rule 50 of the Federal Rules of Civil

Procedure is appropriate only when there is insufficient evidence to permit a reasonable jury to

find in favor of the nonmoving party.  <u>Gardner v. Buerger</u>, 82 F.3d 248, 251 (8th Cir. 1996).

The facts must be viewed in the light most favorable to the verdict, assuming that the jury

resolved all evidentiary conflicts in favor of the prevailing party.  <u>Van Steenburgh v. Rival Co.</u>,

171 F.3d 1155, 1158 (8th Cir. 1999).  The Court will "not weigh, evaluate, or consider the

credibility of the evidence." Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345 (8th Cir. 1996). A jury's verdict should not be overturned unless no reasonable juror could have found in favor of the prevailing party. Van Steenburgh, 171 F.3d at 1158; Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997). "A jury verdict will not be set aside unless there is a complete absence of probative facts to support a verdict." Walsh v. National Computer Systems, Inc., 332 F.3d 1150, 1158 (8th Cir. 2003) (quotation omitted).

The decision whether to grant a new trial under Federal Rule of Civil Procedure 59(a) is committed to the discretion of the district court. Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). "A new trial is required only when necessary to avoid a miscarriage of justice." Gearin v. Wal-Mart Stores, Inc., 53 F.3d 216, 219 (8th Cir. 1994) (citing McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994)). "While the standard for granting a new trial is less than that for a judgment as a matter of law, a new trial shall be granted only to prevent injustice or when the verdict strongly conflicts with the great weight of evidence." Maxwell v. Baker, Inc., 160 F.R.D. 580, 581 (D. Minn. 1995). Similar to the standard for granting judgment as a matter of law, a district court reviewing a motion for a new trial is "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [the court] feel[s] that other results are more reasonable." Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc., 466 F.2d 179, 186 (8th Cir. 1972).

A new trial also may be ordered if the court erred in instructing the jury on the applicable law. T.H.S. Northstar Assocs. v. W.R. Grace & Co.-Conn., 860 F. Supp. 640, 650 (D. Minn. 1994), vacated on other grounds, 66 F.3d 173 (8th Cir. 1995). A district court, however, has broad discretion in framing instructions and need not give every proposed instruction as long as

4

the court adequately presents the law and the issues to the jury.  Fleming v. Harris, 39 F.3d 905, 907 (8th Cir. 1994).  Moreover, the instructions are to be considered in their entirety to determine whether, when read as a whole, the charge fairly and adequately submits the issues to the jury.  Laubach v. Otis Elevator Co., 37 F.3d 427, 429 (8th Cir. 1994). "A single erroneous instruction will not necessarily require reversal."  Id.

A motion to amend under Federal Rule of Civil Procedure 59(e) serves the "limited function of correcting manifest errors of law or fact or to present newly discovered evidence."  United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006) (internal quotation marks omitted).  A Rule 59(e) motion is not a vehicle to introduce new evidence, tender new legal theories, or raise arguments that could have been offered or raised before the Court entered judgment.  Id.

**B.    Fair Isaac's Post-Trial Motion**

Fair Isaac's motion raises numerous issues.  The first challenges the jury's verdict that Defendants proved their affirmative defense and counterclaim of fraud on the PTO.  The second issue concerns the Court's ruling regarding the doctrine of licensee estoppel.  The third challenges the Court's decision to rule on summary judgment that the term "300-850" is merely descriptive.  Fair Isaac's fourth issue relates to the jury's determination of secondary meaning.  The fifth issue challenges the Court's decision that there was no right to a jury trial on the passing-off claim.  The sixth issue requests a new trial permitting Fair Isaac to present evidence of spoliation and giving the jury an adverse-inference instruction.  The final issue challenges the Court's summary judgment ruling on Fair Isaac's false advertising claims.

**1.    Fraud on the PTO**

The jury returned a verdict in favor of Defendants on their affirmative defense and counterclaim of fraud on the PTO, finding that (1) Fair Isaac made a false representation during the application process to the PTO for registrations of the "300-850" marks, (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO, and (3) the PTO relied on the false representation in deciding to issue the registrations. Special Verdict at 4. Fair Isaac argues the verdict must be overturned because the evidence adduced at trial was legally insufficient to prove those three elements of fraud on the PTO by clear and convincing evidence. See Allen Homes, Inc. v. Weersing, 510 F.2d 360, 362 (8th Cir. 1975) (proving fraud on the PTO requires clear and convincing evidence).

"Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009) (quotation omitted). "Proof that false statements were made to, or that facts were withheld from, the PTO, however, is not enough to show fraud . . . . In order to show that an applicant defrauded the PTO[,] the party [asserting fraud] must show that the applicant intended to mislead the PTO." Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 877-78 (8th Cir. 1994). The false representation must have been material in the sense that "a reasonable examiner would have considered it important in deciding whether to issue" the registration. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 989 F.2d 985, 992 (8th Cir. 1993) (explaining that the "but for" standard of materiality applies when the party claiming fraud seeks damages under 15 U.S.C. § 1120 but not when the party claiming fraud asserts it as a defense to enforcement). "[T]he very nature of the charge of fraud requires that it be proven to the hilt with clear and convincing evidence. There is no room for

speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." Bose, 580 F.3d at 1243 (quotation omitted).

At trial, the claim of fraud on the PTO was premised on two statements made in response to the PTO's denial of trademark protection for "300-850" on the ground that it was merely descriptive. The first statement is a declaration by Fair Isaac employee St. John, stating that "[t]o the best of my knowledge, only the FICO score uses the 300-850 range as a unique identifier for credit bureau risk scores." Fair Isaac argues the statement is entirely true because the undisputed evidence was that although others may have used the term "300-850," none of them claim to have used it as a unique identifier of their products. Defendants concede that no other parties claimed at the time to have used the term "300-850" as a unique identifier, but they maintain that the statement is still false because Fair Isaac did not actually use "300-850" as a unique identifier, that is, Fair Isaac did not use it as a trademark. Fair Isaac responds that Defendants did not present such an argument at trial and, thus, it cannot now be used to justify the jury's verdict. Further, Fair Isaac claims, the new explanation for the alleged falsity of the statement is simply wrong as the undisputed evidence at trial was that Fair Isaac began using a seal with "300-850" in its center on web sites and other materials in 2004. Trial Tr. at 406-07. Therefore, Fair Isaac concludes, the statement was truthful when St. John signed the declaration in early 2005.

The second statement alleged to be false was the statement by Fair Isaac's outside legal counsel Gustafson that "300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop." Fair Isaac argues that Defendants "cherry picked" this sentence from Gustafson's

submission to the PTO and, in doing so, ignored the context in which it was made. The context, Fair Isaac explains, is as follows:

> 300-850 identifies Applicant's credit bureau-based scoring products, but is not a main feature of credit scoring generally and is far from the exclusive credit scoring scale in the industry. . . . 300-850 is the credit scoring scale only for Applicant's credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop. . . . Thus, while it is true that 300-850 is recognized to identify Applicant's credit bureau risk scoring product, 300-850 is not, per se, descriptive of credit scoring generally, or even bureau risk scoring generally. 300-850 is a trademark that identifies Applicant's products.

See Pls. Mem. in Supp. of Post-Trial Mots. [Docket No. 989] at 10. Fair Isaac contends it is improper to "parse out one sentence from the context of a lawyer's argument that references a truthful underlying declaration [by St. John] and declare that one sentence to be false." Id. at 10-11.

Upon consideration of the evidence and the parties' arguments, the Court concludes that sufficient evidence exists in the record to support the jury's verdict on the fraud on the PTO claim. The jury was shown evidence that when Fair Isaac represented to the PTO through Gustafson that "300-850 is the credit scoring scale *only* for [Fair Isaac's] credit bureau-based risk products and not for . . . other credit bureau-based risk products that competitors develop," (1) that representation was false because competitors sold credit bureau-based risk products that did in fact use the same, or nearly the same, scoring range and (2) Fair Isaac knew these competitors sold such products. See, e.g., Trans Union Exs. 43, 44; Experian Exs. 63, 92, 104, 106, 501. The evidence of Fair Isaac's knowledge of competitors' use of the same scoring range and the evidence of how Fair Isaac responded to the PTO is sufficient to support the jury inferring that Fair Isaac acted with deceptive intent. See Bose, 580 F.3d at 1245 (an inference of

intent is properly drawn when the conduct, viewed in light of all the evidence, indicates sufficient culpability to support a finding of intent). With regard to materiality, the submission of these statements by Fair Isaac was the only intervening event between the PTO's initial rejection of Fair Isaac's registration application and the subsequent issuance of the notice of allowance. These statements, which included the false representation that only Fair Isaac's products used the "300-850" scoring range, were evidence from which the jury could reasonably infer that the PTO relied on the false representation. In addition, the jury heard testimony from Defendants' expert, Anderson, a former Deputy Assistant Commissioner for Trademarks at the PTO for eighteen years, that the question of whether competitors were also using the "300-850" scoring range would have been important to a reasonable examiner in deciding whether to issue the registration. Trial Tr. at 2528-29, 2570-71.

Fair Isaac raises two arguments in support of its claim that the Court erred by permitting Anderson to offer opinion testimony about what would have been important to a reasonable trademark examiner. First, Fair Isaac argues that the test is not whether the false information would have been important to a reasonable examiner but rather whether the registration would not have issued but for the false information. The argument is without merit because, as indicated above, the "but for" standard does not apply when, as here, the fraud claim seeks only to declare the trademark invalid and cancel it and does not seek damages under 15 U.S.C. § 1120. Gilbert/Robinson, 989 F.2d at 992. Second, Fair Isaac argues the decision to allow Anderson to testify regarding materiality was based on an improper reliance on patent law. See Trial Tr. at 2561-63. While there are differences between patent law and trademark law on the claim of fraud on the PTO, nothing in patent cases allowing expert testimony on the issue of

materiality suggests that the allowance of such testimony turned on the nuances specific only to a fraud claim in a patent case. Nisus Corp. v. Perma-Chink Sys., Inc., No. 3:03-CV-120, 2005 WL 6112992, at *5-6 (E.D. Tenn. May 27, 2005) (allowing an intellectual property attorney and former PTO patent examiner to offer opinion testimony on the issue of materiality), cited with approval in Eli Lilly & Co. v. Actavis Elizabeth LLC, 676 F. Supp. 2d 352, 360 (D.N.J. 2009). The Court adheres to its ruling at trial that such testimony is admissible.

This extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry.[1] Over the past three and a half years, both Fair Isaac and Defendants have been represented by highly skilled attorneys who have been recognized as among the best attorneys in the country in the fields of complex business litigation and trademark law. The docket lists fourteen different attorneys as having represented Fair Isaac, and no fewer than six plaintiff attorneys were consistently present in the courtroom during the three week trial. Approximately another thirty attorneys represented the three Defendants, and upward of twelve to fifteen defense attorneys were in the courtroom during the majority of the trial. The jury heard all of the evidence, arguments, and theories by both sides and returned a verdict well supported by the evidence in the case. With regard to the fraud on the PTO claim, Fair Isaac's capable attorneys made their arguments to the jury that the statement that only Fair Isaac's products used the scoring range "300-850" was not false or misleading when considered in view of other statements that included the qualifier "as a unique identifier," but the jury rejected that argument. Indeed, the jury's verdict was a wholesale,

---

[1] As noted in ruling on summary judgment, Fair Isaac enjoys a 74% share of the market for all segments of the credit scoring industry. July 24, 2009 Order at 33-34, 645 F. Supp. 2d at 754-55; Gant Decl., Jan. 30, 2009 [Docket No. 588], Ex. 1(a) at 72.

unambiguous rejection of Fair Isaac's central theory of the case—i.e., that one can legitimately claim trademark protection in the numerical range for credit scores. Fair Isaac's motion for a judgment as a matter of law or a new trial on the fraud on the PTO claim is denied.

### 2. Licensee Estoppel

Fair Isaac argues that undisputed evidence at trial was that both Experian and Trans Union are licensees of Fair Isaac's "300-850" mark. Fair Isaac contends that under the doctrine of licensee estoppel, Defendants should have been precluded from challenging the validity of the mark, and the Court erred by failing to so rule. See Seven-Up Bottling Co. v. Seven-Up Co., 561 F.2d 1275, 1279 (8th Cir. 1977) (holding that under the doctrine of licensee estoppel, a licensee is estopped from contesting the validity of its licensor's marks). Therefore, Fair Isaac requests that the Court enter judgment as a matter of law on the issue of licensee estoppel and order a new trial that precludes Defendants from presenting evidence and argument challenging whether the mark is entitled to protection.

Defendants respond that Fair Isaac's licensee estoppel argument is without consequence here because even if Experian and Trans Union were precluded from challenging the validity of Fair Isaac's "300-850" mark, VantageScore, which is not a licensee, would not be precluded and, thus, the jury would have heard the same challenges to the validity of the mark. Fair Isaac responds that VantageScore is "under the absolute control of the credit bureaus," and, therefore, principles of agency and equity demand that Experian and Trans Union may not use VantageScore to challenge circuitously what they cannot challenge directly. See Pls. Mem. in Supp. of Post-trial Mots. at 24. Fair Isaac has not identified any supporting authority, and the apposite authority proffered is to the contrary. "The licensee estoppel rule precludes only

licensees from a challenge: other parties, even those closely affiliated with the licensee, are not foreclosed." J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 18.63 (4th ed. 2009); <u>Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.</u>, 343 F.2d 655, (7th Cir. 1965) (holding that licensee estoppel could not be invoked to preclude an alleged agent from challenging the validity of a mark licensed to the alleged principal); <u>Papercraft Corp. v. Gibson Greeting Cards, Inc.</u>, 515 F. Supp. 727, (S.D.N.Y. 1981) (refusing to apply the doctrine to preclude a parent corporation from challenging the validity of a mark even though its wholly-owned subsidiary, which had separate employees, records, accounts, offices and only one shared officer, was a licensee of the mark).

Because licensee estoppel would not have precluded VantageScore from presenting evidence and argument challenging the validity of the "300-850" mark, the issue of validity would have been submitted to the jury regardless of whether Experian and Trans Union were so precluded. The findings of fact Fair Isaac requests are unnecessary because the conclusion results from the application of the legal principles mentioned above to undisputed facts regarding VantageScore's relationship to Experian and Trans Union.

### 3. Strength of the "300-850" Marks

In the July 24, 2009 summary judgment ruling, the Court concluded that the term "300-850" is merely descriptive and, thus, entitled to trademark protection only if it has acquired secondary meaning. <u>Fair Isaac</u>, 645 F. Supp. 2d at 759. Fair Isaac argues that the categorization of a trademark is ordinarily a factual determination and the Court's ruling "erroneously stripped the jury of its fact-finding role." Pls. Mem. in Supp. of Post-trial Mots. at 25. Fair Isaac's argument is unavailing.

The Court recognizes that "[w]hether a mark is merely descriptive as opposed to suggestive or arbitrary is typically a question of fact." Fair Isaac, 645 F. Supp. 2d at 758 (citing WSM, Inc. v. Hilton, 724 F.2d 1320, 1326 (8th Cir. 1984)). Nevertheless, appellate courts, including the Eighth Circuit, have affirmed decisions by district courts that a term is, as a matter of law, generic or merely descriptive as opposed to suggestive. See Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 973-75 (8th Cir. 2006) (affirming a district court's conclusion on summary judgment that a claim for infringement of the mark "Brick Oven" failed because "Brick Oven," as it relates to frozen pizzas, is a generic term or, alternatively, a descriptive term that had not acquired secondary meaning); Frosty Treats Inc. v. Sony Computer Entm't Am. Inc., 426 F.3d 1001, 1003-05 (8th Cir. 2005) (affirming a district court's summary judgment ruling that the term "Frosty Treats," used by a company in the business of selling frozen deserts, is merely descriptive, if not generic); Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 485-87 (8th Cir. 1991) (reversing a district court's grant of a preliminary injunction on the basis that the trade name "Cellular Sales," used by a company engaged in the business of selling cellular telephone equipment, was entitled to protection on the ground that "the name 'Cellular sales' is generic in nature and therefore not entitled to trade name protection"); Bernard v. Commerce Drug Co., 964 F.2d 1338, 1340-41 (2d Cir. 1992) (affirming a district court's summary judgment ruling that the term "Arthriticare," used in connection with a product intended for the care of arthritics or the treatment of arthritis, is merely descriptive as opposed to suggestive). The Court continues to be of the view that here, just as in the cited cases, the categorization "300-850" as descriptive was appropriately resolved on summary judgment.

Fair Isaac also raises several arguments challenging the correctness of the summary judgment ruling that the term "300-850" is descriptive. After review of the evidence and arguments that were offered at the time of summary judgment regarding whether "300-850" is descriptive as a matter of law, the Court stands by its July 24, 2009 decision. Fair Isaac's emphasis that it arbitrarily chose the scoring range "300-850" is not a persuasive argument on the issue of whether the term is descriptive. The argument is tantamount to, for example, a manufacturer that owns the mark "Red Bike" contending that the mark is not merely descriptive of its product, a red bicycle, because the manufacturer arbitrarily chose to paint the bicycle red instead of some other color. Second, the argument that "300-850" is suggestive rather than descriptive because the actual scoring range for some Fair Isaac products goes beyond 300-850 is equally unpersuasive. Referring again to the "Red Bike" hypothetical, Fair Isaac's argument would be akin to contending that the mark "Red Bike" is not merely descriptive because it is an approximate, rather than precise description, of the crimson color of the bicycle.

### 4.     Secondary Meaning

Fair Isaac requests judgment as a matter of law or a new trial on the issue of secondary meaning. Fair Isaac first argues that the jury's finding that "300-850" had not acquired secondary meaning is contrary to the great and overwhelming weight of the evidence. Secondary meaning is established "by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." B & B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 389 (8th Cir. 2009) (quotation omitted). Factors that are appropriately considered include direct evidence of secondary meaning, such as

consumer testimony or surveys, and circumstantial evidence, such as "the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying." Frosty Treats, 426 F.3d at 1005.

In claiming that the jury's verdict is contrary to the great weight of the evidence, Fair Isaac relies on evidence adduced at trial that it has consistently used "300-850" as a brand; it sells twelve billion scores each year, all of which have a "300-850" scoring range; its classic score, which is sold in association with the claimed "300-850" mark, is the industry standard; Defendants selected scoring ranges for their credit scoring products with intent to mimic or closely resemble the "300-850" scoring range; and Experian and Trans Union, as licensees of Fair Isaac, used "300-850" in marketing and advertising Fair Isaac scores.

However, a considerable amount of other evidence supports the jury's verdict, including evidence that Fair Isaac's marketing and advertising efforts focused more prominently on Fair Isaac's other trademarks, FICO, Fair Isaac, and myFICO, and, when "300-850" was mentioned in advertisements, the term was used in a descriptive manner rather than as a trademark. See Pls.' Ex. 851 ("Your FICO score is . . . a number—between 300 and 850—that says how likely you are to make your credit payments on time."); Pls.' Ex. 898 ("FICO® credit scores . . . can range from 300-850."); see also Pls.' Exs. 906, 907, 913-15, 932, 953, 851. In addition, as Defendants note, the lack of evidence regarding secondary meaning supports the jury's verdict. No evidence was presented showing how much time, effort, and money Fair Isaac spent in marketing its products specifically under a "300-850" brand, and there was no evidence showing Fair Isaac's promotion of "300-850" as a brand affected its sales. Both sides have identified

evidence in the record in support of their positions.  The Court accepts that the jury resolved the evidentiary conflict in favor of Defendants and cannot disturb the weight the jury afforded to the evidence.  See Van Steenburgh, 171 F.3d at 1158; Fireman's Fund, 466 F.2d at 186.

Fair Isaac argues that a new trial also is required because the Court erred by failing to instruct the jury that the PTO's registration of the "300-850" trademarks required the jury to presume that the marks have acquired secondary meaning.  During the trial, the Court ruled that the registrations warranted placing a burden of production on Defendants to make a prima facie showing that the term has not acquired secondary meaning.  Trial Tr. at 2705.  However, the Court concluded that Defendants met that burden and, thus, Fair Isaac was required to satisfy its burden of persuasion on its claim that the term had acquired secondary meaning.  Id.  In so ruling, the Court relied on Federal Rule of Evidence 301, which provides:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

In Igloo Products Corp. v. Brantex, Inc., 202 F.3d 814 (5th Cir. 2000), the Fifth Circuit was presented with a similar issue regarding the interaction between Rule 301 and the presumption under Texas's trademark laws, which are analogous to the Lanham Act, when a mark has obtained registration.  Id. at 819.  The court assumed for the sake of argument that the registration entitled the mark owner to a presumption of secondary meaning and then, citing Rule 301, explained:

> [T]he burden of *persuasion* on the question of secondary meaning would not have shifted to [the alleged infringer]; instead, merely a burden of *production* would have arisen in [the alleged infringer].
>
> Whether [the alleged infringer] met that burden of production is ultimately a question for the court. If it failed to meet the burden, then the question of secondary meaning would not have properly gone to the jury; the presumption in favor of [the mark owner] would have prevailed. If [the alleged infringer] met the burden, then the advantage created by the presumption would have disappeared, and [the mark owner] would have faced the same burdens it faced before the introduction of the presumption.
>
> Thus, if [the mark owner] *had* deserved the relevant presumption, and had [the alleged infringer] provided no evidence to rebut it, then [the mark owner] might well have asked that the question of secondary meaning be taken from the jury entirely. Under no circumstances, however, did it make sense for [the mark owner] to ask for an instruction about the prima facie presumption to *accompany* the question for the jury about secondary meaning . . . .

Id. This analysis, the court noted, was consistent with the Supreme Court's explanation of the role of similar presumptions in the context of employment discrimination suits. Id. at n.4 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)).

Like the mark owner in Igloo and pursuant to the commands of Rule 301, Fair Isaac's right to a presumption created by the registrations does not extend to a right to an instruction that the jury must presume the "300-850" marks have acquired secondary meaning. The Court finds no error in its treatment of the presumption resulting from the registrations or in its jury instructions on secondary meaning.

**5. Passing Off**

In the Third Amended Complaint [Docket No. 436], the specific words "passing off" appear in Fair Isaac's claims under Section 43(a) of the Lanham Act (Count One) and in its claim under Minnesota common law (Count Four), but they are not found in its claim under the

17

Minnesota Deceptive Trade Practices Act (Count Six). 3d Am. Compl. ¶¶ 180, 195, 204-13. Several of Fair Isaac's pretrial submissions represent that the passing off claim arises under the Minnesota Deceptive Trade Practices Act (MDTPA), Minn. Stat. §§ 325D.43-48, and under the common law but do not mention federal law. See Pls.' Stmt. of Case [Docket No. 741] at 15; J. Proposed Jury Instrs. [Docket No. 787] at 89-90; Pls.' Mem. in Opp'n to Defs.' Improper Mots. to Exclude Passing-Off Claims [Docket No. 816] at 3. In short, and as noted when ruling on jury instructions, what Fair Isaac is alleging in a passing off claim has been rather "amorphous" throughout the litigation. Trial Tr. at 2702.

At the time the case was submitted to the jury, the Court concluded that the passing off claim was tried on a theory arising under the MDTPA. In so ruling, the Court emphasized that Fair Isaac's proposed jury instructions repeatedly cited the MDTPA and caselaw construing the MDTPA. Thus, as a claim under the MDTPA, only equitable relief was available. Accordingly, the Court found there was no right to a jury trial on the claim and the passing off claim would be decided by the Court. Fair Isaac argues that this was error, that its passing off claim also arises under the common law, and that damages are available on that common law claim, rendering it appropriate for jury determination.

The Court iterates its view that the passing off claim was appropriately construed as a claim solely under the MDTPA. But even if Fair Isaac's argument that the claim also arises under the common law were accepted, any error in the treatment of the passing off claim was harmless, and, thus, is not a ground for granting Fair Isaac's post-trial motion. See Fed. R. Civ. P. 61. As the Court has previously acknowledged, it is unclear whether a passing off claim under the MDTPA can survive in the absence of an actionable claim under the Lanham Act. See

<u>United HealthCare Ins. Co. v. AdvancePCS</u>, No. Civ. 01-2320, 2002 WL 432068, at *12 n.15 (D. Minn. Mar. 18, 2002) (stating that "the MDTPA overlaps with the Lanham Act in certain contexts, but is not confined to the metes and bounds of the federal statute").  By contrast, the Court is aware of no authority suggesting that actionable passing off under the common law differs in any way from actionable passing off under the Lanham Act.[2]  Federal law is clear that proof of secondary meaning is required of a passing off claim.  <u>See</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 778-79 (1992) ("[P]roof of secondary meaning was an element of the common-law passing-off cause of action."); <u>Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship</u>, 380 F.3d 126, 131 (2d Cir. 2004) ("Secondary meaning is used in typical passing-off cases involving trademarks or trade dress which are not inherently distinctive; in such a case, a plaintiff, in order to prove consumer confusion, must generally show that the copied features of its product have attained a secondary meaning."); <u>Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.</u>, 781 F.2d 604, 611 (7th Cir. 1986) ("'Passing off' means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off.  The copying of a descriptive mark that has not acquired secondary meaning does not imply passing off, for by definition it describes properties which the brand has in common with other brands."); <u>Vanwyk Textile Sys. B.V. v. Zimmer Machinery Am., Inc.</u>, 994 F. Supp. 350, 379 (W.D.N.C. 1997) ("Section 43(a)

---

[2] The court in <u>United HealthCare</u> dealt exclusively with the issue of whether there are any differences between the MDTPA and federal law, and the court noted that its conclusion that there are differences between conduct actionable under the MDTPA and conduct actionable under federal law was reinforced by the comments to the Uniform Deceptive Trade Practices Act, which expressly provide that "'[t]his subsection permits the courts to block out *new* kinds of deceptive trade practices.'" 2002 WL 432068, at *14 n.17 (alteration in original) (emphasis added) (quoting 1966 Uniform Deceptive Trade Practices Act (U.L.A.) § 2(12), cmt.).

protection against passing off extends even to generic terms [when] there is proof of de facto secondary meaning."). Thus, an acceptance of the jury's finding on secondary meaning, <u>see supra</u> III.B.4, is fatal to the common law passing off claim.

Fair Isaac also challenges the Court's finding that Fair Isaac failed to prove the elements of its passing off claim under the MDTPA. The Court stands by its findings.

### 6. Spoliation

Fair Isaac argues that the Court should grant a new trial that allows evidence of spoliation and an adverse inference instruction for spoliation. The Court gave reasons on the record for denying the spoliation arguments, <u>see</u> Trial Tr. at 1470-73, and declines to revisit its previous ruling.

### 7. False Advertising

Finally, Fair Isaac argues that the Court erred in its July 24, 2009 ruling that Defendants were entitled to summary judgment on Fair Isaac's false advertising claim. Accordingly, Fair Isaac requests that the Court amend its summary judgment order and grant a new trial that allows Fair Isaac to present its false advertising claim. The Court again stands by its earlier decision.

### C. Defendants' Motion to Amend

Defendants' motion requests that the Court amend the judgment to include an order that directs the PTO to cancel Fair Isaac's "300-850" trademark registration, U.S. Trademark Registration No. 3,083,563. Defendants argue that such relief is warranted in light of the jury's (1) finding that "300-850" had not acquired secondary meaning and (2) verdict on Defendants' counterclaim for fraud on the PTO.

In any action involving a registered mark, courts have authority to "determine the right to registration, order the cancelation of registrations, in whole or in part, restore cancelled registrations, and otherwise rectify the register with respect to registrations of any party to the action." 15 U.S.C. § 1119. A court may order cancellation under § 1119 when a trademark at issue in the action is found invalid because it is descriptive and has not acquired secondary meaning. See Midwest Research Inst. v. S & B Promotions, Inc., 677 F. Supp. 1007, 1017 (W.D. Mo. 1988) ("Counterclaimants are correct in noting that a merely descriptive word is subject to cancellation [under § 1119].") (citing WSM, 724 F.2d at 1329). "Cancellation . . . is a discretionary matter for the district court." Pinnacle Pizza Co., Inc. v. Little Caesar Enters., Inc., 598 F.3d 970, 979 (8th Cir. 2010) (quotation omitted).

As a threshold issue, Fair Isaac argues that the Court "should exercise its discretion to *not* order cancellation based on secondary meaning" because Defendants' counterclaim pleaded only fraud on the PTO as a basis for cancellation and Defendants did not assert lack of secondary meaning as a ground for cancellation until the current motion. Pls.' Resp. to Mot. to Am. [Docket No. 1024] at 5. The Court is not persuaded. Under § 1119 courts have the power to order cancellation in any action involving a registered mark, and the plain language of § 1119 does not require any prompting by a party as a prerequisite to the exercise of that power. In addition, cancellation has long been an issue in this litigation, as has the issue of whether "300-850" is merely descriptive without secondary meaning. Furthermore, the pending post-trial motions have afforded the parties ample due process on whether the Court should order cancellation based on a lack of secondary meaning.[3]

---

[3] Fair Isaac argues that 37 C.F.R. §§ 2.106(b)(2)(i) and 2.114(b)(2)(i) make invalidity of a registration a compulsory counterclaim in an opposition or cancellation proceeding before the

Fair Isaac next argues that the Court should deny Defendants' motion, relying on the argument in its own post-trial motion that the jury's verdict on secondary meaning must be set aside. For the reasons explained previously, see supra III.B.4, the jury's verdict on secondary meaning will stand.

Lastly, Fair Isaac argues that the issues raised in its post-trial motion "will likely lead to a judgment as a matter of law, or a new trial, or an appeal" and, thus, "[i]t doesn't make practical sense—nor does it favor judicial economy—to order cancellation at this time based on the jury's findings, and then have to later reinstate the registration in the event that Fair Isaac prevails on any of the outstanding issues." Pls.' Resp. to Mot. to Am. at 6. Defendants counter that judicial economy will not be served by abstaining because if Fair Isaac does not prevail on appeal, the parties will be back before this Court for a ruling on cancellation and then likely will be back to the Eighth Circuit on appeal of that ruling. In addition, Defendants maintain that granting cancellation will "eliminate the need to address issues already resolved in this case before the PTO," thus conserving time, effort, and attorneys' fees. Defs.' Rep. Mem. in Supp. of Mot. to Am. at 14.

The Court agrees with Defendants that ordering cancellation now will further judicial economy, conserve resources, and allow appellate review of the Court's rulings in a single appeal. Recognizing that ordering cancellation now could result in wasted resources should the Eighth Circuit reverse this ruling, the order of cancellation will be stayed pending appeal. See Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc., No. 84 Civ. 5964, 1987 WL

PTO. "However, these rules of course do not apply to an infringement action brought in a district court," and a claim for cancellation due to invalidity is not a compulsory counterclaim, under the Federal Rules of Civil Procedure, to an infringement claim. Nasalok Corp. v. Nylok Corp., 522 F.3d 1320, 1325, n.3 (Fed. Cir. 2008).

12817, at *5 (S.D.N.Y. June 17, 1987) (staying a cancellation order pursuant to § 1119 pending appeal). In light of the conclusion to order cancellation on the basis of a lack of secondary meaning, the Court need not address whether cancellation would also be warranted due to the finding of fraud on the PTO.

**D.      Trans Union's Motion for Attorneys' Fees**

On July 24, 2009, the Court granted summary judgment in favor of Trans Union on Fair Isaac's breach of contract claim. Pursuant to its contractual agreement with Fair Isaac, Trans Union moves for attorneys' fees and costs incurred in defending that claim. The contract provides that the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements incurred in pursuing or defending a legal action regarding the enforcement of the contractual agreement.

Initially, Fair Isaac represents that it will be appealing the Court's summary judgment decision dismissing the contract claim and contends that it is "far from certain" that the Court's decision will be affirmed. Therefore, Fair Isaac argues the Court should defer ruling on Trans Union's motion for attorneys' fees because it will preserve time and resources if the Court's decision is reversed and will enable the Court to resolve all fees and costs issues in one final decision regardless of which side prevails on appeal. Pls.' Mem. in Opp'n to Mot. for Attorneys' Fees [Docket No. 1022] at 2-3. The Court declines Fair Isaac's invitation to defer. Trans Union's motion has been fully briefed by both parties and is ripe for a ruling.

In support of its fee request, Trans Union submitted a table displaying the number of hours spent on seven different categories of tasks: (1) analysis and investigation of the breach allegations; (2) work in connection with securing a protective order regarding algorithms; (3)

work on a motion to compel Fair Isaac to specify the trade secret that was allegedly misappropriated; (4) discovery related to the breach of contract claim; (5) working with experts; (6) work on the motion for summary judgment; and (7) preparation of the pending motion for fees. In addition, Trans Union has submitted the supporting billing entries, showing in detail the work Trans Union's attorneys performed relating to the breach of contract claim.[4]

The amount of reasonable attorneys' fees must be determined on the facts of each case. Hensley v. Eckert, 461 U.S. 424, 429 (1983); Milner v. Farmer Ins. Exch., 748 N.W.2d 608, 620-21 (Minn. 2008) (noting that Minnesota follows the procedure set forth in Hensley when determining reasonable attorneys' fees). A district court has wide discretion in determining the amount of the attorneys' fees award. See Hensley, 461 U.S. at 437; Jarrett v. ERC Props, Inc., 211 F.3d 1078, 1084-85 (8th Cir. 2000); Kelsar v. Bartu, 201 F.3d 1016, 1017 (8th Cir. 2000). The starting point for determining the amount of a reasonable fee is to determine the "lodestar," the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Hensley, 461 U.S. at 433. The reasonableness of a fee depends upon a number of factors, including "the [party's] overall success; the necessity and usefulness of the [party's] activity in the particular matter for which fees are requested; and the efficiency with which the [party's] attorneys conducted that activity." Jenkins v. Missouri, 127 F.3d 709, 718 (8th Cir. 1997).

---

[4] The supporting billing entries were submitted after the hearing and reviewed by the Court in camera. Fair Isaac objects that the in camera submission "represents an ex-parte communication that is at odds with a fair adversarial process." May 4, 2010 Letter [Docket No. 1063] at 1. To the extent that Fair Isaac contends that the decision to allow the in camera submission is improper, the Court is not persuaded. See Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 545 n.14 (8th Cir. 2006) (commenting that a defendant was free to argue on remand that the district court abused its discretion in awarding attorneys' fees for time entries that were examined by the district court in camera but not disclosed to the defendant, but discouraging such an argument and "remind[ing] the [defendant] that the District Court has substantial discretion in awarding fees and costs").

Trans Union calculates the lodestar amount at slightly more than $860,000 in attorneys'

fees for 2,172.5 hours spent defending the breach of contract claim, and it seeks over $674,000

for necessary costs and disbursements.  This was a complex litigation that required the

completion of numerous tasks necessary to the successful litigation of the breach of contract

claim and with an understanding of the impact of those efforts on the other claims.  Having

reviewed the records submitted in support of Trans Union's attorneys' fee request, the Court

finds that the number of hours claimed is excessive.  In particular, Trans Union requests the fees

it incurred in the spring and summer of 2007 in seeking a protective order to safeguard the

confidentiality of the VantageScore algorithm.  While the relevance of the VantageScore

algorithm to the allegations supporting the breach of contract claim is apparent, it is not clear

why it was necessary for Trans Union to bear the responsibility of incurring the attorneys' fees to

safeguard the confidentiality of the VantageScore algorithm.

The fees requested by Trans Union also will be reduced to reflect a reasonable hourly

rate that is more in line with the prevailing market rate in the relevant legal community for

similar services provided by lawyers of comparable skill, experience, and reputation.  Blum v.

Stenson, 465 U.S. 886, 895,  n.11 (1984).  When determining a reasonable hourly rate, the

relevant legal community is the forum in which the district court sits.  See Fish v. St. Cloud State

Univ., 295 F.3d 849, 851 (8th Cir. 2002).  In determining a reasonable hourly rate, a district

court may rely on its own knowledge of prevailing market rates.  Warnock v. Archer, 397 F.3d

1024, 1027 (8th Cir. 2005).  The rates charged by Trans Union's Chicago lawyers are

substantially higher than the rates charged by its Minneapolis lawyers with comparable years of

experience.  The Court concludes that an appropriate award under the prevailing local rate given

the nature and duration of the case and the time and labor reasonably required is $650,000 rather than the $860,000 claimed by Trans Union.

With respect to costs and disbursements, the Court has reviewed the invoices and awards the costs and disbursements claimed by Trans Union, with the exception of the approximately $314,000 claimed as "contract attorney fees" and the approximately $275,000 claimed as "Electronic Discovery Vendor" costs. The claims in this case fell into three categories, the antitrust claims, the trademark-related claims, and the breach of contract claims. Noting these three categories, Trans Union asserts that the breach of contract claims represented a third of the case and thus claims a third of the costs it spent on the contract attorneys and the electronic discovery vendor. See Gardner Aff. [Docket No. 993] ¶ 16. Trans Union overestimates the proportion of the breach of contract claims to the rest of the case. As an indication, the briefing that was devoted to the breach of contract claims in this case did not equal the briefing devoted to the antitrust claims and the trademark-related claims. For example, in arguing the summary judgment motions, the parties devoted more than 200 pages of briefing on the antitrust claims and the trademark-related claims and only 60 pages (approximately 23%) on the contract claims. At the April 1, 2009 summary judgment hearing, 30 minutes per side were allocated for the antitrust claims and 20 minutes per side for the trademark-related claims, while 10 minutes per side (approximately 16%) were allocated for the contract claims. Similarly, 28 pages of the Court's July 24, 2009 summary judgment decision analyzed the antitrust and trademark-related claims, whereas 11 pages (approximately 28%) discussed the breach of contract claims. The costs sought for the contract attorneys and the electronic discovery vendor are reduced to

$240,000 and $210,000, respectively, to better reflect the measure that the breach of contract claims amounted to in this case.

## E. Defendants' Motion for Attorneys' Fees

Defendants move for attorneys' fees on the Lanham Act claims pursuant to 15 U.S.C. § 1117(a), which provides that a court "may award reasonable attorney fees to the prevailing party" in "exceptional cases."[5] An exceptional case is one in which "one party's behavior went beyond the pale of acceptable conduct." Aromatique, 28 F.3d at 877. Such exceptional behavior involves action that is "groundless, unreasonable, vexatious, or pursued in bad faith." Scott Fetzer Co. v. Williamson, 101 F.3d 549, 555 (8th Cir. 1996); Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 123 (8th Cir. 1987).

Defendants contend this is an exceptional case because (1) Fair Isaac's infringement claims were groundless, unreasonable, vexatious, and pursued in bad faith and (2) the jury found in favor of Defendants on the fraud on the PTO counterclaim claim.

In arguing that Fair Isaac's infringement claims were groundless, unreasonable, and pursued in bad faith, Defendants claim that Fair Isaac never used "300-850" as a trademark prior to obtaining registrations, did not introduce evidence to show the extent and effect of its use of marketing materials featuring the "300-850" mark, never presented evidence of advertising expenditures and marketing plans regarding the "300-850" mark, and never conducted a

_____

[5] Also, Defendants claim they are entitled under the MDTPA to attorneys' fees as the prevailing party. The relevant section provides that attorneys' fees may be awarded to the prevailing party if "the party complaining of a deceptive trade practice has brought an action knowing it to be groundless." Minn. Stat. § 325D.45, Subd. 2. The standard is similar to the standard used to determine whether a case is exceptional under the Lanham Act, and none of the parties assert that the resolution of the request for attorneys' fees under the MDTPA would be any different from the resolution of the request under the Lanham Act.

secondary meaning survey.  In addition, Defendants argue that the likelihood of confusion expert Fair Isaac presented at trial lacked credibility; that Fair Isaac did not allege infringement claims against Trans Union and Experian until more than seven months into the litigation, which shows that the true purpose of this lawsuit was to hinder or stifle its new competitor, VantageScore; and that the amount of money Fair Isaac requested for damages—three different figures ranging between approximately $200 million and $320 million, see Pls. Ex. 1525 at 7-8; Trial Tr. at 2131-33—was outrageous.

Fair Isaac responds that its infringement claims were not groundless, unreasonable, vexatious, or pursued in bad faith is demonstrated by the PTO's conclusion that "300-850" was entitled to trademark protection and that Fair Isaac's claims survived Defendants' motion for summary judgment and their motion for judgment as a matter of law at the close of evidence. Furthermore, Fair Isaac claims it reasonably believed that no secondary meaning survey would be necessary because the registration created a presumption that "300-850" was valid, licensee estoppel would preclude a challenge to the validity of the mark, and evidence of Fair Isaac's dominant position, intentional copying, and actual consumer confusion would be adequate to establish that the mark had acquired secondary meaning and thus was entitled to protection. Although the Court found in ruling on the equitable claims that Fair Isaac's expert testimony lacked credibility, Fair Isaac contends that the Court's decision to allow him to testify over Defendants' objection is evidence of the merit of the claims.

The Court concludes that this is not an exceptional case.  Fair Isaac's infringement claims survived a summary judgment motion based on "nearly 300 pages of briefing[,] . . . close to ten thousand pages of declarations and exhibits filling more than nine bankers boxes," and more

than two and a half hours of oral argument. Fair Isaac, 645 F. Supp. 2d at 763. The claims also survived Defendants' motion for judgment as a matter of law at the close of a three week trial. Such circumstances are inconsistent with the contention that Fair Isaac's infringement claims were groundless and unreasonable. See Scott v. Mego Int'l, Inc., 524 F. Supp. 74, 75 (D. Minn. 1981) ("[T]he plaintiff successfully withstood a motion for summary judgment and a motion to dismiss at the end of his case in chief. . . . [Although] the court has decided most of the legal issues adversely to the plaintiff and . . . has made certain comments in evaluating the testimony and the evidence[,] . . . . this was not a frivolous or unreasonable case . . . ."). The jury's resolution of this case suggests that Fair Isaac badly misjudged the evidentiary strength of its infringement claims. The Court cannot say, however, that the claims were wholly without merit, especially in light of uncertainties that the parties undoubtedly had regarding how the Court would rule on (1) motions in limine, (2) the proper role of the registrations at trial, and (3) various legal issues including licensee estoppel and spoliation.

That the jury found Fair Isaac committed fraud on the PTO in obtaining the registrations does not alter the Court's conclusion that this case is not an exceptional one. In Aromatique, the Eighth Circuit, in a per curiam opinion, denied a request for attorneys' fees under the authority of § 1117(a). 28 F.3d at 866. Judge Morris Sheppard Arnold wrote a concurring opinion, explaining that he would have awarded fees because he viewed the plaintiff's actions as being "beyond the pale of acceptable behavior" when the plaintiff (1) falsely told a defendant that the plaintiff had a federally registered tradedress to convince the defendant to cease and desist using that dress, and (2) then used that successful cease and desist effort to convince the PTO that the dress had acquired secondary meaning. Id. at 878-79. However, Judge Arnold did not suggest

that a determination that a party obtained the registration through fraud on the PTO automatically renders the case exceptional. To the contrary, Judge Arnold recognized that if the rule were such that a finding that a plaintiff fraudulently obtained a registration automatically entitled the defendant in an infringement action to attorneys' fees, the effect of such a principle would be to deprive courts of the discretion given to them under § 1117(a). Id. at 876. In addition, Judge Arnold recognized that such a rule would be unworkable in view of "the more general tenor of the law of trademark." Id. Judge Arnold reasoned that a plaintiff can have valid trademark rights under the common law and state law even when the plaintiff obtained the registration through fraud on the PTO. Id. at 876-77. Thus, automatically awarding fees on the basis of fraud on the PTO would permit the "anomalous result" of a plaintiff being required to pay attorneys' fees to a defendant for the fraud on the PTO, yet also being able to recover against the same defendant for infringement of valid trademark rights under state law and common-law. Id.

This litigation included claims that Defendants infringed Fair Isaac's trademark rights under the common law and state law. Although those claims, like claims for infringement of a registered mark, ultimately failed because Fair Isaac's marks are not entitled to trademark protection, the issue of fraud on the PTO was not determinative of the validity of the claimed rights under the common law and state law. Therefore, even if Defendants had not been forced to defend against the claim for infringement of a fraudulently registered mark, they would have still incurred attorneys' fees to defend against the claims for infringement under the common law and state law.

**F.      Defendants' Motion to Strike**

Defendants move to strike three exhibits Fair Isaac submitted in support of its opposition to Defendants' motion to amend to order cancellation of the trademarks.  Defendants contend that the three exhibits were not offered at trial.  Fair Isaac responds that Defendants' motion to amend improperly attempts to justify the jury's verdict regarding fraud on the PTO with an evidentiary argument that was never presented to the jury, and the three exhibits were submitted merely to show what responsive evidence Fair Isaac would have submitted at trial had Defendants actually made the argument to the jury.  Fair Isaac further represents that the exhibits would be relevant only if the Court were to uphold the fraud on the PTO verdict on the basis of Defendants' "newly presented" evidentiary argument.  The Court did not consider any information in the three exhibits in arriving at its decision, and, accordingly, Defendants motion to strike is moot.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Fair Isaac's Motion for Judgment as a Matter of Law, a New Trial, or Detailed Findings [Docket No. 986] is **DENIED**;

2.  Defendants' Motion to Amend the Judgment to Order Cancellation of Trademark Registration [Docket No. 983] is **GRANTED**;

3.  Trans Union's Motion for Attorneys' Fees and Costs [Docket No. 976] is **GRANTED** in part;

4.  Trans Union is awarded $650,000 in attorney fees and $535,857.37 in costs;

5.  Defendants' Motion for Attorneys' Fees and Related Expenses [Docket No. 978] is

**DENIED**;

6.  Defendants' Motion to Strike [Docket No. 1046] is **DENIED**;

7.  The Judgment [Docket No. 970] is **AMENDED**;

8.  The United States Patent and Trademark Office is ordered to cancel U.S. Trademark

Registration No. 3,083,563; and

9.  The order to cancel U.S. Trademark Registration No. 3,083,563 is stayed pending any

appeal of this matter.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

                BY THE COURT:


                _____s/Ann D. Montgomery_____
                ANN D. MONTGOMERY
                U.S. DISTRICT JUDGE

Dated:  May 10, 2010.