UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                            )
Fair Isaac Corporation and  )  CIVIL ACTION
myFICO Consumer Services, Inc., )  NO. 06-4112 (ADM/JSM)
                            )
          Plaintiffs,       )
                            )
      vs.                   )  **Volume XV**
                            )
Experian Information Solutions, )
Inc.; TransUnion, LLC;      )
VantageScore Solutions, LLC; )
and Does I through X,       )  Courtroom 13 West
                            )  Thursday, November 19, 2009
          Defendants.       )  Minneapolis, Minnesota
                            )
------------------------------------------------------------


**J U R Y   T R I A L   P R O C E E D I N G S**


BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE
AND A JURY




**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
**KRISTINE MOUSSEAU, RPR, CRR**
Official Court Reporters – United States District Court
1005 United States Courthouse – 300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S :**


For the Plaintiffs:        **ROBINS, KAPLAN, MILLER & CIRESI, LLP**
                           By:  RONALD J. SCHUTZ, ESQUIRE
                                CHRISTOPHER K. LARUS, ESQUIRE
                                RANDALL M. TIETJEN, ESQUIRE
                                MICHAEL A. COLLYARD, ESQUIRE
                                LAURA E. NELSON, ESQUIRE
                                MARY E. KIEDROWSKI, ESQUIRE
                           800 LaSalle Avenue - Suite 2800
                           Minneapolis, Minnesota  55402-2015



For defendant **Experian**
 **Information Solutions,**
  **Inc.:**      **WHITE & CASE, LLP**
                           By:  ROBERT A. MILNE, ESQUIRE
                                CHRISTOPHER J. GLANCY, ESQUIRE
                                JACK E. PACE, III, ESQUIRE
                                MEGHAN McCURDY, ESQUIRE
                           1155 Avenue of the Americas
                           New York, New York  10036-2787


                           **LINDQUIST & VENNUM, PLLP**
                           By:  MARK A. JACOBSON, ESQUIRE
                                CHRISTOPHER R. SULLIVAN, ESQ.
                           4200 IDS Center
                           80 South Eighth Street
                           Minneapolis, Minnesota  55402



For defendant
 **TransUnion, LLC:**      **BASSFORD REMELE, P.A.**
                           By:  LEWIS A. REMELE, JR., ESQUIRE
                           33 South Sixth Street - Suite 3800
                           Minneapolis, Minnesota  55402-3707

**A P P E A R A N C E S   (Continued):**


For defendant
 **TransUnion, LLC:**      **NEAL, GERBER & EISENBERG, LLP**
                          By:   JAMES K. GARDNER, ESQUIRE
                                RALPH T. RUSSELL, ESQUIRE
                                DAO L. BOYLE, ESQUIRE
                          Two North LaSalle Street
                          Suite 2200
                          Chicago, Illinois  60602-3801



For defendant
 **VantageScore Solutions,**
   **Inc.:**      **KELLY & BERENS, P.A.**
                          By:  BARBARA PODLUCKY BERENS, ESQ.
                               JUSTI RAE MILLER, ESQUIRE
                               CATHERINE A. McENROE, ESQUIRE
                          3720 IDS Center
                          80 South Eighth Street
                          Minneapolis, Minnesota  55402








                      *  *  *  *  *

1      (8:45 a.m.)

2                    **P R O C E E D I N G S**

3                      **IN OPEN COURT**

4      (Without the jury)

5              THE COURT:  Okay.  The record should reflect we are

6      outside the presence of the jury and I think there are a few

7      cleanup items we need to deal with prior to the arrival of

8      the jury.

9              My understanding is that after some discussion

10     between the parties, the demonstrative exhibits issues that

11     remain for the Court's decision related to Exhibits 501 and

12     505 and 506.  501 and 505 will go to the jury.  They were

13     received in evidence and have been seen by the jury.

14             With regard to 506 -- hard for me to read these

15     numbers -- 506 or --

16             Is that a 6, John? -- the Berger slides --

17             THE CLERK:  305.

18             THE COURT:  Oh, 305.  Little dyslexia this morning.

19     305, the Berger survey and opinions, I have pulled out the

20     ones -- I got a copy of the transcript, and even though the

21     transcript doesn't gear it to slides, I tried to follow

22     through as to which ones were displayed and was guided by

23     your notes as well with regard to the items that you agreed

24     were not displayed.  But the packet that'll go to the jury

25     from the Berger -- from the Jacoby slides evaluating Berger's

1    survey and opinions are pages 1 through 27, 31 through 34, 39

2    through 41, and 44 through 46, and the rest have been taken

3    out of the packet as not displayed or whatever, so it's a

4    smaller packet.

5            Everybody got that or do you want me to run through

6    that again?  Okay.  Everybody seems to be on track with that.

7            All right.  John has given you the final set of

8    instructions.  Changes from the last packet you saw related

9    to -- I caught last night that the instructions didn't track

10   the exact order of the special verdict form, so the one

11   relating to Question 7 is moved so that we go through the --

12   consecutively through the verdict form, so it's just a change

13   in order of the number.  And I changed the verbiage a little

14   bit to the first damages instruction will be when I tell them

15   about Question Number 8 so there's a little transition in

16   there.

17           And then so that my children wouldn't be

18   embarrassed by my instructions, I changed the fact that they

19   watched on a "television set" to "monitor," because that

20   would really bother them if I --

21        (Laughter)

22           Things like that, they tell me how old I'm getting.

23   So it would be a monitor when we talk about videotape

24   depositions, they saw it on a monitor rather than a

25   television set.

 1           All right.  And I don't think that would engender

 2     any further objections as they're all nonsubstantive matters.

 3           Mr. Larus, it does.

 4           MR. LARUS:  Well, I'd just like to preserve our

 5     objection for the record, because I don't know that it was

 6     made of record, our objection to Exhibits EX 501 and EX 505

 7     going to the jury.  We understand your Honor's ruling.  We

 8     just want to preserve the objection.

 9           THE COURT:  Yes.  That's noted.  Did anyone wish to

10     argue about the Jacoby slides any more, the ones I -- you

11     can live with what we left in there?

12           Okay.  Very good.  We will start then -- and

13     Mr. Milne, you may set up at the lectern so that when the

14     jury next arrives at 9 -- Mr. Glancy?

15           MR. GLANCY:  Your Honor, we had just one question

16     or comment about the verdict form, that we had requested and

17     I don't think you ruled yesterday either way that the first

18     several instructions refer the jury to Question 9 if they

19     answer in a way that would otherwise end the case.

20           Question 9 is the instruction on fraud on the

21     Trademark Office and we think that that question should be

22     answered regardless of the secondary meaning because it goes

23     to our claim for attorneys' fees in this case and it also is

24     something that we would forward to the Trademark Office.

25           THE COURT:  All right.

1        MR. GLANCY:  And there's a pending cancellation

2   proceeding on that same ground in the Trademark Office.

3        THE COURT:  All right.  Plaintiff contest whether

4   or not they should answer the final question with regard to

5   the fraud on the Trademark Office regardless of their answers

6   to the prior questions?

7        MR. LARUS:  We believe the way it's currently

8   structured is how we suggest it be handled whether or not it

9   relates to some other potential proceeding.

10        THE COURT:  Well, it seems to me it's safer to have

11   them answer that because then we'd at least know.  Whether

12   they should or not we can figure out later, but if we don't

13   have their answer, then we don't know it.

14        John, we can fix the signals on that pretty easily,

15   can't we, just:  Regardless of your answer to Question Number

16   1, instead of saying you're done, say go to

17   Question 9?

18        MR. SCHUTZ:  Well, I don't think it would say quite

19   that.

20        THE COURT:  We'll work on the language and we'll

21   give you the special verdict form to look at.  We can work on

22   that through the morning while you're arguing.  You'll get

23   another chance to look at that before we do it.

24        All right.  And I want to forewarn you that I do

25   tell the jury that they may not take notes during closing

1    arguments because that's not evidence, so I will not let them

2    have their notebooks during argument.

3              MR. REMELE:  You don't give them the special

4    verdict form when we're arguing?

5              THE COURT:  I don't.  I don't.  You can use it, you

6    can put it on the screen, though it might change a little bit

7    in terms of the signals, so you might want to just go with

8    the questions rather than the signals.  The questions will be

9    the same.  And then I do display it on the ELMO as I'm

10   reading it to them in my instructions.

11             All right.  We're set for 9 o'clock?

12             All right.  Court will be in recess till 9.

13        (Recess taken at 8:53 a.m.)

14                          *  *  *  *  *

15        (9:00 a.m.)

16                          IN OPEN COURT

17        (Jury enters)

18             THE COURT:  Good morning.  Please be seated.

19             As I told you Tuesday when we last were in session,

20   that the matters remaining to be accomplished prior to your

21   deliberations are the arguments of counsel and my

22   instructions of law to you.  We're going to proceed with

23   those matters today.

24             Because the arguments of the lawyers are not

25   evidence in the case, I'm going to ask you not to take notes

1    during the argument, just listen to their arguments, and

2    later on I'll be giving you instructions and those will be in

3    writing and I'm going to give you a copy of the instructions.

4         So you don't really need to take any notes today at

5    all.  Devote your full attention to listening to the

6    arguments, please.

7         We will begin first with the argument given on

8    behalf of defendant Experian by their counsel, Mr. Robert

9    Milne.

10        Mr. Milne, you may proceed.

11        MR. MILNE:  Thank you, your Honor.

12    **DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'s**

13                   **CLOSING ARGUMENT**

14        MR. MILNE:  Good morning, everyone.  It's really my

15    pleasure finally at the end of this long, long, long trial to

16    be able to address you at closing.

17        And I want to begin by thanking you, really

18    thanking you for your attention over this trial.  I know it

19    has been a long trial and I know this isn't exactly the most

20    interesting subject matter in the world, it's difficult

21    stuff, and the attention that you all have paid and your

22    ability to stay awake through it all has really been

23    impressive.

24        (Laughter)

25        MR. MILNE:  I appreciate that.  You know, and our

1    system really places great reliance on jurors like you to do

2    that, to pay attention when the evidence is coming in in a

3    trial and to then use your common sense, your good judgment,

4    et cetera, and take that evidence and apply it to the dispute

5    and come to the right result, and judging how well you paid

6    attention, I know you're going to do a great job at that.

7           And what I'd like to do in my closing is to work

8    through some of the evidence with you now in the context of

9    the specific -- you know, the legal requirements of these

10   claims and talk through with you what the evidence is on each

11   of those, and I'm hoping that that will help make your job a

12   little easier when you go back to deliberate.

13          Now, as you've heard from the judge, you're going

14   to get some instructions from her on the law at the end of

15   the case.  And I want to just make clear at the beginning

16   here, because you've heard about some other matters during

17   the course of this trial, things like keyword Internet

18   advertising and the like, you are not going to have to worry

19   about those issues.  You're not going to be asked to make any

20   decisions about those issues and the judge will instruct you

21   about that.  There are only two issues that you're going to

22   have to decide in your deliberations.

23          The first is, you're going to have to decide on

24   this claim of infringement of the claimed 300 to 850

25   trademark, that's number one, and number two, you're going to

1    have to decide on this issue of the defendants' claim of

2    whether Fair Isaac committed fraud, basically lied to the

3    Patent and Trademark Office when it was going through that

4    application on the 300 to 850 patent -- trademark.  I'm

5    sorry.

6          So those are the two issues and what I'd like to --

7    Mr. Remele from TransUnion is going to focus on the fraud

8    claims when he speaks to you and so I'm going to basically be

9    focusing on this 300 to 850 trademark claim.

10         And as I know you're all painfully aware by this

11   point, Fair Isaac claims a trademark in (indicating) this,

12   300-850, and as a practical matter on every number in between

13   300 and 850, because they take the position that any scoring

14   service that has a range that overlaps even just a little bit

15   with 300 to 850 infringes their trademark.

16         And so the first issue that you're going to have to

17   decide is, is this thing 300 to 850 a valid trademark,

18   because if it's not a valid trademark, there's nothing to

19   infringe and the case is over, this 300 to 850 case is over.

20         And you heard a little bit in the testimony the

21   other day from Mr. Anderson, the former Trademark Office

22   official, that 300 to 850 is just a descriptive term, and

23   you'll hear that Judge Montgomery has already decided that

24   that's what 300 to 850 is.  It merely describes something

25   about Fair Isaac's scoring algorithm, the FICO algorithm.  So

1   what that means is that when it comes to validity of 300 to

2   850, the only thing that you have to decide is whether 300 to

3   850 has acquired secondary meaning.  You've heard that term a

4   few times over the course of the trial.

5          And what secondary meaning means, what it's

6   referring to in the context of 300 to 850 is, it's saying

7   that -- and you have to find as a result of the evidence --

8   that a significant portion of the millions of consumers for

9   credit scoring services, when they hear 300-850, they have an

10  automatic thought, an automatic association between that term

11  and a single source, Fair Isaac.  That is the essence of

12  secondary meaning.  It's like the trademarks we know about.

13  You see the Nike swoosh and you think about a particular shoe

14  company and we talked about that during the opening

15  statements.  That's what secondary meaning is.

16         Now, there's another thing that you have to keep in

17  mind and it's very important as well.  Not only does Fair

18  Isaac have to show that secondary meaning in 300 to 850 came

19  into existence, but it also has to show that it came into

20  existence before my client, Experian, began selling its

21  scoring product, the PLUS score, with the alleged infringing

22  score range, so there's a timing element as well on what they

23  have to prove.

24         I just put this little timeline up here.  You've

25  heard the evidence about how the PLUS score from Experian was

1    introduced in October of 2003 with a 300 to 900 scoring

2    range, and then not too long after that they shifted that

3    range to 330 to 830 and then that was rolled out over time

4    across various websites into the middle part of 2004.  So if

5    you're being conservative, you could say that Fair Isaac has

6    to show secondary meaning kicked in, if you will, by about

7    the middle part of 2004, so it's secondary meaning by

8    mid-2004.

9           And you're going to get -- at the end of the

10   instructions from Judge Montgomery, you're going to get a

11   special -- it's a verdict form.  It's a questionnaire that

12   you're going to have to fill out and you'll see these

13   questions -- I've just reproduced the first page of it

14   here, and the first question is:  "Has '300-850' acquired

15   secondary meaning?"  And if you answer that question no,

16   you're basically done, you can stop, you don't have to fill

17   in any more questions.  But even if you find there is some

18   secondary meaning, you have to go to Question 2, which says

19   did it acquire secondary meaning before the defendants'

20   allegedly infringing uses, and you have to look at the entry

21   dates for the different scores, and as I say, Experian, we're

22   talking basically mid-2004.

23          So, that's your job in the first instance is to

24   answer those couple of questions on secondary meaning.

25          Now, Judge Montgomery -- we talked about what

1    secondary meaning is, it's that automatic association -- and

2    in the jury instructions you're going to get from Judge

3    Montgomery a number of factors that you can consider in

4    thinking about secondary meaning and whether it was ever

5    developed, and there are a number of them.  And you're free

6    to consider some of them, all of them, none of them, but in

7    the end you have to use your good judgment and your common

8    sense based on the evidence to decide whether 300 to 850

9    developed secondary meaning before mid-2004.

10        But it's useful to kind of walk through and I've

11   kind of pulled out several of them and simplified them a

12   little bit.  Judge Montgomery's instructions will control, of

13   course, but here are some of the factors that you need to

14   consider, and what I'd like to do is walk through each of

15   them and talk to you a little bit about what the evidence is

16   on each of them.

17        And the first one is was 300 to 850 ever used as a

18   trademark.  You know, in a lot of ways that's the most

19   important question, because if they never used it as a

20   trademark, it -- it just doesn't make sense that it could

21   have developed secondary meaning, so let's talk about that

22   and let's start with just a reminder of what a trademark is.

23        You know, a trademark is a symbol, a term, a phrase

24   that tells you something about the source.  You see that

25   symbol and you automatically think of a particular source.

1    And a trademark, in some ways you can think about a

2    trademark, it answers the question who made this thing, who

3    is supplying this thing.  A merely descriptive term answers

4    the question of what is it, something about this thing, and

5    that's sometimes a useful way to think about the difference

6    between a trademark and something that's just a merely

7    descriptive term.

8            So how do you use something as a trademark?  And we

9    talked about it.  And a good example to think about this is,

10   the other day the example of Kentucky Fried Chicken came up

11   in the questioning of Mr. Anderson.  And how did Kentucky

12   Fried Chicken, which is a descriptive term -- it says

13   something about chicken fried using some Kentucky recipe or

14   in Kentucky -- how did it come to be associated -- nobody

15   thinks of it that way anymore.  When we hear Kentucky Fried

16   Chicken we think of a particular place, a particular

17   restaurant chain.  And the way it came to be -- to have that

18   association is that the Kentucky Fried Chicken Company over

19   years and years relentlessly advertised that name, that term.

20   It was in TV commercials, magazines, radio, you name it.

21   They've been promoting that term for years.  That is

22   trademark use.

23           We talked about American Airlines in my opening

24   statement.  It's the same thing, a descriptive term.  How did

25   it become associated with a particular airline company?

1    Advertisement, promotion, featuring of the thing, not just

2    using it as a descriptive term.

3         So to use something as a trademark, you feature it

4    in advertising.  You use big bold lettering and you say -- in

5    the context of, say, 300 to 850 you say:  Look for your 300

6    to 850 score.

7         You look at the top of the website -- and again,

8    we're focusing on mid-2004 and earlier -- were they using 300

9    to 850 that way?  Did they put 300 to 850 up at the top of

10   their websites, their brochures, their advertisements?  Those

11   are the things that you need to look at to decide whether 300

12   to 850 has ever been used as a trademark.

13        The other thing that you do when you use something

14   really as a trademark is you put the world on notice that

15   you're claiming it as a trademark.

16        Now, Fair Isaac says that it has had trademark

17   rights in 300 to 850 going back to 2001 when they first

18   started selling scores in the consumer marketplace.  That's

19   what they say.  And so one of the questions for you is did

20   they put the world on notice of that before they started

21   writing letters and filing lawsuits in 2006.  Did they use

22   that TM symbol.  Did they put the world on notice.

23        The other thing that you do when you have a real

24   trademark is you enforce it.  If you're aware of somebody

25   using an overlapping term, something that you think is

1    infringing, you write letters.  You go out there and you tell

2    people, you put the world on notice:  I have a trademark.

3           So those are the kinds of things you do when you

4    have a real trademark and you're using it as a real

5    trademark, and so what does the evidence show here about Fair

6    Isaac's use of 300 to 850 before mid-2004?

7           Now, if you think about Fair Isaac's case, you have

8    to go way back to the beginning of the case -- it seems like

9    a year ago -- for their first witness, the only witness from

10   the company that they called to sort of establish trademark

11   rights, and that was Ms. Kramers-Dove.  She testified at the

12   beginning of the case.  And as she told you and as she

13   admitted, she's not even involved in the part of the business

14   that sells FICO scores to consumers.  She's not involved in

15   that piece of the business.

16          Why did Fair Isaac not bring the person who's

17   heading up their consumer business to talk about advertising

18   and the kinds of things that you heard about from the people

19   like Mr. Danaher and Mr. Williams, Mr. Danaher from TU and

20   Mr. Williams from Experian, who came in and talked about the

21   ways in which they promote their scores in the consumer

22   marketplace, and it may be because Fair Isaac doesn't have

23   much to tell us there.

24          So what did Ms. Kramers-Dove present?  What did she

25   present to show that Fair Isaac used 300 to 850 as a

1  trademark in that period before mid-2004?

2        Well, what she did was, Fair Isaac's lawyers walked

3  her through a series of brochures, some press releases and

4  some website pages, and these were all presented as examples

5  of supposed trademark use.  And I just -- you are going to

6  have all this material back in the jury room with you.  I

7  only have a short time to speak to you, so I'm going to show

8  you a couple of examples and I would just ask you to really

9  carefully review this material when you go back to the jury

10  room and see if you see anything much different.

11        Now, this is one of the documents that

12  Ms. Kramers-Dove presented and this is a web page from 2002,

13  and the first thing to focus on is are they featuring

14  300-850.  Are they saying:  "Get your 300 to 850 score up at

15  the top"?  Well, up at the top, what do we see?  We see

16  "myFICO," we see "the FICO score."  We don't see "300 to 850"

17  up there.  It's not being featured.  Where is the reference

18  to 300 to 850?  I'm going to blow it up here.  It's sort of

19  buried over here in a sentence, and it says:  "Based on a

20  scale of 300 to 850, there are three FICO scores."  That's

21  supposed to be trademark use according to Ms. Kramers-Dove.

22        Now, as I said at the beginning, one of the ways

23  you think about a trademark is a trademark tells you

24  something about who makes this product as opposed to

25  something about the product.  And one way to think about

1    whether this is trademark use of 300 to 850 is, let's just

2    pretend that this second half of the sentence was deleted and

3    all it said was:  "Based on a scale of 300 to 850" -- or

4    let's just say they deleted the reference to FICO.  "Based on

5    a scale of 300 to 850, there are three scores."  Let's say

6    that's what the sentence said.  Would 300 to 850 tell you

7    anything about who made this thing, who supplies this thing?

8    That's the question you have to ask yourself.  But if you

9    took out 300 to 850, that first part of the sentence, and you

10   just focused on the last half and it said:  "There are three

11   FICO scores," would you know who was supplying this product?

12   FICO answers the question who made this.  300 to 850 does not

13   answer that question.  300 to 850 is just descriptive use.

14            Now, you may remember just the other day before

15   your day off Mr. Robert Anderson came in and testified.

16   We're putting -- you get to see their pictures.  Mr. Robert

17   Anderson came in and he testified.  He's the one who was the

18   Deputy Assistant Commissioner for Trademarks at the U.S.

19   Patent and Trademark Office for 18 years.

20            Now, Mr. Anderson -- and again, this is your

21   decision whether 300 to 850 is trademark use, but you can

22   consider Mr. Anderson's testimony.  And if you recall,

23   Mr. Anderson was asked some questions about certain articles

24   that appeared in the application file at the Patent and

25   Trademark Office for the 300 to 850 application and I want to

1  put one of those up here.

2          This is a web page from a San Diego real estate

3  guide and there's a sentence in there referencing 300 to 850,

4  and see how it's exactly the same as the sentence that

5  Ms. Kramers-Dove put forward as an example of trademark use?

6  Mr. Anderson was asked is the use of 300 to 850 there merely

7  descriptive, and he said based on Trademark Office procedures

8  and standards, yes, just descriptive.  He was asked is the

9  use of 300 to 850 trademark use, and he said no, according to

10  Trademark Office practice and procedures.  This is what

11  Ms. Kramers-Dove is putting forward as supposed trademark

12  use.  It's exactly the same language.

13          Let's go to another example.  Here's a brochure,

14  another one of the ones Ms. Kramers-Dove put forward as an

15  example of 300 to 850 being used as a trademark.  This is a

16  brochure -- again, this is the first page of it.  Do we see

17  300 to 850 anywhere on that page?  No.  But we do see

18  trademarks:  myFICO, FICO, their little logo, telling you who

19  supplies this thing.  You got to go inside the brochure a

20  little bit to see a reference to 300 to 850, and I think

21  we're going to pull it up here.  And there it is.  It's kind

22  of again buried in the text, not featured like a trademark,

23  and it says:  "Your FICO score is a snapshot of your credit

24  bureau report at a particular point in time.  It's a number

25  between 300 and 850."  You have to judge for yourself.  Is

that merely descriptive reference, 300 to 850, or is it
telling you who made this thing, or is the FICO reference
telling you who made this thing.

Mr. Anderson was asked the other day about this
article as well that was in the Trademark Office file for 300
to 850, and let's pull up the sentence he was asked about.

"What is my FICO score?  It's a number from 300 to
850."  It's a number between 300 and 850.  And Mr. Anderson
was asked those same questions about the use of 300 to 850.
Is it descriptive according to Trademark Office procedures
and standards?  He said it was just descriptive.  According
to Trademark Office procedures and standards, is it trademark
use?  Mr. Anderson said no.  Again, the decision is up to
you, but you can consider that testimony.

Let me show you one more example that
Ms. Kramers-Dove put up as an example of trademark use, and
this is actually one that I showed you during my opening
statement, if you can remember that far back, a web page from
2001.  This is not even the landing page for the myFICO
website.  But again, what do we see?  Do we see at the top
"300 to 850 score," "Get your 300 to 850 score"?  We see
"myFICO," we see their trademarks, their source indicators,
and where is 300 to 850 referenced?  Let's pull it up.  And
it says there:  "Most U.S. consumers score between 300 and
850."  Now, this one isn't even telling you that that's the

1    exact score range.  It's sort of saying that's what most

2    consumers get.

3         But if you recall, Ms. Kramers-Dove was asked

4    during her cross-examination has Fair Isaac -- does Fair

5    Isaac have a trademark in the term "between 300 and 850"?

6    Remember, the trademark is 300-850.  She was asked do they

7    have a trademark in the phrase "between 300 and 850," and she

8    wasn't able to say that they do.  And she was also asked does

9    Fair Isaac have a trademark in the phrase "from 300 to 850"?

10   Again, Fair Isaac doesn't have a trademark in that phrase

11   "from 300 to 850."  So you're going to have to be the judge

12   whether these uses of 300 to 850 come anywhere close to

13   amounting to trademark use, and if you find that they don't,

14   that can be enough alone for you to find no secondary

15   meaning.

16        Now, there are some other factors too.  Let's go

17   back to our -- or wait.  Before we do that one, still

18   focusing on the use of 300 to 850, I want to talk about this

19   issue of notice, because that's another thing.

20        You know, one of the functions of a trademark is to

21   put the world on notice that you're claiming trademark

22   rights, that you're claiming to be the owner of that term in

23   that industry, and here the evidence is really striking, it's

24   unanimous, about the lack of notice that people in this

25   industry had that anybody was claiming trademark rights in a

1    scoring range.  You won't see a document inside Experian's or

2    TransUnion's files that says:  "Hey, we think there's a

3    trademark in a score range."  You heard the testimony from

4    Mr. Oliai and Mr. Williams from Experian, and they both said

5    they never heard of a trademark in a score range.

6    Mr. Danaher from TransUnion said the same thing.  And

7    significantly, so did the two gentlemen who came in who

8    aren't involved in this litigation, Mr. Wilson and

9    Mr. Christiansen, Mr. Wilson from ChoicePoint,

10   Mr. Christiansen with LexisNexis.  Now, they're both owned by

11   LexisNexis, but they both worked at separate companies that

12   ended up being acquired by LexisNexis, and both of those

13   companies had developed scoring products with ranges

14   overlapping 300 to 850.  And they came in here -- they're not

15   parties to the case, they do business with both sides here,

16   so they don't have a stake in the outcome, and they said they

17   never heard of a trademark in a score range.

18         We didn't see any evidence of Fair Isaac writing

19   letters, putting the world on notice:  "Hey you're using an

20   overlapping score range.  Stop it.  We've got a trademark."

21   You didn't see anything like that until Fair Isaac started

22   writing letters after -- in the middle part of 2006, even

23   though, again, they claim trademark rights going back to

24   2001.  Focusing on this period from mid-2004 and earlier,

25   because again that's the period you need to focus on for

1    secondary meaning, again, focus on whether you see any

2    evidence that Fair Isaac used that TM symbol to put people on

3    notice.

4              Now, Fair Isaac's lawyers have made a big point out

5    of the fact that there's no legal requirement to put the --

6    to use a TM symbol, and that's true, we're not debating that,

7    but if you really want to put the world on notice that you

8    have a trademark, that's what you do.  You use that trademark

9    symbol.  And if you mess up every now and then and you don't

10   put it in, that's not a big deal, but it's when you never use

11   it that it's a different issue, and I would ask you again

12   look to see before mid-2004 if you see any instances of that

13   kind of trademark usage.

14             And, you know, it's especially true here the use of

15   the trademark, because as we heard, Fair Isaac has its own

16   manuals, its own guidelines internally that say thou shalt

17   use the TM symbol, so they didn't use it here.

18             Now, Fair Isaac's lawyers have said -- and we heard

19   this from Ms. Kramers-Dove -- that there was confusion out

20   there because different -- the Fair Isaac name -- different

21   companies were using different brand names to sell the FICO

22   score.  The Beacon score, the Empirica score all were FICO

23   scores.  You heard that testimony.  And they said:  Well, we

24   needed to adopt a uniform number range for our score because

25   that was going to be the way we would uniquely identify our

1    score because of all this confusion over the different brand

2    names.  Well, there are a couple observations I want to make

3    on that.

4            The first one is, simply saying that is not an

5    excuse for not actually using that term as a trademark, using

6    it in that featured way that we've talked about.  So simply

7    saying yeah, I want to have a uniform indentifier doesn't

8    mean it's a trademark, doesn't mean that secondary meaning

9    has kicked in.  You have to promote it.  You have to do the

10   things necessary to make people aware.

11           So, if you think about it, and again, if they

12   really serious about using 300 to 850 as their unique

13   indentifier, we would have seen 300 to 850 being featured,

14   right?  That's going to be the way they identify this thing,

15   but why would they use FICO?  That's the brand name that's

16   causing confusion because people are using different names.

17   Why do we still see FICO up there at the top of the ads and

18   we don't see 300 to 850?

19           And the other thing that's interesting about that

20   claim that they needed 300 to 850 to just make sure that

21   everybody knew that that was that one single score -- let's

22   put up --

23           This is EX 16.  This is a document from Fair Isaac

24   files, it's in evidence, and you see they reference here

25   Classic FICO scores.  The score range is 300 to 850.

1              Let's go to the next one.  This is another page

2       from the same document.  And then they've got these --

3       they've got these sector scores that we've heard about.  And

4       if you recall during the cross-examination of

5       Mr. Christiansen, Mr. Larus made a big deal out of the

6       difference between those sector scores, the auto specific

7       scores, the mortgage, the different sector scores and the

8       basic FICO score.

9              Well, these different scores, look at the ranges.

10      300 to 850.  So Fair Isaac is selling two different sets of

11      scores using that score range that they're saying is going to

12      be the unique indentifier.  It just doesn't make sense.  You

13      have to use your common sense and sort of evaluate whether

14      these explanations make any sense.

15             So I'm going to leave trademark use at this point,

16      but I think you'll see that the evidence shows that Fair

17      Isaac has certainly not before mid-2004 used 300 to 850 as a

18      trademark.

19             Let's go to the second item that Judge Montgomery

20      -- one of the factors that Judge Montgomery is going to talk

21      to you about on secondary meaning, and this is the issue of,

22      you know, what evidence is there about consumer association

23      between 300 to 850 and a single source.

24             And I would just observe at the outset here that

25      just -- the mere fact that Fair Isaac sells a lot of scores

1      -- and they certainly do, hundreds of billions of scores,

2      they are the giant in this industry, no question, but the

3      fact that they sell a lot of scores does not mean that on its

4      own that consumers associate, people like you and me

5      associate 300 to 850 with a particular source.  That's not

6      proof of that kind of association.

7              The most common way that you go about determining

8      whether there is this kind of association is you do a survey.

9      You go out and get a cross section of the population and you

10     ask them the direct question.  And Fair Isaac, they had a

11     survey expert.  That was Mr. Berger.  You heard him testify.

12     And he was the gentleman who did not use a control group,

13     didn't use a representative sample, didn't analyze his data

14     correctly.  You may recall Professor Jacoby came in and

15     testified in no uncertain terms what he thought of

16     Mr. Berger's work.  In the end you're going to have to judge

17     whether Mr. Berger -- whether Mr. Berger's work was valid

18     survey work, but right now my point is a different one.

19              Mr. Berger did not ask a secondary meaning

20     question.  He didn't say to his survey participants:  "Do you

21     associate 300 to 850 with any particular source?"  You will

22     not see 300 to 850 in any of the questions that Mr. Berger

23     asked and you're going to get some of those materials that

24     Mr. Berger discussed back to the jury room with you, and take

25     a look.  He did not ask the secondary meaning question.

1              The only person -- the only survey expert who came

2    in and asked that direct question was Mr. Johnson, who did

3    the work for the defendants.  He asked about the association

4    between 300 and 850 and Fair Isaac, and if you recall, what

5    he found is that there is almost no association between 300

6    and 850 and Fair Isaac.

7              Now, Fair Isaac has a lot of criticisms about what

8    Mr. Johnson did.  Mr. Larus got up here and he cross-examined

9    him for it seemed like hours, days.  Anyway, they had a lot

10   of criticisms and you're going to have to judge for yourself

11   whether Mr. Johnson had a good rationale for the way he

12   constructed his survey.  Obviously, we think he did.  But the

13   question here is -- you know, Fair Isaac is the plaintiff

14   here.  They have the burden of proof with evidence to show

15   secondary meaning.  We don't have to show the nonexistence of

16   secondary meaning.  They have to prove it.  And if they had

17   criticisms about the kinds of questions that Mr. Johnson

18   asked, why didn't they ask Mr. Berger to go do a survey

19   asking the direct question and not having those kinds of

20   concerns with it that Mr. Larus was going through with

21   Mr. Johnson?  You have to be the judge of why they didn't do

22   that.  Was it because they were afraid of what the answer

23   would be?

24             You also heard from Ms. Kramers-Dove and she

25   testified that she was not aware whether Fair Isaac had done

1  any kind of testing on this issue of secondary meaning before

2  this lawsuit was filed, so there's no evidence in the record

3  right now that anybody at Fair Isaac had any idea about

4  whether consumers had this kind of direct association between

5  300 to 850 and a single source before they filed this

6  lawsuit.

7  Now, you also heard testimony by videotape of

8  Mr. Thomas Quinn of Fair Isaac, and he's -- here's his

9  picture.  He's a leader in the product management/client

10  support group at Fair Isaac.

11  In addition to that video testimony that you saw,

12  Judge Montgomery has admitted into evidence an interview --

13  summary of an interview of Mr. Quinn done by an advertising

14  firm called Olson, and this was a firm that Fair Isaac had

15  retained to do some work for it and Olson conducted an

16  interview and asked some questions of some Fair Isaac

17  employees, including Mr. Quinn.

18  And this document will be back in the jury room

19  with you so you can review it.  It's EX 310 and here's one of

20  the questions and the answers that Mr. Quinn gave.  He was

21  asked -- and this was in 2006.  Keep the date in mind.  This

22  was in July of 2006, so we're talking well after that

23  mid-2004 time period that really matters for secondary

24  meaning here.  And he was asked:  "What would consumers say

25  Fair Isaac is best at?"  And his answer?  "Would have never

1   heard of Fair Isaac.  Don't know what it is, what it

2   does ... the name doesn't exactly roll off the tongue."

3         Another Fair Isaac employee that you heard from by

4   video deposition, Mr. Andy Jolls of Fair Isaac, he was the

5   head -- for a period of time the head of Fair Isaac's

6   consumer business, the myFICO business.  He testified during

7   the defendants' case by video, but he was also interviewed by

8   Olson and there was a summary prepared and Judge Montgomery

9   admitted that one into evidence.  That's EX 309 and you'll

10  see that back in the room when you deliberate.

11        So Mr. Jolls was asked:  "How would your consumers

12  describe the FICO score?"  "Most can't."  "What would

13  consumers say Fair Isaac is best at?"  "Most can't."  Most

14  consumers don't know that much about credit scoring.  Most

15  consumers don't have an association with Fair Isaac or any

16  other scoring service.  You heard that from Mr. Danaher and

17  there's no evidence to the contrary.

18        Now, you're going to have to be the judge here

19  again, but please keep these pieces of evidence in mind as

20  you consider what the evidence is about consumer association

21  between 300 to 850 and a single source.

22        Let's quickly cover some of these other factors

23  here.  Exclusivity.  I won't spend a lot of time on that, but

24  one of the factors is, was Fair Isaac ever the only one using

25  score ranges overlapping 300 to 850 in the credit scoring

space.  Mr. Oliai came in from Experian and walked you

through -- constructed this timeline.  And there are other

documents that were introduced into evidence that talk about

these scores as well, but as you know, going way back to the

early period of credit scoring, late 1980s, early 1990s, Fair

Isaac has never been the only supplier of credit scores with

ranges overlapping 300 to 850, and that's true.  You know,

Fair Isaac wants to draw a big clean distinction between the

lender market and the consumer market and they say don't

worry about the lender market.  Only focus on the consumer

market.  But as we've heard, there is a connection and

Mr. Schutz in his opening did recognize that there's a

spillover is I think the term he used between the two, and

that's because in the consumer market you're selling

educational scores that are trying to give lenders (sic) a

feel for what they might see from their lenders, and lenders

are using a lot of different scores.  Fair Isaac's the

biggest, to be sure, but they're not the only one, and so

there is a connection.

        But in the lender space it's clear Fair Isaac has

never been exclusive and in the consumer space that's true as

well.  Fair Isaac introduced its score, its FICO score, to

consumers in 2001.  You heard from Mr. Oliai that Experian

launched its National Consumer Score, the first score that it

sold to consumers, in 2000 with the 340 to 820 range, so Fair

1    Isaac hasn't been exclusive in either segment.

2         Okay.  Let's go back to the list of factors.

3    Advertisement.  I won't spend a lot of time because we've

4    kind of covered this, has Fair Isaac advertised 300 to 850.

5         Did you hear anybody come in and say:  "We spend X

6    amount of dollars advertising, doing TV commercials, doing

7    radio, doing whatever, doing Internet banner ads, whatever it

8    takes"?  You didn't hear any testimony about that, none at

9    all.  I played for you at the beginning -- and you may recall

10   in my opening statement I played for you the one and only TV

11   commercial that Fair Isaac has ever put out, and this was for

12   the Super Bowl in 2003.  Remember that?  You probably don't,

13   but that will be back in evidence and you'll be able to look

14   at it if you want to see it again.

15        But the key point is that that commercial, their

16   big shot at the consumer market, did not even mention 300 to

17   850.  The term never gets mentioned, in graphics, in the

18   voice over, at all.  What do they use?  Their real source

19   indicators, FICO, myFICO, their real trademarks.  That was

20   the only -- that's the only TV advertising they've done.  Did

21   you hear about any radio, billboards, magazines, whatever

22   else?  You didn't hear any evidence like that for FICO at

23   all, let alone 300 to 850.

24        And you heard from Mr. Danaher, from Mr. Williams

25   of Experian, about how -- that aggressive TV advertising and

1    the -- you know, the banner ads and things like that.  It's

2    expensive, but that's the way you succeed in marketing a

3    brand in the consumer space.  Fair Isaac just never has done

4    that.  It has never used 300 to 850 as a brand through its

5    advertising or any other way.

6         Okay.  Let's go back to the factors, to the last

7    one, thankfully, and this one is the issue of intentional

8    copying of a trademark.  This is the one that Fair Isaac is

9    emphasizing the most.  And you'll hear from Judge Montgomery

10   that it can be a factor if you intentionally copy somebody's

11   trademark.  That can be a factor on secondary meaning.  And

12   Fair Isaac says that Experian copied Fair Isaac's scoring

13   range when it shifted its score range from 300 to 900 to 330

14   to 830, and Mr. Oliai testified about that and the reasons

15   for that.

16        But keep in mind that what this factor is, it says

17   intentional copying of Fair Isaac's trademark, and

18   remember -- let's go back to the timeline.  The PLUS Score

19   was introduced in 2003, and Mr. Oliai testified -- and you've

20   heard it again and again, I already talked about it -- about

21   how at that time in that 2003 time period, nobody had an

22   inkling that anybody was claiming a trademark in a score

23   range.  Nobody had any idea that Fair Isaac was getting ready

24   to pounce four years later with a trademark claim.  So how

25   can you say that Fair Isaac (sic) intentionally copied

1    somebody's trademark when it didn't even know that there was

2    a trademark?  It just doesn't make sense.

3         Now, Fair Isaac has said that Experian -- you've

4    heard this again and again.  We could have picked any range,

5    any number of ranges, an infinite number, but Mr. Oliai

6    talked with you -- and you've heard it from the other

7    witnesses as well -- that, you know, the PLUS Score was

8    designed to be this educational score.  It was designed to

9    give consumers a look and feel of what lenders -- the types

10   of scores lenders were using, which certainly included the

11   FICO score, which was the biggest, but it was others as well

12   and no one thought that there was a trademark.

13        And when it comes to the lender side of the

14   business, you've heard a lot of testimony about how lenders'

15   systems are set up to accommodate three-digit ranges.  That's

16   what lenders prefer.  And Mr. Oliai said, you know, it's

17   common sense.  You want to make -- even though it's

18   technically possible, you could say it's merely cosmetic to

19   have a particular score range, but when your main customers

20   are used to a particular thing like it, you're going to want

21   to make it easy for them to buy your product, especially

22   when, you know, they're going to have to make a switch.

23        Now, every witness has testified -- I mean, every

24   witness that's been asked about this has testified to the

25   same effect.  You heard it the other day from Ms. St. John by

videotape deposition.  She said that the reason -- that one

of the reasons that Fair Isaac selected a three-digit range

originally was because that's what lenders' systems were set

up to accommodate.

Mr. Osborne of Fair Isaac by videotape testified

that lenders' systems are all calibrated to particular score

ranges and it would be a big effort to switch out to some

different range.

And you also heard the same thing from Mr. Wilson

of ChoicePoint and Mr. Christiansen of LexisNexis.  They're

the ones who aren't parties to this case and they both came

in and said the reason they selected three-digit ranges was

because that's what they perceived lenders prefer.

So that the truth here is that the selection of

score ranges was driven by customer desires, the desires to

please customers and to compete, not by any kind of desire to

copy a trademark, because again, at these points in time

nobody even realized anybody was claiming trademark rights.

So, that brings me to the end of the secondary

meaning factors and I would just -- let's go back to the

list.  I would just -- I would just sum it up by emphasizing

again that you need to focus on whether this secondary

meaning has been shown before that 2004 time frame, because

that's the ultimate decision here.

Now -- and again, if you find that secondary

1    meaning was not established by mid-2004 in 300 to 850, then

2    you would answer no either to the first question and/or no to

3    the second question on the jury verdict form and that's the

4    end of the 300 to 850 case.

5        I do need to go a little bit further, though,

6    because let's -- even if you were to find that secondary

7    meaning did come into play at some point, you still have to

8    find infringement in order to find against my client,

9    Experian.  And as you're going to hear from the judge, the

10   only way you can infringe a valid trademark is if the

11   evidence shows that consumers were likely to be confused

12   about the source of the product you're selling by the way you

13   used that allegedly infringing thing.  In this case it would

14   be the 330 to 830 score range of Experian.

15       And, you know, Judge Montgomery again is going to

16   give you some factors that you can consider and let's just

17   put up a representative group of the factors here.

18       The first one is the strength of the 300 to 850

19   trademark.  You know, you heard from Mr. Anderson, he went

20   through that list of the types of trademarks, you know,

21   running from fanciful down to suggestive, down all the way to

22   generic, and descriptive was the second to the bottom on that

23   list.  And at most -- if you find that 300 to 850 ever

24   acquired secondary meaning -- and again, I think the evidence

25   says exactly the opposite -- at most this thing is a weak

trademark and you can factor that in as to whether anybody's

likely to be confused by the way Experian used its score

range.  And really in a lot of ways the most important factor

here is how did Experian use its score range.  Did it use it,

did it present itself in a way that was likely to make people

think they were getting a FICO score.

And let's take a look -- I'm running out of time

here, but Mr. Williams from Experian walked you through a

comprehensive set of Experian's websites and the ways in

which it communicates its scoring services to the public, and

Experian has major websites.  Things like National Score

Index you heard about, CreditXpert, freecreditreport.com, and

here's National Score Index.  Again, you have to be looking

at is Experian using its score range in a way -- in a

trademark way.  Is it featuring or trying to make people

think:  Hey, I could get the 300 to 850 score here.

Where is the score range on this page?  Well, it's

way down here at the bottom, 300 to 900, so this was right

after Experian introduced 300 to 850.  Is that featuring it?

And what's it doing there?  It's telling you what the scoring

range is.  And is there anything about this web page that

would make you think this is something from Fair Isaac?  It

says Experian all over the place.

Let's just blow up this piece here.  You know, it

says the PLUS score.  It doesn't say anything that sounds

 1    like a FICO score.  And right underneath it says "Developed

 2    by Experian."

 3              Let's go to the next -- and, you know, you see

 4    Experian trademarks all over the place.  This is the next

 5    page -- this is the next page on that website, and again

 6    Experian trademarks being featured.  And where is the score

 7    range?  Well, down here.  And what's it doing there?  It's

 8    telling you what the score range is.  It's describing this

 9    product.  It's not featuring it as a trademark.  It's not

10    using it as a way to confuse people to think they're getting

11    a Fair Isaac score.

12              Let's very quickly go to the freecreditreport.com.

13    This freecreditreport.com is Experian's big website.  It's

14    its flagship website.  It's the one you see in these

15    commercials on TV all the time with these guys playing

16    guitar.  They are really featuring -- they're advertising

17    that brand.

18              But let's look at freecreditreport.com's landing

19    page.  Is 330 to 830 even mentioned?  Is 330 to 830 being

20    used to tell you that this is what we're selling, the 330 to

21    830 score?  No.  They're not featuring the score range, using

22    this thing as a trademark.  And what do we see?  We see

23    Experian, we see Experian's trademarks, the ones that it is

24    promoting as indicators of source.

25              And on every web page -- Mr. Williams talked to you

1    about this -- on every web page of Experian there's also this

2    page that tells you about the PLUS score, and it contains

3    that same language that I talked to you about on the National

4    Score Index web page, and let's just -- you know, the

5    Experian-developed PLUS score, the score range, ranging from

6    330 to 830.  These websites are not -- are being up front

7    this is Experian, and you're going to have to be the judges.

8    By these websites, is Experian trying to make people believe

9    that they are getting a 300 to 850 FICO score?

10         Now, Mr. Schutz put up a TV commercial and a whole

11    bunch of banner ads, you saw the big stack, and focusing on

12    the fact that those banner ads and the TV commercials

13    reference numbers, and here's just some examples.

14         In that big stack of banner ads, for example, take

15    a look and virtually every one of these banner ads has a

16    trademark on it, Experian, consumerinfo.com, and it's using

17    numbers, but Ms. Kramers-Dove admitted during her

18    cross-examination that Fair Isaac doesn't have a trademark in

19    individual numbers.  It couldn't claim that it had a

20    trademark in individual numbers.  And you won't see 330 to

21    830 being featured in any of those banner ads or the like.

22    It's just not there.  So you should consider, if you even get

23    to this issue, the way in which -- look through these

24    websites and consider the way in which Experian was marketing

25    itself, was it trying to make people think that it was Fair

1   Isaac selling the 300 to 850 score.

2         Okay.  Let's go back to the factors very quickly

3   here.  Surveys.  I won't talk about them any further.  Mr.

4   Berger is Fair Isaac's survey expert on likelihood of

5   confusion.  I won't say any more about that.

6         Let's go to the next factor, evidence of actual

7   confusion.  This gets me back to the discussion I had at the

8   opening with you about what is the right kind of confusion.

9   You're going to hear from Judge Montgomery in the

10  instructions that general confusion about credit scoring or

11  credit reports isn't sufficient to show likelihood of

12  confusion because that's the wrong kind of confusion.  We all

13  know there's a lot of confusion out there about credit

14  scores, who sells them, what they are, et cetera.  The kind

15  of confusion that matters here is confusion about source

16  arising from the score range, so it would have to be somebody

17  saying:  "You know, I bought the 330 to 830 score from

18  Experian, and because I know that 300 to 850 is associated

19  with one source or with Fair Isaac, by buying that Experian

20  score I thought I was getting a FICO score."  That's the

21  right kind of confusion.  That's the kind of confusion that

22  you need to see whether any of it exists.

23        Now, Mr. Schutz will perhaps talk to you about some

24  of the consumers calling in or writing e-mails and things

25  like that with questions and maybe even complaints, and I

 1   just want to show you one example to give you a flavor for

 2   this.

 3            One of the e-mails, somebody writes in and says:

 4   "Is my PLUS score from Experian and my FICO score the same?

 5   What are the differences, if any?"

 6            Okay.  Is that confusion about score range?

 7   There's no suggestion that this person at all is confused

 8   about score range.  This person knows that he or she got an

 9   Experian score and a FICO score and is asking what's the

10   difference.  That's not the right kind of confusion.  So I

11   would ask you as you go through the evidence to see if you

12   see any evidence of that kind of confusion, the right kind of

13   confusion.

14            Okay.  You are also going to hear about some

15   defenses that would only -- you would only need to get to

16   these, again, if you find that 300 to 850 was ever used as a

17   trademark, it developed secondary meaning in time and there

18   was infringement, but it's important to think about some of

19   these defenses and Judge Montgomery will give you the full

20   legal standard on those, but one of those in particular I

21   want to focus on, fair use.  And you're going to hear from

22   Judge Montgomery that it's a complete defense to a trademark

23   claim if a defendant uses a trademark term simply to describe

24   its services and not as a trademark and does that in good

25   faith.  That's called fair use.  And we've already talked

about how Experian presented itself and how it used and

marketed its scores, and I'd ask you if you even get to this

point really consider those uses by -- those communications

by Fair -- by Experian, I'm sorry -- and ask yourself is

Experian using 330 to 830 as a trademark.  I don't think

you're going to find any examples of that.

All right.  I'm coming up to the end here and I

want to just make one -- a couple of last observations.  And

you might be asking yourself, you know:  Why is Fair Isaac

doing this?  Why is it pursuing this lawsuit if this

trademark is so worthless?

Well, you heard from Mr. Danaher about how Fair

Isaac hasn't been willing to sort of invest the money, the

big resources to really advertise aggressively in the

consumer space and to do what it needs to do.  And Fair Isaac

is used to being dominant in the lender space.  It's got the

big lion's share of the market.

But remember there was this pie chart that came up

in Mr. Danaher's examination and it showed that Experian had,

like, 37 percent of the market; another company,

Intersections, another supplier, had a big percentage.  And

FICO is kind of low here and even if you count Equifax, it's

still behind those others and that kind of made Fair Isaac

very happy.  And this is from 2005.  So also, you heard about

the entry of VantageScore in 2006, which was something that

was going to put pressure on Fair Isaac.  And so it had a
choice.  It could sue or it could compete, it could invest
the money in competing, and you're going to have to make a
decision about what it actually -- what choice it made here.

Now, what Fair Isaac wants to achieve here with
this case goes beyond just money.  I mean, they're asking for
damages, but what it wants to do is it wants to block
Experian, TransUnion and VantageScore from competing with
three-digit scoring ranges.  And without the ability to use
those three-digit ranges, as we've heard, it's going to be
very difficult for those companies to compete.  And so I
would ask you as you go back and consider the evidence, look
at the evidence and decide for yourself has Fair Isaac ever
used 300 to 850 as a valid trademark.

Thank you so much again for your patience and time.

THE COURT:  All right.  Let's take a standing
stretch break.  Any of you -- we're going to have use our
time carefully this morning.  Any of you that need to make a
bathroom run, feel free to do it now.  We're going to go
ahead and have a longer break after Mr. Remele's argument,
but if you need to make a quick exit or any of the attorneys
do, we'll stand and stretch for a couple minutes to give
anybody that really needs to get to the bathroom a chance to
do so.  Now I've embarrassed you all so that nobody --

(Laughter)

```
 1              THE COURT:  Okay.  If I leave, would anyone else

 2    leave?

 3              Looks like you can all make it, so we'll stretch a

 4    little bit.  I'm sorry.  I didn't mean to embarrass anyone.

 5         (Pause)

 6              THE COURT:  All right.  Please be seated.

 7              We will now proceed to the argument of TransUnion

 8    as given by their counsel, Mr. Lewis Remele.

 9              Mr. Remele.

10              MR. REMELE:  Thank you, your Honor.

11         DEFENDANT TRANSUNION, LLC'S CLOSING ARGUMENT

12              MR. REMELE:  Good morning.

13              As you've now heard, the judge has shared the

14    instructions that she's going to give to you after everybody

15    has argued and she's also shared with us the verdict form

16    that you heard a little bit about, and so we're at a little

17    bit of an advantage over you in the sense that we already

18    know what she's going to tell you.  And so what I hope to do

19    is to go through each of these questions on the verdict form

20    and how the law that the judge is going to give you

21    integrates with these particular questions as well as the

22    evidence, at least as we see it, from TransUnion's

23    perspective.  And my hope is that at the end of my argument

24    I'll have provided you some guidance or assistance on how you

25    should answer this particular verdict form at least from
```

1    TransUnion's perspective.

2          Before I do that, though, I also want to take a

3    chance to thank you for your service as jurors.  Mr. Danaher

4    and TransUnion are very appreciative of the fact that you've

5    taken time from your busy lives and all the things that

6    you're doing to come here and help us resolve this dispute.

7    We know it involves a sacrifice and we really do appreciate

8    it.  And as Mr. Milne said, your patience has been biblical

9    and we also, all of the lawyers, greatly appreciate that.

10         Before I talk about the actual verdict form, I want

11   to talk to you -- I want to highlight for you some general

12   instructions that the judge is going to give you.  Some of

13   these you've heard a little bit.  You may not remember when

14   the judge talked about them at the beginning of the case.

15   These are instructions that are basically given in every

16   case, every civil case, and I think that sometimes we lawyers

17   gloss over them, but they're very important.

18         The first one that I think is very important and

19   that I always talk to jurors about in cases like this is the

20   instruction on how to judge the credibility of witnesses.

21   You may remember that the judge indicated you're going to be

22   the judges of the facts and she's going to read you a fairly

23   long instruction about some guidelines that you might use in

24   determining whether particular witnesses are telling the

25   truth or evaluating the evidence as you've seen it over the

1    last few weeks and as you'll then get a chance to review it

2    in the jury room whether it's credible or not.

3         But what I want to underscore -- and you're going

4    hear this in the instruction and you've heard a little bit

5    about it already -- is, she's going to tell you that you

6    should use your common sense.  And the reason I think that's

7    so important is that I have a lot of friends that ask me on a

8    regular basis:  "How is it that you can bring a bunch of

9    people off the street into a courtroom, assault them with

10   very complex information, how can that possibly work?"  And I

11   always say:  "It's easy."  And the reason it's easy is

12   because when you walk through the front door of the

13   courtroom, nobody said you were supposed to leave your common

14   sense in the hallway.  And the reason why the jury system is

15   great and it works is, when you all go back in the jury room,

16   you're going apply all of your life experiences collectively,

17   all your wisdom, all your judgment that you have from your

18   various experience in life, and you're going to use your

19   common sense to evaluate the facts of this particular case,

20   so you're going to hear me refer to that a little bit when I

21   talk about the verdict form.

22        The second general instruction the judge is going

23   to give you is that a party isn't required to call all the

24   witnesses that might have knowledge or facts about the case,

25   nor is it required to bring into the courtroom every possible

1    exhibit or document that might be applicable to the case, and

2    that's true and she'll give you that instruction and you'll

3    hear it.

4           But she's also going to tell you another thing, and

5    that is that Fair Isaac in its infringement claim, which

6    we'll talk about in a minute, has the burden of proving that.

7    And what that means is -- and she'll explain it to you -- is

8    that they have to prove by a greater weight of the evidence

9    that it's more true than not true that we, TransUnion, have

10   infringed upon their trademark.

11          The only witness that Fair Isaac brought to this

12   trial was Ms. Kramers-Dove, by her own admission somebody who

13   doesn't work in the consumer side of the business, which is

14   what this case is about, and didn't know anything about

15   trademarks.  So your common sense might tell you that if

16   somebody has the burden of proving a claim, that it might be

17   an indication of the strength of their claim if the only

18   witness they brought into the courtroom was somebody who had

19   no knowledge about all the things we've been talking about

20   for the past three to four weeks.

21          It also might suggest to you that as you noticed,

22   the way they tried to prove their case was by calling our

23   witnesses and cross-examining them.  Again, it might be a

24   suggestion if you use your common sense about the strength of

25   the particular claim that they're making.

1           Let's talk about the verdict form.  And you're

2     going to have this when the judge gives you instructions and

3     so I'm going to read this to you so it'll become familiar to

4     you.

5           But this verdict form is basically divided into

6     categories of four questions.  The first three questions

7     relate to this claim of infringement.

8           Then there's going to be a series of questions --

9     they're actually at the end of the verdict form -- that

10    relate to our claim that Fair Isaac committed fraud on the

11    Patent Office, the Trademark Office, when it submitted its

12    trademark registration.

13          Then there's a series of questions in a category

14    called affirmative defenses, the defendants' affirmative

15    defenses, and I'll talk to you about those and what those are

16    and what they mean and why they're important.

17          And then lastly there's questions about damages.

18          As Mr. Milne indicated to you, there's instructions

19    on the verdict form and you're going to see that if you

20    answer the question -- like Question Number 1 a certain way,

21    there's going to be an instruction that you don't need to

22    answer some of the other questions, and there are going to be

23    instructions like that and I'll point them out to you as we

24    go through the verdict form.

25          But even though that's what it says, what I'm going

1    to do is, I want to talk to you about each question on the

2    verdict form and how we believe from TransUnion's perspective

3    you should answer that question on the verdict form, even

4    though it may be as you get through your deliberations that

5    you may end up never getting to those questions, but I want

6    to give our perspective in case you don't necessarily agree

7    with some of the things I'm going to tell you about what

8    TransUnion sees as the evidence.

9          So let's talk about the question on the

10    infringement claim.  The judge is going to give you an

11    instruction that there are two elements to the infringement

12    claim and those two elements are this:  In order to prove a

13    claim of infringement -- and this is on the 300-850

14    trademark -- Fair Isaac has to first prove that they have a

15    valid trademark, and that's where this concept of secondary

16    meaning comes in and I'll talk about that in a minute.

17          The second element actually has two parts to it,

18    and it is that if you find that there is secondary meaning,

19    then you go to the second element and the second element is

20    that we used that trademark, TransUnion used it, without Fair

21    Isaac's consent in an attempt to try to confuse consumers,

22    ordinary consumers, as to the source of that particular

23    trademark.

24          So those are the two elements and, as you might

25    have guessed, they relate to the first three questions on the

 1    verdict form.

 2            So the first question on the verdict form is this:

 3    "Has '300-850' acquired secondary meaning?"  And it's -- the

 4    simple instruction is yes or no.  I think you probably

 5    gathered from everything you've been hearing over the last

 6    few weeks that we would suggest to you from TransUnion's

 7    perspective the answer to that question is no.  Why do I say

 8    that?

 9            Here's what the judge -- Mr. Milne talked to you a

10    little bit about this, but I'm going to tell you -- I'm going

11    to focus in on some things at least from TransUnion's

12    perspective.  Here's what she's going to tell you secondary

13    meaning is.

14            She's going to tell you that basically:  "A term

15    acquires secondary meaning when it has been used in such a

16    way that its primary significance in the minds of the

17    prospective consumers is not the product itself, but the

18    identification of the product with a single source,

19    regardless of whether consumers know who or what that source

20    is."

21            So I was thinking about this last night and I was

22    trying to think:  How can I capsulize all this legalese for

23    you and try to give you some illustration of what do we

24    really mean by secondary meaning, and the old adage came to

25    mind that a picture's worth a thousand words.

1           And, Ryan, could you put up that -- there it is.

2      And here's what I put together, I crafted.  And what it is

3      is, we look at all of these -- visualize yourself driving

4      down the road and you see a billboard, and if you saw a

5      billboard that had any of these common logos that we see

6      there, you would immediately associate those with a

7      particular product, a particular company, some source.

8      That's what we mean by source.  But what would you do if you

9      were driving down the road and you saw a billboard that had

10     300-850?  Would you associate that with anything?  You'd be

11     probably asking yourself:  "What the heck is that?  What are

12     they talking about?  What are those numbers?"  That's what

13     we're talking about in a very general way when we talk about

14     secondary meaning, and I would suggest to you it's that

15     simple in terms of how you can answer this question on the

16     verdict form, that if you think and use your common sense,

17     how could anybody associate with source with 300-850.

18          But the judge is going to tell you -- as you go

19     further in this instruction, she's going to give you some

20     guidelines about what you might -- some factors you might

21     think about to determine whether this is secondary meaning,

22     and I'm going to talk to you about each one of those, because

23     I think they're important and they overlap with some of the

24     other things I'm going to talk to you about on the verdict

25     form, so hopefully I won't be repeating myself.

1          The first factor:  whether the consumers who

2     purchase the products or services that bear a 300-850

3     trademark associate that trademark with a single source.

4          Well, let's go back to Mr. Danaher's testimony on

5     this subject, and I think, hopefully, you heard from Mr. --

6     you understood and heard from Mr. Danaher that what Fair

7     Isaac -- its whole position in this case is that it felt that

8     because it had such prominence in the lender market, the

9     business market, that that would easily translate over to the

10    consumer market and that consumers -- because lenders knew

11    who Fair Isaac was, consumers would immediately associate --

12    once they started hearing about credit scores, they'd

13    associate the FICO score with Fair Isaac and they'd associate

14    the score range 300 to 850.

15         That's what Mr. Danaher talked about, the indirect

16    method of marketing as opposed to direct marketing, and you

17    heard him tell you that in fact he conducted that experiment.

18    He set up two storefronts.  One storefront sold FICO scores

19    through TransUnion, through the TrueCredit operation, the

20    other storefront, they sold TrueCredit scores directly to

21    consumers.  And you heard what he told you, that the only --

22    in the time that he was doing this, none of the consumers

23    associated 300 to 850 with Fair Isaac, or with TrueCredit, or

24    with anybody for that matter.  You heard him tell you that

25    most consumers during this period and even up to the present

time don't know even what a credit score is much less who the

brand is.  You saw some of those percentages and he told you

even in TrueCredit's case where they've done a tremendous

amount of advertising and Experian's case where they've

really done a lot of advertising, consumers still don't even

associate those brands, and they clearly don't associate a

particular product with 300-850, and the reason is because

Fair Isaac has chosen to use this indirect method of

marketing.  They've chosen to try to play off of their

strength with lenders hoping that will spill over into the

consumer market, and as Mr. Danaher told you, that particular

marketing strategy has proven to be unsuccessful.  As he

indicated to you, the only way that you can succeed in the

consumer market is if you advertise directly to consumers.

The second factor she's going to tell you:  to what

degree and in what manner Fair Isaac may have advertised

under the 300 to 850 trademark.  It didn't.  It simply didn't

do any advertising.  We've heard about the fact that all it

did was indirect marketing.  It didn't want to spend the

money to do any advertising relating to the score range much

less to its brand, the FICO score.

Factor three:  whether Fair Isaac successfully used

the 300-850 trademark to increase the sales of its products

or services.  Well, here we call back the evidence -- and I

had quite a discussion with Ms. Kramers-Dove about this.  You

1    remember the internal guidelines, the almanac, which by the

2    way is Exhibit 137 if you want to look at it when you get

3    back in the jury room, their own internal guidelines about

4    how to use a trademark if in fact you're claiming one back in

5    the '04-'05 time frame.  And you remember they said if you're

6    going to use a trademark, you have to use it as an adjective,

7    so here it would be the 300-850 score, the 300-850 FICO

8    score.  And we saw a whole bunch of websites, pamphlets,

9    e-mails, information where Fair Isaac has never, never, never

10   used in any of its publishing or its advertisements 300-850

11   as the center of any marketing campaign.  And you remember I

12   asked Mr. Danaher has TrueCredit ever used 300-850 as a

13   brand, and he said no.  And I said why, and he said because

14   it would never be successful for the same reason as what we

15   looked at on that slide.  If you use 300-850 as a brand, who

16   the heck as a consumer would know what you're talking about.

17   You would never do that if you wanted to be successful in

18   marketing to consumers.

19          Factor four, the judge is going to tell you, the

20   length of time and manner in which Fair Isaac used the

21   300-850 trademark.  Well, this goes to this issue, as you all

22   know by now, I hope, they kept this secret.  Fair Isaac from

23   the time that they claimed they first started to use this in

24   2001 up until 2006 when the Trademark Office issues a

25   registration, Fair Isaac never put anybody on notice, even

1    though in TransUnion's case, as you know, in 2004, in March,

2    it renegotiated its contract with TransUnion.  In fact, a

3    month after it had filed its registration with the Trademark

4    Office in February of 2004, never told them about the

5    registration and never amended the agreement to add 300-850

6    as a trademark.  Wouldn't you think, particularly when you

7    were going to sell competing products, that if you really

8    felt that you had a trademark or you had exclusive rights to

9    that range you'd tell somebody, particularly a competitor?

10            In June of '04, you remember the agreement that

11   they also negotiated on June 1st of '04 that related

12   specifically to trademarks, again didn't mention 300-850 as a

13   trademark, talking directly with TransUnion during that time

14   period and knowing, knowing, knowing that TransUnion was

15   selling at that time the TrueCredit score with a score range

16   of 300-850.  How do we know that?  Mr. Danaher told you that

17   he had numerous conversations with the myFICO people during

18   2004 to tell them that they were using 300 to 850 to sell the

19   TrueCredit score, which was competing with FICO, never heard

20   a peep from Fair Isaac that there was anything wrong with

21   that, that they had any exclusive rights.

22            Mr. Jolls, who you heard from in deposition

23   testimony, who was the head of myFICO, you heard Mr. Danaher

24   say:  I know Mr. Jolls knew, because he bought our products

25   on our website.  And Mr. Jolls confirmed that in his

1    deposition, that he in fact was a subscriber to TrueCredit.

2           And we all know because you've seen it

3    *ad nauseam* that when you went on our TrueCredit website, one

4    of the first things you saw was the scale that we used which

5    showed the range of 300 to 850.  Nobody was trying to hide

6    that.  So in Fair Isaac's case, it simply didn't use the 300

7    to 850.  It never used it on a exclusive basis.

8           And that's the next factor, whether Fair Isaac's

9    use of the 300-850 trademark was exclusive.  It wasn't.  In

10   fact, not only wasn't it exclusive, it tried to hide the fact

11   that it was filing a registration from TransUnion and

12   Experian and it never used or put on notice any of its

13   competitors by using symbols or telling them -- forget about

14   symbols.  How about just a letter?  How about when you're

15   negotiating with them telling them:  "Hey, we think we have

16   exclusive rights to this"?  Never did it, even though it was

17   clearly required under their internal company guidelines as

18   we saw both in the almanac and in the guidelines.  And why

19   did they have those?  Exactly for the reason that we are

20   doing what we're doing here today, that I'm here arguing

21   before you that if you don't put people on notice that you

22   have exclusive rights, you're going to lose the ability to

23   enforce those rights.  And that's exactly what that almanac

24   says and that's what those guidelines say, and that's why

25   they try to emphasize to Fair Isaac employees that they

1    should use those symbols.

2          Factor six:  whether the defendants intentionally

3    copied Fair Isaac's 300 to 850 trademark.  Here you're going

4    to -- this is Fair Isaac's case.  TransUnion used 300-850 to

5    sell TrueCredit scores.  We've never hidden from that.  I

6    told you that in my opening statement, Mr. Danaher admitted

7    it, and what this factor really gets at is the intention

8    part, were we intending to do that to try to confuse people

9    or trick consumers into believing they were buying a FICO

10   score when they were buying a TrueCredit score.  Again, you

11   heard mountains of evidence, particularly from Mr. Danaher,

12   that consumers don't know what 300 to 850 is.  They don't

13   associate it with anything and they certainly aren't confused

14   by it.

15         But you also heard from Mr. Danaher that his

16   business model is such that when he's directly advertising to

17   people, it costs him between 70 to $80 to get a customer.

18   And what he wants to sell them is not a credit score.  I

19   mean, that's part of it, but that's a very small part of it.

20   What he wants to sell them -- he wants to make them loyal

21   customers so they'll become subscribers and they'll continue

22   to be with TrueCredit on a monthly basis over a long period

23   of time so that he can recover the money that he spent to try

24   to obtain that customer.  And I think based on his

25   description, I think it was quite clear that it wouldn't make

any business sense to try to confuse people or trick people
into buying your product thinking they're buying another
product.  What sense would that make?  It would be the
dumbest business decision you could ever make, because all
you do is make people mad and the first thing they're going
to do is cancel their subscription.

The last piece of this, as you heard, that in fact
when Mr. Danaher set up these two storefronts he said:
"Okay.  I'm going to be selling a product which is a FICO
score through the CS website and at the same time I'm going
to be selling a TrueCredit score through the TrueCredit
website.  Both of them have the same score range.  One's a
FICO score, one's a TrueCredit score.  Maybe somebody is
going to think that they've gotten a FICO score rather than a
TrueCredit score, so what should I do?"  Well, right from the
beginning in 2003 he put a disclaimer that you saw in the
website on the credit page that specifically says:  "This is
not a FICO score."  That's what he did.

And then -- that was in December of '03 when they
launched the new TrueCredit product with the score range of
300 to 850, and ten months later when they were still a
minor -- people were calling and saying:  "Hey, we still have
some issues with this about FICO scores," so what do they do?
They redesign the website so that any time you clicked on
credit score wherever it appeared in the website on

1    TrueCredit, you would immediately be brought back to the page

2    that had the disclaimer that said:  "We don't have" -- "This

3    is not a FICO score."  In other words, there wasn't any

4    intent here to try to deceive people, to try to deliberately

5    mislead people by copying something.  There was a real

6    attempt here to try to use a test to see whether or not the

7    FICO scores would sell better or the TrueCredit scores would

8    sell better.  That's what the concept was with the two

9    storefronts.

10           And that's the next factor that the judge is going

11   to tell you, whether the defendants' uses of scoring ranges

12   claimed to be similar to the 300 to 850 mark has led to

13   actual confusion regarding source.

14           And again, the storefronts -- you know, you heard

15   about surveys, and Mr. Berger never even asked a question

16   about 300-850.  His survey is useless.  He didn't even ask

17   the question that's been central to this case for three

18   weeks.  Mr. Johnson did ask that question.  So you might --

19   you know, you might say to yourself:  "Well, heck, I heard

20   from those experts and one says one thing and the other says

21   another thing.  You know, what are we supposed to" -- "how

22   are we supposed to figure that out?  Maybe they cancel each

23   other out."

24           Well, I would suggest to you that the best evidence

25   of the fact that -- we don't really need a survey, because

1    Mr. Danaher conducted the best thing that you can conduct to

2    determine whether people are confused, and that's the fact

3    that he did two storefronts.  And he tried to sell FICO

4    scores in this indirect channel based on Fair Isaac's belief

5    that it in fact had gained this notoriety on the lenders'

6    side of the business that was going to translate into the

7    consumer side, and in fact it didn't work.  And clearly

8    nobody associated 300 to 850 with that product.  If they had,

9    you would have seen that particular storefront selling loads

10   of FICO scores.

11          The next factor is the result of consumer surveys.

12   We touched on that.

13          And the last factor the judge is going to tell you

14   is the extent to which Fair Isaac holds an established place

15   in the market, and that gets to Mr. Danaher's testimony again

16   where remember I asked him:  Okay.  Let's fast forward now.

17   Here we are today.  Where is Fair Isaac in the consumer

18   market?  And he said they're non-existent, basically.  They

19   just aren't a factor in the consumer market.  They're not

20   competing.  There are other people that are competing in the

21   marketplace, but the reason they're not competing is because

22   they won't spend the money to do the direct advertising that

23   you need to do in order to be successful in the consumer

24   marketplace.

25          So the answer to Question Number 1 I think should

1   be no when you weigh all those factors that the judge is

2   going to give you.

3           The second thing the judge is going to tell you is

4   that even if you find that there's secondary meaning, that

5   doesn't end the inquiry.  The second question is:  "Did

6   '300-850' acquire secondary meaning before the following

7   Defendants' allegedly infringing uses?"  This is the question

8   did 300 to 850 acquire secondary meaning, identification with

9   a source, in TransUnion's case before December of 2003.

10  That's what Question Number 2 is, and if you answer this --

11  we believe the answer to this question should be no, and

12  here's the reason why I say that:

13          You heard through all of the evidence that this

14  consumer marketplace didn't even get going until 2001.

15  That's when myFICO was established.  There wasn't any real

16  sales of consumer -- products to consumers until 2002.  You

17  heard that that was the date of the first agreement between

18  TransUnion and FICO, Fair Isaac.  So by December of 2003,

19  this is really still a young emerging market.

20          As you've heard somewhat *ad nauseam* from the

21  various witnesses, consumers didn't identify -- they were

22  confused not only about whether or not -- what a credit score

23  was, but they were confused about who was who selling credit

24  scores.  They didn't even identify even with particular

25  brands.  So clearly by 2003 they hadn't acquired this term of

1    secondary meaning.  And by Fair Isaac's own admission, it

2    wasn't doing any advertising between 2002 and 2003 directly

3    to consumers to try to create that kind of secondary meaning,

4    that it would be in the forefront of consumers' minds at that

5    time frame.

6         And why do I say December of '03?  I kind of

7    noticed when I had to recall Mr. Danaher the other day,

8    everybody went, "Oh, no.  What's going to happen now?  Are we

9    going to be here for another week?"  And I didn't blame you.

10   And the reason I had to recall him, because I thought it was

11   undisputed that we relaunched the TrueCredit product with the

12   score range of 300 to 850 on December 18th of 2003, because

13   that's what he testified to.  Well, in fact, apparently there

14   was some dispute about that, so that's why I introduced those

15   two exhibits, and if you want to look at them, they're

16   Exhibits 112 and 113, and they established clearly that

17   that's when -- on December 18th of 2003 is when TrueCredit

18   launched the new TransRisk score, the new version, using the

19   score of 300 to 850, so that's why I say that's the date.  So

20   Question Number 2 should be no.

21        That doesn't still end the question of whether or

22   not there's infringement.  We're talking now all about

23   infringement.  So the first element, secondary meaning,

24   whether it's valid.  The second element is whether or not we,

25   TransUnion or TrueCredit, used this market without Fair

1   Isaac's consent in an attempt to try to confuse ordinary

2   consumers as to its source.

3           So, this is a two-part question and this is

4   Question Number 3 on the verdict form:  "Did the following

5   Defendants use a mark the same as or similar to Fair Isaac's

6   '300-850' without Fair Isaac's consent in a manner that is

7   likely to cause confusion about the source, sponsorship or

8   affiliation ...?"  Again, we believe the answer to this

9   question should be no.  Why do I say that?

10          First, it's clear that we did have Fair Isaac's

11  consent, and why do I say that?  Again, go back to this 2004

12  time frame when we negotiated the two contracts with them,

13  never heard a peep from Fair Isaac about the fact that they

14  were claiming exclusive rights to 300 to 850.  Secondly,

15  Mr. Danaher's testimony.  The myFICO people clearly knew we

16  were using 300 to 850 as the score range for the TrueCredit

17  product.  Mr. Jolls confirmed that.  That's consent.  And if

18  you consent to somebody using your trademark, you can't claim

19  they're infringing it.

20          And the second piece of this again goes to this

21  confusion question and here's what the judge is going to

22  instruct you on confusion.  This is not general confusion.

23  This isn't confusion as to whether I got a FICO score versus

24  a TrueCredit score or a PLUS score.  This is specifically

25  confusion as to whether or not I thought because of the score

1   range 300 to 850 I was buying a FICO score versus a

2   TrueCredit score.  That's the specific question or confusion

3   that you have to deal with and the judge is going to instruct

4   you on that.  She's going to tell you that general confusion

5   about credit scoring or reporting is not sufficient.  That's

6   part of the instruction she's going to give you.  She's also

7   going to give you a number of factors that you can look at

8   for purposes of looking at confusion, but I've covered most

9   of those.  Again, we go to the question of Mr. Danaher's

10  testimony as to whether or not consumers really are confused

11  and we go to the business model.

12          Let me turn to the second category on the verdict

13  form and I'm going to move this up.  These are Questions 9,

14  10 and 11 and they relate to the claim of fraud on the

15  Trademark Office.  And the question is -- Question Number 9

16  is:  "Did Fair Isaac make a false representation of fact

17  during the application process to the United States Patent

18  and Trademark Office for registrations of the '300-850'

19  trademarks?"  And number 10 is:  "Did Fair Isaac know the

20  representation to be false when it was made and intend to

21  deceive the United States Patent and Trademark Office?"

22  Question Number 11:  "Did the United States Patent and

23  Trademark Office rely on the false representation in deciding

24  to issue the registrations?"

25          Okay.  And these questions you need to answer no

1    matter how you answer -- even if you find that there's no

2    infringement.  In other words, if you agree with us and you

3    answer the first question no or the second question no, you

4    still need to answer Questions 9, 10 and 11.

5           Now, what are we talking about here?  I think you

6    probably have a pretty good idea of what we're talking about,

7    but let me go back to the chronology.

8           February 4th of 2004 they filed the registration

9    for the 300-850 trademark.  On August 28th, I believe it was,

10   of 2004 it's denied, and it's denied because it's

11   descriptive.  All it does is describe a range and that's what

12   the trademark examiner said.  They file a response to try to

13   change the examiner's mind on February 28th of 2005, exactly

14   six months after the denial, and in that response, you heard

15   Mr. Anderson talk about, they listed I think four or five

16   reasons, and he said that the only reason that they gave in

17   that response that had any ability or colorable reason for

18   the trademark examiner to change her mind was the

19   representation by Fair Isaac that no one else was using the

20   score range 300-850 during the time period that they filed

21   their registration, so this '04 time period.  Of course we

22   know, it's undisputed, that starting in December of 2003

23   TrueCredit was using the score range 300-850 for the

24   TrueCredit score, so that's undisputed.

25          So the question then becomes, is, when they made

1    that representation, did Fair Isaac have knowledge and did

2    they intend to misrepresent that fact to the Trademark Office

3    and have the Trademark Office rely on it in order to get a

4    registration?  Could they -- or maybe state it another way.

5    Could they have gotten a registration had they not

6    misrepresented that fact?

7            Well, you heard from Mr. Anderson that he believed

8    -- and he would not have granted the registration for all the

9    reasons you heard him tell, but he particularly focused on

10   the fact that they made that representation of fact.  Well,

11   what do we know about whether they had knowledge about the

12   fact that we had a score range of 300 to 850?

13           Well, we have Mr. Danaher's testimony that I've

14   already gone over where he said the myFICO people knew it.

15   We have Mr. Jolls' testimony where he confirmed that he was a

16   subscriber and he knew.  How could you be a subscriber of a

17   TrueCredit product, go on their website, which you have to do

18   to subscribe, and not know that we're using the score range

19   of 300 to 850?  That's the question.

20           But in case there was any doubt about it, we have

21   Exhibit 43.

22           Ryan, can you put up, please?

23           And you may remember this is the e-mail from

24   December 16th of 2004 -- and you'll have an opportunity to

25   read this back in the jury room -- and you remember I kind of

1    wrangled a little bit with Ms. Kramers-Dove about this, but

2    here's the sentence that says it all, in my view, and it's

3    this sentence.

4           Ryan, if you can highlight it.

5           It says:  "They didn't copy our publicized FICO

6    score range until later."  Well, what's he saying?  Obviously

7    he's saying they didn't copy our score range of 300-850 until

8    later.  He clearly knew and that's what Mr. Watts is telling

9    everybody in this e-mail chain, including -- who's the number

10   one person on the e-mail chain?  Ms. St. John.  She's the one

11   who filed the affidavit under oath with the Trademark Office

12   that you saw and you'll have an opportunity to review that

13   more in the jury room.

14          And you saw Ms. St. John on the video deposition

15   the other day, and when they started asking her questions

16   about paragraph 12 of her affidavit where she said nobody

17   else was using 300-850, you noticed that she couldn't look at

18   the camera.  And again, what does your common sense, what

19   does your life experience tell you about somebody when

20   they're being asked questions and they can't look at either

21   the camera or the person who's questioning them?  It tells

22   you they're not telling the truth, and she wasn't telling the

23   truth.  She knew, she knew that in fact that was a false

24   statement, and she knew that in fact Fair Isaac needed to

25   have the Trademark Office believe that in order to issue the

1  registration.

2         Now, you're going to hear an argument that what she

3  said in paragraph 12 was to the best of her knowledge, nobody

4  else used 300 to 850 as a unique indentifier, and that's the

5  finesse you're going to hear from the lawyers about why she

6  wasn't really -- why she wasn't really lying or not telling

7  the truth.  Well, here's what they said in the body of the

8  actual submission that the lawyers gave to the Trademark

9  Office.  Here's what the quote was:

10        "300 to 850 is the credit scoring scale only for

11  applicant's credit bureau-based risk products and not for

12  other types of credit scoring products that the applicant

13  develops" -- that's Fair Isaac -- and here's the rest of the

14  sentence:  "or even other credit bureau-based risk products

15  that competitors develop."  And if you look at the Exhibit 6,

16  which is the file from the Patent and Trademark Office,

17  you'll see that in the actual lawyer brief or memo that was

18  submitted to the Trademark Office.  The reason you have an

19  affidavit is to confirm those types of statements in the

20  actual memo.

21        So, don't fall for, oh, she didn't really say that

22  it was only -- nobody was using 300 to 850, because this

23  unique indentifier, what it's buzz words for, using it as a

24  trademark.  Well, of course you know we weren't using it as a

25  trademark.  Experian wasn't using it as a trademark.  Nobody

1    who came into this courtroom other than the Fair Isaac

2    witness believed that you could trademark 300-850 or any

3    scoring range, for that matter.  So of course we weren't

4    using it as a unique indentifier.  We were using it as a

5    speedometer.

6          Let's talk about the next category -- I'm moving

7    kind of fast here because my time is limited.

8          The next category on the verdict form is what we

9    call affirmative defenses, and -- but just to circle back, we

10   believe that in answering Questions 9, 10 and 11 you should

11   answer yes to all those questions.  I think that's probably

12   clear.

13         Now, the next category of questions on the verdict

14   form is what we call affirmative defenses, and that's this.

15   So even if you find that TransUnion infringed on Fair Isaac's

16   trademark, you find secondary meaning and you find consent

17   and confusion in those two elements, that still doesn't get

18   Fair Isaac off the hook, because what the law recognizes is

19   that there are certain so-called affirmative defenses where

20   people that use trademarks can still use them, even if

21   they're valid trademarks, if they use them in a certain way.

22         And the first affirmative defense -- and it relates

23   to Question Number 4 on the verdict form.  You're going to

24   find that all of these instructions have a place on the

25   verdict form -- and that's Question Number 4:  "Is the term

1    '300-850' a feature of Fair Isaac's products or services that

2    is 'functional'?"  Yes or no.  And we believe you should

3    answer this yes.

4            What is "functional"?  Well, the judge is going to

5    instruct you that what functional means:  "A feature is

6    functional if it is essential to the use or purpose of the

7    product or service or if it affects the cost or quality of

8    the product or service.  If restricting the ability to use

9    that feature to one provider of the products or services, to

10   the exclusion of competitors, would significantly hinder

11   competitors' ability to compete effectively, the feature

12   functional."

13           Okay.  What does that mean?  Translate that.  What

14   that means is this is the speedometer.  300 to 850.  You

15   remember in opening statement you heard a little bit of

16   reference to this.  This is what the equivalent of an

17   automobile speedometer is.  300 to 850 is a range that

18   everybody uses to try to describe a credit score.  You can't

19   have a credit score in a vacuum.  If you say:  "My credit

20   score is 650," it has to have some context.  It has to have

21   some meaning as to what that is.  That's what the score range

22   is.

23           So, does anybody seriously think that somebody

24   could trademark a speedometer, 0 to 80, or 0 to 120 in my

25   day.  Now I guess it's 0 to 160, whatever it is.  But the

1    point is you wouldn't.  If you put "Chevrolet" in the middle

2    of the speedometer, you can trademark that, or you put Ford

3    or Lexis or Mercedes, but you couldn't trademark the

4    speedometer dial.

5           And the reason why this is functional and the

6    reason it has an impact is, you heard everybody that came

7    into the courtroom tell you that because of the way the world

8    is set up from lenders, banks, everybody, they're all set up

9    to use three-digit numbers.  So if you take away the ability

10   to use three digits, if it's either two digits or four

11   digits, you severely hinder the ability of competitors to

12   compete in the marketplace.  That's what you would do.  So

13   that's what functional means and that's why that's an

14   affirmative defense, that even though it may be a trademark,

15   it may be valid, people are still permitted to use it as long

16   as it's a functional process.

17          The second affirmative defense -- and you heard a

18   little bit about this already -- is Question Number 5:  "Did

19   the following Defendants prove their 'fair use' defense to

20   the claim of infringement of the '300-850' mark?"

21          And what fair use is, I put some demonstratives up

22   on the screen during the trial and you were probably

23   wondering what the heck is he talking about?  Well, what this

24   means is that if you don't use 300 to 850 as a trademark, in

25   other words, you don't make it the center point of your

1    marketing campaign, you don't make that your brand, you don't

2    try to focus everybody's attention on that so it becomes the

3    adjective, the 300 to 850 TrueCredit score, the 300 to 850

4    PLUS score.  If you did that, then it wouldn't be a fair use.

5    But if you only use 300-850 to describe a feature of the

6    product, in other words -- you've seen the language.  Credit

7    scores generally come in the range of 300 to 850.  That's the

8    language.

9           And, Ryan, would you put up the -- here, you saw

10   this during the trial, and what I did is, I tried to put on

11   one slide all of the ways that TransUnion or TrueCredit used

12   300-850, and you can see none of it, none of it is in the

13   form of a trademark.  None of it is an attempt to make that

14   our brand.  None of that is an attempt to make that the focus

15   of our marketing campaign.

16          The last affirmative defense -- and that's Question

17   Number 6 -- is the doctrine of acquiescence, and the question

18   is did Fair Isaac acquiesce to the infringement of 300-850.

19   That gets back to this consent issue.  Acquiescence is the

20   first cousin of consent.  And so if you acquiesce, in other

21   words, you don't stop people from using it even though they

22   know you're using it, if you acquiesce in it, then you can't

23   assert or try to use that trademark on an exclusive basis.

24   And the evidence of that is the same we discussed about for

25   the concept of consent, the fact they knew we were using it,

1  they said nothing about it, they had numerous negotiations

2  with us, TransUnion, in '04, never said a thing about it.  So

3  again, the answer to that question, we believe, should be

4  yes.

5          Now, lastly you're going to hear -- the question

6  number -- the last category is damages and there's also a

7  question on the verdict form that talks about willful,

8  whether or not our conduct was willful, and here's what the

9  judge will tell you willful means.  This is Question Number

10  7.  A defendant's infringement was willful if you find that

11  the defendant intentionally set out to deceive or confuse

12  consumers as to the source, sponsorship, or affiliation of

13  its products ...."

14          Well, I think the easy answer to this, obviously we

15  think it should be no.  We don't think you should even get

16  here because we don't think there was infringement, but

17  assuming you disagree with us, how can you possibly willfully

18  and deliberately infringe on somebody's trademark when they

19  know you're using it and they don't tell you you shouldn't

20  use it?  That's the simple answer to that question, in my

21  view.  Fair Isaac can hardly come into this courtroom and

22  argue that we willfully infringed on something when they knew

23  we were using it and said nothing about it.

24          Now, last, let me talk about damages.  And again, I

25  don't -- I think it's clear from what I've been telling you

 1   that I don't think there should be any damages, because I

 2   don't think there's any liability, but I want to talk to you

 3   about it anyway in case you disagree with me.

 4         Now, I've told you about one way to look at the

 5   strength of somebody's claims is what kinds of witnesses they

 6   call.  We talked that about that a little bit.  Another way

 7   is if a party wildly exaggerates its damage claims, and what

 8   do I mean by that.

 9         Well, Mr. Meyer, the expert, came in here and he

10   gave you three different ranges of damages that were

11   $150 million apart, and what the judge is going to tell you

12   is that when you're looking at damages, they have to be both

13   reasonable and not speculative.  Now, how can anybody -- I

14   don't care how many degrees they have or how much education

15   they have.  How can they come in here and expect you, using

16   your common sense, to believe that it's okay to either award

17   $150 million or $85 million and there really isn't any

18   difference between either one of them?  How can they

19   possibly tell you that and be believable?  I would submit to

20   you they can't.

21         The second part of this -- and this is the Question

22   Number 8, and it's:  "What amount of money in the form of a

23   'reasonable royalty' will fairly and adequately compensate

24   Fair Isaac for any damage caused by Experian's and

25   TransUnion's infringement of the '300-850' mark?"  There's a

1    concept in that question that you really need to focus on,

2    and that's causation.  And what that means is -- the judge is

3    going to define it.  It means that it had to play a

4    substantial part in bringing about the harm, and here's where

5    this goes:

6         Mr. Meyer testified that Fair Isaac should get, I

7    don't know, you know, a couple hundred million dollars in

8    lost royalties based on the theory that from 2004 to the

9    present every TrueCredit score, in our case, that was sold

10   would have been a Fair Isaac score.  So that everybody that

11   came to our website and bought a TrueCredit score would have

12   been a FICO score.  And where was the evidence of that?  You

13   didn't hear -- normally there's two ways you get that

14   evidence in if you're a plaintiff.  One is through a survey

15   expert.  That's one possible way.  Mr. Berger never even

16   asked the question about 300-850, so how could we possibly

17   rely on what he said.  Or the other way is through a damage

18   expert.  They look and they analyze certain things.  And you

19   heard Mr. Meyer.  He never made any analysis.  He just

20   assumed causation.  He assumed that if in fact there was a

21   sale, that in fact it would have been a FICO sale.  In other

22   words, that royalty should have applied.

23        Now, I would suggest to you just on that answer

24   alone, Question Number 8, you should answer there's no

25   damages because they haven't proven causation.  But let's say

1    you disagree with me.  Well, let's look at Mr. Meyer, again,

2    his credibility as a damage expert.

3          And, Ryan, could you put up the exhibit that goes

4    to Mr. Meyer's damage analysis.

5          And you might remember that the way he figured

6    royalties was he used a royalty based on revenues and then he

7    used a percentage.

8          Well, you remember Mr. Bokhart when he testified,

9    he said, well, first of all, you start with his revenue base.

10   You have to immediately take off $165 million, because

11   Mr. Meyer measured royalties from 2004.  Why would you do

12   that?  Under anybody's logic, you wouldn't start measuring

13   royalties until they got a registration of their trademark,

14   particularly given the fact they never told anybody they had

15   a trademark.  So even if you were to consider damages, you

16   certainly wouldn't start measuring them until 2006.  That

17   takes $165 million out of the tank.

18         The next -- you heard he completely blew it when he

19   was analyzing whether the three-in-one report had a credit

20   score and he counted all of those three-in-one sales as also

21   credit scores, and as Mr. Bokhart told you, that's

22   $150 million you got to take out of the tank.

23         And then lastly, because of the projections that he

24   did into 2009, you have to take another $69 million.

25         So we start in terms of his credibility with the

1    base that he used, the revenues he used, were completely off

2    base, absolutely no credibility.  If you start with -- you

3    know, sort of like a three-legged stool.  If one leg of the

4    stool isn't any good, it's going to tip over.  Well, that's

5    what this royalty base is.  If you start with an improper

6    base of improper information, which is what he did, you're

7    not going to have very credible evidence.

8         Then he talked about a royalty rate of 40 percent,

9    and you remember the way he got the 40 percent was to go back

10   to the 2004 agreement, which is when they were selling FICO

11   scores with a 40 percent royalty, and that's true.  They were

12   using that royalty to sell FICO scores through the CS site.

13   But remember, that agreement specifically excluded or didn't

14   mention 300-850.

15        And now think about this again from a commonsense

16   standpoint.  You heard Mr. Danaher testify that the reason he

17   was willing to pay a 40 percent royalty to Fair Isaac is

18   because Fair Isaac claimed that he was going to be able to

19   sell oodles of FICO scores through that site because of Fair

20   Isaac's prominence in the lender market that was going to

21   transfer over to the consumer market, that indirect marketing

22   channel.  What that meant is Mr. Danaher didn't have to spend

23   any money of his own on direct advertising to try to get

24   those customers.  So he's willing.  If he could do that,

25   that's a good deal for him, because effectively he's tagging

1    along on Fair Isaac's coattails and getting that business.

2          Well, you heard him tell you it cost $80 to get a

3    customer when you directly advertise, because you got to

4    spend your own money to advertise.  So why would anybody in

5    their right mind pay a 40 percent -- when they got the right

6    to use 300-850 and they still have to advertise directly to

7    consumers and spend money to do that, why would anybody in

8    their right mind pay a 40 percent royalty?  They wouldn't.

9    So I would suggest to you that Mr. Bokhart's analysis of the

10   damages is a much more reasonable, nonspeculative way to look

11   at damages.

12         And let me just make one last point on damages.

13   What happens -- Mr. Meyer came in, and the reason he gave you

14   these three series of damages, you know, 80 to 150, or

15   whatever it was, I don't even remember, 350 million, is

16   because what he's hoping you'll do is that you'll give Fair

17   Isaac some fraction of that number, hoping that you think

18   you're doing us a favor.  That's what he's hoping.  He's just

19   hoping to throw those numbers up there so somehow you're

20   going to give some small fraction, thinking: "Oh, my gosh.

21   What a good deal.  We're only going to give them, you know,

22   two percent or one percent" or whatever the number is.  Don't

23   fall for that.  You have to analyze the damage testimony

24   based on the instructions the judge is going to give you.

25   That is, they've got to be reasonable and they can't be

1    speculative.  Mr. Meyer fails on both counts.

2            I'm sorry that I talked so fast and gave you so

3    much information, but I again appreciate your attention and

4    your patience in serving on this case.  Thank you very much.

5            THE COURT:  All right.  We will take a 15-minute

6    morning recess.  Court will be in recess for 15 minutes.

7        (Recess taken at 10:55 a.m.)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(In open court with the Jury present.)**

2          THE COURT:  Good morning, again.  Please be

3     seated.  And we'll proceed directly to the argument of

4     VantageScore LLC as given by their counsel, Barbara Berens.

5          Ms. Berens?

6          MS. BERENS:  Thank you, Your Honor.  Again, like

7     the other lawyers, I want to thank you all for your time,

8     your attention, in a case that has been, I'm sure, has been

9     more than you ever wanted to know about an industry that I

10    didn't know much about before this case started.

11         My client is VantageScore Solutions LLC.  You

12    heard a lot about the VantageScore.  You didn't hear very

13    much about what my client actually does.  Ryan, will you

14    pull up slide number 2.  VantageScore Solutions LLC is

15    owned by the three credit reporting agencies.  You've heard

16    about that.

17         VantageScore does not sell scores.  That is

18    undisputed.  Ms. Kramers-Dove testified about that.

19    Various other witnesses both from TransUnion and Experian

20    made clear that VantageScore Solutions is not in the

21    business of selling any sort of credit score.

22         What VantageScore does is principally own and

23    further develop the intellectual property or algorithm that

24    is known as VantageScore, and it makes sure that that model

25    continues to perform over time, and VantageScore Solutions

1    people go out, and they educate certain constituencies

2    about the VantageScore.

3           And those constituencies include regulators,

4    rating agencies, consumer groups, to explain what the

5    VantageScore product is, but there is no direct consumer

6    sales.  Slide 4, excuse me, please, Ryan.

7           What happens is, the VantageScore Solutions

8    entity licenses its algorithm to the three credit reporting

9    agencies, and Equifax markets the score only to lenders,

10   and then TransUnion and Experian market it both to lenders

11   and to consumers, and that is how the score is brought to

12   the consumer arena.

13          Now, I want to talk to you a little bit about

14   marketing of VantageScore because I think it's significant

15   that you have not been shown one web site, one

16   advertisement, one commercial, one banner ad that is

17   VantageScore Solutions' own product.

18          Instead, what you have seen are several different

19   screen shots from the TransUnion and/or the Experian web

20   sites, and again, these are the two outlets for the sale of

21   VantageScore to consumers.  And, Ryan, I would like you to

22   bring up the Experian web site, which is in evidence.  It

23   is slide 18.

24          I think I showed you this in my opening.  This is

25   one of the two examples of web site sales of the

2862

1    VantageScore, and again, I pointed out in the opening how

2    the VantageScore not only uses numbers, but it also uses

3    corresponding letter grades, and I would encourage you to

4    look at this exhibit, which is Plaintiffs' Exhibit 1126,

5    when you go into your room because I think if you look at

6    this document carefully, you'll see that 501 to 990 never

7    appears on this web site.

8            Now, I would like, Ryan, for you to show the TU

9    web site, which is slide 13.  Again, this is the TransUnion

10   site that sells the VantageScore, and again, please take a

11   careful look at that.  This is Plaintiffs' Exhibit 1209.  I

12   think one significant thing about this particular exhibit

13   is in his cross-examination of Mr. Danaher, Mr. Larus

14   actually used this as an example of how a score can be

15   described with clarity, and, again, these are the two

16   outlets for the sale of the VantageScore score.

17           Slide 4, please, Ryan, or excuse me.  8.  Now, we

18   have all heard about 300-850.  VantageScore, 501 to 990

19   with a corresponding letter grade.  So from 901 to 990 is

20   an A.  I think you've heard a lot of testimony about how

21   scores are chosen, scoring ranges are chosen, and I would

22   like you to think about the evidence that came in about why

23   was the 501 to 990 chosen?

24           I think one of the first things that's important

25   to consider is that the scoring range for VantageScore was

1    chosen before the patent and trade office, the PTO, awarded

2    trademark protection to 300 to 850.  Ryan, slide 46,

3    please.  I think you heard a lot of evidence about 0 to 100

4    and that it was a recommended range for the VantageScore.

5         You might be wondering, well, why didn't

6    VantageScore Solutions, why wasn't the range the 0 to 100?

7    I wanted to point out on this time line, it was a very

8    brief period of time in which that score was under

9    discussion.  I think there was some e-mails, and the

10   exhibit number is cited on here that talk about the 1 to

11   100 range, and that was around October of 2005.

12        And then there were some discussions about 0 to

13   999, and those, again, were brief.  If you look at the

14   period of time, we're talking about a time range of less

15   than a week, and by November of '05, again, almost five

16   months before the PTO granted the trademark in 300-850, the

17   VantageScore had been settled on at 501 to 990.

18        So, again, you've heard a lot about notice and

19   when there was notice given and when the TM mark was

20   started being used by Fair Isaac for purposes of the 300 to

21   850.  All this was occurring before there was any trademark

22   issued.

23        Secondly, I think you've heard a lot of testimony

24   from witnesses about why a three-digit range is the most

25   desirable, and you heard testimony.  That's one reason why

1    the 0 to 100 was not chosen.  I think I talked in my

2    opening about the notion of granularity, and I thought both

3    Mr. Christiansen and some of the others, Mr. Oliai, they

4    talked about how when you're developing a credit score,

5    what you're trying to do is predict future human behavior

6    with a number.

7           And you need a certain range so that lenders can

8    be making decisions about creditworthiness with enough

9    detail to make decisions that make sense for their

10   portfolios, and a range of 0 to 100 doesn't do it because

11   there is not enough numbers, not enough granularity,

12   between the 0 and the 100.

13          The same thing with a four-digit range.  You

14   heard testimony about how theoretically a score could have

15   five digits, six digits, but from a practical market

16   acceptance standpoint, a four-digit range I believe as

17   Mr. Christiansen again testified to, you're not getting

18   enough spread over a bell curve.

19          If you only have 50 people that are falling

20   within a particular number, it's not enough, again, for the

21   lenders to be making a decision about whether somebody is

22   creditworthy or not.  Also you've heard a lot of testimony

23   about how the three-digit scoring range really is the

24   industry standard.  So VantageScore did go with a 501 to

25   990 range.

1          Now, Fair Isaac's claim against VantageScore

2    essentially boils down to, because there is an overlap

3    between 501 and 850, that VantageScore Solutions is somehow

4    infringing on 300-850, and I would challenge you again to

5    use your common sense and think about that.

6          Ms. Kramers-Dove said that the 501 to 990 range,

7    she agreed with my statement that it only describes

8    VantageScore and the output of its algorithm.  You have

9    heard a lot of testimony and a lot of argument about what

10   is descriptive versus trademark use.  Again, even in the

11   one web site, the Experian web site, 501 to 990 never even

12   appears as a description, much less as a trademark.

13         So I would encourage you when you're looking at

14   the evidence to see that, again, 501 to 990 is using, is

15   being used merely as a description.  Finally, exhibit or

16   excuse me.  Slide 10, Ryan.

17         There was a lot of testimony that the reason the

18   501 to 990 scale was chosen was because it tracks the

19   academic scale, and you've heard a lot of testimony about

20   consumer confusion, and what better way to explain to a

21   consumer in very few words about how they're doing from a

22   credit standpoint if they look at their VantageScore and

23   they see, well, we're in the A range.

24         We know what that means.  You know if you're in a

25   C range or in a D range.  It has some independent meaning

1    to you.  So one reason why the 501 to 990 was chosen was to

2    track the academic scale.  Now, Ms. Kramers-Dove did admit

3    in cross-examination that Fair Isaac is not claiming every

4    number as a trademark between 300 to 850.  Could I see

5    slide 7, please, Ryan.

6            So, again, when you think about overlapping and

7    whether VantageScore's overlapping range constitutes some

8    sort of infringement, think about Ms. Kramers-Dove and the

9    fact that she said, no, FICO is not claiming a trademark in

10   501 or 502.  They're claiming it in the phrase 300-850, and

11   use your common sense to decide whether VantageScore's

12   overlapping range is an improper use of those numbers.

13           I want to talk a little bit about consumer

14   confusion, and again, I'm going to focus on the TransUnion

15   and Experian web sites because, again, that's where the

16   VantageScore is distributed.  Ryan, will you pull up 14,

17   please.

18           This is the TransUnion web site.  I showed you

19   this briefly before, and I have highlighted some things so

20   you can be thinking about those.  First of all, it says,

21   this is the VantageScore credit scoring formula.  15, Ryan?

22   VantageScore credit scoring is mentioned.  16?  Again, it's

23   using the number combined with a grade.

24           This is a sample score, but again, it's a B, so

25   it gives the consumer some indication of where they might

1    stand in relation to others, and 17?  Here it just says,

2    the numerical score ranges from 990 to 501 equaling grade

3    ranges from A to F.

4        Here they're not even using 501 to 990, and

5    again, they're equating it with the grading system, and you

6    heard testimony about what a trademark use is, and you

7    heard from Mr. Anderson that uses of like 300 to 850 are

8    not trademark uses.  Again, question whether 990 to 501 is

9    a trademark use in the context of the TransUnion web site

10   that markets VantageScore, and also query whether a

11   consumer would be confused by this.

12       Now, Ryan, could I see 19, please.  Again,

13   Experian's web site.  Examine it carefully.  It never even

14   uses the phrase "501 to 990."  What does it do to

15   distinguish itself and tell a consumer what they are

16   purchasing?

17       First, VantageScore for businesses.  Slide 20.

18   VantageScore, and it shows service mark.  21.  The

19   VantageScore scale.  22.  Your VantageScore number.  23.

20   Lenders using VantageScore.  24.  VantageScore when you're

21   clicking on it to see if you want to learn about your

22   VantageScore.

23       Next slide.  National VantageScore averages.

24   Next one, Ryan.  VantageScore mentioned again, and finally,

25   the range coupled in segments with the academic grades.  I

1    would ask you, use your common sense.  Would a consumer be

2    confused if they went to this web site to buy a

3    VantageScore?

4          Another, I think, test of the consumer confusion

5    relates to what would you get if you actually purchased a

6    VantageScore, and I don't think this was shown to anybody,

7    but I wanted to spend a little time on this, too.  Ryan,

8    slide 28, please.

9          This is an actual example of somebody's

10   VantageScore.  This was purchased from the Experian web

11   site.  Next slide.  Again, it says at the top, Experian and

12   then VantageScore with the service mark.  Next one, Ryan.

13   It's an Experian VantageScore report.  Next one.

14   VantageScore is generated.

15         Next one.  VantageScore from Experian.  Next.

16   This VantageScore is based on.  Next.  Your VantageScore is

17   990, I wish, on a scale of 501 to 990.  Next.  A

18   VantageScore summary.  Next.  About your VantageScore.

19   Next.  VantageScore is.  Next.  What your VantageScore

20   means.  Next.  What factors lower your VantageScore.

21         Next.  Your risk grade is A.  Next.  Your score

22   currently falls into a risk grade category of A.  Again,

23   think about whether an average consumer purchasing this

24   score would be confused about what the source of this score

25   was.  I would suggest that the answer to that question is

1    no.

2              I want to talk to you a little bit about some of

3    the special verdict questions and how I believe the

4    evidence would suggest answers.  I'm not going to spend any

5    time on secondary meaning.  I think some of the other

6    attorneys already have spent a lot of time on this, but I

7    did want to spend a little time on question number 2 of the

8    special verdict form, which you will be answering for each

9    of the defendants individually.

10             And you've heard a little bit about, did the

11   phrase "300 to 850" acquire secondary meaning before

12   defendants' allegedly infringing uses?  And I would like to

13   talk about, again, slide 46.  Again, this range was chosen

14   before a trademark was issued, but I think another factor

15   you can consider in terms of secondary meaning is

16   Mr. Johnson's survey, and I know you've heard a lot about

17   the surveys.

18             But I just wanted to call attention to the fact

19   that Mr. Johnson's survey, which you can accept, reject,

20   you make your own decision about it, but the date of that

21   survey was in September of 2008.  And Mr. Johnson did ask

22   questions about the range of 300 to 850, and I'm sure

23   you'll remember how small the percentage, I believe it was

24   only 2 percent, of the folks who even knew what a range

25   like that referred to.

1          So this is almost two years after -- excuse me.

2     Three years.  I can't do the math -- three years after the

3     VantageScore scoring range was chosen, and still in this

4     survey, secondary meaning was not established.  Question 3

5     has to deal with consumer confusion, and I think we went

6     through that with the web sites.

7          Again, use your common sense to decide whether

8     the average consumer would be confused about the source of

9     the VantageScore when purchasing.  I'm not going to spend

10    any time on the functional defense.  I know Mr. Remele

11    spent some time on that.  I did want to spend a little bit

12    of time on fair use, which is a defense that VantageScore

13    is also asserting, and again, it is a bar to any sort of

14    liability, and it is question 5 of the special verdict

15    form.

16          It has three elements:  Did a defendant use

17    300-850 otherwise than a trademark?  I would argue that

18    VantageScore Solutions has never used 300 to 850 as a

19    trademark or 300-850, nor was any evidence introduced that

20    VantageScore Solutions has ever used any sort of seal logo.

21          Secondly, did the defendant use 300-850 fairly

22    and in good faith?  The evidence, I believe, shows that the

23    only time VantageScore is using its scoring range is to

24    describe the output of its algorithm, and that is a

25    statement to which Ms. Kramers-Dove did agree.  And, again,

1    it goes to the descriptive use.

2            If we are using our mark and our scoring range

3    only to describe the output of the algorithm, we are

4    entitled to the benefit of that fair use defense.  I want

5    to spend a little time on fraud on the PTO.  May I have the

6    first slide, Ryan, on the fraud on the PTO.

7            I know you've heard a lot of testimony about

8    this, and again, you have to use your common sense, but I

9    wanted to draw your attention to several things.  First of

10   all, this is what Fair Isaac in its submission to the PTO

11   on February 28th, 2005, what they told the PTO.

12           300-850 is the credit scoring scale only for

13   applicant's credit bureau-based risk scores and not for

14   other types of credit scoring products that the applicant

15   develops or even other credit bureau-based risk products

16   that competitors develop.  That is what they told the PTO

17   in February of '05.

18           But what did Fair Isaac know?  I want to show you

19   a couple examples of that.  First of all, other side of the

20   slide, you've heard a lot of mention of Mr. Watts who did

21   not testify in this case, and this is a quote of his from a

22   newspaper article on July 29th, 2001.  "Many other

23   companies have developed their own scoring systems,

24   although a ranking from 300 to 850 is used by most

25   systems."

1          Next slide.  Another example of what Fair Isaac

2    knew.  This is an internal e-mail, Fair Isaac e-mail from

3    Andrew Jolls, and again you'll recognize his name.  His

4    video deposition, excerpts were played.  November 25th,

5    2003.  "Experian is offering its PLUS Score, a credit score

6    exclusively for consumers.  The scores use a scale of 300

7    to 900 and look similar to the FICO scores that banks buy

8    from Fair Isaac Corporation."

9          Again, 18 months before this statement was made

10   to the PTO.  Next slide, Ryan.  Here is a statement made

11   about TransUnion on December 16th, 2004, and again, this is

12   an e-mail from Craig Watts to Cheri St. John, Keri

13   Kramers-Dove and others, and I'm sure you'll recognize

14   Cheri St. John's name as the person who had put in the

15   affidavit to the PTO.

16          TransUnion has announced a promotion to identify

17   consumers who have the, "Perfect credit score of 850, but

18   they're not referring a FICO score.  TU's consumer site,

19   TrueCredit.com sells an imitation score to consumers, not

20   FICO scores."  Now, again, you're going to have to decide

21   whether those constitute fraud on the PTO or not, and those

22   particular questions related to defendants' counterclaims

23   should be questions 9, 10 and 11 of the special verdict

24   form.

25          In summary, I would encourage you to use your

1    common sense and find that 501 to 990, coupled with an

2    academic grade, does not constitute a same or similar mark

3    and find that VantageScore Solutions LLC did not infringe

4    on 300-850.

5         Thank you.

6         THE COURT:  All right.  We'll take another

7    in-place standing stretch break.

8              **(Standing stretch break.)**

9

10             **(In open court with the Jury present.)**

11        THE COURT:  All right.  Please be seated.

12   Because the plaintiff has the burden of proof.  They have

13   the opportunity of giving the last argument.  We will now

14   proceed to the argument of Fair Isaac as given by their

15   counsel Robert Schutz.

16        Mr. Schutz.

17        MR. SCHUTZ:  Thank you, Your Honor.  Ladies and

18   gentlemen, I, too, would like to thank you on behalf of

19   Fair Isaac, Renee Jackson, corporate counsel, and Keri

20   Kramers-Dove, who has been sitting here the whole time, and

21   you've had a chance to hear testify.

22        You know, I've been doing this for a long time,

23   and I sure hope that your experience hasn't been painful in

24   any way.  I believe life is the collection of stories, and

25   a week from today, probably most of you will be sitting

1    around a table carving up a turkey or a ham or something

2    like that, and you will be without a doubt the premier

3    experts inside your houses at the table on credit scores,

4    and so you should have some good stories to tell about

5    that.

6            At the beginning of the case, I said that a

7    couple of central things, that this case was about consumer

8    credit scores and how they're marketed, and it's a case

9    about informed consumer choice, and that hasn't happened.

10   And in my opening, I also had a top ten list.  Well, I have

11   carved that list down a little bit.

12           I now have a top nine list, and I'm going to use

13   that to walk us through the evidence here, and of course, I

14   have here, like my opponents on the other side of the

15   courtroom, I have a limited amount of time.  I can't talk

16   about every piece of evidence, but I am going to cover some

17   highlights.

18           So what I have constructed here is a top nine

19   list, and it's the top nine myths perpetrated by the

20   defendants in this case.  Myth number one:  You cannot

21   trademark numbers.  Of course, you can trademark numbers.

22   If you could not trademark numbers, we wouldn't be here.

23           You will have the definition from the Court on

24   what a trademark is, word, name, symbol or device or

25   combination thereof that indicates the source of the goods

1    or services even if that source is generally unknown.  I

2    will come back to that a couple of times.

3         We don't have to be McDonald's.  We don't have to

4    be Kentucky Fried Chicken.  We don't have to be Apple

5    Computer.  We don't have to be any of the famous marks that

6    have been used by, as examples of the defendants, and

7    people do not have to associate 300 to 850 with Fair Isaac.

8    They only need to associate it from a single source, even

9    if they have no idea of the name of that source.

10        The defendants' real complaint here is that they

11   don't think that we can trademark a score range, but even

12   the defendants here acknowledge that you can have a

13   trademark and a score range.  Jeff, let's pull up

14   Plaintiffs' Exhibit 975.

15        You will recall that Plaintiffs' Exhibit 975 is a

16   contract, three-way contract, entered into in August of

17   2006 between TransUnion on the one hand and Fair Isaac and

18   WAMU, the other two parties, and let's take a look at two

19   sections on this screen.  Let's look at 7.3.

20        And if we look at Section 7.3, we can see here

21   that Fair Isaac has put in this that they have a 300-850

22   score range trademark.  It's a registered trademark.  This

23   agreement was signed by Mr. Danaher, and there was never

24   any, you know, correspondence, telephone call, e-mail or

25   anything from Mr. Danaher that said, whoa, wait a minute.

1    You cannot trademark score ranges, nothing like that.

2             Now, let's go to the next paragraph, and here we

3    have another provision that says, No party may use

4    another's mark or company names in advertising or other

5    promotional material without first obtaining the prior

6    owner's consent.

7             So it's clear, a clear indication that we have a

8    trademark on the 300 to 850 score range and a clear

9    acknowledgment that, hey, you can't use it.  You can't use

10   it.  Now, I'm going to be leaping ahead and back a little

11   bit because some things I showed you are relevant to

12   various things.

13            This acquiescence defense that we will talk about

14   requires an affirmative act on our part saying, it's okay

15   to use our marks.  That's really what, you will have a jury

16   instruction on that.  Keep this in mind when we get to

17   there.

18            Now let's go to Experian.  We had a contract with

19   Experian.  The master contract was April, April 15th, I

20   think of 2005, and there were a couple of addendums, and

21   let's look at restated addendum number one, which is

22   February of 2006.

23            And if we go to paragraph 5.4 here, if we go to

24   paragraph 5.4, we can see that among a defined term here is

25   a Fair Isaac optional trademark 300-850 TM score range,

1    score range, and this was, of course, at the time when we

2    had filed our federal registration but had not yet been

3    granted the registration.  That's why it's a TM as opposed

4    to a circle R.

5         You put a circle R once you've got the trademark

6    registration from the patent office.  The other thing that

7    is very clear, not in dispute, is that when we were

8    prosecuting these applications before the Patent and

9    Trademark Office, it was clear that it was a score range

10   that we were seeking trademark protection for.

11        There is no doubt about that.  Mr. Anderson

12   acknowledged that.  It's not part of any defense on their

13   part that we have somehow, you know, pulled the wool over

14   the eyes of the people at the Patent and Trademark Office.

15   It was always up front that what we were trademarking was a

16   score range.

17        What the issue boils down to at the end of the

18   day is, yes, you can trademark numbers, and you can

19   trademark score ranges.  It's whether this particular

20   trademark score range has achieved secondary meaning, and

21   that's going to be the next topic I talk about, but before

22   we move into that, the next myth the defendants have tried

23   to perpetrate here, I think it important to refresh our

24   recollection of why trademarks are important.

25        Consumers rely upon trademarks to signal to them

1    certain characteristics or qualities about goods they're

2    purchasing.  I have used the example of Coke and Pepsi

3    before.  Coke lovers love the characteristic taste of Coke.

4    Pepsi lovers love the characteristic taste of Pepsi so that

5    when someone buys a Coke, they know what taste they're

6    getting and vice versa with Pepsi.

7            One of the important characteristics of the FICO

8    300 to 850 is it's the score that lenders use.  It's the

9    score probably that most lenders use or it's the score that

10   the majority of lenders use.  I think that's really

11   undisputed in this case.

12           It's one of the essential characteristics of the

13   score, and so when somebody buys that score, they can rest

14   assured that maybe not every lender uses it.  Maybe my

15   lender might not use it, but most lenders use it, majority

16   of lenders, 75 percent of mortgage applicants.  You'll have

17   the evidence back there, and it's replete through all the

18   documents.

19           And, again, people do not need to know that the

20   300 to 850 product comes from Fair Isaac.  I would submit

21   that before this trial, most of you might not have known

22   that Crest toothpaste comes from Procter & Gamble, and you

23   might not have known that Haagen-Dazs ice cream comes from

24   General Mills.

25           Let me just, a couple of other things on the

1      lender's use issue.  Okay?  Let's look at Plaintiffs'

2      Exhibit 893.  Plaintiffs' Exhibit 893, this is a document

3      from 2004, so one thing to note about this 2004 document,

4      and you will recall the testimony of Keri Kramers-Dove that

5      trademarks were applied for in February of 2004.

6           And this was early in the year, certainly before

7      mid 2004, when there is some testimony at least by Experian

8      that they started using the range that we think infringes,

9      you have pretty prominent use on this web site of 300 to

10     850 in one of our applications.  It's prominent, the seal,

11     and also you see here, most lenders base approval on that.

12          You've got a direct connection between the 300

13     and 850 trademark score range and lenders, but you don't

14     have to take our word for it.  Let's go to Plaintiffs'

15     Exhibit 1157A-68.  This is an Experian document.  This is

16     the web site where Experian sells the FICO score.  Remember

17     that we've got this arrangement that they do have this,

18     what they referred to, as the other score -- I'm sorry --

19     TU, we've got the other score range.  TU has got two score

20     ranges.

21          Here you can see here there is a clear reference

22     here, second bullet point, that the FICO score range is 300

23     to 850, and I think it's on the second page, Jeff, that

24     there is the reference to lenders.  Okay?  So here you can

25     see how lenders see you.  Majority of lenders use FICO

1    scores, and this is from TransUnion, so even TransUnion in

2    their public face to the world about the FICO score says

3    that.

4         One final point on this before we move to the

5    next factor, next myth, we do not have to use a TM or an SM

6    or a circle R to have trademark rights.  Would it have been

7    a good practice to have done so?  Probably.  We didn't do

8    it.  It's not legally relevant, and I'll talk about the

9    notice issue in a few minutes, but let's move on to the

10   next myth.

11        Myth number two.  Myth number two:  This case is

12   about lender scores and overlapping score ranges.  That's

13   the myth that the defendants are trying to perpetrate here.

14   It's not about lender scores.  It's about consumer credit

15   scores.  We are not seeking damages.  We are not seeking to

16   stop any behavior in the lenders' space.  The world will

17   not come to an end.

18        It's about four scores, specifically:  The FICO

19   300 to 850 score, the Experian PLUS Score, the TransUnion

20   TransRisk score and the VantageScore.  That's what this

21   case is about, and it's not about overlapping score ranges.

22   It's about whether they have marketed their product to

23   consumers, each of their respective products, using those

24   score ranges we've alleged infringe in a manner likely to

25   cause confusion as to source, sponsorship or affiliation.

1          That is the legal test, not that it actually

2    caused confusion, although it certainly did.  We'll talk

3    about that evidence, but whether they're marketing their

4    product, using what we allege is an infringing score range,

5    is likely to cause confusion about source, sponsorship or

6    affiliation.

7          Lenders, of course, are not confused.  Even if

8    they had used 300 to 850 in the lender market and there is

9    some reference to some, perhaps, in scores very close to

10   this in the lender market, lenders know exactly what

11   they're getting.  They're not confused at all.

12         Somebody walks in and says, I've got a score and

13   the range is 350, and it's from Experian or some XYZ

14   company.  They know whether it's a FICO score or whether

15   it's not.  Lenders know exactly what they're buying.  There

16   may, however, be some relevance to lender scores in this

17   sense:

18         You heard two third parties come in here from

19   Choice Point and Lexis-Nexis, and they gave testimony.

20   What I would submit is the most interesting about their

21   testimony is that they, those two witnesses came in here

22   and said, we compete with Fair Isaac.  We compete with Fair

23   Isaac across a range of scores.

24         So they compete with Fair Isaac, but they did not

25   have to copy our score range to compete.  All right?  I

2882

1    found that very interesting, that they did not have to copy

2    to compete, and we're going to get to copying in a minute.

3              Myth number three:  300 to 850 has no secondary

4    meaning.  All right?  And again, what the defendants are

5    trying to say is, and Mr. Remele put the slide up, would

6    you recognize Kentucky Fried Chicken.  Would you recognize

7    McDonald's?  Would you recognize all these famous marks and

8    then 300 to 850.  That's not the test.  The test isn't

9    whether I recognize it, the judge recognizes it, they

10   recognize it or you recognize it.

11             The test is whether a prospective purchaser would

12   associate it with a single source, not that it's associated

13   with Fair Isaac, but with a single source.  Remember the

14   testimony from Mr. Anderson of the PTO?  100,000 trademarks

15   are registered every year.  100,000.

16             Yes, we all know famous ones, but for those

17   trademarks registered in smaller products that don't have

18   that kind of market penetration and the like, the issue is

19   whether prospective purchasers of that product.  It's not

20   whether somebody doesn't care, would never purchase a

21   credit score, doesn't give a darn about credit scores would

22   associate it.  It's whether a perspective purchaser would.

23             The evidence that you will be able to consider.

24   The judge will give you instructions.  There is a list of

25   things you can consider, and I would like to talk about

1   some of them.  First, intentional copying.  The second fact

2   you can consider is actual confusion.  Third factor is

3   sales and extent of use, and the fourth factor is exclusive

4   use of the mark.  There are some other factors, but I think

5   those four are highly relevant.

6           Let's start with intentional copying.  All right.

7   Why, you might ask yourself, is intentional copying

8   something you should take into account about secondary

9   meaning, and it makes perfect common sense.  If someone is

10  picking in this case a score range and they've got the

11  whole broad spectrum of options to choose from but they

12  choose the score range of the market leader of a recognized

13  one, they're doing so because they know it has secondary

14  meaning.

15          They know that people have associated that

16  particular score range with a single source.  That's why

17  people copy things.  That's why people make fake Rolexes.

18  That's why they make fake knock-off products.  All right?

19  They copy because they know that that's a way maybe they

20  will be able to fool a consumer into purchasing the

21  knock-off product.  That's exactly why copying, intentional

22  copying, is one of the factors that you can use in

23  assessing whether there is secondary meaning.

24          Here's what we're going to do next.  We're going

25  to look at some of the copying evidence, and one of the

1    things that we can, that we're going to do in this case is,

2    we're going to go behind closed doors, and we're going to

3    look at what happened behind the closed doors in the

4    VantageScore development, what would happen behind closed

5    doors at Experian, and what happened behind closed doors at

6    TransUnion, and we're going to apply what I call Ron's

7    mom's rule.

8         When I was a boy growing up on the farm, the

9    wisest person I knew then and the wisest person I know

10   today is my mother, and she told me when I was young,

11   listen to what people say, but watch what they do because

12   actions speak louder than words.  So let's go behind closed

13   doors, see what the defendants did back then, what they

14   wrote down before there was a lawsuit, before they hired

15   lawyers to get involved to spin some facts.

16        Let's start by looking at Plaintiffs'

17   Exhibit 102.  This is in November, and we're going to start

18   looking at the VantageScore.  We're going to go behind the

19   scenes at VantageScore, and here's why we're going to start

20   there because VantageScore, remember, is a joint venture

21   between all three of the credit bureaus, including two of

22   the defendants in this case, Experian and TransUnion.

23        So let's take a peek behind the closed doors at

24   VantageScore in November, November of 2004, and here we've

25   got a meeting, and there are some names up there at the

1    top, at least a couple of them.  Mr. Wiermanski and

2    Mr. Hellinga are people who testified in this case by video

3    deposition, and FICO was mentioned.

4         Here's what they say:  Replace FICO anywhere they

5    appear.  B2B and consumer, everyone would see the same

6    score.  So this is the mindset.  This gives you some

7    background mindset of these people.  Okay?  They want to

8    replace us.  Let's now go to Plaintiffs' Exhibit 34.

9         Plaintiffs' Exhibit 34 is a March 31st, 2005,

10   memo to Keri Williams, and you know, his title is up here.

11   I think he has been mentioned a couple of times.  Let's

12   look at second page I think it is, Jeff.  Here this memo,

13   there is this paragraph entitled calibrate to FICO, and

14   there is a reference to the TBS score.

15        And recall that tri bureau score, and before

16   VantageScore had the name VantageScore it was talked about

17   as the tried bureau score or project Trident, and

18   ultimately that's what led to VantageScore, but here we've

19   got, again behind closed doors before, this is nonspin

20   stuff.  Okay.  These are just their words.

21        The TBS score would only conform to the current

22   FICO range by accident.  The bureaus could provide the TBS

23   scores to customers on a new and clearly defined scale,

24   along with a conversion table to FICO scores.

25   Alternatively, the TBS score could be transformed so that

1      it appeared to be the on same scale as the FICO score.

2             These people know exactly what they're doing.

3      These are people that have been our partners.  That's

4      another thing to keep in mind.  I will talk about this a

5      little more.  We have been in business with these people

6      since 1989 when we first did our first bureau score.  They

7      know about us.

8             All right.  We have taken their data, run it

9      through our algorithm and outputted a score.  They know

10     about the FICO score range.  They know about how hard Fair

11     Isaac had worked to get its position in the marketplace,

12     and they clearly also know that there is an option out

13     there when they're developing a tri bureau score.  New and

14     clearly defined scale.

15            Look at 501 to 990 in a couple different ways.  I

16     would submit, it's not a clearly defined scale different

17     from the FICO score.  Now, let's go to jump ahead here a

18     few months to October of 2005.  Let's look at Plaintiffs'

19     Exhibit 44.

20            This is again project Trident, ultimately led to

21     VantageScore, and on this page, I think it's internal page

22     10, score scale and range, 1 to 100, and we have got some

23     pros and some cons.  What are the pros?  Consumer friendly.

24     0 to 100 actually conforms much more, I would submit, to an

25     academic scale than 501 to 990.

1    The schools that I grew up in in the small

2    farming community when I was a boy had 0 to 100, not 501 to

3    990.  So it's consumer friendly.  It is regulator friendly

4    and bullet point three is very important.  Product

5    distinction.  Product distinction.  Nobody would be

6    confused between a credit score product that had a range of

7    0 to 100 with one that had a range of 300 to 850.

8    So they clearly know the benefits of going there.

9    Meaningful outcome?  What does meaningful outcome tell us?

10   Well, there is enough granularity to provide a meaningful

11   outcome for lenders to use that score.  Let's now go to

12   Plaintiffs' Exhibit 338.

13   This is an e-mail.  Mr. Oliai is part of this

14   e-mail.  He testified in this case.  Among our team we

15   refer to Oliai as Mr. Perfect Memory Man.  He came in and

16   testified about 30 plus credit scores from memory and then

17   drew this nice chart of all these different credit scores.

18   And the most interesting part of that, of course,

19   is lots and lots of scores all related to lenders, all

20   kinds of options they could have picked when they decided

21   to launch the new TransRisk score or the Experian score,

22   and they didn't pick those.  They picked our range.

23   So what do we have here?  A couple of things.

24   First of all, we've got use of score, and this point is a

25   little bit esoteric, but I do want to make it.  Use of the

2888

1    score, and he's talking here about the VantageScore, and

2    the point that this is making is, the VantageScore range

3    output is actually something they considered to be

4    proprietary.

5         501 to 990, nobody else can use that because the

6    discussion here relates to, you will see this in a whole

7    document, whether one of the parties by themselves can use

8    that score range on some other product, and we also

9    introduced into evidence that might be Plaintiffs'

10   Exhibit 30, I'm not going to pop it up here, but it's the

11   VantageScore IP agreement.

12        And you walk through the definitions, clearly the

13   score range they consider to be protectable property in

14   that agreement.  There is another page here, Jeff.  Let's

15   go.  So the scale.  They talk about the scale.  Extensive

16   discussion of pros and cons of mimicking currently used

17   score range versus different score range.

18        Well, the currently used range is the FICO score

19   range, and they're talking about mimicking.  All right.

20   You know, is mimicking a word that means you're doing the

21   right thing?  I would submit not.  I would submit that

22   these people knew exactly what they were talking about when

23   they talked about should we mimic the FICO range.

24        The reason, of course, they want to mimic the

25   FICO range is that we had obviously established ourselves a

1    leader in the lender market, and we were the first to

2    launch a FICO score to the public in March of 2001 with

3    myFICO.com, and this was their discussion of whether they

4    in essence could figure that out off of all the work that

5    we had done.

6            Let's continue here.  Let's now go to Plaintiffs'

7    Exhibit 22.  It's November 16th of 2005, and let's go to

8    internal page 25.  Would you enlarge that, Jeff?  Let's

9    just look at a couple of things here.  At this point, they

10   had decided to go with 501 to 990, and what do they say?

11           Easier adoption and implementation if score scale

12   is similar to others in the market.  Well, who is the other

13   score in the market?  That's us.  Okay?  And then there is

14   one on difficulty with consumer adoption if new scores are

15   generally lower than existing scores.  I think that goes to

16   the 0 to 100.  People might not be crazy about having a 78

17   when there is a different scale, but that's another issue

18   I'll address here.

19           Look at the bullet point that says, Cannot mimic

20   competitor scores exactly.  Well, let's just think back

21   about this.  So they acknowledge you can't mimic them

22   exactly.  Well, why can't you mimic that them exactly?

23   Well, that would be wrong somehow, but we know that's

24   exactly what TransUnion did, and we'll look at their -- and

25   TransUnion is part, they're one-third owner of this.

1    So people know you can't copy exactly.  They

2    think that it's okay to copy close because that's what this

3    gets to.  Let's look at the next bullet point.  The concept

4    of setting a new standard is valuable but too many hurdles.

5    So the concept of having a completely different score range

6    valuable because why would it be valuable?  What does your

7    common sense tell you?

8    Brand distinction.  No possibility of confusion,

9    whether it's 0 to 100, 0 to 300 or 1,000 to 2,000 or 1,000

10   to 1500.  You would have the ability to set a new standard

11   and everything else, but too many hurdles.  Well, what kind

12   of hurdles might there be?  Let's just think about this.

13   Did Fair Isaac get to where it is today in the lender

14   market overnight?  Of course not.

15   Of course not.  Started in 1989 with the first

16   bureau score.  Added other scores in the early nineties,

17   and all of a sudden after 20 years, they're an overnight

18   success.  Took Fair Isaac a long time to get to that spot.

19   All right.  The defendants wanted to shortcut that.  They

20   wanted to shortcut getting substantial market penetration

21   and establishing themselves in the market.

22   The best way to do that was to mimic or copy the

23   scores.  Let's now go to Plaintiffs' Exhibit 505.  This is

24   out of Experian's files.  Okay?  And what we see here, they

25   say FICO score range is 350 to 850.  Apparently a typo.  We

1    want to keep it close, but not exactly like FICO's.

2          And of course what did was, they went ahead with

3    the suggested change which was to go from -- you have to

4    remember the score was 300 to 900, and they went from 300

5    to 900 to 330 to 830.  Well, why would they do that?  Well,

6    we see, they want to keep it close but not exactly like

7    FICO's.

8          The score they actually sell to lenders, there

9    has been evidence about this, is the 300 to 900 score.

10   Mr. Oliai, Mr. Perfect Memory Man, came in and testified

11   about this whole laundry list of the scores.  They didn't

12   pick any of those scores.  They picked what was in essence

13   the FICO score range, but not quite but almost exactly.

14         Let's go to TransUnion.  Now let's go to

15   Plaintiffs' Exhibit 201.  These are, this is a list of

16   TransUnion risk models, and, Jeff, you could highlight 150

17   to 950.  The TransRisk model that they use in the lender

18   market is 150 to 950.  It's not the 300 to 850 that they

19   use when they're selling to consumers.  All right?

20         There is no possible rational explanation for why

21   when they're out there with their bag of credit scores

22   going into banks and lenders and say, here's our score,

23   it's 150 to 950, why they couldn't use that same exact

24   score range when they're with consumers.

25         In fact, you would think they would say,

1    TransRisk credit score has a range of 150 to 950, exactly

2    what lenders use when they use a TransRisk score, and

3    that's what you Mr. and Mrs. Consumer should buy.  Instead

4    they decide to knock off our score range.

5         Let's go to 326.  This is an e-mail that you have

6    seen before, and it's Mr. Danaher is in the loop here.  You

7    can see it's from Justin Depow saying I think we should use

8    the range 300 to 850 to be completely compatible with the

9    FICO scale, which is what we are trying to mimic.

10        Mr. Danaher sent back in about 45 seconds.  Clear

11   copying, clear mimicking.  Thought about it for 45 seconds,

12   even though in the lender market we're going 150 to 950,

13   just copy it when we're going in the consumer market.

14        Let's go to Plaintiffs' Exhibit 647.  I just

15   highlight this to show there are consumers out there --

16   highlight the top of that, Jeff -- some consumers out there

17   that refer to the TransRisk score as the fake-O score.

18   They know, some people, consumers once they find out it's a

19   fake-O score, and they know that inside of TransUnion.

20        Okay.  I want to move on to another factor that

21   you can consider in secondary meaning.  So we're on the

22   myth of there is no secondary meaning, and what we have

23   looked at is intentional copying.  I want to look at extent

24   of sales of myFICO.

25        Remember that or FICO scores sold, and they were

1   sold through the myFICO.com web site.  Remember it was

2   launched in March of 2001.  Let's go to Plaintiffs'

3   Exhibit 925.  Plaintiffs' Exhibit 925 is a memo to the

4   board of directors, and this is very shortly after the

5   launch.  The launch was in March 19, 2001.  This is May 1,

6   2001, so about five and a half to six weeks, and how was

7   this perceived?

8           This is one of the factors that you can take into

9   account, and what does it say?  Volumes:  Initial response

10  has surpassed expectations.  We had over 20,000 orders by

11  the end of the first day, and remember, every single one of

12  these sales was of a score with a range 300 to 850, and

13  that range was clearly set forth on the -- it's been

14  consistent that the range has always been the same.

15          And an offering of just shy of 100,000 orders by

16  the end of March with only 13 days of service.  It talks

17  about gross revenues of 583,000.  Then it goes on to say,

18  So far the volume can be directly related to press

19  coverage.  See information below, and let's go to that.  So

20  what has been the press coverage?

21          Major media public relations blitzed.  Leveraged

22  a wide variety of consumer media outlets.  Is this the

23  first time that Fair Isaac has by design embraced direct to

24  consumer market and media attention.  This was their first

25  foray into the direct to consumer market.

1      It says, This has also been the most positive

2   consumer media portrayal Fair Isaac has ever received.  The

3   more notable coverage, not all of it, just the notable

4   coverage.  300 plus local and regional TV news programs

5   covered the story.  Over 200 plus newspapers covered the

6   story, including papers as you see here, like the New York

7   Times, the LA Times, Washington Post and Wall Street

8   Journal, including, you know, well-known columnists Ken

9   Harney and Jane Bryant and then also on national public

10  radio as well.  Okay?

11      Go to the next page, Jeff.  Then some additional

12  stuff.  Web portals, a lot of web portals covered it.

13  Microsoft Network, Wall Street Journal and Trade

14  Publications.  You will recall the testimony of

15  Ms. Kramers-Dove, and I've got the number I think exactly

16  here, that through 2003 the sales of these 300 to 850

17  credit scores on myFICO, through all the channels, which

18  would be myFICO,and remember we had a partnership with

19  Equifax and one with TransUnion.

20      But through all channels had sold 5.3 million

21  scores, and then through spring, I think May of '05, there

22  was a press release.  I won't bother flashing it up where

23  they sold ten million, and so it was a very successful

24  product, and each time it was sold, it was sold with that

25  score range.

1          Exclusive use.  Another thing that you can

2     consider.  No one else ever used 300 to 850 until

3     TransUnion came along and copied it.  So we did in fact

4     have exclusive use of that until they came along and copied

5     the mark.  Another thing you can consider is survey

6     evidence.

7          The only survey on secondary meaning is by this

8     fellow named Johnson.  His survey, of course, is

9     fundamentally flawed.  You will remember, and let's just

10    put up here as a demonstrative exhibit this 1507.  This is

11    the question that was posed by Mr. Johnson, and I think it

12    is worth taking a look at this a little bit.

13         It says, As you may or may not know, a credit

14    report often contains a credit score.  So right away we're

15    talking about reports and scores.  Then he says, if you saw

16    a credit report, not if you saw a credit score, if you saw

17    a credit report containing a credit score which used a

18    range from 300 to 850, would that or wouldn't that tell you

19    anything about who or what company or organization was

20    responsible for creating or producing the credit score used

21    in that credit report.

22         The problems with this question are almost too

23    many to list, mixing up reports and scores.  And as we

24    know, credit reports are produced by everybody but Fair

25    Isaac.  Okay?  We don't produce credit reports.  Experian,

1    TransUnion and Equifax produce credit reports.

2           So necessarily, the right answer to this question

3    is, I wouldn't necessarily know.  It's certainly not a

4    single source because it comes from all kinds of sources.

5    Mr. Jacoby, he's the professor from New York came into this

6    courtroom as a critic.  Apparently, he's the smartest guy

7    in the world because even a lot of federal judges who

8    disagreed with him over the course of his testimony are

9    just plain wrong, according to his testimony.

10          Even he, however, said this is a double or triple

11   barrel question in response to seeing this when Mr. Larus

12   put that to him.  That's not surprising.  This is a survey

13   that was conducted by the defendants.  I would submit that

14   this survey was clearly designed, it's just the questions,

15   to achieve the result they got.  The result they got was no

16   secondary meaning.

17          It was clearly designed to do that.  This isn't

18   the first time they've done that.  Let's look at

19   Plaintiffs' Exhibit 665.  Let's go back behind closed doors

20   again.  Let's go back behind closed doors to TransUnion and

21   see what they have done here.  Here he have got some e-mail

22   exchange involving Lucy Duni, and subject.  Okay.  Look at

23   the subject line:  New Roper survey to prove low awareness

24   of FICO score.

25          Okay?  Think about this.  Just think about this.

1   Not, we're going to conduct a survey, a Roper survey to see

2   if FICO has some awareness.  It's, we've decided how we

3   want to rig this survey.  We're going to rig this survey to

4   prove low awareness.  Go down toward the bottom of the

5   e-mails.  Okay?  I'm sorry.  Yeah.  So what do we have

6   here?

7          Hello, and it goes on.  Emily put together some

8   potential survey questions.  We want to ensure that the

9   final outcome shows very low awareness of the FICO name.

10  Now this happened to deal with the FICO name, not 300 to

11  850, so that we can share these results with Providian.

12          They wanted to sell their product to Providian

13  and show to Providian how FICO has low awareness, and

14  that's what they did behind closed doors, and then they

15  come into this courtroom with an expert with a survey that

16  is questioned as double or triple barreled by another

17  expert, and lo and behold, it doesn't show secondary

18  meaning.

19          Should we be surprised about that?  No, we should

20  not be surprised about that because Mr. Johnson's survey, I

21  would submit, was rigged at least as bad as this Roper

22  survey that they talked about in Plaintiffs' Exhibit 665.

23          Let's now go to myth number four.  Myth number

24  four:  Consumers are not confused.  The test, again, is not

25  whether -- the test, rather, is whether consumers are

1    likely to be confused about source, origin or sponsorship,

2    not whether they're actually confused, but whether they're

3    likely to be confused and prospective purchasers.  Okay?

4        And you will have a whole laundry list of things

5    that you can consider, but as we look at the confusion

6    issue, let's take a look at what the defendants are doing,

7    and then let's look at the confusion issue.  Let's start

8    with some web shots from TU.  Let's look at Plaintiffs'

9    Exhibit 1198.

10        Plaintiffs' Exhibit 1198, here we see a screen

11   shot, I would submit, very prominent use of 300 to 850.  No

12   disclaimer.  You recall some argument by TransUnion's

13   counsel about what they did was, they did a disclaimer.  No

14   disclaimer here.  Let's go to Plaintiffs' Exhibit 1201.

15   Again, similar.  Prominent use of 300 to 850 in marketing

16   the product.

17        1125.  If you walk through 1125, you saw some of

18   this in damages, here you see again the bar graph showing

19   300 to 850.  Let's look at a couple of Experian web sites.

20   Let's look at Plaintiffs' Exhibit 1124.  Here, you see if

21   you scroll that up, Jeff, very prominent use on a National

22   Score Index of 330 to 830 down there at the bottom, and

23   I'll take the next one, Jeff.

24        And let's look at another Experian web site.

25   This is from consumerinfo.com, and here we've got pretty

1    clear use of 330 to 830.  Here the score range, now, what's

2    also interesting, and you can, we'll touch on this a little

3    later, but clear ability to use a different scale.  Clear

4    ability to click on this button and see what you look like

5    on a 0 to 100 scale.

6              All right.  And then it tells you about your PLUS

7    Score, and let's look at a few things it says about the

8    PLUS score.  It says, the score is formulated using

9    information in your file.  Some of these exhibits will

10   refer to your score, your credit score.

11             Remember when we had Mr. Williams on the stand.

12   I showed him all those banner ads that said, the banner ads

13   said what's your score, and I asked him, well, what score

14   are they talking about, and he didn't know.  He knew it was

15   not the Experian score.  He didn't know what score it was,

16   and yet, that score drives people to these web sites.

17             You will see if you look at this web site, and we

18   will look at another one in a second.  You go through it

19   and ask yourself, all right, they're using the score.

20   Here's how they're marketing.  They're using the score

21   range, and they are, I would submit, you get to make this

22   choice, submit clearly implied that the score they're using

23   has the same characteristic that consumers associate with

24   the FICO score that is used by lenders, and we, of course,

25   know that the Experian PLUS Score is not used by lenders.

1          Let's go to, let's see, 285 a second here.

2     Experian Exhibit 285, another one of their web sites.  This

3     is from CreditExpert.  You go back to the page at the end

4     here.  You will see, again, use of -- you'll see in the

5     middle here, you know, reference to the range, and then it

6     talks about your PLUS Score explanation.

7          It says, your PLUS Score is formulated using the

8     information in your credit file.  Your credit score helps

9     potential lenders, so they switch back and forth between

10    talking about your score, your PLUS Score, all with the

11    range, same page, close proximity here.  This is the way

12    they market the products.

13         I would submit to you that that's done in a way

14    likely to cause confusion as to source here.  Then they've

15    got several sites that they use.  There is another one

16    called Q space.  Let's see.  EX 272.  Let me get that.

17    Just a second.

18         It's another one of the Experian web sites, and

19    much like the other ones, it has the score range 330 to

20    830.  Again, you can click a 0 to 100 scale.  Discussions

21    again about how credit scores are used in application

22    processes, things of the like, and you go through this.  I

23    would submit that the marketing package they have talks

24    about the score range in association with the

25    characteristic that consumers have come to associate with

1    the FICO score.

2            All right.  Another way that they advertise is

3    through television ads.  Okay?  We're going to look at an

4    ad that has been played before.  We call it the "I'm

5    thinking of a number," ad and just to highlight so you can

6    pick up on it, the young man in the commercial says, I'm

7    thinking of a number between I think it's 450 and 850, the

8    important part of course is the 850.

9            This is for FreeCreditReport.com, which is one of

10   Experian's web sites.  They don't sell a score on this site

11   that goes to 850.  They don't.  They spent money on

12   television advertising that says I'm thinking of a score

13   that goes between 450 and 850, and it's your credit score.

14   It is an important number.  FreeCreditReport.com.  Why did

15   they do that?  What does your common sense tell you why

16   they did that?  They would want the people to recognize the

17   850 part of it because that's the FICO score.

18                  **(Videotape PX 425 played.)**

19           MR. SCHUTZ:  Now let's look at, now that we know

20   what it is they do, let's look at the impact of what it is

21   they do.  Let's look at Plaintiffs' Exhibit 21.  We'll

22   start with VantageScore.  Just one e-mail will show up.

23   This is an e-mail to Barrett Burns, and you know Barrett

24   Burns would be the CEO, and if you could highlight the

25   paragraph here that says, you know, we did a VantageScore

1    interview today with bankrate.

2            And there is a discussion about a consumer who

3    got an Experian VantageScore of 668.  Went to see her

4    mortgage lender thinking she would receive a prime rate,

5    but of course, she didn't because the scale is slightly

6    different, but she thought that, you know, the FICO score

7    the lender received was only 574 and the consumer wanted to

8    know why.

9            Points out that it makes a difference what is

10   being done out there.  Let's go to some other evidence.

11   Let's look at Plaintiffs' Exhibit 462.  This is an

12   internal, again.  We're inside behind doors at Experian,

13   and they've got various call centers.  This particular call

14   center handles reports about inquiries, a lot about credit

15   reports and scores that may come with that.

16           And it says here in the second bullet point

17   about, it says, One in five callers has one or more

18   questions about scores, and what are the questions?  They

19   include a range of stuff, how to get a score, general

20   questions about scores including FICO.  So some of these

21   callers are calling in to the Experian web site asking

22   about a FICO score.  All right.  Let's now go -- Jeff, I'll

23   take this one.

24           Let's now go to Plaintiffs' Exhibit 433.  All

25   right?  These are call scripts that Experian put together

1    to give guidance to their call center operators on how to

2    respond to calls and e-mails.  All right?  And counsel,

3    when they said that the confusion can't be general

4    confusion, they're right about that.

5         The confusion has to be confusion related to the

6    sale of the product.  Can't be simply, I'm confused about

7    credit scores.  I have no idea what a credit score is.  Can

8    you help me out there?  That's not the test.  That's not

9    the confusion that we have here.  We have confusion that

10   people think they got a FICO score when they bought

11   something else.  It's not general confusion.  It's very

12   specific confusion about they think they got the FICO score

13   when they did not.

14        MR. MILNE:  Objection, Your Honor.  He is

15   misstating the law.

16        THE COURT:  Again, just like with all of the

17   facts, with regard to the law, you are going to have to

18   trust me to give you the law to apply.  Don't trust any

19   counsel's version of the law.

20        Let's proceed.

21        MR. SCHUTZ:  Let's now look at what it is they

22   say here with the PLUS scripts.  All right?  And the

23   discussion here doesn't refer to any other score other than

24   the PLUS Score and the Fair Isaac score.  All right?  All

25   these other other scores that Mr. Memory Man Oliai

1    testified about, the 30 some scores, you won't find another

2    one of those in this particular call script.

3           All right?  So a couple of things.  These are

4    potential questions that we might look at.  Let's go inside

5    this document and look at a few things.  This is entitled,

6    this particular page is, PLUS Score is not the FICO score

7    and a couple of things here.

8           Two take-a ways from looking at this document,

9    and you know, there is this question in particular.  It

10   says, I want a refund because this is not a FICO score.

11   The only reason somebody would ask a question and say I

12   want a refund because this isn't a FICO score is because

13   they thought they bought a FICO score when in fact that's

14   not what they got.

15          Two things to keep in mind here, though.  They

16   clearly recognize that there is going to be confusion, and

17   they're prepping their operators to deal with that.  What

18   do they say?  Do they ever clear up the confusion, or is

19   the guidance actually in some circumstances perpetuate that

20   confusion?

21          So among the things that they, the guidance given

22   here is, they say PLUS Score is not a FICO score.  They say

23   that.  FICO is the company that developed it.  Experian

24   developed the PLUS Score.  Think of FICO and PLUS as a

25   couple of the many brand names of credit scores.  In

1    general, they serve the same purpose, but different brand

2    names in the marketplace.

3              So, again, just basically saying, do the same

4    thing.  You can buy the PLUS Score.  You can buy the FICO

5    score.  No difference.  Let's go on.  This one.  Use of the

6    plus scores by lenders, which I've talked about as primary

7    characteristic we would submit that people associate with

8    the FICO score, and very specific question that a consumer

9    might ask.  Can you tell me which lenders use the PLUS

10   Score?  All right.

11             And you'll have a chance to look at this document

12   when you get back there, but what do they say?  Experian

13   has a confidentiality agreement with each of their clients.

14   Experian cannot disclose information about their business

15   clients, including what products they purchase and use from

16   Experian.  You know, it goes on.  Never.  And I asked I

17   think it was Mr. Williams, an Experian witness, why didn't

18   you just come out and give the simple answer, PLUS Score is

19   not used by lenders.  Never did that.  Okay.

20             Let's now look at TransUnion.  Okay?  Let's go to

21   Plaintiffs' Exhibit 649.  This is, again, sticking with

22   actual confusion, Plaintiffs' Exhibit 649 is -- you take

23   it, Jeff -- is an internal.  Again, we're inside the halls

24   of TransUnion, and let's look at I think it's internal page

25   4 here.

1         You look at the summary.  Two things are

2    important here.  A couple of sentences, the one that says,

3    third line that says there are several places on the

4    TrueCredit web site that there is either incomplete

5    description of the score, credit score being offered or no

6    description at all.  Some customers believe that the score

7    they are receiving is the Fair Isaac & Company score.

8         There may be some testimony in the record.  I

9    can't recall it exactly.  I'll give Mr. Danaher the benefit

10   of the doubt that they then put a disclaimer saying it's

11   not a FICO score.  Try to find that disclaimer when you go

12   back in the evidence.  It may be in tiny, tiny print

13   lightly shaded on a web site at the very end somewhere.

14   Perhaps there is a disclaimer there.

15        If that's the way they tried to fix it, he

16   testified that there is still confusion today, and they

17   have not stopped.  They have not done enough to stop the

18   confusion.  We've also got TransUnion call logs.  You

19   recall we had a huge box of documents.  That's Exhibit 667.

20   We had a subset of that.  We're just going to show you a

21   few of the items from the TransUnion call log.

22        Here is one.  You know.  This is what they wrote

23   inside Experian again.  Wants a refund for the score

24   because customer thought it was a FICO.  Told him it's a TU

25   and not a FICO and directed him to TUCS to get a FICO.  He

1      demands refund because he says he got misled to get that

2      score.  Let's look at another one.

3              This one says, Customer wants refund for scores.

4      He said that this is not the FICO score and that we lied to

5      him.  I told him that the web site says score and FICO

6      score.  Call a number.  He gives the number.  Let's look at

7      another one.  Another one.

8              Refund given.  She said that look the score

9      because it was the Empirica one FICO and that it is

10     incorrect.  Explained to her the situation.  Said there is

11     not any place on the web site that says we offer only the

12     TransRisk.  Just customer satisfaction.  Refund.  One more,

13     and then we will move on.

14             This one, she wanted to order the FICO.  You

15     know, big box of this stuff.  They're spread throughout,

16     spread throughout this.  So now let's look at the other

17     thing on confusion.  So is there confusion?  The test is

18     likelihood of confusion.  We've shown actual confusion.

19             Even though there is no requirement to show

20     actual confusion, we've shown it.  The other thing you can

21     consider on likelihood of confusion is survey evidence, so

22     let's talk about the survey evidence.  Mr. Berger came in

23     here and presented testimony on a survey he had done on the

24     likelihood of confusion, and let's just take a look at the

25     results of that.  I think it's slide 9, I think, here.

1          And here is the key take-away on this.  The

2     levels of confusion increased in direct relation to how

3     close the score was to 300 to 850.  If you recall back the

4     testimony, he used web site W and Z to mask what the

5     confusion levels were -- mask what the actual sites were,

6     as you can see, site W was the VantageScore site, and I

7     can't remember X and Y.

8          One was the Experian site, and one was the

9     TransUnion site.  I can't remember which one was which.

10    The scores are very close.  The point of the matter is that

11    VantageScore is a little farther away from 300 to 850, and

12    TransUnion is exact, and TU is almost exact.  As this score

13    got closer to the exact copy, the confusion went up

14    demonstrates that the confusion is not general confusion

15    about credit score.  It's specific confusion about ranges.

16         Now, another thing about Mr. Berger.  Mr. Jacoby

17    came in here and criticized Mr. Berger.  He did not have a

18    nice thing to say about Mr. Berger at all, and the

19    defendants brought two witnesses into this courtroom,

20    Mr. Jacoby and Mr. Johnson, both of whom are in the survey

21    business.  Either one of which, either one of whom could

22    have conducted a likelihood of confusion survey but neither

23    of them did.  So step back and ask yourself this question:

24         Well, likelihood of confusion is a big deal.

25    It's a big deal.  They've said, well, why didn't we do a

1   secondary meaning survey.  We've got copying and we've got

2   actual confusion, two important factors.  We didn't need a

3   secondary meaning survey.  We were the first in the market.

4   We've sold millions of scores.

5          We've satisfied a whole laundry list of the

6   things the judge was talking about.  On consumer confusion,

7   on the likelihood of confusion, we brought in two folks.

8   Could have done that survey.  Never did.  Why didn't they

9   do it?  Well, could it have been for lack of resources?  I

10  don't think so.  They had the resources to do it if they

11  wanted to.

12         They didn't do it because they knew that the

13  results of a survey would show that consumers were likely

14  confused about what was going on out there because that's

15  what actually happened.  That's what is actually happening

16  today.  Even Mr. Danaher testified about that, so that's

17  why they didn't do the survey because it would have yielded

18  the same results that Mr. Berger got.

19         Let's go to myth number five.  Myth number five:

20  The defendants had to copy, they had to copy the 300 to 850

21  score.  Okay?  Technically, that's flat wrong, and again,

22  let's go to their documents, Plaintiffs' Exhibit 409.

23  Actually, this is one of our documents.  I'm sorry, but it

24  talks about how, let's go to the -- there is a scoring.

25         This is in FICO scores, and the computer fields

1    using the FICO scores and the length here is 4.  Internal

2    computer systems that take the FICO score are set up to

3    type a four-digit score.  I think Mr. Larus elicited some

4    testimony perhaps from Mr. Danaher about five, you have to

5    rely on your own memory, but about five digit

6    possibilities.

7            So fact of the matter is, doesn't matter.  You

8    can use -- you don't have to copy.  You don't have to have

9    a three-digit number, and you don't have to copy the FICO

10   score.  It has nothing to do with lender adoption issues

11   because what do we know about the infringing scores sold by

12   Experian and TransUnion?

13          They're not used by lenders.  PLUS Score is not

14   sold to lenders, and the TransRisk score in the form it is

15   sold to consumers is not sold to lenders.  When they sell

16   their TransRisk score, it's 150 to 950.  So there is no

17   reason to copy our score other than they wanted to

18   piggyback off of our name recognition and good will to sell

19   their products.

20          This whole argument that Mr. Danaher says, well,

21   why would we want to copy somebody.  That would be bad for

22   business.  You know, people copy stuff all the time because

23   they want to sell the stuff and make money.  That's why

24   people copy things.  Copying has been proven over the

25   course of history to frequently be very good for business

1    because you get to piggyback off of somebody else's

2    trademark and their goodwill.

3           And of course we know the scores don't have to be

4    three-digit numbers.  It can be any range.  They are merely

5    cosmetic.  Again, let's go to Plaintiffs' Exhibit 18.  This

6    is another e-mail in which Mr. Burns is involved.  The

7    e-mail is to him.  He's the CEO of VantageScore, and he's

8    getting some advice from Starkman & Associates, which is a

9    PR firm.

10          And it says here, Although VantageScore relies on

11   a three-digit number, a third party could easily develop a

12   competing score that returns a two- to four-digit number or

13   any other digit.  Hence, do not make it appear that

14   VantageScore is asserting that credit scores need to be

15   three-digit numbers.  Yeah.  This is behind the walls.

16   This is without lawyer spin.  It is behind the walls of

17   what is going on at VantageScore.

18          Let's take a look at at Plaintiffs' Exhibit 340,

19   internal page 15 of this.  Project Trident business plan,

20   this is again where they're figuring out what score range

21   for VantageScore.  If you look at market background, the

22   first sentence says, A credit score's range is merely

23   cosmetic.

24          I went through this with one of the witnesses.

25   You'll have this back there.  The scientific background,

1    you can do anything.  It's a probability between zero and

2    one.  You can scale it just about any way you would like.

3              Myth number six.  All right.  Myth number six:

4    Myth number six is that Fair Isaac should lose because they

5    acquiesced and they waited too long to sue.  A couple

6    things to keep in mind here.  These folks have been doing

7    business with us for a long time.  They have known about

8    our score range.

9              They have sold scores to lenders with our score

10   range, billions and billions of scores, and they recognize

11   that you can't mimic, that you can't copy.  They

12   acknowledge it in the contracts, and we showed you some of

13   those, but here's what is required before they can prove

14   acquiescence, and you will have this.

15             And the judge is the final say on this, but I

16   believe that she will say something along the lines of,

17   that to prove this they must show that Fair Isaac actively

18   represented that it would not assert a right on the

19   infringement claim, that the delay between the act of

20   representation and the assertion of the right was not

21   excusable and that the delay caused harm to the defendants.

22   I would submit there is no evidence that we actively

23   represented to them that we would not assert a right on the

24   infringement claim.

25             Myth number seven:  If Fair Isaac wins this case,

1    the world as we know it will come to an end.  That's

2    another myth.  Lenders are not in this case.  Lenders are

3    not confused.  Nothing is going to happen to the lender

4    market regardless of the outcome of this case.  The world

5    is not going to come to an end.

6            Now, some of you may be thinking, well, wouldn't

7    it be nice if we could all get along and use the same

8    standard scale?  Perhaps.  The best scale to use if we

9    wanted to do that would be 0 to 100 because then you would

10   know.  It would not be algorithm specific.

11           You would know where you would be on percentage

12   with the rest of the population.  That could be very

13   useful, and of course, the defendants do in fact offer

14   that.  TransUnion offers it as a risk percentage on some of

15   their web sites, as does the PLUS Score.

16           There is, there is a myth here that a score, say,

17   a 720 FICO is the same as a 720 PLUS Score.  That's not

18   true because they use different algorithms.  Right?  So you

19   could have a consumer on an almost identical scale get a

20   PLUS Score of 730 think, well, wow, I'm going to get a

21   great mortgage rate.  I'm going to get a low interest rate.

22           I'm going to my bank.  I signed a purchase

23   contract on my house.  I go to a bank, and the bank says

24   your FICO score that we're going to base the mortgage on is

25   680, and your interest rate is a half a point or a point

1    higher than what you thought you were going to get, and you

2    can't afford the house.  That is the real world impact.

3         That's because they don't use the same underlying

4    algorithm, even if they used the identical score ranges.

5    So the idea that there are to be some standard score

6    ranges, everything is the same no matter what, is another

7    myth.  That is another myth.  If you really want some

8    standardization, people want to know where they sit in the

9    population, use 0 to 100.

10        Myth number eight:  Fair Isaac committed fraud on

11   the PTO.  Mr. Anderson testified, one of the first

12   questions he was asked in cross-examination by Mr. Larus

13   was, do you have an opinion as to whether Fair Isaac

14   committed fraud on the Patent and Trademark Office?  And

15   his answer was, no.  No.  He was not offering that opinion.

16        He went and offered a lot of opinions, a lot, but

17   he would not offer that opinion, and there is a reason,

18   because Fair Isaac did not in fact commit fraud on the PTO.

19   They are focused on a couple of things.  They have focused

20   on Cheri St. John, paragraph 12, where she said that based

21   on her personal knowledge she was not aware of any use of a

22   300 to 850 range as a unique identifier by anybody else.

23        First, the statement is absolutely true.  Even by

24   the defendants' own admissions, they claim in this

25   courtroom not using their score range as a unique

1    identifier.  They speak out of one side of their mouth for

2    that, and then when they want to find the trademark

3    invalid, they speak out of the other side, but you will

4    also remember Mr. Johnson testifying about what would be

5    relevant and material to the patent office in deciding

6    whether to grant the trademark.

7         I'm sorry.  Mr. Anderson, among the things that

8    Mr. Anderson said was, you don't have to say what infringer

9    is doing out there.  All right?  Then he was asked this

10   question by Mr. Larus:  "Now, I want to go to, I want to go

11   to Ms. St. John's declaration, and you were asked only a

12   couple of questions about this document, but I want to ask

13   some follow-up questions.

14        "And I believe the only paragraph that you

15   specifically talked about was the paragraph in which

16   Ms. St. John states, To the best of my knowledge, only the

17   FICO score uses the 300 to 850 range as a unique identifier

18   for credit bureau risk scores.  Do you see that?

19        "Answer:  Yes.

20        "Question:  Sitting here today, are you aware of

21   any other party that has ever used the 300 to 850 as a

22   unique identifier for credit bureau risk scores?

23        :Answer:  No."

24        This is after he has been hired and sorted

25   through everything.  I don't know where they get the idea

1      that there was a fraud committed on the patent office,

2      especially intentional fraud, but there is another document

3      we should look at, Exhibit 762.  This is an e-mail that

4      supposedly, supposedly gives some knowledge to Fair Isaac

5      about the knock-off score, a score of course Mr. Anderson

6      says is not relevant.

7             An infringer, somebody else is infringing or

8      copying your score, they're an infringer.  You don't have

9      to deal with that.  Let's look at in fact what this e-mail

10     said.  There was a snippet of this put up I think by

11     Ms. Berens that left some stuff out.  I think it's

12     important that we should look at the whole thing.  All

13     right?

14             So it's talking about, this gets interesting when

15     you remember that TU's original customer score had a range

16     of 330 to 830.  If memory serves, they didn't copy our

17     publicized FICO score range until later.  Then it goes on

18     and says, TU has done a good job of hiding this

19     information.  I can't find the score range for its consumer

20     score anywhere on TransUnion.com or TrueCredit.com.

21             All right?  So he doesn't know.  He can't find

22     it.  All right?  He can't find it.  No knowledge on that.

23             Number nine:  Last myth, and I will move on to a

24     couple of other things very quickly, is that the myth is

25     that Fair Isaac would have accepted $75,000 from each of

1    its competitors in exchange for use of its 300 to 850 mark.

2         First of all, listen very carefully to what the

3    judge tells you about how to calculate the damages in this

4    case if you get to that point, and you will see among the

5    things that she tells you is that you can take factors that

6    you can consider are the same ones that Mr. Meyer

7    considered.  Called them the Georgia-Pacific factors, and

8    he had a chart that had a couple of pages of

9    Georgia-Pacific factors, and you will get an instruction on

10   that.

11        We are not, and I think Mr. Remele said, and I'll

12   give him the benefit of the doubt that he misspoke.  We are

13   not seeking lost profits.  This is not a case about we have

14   to prove that we lost profits.  There are different ways

15   you can measure damages.  The way that Mr. Meyer chose was

16   a reasonable royalty.

17        If the defendants wanted to propose an alternate

18   theory that the measure of damages should be lost profits

19   and that Fair Isaac lost no profits, they could have done

20   so.  They did not bring an expert in here to put forth an

21   alternate theory.  They brought an expert in here to

22   criticize Mr. Meyer's reasonable royalty theory.

23        So if they want to make an argument that we have

24   to show we lost some profits, they can't do that because

25   they haven't presented any testimony.  Mr. Meyer did not

1    say I am measuring damages based on the lost profits

2    analysis.

3            He has said, I'm doing it on a royalty basis, and

4    the way you calculate a royalty is, you look at a base --

5    remember, he had this -- you look at a revenue base, and

6    you have to remember that every single score that the

7    defendants sold was with a range that we allege is

8    infringing, every one.  They haven't used some other range

9    and made some money selling scores with another range.

10           Every range has been alleged to be infringing,

11   and the context of a reasonable royalty calculation is

12   that, there is this hypothetical negotiation called legal

13   contract that the case law has set.  It's two people

14   sitting down at the bargaining table negotiating, saying I

15   want to use 300 to 850, how much will it cost me, and

16   that's the analysis he went through, and it's for every

17   single use of it.

18           There is no causation factor on that.  There is

19   no lost profits.  It's I Experian, I TU, want to use that

20   score range in selling my consumer credit score product.

21   How much is it going to cost me, and that's the analysis

22   that Mr. Meyer went through, and it's a fairly

23   straightforward analysis.  What's the revenue that would be

24   generated by that times some rate equals the royalty.

25           What Mr. Meyer did, and you will have, I think,

1    most of these slides.  He provided you with a lot of tools

2    to make a decision on this.  He went through and he

3    calculated agreement price, and he went through and

4    calculated actual revenue price, and for Mr. Meyer's hard

5    work in being very up front about what he was doing and

6    being meticulously detailed on how he put together his

7    numbers, he's criticized in somehow being sloppy or

8    speculative, and that's certainly not the case.

9         And the numbers, the numbers are what the numbers

10   are, right?  He came up with and among the things he looked

11   at, one of the things that is driving the price at some

12   level is this bundling aspect, but they bundle their

13   products.  They make a lot of money off of their products.

14   They make a lot of money off a site called

15   FreeCreditReport.com.

16        So the web sites they tell consumers about on

17   television and on web sites is Free Credit Report.  You can

18   go there, and you can buy a score with a credit report.

19   They're not out there marketing CreditScore.com.  They talk

20   about a free credit report.  You can, in fact, get a free

21   credit report at annualcreditreport.com.  You have seen

22   that testimony.

23        Mr. Meyer's slides will be available to you as to

24   how you go about analyzing that, and you know, the numbers,

25   the numbers are what the numbers are for Mr. Meyer.  Right?

1    This is based on agreement prices, this particular chart,

2    and this one is based on actual revenues.

3         And a 40 percent royalty, that's what TransUnion

4    agreed to in an arm's length transaction.  That's where he

5    started.  Mr. Meyer didn't pull this number out of the air.

6    It's an actual contract between the parties.  So those are

7    the nine factors, ladies and gentlemen.  So I've got just

8    two brief things to cover, and then I am done.  May I have

9    the Elmo, Jeff?  Oh, I can take it up here.

10        The first is the special verdict form, and you'll

11   have this form, and you are going to decide who prevails in

12   this case and who loses, and if you decide that Fair Isaac

13   prevails in this case, this form has to be filled out in a

14   very specific manner.

15        All right?  So if you come to the conclusion that

16   we have proven our case and we win, you have to fill the

17   form out.  You have to fill question one out by saying yes,

18   we have shown secondary meaning, and then you have to fill

19   out number two that we have shown it before the following

20   defendants alleged infringing use.

21        Now just one comment on TU.  There is zero

22   evidence of a web site that TU has put in in this case

23   showing their use of their knock-off score range before mid

24   2004.  Mr. Danaher has testified about it.  It's their

25   case, their company, not a single web site.  You can search

1    high and low, and you won't find it.  There have been tons

2    of web sites produced in this case.

3            The next page has questions on, you know, do they

4    have a similar score range without our consent in a manner

5    likely to cause confusion about source, sponsorship or

6    affiliation.  That's the test, in a manner likely to cause

7    confusion about source, sponsorship or affiliation of their

8    products or services.

9            Then you get into what has been referred to as

10   the defenses, and you've got, is it functional.  If you

11   want us to prevail, you check that no.  If you want them to

12   win, you check it yes.  Same thing on the fair use.  You

13   need to check that no.  Then here, acquiescence, again, no.

14   Then on this box on willful infringement, if you find that

15   what they have done is willful, then you check those boxes

16   yes.

17           Then question 8 which carries -- your form might

18   be slightly different.  The questions are the same.  Some

19   of the other information may change when you get the very

20   final version.  This one is on money damages.  It's got a

21   question here, and of course there is only Experian and

22   TransUnion because the VantageScore is sold through those

23   sites, and it is taken into account in Mr. Meyer's numbers.

24   I have left that blank.

25           Okay.  I have checked the other ones because

1    those must be checked the way I said if we're going to

2    prevail.  You have all the tools you need to make a

3    decision on what the right number is to put in there if you

4    find that we should win, and then there are three questions

5    on the fraud on the patent office, and we would submit that

6    each one of those needs to be checked no.  All right?

7           So final point:  Let's just -- what you do

8    matters.  You are part of a tradition that goes back almost

9    800 years.  Back in the year 1215, the barons of England

10   confronted King John and demanded certain rights, and one

11   of the rights they demanded, and it was written in a

12   document called the Magna Carta, was the right to a jury

13   trial.

14          That right carried through the English common law

15   and was taken over here by the founders of this country and

16   has been incorporated into this system, and so what you do

17   matters.  You are the voice of the community, and your

18   decision in this case will say certain conduct is okay or

19   certain conduct is not okay.

20          And I have been doing jury trials for a long

21   time, and I think it's important to understand what it

22   means when you reach your verdict, and if you decide that

23   the defendants get off the hook here, ladies and gentlemen,

24   and if they walk out of this courtroom, and you find that

25   their behavior has not caused confusion to consumers, and

1    you find that Fair Isaac should take nothing for that, then

2    you will, what you will have in effect done is taken

3    Exhibit 326, which is the Experian copying exhibit, and you

4    will give it a seal of approval.

5            Actually, it's the TransUnion copied document.

6    You have given that seal of approval.  You will have given

7    the copying done by Experian a seal of approval.  You will

8    have given the call scripts a seal of approval.  You will

9    have given the confusion evidence a seal of approval.  You

10   will have given the web sites a seal of approval.

11           I have a lot of stickers, and I have a lot of

12   documents, but I hope that I have made the point that what

13   you do is incredibly important.  You have not sat here for

14   three weeks at some academic mock exercise.  Your decision

15   has an impact on what happens in the consumer marketplace.

16           With that, ladies and gentlemen, I thank you very

17   much for your time.

18           THE COURT:  All right.  Members of the Jury, I'm

19   going to send you to lunch now.  I'm going to send you to

20   lunch in the custody of the court security officers, mainly

21   because I want to you get your lunch paid for at the

22   cafeteria downstairs, but also to make sure that nobody

23   runs away on me before I give you the instructions.

24           So we're going to send you to lunch now.  We're

25   going to have you come back.  We're going to have a little

2924

1    shorter lunch hour, 45 minutes.  We're going to begin at

2    quarter to two, at quarter to two.  1:45 we will begin, and

3    I will give you the instructions of law at that time.

4              The Court will be in recess until 1:45.

5                    **(Lunch recess taken.)**

1      (1:42 p.m.)

2                           IN OPEN COURT

3      (Without the jury)

4           THE COURT:  Good afternoon.  Please be seated.

5           It's my understanding that someone had an issue

6      prior to the arrival of the jury.

7           Mr. Glancy, you appear to be the person.

8           MR. GLANCY:  Your Honor, if I may.

9           There was a serious misrepresentation made in

10     Mr. Schutz's closing that we believe needs to be addressed

11     with the jury; otherwise, we have no remedy.

12          You may recall that Mr. Schutz represented that

13     Mr. Anderson testified in response to a question from

14     Mr. Larus that he had no opinion as to whether or not there

15     was fraud on the Trademark Office.  He was never asked that

16     question by Mr. Larus.  There is no --

17          THE COURT:  This is the question about deception,

18     as I recall.

19          MR. GLANCY:  Right.  And then Mr. Schutz went so

20     far as to infer from that or ask the jury to infer that

21     Mr. Anderson had concluded that there was no fraud on the

22     Trademark Office.

23          Now, the only reason he was not testifying about

24     that was because your Honor restricted his testimony, so I

25     think it's fundamentally unfair for them to take -- to

1    leverage that restriction and suggest to the jury that

2    Mr. Anderson has no opinion when he clearly does.  He's just

3    not able to testify to it.  And the impression left by

4    Mr. Schutz is that Mr. Anderson had concluded for himself

5    that there is no fraud on the Trademark Office.

6         THE COURT:  I don't think it -- I'm going to give

7    them the standard cautionary instruction about reliance on

8    what the Court says of the law and the facts.  I do think

9    that there was no testimony with regard to Anderson and a

10   conclusion with regard to fraud, but he did clearly say that

11   he found -- that he didn't make an opinion with regard to

12   deception.  The jury listened carefully to the testimony.  I

13   don't think they'll rely on Mr. Schutz's version for that.  I

14   think they've got their -- they've got their notes.

15        MR. GLANCY:  I understand the point, your Honor.

16   It's just that, you know, there's been a week and a half of

17   testimony and I don't understand -- I don't see how a

18   reasonable juror could have in his or her notes what

19   Mr. Anderson did not testify about to check against

20   Mr. Schutz's representation.

21        THE COURT:  Well, they could check to see if he

22   said anything about fraud.

23        MR. GLANCY:  Right.  Well, some people -- well,

24   here's the insidious part.  I asked him up front whether or

25   not he was here to offer an opinion about intent and he said

1   no, which was true, because we wanted to make it clear to the

2   jury this is the box he's in.  So that was the only question

3   about intent or fraud on that.  And so they've taken my

4   question and insinuated that he affirmatively represented he

5   has no opinion, so they may actually recall there was a

6   question about intent asked of Mr. Anderson and he did say he

7   didn't have an opinion on that.  This is the insidious game

8   being played here in the closing.

9        THE COURT:  I understand and I understand where

10  you're coming from.  I think any cure I attempt is going to

11  be worse than the harm.  I think it may highlight that area

12  of the testimony unnecessarily.  So we'll proceed to summon

13  the jury and get on with the instructions.

14       (Jury enters)

15       THE COURT:  Good afternoon again.  Please be

16  seated.

17       We are in the bottom of the ninth inning.  What

18  remains is my instructions of law to you and I will do the

19  best I can to get through these instructions.  Some of you

20  may have noticed I have something that my doctor calls an

21  irritated airway, and so if I can't make it, we may have to

22  take a break or worse case scenario, my law clerk may have to

23  read and I'll just move my lips and do it that way.

24       (Laughter)

25

1    **COURT'S INSTRUCTIONS TO THE JURY**

2    THE COURT:  Members of the Jury:

3    The instructions that I gave you at the beginning

4    of this trial and those that I gave you during the course of

5    the trial remain in effect, and I'm now going to give you an

6    additional set of instructions.

7    But you must, of course, continue to follow the

8    instructions I gave you earlier as well as those I'm giving

9    you in this set of instructions.  This is true even though

10   some of the instructions that I gave you at the beginning of

11   the trial might not be repeated again now.

12   The instructions that I am about to give you, as I

13   mentioned this morning, are in writing and we're going to

14   provide several copies of those for your use in the jury

15   room.  But I want to emphasize that just because these

16   instructions are in writing doesn't mean that they're any

17   more important than my earlier instructions.  All

18   instructions, whether or not given to you in writing, must be

19   followed by the jury.

20   Now that you have heard the evidence and the

21   arguments of counsel, it does become my duty to give you the

22   instructions of the Court as to the law which is applicable

23   to this case.

24   And it is your duty as jurors to follow the law as

25   I shall state it to you and apply that law to the facts as

1    you find them to be from the evidence in this case.  You are

2    not to single out any one instruction alone as stating the

3    law, but you should consider these instructions as a whole.

4    You're also not be concerned with the wisdom of any rule of

5    law as stated by me.

6         Now, the lawyers in their arguments have quite

7    properly referred to some of the governing rules of law, but

8    if there's any difference that appears to you between the law

9    as it's told to you by the lawyers in the case and that that

10   I'm giving you now in these instructions, you are of course

11   to be governed by the Court's instructions.

12        Now, nothing I have said in these instructions is

13   intended in any way to indicate to you that I have an opinion

14   about the facts of this case or what that opinion might be,

15   because it's not my function to determine the facts, but

16   rather that's your function.  Also, during the course of the

17   trial, I've occasionally asked questions of a witness or made

18   various comments from time to time, but you should not assume

19   that because I asked any questions or said anything to the

20   witnesses, that I hold any opinion with regard to the matters

21   on which my questions were asked.  Most of the time I think

22   they were to hurry up and get the witness to a point to be

23   efficient in our use of time and from time to time I tend to

24   add a little levity to the proceedings when the lifting gets

25   a little heavy around here.

1        You may perform your duties as jurors and you must

2   perform your duties without bias or prejudice to any party.

3   The law does not permit you to be governed by sympathy,

4   prejudice or public opinion.  All of these parties have a

5   right to expect that you will carefully and impartially

6   consider all of the evidence, follow the law as it is now

7   being given to you, and reach a just verdict, regardless of

8   the consequences.

9        As you know, all of the parties in this case are

10   corporations, and a corporation is entitled to the same fair

11   trial at your hands as an individual.  All parties, including

12   corporations, partnerships, unincorporated associations, and

13   all other types of organizations, stand equal before the law,

14   and are to be dealt with as equals in a court of justice.

15        A corporation, of course, can only act through its

16   employees, agents, directors, or officers.  Therefore, a

17   corporation is responsible for the acts of its employees,

18   agents, directors, and officers performed within the scope of

19   those individuals' authority.

20        Now, I have allowed you during the course of the

21   trial to take notes and I know many of you have, and you may

22   use your notes with you in the jury room.  But I want to

23   caution you that you should not consider your notes as

24   binding or conclusive, and that's true whether they're your

25   notes or those of one of your fellow jurors.  Another way of

1   saying this is your notes should be used as an aid for your

2   memory, not a substitute for your memory.  You should not

3   give greater weight to a particular bit of evidence solely

4   because someone chose to reduce it to writing.  I want to

5   make clear to you that it's your recollection of the evidence

6   which should control, and you should disregard anything

7   contrary to your own recollection which might appear in your

8   notes or those of another juror.

9          Now, the statements and the arguments, all of the

10   things the lawyers say, are not evidence in the case, but

11   from time to time when the lawyers on both sides stipulate --

12   which is just really a lawyerly way of saying agree -- as to

13   the existence of a fact, the jury may, unless otherwise

14   instructed, accept that stipulation and regard that fact as

15   proved.

16          Unless you are otherwise instructed, the evidence

17   in this case always consists of the sworn testimony of the

18   witnesses, regardless of who may have called the witness; all

19   of the exhibits which were received in evidence, regardless

20   of who may have produced the evidence and the exhibits; and

21   all of the facts which have been admitted to or stipulated

22   to.

23          Now, the attorneys have at times objected to

24   evidence that they believed was not properly offered under

25   the rules of evidence.  Any evidence to which an objection

1    was sustained by the Court, and any evidence I ordered

2    stricken during the course of the trial, must be entirely

3    disregarded by the jury.

4          If a lawyer asks a witness a question which

5    contains an assertion of fact, you may not consider the

6    assertion as evidence of the fact, because again, the

7    lawyers' statements are not evidence.

8          Now, the burden is on the plaintiff, in this case

9    Fair Isaac, to prove every essential element of their claims

10   by the greater weight of the evidence.  If the proof shall

11   fail to establish any essential element of Fair Isaac's

12   claims by the greater weight of the evidence in the case, the

13   jury should find for the defendants as to those claims.  In

14   addition, the defendants here have raised what are known as

15   affirmative defenses to Fair Isaac's claims.  Defendants have

16   the burden of proving these affirmative defenses which I'll

17   be explaining to you in a few minutes.

18         To prove something by the greater weight of the

19   evidence means to prove that something is more likely so than

20   not so.  In other words, the greater weight of the evidence

21   in the case means such evidence as, when considered and

22   compared with that opposed to it, has more convincing force,

23   and produces in your minds belief that what is sought to be

24   proved is more likely true than not true.  The rule does not,

25   of course, require proof to an absolute certainty, since

1    proof to an absolute certainty would seldom be possible in

2    any case.  You may have heard the term from time to time

3    "proof beyond a reasonable doubt."  That is a stricter

4    standard, a higher standard of proof, which applies only in

5    criminal cases.  It does not apply in civil cases such as

6    this and therefore you should put the notion of proof beyond

7    a reasonable doubt out of your minds for purposes of this

8    case.

9         In determining whether any fact in issue has been

10   proved by the greater weight of the evidence in the case, you

11   may, unless otherwise instructed, consider all of the

12   testimony of the witnesses, again, regardless of who may have

13   called them, and all of the exhibits which were received in

14   evidence, again, regardless of who may have produced them.

15        When I say in these instructions that a party has

16   the burden of proof on any particular proposition or claim,

17   or I use an expression such as "if you find" or "if you

18   decide," I mean that you must be persuaded, considering all

19   of the evidence in the case, that a proposition is more

20   probably true than not true.

21        As you know, there are three defendants in this

22   case:  Experian, TransUnion, and VantageScore, LLC.  However,

23   you should decide this case as to each defendant separately.

24   If you should find that one of the defendants is liable to

25   Fair Isaac, it does not necessarily follow that all

1    defendants are liable.  Unless otherwise instructed, though,

2    my instructions are going to apply to all of the defendants.

3    And then you'll see as you get to the special verdict form

4    how it breaks out the different defendants as you proceed

5    through the questions.

6         Now, there are, generally speaking, two types of

7    evidence from which a jury may properly find the truth as to

8    the facts of the case.  One of those we call direct evidence

9    and the other is circumstantial evidence.  Direct evidence is

10   such things as the testimony of an eyewitness.  The other

11   kind of evidence, circumstantial evidence, is also known as

12   indirect evidence and it is the proof of a chain of

13   circumstances pointing to the existence or the nonexistence

14   of certain facts.

15        As a general rule, the law makes absolutely no

16   distinction between direct and circumstantial evidence, but

17   simply requires that the jury find the facts in accordance

18   with the greater weight of all of the evidence in the case,

19   whether it's direct evidence or circumstantial evidence.

20        Now, you should consider only the evidence in the

21   case.  But in your consideration of the evidence you are not

22   limited to the bald statements of the witnesses.  In other

23   words, you are not limited to what strictly what you see and

24   hear as the witnesses testify.  You are permitted to draw,

25   from the facts which you find have been proved, such

1    reasonable inferences as seem justified in light of your own

2    experience.

3              Inferences are deductions or conclusions which

4    reason and common sense lead the jury to draw from the facts

5    that have been established by the evidence in the case.

6              You will make your decision based upon what you

7    recall of the evidence.  You will not have a typewritten

8    transcript of the case to consult.  So it's your memories and

9    your notes that should guide in your deliberations.

10             Now, ordinarily the rules of evidence do not permit

11   witnesses to come into court and to express opinions or

12   conclusions, but there is an exception to that opinion rule

13   as to witnesses who we call expert witnesses.  Witnesses who,

14   by virtue of their education and experience, have become

15   expert in some art, science, profession, or calling, may

16   state their opinions as to relevant and material matters in

17   which they profess to be expert, and may also state their

18   reasons for their opinions.

19             You should consider each expert opinion received in

20   this case and give it such weight as you think it deserves.

21   If you should decide that the opinion of an expert witness is

22   not based upon sufficient education and experience, or if you

23   should decide that the reasons given in support of the

24   opinion are not sound, or if you feel that it is outweighed

25   by other evidence, you have the right to disregard the

1    opinion entirely.

2            During the course of the trial, I have allowed

3    certain charts and summaries to be shown to you in order to

4    help explain the facts which are disclosed by the books,

5    records, and other documents which are in evidence in the

6    case.  However, any charts or summaries are not in and of

7    themselves proof or evidence of any facts.  If such charts or

8    summaries do not correctly reflect the facts or figures shown

9    by the evidence in the case, you should disregard them.

10           In other words, charts and summaries are used only

11   as a matter of convenience, so if and to the extent that you

12   find they are not in truth summaries of facts or figures

13   shown by the evidence in the case, you are to disregard them

14   entirely.

15           Now, you are not bound to decide any issue of fact

16   in accordance with the testimony of any number of witnesses

17   that does not produce in your minds belief in the likelihood

18   of truth, as against the testimony of a lesser number of

19   witnesses or other evidence which does produce such belief in

20   your minds.

21           In other words, the test is not which side brings

22   the greater number of witnesses or presents the greater

23   quantity of evidence, but which witness, and which evidence,

24   appeals to your minds as being most accurate or otherwise

25   trustworthy.

1       The testimony of a single witness which produces in

2   your minds belief in the likelihood of truth is sufficient

3   for the proof of any fact, and would justify a verdict in

4   accordance with such testimony even though a number of

5   witnesses may have testified to the contrary, if, after

6   consideration of all of the evidence in the case, you hold

7   greater belief in the accuracy or the reliability of the one

8   witness.

9       Now, one of your principal jobs as jurors will be

10  to determine the credibility -- that's another word for

11  believability -- of each of the witnesses and the weight that

12  their deserves.  You may be guided by the appearance and

13  conduct of the witness, or by the manner in which the witness

14  testifies, or by the character of the testimony given, or by

15  evidence to the contrary of testimony given.

16      You should carefully scrutinize all of the

17  testimony given, the circumstances under which each witness

18  has testified, and every matter in evidence which tends to

19  show whether a witness is worthy of belief.  Consider each

20  witness's intelligence, motive, and state of mind, and the

21  witness's demeanor or manner while on the witness stand.

22  Consider the witness's ability to observe the matters as to

23  which he or she has testified, and whether he or she

24  impresses you as having an accurate recollection of these

25  matters.  Consider also any relation each witness may bear to

1    either side in the case, the manner in which each witness

2    might be affected by your verdict, and the extent to which,

3    if at all, each witness is either supported by or

4    contradicted by other evidence in the case.

5          Now, inconsistencies or discrepancies in the

6    testimony of a witness, or between the testimony of different

7    witnesses, may or may not cause you as the jury to discredit

8    such testimony.  As I think we all know, two or more persons

9    witnessing an incident or a transaction may simply see and

10    hear it differently, and innocent misrecollection, just like

11    failure of recollection, is not an uncommon experience.  In

12    weighing the effect of a discrepancy, always consider whether

13    it pertains to a matter of importance or an unimportant

14    detail, and whether that discrepancy results from an innocent

15    error or an intentional falsehood.

16          After making your own judgment, you will give the

17    testimony of each witness such weight, if any, that you think

18    it deserves.  Again, you should rely upon your own

19    experience, good judgment, and common sense.

20          You may, in short, accept or reject the testimony

21    of any witness either in whole or in part.

22          A witness may be discredited or -- another lawyerly

23    word -- impeached by contradictory evidence, or by evidence

24    that at some other time the witness has said or done

25    something or has failed to say or do something which is

1    inconsistent with the witness's present testimony.

2            If you believe that any witness has been impeached

3    and thus discredited, it is your exclusive province to give

4    the testimony of that witness such credibility, if any, that

5    you may think it deserves.

6            If a witness is shown to knowingly have testified

7    falsely concerning any material matter, you have a right to

8    distrust such witness's testimony in other particulars, and

9    you may reject all of the testimony of that witness or you

10   may give it such credibility as you think it deserves.

11           An act or omission is knowingly done if done

12   voluntarily and intentionally and not because of mistake or

13   accident or other innocent reason.

14           The law does not require any party to call as

15   witnesses all persons who may have been present at any time

16   or place involved in the case or who may appear to have some

17   knowledge of the matters in issue at this trial.  Nor does

18   the law require any party to produce as exhibits all papers

19   and things mentioned in the evidence in the case.

20           I'm sure you will recall that during the course of

21   this trial certain testimony was presented to you by way of

22   videotape deposition and maybe regular depositions.  I can't

23   remember.  There may have been some.  I can't remember if

24   there were any just read to you.  I think they were all

25   videotape.  But these depositions consist of the sworn

1    recorded answers to questions which were asked of the witness

2    in advance of the trial by one or more of the attorneys for

3    the parties to the case.  The testimony of a witness who, for

4    some reason, cannot be present to testify from the witness

5    stand may be presented in writing under oath or on a video

6    recording played on a monitor like we did in this case.  Such

7    testimony by videotape is entitled to the same consideration

8    and is to be judged as to its credibility, and weighed, and

9    otherwise considered by the jury, insofar as possible, in the

10   same way as if the witness had been present and had testified

11   from here on the witness stand.

12          You might recall that at the beginning of this

13   trial I previewed some of the legal concepts which you heard

14   during the course of the trial, and I'm now going to explain

15   some of those concepts again, as well as the other legal

16   concepts that you will need to understand to decide this

17   case.

18          A trademark is also referred to in short as a mark,

19   and it is a word, name, symbol, or device, or a combination

20   of those things, that indicates the source of products or

21   services.  The owner of a valid trademark has the right to

22   exclude others from using the mark or a similar mark in a

23   manner that would be likely to cause confusion as to the

24   source, sponsorship, or affiliation of the products or

25   services at issue and may enforce this right in an action for

1    trademark infringement.

2          Rights in a trademark are obtained only through

3    commercial use of the mark.  It is not necessary for the

4    owner of the trademark to obtain a registration of its mark

5    from the United States Patent and Trademark Office, but

6    registration provides certain additional rights and benefits

7    to the owner.

8          You have heard during this trial that Fair Isaac

9    obtained registrations from the United States Patent and

10   Trademark Office of its trademarks relating to the 300 -- and

11   I don't know for sure what you call the little thing, the

12   little bar in the middle, whether it's a hyphen or a dash,

13   but I think you know what I'm talking about -- 300 -- and I'm

14   going to say dash -- 850 scoring range.  Once the owner of a

15   trademark has obtained the right to exclude others from using

16   the trademark, the owner may also obtain a certificate of

17   registration issued by the Patent and Trademark Office.  When

18   the owner of a registered trademark brings an action for

19   infringement of a trademark, a certificate of registration is

20   evidence of the validity of the mark and the registration,

21   the owner's ownership of the trademark, and the owner's right

22   to exclude others from using the trademark.  However,

23   registration of the "300-850" trademark is not conclusive as

24   to the validity of the trademark, and you may also consider

25   evidence offered by the defendants that the "300-850"

1   trademarks are invalid.

2          Fair Isaac's trademark registrations and the

3   registration certificates were admitted to show issuance of

4   the mark.  The registrations and certificates should not be

5   considered as evidence of secondary meaning in the term

6   "300-850."

7          Now, it is important for you to understand that

8   throughout these instructions from now on, I'm going to

9   "300-850" as a trademark or mark, and whether it's a valid

10  trademark will be for you to determine in accordance with

11  these instructions.  But for convenience and ease of

12  reference so that I don't have to keep saying "alleged

13  trademark" or "alleged mark," I'm going to refer to "300-850"

14  as a trademark.

15         Fair Isaac alleges that the defendants are

16  infringing its trademarks in the term "300-850."  To prevail

17  on this infringement claim, Fair Isaac has the burden of

18  proving two elements by the greater weight of the evidence,

19  and here are the two elements:

20         1.   That the term "300-850" is a valid,

21  protectable mark; and

22         2.   That the defendants made use of a same or

23  similar term without the consent of Fair Isaac in a manner

24  that is likely to cause confusion among ordinary customers as

25  to the source, sponsorship, or affiliation of the credit

1    scoring products or services.

2           As I mentioned earlier, you should decide this case

3    as to each defendant separately.  Accordingly, you shall

4    evaluate each of the elements just mentioned as to each

5    defendant separately.  In other words, your determination of

6    these elements to a particular defendant need not necessarily

7    be the same as your determination to the other defendants.

8           All right.  Now, John is going to display on the

9    monitor so that you can follow along with me the questions as

10   I'm going to walk you through the special verdict form.

11          There you will see the official case caption of the

12   case, Fair Isaac Corporation versus Experian Information

13   Solutions, TransUnion LLC, VantageScore, LLC, and some other

14   material there, and it lists Special Verdict Form and the

15   civil case number, all of which are important to the court

16   system but you shouldn't worry about.

17          "We, the jury in the above-titled matter, find the

18   following answers to the following questions submitted to us

19   by the Court."

20          And Question Number 1 asks you, as you see there:

21   "Has '300-850' acquired secondary meaning?"

22          Again, the first element of Fair Isaac's claim that

23   the defendants are infringing the alleged "300-850" mark is

24   that the mark is valid.  This descriptive mark is valid and,

25   thus, protectable, only if you find that the term "300-850"

1    has acquired what is known as secondary meaning.

2            A term acquires secondary meaning when it has been

3    used in such a way that its primary significance in the minds

4    of the prospective consumers is not the product itself, but

5    the identification of the product with a single source,

6    regardless of whether consumers know who or what that source

7    is.  The evidence must show that a significant number of the

8    consuming public associate the term "300-850" with a single

9    source in order to find that it has acquired secondary

10   meaning.  It is for you to decide how many constitute a

11   significant number.

12           You may consider the following factors in

13   determining whether the term "300-850" has acquired secondary

14   meaning.  Here's a list now I'm going to give you of nine

15   different factors to consider in determining secondary

16   meaning.

17           1.  Whether the consumers who purchase the products

18   or services that bear a"300-850" trademark associate the

19   trademark with a single, anonymous source;

20           2.  To what degree and in what manner Fair Isaac

21   may have advertised under the "300-850" trademark;

22           3.  Whether Fair Isaac successfully used the

23   "300-850" trademark to increase the sales of its products or

24   services;

25           4.  The length of time and manner in which Fair

1    Isaac used the "300-850" trademark;

2         5.  Whether Fair Isaac's use of the "300-850"

3    trademark was exclusive;

4         6.  Whether the defendants intentionally copied

5    Fair Isaac "300-850" trademark;

6         7.  Whether the defendants' uses of scoring ranges

7    claimed to be similar to the "300-850" mark has led to actual

8    confusion regarding source;

9         8.  The results of consumer surveys; and

10        9.  The extent to which Fair Isaac holds an

11   established place in the market.

12        Just because Fair Isaac is using the term "300-850"

13   or began using the term before the defendants used their

14   scoring ranges does not, by itself, mean that Fair Isaac is

15   using the term as a trademark or that the term has acquired

16   secondary meaning.  However, there is no particular length of

17   time that a trademark must be used before it obtains

18   secondary meaning.

19        If you find that the term "300-850" has not

20   acquired secondary meaning, then Fair Isaac's "300-850" mark

21   is not valid and protectable.  If you find that the term has

22   acquired secondary meaning, you must then determine whether

23   Fair Isaac so used the term as to develop a secondary meaning

24   before the defendants began their allegedly infringing

25   conduct.  If you find that Fair Isaac has not established

that Fair Isaac so used the term to develop a secondary

meaning before a particular defendant began its allegedly

infringing conduct, there has been no infringement of the

"300-850" trademark as to that defendant.

And that issue about the timing is addressed in

Question Number 2 which will pose the following question to

you for an answer:  "Did '300-850' acquire secondary meaning

before the following Defendants' allegedly infringing uses,"

and you'll see a subquestion there as to each defendant,

Experian, TransUnion, and VantageScore, and a yes or a no.

Now, you'll see following each question, like after

Question 1, we've given you some signaling language which

tells you where to go, because there's some questions you may

not need to answer depending upon your answer to various

questions.  And hopefully we've gotten our signals right.

We've all tried to proofread this a number of times to make

sure we've got it down.

But if your answer to Question Number 1 is yes, you

would then continue to Question Number 2, logically.  If you

answer Question Number 1 no, you will be skipping over

Questions 2 through 8 and proceeding to Question Number 9.

Now, I'm going to assume that you've gotten to

Question Number 2 because I've just read that to you, and

again, with regard to your second answer as it relates to the

subparts as well, if your answer is yes as to a defendant,

 1    you then continue on to Question Number 3 as to that

 2    defendant.  If your answer is no, again, you would then skip

 3    ahead to Questions 3 through 8 as to that defendant.

 4         All right.  Now I think we are ready to move on to

 5    Question Number 3, which asks you:  "Did the following

 6    Defendants use a mark the same as or similar to Fair Isaac's

 7    "300-850" mark without Fair Isaac's consent in a manner that

 8    is likely to cause confusion about the source, sponsorship,

 9    or affiliation of their products or services?"  And then you

10    will answer the question as to each defendant, Experian,

11    TransUnion, and VantageScore.  If your answer is yes as to a

12    defendant, you would continue to Question Number 4 with

13    respect to that particular defendant.  If you answer Question

14    Number 3 no as to a defendant, you do not answer Questions 4

15    through 8 as to that defendant.

16         Any further reference I make to the term "300-850"

17    being a mark or trademark assumes again that you have found

18    the term to be a valid trademark.  Again, I'm doing this

19    simply for ease of reference and does not suggest that I have

20    a view one way or another on the issue of secondary meaning.

21         The second element of Fair Isaac's infringement

22    claims requires you to consider whether the defendants used

23    Fair Isaac's "300-850" trademark in a manner that is likely

24    to cause confusion about the source, sponsorship, or

25    affiliation of their products or services.  General confusion

about credit scoring or reporting is not sufficient.  Like

your evaluation of the first element, your evaluation of this

element is required as to each defendant.  You may draw upon

your common experience as citizens of the community in

deciding this question.  In addition to the general knowledge

you have acquired throughout your lifetimes, you may also

consider the following list of factors:

1.  The strength or weakness of Fair Isaac's mark.

The more the consuming public recognizes Fair Isaac's

trademark as an indication of origin of Fair Isaac's products

or services, the more likely it is that consumers would be

confused about the source, sponsorship, or affiliation of the

defendants' products or services if the defendants use a

similar mark.

Another factor you consider is the defendants' use

of the mark.  If the defendants and Fair Isaac use their

trademarks on the same, related or complementary kinds of

products or services, there may be a greater likelihood of

confusion about the source of the products or services than

otherwise.

Third factor:  Similarity of Fair Isaac's and the

defendants' marks.  If the overall impression created by Fair

Isaac's trademark in the marketplace is similar to that

created by the defendants' trademark in appearance, there is

a greater chance of likelihood of confusion.

1           Another factor is actual confusion.  Actual

2    confusion as to the source, sponsorship, or affiliation is

3    not required for a finding of likelihood of confusion.  Even

4    if actual confusion did not occur, the defendants' uses of

5    the trademark may still be likely to cause confusion.  If

6    uses by the defendants of Fair Isaac's trademark have led to

7    instances of actual confusion, this strongly suggests a

8    likelihood of confusion.  As you consider whether the

9    trademark used by the defendants creates for consumers a

10   likelihood of confusion with Fair Isaac's trademark, you

11   should weigh any instance of actual confusion against the

12   opportunities for such confusion.  If the instances of actual

13   confusion have been relatively frequent, you may find that

14   there has been a substantial actual confusion.  If, by

15   contrast, there is a very large volume of sales, but only a

16   few isolated instances of actual confusion, you may find that

17   there has not been substantial actual confusion.  I will

18   caution you, however, that you should consider only those

19   instances of actual confusion that you find were caused by

20   the defendants' uses of Fair Isaac's trademark, as opposed to

21   instances of actual confusion that were caused by other

22   factors.

23           Next factor to consider:  Defendants' intent.

24   Knowing use by a defendant of Fair Isaac's mark to identify

25   similar products or services may strongly show an intent to

1   derive benefit from the reputation of Fair Isaac's mark,

2   suggesting an intent to cause a likelihood of confusion.  On

3   the other hand, even in the absence of proof that a defendant

4   acted knowingly, the use of Fair Isaac's trademark to

5   identify similar products or services may indicate a

6   likelihood of confusion.

7           Another factor to think about is marketing and

8   advertising channels.  If Fair Isaac's and the defendants'

9   products or services are likely to be sold through the same

10  or similar channels, or advertised in similar media, this may

11  increase the likelihood of confusion.

12          Consider also the consumer's degree of care.  The

13  more sophisticated the potential buyers of the products or

14  services or the more costly the products or services, the

15  more careful and discriminating the reasonably prudent

16  consumer exercising caution may be.  They may be less likely

17  to be confused by similarities in Fair Isaac's and the

18  defendants' trademarks.

19          Another factor to consider is the results of

20  consumer surveys.

21          You're also allowed to consider other any other

22  factors about Fair Isaac's and the defendants' products or

23  services that would tend to reduce or increase the likelihood

24  of confusing the consumer as to the source, sponsorship, or

25  affiliation of the products or services.

1          In light of these considerations and your own

2     common experience, you must determine if ordinary consumers,

3     neither overly careful ones nor overly careless ones, would

4     be confused as to the origin of the product or service, upon

5     encountering the marks as the respective parties may have

6     used them in connection with their products and services.  No

7     one factor or consideration is conclusive, but each aspect

8     should be weighed in light of the total evidence presented

9     during the trial.

10          Question Number 4.  As you can see on the screen

11     there, Question Number 4 is going to ask you:  "Is the term

12     '300-850' a feature of Fair Isaac's products or services that

13     is 'functional'?"

14          As I mentioned earlier, the defendants have raised

15     certain affirmative defenses to Fair Isaac's claims.  The

16     defendants have the burden of proving these defenses by the

17     greater weight of the evidence.  The first such defense is

18     that the term "300-850" is a feature of Fair Isaac's products

19     or services that is "functional."  Features that are

20     functional are not entitled to trademark protection.  A

21     feature is functional if it is essential to the use or

22     purpose of the product or service or if it affects the cost

23     or quality of the product or service.  If restricting the

24     ability to use that feature to one provider of the products

25     or services, to the exclusion of competitors, would

1   significantly hinder the competitors' ability to compete

2   effectively, the feature is functional.  But if a competitor

3   can effectively compete without copying the particular

4   feature, then the feature is not functional.  If you find

5   that the defendants have proved this defense by the greater

6   weight of the evidence, there has been no infringement of

7   Fair Isaac's "300-850" mark.

8        If you answer Question 4 no -- that's the one about

9   functional -- you would continue to Question 5.  If you

10  answer yes, you would be skipping ahead as to that defendant

11  who you are tracking as you go through the special verdict

12  form.  And you would get to Question Number 5, which poses

13  the following question to you:  "Did the following Defendants

14  prove their 'fair use' defense to the claim of infringement

15  of the "300-850" mark?"  And again, you will be asked

16  questions to separate out each of the three defendants,

17  Experian, TransUnion, and VantageScore.

18        The defendants assert the affirmative defense of

19  'fair use' to the claims regarding the "300-850" mark.  Under

20  the law, the owner of a trademark cannot exclude others from

21  making fair use of that mark.  A defendant makes fair use of

22  a mark when the defendant uses it other than as a trademark

23  to accurately describe the defendant's own products or

24  services.

25        To prevail on this defense, a defendant must prove

1    the following elements by the greater weight of the evidence,

2    and this time we have a set of three elements.

3         1.  The Defendant used "300-850" otherwise than as

4    a trademark;

5         2.  The Defendant used "300-850" fairly and in good

6    faith; and

7         3.  The Defendant used "300-850" only to describe

8    its products or services.

9         Again, remember that you are to decide this case as

10   to each defendant separately.  Therefore, you should evaluate

11   each of the elements just mentioned as to each defendant

12   separately.  Your determination again of whether a particular

13   defendant has established these elements need not necessarily

14   be the same as your determination regarding the other

15   defendants.

16        If you find that a defendant has proved this

17   defense by the greater weight of the evidence, there has been

18   no infringement of Fair Isaac's "300-850" mark as to that

19   defendant.

20        I think we'll take what probably is going to be our

21   last standing stretch break together.  Two outs in the ninth.

22   Just one to go.

23        (Laughter)

24        (Pause)

25        THE COURT:  Okay?  Everybody ready?

 1           I believe we are to Question Number 6.  Question

 2   Number 6 poses the following interrogatory to you.  It says:

 3   "Did Fair Isaac 'acquiesce' to the infringement of the

 4   "300-850" mark by the following Defendants," and I'm guessing

 5   you know the three defendants by now:  Experian, TransUnion,

 6   and VantageScore.

 7           Defendants assert the affirmative defense of

 8   acquiescence regarding the "300-850" mark.  Acquiescence

 9   means the active consent through words or actions by the

10   owner of a mark to another's use of the mark.  To establish

11   this defense, defendants must prove by the greater weight of

12   the evidence that -- three factors:

13           1.  Fair Isaac actively represented that it would

14   not assert a right on the infringement claim;

15           2.  The delay between the active representation and

16   the assertion of the right or claim was not excusable; and

17           3.  The delay caused undue prejudice to the

18   defendants.

19           In evaluating whether any delay was not excusable,

20   the time of the alleged delay is measured not from when Fair

21   Isaac first learned of the potentially infringing use, but

22   instead from when such infringement became actionable and

23   provable.  In this regard, you may also take into account the

24   extent to which Experian and TransUnion altered or expanded

25   their marketing efforts or changed the nature of their uses

1    over time in such a manner that their uses became more

2    similar to Fair Isaac's "300-850" mark or more directly

3    competitive with Fair Isaac.

4            Again, you should evaluate this defense as to each

5    defendant separately.  If you find that a defendant has

6    proved the elements of this defense by a greater weight of

7    the evidence, there has been no infringement of Fair Isaac

8    "300-850" mark as to that defendant.

9            Question Number 7 reads as follows:  "Was any

10   infringement of the '300-850' mark by the following

11   Defendants willful?"  Again, you will be required to answer

12   that question as to Experian, TransUnion, and VantageScore.

13           If you find that a defendant infringed Fair Isaac's

14   "300-850" trademark, you must also determine whether that

15   defendant's infringement was willful.  A defendant's

16   infringement was willful if you find that the defendant

17   intentionally set out to deceive or confuse consumers as to

18   the source, sponsorship, or affiliation of its products or

19   services.

20           The next three instructions all relate to Question

21   Number 8 which I'll refer to as the damages question.

22   Question Number 8 as you'll see it on the verdict form will

23   ask you:  "What amount of money in the form of a 'reasonable

24   royalty' will fairly and adequately compensate Fair Isaac for

25   any damage caused by Experian's and TransUnion's infringement

1   of the '300-850' mark," and you'll have to answer that

2   breaking out the damages as to Experian and TransUnion.

3          If you find that Fair Isaac has proved an

4   infringement claim against a defendant, you must then

5   determine the amount of money that will reasonably and fairly

6   compensate Fair Isaac for any injury you find was caused by

7   that defendant's infringement of Fair Isaac's trademark.  For

8   an injury to be "caused" by a defendant's infringement means

9   that the infringement played a substantial part in bringing

10  about the injury.  Fair Isaac has the burden of proving its

11  actual damages by the greater weight of the evidence.

12  Determination of damages must not be based upon speculation

13  or guess.

14         Fair Isaac seeks damages on its claims against

15  Experian and TransUnion for what is known as a "reasonable

16  royalty."  A reasonable royalty is an amount of money that a

17  trademark owner and a defendant would have agreed upon or

18  agreed to in a hypothetical arm's-length negotiation taking

19  place at the time when that defendant's alleged infringement

20  first began.  You may award a reasonable royalty as damages

21  only for past infringement you may find.  You should not

22  consider any future infringement.

23         You may consider the following long list of factors

24  in determining a royalty, and I think there are 14 of those

25  and I'll read those to you now.  These are the factors that

1     apply in consideration of a reasonable royalty:

2          1.   Royalty rates received by prior licenses by

3     Fair Isaac;

4          2.   Prior rates paid by Experian and TransUnion;

5          3.   The nature and scope of the license, such as

6     exclusive or nonexclusive;

7          4.   Fair Isaac's licensing policies;

8          5.   The commercial relationship between Fair Isaac

9     and Experian and TransUnion;

10         6.   The special value of the mark to Experian and

11    TransUnion;

12         7.   The duration of the trademark and the term of

13    license;

14         8.   The profitability of the trademark;

15         9.   The utility and advantages of the trademark

16    over prior marks;

17         10.  Benefits to those who have used the trademark;

18         11.  The extent to which Experian and TransUnion

19    have used the mark;

20         12.  Reasonable royalties within the industry;

21         13.  Opinion testimony by experts; and finally

22         14.  The amount that the parties would have agreed

23    upon in voluntary negotiations.

24         Now, the fact that I have instructed you as to the

25    proper measure of damages should not be considered by you as

1   intimating any view of mine as to which party is entitled to

2   your verdict in this case.  Instructions as to the measure of

3   damages are given to you for your guidance in the event you

4   should find in favor of a party from the greater weight of

5   the evidence in accordance with the other instructions.

6         Let me now read to you Questions 9, 10 and 11 of

7   the special verdict form.

8         Question 9 will ask you to answer this question:

9   "Did Fair Isaac make a false representation of fact during

10   the application process to the United States Patent and

11   Trademark Office for registrations of the '300-850'

12   trademark?"

13         If your answer to Question 9 is yes, you would

14   continue to Question 10.  If your answer to Question 9 is no,

15   you would have completed the special verdict form and you

16   would not answer Questions 10 nor 11.

17         Question 10 asks you to determine:  "Did Fair Isaac

18   know the representation to be false when it was made and

19   intend to deceive the United States Patent and Trademark

20   Office?"

21         Again, if your answer is yes, you would continue on

22   to Question 11.  However, if your answer is no, you would not

23   answer Question 11.

24         And finally, Question 11 asks you to determine:

25   "Did the United States Patent and Trademark Office rely on

1    the false representation in deciding to issue the

2    registrations?"

3            Again, that would be responded to with a yes or no

4    answer.

5            As I told you at the beginning of the case, the

6    defendants have asserted what's called a counterclaim,

7    alleging that Fair Isaac committed fraud on the United States

8    Patent and Trademark Office during the application process

9    for registration of its "300-850" trademark.  To prevail on

10   this counterclaim, the defendants have the burden of proving

11   the following elements by clear and convincing evidence.

12   This is different than greater weight of the evidence.  It's

13   a higher standard, clear and convincing, and it requires that

14   you find three elements:

15            1.  Fair Isaac made a false representation of fact

16   during the application process;

17            2.  Fair Isaac knew that representation to be false

18   when it was made and intended to deceive the United States

19   Patent and Trademark Office; and

20            3.  The false representation was material in the

21   sense that the Patent and Trademark Office relied upon it in

22   deciding to issue the registration.

23            To prove something "by clear and convincing

24   evidence" means you must be persuaded by the evidence that it

25   is highly probable.  This again is a higher standard than

1    "greater weight of the evidence."  Nevertheless, this

2    standard, just like greater weight of the evidence that I

3    spoke to you about earlier, does not require proof to an

4    absolute certainty, again, since proof to an absolute

5    certainty is seldom possible in case.  Again, I will remind

6    you to put out of your minds any thought about the burden of

7    proof beyond a reasonable doubt, which is simply inapplicable

8    to this case.

9         Now, there are some matters that you may have heard

10   mentioned during opening statements or about which there was

11   testimony, and one of these would be the use of keywords as

12   Internet search terms, which are no longer in the case for

13   your consideration.  These are matters that the Court will

14   decide rather than the jury.

15        Members of the jury, it is your duty as jurors to

16   consult with one another and to deliberate with a view to

17   reaching an agreement, if you can do so without violence to

18   your own individual judgment.  Each of you must decide this

19   case for yourself, but only after an impartial consideration

20   of the evidence with your fellow jurors.  In the course of

21   your deliberations, do not hesitate to reexamine your own

22   views, and to change your opinion, if you become convinced

23   that it is erroneous.  On the other hand, do not surrender

24   your honest conviction as to the weight or the effect of the

25   evidence solely because of the opinion of your fellow jurors,

1    or for the mere purpose of returning a verdict.

2            Remember at all times that you are not partisans.

3    You are judges -- judges of the facts, and your sole interest

4    should be to seek the truth from the evidence in this case.

5            Upon next retiring to the jury room, you should

6    select one of your members to act as your presiding juror.

7    That presiding juror will preside over your deliberations and

8    will become your spokesperson here in court.  The form of

9    verdict has been prepared for your convenience and you will

10   be taking it with you to the jury room.

11           Again, you will note that some of the questions

12   call for a yes or no answer and the answer to each question

13   must be the unanimous answer of the jury.  Your presiding

14   juror will write the unanimous answer of the jury in the

15   space provided opposite each question.  And again, you will

16   note that there are some questions that do not require a yes

17   or no answer.  As with all other questions, your answer to

18   these questions must be the unanimous answer of the jury.

19           Again, your verdict must be based solely on the

20   evidence and on the law which I have now given you in these

21   instructions.  Again, nothing that I have said or done during

22   the case is intended to suggest to you what verdict I think

23   you should reach because that's entirely for you to decide.

24   You must not permit prejudice, sympathy, or emotion to

25   influence your verdict.

1          After the jury has answered each of the questions

2     asked, the presiding juror will date and sign that verdict

3     and it will be complete and you will then be returning with

4     it to the courtroom.

5          If it does become necessary during the course of

6     your deliberations to communicate with the Court, you may do

7     so by sending a note through the court security officer

8     signed by your presiding juror or by one or more members of

9     the jury.  No member of the jury should ever attempt to

10    communicate with the Court by any means other than a signed

11    writing, and the Court will never communicate with any member

12    of the jury on any matter which touches the merits of this

13    case other than in writing or orally here in open court.

14         You will note from the oath about to be taken by

15    the court security officers that they too, as well as all

16    other persons, are forbidden to communicate in any way or

17    manner with any member of the jury on any subject touching

18    the merits of this case.

19         Bear in mind that you are not to reveal to any

20    person -- not even to the Court -- how the jury stands,

21    numerically or otherwise, on the questions before you until

22    after you have reached a unanimous verdict.

23         Members of the jury, your duty is to both the

24    plaintiffs and the defendants.  They each have a right and an

25    expectation that you will see that justice is done.  This

1  responsibility must be borne courageously and without fear or

2  favor.  It is not an arbitrary power, but one that must be

3  exercised with fairness, sincere judgment and sound

4  discretion.

5          The final test of the quality of your service will

6  lie in the verdict which you return to this Court and not in

7  the opinions any one of you may hold as you retire from the

8  case.  Remember again at all times you are not partisans nor

9  advocates, but triers of the fact.

10          Counsel, does anyone wish to call my attention to

11  any errors, omissions or corrections in the charge read to

12  the jury?

13          On behalf of the plaintiff, Mr. Schutz?

14          MR. SCHUTZ:  None, your Honor.

15          THE COURT:  Mr. Milne?

16          MR. MILNE:  None, your Honor.

17          THE COURT:  Mr. Remele?

18          MR. REMELE:  None, your Honor.

19          THE COURT:  Ms. Berens?

20          MS. BERENS:  None, your Honor.

21          THE COURT:  All right.  The court deputy will come

22  forward to be sworn.

23      (Court security officer sworn by the calendar clerk)

24          THE COURT:  All right.  Members of the jury, we are

25  going to send in with you one copy of the special verdict

1    form.  I'm not silly enough to send multiple copies in and

2    get multiple answers back, just one.  You will get multiple

3    copies of the instructions so that you can look at those and

4    go through them, and then in just a few minute all of the

5    exhibits will be arriving and you'll have those to examine as

6    well.

7              All right.  At this time we will stand for the jury

8    and the jury may proceed to commence their deliberations.

9         (Jury excused to deliberate at 2:43 p.m.)

10             THE COURT:  Please be seated.  The record should

11   reflect that we are outside the presence of the jury.

12             Anything that needs to be brought to the Court's

13   attention outside the presence of the jury on behalf of the

14   plaintiff?

15             MR. SCHUTZ:  None, your Honor.

16             THE COURT:  Anything on behalf of any defendant?

17             MR. MILNE:  None, your Honor.

18             THE COURT:  All right.  Let's see.  The procedure

19   of the Court with regard to jury interrogatories is that you

20   are all -- at least one attorney for each party is required

21   to be available by telephone.  Gertie or John will call you

22   in the event of any questions.  I will get you all on the

23   phone and we'll deal with those by a conference call.  I

24   won't answer any questions without conferring with you unless

25   it's something pretty minor.

1          I assume everybody's agreeable that if they ask for

2     equipment to -- let's see.  We've got a couple disks in there

3     and a CD.  If they need viewing equipment, I take it nobody

4     has any problem providing that.  We'll get them what they

5     need for that.

6               MR. SCHUTZ:  No objection from the plaintiff.

7               THE COURT:  Okay.  We'll make sure they get that

8     and we'll note everything that happens, but anything that

9     requires any matter of substance we would be in touch with

10    you on.

11         You need to also meet as soon as we adjourn here

12    shortly with John and Gertie to make sure that the exhibits

13    conform to with what you think is going in.

14         All right.  Mr. Schutz has spoken of his mother as

15    being a guiding influence in the trial.  For me at least in

16    this regard, trying cases, it was my father, who was a trial

17    attorney in rural Minnesota.  My father over the years

18    developed a great friendship and sense of the profession from

19    his favorite judge, and his favorite judge after every long

20    trial invited counsel back to his chambers for brandy and

21    cigars.

22         (Laughter)

23              THE COURT:  As you might guess, it's not exactly my

24    style to serve cigars and brandy, but I invite all members of

25    the trial team back to my chambers for cookies and milk.

1          (Laughter)

2               THE COURT:  And we will have them available when

3     you finish your exhibit review with John.

4               Court is in recess.

5          (Recess at 2:47 p.m.)

6                              * * * * *

7          (5:03 p.m.)

8                         IN OPEN COURT

9          (No counsel or parties present)

10         (Jury enters)

11              THE COURT:  I need to tell you a bedtime story

12    before I send you home.  Please be seated.

13              Members of the jury, I understand through the court

14    security officer that you have elected to go home and resume

15    your deliberations tomorrow morning.  Have you gotten as far

16    as electing a presiding juror?

17              Ms. Weis.  Ms. Weis, what time would you like to

18    have the jury proceed with their deliberations tomorrow

19    morning?

20         (Laughter)

21              THE COURT:  Eleven o'clock doesn't work.

22              A JUROR:  Right around noonish.

23              JUROR WEIS:  I'm here at 8.  All right.

24    Nine o'clock.

25         (Jurors confer)

1              JUROR WEIS:  9:30.

2              THE COURT:  That's often wise for us, because the

3     traffic usually works better from all directions at 9:30.  So

4     I'm going to adjourn your deliberations until tomorrow

5     morning at 9:30.

6              During the course of this adjournment now,

7     obviously you've started to talk about the case, so it's

8     important that you not discuss this case with anyone at home,

9     particularly the nature of your deliberations, and you must

10    not permit anyone to discuss it with you, and you should not

11    undertake any investigations personally or by others to

12    resolve any question that might have arisen during the course

13    of your deliberation.

14             It's really important that you only have

15    discussions when all 12 of you are present, so there can't be

16    any subcaucuses or meetings.  So you should not discuss the

17    case until all 12 of you are present tomorrow.  So you need

18    to come in and check in downstairs and then they'll bring you

19    up when all 12 of you are together and you should make sure

20    that you again don't discuss the case until all 12 of you are

21    present.

22             And again I want to caution you, don't get on the

23    Internet and check your credit score or anything, no contact

24    or attempt to research this in any way, shape or form.

25             Other than that, I think we will see you tomorrow

1   and you may be adjourned until tomorrow morning at 9:30.

2   Meet downstairs, they'll bring you up and you can go from

3   there.  We'll leave everything just as it is in the jury

4   room, so your notes and everything are safe in there.

5            Okay?  See you tomorrow.

6        (Jury excused)

7        (Proceedings concluded for the day at 5:06 p.m.)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

                                                                    **PAGE**


Defendant Experian Information Solutions, Inc.'s
        Closing Argument by Mr. Milne . . . . . . . . .   2789


Defendant TransUnion, LLC's
        Closing Argument by Mr. Remele  . . . . . . . .   2824


Defendant VantageScore Solutions, LLC's
        Closing Argument by Ms. Berens  . . . . . . . .   2860


Plaintiffs'
        Closing Argument by Mr. Schutz  . . . . . . . .   2873


Court's Instructions to the Jury  . . . . . . . . . .   2928


Jury Deliberations adjourned for the day
        by the Court  . . . . . . . . . . . . . . . . .   2966



                    *  *  *  *  *

**C E R T I F I C A T E**

We, **TIMOTHY J. WILLETTE** and **KRISTINE MOUSSEAU,** Official Court Reporters for the United States District Court, do hereby certify that the foregoing pages are a true and accurate transcription of our shorthand notes, taken in the aforementioned matter, to the best of our skill and ability.


*/s/ Timothy J. Willette*
_____
**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**


*/s/ Kristine Mousseau*
_____
**KRISTINE MOUSSEAU, RPR, CRR**


Official Court Reporters – U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415–2247
612.664.5108