```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

-------------------------------------------------------------
                            )
Fair Isaac Corporation and  )  CIVIL ACTION
myFICO Consumer Services, Inc., )  NO. 06-4112 (ADM/JSM)
                            )
            Plaintiffs,     )
                            )
        vs.                 )
                            )
Experian Information Solutions, )
Inc.; TransUnion, LLC;      )
VantageScore Solutions, LLC; )
and Does I through X,       )  Courtroom 13 West
                            )  Tuesday, February 23, 2010
            Defendants.     )  Minneapolis, Minnesota
                            )
-------------------------------------------------------------
```

**H E A R I N G   O N   P O S T - T R I A L   M O T I O N S**


BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE


**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter - United States District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S :**


For the Plaintiffs:        **ROBINS, KAPLAN, MILLER & CIRESI, LLP**
                           By:  RONALD J. SCHUTZ, ESQUIRE
                                CHRISTOPHER K. LARUS, ESQUIRE
                                RANDALL M. TIETJEN, ESQUIRE
                                MICHAEL A. COLLYARD, ESQUIRE
                           800 LaSalle Avenue - Suite 2800
                           Minneapolis, Minnesota  55402-2015




For defendant **Experian**
 **Information Solutions,**
  **Inc.:**                **WHITE & CASE, LLP**
                           By:  ROBERT A. MILNE, ESQUIRE
                                CHRISTOPHER J. GLANCY, ESQUIRE
                                JACK E. PACE, III, ESQUIRE
                           1155 Avenue of the Americas
                           New York, New York  10036-2787




                           **LINDQUIST & VENNUM, PLLP**
                           By:  MARK A. JACOBSON, ESQUIRE
                           4200 IDS Center
                           80 South Eighth Street
                           Minneapolis, Minnesota  55402




For defendant
 **TransUnion, LLC:**      **BASSFORD REMELE, P.A.**
                           By:  LEWIS A. REMELE, JR., ESQUIRE
                           33 South Sixth Street - Suite 3800
                           Minneapolis, Minnesota  55402-3707

**A P P E A R A N C E S   (Continued):**


For defendant
 **TransUnion, LLC:**          **NEAL, GERBER & EISENBERG, LLP**
                               By:  JAMES K. GARDNER, ESQUIRE
                                    DAO L. BOYLE, ESQUIRE
                               Two North LaSalle Street
                               Suite 2200
                               Chicago, Illinois  60602-3801



For defendant
 **VantageScore Solutions,**
   **Inc.:**                   **KELLY & BERENS, P.A.**
                               By:  BARBARA PODLUCKY BERENS, ESQ.
                               3720 IDS Center
                               80 South Eighth Street
                               Minneapolis, Minnesota  55402








                    *   *   *   *   *

```
 1       (2:00 p.m.)

 2                    P R O C E E D I N G S

 3                     IN OPEN COURT

 4            THE COURT:  Good afternoon.  Please be seated.

 5            THE CLERK:  The matter before the Court is Fair

 6   Isaac Corporation and myFICO Consumer Services, Inc. v.

 7   Equifax, Inc., et al.

 8            Counsel, would you please note your appearances for

 9   the record.

10            THE COURT:  I'm having flashbacks to November, I

11   think.

12       (Laughter)

13            THE COURT:  Mr. Schutz.

14            MR. SCHUTZ:  Good afternoon, your Honor.  It's good

15   to be back.  And I'm Ron Schutz and I'm representing the

16   plaintiffs in this case.

17            THE COURT:  All right.  Let's see.  Let's go ahead

18   and -- Mr. Collyard?  Let's put all the appearances on the

19   record.

20            MR. SCHUTZ:  Well, I'll put -- also with me in court

21   today, your Honor, are Mike Collyard, Randy Tietjen, Chris

22   Larus, and in-house counsel for Fair Isaac, Renee Jackson.

23            THE COURT:  All right.

24            Mr. Milne, we'll start with you.

25            MR. MILNE:  Good morning, your Honor.  It's good to
```

1    be back.  Robert Milne on behalf of Experian, and with me is

2    Chris Glancy, Jack Pace, and Mark Jacobson for Experian.

3              THE COURT:  All right.  Mr. Remele doesn't have his

4    own table anymore, but --

5              MR. REMELE:  I know, you're right, your Honor.  Good

6    afternoon, your Honor.  Good to see you.  It's -- Jim Gardner

7    and Dao Boyle are with me for Trans Union.

8              THE COURT:  All right.  And, Ms. Berens, I guess you

9    were the one that had your separate own table, but --

10             MS. BERENS:  Yes, and I feel neglected now, your

11   Honor.  Barbara Berens on behalf of VantageScore.

12             THE COURT:  All right.

13             We have a total of five motions in front of me.

14   Obviously, I think the motion to strike won't take a couple

15   seconds, and I think you got word I was allotting roughly 20

16   minutes apiece per side to divide up however you wish to among

17   the motions.

18             So I think we'll start with you, Mr. Schutz, with

19   regard to your -- I assume you're going to start with the new

20   trial motion.  Maybe we should just orally grant that and

21   begin right away in a couple weeks and do it all over again.

22        (Laughter)

23             MR. SCHUTZ:  We're ready, Judge.

24             THE COURT:  I'm still in recovery mode.  It would

25   take me a little while longer to get ready.

1          MR. SCHUTZ:  Yes, your Honor.  I understand you've

2    allotted about 20 minutes a side, so I put together a fairly

3    thin, brief PowerPoint presentation --

4          THE COURT:  Okay.

5          MR. SCHUTZ:  -- I'll hand to your clerk.  And the

6    motions have been briefed extensively, you've got a lot of

7    paper and a lot of exhibits, and I do not intend today to

8    cover all of the pending motions.  I'm just going to

9    concentrate on these three points in the time that's allotted

10   to me, Judge.

11         THE COURT:  All right.

12         MR. SCHUTZ:  So the three areas that I'd like to

13   cover are, first, our motion for a new trial on the issue of

14   licensee estoppel, then I'm going to talk about the defense

15   and counterclaim of fraud on the PTO, and then I'm going to

16   address the defendants' motion that the case be deemed an

17   exceptional one and that they be awarded attorneys' fees.

18         First, on the licensee estoppel, I think it's

19   important to recognize that there were three separate

20   defendants in the case and three separate allegations of

21   trademark infringement in this case.  And our position that we

22   think is well supported by the facts in the case as I'm going

23   to go through in the documents is that none of the defendants

24   should have been allowed to challenge the validity of the

25   300-850 trademark.  We think there's undisputed evidence at

1    trial that Experian and TU are licensees and I'll unpack that

2    as we go through this, and then, of course, VantageScore, the

3    third defendant in the room, is controlled by everyone else.

4          I just noticed that you -- I hope there's a good

5    story behind that, your Honor.

6          THE COURT:  Well, I was doing a triple-toe loop

7    getting ready for the Olympics and missed my landing.

8    (Laughter)

9          THE COURT:  No.  I fell on the ice and fractured my

10   elbow.

11         MR. SCHUTZ:  Sorry about that, Judge.

12         THE COURT:  No problem.

13         MR. SCHUTZ:  So the doctrine of licensee estoppel is

14   established and we cite some cases in our brief, but the

15   **Seven-Up Bottling** case and of course *McCarthy* as well

16   recognizes that the doctrine exists and prevents someone who

17   is in fact a licensee of a trademark from challenging the

18   validity of that mark.  So, what is the evidence that was

19   presented at trial?  Let's start with Experian.

20        You'll recall that there was a master agreement with

21   Experian dated April of -- or excuse me.  There was a master

22   agreement -- I'll get to that in a second -- and an addendum,

23   and in the master agreement there was a reference to

24   trademarks, there was a reference to optional trademarks, and

25   there was a no-challenge provision.

1          In the addendum dated April 15th, that addendum

2     included an additional definition of Fair Isaac optional

3     trademarks and it specifically included 300-850, and of course

4     at that time was clearly designated as a trademark, had the TM

5     by it in the agreement and was incorporated by reference back

6     into the master agreement, which was Exhibit 1074.  And as you

7     can see in the master agreement itself, there is a

8     no-challenge provision in the master agreement.  And it's very

9     clear that there's a no-challenge provision here, and in fact,

10    I don't believe that Experian contends otherwise in their

11    briefing on this issue.  Their position is that they --

12    licensee estoppel should not apply for various equitable

13    reasons that they talk about and that the agreement hadn't

14    been in place that long before the lawsuit was filed.  Those

15    do not justify or warrant ignoring the doctrine of licensee

16    estoppel as it applies to Experian in this case.  And the

17    agreement which Experian signed, it's a detailed, lengthy

18    agreement.  The testimony I believe was that it went through,

19    you know, a back-and-forth drafting process and it says

20    Experian agrees that it will not challenge the validity of

21    Fair Isaac's exclusive rights in the Fair Isaac trademarks,

22    and one of those marks clearly set forth in the agreement is

23    the 300-850 mark.

24          Moving on to TU, they acknowledge the validity of

25    that mark and took a license to it in the three-way agreement

1  between Fair Isaac, TransUnion and WaMu, standing for

2  Washington Mutual, and it was an explicit license to TU and

3  its customer.  Washington Mutual was a customer of TU and the

4  agreement dealt with the incorporation of TransUnion's version

5  of the 300-850 FICO score.

6       Your Honor will remember that each of the credit

7  bureaus ran their own data through Fair Isaac's algorithm and

8  this is the agreement I've got on the screen here now.  It's a

9  three-way license agreement that again --

10          THE COURT:  So you want me on page 8?

11          MR. SCHUTZ:  I'm on page 8, your Honor.

12          THE COURT:  Okay.

13          MR. SCHUTZ:  It's a three-way license agreement that

14  went through a back-and-forth drafting process.  It was signed

15  by John Danaher, and John Danaher was I believe TU's only live

16  witness at trial.  His name was on the agreement.  As you can

17  see here, there's a clear acknowledgment of the 300-850

18  trademark.  It's in the agreement and this is an explicit

19  provision allowing the use of that mark by WaMu for the TU

20  FICO score, the TU -- the score run through FICO's algorithm

21  with the TU data in it.  And again, the doctrine of license

22  estoppel says you take a license, you can't challenge the

23  mark.  So, that is the basis of the licensee estoppel issue,

24  your Honor.

25          With regard to VantageScore, as I mentioned earlier,

1  VantageScore is controlled by the three credit bureaus, two of

2  whom were defendants --

3          THE COURT:  They were not a signatory to any

4  licensing agreement.

5          MR. SCHUTZ:  They were not signatories to the

6  license agreement, but the general legal principle that an

7  agent should not be able to do what its principal cannot do

8  clearly should apply in this case, and that's what would

9  prevent VantageScore from challenging these marks.

10          But again, there were three separate trademark

11  allegations here, and had licensee estoppel been applied as we

12  think it should have, it's difficult to say in hindsight what

13  might have happened to the lawsuit against VantageScore.  It

14  certainly would have changed various bargaining positions and

15  thinking on various things, and the fact that the defendants

16  were allowed to go forward and challenge the marks put us at

17  -- in a position of extreme prejudice here, your Honor.

18          Moving on now to our motion for a new trial on the

19  defendants' defenses and their counterclaim of fraud on the

20  PTO, a couple overview points and then we'll go down into some

21  more detail here.

22          The **In re: Bose Corp.** case, which is the Federal

23  Circuit -- recent Federal Circuit case on fraud regarding

24  trademarks, was the basis, I believe, for the Court's jury

25  instruction on this and in fact I believe was also cited as

1  support by the defendants for the jury instructions, so I

2  don't think there's any doubt that **Bose**, even though it's a

3  Federal Circuit case, really is the best law on point here.

4  And **Bose** makes it very clear that of course -- and there's no

5  dispute about this -- that the burden is clear and convincing,

6  but it has to be clear and convincing evidence that Fair Isaac

7  knowingly made a false and material representation and that

8  they did so with an intent to deceive.  So we have three

9  things here.  It has to be knowing, it has to be material, and

10  there has to be an intent to deceive here.  **Bose** goes on to

11  state, of course, that fraud has to be proven to the hilt, and

12  importantly here, your Honor, "no room for speculation,

13  inference or surmise, and obviously, any doubt must be

14  resolved against the charging party."

15       I'll probably reiterate this point in a few

16  additional slides, but going through their brief on this

17  issue, it was striking how many times they made reference to

18  the two key players in this, which were Cheri St. John and

19  Laura Gustafson, with comments like:  Ms. Gustafson clearly

20  knew this fact or that fact, no citation to the record.  And

21  of course, there could be no citation to the record because

22  Ms. Gustafson did not testify either live or by deposition in

23  this case.  And so those statements which they put in their

24  motion which they made arguments about at trial were in fact

25  nothing more than surmise and speculation.  That's not enough

1    under the standard in **Bose** or any clear and convincing

2    standard, for that matter.

3          So let's look at the two separate statements that

4    the defendants relied upon at trial.  You remember that Cheri

5    St. John submitted a declaration and the focus in that

6    declaration --

7          THE COURT:  We heard her by way of videotape as

8    well.

9          MR. SCHUTZ:  She testified by way of videotape

10   deposition.  Her declaration was an exhibit at trial.  I'm

11   sorry I don't have the exhibit number here on the slide, but

12   the statement that is the subject of the dispute here was in

13   paragraph 12 of her declaration.  And very straightforward it

14   says there:  "To the best of my knowledge, only the FICO score

15   uses the 300-850 range as a unique identifier for credit

16   bureau risk scores," and there's a lot of argument about, you

17   know, that statement and we're going to get into some things

18   in a minute.  It's undisputed that that statement was in fact

19   true.  The defendants tried to make an argument that somehow

20   this statement was still trying to pull the wool over the

21   Patent Office's eyes.  We need to keep in mind that the Patent

22   Office and the patent examiners in the trademark side of the

23   house are experts in trademark law, they're experts in

24   trademarks, and so they fully would understand and know what

25   the term "unique identifier" meant in this affidavit.

1           The other distinction that I'll point out here -- I

2     think we may make it later on as well -- there is a

3     substantial difference between the trademark charge of fraud

4     on the PTO regarding trademarks and fraud on the PTO regarding

5     patents.  The process in getting a patent is purely an

6     *ex parte* process.  That is not true for a trademark.

7     Trademarks are published for opposition and before they in

8     fact issue it can be an adversarial proceeding, so there is a

9     different standard that the court --

10          THE COURT:  Judge Davis wrote on this just recently,

11    didn't he?

12          MR. SCHUTZ:  Yes, he did.

13          THE COURT:  Okay.

14          MR. SCHUTZ:  And there's a difference here.

15          The other statement that they focused on was Laura

16    Gustafson's statement, and Laura Gustafson was the trademark

17    attorney that represented Fair Isaac here and she made a legal

18    argument and I've set it forth in the slides and it's in the

19    record.  And the statement that really is the focus here is

20    the one in the middle of this broader paragraph and I think

21    it's important to focus on the broader paragraph so that you

22    have some context here.  Again, we're dealing with the Patent

23    and Trademark Office where we have experts, but the statement

24    that they focused on and really pulled out of context is the

25    one here that says, quote:  "300-850 is the credit scoring

1    scale only for Applicant's credit bureau-based risk products

2    and not for ... other credit bureau-based risk products that

3    competitors develop."  And again, her statement was part of a

4    brief that included Cheri St. John's declaration.

5            Again, no testimony in this proceeding from Laura

6    Gustafson, and the defendants had plenty of opportunity to

7    take her deposition and did not.  Here's why the jury's

8    finding is erroneous, your Honor, moving on to slide 11.

9            Looking at the three issues, falsity, materiality

10   and intent to deceive, no evidence that any of that existed

11   here, much less clear and convincing evidence.  The defendants

12   admitted that Cheri St. John's statement was true, no evidence

13   that Gustafson intended to deceive anybody, she never

14   testified, and neither statement was material, so let's look

15   at the support in the record, really undisputed support, that

16   Cheri St. John's statement was true.

17           The only company ever to use 300-850 was TU.  There

18   was a lot of evidence about various and sundry scores and

19   ranges, especially three-digit scores and ranges, some close

20   to 300-850, but only one that was exactly 300-850, and that

21   was TU's score.  But TU adamantly took the position that it

22   never used 300-850 as a unique identifier.  John Danaher

23   admitted that.  TU's counsel in closing argument went out of

24   his way to say, quote:  "So of course we weren't using it as a

25   unique identifier," and in fact, Defendants' expert

1    Robert Anderson admitted that nobody else had ever used it as

2    a unique identifier.

3           Moving on to Gustafson, no evidence that she

4    intended to deceive the Patent and Trademark Office.  Again,

5    they did not depose her, and this is a case in which the

6    defendants are seeking $8 million for defending a trademark

7    case, $8 million, and they didn't spend a penny to depose the

8    lawyer that prosecuted this application.

9           And again, the brief makes reference to what

10   Gustafson knew with no citations because there can be no

11   citations, because we don't know what she knew, what she

12   intended or what she didn't know, because she never testified.

13   And it's their burden on that issue, so it's not as if any

14   inference can be drawn against us about what she knew.  It's

15   their burden on this, your Honor.  Again, pure surmise and

16   speculation about what she did.  So now let's look at the

17   materiality issue.

18          Neither of the statements were material as a matter

19   of law.  Fair Isaac, no duty to disclose TU's use to the

20   Patent and Trademark Office even if we had known about it.  So

21   even if you take as true that somehow Gustafson knew about the

22   300-850 or that Cheri St. John did -- by the way, hotly

23   contested issues at trial, in our view -- those were not

24   material, because there's no duty to disclose third-party use

25   if the person prosecuting the trademark believes its rights

1    are superior, and that was clearly the case here.  We were in

2    the market first with 300-850, they copied us is what

3    happened, and at trial that was basically admitted, all right?

4    So the third-party use would have no bearing on this.  It's

5    simply not relevant and not material.

6          Of course, the defendants now, they assert after

7    trial for the first time that St. John's reference as a unique

8    identifier fraudulently implied Fair Isaac had used it as a

9    trademark by February 2005, okay?  This is a new argument

10   they've made, they didn't make this at trial, but they're

11   making it post-trial.  This fails as well, because we in fact

12   were using 300-850 as a unique identifier when she made the

13   statement in paragraph 12 that the defendants have admitted

14   was a true statement.

15         What's the evidence on that?  And again, this is

16   going into the weeds just a little bit on trademark

17   application, but this was an intent-to-use application, and

18   part of the process in an intent-to-use application is that

19   sometime down the road you submit a specimen of use.  We had

20   four trademarks, one of which was just what I'll call the raw

21   300-850, and the specimen of use for that 300-850 is the

22   exemplar, Plaintiff's Exhibit 6, I believe, that I have -- or

23   part of Plaintiff's Exhibit 6 that is on screen shot 16 here,

24   and that's the seal that you see.  So the seal that includes

25   300-850 in it was the use of our mark 300-850, and we

1    presented many documents showing that prior to February 2005

2    we were using at least the 300-850 in conjunction with or as

3    part of the seal.

4          In addition, Keri Kramers-Dove, our witness,

5    testified when we started using that and we've set forth the

6    testimony and citation to the transcript and she said in 2004.

7    And again, no evidence that St. John believed that we did not

8    use it as a trademark.

9          Finally, your Honor, I'd like to address a little

10   bit the exceptional case issue.  Defendants are seeking

11   $8 million to defend a trademark case.  Not just any trademark

12   case, but a trademark case where two of the three defendants

13   took licenses, where we owned four federal trademarks.  We

14   walked into court with four federal trademark registrations.

15   Undisputed evidence of intentional copying and undisputed

16   evidence that there was -- or the defendants admitted that

17   there was confusion, actual confusion in this case.

18         The case law is clear, exceptional means

19   exceptional, and trademark cases are different than patent

20   cases.  The defendants cite a lot of patent cases where,

21   again, because of the different nature of a patent prosecution

22   and a trademark prosecution, a finding of fraud on the Patent

23   Office in a patent case appears in some of the cases to

24   support an award of attorneys' fees in situations that clearly

25   would not happen in a trademark case.  And of course, in this

1  case the defendants are relying almost exclusively on the

2  fraud finding to justify their request that the case be deemed

3  exceptional.

4        It's curious at one level and I suppose a person

5  could draw some other inferences, but there are cases in this

6  district that have dealt with the issue of whether a trademark

7  case is an exceptional case and I've got them on slide 19.

8  There's the **Transclean** case, the **Scott v. Mego** case, and the

9  **Scott Fetzer** case.

10       THE COURT:  Are there any cases that deal with a

11  fact pattern where there's been a jury finding of a fraud on

12  the Trademark or Patent Office, for that matter?  Most of the

13  cases, as I recall, are in the summary judgment context.

14       MR. SCHUTZ:  Could be, your Honor.  You know, I'd

15  have to go back and look at the procedural posture of the

16  case, but a couple things are clear from the case law, one of

17  which is that despite the defendants trying to say that the

18  **Aromatique** case out of the Eighth Circuit, which was a

19  *per curiam* opinion, three different judges writing, does not

20  support the position that a finding of fraud means you must

21  therefore find the case to be exceptional.  You cannot get

22  that reading in **Aromatique**.  So we have not found any case

23  that would support that proposition, that you find fraud, the

24  case is automatically exceptional.  No case that supports

25  that.

1      THE COURT:  But it would be a factor, wouldn't it?

2  Wouldn't it be something we should look at?

3      MR. SCHUTZ:  Oh, we're not arguing that a finding of

4  fraud, like any other host of factors in the case, could be a

5  factor the Court could consider.  I mean, you have to consider

6  everything that happened in the case and that's what we're

7  urging the Court to do here.  We think the fraud finding

8  should be set aside.

9      THE COURT:  I understand.

10     MR. SCHUTZ:  But looking at, you know, the state of

11  the case we had, the licenses, the copying, actual evidence of

12  actual confusion, the four federal trademark registrations.

13  All of that evidence, even with the jury finding of fraud,

14  does not support an exceptional case finding in this case, but

15  the defendants conveniently ignore in their briefing the cases

16  where there was no finding of fraud -- excuse me -- where

17  there was no finding of an exceptional case even where a

18  plaintiff lost in here.

19      So, what did this case look like out of the box?  I

20  mean, out of the box, we filed this case in October.  As of

21  that time, both Experian and TU acknowledged that they had

22  trademark rights.  And, you know, your Honor mentioned summary

23  judgment.  Of course, we overcame a summary judgment motion to

24  get --

25      THE COURT:  And a JMOL motion.

 1          MR. SCHUTZ:  -- And a JMOL motion to get to trial on

 2     the case.  So to find it exceptional under those

 3     circumstances, we would argue, is not something there's

 4     precedent for.

 5          We also had extensive common-law trademark rights.

 6     We own four federal registrations.  We uncovered -- after

 7     discovery, after we filed the suit and we start digging into

 8     their records, we uncover a substantial amount of

 9     incriminating evidence that they intentionally copied our

10     mark, and we introduced several of these documents and

11     referred to them repeatedly through the trial on the mimic,

12     keep close, mirror language.  We don't think there's really

13     any dispute about what the defendants did in terms of coming

14     up with their numbers.  It was clearly with a view of either

15     being exactly 300-850 or as close as they thought they could

16     get to it.

17          And then actual customer confusion.  We presented a

18     lot of evidence on actual customer confusion.  John Danaher,

19     TU's executive, got up here on the stand and basically

20     admitted that people were confused about what they were

21     buying.  And with regard to Experian, they developed a

22     document that they would give to their call center operators

23     that, you know, right out of the box recognized that people

24     would be calling in thinking they purchased a FICO score when

25     in fact they had purchased something else.

1            So, we've got evidence of actual confusion, evidence

2     of copying, all of that as we move in.  And, Judge, I think

3     that I've kept pretty close to my --

4            THE COURT:  Well, I think Mr. Collyard had a note

5     that you should probably read, but I'm going to give you 30

6     minutes.  There's quite a few issues here.  So if you're not

7     done, why don't you take a few minutes to --

8            MR. SCHUTZ:  Well, actually, Judge, what I'd like to

9     do is have a few minutes in rebuttal --

10           THE COURT:  Okay.  That's fine.

11           MR. SCHUTZ:  -- because they're going to get up, so

12    I'll take whatever time the Court is willing --

13           THE COURT:  Okay.  I think you used 25 now, so we'll

14    give you five minutes additional.

15           MR. SCHUTZ:  Right.  Thank you, your Honor.

16           THE COURT:  Mr. Milne, you seem to be in the

17    driver's seat there with regard to motions.  No?

18           MR. MILNE:  Well, actually, we're going to split the

19    argument, your Honor.

20           THE COURT:  All right.

21           MR. MILNE:  Mr. Glancy is going to take the fraud

22    issues and --

23           THE COURT:  All right.  I'll give the defendants 30

24    minutes total instead of 22.

25           MR. GLANCY:  Your Honor, before I begin -- and by

1   and large, many of the points made by Mr. Schutz are addressed

2   in our brief and I don't intend to belabor those points here

3   today, but I would like to address some specific things that

4   he stated.

5          THE COURT:  Okay.

6          MR. GLANCY:  And before I begin, I think it's

7   helpful to actually remind everybody about what we're talking

8   about when we're talking about the plaintiff's purported

9   trademark.

10          Is this on?  Is this working?

11      (ELMO adjusted)

12          MR. GLANCY:  And this is a printout from Fair

13   Isaac's website from 2001 that they claim was their first use

14   of the 300-850 trademark.  That's this number here and this

15   number here, and that's how they used 300-850 in 2001, in

16   2002, in 2003.  In 2004 they put it into the gold seal, but

17   pretty much by and large they continued to use it in

18   descriptive sentences in 2004, 2005.  After the suit was filed

19   in 2006, continued to use it descriptively.

20          I'll get to the seal in just a moment, but I think

21   that it's important to realize when they filed their trademark

22   application what it is they were setting out to do.  They were

23   setting out to get patent-like protection over a range of

24   numbers in order to exclude competitors from using similar or

25   overlapping ranges of numbers and pretty much just occupied

1    the field of three-digit ranges that they knew was a valuable

2    competitive advantage.  This is no mere trademark case.  It

3    has very many patent overtones to it.

4         Now, Mr. Schutz discussed some of the standards that

5    apply from the **Bose** case, and in fact the jury in this case

6    was properly instructed about every specific element of fraud

7    on the Trademark Office and they were instructed about the

8    standard of clear and convincing.  If Mr. Schutz wanted some

9    additional instruction in **Bose** that somehow didn't get in

10   there, it was incumbent upon him to ask for that.  He didn't,

11   his side didn't, and so therefore that is waived.

12        Now, I also heard the word "undisputed" many, many,

13   many times, and I think it's -- it strikes me when you see the

14   word "clearly" in a brief, it usually means that something is

15   not clear.  In fact, I think just about everything that he

16   stated that was undisputed is in fact disputed, and if I could

17   just point out a few.

18        Unique identifier.  The first statement he said was

19   that the two fraudulent statements, Ms. St. John's statement

20   that to the best of her knowledge, only the FICO score uses

21   the 300-850 range as a unique identifier for credit bureau

22   risk scores, that is -- and they say that it's undisputed that

23   that's true.  That is entirely disputed and there's ample

24   evidence that that is actually false.

25        First of all, the question arises as to whether or

1    not "unique" -- what's the meaning of these two words, "unique

2    identifier."  It has no meaning in trademark law.  There's

3    nothing in the Trademark Manual of Examining Procedure that

4    says "unique identifier" means thus and such.  These are

5    lawyer hedge words that were thrown in there in order to

6    imply, clearly, that they're using it to identify the source

7    of their products.  Otherwise, why include that in the

8    statement.  So clearly she's trying to imply that 300-850 was

9    used as a trademark for credit bureau risk scores, and this

10   was in 2005.

11           Now, was it used as a trademark?  No.  We have the

12   evidence over and over again of their descriptive use.  We

13   also have the expert testimony of Robert Anderson,

14   uncontradicted, who said over and over again that these uses

15   were descriptive uses and these uses were not trademark uses.

16           Turning to the seal, Mr. Anderson also reviewed the

17   specimen that Mr. Schutz pointed out and he was asked whether

18   or not the 300-850 that appears in the seal, whether or not

19   that was trademark use of 300-850.  He said no.  He said

20   that's only descriptive use, and it doesn't support

21   registration, doesn't confer trademark rights any more than

22   the words "officially certified," which also appear in the

23   seal do.  So it is in fact disputed and the jury was free to

24   take that evidence and come to their own conclusions about the

25   truth or falsity of that statement.

1          And in fact, when Ms. St. John says to the best of

2     her knowledge, they actually had the videotape testimony where

3     they could assess her demeanor and take a look at the

4     circumstances.  This is a woman who Ms. Keri Kramers-Dove

5     described as a person who knew what was going on in the

6     industry.  If anybody in the company knew, she knew.

7          Now, as far as the second false statement, it's even

8     more clear, it's even more stark.  There's no hedge word

9     there, there's no unique identifier, there's no "to the best

10    of my knowledge."  Laura Gustafson, the attorney, says 300-850

11    is the credit scoring scale only for applicants' credit bureau

12    risk-based products and not -- she goes even further and says

13    and not for other credit bureau-based risk products that

14    competitors develop.

15          THE COURT:  How did that statement get in front of

16    the jury, though?  Ms. Gustafson was not called at trial.

17          MR. GLANCY:  No, she was not, but Mr. Anderson as

18    the expert on the stand went through and explained that that

19    statement was material in the --

20          THE COURT:  So it's in the record from Anderson as

21    the -- testifying that that was part of the materials; is that

22    how it came --

23          MR. GLANCY:  Right.  It's also as part of the

24    official file history of the trademark prosecution of that

25    particular trademark.

1           THE COURT:  Was that offered during trial?

2           MR. GLANCY:  Yes, offered and received without

3    objection.

4           And so that statement's very clearly false because

5    TU was at the time using 300-850.  But more than that,

6    actually, it was materially misleading, because the suggestion

7    is, look, nobody's going to be harmed if we issue this

8    registration for 300-850 while Experian was using 330-830,

9    which is very similar.  And so here we have Fair Isaac saying

10   to the Trademark Office:  Give me a registration because

11   nobody else is using this, and as soon as they get it, they

12   turn around and sue Experian, and they sue VantageScore for

13   501-990.  So even though it's materially false as to TU, it's

14   also materially misleading as to Experian and VantageScore and

15   numerous other competitors.

16          Now, there's actually a third false statement which

17   we point out in our brief, which is the repeated

18   characterization of 300-850 as a unique identifier and saying

19   over and over again that Fair Isaac used it as a unique

20   identifier.  As they explained, they never used it as a

21   trademark and the jury was entitled to find that.

22          Now, getting to the standard of materiality, this is

23   a different argument than Plaintiffs raised in their brief.

24   In their brief they said the standard of materiality was the

25   "but for" standard, and as we pointed out in the

1    **Gilbert/Robinson** case, it is not the "but for" standard unless

2    you're seeking damages.  In this case it is, as your Honor

3    instructed, what is important to a reasonable examiner in

4    deciding whether or not to let the registration issue.

5            Now, today Plaintiffs are arguing that FICO had no

6    duty to disclose this information because there's no duty to

7    disclose third-party use of a mark if it believes that the

8    rights of such others are not superior.  Well, that case

9    that's cited and all the other cases that address this are

10   correct insofar as when you file an initial application

11   there's no duty to disclose that others are using the mark in

12   an infringing manner, but -- and here's the big but -- when

13   you make a representation to the Trademark Office, you must be

14   candid, you must be truthful.  No half-truths, no tricky

15   business, no throwing in unique identifiers and hedge words so

16   that you can later claim that you were telling the truth.  So

17   that's not an applicable standard of materiality in this case,

18   because the statements were made affirmatively as part of the

19   prosecution process.

20           Now, Plaintiffs also argue that somehow Mr. Anderson

21   and Mr. Danaher admit that Fair Isaac was using 300-850 as a

22   trademark and that's just not the case.  If you take a look at

23   their testimony, Mr. Anderson testified that no other company

24   was using 300-850 as a unique identifier, which was true.

25   Nobody has ever used a credit score as a trademark in this

 1    industry, including Fair Isaac.  Mr. Anderson never testified

 2    that Fair Isaac used 300-850 as a trademark, and to suggest

 3    otherwise is just ludicrous.  I mean, he actually said over

 4    and over again that 300-850 was being used descriptively and

 5    not as a trademark.  The same goes for Mr. Danaher, who

 6    testified that he never used 300-850 as a trademark, but

 7    again, it's absurd to transport that and say that that means

 8    that he's conceding that Fair Isaac was using it as a

 9    trademark.  The two just don't -- it's a *non sequitur*.

10            Turning to the issue of intent here, I'd submit that

11    there's more than enough evidence for a jury to find that

12    there was intent to deceive, not only -- an intent to deceive

13    is almost always proved through circumstantial evidence and

14    the circumstantial evidence here is overwhelming.  Not only

15    were highly material misrepresentations made to the Trademark

16    Office, but you also had other indicia of bad faith, arguing,

17    for example, that the mark was arbitrarily selected when that

18    argument has absolutely no relevance in the prosecution of a

19    trademark application, as Mr. Anderson testified, not

20    disclosing the manner in which they actually used the

21    trademark when they're arguing to the trademark examiner that

22    they're using it as a unique identifier, as a trademark.

23            Now, I agree they didn't technically have an

24    obligation to disclose it, but here what we're saying is

25    that's evidence of a scheme of bad faith, trying to pull the

1    wool over the eyes of the examiner.  There was misdirection in

2    other arguments throughout that paper, including the

3    representation that the radio call indicators indicated that

4    300-850 could be informational and a trademark.

5              As for the knowledge of both Ms. Gustafson and

6    Ms. St. John, I think there's more than enough evidence for

7    the jury to conclude that they knew that these statements were

8    false.

9              For example, there is no evidence that 300-850 was

10   ever used as a trademark, so how could Ms. Gustafson in good

11   faith, who's under a duty to make an investigation before

12   making any factual representation to the Trademark Office, how

13   could she then argue that it was a unique identifier over and

14   over again?  And Ms. St. John, testimony showed, was very well

15   aware of what her competitors were doing and she was copied on

16   many e-mails that referenced competing trademarks, including

17   TU's 300-850 mark.

18             Now, if I could turn just briefly to the exceptional

19   case standard for awarding attorneys' fees and just address

20   some points that were made there.

21             It's true that there aren't very many cases of fraud

22   on the Trademark Office.  It's not as common as in patent

23   practice, but trademark cases do borrow a lot in this instance

24   from the patent cases as the Eighth Circuit mentioned in the

25   **Gilbert/Robinson** case.  And we do see in patent cases that it

1    is almost routinely granted that the defendant gets attorneys'

2    fees when there's been fraud on the Patent Office, and we

3    think the same principles apply here, that the fraud in and of

4    itself renders this case exceptional.

5          THE COURT:  All by itself?  I don't have to go

6    beyond that issue?

7          MR. GLANCY:  But if you want to go beyond, there are

8    other reasons why this case is exceptional.  If I could just

9    go through a few of them.  They're listed in our brief.

10         First, the fact that they brought this suit without

11   any evidence of secondary meaning, without any kind of

12   marketing plan.  They never even tried to make this thing a

13   trademark, and yet they forced us into a jury trial of three

14   weeks where they were asserting $500 million worth of damages

15   and put these companies to that burden.  The fact that they

16   asserted a half a billion dollars' worth of damages in itself

17   makes this an exceptional case.  There is no support for any

18   kind of award of that type in a trademark case.

19         Now, the fact that they never conducted a survey to

20   show secondary meaning, even though that was the critical

21   issue in this case and they had plenty of time and money to do

22   so, the fact that the only survey that they offered was the

23   Berger survey.  The only expert they could find to support

24   their side was Mr. Berger, and I don't think I need to say any

25   more about that other than that his testimony was extreme --

1   was beyond not credible, I would submit.  It was beyond the

2   pale of acceptable behavior in a court.

3          The evidence further showed that they never thought

4   they had a trademark.  They never put it on their list of

5   trademarks, they never had a branding campaign, they never put

6   the TM or the R next to it.  They were using this as a

7   competitive hammer against TU, Experian, Equifax and

8   VantageScore.  They didn't care about the brand.

9          And finally, there's evidence from internal e-mails

10  that they made a conscious decision to sue, to put their money

11  into paying their lawyers to sue the defendants rather than

12  put that money into building a brand, and I submit that that

13  also is evidence that this case was frivolous from the get-go.

14         That's all I have.

15         THE COURT:  What should I make, if anything, of the

16  fact that I chose to allow it to go forward, denied summary

17  judgment and denied the motion for judgment as a matter of

18  law?  Is that a factor I should consider?

19         MR. GLANCY:  Well, we cited some cases that address

20  this very point in our brief.  The fact that trademark cases

21  are extremely factual in nature and that summary judgment is

22  rarely granted in trademark cases I think is one reason why I

23  don't think that summary judgment itself is a persuasive

24  factor to consider.  But more than that, I think from reading

25  your Honor's opinion that two of the most persuasive reasons

1   why summary judgment was denied was because they had federal

2   registrations and because they had the Berger survey.

3          Now, we had a word limit and we couldn't -- we did

4   not prevail on convincing you as a matter of law that those

5   two things shouldn't defeat summary judgment, but that the

6   trademark registrations were fraudulently obtained, which the

7   jury decided, and that the Berger surveys were proven to be

8   essentially worthless as evidence I think says a lot about why

9   they were able to prevail at summary judgment.

10          THE COURT:  So if I had relaxed the word-limit rule,

11   you would have convinced me?  Is that what you're saying?

12          MR. GLANCY:  I don't know if -- I would have tried,

13   anyway.

14          THE COURT:  All right.  Thank you.

15          Mr. Milne.

16          MR. MILNE:  Thank you, your Honor.  I'm going to

17   address the licensee estoppel issues, but before I do, I would

18   just add to what Mr. Glancy just said and say that with

19   respect to the summary judgment denial and its impact on your

20   thinking here about exceptional case, I would go back to -- I

21   certainly echo what Mr. Glancy said, but say fraud is really a

22   key here.  It is rare.  And the fact that fraud was proven by

23   this jury -- proven to this jury and found by this jury, it's

24   hard for me to imagine what could -- if not fraud, then what?

25   What is an exceptional case?

1            I also want to comment, though this doesn't relate

2   directly to the licensee estoppel issue, on Mr. Schutz's

3   repeated reference to all this evidence of copying that he

4   said was presented to jury.  Basically, he was talking about

5   two documents that were presented to the jury, both relating

6   to time periods in the early 2000s when the credit bureaus

7   were selecting -- when TransUnion and Experian were selecting

8   the score ranges for the Plus Score and for the TransRisk

9   Score.

10          THE COURT:  This is the Project Trident era.

11          MR. MILNE:  No, no, no.

12          THE COURT:  No, this --

13          MR. MILNE:  Before the Project Trident era.

14          THE COURT:  Okay.  All right.

15          MR. MILNE:  Before that.  And there was ample

16   evidence at the trial about how at that time -- in the case of

17   Experian, the Plus Score was introduced in 2003, and there was

18   ample evidence at trial that during that period before and

19   certainly after as well, but clearly before the Plus Score had

20   been launched, there were lots and lots of scoring services

21   using ranges that overlapped 300-850, including a number of

22   consumer scores, including the Experian National Consumer

23   Score, which was introduced right around the same time that

24   Fair Isaac introduced its consumer score, and that this --

25   copying -- the only way in which copying can matter for a

1  trademark case is if it's done with the intent to commit

2  trademark infringement, to pass yourself off as the other

3  guy's product.  And since there was no suggestion, nobody was

4  claiming trademark rights at that period of time, the idea

5  that that copying -- and, of course, this was argued fully to

6  the jury and the jury obviously agreed with the defense

7  position here -- that that copying, to the extent you can even

8  call it copying, was not pertinent to the trademark issue, so

9  the continued reference to all this copying I just think needs

10  to be put in its proper context.

11      Very briefly then on the estoppel issues.  I would

12  start with VantageScore and note that there is no authority

13  that we're aware of that would say that a party -- that an

14  entity that is not party to a license agreement could ever be

15  subject to an estoppel claim.

16      THE COURT:  It sounds like the theory is one of

17  agency.  What's your understanding of the law --

18      MR. MILNE:  And I am not aware of any law that would

19  say that an agency theory could then be bootstrapped into an

20  estoppel theory, and here there are no facts to support that.

21  The two defendants on these trademark claims, TransUnion and

22  Experian, are two of the three owners of VantageScore.

23  There's no claim of veil piercing or alter ego or anything

24  like that, and there was never a claim against the third

25  owner, Equifax, that Equifax had a consumer score that

1    infringed.  So, you know, the idea that these two credit

2    bureaus somehow controlled VantageScore when there's a third

3    owner out there -- and had we gotten into this at trial, it

4    would become clear that basically decisions are made with

5    unanimity among the owners of VantageScore, LLC -- there's

6    just no factual support and no legal support for some kind of

7    agency theory here.  In fact, as we cite in our brief, the

8    excerpt from the *McCarthy* treatise, that says:  "Other

9    parties, even those 'closely affiliated' with a licensee, are

10   not foreclosed" under an estoppel theory.

11       And then the idea that, well, we're dealing with

12   three separate claims here, I don't know how that makes sense.

13   If VantageScore -- let's just assume a hypothetical lawsuit

14   with VantageScore only challenging the validity of the

15   trademark here and succeeding.  The fact of that judicial

16   determination of invalidity would then serve as -- I mean, how

17   in any feasible way could Fair Isaac then turn around and

18   assert that trademark against the other two bureaus?  I just

19   don't see how that works.  So, you know, that should be the

20   end of it.  Your Honor has already considered these issues and

21   I think come to the right decision.

22       I will just comment briefly on the Experian

23   situation and some of this is echoed by what Mr. Glancy said

24   and we discuss this in the briefs.  The **Lear** case out of the

25   Supreme Court talks about circumstances under which the rights

1    of contract can be overshadowed by public policy

2    considerations.  Now, granted, the **Lear** case came up in the

3    context of a patent, but the court since **Lear** has looked at

4    the **Lear** factors, the **Lear** test, in the context of trademark

5    cases and asked the question whether the trademark issue in

6    play there is one that implicates these public policy concerns

7    about systemic competition, you know, is the assertion of this

8    allegedly invalid trademark going to materially impact

9    competition.

10         Now, in many trademark cases that may not be true.

11   That may not be the case.  It may be a very narrow-bore case.

12   This is not that case.  This is a case where Fair Isaac was

13   taking a position -- and there was ample evidence at trial --

14   that lenders prefer three-digit scores.  There's this issue

15   about granularity and having enough of a range to adequately

16   capture the gradations of risk, and Fair Isaac was taking the

17   position that this entire range of numbers, even a slight

18   overlap, would infringe, and the practical effect of that, if

19   successful, would be to really substantially impair

20   competition.  And so we would submit that the **Lear** factors

21   clearly apply in this case.

22         And then when you layer on top of that -- and we

23   talk about this in the brief.  We cited authority for the

24   proposition that a license will not bar a challenge where you

25   have fraud, also where it's of short duration, and that's

1  clearly the case with respect to the Experian license here.

2  The specific license that relates to -- that involved the

3  no-challenge provision was entered into in the early part of

4  2006, just months before this lawsuit was filed, and there was

5  no -- basically, there was no negotiation over the insertion

6  of 300-850 as a trademark covered by this no-challenge

7  provision.  It wasn't negotiated, there was no substantive

8  discussion, there was no consideration.  The royalty structure

9  wasn't changed as a result of this new thing being put onto

10  the table.  So the fact of these competitive considerations,

11  fraud, the lack of any significant negotiation, et cetera, we

12  say independently would support Experian being able to

13  challenge the validity.

14          And I'll defer to TU counsel if they want to address

15  the specifics around their claim.

16          THE COURT:  All right.  Thank you.

17          MR. MILNE:  Thank you.  Oh, your Honor, one last

18  point, which is that with respect to our fees motion, there

19  was some issue about whether your Honor wished to see the

20  actual underlying time records and we are prepared to produce

21  those and to -- you know, if your Honor would like to see

22  them, we would do that and we'd make those available to Fair

23  Isaac counsel as long as it was on some kind of

24  attorneys-eyes-only basis, et cetera.  So if your Honor would

25  like that, we'd be happy to.

 1              THE COURT:  All right.  I'll keep that thought in

 2     mind.

 3              Mr. Pace, you looked like you were getting up to say

 4     something.  Was that on the attorneys' fees issue?

 5              MR. PACE:  He just said it, your Honor.

 6              THE COURT:  All right.  I think we're ready for

 7     Mr. Schutz's rebuttal, I guess.

 8              MR. SCHUTZ:  Thank you, your Honor.  Just a handful

 9     of points here in the time I've got left.

10              First of all, this case alleged infringement of

11     three trademarks, 300-850, 330-830, 501-990.  This was not a

12     case where we came into court and said, "Judge, we need an

13     advisory opinion that we get to exclude every possible

14     three-digit to three-digit range."  They keep saying that it

15     was about three-digit ranges and that we wanted to occupy the

16     field.  Nothing could be further from the truth.  In fact,

17     repeatedly we made reference to pick a different range, 0-300,

18     1000-2000.  There were all kinds of ranges they could have --

19              THE COURT:  Were there any three-digit ranges that

20     were left available?

21              MR. SCHUTZ:  Sure, 000 or 001-300.  001-300 -- and

22     do you want to talk about granularity?  That's 300 points of

23     granularity.  There was sufficient granularity there and they

24     could have done that, but they chose not to.  So it's not a

25     case about our trying to preempt three-digit fields.

 1          Next point.  On this issue of unique identifier in

 2     paragraph 12 of Cheri St. John's affidavit.  The theory that

 3     they have put forth at the motion stage here now is not a

 4     theory that was argued to the jury.  It was simply not a

 5     theory that was presented.  The issue on unique identifier was

 6     whether Cheri St. John, or Laura Gustafson, or anybody at Fair

 7     Isaac knew that TU was using 300-850.  That's what was the

 8     subject of a lot of cross-examination, the subject of their

 9     trying to get in Craig Watts' documents.  I mean, that was the

10     whole purpose of their trying to get in the Craig

11     Watts-related documents.  It was not this new theory that

12     they've got now, which is that the unique identifier was that

13     Fair Isaac was not using it as a unique identifier.  And of

14     course, I covered in my initial presentation that in fact we

15     had been using the seal as of 2004, well before Cheri St. John

16     put that in.

17          With regard to the comment -- some other arguments

18     they're making about supposed fraud, that we said to the

19     Patent Office it was descriptive when we had not used it as

20     descriptive.  Well, the Patent Office, they make that

21     determination.  We submitted all that evidence to the Patent

22     Office.  It decided that the mark was in fact not descriptive.

23     The fact that Mr. Anderson got up here and testified on that

24     issue -- and he did so, by the way, over our objection to him

25     going beyond merely practice and procedure.  He moved beyond

1  this is how you get a trademark to let me tell you what I

2  think and how the case should be decided, because that's in

3  essence what he did here.

4       They also talked about our making statements to the

5  Patent Office on how the mark was selected, that it was

6  arbitrarily selected.  We did put that in here.  We're dealing

7  with patent experts.  We didn't get the trademark on that

8  basis.  It was just something else that's in there.  The

9  Trademark Office clearly knows the standards for patentability

10 here.

11      But apparently what we've got, according to the

12 defendants, is this scheme.  There's this scheme that was

13 hatched from the beginning that Ms. Gustafson was an integral

14 part of, and this scheme was just to defraud the Patent Office

15 and then take these marks and stifle competition.  If that was

16 the scheme and if that's really what they believed, they

17 should have asked Ms. Gustafson:  "Is that what you intended

18 to do?" or at least asked her what she was thinking and not to

19 spend $8 million defending the case, but not one penny to find

20 out what Ms. Gustafson actually thought.  No testimony from

21 her.

22      Couple other facts.  They never opposed the mark.

23 These are sophisticated -- this is an inference you could draw

24 from the record, your Honor.  These are sophisticated

25 companies with lots of lawyers, lots of money, lots of their

1   own trademarks.  You could draw an inference that they know

2   what's going on in the Trademark Office.  They never opposed

3   our marks.  Not only did they not oppose our marks, but when

4   those marks were put in contracts, they never said, "Whoa,

5   whoa, whoa.  Wait a minute.  300-850, that's not a trademark.

6   We're not going to agree to that."  No.  They not only agreed

7   to it, but in the case of Experian, there was a very explicit

8   no-challenge clause in the master agreement between Experian

9   and Fair Isaac.  So to sit there and say that they're, you

10  know, shocked that there's trademark rights here when in

11  writing they acknowledged that just simply doesn't hold water.

12          There was also a statement made here in court today

13  and in the briefs that other facts support finding an

14  exceptional case, one of which is that we did not do a

15  secondary meaning survey.  Well, let's step back a second and

16  let's ask this question:  When does one need to do a secondary

17  meaning survey, if at all?  It certainly isn't when you've got

18  a federally registered trademark, because you have it.  It's

19  -- you don't need to prove secondary meaning.  You only need

20  to -- secondary meaning only becomes an issue when the mark is

21  found to be descriptive.  That didn't happen until your

22  Honor's summary judgment ruling, which was after discovery had

23  closed, after expert reports had been done.  At that point --

24  I mean, we walk in with these marks that we believed, believe

25  today, are in fact not descriptive, that we were entitled to

1    these, and to now come in say, well, you should have done a

2    secondary meaning survey, there was no time for us to in fact

3    do a secondary meaning survey.

4         The summary judgment ruling that your Honor made was

5    not as represented at the podium here by opposing counsel.  On

6    page 23 of our slide we actually have the Court's actual

7    language, which is at its Memorandum Opinion at page 43.  The

8    Court said -- this is how we got to proceed with the trademark

9    case:  "The evidence identified" -- I'm quoting:

10        "The evidence identified by Fair Isaac lends support

11   to the inference that Defendants intentionally copied Fair

12   Isaac's 300-850 mark and that consumers confused Defendants'

13   credit scores with FICO credit scores as a result."

14        So what we had was copying and actual confusion.

15   That was evidence in the record that you had at summary

16   judgment.  That supports -- and of course copying and actual

17   confusion supports the secondary -- the fact that there might

18   be secondary meaning.  That's what the Court found in this

19   case and that's what we went forward on.

20        Finally, your Honor, on the licensee estoppel issue,

21   again, the theory here with regard to VantageScore is in fact

22   an agency theory and the black-letter law of agency is that an

23   agent should not be allowed to do what its principal cannot

24   do.  You can't get a couple parties together and say, "Well,

25   we're legally precluded from doing X" --

```
 1              THE COURT:  What's the evidence, though, that
 2      VantageScore is an agent --
 3              MR. SCHUTZ:  The documents that are -- and I don't
 4      have the record cite in front of me, but at least one or more
 5      of the formation documents for VantageScore is in the record.
 6      And also clearly in the record -- and this is from -- I guess
 7      I do have a cite here.  "VantageScore was under absolute
 8      control of the CRAs."  It's on slide 3, testimony by Mr. Burns
 9      that came in through deposition.  He was asked at his
10      deposition who controls VantageScore.
11              THE COURT:  What about the point that was made,
12      though, that Equifax also would have had an equal control
13      over, if I buy your agency theory?  We have another player
14      here, don't we?
15              MR. SCHUTZ:  Well, I don't think Equifax could
16      challenge the market either.  I mean, I don't -- first of all,
17      I don't think Equifax could have -- let me rephrase that,
18      your Honor.
19              VantageScore, even though there was another party
20      involved, three parties as opposed to two, I don't think that
21      changes the scenario here that they're an agent of the credit
22      bureaus and they should not be allowed to do what the credit
23      bureaus themselves cannot do.  And if Equifax were in here
24      arguing that they should be able to challenge the validity of
25      the mark, I'd be making exactly the same -- through its agent,
```

1    I'd be making exactly the same argument.

2           And the authority that they cite from *McCarthy* on

3    licensee estoppel cannot be argued by someone closely

4    affiliated.  This is not a case where VantageScore is closely

5    affiliated.  This is a case where VantageScore is controlled

6    by the credit bureaus, not merely closely affiliated.

7           Finally, your Honor, last point I'd like to make is

8    that one of the things that distinguishes our case from many

9    of the cases cited by the defendants is that we also had

10   extensive common-law rights here, and that was frequently not

11   the case in many of the cases they cite with their brief.

12          And I thank your Honor for your time.

13          THE COURT:  All right.

14          Mr. Milne, do --

15          MR. MILNE:  May I just respond briefly?

16          THE COURT:  One minute.

17          MR. MILNE:  With respect to this issue of agency, I

18   don't think you're going to find anything in the record -- I'm

19   not aware that it would exist in any context -- that would

20   suggest that VantageScore, LLC is in some manner an agent for

21   the credit bureaus with respect to the use of a 300-850

22   trademark.  I mean, there's no suggestion of VantageScore, LLC

23   being an agent for any purpose, but even if you did

24   hypothetically have that scenario, you have an issue of for

25   what purpose?  And there's no suggestion that

1     VantageScore, LLC was in any manner set up to sort of assist

2     any individual credit bureau in using some scoring range that

3     allegedly would infringe with some Fair Isaac score, so I

4     would point that out.

5          And then Mr. Schutz's point about how Fair Isaac had

6     never really -- had been very discrete about 330-830 and

7     300-850 being infringing, I would just point to Exhibit 114,

8     which I guess I can put up here.  This is the letter that was

9     sent to Experian -- and I believe a similar letter was sent to

10    TransUnion -- and it's crystal clear that Fair Isaac was

11    taking the position that it wasn't just 501-990 or 330-830

12    that infringed, but in fact they took the position that

13    anything that took the form of three digits to three digits

14    infringed, and certainly anything that overlapped even by --

15    where even part of the range overlapped 300-850.  That's the

16    position they took and that's the position they've taken

17    throughout this litigation.

18          THE COURT:  All right.

19          Thank you, counsel.  I will take the matter under

20    advisement.  Obviously there's a number of different motions

21    here that I'll be addressing.

22          Mr. Gardner, you look like a man that has to say

23    something here.

24          MR. GARDNER:  As long as we're all here, which

25    doesn't happen that often, one housekeeping matter.  I just

1    want to make it clear for the record that with respect to

2    TransUnion's separate petition for attorneys' fees, we also

3    would agree and would be happy to produce all of the documents

4    that support --

5                THE COURT:  Billing records?  Is that what we're

6    talking about?

7                MR. GARDNER:  Yeah, billing records to the Court,

8    outside counsel only, and we'd like some acknowledgment that

9    it won't be a waiver of the attorney-client privilege.

10               THE COURT:  All right.  We'll make note of that and

11   if I get to that issue, we'll deal --

12               MR. GARDNER:  Fine.  And then I just would note, as

13   long as I'm here, also that as far as the rate is concerned,

14   we'd be happy to accept the same rates that Robins Kaplan uses

15   without even knowing their rates.

16        (Laughter)

17               THE COURT:  All right.  I feel like I'm dealing with

18   my receivership issues and rates all over again.  I've seen

19   more billing records in the last six months than I'd seen in

20   my life prior to that.

21               I am going to take these matters under advisement.

22   Obviously there's a number of motions to be addressed.

23   However, I'm not going to be able to get you an order -- so

24   you don't need to be checking your CM/ECF mailings -- any time

25   prior to April 7th.  I know I'm going to be doing some

1   teaching in Africa for the U.N., so I'm going to be gone for a

2   big chunk of time, longer than I've ever been gone in my

3   career before, but I will be back.  Obviously John will be

4   starting the process of work while I'm gone, but don't expect

5   to see an order prior to then.

6            I will tell you you don't need to be preparing for

7   another trial real soon.  If I have to do this again, some

8   other judge is going to have to tell me that I have to do it

9   all over again, so I won't deal with any issues of amended

10  judgment or anything else, but I'm not going to throw myself

11  on that spear.  Somebody's going to have to throw me there.

12  So the motion for new trial will not be granted, but we'll get

13  you an order that deals with all the other issues as soon as

14  we can, probably toward the end of April.

15            Anything further?

16       (No response)

17            THE COURT:  All right.  Thank you.

18       (Proceedings concluded at 3:07 p.m.)

19                      *  *  *  *  *

20

21

22

23

24

25

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter - U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108